**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **JERRY A. MacCARTNEY, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:  2:05cv1207-MHT** |
| | ) | |
| **ONYX CAPITAL VENTURES, LLC, et** | ) | |
| **al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**AS TO ALL CLAIMS OF PLAINTIFF SHANNON MCGLON**

Defendants Jeff Larry, Chris Day, and Henry Hicks (collectively the "Defendants") hereby move this Court for Summary Judgment on all claims brought by Plaintiff Shannon McGlon ("Plaintiff" or "McGlon").  This is a reverse race discrimination case under 42 U.S.C. § 1981.  Plaintiff claims she was discriminated against in the terms, conditions and privileges of her employment with Piknik Products Company because she is Caucasian, and she seeks to hold each defendant <u>individually</u> liable for the alleged discrimination.  Plaintiff's claims fail as a matter of law for several reasons.  Plaintiff has no direct evidence that any decisions affecting her employment were made because of her race.  Even in the absence of direct evidence, Plaintiff's claims fail because she cannot establish a <u>prima facie</u> case of race discrimination, all decisions regarding her employment were made for legitimate, non-discriminatory reasons, and she cannot adduce any evidence that those reasons are lies.  No genuine issues of material fact exist, and the Defendants are entitled to judgment as a matter of law.

## I.    STATEMENT OF FACTS

### A.    The Relationship Between Piknik Products Company, Piknik Acquisition Corporation and Onyx Capital Ventures, LLC:  Because of Piknik's dire financial condition, Onyx obtained a 51% ownership interest in Piknik.

Onyx Capital Ventures, LLC ("Onyx") is a minority-owned business enterprise ("MBE") specializing in the acquisition or recapitalization of businesses.  (Day Dep. 33/4-5, 14-25; 52/22-53/1).  Onyx was formed as a "firm that was going to be deploying capital to acquire businesses."  (Id. at 33/4-5).  Defendant Chris Day ("Day") defined Onyx's mission as an MBE as follows:

> [T]he anticipated mission was to acquire businesses whose customers valued supplier diversity.  And therefore, by – it was explicitly an African-American-owned entity that Onyx was going to be.  And we all knew that when we signed onto it.
>
> And the opportunity was to try and solve the, what they call the MBE conundrum, "MBE" meaning minority business enterprise, through the use of our specific expertise in raising leverage finance and in finding and acquiring businesses that would benefit from MBE ownership.

(Id. at 33/13-25).  Defendant Jeff Larry ("Larry") further explained Onyx's strategy:

> We were really focused on taking advantage of some opportunities under what are called the supplier diversity programs at a lot of these companies, and they generally focus in the manufacturing businesses, or at least that's where the opportunities are most developed.
>
> But then the other thing was that we saw an opportunity beyond that to just roll up businesses that weren't getting the focus of the big boys at the time when people were looking at high tech and other sexy things and just making them better and more efficient.

(Larry Dep. 14/18-15/5).

Qualification as an MBE requires minorities to have a controlling interest in all classes of stock and a minority to have management control of the business, which means that the most

senior decision maker (i.e., chairman of the board, chief executive officer) must be a minority. (Day Dep. 73/22-74/13). Attaining MBE status does not require the replacement of managerial employees, and Larry made clear that such was not Onyx's mission:

> And sometimes, you know, customers would say you're not really an MBE, because, you know, you're black but everybody else isn't. And I would say that's not our gig. We don't go in and fire people and turn over management. We go in, hopefully identify a company that has a stable and talented management, and work with that management to move forward.

> Now, to the extent that the management team needs to be supplemented or there's some deficiencies and there's some transitioning, then of course we'll go out and we'll hire folks.

(Larry Dep. 76/11-22).

The six original partners of Onyx were Defendant Larry (African American), David Palmer (Caucasian), Russell Pallesen (Caucasian), Patrice Daniels (African American), Pat McGreevy (Caucasian) and Defendant Day (Caucasian). (Day Dep. 29/18-30/12; 34/3-16). At the time the six original members joined Onyx, Larry controlled approximately 53% or 54% of the shares in Onyx. (Id. at 40/4-6). Day initially had an approximately 5% ownership interest in Onyx, but resigned in October of 2005 and no longer has an ownership interest. (Id. at 27/9-29/20; 32/9-11; 64/5-6). Defendant Henry Hicks ("Hicks") has never had any ownership interest in Onyx. (Hicks Dep. 38/8-14).

Piknik Products Company ("Piknik") was a Montgomery-based company that manufactured and bottled beverages and condiments for various companies. For many years Piknik struggled financially. Ricky Loeb ("Loeb"), the majority owner of Piknik, wanted to sell the company and hired an investment bank to facilitate this, who in turn contacted Onyx. (Day Dep. 46/1-48/1). Loeb initially offered to sell his share of Piknik to Onyx for $20 million. (Id. at 48/5-12). Piknik had roughly $17 million in indebtedness and Loeb hoped to pay off that debt

from the sale proceeds and make a profit.  (Id. at 48/13-17).  Because Piknik's business did not

support such a high valuation, Onyx declined to purchase Piknik on those terms.  (Id. at 48/18-

25).

In the six months following Loeb's $20 million offer to Onyx, Piknik continued

deteriorating and "missed their numbers by a mile."  (Id. at 49/1-9).  In fact, Day characterized

Piknik's decline as a "catastrophe" because "they were missing their numbers during the months

where they really needed to start making hay."  (Id. at 50/6-17).  Due to the further decline of

Piknik's financial condition, Onyx set up Piknik Acquisition Corporation[1] and through it

purchased a 51% of the ownership in Piknik for only one dollar.  (Id. at 52/14-17; 54/6-16;

70/14-71/7).  Day testified that the deal was done out of "desperation" because Loeb had no

other choice due to the poor financial condition of his company.  (Id.)  After Onyx's arrival,

Piknik also became certified as a minority-owned business enterprise.  (Id. at 73/5-25).

### B.      The Defendants' Positions at Piknik.

Piknik hired Defendants Larry, Day and Hicks after Onyx acquired majority ownership

interest.  Larry, Chairman and CEO of Onyx, assumed the title of Chairman and CEO of Piknik

as a result of the sale transaction.  (Id. at 132/3-4).  Larry is African American.  (Id.)

