**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **JERRY A. MacCARTNEY, et al.,** ) | |
| ) | |
|     **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.:  2:05cv1207-MHT** |
| ) | |
| **ONYX CAPITAL VENTURES, LLC, et** ) | |
| **al.,** ) | |
| ) | |
|     **Defendants.** ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**AS TO ALL CLAIMS OF PLAINTIFF BERT MAYER**

Defendants Jeff Larry, Chris Day, and Henry Hicks (collectively the "Defendants") respectfully move this Court for Summary Judgment on all claims by Plaintiff Bert Mayer ("Plaintiff" or "Mayer").  This is a reverse race discrimination case under 42 U.S.C. § 1981. Plaintiff claims his employment with Piknik Products Company was terminated because he is Caucasian, and he seeks to hold each defendant <u>individually</u> liable.  Plaintiff's claim fails as a matter of law because he signed a general release barring his current claim.  Even absent the general release, Plaintiff's claim fails on the merits because he was terminated for a legitimate, non-discriminatory reason, and he cannot adduce any evidence that this reason is a lie.  No genuine issues of material fact exist, and the Defendants are entitled to judgment as a matter of law.

# I.     STATEMENT OF FACTS

### A.     The Relationship Between Piknik Products Company, Piknik Acquisition Corporation and Onyx Capital Ventures, LLC:  Because of Piknik's dire financial condition, Onyx obtained a 51% ownership interest in Piknik.

Onyx Capital Ventures, LLC ("Onyx") is a minority-owned business enterprise ("MBE") specializing in the acquisition or recapitalization of businesses.  (Day Dep. 33/4-5, 14-25; 52/22-53/1).  Onyx was formed as a "firm that was going to be deploying capital to acquire businesses."  (Id. at 33/4-5).  Defendant Chris Day ("Day") defined Onyx's mission as an MBE as follows:

> [T]he anticipated mission was to acquire businesses whose customers valued supplier diversity.  And therefore, by – it was explicitly an African-American-owned entity that Onyx was going to be.  And we all knew that when we signed onto it.
>
> And the opportunity was to try and solve the, what they call the MBE conundrum, "MBE" meaning minority business enterprise, through the use of our specific expertise in raising leverage finance and in finding and acquiring businesses that would benefit from MBE ownership.

(Id. at 33/13-25).  Defendant Jeff Larry ("Larry") further explained Onyx's strategy:

> We were really focused on taking advantage of some opportunities under what are called the supplier diversity programs at a lot of these companies, and they generally focus in the manufacturing businesses, or at least that's where the opportunities are most developed.
>
> But then the other thing was that we saw an opportunity beyond that to just roll up businesses that weren't getting the focus of the big boys at the time when people were looking at high tech and other sexy things and just making them better and more efficient.

(Larry Dep. 14/18-15/5).

Qualification as an MBE requires minorities to have a controlling interest in all classes of stock and a minority having management control of the business, which means that the most

senior decision maker (i.e., chairman of the board, chief executive officer) must be a minority. (Day Dep. 73/22-74/13). Attaining MBE status does not require the replacement of managerial employees, and Larry made clear that such was not Onyx's mission:

> And sometimes, you know, customers would say you're not really an MBE, because, you know, you're black but everybody else isn't. And I would say that's not our gig. We don't go in and fire people and turn over management. We go in, hopefully identify a company that has a stable and talented management, and work with that management to move forward.
>
> Now, to the extent that the management team needs to be supplemented or there's some deficiencies and there's some transitioning, then of course we'll go out and we'll hire folks.

(Larry Dep. 76/11-22).

The six original partners of Onyx were Defendant Larry (African American), David Palmer (Caucasian), Russell Pallesen (Caucasian), Patrice Daniels (African American), Pat McGreevy (Caucasian) and Defendant Day (Caucasian). (Day Dep.29/18-30/12; 34/3-16). At the time the six original members joined Onyx, Larry controlled approximately 53% or 54% of the shares in Onyx. (Id. at 40/4-6). Day initially had an approximately 5% ownership interest in Onyx, but resigned in October of 2005 and no longer has an ownership interest. (Id. at 27/9-29/20; 32/9-11; 64/5-6). Defendant Henry Hicks ("Hicks") has never had any ownership interest in Onyx. (Hicks Dep. 38/8-14).

Piknik Products Company ("Piknik") was a Montgomery-based company that manufactured and bottled beverages and condiments for various companies. For many years Piknik struggled financially. Ricky Loeb ("Loeb"), the majority owner of Piknik, wanted to sell the company and hired an investment bank to facilitate this, who in turn contacted Onyx. (Day Dep. 46/1-48/1). Loeb initially offered to sell his share of Piknik to Onyx for $20 million. (Id. at 48/5-12). Piknik had roughly $17 million in indebtedness and Loeb hoped to pay off that debt

3

from the sale proceeds and make a profit.  (Id. at 48/13-17).  Because Piknik's business did not support such a high valuation, Onyx declined to purchase Piknik on those terms.  (Id. at 48/18-25).

