**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JERRY A. MacCARTNEY, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:  2:05cv1207-MHT** |
| | ) | |
| **ONYX CAPITAL VENTURES, LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AS TO ALL CLAIMS OF PLAINTIFF ROBERT WINTER**

Defendants Jeff Larry, Chris Day, and Henry Hicks (collectively the "Defendants") respectfully move this Court for Summary Judgment on all claims brought by Plaintiff Robert Winter ("Plaintiff" or "Winter").  This is a reverse race discrimination case under 42 U.S.C. § 1981.  Plaintiff claims he was discriminated against in the terms, conditions and privileges of his employment with Piknik Products Company because he is Caucasian, and he seeks to hold each defendant <u>individually</u> liable.  Plaintiff's claims fail as a matter of law for several reasons. Plaintiff has no direct evidence that any decisions affecting his employment were made because of his race.  Even in the absence of direct evidence, Plaintiff's claims fail because he cannot establish a <u>prima facie</u> case of race discrimination, all decisions regarding his employment were made for legitimate, non-discriminatory reasons, and he cannot adduce any evidence that those reasons are lies.  No genuine issues of material fact exist, and when the evidence is viewed in the light most favorable to Plaintiff, the Defendants are entitled to judgment as a matter of law.

## I.    STATEMENT OF UNDISPUTED FACTS

### A.    The Relationship Between Piknik Products Company, Piknik Acquisition Corporation and Onyx Capital Ventures, LLC:  Because of Piknik's dire financial condition, Onyx obtained a 51% ownership interest in Piknik.

Onyx Capital Ventures, LLC ("Onyx") is a minority-owned business enterprise ("MBE") specializing in the acquisition or recapitalization of businesses.  (Day Dep. 33/4-5, 14-25; 52/22-53/1).  Onyx was formed as a "firm that was going to be deploying capital to acquire businesses."  (Id. at 33/4-5).  Defendant Chris Day ("Day") defined Onyx's mission as an MBE as follows:

> [T]he anticipated mission was to acquire businesses whose customers valued supplier diversity.  And therefore, by – it was explicitly an African-American-owned entity that Onyx was going to be.  And we all knew that when we signed onto it.
>
> And the opportunity was to try and solve the, what they call the MBE conundrum, "MBE" meaning minority business enterprise, through the use of our specific expertise in raising leverage finance and in finding and acquiring businesses that would benefit from MBE ownership.

(Id. at 33/13-25).  Defendant Jeff Larry ("Larry") further explained Onyx's strategy:

> We were really focused on taking advantage of some opportunities under what are called the supplier diversity programs at a lot of these companies, and they generally focus in the manufacturing businesses, or at least that's where the opportunities are most developed.
>
> But then the other thing was that we saw an opportunity beyond that to just roll up businesses that weren't getting the focus of the big boys at the time when people were looking at high tech and other sexy things and just making them better and more efficient.

(Larry Dep. 14/18-15/5).

Qualification as an MBE requires minorities to have a controlling interest in all classes of stock and a minority having management control of the business, which means that the most

senior decision maker (i.e., chairman of the board, chief executive officer) must be a minority.

(Day Dep. 73/22-74/13). Attaining MBE status does not require the replacement of managerial

employees, and Larry made clear that such was not Onyx's mission:

> And sometimes, you know, customers would say you're not really
> an MBE, because, you know, you're black but everybody else
> isn't. And I would say that's not our gig. We don't go in and fire
> people and turn over management. We go in, hopefully identify a
> company that has a stable and talented management, and work
> with that management to move forward.
>
> Now, to the extent that the management team needs to be
> supplemented or there's some deficiencies and there's some
> transitioning, then of course we'll go out and we'll hire folks.

(Larry Dep. 76/11-22).

The six original partners of Onyx were Defendant Larry (African American), David

Palmer (Caucasian), Russell Pallesen (Caucasian), Patrice Daniels (African American), Pat

McGreevy (Caucasian) and Defendant Day (Caucasian). (Day Dep. 29/18-30/12; 34/3-16). At

the time the six original members joined Onyx, Larry controlled approximately 53% or 54% of

the shares in Onyx. (Id. at 40/4-6). Day initially had an approximately 5% ownership interest in

Onyx, but resigned in October of 2005 and no longer has an ownership interest. (Id. at 27/9-

29/20; 32/9-11; 64/5-6). Defendant Henry Hicks ("Hicks") has never had any ownership interest

in Onyx. (Hicks Dep. 38/8-14).

Piknik Products Company ("Piknik") was a Montgomery-based company that

manufactured and bottled beverages and condiments for various companies. For many years

Piknik struggled financially. Ricky Loeb ("Loeb"), the majority owner of Piknik, wanted to sell

the company and hired an investment bank to facilitate this, who in turn contacted Onyx. (Day

Dep. 46/1-48/1). Loeb initially offered to sell his share of Piknik to Onyx for $20 million. (Id.

at 48/5-12). Piknik had roughly $17 million in indebtedness, and Loeb hoped to pay off that debt

from the sale proceeds and make a profit.  (Id. at 48/13-17).  Because Piknik's business did not support such a high valuation, Onyx declined to purchase Piknik on those terms.  (Id. at 48/18-25).

In the six months following Loeb's $20 million offer to Onyx, Piknik continued deteriorating and "missed their numbers by a mile."  (Id. at 49/1-9).  In fact, Day characterized Piknik's decline as a "catastrophe" because "they were missing their numbers during the months where they really needed to start making hay."  (Id. at 50/6-17).  Due to the further decline of Piknik's financial condition, Onyx set up Piknik Acquisition Corporation[1] and through it purchased 51% of the ownership in Piknik for only one dollar.  (Id. at 52/14-17; 54/6-16; 70/14-71/7).  Day testified that the deal was done out of "desperation" because Loeb had no other choice due to the poor financial condition of his company.  (Id.)  After Onyx's arrival, Piknik also became certified as a minority-owned business enterprise.  (Id. at 73/5-25).

**B.    The Defendants' Positions at Piknik.**

Piknik hired Defendants Larry, Day and Hicks after Onyx acquired a majority ownership interest.  Larry, Chairman and CEO of Onyx, assumed the title of Chairman and CEO of Piknik as a result of the sale transaction.  (Id. at 132/3-4).  Larry is African American.  (Id.)

