# Exhibit 2

VIDEOTAPED DEPOSITION
CHRISTOPHER JAMES DAY


UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA

-----------------------------------------
JERRY A. MacCARTNEY, et al.,


                Plaintiffs,


      - vs -      Index Number
                2:05cv 1207-MHT

PIKNIK ACQUISITION CORP., LLC, et al.,


                Defendants.
-----------------------------------------


      Videotaped deposition of CHRISTOPHER

JAMES DAY, taken pursuant to the Federal Rules of


Civil Procedure, at the Hampton Inn, 4 West Oak


Hill Road, Jamestown, New York, on September 12,


2007, commencing at 9:50 a.m., before ANN M.


SAWYER, Notary Public.



Page 2

1    APPEARANCES:   LAW OFFICES OF JAY LEWIS,
       By K. ANDERSON NELMS, ESQ.,
2         847 South McDonough Street,
          Montgomery, Alabama 36104,
3         Appearing for the Plaintiff.
4
          BRADLEY, ARANT, ROSE & WHITE,
5         By ROBERT E. POUNDSTONE, ESQ.,
          Alabama Center for Commerce,
6         401 Adams Avenue,
          Suite 780,
7         Montgomery, Alabama 36104,
          Appearing for the Defendant.
8
9    PRESENT:     MATTHEW W. MESSING, Videographer.
10
11       (STIPULATIONS:  Waive filing and signing of
12       the transcript, waive Oath of the Referee,
13       reserve all objections until trial, with
14       exception of objections as to form.)
15
16
17
18
19
20
21
22
23
24
25

Page 3

1    C H R I S T O P H E R   J A M E S   D A Y, 79 East
2    Terrace Avenue, Lakewood, New York, 14750, after
3    being duly called and sworn, testified as follows:
4
5        MR. NELMS:  Usual stipulations?
6        MR. POUNDSTONE:  Yes.
7
8        EXAMINATION BY MR. NELMS:
9
10       Q.  Mr. Day, we've met already.  My name is
11   Andy Nelms, and I represent the Plaintiffs in this
12   matter.  And we're here for your deposition today.
13       Have you ever before deposed before?
14       A.  Yes.  Once.
15       Q.  Once?  What was the occasion?
16       A.  It was in a -- another suit brought by,
17   I guess, it's the stay of Piknik against Onyx
18   Capital Ventures and other individuals.
19       Q.  Approximately when did you give that
20   deposition?
21       A.  Around the first of the year, this
22   year.
23       Q.  Okay.  Are you -- are you a named
24   defendant in that action?
25       A.  Yes, I am.

Page 4

1        Q.  Who was your representative counsel, if
2    any, in that deposition?
3        A.  At that time, it was the law firm of
4    Katten, Muchin, Rosenman.
5        Q.  Where are they located?
6        A.  In Chicago.
7        Q.  Okay.  Do you remember the lawyer's
8    name who represented you?
9        A.  Jeffrey Chadwick.
10       Q.  Chadwick?
11       A.  C-H-A-D-W-I-C-K.
12       Q.  Thank you.
13       And you do reside here in Jamestown now; is
14   that correct?
15       A.  Yes.
16       Q.  And how long have you been a resident
17   of Jamestown?
18       A.  About three weeks.
19       Q.  Okay.  Three weeks?
20       A.  Yeah.
21       Q.  Glad we caught you.
22       A.  Yeah.
23       Q.  You've been deposed recently, and I'm
24   sure they reviewed what a deposition is all about
25   and what's expected of you and -- and what, you

Page 5

1    know, rights you have.  I just want to review a few
2    things.
3        First of all, are you feeling okay today?
4        A.  Um-hum.  Yes.
5        Q.  Any reason why --
6        A.  Thank you for clarifying.  Yes.  I was
7    hoping they would pick up my head nod on the video.
8        Q.  Well, they will, but Ann can't pick it
9    up on that stenographic machine.
10       Any reason why you can't testify truthfully
11   and honestly today?
12       A.  No.
13       Q.  Okay.  If I ask any questions that you
14   don't understand, please feel free to ask me to
15   explain myself or clarify the question.
16       You have the right to stop the deposition at
17   any time.  I encourage you to do so if you're
18   uncomfortable, need to use the rest room, take a
19   break for any reason, even if you'd like to speak
20   to Mr. Poundstone who's your lawyer here today.  I
21   will not object in the least.  In fact, as I said,
22   I encourage you to do so.
23       This deposition shouldn't last too long,
24   maybe two, three hours tops.  And you are, again,
25   welcome to take any breaks that you feel that you

Page 6

1   need during the course of the deposition.
2       Where did you live before you moved to
3   Jamestown?
4       A.  Most recently in the -- the Cleveland,
5   Ohio area.
6       Q.  Okay.  And do you remember the address?
7       A.  Sure.  It's 17710 Shaker Boulevard in
8   Shaker Heights, Ohio.
9       Q.  Okay.  And what -- what caused you to
10  leave --
11      A.  Sorry?
12      Q.  -- Cleveland?
13      A.  Job change.
14      Q.  Who were you working for in Cleveland?
15      A.  Core Systems, LLC.
16      I'll just turn this off.
17      Q.  And your employment with Core Systems
18  ended?
19      A.  On August 10th.
20      Q.  Okay.  Are you employed now?
21      A.  No.
22      Q.  Okay.  Let me get this question out of
23  the way.  Do you have any relatives who live within
24  80 miles of Montgomery, Alabama?
25      A.  No.

Page 7

1       Q.  Okay.  Let's talk about your education
2   for a minute.  Where did you attend high school?
3       A.  I received my diploma from Saint
4   Charles High School, which is a western suburb of
5   Chicago.
6       Q.  Okay.  What year did you graduate?
7       A.  Received a diploma in 1981.
8       Q.  Okay.  You seemed to qualify that.
9   Why?
10      A.  I left high school after my junior year
11  and went right to college.  And then received
12  credit for the first couple of classes in college
13  towards the diploma.
14      Q.  Got you.  I did the same thing.
15      A.  Oh.
16      Q.  It was the best move I ever made.  Just
17  didn't get to play football that last year.
18      Did you go to college, obviously?
19      A.  Yes, I did.
20      Q.  Where did you go to college?
21      A.  Graduated from North Western University
22  in Evanston, Illinois.
23      Q.  What year?
24      A.  It had a similar circumstance.  I
25  received the degree, the undergraduate degree in

Page 8

1   1984 though I left the undergraduate institution in
2   1983 to attend the graduate school of business.
3   The Kellogg School.
4       Q.  Kellogg.  Right, Kellogg School.
5   MBA program?
6       A.  Which I completed in 1985.
7       Q.  Good school.
8       A.  Thank you.
9       Q.  All right.  And have you had any formal
10  education since your graduation from Kellogg?
11      A.  You know, I've attended executive
12  education classes.  I -- I took a week-long
13  negotiations class at Kellogg prior to a collective
14  bargaining that we did in the mid '90s.  Just --
15  nothing in -- that's a degree or certificate
16  program, no.
17      Q.  Okay.  I guess from there, a Ph.D.
18  would be your only option, would it?
19      A.  Or masters in other subjects, I guess.
20      Q.  True enough.
21      Well, let's talk about your employment
22  history then.  Since graduating from Kellogg,
23  beginning with your first job after Kellogg, tell
24  me about your employment.
25      A.  My first job after Kellogg, I joined

Page 9

1   the investment banking firm of Kidder Peabody and
2   Company, and was employed there as a generalist
3   investment banking associate working on corporate
4   finance, merger and acquisition activities.
5       Q.  And how long did you stay at Kidder
6   Peabody?
7       A.  I was there for one year.  The firm was
8   acquired by General Electric near the end of my
9   time.
10      And -- and then I went and left the firm to
11  join Morgan Stanley, also in Chicago.  And that was
12  in 1986.
13      Q.  What did you do at Morgan Stanley?
14      A.  At Morgan Stanley, I actually moved
15  over into the capital markets and derivatives area,
16  and was a -- the term was called a sales trader,
17  somebody who called on professional trading
18  accounts to support the on-the-floor derivatives
19  trading activities -- when I say on the floor, I
20  mean on the trading floor -- and the particular
21  product area was equity options.
22      And Chicago is a big trading community.  So
23  we would -- the New York trading desk at Morgan
24  Stanley would originate the product flow, they
25  would call us in Chicago, and we would call on the

Page 10

1  professional trading accounts to try and get the
2  other side of the transaction, thereby generating
3  commissions and leveraging the firm's capital.
4      Q.  How long did you stay with Morgan
5  Stanley?
6      A.  Three years.
7      Q.  Other than the title position of sales
8  trader, did you have any other positions while at
9  Morgan Stanley?
10     A.  For about nine months before leaving, I
11 moved over out of derivatives and into just
12 straight equity sales.
13     Q.  So, would it be 1989 that you left
14 Morgan Stanley?
15     A.  That's correct.
16     Q.  What was the cause of your leaving?
17     A.  There was a reduction in force.  And
18 after the market crashed at the end of 1987, the
19 professional trading accounts really dried out, the
20 number of accounts that I was calling on went belly
21 up.  And they -- the liquidity that was in the
22 options market was now going to be -- they tried to
23 give me an opportunity to move over into the equity
24 sales side, but it was really more of a temporary
25 move.

Page 11

1      Q.  And after leaving Morgan Stanley, what
2  was your next employment?
3      A.  I joined Sears, Roebuck in Chicago as
4  a -- as manager of mergers and acquisitions in
5  their specialty merchandising group.
6      Q.  How long did you stay with Sears?
7      A.  About three years.
8      Q.  You stayed mergers and acquisitions the
9  entire time?
10     A.  No.  I, the -- the group was formed to
11 bring in people who had had M and A and consulting
12 experience, to help go out and acquire companies
13 that were augmentive to the core of Sears'
14 business.
15     And then the appeal was once you did that,
16 you then had the opportunity to go take an
17 operating job within one of those businesses.
18     So, in my case, I was able to become the
19 director of marketing for the computer service
20 business at Sears.  And I did that for about a year
21 and a half.  So it was about half and half during
22 the three-year time.
23     Q.  Okay.  Director of marketing and
24 computer --
25     A.  In the computer service business.

Page 12

1      Q.  -- service.
2      A.  Sears sold about a billion and a half
3  dollars of computers annually, and they were not --
4  they were using the same people to fix your washer,
5  dryer and television to fix the computers, and they
6  were not doing a very good job of it.  So, we
7  revamped that organization and put in new marketing
8  programs.  And I was responsible for that.
9      Q.  Regarding your employment at Sears, and
10 specifically regarding the end of your tenure of
11 employment with Sears, what was your -- what do you
12 estimate your annual salary to be?  To have been?
13     A.  I'm trying to remember.  I think the
14 salary at that time when I left Sears was about
15 $78,000 a year.
16     Q.  And -- and that would be 1991?
17     A.  1992.
18     Q.  And what was your next full-time
19 employment after leaving Sears?
20     A.  I joined Packaging Corporation of
21 America, which was a subsidiary of Tenneco, as
22 manager of corporate development.
23     Q.  What did that job entail?
24     A.  It was almost an
25 assistant-to-the-president role.  It was strategy

Page 13

1  work, special assignments, looking at acquisitions
2  and divestitures, doing financial analysis on
3  specific product lines and overall decision support
4  for the CEO.
5      Q.  Okay.  Any management of actual
6  operations?
7      A.  Not in that particular role.
8      Q.  Okay.
9      A.  Again, it was actually a similar -- I
10 was recruited by Russell Reynolds, the large
11 recruiting firm, to take the position.  And the
12 promise was they were looking for someone who had
13 the analytical horsepower and could come in and
14 learn the business through these assignments, and
15 then take operating roles after that.
16     Q.  How long were you with Packaging
17 Corporation of America?
18     A.  A total of six years.  Held a number of
19 different assignments.
20     Q.  Would that be to 1998?
21     A.  Yes, that's right.
22     Q.  After being the manager of corporate
23 development, what roles did you fulfill as an
24 employee of Packaging Corporation of America?
25     A.  I moved in to the director of

1  manufacturing planning for the specialty packaging
2  group at the start of 1994.
3      And then in the middle of 1994, had the --
4  with the full support of the company, had the good
5  fortune of being selected as White House fellow,
6  and spent a year working in the Clinton White House
7  as the director of Middle East and Mediterranean
8  trade for U.S. Trade Representative Mickey Kantor,
9  K-A-N-T-O-R.
10     I took a leave of absence from -- from
11  Tenneco. But the -- the chairman and the CEO of --
12  of Tenneco were both former White House fellows,
13  and they were very supportive of the program and
14  its aims. And then returned to Tenneco at the end
15  of that year to become the group controller of the
16  primary mill group which is --
17     Q.  I'm sorry, I didn't hear you. Of the
18  primary --
19     A.  -- primary mill group was the largest
20  division of -- PCA, in 1995, renamed itself as
21  package -- Tenneco Packaging. So, if I use the
22  terms interchangeably, I'm talking about the same
23  organization.
24     Q.  What is -- what is primary middle
25  group?

1      A.  It's the -- it is the group of assets,
2  paper mills. So, we had liner board mills,
3  corrugated medium mills, and recycled paperboard
4  mills throughout the country that were in support
5  of the converted packaging operations that were --
6  that resided in a separate division.
7      Q.  And you became the manager of --
8      A.  I was the group controller, so I
9  controlled --
10     Q.  Controller?
11     A.  -- basically I was the head of finance
12  for that group, reporting to the senior VP of the
13  mills.
14     Q.  Right. And was that the last position
15  you held with Tenneco?
16     A.  No. I did -- I did that for
17  approximately a year, and then was given the
18  opportunity to be the plant manager of the Mentor,
19  Ohio folding carton plant. And that took place in
20  August of 1996.
21     Q.  Was that a promotion?
22     A.  It was a further developmental role.
23  It was one of the nice things about Tenneco is that
24  I think you can kind of see from the different jobs
25  that I was having was that my MBA was in finance

1  and accounting, I had strategy work, I'd had
2  finance work, I'd had acquisition work, and they
3  were trying to round out my experience by giving me
4  more direct operating assignments.
5      Q.  Was that the last job role you had at
6  Tenneco?
7      A.  Yes.
8      Q.  Okay.
9      A.  Yes.
10     Q.  Do you recall what your ending annual
11  salary was at Tenneco in 1998?
12     A.  Yeah. It was about $135,000. Again,
13  in the -- in the salary, not any of the variable
14  compensation.
15     Q.  Talk to me about the variable
16  compensations. What other kind of compensations
17  might you have been afforded? And let me --
18  specifically in 1998.
19     A.  Sure.
20     Q.  Is that someone at the door?
21     Sorry.
22     A.  What was customary for somebody at my
23  level was to have salary and annual incentive,
24  which would be some subjective and some based on
25  the operating performance of the business that you

1  were in. Stock options, which had a vesting over
2  time. And then other, as you -- as you rose in the
3  company, further perks.
4      Q.  And I know that I'm asking you to
5  generalize, but --
6      A.  Sure.
7      Q.  -- what would your additional income
8  have been on top of your base salary in -- let's
9  just be specific to the last year of your
10  employment with Tenneco.
11     A.  The cash portion, I'd say, was probably
12  $155,000. So about 20,000 of additional cash
13  compensation.
14     Q.  Okay. So, an extra $20,000 on top of
15  your base salary?
16     A.  Yep.
17     Q.  Okay. And what was the cause or reason
18  for you ending your relationship -- your employment
19  relationship with Tenneco?
20     A.  I was recruited to become the general
21  manager of the closure business at Silgan Holdings
22  S-I-L-G-A-N. It's a publicly-traded packaging
23  company, about 2 billion in revenue.
24     Q.  And, I'm sorry, to take what position?
25     A.  General manager of the closure

Page 18

1  division.
2      Q.  What is closure division?
3      A.  Closures are bottle caps.  So, things
4  that would be -- food and beverage.  It was about
5  110 million dollar annual revenue business that I
6  had sole responsible for.
7      Q.  Okay.  And that would be in 1998?
8      A.  Yes.  That's right.
9      Q.  And how long did you work for Silgan?
10     A.  Yeah, Silgan.  Well, I had -- I had two
11  positions with Silgan.  I was in the closure
12  business for just about two years.  And while I was
13  in the closure business, it was a little bit --
14  Silgan's a little bit unique.
15     Silgan is two people's last name, Silver and
16  Horrigan, who founded the business in the late
17  1980s, and they were backed by Morgan Stanley
18  Capital Partners.
19     And Morgan Stanley retained about a
20  30-percent ownership of the firm, even at the time
21  that I was there in 1998, and still had two seats
22  on the board.
23     And Greg and Phil, Greg Horrigan and Phil
24  Silver, owned just over 50 percent, and then the
25  rest was a public float.

Page 19

1      The -- I bring that up to say that these
2  were, despite it being a 2 billion dollar
3  publically-traded company, these were still
4  entrepreneurial guys who were accessing the capital
5  markets to further their strategies.
6      And if you think of the context of the time
7  frame, I joined them in the spring of 1998 through
8  the fall of 1999, the E-commerce and internet hay
9  day was going on, and they had this deep
10  relationship with Morgan Stanley Capital Partners,
11  and I was the only member of the management team
12  that was under the age of 55.  And at that time I
13  was 35.
14     And so, I was proposing some strategies to
15  try and deal with this very old-line metal closure
16  business that involved taking advantage of
17  technology.
18     And the long and the short of it is, is that
19  I proposed some internet strategies that Greg and
20  Phil really liked.  They presented them to the
21  board, which was made up of the Morgan Stanley
22  gentlemen I mentioned.
23     Morgan Stanley said to Greg and Phil, Hey,
24  we're sitting on a mountain of money at the point
25  of B-to-B E-commerce -- B-to-B is an abbreviation

Page 20

1  for business-to-business E-commerce space -- and
2  you guys are our packaging experts.  And do you
3  think there's something that you would guys would
4  like to try and put forward that we could back?
5      And they said, Well, we -- we have just the
6  guy to do it.
7      So, I wrote the white paper that convinced
8  Morgan Stanley and Silgan and the consulting firm
9  that we hired, Diamond Technology Partners, to --
10  to back -- create and back an entity which became
11  Packtion, P-A-C-K-T-I-O-N.
12     Q.  I'm sorry, spell it again.
13     A.  P-A-C-K-T-I-O-N.
14     And we launched Packtion in the spring of
15  2000.
16     Q.  Did you use your prior employment with
17  Morgan Stanley as -- as -- to help with the -- the
18  new relationship with Packtion?
19     A.  It -- it didn't need to, because Silgan
20  had this deep relationship with Morgan Stanley.  It
21  sort of came in with the credibility of having once
22  been at the firm, did help.
23     Q.  So what role did you assume at
24  Packtion?
25     A.  I was employee number one, and became

Page 21

1  the co-president.
2      So, one of my other former Tenneco
3  colleagues who I had recruited to Silgan, he took
4  the co-president job along with me.
5      Q.  And what exactly were your
6  responsibilities as co-president of Packtion?
7      A.  We shared the responsibility for
8  creating and running the firm.
9      There were -- there were sort of natural
10  divisions of labor.  I spent more time on the
11  recruiting, sales and marketing, the business
12  development, alliances, merger and acquisition.  I
13  was the primary face to the board of directors.
14     But, it was such a collaborative
15  environment, we -- there -- there wasn't anything
16  that I wasn't involved in.
17     And I think that's probably the same for
18  Bill McLennan, M-c-L-E-N-N-A-N, and Bill was the
19  co-president of -- of Packtion with me.
20     Q.  All right.  Now, you said that you had
21  been with Silgan for two years.  Was -- was it in
22  2000 that you went to Packtion?
23     A.  Yes.  And -- and the reason why it --
24  it wasn't a clean -- it wasn't a clean break
25  because Greg and Phil were backers of the entity.

Page 22

1    And they, in fact, at the time that I signed
2    my employment agreement with Packtion and -- and
3    formally took that job, I still had a, I don't know
4    what you'd want to call it, like a boomerang letter
5    that said that if anything happened at Packtion, if
6    things didn't work out, that they made a commitment
7    to provide me equal or better employment at Silgan.
8        Q.  All right.  When you left Silgan, if
9    you recall, what was your annual base salary?
10       A.  Annual base salary of 191,000 a year.
11       Q.  And any bonuses or incentives that you
12   might receive?
13       A.  Yes.
14       Q.  Let me -- let me -- that's a terrible
15   question.
16       I -- I just want an idea of what extra
17   income you may have received during, let's just
18   say, your last year, 1998, of Silgan.
19       A.  1999?
20       Q.  1999, I'm sorry.
21       A.  Yeah, it -- the bonus I received in
22   1999 was $130,000.
23       Q.  On top of the 191?
24       A.  On top of the 190.  We had had a
25   fantastic year in turning around the closure

Page 23

1    business, and we maxed out on the incentive.
2        Q.  Okay.  Let's move on to Packtion then
3    in 2000.
4        Describe for me in 2000 what your daily job
5    duties and responsibilities would have been as
6    co-president of Packtion.
7        A.  I'll tell you, that was one of the most
8    fun jobs I've ever had.
9        It was -- I was working around the clock,
10   trying do create something that literally started
11   as a blank sheet of paper with some ideas on it,
12   and trying to create the strategy and bring it to
13   life through -- through people and activity.
14       And, so, everything from defining job
15   requirements; going out and utilizing personal
16   network and -- and other forms of media to attract
17   talent; and cold calling major consumer goods
18   companies and packaging companies to try and both
19   further refine the research and define the product
20   that we were going to create; and also establish
21   alliances which were very important to getting
22   adoption of the product.
23       And, so, I spent -- I spent my days working
24   on that.
25       Q.  Yeah.  Help me -- I want to make sure I

Page 24

1    understand what Packtion was doing.
2        You, using internet commerce, you were
3    developing relationships business to business in
4    the packaging industry?
5        A.  Yes.  It -- we were trying to provide
6    an end-to-end solution for the major consumers of
7    packaging, which are the major consumers goods
8    companies.
9        The packaging converters that people
10   actually supply, the finished packaging, and even
11   reaching back to the raw material providers -- and
12   in this case resin for plastic packaging, paper,
13   paper mills for the paper-based packaging, metal,
14   et cetera.
15       So, it was an end-to-end solution primarily
16   focused on the packaging creation and design
17   process, which involves multiple parties within a
18   consumer-goods company within a packaging designer,
19   even back to the resin.
20       So, we had a collaborative design tool that
21   we developed.  To try and speed the market was the
22   goal.
23       Q.  How long -- how long did you stay at
24   Packtion?
25       A.  Until -- until we made the decision to

Page 25

1    liquidate it, which was in June of 2001.
2        Again, against the context of the -- of the
3    market at the time, the NASDAQ crashed in April of
4    2000 just as we were launching.
5        And yet, we still went forward and achieved
6    what was then recognized as the leading position in
7    the packaging E-commerce space.
8        The problem was, is that the time to peak
9    revenue was significantly longer than what people
10   thought, and the opportunity to hit a public market
11   IPO window, it appeared, had passed.
12       And, so the initial funding that was
13   committed, which was $53 million, then a record of
14   first-round funding for a B-to-B launch, we
15   returned back to the investors whatever had not
16   been spent.
17       So, it was not a bankruptcy.  It was just a
18   return capital.
19       Q.  So, you liquidated in 2001.
20       A.  Yes.
21       Q.  And what was your last base annual
22   salary as a co-president of Packtion then?
23       A.  It was 200 and -- $230,000 a year.
24       Q.  Did you receive any other compensation
25   in the way of bonus?

