# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JERRY A. MacCARTNEY,          *
BERT MAYER, SHANNON A.        *
McGLON and ROBERT A. WINTER,  *
                              *
            Plaintiffs,       *      CIVIL ACTION FILE
                              *
vs.                           *      NO. 2:05cv1207-MHT
                              *
PIKNIK ACQUISITION CORP.,     *
L.L.C., et al,                *
                              *
            Defendant.        *


          The deposition of HENRY B. HICKS, taken pursuant to

the stipulations contained herein; the reading and signing of

the deposition waived, before Susan F. Roper, B-1106,

Certified Court Reporter, commencing at 10:01 a.m., on

Thursday, August 30, 2007, at Equitable Building, Suite 2100,

Atlanta, Georgia.


APPEARANCES:

FOR THE PLAINTIFFS:  K. ANDERSON NELMS, ESQUIRE

FOR THE DEFENDANT:   ROBERT E. POUNDSTONE, IV, ESQUIRE


                VERBATIM COURT REPORTERS, INC.
                        P.O. Box 2637
                  Covington, Georgia 30015

                      (770) 788-2373



EXHIBIT
3

Page 2

APPEARANCES

FOR THE PLAINTIFFS:

K. ANDERSON NELMS, ESQUIRE
LAW OFFICES OF JAY LEWIS, LLC
Post Office Box 5059
Montgomery, Alabama 36103
(334) 263-7733

FOR THE DEFENDANT:
ROBERT E. POUNDSTONE, IV, ESQUIRE
BRADLEY ARANT ROSE & WHITE, LLP
Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, Alabama 36104
(334) 956-7700

VERBATIM COURT REPORTERS, INC.
P.O. Box 2637
Covington, Georgia 30015
(770) 788-2373

Page 3

INDEX

WITNESS                          PAGE

HENRY B. HICKS

Cross-Examination by Mr. Nelms......................4

Redirect Examination by Mr. Poundstone.............150

EXHIBITS

BY THE PLAINTIFFS:
Exhibit No. 1 -- Personnel Announcement.............119
Exhibit No. 2 -- Piknik Products External
          Communications.....................119

Exhibit No. 3 -- E-mail - Pay Cuts & Severance.......126

Exhibit No. 4 -- E-mail correspondence...............129

Exhibit No. 5 -- Piknik Executive Discussion
          Document re: Hershey Foods..........130
Exhibit No. 6 -- E-mail - New Reporting Structure....142
Exhibit No. 7 -- The Competitive Realty of
          Supplier Diversity.................144

(Originally marked exhibits attached to the original of
the deposition and a copy attached to all copies produced.)

VERBATIM COURT REPORTERS, INC.
P.O. Box 2637
Covington, Georgia 30015
(770) 788-2373

Page 4

1        PROCEEDINGS
2            10:01 a.m.
3    (Witness sworn by court reporter)
4  Whereupon,
5        HENRY BEECHER HICKS
6  was called as a witness herein, and having been first duly
7  sworn, was examined and testified as follows:
8        CROSS-EXAMINATION
9  BY MR. NELMS:
10   Q   State your name for the court reporter, please.
11   A   Henry Hicks.
12   Q   And your middle name, please?
13   A   Beecher.
14   Q   Beecher?
15   A   Yes.
16   Q   And how old are you Mr. Hicks?
17   A   I am 39 years old.
18   Q   And where do you reside currently?
19   A   I reside in Atlanta, Georgia.
20   Q   Okay.  And your address?
21   A   5255 Serenity Lane, Atlanta, Georgia.  The ZIP code
22  is 30349.
23   Q   And your actual date of birth, please?
24   A   September 21, 1967.
25   Q   How long have you lived at your current address?

Page 5

1    A   For approximately two years.
2    Q   And at what address did you live before that?
3    A   3735 Winfield Court, Atlanta, Georgia 30331.
4    Q   Have you ever given a deposition before?
5    A   Yes.
6    Q   Do you recall how many?
7    A   One.
8    Q   Just once?
9    A   Yes.
10   Q   What kind of action was it; do you remember?
11   A   It was a bankruptcy proceeding.
12   Q   Okay.  Was it revolving around Piknik?
13   A   It was.
14   Q   Okay.  When was that deposition taken?
15   A   Six to 12 months ago.
16   Q   Do you recall the lawyer that took the deposition,
17  his name?
18   A   No, I don't.
19   Q   Was it here in Atlanta?
20   A   It was done by phone.
21   Q   Okay.  Were you a party?
22   A   Who is a party?  I was a defendant in a -- in -- in
23  a lawsuit relating to the bankruptcy.
24   Q   Okay.  Was that an adversarial proceeding?  Does
25  that sound familiar?

Page 6

```
 1    A   I'm not sure.  What would that mean in this
 2  context?
 3    Q   Well, you didn't file bankruptcy, I would assume?
 4    A   I did not, no.
 5    Q   Okay.
 6    A   The company filed bankruptcy and -- and I was sued
 7  because I was paid.  I was compensated by the company and I
 8  was sued to retrieve some of that compensation.
 9    Q   Thank you.  And what was the ultimate outcome of
10  that suit?
11    A   It's still being litigated.
12    Q   Let me just cover some of the ground rules on a
13  deposition so you'll be familiar with them.
14        That one was given telephonically, so the rules may
15  be a little bit different.  Your lawyer is here with you
16  today.  You certainly have the right at any time to confer
17  with him regarding any issue at all you wish to.
18        I have absolutely no problem -- you have a right to
19  go on break any time you want to, if the need strikes you.
20  If you don't understand any of my questions, just say, I'm
21  sorry.  I didn't understand that.  I have a bad habit of
22  asking compound questions, which could confuse the brightest
23  of people.  It's not your fault, it's mine.  So just -- you
24  know, just please just bring it to my attention and I'll try
25  to correct myself.
```

Page 7

```
 1        Again, if you need to confer with Bobby at any
 2  point in time, there's absolutely no reason why you can't
 3  stop and do that.
 4    A   Okay.
 5    Q   Is there any reason that you may be inhibited in
 6  any way as to your testimony that you're going to give today?
 7    A   Not to my knowledge.
 8    Q   Okay.  Are you on any medications that may affect
 9  your memory or your ability to testify today?
10    A   No.
11    Q   Okay.  Any -- forgive me, some questions are
12  strange.
13        Any mental incapacities that would prevent you from
14  being able to truthfully and completely answer any questions
15  that I ask you today during the course of this deposition?
16    A   No.
17    Q   Okay.  Thank you.
18    A   Uh-huh.
19    Q   Who is your current employer?
20    A   I am unemployed.
21    Q   All right.  Who was your last employer?
22    A   Packaging Division Industries out of Chicago,
23  Illinois.
24    Q   Packaging Division Industries?
25    A   Yes.
```

Page 8

```
 1    Q   And what kind of business is that?
 2    A   They are a contract manufacturer and packager.
 3    Q   Okay.  Is Packaging Division Industries owned or
 4  affiliated in any way with Onyx?
 5    A   It is.
 6    Q   Okay.  What's that relationship, if you know?
 7    A   Onyx owns a controlling interest in that company.
 8    Q   Do you know what percentage share?
 9    A   I don't.
10    Q   Okay.  How did you come to work at Park [sic]
11  Division Industries?
12    A   It's Packaging Division Industries.
13    Q   Packaging, I'm sorry.
14    A   I got a call from Jeff Larry, asking if I would
15  consider doing that.
16    Q   And what position did you hold?
17    A   Vice president of sales and marketing.
18    Q   And, again, Packaging Division Industries, what
19  exactly is -- what type of business is that?
20    A   They are a contract manufacturer primarily of Heinz
21  brand soup products, as well as a re-packager of consumer
22  package goods for companies like Kraft and Wrigley.
23    Q   What does it mean to be a re-packager?
24    A   For example, they take Oreo's out of the package
25  that you would buy in the store and put them in the two-count
```

Page 9

```
 1  that you would buy at the gas station.  So they re-package
 2  the product for the brand owner.
 3    Q   And how long did you work there?
 4    A   For about nine months.
 5    Q   What caused you to stop working there?
 6    A   I was tired of the travel.
 7    Q   Were you living here in Atlanta at the time?
 8    A   Yes.
 9    Q   So you were having to travel to Chicago?
10    A   Yes.
11    Q   How often were you traveling to Chicago?
12    A   Weekly.
13    Q   Flying?
14    A   Yes.
15    Q   What was your -- how were you compensated?  Were
16  you paid a salary?
17    A   Yes.
18    Q   What were you paid?
19    A   $180,000 a year.
20    Q   Give me the approximate months that you worked
21  there.
22    A   July of '06 until April or May of '07.
23    Q   Before working at Packaging Division, what was your
24  next employment?
25    A   I was self-employed.
```

Page 10

```
1    Q   Did you have a company?
2    A   I did, called Equilibrium Growth Advisors.
3    Q   And what kind of business is that?
4    A   It's an interim management and strategic consulting
5    firm.
6    Q   Intern?
7    A   Interim.
8    Q   Interim?
9    A   Yes.
10   Q   And what exactly is that?
11   A   We'd go and do things for companies, like help them
12   develop financial projections and raise capital or go in and
13   take an interim management role with a company to accomplish
14   some specific task and then execute that for a period of time
15   before leaving to do something else.
16   Q   Can you -- who was your largest -- first of all,
17   how long did you have Interim -- excuse me, Equilibrium?  How
18   long did you have that as your business?
19   A   Well, I've had Equilibrium -- I've used Equilibrium
20   off and on since probably 2000.
21   Q   Is it currently active?
22   A   It is not.
23   Q   Okay.  When did it stop being an active company?
24   A   When I joined -- I'm sorry, if you mean by active,
25   I pay the fees every year to keep it active as a -- as a
```

Page 11

```
1    legal entity.
2    Q   Yes, sir.
3    A   But I'm not pursuing any of that kind of work
4    today.  So that's -- so it depends on what you mean by
5    "active".
6    Q   Okay.  I assume that you had some clientele or
7    customers for Equilibrium?
8    A   I did.
9    Q   And you began having those customers in the year
10   2000, I'm guessing?
11   A   Yes.
12   Q   All right.  When did you have your last customer?
13   A   My last customer was in 2006 -- actually, 2005.
14   Q   Who was your last active customer at Equilibrium?
15   A   It was Core Systems, LLC in Cleveland, Ohio.
16   Q   What is Core Systems?
17   A   Core Systems is an injection molding company.
18   Q   What kind of sub straight is being injected?
19   A   Plastic.
20   Q   Plastic?
21   A   Plastic.
22   Q   Making any particular type of product?
23   A   Yes, automotive electrical components and household
24   appliances.
25   Q   The electrical parts, are those for the automotive
```

Page 12

```
1    industry particularly?
2    A   Not -- no.  Not necessarily.  No.  Their largest
3    customer segment was household appliances.  So even the
4    electrical parts would go in there.  And the automotive stuff
5    is really a -- is a bit of a misnomer, as transportation with
6    automotive companies would actually tend to, for example,
7    with Honda to be in their lawnmower division or something
8    like that, as opposed to -- or in their ATVs as opposed to in
9    their automobiles.
10   Q   And what did Equilibrium do for Core Systems?
11   A   I ran the sales and marketing function for that
12   company.
13   Q   As an independent contractor?
14   A   Yes.
15   Q   Okay.  Were you paid by Core Systems or by
16   Equilibrium?
17   A   I personally was paid by Equilibrium.
18   Q   So were you paid as a representative of Equilibrium
19   in Equilibrium's -- for purposes of taxation, were you paid
20   as an employee of Equilibrium or you were directly paid as a
21   W-2 employee of Core Systems?
22       MR. POUNDSTONE:  Object to the form.  You can
23   answer.
24   BY THE DEPONENT:  (Resuming)
25   A   Equilibrium was paid by Core and I was paid by
```

Page 13

```
1    Equilibrium.
2    Q   Okay.  That's what I wanted to clear up.  Thanks.
3    I probably didn't word that the right way.  But we got where
4    we wanted to be.
5        And does Core Systems have any affiliation with
6    Onyx?
7    A   It does.
8    Q   And what's that affiliation, if you know?
9    A   Onyx -- Onyx owns some portion of Core Systems.
10   Q   Are you aware of the percentage of ownership?
11   A   I am not.
12   Q   Okay.  And how is it you came to work at Core
13   Systems or -- excuse me, Equilibrium came to be associated
14   with Core Systems?
15   A   Chris Day gave me a call and asked if I would come
16   help him.
17   Q   And was his request specific to the marketing and
18   sales department?
19   A   Yes.
20   Q   Okay.  And going back to Packaging Division
21   Industries in Chicago --
22   A   Uh-huh.
23   Q   -- who would some of your customers have been?
24   A   Kraft, Heinz, PepsiCo, Wrigley.
25   Q   Did you bring any new customers or clients to
```

1  Packaging Division?
2      A   No. I don't believe I did.
3      Q   During the nine months that you were at Packaging
4  Division, were you able to increase sales or revenue for the
5  corporation?
6      A   No.
7      Q   Moving to Core Systems in Cleveland, you mentioned
8  Honda as being a client or customer of Core Systems. Are you
9  aware of any others?
10     A   Whirlpool, Electrolux.
11     Q   Okay. And how long were you or Equilibrium
12 associated with Core Systems?
13     A   About six months.
14     Q   Was that in 2005?
15     A   The end of 2005 through mid-2006.
16     Q   Okay. And why was that relationship terminated?
17     A   Contract ended.
18     Q   How much was Equilibrium or you paid by Core
19 Systems?
20     A   I don't recall. I can give you a range. Somewhere
21 in the neighborhood of 15 to $20,000 a month.
22     Q   To the best of your knowledge, while you were in
23 charge of marketing and sales -- and you were in charge of
24 marketing and sales; right?
25     A   Yes.

1      Q   Okay. I believe you said Chris had asked you to
2  run marketing and sales; is a fair characterization?
3      A   I didn't say that. But that is a fair
4  characterization.
5      Q   I'm sorry, I thought you said Chris Day called you
6  and asked you to come run marketing and sales?
7      A   I think I said Chris Day called and asked me to
8  come help.
9      Q   Okay. Fair enough.
10         What did that job entail?
11     A   It entailed managing a customer service team of
12 three folks, interacting with and negotiating agreements with
13 manufacturers' representatives, and cultivating relationships
14 with the company's largest customers, as well as doing
15 financial analysis to determine the profitability of certain
16 customers and their -- and the business that the company was
17 doing with those customers.
18     Q   During the period of time that either Equilibrium
19 or yourself were working at Core Systems, were you able to
20 improve sales or revenue for Core Systems?
21     A   Yes.
22     Q   Okay. Was that for any particular one client?
23     A   Sure.
24     Q   Which one?
25     A   Well, I wouldn't say any particular one client.

1  But there were -- there were at least two that come to mind
2  where revenue increased while I was there. And we won large
3  jobs while I was there.
4      Q   Which two?
5      A   Honda and Whirlpool come to mind.
6      Q   Okay. Was that through increased sales?
7      A   Yes.
8      Q   Okay. I would assume if it wasn't through
9  increased sales, it would be through increased profitability
10 on average sales?
11     A   I'm not sure I understand.
12     Q   Well, one could sell more units and increase sales
13 volume, increase profits, or one could sell the same number
14 of units or lesser units but increase profitability on the
15 units sold.
16         Was either the case with Core Systems?
17         MR. POUNDSTONE: Object to the form.
18 BY THE DEPONENT: (Resuming)
19     A   Specifically, with Whirlpool, there were one or two
20 large new jobs that were won while I was there.
21         With Honda, there may have been some new work that
22 was won. But there was also a specific instance where there
23 was some work that was unprofitable that became profitable
24 while I was there, because we negotiated a price increase, a
25 substantial price increase.

1      Q   All right. Regarding the price increase, who was
2  Core Systems manufacturing for? Who was the customer?
3      A   Honda.
4      Q   Honda.
5          Do you believe you were instrumental in getting the
6  pricing increase that you allude to?
7      A   Yes.
8      Q   Okay. And tell me what the product was?
9      A   I don't recall. I don't recall. The company
10 manufactured a bunch of parts for Honda. It was on a
11 portfolio of those parts. And in my head now I'm seeing a
12 picture of a long list of part numbers and the analysis that
13 was done to determine whether the manufacture of those parts
14 was profitable. And we went and had a conversation with them
15 and we said, "This group of parts is not profitable. And we
16 -- you know, we need a price increase, and this is what it
17 needs to look like, and this is when it needs to occur." And
18 we were successful in negotiating through that process to get
19 that price increase, but I can't tell you exactly which parts
20 they were.
21     Q   Okay. Exactly when was this?
22     A   I can't tell you exactly when it was. It was some
23 time during that six-month or so period.
24     Q   Okay.
25     A   It wasn't at the beginning.

Page 18

1    Q   So that would have been 2005?
2    A   It was -- it was in -- it was sometime in the first
3  part of '06.
4    Q   First part of '06. Okay.
5       Is this America Honda Manufacturing Corporation
6  that we're talking -- I know generically we're saying Honda,
7  but, specifically, is it America Honda Manufacturing Company?
8  Do you recall?
9    A   I don't recall.
10   Q   Okay. Just Honda?
11   A   Yeah.
12   Q   Where were they located?
13   A   Marysville, Ohio, I believe. Just outside of
14  Columbus.
15   Q   And I know you can't remember specific parts. But
16  more generally, were they parts for recreation vehicles or
17  lawn mowers or do you recall?
18   A   I don't recall. If I had to guess, I would say
19  they were for ATVs. But I don't recall.
20   Q   Did Core Systems have -- excuse me -- check that.
21       What is a, if you know, a minority business
22  enterprise?
23   A   I do have some knowledge of what a minority
24  business enterprise is.
25   Q   What is your understanding of what a minority

Page 19

1  business enterprise is?
2    A   A minority business enterprise is a company that is
3  substantially owned and controlled by members of an ethnic
4  minority group, as certified by one of several different
5  agencies around the country.
6    Q   Are you familiar with any of those agencies?
7    A   Sure. The -- probably the largest one is the
8  National Minority Supplier Development Council, or the NMSDC.
9    Q   Any others?
10   A   The federal government, I suppose, through among
11  others their ADA program.
12   Q   Any others?
13   A   There are others that certify women-owned
14  businesses and things of that nature, but I don't know what
15  the names of those are.
16   Q   Regarding Core Systems, do you know whether or not
17  Core Systems was a certified minority business enterprise?
18   A   It was.
19   Q   Okay. And was Core Systems' status as -- and if I
20  refer to it as MBE, do you understand?
21   A   Sure.
22   Q   Okay. Is Core Systems' certification as an MBE,
23  was it important in your negotiating with Honda on the
24  contract that we have been discussing?
25   A   No, I don't think it was.

Page 20

1    Q   It was -- was it a topic of discussion with Honda,
2  to the best of your recollection?
3    A   It may have been.
4    Q   Okay. Going back to Packaging Division Industries
5  in Chicago and your term of employment there, during that
6  term of employment was Packaging Division Industries an MBE?
7    A   Yes.
8    Q   Do you know how long it had been an MBE?
9    A   Approximately, three years from the time when Onyx
10  acquired their interest in the company.
11   Q   After Onyx acquired their interest in the company?
12   A   Yes.
13   Q   And back to Packaging Division Industries, do you
14  know which agency certified MBE status for Packaging Division
15  Industries?
16   A   Yes. The Chicago Chapter of the NMSDC certified
17  Packaging Division Industries.
18   Q   And referring to Core Systems, are you aware as to
19  which organization certified Core Systems' status as an MBE?
20   A   I believe it was the Northern Ohio Chapter of the
21  NMSDC. I believe there are two chapters in Ohio. Southern,
22  which kind of is around Cincinnati. And the northern, which
23  is closer to Cleveland.
24   Q   Are you in any way associated with the NMSDC,
25  yourself personally?

Page 21

1    A   No.
2    Q   Have you ever sat on any boards of directors for
3  the NMSDC in any chapter?
4    A   No.
5    Q   Before working at Packaging Division Industries,
6  how were you employed?
7       I'm about to lose my contact here. Excuse me.
8       Go ahead.
9    A   I was employed by Equilibrium before working at
10  Packaging Division.
11   Q   I'm sorry, I'm going backwards.
12      Before Equilibrium --
13   A   Do you need to take a break?
14   Q   It will eventually work itself out. Let's just
15  move on.
16      Let's see, you last worked at Packaging Division.
17  Then you were at Equilibrium, where you had a job at Core
18  Systems, or an assignment at Core Systems. After -- excuse
19  me, preceding Core Systems, how were you employed?
20   A   I was employed by Piknik Products Company in
21  Montgomery, Alabama.
22   Q   All right. Let's skip Piknik. How were you
23  employed prior to Piknik Products?
24   A   Prior to Piknik, I was employed by Equilibrium.
25   Q   Did Equilibrium have any employees other than

Page 22

1  yourself?
2      A   No.
3      Q   Okay.  What was the address of Equilibrium during
4  the period of time that you were at Core Systems?
5      A   Oh, boy.  To be completely honest with you, I don't
6  know.
7      Q   Well, was this something you operated out of your
8  house or did you have your own office?
9      A   The -- both, at times.  But the registered address
10 for Equilibrium has probably been either one of the last --
11 either one of my home addresses.  The registered address is
12 probably one of my home addresses.
13     Q   What's the time frame you worked at Piknik?
14     A   November of 2003, as I recall, is when I get
15 started and I was terminated in November of 2005.
16     Q   What customers did Equilibrium have before November
17 of 2003?
18     A   A company by the name of Rollover Systems in
19 Charlotte, North Carolina.  And a company by the name of
20 ALICIA, Atlanta Life Insurance Company Investment Advisors,
21 which was here in Atlanta.
22     Q   Atlanta Life Insurance --
23     A   -- Company Investment Advisors.
24     Q   What kind of business is Rollover Systems?
25     A   It's a software company.

Page 23

1      Q   What kind of software?
2      A   Rollover Systems is a software platform designed to
3  assist in the rollover of a 401(k) plan from one employer
4  into a self-managed 401(k) program, managed by, you know, a
5  third-party asset manager, Schwab or Wachovia or any number
6  of those kinds of firms.  So it was similar to Lending Tree's
7  -- you know, financial institutions compete for your 401(k),
8  you win.  You get the best rate or the best deal.  That's
9  what Rollover Systems does.
10     Q   Used one myself.
11         Was that a certified MBE corporation?
12     A   I don't believe it was.
13     Q   How did -- how long did Equilibrium associate
14 itself with Rollover Systems?
15     A   I don't know.  Six to nine months.
16     Q   And so I understand the relationship between
17 Rollover and Equilibrium, did Equilibrium work on a contract
18 with Rollover?
19     A   Yes.
20     Q   Okay.  And how was Equilibrium compensated?
21     A   A monthly fee.
22     Q   Okay.  And what was that fee?
23     A   I don't recall.  Probably -- I don't recall.
24 Probably somewhere in the neighborhood 10 to $15,000 a month.
25 I'm guessing.  I don't recall.

Page 24

1      Q   And what role did Equilibrium assume --
2      A   Plus a success fee --
3      Q   I'm sorry.
4      A   -- on any capital that was raised.
5      Q   Do you recall whether or not Equilibrium was
6  actually ever paid any success fee.
7      A   No, it was not.
8      Q   Not paid.  All right.
9          During that six to nine months, what role did
10 Equilibrium assume in the day-to-day activities of Rollover
11 Systems?
12     A   Succinctly, it was the role of vice president of
13 corporate development, which -- which entailed refining the
14 company's business plan, developing the company's financial
15 projections, interacting with prospective customers to gain -
16 - or customers -- customers, but really partners in that
17 instance.  Companies that would come on to the system as
18 effectively a customer, but really more of a partner and
19 seeking to add some of those folks, as well as interacting
20 with prospective investors in the company.
21     Q   How was it that Equilibrium came to work for
22 Rollover?
23     A   Marketing, personal contacts and relationships with
24 the CEO of the company.
25     Q   Who was the CEO of Rollover?

Page 25

1      A   A gentleman by the name of Reginald Bowser.
2      Q   Can you spell his last name?
3      A   B-o-w-s-e-r.
4      Q   And why did the relationship between Equilibrium
5  and Rollover end after six to nine months?
6      A   Contract ended.
7      Q   Contract was over?
8      A   Yes.
9      Q   Do you know whether or not Equilibrium was
10 successful in its attempts to do corporate development for
11 Rollover Systems?
12     A   Yes.
13         MR. POUNDSTONE:  Object to the form.
14 BY MR. NELMS:  (Resuming)
15     Q   How -- in what way was Equilibrium successful in
16 corporate development for Rollover Systems?
17     A   The company raised several million dollars in
18 equity capital and added several new customer partners to
19 their network during the time that I was there.
20     Q   Can you name one equity partner?
21     A   RLJ Companies out of Washington, DC
22     Q   What is RLJ?
23     A   It's the name of the company.  I don't...
24     Q   What kind of -- I understand that they became an
25 equity partner in Rollover Systems.  But --

Page 26

1    A   What kind of firm are they?
2    Q   What kind of business is RLJ, if you know?
3    A   Okay. It is a -- it's a -- it's a diversified
4   financial investment holding company. I mean, they are
5   essentially a private equity firm. But they're -- they're
6   really -- they're investing the assets of an individual. And
7   he kind of does what he wants to do. And so they're not
8   really structured like a fund. But they're an investor.
9    Q   Okay. Were you the only employee of Equilibrium to
10  work at Rollover Systems?
11   A   No.
12   Q   Okay. Who else?
13   A   A gentleman by the name of David Richardson.
14   Q   So Mr. Richardson was actually an employee of
15  Equilibrium?
16   A   Yes.
17   Q   What did he do at Rollover?
18   A   He assisted in similar efforts.
19   Q   What race is Mr. Richardson?
20   A   He's African-American.
21   Q   Moving on to ALICIA.
22   A   Uh-huh.
23   Q   You said that's here in Atlanta?
24   A   Yes.
25   Q   Approximately how long was Equilibrium associated

Page 27

1   with ALICIA?
2    A   Approximately six marks.
3    Q   And what did Equilibrium do for ALICIA, if you can
4   recall?
5    A   Equilibrium drafted a private placement memorandum
6   for the company and advised on management structure.
7    Q   What is a private placement memorandum?
8    A   It's essentially a business plan that asks people
9   to put money in the company.
10   Q   So is it a marketing tool?
11   A   Yes, it is in part. It's a marketing tool that
12  also goes into a lot of detail about the financial
13  projections of the company, describes the management team of
14  the company, what the objectives of the business is. So it's
15  kind of a -- excuse me, it's about to fall.
16   Q   It's the second time. It's giving me a hard time
17  today. I'm just going to throw it out. Sorry about that.
18       Yeah. I knew it was bad when I put it in this
19  morning. I should have not used it and gotten a new one.
20  But you know how it goes. I tried to get one more day out of
21  it.
22       I feel much better now. Thank you. I apologize.
23       MR. POUNDSTONE: Just for the record, if "It's
24  about to fall" is on the transcript, it's referring to
25  Mr. Nelms' contact.

