# Exhibit 4

Page 1

1              IN THE UNITED STATES DISTRICT COURT
2           FOR THE MIDDLE DISTRICT OF ALABAMA
                    NORTHERN DIVISION
3

4                                        COPY
    JERRY A. MacCARTNEY, et al., )
5                                )
                    Plaintiffs,  )
6                                )
              vs.                )    No. 2:05cv1207-MHT
7                                )
    PIKNIK ACQUISITION           )
8   CORPORATION, L.L.C., et al., )
                                 )
9                   Defendants.  )

10

11

12          The videotaped deposition of JEFFERY

13   LARRY taken before Kathy A. O'Donnell, Registered

14   Professional Reporter and Notary Public, at One North

15   Wacker Drive, Suite 4400, Chicago, Illinois,

16   commencing at 10:35 a.m. on the 10th day of October,

17   2007.

18

19

20

21

22

23

24

EXHIBIT
4
ALL-STATE LEGAL®

Page 2

```
 1   APPEARANCES:
 2      ANDERSON, NELMS & ASSOCIATES
        847 South McDonough Street
 3      Montgomery, Alabama 36104
        Phone: (334) 263-7733
 4      MR. ANDY NELMS
 5          On behalf of the Plaintiffs;
 6      BRADLEY, ARANT, ROSE & WHITE, LLP
        401 Adams Avenue
 7      Suite 780
        Montgomery, Alabama 36104
 8      Phone: (334) 956-7645
        MR. ROBERT E. POUNDSTONE
 9
            On behalf of the Defendants.
10
11   ALSO PRESENT:  Mr. Anthony Micheletto (Videographer)
12
13          * * * * * *
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2   WITNESS                  EXAMINATION
 3   JEFFERY LARRY
 4      By Mr. Nelms                5
 5      By Mr. Poundstone          82
 6
 7            E X H I B I T S
 8   NUMBER                 MARKED FOR ID
 9   Larry Deposition Exhibit
10      No. 1                      73
11      No. 2                      74
12      No. 3                      78
13      No. 4                      80
14      No. 5                      81
15      No. 6                      81
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1          THE VIDEOGRAPHER:  This is Anthony Micheletto
 2   of Legal Visual Services, Incorporated, 205 West
 3   Randolph Street, Chicago, Illinois.  I am the
 4   operator of this camera.  We are on the record on
 5   October 10th, 2007.  The time is 10:35 a.m., as
 6   indicated on the video screen.
 7          This is the videotaped deposition of
 8   Jeff Larry, and it's being taken pursuant to Federal
 9   Rules of Civil Procedure on behalf of the plaintiff.
10   We are located at One North Wacker Drive, Chicago,
11   Illinois.
12          This case is captioned Jerry
13   MacCartney, et al., vs. Piknik Acquisition Corp.,
14   LLC, et al., Case No. 205 CV 1207-MHT.
15          Will the attorneys please identify
16   themselves for the video record?
17      MR. NELMS:  Andy Nelms for the plaintiff.
18      MR. POUNDSTONE:  And Bobby Poundstone for the
19   individual defendants.
20      THE VIDEOGRAPHER:  The court reporter today
21   is Kathy O'Donnell, from Amicus/Talamo Court
22   Reporters.
23          Please swear in the witness.
24          (Witness sworn.)
```

Page 5

```
 1   WHEREUPON:
 2              JEFFERY LARRY,
 3   called as a witness herein, having been first duly
 4   sworn, was examined and testified as follows:
 5              EXAMINATION
 6   BY MR. NELMS:
 7      Q.  Would you state your full name, please?
 8      A.  Jeffery Larry, J-e-f-f-e-r-y, L-a-r-r-y.
 9      MR. NELMS:  Usual stipulations, Bobby, right?
10      MR. POUNDSTONE:  Right.  Correct.
11   BY MR. NELMS:
12      Q.  And your current address, Mr. Larry?
13      A.  6700 South Bennett Avenue, Chicago 60649.
14      Q.  How long have you been at that address?
15      A.  For 14 years.
16      Q.  Are you currently employed?
17      A.  Yes.
18      Q.  How are you employed, sir?
19      A.  I am employed by a number of companies, I
20   guess.  I have employment contracts with a company
21   called Core Systems in Painesville, Illinois [sic].
22      Q.  What is your title there?
23      A.  Chairman and CEO.
24          Packaging Division Industries,
```

2 (Pages 2 to 5)

Page 6

1  chairman and CEO.
2      Q.  All right.
3      A.  And I should say and Core's affiliates.
4  Core has three -- two or three affiliates, and I'm a
5  chairman and CEO of each of those affiliates.
6      Q.  Can you name them?
7      A.  Innovatech something or other.
8      Q.  Innovatech?
9      A.  I-n-n-o-v-a-t-e-c-h.
10          And Vials, V-i-a-l-s, something or
11  other.  They're nonoperating affiliates, but they are
12  some kind of affiliates.
13      Q.  I see.  Any other?  Affiliates, that is.
14      A.  Of Core, no.
15      Q.  And Packaging Division Industries?
16      A.  Yes.
17      Q.  Any affiliates to that organization?
18      A.  Not that I'm involved with, not that I'm
19  an officer of.
20      Q.  Other than Core Systems and Packaging
21  Division Industries, any other employment contracts?
22      A.  Yes.  Onyx Capital Ventures.
23      Q.  And you're chairman and CEO?
24      A.  Chairman and CEO.

Page 7

1      Q.  Any others?
2      A.  We may have started some -- some -- In
3  connection with acquisitions, we would generally
4  create an acquisition co.  And there may be some
5  acquisition cos. out there for acquisitions that
6  didn't happen; but other than that, those are the
7  three companies I have employment agreements with.
8      Q.  I understand you're an attorney?
9      A.  Yes.
10      Q.  Are you employed in any capacity as a
11  member of a law firm?
12      A.  Well, I -- No.  I do some stuff for my
13  wife from time to time.  She has her own practice,
14  but I'm, I guess, a lawyer associate in that
15  practice.
16      Q.  Understood.
17          What is your current salary at Core
18  Systems?
19      A.  300,000 a year.
20      Q.  Is there any kind of bonus structure?
21      A.  No.
22      Q.  Other than the 300,000, any other form of
23  benefit or compensation you're given from Core
24  Systems?

Page 8

1      A.  Yeah.  Well, I guess my health insurance
2  and my cell phone from Core.
3      Q.  Anything else?
4      A.  No.
5      Q.  How long have you been the chairman of
6  Core Systems?
7      A.  Two years, two-plus; since, I think it
8  was -- Maybe it was longer than that.
9      Q.  2004?
10      A.  Maybe.  Maybe.
11      Q.  I believe that's what I remember it
12  being.
13          And what is your salary, if any,
14  with Packaging Division Industries?
15      A.  275.
16      Q.  Any other forms of compensation or
17  benefits that you receive as chairman and CEO of
18  Packaging Division Industries?
19      A.  No.
20      Q.  Any bonus program affiliated with your
21  employment as chairman and CEO of Packaging
22  Industries -- Division Industries?
23      A.  We're going to do all of that, but no.
24      Q.  So there's a plan to, but none in place

Page 9

1  at present?
2      A.  Right.  I should also say that payment of
3  the salary for Core Systems is now blocked by Core's
4  bank pursuant to our deal agreements, so that's not
5  currently being paid.  In the event of a default,
6  under the loan agreement, the bank had the right to
7  block my -- payment of my salary.  So it gets
8  accrued, but it doesn't get paid until that default
9  is cured.
10      Q.  I understand.
11          Are you currently receiving your
12  income as CEO and chairman of Packaging Division
13  Industries?
14      A.  Yes.
15      Q.  Are you compensated as chairman and CEO
16  of Onyx?
17      A.  I have an employment agreement, but there
18  are no payments being made under it.
19      Q.  Have you ever been paid by Onyx?
20      A.  Yes.
21      Q.  When was the last time you were paid by
22  Onyx?
23      A.  I'm sorry.  That's hard to say because we
24  would do things just based on cash flow.  So when I

3 (Pages 6 to 9)

Page 10

1  had other partners, there were income streams that we
2  would start payments over here, stop them when they
3  develop. So it was not unusual for the payments
4  under Onyx to stop and start. But probably a year,
5  maybe, 12 months.
6     Q.  Since you were last paid?
7     A.  Yes.
8     Q.  Going back to Core Systems, what -- And
9  this is a vague question, so forgive me at the onset.
10        What are your general duties and
11  responsibilities as CEO and chairman?
12     A.  Well, those have changed from time to
13  time depending on what was going on. But my role at
14  Core was basically to deal with external
15  constituencies. I deal with the shareholders, deal
16  with the customers, deal with the banks, depending on
17  whether there are cash flow issues or not, depending
18  on dealing with the suppliers, and I might have
19  mentioned working with the banks.
20        But I am not an operational guy.
21  And while I, in all of our different deals, have, you
22  know, been the chairman and CEO, I've generally had
23  to work through an operator -- Not generally. I have
24  had to work through an operator because I'm not -- I

Page 11

1  don't try to be or pretend to be.
2     Q.  I understand.
3        Now, my recollection of Core Systems
4  from Mr. Day's deposition is that they make plastic
5  parts for the automotive industry, generally?
6     A.  Appliance industry, mainly. And I don't
7  know that -- They may be doing a small amount for
8  automotive, but mostly appliance.
9     Q.  The name Honda came up.
10     A.  It used to do some work for Honda, but
11  that was -- We actually gave that work back. Our
12  biggest customer is Whirlpool. We do a lot of stuff
13  with Electrolux. But it's predominantly appliance.
14     Q.  So when you say you don't have any
15  operational experience, you don't have any experience
16  in the area of manufacturing the kind of plastic
17  products that Core Systems manufactures?
18     A.  Or anything else.
19     Q.  And Packaging Division Industries --
20     A.  Yes.
21     Q.  -- which is difficult for me to say, for
22  some reason, what is the product that is produced by
23  that organization?
24     A.  It's -- That's two things. One side of

Page 12

1  the business is a repacker. And simply -- To put it
2  simply, a repacker -- One of the things that PDI does
3  is takes Oreos out of grocery-size store packages and
4  put them into club store packages or break them down
5  into convenient store packages, so, therefore, the
6  name repacker.
7        That's kind of oversimplifying it
8  for everything that they do, but most of it has to do
9  with doing something outside of an existing package
10  or SKU that's already been marketed. Because most
11  people, when they do manufacturing, they have one
12  line spit out one size package. And then to the
13  extent the market develops for other sizes, they
14  don't rejigger their line. They say, okay, we'll
15  send it to somebody else and have them work it and
16  put in labor arbitrage.
17        And the other side of the business
18  is a code manufacturer for Hines's soup and bouillon
19  products worldwide. So that actually is converting
20  ingredients into finished product.
21     Q.  And here again, you don't have any
22  operational experience in the repacking or
23  comanufacturing?
24     A.  No.

Page 13

1     Q.  And my understanding of Onyx is that
2  you're a capital venture firm?
3     A.  Mm-hmm.
4     Q.  Simply put.
5     A.  Mm-hmm.
6     Q.  About Onyx --
7     A.  Those were yeses.
8     Q.  Good for you. I'm not paying attention
9  myself.
10        When was Onyx founded?
11     A.  I believe it was 1999.
12     Q.  And you were the founder?
13     A.  Yes.
14     Q.  Who were the original -- Did you have any
15  partners with you?
16     A.  Well, I founded it by myself originally
17  and then took on another partner -- I don't remember
18  the date -- Rich Coleman.
19     Q.  Coleman?
20     A.  Coleman, C-o-l-e-m-a-n.
21        And then -- I don't know -- a year,
22  18 months after that, when we started capitalizing it
23  with investor money, I took on six -- five or six
24  other partners.

4 (Pages 10 to 13)

Page 14

1  Q.  Can you name them for us?
2  A.  Chris Day -- Well, not initially.  Chris
3  was one of the -- Does it matter for the timing?
4  Q.  No.  I'll tell you Mr. Day told us he was
5  four of six, and he counted you as one.
6  A.  Okay.  And then there was David Palmer,
7  Russ Pallesen, Patrice Daniels, Chris, and Pat
8  McGarvey.
9  Q.  What was the original mission of
10  Capital -- I mean of Onyx Capital Ventures?
11  A.  Really, just to acquire companies in the
12  manufacturing business, and we went out and raised
13  some operating capital to do that.  And the strategy
14  was to do some three or four deals and then go to
15  pension funds and track pension funds for a private
16  equity fund.
17  Q.  Why manufacturing businesses?
18  A.  We were really focused on taking
19  advantage of some opportunities under what are called
20  the supplier diversity programs at a lot of these
21  companies, and they generally focus on the
22  manufacturing businesses, or at least that's where
23  the opportunities are most developed.
24  But then the other thing was that we

Page 15

1  saw an opportunity beyond that to just roll up
2  businesses that weren't getting the focus of the big
3  boys at a time when people were looking at high tech
4  and at other sexy things and just making them better
5  and more efficient.
6  Q.  Define for me, in your mind, the supplier
7  diversity programs.
8  A.  A lot of the Fortune 500 -- I'd say
9  mostly -- probably certainly the overwhelming
10  majority of them have what are called supplier
11  diversity programs, where they're trying to do more
12  business with women-owned businesses and businesses
13  of minority-owned companies.  And those programs
14  started about -- I don't know -- in the early '60s,
15  and they have developed into programs where, you
16  know, there are some opportunities.
17  People often ask, what are those
18  opportunities?  The opportunities that you get
19  through the door.  There's no price break, no let's
20  look the other way on quality.  It's, "Okay.  We're
21  trying to do this.  If you might be able to do
22  something, let's have a conversation."
23  Q.  So the Fortune 500 businesses that you
24  define or tell us about are looking to do business

Page 16

1  with more diverse suppliers --
2  A.  Yeah.
3  Q.  -- of goods?
4  A.  And actually, that has been expanded now
5  to be, you know, transgender and -- You know,
6  diversity means a whole lot now.  And if you look at
7  the programs, it reflects a lot of different efforts.
8  Q.  Have you had any special training or
9  education in the area of employment law?
10  A.  No.
11  Q.  Did you have employment law as a topic in
12  law school?
13  A.  No.  I had labor law, but not employment
14  law.
15  Q.  How did you first come to learn about
16  Piknik products in Montgomery, Alabama?
17  A.  After we had gotten the group together,
18  we started calling investment bankers and saying, you
19  know, "We're looking for opportunities.  Here's the
20  type of opportunities we're looking for and here's
21  what we do and here's how we think we can do it, and
22  you're in the type of business that we're looking
23  for."  And at the same time, you know, you're talking
24  to investment bankers, and they're sending you books,

Page 17

1  a lot of different deals, where you just open a book
2  and you see something, and I think that's how we got
3  introduced to Piknik.  One of the investment bankers
4  had a relationship with one of the initial partners,
5  sent a book, and it looked interesting.  We read the
6  book, proceeded to have some conversations, and those
7  conversations kind of developed further.
8  Q.  Do you recall the year?
9  A.  I don't.  I know it started early on.  I
10  mean, you know, the first introduction was Ricky, and
11  I don't remember the dates.  But I'm guessing -- The
12  deal closed in '4 or '5?
13  Q.  Basically, June of 2003.
14  A.  Okay.  Then we must have gotten the
15  initial book or information about Piknik in 2000,
16  2001, because it was a very long process.
17  Q.  Describe for me the deal.  What was the
18  arrangement between Onyx and Piknik?
19  A.  As I told you, it was a long process.  So
20  initially, based on the book and based on some of the
21  company's projections, a deal was structured
22  whereby -- I forgot what Ricky's price was, but I
23  think it was $20 million.
24  Q.  You're referring to Ricky Loeb?

5 (Pages 14 to 17)

Page 18

1    A.   Ricky Loeb.  I think it was $20 million.
2    And we said, you know, for $20 million, there has to
3    be a lot of business there.  How much business are
4    you thinking -- What's your EBITDA going to be for
5    this particular period leading up to the transaction?
6    There are a lot of different ways to value a
7    business.  Looking at the EBITDA and putting a
8    multiple in is one of them.
9         So Ricky said his EBITDA was going
10   to be -- Ricky Loeb said his EBITDA was going to be a
11   certain amount, and that justified a
12   20-million-dollar purchase price.  So if I'm not
13   mistaken, we signed a letter of intent around that
14   purchase price.  And then the next quarter, the
15   numbers were actually worse than they were before;
16   and then the next quarter, you know, continued to
17   show a downward trend, at which point we told Ricky,
18   you know, "You said your number was $20 million.  We
19   don't even want to renegotiate that.  Why don't you
20   go back, run your business, get your EBITDA -- you
21   know, build your EBITDA level back up to where it
22   would support that purchase price, and then come back
23   and we'll do the deal that you said you wanted to
24   do."

Page 19

1         At the time, we were working through
2    the investment banking firm -- I can't think of their
3    name.  They're a Minnesota shop.  They have a Chicago
4    office, big firm.  It will come to me.  I'm looking
5    right at their book.
6         Q.   I can't recall, either.
7              Do you recall whether or not, in
8    your investigation, in your diligence in looking into
9    the value of Piknik products, whether or not there
10   was any outstanding debt?
11        A.   Oh, yeah.  Yeah, there was a significant
12   amount of debt.  Yeah, I want to say initially close
13   to $20 million of debt.  As you value it and you take
14   the EBITDA, you normally will take out the debt.  So
15   Ricky was projecting numbers that would suggest a --
16   with the debt, you know, sort of a net of the debt
17   for a 20-million-dollar valuation.
18             So like I say, I don't remember what
19   the exact numbers were, but there was a significant
20   amount of debt on it.
21        Q.   Well, ultimately, Onyx did make a
22   decision to purchase stock of Piknik products,
23   correct?
24        A.   Mm-hmm.

Page 20

1         Q.   Tell me what your understanding of that
2    purchase arrangement is or was.
3         A.   Well, a few months after we had told
4    Ricky that we can't give him his number, we suggested
5    that he go back and build the business and come back
6    to us; because he was very adamant, or at least his
7    representatives were very adamant, that that was the
8    number.  And probably two or three months after that,
9    we got a call from his representative saying, "Given
10   that the numbers are not trending and where things
11   are, you know, now that you know what you know, what
12   deal would you do for the company?"  I think the
13   structure was, you know, we'll buy 51 percent with a
14   note from the company and pay him a salary of
15   $250,000 a year interest on the note and some other
16   things that he had been paying through the company
17   when he was the sole owner.
18        Q.   Did Onyx then assume Piknik's debt?
19        A.   No.  No.
20        Q.   So Onyx received a 51 percent share
21   ownership of Piknik products?
22        A.   Yes.
23        Q.   And was anything paid by Piknik to Onyx
24   for Onyx's services related to Piknik's development?