Day was the Onyx partner assigned to managing Onyx's investment in Piknik.  (Id. at

29/6-9; 78/8-17).  During the early days of Onyx having an ownership interest, Day temporarily

filled management positions at Piknik, while Piknik searched for qualified individuals to fill the

positions permanently.  (Id. at 79/5-9, 16-18; 82/3-12; 84/1-23; 85/3-11; 86/6-8).  In January

2004, Day became Executive Vice President of Piknik.  (Id. at 84/1-8).  From February 1, 2005

---

[1]    It was actually Piknik Acquisition Corporation, which was a wholly owned affiliate of Onyx, which had an
ownership interest in Piknik, which is common in such acquisitions.  (Day Dep. 70/14-71/7).  To avoid confusion
due to there being two "Piknik" entities involved, Defendants will refer to both entities as "Onyx" in this brief.
However, it was actually Piknik Acquisition Corporation that had the ownership interest in Piknik.

until July 7, 2005, Day was President and COO of Piknik.  (Id. at 86/6-8; 87/23-88/10).  Day is Caucasian.  (Mayer Dep. 93/20-23).

Piknik hired Hicks in November 2003 as Vice President of Sales and Marketing.  (Hicks Dep. 45/12-15; 47/5-7).  Hicks oversaw all sales and marketing efforts for Piknik's beverage and condiment divisions.  (Id. at 50/6-10).  Hicks is African American.  (Larry Dep. 33/13-17).

> **C.     Background of the Defendants: Because of his extensive business and operating experience, Chris Day took on the responsibility of managing the day to day operations of Piknik, including responsibility for making personnel decisions.**

Defendant Larry has an undergraduate degree in economics and a law degree.  (Id. at 48/10-14).  Larry's expertise is in mergers and acquisitions.  (Id.)  By his own admission, he is "not an operational guy."  (Id. at 10/20).  Accordingly, while CEO of Piknik, Larry had to work through an operator because: "I'm not – I don't try to be or pretend to be [an operational manager]."  (Id. at 10/15-11/1).  Rather, as CEO of Piknik, Larry interfaced with shareholders, the bank, customers and suppliers.  (Id. at 10/15-19).  Larry had no involvement with the internal operations of Piknik:

> Well, really, as I said, I would deal with the external world, did a lot with the customers; and initially, that was my almost whole focus.  I would have periodic conversations with Chris, where he would tell me what's going on with the business and whatever challenges or successes he was having, but I was, you know, completely externally focused.

(Id. at 24/1-8).

Like Plaintiff, Defendant Day is Caucasian.  (Day Dep. 34/12).  Day received his undergraduate degree from Northwestern University and received his M.B.A. from Northwestern's Kellogg School of Management the following year.  (Id. at 7/20-8/6).  Following his graduation, Day was a general investment banking associate for the investment firm Kidder

Peabody and Company. (Id. at 8/25-9/4). He later joined Morgan Stanley as a sales trader and then transferred to straight equity sales. (Id. at 9/5-10/12). Three years later, Day joined Sears & Roebuck as manager of mergers and acquisitions in the specialty merchandising group and then became director of marketing for the computer service business. (Id. at 10/13-12/8). Thereafter Day joined Packaging Corporation of America, a subsidiary of Tenneco, as manager of corporate development. (Id. at 12/20-13/21). He worked at Packaging Corporation of America for more than 6 years, holding the titles of manager of corporate development, director of manufacturing planning, group controller and plant manager. (Id. at 13/22-14/2; 14/14-16/7). In 1994, Day took a one year leave of absence from Packaging Corporation of America to serve as a White House Fellow during the Clinton administration. (Id. at 14/3-16). Upon leaving Packaging Corporation of America, Day became the general manager of the closure business at Silgan packaging and, thereafter, became the co-president of Packtion, a joint venture between Silgan and Morgan Stanley. (Id. at 17/20- 27/8).

Unlike Larry, Day had extensive operational experience and thus it was natural for Day to take an active role in managing Piknik. Indeed, he was the only Onyx partner with "business and operating experience, as opposed to the other partners [who] had experience as transactional attorneys in mergers and acquisitions or leveraged finance, in particular." (Id. at 32/17-22). Accordingly, Day was assigned by Larry to manage Piknik. (Id. at 78/8-17).

When Day began his role in management for Piknik, he hired Defendant Hicks as Vice President for Sales and Marketing. (Id. at 101/20-22). Day knew Hicks because Hicks was also a White House Fellow during the Clinton administration. (Id. at 101/23-102/2). The position of Vice President for Sales and Marketing did not exist before Onyx obtained an ownership interest in Piknik; rather, it was a new position created by Day. (Id. at 102/3-9).

Hicks received his undergraduate degree from Morehouse College and an M.B.A. from the University of North Carolina. (Hicks Dep. 37/9-38/1). His pre-Piknik employment experience included positions with Coopers and Lybrand, Bank of America, and Catalyst, LLC, which was an interim management consulting firm. (Id. at 22/14-21; 30/20-31/1; 31/25-32/16; 36/2-17). Immediately preceding his employment with Piknik, Hicks owned a consulting business that helped companies develop financial projections, raise capital and took on interim management roles at various companies. (Id. at 10/2-15; 21/24-22/2).

### D. The relationship between the new management that came in after Onyx obtained an ownership interest in Piknik and Piknik's former majority owner, Ricky Loeb, was contentious.

The relationship between Loeb, the former majority owner of Piknik, and the new management put in place after Onyx took an ownership interest was contentious. According to Day, "Ricky, on his best day, is a distraction." (Day Dep. 176/15-16). In fact, Day believed that Loeb's "meddling" within Piknik was so disruptive that he asked Piknik managers who had previously worked directly for Loeb, including Plaintiff, to cease all communications with Loeb concerning Piknik's business. (Id. at 176/3-177/21). Specifically, Day testified:

> And he [Loeb] was causing us a tremendous amount of wasted non-value added effort trying to clean up messes he was starting with his meddling. And his meddling was not to try and further the business. He was trying to meddle so that he had something to do and people would think that he was important and still involved in the business.
>
> And, so, I didn't say that you couldn't talk to him outside of work. I didn't say you couldn't talk to him at all.
>
> I said, don't talk to him about business stuff because he doesn't have a business role.
>
> And I was doing it as much for their protection. Make me the bad guy. Make Jeff the bad guy. We'll give you a reason not to talk to him.

> Because so many of them were saying, he calls me and what am I supposed to say?
>
> I said, make me the bad guy. That's fine. I'm trying to keep you from having a boatload of wasted time in your day. And it's wasted time just talking to him, but it will be five times as much waste when you're trying to clean up the mess that he will instigate.

(Id. at 176/16-177/15; Day Dep. PX1).