In the six months following Loeb's $20 million offer to Onyx, Piknik continued deteriorating and "missed their numbers by a mile."  (Id. at 49/1-9).  In fact, Day characterized Piknik's decline as a "catastrophe" because "they were missing their numbers during the months where they really needed to start making hay."  (Id. at 50/6-17).  Due to the further decline of Piknik's financial condition, Onyx set up Piknik Acquisition Corporation[1] and through it purchased a 51% of the ownership in Piknik for only one dollar.  (Id. at 52/14-17; 54/6-16; 70/14-71/7).  Day testified that the deal was done out of "desperation" because Loeb had no other choice due to the poor financial condition of his company.  (Id.)  After Onyx's arrival, Piknik also became certified as a minority-owned business enterprise.  (Id. at 73/5-25).

## B.     The Defendants' Positions at Piknik.

Piknik hired Defendants Larry, Day and Hicks after Onyx acquired majority ownership interest.  Larry, Chairman and CEO of Onyx, assumed the title of Chairman and CEO of Piknik as a result of the sale transaction.  (Id. at 132/3-4).  Larry is African American.  (Id.)

Day was the Onyx partner assigned to managing Onyx's investment in Piknik.  (Id. at 29/6-9; 78/8-17).  During the early days of Onyx having an ownership interest, Day temporarily filled management positions at Piknik, while Piknik searched for qualified individuals to fill the positions permanently.  (Id. at 79/5-9, 16-18; 82/3-12; 84/1-23; 85/3-11; 86/6-8).  In January 2004, Day became Executive Vice President of Piknik.  (Id. at 84/1-8).  From February 1, 2005

---

[1]     It was actually Piknik Acquisition Corporation, which was a wholly owned affiliate of Onyx, which had an ownership interest in Piknik, which is common in such acquisitions.  (Day Dep. 70/14-71/7).  To avoid confusion due to there being two "Piknik" entities involved, Defendants will refer to both entities as "Onyx" in this brief.  However, it was actually Piknik Acquisition Corporation that had the ownership interest in Piknik.

until July 7, 2005, Day was President and COO of Piknik.  (Id. at 86/6-8; 87/23-88/1-10).  Day is Caucasian.  (Mayer Dep. 93/20-23).

Piknik hired Hicks in November 2003 as Vice President of Sales and Marketing.  (Hicks Dep. 45/12-15; 47/5-7).  Hicks oversaw all sales and marketing efforts for Piknik's beverage and condiment divisions.  (Id. at 50/6-10).  Hicks is African American.  (Larry Dep. 33/13-17).

### C.    Background of the Defendants: Because of his extensive business and operating experience, Day took on the responsibility of managing the day-to-day operations of Piknik, including responsibility for making personnel decisions.

Defendant Larry has an undergraduate degree in economics and a law degree.  (Id. at 48/10-14).  Larry's expertise is in mergers and acquisitions.  (Id.)  By his own admission, he is "not an operational guy."  (Id. at 10/20).  Accordingly, while CEO of Piknik, Larry had to work through an operator because: "I'm not – I don't try to be or pretend to be [an operational manager]."  (Id. at 10/15-11/1).  Rather, as CEO of Piknik, Larry interfaced with shareholders, the bank, customers and suppliers.  (Id. at 10/15-19).  Larry had no involvement with the internal operations of Piknik:

> Well, really, as I said, I would deal with the external world, did a lot with the customers; and initially, that was my almost whole focus.  I would have periodic conversations with Chris, where he would tell me what's going on with the business and whatever challenges or successes he was having, but I was, you know, completely externally focused.

(Id. at 24/1-8).

Like Plaintiff, Defendant Day is Caucasian.  (Day Dep. 34/12).  Day received his undergraduate degree from Northwestern University and received his M.B.A. from Northwestern's Kellogg School of Management the following year.  (Id. at 7/20-8/6).  Following his graduation, Day was a general investment banking associate for the investment firm Kidder

Peabody and Company.  (Id. at 8/25-9/4).  He later joined Morgan Stanley as a sales trader and then transferred to straight equity sales.  (Id. at 9/5-10/12).  Three years later, Day joined Sears & Roebuck as manager of mergers and acquisitions in the specialty merchandising group and then became director of marketing for the computer service business.  (Id. at 10/13-12/8).  Thereafter Day joined Packaging Corporation of America, a subsidiary of Tenneco, as manager of corporate development.  (Id. at 12/20-13/21).  He worked at Packaging Corporation of America for more than 6 years, holding the titles of manager of corporate development, director of manufacturing planning, group controller and plant manager.  (Id. at 13/22-14/2; 14/14-16/7).  In 1994, Day took a one year leave of absence from Packaging Corporation of America to serve as a White House Fellow during the Clinton administration.  (Id. at 14/3-14/16).  Upon leaving Packaging Corporation of America, Day became the general manager of the closure business at Silgan packaging and, thereafter, became the co-president of Packtion, a joint venture between Silgan and Morgan Stanley. (Id. at 17/20- 27/8).

Unlike Larry, Day had extensive operational experience and thus it was natural for Day to take an active role in managing the day-to-day operations of Piknik.  Indeed, he was the only Onyx partner with "business and operating experience, as opposed to the other partners [who] had experience as transactional attorneys in mergers and acquisitions or leveraged finance, in particular."  (Id. at 32/17-22).  Accordingly, Day was assigned by Larry to manage Piknik.  (Id. at 78/8-17).

When Day began his role in management for Piknik, he hired Defendant Hicks as Vice President for Sales and Marketing.  (Id. at 101/20-22).  Day knew Hicks because Hicks was also a White House Fellow during the Clinton administration.  (Id. at 101/23-102/2).  The position of

Vice President for Sales and Marketing did not exist before Onyx obtained an ownership interest in Piknik; rather, it was a new position created by Day. (Id. at 102/3-9).