Day was the Onyx partner assigned to managing Onyx's investment in Piknik.  (Id. at 29/6-9; 78/8-17).  During the early days of Onyx having an ownership interest, Day temporarily filled management positions at Piknik, while Piknik searched for qualified individuals to fill the positions permanently.  (Id. at 79/5-9, 16-18; 82/3-12; 84/1-23; 85/3-11; 86/6-8).  In Janaury 2004, Day became Executive Vice President of Piknik.  (Id. at 84/1-8).  From February 1, 2005

---

[1]    It was actually Piknik Acquisition Corporation, which was a wholly owned affiliate of Onyx, which had an ownership interest in Piknik, which is common in such acquisitions.  (Day Dep. 70/14-71/7).  To avoid confusion due to there being two "Piknik" entities involved, Defendants will refer to both entities as "Onyx" in this brief. However, it was actually Piknik Acquisition Corporation that had the ownership interest in Piknik.

until July 7, 2005, Day was President and COO of Piknik.  (Id. at 86/6-8; 87/23-88/1-10).  Day is Caucasian.  (Mayer Dep. 93/20-23).

Piknik hired Hicks in November 2003 as Vice President of Sales and Marketing.  (Hicks Dep. 45/12-15; 47/5-7).  Hicks oversaw all sales and marketing efforts for Piknik's beverage and condiment divisions.  (Id. at 50/6-10).  Hicks is African American.  (Larry Dep. 33/13-17).

### C. Background of the Defendants: Because of his extensive business and operating experience, Chris Day took on the responsibility of managing the day to day operations of Piknik, including responsibility for making personnel decisions.

Defendant Larry has an undergraduate degree in economics and a law degree.  (Id. at 48/10-14).  Larry's expertise is in mergers and acquisitions.  (Id.)  By his own admission, he is "not an operational guy."  (Id. at 10/20).  Accordingly, while CEO of Piknik, Larry had to work through an operator because: "I'm not – I don't try to be or pretend to be [an operational manager]."  (Id. at 10/15-11/1).  Rather, as CEO of Piknik, Larry interfaced with shareholders, the bank, customers and suppliers.  (Id. at 10/15-19).  Larry had no involvement with the internal operations of Piknik:

> Well, really, as I said, I would deal with the external world, did a lot with the customers; and initially, that was my almost whole focus.  I would have periodic conversations with Chris, where he would tell me what's going on with the business and whatever challenges or successes he was having, but I was, you know, completely externally focused.

(Id. at 24/1-8).

Like Plaintiff, Defendant Day is Caucasian.  (Day Dep. 34/12).  Day received his undergraduate degree from Northwestern University and received his M.B.A. from Northwestern's Kellogg School of Management the following year.  (Id. at 7/20-8/6).  Following his graduation, Day was a general investment banking associate for the investment firm Kidder

Peabody and Company. (Id. at 8/25-9/4). He later joined Morgan Stanley as a sales trader and then transferred to straight equity sales. (Id. at 9/5-10/12). Three years later, Day joined Sears & Roebuck as manager of mergers and acquisitions in the specialty merchandising group and then became director of marketing for the computer service business. (Id. at 10/13-12/8). Thereafter Day joined Packaging Corporation of America, a subsidiary of Tenneco, as manager of corporate development. (Id. at 12/20-13/21). He worked at Packaging Corporation of America for more than six years, holding the titles of manager of corporate development, director of manufacturing planning, group controller and plant manager. (Id. at 13/22-14/2; 14/14-16/7). In 1994, Day took a one year leave of absence from Packaging Corporation of America to serve as a White House Fellow during the Clinton administration. (Id. at 14/3-14/16). Upon leaving Packaging Corporation of America, Day became the general manager of the closure business at Silgan packaging and, thereafter, became the co-president of Packtion, a joint venture between Silgan and Morgan Stanley. (Id. at 17/20- 27/8).

Unlike Larry, Day had extensive operational experience and thus it was natural for Day to take an active role in managing Piknik. Indeed, he was the only Onyx partner with "business and operating experience, as opposed to the other partners [who] had experience as transactional attorneys in mergers and acquisitions or leveraged finance, in particular." (Id. at 32/17-22). Accordingly, Day was the Onyx partner assigned to manage Piknik. (Id. at 78/8-17).

When Day began his role in management for Piknik, he hired Defendant Hicks as Vice President for Sales and Marketing. (Id. at 101/20-22). Day knew Hicks because Hicks was also a White House Fellow during the Clinton administration. (Id. at 101/23-102/2). The position of Vice President for Sales and Marketing did not exist before Onyx obtained an ownership interest in Piknik; rather, it was a new position created by Day. (Id. at 102/3-9).

Hicks received his undergraduate degree from Morehouse College and an M.B.A. from the University of North Carolina. (Hicks Dep. 37/9-38/1). His pre-Piknik employment experience included positions with Coopers and Lybrand, Bank of America, and Catalyst, LLC, which was an interim management consulting firm. (Id. at 22/14-21; 30/20-31/1; 31/25-32/16; 36/2-17). Immediately preceding his employment with Piknik, Hicks owned a consulting business that helped companies develop financial projections, raise capital and took on interim management roles at various companies. (Id. at 10/2-15; 21/24-22/2).

> **D.    The relationship between the new management that came in after Onyx obtained an ownership interest in Piknik and Piknik's former majority owner, Ricky Loeb, was contentious.**

The relationship between Loeb, the former majority owner of Piknik, and the new management put in place after Onyx took an ownership interest was contentious. According to Day, "Ricky, on his best day, is a distraction." (Day Dep. 176/15-16). In fact, Day believed that Loeb's "meddling" within Piknik was so disruptive that he asked Piknik managers who had previously worked directly for Loeb, including Plaintiff, to cease all communications with Loeb concerning Piknik's business. (Id. at 176/3-177/21). Specifically, Day testified:

> And he [Loeb] was causing us a tremendous amount of wasted non-value added effort trying to clean up messes he was starting with his meddling. And his meddling was not to try and further the business. He was trying to meddle so that he had something to do and people would think that he was important and still involved in the business.
>
> And, so, I didn't say that you couldn't talk to him outside of work. I didn't say you couldn't talk to him at all.
>
> I said, don't talk to him about business stuff because he doesn't have a business role.
>
> And I was doing it as much for their protection. Make me the bad guy. Make Jeff the bad guy. We'll give you a reason not to talk to him.