Page 26

1    A.  Yes.  I received a -- I think -- I
2  think it was almost exactly half, $115,000 bonus.
3    Q.  Who -- who made the decision to pay the
4  bonuses?
5    A.  The board of directors.
6    Q.  Who set your salary?
7    A.  The board.
8    Q.  Who sat on the board of Packtion?
9    A.  It was Greg and Phil, two founders of
10  Silgan.  And then there were three members of
11  Morgan Stanley Capital Partners.
12    There's actually two from Capital Partners,
13  and one from Venture Partners.
14    And then one member of Diamond Technology
15  Partners.
16    So we had a six-person board.
17    Q.  Now, who is Diamond Technology
18  Partners?
19    A.  They were the technology consulting
20  firm that helped us define the original business
21  model.  And they owned, I think, about 10 percent
22  of the firm.  So when the firm was initially
23  capitalized, they -- they put in some money.
24    Q.  Do you remember who the one member from
25  Diamond Tech was at the board?

Page 27

1    A.  It changed.  I honestly can't remember
2  his name.
3    He was the chief operating officer of
4  Diamond.  I can picture him, but I can't remember
5  his name.
6    Q.  That's fine.  That's fine.
7    I'm wondering why it's important, as I ask
8  you.
9    All right, after the liquidation of
10  Packtion, then what was your next employment?
11    A.  I was with Onyx Capital Ventures.
12    Q.  You didn't go back to Silgan?
13    A.  No.  In fact, it -- part of -- part
14  what was allowed me to do something like Onyx was
15  that I received severance from Packtion, and also
16  received a -- a one-year payment of -- of salary on
17  top of that for Silgan not bringing me back in to a
18  senior operating position.
19    That was that boomerang letter I was telling
20  you about.
21    Q.  So your severance was one year's salary
22  that you would have gotten at Silgan had you gone
23  back?
24    Or are you saying that's one year's salary
25  that you would have gotten at Packtion had it

Page 28

1  continued on?
2    A.  Right.  So the employment agreement was
3  with Packtion.
4    Q.  Okay.
5    A.  And the investors honored that.
6    And in addition to that, separate from
7  Packtion and its investors, Silgan had this letter.
8    And when, you know, I talked to Greg and
9  Phil about different jobs and interviewed for them.
10  And they -- the hallmark of their decision-making
11  is they are disciplined in every way, and they
12  don't force anything if it's not there.
13    And they said, Look, we've only got two
14  business units.  You can either be --
15    I was -- I was now too senior to go into
16  just sort of any role in one of those companies.
17  And they didn't have any spots that were open.
18    So, in addition to the year at Packtion, I
19  received a year from Silgan.
20    Q.  And I neglected to ask you, Packtion
21  was in Chicago?
22    A.  Yes.
23    Q.  And so was Silgan, right?
24    A.  Silgan's corporate headquarters are in
25  Connecticut.  But the -- the closure business was

Page 29

1  in Chicago.
2    Q.  Okay.  And, so, when you left Packtion
3  and did not go back to Silgan then, you started
4  Onyx Capital Ventures?
5    A.  Jeffrey Larry is the founder and CEO.
6    I was the fourth of the six partners,
7  initial partners, to join the firm.
8    I was the only operating partner.  The
9  others were transactional.
10    Q.  You said earlier that the money from
11  Packtion or Silgan helped you to -- to go in to do
12  something like capital -- Onyx Capital Ventures.
13    What -- what did you mean by that?
14    A.  It was a long, long time before we
15  raised any money and got a paycheck.  So, I
16  was -- I was living off of that money for -- for a
17  long time.
18    Q.  You -- you indicate you were the fourth
19  of six founding partners?
20    A.  Yes, that's right.
21    Q.  And Jeff Larry was the first?
22    A.  Yes.
23    Q.  And then who was the second?
24    A.  David Palmer, and Russell Pallesen
25  were -- I think they came in at the same time.

Page 30

1    They had been partners in another venture, and they
2    were all officing out of the same law office that
3    Jeff was -- had previously been a part of.
4        Q.   Spell Pallesen for me.
5        A.   P-A-L-L-E-S-E-N.
6        Q.   And his first name is --
7        A.   Russell.
8        Q.   -- Russell?
9        Then you're the fourth.
10       Who's the fifth and the sixth?
11       A.   Patrice Daniels, and Patrick McGarvey,
12   M-c-G-A-R-V-E-Y.
13       Q.   If you know, did Jeff Larry infuse any
14   funds into capital -- into Onyx Capital Ventures?
15       A.   Over its life, or --
16       Q.   Initially at start-up.
17       A.   We -- when we all came on board, we
18   were all coming on board unpaid.  And, so there was
19   no initial capitalization at the time that we all
20   kind of tossed our hats in.
21       Q.   Okay.
22       A.   The -- the goal was to put the business
23   plan together, and then go out and raise money.
24       Q.   The best of your knowledge, was there
25   any cost involved in the start-up?

Page 31

1        A.   Oh, absolutely.  I mean, we were
2    officing out of the Katten -- the KMR law firm
3    offices at that time.
4        And, you know, we had administrative support
5    that was provided, also by Katten -- KMR, I'll just
6    call them KMR, the law firm.
7        So -- and there were -- certainly we were
8    having meetings all over the place.  So there was a
9    lot of travel and entertainment expense.
10       Q.   Where was the money coming from for
11   those expenses?
12       A.   We were personally funding it.
13       Q.   Okay.  What was the start-up date, if
14   you recall, of Onyx?
15       A.   I don't -- I don't recall what the
16   official start-up date was because I started
17   working there full time in September of 2001.
18       And David and Russell had been there
19   probably -- end of July of '01.
20       And Jeff will tell you various dates as to
21   when he officially started doing Onyx-related work
22   at sometime before that.  But --
23       Q.   Would it have been basically sometime
24   in 2001, though?
25       A.   He -- he would -- he would say that he

Page 32

1    had been doing it for a couple years prior to that.
2    And he was informally working with one of his
3    boyhood friends, Rich Coleman, to do that.
4        But when -- when we came together and
5    started defining the business model in a more
6    granular way, it became clear that Rich didn't have
7    much to offer to that new effort.  And -- and Rich
8    left.
9        Q.   So, you officially joined in September
10   of 2001?
11       A.   Yes.
12       Q.   All right.  And you were the only
13   operating partner?
14       A.   That's right.
15       Q.   Define what you mean by "operating
16   partner."
17       A.   Someone who had had, you know, business
18   and operating experience, as opposed to the other
19   partners had experience as transactional attorneys
20   in mergers and acquisitions or leveraged finance,
21   in particular, which was a key element of the Onyx
22   strategy.
23       Or, in Pat McGarvey's case, he had spent 15
24   years raising money for private equity firms.
25       Q.   And the name Onyx Capital Ventures

Page 33

1    certainly implies that it was a capital venture
2    firm; is that a correct statement?  That it was, in
3    fact, a capital venture firm?
4        A.   It was a firm that was going to be
5    deploying capital to acquire businesses, yes.
6        Q.   Did you have a defined mission
7    statement for Onyx in September of 2001?
8        A.   No.  We were in -- that was part of
9    what we were coming together to do, was to define
10   it more specifically.
11       Q.   What was the anticipated mission
12   statement going to be, if -- if you can recall?
13       A.   I don't know if I would call it a
14   statement.  But, the anticipated mission was to
15   acquire businesses whose customers valued supplier
16   diversity.  And therefore, by -- it was explicitly
17   an African-American-owned entity that Onyx was
18   going to be.  And we all knew that when we signed
19   onto it.
20       And the opportunity was to try and solve
21   the, what they call the MBE conundrum, "MBE"
22   meaning minority business enterprise, through the
23   use of our specific expertise in raising leverage
24   finance and in finding and acquiring businesses
25   that would benefit from MBE ownership.

Page 34

1     MR. NELMS: Excuse me. Sorry.
2     BY MR. NELMS:
3     Q. Well, is -- what is Jeff Larry's race?
4     A. He's African-American.
5     Q. And David Palmer?
6     A. Caucasian.
7     Q. Russell --
8     A. Is also Caucasian.
9     Q. -- Pallesen? Pallesine?
10     A. Pallesen.
11     Q. Pallesen?
12     And then you're Caucasian, obviously.
13     Pat -- Patrice Daniels?
14     A. Is African-American.
15     Q. And Pat McGreevy?
16     A. McGarvey. Is also Caucasian.
17     Q. Okay. And Rich Coleman?
18     A. Is African-American.
19     Q. Okay. And is it your position that the
20     idea for Onyx was originally conceived by Jeff
21     Larry?
22     A. At a very high level, it was, yes.
23     And then it was -- what I think the turning
24     point was, when David Palmer and Russell Pallesen
25     then brought the leverage finance focus to it as a

Page 35

1     way of getting access to much more sizable amounts
2     of capital to go after businesses that were more
3     substantial.
4     Q. How much time lapsed, if you recall,
5     between when you left Packtion and when you started
6     working in September of 2001 for Onyx?
7     A. Three months. June 1st was the
8     official liquidation date of Packtion, meaning that
9     was the day we informed all the employees that we
10     were going to cease operations.
11     There was a lot of trailing activities that
12     I had to be involved in over the course of the
13     summer, but the main thing was just to make sure
14     you pay all the bills, get everything logged up.
15     Q. How did you know Jeff Larry?
16     A. I didn't. I -- I was introduced to
17     Jeff through David Palmer. David and I went to
18     Kellogg together.
19     Q. Okay. And Mr. Larry's an attorney?
20     A. Yes.
21     Q. At KMR?
22     A. At KMR. He was a capital partner at
23     KMR.
24     And KMR is a -- is an unusually
25     entrepreneurial -- it's I think it's the 24th or

Page 36

1     25th largest law firm in the country. And they are
2     very entrepreneurial in that they regularly set
3     aside a portion of their offices for start-up
4     businesses that they back, who tend to be legal-fee
5     intensive.
6     So, they back a lot of firms that are in the
7     deal business, knowing that those firms, when they
8     start doing their deals, will use Katten for all
9     their legal services.
10     Q. Katten, it's -- what's the full proper
11     name of the law firm?
12     A. It's changed three times since I've
13     been there through acquisition. At the -- at
14     the --
15     Q. Law firms do that.
16     A. -- yeah, at -- at the time that we
17     started, it was KMZ, Katten, Muchin and Zavis.
18     K-A-T-T-E-N, M-U-C-H-I-N, and Zavis, Z-A-V-I-S.
19     That's what it was when I got there.
20     They then acquired a firm, and it became
21     Katten, Muchin, Zavis, Rosenman, R-O-S-E-N-M-A-N.
22     And then within the last, I want to say 18
23     months, they dropped the "Z." Mr. Zavis left, and
24     it became Katten, Muchin, Rosenman, LLP.
25     So as far as I know, that's what they are

Page 37

1     now.
2     MR. POUNDSTONE: Can we take a break real
3     quick?
4     MR. NELMS: Yeah.
5     (Discussion off the record at 1033.)
6     (On the record at 1045.)
7     BY MR. NELMS:
8     Q. All right. Before we broke, we were
9     discussing KMR. And as a -- as a law office, they,
10     as you say, make investments in different
11     businesses. And -- and that's where we left off.
12     I guess my next question --
13     A. Yeah. So they were angel to Onyx.
14     Q. There you go.
15     My next question was: Did -- did they put
16     money into the Onyx start-up?
17     A. Through the provision of services. We
18     never received any cash.
19     Q. Okay. So, it was kind of an inkind --
20     A. Um-hum.
21     Q. -- contribution to the start up of --
22     of Onyx.
23     And I'll assume that meant use of their
24     space, secretarial services?
25     A. Yeah.

1    Q.  Okay.  Any administrative support that
2  you might have needed at the time?
3    A.  Yeah.
4    Q.  Okay.  Now, you considered yourself the
5  fourth of six initial founders or partners --
6    A.  Right.
7    Q.  -- of -- of Onyx?
8    Did you, yourself, put any money into Onyx?
9    A.  I did at the time of the initial
10  capitalization, which was at the end of 2002.
11    So, we were for a little over a year before
12  we raised any money.
13    Q.  How much do you put -- did you put in?
14    A.  A hundred thousand dollars.
15    Q.  And did that buy you a share ownership?
16    A.  Yeah.  There was an -- there was an
17  overall share ownership that was determined.
18    The other part, Jeff Larry and I were the
19  only ones that put cash in.  The other four
20  partners did not.
21    So, and -- and they all received equity
22  shares.  Again, as founders' equity.
23    Q.  All right.  Do you remember --
24    A.  So --
25    Q.  -- what your equity share was?

1    A.  At the time of the founding, it was
2  5 percent.
3    Q.  And do you remember, how much money did
4  Jeff Larry put in?
5    A.  Honestly, I -- I don't know the exact
6  amount.  Because I know that Jeff put money in of
7  his own, and he also borrowed substantial amounts
8  of money that he then put in.
9    So, I don't know how much of it was his own,
10  and how much was sort of, I guess I'd call it,
11  passing through that he raised from other people.
12    But it was -- it was well more than a
13  hundred thousand dollars.
14    Q.  More than a hundred thousand dollars?
15    A.  Yeah.  I mean, I -- I would be
16  guessing, but I would be -- I think he probably put
17  in at least a half a million.
18    Q.  Half a million?
19    A.  Yeah.  Through those combined.
20    Q.  And if you recall, what was Jeff
21  Larry's percentage of equity or ownership of Onyx?
22    A.  It came in two forms.  He had an amount
23  that was specifically in his name.
24    And as -- because of the governance, he had
25  control over the pool, the amounts that were not

1  awarded to anybody that were set aside for future
2  people or partners.  So, he was able to vote those
3  shares, as well.
4    And I want to say that -- I want to say that
5  his percentage would, if you add those two
6  together, was 53, 54 percent.
7    Q.  Okay.  And David Palmer, do you recall
8  what percentage ownership he had?
9    A.  David, Russell, Pat and Patrice all had
10  about 13 percent each.
11    Q.  13 each?
12    A.  Each.
13    And that -- and you know what?  I'm giving
14  you pre-dilution numbers.  I think I just -- I
15  think I just mixed two -- two numbers.  Because
16  once we actually raised the money, those numbers
17  went down, were diluted by the money that came in.
18    Q.  So, that would drop from 13 percent?
19    A.  From 13 down to you know, 9 or 10, I
20  think.
21    Q.  I mean --
22    A.  Yeah, I -- using round numbers, I
23  haven't gone through this since the date of that.
24    But, then, after -- after the money came in,
25  I was three and a half, 4 percent.

1    The rest of them were around 10 percent.  So
2  it gets you about 44.
3    Q.  I'm just looking at 13?
4    A.  Yeah.  So, yeah, I'm -- so let me give
5  you --
6    Q.  13 times 4 would be 52, which is more
7  than half.
8    A.  Yeah.  After the dilution, the other
9  folks had between 35 and 40 together.  And then
10  Jeff had 50-ish.
11    Q.  Was it important for Onyx to be
12  majority minority-owned?
13    A.  Absolutely.  And it had to be --
14    Q.  Okay.
15    A.  -- in order to be able to achieve the
16  mission.  Because if -- if Onyx weren't, then the
17  companies that bought wouldn't be able to be --
18  the -- the criteria to be certified as an MBE is
19  that minorities, whether they're black or other
20  minorities, had to control every class of stock and
21  have management control of the firm.
22    So, at -- at a minimum, those are the two.
23  There's a whole certification you have to go
24  through, and they -- each certifying body will
25  throw in other things, depending on what region

Page 42

1  you're in. It's not --
2      But those two things are bedrock.
3      Q.  Okay. And what was the -- what was
4  going to be the first anticipated source of revenue
5  for Onyx during late 2001?
6      A.  Well, the anticipation was that Onyx
7  would make its money through fees off of the money
8  it raised, fees from the companies that it managed,
9  and then, you know, share appreciation in the
10  companies that it had acquired, and then later went
11  to a liquidity event.
12      Q.  Okay. And name for me, if you can
13  recall, the first acquisition that Onyx attempted.
14  Or merger. However.
15      A.  Completed? Or just --
16      Q.  Anticipated.
17      A.  Because we looked at, you know, in --
18  in the deal business, 95 percent of stuff you look
19  at doesn't come to fruition. You know, it's a very
20  low close rate.
21      Q.  Well, that's a bad question. Let me
22  phrase it this way.
23      Did Onyx make any attempts in 2001 to close
24  on any mergers or acquisitions with third parties?
25      A.  Prior to Piknik?

Page 43

1      Q.  Prior to Piknik.
2      A.  Oh, absolutely. We were in a very late
3  stage of trying to acquire the folding carton
4  business that was inside of Silgan Holdings. It
5  was called Seaboard Container.
6      Needless to say, I was the one who generated
7  that deal and moved it down to the end.
8      Q.  Seaboard Container is big.
9      A.  You know, there's -- it's a different
10  Seaboard Container.
11      Q.  Okay.
12      A.  This was a single plant folding carton
13  operation. It ran 20 million in revenue.
14      Q.  Okay. I think of Seaboard Container --
15      A.  You're thinking of over the -- the
16  over-the-ocean --
17      Q.  Yeah.
18      A.  A lot of people confuse. That was
19  Sealand Container.
20      Q.  Oh. That may be.
21      Where was Seaboard Container's plant?
22      A.  Where was it? Oh. It was in the
23  western suburbs of Chicago.
24      Q.  Okay. I was thinking maybe it was over
25  in Georgia or something, and maybe that's why I'd

Page 44

1  heard of it.
2      Okay. And that fell through?
3      A.  Yeah. At the last minute, too. It
4  was -- it was too bad.
5      Yeah, they had a significant pension
6  liability that was undisclosed that we found kind
7  of late.
8      Q.  That can be a problem.
9      A.  Yep. Yep.
10      And then we were down the path of acquiring
11  the Graf-X, G-R-A-F-X, folding carton plant from
12  Smurfit Stone.
13      And then they pulled that off the table.
14      We were down the path of acquiring the
15  Ashland Ohio folding carton plant from Caraustar,
16  C-A-R-A-U-S-T-A-R, which publicly-traded paper base
17  packaging company. And their terms ended up being
18  a little too unreasonable.
19      Q.  Any other close calls before you get to
20  Piknik?
21      A.  Those three.
22      I'm trying to remember. I mean, there
23  were -- there were so many different ones that we
24  looked at.
25      But those were the ones that -- that -- and

Page 45

1  we also looked at the Charlotte, North Carolina
2  folding, carton plant from Sonoco, S-O-N-O-C-O.
3      Again, I mean, you notice the pattern, that
4  I was out there knocking on a lot of doors looking
5  for deal flow.
6      Q.  I notice that they're all in the
7  container world. The Seaboard, the Smurfit, the
8  Ashland --
9      A.  Right.
10      Q.  -- the Sonoco?
11      A.  And the Sonoco one, yeah.
12      And that was the -- that was the business,
13  that plant that I ran in Mentor, Ohio was a folding
14  carton plant, so it was business I knew well, and I
15  had a contacts in the industry.
16      Q.  Right. And then do we reach a point in
17  time, then, when we're talking to Piknik?
18      A.  Piknik came to us through an investment
19  banker. So, as opposed to an outbound deal where
20  I'm calling on guys that I used to know and saying,
21  Hey, you got anything for sale? Or any deals you
22  might want to work on? There's also an inbound
23  flow of investment bankers who are representing
24  companies who send their offering memoranda to the
25  buy-out shops like us.

Page 46

1    And that's how we first were made aware of
2  Piknik.
3       Q.  Who -- who was that investment banker?
4  Or, if you recall, the firm?
5       A.  I'm trying to remember.  I think it
6  was -- I think it was Goldsmith-Agio.  Goldsmith
7  A-G-I-O.
8       Q.  Where are they located?
9       A.  They have offices all over.  We were
10 called on by the Chicago office.
11      Q.  And describe for me the introduction to
12 Goldsmith-Agio.
13      A.  Well, of those six partners, Russell
14 Pallesen and David partner -- Palmer had been in
15 the private equity acquisition space for 20 years
16 each.  And so they knew -- they knew all the
17 investment bankers that called on the, you know,
18 small, middle, even on a larger market.  So these
19 were just regular phone -- they were getting calls
20 from Goldsmith-Agio back when they had their own
21 private equity firm before Onyx.
22      So, was just regular course of business.
23 Hey, guys, do you want to take a look at a deal in
24 this space?  How does this fit with your new firm?
25      Q.  And did you ultimately have any direct

Page 47

1  contact with Piknik, then?
2       A.  I didn't.  Because I was the operating
3  partner and because I was more focused on the --
4  sort of the other packaging kind of deals, I didn't
5  get brought into this one until it was pretty far
6  along.
7       And then, you know, when it looked like it
8  was -- because the deal took many different forms.
9       When they -- when Ricky first hired the
10 investment bankers, he thought he was going to get,
11 you know, a boatload of money and, you know, his
12 life would be different.  And then, you know, they
13 got no responses.
14      And, so, then they split up the beverage and
15 the condiment business and said, Well, maybe we'll
16 get different buyers for that.
17      That didn't work.
18      And so they -- they reengaged them once,
19 pulled back because it didn't look like it was the
20 value that Ricky was looking for.
21      And then kind of Ricky came back to us and
22 said, Look, I need to do something.
23      Q.  You're referring to Ricky Loeb?
24      A.  Yes, I am.
25      Q.  Okay.

Page 48

1       A.  The owner of the business.
2       Q.  The first offer that -- that Mr. Loeb
3  came to you with, do you remember the -- the basic
4  or the outlined terms of the first offer?
5       A.  I don't remember the dollar amounts
6  that were involved.  I think the initial -- the
7  initial -- he was -- he was hoping to get between
8  15 and 20 million dollars for the overall business
9  when they first had the book out.
10      Q.  That would be -- that would be bottling
11 and condiment?
12      A.  Yeah.  The entire enterprise.
13      And that coincides with the fact that he
14 had, at the time, about 17 million of indebtedness
15 on the business.  So he was hoping to get the debt
16 paid off and get a couple million for himself at
17 the time.
18      The business did not support that valuation,
19 as evidenced by the fact that nobody came in.
20      I think we talked to him.  I don't know if
21 we ever put anything in writing.  But we kind of
22 kicked around with the investment bankers some much
23 lower valuations with some light back-end equity
24 that might be able to, if the business grew, get
25 him his money out and those kinds of things.

Page 49

1       But, and during -- so, I want to say that
2  probably six months went by from the time that we
3  first looked at the business to the time that Ricky
4  came back.
5       And -- and the business had been
6  deteriorating since that time.  They had missed
7  their numbers by a mile in, I want to say, April
8  and May.  And these were -- it's a highly seasonal
9  businesses.
10      Q.  What year is this?
11      A.  This is in 2003.
12      Q.  Okay.  Now, you said that you were
13 working operations for Onyx, so you were not
14 directly involved with negotiations with Ricky Loeb
15 or Piknik, generally?
16      A.  Yeah.  Prior to the acquisition, right.
17      Q.  Who was from Onyx?
18      A.  It was Jeff and Russell and David were
19 the primary.
20      Q.  Okay.  So now we're in mid 2003?
21      A.  Right.
22      Q.  And you've got a second offering
23 because -- or, that's come right after their
24 failure to perform --
25      A.  Right.