Page 28

1   BY MR. NELMS:  (Resuming)
2    Q   All right. A private placement -- drafted a
3   private placement memorandum. I mean, in essence, what did
4   the memorandum say?
5    A   Essentially, it said, This is a newly-formed
6   division of Atlanta Life and they're going to invest assets
7   and they want you to either invest -- put capital in the
8   company that they can invest on your behalf or put equity
9   capital in the company to permit the company to pay its
10  management while it grows.
11   Q   Was ALICIA an MBE?
12   A   No.
13   Q   Okay. To the best of your knowledge, did it
14  attempt to obtain MBE status?
15   A   Not to the best -- to the best of my knowledge, it
16  did not.
17   Q   All right. You also said you -- Equilibrium
18  advised on management structure?
19   A   Yes.
20   Q   What exactly does that mean?
21   A   Well, there was a -- ALICIA was a division of an
22  existing company. There was a new management team going in
23  to start that division and a board of directors of the parent
24  company that didn't quite understand what the heck was going
25  on in this new division they started. And so I --

Page 29

1   Equilibrium provided both counsel to that new management team
2   as to kind of how to get themselves stabilized, as well as
3   some input to the board as to what was going on and what best
4   they should do.
5    Q   In regard specifically to the private placement
6   memorandum, to the best your recollection, did ALICIA act on
7   the prescription or advice contained within the private
8   placement memorandum?
9    A   Well, it -- it wouldn't -- it wouldn't require
10  ALICIA to act on the -- there was no advice in that
11  memorandum.
12       But I -- but I believe I can sort of get where
13  you're trying to go. Ultimately, they decided not to go to
14  the outside markets to raise capital. They went back to
15  their board of directors and got additional capital. And
16  they -- they made some management changes, which have allowed
17  them to go on and be successful.
18   Q   Regarding the management changes, were they a
19  result of the advice given by Equilibrium on management
20  structure?
21   A   In part.
22   Q   Okay. Do you recall what the compensation to
23  Equilibrium was by ALICIA?
24   A   It was -- it was nominal. I don't recall. But it
25  was -- it was a very small number. It was a very low number.

Page 30

1    It was office space and some nominal fee.
2      Q   Less than $10,000?
3      A   Yes.
4      Q   Was ALICIA the first client that Equilibrium had?
5      A   No.
6      Q   Going back in time, what was the next client before
7    ALICIA?
8      A   I can't recall.  It would be -- it would have been
9    -- you know, not to be disparaging, but it would have been
10   kind of cats and dogs folks that I was helping write business
11   plans and, you know, other kinds of things.
12        Prior to Rollover Systems, which really -- really
13   came -- Rollover Systems and ALICIA were contemporaneous.
14   They overlapped in terms of their timing.
15        Prior to Rollover Systems, there would have been
16   all kind of cats and dogs.  It was something I did kind of
17   part-time while I was doing other things.  And so it was...
18     Q   Okay.  Well, talk to me about your employment
19   before you founded Equilibrium?
20     A   Sure.  I worked for -- I worked for a company
21   called Catalyst, LLC that was in Philadelphia, Pennsylvania.
22   Catalyst was an interim management firm that also had -- it
23   was essentially management consulting or interim management,
24   investing banking, and private equity, focused on early-stage
25   technology companies and providing them with all three

Page 31

1    services, depending upon what they may have needed.
2      Q   Was Catalyst a certified MBE, if you recall?
3      A   No, it was not.
4      Q   Did Catalyst work to promote companies to become
5    certified MBEs?
6      A   No.
7      Q   Okay.  And what years did you work for Catalyst?
8      A   2001 to -- it must have been 2000 to 2002.
9      Q   What caused you to leave Catalyst?
10     A   Massive layoffs.
11     Q   Do you recall how you were compensated?
12     A   I was paid $125,000 a year.
13     Q   Do you have an exact job title that you had?
14     A   Principle.
15     Q   Okay.  And before Catalyst in 2000, how were you
16   employed, if employed?
17     A   I was unemployed for a period.
18     Q   Do you recall how long?
19     A   Six to nine months.
20     Q   Did you live in Philadelphia while you were
21   unemployed?
22     A   No, I lived in Charlotte, North Carolina.
23     Q   So going back in time, your next gainful employment
24   before working at Catalyst would have been in 1999?
25     A   It was '99 through 2000, I worked for Bank of

Page 32

1    America.  I really worked for Bank of America from 1996
2    through 2000.
3      Q   Do you have a period of time where you were
4    employed with them, not employed with them, then re-employed
5    with them?  Is that how that happened?
6      A   I -- I took a leave of absence for a year, from --
7    from September of '98 through August of '99.  I took a one-
8    year leave of absence and worked for the White House.
9      Q   Oh, great.  I've got to hear about that.  Those
10   were good years.
11     A   Yeah.
12     Q   And what did you do there?
13     A   I was in a program called White House Fellows
14   Program.  And I -- my title -- my agency -- I was -- my title
15   was White House Fellow.  But it was also senior advisor to
16   the CEO of the Corporation for National Service.
17        Among other things that I did there was I launched
18   a program called the AmeriCorps Promise Fellows Program for -
19   - on behalf of General Colin Powell and President Bill
20   Clinton.
21     Q   Hold on.  You're faster than I am.  AmeriCorps --
22     A   -- Promise Fellows.
23     Q   All right.  And what did the AmeriCorps Promise
24   Fellows do?
25     A   It was a cadre of elite young folks who were

Page 33

1    deployed in communities around the country to volunteer -- to
2    volunteer to do good things in their communities on behalf of
3    the five tenets of America's Promise, which include safe
4    places and -- I can't remember the other four.  General
5    Powell would be disappointed.
6        But essentially, it's to support young people in
7    their -- in their goal of essentially getting -- getting home
8    from school and staying out of trouble and doing something
9    productive.  So those -- those AmeriCorps Promise Fellows
10   were working with young people to provide them with some
11   support.
12     Q   Then you went back to Bank of America?
13     A   I did.
14     Q   And what was your role or position at Bank of
15   America?
16     A   Do you want me to start in 1996 and go forward or
17   do you want me to start in 2000 and go backwards?
18     Q   Whatever's comfortable for you.  Go ahead.
19     A   Okay.  Why don't I go forward.
20        In 1996, I joined the company as an associate in
21   their investment bank and worked in their mergers and
22   acquisitions group.  I also went on to be the assistant to
23   the chairman of the bank and then worked as an associate in
24   the, what's called, NationsBank Capital Partners, which is
25   their private equity investing group.

Page 34

1    And then I was a vice president in their mergers
2  and acquisitions practice. And that was in -- and after
3  doing that for a while, that's when I left and went to do the
4  White House Fellows Program.
5    And then I came back and I was a vice president in
6  a group called the Catalyst Fund, which was a private equity
7  investing activity of the bank.
8    Q   Any of the positions that you just named relative
9  to your employment with Bank of America involve sales or
10  marketing?
11    A   Yes.
12    Q   Okay. You want -- starting in '96 and working
13  forward?
14    A   Yeah. The -- essentially, the positions with the -
15  - in the M&A practice of the bank, what I did was sell-side
16  M&A primarily. So it was all selling.
17    And I mean, you can certainly -- you could argue
18  that all of it was selling. But because the private --
19  particularly, the Catalyst Fund and the private equity
20  activity, my job was to go out and find deals. And that
21  required selling the bank to get folks to show us deals. But
22  the -- more specifically, the M&A activity was sell-side M&A.
23  It was -- it was selling someone's company on their behalf
24  and developing a strategy to do that.
25    Q   Any other sales and marketing in any of the

Page 35

1  positions that you held at Bank of America?
2    A   No.
3    Q   Do you recall what your compensation was in 2000
4  when you left Bank of America?
5    A   It was $100,000 plus bonus.
6    Q   Do you recall what, if any, bonus you received in
7  2000?
8    A   It was ten to $15,000.
9    Q   Was it basically the same in 1999?
10    A   Well, most of '99, I was -- was when I was doing
11  the White House Fellows things.
12    But prior to that, when I was with the bank, it was
13  -- maybe my salary was $85,000 plus bonus, and the bonus was
14  $190,000.
15    Q   Why was your employment with Bank of America
16  terminated? Why did it end? Sounds like you got fired. I
17  didn't mean to imply that.
18    Why did you stop working at Bank of America?
19    A   The bank -- the bank decided they no longer wanted
20  to do the Catalyst Fund, which was the role that I took when
21  I came back from the White House. And I decided that I
22  wanted to go find something else to do outside of the bank.
23    Q   Got you.
24    And in 2000, when you were with Bank of America,
25  what city was that in?

Page 36

1    A   Charlotte, North Carolina.
2    Q   Where were you employed before Bank of America in
3  1996?
4    A   Coopers & Lybrand in Washington, D.C.
5    Q   Coopers and?
6    A   Lybrand, L-y-b-r-a-n-d.
7    Q   And what is Coopers & Lybrand?
8    A   It was one of the big six accounting firms.
9    Q   And what did you do there?
10    A   Financial advisory services. Which was -- it was a
11  little bit of M&A work. It was essentially advising clients
12  from entrepreneurs to Fortune 500 companies on doing some
13  sort of a transaction. And it would range anywhere from
14  helping a startup raise -- you know, I helped one start-up
15  raise $600 million in financing, and I helped Southern
16  Company acquire a $3 billion electrical utility asset in
17  Peru.
18    Q   How long were you an employee of Coopers & Lybrand?
19    A   Two years.
20    Q   Two. Are you, 1994 now, you think?
21    A   I joined them in the summer of '93. So I probably
22  joined them in June or July of '93 and worked there until
23  July of '96, when I went to join Bank of America.
24    Q   We ran out of paper, so I'm going to change topics.
25    A   Is that how this works?

Page 37

1    Q   Yeah. I didn't feel like getting a new sheet of
2  paper. All right. Where did you go to high school?
3    A   I went to St. John's College High School in
4  Washington, D.C.?
5    Q   What year did you graduate?
6    A   1985.
7    Q   And did you go to college?
8    A   I did.
9    Q   And what college did you go to?
10    A   I went to Morehouse College here in Atlanta,
11  Georgia.
12    Q   Good school.
13    A   Thank you. We like to think so.
14    MR. NELMS: Off the record.
15    (Off the Record)
16  BY MR. NELMS: (Resuming)
17    Q   Okay. Morehouse. And you graduated and your
18  degree is in?
19    A   My degree is in marketing.
20    Q   1999? I mean, 1989?
21    A   1989.
22    Q   You graduated. And do any postgraduate studies?
23    A   I did.
24    Q   And where was that?
25    A   I went to the University of North Carolina and got

1  an MBA. I finished in 1993.
2      Q   Any area of specialization in your MBA or was it
3  just a general MBA?
4      A   It was -- just a general MBA.
5      Q   Any education after -- any formal education after
6  UNC?
7      A   No.
8      Q   Do you presently have any ownership interest in, I
9  believe it's, Onyx Capital Ventures, LLC?
10     A   No.
11     Q   Am I saying that name right?
12     A   Yes.
13     Q   Did you -- have you ever?
14     A   No.
15     Q   How was it you came to work at Piknik? And for the
16  record, I'm going to just generally refer to Piknik as
17  Piknik. Is that okay with you?
18     A   Sure. That's fine with me.
19     Q   I believe it's properly Piknik Products Company.
20     A   Yeah, Piknik's fine.
21         I received a call from Chris Day. I was in my
22  driveway planning for -- bringing groceries in the house for
23  my son's birthday party. And he called and said that Onyx
24  had just acquired Piknik and asked me to consider coming down
25  to run sales for the company.

1      Q   What kind of company did you understand, at that
2  time, Piknik to be?
3      A   A company that manufactured mayonnaise and
4  Gatorade.
5      Q   Did you accept Chris Day's offer?
6      A   Eventually.
7      Q   What position did Chris Day hold at that time
8  relative to Piknik, if any?
9      A   I'm not sure. At that time, I'm not sure. He was
10  -- he was in -- he was a partner in Onyx. Onyx had acquired
11  Piknik. And so I'm not sure. I'm not sure what his role was
12  with Piknik, specifically, other than an owner or a
13  representative of the owner.
14     Q   Okay. And did you have that understanding through
15  your conversation with Chris Day?
16     A   Yes.
17     Q   Okay. And what --
18     A   I --
19     Q   I'm sorry.
20     A   I was going to say, I should say I had no -- I had
21  no more specific understanding than that.
22     Q   Okay. And I understand that he asked you to come
23  to Piknik and work. And I believe you just said it was in
24  sales and marketing?
25     A   Yes.

1      Q   Okay. Was there any discussion with him -- and, by
2  the way, what -- what day is this, what time is this? Is
3  this 2003?
4      A   Yes, this is probably -- since it was my son's
5  birthday, it was probably September of 2003.
6      Q   What specifically did he tell you about sales and
7  marketing at Piknik, if anything?
8      A   Well, he told me that the company on the beverage
9  side did not have a very good reputation or relationship with
10  its beverage customers. And that they needed help improving
11  the company's image in the eyes of those customers. And that
12  the condiment business really didn't have a very well or
13  actively-managed sales force, and that that needed attention,
14  as well.
15         He told me that I would have to come down and
16  interview for the position, which I did. I met with Ricky
17  Loeb and Mike O'Connell. And that was -- at the time, that
18  was what he told me about it.
19         You know, if there's something else -- I'd be happy
20  to tell you more. But I -- I need to kind of know what
21  you're asking me.
22     Q   No, that's fine.
23     A   Okay.
24     Q   That's fine. That's exactly what I was asking for.
25     A   Okay.

1      Q   I guess my question was why you? What -- did Chris
2  express that you had some particular skill set that was
3  necessary to improve sales or marketing at Piknik Products?
4         MR. POUNDSTONE: Object to the form. You can
5      answer.
6         THE DEPONENT: Okay.
7  BY THE DEPONENT: (Resuming)
8      A   I think it was -- I think -- primarily, it was, he
9  said, it was trust. It was -- he -- he was looking for
10  someone with the skills and the capabilities to, number one,
11  manage people, manage the function, number two, get in there
12  and figure out what was wrong on the condiments side of the
13  business, you know, from a strategic as well as a financial
14  standpoint.
15     Q   I believe you mentioned that from the beverage side
16  of the business he had an impression that Piknik did not have
17  a good relationship with its customers?
18     A   Yes.
19     Q   I'll assume he thought you would be able to improve
20  the relationship between Piknik and the beverage customers.
21         MR. POUNDSTONE: Object to the form.
22  BY THE DEPONENT: (Resuming)
23     A   Yes. It was related to -- that's where trust came
24  in. It was related to trust.
25     Q   Trust between yourself and Chris Day?

Page 42

1    A    No. Well, trust between myself and Chris Day,
2  relative to what's really going on in this company day-to-
3  day. There was -- there was -- there was a -- number one,
4  the company hadn't been performing well financially at the
5  time Onyx acquired its interest in the company.
6         Number two, there was a suspicion that -- that --
7  there was an attempt to determine whether or not management
8  was competent. And so I think any time you're going into a
9  new entity, you'd like someone, or at least someone in that
10  company that you trust. So yes, there was an element of we
11  need somebody that we can trust.
12         There was also -- and to more to your question,
13  there was a question of someone that can help us build up a
14  trusting relationship between the company and its customers
15  on the beverage side.
16    Q    Speaking specifically to the September 2003
17  conversation that you had with Chris Day --
18    A    Uh-huh.
19    Q    -- that was on the telephone --
20    A    Uh-huh.
21    Q    -- do you recall, did Mr. Day express to you what
22  he felt the problem of the poor relations between the
23  customers in the beverage division to be?
24    A    No.
25    Q    Regarding the condiment division of Piknik, you

Page 43

1  mentioned that he expressed to you that it was not well-
2  managed; is that a correct statement?
3    A    The sales function wasn't well-managed.
4    Q    Did he give you any specifics during that
5  conversation about how he perceived that the condiment sales
6  division was not well-managed?
7    A    He did give me some input. For example, he said
8  there were two sales guys, one of whom kind of did his own
9  thing, seemed to be pretty -- pretty on top of it. The other
10  one, who was believed to be running a barbecue restaurant on
11  the side. And so, therefore, since nobody knew exactly what
12  these people were doing and one full-time employee had time
13  to run a barbecue restaurant on the side, suggested that it
14  wasn't well-managed.
15    Q    All right. Regarding the salesman that was running
16  the barbecue stand, do remember that salesman name?
17    A    Bill Beadle.
18    Q    And the other salesman would be?
19    A    Bob Gross.
20    Q    Okay. Anything else that you can recall from the
21  conversation that you had with Chris Day in September of
22  2003, regarding his attempt to have you come and work for
23  Piknik Products?
24    A    No. I think he wanted to give me kind of a 50,000
25  foot overview, give me a sense that it was an interesting

Page 44

1  opportunity maybe, but it was going to have its challenges,
2  and the next step was to come talk to some other people about
3  it.
4    Q    You lost me. Give you a 50,000 for an overview?
5  What do you mean?
6    A    A 50,000 foot view. I'm sorry. So he was just
7  giving me a high-level overview of the company. And he said
8  the next step would be to meet with some other people.
9    Q    Got you. Did you ultimately go and meet with
10  anyone at Piknik?
11    A    I did. I went and met with Ricky Loeb and Mike
12  O'Connell.
13    Q    Okay. And do you remember when that was?
14    A    No. I would -- it was probably -- it would have
15  had to have been late September or some time in October of --
16  of that year.
17    Q    2003?
18    A    Yes.
19    Q    Okay. And tell me about your meeting with Mike
20  O'Connell and Ricky Loeb. Did you meet with them together?
21    A    No, I met with them separately. I went down and
22  met with Ricky in his office, talked to him about my
23  background. And he said that I was -- you know, he was -- he
24  was excited about the transaction with Onyx, he was amazed at
25  my background, he couldn't imagine why the hell I would want

Page 45

1  to come down and run a -- help run a mayonnaise company, and
2  he was looking forward to us working together.
3  And he -- you know, he asked a number of questions about my
4  background and that kind of thing.
5         And then I met Mike O'Connell over dinner and had
6  more questions about the company and the way it was run. And
7  he -- I remember him and I drove down to Brundidge and talked
8  a lot about his background and his -- his vision of the way
9  the company would run post-Onyx and how he and I could work
10  together. And, you know, he said that he hoped that I would
11  consider taking their offer.
12    Q    And did they ultimately make you an offer?
13    A    They did.
14    Q    What was the position?
15    A    Vice president of sales and marketing.
16    Q    How were you to be compensated?
17    A    Salary plus bonus.
18    Q    And what was the salary?
19    A    $150,000.
20    Q    How was the bonus structured?
21    A    It was to be structured as some percentage of EBIDA
22  or earnings before interest, taxes, depreciation and
23  amortization of the company on a going-forward basis.
24    Q    Okay. Were you aware at the time that offer was
25  made of the profitability in the previous years of Piknik?

Page 46

1    A   Yes.
2    Q   Okay.
3    A   Generally speaking, yes.
4    Q   Any other perks or benefits to be included in your
5    compensation package?
6    A   Yes. The company was going to pay for me to have
7    an apartment in Montgomery for a period of time.
8    Q   Do you recall how long?
9    A   There was no specified period of time. There was -
10   - there was no specified period of time.
11   Q   $150,000, a bonus based on percentage, the
12   apartment? Any other forms of compensation?
13   A   No.
14   Q   Any car allowance?
15   A   No.
16   Q   Cellular telephone?
17   A   No. I was reimbursed for my cellular phone bill,
18   like any other business expense would have been reimbursed.
19   Q   Who did you have service with during your tenure at
20   Piknik on your cell phone?
21   A   I had it with both Verizon and Nextel.
22   Q   Do you remember the telephone number?
23   A   No.
24   Q   Was the phone in your name?
25   A   When it was with Verizon, yes. I believe that when

Page 47

1    I had a Nextel phone, it was in the company's name.
2    Q   Any other forms of compensation or benefits given
3    to you upon hire at Piknik?
4    A   Not that I recall.
5    Q   Okay. And did you then begin working at Piknik in
6    October of 2003?
7    A   I believe it was November, but I did.
8    Q   Okay. Did you have an office at Piknik?
9    A   I did.
10   Q   Where was it located?
11   A   In the Day Street Plant.
12   Q   In November of 2003, did you have a superior that
13   you reported directly to?
14   A   Yes.
15   Q   Who would that be?
16   A   Mike O'Connell.
17   Q   What was his position at the time?
18   A   Chief operating officer.
19   Q   What position did Chris Day hold at that time, if
20   any?
21   A   I don't know.
22   Q   Was he in Montgomery?
23   A   From time to time he was; he never lived there.
24   Q   Are you aware or not, did he have a position as an
25   employee of Piknik?

Page 48

1    A   I'm not aware.
2    Q   Did he maintain an apartment in Montgomery?
3    A   He shared an apartment with some other folks, yes.
4    Q   Who were those other folks?
5    A   I believe it was -- well, it changed from time to
6    time. Patrice Daniels and Athenia Figgs. And then I believe
7    he also for a period of time shared an apartment with Bill
8    McClennan.
9    Q   Bill McClenna?
10   A   McClennan, M-c-C-l-e-n-n-a-n.
11   Q   I believe you said that you got an apartment?
12   A   Yes.
13   Q   Where was the apartment?
14   A   It was in Montgomery. I don't recall exactly where
15   it was.
16   Q   Do you remember the name of the apartment complex?
17   A   I don't.
18   Q   Was it in an apartment complex?
19   A   Yes.
20   Q   Do you remember the street?
21   A   No. I just knew how to point my car there.
22   Q   How often did you stay in that apartment on
23   average?
24   A   Initially, I was there for three to four nights a
25   week.

Page 49

1        MR. NELMS:  Y'all, I'm sorry, I've got to go to the
2    bathroom. All that coffee on the way up here.
3        MR. POUNDSTONE:  No problem.
4        (Off the Record)
5    BY MR. NELMS:  (Resuming)
6    Q   All right. The last thing we were talking about is
7    you had an apartment in Montgomery. You didn't remember
8    where it was exactly. And you stayed on average three to
9    four nights a week. Did you have the apartment by yourself?
10   A   Yes.
11   Q   Okay. And just to remind me, you said it was
12   something that was supposed to be paid for by Piknik as part
13   of your perk of your job?
14   A   Yes.
15   Q   And I called it a perk. But they asked you to come
16   down from Atlanta?
17   A   Right.
18   Q   Okay.
19   A   And they thought it would be cheaper than having me
20   relocate.
21   Q   Okay. And approximately how long did you have this
22   apartment?
23   A   Nine to 12 months.
24   Q   One bedroom, two bedroom?
25   A   It was a two-bedroom. I remember Chris said the

| Page 50 | Page 52 |
|---|---|

**Page 50**

1  two-bedroom was the same price as the one-bedroom.
2    Q  Knowing Montgomery, it was probably was. And a
3  three-bedroom was probably exactly twice what a two-bedroom
4  was.
5    A  Right.
6    Q  Tell me about -- I'm referring to a period of time
7  in November of 2003 when you first started working at Piknik.
8  And what were your job duties and responsibilities?
9    A  I was responsible for managing the sales function
10  for the beverage and the condiment business.
11    Q  What did that entail?
12    A  Well, it entailed getting to know Bob Winter and
13  all of the beverage customers. It entailed getting to know
14  Bob Gross and the beverage customers -- I mean, I'm sorry,
15  and the condiments customers. And figuring out how to price
16  mayonnaise. Figuring out whether that business was
17  profitable and how to make it profitable.
18    Q  Getting to know customers in the beverage division.
19  Name some of the customers that Piknik had in the beverage
20  division at that time in 2003.
21    A  PepsiCo, Hershey, Kraft.
22    Q  Those the biggest ones?
23    A  Yes. End Zone Brands was another one.
24    Q  Can you remember any others?
25    A  No. I believe that's all.

**Page 52**

1  their human resources department. And that was in the
2  summer, maybe of '88.
3    Q  Was that in Washington, D.C.?
4    A  It was in Philadelphia, Pennsylvania and in
5  Pittsburgh, Pennsylvania.
6    Q  Did you work in production any --
7    A  No.
8    Q  -- during that period of time at PepsiCo?
9    A  Only as a training exercise to familiarize me with
10  the equipment and that sort of thing.
11    Q  Okay. Do you have any experience working in the
12  manufacture and production of consumable condiments other
13  than -- before you got to Piknik?
14    A  No.
15    Q  Other than what you've told me about with your
16  experience in human resources at PepsiCo, did you have any
17  ongoing relationship with PepsiCo regarding their beverage
18  bottling products prior to your being employed at Piknik?
19    A  No.
20    Q  Same question for Hershey?
21    A  No.
22    Q  Same question for Kraft?
23    A  No.
24    Q  End Zone Brands?
25    A  No.

| Page 51 | Page 53 |
|---|---|

**Page 51**

1      PepsiCo, we had the -- the Quaker Division and the
2  Tropicana Division. But they were both PepsiCo.
3    Q  Thank you for reminding me of that. I was about to
4  ask you, what about Tropicana. But that's right, they were
5  owned by PepsiCo, as was Quaker.
6      What did you do for Hershey? Or, excuse me, what
7  did Piknik do for Hershey's?
8    A  Packed chocolate syrup, I think.
9    Q  Anything else?
10    A  That's all. There may have been some other SKUs,
11  but essentially that's what it was.
12    Q  What about Kraft?
13    A  We made the bottle/can of Capri Sun product.
14    Q  Is that a fruit juice?
15    A  Yes.
16    Q  Okay. And regarding PepsiCo's Tropicana, what did
17  you do for Tropicana?
18    A  Made the Tropicana smoothie product.
19    Q  Anything else?
20    A  No.
21    Q  And Quaker, what did you make for Quaker?
22    A  Gatorade.
23    Q  Prior to coming to Piknik, did you have any
24  experience in the bottling of consumer consumable goods?
25    A  Only in that I worked for a summer for PepsiCo in

**Page 53**

1    Q  Where is End Zone Brands located out of?
2    A  Here in Atlanta.
3    Q  I think you said it was a beverage. What kind of -
4  - more specifically, what kind of products does End Zone
5  Brands make?
6    A  It's a fruit juice product for kids.
7    Q  Any special bottling?
8    A  Yes, it's -- it's funny-shaped bottles; difficult
9  to run. It was -- the product was called Tummy Tickler.
10      COURT REPORTER:  I didn't catch that.
11      THE DEPONENT:  Tummy Tickler.
12  BY MR. NELMS:  (Resuming)
13    Q  Tummy Tickler. Probably funny looking to us, but
14  probably very attractive to children.
15    A  Yep, they begged their moms and dads to buy it in
16  Wal-mart.
17    Q  I'm sure. Okay. I asked you who your immediate
18  supervisor was, and you said it was Mike O'Connell who was
19  the CEO.
20    A  He was the Chief Operating Officer.
21    Q  Oh, I'm sorry, COO.
22    A  Yeah.
23    Q  My mistake. Was there a CEO?
24    A  Jeff Larry was a CEO.
25    Q  And did you report to Jeff Larry then, also?