Page 21

1         A.   Yes, a management fee of $250,000 a year.
2         Q.   I'm sorry.  I thought that was what
3    Ricky's salary was going to be.
4         A.   That was, yes.
5         Q.   So Ricky was getting paid $250,000 a year
6    as a consulting fee?
7         A.   He had the title of vice chair, but we
8    weren't looking for him to do anything related to the
9    business.  And in fact, he wasn't doing anything
10   related to the business.
11        Q.   And then there was a fee paid to Onyx for
12   consulting?
13        A.   Right.
14        Q.   Did Onyx ultimately do that consulting
15   for Piknik?
16        A.   It wasn't consulting.  It was a
17   management fee.  Yes, definitely.  Onyx did a lot for
18   Piknik.
19        Q.   In general terms, can you tell us what
20   types of management activities Onyx did in relation
21   to Piknik pursuant to the agreement?
22        A.   I wouldn't say management activities.
23   They really acted as consultants.  And Onyx was
24   charged with providing, in a sense, Piknik with

Page 22

```
 1   everything that it needed outside of management.  So
 2   if you need capital, okay, we've got capital sources.
 3   Let us introduce you to these guys and show them what
 4   the deal is, see if they want to provide capital.
 5   Even with -- We were looking at equipment financing;
 6   we would take Piknik to people that we had
 7   relationships with.
 8              And, you know, so to the extent -- I
 9   mean, Onyx was involved in developing Piknik, but
10   really strictly from an external standpoint:  What do
11   you need, and we'll find it.  You know, we'll
12   supplement -- You know, Bob Lampert was the CFO.
13   "Okay, Bob, you know, you need to go to the bank.
14   Why don't you send Onyx your presentation that you're
15   going to the bank with so it can get scrubbed and,
16   you know, you can get beat up about what the bank's
17   going to do so that you're prepared when you go into
18   the meeting."
19              I do recall, if you're looking at
20   the management consulting or whatever it was,
21   agreement, some of those activities were spelled out.
22     Q.   In the management agreement?
23     A.   Yes.
24     Q.   Did you ever become an employee of
```

Page 23

```
 1   Piknik?
 2     A.   I was a chairman and CEO of Piknik.  And
 3   I don't have a copy of it; I do believe that I signed
 4   an employment agreement because I have every place
 5   else.  But I don't -- I can't -- I'm not absolutely
 6   certain of that.  I do recall part of the negotiation
 7   when we were doing the deal was that I was going to
 8   take a salary, and we negotiated that long and hard.
 9   But the reality was that the company, meaning Piknik,
10   could not -- You know, I was going to take a salary
11   and Onyx its management fee, but Piknik did not have
12   the cash flow to support it at the time.  And I
13   basically said, "Okay.  I'll do it when it does," and
14   it never did.
15     Q.   So you never got paid?
16     A.   No.
17     Q.   Do you recall when you first took on that
18   position with Piknik?
19     A.   Yes, since day one.
20     Q.   Day one the deal closed?
21     A.   Yeah.
22     Q.   Describe some of the job functions and
23   responsibilities, then, you would have as chairman of
24   Piknik.
```

Page 24

```
 1     A.   Well, really, as I said, I would deal
 2   with the external world, did a lot with the
 3   customers; and initially, that was my almost whole
 4   focus.  I would have periodic conversations with
 5   Chris, where he would tell me what's going on with
 6   the business and whatever challenges or successes he
 7   was having, but I was, you know, completely
 8   externally focused.
 9              Because once we got involved, we
10   found out that PepsiCo was about to desource Piknik,
11   and PepsiCo was one of the companies that we had a
12   pretty good relationship with -- fantastic
13   relationship with.  And we went to PepsiCo and said,
14   "Hey, guys" -- Actually, before we closed the deal,
15   we found that out.  And we said, "Hey, guys, don't do
16   that.  We may be able to help you with this company.
17   Here's our plan for this company, and here's what
18   we're bringing to the company."
19              So once that deal closed -- I mean,
20   before the deal closed, I started working with
21   PepsiCo and continued working with PepsiCo
22   significantly after it closed regularly and right up
23   to the day that -- well, right up until after the day
24   that we got kicked out.
```

Page 25

```
 1     Q.   Talk to me about the diversity issue that
 2   we discussed earlier, about minority incentives, and
 3   what Onyx brought to the table for Piknik in that
 4   regard.
 5     A.   Well, we just brought relationships.  I
 6   mean, you know, it was nothing more than that.
 7   Because of Onyx's ownership, it was a minority
 8   business enterprise.  Because of our acquisition of
 9   51 percent of Piknik, that made that a minority
10   business enterprise.  But after that, you know, what
11   we brought were relationships, and we offered those
12   fully to PDI --
13         MR. POUNDSTONE:  Piknik.
14   BY THE WITNESS:
15     A.   -- with tremendous success.
16         MR. POUNDSTONE:  Piknik.
17   BY THE WITNESS:
18     A.   I'm sorry.  Piknik.  Piknik.
19     Q.   I talked with Mr. Day and I talked with
20   Mr. Hicks about certification for -- under National
21   Minority Supplier Development Council.  Are you
22   familiar with that as well?
23     A.   I am.
24     Q.   Did Piknik receive certification --
```

7 (Pages 22 to 25)

Page 26

1    A.   Yes.
2    Q.   -- in that regard?
3    A.   Yes.
4    Q.   Who made the application for that
5  certification?
6    A.   I did on behalf of Piknik.
7    Q.   And what requirements or criteria needed
8  to be met by Piknik in order to be certified?
9    A.   There's a website. I'll give you this
10  website, and then I'll answer your question. There's
11  a website, nms -- www.nmsdc --
12    Q.   Dot org?
13    A.   Dot org, right. And it talks about its
14  requirements. But principally the requirements are
15  to be an MBE, and you have to be 51 percent owned by
16  minority, women, whatever the target is, and -- owned
17  and controlled, which essentially means that your
18  senior executive has to be one of the targeted
19  groups.
20    Q.   Anything else?
21    A.   I mean, there's a whole lot, as you know
22  as a lawyer, that goes into what that means, but
23  those are the two big requirements.
24    Q.   And obviously, Piknik got certified, so

Page 27

1  Piknik met the criteria. How specifically did Piknik
2  meet the criteria?
3    A.   Well, Onyx, an MBE, acquired 51 percent
4  of Piknik, making it an MBE. We went to the southern
5  Alabama region for the NMSDC and filed an application
6  on behalf of Piknik saying we're 51 percent
7  minority-owned and we are -- and controlled. And
8  because of my position as chairman and CEO, we met
9  that other requirement.
10    Q.   Was there a requirement that you have
11  operational control by minorities of the business?
12    A.   No. It's day-to-day control, and I had
13  day-to-day control as the CEO and chairman. I
14  certainly would delegate that to Chris; but from an
15  NMSDC standpoint, that met the criteria.
16    Q.   I know you told me that you never
17  actually received any income as your position of
18  chairman of Piknik, but what was the actual promised
19  amount of income that you were supposed to receive?
20    A.   You know, I don't recall. As I said, I
21  don't -- I believe -- I believe it was 250,000.
22    Q.   It would be easy to remember if you got
23  it.
24    A.   When you don't get it, you tend to forget

Page 28

1  about it. It would have been right around what Ricky
2  was getting. But then, you know, you stacked that on
3  everything else that was happening, that was just too
4  much for the company.
5    Q.   From the time you took your position with
6  Piknik, how often would you visit, if you did at all
7  visit, Montgomery, Alabama?
8    A.   It will really depend on what was
9  happening with the customers. I mean, there were
10  probably a couple times that I would go down and kind
11  of fly the flag and let people know that we cared
12  about what was going on. I say "we"; I mean I. I
13  sometimes use the editorial "we," so I have to stop
14  myself.
15        And then if there were customer --
16  there was customer activity for customers that I was
17  working with, or banks or financing sources, I would
18  come to Montgomery. So towards the end, it was
19  probably, you know, sometimes twice a week, depending
20  on whether I had to get out or not or coming for
21  three or four days, because we were bringing in a
22  bunch of different financing sources and we're having
23  a lot of different customers in. And we were trying
24  to manage our equipment suppliers at that time, so I

Page 29

1  spent a lot of time then.
2        There were other times, if things
3  were just going along and no fires, where there would
4  be weeks -- I wouldn't say months, but weeks where
5  there would be no reason for me to be there.
6    Q.   Would it be fair to say that you, then,
7  were at least once a month in Montgomery?
8    A.   Yeah. Yeah.
9    Q.   Who paid your travel expenses?
10    A.   Piknik.
11    Q.   Who -- What position did Chris Day
12  initially have at Piknik?
13    A.   I'm not clear on that. When we closed
14  the deal, Mike O'Connell was the president, and we
15  left him in place for a while. And during that
16  period, I don't know if Chris had a title with Piknik
17  or not. I don't know the answer to that because at
18  some point, if he didn't have one, he got a formal
19  title.
20    Q.   During this initial period of time, was
21  Chris Day in Montgomery working at the Piknik
22  facility?
23    A.   I think initially, no. I'm real, real
24  foggy on this, so I'll do my best. I think

Page 30

1  initially, no, and then we started seeing things that
2  were problematic. And at some point, he started
3  visiting, and at some point he was there, you know,
4  three days a week and four days a week. Then we got
5  another guy to come in to run the company, Bill ...
6      Q.  Lampert?
7      A.  No, no.  Bill...
8      MR. POUNDSTONE: McClennon?
9  BY THE WITNESS:
10     A.  Yeah, McClennon.  At which point, then,
11 Chris stepped back.  And I'm fuzzy with all those
12 dates.
13     Q.  Do you remember any specific title that
14 Chris Day held?
15     A.  Yeah.  He was president at one point.  I
16 think he was executive vice president when O'Connell
17 was in place at one point.  I'm a little foggy on it,
18 but I'm sure he was -- I'm sure he was president, and
19 I believe he was executive vice president at some
20 point.
21     Q.  Who made the decision that Chris Day
22 would go to Montgomery and have some operational
23 control of Piknik?
24     A.  I think it was a decision that originated

Page 31

1  with me.  I do believe that Ricky Loeb was involved.
2  We had a board, and certainly the board was consulted
3  about it.  So I would say it was a board decision,
4  although it may not have been unanimous.
5      Q.  But you were for Chris Day having some
6  operational control at Piknik?
7      A.  Yes.
8      Q.  Did Chris Day have any particular
9  experience in the condiment business or in copacking
10 that made him important for you to have in Montgomery
11 operating, or partially operating, Piknik?
12     A.  No, but he has significant manufacturing
13 experience and ran a company at a very young age, and
14 did it very successfully.  I mean, a division of a
15 pretty large company, 100-million-dollar business.
16 And probably more important than that, he was a guy
17 who kind of knew his way around the issues with
18 manufacturing.  But way more important than that was
19 that he was somebody that we knew and trusted.  You
20 know, you're trying to get your arms around a
21 problem, you need to know that what you're getting
22 is -- you need to know that what you're getting --
23 what you're being told is exactly what's going on.
24     Q.  Well, did you have trust issues with some

Page 32

1  of the employees at Piknik when you first got
2  involved with it?
3      A.  No.  But if you work with somebody you
4  don't know, you've got to build a trust.  You kind of
5  get a sense of their cadence and their pace, and
6  you've got to learn how to work together.  That
7  wasn't a step we had to take with Chris.
8      MR. NELMS: Off the record.
9      THE VIDEOGRAPHER:  We're off the record at
10 11:11 a.m.
11          (Discussion off the record.)
12 BY MR. NELMS:
13     Q.  Who is Henry Hicks?
14     A.  Henry Hicks is --
15     THE VIDEOGRAPHER:  Hang on.  We are back on
16 the record at 11:14 a.m.
17 BY THE WITNESS:
18     A.  Henry Hicks is a guy who, at some point
19 after we closed the deal, became vice president of
20 sales for Piknik.  And Henry was introduced to Piknik
21 by Chris Day.  Henry's a White House fellow, as is
22 Chris Day, and they knew each other.
23     Q.  Who made the decision, then, to hire
24 Henry Hicks?

Page 33

1      A.  Chris Day.
2      Q.  Did that decision have your endorsement?
3      A.  I generally don't give endorsements.  A
4  conversation -- A typical conversation was, "I just
5  want to let you know what I'm doing.  Here's what I'm
6  doing.  I found this guy.  He's great.  Here's what
7  we're doing.  Here's what his pay is going to be.  Do
8  we need to do anything with Ricky on the board?"
9          "No."
10         "Okay.  I did it" or "I'm doing it."
11 It really was more of a -- It wasn't ever seeking my
12 blessing.
13     Q.  Was there ever any discussion with Chris
14 Day regarding the hiring of Henry Hicks regarding
15 Henry Hicks' status as an African-American?
16     A.  I'm sure he told me that Henry was an
17 African-American.
18     Q.  Would that have -- I'm sorry.  Go ahead.
19     A.  But it really was -- You know, what
20 prompted it was we have a -- When we acquired Piknik,
21 it didn't have an outbound sales force, so we wanted
22 to develop that.  And when I was talking with Chris
23 about that, he said, "I've got the perfect guy.  If
24 we can just get him, he can come in.  He has sales

9 (Pages 30 to 33)

1  experience."
2      You know, one of the things that
3  I've found in this business is, really, probably the
4  next most important thing that people bring to the
5  business, other than their capability, are the
6  relationships that they have and the network that
7  they have in getting additional folks to come in and
8  take a seat at the working order. It's hard. That's
9  really what was driving a lot of the repositioning of
10  Piknik, that we had really tapped into a good network
11  with Chris, that he was -- You know, as I was
12  explaining it to Bobby, one of the problems that we
13      was that we were a struggling company of a
14  certain size in Montgomery, and that presented a lot
15  of recruiting challenges, significant recruiting
16  challenges. And when we first got to Piknik, what we
17  found was that most of the people heading up their
18  functions -- I shouldn't say most. A significant
19  amount heading up their functions either had not had
20  the formal training or had not had sort of the big
21  Fortune 500 experience that will get you a certain
22  amount of training and discipline.
23      So we had to -- You know, we would
24  always look for opportunities to move people along,

1  you know, up in the company if they were showing
2  certain activity -- successes, I should say. But one
3  of the things that Chris brought to the table was a
4  significant network, and then his network had a
5  network.
6      I'll also tell you -- I've told
7  Bobby this many times. One of the things that's
8  really disturbing about this whole situation is that,
9  you know, what was done for Piknik was nothing short
10  of absolutely incredible. I mean, we took a company
11  that was dead, I mean flat line as it could be. The
12  major customer was preparing to pull the plug on the
13  life-support system.
14      Q.  PepsiCo?
15      A.  PepsiCo. And we got them not to do that.
16  Not only that, but we got them to start giving us a
17  lot of trust and giving us more business. And we
18  used that to go to other people and say, "Hey, we're
19  doing it for PepsiCo, and they've got trust. And
20  their brand is way bigger than yours, why can't you
21  give us a shot?" At a time when the hot field market
22  was just crazy, Piknik couldn't get business,
23  couldn't get enough business to sustain itself.
24  That's why Ricky came to us after the deal had kind

1  of collapsed because he knew that we had
2  relationships that could bring volume into the
3  business.
4      Q.  When you say that the hot field business
5  was crazy, you mean there was a lot of volume
6  available in the marketplace?
7      A.  Yeah, and remains to this day. One of
8  the things that PepsiCo did after Piknik went under,
9  directly related to it, was decide to build two
10  dedicated Gatorade facilities. Because unlike your
11  carbonated drinks and your -- where that distribution
12  and manufacturing business is built out, this place
13  isn't built up. This space isn't built up. There
14  really are no national players.
15      So once we got involved with Piknik,
16  we were, like, wow, this is phenomenal space, the hot
17  field space. There's great opportunities. You look
18  around, and there's mom and pop players. Everybody
19  was telling us you need to have a national player.
20  We need to be able to call one guy and get all of our
21  stuff done. And we kind of stumbled over Piknik; but
22  after we were in there, we were, like, this is a
23  great vehicle for us. This is a great vehicle to
24  build up that national footprint. And we set about

1  doing it, and we got it -- you know, not the national
2  footprint, but we got the resuscitation of Piknik
3  well along its way.
4      Then it got to a point where our
5  bank had a certain amount fatigue, had some
6  protection. It's my understanding that the bank had
7  a make whole deal in connection with Wachovia's
8  purchase of SouthTrust. And how I understand that to
9  work is, and in negotiation of a deal, there was a
10  certain pool of loans that was put out there saying,
11  okay, if these loans don't pay, then the purchase
12  price gets deducted. If they do pay, then the
13  purchase price doesn't get deducted.
14      Q.  And the Piknik debt fell into that
15  category?
16      A.  Yes. And what was unspoken, but what
17  became a problem for us, was that if they -- That's
18  just within this period. So I don't know what the
19  period was; six-, eight-month period. So it was my
20  understanding that Wachovia was fully protected in
21  Piknik's debt because it came off of SouthTrust.
22  That whole amount came off of SouthTrust
23  shareholders.
24      But if they, in fact, had said, no,

Page 38

1  we want to support what you're doing four months
2  later and then it fails, now you're outside that
3  period, and now that whole 20 million is yours. So
4  we basically ran into a bank that it was in its best
5  economic interest that the company not proceed any
6  further. And we didn't really understand that until
7  way after we had gotten thrown out.
8       When I look at companies and I see a
9  value, I always say, you know, everybody's an
10  economic actor. There's value. People are going to
11  do what makes sense for them, and it makes sense to
12  have this business go on. It makes sense for PepsiCo
13  to put business in here, not for any reason other
14  than they're selling more Gatorade than they can
15  make. And so every potential issue -- And there's
16  a limited amount that they can actually run, and they
17  do. As I said, we just had a bank that we found out
18  later was, okay, if you want to pay me all of my
19  debt, which is completely unheard of in that
20  situation -- at one point, it was my debt plus
21  10 percent -- then I'll act reasonably. Otherwise,
22  I'll just pull the plug.
23       Q. Just for the record, forgive the form of
24  the question, but PepsiCo owns Quaker Oats --

Page 39

1       A. Yes.
2       Q. -- which owns Gatorade, which is a hot
3  field product, which was done at Piknik in
4  Montgomery?
5       A. Yes. Among other places, but yes.
6       Q. So you attribute the failure of Piknik to
7  the bank's pulling of its loans?
8       A. When we did -- Well, when we closed the
9  deal on Piknik, Piknik was in default, you know,
10  default from day one. When they were SouthTrust, we
11  had a bank that was working with us. The loan kind
12  of migrated from Montgomery at SouthTrust to
13  Birmingham at SouthTrust to Wachovia in Birmingham.
14  When it was in Montgomery, that predated us. I think
15  people thought, okay, this was a problematic loan; it
16  should not have been made, and maybe it shouldn't
17  have had the authority to make it in Montgomery. And
18  then that loan package got shipped off to Birmingham,
19  and we started dealing with a guy by the name of Andy
20  Raines.
21       So I think it was what happens when
22  these big companies go in and buy small banks. A lot
23  of the clientele, the companies look at them and say,
24  okay, they're not our target clientele; and, oh, by

Page 40

1  the way, if I have a provision in my agreement that,
2  if I kill you, I don't feel the pain, prepare your
3  will.
4       Q. I understand. Andy Raines was your
5  contact person at SouthTrust?
6       A. Mm-hmm.
7       Q. R-A-I-N-E-S?
8       A. Mm-hmm.
9       Q. And as a matter of fact, there were a
10  number of forbearance agreements made --
11       A. Yes. Yes. And we went through a
12  period -- I mean, we were in a forbearance agreement
13  when we got in, probably on two or four, and we got
14  all the way up to double digits because, you know, we
15  did asinine stuff like you'll have a forbearance
16  agreement for three months. What the hell does that
17  do, other than make everybody nervous? And it went
18  on for a period of time, so much so that you kind of
19  got dull to the fact that you're living three months
20  at a time until the guy says, "Okay. I'm got doing
21  it again."
22       "Whoa. We do this every three
23  months."
24       "No. I'm not doing it again unless

Page 41

1  you do all of this."
2       So what had happened was we had a
3  conversation with Andy, and we said, "Andy, we have
4  customers coming to the party. We have financing
5  sources coming to the party. We need some equipment.
6  We've got a structure that works. If we don't do
7  this, there is no future for Piknik. If we do this,
8  Piknik will thrive."
9       That was -- We kept working it and
10  kept working it, and Andy said, "Okay. If they'll
11  come in on these terms, they can come in." You know,
12  I'll share my collateral. Because remember, you've
13  got that 20-million-dollar debt and you've got a bank
14  that's already under water and, you know, people are
15  coming in and saying, "I'm standing behind that guy?"
16  No. I want to be either with him" -- New money. New
17  money and deals always come in and say, "I'm not
18  standing behind the old money, because there's a
19  reason why it's old money. I'll come in, and I'll
20  stand next to it. And generally, I'll stand in front
21  of it." But since Andy was a senior lender, you
22  know, you don't stand him in front of those guys.
23       Q. And I believe you mentioned earlier that
24  part of your role was you were out attempting to get