**E.    Both before and after Onyx obtained an ownership interest in Piknik, the company was multimillions of dollars in default on its loan and was only able to operate subject to a forbearance agreement with SouthTrust Bank (later Wachovia). Piknik eventually ceased doing business and filed for bankruptcy when the bank refused to extend the forbearance agreement.**

Piknik was involved in a forbearance agreement with SouthTrust[2] because it was in default on loans from SouthTrust both before and during the time Onyx had an ownership interest in Piknik. (Day Dep. 108/24-109/6). The forbearance agreement with SouthTrust came up for an extension at regular intervals and was generally extended by either a year or six months. (Id. at 109/16-19). During Onyx's two year tenure with Piknik, the company's indebtedness improved from $17 million to approximately $15.3 million. (Id. at 108/25-23). Although Piknik significantly reduced its indebtedness and remained current on its principal and interest payments, it continued to be in violation of the financial covenants in its forbearance agreement with SouthTrust, such as "interest coverage ratios, the liquidity cash flow ratios, the working capital." (Id. at 108/13-15).

In the Fall of 2004, Piknik was awarded a significant amount of new business that it forecasted would result in a substantial increase in production volume. (Id. at 99/17-100/19). This business growth required Piknik to invest approximately $3.5 million in new equipment. (See id. at 116/12-22 (explaining the capital investment was necessary "to buy new fillers, new

---

[2] SouthTrust later became Wachovia. For purposes of this brief, we will refer to both as "SouthTrust."

cappers, any number of different things to customize to that particular product and formulation")). Piknik looked to SouthTrust to fund this capital investment; however, SouthTrust declined to extend additional credit to Piknik. (Id. at 116/23-25; Hicks Dep. PX2). By the Spring of 2005, Piknik realized it was "going to be in a real battle with SouthTrust" and the bank was not going to let Piknik bring in the money that was necessary to position the company to receive new business. (Day Dep. 116/23-117/24). Although it could not get additional loans, Piknik had to find an alternative way to fund these capital investments that were required to secure new business and to keep the company "afloat." (Id. at 117/22-24). Faced with this "increasingly tight, tight, tight, tight, tight, situation," Day had to make "painful and difficult" decisions regarding personnel. (Id.)

On June 30, 2005, Piknik's last forbearance agreement expired. Despite all of its efforts to negotiate another six month extension of the forbearance agreement, such negotiations were ultimately unsuccessful. (Id. at 109/20-110/3). On July 7, 2005, the bank informed Piknik that it was ending all negotiations regarding any extension of the forbearance agreement and exercised its right to take control of the company. (Id. at 110/1-3; 169/22-25). Upon the bank taking control of Piknik, Loeb was reinstalled as CEO. (Id. at 87/23-88/10; 169/22-170/1). Loeb immediately fired both Defendants Day and Larry. (Id. at 170/2-3). Shortly thereafter, in September or October 2005, Loeb fired Defendant Hicks. (Hicks Dep. 107/23-108/3). Even after the bank placed Loeb back in charge of Piknik, the company's financial condition continued to deteriorate. Piknik filed for chapter 11 bankruptcy in September of 2005 and ceased all operations in approximately December of 2005. (Winter Dep. 329/1-3).

**F.      Plaintiff Shannon McGlon's employment history with Piknik**

Piknik hired Plaintiff in March 2001, before Onyx acquired any ownership interest in Piknik and before any of the Defendants ever held any position with Piknik. (McGlon Dep. 47/5-7; 51/6-9). In January 2002, Plaintiff became the Director of Quality Assurance. (Id. at 52/14-15).

In March 2004, Plaintiff asked to work a modified schedule and Day granted her request. (Id. at 93/23-94/5; 95/10-16; 96/12-97/15; Day Dep. 135/20-136/22; 140/4-5). Pursuant to this modified schedule, Plaintiff worked regular workdays twice a week and left at 2:30 on the remaining three days of the week. (McGlon Dep. 94/14-18). Plaintiff worked this modified schedule for the remaining duration of her employment with Piknik. (Id. at 96/4-7).

**G.      In June of 2005, Piknik was forced to introduce across the board pay cuts due to the financial crisis the company was experiencing.**

In June of 2005, to stave off its growing financial constraints, Piknik introduced across-the-board pay cuts, which applied to virtually everyone in the company except for three employees (two African Americans and one Caucasian) who had recently been hired by Piknik. (Day Dep. 137/2-21; 154/2-8; PX 6; Larry Dep. 82/12-83/16). Day explained why he did not cut the pay of these three brand new employees:

> I did not ask the three new employees to take pay cuts. So, Anthony Barber, Annissia Haynard and Carl Bleier did not have to participate because it just didn't feel like it was the right thing to do to go out and recruit them to come join the firm and within the first week on the job get five or ten percent off of their agreed-upon deal, especially since all three of them were relocating to take the jobs and were enduring a financial hardship to do that.

(Day Dep. 137/11-21). With limited exception, there was an across-the-board 5% pay cut for all employees of every race, including African Americans. (Id. at 137/22-138/1; 161/17-23; PX 6; see also id. 139/5-9 (Day stating his belief that his salary was also reduced by 5%); Hicks Dep.

108/4-109/3 (explaining that his salary was reduced)).    A few Piknik employees, including

Plaintiff, were given pay cuts greater than 5% for separate and independent reasons.  (Day Dep.

139/10-16).

**H.    Chris Day decided to cut McGlon's salary more than 5% because she had been working a reduced hour schedule.**

Plaintiff's salary was cut more than 5% because, with her modified work schedule, she

had become "de facto a part-time employee."  (Id. at 135/20-136/22; 140/4-5).  Day testified in

relation to his conversations with Plaintiff over the pay cut as follows:

> Shannon and I had spent a lot of time talking during the spring of 2005 about how demands of the job, a director-level quality job, one of my direct reports, had a certain level of work associated with it.
>
> And Shannon was – needed to decide what she wanted to do.  And did she want to prioritize making sure she was home at certain hours given this critical time?  Or did she want to take the job as it was constructed.
>
> And I offered her flexibility to do whatever suited her best.  And, in fact, I counseled her that you might be better off as a young mother, focus on your family.  And we can't pay you what we used to pay you because you're not going to be doing the job that you used to do, but I'm okay with that if you're okay with that.
>
> And that was part of why she felt a more substantial pay decrease than the across-the-board cuts that were there, because I was now paying her for what she was actually doing.

(Id. at 135/21-136/17).  Piknik informed Plaintiff of her salary reduction as follows:

> Shannon, I regret that the current circumstances at Piknik necessitate imposing salary reductions.  Effective with this pay period, your rate of salary will be $50,000 per year until further notice.  I am hopeful that we can emerge from this bank-induced situation before too long and increase pay rates again, but until then we have to make painful choices to keep the company operating.  Please accept my apologies.