Hicks received his undergraduate degree from Morehouse College and an M.B.A. from the University of North Carolina. (Hicks Dep. 37/9-38/1). His pre-Piknik employment experience included positions with Coopers and Lybrand, Bank of America, and Catalyst, LLC, which was an interim management consulting firm. (Id. at 22/14-21; 30/20-31/1; 31/25-32/16; 36/2-17). Immediately preceding his employment with Piknik, Hicks owned a consulting business that helped companies develop financial projections, raise capital and took on interim management roles at various companies. (Id. at 10/2-15; 21/24-22/2).

> ### D. The relationship between the new management that came in after Onyx obtained an ownership interest in Piknik and Piknik's former majority owner, Ricky Loeb, was contentious.

The relationship between Loeb, the former majority owner of Piknik, and the new management put in place after Onyx took an ownership interest was contentious. According to Day, "Ricky, on his best day, is a distraction." (Day Dep. 176/15-16). In fact, Day believed that Loeb's "meddling" within Piknik was so disruptive that he asked Piknik managers who had previously worked directly for Loeb, including Plaintiff, to cease all communications with Loeb concerning Piknik's business. (Id. at 176/3-177/21). Specifically, Day testified:

> And he [Loeb] was causing us a tremendous amount of wasted non-value added effort trying to clean up messes he was starting with his meddling. And his meddling was not to try and further the business. He was trying to meddle so that he had something to do and people would think that he was important and still involved in the business.
>
> And, so, I didn't say that you couldn't talk to him outside of work. I didn't say you couldn't talk to him at all.
>
> I said, don't talk to him about business stuff because he doesn't have a business role.

> And I was doing it as much for their protection.  Make me the bad guy.  Make Jeff [Larry] the bad guy.  We'll give you a reason not to talk to him.
>
> Because so many of them were saying, he calls me and what am I supposed to say?
>
> I said, make me the bad guy.  That's fine.  I'm trying to keep you from having a boatload of wasted time in your day.  And it's wasted time just talking to him, but it will be five times as much waste when you're trying to clean up the mess that he will instigate.

(Id. at 176/16-177/15; Day Dep. PX1).

**E.      Both before and after Onyx obtained an ownership interest in Piknik, the company was multimillions of dollars in default on its loan and was only able to operate subject to a forbearance agreement with SouthTrust Bank (later Wachovia).  Piknik eventually ceased doing business and filed for bankruptcy when the bank refused to extend the forbearance agreement.**

Piknik was involved in a forbearance agreement with SouthTrust[2] because it was in default on loans from SouthTrust both before and during the time Onyx had an ownership interest in Piknik.  (Day Dep. 108/24-109/6).  The forbearance agreement with SouthTrust came up for an extension at regular intervals and was generally extended by either a year or six months.  (Id. at 109/16-19).  During Onyx's two year tenure with Piknik, the company's indebtedness improved from $17 million to approximately $15.3 million.  (Id. at 108/25-23).  Although Piknik significantly reduced its indebtedness and remained current on its principal and interest payments, it continued to be in violation of the financial covenants in its forbearance agreement with SouthTrust, such as "interest coverage ratios, the liquidity cash flow ratios, the working capital."  (Id. at 108/13-15).

In the Fall of 2004, Piknik was awarded a significant amount of new business that it forecasted would result in a substantial increase in production volume.  (Id. at 99/17-100/19).

---

[2] SouthTrust later became Wachovia.  For purposes of this brief, we will refer to both as "SouthTrust."

This business growth required Piknik to invest approximately $3.5 million in new equipment. (See id. at 116/12-22 (explaining the capital investment was necessary "to buy new fillers, new cappers, any number of different things to customize to that particular product and formulation")). Piknik looked to SouthTrust to fund this capital investment; however, SouthTrust declined to extend additional credit to Piknik. (Id. at 116/23-25; Hicks Dep. PX2). By the Spring of 2005, Piknik realized it was "going to be in a real battle with SouthTrust" and the bank was not going to let Piknik bring in the money that was necessary to position the company to receive new business. (Day Dep. 116/23-117/24). Although it could not get additional loans, Piknik had to find an alternative way to fund these capital investments that were required to secure new business and to keep the company "afloat." (Id. at 117/22-24). Faced with this "increasingly tight, tight, tight, tight, tight, situation," Day had to make "painful and difficult" decisions regarding personnel. (Id.)

On June 30, 2005, Piknik's last forbearance agreement expired. Despite all of its efforts to negotiate another six month extension of the forbearance agreement, such negotiations were ultimately unsuccessful. (Id. at 109/20-110/3). On July 7, 2005, the bank informed Piknik that it was ending all negotiations regarding any extension of the forbearance agreement and exercised its right to take control of the company. (Id. at 110/1-3; 169/22-25). Upon the bank taking control of Piknik, Loeb was reinstalled as CEO. (Id. at 87/23-88/10; 169/22-170/1). Loeb immediately fired both Defendants Day and Larry. (Id. at 170/2-3). Shortly thereafter, in September or October 2005, Loeb fired Defendant Hicks. (Hicks Dep. 107/23-108/3). Even after the bank placed Loeb back in charge of Piknik, the company's financial condition continued to deteriorate. Piknik filed for chapter 11 bankruptcy in September of 2005 and ceased all operations in approximately December of 2005. (Winter Dep. 329/1-3).