> Because so many of them were saying, he calls me and what am I supposed to say?
>
> I said, make me the bad guy. That's fine. I'm trying to keep you from having a boatload of wasted time in your day. And it's wasted time just talking to him, but it will be five times as much waste when you're trying to clean up the mess that he will instigate.

(Id. at 176/16-177/15; Day Dep. PX1).

     **E.    Both before and after Onyx obtained an ownership interest in Piknik, the company was multimillions of dollars in default on its loan and was only able to operate subject to a forbearance agreement with SouthTrust Bank (later Wachovia).  Piknik eventually ceased doing business and filed for bankruptcy when the bank refused to extend the forbearance agreement.**

Piknik was involved in a forbearance agreement with SouthTrust[2] because it was in default on loans from SouthTrust both before and during the time Onyx had an ownership interest in Piknik. (Day Dep. 108/24-109/6). The forbearance agreement with SouthTrust came up for an extension at regular intervals and was generally extended by either a year or six months. (Id. at 109/16-19). During Onyx's two year tenure with Piknik, the company's indebtedness improved from $17 million to approximately $15.3 million. (Id. at 108/25-23). Although Piknik significantly reduced its indebtedness and remained current on its principal and interest payments, it continued to be in violation of the financial covenants in its forbearance agreement with SouthTrust, such as "interest coverage ratios, the liquidity cash flow ratios, the working capital." (Id. at 108/13-15).

In the Fall of 2004, Piknik was awarded a significant amount of new business that it forecasted would result in a substantial increase in production volume. (Id. at 99/17-100/19). This business growth required Piknik to invest approximately $3.5 million in new equipment. (See id. at 116/12-22 (explaining the capital investment was necessary "to buy new fillers, new

---

[2] SouthTrust later became Wachovia. For purposes of this brief, we will refer to both as "SouthTrust."

cappers, any number of different things to customize to that particular product and formulation")).    Piknik looked to SouthTrust to fund this capital investment; however, SouthTrust declined to extend additional credit to Piknik.    (Id. at 116/23-25; Hicks Dep. PX2). By the Spring of 2005, Piknik realized it was "going to be in a real battle with SouthTrust" and the bank was not going to let Piknik bring in the money that was necessary to position the company to receive new business. (Day Dep. 116/23-117/24).    Although it could not get additional loans, Piknik had to find an alternative way to fund these capital investments that were required to secure new business and to keep the company "afloat." (Id. at 117/22-24).    Faced with this "increasingly tight, tight, tight, tight, tight, situation," Day had to make "painful and difficult" decisions regarding personnel.  (Id.)

On June 30, 2005, Piknik's last forbearance agreement expired.  Despite all of its efforts to negotiate another six month extension of the forbearance agreement, such negotiations were ultimately unsuccessful.  (Id. at 109/20-110/3).  On July 7, 2005, the bank informed Piknik that it was ending all negotiations regarding any extension of the forbearance agreement and exercised its right to take control of the company.  (Id. at 110/1-3; 169/22-25).  Upon the bank taking control of Piknik, Loeb was reinstalled as CEO.  (Id. at 87/23-88/10; 169/22-170/1).  Loeb immediately fired both Defendants Day and Jeff Larry.  (Id. at 170/2-3).  Shortly thereafter, in September or October 2005, Loeb fired Defendant Hicks.  (Hicks Dep. 107/23-108/3).  Even after the bank placed Loeb back in charge of Piknik, the company's financial condition continued to deteriorate.  Piknik filed for chapter 11 bankruptcy in September of 2005 and ceased all operations in approximately December of 2005.  (Winter Dep. 329/1-3).

### F.     Plaintiff's Employment with Piknik

Plaintiff worked for Piknik for approximately 4 ½ years.  He was hired by Piknik in October 2000, before Onyx acquired any ownership interest in Piknik and before any of the Defendants ever held any position with Piknik.  (Winter Dep. 40/7-11).  His employment continued until June 2005. (Id. at 275/14-16).  Due to Piknik's changing management structure, Plaintiff reported to several different people throughout his time at Piknik.  By March of 2004, Plaintiff was reporting directly to Defendant Hicks.  (Hicks Dep. 89/2-3).  Also, due to Plaintiff's contributions to Piknik, Plaintiff received an 8%-9% increase in his salary in March of 2005. (Winter Dep. 231/13-18; 255/18-256/2 (explaining his salary increased from $92,000 or $93,000 to $100,000); Winter Dep. DX5).

Plaintiff held several positions during his tenure at Piknik.  He originally joined the company as a Vice President of Operations Sales & Marketing.  (Id. at 49/3-12).  He later became a Vice President of Administration, and then a Vice President of Purchasing.  (Id. at 58/2-22).  At the end of his employment, he was the Director of Customer Relations.  (Id.) While Plaintiff's title varied over the course of his employment, his job responsibilities remained the same.  (Id. at 58/13-15 ("I mean, I always did the same job, but the titles kept changing.")). Plaintiff was responsible for customer contract administration.  (Day Dep. 163/10-16).  His position involved sales, marketing, customer relations, and, for most of his employment, internal financial meetings.  (Winter Dep. 57/13-17).

Prior to hiring Defendant Hicks as Vice President for Sales and Marketing, Piknik had taken a "reactive" approach to customer service rather than a "proactive" approach. (Day Dep. 104/10-17).  Chris Day further explained why he created the Vice President for Sales and Marketing position:

> The effort was entirely different prior to our arrival. It was what I would call more of a customer service function. People did not call outbound and say, we'd like to talk to you about what business you have for us. People waited for the phone to ring, and when the customer called and said, we have this product do you have line time available, we picked up the phone.
>
> And that's a fundamentally different approach. And that – that's why we needed a – an outbound calling presence.