13  (Pages 46 to 49)

Page 50

1   Q. -- in production.
2   A. Because we saw -- we -- I think we
3   first saw the book in late 2002. And so then they
4   came back to us in the -- in the spring-ish of
5   2003.
6   Q. All right. And you mentioned it was a
7   seasonal business. Was -- was that --
8   A. Beverage in particular.
9   Q. Yeah. Was that lull in their
10  production during a typically off-season period of
11  time?
12  A. No.
13  Q. Okay.
14  A. That was -- that was the catastrophe,
15  was that they were missing their numbers during the
16  months where they really needed to start making
17  hay.
18  Q. Got you.
19  Okay. And then tell me about discussions
20  then after this second encounter in 2003 with
21  Piknik, and they've had the low production numbers.
22  A. Well, needless to say, the financial
23  terms dropped pretty dramatically.
24  We -- we talked about different ways that we
25  could help get some kind of up-front cash for the

Page 51

1   business. But, it was clear that there was a
2   combination -- our -- our due diligence indicated
3   that there was a market need for production in the
4   southeast.
5   And again, I'm focusing on the primarily on
6   the beverage business, because that's what we were
7   really -- those were the customers that cared about
8   what Onyx brought to the table.
9   So, we're looking at it, all right, what can
10  we bring? How can we help?
11  And when I was running the closure business
12  at Silgan? All my customers, I provided beverage
13  and food closures for PepsiCo and Arizona Iced Tea
14  and Campbell Soup which makes V8, and, you know, a
15  lot of people who did business with Piknik. So,
16  I -- I had a real understanding for, at least, the
17  beverage side of that business and the closure.
18  And I had some relationship to bring to bear, to --
19  to help at Piknik.
20  And in our due diligence, it showed that the
21  company was not well regarded by its customers.
22  Its quality was considered poor.
23  Ricky personally was not trusted by the
24  customers, and there were instances that they cited
25  of how he had done things that really aggravated

Page 52

1   them.
2   And -- and yet, they still needed to give
3   them volume because they needed a southeast
4   presence for transportation purposes to reach those
5   markets.
6   So we thought, Well, shoot, if these guys,
7   as bad as they are, are still in business and still
8   have some volume -- now that they can't convert for
9   a lick, that's why we're losing all this money --
10  but if we come in there and maybe shore the thing
11  up and bring some of our credibility, maybe we
12  can -- maybe we can drive some additional line to
13  the top line and have it work better.
14  Q. So, what -- what kind of deal was
15  ultimately cut?
16  A. Onyx took 51 percent of the company for
17  a dollar.
18  Q. Okay. Why was it important for Onyx to
19  take a 51-percent share interest?
20  A. In order for the entity to be
21  certifiable as a minority business enterprise.
22  Q. Okay. So Onyx was a minority owned --
23  or, majority minority-owned enterprise, and it was
24  now going to own a 51-percent share interest in
25  Piknik --

Page 53

1   A. Yes.
2   Q. -- Products? Okay.
3   And who -- who negotiated with Onyx the deal
4   with Piknik for the acquisition?
5   A. Ricky Loeb was the owner and the lead
6   negotiator. He was advised with -- his COO at the
7   time was a guy named Mike O'Connell.
8   Q. Who -- who for Onyx was negotiating the
9   deal on behalf of Onyx Capital Ventures?
10  A. Jeff was always the final negotiator.
11  David and Russell were actively involved in
12  it.
13  Q. Any of the terms of the acquisition
14  other than one dollar perks, 51 percent share of
15  Piknik?
16  A. Yeah. Ricky received an employment
17  contract, a five-year employment contract at
18  $250,000 a year. And he had a life insurance
19  policy that we had to buy him, as well. I can't
20  remember. It as a substantial one. It was, like,
21  a $5 million one.
22  Q. You mentioned earlier that there was a
23  lot of debt load that came along with Piknik, and I
24  believe you mentioned $12 million?
25  A. No. 17 million.

Page 54

1    Q.   17 million?
2    A.   At the time that we started.  We paid
3 it down over time.
4    Q.   Was that debt personally guaranteed by
5 Ricky Loeb, if you know?
6    A.   Yes.  He and his family had guarantees
7 on -- I think they had it all guaranteed.  They had
8 cash and marketable securities that were pledged
9 against a portion of it, and then the rest was
10 personally guaranteed.
11    And I think that's what drove this very
12 unusual -- I mean, you can tell by the economics of
13 that deal.  This was a deal that was done out of
14 desperation on Ricky's part.  He really didn't have
15 another choice.  You don't do that kind of deal
16 unless -- if you have another choice.
17    Q.   Was there -- was there any contingency
18 or arrangement made in the acquisition deal between
19 Onyx and Piknik to accommodate the personal
20 guarantee that Ricky Loeb had relevant to the $17
21 million in debt?
22    A.   When you say "accommodate," meaning
23 relieve it in some way?  Or transfer it?  Or --
24    Q.   Well, I don't know.  That's why I'm
25 asking.  Was there -- was there any --

Page 55

1    A.   No.  Onyx was very, very clear and
2 careful not to assume any of that obligation.
3    We were very aware of it, and had no desire
4 to have any part of it.
5    Q.   Got you.  Okay.
6    And I'll tell you that our records reflect
7 that the actual acquisition took place in, I
8 believe, June of 2003.  Do you agree with that?
9    A.   No, because by the time it actually
10 closed, I think the documents were signed
11 July 31st, August 1st, somewhere.  It -- because I
12 did -- I -- I remember sitting there that summer
13 and having Jeff say, All right, get your plane
14 tickets.
15    And then I'd have to keep putting them out
16 and putting them out and putting them out.  So, I
17 lost half the summer.  I couldn't get down there
18 until the first or second week of August.  And it's
19 just because we hadn't closed the deal yet.
20    Q.   Okay.  To your recollection, it would
21 be August of 2003?
22    A.   On or about August 1st of 2003.
23    Q.   Okay.  Other than the acquisition of
24 Piknik Products in the summer of 2003, let's just
25 say June and July and August of 2003, were you

Page 56

1 working on any other products, projects for Onyx?
2    A.   Oh, yeah.  I was hunting all kinds of
3 different acquisitions.  Some of them were fairly
4 large.  But, yes, I was actively looking for other
5 acquisitions.
6    Q.   Can you remember any of them?
7    A.   We were actually very close to buying
8 all of the Proctor & Gamble Sunny Delight beverage
9 operations.  And I was -- I was the lead on that.
10    That was four very substantial beverage
11 plants.
12    And -- and I'll -- I'll step back and tell
13 you that Proctor & Gamble was a -- a significant
14 supporter of Onyx Capital Ventures, and that's
15 actually -- the P&G relationship is part of why I
16 came on board and why Jeff was interested in having
17 me come on board.
18    I was the one in Packtion in the start-up
19 who cold called Proctor & Gamble and said, We just
20 started this firm.  Here's the business model that
21 we're going after.  Can I help -- can I help you?
22    And eleven months later, P&G selected us and
23 invested $2 million in Packtion and helped us, you
24 know, get other alliances.
25    So, not patting myself on the back too much,

Page 57

1 but I knew that organization really well.  I got to
2 know P&G through the purchasing organization really
3 well.
4    Q.   That's your job, I mean, to -- to make
5 those associations and take advantage of them,
6 right?
7    A.   Right.  And how that applied to Onyx
8 was that Jeff grew up in Cincinnati.
9    John Pepper, who was chairman of Proctor and
10 Gamble, and Jeff Larry served on the race
11 commissions that were formed after the 2000 riots
12 in Cincinnati.  The Cincinnati Can Commission.
13    And P&G actually gave us a letter -- gave
14 Jeff a letter stating that they had a -- had an
15 intention, non-binding, to do $250 million worth of
16 business with Onyx Control Company over the next
17 five years.
18    While -- when he had that, and he's talking
19 to David Palmer, and David had just done some
20 consulting work for me over at Packtion, he said to
21 Jeff, Well, shoot, if you want to get to know P&G,
22 you know P&G up here, you don't know squat about
23 how it works down here.  You got to get -- you got
24 to talk to my friend, Chris Day.
25    So, I give you that, which then helped us

Page 58

1  get access to a tremendous inside exclusive deal to
2  look at the Sunny Delight assets.
3      Q.  So even though -- even though it wasn't
4  binding then, Proctor and Gamble stated that they
5  were interested in doing up to $250 million with
6  Onyx owned and operated --
7      A.  Right.
8      Q.  -- MBE businesses?
9      A.  Which, if you know the bureaucracy at a
10  place like P&G, to get a document like that even in
11  a non-binding form is an -- is an accomplishment.
12  And it's a statement of the credibility that Onyx
13  had brought to the table.
14      Q.  Did you then look at Piknik as --
15  Piknik was doing bottling --
16      A.  Um-hum.
17      Q.  -- right?  Were they doing any Sunny
18  Delight product?
19      A.  No.
20      Q.  Could they have done Sunny Delight?
21      A.  It was a slightly different filling
22  technology.  It was a cold fill, it was not a hot
23  fill.  But yes, they could have done it with some
24  modification.
25      Q.  What kind of pasturization process --

Page 59

1  was there a pasturization process for Sunny
2  Delight?
3      A.  There was, but it was not -- it was
4  part of why the product had to be kept refrigerated
5  prior to shipping.  There was -- it had a shorter
6  shelf life to it because it had a small juice
7  component to it.
8      Q.  I guess my question was:  Was there
9  consideration made regarding the acquisition of
10  Piknik knowing that you had the Sunny Delight
11  product out there as a potential customer for
12  Piknik?
13      A.  That was -- that was a potential.
14  Again, you know, when you're in the -- the deal
15  business, you know that the vastly majority of
16  these deals don't end up coming through, but it was
17  certainly something we were thinking about.
18      Q.  Be -- be careful, because my question
19  is:  Was there actual consideration made when it
20  came to the acquisition of Piknik because you knew
21  the Sunny Delight product was out there?
22      You said there was potential.
23      A.  Yeah.
24      Q.  I'm asking was there actual
25  consideration, thought given by you and in

Page 60

1  conversations with others, thoughts about if we --
2  if we have this relationship with Proctor and
3  Gamble, then we go and get Piknik, we can meld the
4  two together for purposes of profit?
5      A.  Well, you always kick through those
6  scenarios.
7      Q.  Okay.
8      A.  Yeah.
9      Q.  Okay.  Did -- did Proctor and Gamble
10  have any initiative in place to associate itself
11  with minority businesses?
12      A.  Absolutely.  They had a director of
13  supplier diversity.
14      Q.  Who was that?
15      A.  There was -- the guy retired just as we
16  were starting, so I can't remember the -- the
17  predecessor.  I want to say he retired in December
18  of '01, and then his successor was a woman named
19  Icy Williams -- like it sounds, I-C-Y.
20      And the -- the president of the company had
21  made a public commitment, president of Proctor and
22  Gamble, had said that they would buy a billion
23  dollars worth of goods from minority-owned
24  companies by 2005.
25      So, he stated it in 2000 right after the

Page 61

1  race riots.  And they said we have a five-year plan
2  to get to a billion dollars in minority spend.
3      Q.  Did John Pepper make that statement?
4      A.  I can't remember if it was Pepper or
5  the -- Dirk Yeager, but it was the CEO at the time.
6      Q.  Were any special incentives given to
7  minority business enterprises that were typically
8  not given to non-minority business enterprises?
9      A.  When you say "incentives," I mean by
10  P&G or --
11      Q.  Yes, specifically by Proctor and
12  Gamble.
13      A.  They -- they -- there were no -- P&G is
14  a pretty savvy group.  And they're very careful to
15  make sure that they offer as much encouragement as
16  they can without crossing a line into hard and fast
17  commitments and things that could be held up as
18  discriminatory the other way.
19      So, and that as -- as Onyx, we -- we toiled
20  against that through our entire career, or our
21  entire life.  To try and pin these guys down.
22      Q.  Toiled against?
23      A.  Their -- their desire to both encourage
24  and not commit.  Does that make sense?
25      Q.  Yes.  Yes, it makes great sense, yeah.

Page 62

1    A.  So, when I said --
2    Q.  I see the dilemma.
3    A.  Yes.  And, you know what?  When you
4  launch a new firm that's trying to do something
5  that hasn't been done, which Onyx was set out to
6  do, you can't know everything.  You have
7  hypotheses, but they get tested in the marketplace.
8  And you can't test them in the marketplace until
9  you form your company and you're out there knocking
10  on the door and you're saying, Here's who we are.
11  Will you buy from us?  Will do you this?
12    And that was one of the things that we had
13  to test.  How real is this commitment?  You.
14    Can get this $250 million letter.  What's
15  the substance behind it?
16    And P&G was a very challenging group to deal
17  with.
18    Q.  I guess my question is:  How is
19  facilitated?  You -- you -- you've got an MBE, and
20  you're a fortune 100 company, and you -- you have
21  a letter of non-binding commitment.
22    What did P&G do to facilitate growing more
23  business with minority suppliers?
24    A.  Oh, that's a good question.
25    It's -- it's -- it's a hard thing for the

Page 63

1  P&Gs to do.  You can talk about it at this level.
2  Say you want to.  It's your objective.
3    Organizing yourself down here in your
4  day-to-day business activities, when -- I call them
5  the meat eaters, the people who are in the
6  purchasing jobs who have to go out and beat the
7  crap out of the suppliers to get the prices down
8  and -- and -- and buy the goods for P&G, who are
9  measured on did you get the price down?  Getting
10  those guys to say, now you've always been doing
11  business with these -- this set of suppliers, I
12  want you to introduce MBE's into your supply mix.
13    Well, until you make it part of their
14  incentive package, not a lot of -- not a lot of
15  reason to do it.  Right?
16    And -- and -- and it -- and it didn't
17  happen.  So, we would always get tremendous support
18  up here, and run into road blocks down here.
19    That was -- that was the thing that I was --
20  and I was -- I was the guy at Onyx who was on the
21  front lines of it trying to overcome that.
22    And so, what -- what had to happen was you
23  had to try and align -- align the incentives so
24  that it was a win/win, not just for the guys up
25  here, but for the guys down here.

Page 64

1    It took a long time for us to persuade the
2  guys up here that you need to change the incentives
3  for guys down here and make it actually part of
4  what they get measured on for anything to change.
5    It never changed in my career at Onyx.  I
6  resigned from in Onyx in October of 2005.  It
7  didn't change while I was there.  But, they made
8  some movement in that direction.
9    But I'll tell you what.  The thing that made
10  me join Onyx was ultimately one of the things that
11  caused Onyx not to work.
12    Q.  Explain that.
13    A.  The guy who was the former head of
14  supplier diversity at P&G showed me a slide.  And
15  he said, We did a study of all of our supply base
16  at P&G.  And 90 percent of the suppliers to Proctor
17  and Gamble of every imaginable material have annual
18  revenues of $100 million or more.
19    Which makes sense.  They were, at the time,
20  a $45 billion global company.  You need to have a
21  critical mass to be able to supply these guys in
22  the quality and the size that they need.
23    They said, We have a roster of 20,000 --
24  20,000 MBEs that supply us.
25    Okay?  We beat the bushes.  We -- we're

Page 65

1  trying to find them.
2    The average MBE in the United States, 95
3  percent of them have average annual revenues of $1
4  million or less.
5    So, all our suppliers are generally up here,
6  all the MBEs are way down here.
7    We can have the best goals and intentions
8  out there.  We can't find what we need up here in
9  the pool down here.
10    And that was what Onyx was created to do,
11  was to bring our sophisticated leveraged finance
12  strategies, because debt is colorblind, which
13  allows you to leverage that scarce black capital
14  which there ain't much out there of to buy
15  businesses of size, and move into this category.
16  And instead of buying a small black-owned business,
17  you buy a large white-owned business and make it
18  black.
19    Does that -- so, that was -- that was the
20  theory and promise of Onyx.  And we came in a close
21  second a lot of different times.
22    But that was -- that was what enticed P&G
23  about the Onyx business model because we were the
24  only ones in the country out there trying to do it
25  that way.  But it was also the challenge of all the

Page 66

1  baggage that came from their 20 years of dealing
2  with these 20,000 guys.
3       I'm sorry. I'm half Italian, I mean, I'm
4  sorry, I'm using my hands.
5       Made it difficult for these guys, you know,
6  to sit across the table from you and look at you as
7  something that's different from what they had
8  always been used to dealing with.
9       Q. So --
10      MR. POUNDSTONE: Chris, just make sure --
11 it's Andy's deposition, and I think that was --
12      THE WITNESS: I know. That was my Onyx
13 business spiel.
14      MR. POUNDSTONE: Yeah, right.
15      THE WITNESS: But I want -- I want people
16 who understa -- hearing this to understand this
17 wasn't -- this was not a sham. This was not,
18 supplier diversity had been characterized for all
19 of its many years as -- as shams.
20      MR. POUNDSTONE: Okay.
21      THE WITNESS: Throw a black face in front of
22 a bunch of white guys, and they called it paying
23 the tax. Okay?
24      Buy from the white guys, and -- and put a
25 black store front in front of it, mark it up

Page 67

1  5 percent, and then buy those goods and count it as
2  black spent.
3       Okay? We were -- we were trying to do it
4  right. We wanted to own assets. We wanted to go
5  after it the right way.
6       So, I mean, what you're hearing is a guy who
7  threw his hat in the ring and went without pay for
8  I counted to 18 of the first 50 months that I was
9  there. I never got a paycheck. I'm -- I was a
10 passionate individual trying to help this cause and
11 trying to do it the right way. And we faced a lot
12 of hurdles to do it.
13      MR. POUNDSTONE: Okay.
14      THE WITNESS: I'm sorry. I'm.
15      MR. POUNDSTONE: No problem. Just -- just
16 make sure there's a question on -- on the table
17 before you --
18      THE WITNESS: That's excellent advice,
19 counsel.
20      MR. POUNDSTONE: -- before you answer.
21      THE WITNESS: Thank you.
22      BY MR. NELMS:
23      Q. Well, and -- and the question was,
24 and -- and if you don't -- if there's not an answer
25 to it, I guess that that is an answer in itself.

Page 68

1  But my question was, I -- I guess, and I
2  like your -- your -- the way you explained that you
3  had your guys up here who were -- were talking the
4  talk. They were saying, Hey, we wanted to do
5  business with MBEs.
6       A. Right.
7       Q. But we want to make that a mission of
8  ours. But then you as a practical matter, you went
9  to what you called the meat eaters, which I really
10 like that. That's -- that's a good way -- I know
11 exactly what you're talking about. You had that
12 group of mid-level people who actually made the
13 purchases for your fortunate 100 companies. And
14 how do you get those people engaged in the thought
15 process of the upper level management and their
16 promise, their mission statement, to do this thing
17 with MBEs.
18      And my question was: Was there some -- some
19 kind of program or initiative -- the terminology
20 escapes me -- but that -- that was put in place to
21 encourage MBEs to -- to do business with a
22 fortunate 100 company?
23      And -- and, you know, Bobby's going to
24 object and I don't blame him because I'm way out of
25 line with the question.

Page 69

1  But, I mean, if you're an MBE, did Proctor
2  and Gamble say, If we come to a situation where
3  everybody bids on a particular item project, and
4  there's equality, the basic equality, that the MBE
5  numerically is equal to the non-MBE, do we give
6  preference to the MBE in a situation like that? Or
7  is there -- was there ever a program in place that
8  you're aware of among any of the -- the large
9  fortunate -- the fortunate 100 companies that
10 you're dealing with that would say, We're going to
11 give you a two and a half point break?
12      A. No.
13      Q. You know, and --
14      MR. POUNDSTONE: Object to --
15      THE WITNESS: Let him object.
16      MR. POUNDSTONE: -- the form.
17      THE WITNESS: Let him object.
18      MR. POUNDSTONE: Just to get that in there.
19 You can answer.
20      BY MR. NELMS:
21      Q. Yeah.
22      A. The answer is no. If the question is,
23 were there any known parameters that gave us
24 advantage? No.
25      We wanted there to be. That's a great way

1    to make money.
2         But, there weren't.
3         I could tell you where I think there were
4    areas of advantage that were not specified. I -- I
5    don't -- there were -- and I think that's that
6    caginess that I was telling you about where these
7    guys were saying, We'd like to do business, but.
8         When you wanted to try and pin them down to
9    all right, what do I need to do? They wouldn't
10   tell you.
11        Q.   Okay. All right. Back -- back down to
12   the important stuff. That's probably more
13   important than this.
14        All right. So, specifically with Piknik, we
15   had the August 2003 acquisition of Piknik. And I
16   note from the record that was done through Piknik
17   Acquisition Corporation.
18        Are you familiar with Piknik Acquisition?
19        A.   Yeah. It's -- it's very common, in
20   fact it's almost prescribed in the acquisition
21   business, that a -- a special-purpose entity is set
22   up to own the stock of any business that you
23   acquire.
24        Q.   Okay. Whose idea was it for formulate
25   Piknik Acquisitions?

1         A.   I don't know who in particular. I know
2    that it was, like I said, it -- in your business,
3    there's certain things that you know you just
4    always do when you hit the circumstance.
5         When you acquire a company in the buy -- in
6    the private equity space, you form an entity to do
7    it.
8         Q.   Okay.
9         A.   Because that way, you don't get mixing
10   of -- presumably, we were going to get a lot of
11   acquisitions, so you wanted to keep it in separate
12   vehicles.
13        Q.   Did KMR represent Onyx in the
14   formulation of Piknik Acquisition Corporation?
15        A.   I believe so.
16        Q.   Was it Jeff Larry that primarily did
17   the work in formulating Piknik Acquisitions?
18        A.   I believe so.
19        Q.   Best to you --
20        A.   It might have been -- it might have
21   been Russell, as well, because Russell was also a
22   former partner at KMR.
23        Q.   Do you know if any money was actually
24   put into Piknik Acquisitions by Onyx?
25        A.   I -- I'm not aware of any being put in,

1    in the same way that no money went across the
2    table.
3         Q.   Now, the only consideration that I
4    understand from the acquisition of -- of Piknik was
5    the one dollar. Was the one dollar actually paid?
6         A.   I -- I do not know.
7         Q.   Okay. If it was paid, well, it would
8    be speculation. You don't know.
9         A.   I really don't know.
10        Q.   Was a checking account ever made in the
11   name of Piknik Acquisitions?
12        A.   Not to my knowledge.
13        Q.   Do you know of any of the executive
14   members of Piknik Acquisitions?
15        A.   I -- I'm -- I'm not at all familiar
16   with the, sort of, articles of incorporation or
17   governance or anything that went with Piknik
18   Acquisitions.
19        Q.   Were you a member of Piknik
20   Acquisitions?
21        A.   No.
22        Q.   Okay. As a -- you were a partner of
23   Onyx at the time, did you feel that you had an
24   ownership interest in Piknik Acquisitions?
25        A.   I felt that my ownership of Onyx --

1    again, you know, that's a less than 5 percent
2    level -- would entitle me to some share of the
3    profits when that flowed up to the Onyx level, if
4    it ever happened.
5         Q.   At the time of the acquisition, did
6    Piknik Products qualify as an MBE?
7         A.   It wasn't certified on the day of
8    closing. I think we received our certificate nine,
9    ten months later. But Piknik was certified as an
10   MBE.
11        Q.   Who -- who ultimately certified Piknik
12   as an MBE?
13        A.   It's the -- the national governing body
14   that does the certification. It's called the
15   NMSDC, National Minority Supplier Development
16   Council.
17        And that work of the actual certification
18   and reviewing the form, sending somebody out to do
19   the audit and all of that is done by their regional
20   offices. I believe that Piknik's was done out of
21   the Atlanta office.
22        Q.   Okay. Prior to the acquisition,
23   would -- to the best of your knowledge, would
24   Piknik have qualified for certification as an MBE?
25        A.   Prior to the acquisition? No.