Page 54

1    A    No.
2    Q    You knew Jeff Larry before you went to Piknik;
3    didn't you?
4    A    No.
5    Q    So I understand what my timeline is, when you went
6    to work at Piknik in November of 2003, Jeff Larry was the
7    CEO; is that correct?
8    A    Yes.
9    Q    And Mike O'Connell was the Chief Operating Officer?
10   A    Yes.
11   Q    Okay. I had my facts wrong.
12        And you don't know that Chris Day had any title or
13   position with Piknik?
14   A    Not to my knowledge.
15   Q    Okay. So Mike O'Connell was a person you reported
16   to. What employees in the hierarchy of Piknik's employees
17   reported directly to you?
18   A    Bob Gross and Bill Beadle reported directly to me.
19   And Bob Winter had a dotted line to me.
20   Q    And I understand what a dotted line is. If he
21   wasn't reporting to you, what was the alternative superior
22   that he would report to?
23   A    I suppose he was reporting -- had a solid line to
24   Mike O'Connell. At the time when I joined the company, it
25   appeared as though Bob had several bosses.

Page 55

1    Q    All right. Were there specific issues that would
2    come up during the course of your work at Piknik that
3    required Bob to report directly to O'Connell rather than you?
4    A    I'm sure. You know, when I first joined the
5    company, despite what my responsibilities were, I really
6    spent -- probably for the first three to four months of the
7    time I was there, I spent most of my time on the condiments
8    business learning that business. Excuse me. And Bob Winter,
9    I suppose, is who we're talking about -- Bob Winter was kind
10   of a jack-of-all-trades. Bob had operations and production
11   responsibilities. He had finance related responsibilities.
12   He had sales responsibilities. I mean, so Bob was kind of
13   very, very broad in terms of the kinds of -- the areas that
14   he touched on the beverage side of the business. And so, he
15   would have had to have worked with Mike O'Connell to do all
16   that.
17   Q    Okay. Did Bob Winter, for the first three or four
18   months that you began to work at Piknik in 2003 and early
19   2004, have any marketing or sales responsibilities that you
20   can recall relevant to the beverage division?
21   A    Yes and -- yes, he did. On the -- and he continued
22   to throughout both of our time there. He was really focused
23   on the inside of the company. And for the first three or
24   four months, that's what he did. So there were -- inside of
25   each of the beverage customers, there were really two

Page 56

1    customers. So inside of Quaker, there were really two
2    customers. There was a Ken Shelley, who was a plant
3    production-focused customer for Quaker. And so Bob Winter
4    interacted very closely with Ken Shelley and his counterparts
5    in Quaker. And there was also more of a commercial person
6    who was a customer for Quaker; in this instance, April
7    Blackmore. April was really the commercial contact who --
8    who I was really supposed to go interact with. The -- for
9    the first three or four months, there was not so much that
10   was going on on the commercial side. And to the extent that
11   it was, some of the Onyx folks may have done that. And so,
12   yes --
13   Q    Let me interrupt you because I'm lost.
14   A    Okay. I'm sorry.
15   Q    When you say the commercial side, what exactly are
16   you referring to?
17   A    What I'm referring to is establishing and setting
18   pricing, agreeing on contracts and how that will work; and
19   really the relationship side of the -- of the customer
20   interaction.
21   Q    Just so I understand.
22   A    Yeah.
23   Q    So that would be Onyx or Piknik personnel having
24   contact with the customer itself, like Quaker for instance?
25   A    Right.

Page 57

1    Q    Okay. And during this time period, that was not
2    something that you were doing?
3    A    Right.
4    Q    That was something that Bob Winter was doing?
5    A    No.
6    Q    No?
7    A    No.
8    Q    Who was doing that?
9    A    Some of the Onyx folks were probably doing that.
10   Q    Okay.
11   A    But there was -- what I'm -- but having contact
12   with the customer has a -- so in other words there were two
13   pieces. One is, who are we going to make this -- who's going
14   to make this product for us. That's the commercial decision.
15   And so Onyx was doing that. I was supposed to be doing that
16   once I was ready to do it.
17        Then there's a decision -- okay, now we've decided
18   that Piknik is going to make this product. Somebody else
19   with that same company would come down and say, "Okay, you
20   guys got to get this stuff up on the line and do it right."
21   That's the part that Bob Winter was doing. So it was
22   interacting with the customer, but it was interacting with
23   the production side of the customer relationship, as opposed
24   to the commercial -- what I call the commercial side.
25   Q    Okay. Now, I understand what you say when you said

1  earlier that he was more of the inside-of-the-company guy.
2    A  Right.
3    Q  When you talk about the Onyx people having this
4  commercial relationship with the customer itself, who,
5  specifically with Onyx, was having that relationship with the
6  customer?
7    A  It -- it was probably some combination of Jeff
8  Larry, Chris Day and Patrice Daniels.
9    Q  Okay.  Now, we haven't talked about Patrice
10  Daniels.  Who is Patrice Daniels?
11    A  Patrice Daniels was one of the partners in Onyx.
12    Q  Did she ever -- so what was her role in
13  relation to Piknik?
14    A  She was similar to Jeff Larry and Chris Day, at
15  that time, one of the owners.
16    Q  So they're going out and having -- and building
17  this relationship with the customer on behalf of Onyx to
18  build business for Piknik; is that what we're saying?
19    A  Right.
20    Q  Okay.  Back to Bob Winter.
21    A  Okay.
22    Q  So once you have this relationship with the
23  customer and you get the business, then you're saying that
24  the product is being manufactured, then Bob Winter takes over
25  having primary relationship with the operational aspects of

1  making the product for the customer?
2    A  Right.
3    Q  Okay.  All right.  Can you give me a for instance?
4    A  Yes.  The Gatorade contract come up for renewal.
5  And I would review the contract, confer with Bob and discuss,
6  you know, what language do we want to have changed, what --
7  you know, what are we -- what are we concerned about.  And I
8  would make trips to Chicago to talk with April Blackmore
9  about the contract and --
10    Q  Now, April Blackmore's with?
11    A  She's with PepsiCo.
12    Q  PepsiCo.  So your Gatorade --
13    A  She's with the Quaker Division of PepsiCo which
14  includes Gatorade.
15    Q  Okay.
16    A  So I would go to Chicago to meet with April and
17  talk with her about that and take her to lunch and make sure
18  we understand, you know, what she's looking for and what
19  we're looking for.  And I would discuss with the operations
20  folks at Piknik, including Bob Winter and Bert Mayer and
21  others, what it is Pepsi's asking for and we determine is
22  this something we can give them.  And then I would go back
23  and negotiate that.
24    And then once -- once we agreed on that, agreed on
25  the terms of the contract and Quaker then said, "Okay, we'll

1  keep making Gatorade at your facility", they would send Ken
2  Shelley in to say, "Okay, we're going to keep making Gatorade
3  at your facility.  Here's what we need from a quality or
4  production standpoint, or a scheduling standpoint."  And Bob
5  Winter would say, "I'm glad Henry and April figured that out
6  on the contract side.  Here's what we can do for you on the
7  operations side."
8    Q  Got you.  And you mentioned Ken Shelley a moment
9  ago.
10    A  Yes.
11    Q  But Ken Shelley was actually a PepsiCo employee --
12    A  That's correct.
13    Q  -- who worked in Montgomery?
14    A  No.  He -- Ken Shelley traveled around the country.
15  I think he -- he lived and worked in Indianapolis, I believe,
16  where there is a Pepsi plant.  And -- but his job was to
17  manage a relationship with the contract manufacturers, or
18  some subset of the contract manufacturers that Pepsi used to
19  produce Gatorade.
20    Q  Got you.
21    A  So his job was to travel from place to place to
22  visit the plants.
23    Q  All right.  Our timeline goes through the first few
24  months that you began at Piknik.  Moving forward into early
25  to mid 2004, did your job responsibilities change any?

1    A  Well, they -- yes and no.  I mean, the
2  responsibilities were always the same, but I began to take on
3  more of them.  As I got more comfortable with the condiment
4  business, I began to get more involved in the beverage
5  business.
6    Q  Were you able to facilitate any of the change that
7  you had hoped and that you and Chris Day had talked about in
8  your original September, 2003, conversation in the condiment
9  division?
10    A  Yes.  I mean, it was a -- it was an ongoing
11  process, but certainly the change had begun.  I understood
12  the business, you know, much better, you know, certainly
13  after three or four months.  Had developed a mechanism for
14  determining what profitable pricing for the products would
15  be.  Had determined that some personnel changes needed to be
16  made and begun making those changes.  And had begun to
17  establish relationships with those -- the larger condiment
18  customers.
19    Q  Okay.  You had expressed some issues regarding one
20  of the salesmen in the condiment division, Mr. Beadle?
21    A  Yes.
22    Q  You said something about him selling barbecue on
23  the side?
24    A  Yes.
25    Q  Was anything done about that?

Page 62

1   A  I terminated him, terminated his employment.

2   Q  Is that a decision you made on your own?

3   A  No. It was done with -- consultation with probably

4  with Mike O'Connell at that time.

5   Q  Do you remember any specific conversations you had

6  with Mr. O'Connell?

7   A  It was -- I -- no, I don't remember a specific

8  conversation. I imagine it was a short conversation, though.

9  It was pretty clear that he needed to go do something else.

10   Q  How was it clear?

11   A  He was late for meetings. His customers were

12  telling me that -- you know, "Wow, Bill, we haven't seen you

13  in a long time." He was poorly dressed. And he openly would

14  comment to me about other things that he was doing. And

15  there were things that I would ask him for that he would say

16  he wasn't certain that he had records on and were pretty

17  basic.

18   Q  What other things? Are you referring to things he

19  was doing outside the workplace?

20   A  I'm sorry. He would refer to things that he was

21  doing outside of the workplace openly. But also I would ask

22  him for things, meaning documents and things, records of

23  customer visits or records of customer relationships,

24  primarily so that I could understand what was going on and he

25  would not be able to produce that information. So it was

Page 63

1  very clear to me that he was not focused on the company.

2   Q  You said earlier that you had a belief that he was

3  running a barbecue company, or a barbecue pit, or something

4  outside of Piknik. And then you just said he was doing other

5  things, which led me to believe other things outside the

6  workplace that might have been inappropriate. And I'm just

7  trying to connect -- I'm guess I'm asking, when you say other

8  things, are you referring to this barbecue business he had?

9   A  Well, he -- he never confirmed that he had a

10  barbecue business. But he would say, you know, I had to go -

11  - you know, he would disappear for -- he lived here in

12  Atlanta. And so if -- you know, and I would spend two days a

13  week or so here in Atlanta. And so I would call my salesman

14  and find out where he was. And, you know, he was -- he'd

15  disappear for a day at a time. You know, he -- so he may

16  have been working. I mean, I'm referring potentially to that

17  barbecue business, but I don't know it to be the barbecue

18  business. It just -- he wasn't working for Piknik.

19   Q  I get you. I get you.

20   A  Whatever he was doing.

21   Q  All right. Well, let's talk about the other

22  salesman that you mentioned earlier, Bob Gross.

23   A  Uh-huh.

24   Q  Tell me about Bob Gross' performance. First of

25  all, just tell me about his performance.

Page 64

1   A  Sure. Bob was a solid and interested and engaged

2  salesperson with generally good relationships with his

3  customers and he worked hard. I think he -- he was a little

4  offended that -- that I was -- that I had the position that I

5  had. I think that he was hoping that at some point he could

6  -- he would have become the director of sales for the

7  condiment business. But he told me that, and nevertheless he

8  went out and he worked hard. You know, I think you're aware

9  that we did have some challenges with Bob in terms of his --

10  on the personnel side from the standpoint of his performance.

11  But in terms of his activity with his customers, he generally

12  did a pretty good job. Grew the business, brought new

13  opportunities that -- and if he did, he -- he would be able

14  to handicap them pretty well in terms of whether or not we'd

15  be able to win that business and he'd be able to deliver.

16   Q  From your position, did you make any attempts to --

17  you personally go out and develop new business for the

18  condiment division?

19   A  Yes, I did. Most of my activity, though, was spent

20  assisting Bob Gross. And eventually I hired two or three

21  other salespeople in helping them to penetrate their regions.

22   Q  Was Bob Gross, with your assistance, able to bring

23  on any new clients for Piknik?

24   A  He was.

25   Q  Who?

Page 65

1   A  I can't recall. Cisco Calera, which we may have

2  been doing some business with, that grew substantially.

3  There was a company called Halsey Foods in the -- in the

4  Birmingham area. And there were some other smaller barbecue

5  -- barbecue brands that he -- that he brought on. I -- I

6  really -- I really don't recall.

7      MR. POUNDSTONE: Do you need to go?

8      THE DEPONENT: Yeah. If we can break.

9      MR. NELMS: That's fine.

10      MR. POUNDSTONE: What time do you think you'll be

11  back?

12      THE DEPONENT: Yeah, it will be -- hopefully, it

13  will be around 1:15 or so.

14      MR. NELMS: Do you just want to reconvene at 1:30?

15      THE DEPONENT: Sure.

16      MR. NELMS: Okay. Great.

17      (Off the Record)

18      MR. NELMS: Back on the record.

19  BY MR. NELMS: (Resuming)

20   Q  I believe we were -- before we broke for lunch, we

21  were talking about -- we had talked about Bob Gross and the

22  customers that Bob had had and Mr. Beadle, who had to be

23  terminated. He was -- then you hired, I assume -- other

24  sales people were hired for the condiment division; is that

25  correct?

Page 66

1    A    Yes.
2    Q    Okay. Who were they?
3    A    Megan Mayor.
4    Q    Okay. And who else?
5    A    Michael Gray.
6    Q    All right.
7    A    Jackie Oliver.
8    Q    Okay. What is the race of Megan Mayor?
9    A    White, Caucasian.
10   Q    Mike Gray?
11   A    Caucasian.
12   Q    And Jackie Oliver?
13   A    Caucasian.
14   Q    All right. And this was -- you had expressed that
15   you had hopes of developing a new customer base for the
16   condiment division; is that correct?
17   A    Yes.
18   Q    And were you successful in developing a new
19   customer base for the condiment division?
20   A    Yes.
21   Q    Tell me about the new customers that you were able
22   to bring on.
23   A    Well, Michael and Jackie were both talented sales
24   reps with good relationships. Michael, in particular, worked
25   south Georgia, very south Georgia and northern Florida and

Page 67

1    brought in several new relationships. Jackie Oliver lived
2    here in Atlanta and was competent and good, as well. So she
3    was -- had the experience in the industry. And she brought
4    on several new customers. I can't recall who they are.
5    What I do recall is that, shortly after I joined
6    the company, probably if not before the end of 2003 and early
7    2004, Denny's, which was one of the large companies -- large
8    customers left. And by the end of -- and it was -- you know,
9    it was probably a million dollars in revenue for that
10   division. Before the end of 2004, we were back to pre-
11   Denny's revenue levels with the new customers that the two
12   brought in.
13   Q    Okay. Moving on, referring back to Bob Gross.
14   A    Yes.
15   Q    You had mentioned that he was a solid salesperson,
16   but you said he had issues in his employment on the personnel
17   side. And I want to elaborate on that for just a minute.
18   What is your understanding of that?
19   A    Okay. First of all, there was -- you know, he was
20   -- he was a bit -- he could be a bit abrasive and he was very
21   confident that his perspective is the way that things should
22   be done. And so we had to work through a number of those
23   kinds of things from time to time.
24   I can think of three incidents while he was at the
25   company that I had to address specifically. One, was we --

Page 68

1    we located -- or the IT department of the company identified
2    pornographic material on his laptop, on his company owned
3    laptop computer, which was in violation of the company's --
4    Q    Yeah, that's --
5    A    -- IT policy.
6    Second, was he -- he got into an altercation of
7    some sort with Shannon McGlon.
8    And then the third was, he referred to -- we were
9    in a meeting with a bunch of people and he referred to
10   Hispanics using something of a derogatory term. I can't
11   remember what it was. But something that was a slang term
12   that was probably inappropriate.
13   Q    Was he counseled for that, to the best of your
14   knowledge?
15   A    For which?
16   Q    The slang term for Mexicans that you referred to.
17   A    He was. He was sent to a -- I talked to him about
18   it and sent him to a sensitivity training course.
19   Q    Any other personnel-related issues with Bob Gross
20   that you can recall?
21   A    Those are the three that come to mind.
22   Q    Okay. And you indicated earlier that he was also
23   terminated?
24   A    Yes, he was.
25   Q    Was that a decision that you made?

Page 69

1    A    No -- or yes and no. In consultation with, my boss
2    at the time was, I would guess, Bill McClennan, by that time.
3    Q    Okay. And ultimately, what was the cause or reason
4    for Gross' termination?
5    A    I don't recall. I knew -- I do -- I don't recall
6    specifically. I know that there was, certainly, a cumulative
7    effect of these -- of these personnel-related issues that
8    were coming up. And it -- it just became disruptive for the
9    company. I can't say that was the ultimate issue, but that
10   was certainly a big part of it.
11   Q    Changing the subject matter a little bit.
12   A    Sure.
13   Q    You told me about when you went on to work and were
14   hired at Piknik. And did I ask you what your income was? I
15   know we had talked about perks that you got. What was your --
16
17   A    You did. It was -- it was $150,000.
18   Q    All right. Did you ever get any raise or bonus
19   while you were at Piknik?
20   A    I did get a raise.
21   Q    When and how much?
22   A    It was probably in early 2005. And I think I was -
23   - I got a raise to $190,000 or so.
24   Q    Were you ever paid any kind of bonus?
25   A    I was paid a bonus in May or June of 2005, probably

1   June.
2   Q   How much was that?
3   A   $30,000 or so.
4   Q   Any other bonuses during your tenure at Piknik?
5   A   No.
6   Q   What ultimately happened to your employment at
7   Piknik?
8   A   I was terminated.
9   Q   Who made that decision, if you know?
10  A   Ricky Loeb.
11  Q   Do you remember the approximate date?
12  A   November of 2005.
13  Q   Did he give you a reason why he was terminating
14  you?
15  A   No, he didn't.
16  Q   Did you have an understanding as to why he was
17  terminating you?
18  A   Yeah. The company was in -- first of all, he did
19  not deliver the message, it was Brenda Sellers, the human
20  resources person. The reason was because the company was in
21  significant financial difficulty. He didn't trust me. And
22  frankly, the company -- I had done all -- really probably all
23  that I could have done for the company to preserve its
24  customer relationships going through that difficult period of
25  time. And there was no need for -- for -- for an outgoing

1   sales activity given the direction the company was heading.
2   Q   Okay. You indicated earlier in the deposition that
3   you primarily focused on the condiment division of Piknik
4   when you began your employment. And then you later began to
5   work in the beverage division, as well.
6   A   Yes.
7   Q   I want to talk about the period of time where you
8   were in that phase of transition and you were beginning to do
9   some more work in the beverage division. What precipitated
10  you starting to do, if anything, your starting to do work in
11  the beverage division?
12  A   Well, there was -- I had spent a fair amount of
13  time learning the condiments business. And it was -- it was
14  time. It was -- you know, kind of, "All right, you learned
15  this. It's time for you to take your full job, which is to
16  begin to get engaged more with the beverage customers." And
17  that's what -- I think there was a feeling that -- among --
18  you know, my boss at the time who may have been, at that
19  time, Chris Day or Patrice Daniels, that -- and -- and/or
20  Bill McClennan, that it was time to start making some
21  outbound calling efforts on the beverage customers and trying
22  to generate some new business there.
23  Q   Okay. And we've talked about PepsiCo and Hershey
24  and Kraft and End Zone. And my understanding is, those were
25  all customers of the beverage division of Piknik?

1   A   Yes.
2   Q   Okay. What new customers did you begin to call on
3   in the beverage division or on behalf of the beverage
4   division of Piknik?
5   A   Sure. Nestlé, AriZona Iced Tea, Kellogg's and --
6   let's see, let me think. There's some more. Cott Beverages.
7   Q   Spell that for me.
8   A   C-o-t-t.
9   Q   Let's stop there.
10  A   I mean, we all -- we pursued new business with the
11  existing customers, as well.
12  Q   Specifically with PepsiCo, what new business did
13  you pursue with PepsiCo?
14  A   Twenty-ounce Gatorade and some -- what might be
15  called New Age beverages, which are like the energy drinks
16  and that sort of thing.
17  Q   My favorite, Red Bull.
18  A   There you go.
19  COURT REPORTER: I didn't hear you.
20  MR. NELMS: Red Bull.
21  BY THE DEPONENT: (Resuming)
22  A   That's not a Pepsi product, though.
23  Q   Who does make that?
24  A   It's a separate -- it's an independent company. As
25  well as Cadbury, that was another customer that we pursued

1   business with.
2   Q   Now, Cadbury would be a new-to-Piknik customer?
3   A   Yes.
4   Q   Back to new business with PepsiCo. Twenty-ounce
5   Gatorade and the New Age beverages. Anything else?
6   A   There was a new smoothie. They were coming out
7   with another version of the Tropicana smoothie.
8   Q   Okay.
9   A   That's all I can --
10  Q   That's fine. You're remembering more than I
11  probably could.
12      Hershey, what kind of new business did you pursue
13  with Hershey?
14  A   Well, there was also, I'd say for all the
15  customers, a fair amount of work keeping the existing
16  business that we had.
17  Q   Okay.
18  A   So there was that. And with Hershey in particular,
19  there was a fight to -- to keep that business. There was
20  some new business pursued with Kraft, as well. Although, I
21  can't -- I can't take -- I -- that wasn't me really who --
22  who went and got that business. I'm trying to think. What
23  was your question again?
24  Q   We were exploring --
25  A   New business with Hershey?

Page 74

1    Q    We were exploring expanding currently existing
2    customers' --
3    A    Right.
4    Q    -- business with Piknik.
5    A    Right.
6    Q    Adding all new product lines.
7    A    Eventually, we did get another opportunity with
8    Hershey to bid on strawberry syrup, or something like that.
9    That was really the consequence of fighting to keep the
10   business that we had. They decided to give it to someone
11   else and threw us a bone to give us the opportunity to bid on
12   the strawberry syrup business.
13   Q    All right. Let's go back to new customers.
14   A    Okay.
15   Q    You had first mentioned Nestlé.
16   A    Uh-huh.
17   Q    Were you successful in securing new business with
18   Nestlé?
19   A    Yes.
20   Q    And what kind of product was it?
21   A    Juicy Juice, 64 and 48-ounce Juicy Juice.
22   Q    Anything else?
23   A    That's all I recall.
24   Q    AriZona Iced Tea?
25   A    Yes, gallon iced tea.

Page 75

1    Q    Any other products?
2    A    No.
3    Q    Kellogg's?
4    A    Kellogg's was developing a brand new launch of a
5    beverage -- of beverage products. And there were going to be
6    two products. One was a smoothie product and the other was a
7    juice product.
8    Q    Any other Kellogg's products?
9    A    No.
10   Q    Cott Beverages?
11   A    We bid and discussed several items with them. We
12   never won any of that work.
13   Q    Cadbury?
14   A    Cadbury, I can't -- I can't even remember what
15   their brands are. I don't think we ever won any work from
16   them.
17   Q    Regarding the Juicy Juice and Nestlé products, did
18   you make sales calls directly on Nestlé yourself?
19   A    Yes.
20   Q    Okay. Do you know when that was?
21   A    No. He came to Piknik several times. And I went
22   out to Glendale, California once or twice.
23   Q    Okay. Regarding AriZona and the gallon teas, did
24   you make sales calls in person yourself?
25   A    I did.