11 (Pages 38 to 41)

Page 42

1  new money?
2      A.  Yes.
3      Q.  And was that in an attempt to get
4  SouthTrust out of the picture altogether?
5      A.  Yes.  Yes.  Yes, because we knew that as
6  we remade the capital structure, you've gotta have
7  somebody who wants to work with you.  You just can't
8  have a guy who's saying, you know, give me my money
9  back.  I mean, that's what you're ultimately trying
10  to do.
11      Q.  In regard to the forbearance agreement,
12  were you actually signing on Piknik's behalf?
13      A.  Yes.  Piknik was the obligor on the loan,
14  and I was signing loan documents on behalf of Piknik.
15      Q.  Do you remember how often or how
16  frequently it was required of you that you sign on
17  Piknik's behalf as chairman in regard to the loans
18  with SouthTrust?
19      A.  It's certainly every forbearance
20  agreement.  However many there were during our
21  tenure, I signed.  There may have been some other
22  stuff, but that's all I'm aware of.
23      Q.  What is Apollo?
24      A.  Apollo Financial Management and its

Page 43

1  affiliates is one of the preeminent private equity
2  firms in the world, started by Leon Black, a legend
3  in the private equity business.  They have done
4  phenomenal work and were one of the early pioneers
5  in the private equity business.
6          They started in private equity, and
7  they developed other financing affiliates that did,
8  you know, distress debt or emerging markets or
9  whatever specialty they were looking at.  But they
10  were -- That's who they are.  We had gone to Apollo
11  and a number of others when we were looking to
12  recapitalize the balance sheet for Piknik, and had
13  actually gotten quite a long ways with them before
14  our efforts were shut down.
15      Q.  Did you believe there was an intent on
16  behalf of Apollo to make an investment?
17      A.  No question.
18      Q.  What stopped that?
19      A.  They were making an investment at a few
20  different places on the balance sheet.  They were
21  going to do some sub-debt.  They were going to do
22  some equity.  And they wanted a part of their
23  injection of capital to be senior debt, pari passu
24  with SouthTrust, meaning basically standing in the

Page 44

1  same place in line vis-a-vis the assets for
2  SouthTrust.  Initially, it was our understanding that
3  Andy was going to let that happen; and then shortly
4  after that, when we brought him to the table, Andy
5  said -- after flip-flopping for months, Andy finally
6  said no.  And the Apollo guys shook their head and
7  said, guys, I'm out of here.  They took four or five
8  bites at the apple.  Because as soon as they would
9  leave, we we're saying, "Andy, what are you doing?"
10          And he'd say, "Well, I didn't
11  understand.  If you had told me it was this, then
12  maybe I could have" --
13          "Okay.  It is this, Andy."
14          "Okay.  We'll come back together."
15  And so then -- I'm sorry.  I'm having a couple
16  conversations with myself.  I'll slow down.
17      Q.  Which leads me to think of other things,
18  such as I can't imagine -- that's inappropriate --
19  Why, if you know, would SouthTrust not take a deal
20  with Apollo where Apollo was straight out buying
21  their interest?
22      A.  Unless you've got the make whole -- And
23  that was the thing that we scratched our head about.
24  You can look at what the alternative is.  The

Page 45

1  alternative is bring in this $15 million of capital
2  so that we can buy this equipment, explore all the
3  opportunities that we have not -- We've got
4  contracts.  We're not going to look for the stuff;
5  we've got contracts.  Let us bring it in.
6          Andy's position was Apollo has all
7  the money in the world; if they want in this deal,
8  they've got to pay a premium and they've got to pay
9  100 percent.  Then it was, okay, I will stand next
10  to -- I will let them stand next to me.  And then it
11  was I won't.  And after about the fifth flop --
12  Unfortunately, it happened on the day my cousin was
13  getting buried; on the way to the funeral, Apollo
14  said -- on the cell phone -- Apollo said we're gone;
15  we're not coming back; this guy is a maniac.
16      Q.  Referring to Raines?
17      A.  Referring to Raines.
18      Q.  Was Raines -- In your mind, was Raines
19  the one actually making the decisions?
20      A.  Andy was in an interesting position.  In
21  fact, if you look back at what happened at
22  SouthTrust -- Wachovia after -- SouthTrust after
23  Wachovia bought it, most of Andy's division got wiped
24  out except Andy, and he didn't get wiped out because

AMICUS/TALAMO COURT REPORTERS, INC
CHICAGO, ILLINOIS 312.641.3500

Page 46

1  of the work that we had done at Piknik to get him
2  repaid and to get him repositioned. So he went from
3  one year from being -- having a nonperforming loan to
4  having $8 million paid down on that loan with the
5  collateral. So he was sitting there looking like the
6  golden child. We were, again, making steady progress
7  with the company in a real good position.
8      Q.  With the make whole deal and with Andy
9  Raines, are you of the belief that his portfolio was
10  so limited after the Wachovia merger that, once he
11  completed his business with Piknik, he may have
12  worked himself out of a job?
13      A.  No. In fact, it was just the opposite.
14  He got a promotion because -- largely, in fact,
15  because of work that he'd done at Piknik. I mean, if
16  you look at it -- I'm telling you the story from my
17  side. But from a banker's side, what a phenomenal
18  success. Right before we take this thing down, we
19  get a 10-million-dollar payment or an
20  8-million-dollar payment on the outstanding debt;
21  you've managed a portfolio; you know, we've got this
22  make whole. So from a banker's standpoint, I can
23  tell you, he got a promotion. And he got a promotion
24  in large fact because right before the transition,

Page 47

1  he's able to show a great improvement in his credit.
2  And they tanked everybody but Andy.
3          And I tell you, what happened was
4  borderline criminal. You can look at business in a
5  lot of different ways. There's the financing,
6  there's the customers, but there are also a lot of
7  workers. And I took a lot of pride in knowing, you
8  know, where people were sending their kids to school
9  and what they were doing and how they were buying
10  their house and everything, because a lot of times I
11  had to sign stuff. It's funny, I mean, some of the
12  stuff I would sign were letter references, where they
13  thought it was more important that it came from me
14  than from Chris. But in signing that reference, you
15  know, going to a bank or something, what are you
16  doing? Well, I'm trying to borrow this money and
17  we're going to do this and my son's doing this. We
18  took a lot of pride in that, and all of those people
19  were out of a job needlessly.
20      Q.  To the best of your knowledge, was there
21  ever a thought among the executives at Piknik that
22  the reason why there was a refusal to continue with
23  the forbearance agreements was because Piknik had
24  become a minority-owned business?

Page 48

1      A.  I don't think that.
2      Q.  Okay. Was there ever a thought of making
3  that allegation in an attempt to cajole the bank into
4  continuing with --
5      A.  No. I would never do that.
6      Q.  Okay.
7      A.  Now, I won't say that people didn't
8  suggest that I do that; but I never would raise that
9  with anybody, and I would never do that. The reality
10  was -- I go back to -- We talked about -- Well, we
11  didn't talk about my background, but I was an
12  economic major as an undergrad. I've been doing
13  mergers and acquisitions all of my professional
14  career pretty much. I have bought off on the belief
15  that generally people act in their own economic
16  interest. That's how we got people to the table for
17  that recapitalization of Onyx -- I mean, of Piknik.
18  That's how we got Apollo there. That's how we got
19  service there. That's how we got the equipment guys
20  there. That's how we got the customers there. And
21  we couldn't understand, what don't you understand
22  about this? If you push the button, you have
23  something wonderful. If you don't push the button,
24  you have something that's just going to basically

Page 49

1  crash and burn. And he didn't push the button.
2      Q.  Well, you didn't ask, but I'll share my
3  opinion. Logic, reasoning, and banking don't go
4  together.
5      A.  I would agree with that. I would agree
6  with that.
7      Q.  Bankers make the worst business people
8  I've ever seen.
9      A.  Well, we're going through that now. As
10  people get very conservative, fearful of the
11  recession, they pull back. But thankfully, what's
12  happening now is that people are starting to get more
13  entrepreneurial in saying, okay, I'll find those type
14  of loans. And I don't have to be a bank -- In fact,
15  not being a bank, I mean, I don't get the regulation
16  that comes along with it. It's part of it. And
17  they're also not real good for private equity deals
18  because most of those have hair on them, or you
19  overpay for them.
20      Q.  I understand. While affiliated with
21  Piknik, did you have occasion to work with Shannon
22  McGlon?
23      A.  Yes, I did.
24      Q.  What did you understand her employment

13 (Pages 46 to 49)

1  position to be at Piknik?
2      A.  I don't know if her title changed. I
3  know she was head of the quality department. I don't
4  know what her title was.
5      Q.  Are you of the opinion she was fired from
6  her position at Piknik?
7      A.  I understand that -- Well, I don't really
8  know.  I mean, I think -- I think she was, but I
9  can't sit here and tell you that I know that she was.
10  I don't know what the series of events were. I know
11  it wound up where she was no longer employed at
12  Piknik.
13      MR. POUNDSTONE: Jeff, I'll just advise you,
14  don't speculate or guess. If you know something,
15  answer. If you don't --
16  BY THE WITNESS:
17      A.  I don't. All I know is that she got to
18  the point where she was no longer working at Piknik,
19  and I can't say that I know anything about the actual
20  series of events.
21      Q.  So you would not know, then, who -- if
22  she were terminated, who made the decision that her
23  employment be terminated?
24      A.  If she was terminated, there was only one

1  person who could, and that would be Chris.
2      Q.  Basically, the same questions regarding
3  Bob Winter. Are you of the opinion that Bob Winter
4  was fired from Piknik or voluntarily resigned his
5  position?
6      A.  I just don't know. I don't know the
7  series of events. With Bob, I know that there was a
8  whole lot of movement from the time he started with
9  Piknik from position to position as people were
10  trying to find a better fit or cover and uncover
11  territory. I have a slight recollection of what
12  actually transpired, but I don't want to speculate.
13      Q.  If Bob Winter were terminated, who would
14  be in the position to make that decision regarding
15  his employment status?
16      A.  Certainly Chris. But at this time I
17  don't know if Bob was reporting to Henry or not. But
18  I don't know.
19      Q.  But either one of those, either Chris Day
20  or Henry Hicks?
21      MR. POUNDSTONE: Objection to form.
22  BY THE WITNESS:
23      A.  It depends.
24      THE WITNESS: I'm sorry?

1      MR. POUNDSTONE: I just objected to the form.
2  You said you didn't know about Henry, and I thought
3  his question assumed that you had said Henry.
4  BY THE WITNESS:
5      A.  As I said, Bob got moved around quite a
6  bit, and at times he reported to Henry. I think at
7  times he reported to other people. I don't know what
8  the status of events was when that transition
9  occurred.
10      Q.  Are you familiar with the plaintiff Burt
11  Mayer?
12      A.  I am.
13      Q.  And are you aware that his employment was
14  terminated at Piknik?
15      A.  Again, not -- I know that there was a
16  separation. I don't know the precise series of
17  events.
18      Q.  If you know, who would be the person that
19  would make such a decision?
20      A.  That would be Chris.
21      Q.  And do you know the plaintiff Jerry
22  MacCartney?
23      A.  I do.
24      Q.  And do you know what ultimately happened

1  to his status as an employee at Piknik?
2      A.  I understand there was a separation. I
3  don't know the series of events.
4      Q.  And same question: Who would be in a
5  position to make the decision regarding his
6  employment status? MacCartney's, that is.
7      A.  I think Chris, but I'm not certain. I
8  believe Jerry had gotten moved around. I'm not sure
9  who he was directly reporting to. And, of course,
10  the person he was directly reporting to could have
11  that capability to terminate him too.
12      All very good people, by the way. I
13  really liked them. I thought early on there was some
14  significant distrust of what we were trying to do,
15  but I thought that for a while there things were
16  working out pretty good.
17      Q.  Do you recall any sales presentations
18  that would have been put together for potential or
19  actual customers of Piknik that recognized Piknik's
20  MBE status?
21      A.  I'm sure, yes.
22      Q.  Who generally prepared such sales
23  presentations?
24      A.  Well, Henry and I would comment on them

Page 54

1  from time to time, or Chris. I mean, it was more of
2  a collective effort. You know, that's the beauty or
3  ugliness of e-mail. You push a button, and six
4  people get it; and then everybody feels like they
5  need to have input on the final product. But it
6  probably originated with Henry.
7      Q. Did you know Letitia Stowbridge?
8      A. Strowbridge, S-T-R-O-W, yes.
9      Q. And who is she?
10     A. She is a woman who, at the time we were
11  at Piknik, I think, was actually a consultant at one
12  point. I don't know if she ever got hired as a
13  full-time employee, but she was a consultant.
14     Q. If you know, how did she come to be a
15  consultant at Piknik?
16     A. I think it was Henry's decision.
17     Q. And is Ms. Stowbridge African-American?
18     A. Yes.
19     Q. Did Ms. Stowbridge go on to --
20     A. Strowbridge.
21     Q. Strowbridge, forgive me.
22         (Continuing) -- go on to work with
23  you on any other projects other than the one she did
24  for Piknik?

Page 55

1      A. Work with me in what capacity? Are you
2  asking about Piknik, or are you asking about me?
3      Q. In any capacity -- What I'm asking is:
4  Did she go to work for Onyx in any other capacity
5  after the period of time she worked --
6      A. She works for PDI now.
7      Q. Who hired her for that job?
8      A. The board did. When we got involved with
9  PDI, Letitia was really the first person that, you
10  know, we wanted to see have a role in PDI. She
11  really is a bulldog. I actually hired her over my
12  best friend, who -- It was a point of consternation
13  for a little while. But he's in sales, and I told
14  him he could come in and apply for the sales position
15  at PDI but there's a woman here who I know is a
16  bulldog and I think her expectations are different
17  than yours. And she came in, and she kind of
18  interviewed with the partners, my partners at PDI;
19  and they liked her, and she did that. Now she's
20  moved over to director of quality and is doing an
21  absolutely bang-up job.
22     Q. What did she do at Piknik?
23     A. I don't know. I didn't get to know
24  Letitia until she came to PDI. I mean, I knew who

Page 56

1  she was. I knew she raised a lot of hell out at
2  Brundage from time to time, and I would hear about
3  it. But other than waving at her and just seeing her
4  walk, I didn't know much about her or what she was
5  doing.
6      Q. When you say "raised a lot of hell," you
7  mean -- I'm assuming you mean she pushed the
8  employees to work harder and do better?
9      A. Yes.
10     Q. And was aggressive at it?
11     A. With Letitia, if it's not right, it's
12  wrong. And that's a great person to have in a
13  business where you're dealing with food.
14     Q. Some of the same questions: Annissia
15  Hanyard?
16     A. I know she, at some point, came to work
17  for PDI. I don't know who hired her. I don't know
18  what role.
19     MR. POUNDSTONE: Piknik, again.
20  BY THE WITNESS:
21     A. Piknik. I'm sorry.
22     Q. I was going to ask, did she go to PDI
23  too?
24     A. No. Piknik. I don't know what role or

Page 57

1  who hired her or what she did.
2      Q. You don't recall her area of expertise?
3      A. I don't.
4      Q. Who is Joe Yates?
5      A. Joe Yates is a consultant -- was a
6  consultant at PDI -- I mean, at Piknik.
7      Q. Piknik.
8      A. Former PepsiCo guy. I didn't know
9  anything about Joe when he was at Piknik.
10     Q. He's new to me too. I don't know much
11  about him.
12         Annissia Hanyard, make sure I have
13  spelled her name right, if you know.
14     A. I don't know.
15     Q. I have it A-n-n-i-s-s-i-a, H-a-n-y-a-r-d.
16     MR. POUNDSTONE: I think that's right.
17     MR. NELMS: I'm the worst speller.
18  BY MR. NELMS:
19     Q. Annissia Hanyard is African-American?
20     A. Mm-hmm.
21     Q. Is Joe Yates African-American?
22     A. Mm-hmm.
23     Q. If you know, who made the decision to
24  hire Letitia Strowbridge? Did I say it right that

15 (Pages 54 to 57)

Page 58

1  time?
2    A.  Where, at PDI or Piknik?
3    Q.  Piknik.
4    A.  I think Henry.  Henry.
5    Q.  Same question for Ms. Hanyard.
6    A.  I don't know.
7    Q.  You did not make that decision?
8    A.  I did not make that decision.
9    Q.  Same question for Joe Yates.
10   A.  I don't know.  I believe -- I don't know.
11 I believe it was Anthony Barber, who was the general
12 manager of the beverage division, and Joe was a
13 consultant coming in to work in that division.  But I
14 don't know.
15   Q.  Who hired Anthony Barber?
16   A.  Chris.
17   Q.  If you know, where did he come from?
18 Where was he before he came to Piknik?
19   A.  I don't know.  Anthony has bounced around
20 quite a bit.  I know we got him through a headhunter,
21 but I'm not sure -- I don't recall where he was
22 before he came to Piknik.
23   Q.  Do you know -- If you know, did Anthony
24 Barber bring any area of expertise or experience to

Page 59

1  Piknik?
2    A.  Yeah, a phenomenal amount.  He used to
3 be part of the Pepsi system.  We always saw value in
4 bringing Pepsi folks into the facility because that
5 just increased their comfort level.  But Anthony had
6 a wealth of experience from logistics to warehousing
7 to manufacturing, and he has done just incredible
8 things.  I mean, I just -- So he brought a lot.  He
9 brought a wealth of capabilities that, in fact -- And
10 he also was an engineer, so he also could look at a
11 line and say, "That's not right.  Now I couldn't tell
12 you exactly how to make it right; but when I look at
13 a line that bends like that, I know that you're going
14 to have some drag on the efficiency.  Then that
15 shouldn't be like that."
16       Yeah, he brought a phenomenal amount
17 of experience and expertise, but his biggest strength
18 was he had the opportunity -- he had the capability
19 of calming customers down like he had given them a
20 drug.  I mean, when customers come in -- And at that
21 time, we had a lot of failures at Piknik.  We had
22 three or four startups happening at the same time,
23 all of which were being adversely impacted by the
24 stuff that was going on.  And Anthony had the

Page 60

1  incredible capability of just letting people know
2 that he was in charge and that they could go home,
3 and that's huge.
4    Q.  And what role or position did Anthony
5 Barber take when he came to Piknik?
6    A.  I don't recall.  I don't recall the
7 actual position.  I believe it was general manager of
8 the beverage division, but I could be wrong about
9 that.  But I do know that when Chris was --
10 restructured the org chart shortly after Anthony and
11 Carl Bleier came on, and Carl was the head guy over
12 the condiments division and Anthony was the guy over
13 the beverage division.  And what their titles were, I
14 don't recall.
15   Q.  Who would have been running the beverage
16 division prior to Anthony Barber's arrival?
17   A.  Well, I guess you would say Burt.  If I
18 recall correctly, when Chris was having a
19 conversation -- You know, Burt was having some
20 issues.  Burt was a very nice -- is a very nice guy,
21 but he is just -- He can't get in anybody's face in
22 any kind of a positive way and say you did this
23 wrong.  We kept having these failures, and nobody
24 would take accountability for it.  "Well, Dave did

Page 61

1  this.  When he started doing it, I knew it was not
2 going to work, but I let Dave do it because Dave's a
3 nice guy."  Now we've got cases that were shorted
4 customers or worse.  It was affecting our financial
5 reports.  So I believe -- And I'm rusty.  I told
6 Bobby yesterday -- well, actually today -- the human
7 mind is a wonderful instrument.  I mean, this was
8 such a painful experience for me the way it all ended
9 up that my mind has purged a significant amount of
10 it, and thankfully it's been filled in by more
11 pleasant memories.
12   Q.  A natural defensive reaction.
13       I was going to ask you a lot of
14 questions about your expenses related to -- your
15 personal expenses, your travel expenses, and items
16 such as your cell phone and things like that.  I know
17 that you and Bobby have been working on responding to
18 the written discovery; and those questions are in
19 that written discovery, so I'll just rely on that.
20       You said you had a cell phone.  Is
21 that a -- Did Piknik provide that?
22   A.  At the time, I provided it.  I paid for
23 it, the fees and the bills.  So at the time when I
24 was at Piknik, I didn't get anything from Piknik.  I

16 (Pages 58 to 61)

Page 62

1  might have been on their -- I don't know if I
2  mentioned this. I might have been on Piknik's
3  insurance program. But I paid for my own cell phone.
4      Q.  But your flights from Chicago to --
5      A.  Piknik.
6      Q.  Piknik paid those.
7          If you had to rent a car?
8      A.  Piknik, if it was Piknik's business.
9      Q.  When did Onyx and Core Symptoms become
10 affiliated?
11     A.  I think it was 2005.
12     Q.  And did Onyx assume a majority ownership
13 of Core Symptoms?
14     A.  Well, an acquisition company that was an
15 affiliate of Onyx. That one was structured different
16 than Piknik. That one, I think there was actually
17 9 or $10 million of equity raised and probably
18 another 10 million or 11 million of debt to purchase
19 the interest in Core. And we did that through an
20 acquisition vehicle, Core Acquisition Company, and
21 that's where the investors invested.
22     Q.  Does Core now have minority business
23 status?
24     A.  Yes.