(Day Dep. PX4). Before the pay cut, Plaintiff was making approximately $85,000 per year, even though she was working reduced hours. (McGlon Dep. 54/18-23; 321/17-322/3; Day Dep. 173/10-17; Day Dep. PX4).

I.    **The Termination of Plaintiff's Employment**

Day made the decision to terminate Plaintiff's employment. (Day Dep. 129/25-130/3). The termination decision was based on two factors: insubordination and untrustworthiness. First, Day received reports that Plaintiff discussed her pay cut with other employees in contravention of specific instructions not to do so. (Id. at 130/3-131/14). According to Day, Plaintiff discussed pay cuts with the employees who she managed "in a group environment in a very public and demoralizing way." (Id. at 130/13-15). Second, Day learned that Plaintiff was involved in discussions with Loeb (Piknik's former majority owner) and Plaintiff Bob Winter (who had recently left Piknik's employment, surreptitiously taken Piknik's proprietary information, and contacted some of Piknik's largest customers) regarding forming a group to take control of Piknik from Onyx. (Id. at 130/3-131/14). Day testified that "between violating the direct instructions by talking to the people, and then going off site to a meeting attended by Ricky [Loeb] and Bob Winter, we no longer could sort of trust her ability to lead in the company." (Id. at 130/25-131/4).

J.    **No employee was hired to fill the position vacated by Plaintiff McGlon; rather, her job duties were divided among existing employees.**

After the termination of Plaintiff's employment, Piknik divided her Director of Quality job duties among the remaining employees – both Caucasian and African American – in the quality department. (Id. at 134/5-19). Allan Walters, who is Caucasian, was the quality manager of the Day Street facility at the time of Plaintiff's termination and "took the lion's share" of

Plaintiff's job duties.  (Id. at 134/2-19; see also McGlon Dep. 357/6-17 (stating she does not know who assumed her job responsibilities after her termination)).

> **K.    Neither Jeff Larry nor Henry Hicks participated in the decision to fire Plaintiff McGlon.**

Although Day informed Defendant Larry whenever he terminated an employee, such as Plaintiff, Larry did not participate in any of the termination decisions.  (Day Dep. 131/21-132/16).  Specifically, Day testified about his discussions with Larry over terminations, which were merely meant to inform Larry of termination decisions, as follows:

> . . . he was chairman and CEO of the organization.  And I wasn't required to, but the relationship that I had with Jeff was always one of I'll tell you what I think you need to know.  And I'll make sure that you're – you're not caught off guard or surprised by anything that may come back and – you know, that Ricky [Loeb] may come and question you about.  I always made sure I was out in front on those things.

(Id. at 131/5-132/11).  Larry similarly testified that any decision to terminate Plaintiff would have been by Day or Plaintiff's direct supervisor.  (Larry Dep. 52/5-53/16).  In fact, Larry is not even aware of the series of events that resulted in the Plaintiff's departure from Piknik.  (Id. at 52/5-53/16).  Additionally, Jeff Larry was not involved in the decision as to whose salaries were cut and how much they were cut.  (Id. at 82/12-83/16).

Plaintiff never reported to Defendant Hicks at any time.  (Hicks Dep. 88/14-89/19).  Hicks did not make any decisions concerning the Plaintiff's employment with Piknik.  (Id. at 156/5-8).   Hicks was not even involved in making the decision to make the across-the-board salary cuts and was not involved in determining the percentage of cut that the Plaintiff received.  (Id. at 109/4-13; 127/21-23).

13

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist. Celotex Corp. v. Catrett, 477 U. S. 317 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604 (11th Cir. 1991). After the moving party discharges its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593 (11th Cir. 1995). "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995), cert. denied, 516 U.S. 817 (1995) (citation omitted). Moreover, evidence that is merely colorable, conclusory, or conjectural, does not create a genuine issue of material fact. See Brown v. City of Clewiston, 848 F.2d 1534, 1537 (11th Cir. 1988); Peppers v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989). The summary judgment rule applies in employment discrimination cases just as in other cases. See Chapman v. AI Transport, 229 F.3d 1012, 1025 (11th Cir. 2000).

## III.    ARGUMENT

Plaintiff contends the Defendants discriminated against her because of her race in the following seven ways: (1) Hicks emailed her and other employees summarizing his meeting with a customer during which they discussed how to recruit minorities into operating roles; (2) Day emailed Plaintiff and other employees about the Orthodox Union's rules for complying with kosher requirements; (3) Hicks voiced his concern that the name "Piknik" had a negative

connotation, particularly within the African American community; (4) Day encouraged her to hire Mavis Richardson, who is an African American; (5) the Defendants did not help resolve the conflict between Plaintiff and a white co-worker as expeditiously as Plaintiff preferred; (6) her salary was reduced by a greater percentage than other employees; and (7) her employment was terminated.  (McGlon Dep. 158/11-164/19; McGlon Dep. DX7-8).  We will demonstrate below why each of Plaintiff's claims fails as a matter of law.

### A.     Plaintiff has no direct evidence of discrimination.

Plaintiff does not have any direct evidence of race discrimination.  (McGlon Dep. 383/12-23 (stating she never heard any of the individual defendants use derogatory language about Caucasians)).  Direct evidence is evidence that "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).  "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004).  Direct evidence must relate directly in time and subject to the adverse employment action.  "[R]emarks…unrelated to the decisionmaking process itself are not direct evidence of discrimination."  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); see also Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002) (explaining that the remark "[w]e'll burn his black ass" did not constitute direct evidence of discrimination because it was made 2 ½ years before and thus was not directly related to plaintiff's termination); Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997) (finding CEO's remark about wanting to hire a man instead of a woman because too many women already held officer positions was not direct evidence of discrimination).