**F.       Plaintiff Bert Mayer's employment history with Piknik**

Piknik hired Plaintiff in April 2000, before Onyx acquired any ownership interest in Piknik and before any of the Defendants ever held any position with Piknik.  (Mayer Dep. 48/14-18).  For the first three years of his employment, Plaintiff worked in finance, initially as cost accountant and then as financial manager.  (Id. at 48/14-18; 49/15-17; 51/21-23; 52/12-18).

Plaintiff became the Director of Operations in 2003.  (Id. at 57/3-7).  After his first year in this position, Plaintiff expressed to Day his preference to return to the finance side of Piknik's business.  (Id. at 88/5-23; Mayer Dep. DX2).  In response, Day specially created an open "place holder" finance position for Plaintiff to fill as soon as the company was on solid enough footing that Plaintiff was no longer needed on the operational side of the company.  (Mayer Dep. 89/3-7; Mayer Dep. DX2).  At the same time, Day also concluded that Plaintiff's salary as Director of Operations – $73,000 – was below the market rate and thus increased Plaintiff's salary by 33% to $97,000.  (Mayer Dep. DX2).  Day further agreed to keep Plaintiff's salary the same whenever Plaintiff returned to finance, even though the market rate for the finance position was considerably less than $97,000.  (Id.)

**G.       Due to his inability to perform under the severe financial constraints that Piknik faced, Mayer was reassigned from Director of Operations to Day Street Plant Manager.  However, Mayer's performance as the Day Street Plant Manager was also unacceptable and he was terminated.**

Anthony Barber, Vice President and General Manager of the Beverages Division and Plaintiff's immediate supervisor, made the decision to terminate Plaintiff's employment.  Day supported the decision.  (Day Dep. 123/11-15).  According to Day:

> The problem with Bert was that he had knowledge, and he – he had very little ability to get things done.  And that was the painful thing about managing Bert, was that everybody liked him so much.  And I did.  And we were pulling so hard for him to succeed.  And it was

> – it was hard to just see sort of repeated failure taking place under
> his leadership.

(Id. at 121/15-22).  Piknik initially dealt with the problems demonstrated by the Plaintiff by "trying to be as creative and humane as we could be to not have to throw him or any of them out the door in these difficult circumstances, but to try to find something else that would be, either, a better fit for their skills."  (Id. at 121/25-122/5).  As evidence of Day's efforts to find Plaintiff a suitable position within Piknik, Plaintiff remained employed in a managerial capacity at Piknik approximately two years after Onyx obtained an ownership interest in Piknik.  (Id. at 172/20-173/6).  Because Day thought the Plaintiff was "struggling" in his position as Director of Operations, which required having responsibility for two plants, Plaintiff was reassigned and given responsibility for only one plant, the Day Street plant.  (Id. at 122/11-17).  Plaintiff's salary remained the same when he was reassigned.  (Mayer Dep. 261/9-13).

However, Plaintiff's performance being responsible for only the Day Street plant was also unacceptable because, according to Day, "[i]t was – it was difficult – running the Day Street plant was a very difficult job with all the new business coming in and the capital constraints. And it required a very different personality and leadership style than what Bert had."  (Day Dep. 123/22-124/2).

Accordingly, on June 9, 2005, Day informed Plaintiff that his employment was being terminated.  (Mayer Dep. 149/18-151/14).  Specifically, Day terminated Plaintiff's employment because he felt Piknik needed a Day Street plant manager with a different management style and more leadership skills than Plaintiff.  (Day Dep. 123/11-15).  Day believed a management change at the Day Street plant was critical to balance the demands created by an imminent influx of new business and the financial constraints imposed on Piknik.  (Id. at 123/16-124/2).  Day further felt that Piknik "needed to bring specific focus and accountability to the Day Street plant.

It was our flagship.  That's where many of those new product launches were going, and it was performing pretty badly."  (Id. at 118/15-19).  Day testified that he simply felt Plaintiff was not qualified for this role: "Bert could not criticize anybody.  He could not hold people accountable.  He was the nicest-stinking guy out there, but it was the wrong thing for us in the crisis mode we were in."  (Id. at 125/7-11).

### H.    Neither Jeff Larry nor Henry Hicks participated in the decision to fire Plaintiff Mayer.

Although Day informed Defendant Larry whenever he terminated an employee, such as Plaintiff, Larry did not participate in any of the termination decisions.  (Id. at 131/21-132/16).  Specifically, Day testified about his discussions with Larry over terminations, which were merely meant to inform Larry of termination decisions, as follows:

> . . . he was chairman and CEO of the organization.  And I wasn't required to, but the relationship that I had with Jeff was always one of I'll tell you what I think you need to know.  And I'll make sure that you're – you're not caught off guard or surprised by anything that may come back and – you know, that Ricky [Loeb] may come and question you about.  I always made sure I was out in front on those things.

(Id. at 131/5-132/11).  Larry similarly testified that any decision to terminate Plaintiff would have been by Day or Plaintiff's direct supervisor.  (Larry Dep. 52/5-53/16).  In fact, Larry is not even aware of the series of events that resulted in the Plaintiff's departure from Piknik.  (Id. at 52/5-53/16).

Plaintiff never reported to Defendant Hicks at any time.  (Hicks Dep. 88/14-89/19).  Hicks did not make any decision concerning the Plaintiff ending his employment with Piknik.  (Id. at 156/5-8).