(Id. at 104/1-12). Specifically, when asked whether he intended for Hicks to replace Plaintiff, Chris Day testified: "No. I mean…I viewed those jobs as different. We did not have somebody who was in an outbound calling mode. And Bob's expertise was more in what I would call contract administration." (Id. at 163/10-16). In fact, Hicks and Plaintiff worked together at Piknik for approximately 19 months. (Id. at 164/3-6).

**G.     In June of 2005, Piknik was forced to introduce across the board pay cuts due to the financial crisis the company was experiencing.**

In June of 2005, to stave off its growing financial constraints, Piknik introduced across-the-board pay cuts, which applied to virtually everyone in the company except for three employees (two African Americans and one Caucasian) who had recently been hired by Piknik. (Day Dep. 137/2-21; 154/2-8; PX 6; Larry Dep. 82/12-83/16). Day explained why he did not cut the pay of these three brand new employees:

> I did not ask the three new employees to take pay cuts. So, Anthony Barber, Annissia Haynard and Carl Bleier did not have to participate because it just didn't feel like it was the right thing to do to go out and recruit them to come join the firm and within the first week on the job get five or ten percent off of their agreed-upon deal, especially since all three of them were relocating to take the jobs and were enduring a financial hardship to do that.

(Day Dep. 137/11-21). With limited exception, there was an across-the-board 5% pay cut for all employees of every race, including African Americans. (Id. at 137/22-138/1; 161/17-23; PX 6; see also id. 139/5-9 (Day stating his belief that his salary was also reduced by 5%); Hicks Dep.

11

108/4-109/3 (explaining that his salary was reduced)).  A few Piknik employees were given pay

cuts greater than 5% for separate and independent reasons.  (Day Dep. 139/10-16).

> **H.     Due to the financial crisis Piknik was experiencing, Plaintiff's job was scheduled for elimination.  Piknik offered Plaintiff a reduced salary as an informal form of severance and in lieu of an immediate termination of his employment so that he could draw a salary while looking for another job; however, Plaintiff declined the offer and, instead, chose to resign.**

In June 2005, Plaintiff's position was targeted for elimination "in response to the cash

crisis of the company."  (Day Dep. 167/20-25; Hick's Dep. 109/18-24).  In particular, Day

decided to eliminate Plaintiff's position because he felt Piknik "didn't need the contract

administration elements of what [Plaintiff] provided" because they were "already full."  (Day

Dep. at 168/12-17).  Piknik, at the time, was not in need of more business; rather, Piknik needed

to be able to run the customer orders that it already had.  (Id. at 168/18-20).  Day believed that

between himself, Hicks, and Anthony Barber (Vice President and General Manager of the

Beverages Division), Piknik had "enough knowledge to be able to cover the contract

administration elements that were probably the most valuable or acute aspects of [Plaintiff's]

responsibility."  (Id. at 168/21-25).  Henry Hicks similarly testified that the decision to eliminate

Plaintiff's position "was – really, based upon the fact that there were a number of people who

were able and capable and, in fact, doing some of the work that [Plaintiff] was – much of the

work that [Plaintiff] was doing, as well.  So there were already those people in the company who

could take on those responsibilities."   (Hicks Dep. 155/16-23).   Moreover, Piknik had no

available position in a "need area" in which to transfer Plaintiff.  (Day Dep. at 169/5-9).

After the decision was made to eliminate Plaintiff's position, Day chose not to eliminate

the position immediately.  Instead, on June 22, 2005, Day offered to reduce Plaintiff's salary by

fifty percent and to continue Plaintiff's employment for an additional five weeks.  (Winter Dep.

277/9-278/5; Winter Dep. DX8). This salary reduction was intended to be a form of severance (although the bank had instructed Piknik not to pay any severance) to provide Plaintiff with time to search for a new job. (Day Dep. 140/6-23; 161/2-5). Day explained:

> In Winter's case, his job was being eliminated, and the bank had prohibited us from paying severance. So as a result of that…I told Henry Hicks, well, let's try to find a humane thing to do for [Plaintiff] since he is relatively high paid, he as (sic) family obligations, and since we can't pay him severance, let's give his pay cut rather than a severance and keep him sort of employed in place but looking for his next job.
>
> So that 50 percent pay was to allow him to go look for another job. He wasn't – it was to try to give him a running start on his next job.

(Day Dep. 140/6-19; <u>see also</u> Hicks Dep. 109/18-24; 153/9-2)).

The very next day, Plaintiff rejected the offer of a salary reduction and continued employment for an additional five weeks and, instead, resigned. (Winter Dep. DX9 (tendering his resignation); Day Dep. 140/20-21; 158/16-18 (stating Plaintiff quit his employment and was not fired); Day Dep. DX10 (accepting Plaintiff's resignation); Hicks Dep. 154/3-155/13). No one was hired to replace Plaintiff. Rather, his duties were divided among existing employees – namely, Day (Caucasian), Barber (African American), Hicks (African American) and Bob Lampert (Caucasian). (Hicks Dep. 151/24-152/9; Day Dep. 168/21-25).

Within hours of receiving Plaintiff's resignation, Piknik learned that Plaintiff had returned to his office under the cover of night on June 22, 2005, and took a company laptop and downloaded proprietary information without authorization. (Day Dep. 166/10-21; Winter Dep. 305/2-6; 306/20-307/19; 310/19-311/22; Winter Dep. DX11). Additionally, Plaintiff called on Piknik's customers and undertook other efforts to undermine Piknik after he left its employ. (Day Dep. 166/22-167/19). For example, as of June 23, Plaintiff was independently and

"actively seeking other investors to purchase Piknik." (Winter Dep. 312/22-313/1). In trying to "take over" Piknik, Plaintiff contacted Loeb, Plaintiff Shannon McGlon and her husband, and Plaintiff Jerry MacCartney. (Id. at 297/6-19). Plaintiff sent letters to and spoke with several Piknik customers regarding the company's financial position. (See id. at 298/2-301/20). Finally, Plaintiff and Loeb "lin[ed] up attorneys to meet with, to talk about moving forward with the strategy to, you know, have investors come in and ensure the company's health and survival." (Id. at 301/21-302/3). However, these efforts failed, and Piknik ceased operations just a few months after Plaintiff was offered severance. (See id. at 329/1-3).