Page 74

1    Q. Why not?
2    A. Because of those two criteria that I
3  gave you.
4    Q. Ownership?
5    A. Minorities had to be in control of all
6  classes of stock and have management control of the
7  business.
8    Q. Okay. What is management control of
9  the business?
10    A. It means the -- the most senior
11  decision maker, the chairman of the board, chief
12  executive officer, had to be an African-American.
13  Or, in our case, African-American, and minority.
14    Q. Okay.
15    A. And Ricky, you know -- okay, I'm going
16  to answer something that wasn't asked.
17    MR. POUNDSTONE: Just wait and --
18    THE WITNESS: Go ahead.
19    MR. POUNDSTONE: -- get a question on the
20  board.
21    THE WITNESS: Okay. But he won't know to
22  ask it.
23    BY MR. NELMS:
24    Q. Let me just -- I'm skipping around.
25  Let me check off the things so I don't forget

Page 75

1  something. I may ask it ultimately. You never
2  know.
3    A. I'll give you credit, if you do.
4    Q. Okay.
5    MR. POUNDSTONE: Just remember, it's Andy's
6  show.
7    THE WITNESS: It is Andy's show. I'm sorry.
8  I've been sitting out here in Lakewood for three
9  weeks. I'm dying to talk to somebody.
10    MR. NELMS: It's a nice place to be. I
11  mean, it's nice out here. It's quiet.
12    BY MR. NELMS:
13    Q. How many employees it Onyx have in
14  August of 2003?
15    A. The six partners. And we had a
16  director of business development named Athenia
17  Figgs.
18    Trying to think if we had anybody else.
19    Q. What does a director of business
20  development do?
21    A. Her role was, you know, in a small firm
22  you have to wear a lot of different hats. But
23  Athenia had worked for me at Packtion. And her
24  desire to come to Onyx was, A, she was
25  African-American and believed in the Onyx mission.

Page 76

1  And her background had been in information
2  technology consulting. She had worked for KPMG and
3  had done a lot of national rollouts of IT projects
4  for major Fortune 500 companies. And that was the
5  kind of work she did at Packtion.
6    She wanted to expand her skills and
7  experience. And so she was going to, in addition
8  to supporting our operations in IT, she was going
9  to call on the supplier diversity directors at
10  these major companies to try and introduce them to
11  who Onyx was and help us maintain our relationships
12  there in the event that we needed to.
13    Q. It had seven employees?
14    A. Yes.
15    Q. Tell me --
16    A. At that time.
17    Q. Did -- did Onyx grow to have more
18  employees after August of 2003?
19    A. No. It shrank from there.
20    Q. Okay. And what about Piknik
21  Acquisitions Corporation? How many employees did
22  it have?
23    A. Again, it was, a special-purpose
24  vehicle that didn't have any employees.
25    Q. Okay. And if you know, how many

Page 77

1  employees did Piknik Products have in August of
2  2003?
3    A. Boy. I don't know what the exact
4  number was, but I think it was between 3- and 400,
5  across all their different plants.
6    Q. And they had three plants?
7    A. Yes.
8    Q. Alatex, the condiment plant in
9  Brundage -- just like it sounds, if you can
10  understand the way I talk -- and the Day Street
11  Plant.
12    A. Yes.
13    Q. Named after you. They named it after
14  Mr. Day. Named the street, the plant, everything.
15    A. Whole thing.
16    Q. He's famous in Montgomery.
17    A. Word travels fast.
18    Q. All right. What time is it?
19    A. 11:30.
20    MR. POUNDSTONE: 11:30.
21    BY MR. NELMS:
22    Q. All right. So tell me about Onyx's
23  initial involvement in Piknik after the acquisition
24  in 2003.
25    A. I started spending time at Piknik on a

Page 78

1  weekly basis.
2      Q.  You were living in Chicago at the time?
3      A.  In Chicago, right.
4      To try and assess the business.
5      It's one thing to do due diligence out of a
6  book and visit a plant now and then, but it's very
7  different once you get inside.
8      Q.  Okay.  And just specifically talking
9  about late 2003, what -- what was your role in
10  regard to Piknik?
11     A.  I was the operating partner assigned to
12  managing the Piknik investment.
13     Q.  Operating partner assigned to operating
14  Piknik?
15     A.  Overseeing.
16     Q.  Managing, you said?  Managing?
17     A.  Yeah.
18     Q.  So, speaking specifically of that time
19  period between August 2003 and January 1, 2004,
20  tell me some of the things that you would do on a
21  weekly basis in regards to Piknik.
22     A.  Well, prior to early September of 2003,
23  I was down there reviewing the operations, visiting
24  the different facilities, meeting with members of
25  senior management, reviewing the statistics and

Page 79

1  financials, and getting -- getting an assessment of
2  what the issues and opportunities were.
3      Q.  Okay.  Did you have any position as an
4  employee of Piknik during that period of time?
5      A.  In -- starting in -- some point during
6  the month of September, I went on to the payroll
7  because the Brundage condiment business lost its
8  general manager, who, at that time, was actually
9  only a consultant anyway.
10     Q.  Do you remember who that was?
11     A.  I can picture him.  It's actually a
12  senior citizen.  I want to say he was in his
13  mid-70s.
14     Q.  Okay.  Never mind.
15     A.  I can't remember.
16     Q.  So, you became operations manager for
17  Brundage?
18     A.  Yeah.  On an interim basis.
19     Q.  And did you assume a salary?
20     A.  I did.  I stepped into the salary that
21  the consultant had been making.
22     Q.  Do you recall?
23     A.  It was -- and I'm not -- I just -- I
24  don't recall exactly.  It was somewhere between
25  100- and a 125,000 a year.

Page 80

1      Q.  So, what -- what month do you think
2  that was when you assumed that role?
3      A.  I think it was in September.
4      Q.  September?  I'm sorry, you told me
5  that.  Of '03?
6      A.  Yes.
7      Q.  Okay.  And on average, during, say,
8  September and October and November and December of
9  2003, how many days a week were you spending
10  actually in Alabama?
11     A.  Probably four days a week, because I
12  got an apartment, I -- I took the apartment that
13  the predecessor had down in Brundage.
14     Q.  So, describe for me a typical workweek
15  during that period of time in late 2003.
16     A.  Once I started the Brundage job.
17     Q.  Yeah.  I assume you're spending the
18  weekends in Chicago?
19     A.  Right.  I would be flying back and
20  forth on the weekends.
21     Q.  That four days a week that you were
22  spending in Alabama, I'll assume the fifth day was
23  travel time?
24     A.  Usually, yeah.
25     Q.  Okay.  Were you doing any work out of

Page 81

1  the -- the Onyx offices?
2      A.  I would -- I would try and stay
3  connected with the Onyx folks.
4      The -- the typical, I'd fly down on Monday
5  morning and I'd fly back on Thursday night, and
6  then try to operate out of the Onyx office on
7  Friday.
8      Q.  And what kind of things were you doing
9  in the Onyx office on Fridays?
10     A.  Looking at the other deals that we were
11  looking at.  I would be consulting with my partners
12  about what was going on down at Piknik.
13     MR. NELMS:  Excuse me.  I'm just checking my
14  list again.
15     (Discussion off the record and ending Tape
16  #1 at 1140.  A luncheon recess was taken.)
17     (On the record and beginning Tape #2 at
18  1246.)
19     BY MR. NELMS:
20     Q.  All right.  On our time line, as we
21  left, Mr. Day, we were talking about the end of
22  2003, and you were telling me about how you came
23  down to be the operations manager of the Piknik
24  Brundage facility.
25     Picking up from there, any other job

Page 82

1  responsibilities that you had in relation to Piknik
2  in late 2003?
3      A.  Once we were able to find a suitable
4  full-time replacement, I then went back to the
5  oversite role that I mentioned earlier and
6  continued to spend three, four days a week down in
7  Alabama, but working mostly out of Day Street with
8  then COO, Mike O'Connell.
9      Q.  What job title, if any, did you assume
10 then?
11     A.  I was no longer on the payroll at that
12 time.
13     Q.  Okay.  But you were coming to
14 Montgomery --
15     A.  Every week.
16     Q.  -- every week?
17     In your capacity as operations manager for
18 Onyx?
19     A.  As the operating partner, yep.
20     Q.  Okay.  And what -- what would you do
21 generally on a day-to-day basis then, in that
22 capacity while at Piknik?
23     A.  Prior to January of --
24     Q.  '04, yes, correct.
25     A.  Similar to the prior answer.  It was

Page 83

1  reviewing the financials, helping to provide
2  oversight and advice to Mike O'Connell, hiring
3  personnel, sales and marketing operations.  Whole
4  range.
5      Q.  When Onyx acquired Piknik, to the best
6  of your knowledge, was there an operating agreement
7  between Onyx and Piknik?
8      A.  It was -- it was customary for Onyx to
9  have a management agreement between its operating
10 companies and Onyx which is what resulted in
11 that -- the management fee that got paid.
12     So there was a, from the inception of
13 the -- of the transaction, Onyx received a monthly
14 management fee.
15     Q.  Okay.  Other than what we've talked
16 about thus far between August of 2003 and January
17 the 1st, 2004, did you have any other job roles or
18 responsibilities directly relating to Piknik?
19     A.  No.
20     Q.  Okay.  And moving on in the time line,
21 January of 2004 moving forward, did you ever go
22 back on the Piknik payroll?
23     A.  From June 2004 until the end of my
24 tenure?
25     Q.  Let's just say all of 2004.

Page 84

1      A.  I -- I had a title starting in January
2  of 2004.
3      Q.  What was that?
4      A.  Executive vice-president.
5      Patrice Daniels, who was another Onyx
6  partner that I mentioned before, and I both took
7  the title of executive vice-president and kind of
8  split the duties that Mike O'Connell had previously
9  had when he resigned.
10     Q.  Okay.  And when did your executive
11 vice-president role begin?
12     A.  I think it was on or about January 9th
13 of '04.  I think that was the date that he
14 resigned.
15     Q.  Okay.  And did you maintain that role
16 as executive vice-president throughout the entire
17 2004 year?
18     A.  No, it was until June.
19     Q.  What happened in June 2004?
20     A.  In June, we hired a new president and
21 COO for the company.
22     Q.  Who was that?
23     A.  Bill McLennan.  You may recall Bill was
24 a name that we mentioned from beforehand --
25     Q.  Correct.

Page 85

1      A.  -- from Packtion and Silgan and
2  Tenneco.
3      Q.  And did your job title change when Bill
4  McLennan came in in June?
5      A.  Yeah, it ceased.  I was no longer -- I
6  was no longer employed by -- and honestly, I
7  can't -- I cannot recall whether I was being paid
8  directly by Piknik or whether I was being paid by
9  Onyx out of the management fee during that early
10 2004 period of time.  I just -- I just honestly
11 can't remember.  I think.  I -- I can't remember.
12     Q.  Well, for 2003, did you get a W-2 as a
13 Piknik employee?
14     A.  Yes.
15     Q.  Okay.  And did you get a W-2 as an Onyx
16 employee?
17     A.  Yes.
18     Q.  Okay.  For 2004, did you get a W-2 as a
19 Piknik employee?
20     A.  That's what I honest -- I honestly
21 can't recall.  I don't think so.  I think for 2004
22 I just had an Onyx W-2 --
23     Q.  Okay.
24     A.  -- but I'm not -- I honestly can't
25 remember.

Page 86

1   Q. Well, let's ask --
2   A. Easy to check.
3   Q. Yeah, right. Exactly.
4   For 2005, did your -- did you have any role
5   in 2005 as a Piknik employee?
6   A. Yes. Because when Bill McLennan
7   resigned on February 1st of 2005, I was the named
8   president to take -- to take that role.
9   Q. Okay. And did you get a salary as CEO?
10  A. Yes.
11  Q. What was that salary?
12  A. 309,000.
13  Q. 309. Any incentive or bonuses?
14  A. Yes, I was eligible, you know, for a
15  target bonus of 50 percent of base salary. Which
16  adds, upside, to 100 percent, or downside is zero.
17  But the target was 50.
18  Q. Okay.
19  A. It was the identical compensation
20  package that Bill McLennan had, so there was no
21  questions about -- whatever he had, I stepped into
22  the exact same contract.
23  Q. And who made the decision as to what
24  your pay would be?
25  A. Jeff Larry, who was the chairman of the

Page 87

1   board.
2   Q. All right. And for 2004, can you
3   recall what your income was for 2004?
4   I know you can't remember whether you were
5   an Onyx employee or an employee of some merger of
6   the two.
7   A. Right. Well, let me put it this way.
8   My rate of salary at Onyx Capital Ventures was
9   $325,000.
10  Q. All right.
11  A. So, it was right around -- pretty
12  similar.
13  Q. So, when you're executive
14  vice-president with Patrice Daniels, during that
15  period of time in 2004 --
16  A. That's why I don't think I was being
17  paid by Piknik, because it would have been hard --
18  and Patrice's salary at Onyx was $360,000 a year.
19  So I don't think we could have burdened the
20  business with that level of salary load during that
21  time.
22  Q. Okay. Makes sense to me.
23  All right. Now, we've already alluded to
24  sometime in 2005, you stopped working at Piknik,
25  correct?

Page 88

1   A. Right. I -- it was about July 7th, I
2   think was the date.
3   Q. And what was the reason?
4   A. The bank, Wachovia, formerly South
5   Trust, exercised its right to take control of the
6   company when the forbearance agreement expired.
7   Q. Okay.
8   A. And, so, they took control of the
9   company and decided to install Ricky Loeb as the
10  COO. CEO, too.
11  Q. All right. You know who the Plaintiffs
12  are in this case?
13  A. Yes.
14  Q. Do you remember first meeting Bob
15  Winter? Your first encounter with Bob Winter?
16  A. I don't remember the first encounter,
17  specifically. But Bob's a very memorable guy.
18  Q. Would that have been late 2003?
19  A. Yeah. It would -- it would have been
20  in -- it's as soon as I got down there that first
21  week of August, I would have -- I would have run
22  into Bob.
23  Q. And do you remember any -- your first
24  conversations with Bob?
25  A. I don't know if I remember the subject

Page 89

1   matter of the conversations.
2   Q. Do you ever --
3   A. Usually, it would have been about, you
4   know, what do you do, and tell me your impressions
5   of the business.
6   Q. Did you ever have an opportunity in
7   late 2003 to explain to Mr. Winter the mission of
8   Onyx?
9   A. I'm -- I would expect that I did.
10  Q. Do you remember any specific
11  conversations, though, that you had with him
12  related to the mission of Onyx?
13  A. Not a specific conversation, no. But
14  I -- I know that it was a regular part of what I
15  did as sort of the person on the ground to explain
16  to people who Onyx was and what our business was
17  and so forth.
18  And if I didn't bring it up, I got asked.
19  Q. Well, that was my next question.
20  Do you remember Mr. Winter asking you any
21  questions about how Piknik would become a minority
22  business enterprise?
23  A. Bob asked a lot of questions relating
24  to Onyx, its strategy, a future for Piknik, his
25  role.

23 (Pages 86 to 89)

Page 90

1    He was -- he was a very, sort of, nervous
2  and concerned guy, given the experience that he had
3  had with the prior leadership. He was -- he was
4  not -- he was just very concerned about what was
5  going to happen to him.
6    Q. With his job? Yes?
7    A. Yes.
8    Q. Okay. Shannon McGlon, S-H-A-N-N-O-N,
9  M-c-G-L-O-N. Do you remember first meeting
10 Shannon?
11   A. Again, I will -- I will tell you that
12 if -- if you're going to ask this question for each
13 one, I don't recall the first meeting, you know,
14 what was in the first conversation or something.
15 But I met all of them during that first week that I
16 was on the job.
17   Q. Okay. Well, then the next question
18 would be: Do you remember having any conversations
19 with Ms. McGlon about Onyx's mission statement or
20 mission?
21   A. Again, I -- I -- I'm not trying to be
22 flip or anything. I would have -- I would have had
23 those same kinds of conversations with each of the
24 four Plaintiffs.
25   Q. Okay. Well, that -- that takes care of

Page 91

1  that. I was going to ask you the same question
2  about -- about Bert and Jerry.
3    A. Sure.
4    No, these were normal questions that they
5  would have had about who's Onyx and what are we
6  doing.
7    Q. Do you remember any specific
8  conversations with either of the four Plaintiffs
9  regarding Onyx's mission or purpose in regard to
10 obtaining MBE status for Piknik?
11   A. I don't recall any specific
12 conversation be the MBE status, other than we
13 intend to get MBE certification for the business
14 and that it was an important part of our strategy.
15   Q. Do you recall any conversations with
16 either of the four Plaintiffs about replacing white
17 managerial employees with African-American
18 managerial employees?
19   A. No. Because I would never have said
20 such a thing. It -- it is a -- it presumes a level
21 of stupidity on my part.
22   Q. Well, forgive me, I don't mean to imply
23 it.
24   A. On the part of the Plaintiffs, perhaps,
25 that somebody in my position would make such a

Page 92

1  statement. It -- so, no, I would never have said
2  that.
3    Q. Okay. Was an application made by
4  Piknik with one of the certifying agencies to get
5  MBE status?
6    A. Yes.
7    Q. Who would make that application?
8    A. Jeff Larry.
9    Q. Okay. Did you participate in the
10 application process?
11   A. No.
12   Q. Okay. Do you know which certifying
13 agencies or organizations that Mr. Larry attempted
14 to get MBE status through?
15   A. The one that I mentioned before, I
16 believe is the only one that was necessary to -- to
17 receive --
18   Q. Okay.
19   A. -- which was the NMSDC Atlanta office.
20   Q. Okay. What about the Southern Regions
21 Minority Business Council?
22   A. The southern region of the NMSDC?
23 Or -- I'm kind of --
24   Q. I believe you are correct. I believe
25 the NMSBC -- DC has suboffices or regional offices.

Page 93

1    A. Right. And -- and I believe the
2  southern region is out of Atlanta. So that's the
3  one I'm referring to.
4    Q. Okay. Are you familiar with the
5  Harland Group, H-A-R-L-A-N-D?
6    A. I'm familiar with the Harlan Group
7  without the "D," the executive search firm.
8    Q. Have you heard of Harry Morris?
9    A. Yes. I've heard of the Harlan -- that
10 group, I don't believe, has a "D" on the end of it.
11   Q. All right. And then Harry Morris is
12 your contact person?
13   A. Yes.
14   Q. And do you know what Mr. Morris's
15 position is with Harland?
16   A. I think he is the proprietor of the
17 Montgomery office.
18   Q. Okay.
19   A. I think it -- my understanding is it's
20 a franchise executive search group.
21   Q. Head hunters?
22   A. Yes.
23   Q. Did you ever employ Harlan Group --
24   A. Yes.
25   Q. -- for -- for services regarding

Page 94

1  Piknik?
2      A. Yes, I did.
3      Q. Okay. Can you specifically remember --
4  I assume this was to fill certain employment roles?
5      A. Yes.
6      Q. Can you -- can you recall when and for
7  which roles?
8      A. Harry works on a -- Harland works on a
9  contingency basis, meaning he only gets paid if he
10 actually fills the job.
11     And I -- I bring that up because I worked
12 with Harry on a number of different openings, some
13 of which he filled, some of which he did not.
14     So, in terms of the ones that he filled, he
15 was responsible for bringing us Anthony Barber,
16 general manager of the beverage business; Carl
17 Bleier, B-L-E-I-E-R, general manager of -- both
18 were vice-president and general manager -- of the
19 condiments business.
20     He brought us Jessica Daniels, who was the
21 quality manager at the Brundage plant.
22     I -- I -- I'm pretty sure he brought us
23 Allan Walters, who became the quality manager at
24 the Day Street plant.
25     And we -- we had him looking, he -- he

Page 95

1  was -- he was routinely involved in those kinds of
2  searches for us.
3      Q. Did you ever instruct Mr. Morris to
4  give emphasis to the hiring of African-Americans
5  over Caucasian?
6      A. No. I never gave him that.
7      The -- the thing that I told Harry, which is
8  what -- and I've actually used Harry and other
9  search people in subsequent searches for Onyx
10 outside of Piknik, was always I'd like to at least
11 see candidates of African-American descent as part
12 of the consideration process.
13     And that was something that was new to
14 Piknik.
15     That I didn't want to go through a search
16 without at least being able to see somebody in the
17 files.
18     Three of the four people that I just named
19 for you were Caucasian. Those were the ones that
20 we hired.
21     In the process of hiring those Caucasians,
22 we always at least looked at a qualified
23 African-American candidate. That was -- that was
24 the emphasis.
25     Q. And the black -- or, excuse me, the

Page 96

1  African-American candidate who was ultimately hired
2  was Anthony Barber, right?
3      A. In -- of those four, yes.
4      Q. Okay. In any of your roles as related
5  to Piknik or Onyx, was it part of your
6  responsibility or did you assume a responsibility
7  where you were marketing Piknik to potential
8  vendors?
9      A. Oh, yes.
10     Q. Beginning in --
11     A. I'm sorry -- my "oh, yes" was to
12 potential customers, not vendors.
13     Was that what you meant?
14     Q. Yes. I did mean customers.
15     A. Okay.
16     Q. Okay. And is that the proper
17 terminology? I mean, when you're referring to
18 Quaker Oats, for instance, is that a customer?
19     A. That's a customer. Whereas a vendor
20 would be somebody who's supplying goods to us --
21     Q. Got you.
22     A. -- as an input to the product.
23     That's why I just wanted to make sure.
24     Q. Got you.
25     A. I didn't really talk to the vendors

Page 97

1  much.
2      Q. Well, beginning in August of 2003 and
3  ending in January 2004 -- January 1, 2004, can you
4  specifically recall speaking to any customers of
5  Piknik's?
6      A. On the beverage side of the business or
7  the condiment side of the business?
8      Q. For any side of the business.
9      A. For any side of the business?
10     Q. Yes, sir.
11     A. Well, when I was in the condiments role
12 down in Brundage, I did talk to some of our
13 customers. So, yes, I can specifically remember
14 talking to them.
15     On the beverage side of the business, I did
16 place initial calls to contacts that I had from my
17 time in at Silgan to make them aware of our
18 purchase of Piknik and -- and to begin the
19 conversation about whether they had any business
20 that they could throw our way.
21     Q. Can you recall making any calls on
22 customers by telephone or in person to try to bring
23 new business in to Piknik, and we're talking about
24 that time period between August 1 of 2003 and
25 January the 1st, 2004.