Page 76

1    Q    Kellogg's smoothies and the juices, did you make
2    sales calls on those as well in person?
3    A    I did.
4    Q    Cott -- well, we didn't get anything for Cott, did
5    we.
6    A    I went to see them, though. I tried.
7    Q    So describe for me some of the roles and job duty
8    responsibilities that you assumed when you began to work more
9    closely with the beverage division. I mean, you've told us
10   about these new customers. You were obviously making sales
11   calls.
12   A    Uh-huh.
13   Q    Internally, what kind of responsibilities were you
14   assuming in the beverage division?
15   A    Well, the first thing I had to do was learn. So I
16   spent a lot of time with Bob Winter and Bert Mayer and Jimmy
17   Whitehead and others learning the lingo and the -- the things
18   that were important to the customers, learning how to
19   calculate line speeds and how to translate that into a price
20   and that sort of thing. So I spent a fair amount of time
21   doing that.
22       And then I think, you know, it -- it really became
23   a function of understanding what the things were that --
24   remember I talked about those production customers wanted and
25   what was important to them. And what was important to the

Page 77

1    commercial side of the business as well and what they were
2    looking for. And so those are the kinds of things I spent
3    time doing.
4    Q    And who were you directly reporting to during this
5    period of time when you were assuming more responsibilities
6    in the beverage division?
7    A    Well, there was -- there was a lot of change during
8    that time. So at one point Chris Daniel -- Chris Day and
9    Patrice Daniels assumed co-leadership of the company.
10       And then after four to six months of that, Bill
11   McClennan was hired to be the president of the company.
12       And then when Bill McClennan left, Chris Day became
13   solely the president of the company.
14   Q    Okay. Well, I guess my question is, so then at
15   some point in time, you reported directly to Patrice Daniels
16   and Chris Day?
17   A    Yes.
18   Q    And then O'Connell -- you reported directly to
19   O'Connell for some period of time?
20   A    So initially I reported to Mike -- to O'Connell.
21   And then he left. He resigned from the company. I don't
22   remember exactly when. Then it was Chris Day and Patrice
23   Daniels assumed the role of leadership. They had EVP titles
24   or something like that. So I don't know what -- and then
25   they did that for a period of time. And then Bill McClennan

Page 78

1  was hired to be the president of the company. And then Bill
2  McClennan resigned. And then Bill McClennan -- and then
3  Chris Day came back as the president of the company. So I --
4  and I reported to each of those folks in succession.
5    Q  Okay. Was it a common practice for you to be
6  involved in meetings related to the financial status of
7  Piknik as a whole?
8    A  Yes.
9    Q  How often were such meetings held, typically?
10   A  There were staff meetings every week to two weeks
11  where there was an update on how the business was doing.
12   Q  Were you familiar or not with whether Piknik had
13  any lines of credit?
14   A  I know that they did.
15   Q  What do you remember about the lines of credit?
16   A  I remember that there was -- the company had a
17  substantial amount of debt outstanding when Onyx acquired the
18  company. That the relationship between the ownership of the
19  company, including Onyx and Ricky Loeb and the bank, improved
20  initially after the transaction. And that the plan -- there
21  was a plan to restructure that debt to reduce the leverage on
22  the company so that it would make it easier for the company
23  to operate.
24   Q  Which bank?
25   A  I believe it was SouthTrust.

Page 79

1    Q  Did you ever have any direct contact with
2  representatives of SouthTrust relative to the lines of credit
3  that were extended to Piknik Products?
4    A  No.
5    Q  Were you ever involved in any meetings where
6  representatives from SouthTrust Bank were present to discuss
7  the status of the relationship between SouthTrust and Piknik
8  Products?
9    A  No.
10   Q  Were you ever involved in any discussions among
11  Piknik personnel about the lines of credit that were extended
12  by SouthTrust and the status of those lines of credit?
13   A  No.
14   Q  Ever have any discussions with Jeff Larry about the
15  status of the lines of credit between Piknik and SouthTrust?
16   A  Yes.
17   Q  Do you recall dates?
18   A  No.
19   Q  Generally, do you recall a year or time? I mean,
20  obviously between 2003 and 2005.
21   A  Yeah, I would say generally, you know, it went like
22  this. Sort of late 2003, "Hey, we have a great relation with
23  the bank. Things are going to get better. You go do your
24  job, sell and don't worry about it. We got it." To, "Hey,
25  the team is doing a great job, you know, things are getting

Page 80

1  better with the bank. We're going to be bringing in some
2  more capital." That would have been '04-ish, until, you know
3  -- and that lasted -- that general message -- and I was
4  certainly aware that there were various parties -- there were
5  discussions with the bank where various parties were
6  proposing to restructure the debt. I recall that being
7  mentioned on two or three times -- two or three occasions.
8       And in May or June of 2005, "The bank is no longer
9  cooperating and we're going to have to fix it, but we think
10 it will be okay." And I recall saying, "Are you sure?" And
11 the message coming back, "Yeah, don't worry about it. Keep
12 doing what you're doing. Things are going to be fine."
13 Until I got the call saying, you know, it's -- we've -- we've
14 run into a brick wall. We've got to go into survival mode.
15      But nothing more specific really than that in terms
16 of numbers or dates or people involved in meetings or
17 anything of that nature. I was not -- that wasn't -- that
18 wasn't what I was doing.
19   Q  Was it -- and were all these -- was all this
20 knowledge that you obtained due to conversations that you had
21 with Jeff Larry, specifically?
22   A  It may have involved -- they may have involved
23 Chris Day or Bill McClennan, as well.
24   Q  Was it ever expressed to you that the future
25 survival of Piknik was dependent upon SouthTrust's

Page 81

1  willingness to provide extended lines of credit?
2    A  Not until the end.
3    Q  What happened at the end?
4    A  Again, I got a phone -- I got a -- I ran -- I saw
5  Chris or I got a call from Jeff or something saying, "Hey,
6  had an unsuccessful meeting with the bank. And they are, you
7  know, playing hardball and we're going to have to -- we're
8  going to have to fix it. And we're going to have to start
9  looking at making some hard decisions about what to do about
10 the company so we can keep it running while we work through
11 this. And there's still, you know, additional options that
12 we have in terms of bringing in additional capital. And --
13 but, you know, batten down the hatches and prepare for rough
14 seas," kind of thing.
15   Q  To the best of your knowledge, did Piknik ever
16 maintain an office in Atlanta or metro Atlanta during your
17 term of employment?
18   A  Yes.
19   Q  Where was that?
20   A  It was somewhere near Georgia Tech; not too far
21 from here.
22   Q  They actually had a physical office?
23   A  Yes.
24   Q  What was that for? What was the purpose of having
25 an office in Atlanta?

Page 82

1    A   It was a sales office.  I -- essentially, after
2  nine to 12 months, or however long we kept the apartment that
3  I was using -- the company was paying a lot of money for
4  that.  And I went to Bill McClennan or -- I can't remember.
5  It probably was Bill McClennan, and said, "Hey, I really need
6  to spend a little bit more time in Atlanta.  And -- and --
7  you know, this apartment is costing a lot of money.  You
8  know, how about we trade, you know, $1,500 a month apartment
9  for a $400 a month office.  And -- you know, I can spend, you
10  know, two days a week in Montgomery and three days a week in
11  Atlanta.  And that would be -- you know, and I'm traveling
12  out of Atlanta anyway.  And how about that?"  And they said,
13  "Okay."
14    Q   So it was a matter of economic practicality to open
15  an office in Atlanta versus your having to travel to and stay
16  in Montgomery?
17    A   Yeah.  I mean, particularly as I was -- you know,
18  Jackie Oliver lived in Atlanta and I was here.  And so, yes,
19  it was beneficial.  And I was traveling a lot more because I
20  was focusing more time on the beverage business.  So, yes, it
21  was a matter of economic practicality and -- and a certain
22  amount of convenience.
23    Q   Mr. Gray, Michael Gray, I believe, was in south
24  Georgia?
25    A   He -- and he lived in the Jacksonville area.

Page 83

1    Q   Okay.  So quite a haul from where he was to
2  Atlanta?
3    A   Right.
4    Q   I made that trip before.
5        So Ms. Oliver was using the Atlanta office, as
6  well?
7    A   Yes.
8    Q   Okay.  And was it used for anything other than a
9  sales office?
10    A   No.
11    Q   Have you ever been -- or did you ever serve in any
12  role as a director of human resources for Piknik?
13    A   No.
14    Q   Did you ever have reason or cause to promote for
15  purposes of hire employees for Piknik in your role as sales
16  and marketing vice president?
17    A   Could you rephrase?  I don't -- I'm not sure I
18  understand.  When you say promote for purposes of --
19    Q   Did you ever go out in search of new employees for
20  Piknik Products?
21    A   I'd say not specifically.  But we're always looking
22  for people to the extent they were needed.
23    Q   How did you come across Ms. Oliver?
24    A   I asked Michael Gray.  And Michael Gray had known
25  her from his travels in the industry.  And he sent me her

Page 84

1  resume and said, "This person would be great."
2    Q   And how did you come across Mr. Gray then?  Did you
3  know him from some prior business relationship?
4    A   No, I didn't know him previously.  So I don't
5  recall.
6    Q   Okay.  And Megan Mayor?
7    A   Megan Mayor, if I'm not mistaken, came as a result
8  of an executive recruiter, a recruiter that we -- a
9  contingency recruiter that we engaged to help identify folks.
10    Q   Who was that recruiter?
11    A   I don't know.
12    Q   What is the Harlem Group?
13    A   Who?
14    Q   Harlem Group?
15    A   I don't know.
16    Q   Harlem Consulting?
17    A   I don't know.
18    Q   During your tenure at Piknik, did you ever hire or
19  be involved in the hiring of a consulting group?
20    A   Yes.
21    Q   Who?
22    A   I hired a firm called Business Promotion
23  Consultants.  And I also hired a firm called the Coalescent
24  Group.
25    Q   Coalescence?

Page 85

1    A   Coalescent, C-o-a-l-e-s-c-e-n-t.
2    Q   C-o-a -- I'm sorry.
3    A   C-o-a-l-e-s-c-e-n-t.
4    Q   Is that Coalescent Group?
5    A   Yes.
6    Q   Where is Business Promotions Consultants located
7  out of?
8    A   Washington, D.C.
9    Q   And what was the purpose in their retention?
10    A   The purpose was to help to identify opportunities
11  for Piknik to sell its condiment products to -- to and
12  through government and military agencies.
13    Q   About when did you -- first of all, who actually
14  hired, within Piknik, Business Promotion Consultants?  Is
15  that a decision you made yourself, or Jeff Larry, or Chris
16  Day?
17    A   No, it was -- it was made in consultation with
18  Ricky Loeb and probably Chris Day or Patrice Daniels.
19    Q   And was Business Promotion Consultants successful
20  in bringing military and government business to Piknik?
21    A   Well, they identified a lot of opportunities for us
22  in a well put together report.  And, to the best of my
23  knowledge, if we -- if we got -- gained any business as a
24  result of that, it was marginal.  It wasn't -- there wasn't -
25  - a boat load of business didn't come as a result of it.  But

Page 86

1    I think we did get some.
2        Q    Moving on to Coalescent Group, what was the purpose
3    of retaining Coalescent Group?
4        A    They were hired to provide marketing support for
5    the -- for the sales function of the company.
6        Q    Where is Coalescent Group located?
7        A    Here in Atlanta.
8        Q    About what time frame did Coalescent Group work
9    with Piknik?
10       A    Maybe -- I seem to recall that they may have
11   actually been at -- engaged on two separate occasions. One
12   may have been in mid '04 for a month or two. And then
13   another -- and then again at the late '04 or into early '05
14   for three or four months.
15       Q    What exactly did they do? I mean, you told me they
16   were marketing support.
17       A    Yeah.
18       Q    But specifically, what was that?
19       A    Well, provide -- there's a woman by the name of
20   Letitia Strowbridge, who was the -- the principle of that
21   firm. And she provided -- she did a lot of presentations,
22   development for us. She did some -- for example, she did a
23   big one on -- for PepsiCo. She did account reviews. That
24   was one thing. We were instituting on the beverage side, was
25   to go through and really thoroughly understand the nature of

Page 87

1    the relationship with all -- with our beverage customers.
2    And so she did that research and analysis and put it together
3    in a presentation format that we could use both inside the
4    company, as well as with the customer. So she did that.
5        And then later on, she did some troubleshooting
6    work in our customer service function on the condiment side
7    of business in Brundidge.
8        Q    What exactly did she do in troubleshooting?
9        A    Oh, boy, I think we were having -- we were having
10   some turnover in that department. And it seemed like the
11   processes were very inefficient. So things that it -- it
12   would appear you could get done, you know, in an hour, would
13   take all day long and we couldn't figure out why. And so she
14   went down to do some of that, get involved in some of that,
15   in terms of helping streamline some of that.
16       Q    Do you know how she was paid?
17       A    She was paid on a monthly -- I don't know. She was
18   paid as a contract employee by Piknik. She would submit an
19   invoice and she'd get paid. If it was a flat fee, more
20   than likely, for monthly chunks of time.
21       Can we take just a sixty-second break?
22       Q    Yeah, sure.
23       (Off the Record)
24   BY MR. NELMS: (Resuming)
25       Q    Back on the record. We were talking about the

Page 88

1    Coalescent Group --
2        A    Yes.
3        Q    And Letitia Strowbridge and troubleshooting a
4    problem with a customer for the condiment division.
5        A    Well, it was the customer service function in the
6    condiment division.
7        Q    And what exactly was the problem?
8        A    I don't recall. I think -- I gave an illustration,
9    some -- the processes were not working the way that it seemed
10   like they should and relative to the way orders were
11   processed. And it seemed like, you know, paperwork was
12   stacked to the ceiling. So she was -- I -- I can't remember
13   exactly what it was.
14       Q    Okay. Did Shannon McGlon report to you at any time
15   during your tenure at Piknik?
16       A    No.
17       Q    Did Bert Mayer report directly to you at any time
18   during your tenure at Piknik?
19       A    No.
20       Q    Did Bob Winter report directly to you at any time
21   during your tenure Piknik?
22       A    Yes.
23       Q    And describe -- tell us when he would have reported
24   to you.
25       A    Well, as I said earlier, Bob had a dotted line to

Page 89

1    me when I joined the company in November. And probably by --
2    I don't know, by March of '04, he was reporting directly to
3    me.
4        Q    What kind of things would he report to you?
5        MR. POUNDSTONE: Object to the form. You can
6    answer it.
7    BY THE DEPONENT: (Resuming)
8        A    As I described -- and the way I would sometimes
9    refer to -- it to Bob was, he was Mr. Inside and I was Mr.
10   Outside. So he would take care of the operations side of the
11   customer relationship and I would take care of the commercial
12   side.
13       Q    But he was reporting to you?
14       A    Yes.
15       Q    And then you were reporting directly to whoever was
16   the CEO or COO at any given time?
17       A    That's correct.
18       Q    Okay. What about Jerry MacCartney?
19       A    He never reported to me.
20       Q    Okay. What was Jerry's role, to your
21   understanding, during your tenure at Piknik?
22       A    Jerry was the head of warehousing and logistics.
23   And then towards the end, he was the plant manager at Alatex.
24       Q    Did you ever have an office at Alatex?
25       A    No.

| Page 90 |
|---|

1  Q   Did you ever have an office at Day Street?
2  A   Yes.
3  Q   Where was that office?
4  A   It was in the office building part of the plant, on
5  the second floor.
6  Q   Okay.  What was in that office before you moved
7  into it?
8  A   I believe that that office -- that there were some
9  production scheduling or inventory, materials management
10 people who were in that office before I was there.
11 Q   Did the office get painted before you moved in?
12 A   I don't know.
13 Q   Do you remember what color the walls were?
14 A   White or off-white.
15 Q   Okay.  Do you ever -- do you recall having a
16 conversation with Jerry MacCartney about the paint on the
17 walls?
18 A   No.
19 Q   Okay.  Got to ask some questions.
20     Do you know someone named Annissia Hanyard?  And
21 I'll spell her name, A-n-n-i-s-s-i-a.
22 A   I do.
23 Q   Her last name is H-a-n-y-a-r-d.
24     Who is this person?
25 A   Annissia Hanyard became the Day Street plant

| Page 91 |
|---|

1  manager in, I don't know, late 2004.
2  Q   Did you know Ms. Hanyard prior to her employment at
3  Piknik?
4  A   I did not.
5  Q   Do you recall her -- or do you know what her
6  employment was before she came to Piknik?
7  A   I don't recall.
8  Q   Okay.  To the best of your knowledge, did Jeff
9  Larry ever use the sales office in Atlanta for any purpose?
10 A   I don't believe so.
11 Q   Okay.  If you know, what race was Annissia Hanyard?
12 A   She was African-American.
13 Q   And I believe you said that -- I'm sorry, who was
14 the plant manager at Day Street before Ms. Hanyard came on
15 board at Piknik?
16 A   I believe it was Bert Mayer.
17 Q   What happened to Mr. Mayer?
18     MR. POUNDSTONE: Object to form.
19 BY MR. NELMS: (Resuming)
20 Q   Let me re-ask that question.
21     We've already established you knew who Mr. Mayer
22 was.  Did there come a point in time when he no longer worked
23 at Piknik?
24 A   Yes.
25 Q   Was that during a period of time that you were

| Page 92 |
|---|

1  working at Piknik?
2  A   Yes.
3  Q   Do you recall when his employment ended at Piknik?
4  A   It was -- it was immediately prior to Ms. Hanyard
5  joining the company.
6  Q   Do you have any knowledge or reason to know why Mr.
7  Mayer no longer worked at Piknik?
8  A   I did, but I cannot recall.
9  Q   Okay.  Did you make the decision that Mr. Mayer was
10 no longer working at Piknik?
11 A   I did not.
12 Q   Did you make the decision to hire Annissia Hanyard?
13 A   I did not.
14 Q   Thank you.  We're closer to the end than the
15 beginning.  Does that make you feel better?
16 A   No.
17 Q   We've already established you're familiar with the
18 Plaintiff Shannon McGlon?
19 A   Yes.
20 Q   What did you understand her role, her position to
21 be at Piknik?
22 A   Director of quality assurance.
23 Q   Okay.  Were you working at Piknik when Ms. McGlon
24 lost her employment?
25 A   Yes, I was.

| Page 93 |
|---|

1  Q   Did you make the decision, any decision regarding
2  her employment?
3  A   I did not.
4  Q   Do you know who did?
5  A   I do not.
6  Q   Do you recall when she stopped working at Piknik?
7  A   Not specifically.  If I were wagering a guess, it
8  would be early 2005.
9  Q   Okay.  Do you have any knowledge as to why her
10 employment with Piknik was terminated or stopped?
11 A   No.
12 Q   Do you know who assumed the roles that Shannon
13 McGlon filled in quality assurance after her departure?
14 A   My recollection is that the people that she had
15 working for her assumed those roles.  So she was not -- she
16 was not -- you know, no one was ever hired to take that job.
17 Q   Were you working at Piknik when Bob Winter and his
18 employment at Piknik ended?
19 A   Yes.
20 Q   Do you recall when that was?
21 A   Yes.
22 Q   Can you tell us?
23 A   It was May or June of 2005.
24 Q   Were you involved in the decision to terminate the
25 employment of Bob Winter?

1    A  No. Bob -- Bob Winter resigned from the company.

2    Q  Did Bob Winter tell you he resigned?

3    A  I believe he called me and he sent me an e-mail.

4    Q  Who, if anyone, assumed Bob Winter's roles and

5    duties in his position after his absence?

6    A  Well, his -- his duties were assumed by a

7    combination of Anthony Barber, Robert Lampert and myself and

8    others, Don Mitchell and -- lots of folks. Bob -- you know,

9    I can think of probably two or three others, but Bob had his

10   hands on lots of different things.

11   Q  Are you familiar with a company called Piknik

12   Acquisition Corporation?

13   A  I am.

14   Q  What is that?

15   A  I believe that is the company, the corporation that

16   acquired Piknik Products.

17   Q  Do you know any employees of Piknik Acquisition?

18   A  No. I mean, I would imagine that anyone who was

19   employed by Piknik was also employed, you know, by

20   association with Piknik Acquisition. But I don't know. That

21   may be a legal distinction. I don't -- that may be out of my

22   depth.

23       MR. POUNDSTONE: And again, I don't think he wants

24   you to speculate. If you know something, answer it.

25   But if you're just guessing or speculating and you

1    really have no idea, let's don't -- let's don't make

2    statements that you're not sure of.

3    BY THE DEPONENT: (Resuming)

4    A  I have no idea.

5    Q  Do you know of or understand what the relationship

6    between Piknik Acquisition and Onyx is?

7    A  I don't know.

8    Q  Okay. Do you have in your possession today any

9    documents or things related to any association you may have

10   had with Onyx?

11   A  No.

12   Q  Same question, Piknik Acquisition?

13   A  No.

14   Q  Same question, Piknik Products?

15   A  No.

16   Q  Okay.

17       MR. POUNDSTONE: Well, the answer to that may be

18   yes. Those documents --

19       MR. NELMS: Y'all want to confer?

20       MR. POUNDSTONE: Well, I'll just give it to you.

21   BY THE DEPONENT: (Resuming)

22   A  They're not it my possession.

23   Q  True enough.

24       MR. NELMS: Do you mind if I go ahead while you're

25   looking?

1       MR. POUNDSTONE: I've got them. Do you want to

2    make copies of them? I'm not sure -- I was going to

3    talk to Henry, once we took a break later on, about

4    these.

5       This may have been -- I'm not sure if this is

6    something that's responsive to your new set of request

7    for production, or if it's something that was brought up

8    from the depos with Jennifer, George Parker asked Henry

9    to give those to me so we could give them to you. So

10   I'm not exactly sure what they're responsive to. But

11   we've got them nevertheless.

12       (Off the Record)

13   BY MR. NELMS: (Resuming)

14   Q  Back on the record. Do you recall a Rudy

15   Mansfield?

16   A  Yes.

17   Q  Now, who is that?

18   A  He was a contract manufacturing manager for Kraft.

19   Q  Okay. That's someone you'd have contact with in

20   your role as vice president of sales and marketing?

21   A  Yes.

22   Q  That's someone you would e-mail?

23   A  Probably.

24   Q  Now, we talked earlier about what an MBE is.

25   A  Yes.

1    Q  What's your understanding as to whether or not

2    Piknik had MBE certification?

3    A  It did.

4    Q  And which organization certified Piknik as an MBE?

5    A  The National -- the Alabama Chapter of the NMSDC.

6    Q  And do you know when that happened?

7    A  No.

8    Q  Was it before your arrival?

9    A  No, it was after my arrival.

10   Q  Was having an MBE status helpful in your role as

11   vice president of marketing and sales?

12   A  It was.

13   Q  Was this a tool that you would use in marketing

14   Piknik Products?

15   A  Yes.

16   Q  And how would you use it?

17   A  Well, primarily -- well, there are -- inside of

18   most large corporations, there is a supplier diversity

19   function. And those folks are charged with the

20   responsibility of sourcing products and services from

21   qualified minority businesses. In other words, those

22   businesses which are certified as MBE's. And so those people

23   could -- in addition to the traditional procurement and

24   supply chain and selling channels, those people could be an

25   additional resource for a company to go through to try to

Page 98

1    gain audience with those who could buy products and services.
2        Q    Would a company that had a supplier diversity
3    program have incentive to do business with an MBE?
4        A    At times they would.
5        Q    What kind of incentive would they have?
6        A    Well, usually, -- I mean -- actually, I mean,
7    there's some research that suggests that companies that have
8    robust diversity programs, whether it's employment or
9    supplier diversity, that their stock performs better. So --
10   and they do a better job of retaining employees and things of
11   that nature. So there might be that kind of incentive.
12   Also, if companies do business with the government, then
13   there can be an incentive, as well.
14       Q    Name some of the businesses that -- of the
15   businesses that we've discussed that were customers with
16   Piknik during your tenure, that had supplier diversity
17   programs.
18       A    Cisco, US Food Service, PepsiCo, Kellogg's, Kraft.
19   Those are the ones that come to mind.
20       Q    AriZona Iced Tea?
21       A    I don't believe so. AriZona Iced Tea is a
22   privately held company. And I don't -- I don't think they
23   have a supplier diversity program.
24       Q    Are you familiar with a company called Community
25   Coffee?

Page 99

1        A    Yes. Community Coffee did not have a supplier
2    diversity program.
3        Q    End Zone?
4        A    End Zone did not have a supplier diversity program.
5        Q    Unilever?
6        A    Unilever does have a supplier diversity program.
7        Q    Did you, in your role as vice president of
8    marketing and sales, have an opportunity to discuss with the
9    representative of Unilever Piknik's MBE status?
10       A    Yes.
11       Q    Who and when, please?
12       A    Oh, I can't recall either.
13       Q    What specifically would have been discussed with
14   Unilever regarding Piknik's MBE status?
15       A    Really -- really essentially that. Piknik was an
16   MBE. And that -- in addition to Piknik being a capable
17   supplier to them, doing business with Piknik could also be
18   beneficial to some of their marketing efforts, or however it
19   is they use their supplier diversity or their diversity
20   efforts within their company.
21       Q    Did you ever have an opportunity to talk to anyone
22   at Quaker Oats regarding Piknik's MBE status?
23       A    Yes.
24       Q    Who and when?
25       A    Oh, lots of folks. For PepsiCo, it is a diversity

Page 100

1    -- including supplier, as well as employment diversity, it's a
2    big deal. So, there is, you know, Jean Lacefield, Ernie -- I
3    forget Ernie's last name. There's probably, you know, ten
4    folks in their diversity function who I had opportunity to
5    talk with from time to time. And then, you know, there would
6    have also been, probably, April Blackmore and her boss, who's
7    name I've forgotten.
8        Q    Did you ever tell April Blackmore that it was the
9    intent of Piknik Products to hire more African-American
10   executives and managers?
11       A    I'm sure we had a conversation along those lines.
12       Q    Who is Sharon LaBree?
13       A    Sharon LaBree would have been April's counterpart
14   in the Tropicana division. So she would have been the
15   commercial customer for Tropicana. She would have been -- so
16   April Blackmore and Ken Shelley, on the Quaker side, were a
17   team. And Sharon LaBree I've forgotten --
18       Q    Rick Valentine?
19       A    -- and Rick Valentine would have been her
20   production counterpart. So they were a team on the Trop
21   side, yes.
22       Q    April is in Illinois; correct?
23       A    The last I heard, she was in Illinois.
24       Q    Well, let's just say -- I mean, the department she
25   worked in with Quaker Oats was at the time you were --

Page 101

1        A    Yes.
2        Q    -- at Piknik in -- or outside of Chicago?
3        A    Yes.
4        Q    And the Tropicana sister division was in
5    Jacksonville?
6        A    Bradenton, Florida.
7        Q    Bradenton.
8             And that's where LaBree and Valentine worked out
9    of; right?
10       A    Correct.
11       Q    My bad grammar.
12            Did you ever discuss with LaBree the intent of
13   Piknik to hire minority managers and executives?
14            MR. POUNDSTONE: Object to the form. You can
15       answer the question.
16   BY THE DEPONENT: (Resuming)
17       A    Not that I recall, specifically.
18       Q    What about Mr. Valentine?
19       A    Not that I recall.
20       Q    Could you have?
21       A    I don't believe I did with Mr. Valentine. I could
22   have with Ms. LaBree.
23       Q    Who were your contact persons at Hershey?
24       A    I've forgotten.
25       Q    Okay. Who is Joe Yates?