Page 63

1      Q.  And how was that brought about?
2      A.  I filed the application. Because of the
3  ownership structure of Core, it fit the guidelines;
4  and because I was chairman and CEO, it fit the other
5  guidelines.
6      MR. NELMS:  Would this be a good time to take
7  a break?
8      MR. POUNDSTONE:  Yeah.
9      THE VIDEOGRAPHER:  We're off the record at
10 11:52 a.m. with the end of Tape No. 1.
11          (A short break was had.)
12     THE VIDEOGRAPHER:  We are back on the record
13 at 12:03 p.m.
14 BY MR. NELMS:
15     Q.  You mentioned earlier, Mr. Larry, that
16 one of the responsibilities you assumed in regard to
17 Piknik was marketing the company?
18     A.  Yes.
19     Q.  I'm going to ask you about some of the
20 contacts that I believe you may have had in your
21 attempts to market the company and then ask you a few
22 questions about each one of those contacts.
23          Who is, if you know, Sharon Labree,
24 L-a-b-r-e-e?

Page 64

1      A.  Sharon was -- is -- Well, she worked with
2  Tropicana. I don't recall -- I know she was in over
3  at the smoothie division, comanufacturing, I believe.
4  I don't recall her title. She was our contact -- one
5  of our contacts at Quaker for their smoothie
6  product.
7      Q.  You said Quaker. You meant Tropicana?
8      A.  Tropicana. I'm sorry.
9      Q.  Did you ever discuss with Sharon Labree
10 any plan to hire or bring on minority employees at
11 Piknik?
12     A.  I can't say that I recall that.
13     Q.  Who is Rick Valentine?
14     A.  Rick reported to Sharon. I don't recall
15 his title.
16     Q.  So he was at Tropicana as well?
17     A.  Yes.
18     Q.  Did you have any conversations with
19 Mr. Valentine regarding Piknik's intent to hire
20 minority employees?
21     A.  No, I don't -- I can't say that I do.
22     Q.  Who is Jim Lynch, L-y-n-c-h?
23     A.  He's one of the executives at Quaker. I
24 think he was head of their beverage division or

Page 65

1  comanufacturing of their beverage division. He was
2  ultimately the one responsible for our Gatorade
3  orders.
4      Q.  Did you ever have any conversations with
5  Mr. Lynch regard Piknik's MBE status?
6      A.  Probably. Probably.
7      Q.  Do you recall specifically any of those
8  conversations?
9      A.  No. But PepsiCo, who owns Quaker, is a
10 big supporter of supplier diversity. In fact,
11 PepsiCo's chairman was the chairman of the NMSDC last
12 year or two years ago. So it would be something
13 that, as we were marketing the company, we certainly
14 would have mentioned it.
15     Q.  April Blackmore?
16     A.  April was our principal contact for the
17 beverage division at Quaker, and April really was the
18 person with whom we developed the best relationship
19 first. April was in town one time trying to get
20 Piknik to acknowledge some of their failings and to
21 take responsibility for their obligations. And Bob
22 Winter was leading the charge, and the charge was
23 just say no, we don't acknowledge the obligation.
24 And after talking to Bob about it, we went back in

17 (Pages 62 to 65)

1  the meeting -- we stepped out of a meeting, and I
2  said, "Bob, it just doesn't sound like your rationale
3  for not accepting responsibility is holding up to
4  me."
5      And he said, "Well, the reason
6  they're saying this is because if we say that we owe
7  it, then we'll have to pay it."
8      And I said, "Well, what I would
9  prefer to do is to tell them that we acknowledge that
10  we owe it and tell them that we can't pay it, and
11  then work out a payment plan." So that's what we
12  did. And April really was supportive of that and
13  actually, because of that, wiped out a lot of the
14  items that were, in fact, disputed. We went on a
15  manageable payment plan, and our relationship with
16  PepsiCo continued to grow.
17      Q. Did you have any discussions yourself
18  with April Blackmore regarding Piknik's MBE status?
19      A. Well, let me just go back to your other
20  question. When you say have discussions about, you
21  know, when you're an MBE and you're trying to become
22  a supplier at a company like PepsiCo, you have to
23  fill out -- you have to register in their supplier
24  database, and you get registered as an MBE. So most

1  of the time when you're meeting with people, you
2  don't have to talk about it. They know it. You're
3  certified. You're in their database. That's kind of
4  how it works.
5      Q. Did having MBE status improve your
6  prospects of getting business from PepsiCo?
7      A. It certainly got us in the door. But
8  remember, Piknik had a significant amount of PepsiCo
9  business before we got there. It got us in the door,
10  and I think it got us -- It differentiated us from
11  other customers, but that didn't mean anything if
12  they didn't need to have Gatorade that month, if they
13  didn't need to have it produced in that region.
14  Never did it ever say, okay, we're going to move this
15  business from this guy in your region to you. It
16  doesn't work like that. It really is, to the extent
17  that it's anything, a thumb on the scale. In the
18  event of all other things being equal, you might have
19  a better chance. I've been working that space for a
20  lot of years, and it certainly is nothing other than
21  if you can do it, we want you to do it; and you're
22  the lowest bidder and you're an MBE, you've got the
23  business.
24      Q. So you still had to compete --

1      A. Scratch and claw.
2      Q. -- on an economic level?
3      A. Yeah.
4      Q. There was no specific credit given
5  because you had MBE status? For instance, you could
6  be 2 or 3 percentage points over what other bidders
7  have; and because you've got MBE status, you were
8  given an allowance?
9      A. No, never. None of that. In fact, at
10  the time I think we were -- Piknik was marketing
11  itself as a low-cost provider.
12      Q. Do you know a Grover Dixon?
13      A. No.
14      Q. Victor Ericson?
15      A. I think he may be a guy at Kraft. I
16  think he was head of the comanu- -- Well, senior guy
17  at Kraft Foods. And I'm sure I met with Victor, you
18  know, two or three times, you know, four or five
19  years ago, maybe six.
20      Q. Is he someone you would have discussed
21  Piknik's MBE status with?
22      A. Same with Kraft. When we walked in the
23  door, they knew that it was MBE because we had to
24  register in their database. We'd meet some of these

1  people at different functions; but again, Piknik was
2  already producing for Kraft.
3      Q. Jeff Slaby, S-l-a-b-y?
4      A. No.
5      Q. Chuck O'Brien?
6      A. No, don't recognize that name.
7      Q. Jim Scott?
8      A. No, I don't recognize the name.
9      Q. Are you familiar with In-Zone, I-n, dash,
10  Z-o-n-e?
11      A. Does Jim Scott work at In-Zone?
12      Q. I believe so.
13      A. I'm familiar with In-zone. I don't
14  remember the principals of the company.
15      Q. What is In-Zone?
16      A. They were a company -- I think they have
17  since transitioned, but they were a company out of
18  Atlanta that basically did sugar water in containers
19  that looked like super heroes. So they would go get
20  licensing for Batman and put a very cheap product in
21  that and sell it for $1.99.
22      MR. POUNDSTONE: I've got about 9 million of
23  those bottles in my house. Can't go through Target
24  or Walmart without my 2-year-old --

18 (Pages 66 to 69)

Page 70

1    THE WITNESS: Right, right. They had just
2 sold those guys when we were doing business with
3 them.
4    MR. NELMS: My kids just never really got
5 into all that. Lucky, I guess.
6    MR. POUNDSTONE: Lucky. Very lucky.
7 BY MR. NELMS:
8    Q. Richard Lenny, L-e-n-n-y?
9    A. I can't say I'm familiar with that name.
10    Q. Possibly with Hershey's?
11    A. Oh, yeah. He may be the CEO.
12    Q. Did you make any sales calls on behalf of
13 Piknik to Richard Lenny?
14    A. Yes. Yes. If he wasn't the CEO, he was
15 the head of comanufacturing at Hershey. When we got
16 into PDI -- or Piknik, Piknik had been failing with
17 Hershey. And in fact, we found out that when we got
18 to -- when we went to visit Hershey, that in all of
19 Hershey's years, they had had three products recalls,
20 and two of them were Piknik recalls. And we had an
21 issue shortly after we got involved. I think --
22 Well, actually Bill McClennon -- Bill McClennon was
23 involved because he actually went to Hershey too.
24 And Hershey told us they were going to move the

Page 71

1 business, and we went to Hershey trying to convince
2 them not to move the business.
3    Q. When you say you went to Hershey, are you
4 saying you actually went to Hershey, Pennsylvania,
5 and met with him?
6    A. Yes.
7    Q. Who went with you then?
8    A. Me, Bill McClennon, if Bill was president
9 at the time, and Henry Hicks.
10    Q. Okay. Do you know when that was?
11    A. I don't recall.
12    Q. In meeting with Mr. Lenny, did you have
13 any discussions about Piknik's MBE status?
14    A. I don't know if we had any discussion. I
15 think they knew. I don't think we discussed it. You
16 know, a lot of times when we were going to these --
17 talking to customers, it was here's what we plan to
18 do for Piknik and here's what we plan to do to
19 develop Piknik and here's our plan for turning Piknik
20 around. The fact that we were an MBE would be
21 relevant, but it generally didn't involve a whole lot
22 of discussion.
23    Q. Michael Cutner, C-u-t-n-e-r -- excuse
24 me -- K-u-t-n-e-r?

Page 72

1    A. I think he may be with Arizona Ice Tea.
2 I met Mike, I don't know, five -- however many years
3 ago we went to see him in New Jersey. Me and Chris
4 Day and, I think, Henry may have gone in the initial
5 stages when we were trying to get some Arizona Ice
6 Tea business, which we ultimately wound up getting
7 but couldn't run because of how things transpired.
8 We actually got the business.
9    Q. But you couldn't run it because of the
10 way things transpired? Help me with that. What does
11 that mean?
12    A. The bank wasn't -- Well, we were
13 moving -- I mean, call it herding cats. We were
14 moving down a path just trying to keep all the
15 different solutions moving along with us. So we were
16 actually using working capital to buy capital
17 equipment, knowing that if you didn't, you were going
18 to miss the deadlines; and if you did, you were going
19 to impact your availability. That was when we still
20 were talking to people about bringing in another --
21 some additional financing, some of which would be
22 used to buy some additional equipment to make what we
23 had run better, to re-engineer what we had, or to buy
24 some other stuff that we needed to run the new

Page 73

1 products that we were getting. And when we didn't
2 get the financing, all those offers dried up. And
3 like I said, we got the business, but I don't think
4 we ever ran it successfully.
5    Q. Did Onyx Capital Ventures have a website?
6    A. Yes.
7    Q. Was that www.onyxcapitalventures.com?
8    A. Yes.
9    MR. NELMS: Bobby, I don't have copies, and I
10 apologize for that.
11    MR. POUNDSTONE: No problem. I'll just move
12 over if I need to look.
13    MR. NELMS: I'll give them to you first.
14 BY MR. NELMS:
15    Q. I'm going to show you, Mr. Larry, six
16 pages of a composite exhibit. These are, I will tell
17 you, printed pages from the Onyx website. I would
18 ask that you look at them and, if you can, confirm
19 for us that, in fact, they are printed pages from
20 your Onyx website.
21    A. Okay. These are.
22    Q. That's the only question I had.
23    MR. NELMS: And I don't have stickers, Kathy.
24 That will be No. 1.

Page 74

1    (Larry Deposition Exhibit No. 1
2        marked for identification.)
3    MR. NELMS:  This, for your knowledge, is one
4 of the various million e-mails that were on that DVD.
5    MR. POUNDSTONE:  Okay.
6 BY MR. NELMS:
7    Q.  I'm going to show you a document that
8 appears to me to be a copy of an e-mail
9 correspondence from you to Ricky Loeb.
10    A.  Yep.
11    Q.  Do you recall authoring this particular
12 e-mail?
13    A.  I don't -- Yeah, I wrote that.
14    Q.  And it's a conversation that you seem to
15 be having that's ongoing with Ricky Loeb regarding
16 financing?
17    A.  Yes.
18    Q.  With Andy Raines and all the stuff we
19 talked about earlier with SouthTrust Bank?
20    A.  Yes.
21    MR. NELMS:  That will be No. 2.
22        (Larry Deposition Exhibit No. 2
23            marked for identification.)
24

Page 75

1 BY MR. NELMS:
2    Q.  This is an outline that we did of all the
3 documents and e-mails that you had with Ricky and
4 Andy Raines and a million others related -- almost
5 all of these are related to the financing and the
6 conversations that took place regarding the
7 financing. I'm just telling you that for your own
8 edification.
9    A.  I lived it.
10    Q:  It was so many that this is how we had
11 to --
12    A.  I lived it.
13    Q.  I don't know how many Bates-stamped items
14 we had, but it was in the thousands.
15    A.  Yeah. I wanted to make a point, because
16 I think that -- I don't want to talk about whatever
17 theories you guys may have for your case, but a lot
18 of times we would go to -- Our strategy was very
19 different. If you look at -- Typical minority
20 business enterprises have been started by a founder,
21 grown to a certain size, but most of them are
22 extraordinarily small -- or I should say relatively
23 small, given that you're servicing corporate America
24 and 95 percent of their suppliers have revenue in

Page 76

1 excess of $100 million. So one of the challenges of
2 making the supplier diversity programs work is how do
3 you take a company where you have 95 percent of your
4 supply base in excess of $100 million and work with
5 some companies who are certainly not in excess of
6 that amount and much smaller than that.
7        So we present a very different
8 strategy. We go in and buy 51 percent of the company
9 that had already reached a certain size, already
10 reached a certain capability, and we inherited their
11 management staff. And sometimes, you know, customers
12 would say you're not really an MBE because, you know,
13 you're black but everybody else isn't. And I would
14 say that's not our gig. We don't go in and fire
15 people and turn over management. We go in, hopefully
16 identify a company that has stable and talented
17 management, and work with that management to move
18 forward.
19        Now, to the extent that the
20 management team needs to be supplemented or there's
21 some deficiencies and there's some transitioning,
22 then of course we'll go out and we'll hire folks.
23 But when we did the deal -- We've done three deals
24 and looked at countless others and signed letters of

Page 77

1 intent with some others. None of them had as their
2 function or plan a change of management, even at the
3 top level. None of them. Piknik, Mike O'Connell was
4 the president when we stated. He was president for a
5 while after that and then decided, "I can't work at
6 your pace. The cadence that you guys are asking me
7 to do doesn't work." What we now realize is that he
8 couldn't get information as we thought he could
9 because of the IT system, which, once we found that
10 out, we said, "Okay. You need to fix this." But a
11 change in management was never anticipated or
12 planned.
13    MR. NELMS:  Bobby, that first page that says
14 Doc 13 on it, that's just my note. That needs to be
15 pulled off.
16 BY MR. NELMS:
17    Q.  I'll just ask you to, please, Mr. Larry,
18 look at that document and ask you if you can identify
19 it.
20    A.  Mm-hmm.
21    Q.  And what is that document?
22    A.  Ricky had the right, under the terms of
23 the deal, to appoint two members of the PDI -- Piknik
24 board.

20 (Pages 74 to 77)

Page 78

1    Q.  My question is:  Is it an e-mail
2   conversation that took place?
3    A.  Yes.  Yes.
4    Q.  And were you -- In fact, when it says JL,
5   is this your signature and did you author these
6   portions attributed to you?
7    A.  Yes.
8    MR. NELMS:  That's No. 3, please.
9        (Larry Deposition Exhibit No. 3
10        marked for identification.)
11    MR. NELMS:  I think you've seen that before.
12   You guys generated a lot of paper.
13    THE WITNESS:  I guess.
14    MR. POUNDSTONE:  Not as much as lawyers.
15    MR. NELMS:  Document management is an
16   absolute art.
17    MR. POUNDSTONE:  Absolutely.
18    MR. NELMS:  I've got a young lady that works
19   for me, and she works for me because she can arrange
20   a file.  That is her gift.
21    MR. POUNDSTONE:  I think there's a lot of
22   money to be made in the paper shredding business.
23   You know, because law offices have so many different
24   drafts of motions and everything, and you've got

Page 79

1   privileged stuff that you have extra copies of and
2   you can't put them in the trash can.  I think there's
3   a pretty good market there.
4    MR. NELMS:  All the federal courts' attempts
5   at paper reduction have quadrupled the amount of
6   paper we have to have in the office.  Nothing like
7   bureaucracy at work, because now you've got to keep
8   copies of all the court --
9    MR. POUNDSTONE:  They just shifted the paper.
10    MR. NELMS:  The court sends you that little
11   signature, and we have to print those off and put it
12   in the file, so it just increases the volume of
13   paperwork.
14    MR. POUNDSTONE:  The state court system, it's
15   the same thing, the same way.
16    MR. NELMS:  And if you didn't do it, that
17   would be the minute something would happen, and you'd
18   get accused of not filing something timely.
19   BY MR. NELMS:
20    Q.  Do you recognize this document?
21    A.  No.
22    Q.  You do not?
23    A.  No.
24    Q.  What does it appear to be?

Page 80

1    A.  Well, I recognize some of the stuff in
2   it.  Some of the stuff is the information that we
3   were using to talk to our potential capital sources
4   about -- I don't ever remember having this
5   presentation for SouthTrust, though.
6    Q.  I'll be candid with you.  The only reason
7   I produced it is I was just trying to just kind of
8   show the timeline of what was going on and support
9   what --
10    A.  You know, that information was
11   information I had seen because we use the same
12   information for everybody we talk to.
13    MR. NELMS:  Number 4.
14        (Larry Deposition Exhibit No. 4
15        marked for identification.)
16   BY THE WITNESS:
17    A.  Okay.
18   BY MR. NELMS:
19    Q.  I'll just ask you to identify the
20   document again.
21    A.  It appears to be an amended forbearance
22   agreement, one of the forbearance agreements that we
23   signed towards the end of the situation with
24   Wachovia.