Defendants anticipate that Plaintiff may rely on an email from Hicks as "direct evidence" of discrimination. (McGlon Dep. DX8). In this email summarizing a meeting with a customer, Hicks briefly noted that "[w]e discussed our desire to recruit talented minorities in operating roles within the company." (Id.) This email falls short of being direct evidence as it has absolutely nothing to do with Plaintiff or her employment. Indeed, Hicks was not even involved in any decision affecting Plaintiff's employment. (Hicks Dep. 88/14-16; 156/5-8). As such, the email falls short of constituting direct evidence. See Trotter v. Bd. of Trustees, 91 F.3d 1449, 1453-54 (11th Cir. 1996) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision"); Standard, 161 F.3d at 1330 (stating "remarks by non-decisionmakers…are not direct evidence of discrimination"). Moreover, for this email to establish the existence of a discriminatory intent, it would require the drawing of inferences and presumptions. By way of example, it would require a presumption that "operating roles" included Plaintiff's position. (See McGlon Dep. 239/16-19 (stating she interpreted "operating roles" as a reference to "[p]eople that manage the business")). It would similarly require a presumption that "recruit[ing]" minorities also meant terminating Caucasian employees to create vacancies – none of which has any basis in fact. Because inferences and presumptions must be drawn from this email to establish any discriminatory intent, this email from Hicks is not direct of evidence of discrimination. See Joe's Stone Crab, 220 F.3d at 1286 (stating direct evidence of discrimination must "establish the existence of discriminatory intent…without any inference or presumption"). For these reasons, this email is not direct evidence of race discrimination.

Defendants also anticipate that Plaintiff may rely on an email from Day regarding a production issue with the Orthodox Union as "direct evidence" of discrimination. (McGlon Dep.

DX7).  However, when read in context, it is clear that this email also falls short of being direct evidence of discrimination.  Piknik's Brundidge facility manufactured kosher products under the supervision of the Orthodox Union.  (Id. at 204/1-207/19; 209/13-210/2).  Because Loeb, a Jewish individual, still had an ownership interest in Piknik, the Orthodox Union's rules prohibited Piknik from operating during Passover.  (Id. at 205/3-10; 211/10-20).  This rule imposed by the Orthodox Union had the potential to shut down an entire Piknik facility for all of Passover.  Plaintiff conferred with Day about the issue, and Day suggested several "talking points" for Plaintiff to use during her discussions with the Orthodox Union officials.  (McGlon Dep. DX7).  One of the talking points included:

> (In case threats get out of hand): HOWEVER:
> 1)  Piknik is no longer Jewish owned, and it will not be discriminated against because of its lingering Jewish stake.  That means we insist on being held to the kosher standards of every other non-Jewish food company.  Kosher manufacturing processes and Kosher manufacturing processes.  We will view any special requirements that don't apply to non-Jewish firms (such as Southern Classics) as blatant discrimination because we are now African-American owned.  And we will not be silent about it.

(Id.)  Clearly this email has everything to do with ongoing negotiations with the Orthodox Union concerning a production issue and has absolutely nothing to do with Plaintiff, her employment with Piknik, or any intent to discriminate against her or other Caucasians because of their race.  Because the email was not directly related to any decision affecting Plaintiff's employment, it cannot constitute direct evidence of discrimination.  Standard, 161 F.3d at 1330; Scott, 295 F.3d at 1227-28; Burrell, 125 F.3d at 1393.  Accordingly, any reliance on it falls short.

**B.  Plaintiff's reverse discrimination claims fail as a matter of law because she cannot establish a prima facie case of discrimination, all decisions regarding her employment were made for legitimate non-discriminatory reasons, and she cannot adduce any evidence that these legitimate non-discriminatory reasons are merely pretext for intentional discrimination.**

Because Plaintiff has no direct evidence of race discrimination, she must rely on circumstantial evidence to show a discriminatory motive.[3]  The law governing disparate treatment cases involving circumstantial evidence is well-settled.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, a plaintiff must establish a prima facie case by showing (1) that she belongs to a protected group; (2) that she experienced an adverse job action; (3) that she was qualified for her position; and (4) that her employer treated similarly-situated persons outside of the protected group more favorably.  Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984).  If a plaintiff successfully establishes a prima facie case, a defendant must then articulate legitimate non-discriminatory reasons for its actions.  McDonnell Douglas, 411 U.S. at 802.  After a defendant articulates its reasons, a plaintiff must come forward with substantial evidence that the articulated reasons are pretext –lies – to cover up intentional discrimination.  Id. at 804.  Plaintiff's discrimination claims fail because she cannot establish a prima facie case and/or she cannot show that the articulated reasons for the decisions affecting her employment are pretextual.

     1.     Plaintiff's discrimination claims concerning the emails sent by Hicks and Day, Hicks' perception of the name "Piknik," and the hiring of Mavis Richardson, fail as a matter of law because Plaintiff did not suffer an adverse employment action.

Plaintiff cannot establish that she suffered an adverse employment action when she received the two emails from Hicks and Day, when Hicks voiced his opinion regarding the company's name, and when she was encouraged to hire Mavis Richardson.  The law is clear that "not everything that makes an employee unhappy is an actionable adverse action."  Stavropoulos

---

[3]  The test for intentional discrimination in suits under 42 U.S.C. § 1981 is the same as under Title VII.  Ferrill v. The Parker Group, Inc., 168 F.3d 468, 472 (11th Cir. 1999).

v. Firestone, 361 F.3d 610, 618 (11th Cir. 2004); see also Davis v. Town of Lake Park, Fla., 245

F.3d 1232, 1238 (11th Cir. 2001) (stating "not all conduct by an employer negatively affecting an

employee constitutes an adverse employment action").  Rather, the Eleventh Circuit explained

the standard for establishing an adverse employment action as follows:

> [T]he employer's action must impact the "terms, conditions, or
> privileges" of the plaintiff's job in a real and demonstrable
> way….[T]he asserted impact cannot be speculative and must at
> least have a tangible adverse effect on the plaintiff's employment.
> We therefore hold that, to prove adverse employment action…, an
> employee must show a *serious and material* change in the terms,
> conditions, or privileges of employment.   Moreover, the
> employee's subjective view of the significance and adversity of the
> employer's action is not controlling; the employment action must
> be materially adverse as viewed by a reasonable person in the
> circumstances.

Davis, 245 F.3d at 1239 (italics in original).

Plaintiff's receipt of the aforementioned emails from Hicks and Day (McGlon Dep. DX7-

8) does not meet the standard for an adverse employment action.  The terms, conditions or

privileges of Plaintiff's employment were not seriously and materially changed by her receipt of

these two emails.  While Plaintiff may have disagreed with Piknik's "desire to recruit talented

minorities in operating roles within the company" or with Day's suggested approach to the

negotiations with the Orthodox Union, federal anti-discrimination law is not intended to remedy

everything that Plaintiff may disagree with.  Davis, 245 F.3d at 1242.  Accordingly, her mere

receipt of these emails does not constitute an adverse employment action, and her claims based

on her receipt of these emails fail as a matter of law.   See, e.g., Walker v. Johnson, 501

F.Supp.2d 156, 177 (D.D.C. 2007) (finding that receipt of email did not amount to a materially

adverse employment action); White v. Baxter Healthcare Corp., 2007 WL 1119881, at *19

(E.D.Mich. Apr. 16, 2007) (noting that the receipt of an email was not an adverse employment

action); Eberhardt v. First Centrum, LLC, 2007 WL 518896, at *11 (E.D.Mich. Feb. 15, 2007) (holding plaintiff's receipt of emails of a religious nature did not amount to an adverse employment action in her religious discrimination claim because the receipt of the email did not alter the terms and conditions of her employment); Bennett v. City of Dallas, 2003 WL 22077719, at *5 (N.D.Tex. Aug. 7, 2003) (concluding that plaintiff's receipt of threatening emails was not an adverse employment action).