### I.    Plaintiff's Severance Agreement and General Release

During the June 9, 2005 termination meeting, Plaintiff received a proposed severance agreement and general release ("Agreement").    Plaintiff did not execute the Agreement immediately.    Rather, he reviewed the Agreement and discussed it with his father, a retired lawyer.    (Mayer Dep. 159/14-160/7).    Plaintiff executed the Agreement on June 14, 2005.    (Mayer Dep. DX5; Mayer Dep. 162/16-20).    The Agreement provides, in pertinent part:

> 2.    [Plaintiff] acknowledges and agrees that the terms of Release…specifically include the release of (a) any and all claims arising from or related to [Plaintiff's] employment or the termination or (sic) [Plaintiff's] employment; (b) any and all claims arising from any alleged violation of any federal…law….

(Mayer Dep. DX5 at ¶2).    In return, Plaintiff received five weeks of severance pay – one week of severance for every year of service – plus five weeks of paid vacation.[3]    (Mayer Dep. DX5 at Exhibit A; Mayer Dep. 154/18-155/20; Day Dep. 160/14-16).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."    Fed. R. Civ. P. 56(c).    The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist.    Celotex Corp. v. Catrett, 477 U. S. 317 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604 (11th Cir. 1991).    After the moving party discharges its burden, the non-movant must go beyond the pleadings and

---

[3] After Plaintiff received his first two payments under the Agreement, SouthTrust further restricted Piknik's cash flow and specifically ordered Piknik not to pay any severance.    (Day Dep. 160/14-161/5; see also Mayer Dep. 164/18-165/8; 170/14-19; 171/5-10).    Piknik temporarily stopped making the severance payments.    However, within a few weeks, Piknik paid Plaintiff the remaining balance of his severance.    (Mayer Dep. 173/21-174/10; 177/20-178/3; 199/9-200/16).

designate specific facts showing there is a genuine issue for trial.  <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593 (11th Cir. 1995).  "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment."  <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 592 (11th Cir. 1995), <u>cert. denied</u>, 516 U.S. 817 (1995) (citation omitted).  Moreover, evidence that is merely colorable, conclusory, or conjectural, does not create a genuine issue of material fact.  <u>See</u> <u>Brown v. City of Clewiston</u>, 848 F.2d 1534, 1537 (11th Cir. 1988); <u>Peppers v. Coates</u>, 887 F.2d 1493, 1498 (11th Cir. 1989).  The summary judgment rule applies in employment discrimination cases just as in other cases.  <u>See</u> <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1025 (11th Cir. 2000).

## III.    ARGUMENT

### A.    The Defendants are entitled to summary judgment because Plaintiff knowingly and voluntarily released them from any liability arising out of his employment or the termination of his employment.

Plaintiff's reverse race discrimination claim fails as a matter of law because it is barred by the release provision in the Agreement that he executed on June 14, 2005.  By executing the Agreement, Plaintiff released the Defendants from "any and all claims arising from or related to [Plaintiff's] employment or the termination or (sic) [Plaintiff's] employment."  (Mayer Dep. DX5 at ¶2).  Plaintiff further released the Defendants from any claims seeking "reinstatement, back pay, compensatory damages, punitive damages, liquidated damages, prejudgment interest, attorney's fees, costs, expenses, or any other relief, remedy or damages."  (Mayer Dep. DX5 at ¶1).

The Eleventh Circuit has consistently held that such releases bar discrimination claims if the release was executed knowingly and voluntarily.  "When an employee knowingly and voluntarily releases an employer from liability for Title VII and § 1981 claims with a full

understanding of the terms of the agreement, he is bound by that agreement." Puentes v. United Parcel Serv., Inc., 86 F.3d 196, 197 (11th Cir. 1996).  When determining whether a release was executed knowingly and voluntarily, a court should look at the "totality of the circumstances" and consider the following six factors:

1.   The plaintiff's education and business experience;
2.   The amount of time the plaintiff considered the agreement before signing it;
3.   The clarity of the agreement;
4.   The plaintiff's opportunity to consult with an attorney;
5.   The employer's encouragement or discouragement of consultation with an attorney; and
6.   The consideration given in exchange for the waiver when compared with the benefits to which the employee was already entitled.

Myricks v. Fed. Reserve Bank of Atlanta, 480 F.3d 1036, 1040 (11th Cir. 2007) (holding plaintiff knowingly and voluntarily signed severance agreement and general release and thus released his Title VII race discrimination claim).  The undisputed evidence, in light of these six factors, establishes that Plaintiff knowingly and voluntarily released any claim for race discrimination.

First, Plaintiff is educated.  He has an accounting degree and is a certified public accountant.  (Mayer Dep. 45/2-22).  When he executed the Agreement, Plaintiff had years of business experience, including experience in negotiating and reviewing contracts.  (Id. at 130/4-16; see also Mayer Dep. DX3 (outlining Plaintiff's business experience before working at Piknik)).

Second, Plaintiff was given adequate time to consider the Agreement before he signed it. Plaintiff received the proposed Agreement during his termination meeting on June 9, 2005. (Mayer Dep. 151/12-14; 154/18-21; 155/16-20, 21-23; 156/1-3).  He executed the Agreement five days later on June 14, 2005.  (Mayer Dep. DX5).  Notably, Piknik allowed Plaintiff 21 days to consider the Agreement:

> Employer further advises [Plaintiff]…that he has 21 days from the date this Release has been presented to him in which to consider this Release. [Plaintiff] acknowledges that, if he executes this Release before 21 days after receiving it, he does so knowingly and voluntarily….