## I.    Jeff Larry did not participate in the decision to fire Plaintiff Winter.

Although Day informed Larry whenever he terminated an employee, such as Plaintiff, Larry did not participate in any of the termination decisions. (Day Dep. 131/21-132/16). Specifically, Day testified about his discussions with Larry over terminations, which were merely meant to inform Larry of termination decisions, as follows:

> . . . he was chairman and CEO of the organization. And I wasn't required to, but the relationship that I had with Jeff was always one of I'll tell you what I think you need to know. And I'll make sure that you're – you're not caught off guard or surprised by anything that may come back and – you know, that Ricky [Loeb] may come and question you about. I always made sure I was out in front on those things.

(Id. at 131/5-132/11). Larry similarly testified that any decision to terminate Plaintiff would have been by Day or Plaintiff's direct supervisor, Hicks. (Larry Dep. 51/13-52/9). In fact, Larry is not even aware of the series of events that resulted in the Plaintiff's departure from Piknik. (Id. at 52/7-9).

**J.      Chris Day's and Henry Hick's personnel decisions demonstrate that they had no intent to discriminate against Caucasians.**

Day hired more Caucasian managers than African Americans during his employment with Piknik.  (Day Dep. 174/1-14).  For example, he hired (1) Carl Bleier – General Manager and Vice President of the Condiments Division, (2) Jessica Daniels – Quality Manager of the Brundidge facility, (3) Allan Walters – Quality Manager of the Day Street facility, and (4) Robert Niedbalski – Corporate Controller.  (Id. at 94/14-24; 95/18-20; 173/22-25; 174/1-14).  Similarly, Henry Hicks hired three Caucasian sales employees during his tenure at Piknik: Megan Mayer, Michael Gray and Jackie Oliver.  (Hicks Dep. 65/20-66/13; 150/14-18).  Day even replaced an African American manager with a Caucasian male.  (Day Dep. 175/12-176/2 (explaining Mavis Richardson, African American, was replaced by Allan Walters, Caucasian)).  When Day left his position at Piknik, there were still more Caucasian managers at Piknik than African American managers.  (Id. at 174/18-20).

## II.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604 (11th Cir. 1991).  After the moving party discharges its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593 (11th Cir. 1995).  "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment."  Resolution Trust Corp. v.

Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995). Moreover, evidence that is merely colorable, conclusory, or conjectural, does not create a genuine issue of material fact. See Brown v. City of Clewiston, 848 F.2d 1534, 1537 (11th Cir. 1988); Peppers v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989). The summary judgment rule applies in employment discrimination cases just as in other cases. See Chapman v. AI Transport, 229 F.3d 1012, 1025 (11th Cir. 2000).

## III.    ARGUMENT

Plaintiff identifies four ways in which he contends he was discriminated against because of his race. First, he claims "that there was an emasculation of [his] role in the company." (Winter Dep. 162/2-5). Within this claim, he argues that Patrice Daniels, Anthony Barber, and Defendants Day, Larry, and Hicks treated him differently than others. (Id. at 154/9-22; 161/2-6). This alleged disparate treatment is based on his claim that, despite his responsibilities staying the same and his salary increasing, his ideas were not taken seriously by management. (Id. at 155/4-12; 231/13-18).

Second, Plaintiff claims Patrice Daniels treated him "disrespectfully" because he is Caucasian. (Id. at 167/21-168/1). Specifically, Plaintiff complains that Patrice Daniels called him by his last name, Winter, instead of calling him by his first name, Bob. (Id. at 156/9-12). He further alleges that Patrice Daniels "talked down to" him, disregarded his point of view, and generally, "made it clear she was running the show." (Id. at 164/4-11). Finally, she looked at Plaintiff in an intimidating way and did not give him positive reinforcement. (Id. at 174/11-18; 176/5-10; 184/8-17). Plaintiff has not sued Patrice Daniels in this action.

Third, Plaintiff claims that he was treated disrespectfully by Day, who is also Caucasian, because of his race. (Id. at 168/5-22). Plaintiff does not claim that Day treated him differently

or engaged in any specific conduct.  (Id. at 168/8-22).  Plaintiff simply claims that Day was a part of a conspiracy to terminate him.  (Id.)

Fourth, Plaintiff claims he was terminated and replaced by Hicks and that this termination was a part of a conspiracy to replace him because of his race.  (See id. at 168/23-169/16). Specifically, Plaintiff claims that the Defendants and other Piknik employees conspired against him in order to replace him with Hicks.  (See id. at 168/8-22).  Plaintiff argues that the Defendants' motivation was that, as a certified minority business enterprise, Defendants needed Plaintiff's position to be held by an African American.  (See id. at 168/8-22).

We will demonstrate below why each of Plaintiff's claims fail as a matter of law.

### A.    The Defendants are entitled to summary judgment because there is no direct evidence of that Plaintiff's employment was terminated because of his race.

Plaintiff has no direct evidence of race discrimination.  Direct evidence is evidence that "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).  "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004).  Direct evidence must relate directly in time and subject to the adverse employment action. "[R]emarks…unrelated to the decision making process itself are not direct evidence of discrimination."  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); see also Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002) (explaining that the remark "[w]e'll burn his black ass" did not constitute direct evidence of discrimination because it was made 2 ½ years before and thus was not directly related to plaintiff's termination); Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997)

(finding CEO's remark about wanting to hire a man instead of a woman because too many women already held officer positions was not direct evidence of discrimination).

Defendants anticipate that Plaintiff may argue that a statement allegedly made by Day to other Piknik employees that "it's Onyx's intention to replace all the managers with African-Americans or blacks" constitutes "direct evidence" of discrimination.  (Mayer Dep. 140/13-16; see also Winter Dep. 168/8-22).  Any such attempt by Plaintiff fails for several reasons.  First, Day never made this statement that has been attributed to him.  (Day Dep. 91/15-21).  Rather, Day's actual statement was as follows:

> What I was describing to them was a couple of things.
>
> One was a process.  And that is that in order to – in order to fairly represent both the community that we were doing business in, Montgomery which is 50 percent African-American by census, and the visions of Onyx Capital Ventures of being more than a sham with one black guy at the top, the only way to – the only way to address that when – and – and by the way, I looked around and was pointing out the fact that there were zero African-Americans in management at Piknik in the town that's 50% black, that you had to address that by a process, and that that needed to be – African-Americans needed to become part of the management hiring process.
>
> Doesn't mean we're going to take blacks over whites, it means you got to present African-American candidates when openings were there.