Page 98

1    A.  I know that I made some phone calls
2  during that period of time, yes.
3    Q.  Any specific recollections as to who
4  you might have called?
5    A.  I know that I contacted Michael Cutner,
6  the VP of operations of Arizona Beverage during
7  that time.
8    I know that I contacted Steve -- I can't
9  remember if it was -- Steve Galbraith, who is VP of
10  purchasing at Nestle who is the owner of -- the
11  brand owner of Juicy Juice, who ultimately became a
12  customer of Piknik's through that.  As -- as did
13  Arizona.
14    I know that I contacted people at the -- in
15  the PepsiCo Quaker organization.
16    Bill Barker, who's the VP of strategy and
17  finance for Gatorade and a classmate of mine at
18  Kellogg, so I know I called Bill.
19    So, yes, I know I had several conversations.
20    Q.  And same question for the calendar year
21  2004.  Did you make any contacts with customers to
22  develop new business for Piknik during the year
23  2004?
24    A.  Yeah, absolutely.  In fact, some of
25  those I did with Bill McLennan when he had -- when

Page 99

1  he had come on board.
2    Q.  Were you successful in bringing any new
3  business in 2004 to Piknik?
4    A.  Well, these are long-lead time kinds of
5  transactions.  So, a typical selling cycle is often
6  between six and 18 months.  So, from the time you
7  make that first call to the time that you get
8  something to quote on to the time that it's
9  actually awarded can take quite a while.
10    And in the beverage side, there's a
11  seasonality to it.
12    So, it doesn't much matter if somebody wants
13  to give you an order in October.  Usually, they
14  don't have the demand for it until February or
15  March when they're building up for the summer
16  beverage season.
17    But yes, we -- we finished in the fall of
18  2004 with a substantial increase in potential
19  business volume in the beverage business going into
20  the 2005 spring season.
21    Q.  Can you name for us any specific
22  customers?
23    A.  Yes.  We had -- we had Arizona Iced Tea
24  was going to go and run gallon-sized product
25  Line 101, which we had lost the -- our most

Page 100

1  profitable customer shortly after we -- we bought
2  the company.  Hershey had abandoned us.  And so,
3  that was a huge piece of new business to fill up on
4  a previously-abandoned line.
5    We were awarded a significant amount of
6  business from Nestle Juicy Juice.  And again, in a
7  gallon-sized product for Line 102 in Day Street,
8  which was vital because it was counter seasonal.
9    Gatorade filled up the gallon sizes during
10  the summer, and took everything that we could give
11  them off of 102.  And then the line sat there the
12  rest of the time.  Juicy Juice, because it was
13  after school-aged kids, was a perfect complement
14  for us, and they started running in the fall.  Or
15  were targeted to start running in the fall.
16    And then we received a substantial increase
17  from Gatorade for their quart-size single-serve
18  business, 20 ounce, for Line 103.  And some of that
19  was also over at Alatex.
20    Q.  That's what we call the sport bottles?
21    A.  It wasn't necessarily sport cap.  But
22  it was, yeah, for single-serve consumption.
23    Q.  You said that Hershey -- I'm sorry, in
24  2004, I asked you for --
25    A.  So, those three were all awarded during

Page 101

1  the end of 2004 and started at various times
2  through the end of 2004 and the start of 2005.
3    Q.  Okay.  Any others you can think of?
4  Arizona Iced Tea, Juicy Juice, Gatorade quarts.
5    A.  And then we were -- we were working
6  very closely with Kellogg, the cereal company, on a
7  new product launch of a smoothie-type product.
8    Q.  Was that ultimately successful?
9    A.  Piknik's financial difficulties struck
10  before the launch could be consummated.
11    Q.  Okay.  And you stated that Hershey's
12  abandoned --
13    A.  Hershey was the most profitable
14  customer that Piknik had prior to Onyx coming on
15  board.  We knew that they had been on probation for
16  several years prior to Onyx buying the business.
17  And within -- within the -- within the first year
18  of our acquisition, Hershey pulled their -- pulled
19  their business off of Line 101.
20    Q.  Who is Henry Hicks?
21    A.  Henry is the vice-president or was the
22  vice-president of sales and marketing for Piknik.
23    Q.  How -- how did you first come to know
24  Henry Hicks?
25    A.  Henry was a White House fellow four or

Page 102

1     five years behind me, and I knew him through that
2     association.
3         Q.   And how did Henry Hicks come to be the
4     vice-president of sales and marketing at Piknik?
5         A.   When we made the strategic decision to
6     create that position, a vice-president of sales and
7     marketing, which heretofore had not existed, I
8     reached out to Henry as a -- as a candidate for
9     that job.
10        Q.   What specifically attracted you to
11    Henry Hicks as being a viable candidate for that
12    position?
13        A.   Henry Hicks is one of the best
14    one-on-one sales people that I've encountered. He
15    has a personal charisma that is palpable. He is
16    about six foot, two, big, strapping
17    African-American guy. He has great personal
18    presence. He has an MBA from the University of
19    North Carolina. Very high achiever. Very
20    intelligent. Great business sense.
21        And I knew that the face to the market that
22    we wanted to have at Piknik, Henry would achieve
23    multiple objectives for us, being he'd be able to
24    generate new business because of the aforementioned
25    sales skills. He would do so in an intelligent

Page 103

1     fashion because of his masters degree in finance.
2         And if you put yourself in the shoes of the
3     customers of an MBE-certified business, it's
4     perfectly consistent that a person calling on you
5     would be African-American. And Henry's an
6     African-American.
7         Q.   Did Mr. Hicks have any specific
8     experience in co-packing or condiments?
9         A.   No.
10        Q.   Was that an important consideration for
11    you?
12        A.   No. Because what was -- what was
13    important was that we have somebody who have
14    the -- the selling ability and the business savvy.
15        The business is not that hard to learn. So,
16    you know, it was -- it was not at all a stretch to
17    believe that Henry was going to be able to pick up
18    what he needed to.
19        Q.   There -- before Henry Hicks, there was
20    no vice-president of sales and marketing?
21        A.   Correct.
22        Q.   What -- I assume that there were roles,
23    then, that were filled by others, that --
24        A.   That related to?
25        Q.   Sales and marketing.

Page 104

1         A.   Yeah. The -- the effort was entirely
2     different prior to our arrival. It was what I
3     would call more of a customer service function.
4     People did not call outbound and say, We'd like to
5     talk to you about what business you have for us.
6     People waited for the phone to ring, and when the
7     customer called and said, We have this product and
8     do you have line time available, we picked up the
9     phone.
10        And that's a fundamentally different
11    approach. And that -- that's why we needed a -- an
12    outbound calling presence.
13        Q.   An outreach --
14        A.   Yes.
15        Q.   -- to the customers, rather than being
16    receptive?
17        A.   It was proactive versus reactive.
18        Q.   Great.
19        Okay. You mentioned earlier that there had
20    been a problem with Hershey's. What kind of
21    products did Piknik produce or package for
22    Hershey's?
23        A.   They made syrups and toppings.
24        Q.   Were both done at the Day Street plant?
25        A.   Yes. And on one line in particular.

Page 105

1     Line 101.
2         The majority of Line 101 was actually the
3     property of Hershey. The assets, much of it were
4     owned by them.
5         Q.   Does that mean that if you had a
6     product that was a non-Hershey product, you
7     couldn't --
8         A.   You had to get their permission.
9         Q.   -- you had to get lead from them before
10    you could --
11        A.   Yes.
12        Q.   Okay. Just curious. Weird business.
13        A.   Yeah. Not everybody in the co-packing
14    business does it that way.
15        Q.   I've never seen another business that
16    operates like this.
17        Just my comment.
18        And you said that Piknik had been on
19    probation with Hershey for quite some time?
20        A.   On and off, yes.
21        Q.   Do you know why?
22        A.   For quality-related issues.
23        Q.   And that when exactly did Hershey
24    decide not to do business with Piknik anymore?
25        A.   It happened during Bill McLennan's

1  tenure. And I think it happened shortly after Bill
2  got on board at the start of June of '04.
3       Because I remember -- I remember being out
4  here in Lakewood, and I was only there June, July,
5  August. And I remember getting the call from Bill
6  about meetings that they were having at Hershey to
7  try and salvage the business during the course of
8  that summer.
9       Q. Best of your knowledge, did anyone with
10 Onyx or Piknik make the accusation to Hershey's
11 that Hershey's was pulling the product line because
12 Onyx was minority owned?
13      A. I know there were conversations. I, at
14 that time, again, I had stepped out of an active
15 role at Piknik and was more oversight, but also was
16 looking at some of the other deals we were doing at
17 that time since Bill was on the ground running
18 the -- running the company.
19      I know that when it's -- when it's time to
20 defended a piece of business that looks like it's
21 going to really hurt your company, that you lay all
22 of your potential strategies on the table.
23      And I know that having a conversation
24 relating to Onyx's ownership and the MBE status was
25 one of the things that was discussed. I don't know

1  whether it was -- how it was ultimately presented.
2       Q. Did you -- did you personally feel that
3  Hershey's was discontinuing its business with
4  Piknik because of Onyx's MBE status, or Piknik's
5  MBE status?
6       A. No. In fact, I -- I think it only
7  continued. I think they would have pulled the
8  business before, and we got an extra year out of
9  them because they gave us an additional benefit of
10 the doubt to see whether the changes would be made.
11      Q. Regarding South Trust Bank, which later
12 became Wachovia, we've talked about they -- they
13 had a lien against -- they were -- they were a
14 creditor of Piknik's, correct?
15      A. Yes.
16      Q. And do you recall, and there came a
17 point in time in 2005 when they refused to extend
18 credit any further; is that correct?
19      A. Can you clarify what --
20      Q. Let me ask -- it's a bad question. Let
21 me ask another question.
22      Was, to the best of your knowledge in 2004,
23 Piknik in arrears in its payments to South Trust on
24 loans that it had been extended?
25      A. No. That's the -- the unusual thing,

1  is that to the best of my knowledge -- now, again,
2  there was that eight-month period where Bill
3  McLennan was running the business, but there was a
4  recapitalization that took place during Bill's
5  tenure in the fall of 2004 wherein the marketable
6  securities that I referenced earlier were collected
7  by South Trust to pay down debt.
8       But my understanding is, is that throughout
9  the course of Onyx's tenure, that the company
10 remained current on its principal and interest
11 payments.
12      It was -- the thing that caused the
13 violations were all of the financial covenants, the
14 interest coverage ratios, the liquidity cash flow
15 ratios, the working capital.
16      Those were the sources of the default, not
17 the fact that principal and interest were not being
18 paid. And I mention that because the initial level
19 of long-term debt owed to South Trust at the time
20 of our acquisition was about 17 million, and it
21 went down to about 15.3 on an apples-to-apples
22 basis, because we were making principal payments
23 throughout.
24      Q. Well, in late 2004 and early 2005, was
25 Piknik involved in a forbearance agreement with

1  South Trust?
2       A. It was involved in a forbearance
3  agreement with South Trust during -- before Onyx
4  got there and throughout the entire time that Onyx
5  was there. We were always operating under a
6  forbearance.
7       Q. So the forbearance then, from what
8  you're telling us, is not because of failure to
9  make payments or any deficiency balances that were
10 owed and due, but due to the other caveats
11 contained within the lending agreements?
12      A. Right.
13      Q. Okay. When, if you can recall, did
14 South Trust announce to Piknik that it would no
15 longer honor the agreement?
16      A. There were -- there were extensions of
17 the forbearance agreement that came up at regular
18 intervals. Sometimes they were extended by a year,
19 sometimes by six months.
20      The last one that was in place expired on
21 June 30th of 2005.
22      On June 30th, we were in active negotiations
23 to extend it yet again for another six months. It
24 was sometime after that expiration that South
25 Trust, I mean, that's -- that's -- it was that week

Page 110

1  of July 7th that we got notification that South
2  Trust was not going to negotiate any further, and
3  they were going to take control of the company.
4      Q.   To the best of your knowledge, did
5  anyone at Piknik, including yourself, and/or at
6  Onyx, accuse in any way South Trust of failing to
7  renew the forbearance agreement because Onyx and/or
8  Piknik was now an MBE?
9      A.   I never did; first answer.
10      There were -- there were a lot of comments
11  and speculation that took place around that
12  June 30th to July 7th time frame relating to why
13  South Trust made the decision that it did and why
14  it went back to having Ricky Loeb run the business
15  when they knew that Ricky was patently incompetent
16  to do so.
17      And one of the speculations was that Ricky,
18  a Caucasian, was having conversations with South
19  Trust accusing Onyx of going out and getting ready
20  to hire Johnny Cochrane, of Cochrane and
21  Montgomery, and come after South Trust.  And he
22  used that fear mongering to get South Trust to
23  remove Onyx as the managers of the business.
24      Q.   But did --
25      A.   Okay.  I don't know the truth of what

Page 111

1  actually was said.  That's what made its way back
2  to me.
3      Q.   Okay.  Well, we don't want to hear
4  hearsay?  I don't want -- I want --
5      A.   That's all I got.
6      Q.   Well --
7      A.   I --
8      Q.   I want to know -- I want to know what
9  you actually know.
10      And what the question was: Did anybody, to
11  your knowledge, either the Piknik organization or
12  the Onyx organization, go to South Trust and say,
13  look, you're -- you're refusing to continue the
14  forbearance or renew the forbearance based on the
15  fact that we're a minority-owned business?
16      A.   I'm drawing a -- a careful line here,
17  because when you say in the Piknik organization or
18  the Onyx organization --
19      Q.   You include Ricky in --
20      A.   Ricky's in the Piknik organization --
21      Q.   Got you.
22      A.   -- and --
23      Q.   Other than Ricky Loeb?
24      A.   Other than Ricky Loeb?
25      I'm not aware of anybody making those

Page 112

1  statements.  And, in fact, those statements could
2  only have been made after the fact, after South
3  Trust made their decision.  Because prior to that
4  time, we would have had no -- I can honestly tell
5  you, I had no inclination, no idea whatsoever that
6  South Trust was going to make the decision that it
7  did.
8      I had plane tickets booked for three weeks
9  into July for return visits to go down there and
10  run that business.  I never saw it coming.
11      Q.   Who paid for your travel?
12      A.   It was reimbursable by Piknik as
13  regular business expense.
14      Q.   Piknik paid it?
15      Do you have a cell phone?
16      A.   Yep.
17      Q.   Who paid for the cell phone?
18      A.   Piknik.
19      Q.   Did you have a per diem?
20      A.   No.
21      Q.   Do you have a calling card for
22  telephone use?
23      A.   No.
24      Q.   Do you have a car that you used while
25  you were in the Montgomery area?

Page 113

1      A.   Mike O'Connell had a company-leased
2  vehicle, that I -- and we were on the hook for it,
3  so I started using that while I was in Montgomery,
4  yeah.
5      Q.   Okay.  Who paid for that?
6      A.   Piknik.
7      Q.   Okay.  Other than the Harlan Group that
8  we mentioned earlier, while working at Piknik to
9  the best of your knowledge, did Onyx use any
10  outside consulting firms?
11      A.   Specifically for recruiting?  Or for
12  anything?
13      Q.   Well, I'm really asking for anything.
14  But let's break it down.
15      Other than the Harlan Group, were there any
16  other employee, head hunter, or recruiting firms
17  that were used?
18      A.   We -- we reviewed candidates from a
19  number of contingency search firms, which is pretty
20  normal.
21      Again, you're under no obligation to these
22  people to pay them any fee unless you actually hire
23  the candidate.  So there was no cost in reviewing
24  the candidates.
25      Q.   So they would come to you and say,

Page 114

1  We've got this really interesting person?
2      A.  Right.  And sometimes we'd talk to
3  them, sometimes we wouldn't.
4      Q.  And do you know of any other firms,
5  other than the Harlan Group, that came to you with
6  prospective employees?
7      A.  I can't cite them by name, but I do
8  know that they were there.
9      Q.  Are you familiar with Apollo
10  Consulting?
11      A.  I'm familiar with Apollo Management,
12  which is the second-largest private equity firm in
13  the world, who was involved with Piknik at a point
14  in time.
15      But they are not in the executive search
16  business.  Is that who you were referring to?
17      Q.  No.  Actually, I'll be honest with you,
18  I have no idea who Apollo is and what they did.
19  It's just something that came up, and I'm trying
20  to -- you're the second person I've asked about it.
21      A.  They're -- they're very germane to the
22  demise of Piknik in -- they didn't cause it, they
23  were -- should have been the saviors.
24      And South Trust thumbed their nose at us
25  when we brought them to the table.

Page 115

1      And that was the -- the tragedy of Piknik's
2  ultimate demise, was it was -- there were people
3  handing life jackets to the people on the Titanic,
4  and South Trust was standing there throwing the
5  life jackets back.
6      Q.  Well, off --
7      A.  That's who Apollo was.
8      MR. NELMS:  Off the record.
9      (Discussion off the record at 1329.)
10      (On the record at 1344.)
11      BY MR. NELMS:
12      Q.  Who is Annissia Haynard?  And I'm going
13  to spell it.  A-N-N-I-S-S-I-A, Haynard,
14  H-A-Y-N-A-R-D.
15      A.  Annissia was hired to Piknik, you know,
16  I don't have the date in front of me, but, you
17  know, sometime late April, early May of 2005, to be
18  the Day Street plant manager.
19      Q.  Who was the Day Street plant manager
20  prior to her?
21      A.  We didn't really have a plant manager,
22  per se.  We had a production manager, a guy named
23  Eddie Crosby.
24      And Eddie was liked by a lot of the people,
25  but he was -- he needed -- he needed leadership

Page 116

1  above him.
2      Q.  I'm sorry, he needed leadership --
3      A.  Above him.
4      Q.  What role was Jerry MacCartney playing
5  in his employment with Piknik prior to May of 2005?
6      A.  Well, he had two roles.  He was -- he
7  was hired just before Onyx purchased the company to
8  be the director of, I think, logistics or supply
9  chain, I can't remember which one we called it.
10      But, and he held that role until that spring
11  of 2005.
12      And, you know, as a way of trying to, I -- I
13  should -- I should really emphasize that when we
14  got into that November, December time frame of 2004
15  and we had all that new business that I referenced,
16  and all of that new business required approximately
17  three and a half million dollars of new capital,
18  which was common.  You know, when you got a new
19  piece of business, you had to buy new fillers, new
20  cappers, any number of different things to
21  customize to that particular product and
22  formulation.
23      And when South Trust said, Well, we're not
24  going to put in any of that money.  We're not going
25  to loan it to you.  But you can go out and get it.

Page 117

1  Bring somebody else in to do it.
2      The clock was ticking.  And we had a
3  hard-and-fast spring deadline to have these things
4  up and running at full speed to meet the case
5  commitments that these large customers had.
6      While we were out looking for the money,
7  what's your choice?  You got to start spending the
8  money.  You still got to start ordering the
9  equipment, and you got to start getting it in
10  there.
11      So we were using working capital funds,
12  therefore, in order to do a capital project.
13      It's a fundamental mismatch on your balance
14  sheet, which is a bad thing to do, but we had no
15  choice.
16      So, I bring it up to say we in -- in an
17  increasingly tight, tight, tight, tight, tight
18  situation.  And as it became more and more apparent
19  in that spring that things weren't going to be --
20  that we were in for a real battle with South Trust
21  and they weren't going to let us bring the money
22  in, we were still going to try to keep the company
23  afloat by running these things, we had to make some
24  painful and difficult decisions.
25      Jerry was a good performer.  He was well

Page 118

1   reviewed in his role. But we did not have the
2   luxury of maintaining a staff-kind-of-role in
3   logistics and supply chain when we had individual
4   doers that were capable of doing it without,
5   perhaps, that oversight.
6       So, we moved Jerry into the role of plant
7   manager for the Alatex Road plant sometime in that
8   April-ish time frame of 2005.
9       Q. Who hired Annissia Haynard?
10      A. Anthony Barber hired Annissia, since it
11  was in his chain of command.
12      Q. Did you give any instruction to
13  Mr. Barber to hire someone to manage the Day Street
14  plant?
15      A. I did. I did say that we needed to
16  bring specific focus and accountability to the Day
17  Street plant. It was our flagship. That's where
18  many of those new product launches were going, and
19  it was performing pretty badly.
20      Q. Well, did you interview Annissia
21  Haynard?
22      A. Yes, I did.
23      Q. What specific qualities or
24  qualifications did she have that made you believe
25  that she would be a good fit as a Day Street

Page 119

1   manager position?
2       A. She brought a number of
3   characteristics.
4       She had -- I want to say it was an
5   electrical engineering degree. She had at least
6   six to ten years of experience at Proctor and
7   Gamble, a high-quality environment installing
8   capital equipment, running operations. And at the
9   time, she had worked with Mr. Barber during that
10  time.
11      And it's always -- I found it's always a
12  good thing to let a new manager bring in -- staff
13  their own team and, you know, in that sense I was
14  giving him leeway to work with somebody he had
15  worked with before.
16      And then she had also -- at the time we were
17  looking to bring her in, she was a general manager
18  of a region for a food service company, I believe.
19      So, she had P&L experience, she had people
20  leadership experience, she had customer interaction
21  experience, which was a big part of the plant
22  manager job given that we had so many new product
23  lines.
24      And she had a great personality. She's a
25  bubbly, effusive, people-oriented person.

Page 120

1       Q. Now, correct me if I'm wrong, but
2   Annissia Haynard is also African-American?
3       A. Yes, that's true.
4       Q. Did that play any role in the decision
5   to hire her for the job?
6       A. It wasn't a driving factor, really, in
7   any meaningful way.
8       But, if you look at the work force in
9   Montgomery, it certainly was a -- a benefit, we
10  discovered after she got there, since most of the
11  people she was supervising were African-American.
12      Q. Who decided what her salary would be?
13      A. I believe Anthony proposed it and I
14  approved it.
15      Q. Do you recall what her salary was?
16      A. I -- I don't. I recall what we were
17  paying plant management people at that time. I
18  think Eddie Crosby, who was reporting to her, was
19  at about 75,000 a year. So I would guess that we
20  probably brought her in at the 85-, 90,000 a year
21  range.
22      Q. What -- during this time, May of 2005,
23  what job did Bert Mayer have?
24      A. In May of 2005? I thought we let Bert
25  go in April.

Page 121

1       Q. Okay.
2       A. We --
3       Q. He had no role?
4       A. In May, he had no role.
5       We had -- we had made several moves with
6   Bert to try and candidly just salvage him.
7       Bert is a -- is a good man. He was trusted
8   by people. He had gone back and gotten his MBA
9   prior to coming back to Piknik, and wanted to go
10  into the finance department. He was there for a
11  little while, and -- and was -- prior to my getting
12  there, he was put back out on the floor by Mike
13  O'Connell because he had come up through
14  production.
15      The problem with Bert was that he had
16  knowledge, and he -- he had very little ability to
17  get things done. And that was the painful thing
18  about managing Bert, was that everybody liked him
19  so much. And I did. And we were pulling so hard
20  for him to succeed. And it was -- it was hard to
21  just see sort of repeated failure taking place
22  under his leadership.
23      And, so, we -- we -- we were trying --
24  and -- and -- and this is the case for the other
25  three Plaintiffs, we were trying to be as creative

Page 122

1  and humane as we could be to not have to throw him
2  or any of them out the door in these difficult
3  circumstances, but to try to find something else
4  that would be, either, a better fit for their
5  skills, or --
6      So, we had -- Bert had gone from, I believe,
7  director of operations for the beverage side to
8  then we tried to get him and the other Plaintiffs
9  to take their responsibilities company wide, which
10 did not work when we added Brundage into it.
11     And then we thought, all right, if -- if
12 Bert is struggling just with the two plants, maybe
13 we ought to give him just responsibility for one
14 plant.
15     So, you know what? I think at one point in
16 time just prior to his departure, I think he was
17 down to just running the Day Street plant.
18     So that may have been what you were asking
19 about him being -- who was the manager of the Day
20 Street plant. I mean, for a period of time, he
21 might have been solely responsible for the Day
22 Street plant. I'm not sure if we ever changed his
23 title to Day Street plant manager, because when
24 Anthony Barber came in as vice-president and
25 general manager over all of the beverage

Page 123

1  operations -- sorry -- I think we tried very hard
2  not to publicly damage Bert's reputation or
3  anything by whacking his title.
4      But I think we -- but I do think that we
5  focused him just on responsibility for the Day
6  Street plant.
7      And I think that was probably around the
8  time that we made a similar move with Jerry
9  MacCartney to going from the director of supply
10 chain to the Alatex plant manager job.
11     Q. So who made the decision to terminate
12 Bert Mayer's employment?
13     A. It was -- I mean, by chain of command,
14 it was Anthony's decision. But I -- I was aware of
15 it and supported it.
16     Q. Okay. And from what you're telling me,
17 the reason that Bert was fired was because he, in
18 your estimation, was not capable of fulfilling the
19 job duties and roles that you -- you foresaw would
20 be required of someone to make the changeover in
21 the Day Street operation that you saw coming?
22     A. Yeah. It was -- it was a difficult --
23 running the Day Street plant was a very difficult
24 job with all the new business coming in and the
25 capital constraints. And it required a very

Page 124

1  different personality and leadership style than
2  what Bert had.
3      Q. Okay. And Jerry MacCartney was working
4  at the Alatex facility at this time; is that
5  correct? We're talking about May of 2005.
6      A. Yeah. I -- I -- for some reason, I
7  remember his mother was very sick at the time. And
8  my birthday is May 3rd. And for some reason, I
9  thought she passed away on or around May 3rd.
10 Which means he would have -- we would have put him
11 in the job before that time. So, I'm thinking he
12 was in that job in April.
13     Q. Well, how did Annissia Haynard do as
14 the manager of the Day Street plant?
15     A. She was very well received. She was
16 very well received by the employees. She was very
17 well received by the customers, in part because of
18 her knowledge of capital equipment and the actual
19 mechanical processes of -- of making beverage
20 products, she was able to add a lot of value to
21 that because of her engineering background. But
22 mostly because she was a very hands-on,
23 take-charge, hold-people-accountable manager.
24     And the organizational cadence that was
25 exhibited immediately upon her arrival was very

Page 125

1  noticeable to people inside and outside the
2  organization. There was a step, and when you had a
3  meeting with Annissia and she said, All right,
4  these are the things that need to get done. You
5  got asked about them the next day, and if you
6  didn't have them done, you heard about it.
7      Whereas Bert was just the opposite. Bert
8  could not criticize anybody. He could not hold
9  people accountable. He was the nicest-stinking guy
10 out there, but it was the wrong thing for us in the
11 crisis mode that we were in.
12     Q. How long did Annissia Haynard stay with
13 Piknik?
14     A. Well, she was -- she was on the job
15 when I was let go on July 7th. I'm not sure how
16 much longer she stayed after that. My
17 understanding is that the environment changed
18 pretty radically when Ricky Loeb was put back in
19 charge.
20     Q. Was Annissia Haynard working as a
21 full-time employee at Piknik --
22     A. Yes.
23     Q. -- when she was hired?
24     A. Yes.
25     Q. And did she work a full 40 hours a

Page 126

1  workweek?
2      A. Oh, gosh. I bet that would only be
3  part of it. She put in a lot of hours.
4      Q. Did she live in Montgomery?
5      A. She was in the process of moving to
6  Montgomery. She had been in -- I think she was in
7  Atlanta when we hired her.
8      Q. Do you remember whether or not she had
9  young children?
10     A. Yes. I do remember that she did,
11 because she ended up -- when I got let go, she
12 moved into my apartment in Montgomery. And -- no.
13 No. She was in that same complex, she wasn't in
14 the same apartment. I gave her my coffee machine,
15 that's what it was. But yeah, she did. She had
16 young kids.
17     Q. What apartment complex was that?
18     A. Vaughn Lakes.
19     Q. V-A-U-G-H-N Lakes?
20     A. Correct. No "E."
21     Q. Who's Jessica Daniels?
22     A. Jessica was the quality manager in
23 Brundage.
24     Q. Quality assurance?
25     A. Um-hum.