Page 102

1    A    Joe Yates is an operations consultant.
2    Q    What firm did he work with?
3    A    I don't know.
4    Q    Who was he consulting with at Piknik?
5    A    I don't know.
6    Q    Was he working directly with your departments?
7    A    No.
8    Q    What was Mr. Yates race?
9    A    African-American.
10   Q    And forgive me if I've asked this question before.
11   Letitia Strowbridge, we've talked about her already. Who was
12   she working with?
13   A    She was working with me.
14   Q    And who hired her?
15   A    I did.
16   Q    When, approximately, did you hire her?
17   A    I think I mentioned, it may have been early to mid
18   2000 -- probably mid 2004 for a brief period. And then again
19   in early 2005 for a brief period.
20   Q    All right. I believe you mentioned she's African-
21   American?
22   A    Yes.
23   Q    Have you ever heard of Apollo Consulting?
24   A    No.
25   Q    Do you recall having a meeting with Piknik staff

Page 103

1    where you expressed a concern that the name of Piknik
2    Products should be changed?
3    A    Yes.
4    Q    What did you wish to change the name to?
5    A    I didn't have a suggestion.
6    Q    What was your concern regarding the name that
7    Piknik had at that time?
8    A    Several -- several colleagues, in my travels
9    representing the company, in particular African-Americans,
10   queried me, essentially asked me -- well, first of all, let
11   me say that -- that the conversation came up because Bill
12   McClennan was talking about the future of the company and the
13   future growth and opportunities as we completed the
14   turnaround that was underway at the company. And said, you
15   know, at some point, you know, it may -- you know, it may --
16   it may make sense at some point to change the name of the
17   company to something different or more broad or something of
18   that nature. And that's when I brought it up that several
19   folks had come up to me, in my travels representing the
20   company, and wondered whether or not I was aware of the
21   racial connotations of the word. Initially, of course, I
22   responded, no, I wasn't aware of a racial connotation. And I
23   was educated as to what their interpretation, the name meant.
24   So I was simply sharing that experience with my colleagues.
25   Q    Had anyone at Piknik ever expressed to you that

Page 104

1    they felt that Piknik was a word that had a racial slur or
2    connotation to it?
3    A    No.
4    Q    So these colleagues you refer to were outside
5    Piknik?
6    A    These were perspective customers.
7    Q    To the best of your knowledge, did you or any one
8    employee of Piknik, during your tenure as a Piknik employee,
9    ever hire outside employment agencies for purposes of
10   recruiting minorities to be brought into Piknik for purposes
11   of employment?
12   A    Could you ask the question again, please?
13   Q    Are you aware of Piknik ever retaining or hiring
14   headhunters or employment agencies for purposes of
15   specifically targeting minority employees to come into Piknik
16   to work in positions and roles there at Piknik?
17   A    I'd like to answer that question with a
18   clarification. I'm aware of headhunters or executive
19   recruiters being retained to seek additional employees to
20   come into the company and making certain that a diverse pool
21   of candidates was considered, but not specifically to
22   identify anyone of a certain race to come into the company.
23   Q    To the best to your knowledge, were specifically,
24   any African-Americans recruited to be brought into Piknik for
25   purposes of employment through recruitment agencies,

Page 105

1    employment agencies -- I call them headhunters -- or anything
2    like that? Can you recall anybody specifically being brought
3    in through any of those agencies for purposes of employment?
4        MR. POUNDSTONE: Object to the form. But you can
5        answer the question.
6    BY THE DEPONENT: (Resuming)
7        A    Yes. I recall that Anthony Barber was identified
8    by an executive recruiter or headhunter. I also am fully
9    aware that there was several other candidates who were
10   considered who were not minority candidates for the job.
11   Q    Regarding Shannon McGlon, if you know, who did she
12   report to directly?
13   A    Different people at different times. She reported
14   to whoever was the president or chief operating officer of
15   the company until Anthony Barber joined the company, and then
16   she reported to him.
17   Q    What was Anthony Barber's position at that time?
18   A    He was the general manager of the beverage --
19   beverage division.
20   Q    So Shannon McGlon reported directly to the
21   president until Anthony Barber showed up, and then she
22   reported to Anthony Barber?
23   A    That's correct.
24   Q    And then did Anthony Barber report directly to the
25   president?

1    A  Yes, he did.

2    Q  Okay.  And we talked about Bob Winter already.  He

3  had a dotted line to you and he reported directly to -- I

4  think we're using the term president and CEO interchangeably;

5  correct?

6    A  President and -- or COO.

7    Q  okay.  And then Bert Mayer reported directly to

8  whom?

9    A  You know, I don't recall, except for that when

10  Anthony Barber joined the company, Bert did report to

11  Anthony.  But I -- prior to that, I don't recall.

12    Q  Okay.  And then the same question for Jerry

13  MacCartney.  When you first began to work at Piknik, if you

14  know, who did Jerry directly report to?

15    A  I don't recall.

16    Q  After Anthony Barber's arrival, who did he directly

17  report to?

18    A  I believe he reported directly to Anthony.

19    Q  Okay.  Do you remember an individual named Athenia

20  Figgs?

21    A  Yes.

22    Q  F-i-g-g-s?

23    A  Yes.

24    Q  Who is she?

25    A  Athenia Figgs was the IT director for the company

1  for a period of time.

2    Q  Is she African-American?

3    A  Yes.

4    Q  Did she leave Piknik?

5    A  She did.

6    Q  Of course, we've all left Piknik, haven't we?

7      When did her employment with Piknik end --

8    A  I don't --

9    Q  -- if you recall?

10    A  I don't recall.

11    Q  Do you know the circumstances of her leaving?

12    A  I don't.

13    Q  Do you know whether or not she went on to work at

14  Onyx?

15    A  I don't recall.

16    Q  Do you know whether or not she worked at Onyx

17  before she came to Piknik?

18    A  I believe she did.

19    Q  Did you ever receive a pay reduction during your

20  tenure at Piknik?

21    A  I did.

22    Q  When?

23    A  Well, I received a pay reduction in May or June of

24  2005, and another one in September or October of that year.

25    Q  And I believe you said you left in --

1    A  November.

2    Q  -- November?

3    A  I was terminated in November.

4    Q  All right.  Tell me about the May or June pay

5  reduction.  How much was your pay reduced by?

6    A  That was -- it was reduced by five to ten percent.

7    Q  And if you know, who made the decision to reduce

8  your pay?

9    A  Chris Day.

10    Q  And what were the circumstances that precipitated

11  your pay being reduced by five to ten percent, if you know?

12    A  The -- the company -- this was around the time when

13  the bank was squeezing the company financially and really

14  essentially saying something to the effect of, "We're not

15  going to extend any additional credit."  And I had a meeting

16  with Chris Day, Bob Lampert, Anthony Barber and there may

17  have been one or two other people in the room.  I don't

18  recall who they would have been.  And we were talking about

19  how to get through this financial crisis.  And I suggested to

20  Chris that -- and one of the things was that the bank had

21  essentially indicated that any employees that were

22  terminated, it -- they would not be supportive of paying

23  severance to those employees.  And so I suggested to Chris

24  that we consider pay reductions, in particular for the senior

25  managers of the company, so that we could fund severance for

1  two or three of the people who had been let go prior to that

2  so that we could continue to fund severance and so that we

3  could save the company money.

4    Q  Are you aware as to whether or not Shannon McGlon

5  received a pay reduction during that period of time?

6    A  Yes, I'm sure she did.

7    Q  Do you know the amount or percentage?

8    A  I do not.

9    Q  Same question for Jerry MacCartney.

10    A  I believe he did.

11    Q  Same question for -- or are you aware of the

12  percentage or amount of that?

13    A  I'm not aware.

14    Q  Same question for Bob Winter.

15    A  Bob -- Bob Winter did, yes.

16    Q  And the same question, are you aware of the

17  percentage or amount?

18    A  It was -- it was -- well, we offered him a 50

19  percent pay reduction.  And essentially, Chris suggested that

20  we were going to eliminate the position out of financial

21  necessity.  And I thought about it and went back to Chris and

22  said, "Instead of doing that, why don't we offer him four to

23  six weeks of reduced pay at 50 percent so that he could have

24  time to look for a job."  And Chris accepted that proposal.

25    Q  And I believe Bert Mayer was gone?

## Page 110

1    A    I believe he was, as well. And I recall that
2    Michael Gray was also gone. And -- because those were two of
3    the folks who the pay reduction was aimed at helping to
4    continue pay some of their severance.
5    Q    So you -- are you saying then that Gray was fired?
6    A    Yes. But he was fired because the -- simultaneous
7    with all this occurring and the bank was putting the squeeze
8    on us, the condiment division was substantially curtailed.
9    It wasn't shut down completely, but it was substantially
10   curtailed. So everyone on my sales team was let go at that
11   time, including Michael Gray.
12   Q    How were the -- how was Gray paid, a salary, a
13   commission, or what?
14   A    He was paid a salary.
15   Q    You added a wrinkle and now I've got to go back.
16   A    Okay.
17   Q    What happened at the condiment division that caused
18   the sales to be dropping off?
19   A    Well, it wasn't that the sales were dropping off.
20   The business had been -- just like the entire company, the
21   business had been unprofitable from the time that Onyx
22   acquired it and through everyone's efforts, had not been able
23   to turn it back around.
24        The beverage business, we were having much more
25   success in making it profitable. And so the decision was

## Page 111

1    made to -- in order to -- essentially, let's not throw the
2    baby out with the bath water. So it was kind of like, let's
3    take the baby. Let's take the beverage division and let's
4    protect it by cutting off the bleeding in the condiment
5    business. So let's shut that down so we're not hemorrhaging
6    cash. And then at least the beverage business could continue
7    to operate on a cash profitable or break even basis. So just
8    about everyone was let go from the condiment division at that
9    time.
10   Q    Did you maintain a journal during the course of
11   your employment, a written paper journal?
12   A    I did.
13   Q    Was it on a gray Wilson Jones journal book?
14   A    Not to my knowledge.
15   Q    Describe it, then.
16   A    It was a -- it was a blue -- I don't know what
17   they're called. It was a blue, hard-covered book, very
18   similar to one that Bob Winter used. In fact, he influenced
19   me to do the same. So -- with numbered pages and, you
20   know...
21   Q    Do you know where that book is today?
22   A    It's -- hopefully it's been recycled.
23   Q    So you don't know?
24   A    No, I -- it was -- I threw it away some time ago.
25   Q    In that case, I hope it's been recycled, too.

## Page 112

1        Did you attend a conference in Chicago in May of
2    2005?
3    A    I did.
4    Q    And tell me about that conference. What was that
5    all about?
6    A    I think it was called -- well, I went to a -- I
7    went to a bunch of conferences. And I -- there was one
8    called the Packaging Expo or something, in Chicago that was
9    around that time.
10   Q    What did you do there?
11   A    Attended seminars on the packaging industry and
12   manned a booth where we were seeking new customers. And I
13   also -- I gave a presentation.
14   Q    Tell me about some of the booths that you visited
15   and some of things that you saw while you were there at the
16   conference.
17   A    All kinds of folks doing all kinds of things in the
18   packaging industries from corrugate to, you know, logistics
19   companies. You know, I really can't recall. But there were
20   -- you know, it was a whole big convention hall full of
21   booths and go around talk to people about their products and
22   customers, or potential customers would come and talk to us,
23   as well. I recall having a conversation with a gentleman
24   from Unilever. And we met with someone from Power Packaging
25   and some other folks about potential, you know, Onyx -- Onyx

## Page 113

1    -- opportunities for Onyx, as well as for Piknik. Sorry I
2    can't be more specific. I just...
3    Q    I mean, you were there in your capacity as sales
4    and marketing manager for Piknik?
5    A    Yes.
6    Q    Okay. Were you there in any way as a
7    representative of Onyx?
8    A    Well, I did -- I gave that presentation on behalf
9    of -- on behalf of Onyx and Piknik.
10   Q    Okay. But you were not an employee of Onyx at the
11   time?
12   A    No.
13   Q    Have you -- and I may have asked this earlier.
14   Have you ever received any form of payment directly from
15   Onyx?
16   A    I have not.
17   Q    Have you ever been given an offer of ownership or
18   shareholder position in Onyx?
19   A    No.
20   Q    Tell me about the presentation you gave.
21   A    It was called the Competitive Reality of Supplier
22   Diversity. And I went through and I --
23   Q    We don't have to go through all of that.
24   A    So that's what it was called.
25   Q    And for my simple mind, what exactly is that?

Page 114

1    A   It -- it attempted to answer questions for folks
2    who were curious, why it would make sense to have a supplier
3    diversity program if you were a larger company and what
4    advantages there might be to being an MBE.
5    Q   And did you explain the Piknik MBE status?
6    A   I did.  And I -- and I talked about the success
7    that we were having at Piknik in part because of that.
8    Q   Other than this presentation that you gave in
9    Chicago in 2005, did you ever make any similar such
10   presentations at other events or conventions?
11   A   Not that I recall.
12   Q   Is that the one and only time?
13   A   As best I can recall.
14   Q   All right.  Regarding Patrice Daniels, we talked
15   about her coming in and working at Piknik and some of what
16   position she took as the -- I believe you said she was an
17   executive vice president?
18   A   Yes.
19   Q   What -- exactly what roles did she assume as
20   executive vice president, that you know of?
21   A   Well, she did -- she did lots of things.  As I
22   mentioned previously, she was one of the owners, she was a
23   partner in Onyx.  And so she and Chris, primarily, at certain
24   points in time, took a very active role in the company.  She
25   was initially -- she at some point was engaged in talking

Page 115

1    with customers, particularly at the beginning of Onyx's
2    tenure as owner of the company, in terms of understanding
3    what the relationship was between those customers and the
4    company.
5        I don't recall what else.  But she was -- she was
6    pretty active as, you know, almost as a co-chief operating
7    officer of the company at certain points in time.  So she
8    would have had her hands in a lot of things that were going
9    on inside the company.
10   Q   Did the company have weekly or semiweekly regular
11   financial management meetings?
12   A   There would be financial as well as operational
13   management meetings.  So they would be overall, kind of an
14   all-hands-on-deck conversation about what was going on in the
15   company.  But it would certainly include the financial
16   performance of the company.
17   Q   Were those typically held on Thursdays?
18   A   The date changed from -- I mean, the day of the
19   week changed at different points during the time I was there.
20   Q   When you first got at Piknik, were these meetings
21   being held?
22   A   Yes.
23   Q   So during the calendar year 2004, was it a regular
24   thing for you to have these meetings?
25   A   Yes.

Page 116

1    Q   Typically weekly?
2    A   Typically.
3    Q   Who ran those meanings, if anybody?
4    A   Initially, it was Bob Winter.  And my recollection
5    is that it really began to be driven by all of us.  What I
6    mean by that is that, the president of the company at the
7    time, whoever that might have been, would convene the
8    meeting, but each of us would have a responsibility for
9    reporting on our own functions.
10   Q   When Patrice Daniels came on board with Piknik, did
11   she begin to head up the meetings?
12   A   I don't think she ever headed up the meetings.  But
13   she was -- because as I recall, when Patrice was actively
14   engaged, it was really Bob Winter who was heading up those
15   meetings.  But she were there on a regular basis.
16   Q   Okay.  And when is it that Jeff Larry came on and
17   began to work at Piknik?
18       MR. POUNDSTONE:  Object to the form.
19   BY THE DEPONENT:  (Resuming)
20   A   To my knowledge, Jeff Larry never came on and
21   worked at Piknik.  He was the -- he was the CEO of Onyx.  And
22   he would come in and out of town on a regular basis.  But he
23   never worked at Piknik.
24   Q   What would be the purpose of his coming in to town?
25   A   Talk to the team, see what was going on, meet with

Page 117

1    a customer, review the financial performance of the company.
2    Q   Would he give advice as to how the company should
3    be operated?
4    A   Not to my knowledge.  I don't have any knowledge of
5    that.
6    Q   Did he ever talk to you about what was going on in
7    your department?
8    A   Not -- other than -- other than to ask how it was
9    going.  He -- you know, he would regularly say, "How's it
10   going?  What's going on?"  But he wanted to know what was
11   going on.  I don't recall him ever saying, "You should go do
12   this."
13   Q   Okay.  Did he ever go to any sales calls with you?
14   A   Yes, he did.
15   Q   What did he do at the sales calls?
16   A   He really would talk about -- he really would talk
17   about what was going on with the team, how things were
18   progressing from a -- from a high-level operational basis.
19   He might give a financial status, kind of update, to give
20   customers some comfort about that.  And he might talk about
21   long-range Onyx -- things that Onyx wanted to do like, buy
22   other companies and that sort of thing.
23   Q   To the best of your knowledge, did he make any
24   decisions or have any influence over personnel changes, like
25   promotions, hiring or determinations?

## Page 118

1      A    Not to my knowledge. I'm sure that he was aware.
2  But to my knowledge he didn't influence.
3      Q    To the best of your knowledge, did he have any
4  influence over pay for any of the employees?
5      A    Not to my knowledge.
6      Q    Compensation or bonuses that any employees might
7  receive?
8      A    Not to my knowledge.
9      Q    Did he ever direct anyone at Piknik, to your
10  knowledge, to transfer funds to Onyx, Piknik funds to Onyx?
11      A    Not to my knowledge.
12      Q    What about -- did he give direct instructions that
13  money be sent to packaging or ingredient suppliers?
14      A    Not to my knowledge.
15      Q    And I believe you said that you received a bonus in
16  2005?
17      A    I did.
18      Q    Who made, if you know, that decision to pay you
19  that bonus?
20      A    Chris Day.
21      Q    And what was, if you know, the reason for him
22  paying you that bonus?
23      A    He paid me that bonus because the company was going
24  through a tough time and he wanted to encourage me to stay
25  and ride it out with them.

## Page 119

1      Q    So it was an incentive for you to stay on?
2      A    Yes.
3      Q    Do you have a poster on the wall in your office,
4  specifically of a lion?
5      A    I don't recall.
6      Q    How about we take a quick break?
7      A    Yeah.
8          (Off the record)
9          (Whereupon, Plaintiff's
10          Exhibit No. 1 was marked for
11          identification.)
12  BY MR. NELMS: (Resuming)
13      Q    Mr. Hicks, I'm going to show you a document I've
14  already marked as Plaintiff's Exhibit No. 1. And I'll just
15  ask you if you're familiar with it?
16      A    I am.
17      Q    Just generally, what is it?
18      A    This is a letter -- a note to the employees
19  announcing that I was joining the company and some other
20  folks were taking on new roles.
21      Q    Okay. And I'm going to show you another document
22  that I'm going to mark as No. 2.
23          (Whereupon, Plaintiff's
24          Exhibit No. 2 was marked for
25          identification)

## Page 120

1  BY MR. NELMS: (Resuming)
2      Q    It's a document that was handed to me today by your
3  counsel.
4          MR. NELMS: Do you need a copy, or do you already
5      have a copy, Bobby?
6          MR. POUNDSTONE: Just give it to me. I swear I
7      think we've seen these things four or five times.
8          MR. NELMS: I think we have, too. But I'm just
9      covering all the bases.
10  BY MR. NELMS: (Recording)
11      Q    I would ask you, sir, if you please would look at
12  it and then describe it for the record.
13      A    This is a document that was generated to tell
14  employees of Piknik what was going on as the bank was
15  declining to extend additional credit and explain why, among
16  other things, we were shutting down the condiments division
17  and letting some employees go.
18      Q    You said a while ago that the bank -- you used the
19  term squeezing Piknik. What did you mean by that?
20      A    They declined to extend additional credit, which
21  was going to -- in that particular time frame, was going to
22  make it more challenging for the company to continue to
23  operate.
24      Q    Did you believe there was a racial motivation for
25  the bank not wanting to extend credit?

## Page 121

1      A    No.
2      Q    Did there come a period in time when Hershey's no
3  longer wanted to do business with Piknik Products?
4      A    Yes.
5      Q    Did you believe that there was a racial motivation
6  for Hershey's not wanting to do business with Piknik
7  Products?
8      A    In part.
9      Q    Explain that.
10      A    Well, Piknik had for a long time been a supplier to
11  Hershey. It was probably the company's longest tenured
12  contract. It -- the company had, for a long time, provided
13  Hershey with spotty quality, if you will. There had been
14  some quality concerns that Hershey had. But Piknik had also
15  come to the company's rescue on more than one occasion. And
16  it was a little bit ironic that shortly after Onyx's
17  acquisition of the company, the -- Hershey chose not to renew
18  it's long-standing contract and move the business to a new
19  supplier that had never been in that business for them.
20      Q    So what about that, in your mind, was race
21  motivated?
22      A    Well, again, it -- the irony was that the company
23  had gone from being historical Alabama, Montgomery-run
24  company with local relationships to being owned by a private
25  equity firm out of Chicago that happened to be controlled by

Page 122

1    African-Americans. And all of a sudden Piknik wasn't a good
2    enough supplier for them.
3        Q    So that in itself was why you believed that there
4    was a race-based motivation for Hershey's not continuing to
5    do business with Piknik Products?
6        A    Well, I said in part.
7        Q    And any other parts?
8        A    Sure. The company had -- Piknik hadn't provided
9    them with great quality. So, you know, I think that there
10   are -- and I would also say the relationship had changed.
11       So prior to Onyx acquiring the company, there had
12   been a relationship with some of the people who were running
13   Piknik. So they were more willing to suffer through quality
14   challenges. So I would say there were relationship reasons
15   and I would say that there were also quality reasons.
16       Q    Did you participate in the production of a
17   presentation to be given to Hershey's explaining how there
18   was a belief that there was a race-based motivation for
19   Hershey's no longer doing business with Piknik?
20       MR. POUNDSTONE: Object to the form. You can
21   answer the question, if you understand it.
22   BY THE DEPONENT: (Resuming)
23       A    I was involved in the preparation of a presentation
24   to Hershey's. I don't recall that presentation explaining
25   why there was a race-based motivation.

Page 123

1        Q    Was there a timeline in the presentation?
2        A    There was a timeline in that presentation.
3        Q    Did the timeline delineate the period of time when
4    Piknik was majority owned by the Loeb family versus the
5    period of time when Piknik was owned by the Onyx Corporation?
6        A    There was a period of time that delineated when --
7    there was a long side of the line, which said, "We've had a
8    long relationship with Hershey." And there was a line
9    towards the end of that line -- towards the end of the --
10   that was perpendicular to that line that said, "This is when
11   Onyx acquired the company and we're surprised that you would
12   not renew your contract shortly after Onyx acquired the
13   company."
14       Q    What was the purpose in making that discrepancy in
15   your presentation?
16       A    Right. The purpose was to say, "We're under new
17   ownership. And we understand that there are -- that quality
18   issues have been a concern for a long period of time. So, in
19   other words, nothing is new about Piknik's quality, or lack
20   thereof. What is new is that Onyx acquired the company and
21   now you're pulling the business." And that appeared to be --
22   again, you know, I would say that appeared to be questionable
23   in our -- in my opinion.
24       Q    Questionable in what way?
25       A    Questionable in that ownership had changed. And,

Page 124

1    as I said, in addition to quality, there was also a
2    relationship that had changed. And, yes, the race of the
3    owners had also changed.
4        Q    How did you feel that making this expression of
5    concern known to Hershey would change the relationship that
6    Piknik was having with Hershey?
7        MR. POUNDSTONE: Object to the form.
8        MR. NELMS: On what basis, please?
9        MR. POUNDSTONE: Well, I thought -- number one, I
10   thought it was a compound question. But number two, --
11       MR. NELMS: Which part was compound?
12       MR. POUNDSTONE: I think that you -- I don't think
13   that you -- I don't think that you adequately expressed
14   what his testimony necessarily was on how he felt. You
15   said, "How did you feel," and then you said what he
16   felt. I don't think that that was exactly the way that
17   he testified.
18       MR. NELMS: Could you read the question back for
19   me?
20       (Question read back by Reporter.)
21       MR. NELMS: I don't think that's what I said.
22       COURT REPORTER: Well, I can play it back and let
23   you listen to it.
24       MR. POUNDSTONE: I just didn't understand what you
25   were asking.

Page 125

1        MR. NELMS: Let me ask it another way.
2        COURT REPORTER: I mean, if you want to listen to
3    it --
4        MR. NELMS: No, no, no. That's fine.
5    BY MR. NELMS: (Resuming)
6        Q    You made a delineation on the timeline, that this
7    was a period of time that Piknik was old ownership and this
8    is a period of time when we have a new ownership. And you
9    said already that you had a belief that Hershey's not wanting
10   to do business with Piknik anymore had some racial motivation
11   to it; do you agree with that statement?
12       A    In part.
13       Q    My question is, how does bringing this fact to
14   Hershey's attention help get Hershey business back to Piknik?
15       A    Well, unfortunately in America, folks sometimes
16   make decisions or choose not to make decisions, and race is a
17   consideration. And sometimes folks are not given an equal
18   chance, and race is sometimes a consideration. So I think
19   that actually, the more important part of the presentation
20   outlined a number of tactical changes that were being made at
21   Piknik to improve quality. And the more important part of
22   the presentation simply said, these are all the things that
23   we have done to improve quality, these are the things that we
24   will do to improve the relationship with Hershey and we'd
25   like a chance to develop a relationship with Hershey as a new

## Page 126

1  owner of the company, whether or not race had anything to do
2  with it. And that's -- that was the point of the
3  presentation.
4      Q   Is it your understanding -- that being said --
5  check that.
6          Was there any intent on behalf of Piknik's new
7  ownership to threaten Hershey regarding its perceived race-
8  based motivation for making a decision not to do business
9  with Piknik?
10     A   No, I don't think it was an intent to threaten
11 them.
12     Q   Okay. Let me show you what I've marked as
13 Plaintiff's Exhibit No. 3. And ask you to look at it and
14 tell me if you recognize it.
15             (Whereupon, Plaintiff's
16             Exhibit No. 3 was marked for
17             identification)
18 BY THE DEPONENT: (Resuming)
19     A   Yes, I do.
20     Q   Tell us what that is, please?
21     A   This is Chris Day's recommendation of salary cuts
22 for -- for many people and the severance that it would help
23 to fund.
24     Q   So there was a list people, and the third paragraph
25 that indicates people who it was intended to give severance

## Page 127

1  to?
2      A   Yes.
3      Q   Starting with Bert Mayer?
4      A   Yes.
5      Q   Okay. Up that from that, there are two sentences
6  that begin with dashes. The --
7      A   Yes.
8      Q   -- first one says, "Across-the-board 5 percent
9  salary pay cut." Were you one of the individuals affected by
10 that pay cut?
11     A   Yes.
12     Q   The second dashed line starts, "Deeper cuts for a
13 few specified individuals."
14     A   Yes, I see that.
15     Q   All right. And you were one of the persons that
16 this memorandum is addressed to?
17     A   Yes.
18     Q   Okay. And it says, "already discussed" in
19 parentheticals; do you see that?
20     A   Yes.
21     Q   Were you part of the conversation about who would
22 get deeper cuts?
23     A   Not that I recall.
24     Q   Did you have an understanding as to who would
25 receive these deeper cuts?