Page 81

1    Q.  And does that -- I'll present this just
2   as for reference sake.  These were the forbearance
3   agreements that you were talking about with Andy
4   Raines and SouthTrust Bank and all the trouble you
5   were going through back in 2005?
6    A.  That's one of them.  At one point we got
7   to a point where we were signing, basically,
8   forbearance agreements, I believe, weekly.
9    MR. NELMS:  5.
10        (Larry Deposition Exhibit No. 5
11        marked for identification.)
12   BY THE WITNESS:
13    A.  Okay.
14   BY MR. NELMS:
15    Q.  Does that look familiar to you?
16    A.  No.  I don't think I've ever seen this
17   one.  I mean, I knew it existed, but I didn't -- I
18   didn't really know the terms of Ricky's guarantee.
19    Q.  Okay.  I was going to ask you, does it
20   appear to be the Loeb guarantee?
21    A.  Yeah.  This is the first time I've seen
22   it, though.
23    MR. NELMS:  Number 6.
24

21 (Pages 78 to 81)



Page 82

1    (Larry Deposition Exhibit No. 6
2    marked for identification.)
3    MR. NELMS: If you give me a second, I think
4    I'm finished.
5    MR. POUNDSTONE: I think I've just got one
6    question.
7    MR. NELMS: Would you like to go ahead and do
8    it?
9    MR. POUNDSTONE: Yeah, we can do that.
10    EXAMINATION
11    BY MR. POUNDSTONE:
12    Q.  Jeff, do you recall in the summer of 2005
13    where Piknik made salary cuts?
14    A.  I recall during that period where -- Yes,
15    I do.
16    Q.  Tell me what prompted that, if you know.
17    A.  My recollection is that once we started
18    having our cash flow issues, the bank got really
19    restrictive on its lending. And like I said, I don't
20    know if we were actually signing forbearance
21    agreements every week, but every Monday we had to
22    present to the bank, here are the checks we're going
23    to pay this week and here's what they are for. And
24    the bank would say yes or no, in a sense. If they

Page 83

1    said no -- They wouldn't say yes or no. If they
2    approved it, they would fund it. If they didn't
3    approve it, they wouldn't fund it.
4    At one point we were told by the
5    bank that what we were asking for was too much and
6    here's what they were prepared to do, and we had to
7    go back and make it work from a cash flow standpoint.
8    And the only way it could work was if some people
9    took cuts.
10    Q.  Were you involved at all in the decision
11    of whose salaries were cut and how much?
12    A.  No.
13    Q.  That would have been --
14    A.  Chris.
15    Q.  -- whose decision?
16    A.  Chris.
17    MR. POUNDSTONE: That's all I've got.
18    MR. NELMS: Thank you very much for your
19    time.
20    MR. POUNDSTONE: Thanks, Jeff.
21    THE VIDEOGRAPHER: We are off the record at
22    12:36 p.m. with the conclusion of the deposition of
23    Jeff Larry.
24    FURTHER DEPONENT SAITH NOT

Page 84

1    STATE OF ILLINOIS  )
2                       ) SS.
   COUNTY OF COOK      )
3
4    I, Kathy A. O'Donnell, Registered
5    Professional Reporter and Notary Public, do hereby
6    certify that on the 10th day of October, A.D., 2007,
7    the deposition of the witness, JEFFERY LARRY, called
8    by the Plaintiffs, was taken before me, reported
9    stenographically, and was thereafter reduced to
10    typewriting under my direction.
11    The said deposition was taken at
12    the offices of Barnes & Thornburg, One North Wacker
13    Drive, Suite 4400, Chicago, Illinois, and there were
14    present counsel as previously set forth.
15    The said witness, JEFFERY LARRY, was
16    first duly sworn to tell the truth, the whole truth,
17    and nothing but the truth, and was then examined upon
18    oral interrogatories.
19    I further certify that the foregoing
20    is a true, accurate, and complete record of the
21    questions asked of and answers made by the said
22    witness, JEFFERY LARRY, at the time and place
23    hereinabove referred to.
24

Page 85

1    The undersigned is not interested in
2    the within case, nor of kin or counsel to any of the
3    parties.
4    Witness my official signature and
5    seal as Notary Public in and for Cook County,
6    Illinois, on this 17th day of October, A.D., 2007.
7
8
9
10
11
         _____
12       KATHY A. O'DONNELL, RPR
         CSR No. 084-004466
13
14
15
16
17
18
19
20
21
22
23
24

22 (Pages 82 to 85)

Page 85

1                    The undersigned is not interested in

2    the within case, nor of kin or counsel to any of the

3    parties.

4                    Witness my official signature and

5    seal as Notary Public in and for Cook County,

6    Illinois, on this 17th day of October, A.D., 2007.

7

8

9

10

11    _____
      KATHY A. O'DONNELL, RPR
12    CSR No. 084-004466

13

14

15

16

17

18

19

20

21

22

23

24



February 2005

Onyx Capital Ventures, L. L. C. ("Onyx") is pleased to announce it has acquired a majority interest in Packaging Division Industries, L.L.C. ("PDI"), a Northlake, Illinois-based contract manufacturer and repackager of food, personal care and household products. PDI (www.packdiv.com), is made up of the assets of Packaging Division Incorporated of Northlake and PD-II of Kansas City, MO.

Onyx, a minority-owned private equity firm, purchased a controlling equity interest from PDI's owner, who will continue to retain a substantial ownership interest in PDI. PDI's current management team, led by President David Weiner, will remain in place and continue to provide its customers with the outstanding array of contract manufacturing services they have come to expect from PDI.

About Packaging Division Industries (PDI)
Headquartered in Northlake, IL with an additional plant in Kansas City, MO, PDI is a well-established contract manufacturer and repackaging services firm. Its massive Northlake facility has over 500,000 square feet dedicated to a variety of primary and secondary contract packaging in the food and consumer products industries. The Kansas City facility specializes in contract packaging of liquid personal care and household chemical products. PDI is a recognized contract manufacturer producing or repackaging some of the industry's most recognized brands of food, cookie, confectionary and snack products along with a variety of personal care and household cleaning products.

CLOSE-X



ONYX Capital Ventures



A minority business enterprise.

Home | About ONYX | Announcements | Contact Us



Packing Division Industries, the latest Onyx addition, specializes in primary and secondary packaging or repackaging of food, personal and household products.

**Announcements**

**February 2005**
Onyx Capital Ventures, L. L. C. ("Onyx") is pleased to announce it has acquired a majority interest in Packaging Division Industries, L.L.C. ("PDI"), a Northlake, Illinois-based contract manufacturer and repackager of food, personal care and household products.

□ Read more

- - - - -

**March 2004**
Onyx Capital Ventures, L.L.C. ("Onyx") and Core Systems, LLC ("Core") are pleased to announce that Onyx has acquired a majority interest in Core (www.coresystemsllc.com), an Ohio-based company which designs, engineers, manufactures and assembles highly engineered plastic injection molded parts.

□ Read more

- - - - -

**August 2003**
Onyx Capital Ventures, L.L.C. ("Onyx") is pleased to announce it has acquired a majority interest in Piknik Products Company Inc. (Piknik"), an Alabama based contract manufacturer of condiments and "hot-fill" non-carbonated beverages.

□ Read more

Home | About Onyx | Announcements | Contact Us

525 West Monroe, Suite 1600 Chicago, IL 60661                    ©2004 Onyx Capital Ventures

http://www.onyxcapitalventures.com/announcements.htm                    8/29/2007



March 2004

Onyx Capital Ventures, L.L.C. ("Onyx") and Core
Systems, LLC ("Core") are pleased to announce that
Onyx has acquired a majority interest in Core
(www.coresystemsllc.com), an Ohio-based company
which designs, engineers, manufactures and assembles
highly engineered plastic injection molded parts for
premier consumer products manufacturers such as
Whirlpool Corporation, GE Appliance, Electrolux, Royal
Appliance (Techtronic), Duracell (Gillette), Volvo Trucks,
Bosch and Honda of America. The senior credit facility
was provided by Bank One, NA, and the senior
subordinated credit facility was provided by One
Mezzanine Capital Corporation.

Onyx and Core are especially pleased that the entire
senior management team of Core supports the
transaction and continues to enthusiastically serve Core,
and that some of the Core senior management team
invested alongside of Onyx in the transaction.   Mr. Jim
Glenn, who previously served as Chairman and CEO of
Core, will continue to serve Core in his new capacity as
President. Andy Zarlinski, who previously served as
President, will continue to serve Core as Chief Operating
Officer. Eric Shultz will continue to serve as Chief
Financial Officer, Don Currey will continue to serve as
Vice President of Engineering and David George will
continue to serve as Vice President of Sales. Jeffery
Larry, Chairman and Chief Executive Officer of Onyx, is
serving as Core's Chairman and Chief Executive Officer.

About Core

With its corporate headquarters and an operations
facility in Painesville, Ohio, a facility in Mt. Gilead, Ohio,
and a facility in Greensboro, North Carolina, Core has a
reputation for excellence in the design and manufacture
of highly engineered plastic products that have tight
tolerances, require sophisticated tool designs, and
mandate efficient manufacturing. Core has the resources
to do turnkey program management from ideation to full
part design and prototyping, including production
tooling, molding, decoration, assembly and packaging.
Core has broad and deep design and engineering skills,
and has the capability to design parts and assemblies for
customers from a basic concept to full, detailed CAD
drawings. In addition, Core is recognized for its expertise

in insert molding, filtration products and the use of
highly engineered resins.

CLOSE X



ONYX
Onyx Capital Ventures
A minority business enterprise.

Home   About ONYX   Announcements   Contact Us



Packaging Division Industries, LLC

Packing Division Industries, the latest Onyx addition, specializes in primary and secondary packaging or repackaging of food, personal and household products.

## Management Biographies

The Company's management team includes executives with significant experience in the areas of mergers and acquisitions, private equity, and corporate and operating management capable of professionally participating in a company sale process.

*Jeffery Larry*, **44, Chairman and Chief Executive Officer.** Mr. Larry has over 20 years of specialization in mergers and acquisitions, recapitalizations, restructurings and work outs, secured and unsecured financings, and private equity transactions. Mr. Larry most recently was a Capital Partner in the Corporate Department of Katten Muchin Zavis, with prior experience at the global practices of Mayer, Brown & Platt and Jones, Day, Reavis & Pogue. Mr. Larry received a J.D. from Harvard Law School in 1985 and a B.A. in Economics from University of Cincinnati in 1982.

*Russell Pallesen*, **45, Partner.** Mr. Pallesen has over 20 years of experience in venture finance, mergers and acquisitions, and financial reorganizations and workouts. Mr. Pallesen most recently was a founding partner and principal investor with Vision Capital Partners, LLC, a merchant banking investment partnership. Mr. Pallesen previously was a Capital Partner in the Corporate Department of Katten Muchin & Zavis where he served as chairman of the firm's Venture Capital Group. Mr. Pallesen received a J.D. from Harvard Law School in 1985 and a B.A. from the University of Iowa in 1981.

*David Palmer*, **44, Partner.** Mr. Palmer has over 19 years of experience in leveraged buyout and venture investing; mergers and acquisitions; and restructurings, having been a principal in over 40 transactions totaling in excess of $6 billion in value. Mr. Palmer most recently was a principal with Vision Capital Partners, LLC, and was previously a founder of Velocity Capital, LLC, both merchant banking investment partnerships. Mr. Palmer served as Vice President of Corporate Development for Farley Industries, Inc. and Fruit of the Loom, Inc. Mr. Palmer received an M.B.A. from the J.L. Kellogg Graduate School of Management at Northwestern University in 1986 and an A.B. in Physical Chemistry from Hamilton College in 1983.

**Paula Bachman, 33, Principal.** Ms. Bachman has over ten years of experience in mergers and acquisitions, capital markets transactions and financial consulting services. Most recently, Ms. Bachman assisted private equity portfolio companies with analysis and execution of key strategic initiatives. Previously, Ms. Bachman provided corporate finance and strategic advisory services to leverage buyout firms as an associate at Merrill Lynch. Prior to joining Merrill Lynch, Ms. Bachman specialized in transaction due diligence and financial consulting at Arthur Andersen. Ms. Bachman received her M.B.A. from the University of Chicago in 1999, and a B.B.A. in accounting and finance from the University of Oklahoma in 1994. She is a Chartered Financial Analyst and Certified Public Accountant.

**Diane Ratliff**

| | |
|---|---|
| From: | Dave Borden [dborden@abcpa.com] |
| nt: | Monday, July 11, 2005 8:04 PM |
| J: | tsantoro@glassratner.com |
| Subject: | Fwd: PIKNIK |

Attachments:     PIKNIK Term Loan Term Sheet.pdf; PIKNIK Mezzanine Term Sheet.pdf

   

PIKNIK Term Loan   PIKNIK Mezzanine
Term Sheet.pd...    Term Sheet.pd...

This is the Appollo deal.

>>> "Jeffery Larry" <jlarry@onyxcapitalventures.com> 03/16/2005 3:56:41
>>> PM >>>
Hey Ricky. I hope this email finds you well.

I am attaching hereto the first draft of the term sheets that we received from Apollo in connection with its interest in providing financing to Piknik. While we have been working with Andy Raine all along to keep him abreast of the conversations that we had with Apollo that resulted in these term sheets and expect that he will agree to do what he needs to do to allow this to be put into place, he has not yet approved this approach and his approval is required. I understand that he was sent the term sheets today.

We have gone back to Apollo by phone and told them that we believe its warrant position is a little too rich. They said they will look at it again after they complete the telephone calls with PepsiCo and Nestle that they have requested. As you can see from the term sheets, the transaction proposed is a major recapitalization of Piknik. Your approval to y such recapitalization would also be required, as is ours.

I look forward to discussing these with you soon. Thanks.

JL

EXHIBIT
Larry #2
10/10/07   Ko

1

**Chadwick, Jeffrey**

| | |
|---|---|
| **From:** | Jeffery Larry [jlarry@onyxcapitalventures.com] |
| **Sent:** | Friday, February 04, 2005 2:19 PM |
| **To:** | rloeb@piknikproducts.com |
| **Cc:** | O'Connell Mike; Montana Scott; Dave Borden; Bill Mclennan |
| **Subject:** | Re: Board Meeting |

Hey Ricky. I hope all is well with you, too.

I don't have a problem with Scott taking Mike's place.

As you have heard, we have started getting great traction in our sales efforts. We have to execute! We have to finance some equipment purchases. And we have to deal with SouthTrust. We have started conversations with Bank One and others about coming in to take out SouthTrust. In fact, we met with them today to verbally give them some information on Piknik. We continue to talk with potential equity sources and other potential debt sources, too. There are a lot of moving pieces right now.

Bill told me he has presented to you all of the information you requested. He has that, and I suggest you get it from Bill. Let me know if you don't get it.

We have not had any Piknik related conversations with Apollo in a while. We have had a number of conversations with them about other deals. We still see them as a potential, but expensive, option for additional capital, if needed.

I want you and Scott to get all of the information you need whenever you need it. But, with all of the moving pieces, we are moving into a period where timely and near flawless execution will be critical to adhere to the schedule and other commitments we have made. It is vitally important that our senior management staff focus on executing. That is in all of our best interests. As you make arrangements to get the information you need, it is important that we don't unnecessarily distract our team from that focus. I likely won't be involved in those meetings unless necessary.

Thanks.

JL

---- Original Message ----
From: Ricky Loeb
To: 'Jeffery Larry'
Cc: Dave Borden ; Montana Scott ; O'Connell Mike
Sent: Friday, February 04, 2005 10:54 AM
Subject: RE: Board Meeting

Jeff, hope all is well.
I assume there's no problem with Scott taking Mike's place and I'll tell Mike to submit his resignation. Concerning the board meetings, what you propose sounds fine. I here that everything is going great and we're on track to do great things this year and next. I also understand we're projecting a 2 million dollar loss for 05. I'm concerned about the Bank in March and believe the board should be updated and discussing options and back-up plans.
Information I'd like to know is the following: For 05, what new and existing customers do we have. What products by line by size and associated volumes and pricing. I'd like a copy of the latest Strategic Plan (05, 06) including the financial plan for same. I'd like a copy and update on all communications with Apollo.
I propose that we ( Bill,Scott,Myself and maybe you ) have a formal Bi-Monthly meeting addressing the above questions, preceded by the Agenda so as to prepare questions, beginning next week. After a few months I think one of the monthly meetings could be covered by an Emailed report.

11/28/2006

EXHIBIT
Larry  #3
10/10/07  KO

Scott would like to fly in for the first meeting and all next wk is open as well as the 18 & 21st.
Your thoughts?  Thanks, Ricky

**From:** Jeffery Larry [mailto:jlarry@onyxcapitalventures.com]
**Sent:** Wednesday, January 26, 2005 6:43 PM
**To:** rloeb@piknikproducts.com
**Subject:** Re: Board Meeting

Hey Ricky. Thanks for the email. Things are going great.

I was actually hoping that we can meet less frequently as a board and that we schedule more frequent opportunities for you to stay up with what is going on in the business and get whatever information you want. I talk with Bill many times a day, and speak frequently with Patrice and Kenny. I am also working very closely with Bill, Henry, the rest of the senior management team at Piknik and the Onyx team to continue to successfully implement our strategy at Piknik. Our board meetings have become a way for you to get info, and there are a number of better ways to accomplish that. But let's keep our board meetings for those things that require board action.

Thanks,

JL

------ Original Message ------
**From:** Ricky Loeb
**To:** 'Onyx'
**Sent:** Tuesday, January 25, 2005 5:35 PM
**Subject:** Board Meeting

Jeff, hope all is well.
Mike would like to resign from the board and I would like to appoint Scott Montana if there are no objections. Scott has his own company called Daniel Island Holding Co and I have known him for over 30 years. His Email is Jscottmontana@aol.com and his phone number is 818-451-9796.When we met in Dec. I mentioned we haven't had a board meeting in months and would like to start having them. When will the next one be held? I also would like minutes to be taken and distributed afterwards. I won't have my computer with me starting now through Friday but can be reached at 828-526-2933 or 828-421-1680 in a few hours. ( I can be reached on my cell for the next few hrs )    Thanks  Ricky

11/28/2006

**SouthTrust**

# Piknik Business Update

**SouthTrust**
You're Not Just Another Customer.
We're Not Just Another Bank.

# Includes meeting comments

© Piknik Products Company, 2005 – Confidential



EXHIBIT
Perry #4
10/01/07 KO

PIKNIK

ONYX001927

# Agenda

➤ Business Update

➤ Refinancing Update

➤ Period 4

➤ FY 05 Projection

➤ FY 06 Projection

➤ Capital Requirements

© Piknik Products Company, 2005 - Confidential
1



ONYX001928

# Business Update

# Business Update

➢ Quality and productivity improving dramatically

➢ Business is strong

➢ Beverage business received sizeable new commitments in last 2 weeks
  - ∀ Nestlé – 64 oz Juicy Juice (line 102)
  - ∀ AriZona – Gallon AIT (line 101)
  - ∀ Pepsi (Quaker) - 20 oz Gatorade (line 301)
  - ∀ All new commitments require Piknik to invest in equipment ASAP     **100% probable** *being documented*
    - ∀ Nestlé – line 102 depalletizer & change parts ($1.45 MM)
    - ∀ AriZona – line 101 conversion from syrups to juices ($1.25 MM)
    - ∀ Pepsi (Quaker) – line 301 RO system ($0.5 MM)
  - ∀ Beverage lines full in 2005

  - ∀ Condiments
    - ∀ Hitting sales budget
    - ∀ Cost of oil declining

**SouthTrust**

© Piknik Products Company, 2005 - Confidential

2

**PIKNIK**

ONYX001929

# Refinancing Update

## Update

- ⋎ Onyx is cultivating a number of refinancing opportunities
  - ⋎ Advanced discussions with Harris Bank & Bank One (**phenomenal relationship – did Cleveland deal**) about a total refinance without additional equity capital
  - ⋎ Advanced discussions with Apollo and other potential equity sources regarding junior capital
  - ⋎ Potential acquisition of Midwest co-packer (some **Pepsi** volume / well regarded by **Pepsi; $4.5 M EBITDA; 10.5 million cases / very lean**) to become larger and more attractive credit

- ⋎ Key to our efforts is continuing existing momentum

© Piknik Products Company, 2005 - Confidential

3

PIKNIK

ONYX001930

# Period 4

## Current period

- ✓ Net income favorable to projection by $67K
- ✓ Revenue $114K ahead of budget
- ✓ Brundidge - $9K below projection
  - ✓ Stopped the bleeding (oil pricing cost us $2.4 million last year)

## Year to date

- ✓ Year to date net income - $145K favorable to projection
- ✓ Budget is realistic

**SouthTrust**

© Piknik Products Company, 2005 - Confidential

4

**PIKNIK**

Period 4

ONYX001931

# FY 2005 Projection

➤ New business phases in period 7
   ➤ Nestlé 1.5 million cases
   ➤ AriZona 0.8 million cases
   ➤ Quaker 20 Ounce – 2.7 million cases
   ➤ Products are already successful in market

➤ New business generates profit in last half of FY 05
   ➤ $265K net income (periods 7 -13)
   ➤ $4.4 million incremental EBITDA in FY 05

## FY 2005 Projection

© Piknik Products Company, 2005 - Confidential

5



ONYX001932

# Piknik FY – 05 Pro Forma P&L

## New business secured for FY 2005 is profitable in last half of the year, establishing the basis for the FY 2006 projection.