Similarly, Plaintiff did not suffer an adverse employment action when she heard Hicks explain during a management meeting that he and others were uncomfortable with the company name "Piknik" and recommended that the company name be changed. (McGlon Dep. 169/4-14). Plaintiff testified as follows:

> Q:    Tell me what Henry Hicks said.
> A:    He said that he had – some of his friends and he had become offended by the name of the company Piknik and that he would like to share that with us and that he thought we should consider changing the name. We could not understand how in the world you could be offended by the name Piknik, and then he explained to us how he was offended by it, and his friends.
> Q:    And what did he explain?
> A:    He said that it looked and sounded like pick-a-N.
> Q:    I'm not asking you to say the word that I think you're referencing when you use the term "N." Am I correct in assuming that it is a derogatory term used to refer to African Americans?
> A:    Yes.

(Id. at 169/5-23). Plaintiff was "disturbed," "bothered," and "offended" by Hicks' concern about any negative racial connotation associated with the name "Piknik." (Id. at 170/8-18; see also id. 172/23-173/23 (explaining her assumption that the only reason Mr. Hicks made the statement was because he must have "felt a division between himself and the company" and that she believed a meeting with upper management was an inappropriate venue for Hicks to raise the

issue)).  Although she may have disagreed with Hicks on this point, merely overhearing Hicks express to Piknik management his perception of the company name falls way short of an adverse employment action.  Plaintiff simply cannot show how hearing this comment impacted the terms, conditions or privileges of her job "in a real and demonstrable way."  Davis, 245 F.3d at 1239. In a sense, under Plaintiff's view, anytime an employee voices a concern of discrimination and she or others disagree with it, a company and/or the individual voicing the concern are subject to a claim of discrimination.  Such a view would have a chilling effect in the workplace and would make it unnecessarily hostile.  Fortunately, Plaintiff's view has no support in the law and, again, the concern raised here had no impact on the terms and conditions of her work.  Therefore, this claim fails as a matter of law.

Furthermore, Plaintiff suffered no adverse employment action when Day suggested hiring Mavis Richardson, who is an African American, as a Quality Assurance Manager.  (McGlon Dep. 175/1-13).  Richardson had a bachelor's and a master's degree, previous quality assurance experience, and strong technical proficiency.  (Id. at 182/6-13; 198/3-5).  Plaintiff faulted Richardson for having supervisory experience only and no management experience.  (Id. at 182/6-16).  Nevertheless Plaintiff concedes that Richardson – the only African American candidate in the applicant pool – was the most qualified candidate at the time and that Plaintiff believed that Richardson could perform the job.  (Id. at 179/3-11; 182/17-20; 185/6-8; 192/18-22).  Day and Brenda Sellers, Human Resources Manager, agreed with Plaintiff's assessment and suggested that Plaintiff hire her.  (Id. at 189/15-18; 193/14-18).  Plaintiff now claims that she felt pressured into hiring Richardson.  (Id. at 190/2-3).  However, Plaintiff admits she was never threatened into hiring Richardson.  (Id. at 193/3-6; 194/7-21).  She further admits that any pressure she felt in hiring Richardson had no effect on her employment:

Q:    How did it affect your employment?

A:    The pressure, how did the pressure affect my employment?
      **It didn't.  I continued to do my job**.  And I felt that if
      Chris Day that strongly wanted Mavis in there, that I would
      do the best I could to help Mavis succeed….

(Id. at 197/7-16) (emphasis added).  Plaintiff's own testimony belies any assertion that the terms,

conditions or privileges of her employment were seriously or materially altered by being

encouraged to hire Richardson.  For this reason, the Defendants are entitled to summary

judgment on this claim.

2.    Plaintiff's claim that the Defendants mismanaged her conflict with Bob
      Gross because of her race fails as a mater of law because her contention is
      based solely on impermissible speculation and conjecture and she cannot
      identify any similarly situated employee outside of her protected class who
      received more favorable treatment.

Plaintiff complains about the manner in which her personal conflict with Piknik salesman

Bob Gross was resolved.  The conflict arose because Gross believed that Plaintiff spread rumors

about him.  (McGlon Dep. DX10).  This led to increased tension between Plaintiff and Gross.

(See generally id. (providing the history of the conflict from Plaintiff's perspective)).  Plaintiff

complained about her dispute with Gross.  After Human Resources investigated the matter and

after a meeting among Plaintiff, Gross, Hicks, and Brenda Sellers (Human Resources Manager),

the conflict was ultimately resolved for good.  (Id.; McGlon Dep. 289/19-290/12).  Nevertheless,

Plaintiff apparently remains dissatisfied with the way in which her dispute with Gross was

resolved, claiming it was "horribly mishandled" and "horribly mismanaged" solely because of

her race even though Gross is also Caucasian.  (Id. 260/3-5; 313/18-315/23).

Plaintiff has no factual basis to support this contention; rather, this claim is supported

only by Plaintiff's speculation, conjecture, and gut feeling:

Q:    Do you believe that the situation was handled in such a way
      that it was handled because of your race?

22

A:     Yes.

Q:     What makes you think that?

                                        …

A:     They [Hicks and Sellers] are African-American and I'm not.

Q:     So just the fact that they are African-American makes you believe that the way that the situation was handled was racially motivated?

A:     I don't think if I had been an African-American it would have been handled that way.

Q:     What makes you think that?

A:     Because I think they would have aggressively pursued Bob Gross against talking bad about me.  And I think because Bob Gross was white and I was white, it wasn't a high concern of theirs, and they didn't view it – Henry [Hicks] made concessions for Bob because he needed him.

Q:     What makes you believe that because you are white and Bob Gross was white that nothing more was done.

A:     I just do.  Because nothing more was done.  Jeff Larry blew it off.  Bill McLennan blew it off.  This is a company that was supposed to take the high, moral, ethical road, and they completely – Jeff Larry, Brenda Sellers and Henry Hicks pretty much brushed it aside.