(Mayer Dep. DX5 at ¶4). Plaintiff chose to execute the Agreement before the 21-day period expired. Even after Plaintiff executed the Agreement, he was allowed additional time – 7 days – to consider it further and even revoke his acceptance of it. (Mayer Dep. DX5 at ¶5; Mayer Dep. 166/8-16 (admitting he had seven days to revoke his acceptance)). Plaintiff never revoked his acceptance of the Agreement.

Third, Plaintiff admits the Agreement is clear and that he understood its terms when he signed it. (Mayer Dep. 198/8-20). In particular, Plaintiff understood he was releasing any claims relating to his employment with Piknik, including his termination. (Id. at 166/17-167/15).

Fourth, Plaintiff admits he had an opportunity to consult with an attorney about the Agreement. (Id. at 197/11-15). In fact, he discussed with his father, a retired lawyer, the severance package that Piknik offered. (Id. at 159/17-160/7; 161/18-162/1).

Question:    You spoke with your father about it; correct?

Answer:    Yes.

Question:    What did he say?

Answer:    He asked me how I was going to feed my family, and I said I don't know yet. He said, well, then you better sign the agreement. He said, if you were discriminated against, then the agreement, you know, shouldn't make a difference.

(Id. at 206/4-15).

Fifth, Plaintiff was encouraged to consult an attorney about the Agreement before signing it. The Agreement conspicuously provides:

PLEASE READ CAREFULLY. THIS RELEASE INCLUDES A GENERAL RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS THAT [PLAINTIFF] HAS OR MAY HAVE. **[PLAINTIFF] SHOULD CONSULT AN ATTORNEY BEFORE SIGNING BELOW**.

(Mayer Dep. DX5 (emphasis added); Mayer Dep. 168/21-169/6). The Agreement also advised Plaintiff that "**before signing this Release he should consult with an attorney**…." (Mayer Dep. DX5 at ¶4 (emphasis added)). Plaintiff also admits he was not forced or pressured into executing the Agreement. (Mayer Dep. 168/6-15).

Sixth, Plaintiff received adequate consideration in exchange for his release of claims. Plaintiff received five weeks of severance pay – one week of severance for each year of service with Piknik. (Mayer Dep. DX5 at Exhibit A; Day Dep. 160/14-16). Plaintiff also received five weeks of paid vacation. (Mayer Dep. DX5 at Exhibit A).

The undisputed evidence, viewed in light of the six factors, clearly demonstrates that Plaintiff knowingly and voluntarily released all claims relating to his employment, including his current claim of reverse discrimination. The Agreement and the release provision are valid. Accordingly, the Defendants are entitled to judgment as a matter of law.

**B.** **To the extent the Court finds that Plaintiff did not knowingly and voluntarily release his claim of reverse discrimination, the Defendants are still entitled to summary judgment because Plaintiff was terminated for a legitimate, non-discriminatory reason.**

Even if the Court finds that Plaintiff's claim is not barred by the release provision in the Agreement, his claim still fails as a matter of law because he was terminated for a legitimate, non-discriminatory reason – namely, Plaintiff was viewed as not being able to fulfill the Day Street Plant Manager duties in light of the increased production and severe financial constraints that Piknik faced. Plaintiff cannot adduce any evidence that Defendant Day is lying about this being the true reason for the termination decision.

17

1.   <u>Plaintiff has no direct evidence that his employment was terminated because of his race</u>.

Plaintiff has no direct evidence of race discrimination.  Direct evidence is evidence that "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  <u>EEOC v. Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1286 (11th Cir. 2000).  "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."  <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d 1079, 1086 (11th Cir. 2004).  Direct evidence must relate directly in time and subject to the adverse employment action.  "[R]emarks…unrelated to the decisionmaking process itself are not direct evidence of discrimination."  <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998); <u>see also</u> <u>Scott v. Suncoast Beverage Sales, Ltd.</u>, 295 F.3d 1223, 1227-28 (11th Cir. 2002) (explaining that the remark "[w]e'll burn his black ass" did not constitute direct evidence of discrimination because it was made 2 ½ years before and thus was not directly related to plaintiff's termination); <u>Burrell v. Bd. of Trs. of Ga. Military Coll.</u>, 125 F.3d 1390, 1393 (11th Cir. 1997) (finding CEO's remark about wanting to hire a man instead of a woman because too many women already held officer positions was not direct evidence of discrimination).

Defendants anticipate that Plaintiff may argue that a statement allegedly made by Day, shortly after he arrived at Piknik in 2003, that "it's Onyx's intention to replace all the managers with African-Americans or blacks" constitutes "direct evidence" of discrimination.  (Mayer Dep. 140/13-16).  Any such attempt by Plaintiff fails for several reasons.  First, Day never made this statement that Plaintiff attributes to him.  (Day Dep. 91/15-21).  Day is adamant that he never told any Piknik employee that he was going to get rid of them and replace them with an African American.  (<u>Id</u>. at 173/18-21).  Rather, Day's actual statement was as follows:

What I was describing to them was a couple of things.