(Id. at 170/19-25; 171/1-13; see also id. at 95/7-24 (explaining that his hiring process included the consideration of qualified African-American candidates but that he awarded the job to the most qualified candidate regardless of race)).  Clearly, what Day actually said is not evidence of any discriminatory intent.

However, even assuming, arguendo, that Day made the statement as alleged by Plaintiff, the statement still falls short of rising to the requisite level of direct evidence.  The statement was

not made in connection with the decision making process at issue and, in fact, was purportedly made approximately two years before Plaintiff's termination. (Mayer Dep. 135/22-23; 136/1-4 (stating Mr. Day made the statement within a few months of Onyx acquiring majority ownership of Piknik in August 2003)). Significantly, after the alleged statement was allegedly made, Day even increased Plaintiff's salary (Winter Dep. 231/13-18; Winter Dep. DX5), which belies Plaintiff's assertion of racial animus. Because the alleged remark was not directly related to Plaintiff or any decision affecting his employment, it cannot constitute direct evidence of discrimination. Standard, 161 F.3d at 1330; Scott, 295 F.3d at 1227-28; Burrell, 125 F.3d at 1393. Accordingly, any reliance on it falls short.

Defendants also anticipate that Plaintiff may rely on an email from Defendant Hicks as "direct evidence" of discrimination. (Winter Dep. DX4). In this email dated February 16, 2005 summarizing a meeting with a customer, Hicks noted that "[w]e discussed our desire to recruit talented minorities in operating roles within the company." (Id.) This email falls short of being direct evidence. It has absolutely nothing to do with Plaintiff or his employment. Indeed, Hicks was not even involved in any decision affecting Plaintiff's employment. (Hicks Dep. 92/24-93/10). As such, the email falls short of constituting direct evidence. See Trotter v. Bd. of Trustees, 91 F.3d 1449, 1453-54 (11th Cir. 1996) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision"); Standard, 161 F.3d at 1330 (stating "remarks by non-decisionmakers…are not direct evidence of discrimination").

Moreover, for this email to establish the existence of any discriminatory intent would require the drawing of inferences and presumptions. It would require a presumption that "operating roles" included Plaintiff's position. It would similarly require a presumption and

19

inference that "recruit[ing]" minorities also meant terminating Caucasian employees to create vacancies – none of which has any basis in fact Because inferences and presumptions must be drawn from this email to establish any discriminatory intent, this email from Hicks is not direct of evidence of discrimination.  See Joe's Stone Crab, 220 F.3d at 1286 (stating direct evidence of discrimination must "establish the existence of discriminatory intent…without any inference or presumption").

> **B.     The Defendants are entitled to summary judgment because Plaintiff cannot establish a prima facie case of discrimination, all decisions regarding his employment were made for legitimate non-discriminatory reasons, and he cannot adduce any evidence that these legitimate non-discriminatory reasons are merely pretext for intentional discrimination.**

Because Plaintiff has no direct evidence of race discrimination, he must rely on circumstantial evidence to show a discriminatory motive.[3]   The law governing disparate treatment cases involving circumstantial evidence is well-settled.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  First, a plaintiff must establish a prima facie case by showing (1) that he belongs to a protected group; (2) that he experienced an adverse job action; (3) that he was qualified for his position; and (4) that his employer treated similarly-situated persons outside of the protected group more favorably.  Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1185 (11th Cir. 1984).  If a plaintiff successfully establishes a prima facie case, a defendant must then articulate legitimate non-discriminatory reasons for its actions.  McDonnell Douglas, 411 U.S. at 802.  After a defendant articulates its reasons, a plaintiff must come forward with substantial evidence that the articulated reasons are pretext –lies – to cover up intentional discrimination.  Id. at 804.

---

[3]     The test for intentional discrimination in suits under 42 U.S.C. § 1981 is the same as under Title VII. Ferrill v. The Parker Group, Inc., 168 F.3d 468, 472 (11th Cir. 1999).

    1.     Plaintiff's claims that he was treated disrespectfully by Patrice Daniels and Chris Day because of his race and marginalized by management fail as a matter of law because he suffered no adverse employment actions, and as such, he cannot establish a prima facie case of discrimination.

Plaintiff's claims of disrespectful treatment and marginalization fail to rise to the level required for an adverse employment action.[4] The law is clear that "not everything that makes an employee unhappy is an actionable adverse action." Stavropoulos v. Firestone, 361 F.3d 610, 618 (11th Cir. 2004); see also Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001) (stating "not all conduct by an employer negatively affecting an employee constitutes an adverse employment action"). Rather, the Eleventh Circuit explained the standard for establishing an adverse employment action as follows:

> [T]he employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way….[T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action…, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

Davis, 245 F.3d at 1239 (italics in original); Shotz v. City of Plantation, 344 F.3d 1161, 1181-82 (11th Cir. 2003) (To demonstrate a material change in employment, a plaintiff must "'show a serious and material change in the terms, conditions, or privileges of employment. . . as viewed by a reasonable person in the circumstances.'" (quoting Davis, 245 F.3d at 1239)). The Eleventh Circuit has held that employer criticism does not amount to an adverse employment action:

> Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. Expanding the scope of Title

---

[4] While the Defendants contend that Plaintiff's voluntary decision to resign from his job was not an adverse employment action, this motion for summary judgment will assume, *arguendo*, that Plaintiff's severance offer could constitute an adverse employment action.

> VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance.  Federal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee.

Shotz, 344 F.3d at 1182 (citing Davis, 245 F.3d at 1239); see also Davis, 245 F.3d 1232, 1241-42 (11th Cir. 2001) (citing Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998) (holding that "negative performance evaluations, standing alone, cannot constitute an adverse employment action"), and Rabinovitz v. Pena, 89 F.3d 482, 488 (7th Cir. 1996) (rejecting argument that "a low performance rating is always an adverse employment action"), and Meredith v. Beech Aircraft Corp., 18 F.3d 890, 896 (10th Cir. 1994) (holding that an unjustified negative performance evaluation is not actionable); Merriweather v. Ala. Dep't of Public Safety, 17 F. Supp. 2d 1260, 1275 (M.D.Ala. 1998) (holding plaintiff failed to establish a prima facie case because the written counseling she received did not qualify as an adverse employment action.