Page 127

1      Q. Yes?
2      A. Yes.
3      Q. Who hired Anthony Barber?
4      A. I did.
5      Q. And you got Mr. Barber's name through
6  the Harlan Group; that's correct?
7      A. Yes.
8      Q. What specific qualifications did he
9  have?
10     A. He had spent -- he had spent eight
11 years with Proctor and Gamble coming up through the
12 quality and operations ranks. And he then had gone
13 to PepsiCo, which coincidently was our largest
14 customer, and had spent eight years with them in
15 operations. I think he spent some time in quality,
16 he also did supply chain, he did capital equipment
17 installation work. Had a bachelor's degree in
18 mathematics. Spent three years at Georgia Tech
19 going through engineering, and then his father had
20 a stroke and he had to leave and finished up at
21 Augusta College in math. Just very, very bright.
22 Very energetic. Man of very high integrity.
23 And -- and was known throughout the Pepsi
24 organization as a -- as a very results oriented,
25 made-things-happen-kind-of-guy.

Page 128

1      Q. And what position did he assume there
2  at Piknik?
3      A. He was vice-president and general
4  manager of the beverage business.
5      Q. Did that position exist prior to his
6  arrival?
7      A. No.
8      Q. So, that was a created position?
9      A. Yes. And the reason why I created
10 that, and I created a parallel position as
11 vice-president and general manager of the
12 condiments business which we gave to Carl Bleier, I
13 think they both started on the same day, Anthony
14 being black, Carl being white, both hired by Harry
15 Morris, we -- the guy at the Harlan Group, was that
16 I -- I had mentioned before that I had tried to get
17 it that my level of direct lieutenants to take
18 responsibilities for all three plants. And it just
19 was not working. We were not getting the focus.
20     Either they would focus strictly on the
21 beverage business and Brundage was getting no
22 support, or they would be distracted by this and
23 then the beverage business would lag.
24     And in the meantime, I was getting more and
25 more dragged into, Hey, Chris, we got to get Apollo

Page 129

1  and, you know, Bridge Capital and all the other
2  guys to come in and give us outside money. And I'm
3  trying to keep the customers that I helped bring in
4  happy while we're continually short on product.
5      So, I was getting pulled in all these
6  outside directions, the operations weren't working.
7  So I said, You know what? We need focus and
8  accountability on each of these two businesses.
9  Let me get somebody who will be where the buck
10 stops for each one.
11     So, we created those positions for that.
12     Q. Did the fact -- or, was the fact that
13 Anthony Barber was African-American have any
14 importance in the decision-making process when you
15 considered him for employment purposes?
16     A. No. Because he was so strong in our
17 business, eight years with our largest customer,
18 the personal characteristics were what they were.
19     I interviewed white candidates for the job.
20 And -- and I did the same thing for the condiments
21 business, and I chose a white guy for condiments
22 and it happens to be a African-American for the
23 beverage business. But it was not -- it was not a
24 driver at all.
25     Q. Who made the decision to terminate

Page 130

1 Shannon McGlon's employment?
2    A. I did.
3    Q. What was the reason for your choosing
4 to terminate her employment?
5    A. Insubordination.
6    Q. And what was that based on?
7    A. Two things. Violation of a direct
8 order -- and I know that sounded very military.
9 But we had asked all the employees, in particular
10 the -- she and Mr. MacCartney not to discuss the
11 amount and -- and level of their pay cuts with the
12 people that worked for them.
13    And they -- they not only did so, they did
14 so in a group environment in a very public and
15 demoralizing way.
16    And then they both added to that the -- by
17 attending a meeting with Bob Winter who had been --
18 who had already been terminated and had stolen his
19 computer and was a known enemy combatant, to use
20 Bin Laden terms, because he had been contacting our
21 largest customers and admitted to doing so to try
22 to get them to move over to a group that Ricky Loeb
23 was trying to put together to steal the control of
24 the company from Onyx.
25    So, between violating the direct

Page 131

1 instructions by talking to the people, and then
2 going off site to a meeting attended by Ricky and
3 Bob Winter, we no longer could sort of trust her
4 ability to lead in the company.
5    Q. Who told you that she had a group
6 meeting in -- in which she discussed her pay cut?
7    A. That was Brenda Sellers, the human
8 resource manager.
9    Q. Brenda told you?
10    A. Yes.
11    Q. So Brenda attended this meeting?
12    A. I don't know. I -- I doubt that Brenda
13 attended the meeting. Members of Shannon's staff
14 went to Brenda and said, She just did this.
15    And they did the same thing with Jerry.
16    Q. Okay. Did you discuss the idea of
17 firing Shannon McGlon before you fired her with any
18 other management staff?
19    A. I talked about it with Anthony since
20 she reported to him.
21    Talked about it with -- on all of these
22 firings, I talked about them with Jeff Larry
23 and -- and with Brenda, which is all pretty
24 customary.
25    Q. Why was it important to talk about the

Page 132

1 decisions to fire any of the Plaintiffs with
2 Mr. Larry?
3    A. Because he was the chairman and CEO of
4 the organization. And I wasn't required to, but
5 the relationship that I had with Jeff was always
6 one of I'll tell you what I think you need to know.
7 And I'll make sure that you're -- you're not caught
8 off guard or surprised by anything that may come
9 back and -- you know, that Ricky may come and
10 question you about. I always made sure I was out
11 in front of those things.
12    And Jeff -- Jeff and I have different
13 personalities. And as a trained attorney, he
14 sometimes would look at situations a little
15 differently than I did, and I always valued his
16 counsel.
17    Q. And if Mr. Larry had objected to the
18 firing of Shannon McGlon, what would you have done?
19    A. If he had said, Don't do it? I
20 wouldn't have done it.
21    Both because I respect his opinion, because
22 it's the chain of command, and because he's an
23 attorney.
24    Q. What about Jerry MacCartney? Would you
25 have not fired Jerry MacCartney had he instructed

Page 133

1 you not to?
2    A. Yeah. If -- if Jeff had told me not to
3 fire somebody, I wouldn't have fired him, no matter
4 who they were.
5    Q. Did you discuss the decision to
6 terminate Shannon McGlon's employment with any of
7 the customers at Piknik?
8    A. No.
9    Q. April Blackmore?
10    A. April Blackmore from PepsiCo? I didn't
11 discuss it with her.
12    Q. Okay.
13    A. No, I'm just remembering who she was.
14    Q. Rick Valentine at Tropicana?
15    A. No.
16    I did not discuss it with anybody outside.
17    Now, did I discuss it after the fact when
18 they said, Why did this happen? Was that your
19 question?
20    Q. No. My question was before you
21 fired --
22    A. Beforehand? That's why I wanted to
23 make sure.
24    No, I didn't discuss it with anybody
25 beforehand. That would -- that would not have been

Page 134

1  appropriate.
2      Q.  Who is Allan Walters?
3      A.  Allan was the quality manager at Day
4  Street at the time of Shannon's departure.
5      Q.  Who assumed Shannon's employment duties
6  and roles after her termination?
7      A.  It was split up amongst the group.
8      So, Allan obviously took the lion's share
9  because he was at the Day Street plant that had the
10 most activity going on.
11     But as I mentioned before, Anthony had a
12 very strong quality background, and he was able to
13 provide pieces of that leadership.
14     So, basically, we disbursed it to the
15 individual plant quality leaders.  It wasn't
16 actually that hard to do because Shannon had not
17 been working full time for some period of time.  So
18 she wasn't -- she wasn't carrying a particularly
19 large load.
20     Q.  How do you mean she wasn't working full
21 time?
22     A.  She had been departing at two o'clock
23 most days for child care reasons.  And she had been
24 working less than five days a week for most of the
25 year prior.

Page 135

1      Q.  If I use the term "flex time," does
2  that have any meaning to you?
3      A.  Yeah.
4      Q.  What do you understand flex time to be?
5      A.  Flex time applies to hourly or
6  non-exempt employees who are paid by the hour who
7  are allowed to flex the start and stop time of
8  their day in order to complete the amount of hours
9  that they are required to work.
10     That would not apply to Ms. McGlon.
11     Q.  Why not?
12     A.  Because she was not an hourly or
13 non-exempt employee.
14     Q.  Was there any agreement with Piknik
15 that she be allowed to work hours other than your
16 traditional eight to five or nine to five hours?
17     A.  There was for a period of time, yes.
18     Q.  Was that agreement revoked or rescinded
19 by Piknik in any way?
20     A.  No.  What ended up -- that was the
21 irony of the whole thing, was that Shannon and I
22 had spent a lot of time talking during the spring
23 of 2005 about how the demands of the job, a
24 director-level quality job, one of my direct
25 reports, had a certain level of work associated

Page 136

1  with it.
2      And Shannon was -- needed to decide what she
3  wanted to do.  And did she want to prioritize
4  making sure she was home at certain hours given
5  this critical time?  Or did she want to take the
6  job as it was constructed.
7      And I offered her a flexibility to do
8  whatever suited her best.  And, in fact, I
9  counseled her that you might be better off as a
10 young mother, focus on your family.  And we can't
11 pay you what we used to pay you because you're not
12 going to be doing the job that you used to do, but
13 I'm okay with that if you're okay with that.
14     And that was part of why she felt a more
15 substantial pay decrease than the across-the-board
16 cuss that were there, because I was now paying her
17 for what she was actually doing.
18     Nonetheless, Shannon initially reacted to
19 that as a good thing, and then I think was poisoned
20 by MacCartney and Winter into thinking, No, he's
21 not actually doing you any favors.  He's really
22 trying to stick it to you.
23     And, that started her talking to her staff
24 against the wishes, and going down the path with
25 the other guys for talking to Ricky.

Page 137

1      That's my belief.
2      Q.  You talk about these across-the-board
3  pay cuts.  Who -- who received and when did they
4  receive across-the-board pay cuts?
5      A.  I don't remember the exact date.
6  Again, it was in the -- it was in this April 2004
7  time frame.
8      Q.  2004?  2005?
9      A.  2005, thank you.  April 2005 time
10 frame.
11     It -- it applied to virtually everybody in
12 the company.  I did not -- I did not ask the three
13 new employees to take the pay cuts.  So, Anthony
14 Barber, Annissia Haynard and Carl Bleier did not
15 have to participate because it just didn't feel
16 like it was the right thing to do to go out and
17 recruit them to come join the firm and within the
18 first week on the job get five or ten percent off
19 of their agreed-upon deal, especially since all
20 three of them were relocating to take the jobs and
21 were enduring a financial hardship to do that.
22     Q.  Now, there were actually separate pay
23 cuts, were there not?  There was an
24 across-the-board 5 percent pay cut for all
25 employees?

Page 138

1    A.  Right.
2    Q.  And did that include yourself?
3    A.  I don't honestly remember.
4    Q.  What about Mr. Larry?
5    A.  I don't think Mr. Larry was being paid.
6  He was -- he received his compensation as whatever
7  was left from the management fee that got sent to
8  Onyx. So he was not receiving a paycheck.
9    Q.  I thought he was CEO at the time?
10   A.  He was.
11   Q.  But his only form of --
12   A.  He -- he was never on the payroll,
13  though.
14   Q.  He was CEO of Piknik, but he was never
15  on Piknik's payroll?
16   A.  No.  His compensation came through the
17  Onyx management agreement.
18   Q.  So, he was an Onyx employee?
19   MR. POUNDSTONE: Object to the form.
20   THE WITNESS: He had titles in both Onyx and
21  in Piknik, and in all the other operating companies
22  that we had.
23   It's not an uncommon thing. It's a holding
24  company model. You'll see that in public and
25  private companies through out the country.

Page 139

1   BY MR. NELMS:
2    Q.  Okay. But you were getting paid?
3    A.  During the time in 2005, I was on the
4  payroll at Piknik.
5    Q.  And, but, you can't recall whether or
6  not you got the 5 percent pay decrease in May of
7  2005?
8    A.  I think that I did, but I honestly
9  can't remember.
10   Q.  But there was a separate pay decrease
11  for MacCartney, McGlon, Winter and Mayer?
12   MR. POUNDSTONE: Object to the form.
13   THE WITNESS: No.
14   BY MR. NELMS:
15   Q.  I'm sorry. Mayer was gone?
16   A.  Mayer was gone.
17   There was a greater than 5 percent decrease
18  for MacCartney, McGlon, and Mayer. And Winter, I'm
19  sorry.
20   Q.  And it was 50 percent?
21   MR. POUNDSTONE: Object to the form.
22   THE WITNESS: No. It -- there was a
23  different pay decrease for each person.
24   BY MR. NELMS:
25   Q.  What do you remember it being?

Page 140

1    A.  Well, there was a -- there was a
2  customized reason for each one, so I'll address
3  them in kind.
4    In Shannon's case, it was to reflect the
5  fact that she was in de facto a part-time employee.
6    In Winter's case, his job was being
7  eliminated, and the bank had prohibited us from
8  paying severance. So as a result of that, and
9  I -- and I think it's in one of the E-mails that --
10  that I -- that is in exhibit to the depositions, I
11  told Henry Hicks, well, let's try to find a humane
12  thing to do for Bob since he is relatively high
13  paid, he as family obligations, and since we can't
14  pay him severance, let's give his pay cut rather
15  than a severance and keep him sort of employed in
16  place but looking for his next job.
17   So that 50 percent pay was to allow him to
18  go look for another job. He wasn't -- it was to
19  try to give him a running start on his next job.
20   Bob chose not to view it that way, and he
21  resigned the next day. But that was why we cut him
22  50 percent. It was rather than fire him outright
23  and give him no severance.
24   And in the case of MacCartney, we cut his
25  pay because he was getting paid as director of

Page 141

1  logistics while he was running a plant. He was
2  both not as qualified as he probably could have
3  been, but we were making an investment in him. And
4  the cost of, you know, what you pay a plant
5  manager, somewhere around 70-, $75,000 a year. And
6  I can't remember what we cut him to, but we cut him
7  from around a hundred to something around 70.
8    And that was -- and it was a single -- and
9  it was less than what we were paying the Day Street
10  plant manager, because Day Street was three lines
11  and four times the number of employees. Alatex was
12  a single-line plant.
13   Q.  Okay. Who is Don Day?
14   A.  That's my dad.
15   Q.  Was he ever hired as a consultant for
16  either Onyx or Piknik?
17   A.  I'm -- I'm not trying to be a smart
18  ass, but I'm going to quibble with the term
19  "hired."
20   Q.  Okay.
21   A.  He did a free HR assessment for Piknik.
22  He's a career human resources executive who is
23  retired and came down and did it for us for free.
24   Q.  And what was his assessment?
25   A.  Well, it was a 30-page document that --

Page 142

1 it covered everything from compensation, benefits,
2 you know, HR is a pretty broad -- at a high level,
3 there's a lot of work that needed to be done. We
4 were able to implement a good -- a good chunk of
5 what he recommended.
6     Q. You mention the conversation that you
7 had with Shannon McGlon about her work hours and
8 work practices.
9     Did you ever discipline her for not working
10 regular work hours?
11     A. Discipline? No.
12     Q. Okay. And you talked about Jerry
13 MacCartney a little while ago and his abilities or
14 lack of abilities in some regard.
15     Did you ever discipline him about his work
16 performance?
17     A. No. In -- in Jerry's case, Jerry was
18 very well qualified for the director of logistics
19 job that he was holding, and his reviews indicated
20 as such.
21     To save his job, especially during the
22 difficult time he was going through, we gave him
23 this opportunity to go take the plant manager job
24 which he was not well qualified to do. He was not
25 incompetent to do, but not well qualified to do.

Page 143

1     So, he was -- he would not have been
2 considered as competent for that job. I just want
3 to clarify why I said that in that fashion.
4     But he was -- he was not in a -- in a
5 fashion where he would need to be disciplined for
6 his job performance, other than the insubordination
7 I referenced.
8     Q. Who is Mavis Richardson?
9     A. Mavis Richardson was hired to be a -- I
10 think she was the Day Street plant quality manager
11 at one point in time.
12     Q. Who hired Mavis Richardson?
13     A. Shannon did.
14     Q. Did you have any involvement in her
15 being hired?
16     A. Yes. Yes. Anybody who was hired at
17 sort of the director level or that level reporting
18 to one of my directors, I asked my people to allow
19 me to interview them before making an offer.
20     Q. Now, we talked at the very beginning of
21 the deposition about you gave another deposition at
22 some point in time, and it's involving the
23 bankruptcy and an adversarial proceeding related to
24 the bankruptcy of Piknik?
25     A. Yes.

Page 144

1     Q. You -- you are accused of taking, I
2 believe, some extraordinary compensation for the
3 year 2005 from Piknik; is that correct?
4     A. No.
5     Q. Tell me -- tell me what the nature of
6 the claim is then.
7     A. The nature of the claim is that the
8 stay bonuses that were paid to me and four other
9 members of the management team were preference
10 claims as part of, I guess, under the bankruptcy
11 code.
12     Q. And I'm, sorry, how much money are they
13 claiming is owed and due back to Piknik?
14     A. For us in aggregate? Or me personally?
15     Q. You personally.
16     A. 115,600.
17     MR. POUNDSTONE: And that may not be -- I
18 don't know really anything about that case, but I'm
19 aware that some sort of partial summary judgement
20 has been granted in that thing. So --
21     THE WITNESS: In favor of the Defendants.
22     MR. POUNDSTONE: Right. I don't know what
23 that number is, still what's -- what's --
24     THE WITNESS: Right. That was the initial
25 claim.

Page 145

1     BY MR. NELMS:
2     Q. Letitia Stowbridge?
3     A. Strowbridge.
4     Q. Strowbridge?
5     A. Yes.
6     Q. S-T-R-O-W-B-R-I-D-G-E.
7     Who is she?
8     A. In her role at Piknik, she was a
9 consultant who was hired to be, like, a sales and
10 marketing assistant to Henry Hicks specifically for
11 the Brundage condiments business.
12     Q. Was she a Piknik employee?
13     A. I don't believe so.
14     Q. Was she an Onyx employee?
15     A. No.
16     Q. She was just an independent outside
17 consultant hired to come in for this specific task?
18     A. Yes.
19     Q. Okay.
20     A. She used to work at Inzone,
21 I-N-Z-O-N-E, which was a customer of Piknik's. So
22 she -- that's how we found her.
23     MR. POUNDSTONE: Can we go off the record
24 for two seconds?
25     MR. NELMS: Yeah.

Page 146

1    (Discussion off the record at 1424.)
2    (On the record at 1439.)
3    MR. NELMS: Bobby? Same as this?
4    MR. POUNDSTONE: Okay.
5    MR. NELMS: I was just making sure.
6    MR. POUNDSTONE: Yeah.
7    BY MR. NELMS:
8    Q.   All right. I'm going to show you,
9    Mr. Day, a document that I have marked as
10   Plaintiff's Exhibit Number 1. Ask you to look at
11   it.
12   A.   Um-hum.
13   Q.   This is a document that was given to me
14   by your attorneys. Just ask you to identify the
15   document, is all I'm asking you to do.
16   A.   Identify meaning, have I seen it, or --
17   Q.   Is it an E-mail?
18   A.   Yeah.
19   Q.   Was there, was it written by you?
20   A.   Yes.
21   Q.   Was it to Bob Winter?
22   A.   Eddie Crosby, Bert Mayer, yeah.
23   Q.   Really, all I'm asking you is do you
24   remember writing it?
25   A.   Yes.

Page 147

1    Q.   Is it something you did?
2    A.   Yes.
3    Q.   Okay.
4    MR. POUNDSTONE: And Chris, you certainly
5    can take all the time you need when you get this
6    stuff to look over it and make sure you're familiar
7    with it before you --
8    THE WITNESS: Okay.
9    BY MR. NELMS:
10   Q.   And -- and let me tell you, Mr. Day,
11   all I'm going to do is just pull these documents
12   out and hand them to you and ask you to look at
13   them. And I think you were involved or wrote most
14   of them. And I just want you to certify that they
15   are, in fact, articles of -- that were -- that you
16   were involved in producing or wrote yourself.
17   A.   Okay. Do you have a -- a -- a question
18   about this one?
19   Q.   No, I do not. I'm really just asking
20   you to identify them and tell us that you're
21   familiar with them and that this is something you
22   wrote.
23   A.   Okay.
24   Q.   And is that -- is that, in fact, the
25   case?