## Page 128

1      A   Not specifically.
2      Q   What level do you understand?
3      A   I -- I simply don't recall. There were a -- I -- I
4  do recall that there were some individuals that were going to
5  get deeper cuts. I don't recall whether I was or was not one
6  of those folks.
7      Q   Do you know of any of the folks that were supposed
8  to get the deeper cuts?
9      A   I don't recall. Other than -- other than the
10 conversation about Bob Winter, I don't recall.
11     Q   Bob Winter was one of the individuals to receive a
12 deeper cut?
13     A   Bob Winter was one of the positions to be
14 eliminated. And -- and we discussed previously that I went -
15 - that I went back to Chris and suggested that we handle that
16 a different way.
17     Q   I note that there's a sign-off line from Chris Day
18 at the bottom of the memorandum?
19     A   Yes.
20     Q   And I note that he has an e-mail address of
21 onyxcapitalventures.com?
22     A   Yes.
23     Q   I also note that he expresses in his signature line
24 that he's of Onyx Capital Ventures?
25     A   Yes.

## Page 129

1      Q   Was Chris in Chicago when he sent this e-mail?
2      A   I doubt it.
3      Q   How do you know?
4      A   That's a good question. I simply don't know.
5      Q   Was it common for him to send e-mails to you with
6  the signature line of Onyx Capital Ventures on it?
7      A   Yes.
8      Q   Was it common for him to send you e-mails from
9  Chicago?
10     A   Sure.
11     Q   Let me ask you take a look at a document I've
12 marked as Plaintiff's Exhibit No. 4.
13             (Whereupon, Plaintiff's
14             Exhibit No. 4 was marked for
15             identification)
16 BY MR. NELMS: (Resuming)
17     Q   I'd just ask you if you recognize the document?
18     A   I can't say that I do. If you'd like to rephrase
19 or -- I'd be happy to answer you differently. I mean --
20     Q   No, I'm just asking you, does this ring a bell,
21 does it look familiar, have you seen it before?
22     A   I can't recall. I used to get a hundred e-mails a
23 day and send the like number probably. So I...
24     Q   Okay. Do you have a reason to doubt that's an e-
25 mail --

Page 130

1    A  I don't.
2    Q  -- correspondence between you and Chris Day?
3    A  I don't have any reason to doubt that.
4    Q  Let me ask you take a look at a document, a
5    composite exhibit that I've marked as Plaintiff's Exhibit No.
6    5.
7                (Whereupon, Plaintiff's
8                Exhibit No. 5 was marked for
9                identification)
10   BY MR. NELMS: (Resuming)
11   Q  I'll ask you if you are familiar with that?
12   A  Sure.
13   Q  Is this the document we were referring to earlier
14   as part of the presentation that was to be given to
15   Hershey's?
16   A  It would appear to be.
17   Q  I'm going to ask you to look on what's numbered as
18   page two.
19   A  Uh-huh.
20   Q  I note there's a note blog, I call it, in the top
21   left-hand corner.
22   A  Uh-huh.
23   Q  It's says, "Hicks." Is that something you wrote?
24   A  Possible. I don't specifically recall. But I
25   don't have any reason to doubt that.

Page 131

1    Q  Can I ask you to turn to page four, please? Is
2    that the timeline we were referring to earlier?
3    A  Yes, it is.
4    Q  And I note in the far right-hand of the timeline it
5    states, "Onyx requests Hershey meeting." Do you see that?
6    A  Yes.
7    Q  Who specifically at Onyx to the best -- first of
8    all, did you do this timeline yourself or did you participate
9    in its production?
10   A  I'm sure I participated in it. I don't recall that
11   I did. I don't -- I don't recall who created this.
12   Q  Referring back to the timeline on the right-hand
13   side, it says, "Onyx requests Hershey meeting."
14   A  Yes.
15   Q  Who at Onyx requested the Hershey meeting?
16   A  My recollection is that Jeff Larry sent a letter to
17   Hershey's CEO requesting a meeting.
18   Q  Do you now what the purpose of the meeting was?
19   A  The purpose of the meeting was to discuss Hershey's
20   decision to terminate the contract.
21   Q  Page five there's another note block in top left-
22   hand corner that says, "Hicks" and then gives some
23   instruction.
24   A  Uh-huh.
25   Q  It says, "Redundant for the CEO level." Did you

Page 132

1    write that?
2    A  I don't have any reason to doubt that I did.
3    Q  Okay.
4    A  I don't recall.
5    Q  Page 11, the presentation seems to say, "You also
6    expressed concern about management changes at the executive
7    levels." When it says, "you", is this referring to
8    Hershey's?
9    A  It is.
10   Q  Are you aware that Hershey's made some expressions
11   of concern regarding management changes?
12   A  That would be my recollection.
13   Q  What -- first of all, who expressed these concerns
14   from Hershey's?
15   A  It would have been my contact or contacts at
16   Hershey's when having a conversation with them about why they
17   chose to terminate the contract.
18   Q  Did they express any specific concerns regarding
19   any specific management changes?
20   A  Not that I recall.
21   Q  Well, I note that there are four arrows pointing to
22   specific individuals who, from our discussions, I know are
23   part of the management of Piknik Products.
24   A  Uh-huh.
25   Q  Ricky Loeb being the first. It seems to indicate

Page 133

1    that Ricky Loeb's reduced role in managing the company. Is
2    that something that Hershey's expressly stated was a concern
3    of theirs?
4    A  Not that I recall.
5    Q  Why would it be important for Ricky Loeb's reduced
6    role in managing the company to be bullet pointed here on
7    page 11 in the exhibit, then?
8    A  I think that -- I can't recall exactly what was
9    expressed to me regarding their concern. What I do recall is
10   that there was a comment made to the effect of, "Hey, you
11   guys have a lot of people in and out of there." So our
12   objective was to acknowledge their concern.
13   Q  I note that in the third bullet point it says,
14   "Patrice Daniel's role in managing the company." Did anyone
15   at Hershey's express a concern about Patrice Daniel's role in
16   managing the company?
17   A  I can't recall specifically.
18   Q  Okay. On page 13, you indicate that you're going
19   to adopt Six Sigma process?
20   A  Yes.
21   Q  What is Six Sigma?
22   A  Six Sigma is a methodology for evaluating and
23   measuring deviations from standard procedure in managing a
24   business.
25   Q  The first bullet point under there indicates that a

Page 134

1   QA manager has been hired to start August the 4th, 2004?
2       A   Yes.
3       Q   And there are bullet points under there -- it seems
4   to indicate that there's -- that this person has a BS in
5   chemistry; is that correct?
6       A   That's what it says, yes.
7       Q   Who is this person that's being referred to?
8       A   I believe -- his first name was Allen. I believe
9   his last name was Walters.
10      Q   Okay. He worked at PepsiCo as a co-packer?
11      A   He -- I -- I can't recall where he worked. From my
12  reading of this statement, it doesn't appear that this is
13  suggesting that he worked at PepsiCo. But he worked some
14  place where PepsiCo was a customer. That's the way I read
15  that.
16      Q   Okay.
17      A   And there -- and that he helped to improve their
18  co-packer rate.
19      Q   Was Allen Walters ever brought on-board --
20      A   Yes.
21      Q   -- actually hired?
22      A   Yes.
23      Q   What is his race?
24      A   Caucasian.
25      Q   When was he brought on?

Page 135

1       A   I don't recall. This says August 4, 2004. So I
2   don't have any reason to doubt that was the case. But I
3   don't recall specifically.
4       Q   On page 15, the first bullet point indicates that -
5   - it says, "Request prior owner to disengage from daily
6   operating decisions." It that referring to Ricky Loeb?
7       A   Yes.
8       Q   What was the importance of, if you know, requesting
9   that the prior owner disengage from daily operating
10  decisions?
11      A   Ricky was a -- Ricky could be a disruptive guy.
12  And so it was important to try to get the entire management
13  team focused on winning and focused on working together. And
14  Ricky was divisive.
15      Q   Second bullet point indicates that, "Sent three
16  Onyx executives to try and fill the gap." Which three
17  executives were these?
18      A   Chris Day, Patrice Daniels and Athenia Figgs.
19      Q   Okay. Then is says, "Acquired new VP of Sales and
20  Marketing." Who would that be referring to?
21      A   That would be yours truly.
22      Q   Good for you.
23          Lastly, it says on number five, acquired new
24  President and COO in June of '04. Who is this referring to?
25      A   Bill McClennan.

Page 136

1       Q   Thank you.
2       A   Who was Caucasian.
3       Q   Thank you. If the record didn't say that, he was
4   Caucasian.
5           On page 16 -- and Chris Day is Caucasian?
6       A   Yes, he is.
7       Q   On page 16, it's titled, "Strategic Relationship."
8       A   Uh-huh.
9       Q   Tell me what is the essence of this information on
10  page 16?
11      A   We were offering certain concessions and we were
12  saying, "Hey, Hershey, here's some things we can do together,
13  to partner together, to not only work through this quality
14  problem, but also to make it more attractive for you to
15  continue to give us a shot at the business."
16      Q   And the last bullet point indicates, opportunity
17  for extended Hershey market share in selected areas. 87
18  percent of African-Americans more likely to buy from
19  companies contributing to African-American community.
20  Explain that to me, please.
21      A   I don't how to -- I mean, I don't -- I can read it
22  again. I don't know how -- if you rephrase, I'd be happy to
23  -- I'm not sure I understand what you're asking me.
24      Q   What was the point in explaining, as part of your
25  strategic relationship, that 87 percent of African-Americans

Page 137

1   are more likely to buy from companies contributing to
2   African-American communities?
3       A   I think it ties into the -- to the bullet point
4   above. I think what we were saying was, "Hey, guys, you
5   know, Piknik is among your -- among your largest of MBE
6   suppliers. And that can be a big deal if you want it to be."
7       Q   On page 18 there's another note block in the top-
8   left corner. It says, "Hicks." And it says, "Is this one
9   that we want to put in our pocket rather than in the deck?"
10  Is that something you put into the presentation?
11      A   I don't recall whether I put this in the
12  presentation.
13      Q   Then would you remember what you meant by, "Put in
14  our pocket rather than in the deck"?
15      A   Well, I can -- this really says that we're
16  questioning their decision of where they were going to move
17  the business. And I suppose my question was, was this one we
18  wanted to talk to rather than put down in writing and share
19  it with Hershey.
20      Q   Okay. On the right-hand of that page, there is a
21  separated bullet point that says, "Why would Hershey accept
22  this startup risk versus affording Onyx the time to fix
23  Piknik issues?" When you say, "startup risks", are you
24  referring to the other company that Hershey had chosen to go
25  to?

Page 138

1    A   Yes.
2    Q   Okay. Are you, in essence, trying to ask Hershey
3  for more time to resolve Piknik issues?
4    A   That -- that would be one way to put it. I think
5  what we're saying is, "Hey, guys, you're going to go down the
6  street and start up a completely new company who's never done
7  this before. Why would you do that instead of giving us a
8  shot at fixing our internal issues?"
9    Q   Okay. And I think we've covered this ground. But
10  be patient with me. When you say, "affording Onyx the time
11  to fix Piknik", what is Onyx doing to fix Piknik?
12    A   Onyx was really driving the management and culture
13  changes at Piknik. They were collectively the operator.
14        And it was important to -- in -- in some instances,
15  and this could be one of them, it was important to establish
16  or to brand Onyx in some of these conversations, because many
17  of the customers -- if you recall, Piknik had, not only a
18  tough financial -- was not only in a tough financial
19  situation, but also really didn't have a great reputation
20  with many of its customers. That's, in part, why I was
21  hired, was to try to help offset that. So using the word
22  Onyx was to say, "Hey, we're different from the old Piknik."
23        And I think it's important to say, the next page,
24  19, says, "Whatever you decide to do, we'll work with you to
25  make it work for everybody."

Page 139

1    Q   Mutually agreed on timing; is that what --
2    A   Right. I mean, so, "If you decide to renew, this
3  is what we'll do. And if you decide to exit, this is what
4  we'll do."
5    Q   Okay. Did Hershey's have capital expenditures
6  invested in Piknik itself?
7    A   Capital expenditures, yes. They owned a big chunk
8  of the equipment that the product was running on.
9    Q   When Hershey decided not to do business with
10  Piknik, what happened to the equipment?
11    A   They came and picked it up.
12    Q   On page 21 of Plaintiff's Exhibit 5, the top right-
13  hand corner indicates, "Onyx - Vision." Explain to me what
14  this page of the presentation is about.
15    A   This was about telling Hershey what Onyx wanted to
16  do.
17    Q   And what, specifically, did Onyx want to do
18  according to page 21?
19    A   Create a number of significant, sophisticated MBE
20  suppliers, acquire businesses that had the scale, skills and
21  capabilities to supply large corporations, work in certain
22  specific industry sectors.
23    Q   Why was it important to express Onyx's vision to
24  Hershey's in a Piknik presentation?
25    A   Well, as I said, it was important to overcome

Page 140

1  Piknik's poor reputation. And so a part of that was to say,
2  hey, there's a -- there's a bigger vision here that includes
3  Piknik, but Onyx has a bigger vision and recall Onyx
4  requested the meeting. It was focused on Piknik, but Jeff
5  Larry requested the meeting. It was his meeting.
6    Q   So in your mind, was Onyx taking an active role in
7  improving Piknik's perception in the marketplace?
8    A   Yes.
9    Q   Was Onyx making decisions as to Piknik management
10  decisions regarding their -- that's a bad question.
11        Was Onyx directing Piknik to make certain decisions
12  to help improve that image in the marketplace?
13    A   No.
14    Q   Other than making presentations like this, what
15  steps was Onyx taking to make Piknik a better place?
16    A   Well, Onyx was -- Onyx was essentially identifying
17  the individual who was going to be the president or chief
18  operating officer of the company. I mean, that's -- that's -
19  - and participating on sales calls as needed. I mean, those
20  are the kinds of -- and -- and participating in meetings like
21  this.
22    Q   Okay. Page 22 lists, "Onyx - Piknik Assets." It
23  states in bullet number two that, "70 percent of workforce is
24  minority." And in your mind, how is that an important asset?
25    A   I'm not sure.

Page 141

1    Q   In bullet point number four, it says, "Operating in
2  Economic Development Zone." What is an economic development
3  zone?
4    A   An economic development zone -- I'm not sure.
5    Q   Any idea why it would be important to put in the
6  presentation?
7    A   Well, let me -- let me re-answer you. Both the
8  economic development zone and the HUB zone would suggest that
9  there are lower income people that live within that region.
10  I can't be more specific. I'm not -- I'm not certain beyond
11  that.
12    Q   Look at page 33, please. Again, there's a note in
13  the top left corner of the presentation on page 33 that
14  indicates -- it says, Hicks, H. Hicks, redundant from the
15  front. Is that something you put in the presentation?
16    A   I don't recall specifically. I don't have any
17  reason to doubt it.
18    Q   Okay. Page 33 seems to indicate that, "McGlon
19  hired, began new QA processes." Is that quality assurances
20  processes?
21    A   Yes.
22    Q   Okay. Is the essence of page 33 that Shannon
23  McGlon helped reduce complaints from consumers?
24    A   Yes.
25    Q   Is that a good thing?

Page 142

1    A    That's a good thing. Look at that. Here's that
2    presentation we talked about.
3    Q    Let me show you an exhibit I've marked as
4    Plaintiff's exhibit No. 6.
5                    (Whereupon, Plaintiff's
6                     Exhibit No. 6 was marked for
7                     identification.)
8    BY MR. NELMS: (Resuming)
9    Q    Have you seen this? Are you familiar with this
10   exhibit?
11   A    It's been a long time.
12   Q    Does it report to be a memorandum announcing that
13   Mike O'Connell is leaving Piknik?
14   A    Yes.
15   Q    And it appears to be dated January 22nd, 2004?
16   A    Yes. Actually, it says January 12th.
17   Q    I'm sorry, what did I say?
18        I see -- it's two pages. And the first page says,
19   "From Chris Day, sent Thursday, January the 22nd, 2004 at --
20   A    Sure.
21   Q    -- 3:30 p.m. --
22   A    Right.
23   Q    -- new organizational announcement 011204.doc. I
24   think that would just be a reference to the date.
25        Anyway, the second page, do you recall whether or

Page 143

1    not you ever received this document during the course of your
2    employment some time in January 2004 at Piknik Products?
3    A    I don't recall. But I don't have any reason to
4    doubt it.
5    Q    The second full sentence says, "Mike's
6    responsibilities", and I assume that's Mike O'Connell, "will
7    be split between Chris Day and Patrice Daniels of Onyx
8    Capital Ventures." Do you see that?
9    A    Yes, I see that.
10   Q    The last sentence of that paragraph says, "Jeffery
11   Larry of Onyx remains Chairman and CEO of Piknik."
12   A    I see that.
13   Q    Was this pretty much the way things worked out in
14   early 2004, as far as personnel changes were concerned, to
15   the best of your recollection?
16   A    What do you mean when you say "worked out"?
17   Q    Well, did -- Michael O'Connell left?
18   A    Yes.
19   Q    And then Chris Day and Patrice Daniels came in?
20   A    Yes.
21   Q    They had originally been at Onyx?
22   A    Yes.
23   Q    And then they assumed a role at Piknik.
24   A    Yes.
25   Q    And then the division of responsibilities in -- I

Page 144

1    believe it's the fourth sentence, the first paragraph says,
2    "Chris will take responsibility for operations, logistics,
3    quality and human resources." Is that pretty much the way it
4    worked out?
5    A    Yes, sir.
6    Q    And then, "Patrice will take responsibility for
7    sales, contract administration, purchasing, finance and IT"?
8    A    Yes.
9    Q    Is that pretty much the way that worked out?
10   A    Yes, sir.
11   Q    Okay. So then is it fair to say after January --
12   sometime in January -- this is dated January the 12th.
13   A    Sure.
14   Q    But some time in January, 2004, you reported to
15   Patrice --
16   A    Yes.
17   Q    -- Daniels?
18   A    Yes.
19   Q    I'd just ask you to look at the exhibit that I've
20   marked as No. 7, Mr. Hicks. And I'd ask you if you are
21   familiar with it?
22   A    I am.
23                    (Whereupon, Plaintiff's
24                     Exhibit No. 7 was marked for
25                     identification)

Page 145

1    BY MR. NELMS: (Resuming)
2    Q    Walk through it and make sure that it is complete
3    and accurate and is as you remember it.
4    A    Sure, looks pretty spot on.
5    Q    And a very attractive presentation, at that.
6         All right. Page 20.
7    A    Uh-huh. I'm with you.
8    Q    The first section seems to indicate on page 20 that
9    Onyx is an MBE; is that correct?
10   A    Yes.
11   Q    And did you manufacture or create this publication?
12   A    I did.
13   Q    Did you have any assistance from anyone, or did you
14   do it on your own?
15   A    I'm sure I had assistance. But I -- I'm sure I --
16   I probably pieced it together from other documents and -- I'm
17   substantially the author of it, I'm certain.
18   Q    And as we spoke earlier, you made this presentation
19   on behalf of Onyx Capital Ventures?
20   A    Yes.
21   Q    And was there anyone in particular at Onyx that
22   requested that you represent them in this capacity?
23   A    Chris Day.
24   Q    Did he tell you why he wanted you to do this?
25   A    He just said he thought it would be a good

Page 146

1 opportunity to get up and speak and represent Piknik at Onyx.
2    Q  The second section of page 20 on Exhibit 7
3 indicates Onyx's strategy?
4      MR. POUNDSTONE: What page are we on?
5      MR. NELMS: Twenty.
6 BY MR. NELMS: (Resuming)
7    Q  Second section is Onyx's strategies.
8    A  Yes.
9    Q  You state, "Acquire controlling equity stakes in
10 existing non-MBE suppliers to leading corporations." What
11 does that mean?
12    A  That means that Onyx's objective was to buy 50 or
13 greater percent -- it could have been less -- but to buy a
14 controlling interest in companies which are not minority
15 owned and who are suppliers to leading companies.
16    Q  And what would be the purpose in doing that, if you
17 know?
18    A  Well, because there are few companies of scale --
19 few companies, say greater than $10 million in revenues in
20 this country, that are owned by people of color.
21    Q  So you're saying they're not available?
22    A  Yes.
23    Q  So you have to go to non-MBEs to get them?
24    A  For the most part.
25    Q  Okay.

Page 147

1    A  And if -- and if that particular point can be a --
2 it can be a point of confusion for people who are -- who
3 would otherwise not be familiar with Onyx's strategy. They
4 would think that Onyx's goals was to buy companies that were
5 already MBEs.
6    Q  Your understanding of what it takes to get
7 certification for an MBE, what are some of the steps that
8 have to be taken in order for a company to be certified as a
9 MBE?
10    A  You have to own a controlling interest in the
11 company and you have to control the Board. So you had -- so
12 you have to control the checkbook and you have to control --
13 basically, you have to control the checkbooks and the Board.
14 There are some specific criteria. And it's, kind of, two out
15 of the three, kind of, a deal. But I don't know specifically
16 what they are. But you -- but fundamentally you have to
17 control the checkbook of the company. And then you have to
18 apply to the Regional National Minority Supplier Development
19 Council or other certifying body. And they will come out and
20 they'll do a review of both the financial information that
21 you -- that is provided, that suggests that the minority
22 person or corporation has a controlling interest in the
23 company. And they will also review the operations of the
24 company to make certain that the person who represents they
25 control the company actually knows their way around that

Page 148

1 business and is -- and does appear, in fact, to be in control
2 of the company.
3    Q  Does that include having minority executive --
4 having executive positions within the non-MBE filled with
5 minorities such that it could reach MBE status?
6    A  Not -- other than -- not necessarily, other than
7 the individual or individuals who are representing that they
8 control the company.
9    Q  So Onyx would have to be -- in the Onyx/Piknik
10 relationship, Onyx would have to be in control of Piknik?
11    A  Yes.
12    Q  So you take a non-MBE company -- the paradigm is,
13 you take a non-MBE supplier, you turn them into an MBE, and
14 then you market that MBE status to potential customers?
15    A  Correct.
16    Q  And you would take whatever steps would be
17 necessary in order to obtain that MBE status?
18    A  Yes.
19    Q  In the second section, it says, Onyx's objectives:
20 Produce exceptional risk-adjusted returns for our investing
21 partners. I don't understand what that means. What does
22 that mean?
23    A  That means that they were trying to make -- make
24 money for the -- for the equity holders of the company, as
25 much as they could.

Page 149

1    Q  So Onyx's objective is to take on the non-MBE, turn
2 it into an MBE with the objective being, making as much money
3 as you could?
4    A  Absolutely.
5    Q  Okay. And then secondly under that it says,
6 utilize its status as minority-preferred provider to become a
7 top tier supplier of goods and services to the Fortune 1000.
8    A  Yes.
9    Q  Basically the same thing reiterated; right?
10    A  Yes.
11    Q  Win-win scenario for Onyx investors and corporate
12 partners?
13    A  Yes.
14    Q  I agree. And on page 22 you give a case study for
15 Piknik and you show that Onyx acquired Piknik in August of
16 2003 and it was a non-MBE and is now it is an MBE certified
17 company; is a correct?
18    A  Yes.
19    Q  And again, what steps were taken by Onyx to have
20 Piknik reach MBE certification?
21    A  Onyx acquired a controlling interest in the
22 company, filled out the paperwork and the folks at the NMSDC
23 came by, took a look, looked at both the -- you know, was it
24 real that Onyx controlled the company and did they -- did
25 Onyx, in fact, know their way around the business. And they

Page 150

1  reviewed that and determined that, in fact, it was an MBE.
2  And so they certified it.
3      Q   I'll ask you just look at the rest of the exhibit
4  through page -- I have it numbered through page 29. And just
5  ask you to confirm that, in fact, that is the presentation as
6  you authored it?
7      A   It appears to be.
8      Q   Thank you, sir.
9          MR. NELMS:  Your witness.
10         MR. POUNDSTONE:  Okay.  Henry, I've just got a few
11  things for you.
12             REDIRECT EXAMINATION
13  BY MR. POUNDSTONE:
14     Q   Name for me the employees that you personally hired
15  while you were working for Piknik.
16     A   Megan Mayor, Michael Gray and Jackie Oliver.
17     Q   And what were their race?
18     A   All three of them were Caucasian.
19     Q   You were earlier asked a question by Mr. Nelms as
20  to whether any headhunters identified African-American
21  managers that were hired by Piknik.  Did Piknik hire any
22  white managers that were identified by headhunters?
23     A   Yes.
24     Q   Who did they hire?
25     A   They hired Carl Bleyer, as well as -- I believe

Page 151

1  Michael Gray also came through a headhunter.
2      Q   What was Carl Bleyer's responsibility?
3      A   He was the vice president and general manager of
4  the condiments division.
5      Q   In timing-wise, did he come in to Piknik in the
6  same general timeframe that Anthony Barber came in?
7      A   He did.
8      Q   And Michael Gray, I believe you testified earlier,
9  was a salesman who worked under you?
10     A   Yes.
11     Q   Were there white managers left at Piknik after the
12  four Plaintiffs in this lawsuit were no longer employed at
13  Piknik?
14     A   Sure.
15     Q   Who were those white managers that you remember?
16     A   Robert Lampert, Robert Neoboski, Don Mitchell, Carl
17  Bleyer.  I'm sure there were -- Allen Walters.  I'm sure
18  there were a few others.  Michael Osborn.
19     Q   And earlier question came up in regards to Athenia
20  Figgs.  When she left Piknik, who replaced her?
21     A   Michael Osborn.
22     Q   And what's his race?
23     A   Caucasian.
24     Q   Who at Piknik handled Bob Winters job duties after
25  he left?