$000

| Item | Thirteen Periods Ending September 2004-2005 | | | | | | | | | 10. | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | $1,766 | $1,854 | $1,476 | $1,771 | $2,531 | $2,334 | $3,528 | $3,296 | $3,653 | $3,156 | $2,938 | $2,997 | $2,538 | $33,848 |
| Total Direct Costs | 1,195 | 1,195 | 1,015 | 1,264 | 1,383 | 1,354 | 1,831 | 1,727 | 1,763 | 1,664 | 1,403 | 1,391 | 1,154 | 18,340 |
| Direct Contribution Margin | 571 | 669 | 460 | 507 | 1,147 | 980 | 1,697 | 1,568 | 1,891 | 1,493 | 1,535 | 1,606 | 1,384 | 15,508 |
| Total Mfg Overhead | 597 | 566 | 580 | 508 | 728 | 733 | 854 | 832 | 826 | 801 | 804 | 794 | 715 | 9,338 |
| Gross Margin | (26) | 103 | (120) | (1) | 420 | 247 | 843 | 736 | 1,065 | 692 | 731 | 812 | 669 | 6,170 |
| Total Operating Expenses | 405 | 380 | 495 | 425 | 470 | 473 | 468 | 469 | 495 | 476 | 476 | 476 | 460 | 5,985 |
| Operating Margin - EBITDA | (430) | (277) | (615) | (427) | (50) | (226) | 375 | 268 | 570 | 217 | 256 | 335 | 209 | 206 |
| Depreciation | 146 | 146 | 146 | 146 | 163 | 163 | 177 | 177 | 177 | 177 | 177 | 177 | 177 | 2,146 |
| Interest Expense | 82 | 56 | 58 | 68 | 78 | 89 | 93 | 104 | 107 | 106 | 105 | 107 | 108 | 1,180 |
| Earnings Before Taxes | (658) | (479) | (819) | (641) | (291) | (478) | 106 | (13) | 287 | (65) | (26) | 52 | (76) | (3,101) |
| Income Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Income | ($658) | ($479) | ($819) | ($641) | ($291) | ($478) | $106 | ($13) | $287 | ($65) | ($26) | $52 | ($76) | ($3,101) |
| Cash Availability/(Shortfall) | (1,054) | (264) | (991) | (1,386) | (2,584) | (3,377) | (3,273) | (3,175) | (2,761) | (2,613) | (2,242) | (1,811) | (1,595) | |
| Equipment Facility | | | (3,935) | (2,910) | (2,910) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | 0 |

SouthTrust



© Piknik Products Company, 2005 – Confidential

6

ONYX001933

# FY 05 Projection

## Additional upside – not in FY 2005 projection

| Project | Incremental EBITDA | Comments |
|---|---|---|
| Kellogg's Line Testing | $250,000 | |
| Quaker – Gallons increased pricing | $192,000 | Piknik position acknowledged, contract amendment to be signed |
| Quaker – Gallons increased pricing | $120,000 | Dependent on installation of bulk depalletizer |
| Tropicana – Line time | $300,000 | Line downtime to upgrade equipment |
| Total | $862,000 | |

© Piknik Products Company, 2005 - Confidential

7

SouthTrust



ONYX001934

## FY 2006 Projection

⅄ Full year impact of new business

- ⅄ AriZona - 1.6 million cases
- ⅄ Nestlé - 2.0 million cases
- ⅄ Quaker 20 & 34 Ounce — 7 million cases

⅄ New customer line 103 - 1.0 million cases (Quaker G Slide / Unilever)

⅄ New business results in profit - FY 06

⅄ $2.4 million net income

- ⅄ Utilizes tax loss carryforward
- ⅄ $6.2 million total EBITDA
- ⅄ $9.3 million incremental EBITDA in FY 06



ONYX001935

# Piknik FY 05 Pro Forma P&L

## A full year of new business generates over $6 million EBITDA in FY 2006.

$000

| Item | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Thirteen Periods ending September 23, 2006 | | | | | | | | | | | | | | |
| Net Sales | $2,935 | $2,690 | $2,781 | $3,164 | $3,452 | $3,695 | $4,382 | $3,943 | $4,160 | $4,024 | $3,469 | $3,268 | $2,762 | $44,725 |
| Total Direct Costs | 1,487 | 1,368 | 1,309 | 1,435 | 1,472 | 1,708 | 2,114 | 1,921 | 1,852 | 1,860 | 1,578 | 1,521 | 1,254 | 20,880 |
| Direct Contribution Margin | 1,448 | 1,323 | 1,472 | 1,728 | 1,980 | 1,987 | 2,268 | 2,022 | 2,308 | 2,163 | 1,891 | 1,748 | 1,508 | 22,845 |
| Total Mfg Overhead | 745 | 686 | 694 | 674 | 855 | 861 | 939 | 904 | 930 | 895 | 882 | 871 | 807 | 10,744 |
| Gross Margin | 703 | 656 | 778 | 1,054 | 1,124 | 1,126 | 1,329 | 1,118 | 1,378 | 1,269 | 1,009 | 876 | 700 | 13,101 |
| Total Operating Expenses | 473 | 442 | 446 | 534 | 543 | 552 | 579 | 562 | 613 | 580 | 549 | 519 | 479 | 6,861 |
| Operating Margin - EBITDA | 230 | 194 | 332 | 520 | 581 | 574 | 750 | 566 | 766 | 689 | 460 | 357 | 221 | 6,240 |
| Depreciation | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 182 | 2,370 |
| Interest Expense | 108 | 109 | 112 | 111 | 111 | 110 | 113 | 114 | 110 | 108 | 107 | 101 | 97 | 1,411 |
| Earnings Before Taxes | (60) | (98) | 38 | 227 | 287 | 281 | 455 | 269 | 473 | 399 | 171 | 73 | (59) | 2,459 |
| Income Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Income | ($60) | ($98) | $38 | $227 | $287 | $281 | $455 | $269 | $473 | $399 | $171 | $73 | ($59) | $2,459 |
| Cash Availability/(Shortfall) | (1,547) | (1,467) | (1,568) | (1,688) | (1,467) | (1,348) | (1,407) | (827) | (962) | (424) | 264 | 525 | 837 | |
| Equipment Facility | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | (3,935) | |

SouthTrust



ONYX001936

# FY 06 Projection

## Additional upside – not in FY 2006 projection

| Project | Incremental EBITDA | Comments |
|---|---|---|
| Kellogg's | $500,000 | Will require additional capital at Alatex |

ONYX001937

# Capital Needs

## Capital required + new business

| Project | Investment | Comments |
|---|---|---|
| Line 102 – Nestlé change parts | $285,000 | |
| Line 101- AriZona Tea | $1,228,000 | Converts line from syrup line to run a variety of sizes – juice products |
| Alatex RO System | $496,000 | Enables 20 Oz Gatorade / opens door for Kraft Fruit$_2$0 & other products |
| Line 102 - Depalletizer | $1,160,000 | Required for Nestlé / cost saving for Quaker / enables price increase on gallons |
| Total | $3,169,000 | |

SouthTrust

© Piknik Products Company, 2005 - Confidential
11



ONYX001938

## Capital = Sales

| Customer | Required Capital | Annualized Incremental EBITDA | Required Line Startup |
|---|---|---|---|
| AriZona | $1.23 MM | $1.1 MM | April 30 |
| Nestlé | $1.44 MM | $1.8 MM | April 30 |
| Pepsi (Quaker) | $0.50 MM | $2.7 – 7.6 MM | April 30 |
| | $3.17 MM | $5.6 – 10.5 MM | |

SouthTrust

© Piknik Products Company, 2005 - Confidential
12



ONYX001939

# Capital – Impact on FY 2005

## Estimated incremental EBITDA - FY 2005

| Customer | Cases | EBITDA Impact | Comments |
|---|---|---|---|
| Quaker – 20 oz | 2,700,000 | $2,704,000 | Alatex RO system |
| Nestlé | 1,500,000 | $1,324,000 | Nestlé change parts / bulk depalletizer |
| AriZona | 800,000 | $565,000 | Line 101 Project |
| Quaker Gallons | | $120,000 | Bulk depalletizer |
| Est. Inc. Var. Costs | | $(265,000) | |
| FY 2005 Impact | 5,000,000 | $4,439,000 | |

➤ Capital investment is required to attain these volumes

© Piknik Products Company, 2005 - Confidential
13

# Capital – Impact on FY 2006

## Estimated incremental EBITDA - FY 2006

| Customer | Cases | EBITDA Impact | Comments |
|---|---|---|---|
| Quaker – 20 & 34 oz | 7,000,000 | $7,631,000 | Alatex RO system |
| Nestlé | 2,000,000 | $1,841,000 | Nestlé change parts / bulk depalletizer |
| AriZona | 1,600,000 | $1,122,000 | Line 101 Project |
| Quaker Gallons | | $125,000 | Bulk depalletizer |
| Est. Inc. Var. Costs | | $(815,000) | |
| Est. Inc. Fixed Costs | | $(602,000) | |
| FY 2006 Impact | 10,600,000 | $9,302,000 | |

➢ Capital investment is required to attain these volumes



SouthTrust

© Piknik Products Company, 2005 - Confidential
14

ONYX0019941

# Request

## Required to secure FY 05 & FY 06 business

➤ Waiver of capex covenant

➤ Amendment of forbearance date to December 31, 2005

➤ Equipment financing facility of $3.5 million

➤ Additional Onyx guarantee

© Piknik Products Company, 2005 - Confidential
15

**SouthTrust**

**PIKNIK**

ONYX001942

# Andy Raine Response

## Pre meeting comments:

- ➢ Wachovia has different philosophy
- ➢ Wachovia date for complete exit is 2005
- ➢ Need clear momentum on refinance
- ➢ Suggested Kevin Belanger at Focus
  - ➢ Formerly of Well's
  - ➢ Know Piknik

SunTrust

© Piknik Products Company, 2005 - Confidential

16

PIKNIK

ONYX001943

# Andy Raine Response

## To extend maturity date

➢ Make overadvance go away

   ➢ Eliminate SouthTrust's uncollateralized position

➢ Leter of intent (tangible evidence) – bank / refinance

➢ 2/10/05 - David will have contingent letter of interest week of 2/14/05 (traditional refi)

   ➢ Lot of work with Private Equity Firm / Also equity letter / recap / reorganization

## New dollars

➢ Need to be covered

➢ No assurance of approval

## Other

➢ Feels that SouthTrust – has stepped up each time

➢ Wachovia – new company / changes

➢ Will look at unique situations

© Piknik Products Company, 2005 - Confidential

17

**SouthTrust**

**PIKNIK**

ONYX001944

# Other

## Andy Raine Response

⋎ Advised us to contact Kevin Belanger / Focus

  ⋎ Sounds like equity play
  ⋎ Definitely not easy
  ⋎ Time constraints
  ⋎ Pretty tough

⋎ To provide other contacts

  ⋎ Emailed request Thursday, February 10

© Piknik Products Company, 2005 - Confidential
18

# Andy Raine Response

## SouthTrust Needs

➤ Financial information — Onyx

➤ What else can Onyx do?

➤ Next week (2/14) >> credit
  ➤ Doesn't look good
  ➤ Collateral is "relative"

➤ Why don't we have relationships to take us out

© Piknik Products Company, 2005 • Confidential
19

ONYX0019946

SouthTrust

# Next Steps

# Next Steps

© Piknik Products Company, 2005 - Confidential
20

PIKNIK

ONYX001947

05/23/2005 08:28 FAX 2056675633    SPECIAL ASSETS MGMT    ☒001

ONYX000628

## NINTH AMENDMENT AND AMENDED FORBEARANCE AGREEMENT

THIS NINTH AMENDMENT AND AMENDED FORBEARANCE AGREEMENT (this "Agreement"), dated and effective the _31st_ day of March, 2005 (the "Effective Date"), by and among WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association (successor by merger to SouthTrust Bank, an Alabama banking corporation; hereinafter, "Wachovia"), PIKNIK PRODUCTS COMPANY, INC., an Alabama corporation ("Borrower"), PIKNIK PROPERTIES, INC., an Alabama corporation ("Properties"), HERMAN R. ("RICKY") LOEB, an individual ("Guarantor"), HERMAN LOEB, JR., an individual ("Loeb Jr."), PIKNIK ACQUISITION CORP. LLC, a Delaware limited liability company ("PAC") and ONYX CAPITAL VENTURES, L.L.C., a Delaware limited liability company ("Onyx"; Borrower, Properties, Guarantor, Loeb Jr., PAC and Onyx are sometimes referred to collectively herein as "Obligors").

### R E C I T A L S :

WHEREAS, Borrower is indebted to Wachovia for the following credit facilities (the "Loans"):

    (i)    a revolving line of credit in the stated principal amount of $7,000,000 ("Revolving Line of Credit");

    (ii)    a term loan in the stated principal amount of $6,956,000.00 ("Term Loan A");

    (iii)    letter of credit facility in the stated amount of $6,057,535.00 (the "Letter of Credit"); and

    (iv)    a credit facility in the stated principal amount of $1,300,000.00 (the "Kraft Project Loan").

WHEREAS, the Loans are evidenced, secured and guaranteed by (a) that certain Second Amended and Restated Credit Agreement dated November 5, 2001, between Borrower and Wachovia, as amended by the following amendments between Obligors and Wachovia: Amendment and Forbearance Agreement dated April 10, 2002, Second Amendment and Amended Forbearance Agreement dated August 31, 2002, Third Amendment and Amended Forbearance Agreement dated January 31, 2003, Fourth Amendment and Amended Forbearance Agreement dated April 30, 2003, Fifth Amendment and Amended Forbearance Agreement dated July 23, 2003, Amendment to Credit Agreement dated February 13, 2004, Sixth Amendment and Amended Forbearance Agreement dated February 13, 2004, Second Amendment to Credit Agreement dated June 24, 2004, Seventh Amendment and Amended Forbearance Agreement dated June 24, 2004, and Eighth Amendment and Amended Forbearance Agreement dated October 15, 2004 (as amended, the "Credit Agreement"); (b) the following notes (the "Notes"):

    (v)    as to the Revolving Line of Credit, that certain Second Amended and Restated Revolving Note in the stated principal amount of $5,000,000.00 dated November 5, 2001, from Borrower to the order of Wachovia, which was increased to $7,000,000.00 and amended and modified by that certain Note Modification Agreement dated February 13, 2004, and which was extended to December 31,

1337825 v3



EXHIBIT
Larry #5
10/10/07 KO

PIKNIK ONYX 03121

05/23/2005 08:28 FAX 2056875633          SPECIAL ASSETS MGMT                      ☒002

ONYX000629

2004, by that certain Second Note Modification Agreement dated June 24, 2004 (collectively, and including all amendments heretofore or hereafter made, the "Revolving Note");

(vi)     as to Term Loan A, that certain Second Amended and Restated Term Note A in the stated principal amount of $6,956,000.00 dated November 5, 2001, from Borrower to the order of Wachovia (including all amendments heretofore or hereafter made, "Term Note A");

(vii)    as to the Kraft Project Loan, that certain Promissory Note dated December 23, 2003, payable by Borrower to the order of Wachovia in the principal amount of $1,300,000.00 (the "Kraft Project Note"); and

(c) the other "Loan Documents" (including all "Loan Documents" as defined in the Credit Agreement and the Kraft Project Note), including but not limited to the "Security Documents", the "Guaranty", and the "Pledge Agreements" (as such terms are defined in the Credit Agreement; capitalized terms used herein without definition shall have the meaning ascribed to such term in the Credit Agreement).

WHEREAS, Wachovia is properly perfected in its security interest in all of the Collateral pursuant to the Loan Documents.

WHEREAS, all Obligations owed to Wachovia by Obligors are cross collateralized and cross defaulted, i.e., anything to the contrary notwithstanding, each item of Collateral secures all Obligations, and any default or event of default under any of the Loan Documents constitutes a default or event of default under all other Loan Documents.

WHEREAS, pursuant to the Eighth Amendment and Amended Forbearance Agreement dated October 15, 2004 (the "Eighth Amendment"), the "Partial Repayment" was made and the proceeds thereof were applied to pay off "Term Loan B" and "Term Loan C" (as such capitalized terms are defined in the Eighth Amendment);

WHEREAS, the Obligors have requested that Wachovia extend the Forbearance Period and maturities of the Loans from March 31, 2005, to June 30, 2005.

WHEREAS, Wachovia is willing to extend the Forbearance Period and maturities of the Loans, but only upon the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and other good and valuable consideration, the Obligors and Wachovia agree as follows:

1.     Recitals.  Obligors acknowledge and agree that the foregoing recitals are true, correct, and complete.  The outstanding principal balance of each Loan as of March 8, 2005, is as follows:

(a)     Revolving Line of Credit: $4,946,315.27.

1337835 v3                                    2

PIKNIK ONYX 03122

ONYX000630

(b)    Term Loan A: $3,053,470.79;

(c)    Letter of Credit: $4,886,410.96; and

(d)    Kraft Project Loan: $625,333.40.

Obligors hereby acknowledge and agree that no additional advances are available under Term Loan A, Term Loan B, Term Loan C, the Letter of Credit or the Kraft Project Loan (other than approximately $13,600 under the Kraft Project Loan to be used for such purposes as are mutually agreeable between Borrower and Wachovia).

2.    Forbearance Period.    Wachovia agrees that, in respect of the "Existing Defaults" only, during the "Forbearance Period" (as defined below), Wachovia will not enforce or exercise any remedies available to it under the Loan Documents, and will not seek collection of the Loans from the Obligors, except as set forth herein. As used herein, the term "Existing Defaults" shall mean the following: (a) the financial covenant Events of Default, known to Wachovia and existing as of the date of this Agreement, under Section 11.7(A) of the Credit Agreement and (b) existing defaults relating to the Variable Rate Industrial Development Revenue Bonds Series 2000 issued by The Industrial Development Board of the City of Montgomery which are set forth in one or more written notices to Wachovia. As used herein, the term "Forbearance Period" means the period of time commencing on the Effective Date of this Agreement and ending on June 30, 2005, subject to an earlier termination of the Forbearance Period as provided in Section 4 below. The parties hereto intend that the Forbearance Period is granted to permit the Obligors to secure alternative financing that will pay Wachovia in full on all outstanding Obligations.