Q:     And you think this is because you are Caucasian because that's just the feeling that you had?

A:     Yes.

(Id. at 313/18-315/15).   However, Plaintiff's speculation that her dispute with Mr. Gross was resolved the way it was resolved solely because of her race cannot defeat summary judgment. See, eg., Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value").   Furthermore, Plaintiff cannot identify any similarly situated, non-Caucasian employee who received more favorable treatment.  (McGlon Dep. 313/12-17).  Significantly, by her own testimony, Plaintiff provided a non-racial reason for the alleged failure to handle her complaint in an expedition manner – namely, "Henry [Hicks] made concessions for Bob [Gross] because he needed him."   (Id. at 314/21-23).  For these reasons, Plaintiff's claim fails as a matter of law.

3.    <u>Plaintiff's salary was reduced more than 5% because she only worked a modified, reduced hours schedule.</u>

When Piknik implemented a company-wide 5% pay cut, Plaintiff's salary was reduced more than 5% because she was working a modified, reduced hour schedule, not because of her race.  Plaintiff started working a modified schedule in March 2004.  (<u>Id</u>. at 94/11-13; 96/4-6).  Although she was working less hours, Day allowed Plaintiff to continue earning a full-time salary of $85,000.  (<u>Id</u>. at 173/16-17).   In June 2005, however, Piknik's dire financial condition forced it to make difficult decisions, which included an across-the-board salary reduction. (McGlon Dep. DX11 (explaining that "the current circumstances at Piknik necessitate imposing salary reductions"); DX4 (describing the circumstances Piknik was facing)).   In general, all employee salaries were reduced by 5%.  (Day Dep. 137/22-138/1; Day Dep. PX6).   However, Day chose to reduce Plaintiff's salary more than 5% simply because Plaintiff was working reduced hours yet still receiving a full-time wage.  (<u>Id</u>. at 140/4-5 (explaining that "[i]n Shannon's case, it was to reflect the fact that she was in de facto a part-time employee"); McGlon Dep. DX 11; 324/4-6 (stating Day made the decision regarding the amount of her salary reduction)).

It appears that Plaintiff will attempt to prove that Day is lying about his reason for reducing her salary by more than 5% by arguing that African American employees – namely, Hicks, Anthony Barber, and Annissia Hanyard – did not receive similar salary reductions. (McGlon Dep. 332/23-333/14).   However, these three individuals are not proper comparators because none of them worked part-time like Plaintiff at the time of the salary reduction.  <u>See</u> <u>Manicci v. Brown</u>, 171 F.3d 1364, 1668-69 (11th Cir. 1999) ("We require that the quantity and quality of the comparator's conduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.").   Indeed, Plaintiff was

Piknik's only part-time salaried managerial employee at the time of the pay cuts.  (Day Decl. ¶¶3-6).  Furthermore, Barber and Hanyard are also not proper comparators because they (along with a Caucasian employee whose salary also was not cut) were brand new employees of Piknik, who negotiated salaries with Piknik and relocated immediately before the salary cuts and, accordingly, Day thought it unfair to reduce their salaries when they had just been negotiated. (Day Dep. 137/11-21).  Comparing Barber, Hicks, or Hanyard to the Plaintiff is not confusing apples with oranges; it is confusing grapes with watermelons.  Because Plaintiff cannot identify any similarly-situated non-Caucasian employee who received a more favorable salary reduction, her claim fails as a matter of law.

    4.    <u>Plaintiff's employment was terminated because Day honestly believed that Plaintiff ignored instructions not to discuss her salary reduction with other employees and that Plaintiff plotted with other individuals in an attempt to seize control of Piknik from Onyx.</u>

Plaintiff was terminated for two legitimate non-discriminatory reasons – namely, insubordination and untrustworthiness – and thus her termination claim fails as a matter of law. First, she was terminated for insubordination.  When Plaintiff's salary was reduced in June 2005, she was asked not to discuss with other employees, particularly her subordinate employees, the specifics of her pay cut.  (Day Dep. 130/9-12; <u>see</u> McGlon Dep. 338/19-22 (stating she does not recall receiving the instructions not to discuss her salary reduction with other employees)). However, Day subsequently learned that Plaintiff ignored this clear instruction.  He learned that Plaintiff discussed her pay cut with the employees who reported to her.  (Day Dep. 130/7-15; 131/5-14; 136/23-137/1).  Day thus decided to terminate Plaintiff's employment for violating an explicit instruction not to discuss with her subordinate employees her salary reduction, not because of her race.

Plaintiff's employment was terminated for an additional legitimate, non-discriminatory reason: untrustworthiness. Day received information that Plaintiff and other current and former Piknik employees – including Ricky Loeb and Plaintiffs Bob Winter and Jerry MacCartney – were plotting to seize control of Piknik from Onyx and otherwise undermine Onyx. (Id. at 130/25-131/14). On June 22, 2005, Piknik informed Plaintiff Bob Winter that his salary was being reduced and that his position would be eliminated in five weeks. (Winter Dep. DX8). Winter asked to go home to think things over. (Winter Dep. 283/1-3). Meanwhile, Winter decided to leave Piknik's employment immediately instead of working for the next five weeks until his position was eliminated. (Id. at 306/8-14). Having decided to leave Piknik but before informing Piknik of his decision, Winter returned to his office under the cover of night and took a company computer and various company documents regarding Piknik's customers, including contracts, pricing and cost information, and other proprietary information. (Id. at 305/2-6; 306/20-307/19; 310/19-311/22; Hicks Dep. 154/3-24). Winter tendered his resignation the following day. (Winter Dep. DX9). Piknik discovered Winter's covert operation just hours after Winter resigned. (Winter Dep. DX11; Day Dep. 165/25-167/19; Hicks Dep. 154/3-24).

On or about June 27, 2005, Day learned that Plaintiff was conspiring with Winter (among others) to undermine Piknik customers' confidence in Onyx's role at Piknik and to take control of Piknik from Onyx. (Day Decl. ¶7; see also Day Dep. 130/7-131/5; 166/10-167/19). In particular, Day received the following email summarizing a conversation between Hicks and a Piknik customer:

> I talked with Rudy Mansfield at Kraft today and he mentioned that Peter Lloyd, his counterpart, had received an email from Bob Winter indicating that he was working to pull together a group to make an offer to buy Piknik Products. Kraft's reaction was neutral to negative on this development and cautiously supportive of Onyx. This development does suggest that Winter et. al. are likely

> to have contact other customers in similar manner, and is further unsettling to our customers regarding the stability of the company and its future. Anything that we can do to support their confidence in us is necessary.