One was a process. And that is that in order to – in order to fairly represent both the community that we were doing business in, Montgomery which is 50 percent African-American by census, and the visions of Onyx Capital Ventures of being more than a sham with one black guy at the top, the only way to – the only way to address that when – and – and by the way, I looked around and was pointing out the fact that there were zero African-Americans in management at Pikink in the town that's 50% black, that you had to address that by a process, and that that needed to be – African-Americans needed to become part of the management hiring process.

Doesn't mean we're going to take blacks over whites, it means you got to present African-American candidates when openings were there.

(Id. at 170/19-25; 172/8; see also id. at 95/7-24 (explaining that his hiring process included the consideration of qualified African-American candidates but that he awarded the job to the most qualified candidate regardless of race)). Clearly, what Day actually said is not evidence of any discriminatory intent.

Even assuming arguendo that Day made the statement as alleged by Plaintiff, the statement still falls short of rising to the requisite level of direct evidence. The statement was not made in connection with the decision making process at issue and, in fact, was purportedly made approximately two years before Plaintiff's termination. (Mayer Dep. 135/22-136/4 (stating Day made the statement within a few months of Onyx acquiring majority ownership of Piknik in August 2003)). Significantly, even after the alleged statement, Day increased Plaintiff's salary substantially, which belies Plaintiff's assertion of racial animus. Because the alleged remark was not directly related to Plaintiff's termination, it cannot constitute direct evidence of discrimination. Standard, 161 F.3d at 1330; Scott, 295 F.3d at 1227-28; Burrell, 125 F.3d at 1393. Accordingly, any reliance on it falls short.

Defendants also anticipate that Plaintiff may rely on an email from Defendant Hicks as "direct evidence" of discrimination. (Mayer Dep. DX7). In this email summarizing a meeting with a customer, Hicks noted that "[w]e discussed our desire to recruit talented minorities in operating roles within the company." (Id.) This email also falls short of being direct evidence. Like the alleged comment by Day, it has absolutely nothing to do with Plaintiff's termination or the termination decision making process. Indeed, Hicks was not even involved in the decision to terminate Plaintiff's employment. (Hicks Dep. 92/9-11). As such, it falls short of constituting direct evidence. See Trotter v. Bd. of Trustees, 91 F.3d 1449, 1453-54 (11th Cir. 1996) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision"); Standard, 161 F.3d at 1330 (stating "remarks by non-decisionmakers…are not direct evidence of discrimination").

Moreover, for this email to establish the existence of any discriminatory intent would require the drawing of inferences and presumptions. By way of example, it would require a presumption that "operating roles" included Plaintiff's position. It would similarly require a presumption that "recruit[ing]" minorities also meant terminating Caucasian employees to create vacancies – none of which has any basis in fact. Because inferences and presumptions must be drawn from this email to establish any discriminatory intent, this email from Hicks is not direct of evidence of discrimination. See Joe's Stone Crab, 220 F.3d at 1286 (stating direct evidence of discrimination must "establish the existence of discriminatory intent…without any inference or presumption").

2.    <u>The Defendants are entitled to summary judgment because Plaintiff's employment was terminated for a legitimate, non-discriminatory reason, and he cannot adduce any evidence that this reason is pretextual</u>.

Because Plaintiff has no direct evidence of race discrimination, he must rely on circumstantial evidence to show a discriminatory motive.[4]   The law governing disparate treatment cases involving circumstantial evidence is well-settled.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, a plaintiff must establish a prima facie case.  If a plaintiff successfully establishes a prima facie case, a defendant must then articulate a legitimate non-discriminatory reason for its action.  Id. at 802.  After a defendant articulates its reason, a plaintiff must adduce substantial evidence that this articulated reason is a pretext – a lie – to cover up intentional discrimination.  Id. at 804.

For purposes of summary judgment only, the Defendants will assume arguendo that Plaintiff can establish a prima facie case.  However, his claim still fails because his employment was terminated for a legitimate, non-discriminatory reason – namely, Day believed Plaintiff lacked the necessary management and leadership skills to manage the Day Street plant during the "crisis mode" that Piknik was facing.  (Day Dep. 125/11).  The production volume for the Day Street plant was expanding, yet the Day Street plant was performing poorly.  (Id. at 118/15-19).  Additionally, Piknik did not have access to the investment capital necessary to support this increased business and, as a result, was forced to use working capital.  Piknik had to tighten the reins at the Day Street plant.  In light of these changed circumstances, Day felt the Day Street plant needed a strong, focused leader who was willing to be accountable and to hold employees accountable.  (Id.)  Day, who had worked with Plaintiff for almost two years, simply felt Plaintiff was not fit for this role.  Day observed "repeated failure taking place under [Plaintiff's] leadership" and determined that Plaintiff "had very little ability to get things done."  (Id. at

---

[4]     The test for intentional discrimination in suits under 42 U.S.C. § 1981 is the same as under Title VII. Ferrill v. The Parker Group, Inc., 168 F.3d 468, 472 (11th Cir. 1999).

121/15-22).  Day testified further that "[Plaintiff] could not criticize anybody.  He could not hold people accountable.  He was the nicest-stinking guy out there, but it was the wrong thing for us in the crisis mode that we were in."  (Id. at 125/7-11).  Clearly, Plaintiff's employment was terminated because Day believed he was unable to manage and lead effectively the Day Street plant, not because of his race.