None of Plaintiff's claims of marginalization and "disrespectful" treatment constitute actionable claims of intentional discrimination because he suffered no adverse employment action that seriously and materially altered the terms, conditions, and privileges of his employment.  Plaintiff maintains that the Defendants and other management personnel failed to listen to his suggestions, failed to give him positive reinforcement, and emasculated his role within the company.  However, Plaintiff's role within the company remained constant during his tenure.  (Winter Dep. 58/13-15).  Although his job title changed, Plaintiff continued to oversee sales, marketing, and customer relations.  (Id. at 58/13-15 ("I mean, I always did the same job, but the titles kept changing.")).  Furthermore, Plaintiff's claim that he was marginalized is belied by the fact that Day increased Plaintiff's salary by 8%-9%.  (Id. at 231/13-18; Winter Dep.

DX5).  He could hardly have suffered an adverse employment action when the Defendants actually <u>increased</u> his salary.  Additionally, although Plaintiff may have felt his suggestions were worthy of more attention or that he deserved positive reinforcement, federal anti-discrimination law is not intended to remedy everything that makes an employee unhappy.  <u>Davis</u>, 245 F.3d at 1242.

In sum, Plaintiff cannot establish a <u>prima facie</u> case of discrimination on his claim that his role within the company was emasculated and that Patrice Daniels (who is not even a party to this lawsuit) and Day treated him disrespectfully because of his race.  None of these claims involve an adverse employment action, and Defendants are entitled to judgment as a matter of law.

> 2.  <u>Plaintiff's claim that his salary was reduced and his position was marked for elimination because of his race fails as a matter of law because he cannot establish a prima facie case; however, even if he could establish a prima facie case, this claim still fails because the decision was based on a legitimate, non-discriminatory reason and he cannot adduce any evidence that this reason is merely a cover up for intentional race discrimination.</u>

Plaintiff cannot prove a <u>prima facie</u> case that his salary was reduced and that his position was eliminated because of his race because he was not replaced by an employee outside his protected class.  Plaintiff's bare assertion that he was replaced by Hicks lacks any basis in fact.  Winter testified:

> Q:  And you contend that your "responsibilities were replaced by Henry Hicks, a black male"?
> A:  Yes.
> Q:  And what is the basis of that contention?
> A:  That I was replaced by Henry, a black male?
> Q:  Right.
> A:  That he continued in that role.

(Winter Dep. 355/3-13).  Contrary to Plaintiff's blanket allegation, he was not replaced at all; rather, his job duties were divided among Anthony Barber (African American), Day (Caucasian),

Hicks (African American), and Bob Lampert (Caucasian). (Hicks Dep. 151/24-152/9; Day Dep. 168/21-25).

Even assuming arguendo that only Hicks assumed Plaintiff's job responsibilities, Plaintiff's claim still fails as a matter of law because Hicks was a pre-existing senior employee, not a new hire, and thus did not "replace" Plaintiff. In Tidwell v. Carter Products, 135 F.3d 1422 (11th Cir. 1998), the Eleventh Circuit held that when a pre-existing employee's position subsumes a terminated employee's position, then the pre-existing employee is not "hired to replace [the terminated employee]." Id. at 1427. Thus, replacement must actually occur when a new employee is hired and not when a pre-existing, senior employee takes over the terminated employee's position.

In this case, Hicks supervised Plaintiff for 19 months and the two shared certain responsibilities until Plaintiff resigned. (Day Dep. 163/10-164/6). Thus, under Tidwell, Hicks did not replace Plaintiff. Instead, Plaintiff's position was eliminated and his duties were subsumed by Hicks, a pre-existing, senior employee. Plaintiff cannot, therefore, establish that he was replaced by Hicks for the purpose of a discrimination action. For this reason, Defendants are entitled to judgment as a matter of law.

Alternatively, Plaintiff cannot establish a prima facie case because there were no available positions for Plaintiff when the decision was made to eliminate his position. Because Plaintiff's position was eliminated during a reduction in force, Plaintiff must prove that he "was qualified for another position at the time of termination[] and [] that the employer intended to discriminate in failing to consider the plaintiff for another position." Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995) (citing Wilson v. AAA Plumbing Pottery Corp., 34 F.3d 1024, 1028 (11th Cir.1994)); see also Mitchell v. USBI Co., 186 F.3d

1352, 1354 (11th Cir. 1999) (examining reduction in force in criteria within the context of age discrimination). However, the undisputed evidence demonstrates that there were no available positions in which to transfer Plaintiff when the decision was made to eliminate his position and reduce his salary. (Day Dep. 169/5-9). Day testified that had a position in a "need area" been available, he would have slotted Plaintiff into that position. (Id.) Plaintiff simply has no evidence that Day failed to consider him for any other position because of his race.

Even if the Court finds that Plaintiff can prove a prima facie case of race discrimination, this claim still fails as a matter of law because his salary was reduced and his position was being eliminated for a legitimate, non-discriminatory reason – namely, his position was not necessary during Piknik's cash crisis – and Plaintiff cannot adduce any evidence that Day is lying about this being the true reason for the decision. By June 2005, SouthTrust had not extended its forbearance agreement with Piknik, Piknik was still in default for violating certain covenants in its lending agreement with SouthTrust, and it was becoming more and more likely that SouthTrust would exercise its right to take control of Piknik from Onyx. (Day Dep. 87/23-88/10; 108/8-110/3). In light of the "increasingly tight, tight, tight, tight, tight, situation," Day had to make "painful and difficult" decisions regarding personnel. (Id. at 117/22-24).