Page 148

1    A.   Yes.
2    Q.   Okay. Same with Exhibit Number 2. I
3    ask you to look at that.
4    A.   Okay.
5    Q.   Is that a document that you originated?
6    You wrote that?
7    A.   Yes.
8    Q.   It identifies you as EVP operations and
9    human resources. Is that executive vice-president
10   of operations and human resources?
11   A.   Yes.
12   Q.   And were you, in fact, the executive
13   vice-president of operations and human resources in
14   May of 2004?
15   A.   Yes.
16   Q.   Okay. Thank you.
17   Show you another document I've marked as
18   Exhibit 3. Is that an E-mail from Anthony Barber
19   to you?
20   A.   Yes.
21   Q.   Do you recall receiving such an E-mail
22   in May of 2005?
23   A.   Yes.
24   Q.   Thank you.
25   Same thing with Exhibit 4. Is that a

Page 149

1    memorandum written by you addressed to Shannon
2    McGlon?
3    A.   Yes.
4    Q.   Okay. And did you, in fact, create
5    this memorandum?
6    A.   I -- I believe so.
7    Q.   When you left your employment with
8    Piknik, did you continue and remain to be an
9    employee of Onyx?
10   A.   Was I paid? Or was I --
11   Q.   Were you a member of Onyx?
12   A.   I was still a member of Onyx. I was
13   not paid.
14   Q.   Did you return to Chicago?
15   A.   Yes.
16   Q.   As a matter of fact, you never left
17   Chicago, really?
18   A.   My permanent residence was in Chicago
19   throughout, yes.
20   Q.   Okay. What -- what did you do, if
21   anything, for Onyx after your tenure with Piknik
22   ended?
23   A.   I spent time working on matters for
24   PDI, which was a third Onyx operating company in
25   Chicago, and spent a lot of time working on what

| Page 150 |
|---|

1  ultimately became an acquisition that we did buying
2  a plant from the HJ Heinz Company and merging it
3  into the PDI operations.
4      Q.  What is PDI?
5      A.  Packaging Division Industries.
6      Q.  Okay.  Talked about them earlier, I
7  believe.
8      A.  I'm -- I'm not sure if we did, or not.
9  It's the -- it was the third acquisition
10  that Onyx did.
11     Q.  What was the second one?
12     A.  Core Systems.
13     Q.  Okay.  When did Onyx acquire Core
14  Systems?
15     A.  In February of 2004.
16     Q.  What kind of business is Core Systems?
17     A.  An injection molded plastics company.
18     Q.  And was Core Systems an MBE prior to
19  Onyx's acquisition?
20     A.  No.
21     Q.  Did Core Systems become an MBE
22  subsequent?
23     A.  Yes.
24     Q.  Okay.  How did -- how did that come
25  about?  What certified Core Systems to be an MBE?

| Page 151 |
|---|

1      A.  The fact that Onyx had a -- Core
2  satisfied their requirements of the NMSDC.
3      Q.  Did Onyx take a role in the daily
4  operations of Core Systems?
5      A.  Jeffrey Larry was made, generally,
6  chief executive officer of Core Systems at the time
7  of the acquisition.
8      Q.  Okay.  Prior to its acquisition, was
9  PDI a MBE?
10     A.  No.
11     Q.  Did PDI become an MBE after Onyx's
12  acquisition?
13     A.  Yes.
14     Q.  Okay.  What is the status of Onyx today
15  as we sit here?
16     A.  Can you clarify what you mean by
17  status?
18     Q.  Is it operational?
19     A.  It has, it has one employee.
20     Q.  Who is that employee?
21     A.  Jeffrey Larry.
22     Q.  Okay.  You are not an employee of Onyx
23  as we sit here today?
24     A.  I resigned in October of 2005.
25     Q.  Okay.  What precipitated your

| Page 152 |
|---|

1  resignation?
2      A.  A combination of factors.
3      Q.  Tell us.
4      A.  A combination of -- well, I'd say the
5  most important thing that forced it to happen
6  exactly at the time that it did was the affiliated
7  transaction rules that were in place at Core
8  Systems, and I was taking a job as the president
9  and chief operating officer at Core, and the board
10  preferred that I not be part of Onyx Capital
11  Ventures if I were to take that job.
12     Q.  Why did they have that preference?
13     A.  There were members of the ownership
14  group of Core Systems that were from prior
15  ownership that were in -- were having some
16  challenges with Jeff Larry, and asked if they
17  would -- asked if I would consider resigning from
18  Onyx in order to show that I am independent of
19  Jeff.
20     Q.  So, you continued on as a Core Systems
21  employee thereafter?
22     A.  Yes.
23     Q.  And in what role?
24     A.  As the president and COO.
25     Q.  Okay.  What happened to your employment

| Page 153 |
|---|

1  with Core Systems?
2      A.  It ended on August 10th of 2007.
3      Q.  What was the cause of the end of your
4  employment?
5      A.  I resigned.
6      Q.  Were you asked to resign?
7      A.  No.
8      Q.  Why did you resigning?
9      A.  I was unhappy with the direction that
10  the firm was taking.
11     Q.  Which was what specifically?
12     THE WITNESS:  Can we pause for a moment?
13     MR. POUNDSTONE:  Sure.
14     MR. NELMS:  Go ahead.  Yeah.  Whatever.
15     (Discussion off the record at 1449.)
16     (Back on the record at 1509.)
17     BY MR. NELMS:
18     Q.  Mr. Day, I handed you a document I've
19  marked as Plaintiff's Exhibit Number 5.  I ask you
20  to look at it.
21     Seems to be some E-mail correspondence among
22  yourself, Henry Hicks and Brenda Sellers.  Do you
23  recognize it?
24     A.  Yes.
25     Q.  What -- what is the subject matter of

Page 154

1    these two E-mails?
2        A.  I -- I believe that the subject matter
3    was when we were meeting with employees at this
4    time, we were explaining to people why -- what was
5    going on with the bank, why the across-the-board
6    cuts were taking place, and we just -- in order to
7    make the communication more clear, we handed out
8    talking points at that -- at that meeting.
9        Q.  Okay.  I'm going to show you another
10   document I've marked as Exhibit 6.  It's a two-page
11   document.  I ask you to take a look at it, please,
12   sir.
13       Do you recognize that two-page document?
14       A.  Yes.
15       Q.  And is that a memorandum from you to
16   Bob Lambert regarding the pay cuts that we've
17   talked about already in deposition?
18       A.  Is that what this is?  Is that what
19   you're saying?
20       Q.  Yes.
21       A.  Yes.
22       Q.  Okay.  And specifically the second part
23   of the E-mail is dated Thursday, June 16th, 2005 at
24   5:08 p.m.
25       A.  Yes.

Page 155

1        Q.  Is that the E-mail you wrote to Bob
2    Lambert regarding the cuts in pay?
3        A.  Yes.
4        Q.  Okay.  Kind of the same question for
5    this next exhibit which is Number 7.  Is this an
6    E-mail generated by you sent to Barber, Sellers,
7    and Hicks?
8        A.  Yeah.
9        Q.  My mistake, there's a second page to
10   that, it's the attachment.
11       Did you write this E-mail?
12       A.  Yes.
13       Q.  Okay.  And is the attached letter the
14   letter you refer to in the E-mail?
15       A.  It appears so.  I -- I'm guessing it
16   is.
17       Q.  Well, don't guess.
18       The reason why I have to ask is because we
19   get these from your attorneys and there's some
20   redacted matters, and I'll tell you this was faxed
21   over to me yesterday, but -- and you'll note the
22   September 11th date which was yesterday, it was
23   faxed over to me at the hotel.  But on the original
24   we received from your attorney and on this fax copy
25   that I'm showing you now, there's -- it says from

Page 156

1    CDay12345@aol.com?
2        A.  Yes.
3        Q.  And then it says sent.  And that would
4    be the date and the time stamp?
5        A.  Um-hum.
6        Q.  And I'm assuming that that E-mail
7    corresponds with the attached June 15, 2005
8    memorandum to Jimmy Whitehead regarding a salary
9    cut.
10       I just was going to ask you if you could
11   confirm that E-mail and that letter go together.
12   Or, excuse me, memorandum go together.
13       If you don't know, you don't know.
14       A.  I don't.
15       MR. POUNDSTONE:  Andy, I'm --
16       THE WITNESS:  I'm going to make that
17   assumption, as well.  But I --
18       MR. POUNDSTONE:  I may be able to clarify
19   that for you, as well.
20       These are documents that we got from John
21   Gamble who handled the EEOC file.  And actually,
22   the line -- or, what appears to possibly be to a
23   redaction down there below the top part --
24       MR. NELMS:  Maybe a highlight.
25       MR. POUNDSTONE:  -- I think is actually a

Page 157

1    highlight.  I'm pretty sure we got a copy of it, so
2    our copy looks the same way.  It does not show up.
3        MR. NELMS:  I would think so.
4        MR. POUNDSTONE:  By at any rate, that is not
5    a redaction, I don't believe, down there from the
6    original E-mail.
7        If we can just go off the record real quick
8    for one second.
9        (Discussion off the record at 1515.)
10       (On the record at 1518.)
11       BY MR. NELMS:
12       Q.  Okay.  So, Plaintiff's Exhibit 7, you
13   recognize that as being an E-mail from you to
14   Sellers, Barber and Hicks regarding Whitehead's
15   salary cut?
16       A.  Yes.
17       Q.  Okay.  And you remember sending that?
18       A.  I do.
19       Q.  Okay.  Plaintiff's Exhibit 8 is a
20   two-page document that appears to be -- not to you
21   at all.  I think you got copied on it.
22       It's a letter from -- an E-mail from Henry
23   Hicks to Brenda Sellers and you regarding Bob
24   Winter's pay cut.
25       A.  Yes.

Page 158

1      Q.  And it's dated Tuesday, June the 21st,
2   and then there's -- the attached letter is the
3   second page.  It starts off -- it's dated June the
4   22nd, 2005 to Mr. Winter from you.
5      A.  Right.
6      Q.  Okay.  And, I'm sorry, that's Number 8,
7   right?
8      A.  Number 8.
9      Q.  All right.  Then we have what I'm going
10  to show you is Exhibit 9, and it seems to be an
11  E-mail from you to Bob Winter, Henry Hicks and
12  Brenda Sellers regarding Mr. Winter's immediate
13  termination.
14     A.  No.  It was regarding his -- accepting
15  his resignation.  Just -- clarify.
16     Q.  Yeah, well, you're saying you didn't
17  fire him?
18     A.  We didn't fire him, he quit.
19     Q.  Do you remember there being a trade
20  show in Chicago in May or June of 2005 in which
21  Henry Hicks spoke and gave a presentation?
22     A.  I don't know.  I can't confirm the
23  date.  I do recall him being at a trade show in
24  Chicago, in Rosemont, Illinois, actually, with
25  Henry where he spoke relating to supplier

Page 159

1   diversity.  And it was at the contract packaging
2   expo.
3      Q.  How it is that Mr. Hicks came to give
4   this presentation, if you know?
5      A.  I had helped arrange it with the show
6   sponsors.  I -- I was familiar with them through my
7   previous time.
8      Q.  I'm sorry, your previous --
9      A.  Previous experience.  I knew the
10  publisher of Packaging Web magazine, and they were
11  co-sponsors of the trade show.
12     Q.  Okay.  I'll show you Plaintiff's
13  Exhibit Number 10, ask you is that something -- a
14  document you recognize?
15     A.  Yes.
16     Q.  And is that an E-mail that you produced
17  and sent to Hicks and Sellers --
18     A.  Yes.
19     Q.  -- regarding Bob Winter's resignation?
20     A.  Yes.
21     MR. NELMS:  And -- that's it.
22     MR. POUNDSTONE:  Okay.  Mr. Day --
23     THE WITNESS:  Do you want these back?
24     MR. POUNDSTONE:  She'll keep them.
25     MR. NELMS:  She'll take them and incorporate

Page 160

1   them into the transcript.
2
3      EXAMINATION BY MR. POUNDSTONE:
4
5      Q.  I've got a few questions for you, and
6   I'll try to get you through this real quick and get
7   you on out of here.
8      A.  Thank you.
9      Q.  Do you recall Bert Mayer's severance
10  payments ending before they were paid out?
11     A.  Yes, I do.
12     Q.  Okay.  Tell me what you recall about
13  that.
14     A.  I recall we had given Bert severance in
15  accordance with -- with our standard policy, which
16  was one week for every year that he had been there.
17  And I recall that being a ten-week severance
18  period.
19       Bert actually had the blessing, in a
20  perverse sort of way, being let go earlier than --
21  than others and before the bank became particularly
22  strict about what we did with our cash flows.  And
23  frankly, they -- they outright prohibited any
24  severance to people in -- during the -- I think it
25  was in the May time frame.  And that was what

Page 161

1   caused his severance payments to cease.
2      Q.  Okay.  The bank told you you had to
3   stop paying?
4      A.  The bank told us outright that we could
5   not pay severance.
6      Q.  Okay.  Are you aware if Piknik
7   ultimately paid the balance of Mr. Mayer's
8   severance?
9      A.  Yeah.  I've read in the depositions
10  that he ended up getting his pay.  Which I'm glad
11  to hear.
12     Q.  Were -- were salaries of employees
13  other than Miss McGlon and Mr. MacCartney cut?
14     A.  At the -- at the time of those --
15     Q.  At the time of those cuts.
16     A.  Yes.
17     Q.  Was it across-the-board type of cuts?
18     A.  It was, with the exceptions that were
19  noted earlier, we cut -- we cut pay in one form or
20  another for all employees.
21     Q.  Okay.  Were African-American employees'
22  salaries cut at that time?
23     A.  Absolutely.
24     Q.  Do you recall Joe Yates doing some work
25  for Piknik?

Page 162

1    A.  Yes, I do.
2    Q.  Who made the decision to bring him in?
3    A.  It was a decision of Anthony Barber.
4    He had worked with him before.  But, you know, I
5    certainly approved it.
6    Q.  Was he brought in as an employee or
7    consultant?
8    A.  He was brought in as a consultant.  Joe
9    had -- he had actually been a pretty senior level.
10   He was a vice-president level employee at PepsiCo,
11   and he was just starting a consult -- consulting
12   business, and Anthony brought him in as a
13   consultant.
14   Q.  Okay.  Well when he -- when you engaged
15   Mr. Yates, how long did you bring him in for?
16   A.  He was in on a very narrowly defined,
17   very specific assignment.
18   So, Anthony had laid out a timetable for me
19   that encompassed approximately six weeks with the
20   goal being specifically raise the case counts that
21   we were able to produce on the -- on the new
22   Gatorade launch at the Alatex facility.
23   Q.  Okay.  Did --
24   A.  That was all he was responsible for.
25   Q.  When you brought Mr. Yates in, did you

Page 163

1    intend for him to replace Jerry MacCartney?
2    A.  No.  In fact, it -- it was -- it was
3    actually quite the opposite.  He was brought in
4    because he had very specific beverage experience.
5    And he was -- he was going to be working side by
6    side with Jerry to help bring Jerry up to curve in
7    his new job.
8    And then the idea was for Joe to leave and
9    Jerry to be in a position to sustain the equipment.
10   Q.  When you hired Henry Hicks, was it your
11   intention for him to replace Bob Winter?
12   A.  No.  I mean, I alluded to earlier, I
13   viewed those as different jobs.  We did not have
14   somebody who was in an outbound calling mode.  And
15   Bob's expertise was more in what I would call
16   contract administration.
17   In fact, at a subsequent time during Bob's
18   tenure, we changed his title.  And it was a huge
19   issue to take him from vice-president to director.
20   And we -- but we were trying to draw a clear
21   distinction between the inbound and the outbound,
22   because it was -- our customers wanted to know when
23   do I call Henry?  When do I call Bob Winter?
24   Q.  Okay.  Did -- did Bob and Henry work --
25   both work at Piknik for a period of time --

Page 164

1    A.  Oh, gosh.
2    Q.  -- together?
3    A.  They -- they worked together up until
4    the last week of June.  So they -- they were -- I
5    worked with Bob for 22 months, and Henry and Bob
6    worked together for probably 19 months.
7    Q.  Do you remember a time when you told --
8    told Bob that he came off arrogant after giving a
9    presentation?
10   A.  Yeah.  I -- I do remember telling him
11   that.
12   Q.  Okay.  Tell me what you recall about
13   that.
14   A.  It's always hard to give critical
15   feedback to your employees.  But it's also vital
16   for their growth.  And it was, I -- I -- I pulled
17   him aside after one particularly egregious example
18   of his arrogance, but by no means was it the first
19   time.  And it had been building and building and
20   building.
21   And I thought, You know what?  This guy does
22   not understand how he is coming off.  And it's
23   probably going to do him a favor.
24   And that was actually the feedback that Bob
25   gave me, was nobody's ever said that to me before.

Page 165

1    So, yes, I -- and he -- he was in -- the --
2    the thing in particular that Bob does is he talks
3    to everybody in the room no matter how junior or
4    senior as though they don't know anything and he's
5    the only one that's ever worked in the beverage
6    industry before.  And it's really very off-putting
7    to a lot of people.
8    Q.  Did the statement that you made to Bob
9    have anything to do with his race?
10   A.  No.  No.  It -- it -- it is -- it is --
11   I have given feedback of that ilk to
12   African-American employees that have worked for me
13   before.
14   And I've actually had -- I had a counselling
15   session with Henry Hicks at one point about Henry,
16   you are a very bold and self-assured individual,
17   and you are steamrolling over people, and you need
18   to tone it down.
19   So, absolutely not race.
20   Q.  And just so I think we've kind of
21   touched on it, but I don't know that we've really
22   gotten to the full meat of it.
23   Tell me everything you remember concerning
24   the circumstances about Bob Winter leaving Piknik.
25   A.  You know, the Bob Winter's departure

Page 166

1  was, in my mind, an example of no good deed goes
2  unpunished. Because as you can see from -- I think
3  it was Exhibit 8, the -- the letter that was
4  written to Bob under my signature was trying to
5  conveying a very sincere desire not to hurt him on
6  the way out the door and to try and be helpful.
7      And, so, yes, there was a pay cut involved.
8  But that pay cut was de facto severance that was
9  getting around a bank prohibition on severance.
10     And for Bob, within 12 hours of receiving
11 what I thought was a very humane gesture given the
12 difficult circumstances, to then come back into the
13 building at 2:00 in the morning and not only take
14 the company laptop, but go into the company server
15 and download every imaginable document that he
16 could get his hands on, whether it was in his span
17 of control or not, load that on and then leave the
18 building and then submit, no, you're not -- you're
19 not going to cut my pay, him resigning? That
20 document that I think was Number 9? Was exactly
21 the opposite of the reaction that I was expecting.
22     And it was -- it was a very -- the way Bob
23 then went on to start calling on our customers
24 openly, trying to undermine the Piknik business,
25 openly working with Ricky Loeb to try and steal

Page 167

1  current employees, steal current customers, and
2  undermine the Onyx leadership, and we were -- with
3  us there just trying to save the stinking
4  business was, I just thought, horribly mean
5  spirited, mean spirited and -- and horribly
6  misguided.
7      Q.  Do you remember anything specific that
8  he did to try to undermine Piknik?
9      A.  Yeah. And -- and -- and he never -- he
10 never tried to deny the fact that he actually
11 called on Kraft which was, I think, our second
12 largest customer. It was running the Capri Sun
13 bottle can out of our Alatex plant, and he called
14 out and he said, Hey, I'm working with Ricky Loeb
15 and, you know, we're looking at taking control of
16 the business away from Onyx and we're looking to
17 get a group together to do that. And, you know,
18 how would you feel about coming with us if we take
19 the business?
20     Q.  Did you make the decision to eliminate
21 Bob Winter's position the same time that you were
22 making the decision to cut salaries?
23     A.  Yes. It -- in -- in response to the
24 cash crisis of the company. I mean, which is the
25 proximate cause of everything that we did.

Page 168

1      Q.  Okay.
2      A.  We were looking at and it was
3  MacCartney's job was being eliminated at the
4  director level.
5      The pattern that you saw was were these
6  staff jobs of people who were the high-dollar
7  people who were not responsible for actually doing
8  day-to-day work that could be eliminated or
9  reshuffled and let the people who are the line
10 people doing the work absorb that responsibility
11 and oversight.
12     Q.  What was the reason for eliminating Bob
13 Winter's position?
14     A.  We were -- we didn't need any new
15 business. We didn't need the contract
16 administration element of what he provided. We
17 were already full.
18     Our issue wasn't that we needed more
19 business. It was that we needed to be able to run
20 what we had.
21     And between myself, Anthony Barber, Henry
22 Hicks, we had enough knowledge to be able to cover
23 the contract administration elements that were
24 probably the most valuable or acute aspects of
25 Bob's responsibility.

Page 169

1      Q.  Okay. You mentioned that the same-type
2  thing was done with Jerry MacCartney's position.
3  Was that when he was moved from director of
4  logistics to the Alatex plant?
5      A.  Yes. It was the same thing. We
6  happened to have a position that was a need area
7  for us, in Jerry's case, whereas we did not have
8  that for Bob. If we did, we would have offered him
9  something.
10     Q.  When did you leave Piknik?
11     A.  July 7th --
12     Q.  What were the circumstances?
13     A.  -- of 2005.
14     Q.  What were the -- and I assume that was
15 shortly after the Plaintiffs left Piknik?
16     A.  It was within two weeks.
17     Q.  What were the circumstances of you
18 leaving?
19     A.  The bank, again, I surmise what the
20 circumstances were that made the -- that led the
21 bank to make their decision. But for whatever
22 reason, the bank decided to not extend the
23 forbearance agreement that we were in negotiations
24 to extend, and they decided to exercise the rights
25 to take control of the company and appointed Ricky

Page 170

1    Loeb as the CEO.
2         And the first thing Ricky did was fire me
3    and fire Jeff Larry.
4         (Three-minute warning given by Technician.)
5         (Videotape Number 2 was then concluded at
6    1534.)
7         (Discussion off the record.)
8         (On the record at 1537.)
9    BY MR. POUNDSTONE:
10        Q.   Mr. Day, are you aware of allegations
11   made by Mr. Mayer and Mr. MacCartney particularly
12   in this lawsuit that you made a comment the first
13   day you were in the plant on the plant floor that
14   you wanted to replace white managers with blacks?
15        A.   I'm aware from the depositions that
16   they made that statement.
17        Q.   Okay.  Tell me what, if anything, you
18   recall saying anywhere close to that regard.
19        A.   What I was describing to them was a
20   couple of things.
21        One was a process.  And that is that in
22   order to -- in order to fairly represent both the
23   community that we were doing business in,
24   Montgomery which is 50 percent African-American by
25   census, and the vision of Onyx Capital Ventures of

Page 171

1    being more than a sham with one black guy at the
2    top, the only way to -- the only way to address
3    that when -- and -- and by the way, I looked around
4    and was pointing out the fact that there were zero
5    African-Americans in management at Piknik in the
6    town that's 50 percent black, that you had to
7    address that by a process, and that that needed to
8    be -- African-Americans needed to become part of
9    the management hiring process.
10        Doesn't mean we're going to take blacks over
11   whites, it means you got to present
12   African-American candidates when openings were
13   there.
14        And this was something that we got into
15   discussions with the Pepsis and Proctor and
16   Gamble's with.  They wanted to see what Onyx was
17   doing turned into a social program where we were
18   going in.
19        And we always pushed back and said, no,
20   we're about ownership and management control, and a
21   slow sustainable process of introducing
22   African-Americans into management ranks in the
23   companies that we acquire.
24        Nothing would have been more disruptive than
25   to go in and turn a place upside-down just for

Page 172

1    racial reasons.
2         And oh, by the way, we plan to be in
3    business and acquire another companies, and you
4    don't think word would get out to the other
5    companies we're looking at that, oh, yeah, you
6    better watch out, all you white guys, you're going
7    to -- we never want to do that.  That's bad
8    business.
9         So, they must have misinterpreted the
10   direction that I was giving.
11        Q.   In fact, did you give any of the
12   Plaintiffs raises after you came on board?
13        A.   All of them, I believe.  Maybe -- maybe
14   I didn't give one to Shannon because of the
15   maternity leave.  But I know that I gave a raise to
16   Bob Winter and to Jerry and to Bert.  I think
17   that's even one of the exhibits in here.
18        We recognize good performance where there
19   was.
20        And that's the other thing that made
21   the -- the comment that they were attributing to me
22   sound to ridiculous to me, and that is in mergers
23   and acquisitions, period, about whether it's big
24   companies, small companies, white, black or
25   otherwise, I was reading a Harvard Business Review

Page 173

1    study not that long ago where they were talking
2    about the average tenure of management teams when
3    they're -- when they're acquired is about seven and
4    a half months.
5         All of these guys were still in place almost
6    two years later.  Two years later.
7         I mean, shoot, I'd be happy to get a job
8    right now where I can say that I'm sure I'm going
9    to be working there two years later.
10        Q.   Okay.  And you say you may not have
11   given Shannon a raise because of maternity leave.
12   Do you mean because she went to reduced hours after
13   she had a baby?
14        A.   Right.
15        Q.   Okay.
16        A.   And we kept her at 80 -- I think she
17   was at $85,000 a year working part time.
18        Q.   Did you ever tell anybody that you were
19   going to get rid of them and replace them with an
20   African-American?
21        A.   Never.  Never.
22        Q.   In fact, did you hire whites while you
23   were at Piknik?
24        A.   Yeah.  I did hire whites when I was at
25   Piknik.