Page 152

1      A   They were split up amongst myself, Anthony Barber
2  and Robert Lampert, substantially.
3      Q   Were all three of those folks already employed at
4  Piknik --
5      A   They were.
6      Q   -- at the time Mr. Winter left?
7      A   They were.
8      Q   And what is Mr. Lampert's race?
9      A   He's Caucasian.
10     Q   Do you remember when the time frame was that Bob
11  Winter left Piknik?
12     A   It would have been June of 2005.
13     Q   Prior to June of 2005, had anybody at Piknik
14  suggested to you that Bob Winter be terminated?
15     A   Yes.
16     Q   Who made such suggestion to you?
17     A   Ricky Loeb.
18     Q   Do you remember when Ricky Loeb made this
19  suggestion?
20     A   He made the suggestion in approximately November of
21  2003.
22     Q   Okay.  Tell me what you remember Ricky Loeb saying
23  in that regard.
24     A   He said that, "I might want to fire him," when I
25  came onboard the company.  And that, you know, his -- he

Page 153

1  wasn't sure -- he was a good, smart guy, but he wasn't sure
2  whether I would need him or not.  So he suggested that I
3  might want to fire him.
4      Q   And what was your response to Ricky Loeb?
5      A   I said, "No, I didn't want to do that because I
6  needed to focus on learning the condiment business before I
7  took on the beverage business."  And so I thought that he
8  should stay.
9      Q   Tell me everything you remember concerning the
10  circumstances of Bob Winter leaving being employed at Piknik.
11     A   As I said before, the -- the bank had determined
12  they were no -- not going to extend additional credit to the
13  company.  Chris Day suggested that Bob Winter be let go.  I
14  thought about that and I suggested that instead of doing that
15  we should offer Bob an opportunity to stay around a little
16  bit longer, albeit at a reduced salary.  So effectively in
17  this way we could offer him severance.
18         I went back to Chris the next day, presented that
19  alternative.  Chris said okay, he thought that was a good way
20  to go, wrote it up, discussed it with Brenda Sellers.  Brenda
21  and I met with Bob Winter to share that with him.  He was
22  surprised and disappointed.  And he said that he would --
23  that he would cooperate.  And then he said, you know, he was
24  disappointed, but he didn't want to burn a bridge, he wanted
25  to -- you know, he said he -- he liked and thought well of

Page 154

1  everybody at the company, so he would do what he could, but
2  he needed to go home and think.
3       He went home. And then some time the next day I
4  got a call saying that Bob had come into the building that
5  evening, late that night, and removed his laptop computer,
6  downloaded a lot of files off the company server and removed
7  a number of documents and things from his office.
8       Later that morning he called me and said, "I'm not
9  going to accept your offer to stay with company for five or
10 six weeks. I resign." And I told him -- I asked him why.
11 And he said, "You know, I just -- I think we just need to end
12 this conversation, you know, I'm done."
13      He -- I asked him to return all of -- all of the
14 company property. And he said, "You know, I'm getting off
15 the phone." And so, I think that -- I think I may have
16 gotten the order wrong. That was when we discovered that he
17 had been in the night before and taken all the stuff out of
18 the building.
19      And then I discussed it with Brenda Sellers and
20 with Chris Day. They said, "You've got -- you know, you've
21 got to get that equipment back. You know, that's theft.
22 He's not an employee here." I drafted a letter, had a
23 courier deliver it to him and said, "Return those assets or
24 the company will prosecute," or something to that effect.
25      He -- as I understand it, he returned some of those

Page 155

1  assets to Ricky Loeb. He returned other assets to Brenda
2  Sellers and asked that, you know, we leave him alone. And so
3  that's...
4       Q  What was the reason for the decision to offer Mr.
5  Winter a reduced salary for a period time for him to look for
6  another job? What was the reason that he was going to be
7  ultimately let go?
8       A  He was going to be let go because the company
9  couldn't afford -- the company was -- you know, the company
10 really had to cut to the bare bones in terms of the employees
11 of the company. And we decided to reduce his salary and do
12 it that way, rather then simply terminate him. We just
13 thought it would be more fair and it would be an opportunity
14 to essentially extend him some amount of severance while he
15 took the time to look for a job.
16      Q  How did you go about identifying Mr. Winter as one
17 of the employees that would be let go?
18      A  It was -- really, based upon the fact that there
19 were a number of people who were able and capable and, in
20 fact, doing some of the work that he was -- much of the work
21 that he was doing, as well. So there were already people in
22 the company who could take on those responsibilities if he
23 left.
24      Q  Did Mr. Winter's race ever come up in any
25 discussions concerning letting him go?

Page 156

1       A  Never.
2       Q  Did his race have anything to do with the decision
3  to ultimately let him go?
4       A  No.
5       Q  Did you have any involvement whatsoever in the
6  decisions concerning Ms. McGlon, Mr. Mayer, or Mr.
7  MacCartney?
8       A  I did not.
9       MR. POUNDSTONE:  Thanks.
10
11      MR. NELMS:  All right.  We are concluded.  I
12 appreciate your time.
13      (Whereupon, the deposition in the above-entitled
14 matter was concluded at approximately 4:13 p.m.)

Page 157

CERTIFICATE
STATE OF GEORGIA    )
COUNTY OF FULTON    )

     I, Susan F. Roper, Certified Court Reporter, do
hereby certify that the foregoing deposition was taken down
by me, as stated in the caption; that the foregoing questions
and answers were reduced to print by me via speech
recognition; that the foregoing pages 4 through 156 represent
a true, correct and complete transcript of the evidence given
by the witness, HENRY B. HICKS, who was first duly sworn by
me; that I am not a relative, employee, attorney or counsel
of any of the parties; that I am not a relative or employee
of attorney or counsel for any of said parties; nor am I
financially interested in the outcome of the action.
     This the 7th day of September, 2007.


_____
SUSAN F. ROPER, CCR-B-1106
Certified Court Reporter

Page 158

DISCLOSURE

STATE OF GEORGIA

COUNTY OF FULTON

        Pursuant to Article 8.B. of the Rules and
Regulations of the Board of Court Reporting of the Judicial
Council of Georgia, I make the following disclosure:

        I am a Georgia Certified Court Reporter.  I am here
as a representative of Verbatim Court Reporters.

        Verbatim Court Reporters was contacted by the
offices of K. ANDERSON NELMS, ESQUIRE to provide court
reporting services for this deposition.  I will not be taking
this deposition under any contract that is prohibited by
O.C.G.A. 1514-37 (a)(b).

        I have no contract/agreement to provide court
reporting services with any party to the case, any counsel in
the case, or any reporter or reporting agency from whom a
referral might have been made to cover this deposition.  I
will charge the usual and customary rates to all parties in
the case, and a financial discount will not be given to any
party in this litigation.

        DATED:  August 30, 2007


        SUSAN F. ROPER, CCR-B-1106



## PERSONNEL ANNOUNCEMENT

October 23, 2003

We are pleased to announce the hiring of H. Beecher "Henry" Hicks, III, as Vice President, Sales and Marketing of the Company; the expansion of David Daneshmayeh's role in the Company to include General Manager of the Condiments Business, while continuing his present role as Plant Manager of the Alatex facility; and the expansion of Bob Winter's role in the Company to Vice President, Purchasing, Contract Administration and Strategic Planning. We are extremely excited about these developments!

In Henry's new role, he will be responsible for all of our customer-related activities, including sales, pricing, marketing strategy and customer service, and will report to Michael O'Connell. Henry brings a distinguished 15-year career in sales, investment banking, management consulting and public service. He has worked for Monsanto and Bank of America/Nations Bank, and had the honor of being selected as a White House Fellow in 1999, where he served under President Clinton in the Corporation for National Service. Henry also serves on the Board of Directors of United Therapeutics Corporation (NASDAQ: UTHR). Henry has a BA in marketing from Morehouse College and an MBA from the University of North Carolina, Chapel Hill. He will be based in Montgomery and will start on Monday, November 3.

In David's new role as General Manager of the Condiments Business, he will be responsible for the day-to-day operations of the Condiments Business and will report to Michael O'Connell, while continuing in his role as Plant Manager of Alatex in which he will continue to report to Bert Mayer. David has been an important part of the successful Alatex team and we expect him to have continued success in his expanded role. His expanded role is effective immediately.

In Bob's new role, he will continue to be responsible for responding to customer contract inquiries for the Beverage Business, while also working to establish similar processes for the Condiments Business as well. He is also taking on the purchasing strategy for our key raw materials, including soybean oil and eggs for the Condiments Business, and leading our strategic planning initiative. Bob will continue to report to Michael O'Connell. He will work with Henry Hicks in connection with his contract administration activities, David Daneshmayeh in connection with his purchasing activities for the Condiments Business, and Patrice Daniels in connection with his strategic planning initiatives. Bob's expanded role is also effective immediately.

We now have a very capable team in place to lead our Company. To that end, it is important that every employee support Henry, David and Bob in their new responsibilities and recognize their roles as the decision makers over their respective areas.

We understand that there have been a number of changes recently. Certainly, in our case, this change has been all good, and will remain so. Your continued support is greatly appreciated!!!


Jeffery Larry            Herman R. Loeb        Michael O'Connell      Patrice Daniels
Chairman and CEO         Vice Chairman         President &COO         EVP-Business Development

PLAINTIFF'S
EXHIBIT

/



*For Limited Internal Distribution Only - Do Not Copy or Share with External Constituents*

## Piknik Products Company
## External Communications
### *Recapitalization Talking Points*

| SUMMARY: | The growth that Piknik Products (the "Company") is experiencing in its beverage division requires the Company to invest significant new capital in its operations. The Company's bank has declined to finance this new capital and has rejected financing proposals by third parties, thereby causing the company to seek a recapitalization. As part of this process, the company may be placed up for sale with the goal of emerging as a company that is much stronger financially and operationally. Piknik has not filed for bankruptcy protection. |
|---|---|
| SHORT TERM EFFECTS | Operations in the Company's beverage division will not be materially affected. Some management changes are being made and capital projects delayed, but the business will continue to operate and pursue operational improvements required to meet our customer's needs.<br><br>The operations in the Company's condiments division will be indefinitely suspended with the exception of tolling/co packing business. The will be effective immediately. |
| PERSONELL CHANGES | The beverage division will continue to make necessary staffing changes to improve its operating efficiencies. Bert Mayer has left the company and has been replaced as Day Street Plant Manager by Annissia Hanyard, a veteran of PepsiCo and Procter & Gamble with maintenance, quality and engineering experience.<br><br>Regretfully, this challenge will require that most of the employees in our condiments business will be furloughed. We will maintain a crew of employees to continue limited production, address customer and vendor concerns, and manage logistics for shipping and the warehouse. |



PLAINTIFF'S
EXHIBIT
2

*Please direct all inquiries on this matter to the contacts listed in the CONTACTS section of this document. Do not respond to external inquiry unless approved by one of the persons listed in this section.*

*For Limited Internal Distribution Only - Do Not Copy or Share with External Constituents*

| RECAPITALIZATION | Over the last 4 months the Company has presented to its bank (SouthTrust) proposals for refinancing the Company's debt and injecting additional equity into the Company.  The bank has rejected each of those offers. |
|---|---|
| | The inability to reach agreement on this matter has resulted in a cash shortage to operate the full-case-costed, private label condiments business.  (This business is cash flow intensive, versus the capital intensive nature of the beverage business.)  Piknik has not filed for bankruptcy protection. |
| | Recapitalization negotiations continue, however it is likely that a sale process will be undertaken on an expedited basis.  In any even, full resolution will take place in the next 45 to 90 days. |
| | Hopefully this will mean that customers will observe no degradation in operational attention, continuity in management and a swift conclusion to this distraction from managing and growing the business. |
| | It is not likely that the condiments business will return in it current form. It is likely to be more palatable to the bank and investors that the condiments business proceeds under a tolling/co pack model similar to the beverage business.  This will require reduced working capital to manage and to grow the Company and fit better with Piknik's/Onyx's strategy of partnering with leading consumer packaged goods companies to address their supply chain challenges. |
| | We will work closely with condiments customers to fill orders out of inventory and to transition their business to other suppliers.  This will include providing them with their printed labels and copies of proprietary formulas if requested.  We want to discuss the option of a tolling/co pack agreement with those customers who wish to do so. |
| PLANT LOCATIONS | The Company's Day Street and Alatex plants will remain open and operate normally.  Discussions continue with current and prospective customers about adding additional production lines in the Alatex plant. |
| | The Brundidge plant will remain open and operate a limited production schedule. |



*External Constituents*
*Recapitalization Summary*

| FREQUENTLY ASKED QUESTIONS | **What is happening?**<br><br>The growth that Piknik Products is experiencing in its beverage division requires the Company to invest significant new capital in its operations. The Company's bank has declined to finance this new capital and has rejected financing proposals by third parties, thereby causing the company to seek a recapitalization. Operations in the Company's beverage division will not be materially affected. Some management changes are being made and capital projects delayed, but the business will continue to operate and pursue operational improvements required to meet our customer's needs.<br><br>The operations in the Company's condiments division will be indefinitely suspended with the exception of tolling/co-packing business. This will be effective immediately.<br><br>**How did this happen?**<br><br>Our historic bank (SouthTrust) decided that it no longer wanted to be the Company's financial institution. The bank prevented the Company from bringing in any additional capital to fund the growth that we've been experiencing.<br><br>**Is condiments closed for good?**<br><br>The condiments business is not closed. We will operate under a co packing model in the short term. We are hopeful to preserve a presence in the condiments business, but are unlikely to return to our historical business model.<br><br>**Is Piknik bankrupt?**<br><br>No. Management believes that it has a viable path through this process to avoid bankruptcy, and believes that it is in the best interests of customers and vendors to avoid the bankruptcy process. However, Piknik does not control all elements of this process. Staying out of bankruptcy requires continued cooperation from vendors and the bank while we negotiate the recapitalization. |

### *External Constituents*
### *Recapitalization Summary*

**Is Piknik up for sale?**

As part of the transition to a new capital structure an expedited sale process may need to occur.

**How long will this process take?**

We expect that the recapitalization will be completed within 45 – 90 days.

**What does that mean for condiments customers?**

We will no longer be producing product for most condiments customers. We will continue to produce co packed products. We will sell any products that are in our finished goods inventory. Piknik will work cooperatively with affected customers to assist them in this transition. We will make labels and proprietary formulas available to customers upon request.

**What does that mean for condiments vendors?**

The Company will be unable to pay outstanding invoices at this time.

**What does that mean for condiments employees?**

Piknik will maintain a small staff to continue co pack production and handle the customer transition. All other employees will furloughed until further notice.

**What does that mean for beverage customers?**

Operations in the Company's beverage division will not be materially affected.

**What does that mean for beverage vendors?**

Unlike the condiments business, Piknik does not pay for the packaging and raw ingredient product inputs. These are provided by our customers, making it much easier to continue operations during this transition. Piknik will work with its other beverage vendors to meet necessary obligations.

### *External Constituents*
### *Recapitalization Summary*

<table>
<tr><td></td><td>

**What does that mean for beverage employees?**

The beverage division will continue to make necessary staffing changes to improve its operations efficiencies. The team will continue working together to deliver for our customers.

**What if I get asked a question other than these?**

Please refer any questions that you are not equipped to accurately answer to one of the contacts listed below.

</td></tr>
</table>

| **CONTACTS** | Chris Day, President<br>cday@piknikproducts.com | 334-265-1567 |
| --- | --- | --- |
| **Customers** | Ann Anderson, Condiments Customer Service<br>aanderson@piknikproducts.com | 800-300-8557 x101 |
| | Henry Hicks, VP Sales & Marketing<br>hhicks@piknikproducts.com | 404-313-6669 |
| **Employees** | Brenda Sellers, Director of Human Resources<br>bsellers@piknikproducts.com | 334-265-1567 x206 |
| **Vendors** | Robert Lampert, VP Finance<br>rlampert@piknikproducts.com | 334-265-1567 x218 |
| **Media** | Henry Hicks, VP Sales & Marketing<br>hhicks@piknikproducts.com | 404-313-6669 |

From: Christopher Day [mailto:cday12345@nextel.blackberry.net]
Sent: Thursday, June 16, 2005 3:47 PM
To: Anthony Barber; Henry Hicks; Bob Lampert; Brenda Sellers
Subject: [JunkMail] CONFIDENTIAL-Pay Cuts & Severance

Based on my analysis, here is what I want to go with:

-Across the board 5% salaried pay cut
-deeper cuts for a few specified individuals (already discussed) -
exemption for newly hired person

In return, it will fund the following severance:
Bert Mayer - 4 weeks
Billy Allen   - 4 weeks
Vanessa Harvey - 4 weeks
Amy Kilpatrick - 1 week
Beverly Spivey - 1 week
Pat Saint.   - 4 weeks
Michael Gray - 2 weeks
Clarice Crosby - stop
Bob Gross - stop

In order to keep severance checks from bouncing they need to be payroll
checks funded over time (just like regular payroll).

Unless you have major heartburn with any of this, I will instruct
Brenda to administer the severance amounts above tomorrow morning in
Brundidge.

Chris
Christopher Day
Onyx Capital Ventures
(312) 902-5483 office
(334) 549-6483 mobile
cday@onyxcapitalventures.com

PLAINTIFF'S
EXHIBIT
3

**Unknown**

| | |
|---|---|
| **From:** | Henry Hicks [hhicks@piknikproducts.com] |
| **Sent:** | Thursday, July 22, 2004 8:11 AM |
| **To:** | Bob Winter (E-mail) |
| **Subject:** | FW: Beverage/National Accounts Coverage |

bob - a change in time to talk with Chris.

Henry

H. Beecher Hicks, III
Vice President, Sales and Marketing
Piknik Products Company
334/265-1567 x217 office
334/462-2077 cell
509/471-8561 efax
www.piknikproducts.com


-----Original Message-----
From: Christopher Day [mailto:cday@onyxcapitalventures.com]
Sent: Wednesday, July 21, 2004 2:21 PM
To: Henry Hicks
Subject: Re: Beverage/National Accounts Coverage

Wow, prime afternoon time on a Friday on vacation?  I'd have to call it a low probability
that I'll be hanging by the phone unless it's raining...

Since a 2pm call on Friday doesn't leave much time to reach out to customers afterwards,
why not make it Monday afternoon when I'm back in Chicago?  How about 2:30pm CDT (after our
Onyx staff meeting)?
-----Original Message-----
From: "Henry Hicks" <hhicks@piknikproducts.com>
Date: Wed, 21 Jul 2004 09:59:03
To:<bwinter@piknikproducts.com>,          "'C Day \(E-mail\)'"
<cday@onyxcapitalventures.com>
Subject: RE: Beverage/National Accounts Coverage


I'll book that time.  Chris - I hope that you can as well.  (2:00 eastern)

Henry

H. Beecher Hicks, III
Vice President, Sales and Marketing
Piknik Products Company
334/265-1567 x217 office
334/462-2077 cell
509/471-8561 efax
www.piknikproducts.com


-----Original Message-----
From: Bob Winter [mailto:bwinter@piknikproducts.com]
Sent: Wednesday, July 21, 2004 7:56 AM
To: hhicks@piknikproducts.com; 'C Day (E-mail)'
Subject: RE: Beverage/National Accounts Coverage

PLAINTIFF'S
EXHIBIT
4

This is excellent!
Yesterday was intense.  Today and tomorrow will be more intense.  We will have 16 people

from Kellogg's and their ingredients suppliers here tomorrow all day.  Let's target Friday around 1pm.  By then, Sanjay Vyas and his entourage will be gone. Any downtime I have I need to spend on Cott and Unilever.

Chris, welcome aboard!

-----Original Message-----
From: Henry Hicks [mailto:hhicks@piknikproducts.com]
Sent: Tuesday, July 20, 2004 7:48 PM
To: Bob Winter (E-mail); C Day (E-mail)
Subject: Beverage/National Accounts Coverage


Bob - Join me in welcoming Chris to the team!  See the attached spreadsheet that summarizes a suggested approach to divide and conquer the opportunities that we have in front of us.

Bob, Chris and I would like to find 30 minutes of your time in the next day to talk this through a bit and make sure that we understand what we are doing here and have made all of the necessary handoffs so that we can get running.  Please let us know when you can tear away from Kellogg's to have that conversation.

thanks,


Henry

H. Beecher Hicks, III
Vice President, Sales and Marketing
Piknik Products Company
334/265-1567 x217 office
334/462-2077 cell
509/471-8561 efax
www.piknikproducts.com

Please review and let's discuss at your earliest convenience.

Thanks
Bob Winter
334-265-1567 x222 Off
334-462-1486 Cell

The information contained in this message is confidential and is intended for the addressee only.  If you have received this message in error or there are any problems, please notify the sender immediately.  The unauthorized use, disclosure, copying or alteration of this message is strictly forbidden.
Piknik Products Company, Inc.


*********************************************************************
This message is for the designated recipient only and may contain privileged or confidential information.  If you have received it in error, please notify the sender immediately and delete the original.  Any other use of the E-Mail by you is prohibited.
*********************************************************************



PLAINTIFF'S EXHIBIT
5



# Piknik Executive Discussion Document
# Hershey Foods Corporation

## July 28, 2004

© Piknik Products Company, 2004 - Confidential



## Introduction

**We are pleased to have been invited to visit Hershey today, and hope to continue the growth of our business relationship.**

⋀ We would like to use the time to discuss our relationship from several points of view

- » **Relationship History**
- » **Piknik Issues**
- » **Tactical Changes**
- » **Strategic Relationship**
- » **Revisit Decision**
- » **Next Steps**

© Piknik Products Company, 2004 - Confidential

1

# Relationship History

**hhicks:**

-Do we want to print this? – Instead, slides 23 and 25 are needed to level set the CEO – who are these guys?

...ocked ...th the decision, but ...ay the decision was made

➢ We knew we had historical issues

➢ We asked for a meeting that we never got

➢ Hershey never gave us the opportunity to sit down and review our plans to improve this relationship

➢ We are further confused by Hershey's apparent choice of vendors

➢ We want to know what is really behind this decision

© Piknik Products Company, 2004 - Confidential

2

PIKNIK PRODUCTS COMPANY

HERSHEY'S

## Relationship History

**Hershey Foods has notified Piknik Products they do not intend to renew our co-manufacturing agreement dated June 1, 1992.**

⋏ Notification of decision to exit Piknik due to the following continuous issues:



⋏ Quality

⋏ Manufacturing

⋏ Financial

⋏ Personnel

⋏ Lack of confidence

⋏ Lack of trust

⋏ Hershey has also indicated Piknik's performance has declined since Onyx acquisition



© Piknik Products Company, 2004 - Confidential

3

# Relationship History

## While Piknik's performance has never been stellar, given the length of our relationship we are surprised by the finality and timing of this decision.



**Hershey and Piknik Commence Contract June, 1992**

**Challenged Startup June, 1992**

**FDA Glass Recall 1993**

**Caramel Introduced, Reformulated 2001**

**Strike Support Bonus Bottle 2002**

**Off Flavor Product 2002**

**11 Annual Renewals June, 1993 – June, 2003**

Sustained Period of Marginal Performance

**Onyx Acquisition of Piknik July, 2003**

**Label Issue Withdrawal April, 2004**

**Onyx Requests Hershey Meeting**

**Hershey Terminates Relationship June, 2004**





© Piknik Products Company, 2004 - Confidential

4

# Piknik Issues – Quality Trend

## lity performance has historically been hampered by equipment

**hhicks:**

- Slides 5,7,8,9 seem to be a bit redundant for the CEO level – same point from different POV's

### Pareto (Events)



### Pareto (Cases)



### (ents)



### Quality Holds (Cases)

High Brix - Caramel



© Piknik Products Company, 2004 - Confidential

5

# Piknik Issues – Quality Trend

Consumer complaints have decreased since management changes were made. Additional process improvements are necessary to achieve next level of improved performance.