3.    Payments During Forbearance.    Interest shall continue to accrue on the principal of the Loans, as set forth in the Loan Documents as amended by this Agreement, until such principal is paid in full. During the Forbearance Period, Borrower shall make all payments in accordance with the payment terms set forth in the respective Loan Documents as amended herein.

4.    Forbearance Termination.    Notwithstanding the provisions of Section 2 above, the Forbearance Period shall automatically terminate, after three (3) days' notice by Wachovia to Borrower (unless such notice of prevented by bankruptcy or other applicable law and all other notice otherwise required by the Loan Documents or otherwise being hereby waived) upon (i) any case or other proceeding being instituted by or against Borrower under any state or federal law relating to the bankruptcy or insolvency of debtors; (ii) any "Default" or "Event of Default" (as defined in the Loan Documents and as expanded in section 8 below) occurring under any of the Loan Documents, this Ninth Amendment and/or becoming known to Wachovia other than the Existing Defaults; (iii) any of the acknowledgments, warranties, or representations of Obligors set forth herein being untrue or inaccurate in any material respect as of the date made; or (iv) Obligors breaching, defaulting, or failing to perform any other obligation or agreement contained in this Agreement. Any notice required by this paragraph given by Wachovia to Borrower, shall be deemed sufficient if sent, at Wachovia's election, by hand delivery, over-night courier service (e.g. Federal Express), or facsimile.

5.    Overadvances.    Borrower and Wachovia hereby agree that, notwithstanding anything to the contrary in the Credit Agreement, Wachovia will permit overadvances of the Revolving Line

1337835-v9                                    3

ONYX000631

of Credit over the Borrowing Base from time to time (the aggregate amount of any such overadvances outstanding at any time is hereinafter referred to as the "Overadvance") during the Forbearance Period of up to Three Million and No/100 Dollars ($3,000,000) in the aggregate; provided, however, that the maximum outstanding principal amount under the Revolving Loan shall at no time exceed the Revolving Loan Amount. Borrower acknowledges and agrees that any advance requested by Borrower which will result in an Overadvance shall only be made pursuant to and in conformity with amounts set forth in a budget (the "Advance Budget") delivered to Wachovia prior to the requested advance and which must be in form and content acceptable to Wachovia in Wachovia's sole and absolute discretion.

6.    Extensions of Maturity Dates.  The maturity date for all Loans shall be June 30, 2005.

7.    Conditions.  Except as may be modified or waived by Wachovia, in its sole discretion, the effectiveness of this Ninth Amendment shall be subject to full and complete satisfaction of the following conditions:

(a)    Intentionally omitted.

(b)    Default.  There shall exist no condition, event or act which constitutes, or with notice or lapse of time (or both) would constitute, an Event of Default as set forth in the Credit Agreement, as amended, and as amended by this Ninth Amendment other than the Existing Defaults.

(c)    Certificates of Secretary.  Wachovia shall have received a certificate of the corporate secretary (or equivalent thereof for each LLC) of Borrower, Properties, PAC and Onyx, dated as of the date of this Ninth Amendment, certifying as to the incumbency, title and signatures of the authorized representative of Borrower, Properties, PAC and Onyx signing this Ninth Amendment and the documents delivered in connection therewith and certifying that the organizational documents of such Borrower, Properties, PAC and Onyx, as applicable, have not been amended or modified in any manner since October 15, 2004, together with a copy of the resolutions of the board of directors (or equivalent thereof for each LLC) of each of Borrower, Properties, PAC and Onyx authorizing the execution, delivery and performance of this Ninth Amendment and the documents delivered in connection therewith.

(d)    Intentionally omitted.

(e)    Extension Fee.  Payment of an extension fee by Borrower to Wachovia in the amount of $15,000.

The documents described in this section 7 are collectively referred to herein as the "Amendment Documents" and are hereby included within the definition of "Loan Documents". By signature to this Agreement, Obligors ratify and affirm all provisions of the Amendment Documents, and consent to the execution of the Amendment Documents by each Obligor which is a party thereto.

8.    Additional Events of Default.  Obligors hereby acknowledge and agree that in addition to all Events of Default set forth in the Credit Agreement, each of the other Loan Documents, and amendments thereto, the following shall also constitute an additional Event of Default under the

1337835 v3                                      4

PIKNIK ONYX 03124

ONYX000632

Credit Agreement and each of the other Loan Documents, entitling Wachovia to discontinue any additional advances of the Revolving Line of Credit and exercise any and all other remedies available to Wachovia under the Loan Documents:

    (a)    Other than the Existing Defaults, any "Event of Default" or other violation of any covenant, condition, representation or warranty as defined and/or set forth in any Amendment Document.

9.    Nothing contained herein shall constitute a commitment or guarantee by Wachovia to extend any future financing to Obligors or provide any future modifications or extensions to Obligors, except as set forth in the Loan Documents or as otherwise set forth in a written agreement executed by a duly authorized officer of Wachovia.

10.    Obligors acknowledge and agree that (i) this Agreement is not intended to be, and shall not be deemed or construed to be, a novation or release of the Loan Documents or any of them; (ii) except as expressly provided in this Agreement, this Agreement is not intended to be, and shall not be deemed or construed to be, a modification, amendment, or waiver of the Loan Documents or any of them; (iii) neither this Agreement nor any payments made or other actions taken pursuant to this Agreement shall be deemed to cure the Existing Defaults unless and until all sums payable pursuant to the Loan Documents are paid in full; (iv) except as otherwise expressly provided in this Agreement, Wachovia reserves all available rights and remedies, at law, in equity, and under the Loan Documents, in connection with any Default or Event of Default, including the Existing Defaults, whether now existing or hereafter occurring, whether now known or unknown to Wachovia, under the Loan Documents; and (v) all requirements in the Loan Documents for notice by Wachovia to the Obligors, or any of them, are hereby waived.

11.    Obligors ratify and confirm all terms and conditions of the Loan Documents (as amended hereby, including, but not limited to, the amendments of the Amendment Documents). Obligors acknowledge that: (i) all the Loan Documents are in full force and effect, and (ii) the Loan Documents constitute the legal, valid and binding obligations of Obligors enforceable against Obligors in accordance with their terms. Obligors represent and warrant to Wachovia that as of the date hereof, Obligors have no defenses, setoffs, rights of recoupment, counterclaims or claims of any nature whatsoever in respect to the Loan Documents, and to the extent any such defenses, setoffs, rights of recoupment, counterclaims or claims may exist, whether known or unknown, the same are hereby expressly waived, released and discharged. Obligors represent and warrant to Wachovia that the Loans continue to be secured and guaranteed by the Loan Documents.

12.    Obligors, in consideration of Wachovia's agreement to forbear as set forth above, and as a material inducement therefor, do hereby release, remise and forever discharge Wachovia and its affiliates, parents, divisions, subsidiaries, successors, predecessors, stockholders, officers, directors, agents, employees, attorneys, successors, and assigns (Wachovia and such other parties being collectively referred to herein as the "Released Parties") of and from any and all claims, liabilities, actions, and causes of action, if any, of whatever kind or nature, whether known or unknown, those that are contingent, suspected, or unsuspected, and whether concealed or hidden, which have existed, arising out of or in any way connected with any occurrences, acts,

PIKNIK ONYX 03125

ONYX000633

omissions, or transactions involving, directly or indirectly, the Loan Documents, or any of the Obligations, or any other transactions and dealings between the Obligors.

13.    Obligors further acknowledge and agree that all of the Loan Documents will continue to secure and guarantee all of the Obligations, and Obligors have heretofore and do hereby waive any right for a marshaling of any of the collateral securing the Loans, including the "Pledged Collateral" or the collateral described in the "Mortgage" (as such terms are defined in the Credit Agreement), now or hereafter subject to the liens and security interests of the Loan Documents.

14.    In recognition of Wachovia's right to have all its attorneys' fees and other expenses incurred in connection with the preparation, negotiation and drafting of this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Obligors, Wachovia shall not be required to record any terminations or satisfactions of any of its liens on the Collateral unless and until Obligors have executed and delivered to Wachovia releases of all claims, known and unknown which exist as of the date thereof. Obligors understand that this provision constitutes a waiver of its rights under § 7-9A-513 of the Alabama Code. Nothing contained in this paragraph shall limit the ability of the Obligors to request and secure a partial release of Collateral as specifically set forth in the Loan Documents.

15.    Each Obligor represents and warrants to Wachovia that as to such Obligor: (i) if such Obligor is a corporation as identified on the first page of this Agreement, it is organized, validly existing and in good standing under the laws of the State of Alabama and the individual signing on behalf of such Obligor has full power and authority to execute, deliver and perform this Agreement and the other Loan Documents on behalf of such Obligor (including, but not limited to, the Amendment Documents), and the same has been duly authorized pursuant to all requisite corporate action; (ii) this Agreement and the other Loan Documents (including, but not limited to, the Amendment Documents) constitute valid and legally binding obligations of such Obligor, enforceable in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally, and general principles of equity; (iii) the execution, delivery and performance by such Obligor of this Agreement and the other Loan Documents (including, but not limited to, the Amendment Documents), will not and did not, violate, conflict with, or constitute any default under any law (including laws relating to usury), government regulation, or any other agreement or instrument binding upon such Obligor; and (iv) no approval, authorization or other action by, or filing with, any governmental official, board or authority is required in connection with the execution and delivery of this Agreement or any of the other Loan Documents (including, but not limited to, the Amendment Documents), and the performance of the provisions thereof, except such approvals and authorizations as have been received, such actions as have been taken, and such filings as have been made.

16.    This Agreement shall be construed in accordance with, and shall in all respects be governed by, the laws of the State of Alabama. The Loans owing under the Loan Documents are payable to Wachovia by Obligors at Wachovia's principal place of business in Birmingham, Jefferson County, Alabama, and the Loan Documents and this Agreement shall be enforceable in the state and federal courts presiding in Jefferson County, Alabama, and any other court of competent jurisdiction.

1337835 v2

6

PIKNIK ONYX 03126

ONYX000634

17.   Obligors agree to pay all expenses, including attorneys' fees, incurred by Wachovia in connection with the negotiation and preparation of this Agreement and the Amendment Documents. The validity and effectiveness of this Agreement and Amendment Documents is conditioned upon Borrowers paying all outstanding expenses of Wachovia as of the Effective Date, including attorneys' fees.

18.   WAIVER OF JURY TRIAL. OBLIGORS AND WACHOVIA HEREBY EXPRESSLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN ANY LAWSUIT OR OTHER COURT ACTION RELATED TO THE LOANS, THIS AGREEMENT, ANY OF THE LOAN DOCUMENTS OR ANY TRANSACTION CONTEMPLATED HEREBY OR THEREBY, INCLUDING, WITHOUT LIMITATION, IN RESPECT TO ANY CLAIM, COUNTERCLAIM, THIRD-PARTY CLAIM, DEFENSE, OR SET-OFF ASSERTED IN ANY SUCH LAWSUIT OR COURT ACTION. ANY SUCH LAWSUIT OR COURT ACTION SHALL BE TRIED EXCLUSIVELY TO A COURT WITHOUT A JURY. OBLIGORS SPECIFICALLY ACKNOWLEDGE THAT THEIR EXECUTION OF THIS WAIVER OF JURY TRIAL IS A MATERIAL PORTION OF THE CONSIDERATION RECEIVED BY WACHOVIA IN EXCHANGE FOR ITS ENTERING INTO THIS AGREEMENT.

19.   This Agreement may be executed in any number of counterparts, but it shall not be necessary that each counterpart be executed by all the parties hereto as long as each party executes at least one such counterpart. When each of the parties hereto has executed at least one counterpart hereof, this Agreement shall thereupon be deemed executed by all parties, and together all such counterparts shall comprise but a single instrument. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party to this Agreement by any court or other governmental or judicial authority by reason of such party's having or being deemed to have structured or dictated such provision. This Agreement will inure to the benefit of the parties hereto, their respective successors and assigns. This Agreement and the obligations of the parties hereunder shall be interpreted, construed and enforced in accordance with the laws of the State of Alabama. Time is of the essence in the performance of this Agreement.

1337835 v3

PIKNIK ONYX 03127

05/23/2005 08:31 FAX 2056675633       SPECIAL ASSETS MGMT                                    @008
MAR 31 2005 3:31PM   ONYX CAPITAL VENTURESRSLC   3126124340                       P.2

ONYX000635

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

BORROWER:

PIKNIK PRODUCTS COMPANY, INC.,
an Alabama corporation

By: _____
Print Name: __Jeffery Onyx__
Its: __Chairman & CEO__

STATE OF __Illinois__ )
COUNTY OF __Cook__ )

I, the undersigned Notary Public in and for said County, in said State, hereby certify that __Jeffrey Lacey__, whose name as __Chairman & CEO__ of Piknik Products Company, Inc., an Alabama corporation, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal, this 31st day of March, 2005.

_____
Notary Public
My Commission Expires: June 6, 2007

"OFFICIAL SEAL"
Kimberly Ann Koenig
Notary Public, State of Illinois
My Commission Expires June 6, 2007

1307935 v6                                    8

PAGE 2/4 * RCVD AT 3/31/2005 3:31:29 PM [Central Standard Time] * SVR:BHM-RIGHTFAX/15 * DNIS:5927 * CSID:3126124340 * DURATION (mm-ss):01-38

PIKNIK ONYX 03128

05/23/2005 08:32 FAX 2056875633          SPECIAL ASSETS MGMT                      ☑009

**PIKNIK PROPERTIES, INC.,**
an Alabama corporation

ONYX000636

By: _____

Print Name: _Herman R Lord_

Its: _President_

STATE OF _Alabama_ )
COUNTY OF _Montgomery_ )

I, the undersigned Notary Public in and for said County, in said State, hereby certify that
_Herman R Lord_ , whose name as _President_
of Piknik Properties, Inc., an Alabama corporation, is signed to the foregoing instrument, and
who is known to me, acknowledged before me on this day that, being informed of the contents of
said instrument, he, as such officer and with full authority, executed the same voluntarily for and
as the act of said corporation.

Given under my hand and official seal, this _31_ day of _March_ , 2005.

_Patsy Saint_
Notary Public
My Commission Expires: _2/18/2006_

1337835 v3                    9

PIKNIK ONYX 03129

05/23/2005 08:32 FAX 2056875633     SPECIAL ASSETS MGMT     @010

ONYX000637

_____

**HERMAN R. ("RICKY") LOEB**
Individually and as Guarantor

STATE OF _Alabama_ )
COUNTY OF _Montgomery_ )

I, the undersigned Notary Public in and for said County, in said State, hereby certify that Herman R. ("Ricky") Loeb, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he executed the same voluntarily on the day the same bears date.

Given under my hand and official seal, this _31_ day of _March_, 2005.

_Patsy Saint_
_____
Notary Public
My Commission Expires: _2/18/2006_

1337835 v3                          10

PIKNIK ONYX 03130

05/23/2005 08:32 FAX 2056675633          SPECIAL ASSETS MGMT                      ☒011

**ONYX000638**

HERMAN LOEB, JR.

_____, as Attorney in Fact
HERMAN LOEB, JR.
Individually and as a Pledgor

STATE OF ALABAMA        )
COUNTY OF MONTGOMERY )

I, the undersigned Notary Public in and for said County, in said State, hereby certify that Herman R. Loeb, as Attorney-in-Fact for Herman Loeb, Jr., whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as attorney in fact for Herman Loeb, Jr. executed the same voluntarily on the day the same bears date.

Given under my hand and official seal, this __31__ day of _March_, 2005.

_____
Notary Public
My Commission Expires: __7/18/2006__

11

PIKNIK ONYX 03131

05/23/2005 08:32 FAX 2058675633        SPECIAL ASSETS MGMT                    ☑012
MAR 31 2005 3:31PM    ONYX CAPITAL VENTURESRSLC  3126124340                  P.3

ONYX000639

**PIKNIK ACQUISITION CORP. LLC,** a
Delaware limited liability company, as a Pledgor

By:    **ONYX CAPITAL VENTURES, L.L.C.,** a
       Delaware limited liability company
       its sole member

       By: _____
       Its: _Chairman & CEO_

STATE OF _Illinois_ )
COUNTY OF _Cook_ )

I, the undersigned, a Notary Public in and for said County in said State, hereby certify
that _Jeffery Larry_ whose name as
_Chairman & CEO_ of ONYX CAPITAL VENTURES, L.L.C., a Delaware limited
liability company, the sole member of Piknik Acquisition Corp. LLC, a Delaware limited
liability company, is signed to the foregoing instrument, and who is known to me, acknowledged
before me on this day that, being informed of the contents of said instrument, he, as such officer
and with full authority, executed the same voluntarily for and as the act of said limited liability
company.

Given under my hand and official seal, this the _31st_ day of March, 2005.

                    _____ (SEAL)
                    NOTARY PUBLIC
                    My Commission Expires: _June 6, 2007_

"OFFICIAL SEAL"
Kimberly Ann Koenig
Notary Public, State of Illinois
My Commission Expires Nov 6, 2007

1337235-v3                              12

PAGE 3/4 * RCVD AT 3/31/2005 3:31:26 PM [Central Standard Time] * SVR:EHM-RIGHTFAX/15 * DNIS:3927 * CSID:3126124340 * DURATION (mm-ss):01-33

PIKNIK ONYX 03132

ONYX000640

ONYX  CAPITAL  VENTURES, L.L.C., a
Delaware limited liability company, as a Guarantor

By: _____

Print Name: Jeffery Larry

Its: Chairman & CEO

STATE OF Illinois )
COUNTY OF Cook )

In the undersigned Notary Public in and for said County, in said State, hereby certify that Jeffery Larry , whose name as Chairman & CEO of Onyx Capital Ventures, L.L.C., a Delaware limited liability company, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said limited liability company.

Given under my hand and official seal, this 31st day of March , 2005.

_____
Notary Public
My Commission Expires: June 6, 2007

> **"OFFICIAL SEAL"**
> Kimberly Ann Koenig
> Notary Public, State of Illinois
> My Commission Expires June 6, 2007

1337835 v3                                    13

PIKNIK ONYX 03133

ONYX000641

WACHOVIA:

WACHOVIA BANK, NATIONAL
ASSOCIATION, a national banking association

By: _____
Print Name: _____
Its: _____

STATE OF *Alabama* )
COUNTY OF *Jefferson* )

I, the undersigned Notary Public in and for said County, in said State, hereby certify that _____, whose name as *Vice President* of WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, s/he, as such officer and with full authority, executed the same voluntarily for and as the act of said banking association.

Given under my hand and official seal, this *1st* day of *April* , 2005.

_____
Notary Public
My Commission Expires: MY COMMISSION EXPIRES
OCTOBER 22, 2008

1337835 v3                    14

PIKNIK ONYX 03134

05/23/2005 08:33 FAX 2056675633          SPECIAL ASSETS MGMT                              ☑015

ONYX000642

## CERTIFICATE

I, Herman R. Loeb, do hereby certify as follows:

1.    That I am the President of Piknik Properties, Inc., a corporation created and existing under the laws of the State of Alabama (the "Company"), and that as such officer I have custody and control of the records of the Company and am personally familiar with those books and records and the organization and operations the Company.