(Day Decl. Exhibit A). After learning that Plaintiff was attempting to undermine Piknik and Onyx, Day determined that Plaintiff's actions warranted termination because he simply felt he could no longer trust Plaintiff. (Day Dep. 131/1-5; see also Day Decl. ¶7 and Exhibit A (asking that a copy of the email summarizing Mr. Hicks' call with Kraft be placed in Plaintiff's file and noting "[t]he fact that they are operating as a group, trying to disrupt our business, is further evidence of the need for their immediate termination")). Plaintiff's employment was terminated the very next day. (McGlon Dep. DX13 (stating her employment was terminated on June 28, 2005)). Clearly, Plaintiff's employment was terminated because Day believed that he could not trust Plaintiff, not because of her race.

To survive summary judgment, Plaintiff must rebut each proffered legitimate non-discriminatory reason for her termination. Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1308 (11th Cir. 2007). This she cannot do. Defendants anticipate that Plaintiff will argue these reasons are pretext for discrimination by denying that she discussed her salary reduction with other employees and denying that she participated with a group to seize control of Piknik from Onyx. (McGlon Dep. 338/14-18; 361/10-362/8; but see Winter Dep. 296/14-297/16 (stating Plaintiff was involved with the group that was being formed)). However, the correctness of the facts upon which the termination decision was based is not the relevant legal inquiry. The relevant legal inquiry is whether the decision maker had an honest belief that the events occurred. See Dawson v. Henry County Police Dep't, No. 06-14640, 2007 WL 1893367, at *3 (11th Cir. Jul. 3, 2007) ("The pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of the facts underlying that explanation

without impugning the employer's honest belief, fails to create a triable pretext issue"); <u>Knight v. Baptist Hosp. of Miami, Inc.</u>, 330 F.3d 1313, 1318 (11th Cir. 2003) ("Even if, as Knight claims, the events did not actually occur, they can be considered if Ryder (the decisionmaker) honestly believed they occurred"); <u>Smith v. Papp Clinic, PA</u>, 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such a belief, the discharge is not 'because of race' and the employer has not violated § 1981"). Plaintiff has no evidence that Day lacked an honest belief that Plaintiff discussed her salary reduction with others and conspired with others to seize control of Piknik from Onyx.

Other evidence further demonstrates that Day did not have any racial animus towards Plaintiff or other Caucasian employees. For example, Day accommodated Plaintiff's request to work a modified schedule yet allowed her to continue earning her full-time salary. (Day Dep. 173/10-17; PX 4; McGlon Dep. 54/18-23; 321/17-322/3). Additionally, when Plaintiff's salary was reduced on June 20, 2005, clearly there was no intent to terminate her employment at that time. (McGlon Dep. DX11). Indeed, she was assured that she was not going to be terminated and that she was considered part of the Piknik team. (McGlon Dep. 320/20-321/2; 328/16-20). Day was hopeful that Plaintiff would stick with the company and that he would eventually be able to increase Plaintiff's salary again. (<u>See</u> McGlon Dep. DX11). The thought of terminating Plaintiff's employment arose only after Day learned that Plaintiff discussed her salary reduction with her subordinate employees and that she was attempting to undermine Piknik and Onyx. (Day Dep. 130/7-131/4). Furthermore, Day hired several Caucasians in management positions at

Piknik.[4]  Day also terminated the employment of African-Americans.  (Id. at 175/5-11).  These facts certainly do not suggest that Day was "out to get" Plaintiff or any other employee because of their Caucasian race.

>    **C.**    **Jeff Larry and Henry Hicks are due summary judgment because they did not participate in the decision to terminate Plaintiff's employment and thus they cannot be held personally liable.**

To the extent the Court determines that a trial is warranted on Plaintiff's claim of reverse discrimination, Larry and Hicks are still entitled to judgment as a matter of law because they did not directly participate in the decision to reduce Plaintiff's salary or terminate her employment – the only truly adverse employment actions that Plaintiff complains about.  An individual may be held personally liable under 42 U.S.C. § 1981 only if he was "personally involved in the discrimination" by having "directly participated" in the alleged discriminatory acts.  Al-Khazraji v. Saint Francis Coll., 784 F.3d 505, 518 (3rd Cir. 1986); see also Wallace v. DM Customs, Inc., No. 8:04-cv-115-T-23TBM, 2006 WL 2882715, at *7 (M.D.Fla. 2006) ("To establish a claim for individual liability under § 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action…The claim must be predicated on the actor's personal involvement.'"); Richard v. Bell Atl. Corp., 946 F.Supp. 54, 74 (D.D.C. 1996); Daulo v. Commonwealth Edison, 892 F.Supp. 1088, 1091 (N.D.Ill. 1995) (noting that "Section 1981 liability against an individual demands personal involvement in discrimination").

Neither Hicks nor Larry were "personally involved" in the alleged discrimination.  Hicks never supervised Plaintiff (Hicks Dep. 88/14-16) and was not involved in the decision to reduce her salary or terminate her employment.  (Id. at 109/4-13; 127/21-23; 156/5-8).  Similarly, there is no evidence that Larry was personally involved in the decisions to reduce Plaintiff's salary or

---

[4] Day hired (1) Carl Bleier – General Manager and Vice President of the Condiments Division, (2) Jessica Daniels – Quality Manager of the Brundidge facility, (3) Allan Walters – Quality Manager of the Day Street facility, and (4) Robert Niedbalski – Corporate Controller.  (Day Dep. 94/14-24; 95/18-20; 173/22-174/14).

terminate her employment.  (See Day Dep. 131/21-132/11 (stating he informed Larry of the termination decision to ensure Larry was "not caught off guard or surprised by anything that may come back…."); Larry Dep. 52/5-53/16; 82/12-83/16).   Accordingly, Hicks and Larry are entitled to summary judgment.

## IV.    CONCLUSION AND RELIEF REQUESTED

For all of the foregoing reasons, summary judgment is due in favor of the Defendants on all of Plaintiff's claims and the Defendants respectfully move this Court to dismiss each and every one of the Plaintiff's claims in its entirety, with prejudice.

Respectfully submitted,

s/ Robert E. Poundstone IV
Robert E. Poundstone IV (POU006)
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
E-mail: bpoundstone@bradleyarant.com

OF COUNSEL
George R. Parker
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701

Jennifer J. McGahey
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on October 29, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

            K. Anderson Nelms, Esquire
            Law Offices of Jay Lewis
            P.O. Box 5059
            Montgomery, AL 36103

                                s/ Jennifer J. McGahey
                                OF COUNSEL