Indeed, other evidence demonstrates that Day had no discriminatory animus against Plaintiff because of his race.  For example, in May 2004, Day substantially increased Plaintiff's salary from $73,000 to $97,000 – a 33% raise.  (Mayer Dep. DX2).  At the same time, Day specially created and held open a position in finance for Plaintiff based on Plaintiff's expressed preference to return to a finance position.  (Id.)  Additionally, although Day was unsatisfied with Plaintiff's performance as Director of Operations, Day "tr[ied] to be as creative and humane as we could be to not have to throw him or any of them out the door in these difficult circumstances, but to try to find something else that would be, either, a better fit for their skills…."  (Day Dep. 121/25-122/5).  Thus Day named Plaintiff the Day Street plant manager, which was a position that he initially felt better suited Plaintiff.  (Id. at 121/5-122/14).

In fact, there is no evidence whatsoever that Day ever intended to terminate any existing Caucasian managers and replace them with African Americans.  Rather, there is substantial evidence refuting any such motive by Day.  Day testified that in discussions he had with representatives of Pepsi and Proctor and Gamble, who indicated they would like to see Onyx operated more like a social program, he responded:

> And we always pushed back and said, no, we're about ownership and management control, and a slow sustainable process of introducing African-Americans into management ranks in the companies that we acquire.

> Nothing would have been more disruptive than to go in and turn a place upside-down just for racial reasons.
>
> And oh, by the way, we plan to be in business and acquire another companies, and you don't think word would get out to the other companies we're looking at that, oh, yeah, you better watch out, all you white guys, you're going to – we never want to do that. That's bad business.

(Id. at 170/19-172/8).   Further, in addition to raising Plaintiff's salary, Day also raised the salaries of Plaintiffs Jerry MacCartney and Bob Winter (both Caucasians).  (Id. at 172/11-17). Not only were MacCartney and Winter given raises like Plaintiff, but all three remained employed in managerial capacities approximately two years after Onyx obtained an ownership interest in Piknik.  (Id. at 172/20-173/6).   Moreover, Day hired Caucasian managers[5] at Piknik and, in fact, hired more Caucasian managers than African Americans.  (Id. at 174/1-14).   Day also terminated the employment of African-Americans.  (Id. at 175/5-11).   Day even replaced an African American manager with a Caucasian male.  (Id. at 175/12-176/2).   Not surprisingly, there were still more Caucasian managers at Piknik than African American managers at the time Day left Piknik.  (Id. at 174/18-20).   These facts certainly do not suggest that Day, who himself is Caucasian, was "out to get" Plaintiff or any other employee because of their Caucasian race.

**C.    Jeff Larry and Henry Hicks are due summary judgment because they did not participate in the decision to terminate Plaintiff's employment and thus they cannot be held personally liable.**

To the extent the Court determines that a trial is warranted on Plaintiff's claim of reverse discrimination, Defendants Larry and Hicks are still entitled to judgment as a matter of law because they were not personally involved in the decision to terminate Plaintiff's employment. An individual may be held personally liable under 42 U.S.C. § 1981 only if he was "personally

---

[5] Day hired (1) Carl Bleier – General Manager and Vice President of the Condiments Division, (2) Jessica Daniels – Quality Manager of the Brundidge facility, (3) Allan Walters – Quality Manager of the Day Street facility, and (4) Robert Niedbalski – Corporate Controller.  (Day Dep. 94/14-24; 95/18-20; 173/22-174/14).

involved in the discrimination" by having "directly participated" in the alleged discriminatory acts.   Al-Khazraji v. Saint Francis Coll., 784 F.3d 505, 518 (3rd Cir. 1986); see also Wallace v. DM Customs, Inc., No. 8:04-cv-115-T-23TBM, 2006 WL 2882715, at *7 (M.D.Fla. 2006) ("To establish a claim for individual liability under § 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action…The claim must be predicated on the actor's personal involvement.'"); Richard v. Bell Atl. Corp., 946 F.Supp. 54, 74 (D.D.C. 1996); Daulo v. Commonwealth Edison, 892 F.Supp. 1088, 1091 (N.D.Ill. 1995) (noting that "Section 1981 liability against an individual demands personal involvement in discrimination").

Neither Hicks nor Larry were "personally involved" in the alleged discrimination.  Hicks never supervised Plaintiff (Hicks Dep. 88/17-19) and was not involved in the decision to terminate Plaintiff's employment.   (Id. at 92/9-11; see also Day Dep. 123/11-15 (explaining Anthony Barber, Plaintiff's immediate supervisor, made the recommendation to terminate Plaintiff's employment and Chris Day approved it)).  Similarly, there is no evidence that Larry was personally involved in the termination decision.  (See Day Dep. 131/21-132/11 (stating he informed Larry of the termination decision to ensure Larry was "not caught off guard or surprised by anything that may come back…."))  Accordingly, Hicks and Larry are entitled to summary judgment.

## V.    CONCLUSION AND RELIEF REQUESTED

For all of the foregoing reasons, summary judgment is due in favor of the Defendants on all of Plaintiff's claims and the Defendants respectfully move this Court to dismiss each and every one of the Plaintiff's claims in its entirety, with prejudice.

Respectfully submitted,

s/ Robert E. Poundstone IV
Robert E. Poundstone IV (POU006)
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
E-mail: bpoundstone@bradleyarant.com

OF COUNSEL
George R. Parker
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701

Jennifer J. McGahey
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

K. Anderson Nelms, Esquire
Law Offices of Jay Lewis
P.O. Box 5059
Montgomery, AL 36103

s/ Robert E. Poundstone IV
OF COUNSEL

25

1/1596423.5