One of these "painful and difficult" decisions was to eliminate Plaintiff's position. (Id.) Day believed Plaintiff's position needed to be eliminated. Day testified that Piknik's "issue wasn't that it needed more business. It was that [Piknik] needed to be able to run what [it] had." (Id. at 168/18-20). To focus on the current accounts and orders, Day testified that it was appropriate and necessary for some management personnel to be relocated or laid off so that the day-to-day operations employees could continue manufacturing the products. (Id. at 168/5-11). Day determined that Piknik no longer needed an employee dedicated solely to contract

administration and thus decided to eliminate Plaintiff's position.  (Id. at 168/12-17; see id. at 168/21-25 ("And between myself, Anthony Barber, Henry Hicks, we had enough knowledge to be able to cover the contract administration elements that were probably the most valuable or acute aspects of Bob's responsibility"; Hicks Dep. 155/16-23 ("there were a number of people who were able and capable and, in fact, doing some of the work that [Plaintiff] was – much of the work that [Plaintiff] was doing, as well.  So there were already those people in the company who could take on those responsibilities")).  The evidence is clear that Piknik was under serious financial constraints when Day decided to eliminate Plaintiff's position.  Indeed, shortly after Plaintiff resigned, Piknik ceased all operations and ultimately filed for bankruptcy.  (Winter Dep. 329/1-3).  Clearly, Plaintiff's job was being eliminated due to the "cash crisis" that Piknik faced, not because of his race.

Other evidence demonstrates that Day had no discriminatory animus against Plaintiff because of his race.  For example, shortly before Plaintiff left Piknik, Day increased Plaintiff's salary by 8%-9%.  (Id. at 231/13-18; Winter Dep. DX5).  Additionally, instead of terminating Plaintiff's employment immediately after deciding to eliminate Plaintiff's position, Day chose to reduce Plaintiff's salary and continue his employment for an additional five weeks as a quasi-severance package, despite the bank's instructions not to pay severance to any employees.  Day summarized this decision-making process as follows:

> In Winter's case, his job was being eliminated, and the bank had prohibited us from paying severance.  So as a result of that…I told Henry Hicks, well, let's try to find a humane thing to do for [Plaintiff] since he is relatively high paid, he as (sic) family obligations, and since we can't pay him severance, let's give his pay cut rather than a severance and keep him sort of employed in place but looking for his next job.

26

> So that 50 percent pay was to allow him to go look for another job.
> He wasn't – it was to try to give him a running start on his next
> job.

(Day Dep. 140/6-19; see also Hicks Dep. 109/18-24; 153/9-2)).

In fact, there is substantial evidence refuting any allegation that Day's decisions were motivated by race. Day testified that in discussions he had with representatives of Pepsi and Proctor and Gamble, who indicated they would like to see Onyx operated more like a social program, he responded:

> And we always pushed back and said, no, we're about ownership
> and management control, and a slow sustainable process of
> introducing African-Americans into management ranks in the
> companies that we acquire.
>
> Nothing would have been more disruptive than to go in and turn a
> place upside-down just for racial reasons.
>
> And oh, by the way, we plan to be in business and acquire another
> companies, and you don't think word would get out to the other
> companies we're looking at that, oh, yeah, you better watch out, all
> you white guys, you're going to – we never want to do that. That's
> bad business.

(Day Dep. 170/19-172/8). Further, in addition to raising Plaintiff's salary, Day also raised the salaries of Plaintiffs Jerry MacCartney (Caucasian) and Bert Mayer (Caucasian). (Id. at 172/11-17). Day also hired several Caucasians in management positions at Piknik.[5] Similarly, all three employees that Defendant Hicks hired during his tenure at Piknik were Caucasian. (Hicks Dep. 65/20-66/13; 150/14-18). Day also terminated the employment of African-Americans. (Day Dep. 175/5-11). These facts certainly do not suggest that either Day or Hicks was "out to get" Plaintiff or any other employee because of their Caucasian race.

---

[5] Day hired (1) Carl Bleier – General Manager and Vice President of the Condiments Division, (2) Jessica Daniels – Quality Manager of the Brundidge facility, (3) Allan Walters – Quality Manager of the Day Street facility, and (4) Robert Niedbalski – Corporate Controller. (Day Dep. 94/14-24; 95/18-20; 173/22-174/14).

**D.    Jeff Larry is due summary judgment because he did not participate in the decision to terminate Plaintiff's employment and thus he cannot be held personally liable.**

To the extent the Court determines that a trial is warranted on Plaintiff's claim of reverse discrimination, Larry is still entitled to judgment as a matter of law because he was not personally involved in the decision to terminate Plaintiff's employment.

An individual may be held personally liable under 42 U.S.C. § 1981 only if he was "personally involved in the discrimination" by having "directly participated" in the alleged discriminatory acts.   Al-Khazraji v. Saint Francis College, 784 F.2d 505, 518 (3rd Cir.1986); see also Wallace v. DM Customs, Inc., No. 8:04-cv-115-T-23TBM, 2006 WL 2882715, at *7 (M.D. Fla. 2006) ("To establish a claim for individual liability under § 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action . . . .  The claim must be predicated on the actor's personal involvement.'"); Richard v. Bell Atl. Corp., 946 F. Supp. 54, 74 (D.D.C. 1996); Daulo v. Commonwealth Edison, 892 F. Supp. 1088, 1091 (N.D. Ill. 1995) (noting that "Section 1981 liability against an individual demands personal involvement in discrimination").

Larry was not "personally involved" in the alleged discrimination.  There is no evidence that Larry was personally involved in the termination decision.  (See Day Dep. 131/21-132/11 (stating he informed Mr. Larry of the termination decision to ensure Larry was "not caught off guard or surprised by anything that may come back . . . .")).  Accordingly, Larry is entitled to summary judgment.

28

**IV.      CONCLUSION**

For all of the foregoing reasons, summary judgment is due in favor of the Defendants on all of Plaintiff's claims, and accordingly, Defendants respectfully request that the Court dismiss each and every claim brought by the Plaintiff, with prejudice.

Respectfully submitted,

s/ Robert E. Poundstone IV (POU006)
Robert E. Poundstone IV (POU006)
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
E-mail: bpoundstone@bradleyarant.com

OF COUNSEL
George R. Parker
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701

Jennifer J. McGahey
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 29, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

        K. Anderson Nelms, Esquire
        Law Offices of Jay Lewis
        P.O. Box 5059
        Montgomery, AL 36103

                      s/ Robert E. Poundstone IV
                      OF COUNSEL

30