Page 174

1    And, in fact, if I look at the number of
2  African-Americans that were hired, I mean, I can
3  name the fact that we brought in Anthony Barber,
4  Henry Hicks, and Annissia Haynard during that
5  period of time. And there might have been, you
6  know, another one.
7    But, I mean, we hired Carl Bleier to run the
8  beverage business. We hired Allan Walters as -- in
9  the quality area at Day Street who's white; Jessica
10 Daniels who's white; Robert Niedbalski,
11 N-I-E-D-B-A-L-S-K-I, who is the corporate
12 controller.
13   We -- I hired more whites during my time
14 there than we did African-Americans.
15   Q. And were there still white managers at
16 Piknik after the Plaintiffs left their employment
17 at Piknik?
18   A. There were still more -- yes.
19 And -- and they still outnumber the
20 African-Americans.
21   Q. Do you recall the incident where Bob
22 Gross made a derogatory statement about Hispanics?
23   A. Yes. I wasn't present at the time that
24 it was done, but I was made aware of it, yes.
25   Q. Was anything done to Bob in response to

Page 175

1  those statements?
2    A. Yes. He was reprimanded both verbally
3  and in writing, and he was -- it was mandated that
4  he go to sensitivity training.
5    Q. Were there African-Americans that you
6  terminated while you were at Piknik?
7    A. Yes, there were several that were
8  terminated during that time.
9    Most of whom, since there weren't any in the
10 senior management ranks, most of whom were shift
11 supervisors or department supervisors.
12   Q. Do you remember anybody in particular?
13   A. I can remember a second shift Day
14 Street production supervisor, not by name, that we
15 had to terminate.
16   And Shannon and I actually were within days
17 of terminating Mavis Richardson, who is one of the
18 people that we had talked about before, who is an
19 African-American that was hired on my and Shannon's
20 watch. And she was just -- she was not working
21 out. And she resigned just before we were going to
22 do it.
23   Q. And who, if anybody, did you replace
24 Mavis with?
25   A. We replaced her with Allan Walters.

Page 176

1    Q. What is his race?
2    A. And he's a white male.
3    Q. At some point, did you send a
4  communication to some Piknik managers asking them
5  not to have communications concerning the business
6  with Ricky Loeb?
7    A. Yes. I did. I think it's one of the
8  exhibits in here.
9    Q. Okay. What was your -- what were your
10 reasons for doing that?
11   A. The main reason was that we were all
12 taxed, working extremely long hours at a very, very
13 difficult situation that we were trying to manage
14 through.
15   And Ricky, on his best day, is a
16 distraction. And he was causing us a tremendous
17 amount of wasted non-value added effort trying to
18 clean up the messes he was starting with his
19 meddling. And his meddling was not to try and
20 further the business. He was trying to meddle so
21 that he had something to do and people would think
22 that he was important and still involved in the
23 business.
24   And, so, I didn't say that you couldn't talk
25 to him outside of work. I didn't say you couldn't

Page 177

1  talk to him at all.
2    I said, Don't talk to him about business
3  stuff because he doesn't have a business role.
4    And I was doing it as much for their
5  protection. Make me the bad guy. Make Jeff the
6  bad guy. We'll give you a reason not to talk to
7  him.
8    Because so many of them were saying, he
9  calls me and what am I supposed to say?
10   I said, Make me the bad guy. That's fine.
11 I'm trying to keep you from having a boatload of
12 wasted time in your day. And it's wasted time just
13 talking to him, but it will be five times as much
14 waste when you're trying to clean up the mess that
15 he will instigate.
16   Q. Did race have anything whatsoever to do
17 with your directions in that regard?
18   A. No. Ricky was all the bad things that
19 I could ever say about him, and it had nothing to
20 do with the fact that he was white. It's just who
21 he was.
22   MR. POUNDSTONE: Okay. No more questions.
23   MR. NELMS: I have just one.
24
25

Page 178

1    EXAMINATION BY MR. NELMS:
2
3    Q.  It strikes me, did you have a hard time
4    during the entire time you were associated with
5    Onyx finding qualified minority managers and
6    executives to fill roles?
7    A.  I didn't have a hard time.  It -- is it
8    harder than trying to find the same number of
9    qualified non-minority candidates?  Yes.
10    And that was part of why -- part of the
11    benefit of Onyx's formation was that we were trying
12    to go into industries that historically were not --
13    had no minority ownership whatsoever, and no
14    executives with experience in those industries.
15    So, yes, we did have to, given -- given that
16    what we were operating against in a historical
17    climate, it was a little bit harder.
18    Q.  What steps did you take to try to find
19    the minority managers and executives that you
20    wanted to have onboard with Onyx?
21    A.  Well, I utilized, you know, my personal
22    network through other executives that I knew and
23    White House fellows, which is a great, although
24    small, alumni network.
25    And then just -- just made it a requirement

Page 179

1    as part of the recruiting process.  You didn't have
2    to hire them, but you had to at least present
3    qualified candidates, which forced -- which forced
4    a little extra work on people that they didn't
5    always appreciate.
6    Q.  Did you go to any educational
7    institutions that are historically black in
8    attempts to recruit?
9    A.  Absolutely.  We -- we -- I know Brenda
10    Sellers went to -- what is it?  Alabama State?  Is
11    that the one that's in Montgomery.
12    Q.  I believe so, yes.
13    A.  I believe it's like a bee logo?  Like a
14    stringer or something?
15    MR. POUNDSTONE:  It's a yellow jacket.
16    THE WITNESS:  Yellow jacket.
17    MR. POUNDSTONE:  Hornet.  Hornet.
18    THE WITNESS:  Hornet.  I'm sorry.  I just
19    remembered the visuals.
20    She went there for a -- and did a recruiting
21    fair.
22    I think we also went to -- not me, but
23    Brenda also went to Tuskeegee which wasn't that far
24    away just to -- it was more for awareness.  When
25    you graduate from here, you know, come look us up.

Page 180

1    Q.  Was that for Onyx?  Or was that for
2    Piknik specifically?
3    A.  That was for Piknik.
4    Q.  But, during your tenure at Onyx, there
5    were at least two other business acquisitions?
6    A.  Yes.
7    Q.  Core and --
8    A.  PDI.
9    Q.  -- PDI.
10    Did you have any occasion to attempt to
11    recruit qualified African-American managers and
12    executives for those other two acquisitions?
13    A.  Yes.  I -- I was -- I was in a role of
14    either being a decision maker or a recommender.
15    Q.  The decider, as George Bush would us
16    have us say.
17    A.  I'll use your word, Counselor.
18    MR. NELMS:  I'm done.
19    MR. POUNDSTONE:  Okay.
20
21    The following were marked for Identification:
22    EXH. 1  C. Day E-Mail to Winter, Crosby, et
23    al, Two Pages.
24    EXH. 2  C. Day Letter to Bert Mayer dated
25    5/4/04.

Page 181

1    EXH. 3  Anthony Barber E-Mail to C. Day
2    dated 5/4/05.
3    EXH. 4  C. Day Memo to Shannon McGlon dated
4    6/20/05.
5    EXH. 5  Henry Hicks E-Mail to C. Day, and
6    C. Day E-Mail to Brenda
7    Sellers dated 6/15/05, Two
8    Pages.
9    EXH. 6  Robert Lampert/C. Day E-Mail dated
10    6/16/05, Two Pages.
11    EXH. 7  C. Day E-Mail to Barber, Sellers,
12    Hicks, Two Pages.
13    EXH. 8  Henry Hicks E-Mail to Sellers and
14    Day dated 6/21/05, Two Pages.
15    EXH. 9  C. Day E-Mail to Robert Winter
16    dated 6/23/05.
17    EXH. 10  C. Day E-Mail to Henry Hicks dated
18    6/23/05
19
20
21    (Videotape Number 3 and the proceedings for
22    9/12/07 were concluded at 1549.)
23    * * *
24
25

Page 182

1  STATE OF NEW YORK)
2       ss:
3  COUNTY OF ERIE  )
4
5       I DO HEREBY CERTIFY as a Notary Public in and
6  for the State of New York, that I did attend and
7  report the foregoing deposition, which was taken
8  down by me in a verbatim manner by means of machine
9  shorthand.  Further, that the deposition was then
10 reduced to writing in my presence and under my
11 direction.  That the deposition was taken to be
12 used in the foregoing entitled action.  That the
13 said deponent, before examination, was duly sworn
14 to testify to the truth, the whole truth and
15 nothing but the truth, relative to said action.
16
17
18
                     ---------------------------
19                   ANN M. SAWYER,
                     Notary Public.
20
21
22
23
24
25

Page 184

1              INDEX TO WITNESSES
2  Witness        Examination        Page
3  CHRISTOPHER JAMES   BY MR. POUNDSTONE:     160
   DAY
4            BY MR. NELMS:        178
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 183

1            INDEX TO EXHIBITS
2  Exhibit    Description        Page
3  EXH. 1     C. Day E-Mail to Winter,    180
           Crosby, et al, Two Pages
4
   EXH. 2     C. Day Letter to Bert Mayer   180
5            dated 5/4/04
6  EXH. 3     Anthony Barber E-Mail to C.   181
           Day dated 5/4/05
7
   EXH. 4     C. Day Memo to Shannon      181
8            McGlon dated 6/20/05
9  EXH. 5     Henry Hicks E-Mail to C.    181
           Day, and C. Day E-Mail to
10           Brenda Sellers dated
           6/15/05, Two Pages
11
   EXH. 6     Robert Lampert/C. Day       181
12           E-Mail dated 6/16/05, Two
           Pages
13
   EXH. 7     C. Day E-Mail to Barber,    181
14           Sellers, Hicks, Two Pages.
15 EXH. 8     Henry Hicks E-Mail to       181
           Sellers and Day dated
16           6/21/05, Two Pages.
17 EXH. 9     C. Day E-Mail to Robert     181
           Winter dated 6/23/05
18
   EXH. 10    C. Day E-Mail to Henry      181
19           Hicks dated 6/23/05
20
21
22
23
24
25



| From: | |
|---|---|
| Sent: | |
| To: | *Redacted* |
| Subject: | *Atty/Client Priv.* |

**From:** CDay12345@aol.com [mailto:CDay12345@aol.com]
**Sent:** Friday, 10:15 AM
**To:** bwinter@piknikproducts.com; ecrosby@piknikproducts.com; bmayer@piknikproducts.com; bsellers@piknikproducts.com; smcglon@piknikproducts.com; jwhitehead@piknikproducts.com
**Cc:** cbleier@piknikproducts.com; abarber@piknikproducts.com; hhicks@piknikproducts.com; rlampert@piknikproducts.com; jmaccartney@piknikproducts.com; jlarry@onyxcapitalventures.com
**Subject:** Policy on Communications with Ricky

Bob/Eddie/Bert/Shannon/Jimmy/Brenda:

In the interest of protecting you and the company from unnecessary distractions, please cease all business conversations with Ricky Loeb. Whether you choose to see Ricky outside of work is up to you, but if you do please refrain from discussing Piknik and its business.

Although this applies to everyone at Piknik, this is directed at the 6 of you since you have been around the longest and are on the list of people Ricky feels comfortable calling. Given your relationship with Ricky, I understand how hard it is to say no. This email gives you a specific policy to remove the awkwardness of turning Ricky down. The Mike Ellis resignation fiasco is just the most recent of the countless episodes where Ricky inserted himself, thanks to phone calls to and from some of you, that turned the place upside down and required hours and hours of wasted time trying to put things back together - with no added value.

Part of what made the old Piknik a poor performing company and an unpleasant place to work was the culture of gossip and politics emanating from Ricky. As wonderful a person as he is (and I genuinely like him), Ricky has an inadvertently destructive way of gathering and reacting to information. To succeed at changing to an analysis-based, action and accountability-driven company, we have to cut out the remaining vestiges of the gossip culture. As painful as it is to acknowledge, it won't succeed without cutting off Ricky's communication channels.

Jeff communicated to Ricky back in March that Onyx would honor information requests commensurate with Ricky's status as a board member, but that all information requests must come through Jeff. This is to protect the rest of the management team, including me, from spending time on non-value-added activities initiated by Ricky. Jeff will be the decision maker on what gets said and done regarding Ricky - it is not for you or me to decide if it's a harmless question or not. If you receive a phone call or email from Ricky, please refer to this policy and gently direct him to Jeff.

This includes calls without a direct request - "hey, I heard that this is going on..." Please don't respond. Some of you may not want to do this - getting a call from Ricky may make you feel powerful and important - but I have to insist. Your "innocent" comments to Ricky will never be kept in confidence - it will ALWAYS wind up impacting many other people.

The hiring of Anthony and Carl gives us a permanent, living-in-Alabama leadership that we've needed to complete the culture transformation at Piknik. Now that we have that leadership, I will take every step necessary to support it. If another grapevine fiasco occurs and I can trace it back to anyone, I will deal with it severely. We've had almost 2 years to get used to Onyx' ownership - it's time to cut the cord and be who we are going to be.

**EXHIBIT**

Please call me directly if you have any questions or want any clarifications.

Chris



Date:  May 4, 2004

To:  Bert Mayer
     Director, Operations

From:  Chris Day
       EVP, Operations and Human Resources

Re:  Compensation

When I approached you last month about what department you would like to work in long
term, you mentioned that your preference would be to return to Finance. As a result we
created a placeholder position in Finance that is earmarked for you once we can hire a
replacement for you as Director of Operations. This position is being defined more
specifically by Bob as we speak, but it will be similar to the position you left when you
became Director of Operations.

As we discussed, the market pay rate for this position is approximately what were making
when you left Finance or approximately $53,000 per year. In recognition of your dedication
and sacrifice for the company, we will not ask you to take a pay cut from your current salary
of $73,000 when you return, although your salary will effectively be frozen at that level for
some time until your responsibilities match your compensation.

As for your pay in your current position, your current salary is below the market rate for that
job. In order to reflect a market compensation for the job you are in, while not subjecting you
to a large salary cut when you move back to Finance in the future, we will provide you with a
unique compensation arrangement. Starting April 1, 2004, Piknik will begin to accrue $2,000
per month that will be paid out to you when you leave the Director of Operations job. This
has the benefit of achieving an effective $97,000 per year salary rate while in your current
role; receiving it in a lump sum will keep you from getting used to the extra money each
month, and no salary decline will occur when you return to Finance.

I appreciate all your hard work and dedication, and I hope you feel this is a fair arrangement.
Thanks again.

Chris Day
EVP, Operations & Human Resources

*HR Copy*

EXHIBIT
2

low2



**From:**
**Sent:**
**To:**
**Subject:**

*Redacted*
*Atty/Client Priv.*

**From:** Anthony Barber [mailto:abarber@piknikproducts.com]
**Sent:** Wednesday, May 04, 2005 3:10 PM
**To:** 'C Day'; CDay12345@aol.com; 'Chris Day'
**Cc:** bsellers@piknikproducts.com
**Subject:** Plant Engineer

Chris,
Attached you will find a cover letter and a resume for someone I'd like to interview for the Plant Engineering job. We have an outstanding work history together, and I believe she would be an outstanding candidate for this role. She now lives in the Atlanta area, yet she grew up in Tuskeegee, Al. and has a degree in Electrical Engineering from Tuskeegee Institute. Please review her credentials and let me know your thoughts.
Regards,

**Anthony U. Barber**





EXHIBIT

3

8/17/2005



Date:   June 20, 2005

To:     Shannon McGlon

From:   Chris Day

Re:     Salary Adjustment

Shannon, I regret that the current circumstances at Piknik necessitate imposing salary reductions. Effective with this pay period, your rate of salary will be $50,000 per year until further notice. I am hopeful that we can emerge from this bank-induced situation before too long and increase pay rates again, but until then we have to make painful choices to keep the company operating. Please accept my apologies.


Chris


Cc:     Jeffery Larry, CEO
        Brenda Sellers, HR





Redacted
Atty/Client Priv.

**From:** Henry Hicks [mailto:hhicks@piknikproducts.com]
**Sent:** Wednesday, June 15, 2005 8:20 PM
**To:** cday@piknikproducts.com; 'Brenda Sellers'
**Cc:** cbleier@piknikproducts.com; abarber@piknikproducts.com; rlampert@piknikproducts.com;
dpalmer@onyxcapitalventures.com
**Subject:** RE: Talking Points Document – Destroy Remaining Copies

This revised version of the talking points is more complete that the previous one and is for internal use only.

Henry

H. Beecher Hicks, III
Vice President, Sales and Marketing
Piknik Products Company
404/653-8914 office
404/313-6669 cell
509/471-8561 efax
www.piknikproducts.com

**From:** Chris Day [mailto:cday@piknikproducts.com]
**Sent:** Wednesday, June 15, 2005 6:20 PM
**To:** 'Brenda Sellers'
**Cc:** cbleier@piknikproducts.com; hhicks@piknikproducts.com; abarber@piknikproducts.com;
rlampert@piknikproducts.com; dpalmer@onyxcapitalventures.com
**Subject:** Talking Points Document – Destroy Remaining Copies

Team:

The Onyx legal team was late in getting us their comments to the talking points we just handed out at the 4pm meetings. Henry is in possession of their comments, and is synthesizing them into a final document. It doesn't fundamentally change what was said, but certain statements could be misinterpreted when looked at from a strictly legal point of view.

Please destroy any copies of the original document that are in your possession and retrieve any remain in the office. I realize some may have gone home with people since most people went home after the meetings

8/17/2005

EXHIBIT
5

there is really nothing we can do in that circumstance. Henry will issue a new document for your files and for your use in conversations with external people.

Sorry for the inconvenience.

Chris



-----Original Message-----
From: Robert Lampert [mailto:rlampert@piknikproducts.com]
Sent: Thursday, June 16, 2005 5:37 PM
To: cday12345@aol.com
Cc: 'Brenda Sellers'
Subject: RE: CONFIDENTIAL - Salaried Payroll Changes.

Chris - just wanted to confirm.

Brenda expressed a concern with not putting the changes into payroll until you have
talked with all those affected. Payroll is ok with that, we will plan on holding the payroll
submission until Tuesday, obviously, the earlier the better.

To clarify in my mind, what is the effective date of the changes? Salaried payroll was
paid through the week ending 6/11. Is the change effective for the week ended 6/18
(this week) or the week ending 6/25?

-----Original Message-----
From: Christopher Day [mailto:cday12345@nextel.blackberry.net]
Sent: Thursday, June 16, 2005 5:08 PM
To: Bob Lampert
Cc: Brenda Sellers; Jeff Larry
Subject: CONFIDENTIAL - Salaried Payroll Changes

Bob:
Here are the details of the changes to the salaried payroll for the current pay period:

Reduce all salaried personnel by 5%, retroactive to the start of the pay period, with the
following exceptions -

1

EXHIBIT
6

No cuts for the two new people, Barber and Hanyard;

Cut McGlon, Winter and Whitehead to $50,000 per year each;

Cut MacCartney to $70,000 per year;

Cut E. Crosby to $65,000 per year;

Anthony will have additional changes in the supervisory staffing by Monday.

Call me with any questions.

Chris
Christopher Day
Onyx Capital Ventures
(312) 902-5483 office
(334) 549-6483 mobile
cday@onyxcapitalventures.com





**From:**

**Sent:**

**To:**

**Subject:**

*Redacted*
*Atty/Client Priv.*

**From:** CDay12345@aol.com [mailto:CDay12345@aol.com]
**Sent:**
**To:** abarber@piknikproducts.com; bsellers@piknikproducts.com; hhicks@piknikproducts.com
**Subject:** Whitehead letter, others

Anthony/Brenda and Henry:

Attached is the letter I drew up for Jimmy. You can choose to use it or not in your meeting with him this morning, but I wanted to get it to you.

I'll attach the letters I have for MacCartney, McGlon and Winter as well. I'll plan to let Henry handle Winter when he gets in; Anthony you should handle the other two. Jerry's letter speaks specifically to his job duties.

Let me know if any of you wants me in the meeting - I am willing to deliver the bad news personally if you need me to.

Thanks,
Chris

**EXHIBIT**

7



Date:   June 15, 2005

To:     Jimmy Whitehead

From:   Chris Day

Re:     Salary Adjustment


Jimmy, I regret that the current circumstances at Piknik necessitate imposing salary reductions. Effective with this pay period, your rate of salary will be $50,000 per year until further notice. I am hopeful that we can emerge from this bank-induced situation before too long and increase pay rates again, but until then we have to make painful choices to keep the company operating. Please accept my apologies.



Chris



Cc:     Jeffery Larry, CEO
        Brenda Sellers, HR



From: Henry Hicks [mailto:hhicks@piknikproducts.com]
Sent: Tuesday, June 21, 2005 11:42 PM
To: Brenda Sellers; cday12345@aol.com
Subject: Winter Letter


Chris and Brenda –

Please review the attached letter for Bob W.  Brenda and I plan to meet with Bob tomorrow, preferably in the morning, but before the close of the day.  Chris, I think this should have your signature on the letter so I want to make certain that we have your feedback in advance of the meeting.

<<...>>

Henry

H. Beecher Hicks, III
Vice President, Sales and Marketing
Piknik Products Company
404/653-8914 office
404/313-6669 cell
509/471-8561 efax
www.piknikproducts.com

**EXHIBIT**

8



June 22, 2005

Mr. Robert Winter
3806 Day Street
Montgomery, AL 36108

HAND DELIVERED

Dear Bob:

I regret to inform you that the current circumstances at Piknik necessitate changes in your position with the company. Effective this pay period your rate of salary will be reduced to $50,000 per year, and your position will be eliminated effective July 29th, 2005.

We want to be as supportive as possible as you transition to another career opportunity. Please use the time between now and the end of July to support your colleagues in the transition of your job responsibilities, but also to consider and commence a search for a new position. You are welcome to use me, Henry or Brenda as resources or to answer any questions during this period.

It is with genuine regret that we are making these changes to ensure the continuation of the company. Please accept my thanks for your service and commitment to Piknik Products.

Sincerely,

Chris Day
President

cc:    Henry Hicks
       Jeff Larry
       Brenda Sellers



Redacted
Atty/Client Priv.

---

**From:** CDay12345@aol.com [mailto:CDay12345@aol.com]
**Sent:** Thursday, June 23, 2005 2:59 PM
**To:** robertawinter@bellsouth.net; hhicks@piknikproducts.com; bsellers@piknikproducts.com
**Subject:** Re: Termination effective immediately

Bob:

I am sorry the company's circumstances have changed so quickly, and I wish we didn't have to do some of the things we've had to. I understand your decision to not work the next 5 weeks. Your resignation is accepted.

I know you gave us your best while you were here, and I really appreciate it. I wish you the best going forward.

Chris



EXHIBIT
9



From: ████████
Sent: ████████
To: ████████
Subject: ████████

*Redacted*
*Atty/Client Priv.*

From: CDay12345@aol.com [mailto:CDay12345@aol.com]
Sent: Thursday, June 23, 2005 3:00 PM
To: hhicks@onyxcapitalventures.com
Cc: bsellers@piknikproducts.com
Subject: Announcement on Winter

Henry:

Would you mind drafting a quick email for Piknik-wide distribution informing people that Bob has chosen to resign and we wish him well -

Thanks,
Chris



EXHIBIT
_6_

7/25/2005