Consumer Complaints 1998-2004

McGlon hired, began new QA processes

Number of complaints per 100,000 retail units

© Piknik Products Company, 2004 - Confidential

6

# Piknik Issues – Manufacturing Trend

## Production line variability is impacting output, quality and customer service.

∧ Process not in good control

∧ Focus on exceptions required











© Piknik Products Company, 2004 - Confidential

7

## Piknik Issues – Manufacturing Trend

### These same challenges are reflected in line speed inconsistencies that must be corrected.





- ⋏ Failure frequencies must be addressed

- ⋏ Start-up times require focus

- ⋏ Together they contribute unacceptable swings in the use of production time



# Piknik Issues - Manufacturing Trend

## Poor production performance is driven by frequent equipment failures.

➤ **Issues are well understood**

◆ Labeler and dud detector are the primary causes of downtime

◆ Palletizer and case packer contribute when running the squeeze package

➤ **Corrective action required**



### Downtime Pareto - Glass

January 1, 2004 - June 15, 2004
470 Hours of Machine Downtime



### Downtime Pareto - Squeeze

January 1, 2004 - June 24, 2004
498 Hours of Machine Downtime

© Piknik Products Company, 2004 - Confidential

## Piknik Issues - Financial

**You expressed concern about Piknik's financial strength.**

➢ **We had examined our contract and understand it is an issue**

◆ Manifests in an unwillingness to maintain equipment

◆ Continuous plea for Hershey capital

◆ Manifests in violation of agreement to generate incremental revenue

© Piknik Products Company, 2004 - Confidential

10

# Piknik Issues – Personnel



## You also expressed concern about management changes at the executive levels…

➢ Ricky Loeb's reduced role in managing the company
➢ Mike O'Connell's departure from the company
➢ Patrice Daniels role in managing the business
➢ Chuck Caraway's departure from the company

## …and the many moves at the operating levels.

Employee Changes

| Employee | Position | Type of Change |
|---|---|---|
| Bill Rodman | Director of Operations | Left Company |
| Steve Duncan | Maintenance Manager | Left Company |
| David Rhon | QA Manager | Went to Brundidge facility |
| Shannon McGlon | Director of Quality | Maternity Leave (3 Months) |
| Dennis Wood | Production Supervisor | Left Company |
| Maxine Roland | Production Supervisor | Moved to Lead position |
| John Brewer | Production Supervisor | Moved to Maintenance role |
| Maintenance (several) Mechanics | Mechanics | Lost to other companies as a result of auto-manufacturer. |

# Tactical Changes

**We are taking aggressive steps to make changes in each of these areas of concern.**

⋏ **Quality**
- ◆ Recruiting
- ◆ Training

⋏ **Manufacturing**
- ◆ Six Sigma

⋏ **Financial**
- ◆ Reinvestment capital

⋏ **Personnel**
- ◆ New leadership
- ◆ Upgrade capabilities
- ◆ Improve ethical conduct

⋏ **Restore confidence**

⋏ **Restore trust**



© Piknik Products Company, 2004 - Confidential

12



# Tactical Changes – Quality and Manufacturing

**Quality gaps are acknowledged and solutions have begun. In addition, we are taking the initial steps to adopt Six Sigma process improvement and control methods over the next several months.**

⋏ QA Manager hired, starts August 4, 2004

- ◆ BS Chemistry
- ◆ More than 5 years experience as a QA manager in hot fill products
- ◆ PepsiCo co-packer rating improved from 5th to 1st
- ◆ Attained AIB Superior rating (>925)

⋏ Training needs assessed, external resources engaged to facilitate

⋏ Investments made to improve security and IT infrastructure

⋏ Six Sigma TVPR process commences August, 2004

© Piknik Products Company, 2004 - Confidential

13



## Tactical Changes – Financial

**Piknik's acquisition by Onyx Capital Ventures has improved the company's financial outlook considerably, positioning it to be a much better partner for Hershey.**

➢ **Debt**

➢ **Equity**

➢ **Onyx**



➢ Piknik will acquire the key assets on Line 101 from Hershey

➢ Piknik will make further agreed upon capital investments in plant infrastructure

➢ Piknik is aggressively investing in people and processes to improve our results

© Piknik Products Company, 2004 - Confidential

## Tactical Changes - Personnel

**Piknik has been challenged by a lack of capable leadership. Onyx is making the required changes.**

➤ Request prior owner to disengage from daily operating decisions

➤ Sent three Onyx executives to try and fill the gap

➤ Acquired new VP of Sales and Marketing

➤ Separation agreement with prior President

➤ Acquired new President and Chief Operating Officer June, 2004

© Piknik Products Company, 2004 - Confidential

15



## Strategic Relationship

**Piknik views this as an opportunity to evolve our longstanding relationship into a mutually beneficial strategic alliance. We have offered incentives to partner with us to make this happen.**

⋏ Immediate price concession of $400K

⋏ Piknik to invest in manufacturing assets

⋏ Opportunity for mutually beneficial relationships and press coverage

⋏ Opportunity for extended Hershey market share in selected areas

  ◆ 87% of African Americans more likely to buy from companies contributing to African American community

  ◆ The increasing importance of ethnic markets to CPG companies has led to a $52 billon increase in MBE procurement to $72 billion in the last 10 years

© Piknik Products Company, 2004 - Confidential

16



## Revisit Decision

**We have brought forward new information for you to consider when reaching a final conclusion on this issue.**

⋏ **Positive changes at Piknik**
- ◆ Quality
- ◆ Manufacturing
- ◆ Financial
- ◆ Personnel

⋏ **Economic incentives for Hershey**
- ◆ Price
- ◆ Capital avoidance

⋏ **Broader strategic relationship**
- ◆ Marketing
- ◆ Financial



⋏ Eliminates start-up risk

⋏ Beneficial press coverage from renewal

⋏ Increased market share



© Piknik Products Company, 2004 - Confidential
17

**HERSHEY'S**

# Revisit Decision



**the criteria Hershey has provided for the decision to further confused by the apparent choice of vendors.**

**hhicks:**

· Is this the one that we want to put in our pocket rather than in the deck?

Quality
- Depth of technical expertise
- No Microbiology Lab
- Chocolate absorbs environmental flavors and odors

⋏ **Manufacturing**
- Building new line in a mayonnaise plant (vinegar, lemon, dry spices)
- No hot-fill processing experience

⋏ **Financial**
- D & B review

⋏ **Personnel**
- Some management experience
- No caramel experience

⋏ **Why would Hershey accept this startup risk versus affording Onyx the time to fix Piknik issues?**

© Piknik Products Company, 2004 - Confidential

18

# Next Steps

## We will respect your decision and are prepared to move forward together.

➢ **Decide to renew**

- ◆ Focused quality improvement efforts
- ◆ Acquisition of Hershey assets
- ◆ Revisit contract for extended relationship

➢ **Decide to exit**

- ◆ Internal and external communication
- ◆ Production planning
- ◆ Complete asset transition

➢ Transition team

➢ Communication plan

➢ Mutually agreed upon timing

## Appendix

➢ Onyx

➢ New Piknik

© Piknik Products Company, 2004 - Confidential
20



# Onyx - Vision

A Opportunity exists to create a number of significant, sophisticated MBE suppliers

- ◆ MBE certification is provided annually by a regional affiliate of the National Minority Supplier Development Council

- ◆ Target companies with enterprise values up to $300 million, but will be opportunistic with larger deals

A Onyx is acquiring businesses that have the scale, skills and capabilities necessary to supply large corporations

A Deal Initiatives – Working with Corporate Sponsors on:

- ◆ Contract Manufacturing Platform

- ◆ Food Processing

- ◆ Packaging

- ◆ Opportunistic opportunities

A Completed two acquisitions

- ◆ Piknik Products Company

- ◆ Core Systems



## Onyx – Piknik Assets

**Onyx's interest in Piknik extended beyond manufacturing capabilities and customer relationships**

⋏ Leading private employer in Alabama

⋏ 70% of workforce is minority

⋏ Certified Minority Business Enterprise

⋏ Operating in an Economic Development Zone

⋏ Operating in a Historically Underutilized Business (HUB) zone

# Onyx - Piknik Assets



## Beverage

2 Plants

Square Footage:

- 75,000 Sq Ft Production

- 362,000 Sq Ft Warehouse

4 Lines currently running

8 Line capacity

## Condiments

1 Plant

Square Footage:

- 27,500 Sq Ft Production

- 31,750 Sq Ft Warehouse

7 lines currently running

## Beverage Expertise

➤ Deep R&D experience in bringing new products to commercialization

➤ Hot fill

➤ Cold fill

➤ Glass

➤ PET

➤ HDPE

➤ Bottle/can

➤ In-mold labels

➤ 8 oz. to 1 gallon

➤ Juices and blends

➤ Isotonics

➤ Teas

➤ Nutraceuticals

➤ Dairy-based blends

## Onyx – Piknik Focus

### Onyx acquired control in July of 2003

Upon closing, Onyx immediately began to address Piknik issues

⋗ Invested in IT department, equipment and other assets

⋗ Focus on improving efficiency, quality delivered, and customer relations

⋗ Increased efforts to attract appropriate talent

Onyx is now poised to take Piknik to yet another level

⋗ Hired new COO with over 20 years of manufacturing and operations experience, most recently as president of a $1 billion supply chain business with 3,200 employees and 42 facilities

  ⋗ Extensive turnaround experience

  ⋗ Six Sigma process expertise

  ⋗ Focus on quality, customer satisfaction

© Piknik Products Company, 2004 - Confidential

24



## New Piknik - Vision

**Piknik is developing a culture of accountability and a healthy sense of urgency to realize our vision!**

- Piknik Vision -

What we want to be known for
**"Best company in CPG supply chain"**

What we are working to accomplish
**Superior process control**

What we will stand for
**Quality, Service, Value**



© Piknik Products Company, 2004 - Confidential

25



# New Piknik – CI Plan

## We are building capabilities to become data driven by increasing skills in problem solving throughout our organization



**Phase I**
- TPVR Teams
- Silver Certification
- Gold Certification

**Phase II**
- Black
- Belt
- Hiring

**Phase III**
- Green Belt Managers
- Certification
- Training

**Project examples:**
- Quality holds
- Throughput
- Yield losses

- Process control
- Roll throughput yield

- Yield optimization
- Customer onboarding

## Continuous Improvement areas of Focus

| People | Green Belt / TPVR Rollout | Certification of teams and people | |
|---|---|---|---|
| **Process** | DMAIC | Project Selection | Audits to instill Process Discipline |
| **Methodology** | QI Macros, Excel, PPT | Measurement System Analyses | SOP's Work Instructions |

© Piknik Products Company, 2004 - Confidential

26



**HERSHEY'S**

**hhicks:**

Moved slide forward

# New Piknik – CI Tools

## Weekly Tools



**Pre-Week 1**
- ALN
- On-time Delivery Reports,
- Quality Complaint Logs,

**Week 1**
- Team Charter and Goal Worksheets
- AIR

**Week 2**
- Process Map
- Operational Definitions
- Sampling
- Simple MSA
- AIR

**Weeks 3-4**
- Process Map
- Customer Interviews
- Brainstorming
- Fishbone Diagram
- Sampling
- Simple MSA
- SOPs/WIs
- AIR

**Weeks 5-6**
- Process Map
- Spaghetti Diagram
- Customer Interviews
- Brainstorming
- Fishbone Diagram
- FMEA
- Check Sheets
- Sampling
- Histogram
- Run Chart
- Average
- SOPs/WIs
- AIR

**Weeks 7-9**
- Process Map
- Spaghetti Diagram
- Brainstorming
- Fishbone Diagram
- FMEA
- Check Sheets
- Pareto Chart
- 5 Whys
- Scatter Diagrams
- Sampling
- Histogram
- Run Chart
- Average
- SOPs/WIs
- Audit Checklist
- AIR

**Weeks 10-12**
- Process Map
- Spaghetti Diagram
- Brainstorming
- Fishbone Diagram
- FMEA
- Check Sheets
- Pareto Chart
- 5 Whys
- Scatter Diagrams
- Sampling
- Histogram
- Run Chart
- Average
- SOPs/WIs
- Audit Checklist
- Implementation Plan
- Pilot
- AIR

**Weeks 13-16**
- Process Map
- Spaghetti Diagram
- Brainstorming
- Fishbone Diagram
- FMEA
- Check Sheets
- Pareto Chart
- 5 Whys
- Scatter Diagrams
- Sampling
- Histogram
- Run Chart
- Average
- SOPs/WIs
- Audit Checklist
- Implementation Plan
- Pilot & Results
- Mistake-Proofing
- AIR

Define    Measure    Analyze    Improve    Control

© Piknik Products Company, 2004 - Confidential
27



**hhicks:**
- Moved slide forward

# New Piknik – CI Deliverables

Transactional Process Variability Reduction ("TPVR") is an approach to reduce variation in our transactional processes in a way that dramatically reduces the variation in our transactional outputs.



**Pre-Week 1**
- Process selected
- Supervisor responsibilities adjusted
- Team selected

**Week 1**
- Complete TPVR training
- Establish team charter and goals
- Define cert. requirements
- Initiate AIR

**Week 2**
- Develop high-level process map
- Identify key customers and suppliers
- Establish data collection plan
- Use AIR

**Weeks 3-4**
- More detail on process map
- Collect data on key and root cause analysis measures
- Collect MSA data
- Begin writing SOPs/WIs
- Use AIR

**Weeks 5-6**
- Detailed process map
- More complete SOPs/WIs
- Collect data on process and root cause analysis measures
- Erect visual TPVR Report
- Use AIR

**Weeks 7-9**
- Detailed process map
- Collect data
- Analyze data
- Identify potential sources of variation
- Refine charter and goals
- Refine process boundaries
- Initial application of SOPs/WIs
- Plan audits
- Use AIR

**Weeks 10-12**
- Detailed process map
- Collect data
- Analyze data
- Identify root causes of variation
- Identify and select solutions to address root causes
- Streamline workflow
- Establish process ownership
- Further develop SOPs/WI's
- Develop pilot / implementation plan
- Use AIR

**Weeks 13-16**
- Implement SOP's/WI's
- Implement pilot of root cause solutions
- Establish process controls
- Establish on-going audit process
- Use AIR

Define    Measure    Analyze    Improve    Control

© Piknik Products Company, 2004 – Confidential
28

HERSHEY'S

# New Piknik: Cash Flow Management



© Piknik Products Company, 2004 - Confidential
29

# New Piknik: Key Performance Indicators



| Tactical Drivers | Performance Measures | Performance Goals |
|---|---|---|
| Segmentation<br>Targeting<br>Positioning | Market Share<br>Sales Growth Rate<br>% New Markets/Channels | $ New Sales |
| %Capacity utilization<br>Throughput<br>Material Yield<br>Indirect Productivity | Cost/Unit<br>Cycle Time | $ Cost Productivity |
| Improved Purchasing<br>Inventory Management<br>Receivables Management | Days Payable (DAP)<br>Days Inventory (DIOH)<br>Days Receivable (DSO) | $ Balance Sheet Improvement |
| Productivity Investment<br><6 Month Payback | #Projects Completed | $ Cost Productivity |

© Piknik Products Company, 2004 - Confidential

30



## New Piknik: Accountability Tools

### The OGSM framework promotes the alignment of <u>O</u>bjectives, <u>G</u>oals, <u>S</u>trategies, and performance <u>M</u>etrics





© Piknik Products Company, 2004 - Confidential

31

# New Piknik – Data Driven

**hhicks:**
Redundant from the front

...lity performance has historically been hampered by equipment failures

## Pareto (Events)

Legend: FY 03, FY 04

| Category | FY 03 | FY 04 |
|---|---|---|
| Total | 40 | 43 |
| Manufacturing | 31 | 22 |
| Analytical Specs | 7 | 10 |
| High Brix | 0 | 8 |
| Other | 2 | 3 |

## Pareto (Cases)

Legend: FY 03, FY 04

| Category | FY 03 | FY 04 |
|---|---|---|
| Total | 51,988 | 107,100 |
| Manufacturing | 33,116 | 60,897 |
| Analytical Specs | 20,183 | 17,20 |
| High Brix | 0 | 23,165 |
| Other | 1,672 | 2,855 |

## Quality Holds (Events)

Monthly data Oct-02 through Jul-04 (values: 2, 2, 5, 7, 9, 1, ... 4, 2, 3, 3, 2, 5, ... 4, 5, 2, 7, 6, 12, 2)

## Quality Holds (Cases)

High Brix - Caramel — 63,107 (circled)

Monthly data Oct-02 through Jul-04 (values include 3,524, 1,694, 458, 4,929, 1,455, 3,03, 5,407, ... 21,874 ... 8,709, 8,496, 8,127, 71,212, 2,519, 10,919, 910)



© Piknik Products Company, 2004 - Confidential

# New Piknik – Data Driven

**Consumer complaints have decreased since management changes were made. Additional process improvements are necessary to achieve next level of improved performance.**

hhicks:
Redundant from the front

## Consumer Complaints 1998-2004



Number of complaints per 100,000 retail units

Legend: ■ Toppings ■ Sundae Syrup

McGlon hired, began new QA processes

Data values by year:
- 1998: 0.89, 0.61
- 1999: 0.50, 0.35
- 2000: 0.58, 0.15
- 2001: 0.11, 0.00
- 2002: 0.38, 0.05
- 2003: 0.27, 0.09
- 2004: 0.34

© Piknik Products Company, 2004 - Confidential

33



PIKNIK
PRODUCTS COMPANY

HERSHEY'S

# New Piknik – Data Driven

## Production line variability is impacting output, quality and customer service.

⋏ **Process not in good control**

⋏ **Focus on exceptions required**

hhicks:

Redundant from the front





# New Piknik – Data Driven

These same challenges are reflected in line speed inconsistencies that must be corrected.

hhicks:
- Redundant from the front



Time in 15-minute increments

Glass

Squeeze

- Failure frequencies must be addressed

∧ Start-up times require focus

∧ Together they contribute unacceptable swings in the use of production time



© Piknik Products Company, 2004 - Confidential

35

HERSHEYS

# New Piknik – Data Driven

## Poor production performance is driven by frequent equipment failures.

**hhicks:**
Redundant from
the front

### Issues are well understood

◆ Labeler and dud detector are the primary causes of downtime

◆ Palletizer and case packer contribute when running the squeeze package

### Corrective action required



**Downtime Pareto - Glass**

January 1, 2004 - June 15, 2004
470 Hours of Machine Downtime



**Downtime Pareto - Squeeze**

January 1, 2004 - June 24, 2004
498 Hours of Machine Downtime

**PIKNIK**
PRODUCTS COMPANY

**HERSHEY'S**

**Unknown**

13

| | |
|---|---|
| **From:** | Chris Day |
| **Sent:** | Thursday, January 22, 2004 3:30 PM |
| **To:** | Piknik Products Company |
| **Subject:** | New Reporting Structure |
| **Attachments:** | new Org announcement 011204.doc |

Team:

Attached please find a belated announcement about Mike O'Connell's departure and the new reporting structure.

Please don't hesitate to call if you have any questions.

Chris and Patrice

PLAINTIFF'S
EXHIBIT
6

## PERSONNEL ANNOUNCEMENT

January 12, 2004:

Michael O'Connell has left his position as President of Piknik Products, effective immediately. Mike will not be replaced at this time. Mike's responsibilities will be split between Chris Day and Patrice Daniels of Onyx Capital Ventures. Chris will take responsibility for operations, logistics, quality and human resources, and Patrice will take responsibility for sales, contract administration, purchasing, finance and IT. Jeffery Larry of Onyx remains Chairman and CEO of Piknik.

Reporting to Chris will be David Daneshmayeh, General Manager, Condiments; Jerry MacCartney, Director of Logistics; Bert Mayer, Director of Operations; Shannon McGlon, Director of Quality; and Brenda Sellers, Manager of Human Resources.

Reporting to Patrice will be Henry Hicks, VP Sales & Marketing; Bob Lampert, VP Finance; Bob Winter, VP Purchasing and Contract Administration, and Athenia Figgs, acting Director, Information Technology (IT).

We wish Mike every success in his future endeavors.

Patrice Daniels
EVP – Sales & Finance

Chris Day
EVP – Operations

Jeffery Larry
Chairman and CEO



# The Competitive Reality of Supplier Diversity

## A Procurement Paradox

**H. Beecher Hicks, III**
**Onyx Capital Ventures**
*Presented at the Packaging Services Expo*
*May 11th 2005*

ONYX
Onyx Capital Ventures

PLAINTIFF'S
EXHIBIT
7

1

# Competitive Reality of Supplier Diversity: A Procurement Paradox



- 3,500 Companies have supplier diversity programs

- Companies purchased $54 billion in 2000, up from $15 billion in 1990

- Forecast for supplier diversity programs is $100 billion in 2010



ONYX

2



Competitive Reality of Supplier Diversity: A Procurement Paradox





Competitive Reality of Supplier Diversity: A Procurement Paradox

# AGENDA

◈ **Why Do So Many Companies Care About Supplier Diversity?**

◈ **What is This Paradox?**

◈ **What Do You Do About It?**

◈ **Case Study: Onyx/Piknik**

◈ **Conclusions**







# Competitive Reality of Supplier Diversity: Why Care?

- **Visteon**: *"Minority businesses add value to the bottom line"*

- **Coca Cola**: *"Diversity is productivity-driven"*

- **Whirlpool**: *"We want our products in every home, everywhere"*

- **PepsiCo**: *"An integral part of our mission"*

- **Procter and Gamble**: *"A fundamental business strategy"*

- **Darden Foods**: *"A priority, a strategy, and a way of life"*



## Competitive Reality of Supplier Diversity: Why Care?

# I'm
# STILL
# not convinced!



ONYX

6



## Competitive Reality of Supplier Diversity: Why Care?

In 1950 there were 9 Caucasians for every 1 person of color in the U.S. In 2000, for Americans under 40, there were less than 1.5 Caucasians for every person of color.



*Ratio of Caucasians to People of Color in Successive Age groups Source: US Census, 2000, Diversity, Inc.

# Competitive Reality of Supplier Diversity: Why Care?

**The Minority Population will account for nearly 90% of the total growth in U.S. Population before 2050 and account for 45%–51% of the Total Population by 2045, up from 29% today**



Projected Minority and Non-Minority Population: 2000 to 2045

(% of Total Population)

Total U.S. Minority Population

178 Million

79 Million

% of Population

**■ Minority   □ Non-Minority**

Source: Data are based on U.S. Census Bureau, 2000, Annual Projections of the Resident Population by Age, Sex, Race, and Hispanic Origin

ONYX

8

# Competitive Reality of Supplier Diversity: Why Care?

Percent of total Consumer Purchase power for people of color rose from 12.1% in 1990 to almost 19% in 2002 and is trending to 24% by 2007



**African- American** buying power rose to $572.1 Billion- an 86% increase over 1991

**Hispanic** buying power grew by 118% to $425.5 Billion

**Asian- American**

$253.8 Billion

**American- Indians**

$34.8 Million



9

## Competitive Reality of Supplier Diversity: Why Care?

**The number of minority-owned firms, currently at 3.25 million, is growing at the rate of 17% per year, 6 times faster than the growth rate for all firms**





Source- small business administration, 1999 , Diversity Inc.

10



## Competitive Reality of Supplier Diversity: Why Care?

# Furthermore. . . . .



11

# Competitive Reality of Supplier Diversity: Why Care?

## Diversity Inc.'s, Top 50 companies for diversity out-perform the financial markets



| | 10 Years | 5 Years | 3 Years |
|---|---|---|---|
| S&P 500 | 11.85% | -2.17% | -0.65% |
| DJIA | 13.40% | 0.90% | 1.96% |
| Top 50 Index | 17.58% | 3.17% | 5.20% |



ONYX

12

# Competitive Reality of Supplier Diversity: Why Care?

They also live to fight another day:



**Acquirer**

◆ SBC

◆ Verizon

**Target**

◆ AT&T

◆ MCI

IN Diversity Inc. Top 50

NOT



13

## Competitive Reality of Supplier Diversity: Why Care?

**Another way to look at it is:**



Supplier Diversity = Supplier Competition

Reduced Costs

Encourages Innovation

GROWTH!



# Competitive Reality of Supplier Diversity: Procurement Paradox

**Supplier Diversity makes business sense, but seems to conflict with procurement goals.**





15

## Competitive Reality of Supplier Diversity: Procurement Paradox



- **Corporations desire to rationalize their supplier base**

  - Fewer Suppliers

  - More Sophisticated Management

  - Bigger Footprints

  - Financially Stable

ONYX

16

## Competitive Reality of Supplier Diversity: Procurement Paradox

◈ However......

    ◈ 90% of suppliers to major corporations have revenues in excess of $100 Million!!!

    ◈ 95% of MBE's have less than $1 Million in revenues!



Source: Procter & Gamble, Department of Commerce MBDA, 2000



ONYX

17

# Competitive Reality of Supplier Diversity: What to Do?



GET
TO
SCALE

## As a smaller company:

- ◈ Organic Growth
- ◈ eProcurement
- ◈ Bundling
- ◈ Strategic Alliances
- ◈ Joint Ventures
- ◈ Raise Capitol
- ◈ M&A





ONYX

18

# Competitive Reality of Supplier Diversity: What to Do?

## As a corporate leader...

- Empower the Supplier Diversity Function
  - Not public relations
  - Line of business partners



- Think **BIG** and outside of the
  - What is your supply chain problem?
  - Solve for X !!!



IONYX

19

# Competitive Reality of Supplier Diversity: The Onyx Model

- Onyx Capital Ventures is an African American-owned Minority Business Enterprise ("MBE")

- Onyx' strategy:

  - Acquire controlling equity stakes in existing **non-MBE** suppliers to leading corporations

  - Certify acquisitions as MBEs

  - Aggressively grow acquired companies with specific new purchase commitments from corporate partners

- Onyx' objectives:

  - Produce exceptional risk-adjusted returns for our investing partners

  - Utilize its status as a minority preferred provider to become a top tier supplier of goods and services to the Fortune 1000

  - Win-win scenario for Onyx, its investors and its corporate partners



20

## Competitive Reality of Supplier Diversity: The Onyx Model

◈ **Win-Win-Win** value proposition

◈ For Onyx: mitigates revenue risk and creates stable, growing companies that can proactively hire and mentor minority managers

◈ For Investors: lower risk, revenue-enhanced buyout

◈ For Corporate Sponsors: pool of high quality minority-owned suppliers



ONYX
Onyx Financial Solutions

21

# Competitive Reality of Supplier Diversity: Piknik Case Study

- ❖ **Onyx acquired Piknik in August 2003**

- ❖ **Founded in 1923, non MBE, now MBE certified**

- ❖ **Contract manufacturer of beverages and condiments**
  - ❖ Three plants
  - ❖ Montgomery, AL

- ❖ **Customers included**
  - ❖ Quaker
  - ❖ Tropicana
  - ❖ Atlanta Bread
  - ❖ Publix





22



# Competitive Reality of Supplier Diversity: Piknik Case Study

◈ **Piknik transaction merits**

◈ **Strong management team**

◈ **Excellent customer base**

◈ **Product sector growing in double digits**

◈ **Outsourcing continues to grow**

◈ **Platform for entry into contract manufacturing industry**

◈ **Corporate sponsors engaged and supportive**







23

# Competitive Reality of Supplier Diversity: Piknik Case Study

◈ **Onyx is positioning Piknik for significant growth**

  ◈ **Invested in additions to senior management**

  ◈ **Improvements in IT infrastructure**

  ◈ **Redoubling quality assurance and performance measurement focus**

  ◈ **HR training and development**

  ◈ **Renewed sales and relationship building focus**

  ◈ **Access to capital for capital investment and acquisitions**





24



# Competitive Reality of Supplier Diversity: Piknik Case Study

◈ **Results?**

◈ **Improved top and bottom line results**

◈ **Addition of new customers**
  ◈ Arizona
  ◈ Nestle

◈ **Robust pipeline of projects**





25

# Competitive Reality of Supplier Diversity: Piknik Case Study

- Onyx/Piknik is working with corporate sponsors to solve supply chain challenges

- Relationships at multiple levels of organizations

- Open dialogue regarding prospective transactions

- Collaboration on new product introductions

- Shared resources regarding performance improvement







# Competitive Reality of Supplier Diversity: Conclusions

- ## The importance of supplier diversity is growing:

  - ## $100 billion by 2010

- ## Supplier diversity makes sense from demographic and economic perspectives

  - ## Minority groups make up the majority of the population in America's largest eight cities

  - ## Companies that lead in diversity also lead financially





ONYX
Onyx Capital Ventures

27

## Competitive Reality of Supplier Diversity: Conclusions

◈ **Addressing the Procurement Paradox is easier said than done:**

◈ Suppliers ────────▶ **Get to Scale!**

◈ Corporations ────────▶ **Get Outside the**

────────▶ **Use supplier diversity as a tool to solve supply chain problems**

◈ **Onyx and its portfolio companies would enjoy the opportunity to help!**





ONYX

28



29