2.    That Jamie Lyn Loeb is the sole shareholder of the Company.

3.    That Herman R. Loeb is the sole member of the board of directors of the Company.

4.    That set forth below is the name and signature of the duly elected, qualified and acting President of the Company.

| Name | Title | Signature |
|------|-------|-----------|
| Herman R. Loeb | President | |

5.    There is no Item 5.

6.    That no suit or proceeding for the dissolution or liquidation of the Company which would effect the Ninth Amendment and Amended Forbearance Agreement entered into the 31st day of March, 2005 by and among Wachovia Bank, National Association, Piknik Products Company, Inc., Piknik Properties, Inc. Herman R. Loeb, Herman Loeb, Jr., Piknik Acquisition Corp.LLC, Onyx Capital Ventures, L.L.C. or the transactions described therein (the "Wachovia Forbearance Agreement") has been instituted or is now threatened.

7.    That Exhibit A attached hereto is a true and correct copy of resolutions duly adopted by written consent of the shareholders and directors of the Company on or as of March 31, 2005; such action by the shareholder and directors was authorized by the Articles of Incorporation and Bylaws of the Company and such resolutions remain in full force and effect and have not been modified or amended.

8.    That the resolutions attached hereto as Exhibit A constitute all of the actions required to authorize the Wachovia Forbearance Agreement and the transactions contemplated in such resolution.

<span style="font-size:xx-small">H:\wa\Adam\300\piknik\Mo Forbear\Piknik Properties Certificate  Final.doc</span>

PIKNIK ONYX 03135

05/23/2005 08:34 FAX 2056675633          SPECIAL ASSETS MGMT                              Ø016

ONYX000643

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Company, this 31st day of March, 2005.

_____                    (L.S.)
Herman R. Loeb

F:\nasl\doc00\p2\02-00\Salient\Bank Projection Certificate Final.doc                    2

05/23/2005 08:34 FAX 2056675633          SPECIAL ASSETS MGMT                    ☑017

**ONYX000644**

## ACTION BY BOARD OF DIRECTORS AND SHAREHOLDERS WITHOUT A MEETING
### BY UNANIMOUS WRITTEN CONSENT OF ALL DIRECTORS AND SHAREHOLDERS IN LIEU OF SPECIAL MEETING HELD ON MARCH 31, 2005

As permitted by Code of Alabama 1975, sections 10-2B-8.21 and 10-2B-7.04, the undersigned, being all of the directors and shareholders of Piknik Properties, Inc., an Alabama corporation (the "Corporation"), consent to the following action being taken by the board of directors and shareholders without a meeting, and agree that it is taken with like effect and validity as though it were duly taken by unanimous affirmative vote of all directors and shareholders at a special meeting of the directors and shareholders duly called and legally held on March 31, 2005, and direct that their unanimous written consent to the action taken be filed with the minutes of the proceedings of the board of directors and shareholders of the Corporation.

1.    In order to approve that the Corporation enter into the Eighth Amendment and Amended Forbearance Agreement with SouthTrust Bank, the following resolution is adopted:

"RESOLVED, That the form, terms and provisions of and the transactions contemplated by, the Ninth Amendment and Amended Forbearance Agreement, to be entered into by and among SouthTrust Bank, Piknik Products Company, Inc., Piknik Properties, Inc., Piknik Acquisition Corp., LLC, Onyx Capital Ventures, LLC, Herman R. Loeb and Herman Loeb, Jr. substantially in the form attached hereto as Exhibit "A" and reviewed by the Board, and any and all related agreements (collectively, the "Forbearance Agreement") with such changes therein and additions thereto (substantial or otherwise) as the officer or officers executing the Forbearance Agreement may deem necessary, appropriate or desirable on behalf of or in the name of the Corporation be, and they hereby are, approved and adopted in all respects;

RESOLVE, FURTHER that the appropriate officer or officers of the Corporation be, and they hereby are, authorized to execute and deliver, on behalf of and in the name of the Corporation, the Forbearance Agreement, substantially in the form reviewed by the

P:\Data\Onx00\Piknik\Hb Action\Action by Board and Shareholders (Properies).doc

**PIKNIK ONYX 03137**

05/23/2005 08:34 FAX 2056675633          SPECIAL ASSETS MGMT                                ☑018

ONYX000645

Board, with such changes therein and additions thereto (substantial or otherwise) as they officer or officers executing the Forbearance Agreement may deem necessary, appropriate or desirable, for execution thereof by such officer or officers constituting conclusive evidence of his or their authority to make such changes and to execute and deliver the Forbearance Agreement;

RESOLVED, FURTHER, that the Corporation and its officers are hereby authorized and directed to consummate the transactions contemplated by the Forbearance Agreement, when and if executed, in accordance with the terms and conditions and to perform the obligations of the Corporation thereunder; and

RESOLVED, FURTHER, that the officer or officers of the Corporation be and each of them hereby is on behalf and in the name of the Corporation, authorized and directed to do and perform all such other acts and things and to execute and deliver all such other instruments, certificates, notices and documents as may be necessary, appropriate or desirable to effectuate the purposes of the foregoing resolutions and to pay all such costs and expenses as may be required by the terms of any of the foregoing documents."

2.    The Shareholders and Directors of the Corporation do further certify, warrant and represent:

(i)    There are authorized and outstanding 1,000 shares of common stock of the Corporation;

(ii)    Such shares of common stock are owned by Jamie Lyn Loeb, who is the sold shareholder of the Corporation.

(iii)    Jamie Lyn Loeb, as the sole shareholder of the Corporation has nominated and elected Herman R. Loeb to serve as the sole director of the Corporation.

(iv)    Herman R. Loeb as the sole director of the Corporation has nominated and elected Herman R. Loeb to serve as President of the Corporation.

_____ L.S.                    _____ L.S.
Jamie Lyn Loeb                                  Herman R. Loeb

ALL OF THE SHAREHOLDERS                         ALL OF THE DIRECTORS OF
OF PIKNIK PROPERTIES, INC.                      PIKNIK PROPERTIES, INC.

F:\cwl\files\corp\piknik-506_Forbear\Adv6678 by Board and Shareholders (Properties).doc          - 2 -

PIKNIK ONYX 03138

ONYX000646

**EXHIBIT A**
**RESOLUTIONS**

3

PIKNIK ONYX 03139

ONYX004531

## SECOND AMENDED AND RESTATED GUARANTY

THIS SECOND AMENDED AND RESTATED GUARANTY (this "Agreement") made as of the 15th day of October, 2004, by HERMAN R. ("RICKY") LOEB (the "Guarantor") in favor of SOUTHTRUST BANK, an Alabama banking corporation (the "Bank"). As used in this Agreement, except as otherwise defined herein or unless the context may clearly require to the contrary, all capitalized words and phrases shall have the meaning attributed to them in that certain Second Amended and Restated Credit Agreement dated November 5, 2001, between PIKNIK PRODUCTS COMPANY, INC., an Alabama corporation (the "Borrower") and Bank, as amended by the following amendments between Borrower, PIKNIK PROPERTIES COMPANY, INC., an Alabama corporation ("Properties"), Guarantor, and HERMAN LOEB, JR., an individual ("Loeb Jr."): (Borrower, Properties, Guarantor, and Loeb Jr. are sometimes referred to collectively herein as "Obligors") and Bank: Amendment and Forbearance Agreement dated April 10, 2002, Second Amendment and Amended Forbearance Agreement dated August 31, 2002, Third Amendment and Amended Forbearance Agreement dated January 31, 2003, Fourth Amendment and Amended Forbearance Agreement dated April 30, 2003, Fifth Amendment and Amended Forbearance Agreement dated July 23, 2003, Amendment to Credit Agreement dated February 13, 2004, Sixth Amendment and Amended Forbearance Agreement dated February 13, 2004, Second Amendment to Credit Agreement dated June 24, 2004, Seventh Amendment and Amended Forbearance Agreement dated June 24, 2004, and Eighth Amendment and Amended Forbearance Agreement dated of even date herewith between Obligors, PIKNIK ACQUISITION CORP. LLC, a Delaware limited liability company ("PAC"), ONYX CAPITAL VENTURES, L.L.C., a Delaware limited liability company ("Onyx") and Bank as the same may be amended or modified from time to time, the "Credit Agreement").

*This Second Amended and Restated Guaranty amends, restates and replaces in its entirety that certain Amended and Restated Guaranty from Guarantor in favor of Bank dated November 5, 2001.*

In consideration of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor agrees, covenants and represents as follows:

1.A.  Guarantor hereby absolutely and unconditionally guarantees to Bank the due, regular and punctual payment and prompt performance of all Obligations, including payment of all Default costs. The Obligations specifically include all amounts due and owing under the Credit Agreement, the "Loans", the "Notes" and the other "Loan Documents" (as defined in that certain Eighth Amendment and Amended Forbearance Agreement of even date herewith between Obligors and Bank). Notwithstanding any contrary provision hereof or of any other Loan Document, upon the payment of the "Partial Repayment" (as defined in the Eighth Amendment) and so long as no Event of Default other than Existing Defaults then exists, the maximum cumulative liability of the Guarantor hereunder shall be reduced to the "Guaranteed Amount". As used herein, the term "Guaranteed Amount" shall mean an amount equal to the sum of (i) the outstanding principal balance of the Obligations at the time demand for payment is made against the Guarantor hereunder less $1,700,000, plus (ii) all interest on the outstanding

1289079

PIKNIK ONYX 02340



ONYX004532

indebtedness evidenced by the Notes (whether accrued before or after a demand for payment is made by Bank) plus (iii) any additional or protective advances made pursuant to the Loan Documents after a demand for payment is made by Bank plus (iv) any fees and/or expenses incurred by Bank in connection with exercising its rights and/or remedies under the Loan Documents. The Guaranteed Amount, or the remaining balance thereof at any time outstanding, will be determined without credit or offset for any amounts received by Bank from any other source, including direct payment by Borrower or any other guarantor of the Obligations, or through liquidation of any collateral now or hereafter given as security for the Obligations. The Guarantor will be credited with a payment against the Guaranteed Amount only if paid after the occurrence of an Event of Default and in response to a demand therefor by Bank. The exhaustion of the Guaranteed Amount shall not relieve the Guarantor from its obligation to pay accrued interest or other costs to Bank which thereafter accrue and/or are incurred.

     B.    This Guaranty is an unconditional guaranty, and Guarantor agrees that Bank, upon the occurrence of an Event of Default by Borrower under any Note, the Credit Agreement and/or any one or more of the other Loan Documents, shall not be required to assert any claim or cause of action against Borrower or any other party before asserting any claim or cause of action against Guarantor under this Agreement. Furthermore, Guarantor agrees that Bank shall not be required to pursue or foreclose on any collateral that it may receive from Borrower, Guarantor or others as security for any Obligations before making a claim or asserting a cause of action against Guarantor under this Agreement.

     C.    The failure of Bank to perfect any portion of its security interest in any Collateral as set forth in the Loan Documents or any other collateral now or hereafter securing all or any part of the Obligations, shall not release Guarantor from Guarantor's liabilities and obligations hereunder.

     D.    To the extent permitted by law: notice of acceptance of this Agreement and of any default by Borrower is hereby waived by Guarantor; presentment, protest, demand and notice of protest and demand of any and all collateral, and of the exercise of possessory remedies or foreclosure on any and all collateral received by Bank from Borrower are hereby waived; and all settlements, compromises, compositions, accounts stated and agreed balances in good faith between any primary or secondary obligors on any accounts received as collateral shall be binding upon Guarantor.

     E.    This Agreement shall not be affected, modified, or impaired by the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all of the assets, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangements, composition with creditors or readjustment of, or other similar proceedings affecting Borrower, Guarantor or any other guarantor, or any of the assets belonging to one or more of them, nor shall this Agreement be affected, modified or impaired by the invalidity of any Note, the Credit Agreement, any of the other Loan Documents or any other document executed by Borrower or Guarantor in connection with the Loans.

     F.    Without notice to Guarantor, without the consent of Guarantor, and without affecting or limiting Guarantor's liability hereunder, Bank may:

1123029

2

PIKNIK ONYX 02341

ONYX004533

    (a)    grant any Obligor extensions of time for payment of the Obligations or any part thereof;

    (b)    renew any of the Obligations;

    (c)    grant any Obligor extensions of time for performance of agreements or other indulgences;

    (d)    at any time release any or all of the collateral held by Bank as security for the obligations;

    (e)    at any time release any other guarantor from such guarantor's guarantee of any of the Obligations;

    (f)    compromise, settle, release, or terminate any or all of the obligations, covenants, or agreement of any Obligor under any Note, the Credit Agreement, and/or any one or more of the other Loan Documents; and

    (g)    with Borrower's written consent, modify or amend any obligation, covenant or agreement of Borrower set forth in any Note, the Credit Agreement, and/or the other Loan Documents.

    G.    This Agreement may not be terminated by Guarantor until such time as all Obligations, including any renewals or extensions thereof, have been paid and performed in full and such payments and performance of the Obligations have become final and are not subject to being refunded as a preference or fraudulent transfer under the Bankruptcy Law or other applicable Law.

    2.    Guarantor represents and warrants to Bank and covenants that Guarantor has full power and unrestricted right to enter into this Agreement, to incur the obligations provided for herein, and to execute and deliver the same to Bank, and that when executed and delivered, this Agreement will constitute a valid and legally binding obligation of Guarantor, enforceable in accordance with its terms. Guarantor acknowledges that Bank is relying upon Guarantor's covenants herein in making the Loans to Borrower, and Guarantor undertakes to perform Guarantor's obligations hereunder promptly and in good faith.

    3.    Guarantor covenants and agrees that so long as the Obligations are outstanding, Guarantor will from time to time upon request, furnish to Bank such information regarding the business affairs, finances and conditions of Guarantor and Guarantor's properties as may reasonably be required of Guarantor under the Credit Agreement.

    4.    If Borrower is or shall hereafter be indebted to Bank for any obligations, liability or indebtedness other than the Obligations, and Bank should collect or receive any payments, funds or distributions, which are not specifically required, by law or agreement, to be applied to the Obligations, Bank may, in its sole discretion, apply such payments, funds or distributions to indebtedness of Borrower other than the Obligations.

1289029

3

PIKNIK ONYX 02342

ONYX004534

5.     This Agreement shall be binding upon, and inure to the benefit of, Guarantor, Bank and their respective legal representatives, successors and assigns.

6.     The validity, interpretation, enforcement and effect of this Agreement shall be governed by, and construed according to the laws of, the State of Alabama. Guarantor consents that any legal action or proceeding arising hereunder may be brought, at the election of Bank, in the Circuit Court of Jefferson County, of the State of Alabama, or in the United States District Court for the Northern District of Alabama, Southern Division, and assents and submits to the personal jurisdiction of any such courts in any such action or proceeding.

7.     GUARANTOR HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR IN ANY WAY PERTAINING OR RELATING TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR IN CONNECTION WITH THE TRANSACTIONS RELATED HERETO OR THERETO OR CONTEMPLATED HEREBY OR THEREBY OR THE EXERCISE OF ANY RIGHTS AND REMEDIES HEREUNDER OR THEREUNDER, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE; GUARANTOR AGREES THAT BANK MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED AGREEMENT OF GUARANTOR WITH BANK IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

8.     In the event that any provision hereof is deemed to be invalid by reason of the operation of any law or by reason of the interpretation placed thereon by any court, this Agreement shall be construed as not containing such provisions and the invalidity of such provisions shall not affect other provisions hereof which are otherwise lawful and valid and shall remain in full force and effect.

9.     Any notice or payment required hereunder or by reason of the application of any law shall be given and deemed delivered as provided in the Credit Agreement, except no payment shall be deemed received until the actual receipt thereof.

10.    The failure at any time or times hereafter to require strict performance by Guarantor of any of the provisions, warranties, terms and conditions contained herein or in any other agreement, document or instrument now or hereafter executed by Guarantor and delivered to Bank shall not waive, affect or diminish any right of Bank hereafter to demand strict compliance or performance therewith and with respect to any other provisions, warranties, terms and conditions contained in such agreements, documents and instruments and any waiver of any default shall not waive or affect any other default, whether prior or subsequent thereto and whether of the same or a different type. None of the warranties, conditions, provisions and terms contained in this Agreement or in any agreement, document or instrument now or hereafter executed by Guarantor and delivered to Bank shall be deemed to have been waived by any act or

1189079

4

PIKNIK ONYX 02343

ONYX004535

knowledge of Bank, its agents, officers or employees, but only by an instrument in writing, signed by an officer of Bank, and directed to Guarantor specifying such waiver.

11.    The obligations of Guarantor under this Agreement will continue to be effective or be reinstated, as the case might be, if at any time any payment from Borrower of any sum due to Bank is rescinded or must otherwise be restored or returned to Bank on the insolvency, Bankruptcy, dissolution, liquidation or reorganization of Borrower or as a result of the appointment of a custodian, conservator, receiver, trustee or other officer with similar powers with respect to Borrower or any part of Borrower's property or otherwise. If an event permitting the acceleration of the maturity of the Loans has occurred and is continuing and such acceleration is at such time prevented by reason of the pendency against Borrower of a proceeding under any Bankruptcy Law, Guarantor agrees that, for the purposes of this Agreement and the obligations of Guarantor under this Agreement, the maturity of the Loans will be deemed to have been accelerated with the same effect as if Bank had accelerated the same in accordance with the terms of the Credit Agreement, the Notes, any of the other Loan Documents or any other document executed in connection with the Loan and Guarantor will immediately pay the unpaid balance of Loans.

12.    Guarantor will, on demand, reimburse Bank for all expenses incurred by Bank in connection with the preparation, administration, amendment, modification or enforcement of this Agreement, and if at any time hereafter Bank employs counsel to advise or provide other representation with respect to this Agreement or any other agreement, document or instrument heretofore, now or hereafter executed by Guarantor and delivered to Bank with respect to Borrower or the Obligations, or to commence, defend or intervene, file a petition, complaint, answer, motion or other pleadings or to take any other action in or with respect to any suit or proceeding relating to this Agreement or any other agreement, instrument or document heretofore, now or hereafter executed by Guarantor and delivered to Bank with respect to Borrower or the Obligations or to represent Bank in any litigation with respect to the affairs of Guarantor, or to enforce any rights of Bank or obligations of Guarantor or any other person, firm or corporation which may be obligated to Bank by virtue of this Agreement or any other agreement, document or instrument heretofore, now or hereafter delivered to Bank by or for the benefit of Guarantor with respect to Borrower or the Obligations, or to collect from Guarantor any amounts owing hereunder, then in any such event, all of the reasonable attorneys' fees incurred by Bank arising from such services and any expenses, costs and charges relating thereto shall constitute additional obligations of Guarantor payable on demand.

13.    Guarantor, as a material inducement to Bank to enter into the Amendment Documents, does hereby release, remise and forever discharge Bank and its affiliates, parents, divisions, subsidiaries, successors, predecessors, stockholders, officers, directors, agents, employees, attorneys, successors and assigns (Bank and such other parties being collectively referred to herein as the "Released Parties") of and from any and all claims, liabilities, actions and causes of action, if any, of whatever kind or nature, whether known or unknown, those that are contingent, suspected, or unsuspected, and whether concealed or hidden, which have existed, arising out of or in any way connected with occurrences, acts, omissions, or transactions involving, directly or indirectly, the Credit Agreement, the Loan Documents or any of the Obligations, or any other transactions and dealings between the Bank and the Borrower.

1289679                                       5

PIKNIK ONYX 02344

ONYX004536

14.    Guarantor does hereby waive any rights of exemption of property from levy or sale under execution or other process for the collection of debts under the Constitution or laws of the United States or any state thereof as to any of the obligations created hereunder.

15.    This Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both oral and written, between Guarantor and Bank with respect to the subject matter hereof.

PIKNIK ONYX 02345