# Exhibit 5

In The Matter Of:

## JERRY A. MACCARTNEY, ET AL.
## v.
## ONYX CAPITAL VENTURES, LLC, ET AL.

## NO. 2:05CV1207-MHT

---

## JERRY MACCARTNEY
## August 17, 2007

---



## TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

EXHIBIT

5

ALL-STATE LEGAL®

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 3 of 138
JERRY A. MACCARTNEY, ET AL.                                    JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.                              August 17, 2007

(Pages 1 to 4)

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:05CV1207-MHT

JERRY A. MACCARTNEY, et al.,
        Plaintiffs,
vs.
ONYX CAPITAL VENTURES, LLC, et al.,
        Defendants.


DEPOSITION
OF
JERRY MACCARTNEY
August 17, 2007


REPORTED BY:  Heather Spier
        Court Reporter and
        Notary Public

---

Page 2

1    STIPULATION
2
3        IT IS STIPULATED AND AGREED,
4    by and between the parties, through their
5    respective counsel, that the deposition
6    of JERRY MACCARTNEY may be taken before
7    Heather Spier, Court Reporter, and Notary
8    Public;
9        That the signature to and
10   reading of the deposition by the witness
11   is waived, the deposition to have the
12   same force and effect as if full
13   compliance had been had with all laws and
14   rules of Court relating to the taking of
15   depositions;
16       That it shall not be necessary
17   for any objections to be made by counsel
18   to any questions, except as to form or
19   leading questions, and that counsel for
20   the parties may make objections and
21   assign grounds at the time of trial, or
22   at the time said deposition is offered in
23   evidence, or prior thereto.

---

Page 3

1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        Mr. K. Anderson Nelms
5        Attorney at Law
6        Law Offices of Jay Lewis
7        P.O. Box 5059
8        Montgomery, Alabama 36103
9
10   FOR THE DEFENDANT:
11       Ms. Jennifer J. McGahey
12       Attorney at Law
13       Bradley, Arant, Rose & White
14       1819 Fifth Avenue North
15       Birmingham, Alabama 35203
16
17   OTHERS PRESENT:
18       Mr. Anthony Bush
19       Ms. Amy Lindsey
20
21
22
23

---

Page 4

1    I N D E X
2                            PAGE:
3    EXAMINATION BY MS. MCGAHEY..........  7
4    REEXAMINATION BY MR. NELMS.......... 353
5    REEXAMINATION BY MS. MCGAHEY........ 368
6    REEXAMINATION BY MR. NELMS.......... 369
7
8
9    E X H I B I T S
10
11   Defendant's Exhibit 1................  91
12   Defendant's Exhibit 2................  93
13   Defendant's Exhibit 3................ 119
14   Defendant's Exhibit 4................ 221
15   Defendant's Exhibit 5................ 241
16   Defendant's Exhibit 6................ 259
17   Defendant's Exhibit 7................ 275
18   Defendant's Exhibit 8................ 281
19   Defendant's Exhibit 9................ 287
20   Defendant's Exhibit 10.............. 292
21   Defendant's Exhibit 11.............. 294
22   Defendant's Exhibit 12.............. 296
23   Defendant's Exhibit 13.............. 297

Page 5

1        E X H I B I T S (Continuing)
2
3                    PAGE:
4    Defendant's Exhibit 14............... 341
5    Defendant's Exhibit 15............... 342
6    Defendant's Exhibit 16............... 346
7    Defendant's Exhibit 17............... 348
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

1            I, Heather Spier, a Court
2    Reporter and a Notary Public for the
3    State of Alabama at Large, acting as
4    Commissioner, certify that on this date,
5    pursuant to Rule 30 of the Alabama Rules
6    of Civil Procedure and the foregoing
7    stipulation of counsel, there came before
8    me at 401 Adams Avenue, Montgomery,
9    Alabama, on August 17, 2007, commencing
10   at 9:05 a.m., JERRY MACCARTNEY, witness
11   in the above cause, for oral examination,
12   whereupon the following proceedings were
13   had:
14
15            JERRY MACCARTNEY,
16   being first duly sworn, was examined and
17   testified as follows:
18
19            THE REPORTER:  Usual
20   stipulations?
21            MR. NELMS:  Yes.
22            MS. MCGAHEY:  Yes.
23

Page 7

1        EXAMINATION BY MS. MCGAHEY:
2        Q.   Could you please state your
3    full name?
4        A.   Jerry MacCartney.
5        Q.   Mr. MacCartney, my name is
6    Jennifer McGahey.  We met just a minute
7    ago.  I am one of the lawyers who is
8    representing Chris Day, Henry Hicks and
9    Jeff Larry in the lawsuit that you have
10   filed against them.  Have you ever
11   given -- I'm sorry?
12        A.   How about Anthony Barber?
13            MR. NELMS:  No, we don't have
14   Anthony Barber.
15        A.   Okay.  Sorry.
16        Q.   That's okay.  Have you ever
17   given a deposition before?
18        A.   No.
19        Q.   I would like to just go over a
20   few of the ground rules so you and I are
21   on the same page as we go forward today.
22        A.   Okay.
23        Q.   Do you understand that you are

Page 8

1    under oath?
2        A.   Yes.
3        Q.   I will be asking you questions
4    and you will be providing responses to
5    those questions.  It would be great if
6    you could answer verbally and audibly.
7    You're doing a great job so far.  It just
8    makes it easier for Heather to take down
9    your responses.  I'm going to be asking
10   you from time to time questions that call
11   for a yes or a no answer.  If you could
12   please respond by saying yes or no as
13   opposed to nodding your head or saying
14   uh-uh or uh-uh.
15        A.   Okay.
16        Q.   Again, it makes it easier for
17   Heather to take down your responses.  If
18   you do not understand any of my
19   questions, please speak up and let me
20   know, and I will try to rephrase the
21   question so that you do understand it;
22   okay?
23        A.   Okay.

JERRY A. MACCARTNEY, ET AL.                                    JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.                            August 17, 2007

(Pages 9 to 12)

Page 9

1    Q.   If you don't tell me that my
2  question was unclear, I'm going to assume
3  that you understood the question; is that
4  fair?
5    A.   Yes.
6    Q.   If you need to take a break
7  for any reason, please let me know. I'm
8  happy to take a break. Are you currently
9  on any medications?
10   A.   Yes.
11   Q.   What medications?
12   A.   Aciphex, Singulair and
13  Amitriptyline.
14   Q.   Amitriptyline?
15   A.   Yes.
16   Q.   What do you take Aciphex for?
17   A.   To offset the effects of the
18  Singulair, my asthma. It's stomach
19  irritation.
20   Q.   How long have you been taking
21  Aciphex?
22   A.   Oh, probably ten years.
23   Q.   And Singulair is for your

Page 10

1  asthma?
2    A.   Yes.
3    Q.   How long have you been taking
4  Singulair?
5    A.   I dropped the inhalers I used
6  to take and went to Singulair
7  approximately about two years ago.
8    Q.   And prior to using Singulair
9  you were using an inhaler for your
10  asthma?
11   A.   Yes.
12   Q.   And how long have you been
13  taking Amitriptyline?
14   A.   That's about maybe five years.
15   Q.   And what do you take
16  Amitriptyline for?
17   A.   For nighttime headaches. I
18  don't realize I do, but the doctor says I
19  clench my teeth when I sleep. So it
20  somehow prevents that. I don't know how,
21  but it works good.
22   Q.   Any other medications you are
23  currently taking?

Page 11

1    A.   There's an Albuterol inhaler.
2  That's a rescue inhaler, but that's only
3  as needed. Once or twice a month maybe
4  I'll take a puff depending on weather
5  like today.
6    Q.   Do any of the medicines that
7  you are currently taking affect your
8  memory at all?
9    A.   No.
10   Q.   Do you have any medical
11  condition that may affect your ability to
12  testify truthfully today?
13   A.   No.
14   Q.   Have you had any recent memory
15  lapses?
16   A.   No.
17   Q.   Have you spoken with Bert
18  Mayer about his deposition?
19   A.   No.
20   Q.   Have you spoken with Bob
21  Winter about his deposition?
22   A.   Yes.
23   Q.   When did you speak with Bob

Page 12

1  Winter about his deposition?
2    A.   Yesterday.
3    Q.   Was it over the phone or in
4  person?
5    A.   In person.
6    Q.   Is that because you work
7  together?
8    A.   Yes.
9    Q.   Please tell me what was said.
10  What did he say, what did you say?
11   A.   He said, relax, tell the
12  truth; the people are very nice; they're
13  very kind; they're not going to bully
14  you. But he did say there were three of
15  you, so that's the only difference. Was
16  there three?
17       MR. NELMS: Was for Bob.
18   Q.   Anything else that you and Bob
19  discussed?
20   A.   He said just try to remember
21  as many facts as you can because there
22  are going to be a lot of specific
23  questions, and that's about it.

3

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 13 to 16)

Page 13

1    Q.    Did he tell you the types of
2    questions that you would be asked?
3    A.    Not specifics. He said there
4    would be a lot of detail questions about
5    what happened at Piknik and the events
6    and what happened to it and who was
7    present, and that's about it.
8    Q.    He didn't tell you to -- did
9    he tell you to be prepared about any
10    specific topic?
11    A.    No.
12    Q.    Anything else that you can
13    recall from your discussion with Bob
14    Winter?
15    A.    He said it was a long day.
16    Q.    Anything else?
17    A.    No.
18    Q.    Have you spoken with Shannon
19    McGlon about her deposition?
20    A.    No.
21    Q.    Have you spoken with Scott
22    McGlon about any of the depositions that
23    have taken place this week?

Page 14

1    A.    Yes.
2    Q.    When did you speak with Scott
3    McGlon?
4    A.    Yesterday.
5    Q.    Was this during your
6    discussion with Bob Winter?
7    A.    Yes.
8    Q.    All three of you were present?
9    A.    Yes.
10    Q.    What, if anything, did Scott
11    McGlon say?
12    A.    I'm trying to remember the
13    details. I think he was asking questions
14    about what our opinion was, how far Onyx
15    wanted to take this, whether they wanted
16    to actually go all the way to court or
17    not.
18    Q.    Can you repeat that, please?
19    A.    Whether or not Onyx actually
20    felt like this was in their best interest
21    to go all the way to court on this case
22    or not. He said his opinion was they
23    have no reason not to. And that's pretty

Page 15

1    much all he intervened during Bob's and
2    my discussion.
3    Q.    Anything else that you can
4    recall Scott McGlon saying during your
5    discussion with him and Bob?
6    A.    Yeah. He said Shannon was
7    nervous about hers.
8    Q.    Anything else?
9    A.    No.
10    Q.    Mr. MacCartney, have you ever
11    tape recorded a conversation with anyone?
12    A.    No.
13    Q.    You have no recordings of any
14    conversation with Chris Day; is that
15    correct?
16    A.    That's correct.
17    Q.    And you have no recordings of
18    any conversation with Jeff Larry?
19    A.    That's correct.
20    Q.    And you have no recording of
21    any conversation with Henry Hicks?
22    A.    That's correct.
23    Q.    Do you have any recording of a

Page 16

1    conversation with Brenda Sellers?
2    A.    No.
3    Q.    Do you have any recording of a
4    conversation with Anthony Barber?
5    A.    No.
6    Q.    Have you ever gone by any
7    other name besides Jerry MacCartney?
8    A.    Not formally, no.
9    Q.    What is your date of birth?
10    A.    2/17/61.
11    Q.    And your Social Security
12    number?
13    A.    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.
14    Q.    Do you have any family that
15    resides in the Montgomery area?
16    A.    Yes.
17    Q.    Who?
18    A.    My brother Kenneth.
19    Q.    Is his last name MacCartney as
20    well?
21    A.    Yes.
22    Q.    Does he live in Montgomery?
23    A.    Yes.

JERRY A. MacCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MacCARTNEY
August 17, 2007

(Pages 17 to 20)

Page 17

1   Q.   What does he do?
2   A.   I do not know.
3   Q.   Is he employed?
4   A.   I don't know.
5   Q.   Do you keep in touch with him?
6   A.   No.
7   Q.   Any other family that resides
8   in the Montgomery area?
9   A.   Yes. My mom's brother.
10  Q.   Your uncle?
11  A.   My uncle.
12  Q.   What is his name?
13  A.   Roger Sliter.
14  Q.   S-L-I --
15  A.   T-E-R.
16  Q.   Does he live in Montgomery
17  proper or in the suburb?
18  A.   Montgomery.
19  Q.   Is he employed?
20  A.   No. He's retired.
21  Q.   Do you know what he did before
22  he retired?
23  A.   He was a firefighter.

Page 18

1   Q.   Do you have any other
2   relatives that live in the Montgomery
3   area?
4   A.   No.
5   Q.   Are you married?
6   A.   Yes.
7   Q.   Does your wife live in
8   Montgomery?
9   A.   Yes.
10  Q.   What is her name?
11  A.   Wendy.
12  Q.   With an I or Y?
13  A.   Y.
14  Q.   Does Wendy work?
15  A.   No.
16  Q.   Stay at home?
17  A.   Yes.
18  Q.   How long have you and Wendy
19  been married?
20  A.   Eleven years.
21  Q.   So during the entire tenure
22  that you were with Piknik?
23  A.   Yes.

Page 19

1   Q.   Do you have any children?
2   A.   Yes.
3   Q.   How many?
4   A.   Two.
5   Q.   What are their names?
6   A.   Brittany and Caitlin. Caitlin
7   is our adopted daughter.
8   Q.   How old is Brittany?
9   A.   Eleven.
10  Q.   How old is Caitlin?
11  A.   Nine.
12  Q.   Where do you live?
13  A.   Winding Wood Drive in
14  Wetumpka.
15  Q.   What is the street number?
16  A.   832.
17  Q.   How long have you lived at 832
18  Winding Wood Drive?
19— A.   Just over four years.
20  Q.   Is that where you lived when
21  you worked at Piknik?
22  A.   Yes.
23  Q.   And I take it your wife and

Page 20

1   your two daughters lived with you at that
2   address?
3   A.   Yes.
4   Q.   Has anyone else ever lived
5   with you at that address?
6   A.   Yes.
7   Q.   Your mother?
8   A.   Yes.
9   Q.   Anyone else?
10  A.   No.
11  Q.   Mr. MacCartney, have you ever
12  been arrested?
13  A.   No.
14  Q.   Have you ever been married
15  before, before you married Wendy?
16  A.   Yes.
17  Q.   What is your ex-wife's name?
18  A.   Pamela Shea.
19  Q.   Does she live in the
20  Montgomery area?
21  A.   No.
22  Q.   Massachusetts?
23  A.   No.

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 8 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 21 to 24)

## Page 21

1  Q. Besides your marriage to
2 Pamela Shea and your marriage to Wendy
3 have you been married any other time?
4  A. No.
5  Q. Have you ever served in the
6 military?
7  A. No.
8  Q. Have you ever had to testify
9 in court?
10  A. No.
11  Q. Have you ever given any sworn
12 testimony before?
13  A. No.
14  Q. Have you ever been sued?
15  A. No.
16  Q. Besides this lawsuit have you
17 ever sued an individual or a company?
18  A. No.
19  Q. Have you ever filed for
20 bankruptcy?
21  A. No.
22  Q. Other than the EEOC charge
23 that you filed in connection with this

## Page 22

1 claim, have you ever filed any other EEOC
2 charge?
3  A. No.
4  Q. Where did you attend high
5 school?
6  A. Clinton, Massachusetts.
7  Q. Did you graduate?
8  A. Yes.
9  Q. What year?
10  A. 1979.
11  Q. What was the name of your high
12 school?
13  A. Clinton High School.
14  Q. Did you attend college?
15  A. Yes.
16  Q. Where did you attend college?
17  A. Fitchburg State College.
18  Q. Vicksburg?
19  A. Fitchburg.
20  Q. Is that in Massachusetts?
21  A. Yes.
22  Q. Did you graduate?
23  A. No.

## Page 23

1  Q. How many years did you
2 complete?
3  A. Four.
4  Q. Had you declared a major?
5  A. Yes.
6  Q. What was your declared major?
7  A. Business management.
8  Q. Do you know how much time or
9 how many credits you had left to obtain
10 your degree?
11  A. Six electives.
12  Q. Besides your attendance at
13 Fitchburg State College did you receive
14 any other formal education?
15  A. Yes.
16  Q. Where?
17  A. Mount Wachusett College.
18  Q. And where is Mount Wachusett
19 College?
20  A. In Gardner, Massachusetts.
21  Q. When did you attend Mount
22 Wachusett College?
23  A. Early '90s. I don't remember

## Page 24

1 the exact dates.
2  Q. Did you graduate?
3  A. Yeah. It was a certificate
4 program.
5  Q. What were you obtaining your
6 certificate in?
7  A. In CPIM.
8  Q. CPIM?
9  A. Yes. It's an APICS
10 certification program.
11  Q. What does that mean?
12  A. American production inventory
13 control society.
14  Q. When did you attend Fitchburg
15 State College?
16  A. Seven years. I did it at
17 night. Early '90s to -- until I moved
18 down here.
19  Q. Any other formal education you
20 have received?
21  A. No.
22  Q. Any vocational training?
23  A. Several courses outside of

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 25 to 28)

Page 25

1  work for other certificate programs.
2      Q.   Can you recall what other
3  certificates you have obtained?
4      A.   There was a CQE, which expired
5  in the '90s because I didn't keep taking
6  the additional credits.  Certified
7  quality stuff.  And there was a CIRM, a
8  curriculum through APICS, and I'm taking
9  one more course to finish that one.
10     Q.   You're currently taking a
11 course right now?
12     A.   I'm signed up for one in the
13 Fall if they get enough enrollment.
14     Q.   I want to go through your
15 employment history.  So can you tell me
16 where you have worked?  If you want to
17 take it since high school --
18     A.   Since high school I worked
19 part-time after school from tenth grade
20 through twelfth at a metal stamping and
21 painting company.  It was Clinton Sign &
22 Signal.  I worked for Zare's Warehouse in
23 Clinton.

Page 26

1      Q.   What did you do for Zare's
2  Warehouse?
3      A.   Ran a forklift.
4      Q.   How long did you work there?
5      A.   About a year.
6      Q.   After high school?
7      A.   Yes.
8      Q.   What did you do next?
9      A.   Worked for Digital Equipment
10 Corporation from 1980 to 1999.
11     Q.   Why did you leave Zare's
12 Warehouse?
13     A.   An opportunity to get a job at
14 Digital Equipment Corporation.
15     Q.   What did you do with Digital
16 Equipment Corporation?
17     A.   Several progressive jobs.
18     Q.   Let's start with the first
19 job.
20     A.   Inventory control.  And when I
21 left there, because the company was
22 acquired by Compaq Computer Corporation,
23 I was a Global Supply Chain Manager.

Page 27

1      Q.   Did you have different jobs
2  between Inventory Control and Global
3  Supply Chain Manager?
4      A.   Yes, several.
5      Q.   What were they?
6      A.   Production scheduler,
7  inventory planner, master production
8  scheduler, warehouse manager, materials
9  analyst, purchasing specialist,
10 purchasing manager and then Global Supply
11 Chain Manager.
12     Q.   What did Digital Equipment
13 Corporation do?
14     A.   Made computers.
15     Q.   And I see during your tenure
16 at Digital Equipment Corporation you held
17 management positions at various times?
18     A.   Yes.
19     Q.   Did you have hiring authority?
20     A.   Yes.
21     Q.   Did you have firing authority?
22     A.   Yes.
23     Q.   And you had discipline

Page 28

1  authority I assume?
2      A.   Uh-huh.
3      Q.   Is that a yes?
4      A.   Yes.
5      Q.   Did you ever have to terminate
6  an employee's employment?
7      A.   Yes.
8      Q.   Can you recall how many
9  occasions you've had to terminate
10 someone's employment when you were
11 working at Digital Equipment Corporation?
12     A.   Once.
13     Q.   Did you ever have to -- strike
14 that.  During your employment at Digital
15 Equipment Corporation was there ever a
16 time where jobs were eliminated?
17     A.   Yes.
18     Q.   Did you have to make any
19 decision on which jobs to eliminate?
20     A.   No.
21     Q.   You weren't involved in that
22 process; correct?
23     A.   I wasn't at that level of

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 10 of 138
JERRY A. MACCARTNEY, ET AL.                                    JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.                             August 17, 2007

(Pages 29 to 32)

Page 29

1  management. There was other employment.
2  I'm not sure if you are finished with
3  Digital Equipment.
4      Q.   And you said that Compaq
5  purchased Digital Equipment Corporation?
6      A.   Yes.
7      Q.   And at that time you were
8  Global Supply Chain Manager?
9      A.   Yes.
10     Q.   What did you do as Global
11 Supply Chain Manager?
12     A.   I managed worldwide inventory
13 for my assigned commodities.
14     Q.   By assigned commodities what
15 do you mean?
16     A.   The product sets that were
17 assigned to me to manage.
18     Q.   These are products that
19 Digital or Compaq had manufactured?
20     A.   Yes, and/or distributed.
21     Q.   Why did you leave Digital
22 Equipment Corporation?
23     A.   My job moved to Houston. They

Page 30

1  wanted me to go with it, and I did not
2  want to go to Houston, Texas.
3      Q.   Was Digital Equipment
4  Corporation based in Massachusetts?
5      A.   Yes, Maynard, Massachusetts.
6      Q.   What did you do after you left
7  Digital Equipment Corporation?
8      A.   Went to work for Polar
9  Beverages.
10     Q.   Is that based in
11 Massachusetts?
12     A.   Yes.
13     Q.   What did you do for Polar
14 Beverages?
15     A.   I was hired as their
16 purchasing manager, and I was promoted to
17 Vice President of Logistics.
18     Q.   How long were you purchasing
19 manager?
20     A.   One year.
21     Q.   Is that when you were promoted
22 to Vice President of Logistics?
23     A.   Yes.

Page 31

1      Q.   How long were you Vice
2  President of Logistics?
3      A.   The remaining three.
4      Q.   So you were at Polar Beverages
5  from 1999 to 2003?
6      A.   Yes, March I believe it was.
7      Q.   Until March 2003?
8      A.   Yes, somewhere in there.
9      Q.   How did you come to work at
10 Polar Beverages?
11     A.   After I left Digital I
12 responded to a posting in the newspaper.
13     Q.   What does Polar Beverages do?
14     A.   Manufacture and distribute
15 carbonated and noncarbonated soft drinks
16 throughout New England and the East
17 Coast.
18     Q.   Carbonated and noncarbonated
19 drinks?
20     A.   Yes.
21     Q.   Is it the exact same thing
22 that Piknik did or is it different?
23     A.   Different in the aspect that

Page 32

1  most of the bottling production was
2  carbonated versus noncarbonated hot fill.
3      Q.   Most of the production at
4  Polar Beverages was carbonated and
5  noncarbonated and not hot fill?
6      A.   Yes.
7      Q.   What is the difference? What
8  is hot fill?
9      A.   Hot fill is a pasteurization
10 method; as where carbonated soft drinks
11 have perseveratives. Nothing can grow in
12 there.
13     Q.   What were your
14 responsibilities as purchasing manager at
15 Polar Beverages?
16     A.   Managing the purchasing of
17 products that we did not manufacture but
18 distributed, as well as other inventory
19 items. Manage supply relationships,
20 negotiate costs, contracts, inbound
21 logistics.
22     Q.   So does that include getting
23 the raw materials into the manufacturing

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 33 to 36)

Page 33

1  facility?
2      A.   Yes.
3      Q.   That's what you mean by
4  inbound logistics?
5      A.   Yes.
6      Q.   And you were also in charge of
7  the distribution of products that Polar
8  Beverages did not manufacture but
9  distributed?
10     A.   Yes.  I was purchasing those
11 from the other manufacturers.
12     Q.   You were purchasing product
13 from other manufacturers to distribute?
14     A.   Yes.
15     Q.   Were you also purchasing raw
16 materials that were used to manufacture
17 the products that Polar Beverages was
18 manufacturing?
19     A.   Yes.
20     Q.   Who was your boss when you
21 were purchasing manager?
22     A.   Bob Winter.
23     Q.   Is that the same Bob Winter

Page 34

1  who is your coplaintiff?
2      A.   Yes.
3      Q.   How long have you known Bob?
4      A.   Since he hired me as
5  purchasing manager at Polar.
6      Q.   Was Bob Winter the individual
7  who promoted you to VP of Logistics?
8      A.   No.
9      Q.   Who was your boss when you
10 became VP of Logistics?
11     A.   Chris Crowley.
12     Q.   Chris Crowley?
13     A.   Yes.  He's the owner.
14     Q.   What were your job
15 responsibilities as VP of Logistics?
16     A.   Manage all the warehousing,
17 shipping, transportation, direct store
18 delivery for four warehouses, three cross
19 docks --
20     Q.   Three cross?
21     A.   Cross docks.
22     Q.   Three cross docks?
23     A.   Three cross docks throughout

Page 35

1  New England and the East Coast.
2      Q.   You managed the warehousing?
3      A.   Yes, warehousing, shipping,
4  receiving, transportation, direct store
5  delivery.
6      Q.   You said direct store
7  delivery?
8      A.   Yes.
9      Q.   What were you making as VP of
10 Logistics salarywise?
11     A.   Eighty-five thousand a year.
12     Q.   Is that what you were making
13 at the time you left Polar Beverages?
14     A.   Yes.
15     Q.   As VP of Logistics I take it
16 you had employees who were reporting to
17 you?
18     A.   Yes.
19     Q.   Did you ever have to terminate
20 anyone's employment?
21     A.   Yes.
22     Q.   Do you recall how many times
23 you had to terminate someone's employment

Page 36

1  when you were at Polar Beverages?
2      A.   Directly or indirectly?
3      Q.   Well, let's talk about
4  directly first?
5      A.   Yes, about four times.
6      Q.   And how many times indirectly?
7      A.   Five.
8      Q.   What do you mean by directly
9  versus indirectly?
10     A.   That I sat down and dismissed
11 the person.
12     Q.   Which one is that?
13     A.   The four times, directly.
14     Q.   Did you make the decision to
15 terminate?
16     A.   Yes.
17     Q.   Tell me what you mean by
18 indirectly, then.
19     A.   That one of my managers had
20 employees who needed to be terminated,
21 requested my approval, and I gave them my
22 approval, and they sat down and conducted
23 the termination.

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 37 to 40)

Page 37

1    Q.   So indirectly you made the
2  decision to terminate, but you had one of
3  your employees deliver the news?
4    A.   One of my managers, yes.
5    Q.   The four times that you had to
6  directly terminate someone's employment
7  do you recall the reasons?
8    A.   Yes.
9    Q.   Tell me those reasons.
10    A.   Attendance and misconduct.
11    Q.   All four terminations could be
12  divided between attendance issues and
13  conduct issues?
14    A.   In both, yes.
15    Q.   What about the five times that
16  you indirectly terminated an employee's
17  employment, what were the reasons?
18    A.   Same thing.
19    Q.   Attendance and misconduct
20  issues?
21    A.   Yes.
22    Q.   When you were at Polar
23  Beverages were jobs ever eliminated?

Page 38

1    A.   No.
2    Q.   After Polar Beverages you went
3  to work at Piknik?
4    A.   Yes.
5    Q.   You started at Piknik around
6  April of 2003?
7    A.   Yes.
8    Q.   Early April?
9    A.   Yeah, the 1st or the 2nd I
10  believe.
11    Q.   Tell me how you came to work
12  at Piknik.
13    A.   Bob Winter had contacted me
14  after he went to Piknik, about a year
15  after he went to Piknik. He said the
16  logistics -- the entire logistics and
17  supply chain function needed some serious
18  help. And he tried to recruit me, but I
19  chose not to come at that time. That was
20  in 2000, 2001 I think it was. And I
21  think it was two years later he contacted
22  me again, tried to recruit me. I think
23  Mike O'Connell followed up on recruiting

Page 39

1  me from there.
2    Q.   So initially Bob Winter
3  contacted you in 2000 or 2001 to see if
4  you would come to Piknik?
5    A.   Yes. I came down,
6  interviewed, decided not to pursue it at
7  that time.
8    Q.   Why did you decide not to
9  pursue it at that time?
10    A.   The condition of the company
11  at the time. They were going through
12  some refinancing of their long-term debt,
13  and there was some customer contracts
14  that had not been secured yet.
15    Q.   So approximately two years
16  later you're contacted again by Piknik?
17    A.   Yes.
18    Q.   By Bob Winter?
19    A.   Yes.
20    Q.   And eventually Mike O'Connell
21  enters the recruiting picture?
22    A.   Yes.
23    Q.   What was Mike O'Connell's

Page 40

1  position at the time, if you know?
2    A.   CEO or COO. I'm not sure
3  which one.
4    Q.   At that time had the condition
5  of the company changed from the previous
6  two years?
7    A.   Yes.
8    Q.   For the better?
9    A.   Yes.
10    Q.   And had the customer contracts
11  been secured?
12    A.   There was new customers on
13  board, and they were maintaining cash
14  flow, positive cash flow.
15    Q.   Did you go through an
16  interview process?
17    A.   Yes.
18    Q.   Who did you interview with?
19    A.   Mike O'Connell, Ricky Loeb,
20  Robert Lampert and Becky Messenger.
21    Q.   And you said that Mike
22  O'Connell was either CEO or COO?
23    A.   Yes.

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 41 to 44)

Page 41

1    Q.    What was Ricky Loeb?
2    A.    He was owner.
3    Q.    What about Robert Lampert?
4    A.    He was CFO.
5    Q.    And Becky who?
6    A.    Messenger.
7    Q.    Messenger. Who was Becky
8    Messenger?
9    A.    She was the controller.
10    Q.    Did you have individual
11    interviews with these individuals, or was
12    it a group interview?
13    A.    Both.
14    Q.    At first were they individual
15    interviews?
16    A.    Yes.
17    Q.    Followed by group interviews?
18    A.    Yes.
19    Q.    You got a job offer?
20    A.    Yes.
21    Q.    What position were you
22    interviewing for?
23    A.    Director of Logistics.

Page 42

1    Q.    And that's the job you
2    received the job offer for; correct?
3    A.    Yes.
4    Q.    And you accepted it?
5    A.    Yes.
6    Q.    At the time that you were
7    entering and going through that process
8    were you aware that Piknik was searching
9    for investors in the company or a
10    potential purchaser of the company or
11    anything along those lines?
12    A.    They always told me they were
13    looking for investment and venture
14    capitalists to help secure some of the
15    long-term debt and provide some funding
16    for the expansion and growth plans that
17    were needed to handle the additional
18    customers that were in the pipeline.
19    Q.    Did you know specifically who
20    Piknik was speaking of?
21    A.    At the time I was
22    interviewing?
23    Q.    Yes.

Page 43

1    A.    No.
2    Q.    And you started in April of
3    '03?
4    A.    Yes.
5    Q.    What was your starting salary?
6    A.    96.6.
7    Q.    Ninety-six thousand, six
8    hundred dollars?
9    A.    Yes.
10    Q.    How long were you Director of
11    Logistics?
12    A.    Until May of 2005.
13    Q.    Is Director of Supply Chain
14    Management the same thing as Director of
15    Logistics?
16    A.    Very similar.
17    Q.    Do you recall at all having
18    that title of Director of Supply Chain
19    Management?
20    A.    Director of Supply Chain
21    Manager? No. I was told it was Director
22    of Logistics. I believe that's in my
23    offer letter, if memory serves me.

Page 44

1    Q.    I'm sorry?
2    A.    I believe my offer letter
3    stated it, if memory serves me correctly.
4    Q.    What is the difference, if
5    any, between those two positions, though?
6    A.    Semantics.
7    Q.    Okay.
8    A.    Supply chain management was
9    really becoming an outdated term in the
10    industry. Logistics was more of an
11    encompassing title. That would be more
12    predominantly used.
13    Q.    So the Director of Logistics
14    position encompasses the duties of a
15    Director of Supply Chain Management?
16    A.    Yes.
17    Q.    So you were Director of
18    Logistics until May of 2005?
19    A.    Yes.
20    Q.    What was your next position?
21    A.    Plant manager.
22    Q.    As plant manager were you in
23    charge of one facility or multiple

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 14 of 138
JERRY A. MACCARTNEY, ET AL.                                     JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.                                   August 17, 2007

(Pages 45 to 48)

Page 45

1   facilities?
2       A.   One.
3       Q.   Which facility?
4       A.   Alatex Road.
5       Q.   What is manufactured or
6   produced at the Alatex Road facility?
7       A.   Hot-fill beverages.
8       Q.   Are condiments produced at
9   that facility?
10      A.   No.
11      Q.   And how long were you plant
12  manager of the Alatex facility?
13      A.   Until I was terminated.
14      Q.   And when were you terminated?
15      A.   June 29, I believe.
16      Q.   Of 2005?
17      A.   Yes.
18      Q.   You started out at ninety-six
19  thousand, six hundred dollars per year as
20  Director of Logistics?
21      A.   Yes.
22      Q.   Did you ever receive any pay
23  increase when you were Director of

Page 46

1   Logistics?
2       A.   Yes.
3       Q.   Do you recall when you
4   received a pay increase?
5       A.   Chris Day gave me an increase
6   I believe it was in March or April of
7   2005, increased my salary to one hundred
8   thousand.
9       Q.   Was any reason given to you to
10  explain the pay increase?
11      A.   Yes.
12      Q.   What was told to you?
13      A.   My exemplary performance in
14  logistics, cost savings that I had
15  produced and the increased customer
16  satisfaction and on-time delivery and the
17  example I set as an exemplary employee.
18      Q.   Did you receive a letter from
19  Chris Day?
20      A.   Yes.
21      Q.   Do you have a copy of that
22  letter?
23      A.   No.

Page 47

1       Q.   Do you know what you did with
2   it?
3       A.   No, I don't. I'm sure it's in
4   the HR records.
5       Q.   When you started out as
6   Director of Logistics who was your boss?
7       A.   Mike O'Connell.
8       Q.   Who was your boss after Mike
9   O'Connell?
10      A.   Chris Day.
11      Q.   Is that because Mike O'Connell
12  left the company?
13      A.   Yes.
14      Q.   Do you recall that being in
15  January of 2004?
16      A.   Yes.
17      Q.   Was Chris Day your boss the
18  rest of the time that you were Director
19  of Logistics?
20      A.   No.
21      Q.   How long was Chris Day your
22  immediate boss?
23      A.   Until Bill McLennan was hired.

Page 48

1   I don't recall the interval, maybe six
2   months later.
3       Q.   So Bill McLennan -- so
4   whenever he comes on board he becomes
5   your immediate boss?
6       A.   He was hired as the COO of the
7   company, yes, and I reported directly to
8   him.
9       Q.   And how long did you report
10  directly to him?
11      A.   Until he left six months later
12  I believe it was.
13      Q.   And after Bill McLennan left
14  who was your boss?
15      A.   Chris Day.
16      Q.   And then was Chris Day your
17  boss until you became plant manager?
18      A.   No.
19      Q.   How long was Chris Day your
20  boss for the second time around?
21      A.   I believe it was only a couple
22  of months.
23      Q.   Who was your next boss when

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 49 to 52)

Page 49

1  you were Director of Logistics?
2      A.   Anthony Barber.  They hired
3  him to replace Bill McLennan.
4      Q.   Was Anthony Barber your
5  immediate boss the rest of the time that
6  you were Director of Logistics?
7      A.   Yes.
8      Q.   And then you became a plant
9  manager?
10      A.   Yes.
11      Q.   Who was your boss when you
12  were plant manager?
13      A.   Anthony Barber.
14      Q.   And was Anthony Barber your
15  boss the entire time that you were plant
16  manager?
17      A.   Yes.
18      Q.   What were your job duties as
19  Director of Logistics?
20      A.   Oversee warehouse operations,
21  which included incoming and outgoing
22  materials, purchasing and production
23  scheduling, as well as I was given

Page 50

1  responsibility for the IT department.
2      Q.   So you oversaw warehouse
3  operations?
4      A.   Yes.
5      Q.   And that included materials
6  coming into the manufacturing facilities?
7      A.   Yes.
8      Q.   And materials going out of the
9  manufacturing facilities?
10      A.   Yes.  As well as managing
11  material in between, accounting for it,
12  issuing it to the production line,
13  tracking losses, gains, yields and
14  scheduling the production lines.
15      Q.   As Director of Logistics were
16  you -- did you have responsibility for
17  all of the Piknik facilities?
18      A.   Initially just Montgomery
19  facilities.
20      Q.   Just the beverage facilities?
21      A.   Yes, initially.  And then a
22  few months after I was hired, I don't
23  remember exactly how much, I was given

Page 51

1  responsibility for logistics and material
2  control in the Brundidge facility as
3  well.
4      Q.   You said a few months after
5  you were hired?
6      A.   Yeah.  I don't recall the
7  exact interval.  Six, maybe nine months.
8  I'm not sure.
9      Q.   And whatever point that
10  occurred did you have responsibility for
11  all three facilities the rest of your
12  time as Director of Logistics?
13      A.   Yes.
14      Q.   Where was your office?
15      A.   Day Street.
16      Q.   And you said that you were
17  also responsible for purchasing?
18      A.   Yes.
19      Q.   Is that purchasing of raw
20  materials?
21      A.   Yes.  My staff was, actually.
22      Q.   You oversaw your staff who was
23  responsible for purchasing the raw

Page 52

1  materials?
2      A.   Yes.
3      Q.   And you said you had
4  responsibility for production scheduling?
5      A.   Yes.
6      Q.   And you were also given
7  responsibilities over the IT department?
8      A.   Yes.
9      Q.   As Director --
10      A.   Also safety.  I'm sorry.  I
11  forgot safety.
12      Q.   Roughly how many employees
13  reported to you when you were Director of
14  Logistics?
15      A.   With all three plants I would
16  say forty perhaps, maybe fifty directly
17  and indirectly.
18      Q.   During the time that you were
19  Director of Logistics did you have hiring
20  authority?
21      A.   Yes.
22      Q.   Did you also have firing
23  authority?

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 53 to 56)

Page 53

1    A.   Yes.
2    Q.   You had authority to
3  discipline employees?
4    A.   Yes.
5    Q.   Did you ever have to terminate
6  any employees when you were Director of
7  Logistics?
8    A.   Yes.
9    Q.   Do you recall who you had to
10  terminate?
11    A.   Daniel Edwards.
12    Q.   Anyone else?
13    A.   Other forklift drivers.
14    Q.   Those hourly employees?
15    A.   Yes.
16    Q.   Did you ever have to terminate
17  any salaried employees?
18    A.   Just Daniel Edwards.
19    Q.   What was Daniel Edwards?
20    A.   He was an IT manager.
21    Q.   Why was he fired?
22    A.   He was replaced with a
23  minority from Onyx, Athenia Figgs.

Page 54

1    Q.   Is Athenia Figgs a male or
2  female?
3    A.   Female.
4    Q.   What is Daniel Edwards' race?
5    A.   He's white.
6    Q.   Did you have to deliver the
7  termination message to Daniel Edwards?
8    A.   Yes.
9    Q.   Did you make the decision?
10    A.   No.
11    Q.   Who made the decision?
12    A.   Onyx.
13    Q.   Who at Onyx?
14    A.   Chris Day and Athenia Figgs.
15    Q.   So Athenia Figgs was already
16  working at Piknik at the time?
17    A.   She was working for Onyx. She
18  had committed an assessment of the IT
19  infrastructure, recommended his
20  termination, Chris Day approved it, and
21  she replaced him.
22    Q.   Was Athenia Figgs an employee
23  of Onyx?

Page 55

1    A.   Yes.
2    Q.   Or was she a consultant for
3  Onyx?
4    A.   Employee of Onyx. She had an
5  Onyx business card. Introduced herself
6  as an Onyx employee.
7    Q.   And you said she did an
8  assessment of the IT department?
9    A.   Yes, the overall IT
10  infrastructure for the company.
11    Q.   Do you recall when that
12  overall IT infrastructure assessment was
13  done?
14    A.   I don't know the exact time
15  frame. It was shortly after Onyx bought
16  51 percent ownership in the company. It
17  was within three to six months of that
18  happening, within three months of that
19  happening.
20    Q.   When did Onyx buy 51 percent
21  of the company?
22    A.   Spring 2003. I don't know the
23  exact date. Spring or early summer.

Page 56

1    Q.   Were you involved in the
2  assessment of the IT infrastructure?
3    A.   Yes.
4    Q.   What was your involvement?
5    A.   Providing information.
6    Q.   Excuse me?
7    A.   Providing information.
8    Q.   Just responding to information
9  requests from Athenia Figgs?
10    A.   Yes, as well as a firm she
11  brought in from Atlanta, a minority firm.
12    Q.   Who was the firm that she
13  brought in from Atlanta?
14    A.   I don't recall the name. It's
15  on record somewhere in the company.
16    Q.   Are you saying that the
17  consulting firm was an MBE?
18    A.   I don't know if it was an MBE.
19  There were three minority people that
20  came in for the assessment.
21    Q.   I'm sorry?
22    A.   There were three minority
23  people that she brought in as consultants

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 57 to 60)

Page 57

1  as part of the assessment.
2      Q.   And based on the fact that
3  three minorities were present for the
4  assessments, you believe it was a
5  minority firm?
6      A.   No.  Because I believe there
7  was a minority firm in Atlanta they
8  hired, but I don't have the facts.  But
9  memory serves it was a minority firm as
10  well.
11      Q.   You don't recall the name?
12      A.   No.  I'm sure it's in the
13  accounts payable department because I
14  paid them, hopefully.
15      Q.   Were you involved in the
16  decision to let Daniel Edwards go?
17      A.   Yes.
18      Q.   Were there meetings about
19  terminating Daniel Edwards?
20      A.   Yes.
21      Q.   How many?
22      A.   Don't know.  I wasn't
23  involved.  I was approached, asked if I

Page 58

1  agreed with their assessment and
2  decision, and I was told, yes, I agreed.
3      Q.   Repeat that for me again.  The
4  consulting firm comes in?
5      A.   Did an assessment.
6      Q.   Did the assessment with
7  Athenia Figgs?
8      A.   Yes.
9      Q.   Was a final report done?
10      A.   Yes.
11      Q.   Were you given a copy of that
12  final report?
13      A.   Yes.
14      Q.   Do you have a copy of that
15  final report?
16      A.   No.  I might have it
17  electronically somewhere.  I have never
18  looked for it, actually.
19      Q.   Did you read the report?
20      A.   Yes.
21      Q.   Do you recall what the
22  assessment of the IT infrastructure was
23  in that report?

Page 59

1      A.   Main assessment was that the
2  e-mail infrastructure needed to be
3  upgraded to be more modernized with the
4  latest technology, that the Mass 200 ERP
5  system was more than adequate of handling
6  the needs of the business and that the
7  proposed warehouse management project
8  that was underway was not needed.
9      Q.   That the what?
10      A.   Proposed management warehouse
11  system project was not needed because the
12  Mass 200 system could handle all those
13  needs and the company was not attempting
14  to utilize those facets of the Mass 200
15  system.
16      Q.   Do you recall anything else
17  about the consulting firm's assessment?
18      A.   No.
19      Q.   Did the consulting firm have
20  any recommendations as far as personnel
21  issues?
22      A.   Not that I recall.
23      Q.   You believe there were

Page 60

1  meetings about terminating Daniel
2  Edwards?
3      A.   Yes.
4      Q.   But you were not part of any
5  of those meetings; correct?
6      A.   Correct.  After the consulting
7  project was done, the IT department was
8  given to Athenia Figgs to manage, and
9  within one month Daniel was let go and
10  she replaced his duties.
11      Q.   Do you know Ms. Figgs'
12  educational background?
13      A.   No.
14      Q.   Do you know her work history?
15      A.   Only from what Chris Day told
16  me.
17      Q.   What did Chris Day tell you?
18      A.   She's a sharp individual on
19  projects --
20      Q.   Sharp individual on projects?
21      A.   On technical projects but
22  falls flat on her face when it comes to
23  managing people.  That was before the

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 18 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 61 to 64)

Page 61

1   assessment was done. He informed me of
2   that when he first brought her in. He
3   said I would enjoy working with her, that
4   she was very technical and
5   detail-oriented like myself.
6     Q.   That's what you said?
7     A.   That's what Chris Day told me.
8     Q.   When does it come to your
9   attention that Daniel Edwards is going to
10   be terminated?
11     A.   Athenia approached me in my
12   office, said the decision was being made
13   and why and that I needed to conduct it,
14   the termination meeting, even though he
15   was no longer reporting to me because I
16   felt I was better suited to conduct that
17   meeting, because of Daniel's familiarity
18   with me.
19     Q.   Athenia approaches you in your
20   office?
21     A.   Yes.
22     Q.   Tell me what she says.
23     A.   She said, we're going to be

Page 62

1   terminating Daniel Edwards, we don't feel
2   he has the skills to take the technology
3   department to where the company needs it
4   to be and that I need to conduct a
5   termination meeting. I objected because
6   I said he no longer reported to me, and I
7   was told, pretty much, objection
8   overruled, you need to do it anyway.
9     Q.   Do you do it?
10     A.   Yes.
11     Q.   Did you disagree with Athenia
12   in terms of did you feel that Daniel
13   Edwards had the technical skills
14   necessary?
15     A.   Yes. I voiced to them that I
16   felt he had not be given adequate
17   resources to properly structure and
18   provided the tools our IT department
19   needed to properly run the company.
20     Q.   That's what you told to
21   Athenia?
22     A.   Yes.
23     Q.   During this meeting where she

Page 63

1   comes to you and asks you to terminate
2   Daniel Edwards?
3     A.   Yes.
4     MR. NELMS: I'm sorry. I'm
5   unclear on something. Jennifer asked a
6   question as to whether you agreed with
7   the assessment that Daniel Edwards was
8   not qualified to fulfill the role.
9     A.   Yes.
10     MS. MCGAHEY: I don't think
11   that's what I asked.
12     MR. NELMS: Did you believe
13   that Daniel Edwards was qualified to
14   fulfill the IT role?
15     A.   I believe he was qualified.
16   Their assessment was because he lacked
17   formal education and background and
18   formal training in that area he wasn't
19   qualified. I felt he had plenty of
20   knowledge and ability.
21     Q.   (BY MS. MCGAHEY:) Okay.
22   That's the first time you've said that
23   that's why in terms of he lacked formal

Page 64

1   education. I need to know what was said
2   during that meeting. So Athenia Figgs
3   comes to you and asks you to terminate
4   Daniel Edwards; correct?
5     A.   She said the decision had been
6   made to terminate Daniel Edwards because
7   they feel he lacks the ability to take
8   the company to where it needs to be as
9   far as the IT infrastructure. And I told
10   them I felt he had the ability, just had
11   not been given sufficient resources to do
12   it. They said because he lacks the
13   technical training and formal education
14   in that discipline they don't feel he was
15   qualified.
16     Q.   Did he have formal training in
17   the discipline?
18     A.   Not to my knowledge, as far as
19   college courses on that specific courses.
20   I believe he took a lot of individual
21   courses to teach himself, but I do not
22   know what they were. I don't recall what
23   they were.

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 65 to 68)

Page 65

1    Q.   And you believe that Athenia
2  Figgs then became the IT manager?
3    A.   I believe, if memory serves me
4  correctly, it was about a month before
5  that that they said IT is now going to
6  report to Athenia Figgs, Onyx employee.
7  She's going to take over running that
8  department. It was approximately --
9    Q.   And before that you were
10  running the IT department?
11    A.   Yes.
12    Q.   Who is Mike Osborne?
13    A.   Michael Osborne was hired by
14  Athenia approximately four months after
15  she assumed Daniel's duties.
16    Q.   Was he the new IT manager?
17    A.   Yes.
18    Q.   What is his race?
19    A.   He's white.
20    Q.   Do you know if between the
21  time that Daniel Edwards left and Michael
22  Osborne came on board, whether Piknik was
23  interviewing people for the IT manager

Page 66

1  position?
2    A.   No, I don't know that. I
3  assume they found him somewhere.
4    Q.   But you're unaware of they
5  were also interviewing other candidates
6  besides Michael Osborne during that time
7  period?
8    A.   I'm unaware of whether they
9  were or not.
10    Q.   Besides Daniel Edwards, when
11  you were Director of Logistics did you
12  have to terminate anyone's employment?
13    A.   Yes.
14    Q.   Who else?
15    A.   Clarence. And I don't
16  remember his last name. He got into a
17  heated argument with foul language and
18  unacceptable behavior with another
19  employee from another department on
20  second shift.
21    Q.   What is Clarence's race?
22    A.   He was black.
23    Q.   Anyone else that you have had

Page 67

1  to terminate during the time that you
2  were Director of Logistics?
3    A.   Yes. Jenny -- I can't
4  remember her last name. I don't remember
5  her name. She was an elderly lady that
6  used to track our yield loss reporting
7  and production scheduling adherence.
8    Q.   Why did you terminate Jenny?
9    A.   I was told to by Chris Day.
10    Q.   Did he say why?
11    A.   Felt she lacked sufficient
12  training and skills and the position was
13  no longer needed and that other folks
14  should be able to assume her duties.
15    Q.   Do you recall when this was
16  that Jenny was terminated?
17    A.   Not precisely. January 2004,
18  Spring 2004, perhaps.
19    Q.   Chris Day told you that he
20  felt that Jenny lacked the training
21  necessary to do her job duties?
22    A.   Yes.
23    Q.   And that her job duties would

Page 68

1  be divided amongst other existing
2  employees?
3    A.   Yes, in my department.
4    Q.   Were Jenny's duties divided
5  amongst other employees in the
6  department?
7    A.   Yes. It may not be Jenny.
8  Let me think about it. The name will
9  come to me. I'll just keep going, and if
10  it comes to me, I'll let you know.
11    Q.   Sure.
12    MR. NELMS:  Good time to
13  break?
14    MS. MCGAHEY:  In just one
15  second.
16    Q.   (BY MS. MCGAHEY:)  Who else
17  besides Daniel Edwards, Clarence and
18  possibly Jenny, who else did you have to
19  terminate when you were Director of
20  Logistics?
21    A.   Well, there was actually
22  several positions in the warehouse at
23  Alatex that were eliminated due to the

17

JERRY S. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 20 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 69 to 72)

Page 69

1 process efficiency improvements we made.
2      Q.   Do you recall when those
3 positions were eliminated?
4      A.   Summer of 2004 I believe.
5      Q.   So after Onyx came on board?
6      A.   Yes.
7      Q.   Do you recall roughly how many
8 positions were eliminated?
9      A.   I believe it was eight.
10      Q.   Do you recall the race makeup
11 of those eight positions?
12      A.   I believe they were 50/50.
13      Q.   African-Americans and
14 Caucasians?
15      A.   And I think there was a
16 Hispanic.
17      Q.   What was Jenny's race?
18      A.   She was white.
19      Q.   Do you know who made the
20 decision to eliminate those eight
21 positions --
22      A.   I did.
23      Q.   -- in the Summer of 2004?

Page 70

1      A.   I did. It was stretched over
2 about a three-month period.
3      Q.   Had you received direction to
4 look for positions that could be
5 eliminated?
6      A.   No. That was my job.
7      Q.   It was just part of your job
8 responsibilities?
9      A.   Finding ways to improve the
10 business so we didn't need as many people
11 to run it.
12      Q.   Anyone else you can recall
13 having to let go during your tenure as
14 Director of Logistics?
15      A.   Yes. There was another second
16 shift forklift driver, but I don't
17 remember his name. It was within his
18 ninety-day probation period. He didn't
19 make it through his probation period.
20      Q.   Anyone else?
21      A.   No, not that I can think of.
22      Q.   And besides the eight
23 positions that you eliminated during the

Page 71

1 Summer of 2004, were there other times
2 that you had to eliminate positions
3 during your tenure as Director of
4 Logistics?
5      A.   I'm trying to think if there
6 was any in Brundidge. I don't believe
7 there was any in Brundidge.
8      Q.   So you can't recall any --
9      A.   Not that I recall.
10      Q.   The eight positions that you
11 eliminated in the Summer of 2004, was
12 that at what facility?
13      A.   Alatex.
14      MS. MCGAHEY: Let's take a
15 break.
16      (Whereupon, a break was taken
17      from 10:17 to 10:26 a.m.)
18      Q.   (BY MS. MCGAHEY:) Mr.
19 MacCartney, before the break you were
20 telling me about individuals who you had
21 to terminate during your time as Director
22 of Logistics; correct?
23      A.   Yes.

Page 72

1      Q.   I understand that in addition
2 to the folks that you have already told
3 me about, you recall another individual?
4      A.   Yes.
5      Q.   Who?
6      A.   Clyde Luster.
7      Q.   Clyde?
8      A.   Luster.
9      Q.   What were the circumstances
10 surrounding Mr. Luster's departure?
11      A.   Brenda Sellers informed me
12 that she had been told by another
13 employee that he made racist comments.
14 He denied them, but I was told I needed
15 to terminate him. I was told -- I
16 disagreed because there was no proof, and
17 there was one person's word against
18 another. And I was told that by Brenda
19 that she discussed it with Chris Day and
20 the decision had been made.
21      Q.   What was Clyde Luster's
22 position?
23      A.   He was a warehouse supervisor

Case 2:05-cv-01207-MHT-TFM   Document 74   Filed 10/29/2007   Page 21 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 73 to 76)

Page 73

1    at Day Street.
2       Q.    What is his race?
3       A.    He's white.
4       Q.    So Brenda Sellers comes to
5    you?
6       A.    Yes.
7       Q.    And tells you that there was
8    an employee, Clyde Luster, who had made a
9    racist comment?
10      A.    Yes.
11      Q.    And that Clyde Luster had
12   denied making them?
13      A.    Yes.
14      Q.    But you were told to terminate
15   Mr. Luster anyway?
16      A.    Yes. I was not given an
17   opportunity to get his side of the story.
18      Q.    Do you know if an
19   investigation had already been conducted?
20      A.    It appeared that one had been
21   done.
22      Q.    Do you know what the comment
23   that was attributed to Mr. Luster was?

Page 74

1       A.    I don't recall, but I think it
2    was in the nature of "them people" is
3    what it was reported.
4       Q.    And Brenda Sellers told you
5    that she had discussed the matter with
6    Chris Day?
7       A.    Yes.
8       Q.    And Brenda Sellers told you
9    that a decision had already been made to
10   let Mr. Luster go?
11      A.    Yes.
12      Q.    So did you deliver the news to
13   Mr. Luster?
14      A.    Yes.
15      Q.    Anything else that you can
16   recall regarding Mr. Luster's departure?
17      A.    I understand he made the
18   comment to or in front of Eddie Crosby.
19   Eddie then reported to Brenda, who
20   reported to Chris, and the decision was
21   made. To my knowledge that was the
22   extent of the investigation.
23      Q.    What are you basing your

Page 75

1    knowledge on?
2       A.    I asked her who else she had
3    talked to.
4       Q.    You asked Brenda Sellers?
5       A.    I asked Brenda Sellers who
6    else she had talked to about this.
7       Q.    And she told you she --
8       A.    And she said, I talked to
9    Eddie.
10      Q.    What is Eddie Crosby's race?
11      A.    White.
12      Q.    And you were not present when
13   the comment was made; correct?
14      A.    That's correct.
15      Q.    Anyone else that you recall
16   having to terminate when you were
17   Director of Logistics?
18      A.    No.
19      Q.    When you were Director of
20   Logistics were you ever disciplined
21   either in writing or verbally?
22      A.    Yes.
23      Q.    How many occasions?

Page 76

1       A.    Once.
2       Q.    When was it?
3       A.    June 2005.
4       Q.    What kind of discipline was
5    issued?
6       A.    It was a tongue-lashing.
7       Q.    Who do you believe was
8    engaging in the tongue-lashing?
9       A.    Anthony Barber.
10      Q.    Where did this occur?
11      A.    Near the filling station on
12   the line at Alatex Road.
13      Q.    This is when you are plant
14   manager?
15      A.    That's correct.
16      Q.    I'm asking about when you were
17   Director of Logistics?
18      A.    I'm sorry. Not to my
19   knowledge.
20      Q.    You do not recall being
21   disciplined either in writing or verbally
22   when you were Director of Logistics?
23      A.    That's correct.

JERRY S. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 22 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 77 to 80)

Page 77

1    Q.   The only time that you can
2  recall being disciplined ever was in June
3  2005 when you say that Anthony Barber
4  gave you a tongue-lashing?
5    A.   Yes.
6    Q.   You were near a filling
7  station on the line at the Alatex
8  facility?
9    A.   Yes.
10   Q.   Who else was present?
11   A.   Two engineers from Quaker
12  Corporation and Shannon McGlon.
13   Q.   Who were the two engineers
14  that were present from the Quaker
15  Corporation?
16   A.   I would have to look back
17  through my notes to recall their name.
18   Q.   You have notes of that
19  tongue-lashing?
20   A.   I have notes of my daily
21  activity, journal, meeting notes
22  throughout my entire time at Piknik. I
23  kept a pretty detailed journal of what

Page 78

1  was covered at meetings, what I was
2  supposed to do.
3    Q.   Does that notes or that
4  journal contain information that you
5  believe relate to your claims in this
6  lawsuit?
7    A.   Only with respect to people
8  who were present at certain meetings when
9  certain things were said.
10   Q.   Have you provided that journal
11  or those notes to your lawyer?
12   A.   I have provided those facts.
13   Q.   I'm asking you --
14   A.   The journal itself?
15   Q.   Correct, or a copy of the
16  journal?
17   A.   No.
18   Q.   Tell me what happened.
19   A.   There was a footing to an
20  overhead stand that the cement had
21  cracked and needed to be replaced.
22  Anthony had told me the day before, get
23  that replaced before you do anything

Page 79

1  else.
2    Q.   I didn't catch that. Anthony
3  told you the day before to what?
4    A.   Get that replaced before I do
5  something else. I'm sorry. Before he
6  comes back again is what he said.
7         The next day we are having a
8  discussion on some technical aspects of a
9  line commissioning project with Quaker.
10  He noticed it was still there and
11  proceeded to reprimand me and tell me
12  that I felt I was inadequate to do my
13  job, shirked my responsibilities, didn't
14  take the job seriously, I obviously
15  needed to be micromanaged and much closer
16  supervision.
17   Q.   Are those the words that he
18  used?
19   A.   In that manner.
20   Q.   So those are not the words he
21  used?
22   A.   No. Along those lines, not
23  precisely the words.

Page 80

1    Q.   But you generally recall those
2  statements being along the lines of you
3  weren't taking your job seriously?
4    A.   Yes.
5    Q.   And what else, that you needed
6  to be micromanaged?
7    A.   That I needed to be
8  micromanaged, perhaps he needs to hold my
9  hand more often.
10   Q.   Did he use those words?
11   A.   Yes.
12   Q.   You do recall that
13  specifically?
14   A.   Yes.
15   Q.   What else?
16   A.   He said, I'm thinking maybe
17  you don't know how to do your job and you
18  weren't a good choice for this job.
19   Q.   I'm sorry. I didn't get that?
20   A.   Perhaps you don't know how to
21  do this job and maybe you weren't a good
22  choice for this job.
23   Q.   What else, if anything?

JERRY A. MACCARTNEY, ET AL. vs. Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 23 of 138
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 81 to 84)

Page 81

1    A.    He said, I can see I'm going
2  to have to do some serious consulting
3  with you on your leadership abilities and
4  that you obviously need a lot of work.
5    Q.    Those are the words that he
6  used or is that just kind of the general
7  substance --
8    A.    Most of those words.  Not
9  exactly.
10    Q.    Anything else that Anthony
11  said?
12    A.    On that instance that Anthony
13  said, no.
14    Q.    What, if anything, did you
15  say?
16    A.    I said, we do not have any
17  cement and you did not tell me when you
18  would be returning, that I put a job
19  order in to get it done as soon as the
20  cement arrived.
21    Q.    What, if anything, did Anthony
22  say?
23    A.    He just proceeded to reprimand

Page 82

1  me.
2    Q.    Was he screaming?
3    A.    No.
4    Q.    Just talking in his regular
5  voice?
6    A.    It was quite loud because you
7  need to talk loud in that area.  It's a
8  loud area.
9    Q.    It was loud because of the
10  machines?
11    A.    There were machines in the
12  background, yes.
13    Q.    Anything else you can recall
14  from that tongue-lashing, as you describe
15  it?
16    A.    After Anthony left two clients
17  from Quaker said they felt embarrassed
18  and didn't need to be subjected to that
19  and it was only a four-inch crack in
20  cement in a noncritical food zone.
21    Q.    The Quaker representatives
22  said that they felt embarrassed?
23    A.    Yes.  And no reason for them

Page 83

1  to have been subjected to that or no
2  reason I should have been subjected to
3  that were the words.
4    Q.    What else can you recall?
5    A.    Shannon said she couldn't
6  believe she was witnessing anybody being
7  treated like that in front of customers
8  for something so minor.
9    Q.    What else?
10    A.    That's about it.
11    Q.    Do you know if that incident
12  was the subject of any kind of write-up
13  for your personnel file?
14    A.    I don't believe it was.  I
15  wasn't asked to sign anything or review
16  anything.
17    Q.    Were you suspended for that
18  incident?
19    A.    No.
20    Q.    Were you demoted because of
21  that incident?
22    A.    No.
23    Q.    Were you docked any pay

Page 84

1  because of that incident?
2    A.    No.
3    Q.    Did you complain to Chris Day
4  about that incident?
5    A.    No.
6    Q.    Did you complain to Henry
7  Hicks about that incident?
8    A.    No.
9    Q.    Did you complain to Jeff Larry
10  about that incident?
11    A.    No.
12    Q.    Did you complain to Brenda
13  Sellers about that incident?
14    A.    Yes.
15    Q.    When did you complain to
16  Brenda Sellers?
17    A.    The next day.
18    Q.    Where were you?
19    A.    In the warehouse at Alatex.
20    Q.    Was Brenda Sellers at the
21  warehouse at Alatex that day?
22    A.    Yes.
23    Q.    So it was in person and not a

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 85 to 88)

Page 85

1   phone call?
2       A.   Right.  I met her walking
3   through the warehouse.
4       Q.   I'm sorry?
5       A.   I met her while I was walking
6   through the warehouse and stopped to talk
7   to her.
8       Q.   What did you say to Brenda
9   Sellers?
10      A.   I explained what happened and
11  told her I was confused as to why Anthony
12  would have such an outrage especially in
13  front of a customer, which made us look
14  very unprofessional, and that Anthony
15  said the same day what an exemplary
16  employee I was and the rest of the team
17  should follow the same lead as me and
18  then later gave me a reprimand.  I didn't
19  understand why he would do this, if he
20  had an agenda or if he was just a loose
21  cannon.  And her response was, I don't
22  know, I'll talk to him about it.  And
23  that's the last I heard of it.

Page 86

1       Q.   Okay.  I'm having a little
2   difficulty understanding you.  Brenda
3   Sellers was at the Alatex warehouse?
4       A.   Yes.
5       Q.   And she just happened to be
6   there and you saw her as she was walking
7   through?
8       A.   Yes.  Talked about staffing,
9   open positions, recruiting, where she was
10  on getting new hires, some of the open
11  positions on the production line.  And
12  when we concluded the business
13  discussion, oh, by the way, this
14  happened.
15      Q.   You explained what you have
16  already explained to me?
17      A.   Yes.
18      Q.   That's what you told Brenda
19  Sellers?
20      A.   Yes.
21      Q.   And you said you didn't
22  understand why Anthony Barber would do
23  that?

Page 87

1       A.   Yes, because the same day he
2   had given me very high praises about my
3   leadership abilities, my ability to
4   execute, focus and get things done and
5   wished the rest of the senior team or
6   other members of his team could execute
7   at the same level.  And then twelve hours
8   later gave me such a reprimand.  I didn't
9   understand what that was all about.
10      Q.   And what did Brenda Sellers
11  say?
12      A.   She said she would look into
13  it.
14      Q.   Do you know if Brenda Sellers
15  looked into it?
16      A.   No, I do not know.
17      Q.   Did Brenda Sellers ever follow
18  up with you about it?
19      A.   No.
20      Q.   Did you ever discuss the
21  incident with Anthony Barber?
22      A.   Yes, the next day.
23      Q.   The same day that you spoke

Page 88

1   with Brenda Sellers?
2       A.   Yes.  It was after I spoke to
3   Brenda.
4       Q.   Were you at the Alatex
5   facility?
6       A.   Yes.
7       Q.   Where were you?
8       A.   My office.
9       Q.   Did you ask for a meeting?
10      A.   No.
11      Q.   Anthony Barber just happened
12  to be in your office?
13      A.   He had come to the building
14  and stopped in my office.
15      Q.   What was said?
16      A.   He asked for a progress report
17  on where we were, how well the line was
18  running that day.  I informed him about
19  it.  Said the piece of cement has been
20  fixed.  And I said, I don't understand
21  why I was subjected to such a verbal
22  reprimand over such a small incident,
23  especially in front of our customers.

22

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 25 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 89 to 92)

Page 89

1    Q.   What did Anthony say, if
2    anything?
3    A.   His words were, aw, don't
4    worry about that, let's go talk about how
5    many cases we think we're going to run
6    over the next week.
7    Q.   What, if anything, did you
8    say?
9    A.   I dropped it and started
10   talking about how many cases we're going
11   to run the next week.
12   Q.   Did you ever have any further
13   discussion with Anthony Barber about that
14   incident?
15   A.   No.
16   Q.   Were you ever involved with
17   anyone from SouthTrust about Piknik's
18   financial status?
19   A.   No.
20   Q.   In 2005 was SouthTrust
21   Piknik's primary lender, do you know?
22   A.   I believe so. I don't know
23   for sure. SouthTrust's name was

Page 90

1    mentioned at a lot of meetings.
2    Q.   Do you know how much debt
3    Piknik had with SouthTrust or whichever
4    lender you're aware of?
5    A.   Yes. It was presented by Onyx
6    in a meeting as far as one idea -- they
7    were talking strategy as to what we're
8    going to do with SouthTrust in regards to
9    long-term debt. If memory recalls me, it
10   was someone between four and eight
11   million, but I could be completely wrong.
12   Q.   Are you aware that at some
13   point it time in 2005 or 2004 -- strike
14   that. Are you aware of SouthTrust
15   refusing to finance Piknik in terms of
16   capital expenditures?
17   A.   Yes.
18   Q.   What do you know about that?
19   A.   That they decided they were
20   going to call the long-term note because
21   Piknik has shown no signs of being able
22   to pay off the debt and the financial and
23   accounting records show that the

Page 91

1    situation will only get worse and they
2    had no capability, other than hearsay
3    from Onyx about customers they were
4    courting, that that situation would get
5    any better and that the debt was
6    longstanding and enough -- basically what
7    I was told, they had enough of it and
8    decided to call the note.
9    Q.   So your understanding is that
10   SouthTrust made a decision to call the
11   note?
12   A.   That's what was told to us by
13   Onyx in a memo, talking points memo, that
14   Onyx put out.
15   Q.   Do you recall when that was?
16   A.   May or June I believe.
17   Q.   Of what year?
18   A.   2005.
19        (Whereupon, Defendant's
20        Exhibit 1 was marked
21        for identification.)
22   Q.   I'm handing to you what has
23   been marked as Defendant's Exhibit 1 to

Page 92

1    your deposition. Have you seen this
2    document before? And take your time to
3    read through it if you need to.
4    A.   (Examining document.) I do
5    not know. This document is not dated.
6    Q.   Have you seen this document
7    before?
8    A.   I don't believe this is the
9    one I saw.
10   Q.   You don't recall seeing this?
11   This is not the talking points memo that
12   you recall seeing?
13   A.   No. The one I recall seeing
14   had a different first page.
15   Q.   Okay.
16   A.   Pages 3, 4 and 5 look
17   familiar. Look like they were part of
18   the document that I saw.
19   Q.   So you believe you have seen
20   Pages 3, 4 and 5 of Defendant's Exhibit 1
21   to your deposition?
22   A.   Yes.
23   Q.   Was there a meeting to discuss

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 93 to 96)

Page 93

1   Pages 3, 4 and 5?
2       A.   There was a meeting discussing
3   the overall efforts with SouthTrust and
4   what Onyx was going to do in response.
5       Q.   If you will take the time to
6   read Pages 3, 4 and 5, and my question is
7   going to be whether the substance of the
8   information on Pages 3, 4 and 5 is what
9   you recall being discussed during the
10  meeting?
11      A.   Only the paragraph titled "how
12  did this happen?"
13      Q.   Anything else?
14      A.   During the meeting referenced,
15  no.
16          (Whereupon, Defendant's
17          Exhibit 2 was marked
18          for identification.)
19      Q.   I'm handing to you what has
20  been marked as Defendant's Exhibit 2 to
21  your deposition. Do you recall seeing
22  this e-mail?
23      A.   Yes, but I received it well

Page 94

1   after this meeting had taken place.
2       Q.   Well, this e-mail references a
3   "staff meeting today, Wednesday, June 15,
4   2005 at 4 p.m."; correct?
5       A.   Yes, it does.
6       Q.   Was that the meeting in which
7   Onyx discussed the situation with the
8   bank?
9       A.   No, it's not that meeting that
10  I referenced.
11      Q.   This is a different meeting?
12      A.   Yes.
13      Q.   You can't recall when the
14  meeting about the talking points memo was
15  discussed, you just think it was May or
16  June of 2005?
17      A.   The meeting regarding to the
18  paragraph on Page 3 that says "How did
19  this happen?" occurred about thirty days
20  prior to this.
21      Q.   Prior to what?
22      A.   Prior to this memo being
23  distributed on June 15th. I was not

Page 95

1   present that week. My mom had passed the
2   day before that.
3       Q.   So you were not present for
4   the staff meeting that's referenced in
5   Defendant's Exhibit 2?
6       A.   That's correct.
7       Q.   So you had gotten the talking
8   points memo sometime before June 15th?
9       A.   Either before or shortly
10  after. I don't recall. I'm not sure if
11  it was after I returned to work from my
12  mom's funeral or before.
13      Q.   What else do you know about
14  the decision by SouthTrust to call the
15  note, besides what you've already told
16  me?
17      A.   Basically it was due to the
18  fact that they believed Piknik had no
19  ability to ever repay the debt and the
20  situation looking forward for Piknik was
21  even worse than the current situation.
22      Q.   And that's information that
23  you obtained in a meeting with Onyx?

Page 96

1       A.   That's information that they
2   stated in a meeting, yes, Onyx.
3   Specifically Chris Day and Jeff Larry.
4       Q.   Anything else that you can
5   recall about SouthTrust's decision to
6   call the note?
7       A.   Only that Onyx was stating it
8   was a racist-based decision and that they
9   asked for information from the senior
10  staff on events that had taken place
11  prior in Piknik's history with relation
12  to customers coming and going and
13  different events with the bank and that
14  they're trying to show that -- and they
15  actually put a timeline together that
16  they asked for our input on showing all
17  the events that had happened over the
18  prior years. And then Onyx as an MBE
19  took ownership of Piknik, and then the
20  bank subsequently called note, and they
21  were trying to tie those two events
22  together to say it was a racist-based
23  decision by the bank.

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 97 to 100)

Page 97

1  Q.   And that was discussed during
2  this meeting in which you were present?
3  A.   Yes.
4  Q.   Tell me what was said, who
5  said it.
6  A.   Bert Mayer was asked to put a
7  timeline together. Henry Hicks, Chris
8  Day, and I'm not positive, but Patrice
9  Daniels may have been on the phone via a
10  conference call. They said this is
11  history we've been able to put together,
12  and we feel that this is why SouthTrust
13  has taken these actions. And it pretty
14  much outlined the information that was in
15  that timeline.
16  Q.   Who was speaking?
17  A.   Henry Hicks and Chris Day.
18  Q.   And it's your recollection
19  that Henry Hicks and Chris Day asked that
20  a timeline be put together?
21  A.   Asked for information to be
22  sent to Bert, and they asked Bert to put
23  the timeline together. And then it was

Page 98

1  another meeting --
2  Q.   What kind of info,
3  information, were they asking to be sent
4  to Bert Mayer?
5  A.   Information regarding
6  customers.
7  Q.   What kind of information
8  regarding customers?
9  A.   What sort of volume they had
10  with us, what our cash flow was and
11  different events relating to the
12  interaction or the relationship with
13  SouthTrust.
14  Q.   Do you recall what events they
15  were referring to?
16  A.   Actions regarding the note.
17  Q.   Do you recall what actions
18  regarding the note?
19  A.   Refinancing or extending or
20  continuing to carry. I didn't have any
21  specific information to provide because a
22  lot of that was prior to my history, so I
23  didn't have a lot to provide. So my

Page 99

1  memory wasn't as clear. I wasn't as
2  close to the details or the details that
3  went into the timeline. I just recall
4  seeing the timeline that they showed us
5  and said this is what we're going to
6  present to the bank because we believe
7  this is a race-based decision and this
8  should change their mind.
9  Q.   Who said that they believed it
10  was a race-based decision?
11  A.   Chris Day and Henry Hicks.
12  Q.   Both of them expressed that
13  sentiment?
14  A.   Yes.
15  Q.   They expressed that they felt
16  that SouthTrust was calling the note
17  because of their race?
18  A.   Yes. There was a timeline
19  they put together.
20  Q.   Do you have that timeline?
21  A.   No, I do not.
22  Q.   At one point did you have a
23  timeline?

Page 100

1  A.   I didn't have it. They
2  displayed it on PowerPoint during the
3  meeting.
4  Q.   During a subsequent meeting?
5  A.   Yes.
6  Q.   Chris Day is white, yes?
7  A.   Yes.
8  Q.   Henry Hicks is
9  African-American?
10  A.   Yes.
11  Q.   Anything else you can recall
12  during that first meeting in which Henry
13  Hicks and Chris Day asked for information
14  to be sent to Bert Mayer so that a
15  timeline could be put together?
16  A.   No.
17  Q.   How soon after was the
18  subsequent meeting in which the
19  PowerPoint timeline was presented?
20  A.   Within one week.
21  Q.   Who was present?
22  A.   Bert Mayer, Robert Lampert,
23  Robert Nedavulsky, Bob Winter, Shannon

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 28 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 101 to 104)

Page 101

1  McGlon, Anthony Barber, Chris Day, Henry
2  Hicks and possibly Brenda Sellers, I'm
3  not sure.
4      Q.    And they showed the PowerPoint
5  timeline?
6      A.    Yes.
7      Q.    What did it indicate?
8      A.    It indicated that shortly
9  after Piknik acquisition company took
10 control of Piknik and that them being an
11 MBE that the bank then decided to call
12 the note, and they were trying to relate
13 the event to being because Piknik was now
14 an MBE the bank was going to pull the
15 note.
16     Q.    I'm asking what the timeline
17 showed. I mean, is that what it stated?
18     A.    The timeline showed a lot of
19 historical actions by the bank and the
20 actions they had taken to extend or
21 continue to carry the note, and then it
22 showed the last activity, which was a few
23 months before Onyx's involvement with the

Page 102

1  company, and there was another extension
2  by the bank, and then shortly after the
3  Onyx acquisition another activity by the
4  bank where they decided to pull the note.
5          There was a summary
6  statement -- I don't recall the exact
7  words. There was a summary statement
8  above or below the timeline on the
9  screen, I don't recall, clearly relating
10 to this is a racist-based decision on the
11 behalf of the bank, and the actions being
12 taken -- they felt the action was being
13 taken against Onyx and against Piknik
14 because Onyx was -- because Piknik was
15 now under minority ownership. And they
16 intended to present that to the bank in
17 an attempt to change their mind.
18     Q.    Do you know if it was
19 presented to the bank?
20     A.    I was told it was.
21     Q.    Who told you?
22     A.    Henry.
23     Q.    But you were never involved in

Page 103

1  any discussions with SouthTrust
2  representatives about that decision to
3  call the note; correct?
4      A.    That's correct.
5      Q.    And you weren't involved in
6  any discussions with SouthTrust's
7  representatives about cutting off
8  financing?
9      A.    Correct. I never talked to
10 anybody from SouthTrust.
11     Q.    So you don't know whether
12 SouthTrust instructed Piknik to make
13 personnel cuts?
14     A.    I do not know that.
15     Q.    And you're unaware of any
16 discussions between Piknik and SouthTrust
17 regarding whether SouthTrust would fund
18 payroll?
19     A.    I believe from discussions
20 Anthony Barber had given me that
21 SouthTrust had sent a member of their
22 staff to Piknik to approve all payables.
23     Q.    Including payroll?

Page 104

1      A.    Yes.
2      Q.    And you're unaware of any
3  discussions between Piknik and SouthTrust
4  regarding whether SouthTrust would
5  provide funds to be used for severance
6  packages for Piknik employees?
7      A.    I'm not aware of any of those
8  discussions.
9      Q.    Were you ever involved in any
10 discussions with a group or with anyone
11 who was with a group named Apollo
12 Management?
13     A.    I remember hearing that
14 company's name discussed. I don't recall
15 ever talking to anyone from that
16 organization.
17     Q.    I'm sorry?
18     A.    I don't recall ever talking to
19 anyone from that organization.
20     Q.    What, if anything, do you know
21 about Apollo Management?
22     A.    Nothing. I just recall
23 hearing the name.

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 29 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 105 to 108)

Page 105

1    Q.    And you're unaware of any
2 communications between SouthTrust and
3 Piknik regarding personnel cutbacks to be
4 done at Piknik?
5    A.    I'm not aware of any of those
6 discussions.
7    Q.    It's my understanding, Mr.
8 MacCartney, that you are claiming in this
9 lawsuit that you were treated differently
10 because of your race?
11    A.    Yes.
12    Q.    Is that correct?
13    A.    Yes.
14    Q.    I would like for you to please
15 identify for me the ways in which you
16 believe you were treated differently
17 because of your race.  Just list them for
18 me.  We're going to talk about each one
19 in specific detail.  Just list them for
20 me, and we will take them one by one.
21    A.    My pay was cut retroactively,
22 and I was told by Brenda Sellers that
23 Henry Hicks' and hers were not.

Page 106

1      I was told that I didn't know
2 anything about our Mass 200 or IT systems
3 and Athenia Figgs was the expert and I
4 was not.  And she was later proven to be
5 one hundred percent wrong.
6    Q.    Is this relating to your pay
7 cut?
8    A.    No.
9    Q.    This is something separate?
10    A.    Separate subject.
11    Q.    Okay.  Can you repeat that for
12 me, please.
13    A.    I was told that I do not know
14 a thing about our IT systems, our Mass
15 200 systems or WMS systems and Athenia
16 Figgs was an expert and I was not.  Six
17 months later was proven that all those
18 things that I said were needed were
19 needed and Athenia Figgs was wrong.
20    Q.    I'm having trouble
21 understanding you.  You were told that
22 you knew nothing about the IT systems?
23    A.    Right.

Page 107

1    Q.    And what other systems?
2    A.    WMS, Warehouse Management
3 Systems.
4    Q.    WMS systems?
5    A.    Mass 200.
6    Q.    Mass 200 system?
7    A.    Right.
8    Q.    And what else?
9    A.    I was told that they were more
10 than adequate to do what we were doing,
11 why are you trying to spend money on a
12 WMS system; Athenia Figgs says they are
13 not needed; she's the expert, you're not.
14 And after six months it was proven, and
15 they finally admitted, sorry, we were
16 wrong, you were right; we do need those
17 systems that you were recommending.
18 Athenia was a hundred percent wrong in
19 what she thought those systems could do.
20      And the reason I felt I was
21 discriminated, she, an African-American,
22 was given instant credibility when I was
23 immediately given none when they walked

Page 108

1 in the door.
2      On several occasions -- this
3 is a separate subject -- in several staff
4 meetings where Patrice Daniels was
5 present in the room she, on several
6 occasions, not only myself but other
7 Caucasians, would completely shut us
8 down, give us the hand and not let us
9 talk, just completely shut us off, while
10 Henry Hicks and other people were given
11 more than ample opportunity to talk.
12      On a separate occasion, Bert
13 Mayer and I were trying to recommend
14 purchasing a preventative maintenance
15 software program for a cost of -- it was
16 either five hundred dollars or eight
17 hundred dollars.  Bert and I, mostly
18 Bert, were requested to go through months
19 of e-mail justification, business
20 justifications, documenting and writing
21 up a long business case on why this
22 minuscule, five hundred dollar purchase
23 of software was required and met business

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 30 of 138
JERRY A. MACCARTNEY, ET AL.                         JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.                    August 17, 2007

(Pages 109 to 112)

Page 109

1   needs and what it was going to do, while
2   at the same time Henry Hicks was allowed
3   to buy a thirty thousand dollar piece of
4   software called ACT with no
5   justifications, no business cases
6   whatsoever. That system was never used
7   after it was purchased.
8        In my office on or about the
9   middle of June --
10   Q.   Of what year?
11   A.   -- of 2005 in Alatex Road
12   after the paint in that office had been
13   old and peeling and flaking I asked the
14   warehouse personnel to repaint it with
15   whatever available paint we had on hand
16   and not to buy any paint before I moved
17   my furniture from my Day Street office to
18   that office, which they did.
19        Once I moved in Anthony Barber
20   came to my office. He made the following
21   statement: He looked at the paint on the
22   wall, which was white, which matched the
23   stripes on the floor in the warehouse,

Page 110

1   which is why we only had white paint. He
2   said, are you all about white; is this
3   what you're all about; well, let me tell
4   you something, me and white don't work;
5   white and I don't work well together; I'm
6   all about color; color and me work real
7   well together if you get my meaning. And
8   I said, yes, I get your meaning loud and
9   clear.
10        And when I returned from my
11   mom's funeral there was an
12   African-American named Joe Yates sitting
13   on my desk using my computer and had a
14   Piknik e-mail account. Anthony Barber
15   lied to me and told me he was a
16   consultant and not an employee. The next
17   day when I received the payroll checks
18   for my building to disburse, which are
19   part of my regular duties, there was a
20   payroll check from Piknik to Joe Yates.
21   Joe Yates was an African-American.
22   Within one week of that day I was
23   terminated and replaced by Joe Yates.

Page 111

1        When I was terminated by
2   Brenda Sellers and the reason given was
3   my services were no longer needed, I
4   asked if it was for cause or for any
5   other reason, and I was told, your
6   services are no longer needed; that's all
7   I'm allowed to tell you.
8        And I'm not sure if this
9   qualifies as discrimination, but in one
10   meeting Bob Gross --
11   Q.   Who?
12   A.   Bob Gross. -- made an
13   off-color comment about Mexicans. All
14   the Onyx folks were present and got a big
15   chuckle out of it. Later I asked Henry
16   Hicks if that same comment had been about
17   African-Americans would it have been so
18   funny. He laughed and said, what do you
19   think.
20        Chris Day's first visit to our
21   plant he walked around the warehouse with
22   me and with Bert. He clearly and openly
23   stated that what Onyx's vision and

Page 112

1   mission was and it was to place
2   African-Americans in middle and senior
3   management positions within the company.
4   And I asked him, does this mean we need
5   to be looking for jobs. He stated it
6   would be done through attrition and over
7   time and we had nothing to worry about.
8   That's all I can recall.
9        MR. NELMS: Hopefully we won't
10   have a fire drill today.
11        MS. MCGAHEY: I don't know if
12   we're going to get out at five.
13        MR. NELMS: Just so we're
14   clear on the record, we need to leave at
15   five. And if we have to continue the
16   deposition, we'll do whatever we have to
17   do to make ourselves available.
18        MS. MCGAHEY: Sure.
19        MR. NELMS: But he has an
20   obligation, and it's a serious family
21   obligation.
22        MS. MCGAHEY: I certainly
23   understand that. If we need to continue

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM   Document 74   Filed 10/29/2007   Page 31 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 113 to 116)

Page 113

1  it, I'm certainly more than amenable to
2  following up.
3       MR. NELMS:  Thank you.
4       Q.  (BY MS. MCGAHEY:)  Let's talk
5  about the pay cut first.  That's the
6  first item that you mentioned.  When was
7  your pay cut?
8       A.  May 2005.
9       Q.  What were you making?
10      A.  One hundred thousand.
11      Q.  What was your pay cut to?
12      A.  Seventy thousand.
13      Q.  Tell me how you learned that
14  your pay was getting cut to seventy
15  thousand?  What job were you in at the
16  time?  Were you plant manager?
17      A.  Yes.
18      Q.  How did you learn that your
19  pay was being cut?
20      A.  I'm trying to recall the
21  specifics.  It was either Brenda Sellers
22  or Anthony Barber that informed me.
23      Q.  Is this over the phone or in

Page 114

1  person?
2       A.  In person.  And I believe it
3  was a letter that Brenda gave to me I
4  believe.
5       Q.  During the same discussion?
6       A.  Yes.
7       Q.  So you believe it was Brenda
8  Sellers who told you that your salary was
9  being reduced?
10      A.  Yes.
11      Q.  Did you read the letter during
12  that meeting?
13      A.  Yes.
14      Q.  Well, tell me how the meeting
15  starts.  Did Brenda come to your office,
16  did she ask you to go to her office, what
17  happens?
18      A.  She came to my office and
19  stated that senior and middle management
20  salaries were being cut and there was a
21  letter that I needed to read.  And the
22  letter stated that -- from Chris Day I
23  believe the letter was -- that based on

Page 115

1  actions taken by the bank my pay would be
2  reduced to seventy thousand dollars and
3  it was retroactive.  They went back two
4  or three weeks I believe it was.  And
5  they said they wished the events of the
6  bank would not be long-term and they
7  could put us back to the salary level
8  which we needed to be at or were at,
9  something along those lines, as soon as
10  possible.
11      Q.  And that was all in the
12  letter?
13      A.  Yes.
14      Q.  I want to talk about what was
15  discussed between you and Brenda.  She
16  comes into your office and says senior
17  and middle management salaries are being
18  cut; correct?
19      A.  Yes.
20      Q.  She gives you the letter to
21  read?
22      A.  Said, read the letter, yes.
23  Then I asked her is this for all

Page 116

1  managers.  She said yes, and I said
2  including -- and my next question was
3  including Henry Hicks, and she responded
4  in the negative.  I believe it was a
5  smirk and said, what do you think.  I
6  later asked her, not in that meeting, if
7  he had been cut to be clear, and she
8  said, no, of course not.
9       Q.  Say that again, please.
10      A.  Later at a different time, I
11  think within a few days of that, I'd
12  asked her again, because I wanted to be
13  clear, if Henry's pay had been cut and
14  hers -- she wouldn't answer me about
15  hers.  I heard second-hand that hers was
16  not, but that was second-hand.  But she
17  said Henry's was not, Henry's pay was not
18  cut.
19      Q.  Do you know if there was any
20  kind of contract or agreement in place
21  regarding the compensation for Henry
22  Hicks?
23      A.  No, I do not.  I'm not aware

JERRY MACCARTNEY ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Document 74    Filed 10/29/2007    Page 32 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 117 to 120)

Page 117

1  of any.
2      Q.   And Brenda Sellers wasn't
3  going to share her salary with you?
4      A.   I asked her if she was
5  affected. She would not answer me. She
6  did not respond positive or negative.
7      Q.   Anything else that you can
8  recall from your discussions with Brenda
9  Sellers about your pay cut?
10      A.   She said that the rest of my
11  staff and other managers would also be
12  being informed that same day. I asked if
13  everybody was being cut equally, and she
14  said that middle management was 5 to 10
15  percent and senior management was -- was
16  all being done the same was her words.
17      Q.   Who did you consider to be
18  middle management?
19      A.   Line supervisors and
20  department managers such as Eddie Crosby;
21  Bill Boykin; quality manager, Al -- I
22  can't remember. The big guy that gets
23  very sick. I can't remember his name.

Page 118

1  Was a quality manager.
2      Q.   Allen Walters?
3      A.   Allen Walters, yes. Darren
4  Gates and other folks down in Brundidge.
5      Q.   Who did you consider to be
6  senior management?
7      A.   Henry, Brenda, Robert Lampert,
8  Robert Nedavulsky, Bob Winter.
9      Q.   Who?
10      A.   Bob Winter, Shannon McGlon,
11  Bert Mayer and Anthony Barber.
12      Q.   Now, by this time wasn't Bert
13  Mayer already gone?
14      A.   During the pay cut, I don't
15  believe so. It was after that, if memory
16  serves me. They were close together,
17  those events, so I could be wrong.
18      Q.   Anything else you can recall
19  from your meeting with Brenda Sellers?
20      A.   No. She was very apologetic
21  on behalf of the company.
22      Q.   Do you know if it was Piknik
23  policy that employees not discuss their

Page 119

1  salaries amongst each other?
2      A.   Not to my knowledge.
3      Q.   Were you ever asked by Brenda
4  Sellers or by anyone not to discuss your
5  pay cut with anyone at Piknik?
6      A.   No.
7          (Whereupon, Defendant's
8          Exhibit 3 was marked
9          for identification.)
10      Q.   I'm handing you what has been
11  marked as Defendant's Exhibit 3 to your
12  deposition. Have you seen this document
13  before?
14      A.   Yes.
15      Q.   Is this the letter that you
16  received from Brenda Sellers regarding
17  your pay cut?
18      A.   Yes.
19      Q.   And it's from Chris Day?
20      A.   Yes.
21      Q.   And it's dated in June of
22  2005?
23      A.   Yes.

Page 120

1      Q.   Does that refresh your
2  recollection that this occurred in June
3  and not in May of 2005?
4      A.   I still seem to remember it
5  being in May.
6      Q.   And at the time you were no
7  longer Director of Logistics; correct?
8      A.   Correct.
9      Q.   You had become plant manager
10  at Alatex facility?
11      A.   Yes.
12      Q.   It says that "in your
13  particular case we must pay you a rate
14  commensurate with your current position
15  rather than your prior one;" correct?
16      A.   Yes, that's what it says.
17      Q.   Do you know what the plant
18  manager of the Day Street facility was
19  making?
20      A.   No.
21      Q.   Do you know what the plant
22  manager of the Brundige facility was
23  making?

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 121 to 124)

Page 121

1    A.    No.
2    Q.    Why do you believe that your
3  reduction in salary was based on your
4  race as opposed to the reason that is
5  articulated in Defendant's Exhibit 3?
6    A.    I don't believe I stated it
7  was based on race. I believe it was
8  discriminatory in that other
9  African-Americans did not receive a pay
10  decrease.
11    Q.    So that's why you believe that
12  you were treated differently because of
13  your race?
14    A.    Yes, not treated equally.
15    Q.    And the African-Americans that
16  you believe did not receive a pay cut
17  were Henry Hicks and Brenda Sellers?
18    A.    Correct. And Anthony Barber.
19  I'm sorry.
20    Q.    And you don't know if Henry
21  Hicks' compensation was dictated by any
22  kind of agreement; correct?
23    A.    I don't believe it was, based

Page 122

1  on statements Henry made.
2    Q.    Had Henry Hicks -- what was
3  his position?
4    A.    Vice President of Marketing.
5    Q.    Do you know if he -- strike
6  that. What was Brenda Sellers?
7    A.    Director of Human Resources.
8    Q.    What was Anthony Barber?
9    A.    I think he was brought in as
10  Vice President of Manufacturing
11  or Operations, don't know his exact
12  title.
13    Q.    Was he only over the beverage
14  division?
15    A.    Yes.
16    Q.    Now, you agree that you went
17  from being Director of Logistics to being
18  a plant manager; correct?
19    A.    Yes.
20    Q.    Do you know if Henry Hicks
21  went from becoming VP of Marketing to
22  some other position?
23    A.    I don't believe he did.

Page 123

1    Q.    What about Brenda Sellers, do
2  you know if she went from being Director
3  of Human Resources to some other
4  position?
5    A.    She went from being a manager
6  of human resources to being Director of
7  Human Resources.
8    Q.    Would that be considered a
9  step up?
10    A.    No. It was just a title
11  change I was told.
12    Q.    But no change in job duties?
13    A.    No, not at all.
14    Q.    Do you know if Anthony went
15  from being VP over operations, or
16  whatever his title was, of the beverages
17  division to a different capacity?
18    A.    I don't believe so.
19    Q.    And your responsibilities as
20  plant manager of the Alatex facility were
21  different from your responsibilities as
22  Director of Logistics?
23    A.    I also had responsibility for

Page 124

1  the Director of Logistics. I assumed
2  that I would continue to have those
3  duties while I was plant manager at
4  Alatex. I was told I was still
5  responsible to make sure those things
6  were executed and oversee them.
7    Q.    For all the facilities or just
8  for the Alatex facility?
9    A.    For the Montgomery facilities.
10    Q.    So it's your position that you
11  maintained your Director of Logistics
12  duties after you became plant manager?
13    A.    Yes, and took on additional
14  responsibilities as plant manager of
15  Alatex. One week before I was terminated
16  Anthony Barber said he would now oversee
17  those, I do not need to worry about those
18  anymore.
19    Q.    You would not need to worry
20  about what anymore?
21    A.    Director of Logistics
22  responsibilities in those departments,
23  which I guess you could call it number

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 125 to 128)

Page 125

1  nine in my case or number ten, whatever
2  you want to count it.
3      Q.   Okay.  What is number nine?
4      A.   Number nine is Chris Day said
5  my position was being eliminated, felt
6  those duties were not necessary.  But, as
7  I just stated, they subsequently were
8  given to -- I was asked to continue to
9  keep maintaining watch over those
10  responsibilities, and Anthony Barber
11  subsequently took responsibility for
12  them, so they were not eliminated.
13      Q.   You're talking about your
14  Director of Logistics duties?
15      A.   Yes.
16      Q.   You were told that that was
17  being eliminated?
18      A.   The position was being
19  eliminated.
20      Q.   And it's your position that
21  Anthony Barber took those duties over?
22      A.   Yes.  About one to two months
23  after I was told my position would be

Page 126

1  eliminated and they wanted me to be plant
2  manager at Alatex because they valued my
3  contributions and skills and my ability
4  to get things done.  But they always
5  wanted me to continue to maintain
6  responsibility for those departments and
7  watch over them.  And it was within one
8  to two months later Anthony told me not
9  to worry about those anymore, he was
10  going to take responsibility for those
11  duties.  So in my view the duties weren't
12  eliminated.  I was just given additional
13  duties and a pay cut.
14      Q.   Okay.  We'll talk about that a
15  little later on.  Besides Henry Hicks,
16  Brenda Sellers, Anthony Barber and Jeff
17  Larry, were there other African-Americans
18  in what you call senior management
19  positions at that time?
20      A.   At that time I do not know
21  what the status of Patrice Daniels was.
22  We were never formally told.  She just
23  stopped calling into meetings and taking

Page 127

1  place in the activities before Anthony
2  Barber come on board.  Athenia Figgs had
3  since moved back to her office at Onyx
4  Chicago.
5      Q.   So then the answer is no?
6      A.   Trying to recall the people in
7  Brundidge.  In senior management
8  positions, no.
9      Q.   Just so that I'm clear, it is
10  your contention that at the time of your
11  pay cut you were still doing the Director
12  of Logistics duties plus the plant
13  manager of Alatex duties?
14      A.   With the exception of
15  Brundidge, because I believe at that time
16  Brundidge had been closed.
17      Q.   In terms of your Director of
18  Logistics duties --
19      A.   Yes.
20      Q.   -- you were not handling
21  Brundidge?
22      A.   Correct.
23      Q.   Are there any other

Page 128

1  African-American employees who you
2  believe did not receive a pay cut?
3      A.   No.
4      Q.   Just Henry Hicks, Brenda
5  Sellers and Anthony Barber?
6      A.   Yes.
7      Q.   And you don't know one way or
8  another if Brenda Sellers' pay was
9  reduced?
10      A.   I do not know.  I was told it
11  was not.  As I stated --
12      Q.   Who told you?
13      A.   -- that was second-hand.
14      Q.   Who told you?
15      A.   I believe it was Eddie Crosby.
16      Q.   Have you now told me
17  everything that you can recall about your
18  reduction in salary as it relates to your
19  claim of race discrimination?
20      A.   Yes.
21      Q.   Did you ever talk with Chris
22  Day about your salary reduction?
23      A.   No.

Page 129

1    Q.   Did you ever talk with Jeff
2  Larry about your salary reduction?
3    A.   I think there was a time when
4  he came to the Alatex facility, and he
5  brought it up under the discussion of I
6  wish the bank hadn't been doing these
7  things to us so we wouldn't have to take
8  those measures, and we hope to get you
9  folks back to where you belong as soon as
10 possible.
11   Q.   Did you think he was being
12 insincere?
13   A.   No.
14   Q.   Anything else you can recall
15 Jeff Larry saying?
16   A.   With regards to the pay cut,
17 no.
18   Q.   Did you ever talk to Henry
19 Hicks about your pay cut?
20   A.   No.
21   Q.   I want to talk about the
22 second way in which you believe you were
23 treated differently because of your race.

Page 130

1  And you told me that you were told that
2  you knew nothing about IT systems, WMS
3  systems or Mass 200 systems; correct?
4    A.   Correct.
5    Q.   Tell me about that.
6    A.   In was a meeting.
7    Q.   When was the meeting?
8    A.   I'm going to say late Summer
9  2004 I believe.  It was one of our
10 regular staff meetings to discuss capital
11 spending needs.
12   Q.   Who was present?
13   A.   Patrice Daniels, Chris Day,
14 Henry Hicks, Bert Mayer, Robert Lampert,
15 Robert Nedavulsky, Bob Winter, Shannon
16 McGlon, Brenda Sellers.  I believe that's
17 it.
18   Q.   And you?
19   A.   And me, yes.
20   Q.   Where did the meeting take
21 place?
22   A.   Day Street management
23 conference room.

Page 131

1    Q.   Was Athenia Figgs present?
2    A.   No.
3    Q.   No?
4    A.   No, she was not.
5    Q.   Was this after the IT
6  consultant had done his assessment?
7    A.   Yes, several months after I
8  believe.
9    Q.   And this was just a routine
10 staff meeting?
11   A.   To review capital spending
12 needs.
13   Q.   With respect to your claim of
14 discrimination, what was said, who said
15 it?  Tell me about that.
16   A.   I was asked for what the
17 capital spending needs were for my
18 department.
19   Q.   Who asked you?
20   A.   Patrice Daniels.
21   Q.   Patrice asked you what the
22 capital spending needs for your
23 department were?

Page 132

1    A.   Yes.
2    Q.   And that included your
3  Director of Logistics department?
4    A.   Yes.
5    Q.   Which at the time encompassed
6  the IT department?
7    A.   At that time, no, not the time
8  of the meeting.
9    Q.   Okay.
10   A.   And among other building
11 maintenance repair items listed, I
12 mentioned that we still need the
13 Warehouse Management System because
14 Athenia Figgs' attempts to reimplement
15 the Mass 200 systems to facilitate the
16 functionality of the WMS system had
17 failed, and the project was abandoned.
18 And my statement was, we still need the
19 Warehouse Management System if we're
20 going to achieve the budgets I put in for
21 next year because the budgets for next
22 year included the head count reduction
23 that would be achieved by the Warehouse

(Pages 133 to 136)

Page 133

1   Management System.
2       Q.   What is Warehouse Management
3   System?
4       A.   It's a system that controls
5   inventory, tracking movement and resource
6   utilization through the use of wireless
7   devices and bar code devices.
8       Q.   So it's a technical program?
9       A.   Yes.
10      Q.   What is Mass 200 system?
11      A.   Mass 200 was their system that
12  was in place, legacy system, at Piknik.
13      Q.   A laser system?
14      A.   Legacy.
15      Q.   Legacy system.
16      A.   That is basically an
17  accounting system used by many accounting
18  firms with some other basic
19  functionalities.
20      Q.   Is the Mass 200 system
21  supposed to do the same thing or achieve
22  the same thing that the WMS system was
23  supposed to do?

Page 134

1       A.   According to Athenia Figgs,
2   yes.
3       Q.   But the WMS system you believe
4   is just more advanced?
5       A.   No. The Mass 200 system could
6   not do those things period. The
7   Warehouse Management System could do
8   those things and could achieve the head
9   count reductions.
10      Q.   But at the time Piknik had
11  always been using the Mass 200 system?
12      A.   Yes.
13      Q.   And you felt that an upgrade
14  was needed to use WMS?
15      A.   No. When I arrived at the
16  company a recommendation was done by the
17  senior staff to implement a Warehouse
18  Management System because of the
19  shortcomings and inabilities of the Mass
20  200 system to properly manage inventory,
21  lot control, product recall capabilities
22  and resource utilization.
23          And then during the meeting

Page 135

1   Patrice Daniels told me we do not need
2   the Warehouse Management System, the Mass
3   200 can do it. And I tried to explain
4   all the reasons why Mass 200 could not,
5   and with the hand I was told it can do
6   it; Athenia says it can do it; she's the
7   expert, you're not; we're not doing it.
8           I felt being a white manager
9   that I was instantly given no credibility
10  and Athenia was given all the credibility
11  in the world. Her assertion that the
12  Mass 200 system can do all these things
13  was later failed when the project was
14  abandoned as they attempted to try to get
15  the Mass 200 system to do what the WMS
16  system could do.
17          And the consultants who she
18  brought in that said it could do it
19  finally admitted, no, it cannot. So
20  after spending a couple of hundred
21  thousand dollars on consultants and
22  trying to reimplement the system the
23  project was abandoned, and it was more

Page 136

1   than the cost of the WMS system.
2       Q.   Now, this meeting is after the
3   consultants had already been there?
4       A.   Yes.
5       Q.   You're saying that the
6   consultants had said that the WMS system
7   was needed and the Mass 200 wasn't going
8   to work?
9       A.   Initially they said the WMS
10  system was not needed, Mass 200 system
11  could do all of that we were trying to
12  get the WMS system to do.
13      Q.   That's what the consultant
14  said?
15      A.   That's what the consultant
16  said. And their suggestion was to
17  reimplement the Mass 200 system
18  throughout the organization.
19      Q.   So that's what the decision
20  was. Patrice said that Piknik was going
21  to reimplement the Mass 200 system?
22      A.   Right. It can do all those
23  things; they're the experts -- they being

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 37 of 138
JERRY A. MACCARTNEY, ET AL.                                               JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.                                            August 17, 2007

(Pages 137 to 140)

Page 137

1    the consultants and Athenia -- and you're
2    not.
3       Q.    And you disagreed with that
4    recommendation?
5       A.    Yes. I said, I disagree; it
6    cannot do those things. And they, again,
7    repeated they're the experts, you're not,
8    drop it.
9       Q.    "They're the experts" in terms
10   of the consultants are the experts?
11      A.    Consultants and Athenia. I
12   expressed my concern that Athenia did not
13   spend adequate time doing the research in
14   her investigation of capabilities to
15   understand the full scope of what WMS was
16   intended to do and the efficiency gains
17   we expected to get from it. And I was
18   told, they're the experts, you're not,
19   we're moving on.
20      Q.    So Piknik tried to reimplement
21   the Mass 200 system; correct?
22      A.    Piknik hired through
23   Athenia -- Athenia Figgs hired these

Page 138

1    consultants to come in and reimplement
2    the Mass 200 system.
3       Q.    And ultimately it did not
4    work?
5       A.    That project failed and was
6    abandoned.
7       Q.    And you believe that is
8    evidence of race discrimination because
9    you feel that Athenia Figgs was given
10   instant credibility whereas you were not?
11      A.    Correct.
12      Q.    Do you know if Patrice Daniels
13   had a prior working relationship with
14   Athenia Figgs?
15      A.    I do not believe she did.
16      Q.    You do not believe that they
17   had worked together on other occasions
18   prior to Piknik?
19      A.    Not to my knowledge. To my
20   knowledge she had a previous working
21   relationship with Chris Day and that she
22   shared an office with Chris Day at the
23   Onyx facility in Chicago.

Page 139

1       Q.    Besides your feeling that you
2    were not given instant credibility, are
3    there any other ways in which you feel
4    that that meeting affected your
5    employment?
6       A.    I actually believe I said I
7    wasn't given any credibility where
8    Athenia was given instant. Not that I
9    was not given instant.
10      Q.    Okay. Besides your belief
11   that you were not given any credibility,
12   is there any other way in which that
13   meeting affected your employment?
14      A.    Yes.
15      Q.    How?
16      A.    In several subsequent meetings
17   I was reminded by Chris Day and Patrice
18   and Athenia that I was the one that
19   recommended spending two hundred thousand
20   dollars on a WMS system that wasn't
21   needed because we already had a system
22   that could do it and I had not even given
23   it a try. So I believe my credibility

Page 140

1    came into question and remained in
2    question.
3       Q.    Besides your belief that your
4    credibility remained in question, is
5    there any other way in which you believe
6    that the meeting with Patrice Daniels
7    about the Mass 200 versus WMS system
8    affected your employment?
9       A.    Other than my belief that my
10   credibility was seriously diminished in
11   their eyes, no.
12      Q.    Were you suspended at all
13   because of this perceived diminished
14   credibility?
15      A.    No.
16      Q.    Were you disciplined in any
17   manner because of this perceived
18   diminished credibility resulting from
19   this Mass 200, WMS system?
20      A.    I was asked to redo my budget.
21      Q.    You considered that to be
22   disciplinary?
23      A.    Because my budget was clearly

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 38 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 141 to 144)

Page 141

1  not realistic based on the fact that I
2  didn't have enough facts.
3      Q.   Did you consider their request
4  that you redo the budget to be
5  disciplinary?
6      A.   Yes, although it wasn't
7  written and put in the file. It was now
8  you need to do the budget because those
9  head counts you said you're going to get
10  you cannot get and you were not realistic
11  in your projections.
12     Q.   Did you suffer any reduction
13  in pay as a result of this WMS system and
14  Mass 200 system issue?
15     A.   Not directly. The only one I
16  believe was related is the bonus plan
17  that I was promised would happen -- would
18  be put in place in my offer letter never
19  materialized after that. I think that
20  was a result that I was not able to make
21  a reduction in those head counts in that
22  time frame. They came through later
23  efforts.

Page 142

1      Q.   Was a management bonus plan
2  put in place after Onyx took control?
3      A.   No. We were told it was going
4  to be.
5      Q.   But it was never implemented?
6      A.   Correct.
7      Q.   Have you now told me
8  everything about this issue regarding the
9  WMS system versus the Mass 200 system as
10  it relates to your discrimination claim?
11     A.   No.
12     Q.   What else do you have to add?
13     A.   The IT department's request
14  for capital, as proposed by Athenia
15  Figgs, to upgrade the Mass 200 system and
16  our e-mail systems were approved without
17  any discussion or justifications.
18     Q.   Without any?
19     A.   Correct, during that meeting.
20  They were submitted and agreed to and
21  moved on.
22     Q.   You said that the request for
23  capital spending by the IT department to

Page 143

1  upgrade the Mass 200 and e-mail systems
2  were approved without any justification?
3      A.   Without any scrutiny or
4  justification. During that meeting there
5  was no justification of what was needed
6  and what wasn't needed, just a list of
7  spending items. And they were approved.
8  My assumption was they were justified
9  prior to or some other meeting that had
10  already been discussed. But they were
11  approved during that meeting without any
12  further ado.
13     Q.   I think you said you don't
14  know if there was prior discussion about
15  that request for capital spending?
16     A.   Correct. After watching how
17  the events unfolded, they laid it down,
18  here's what we need, here's the hardware,
19  here's the software, here's the cost.
20  Okay, we're approved. And we went on to
21  manufacturing's needs.
22     Q.   How did that affect your
23  employment, if at all?

Page 144

1      A.   I believe it just continued to
2  lend to the fact that I had zero
3  credibility, and I felt that being a
4  minority I was going to have very
5  diminished capability to get things done
6  because my credibility would be nothing
7  regardless of how many facts we had.
8  That was basically the writing on the
9  wall.
10     Q.   Is this what you were telling
11  me earlier about a thirty thousand dollar
12  software budget?
13     A.   No, that was separate.
14     Q.   So this is a tenth number?
15     A.   No. The other one was in
16  regard to purchase of the preventative
17  maintenance software system that Bert
18  Mayer and I were trying to purchase.
19     Q.   So this is something separate,
20  what you're telling me?
21     A.   Yes. The preventative
22  maintenance software incident took place
23  after that.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 39 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 145 to 148)

Page 145

1    Q.    So you're complaining about a
2    requisition for capital spending to
3    upgrade the Mass 200 e-mail systems
4    without, to your knowledge, any prior
5    approval or justification?
6        A.    I'm not complaining about it.
7    I'm stating what happened was basically I
8    was given no credibility.  They were.
9    And their spending was approved without
10   any scrutiny or justification, which told
11   me that --
12       Q.    Well, you weren't over the IT
13   department at the time; correct?
14       A.    Not at the time, no.  This is
15   a software system that was needed to be
16   implemented in the warehouses of all
17   three facilities.
18       Q.    This request for capital
19   spending for the Mass 200 e-mail system
20   was falling under IT; correct?
21       A.    Yes.
22       Q.    And you weren't over the IT
23   department?

Page 146

1        A.    Correct.
2            MR. NELMS:  But it was for his
3    department's benefit.
4            MS. MCGAHEY:  Well, I'm going
5    to let him testify.
6            MR. NELMS:  Well, he just said
7    it.
8            MS. MCGAHEY:  Okay.  It's on
9    the record.
10       Q.    (BY MS. MCGAHEY:)  And you
11   believe that that decision evidenced
12   discrimination against Caucasians because
13   it showed that they believe you lacked
14   credibility?
15       A.    Yes, and there was no
16   scrutiny -- no scrutiny given to Athenia
17   Figgs' request for capital spending, no
18   justification, but all the scrutiny in
19   the world and basically told I was not
20   allowed to get it because I wasn't an
21   expert and she was and she said it wasn't
22   needed.
23       Q.    So you say that you were

Page 147

1    scrutinized more than Athenia Figgs?
2        A.    Yes.
3        Q.    And you don't know if Athenia
4    Figgs' proposal for this capital spending
5    was scrutinized before this meeting?
6        A.    No, I do not know that.
7        Q.    And you don't know if she had
8    to present justification for it before
9    this meeting?
10       A.    No, I do not.  The purpose of
11   that meeting was to present the
12   justification and the spending.  She did
13   not, so --
14       Q.    She did not present it during
15   that meeting?
16       A.    Correct.
17       Q.    And you don't know if she
18   presented it before the meeting?
19       A.    Or afterwards; correct.
20       Q.    Have you now told me
21   everything that relates to your claim of
22   discrimination in regard to this WMS
23   system and Mass 200 issue?

Page 148

1        A.    For Patrice Daniels, yes.  I
2    believe it was Patrice Daniels
3    demonstrating discriminatory behavior by
4    basically shutting me down, giving me no
5    credibility even though I had plenty of
6    justification while Athenia was given
7    approval with no justification, in short.
8        Q.    So the WMS system and Mass 200
9    system relates to your claim of
10   discrimination against Patrice Daniels?
11       A.    Onyx, yes.
12       Q.    But Patrice Daniels
13   individually is the one who you --
14       A.    She said that, yes.  She's a
15   member of Onyx.
16       Q.    Did Chris Day have any input
17   on the decision on whether or not to use
18   Mass 200 or WMS, do you know?
19       A.    He made some comments during
20   the meeting.  I'm trying to recall what
21   they were.  I think he just echoed
22   Patrice and said we're moving on.  I
23   believe that's all he said.

JERRY MacCARTNEY, ET AL.-TFM    Document 74    Filed 10/29/2007    Page 40 of 138
JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.
August 17, 2007

(Pages 149 to 152)

Page 149

1    Q.    That we're just moving on?
2    A.    Right. Decision had been
3    made, we're moving on.
4    Q.    Is it your contention that
5    Chris Day's comment that a decision had
6    been made, we're moving on, was
7    discriminatory?
8    A.    No. I just believe he
9    concurred with Patrice. And by
10    concurring that meant that I had no
11    credibility.
12    Q.    So you are saying that it was
13    discriminatory?
14    A.    Yes, I guess so, yes.
15    Q.    What about Henry Hicks?
16    A.    During that meeting, no.
17    Henry Hicks was the issue with ACT
18    software that he purchased.
19    Q.    And we'll get to that. As far
20    as this WMS and Mass 200 system, Henry
21    Hicks really wasn't involved; is that
22    correct?
23    A.    That's correct.

Page 150

1    Q.    What about Jeff Larry? I
2    don't think he was even at the meeting?
3    A.    Correct.
4    Q.    And have you now told me
5    everything that relates to the WMS and
6    Mass 200 systems issue as it pertains to
7    your claims of race discrimination?
8    A.    Yes.
9    Q.    The third way in which you
10    believe you were treated differently
11    because of why race is --
12        MR. NELMS: Are you going on
13    to another topic?
14        MS. MCGAHEY: Yeah.
15        MR. NELMS: Let's break for
16    lunch.
17        MS. MCGAHEY: Okay.
18        (Whereupon, a lunch break was
19        taken from 12:02 to 1:15 p.m.)
20    Q.    (BY MS. MCGAHEY:) Mr.
21    MacCartney, do you know how long Chris
22    Day had worked with Athenia Figgs?
23    A.    Not precisely.

Page 151

1    Q.    And you believe this meeting
2    in which y'all discussed the WMS and the
3    Mass 200 systems was sometime in the
4    Summer of '04?
5    A.    I believe so.
6    Q.    I want to talk about a third
7    way in which you believe you were treated
8    differently because of your race.
9    A.    Okay.
10    Q.    And I believe you said it was
11    during staff meetings when Patrice Daniel
12    would, and I think you used the term shut
13    you down and gave you the hand and not
14    let you talk?
15    A.    Yeah, to all of us, yes.
16    Q.    I want to talk about your
17    experience.
18    A.    Okay.
19    Q.    How many times did that
20    happen?
21    A.    Several. Don't know the
22    number. More than a dozen.
23    Q.    Tell me what happened.

Page 152

1    A.    Numerous occasions, but most
2    times it was a common theme when it was a
3    discussion or my input was required or I
4    felt I needed to add to the discussion.
5    It was oftentimes you would just be
6    abruptly interrupted and stopped, we're
7    the experts or we know how to do this
8    dance and we'll take care of that; we've
9    got the subject matter, we'll take care
10    of it.
11    Q.    That was Patrice Daniels
12    saying that?
13    A.    Yes.
14    Q.    Can you recall any specific
15    instances?
16    A.    Other than the one including
17    the Mass 200 and WMS meeting where she
18    said they're the experts, we're not,
19    we're moving on, it was usually at staff
20    meetings when we're discussing period
21    financials and forecasts and business
22    trends and what needed to be done. When
23    I would attempt to put my input as to

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 153 to 156)

Page 153

1    what I felt needed to be done, I was
2    often just shut down.  I did not witness
3    her doing this to any minorities that
4    were present at any time.
5        Q.    And the only minorities that
6    were in the senior management staff at
7    this time were the ones who had been
8    brought in by Onyx?
9        A.    Plus Brenda Sellers.
10       Q.    Plus Brenda Sellers.  And you
11   never saw Patrice Daniels do that to
12   Brenda Sellers?
13       A.    Correct.
14       Q.    So Patrice Daniels would stop
15   any input that you were providing?
16       A.    Yes.  Not every time, but
17   often.
18       Q.    Were there occasions when
19   Patrice Daniels followed through on
20   whatever input you were providing or
21   recommendations you were giving?
22       A.    No.
23       Q.    Never happened?

Page 154

1        A.    No.
2        Q.    Did you complain to Brenda
3    Sellers about it?
4        A.    No.
5        Q.    Did you complain to Chris Day
6    about it?
7        A.    We discussed it once.  I don't
8    think it was a complaint.
9        Q.    Tell me about that discussion.
10       A.    We were discussing one
11   particular topic, and I think it was
12   schedule adherence as it related to
13   revenue.  And when I gave him my insight
14   he said, you need to speak up at staff
15   and make sure your point is clear.  He
16   said, it's a very good point.  And I
17   said, it's very difficult to do that at
18   staff, Chris, because, as I'm sure you've
19   seen, Patrice often gives us the hand and
20   shuts us down; I know she's done it to me
21   several times.
22       Q.    What did Chris say?
23       A.    Speak up anyway.

Page 155

1        Q.    Now, you say that Patrice
2    Daniels would give you the hand.  Would
3    she physically gesture like stop, put her
4    hand out like that, or is that a figure
5    of speech you're using?
6        A.    No.  She physically put the
7    hand up.  And usually it was -- they
8    didn't even give you enough respect to
9    look you in the eye.  It was more like
10   (indicating) and she talked while not
11   looking at you.
12       Q.    Did you ever complain to Jeff
13   Larry about Patrice Daniels' treatment of
14   you in those staff meetings?
15       A.    No.
16       Q.    Did you ever complain to Henry
17   Hicks about Patrice Daniels' treatment of
18   you during the staff meetings?
19       A.    No.
20       Q.    And you think that Patrice
21   Daniels' treatment of you that you've
22   just described was because of your race
23   because you did not observe her treat any

Page 156

1    African-Americans that way?
2        A.    Yes.
3        Q.    How long was Patrice Daniels
4    actively participating in the operations
5    of Piknik?
6        A.    It's very difficult to say
7    because many times she would phone in.
8    Some meetings she would come to, some
9    meetings she wouldn't.  Sometimes she
10   would phone in.  Sometimes she didn't.
11   There would be periods we would get
12   e-mails.  Sometimes a month would go by
13   without e-mail, and then there's a
14   specific subject she would be jumping in
15   on.  So we were never really clear what
16   her involvement was because for a roll of
17   time it seemed like a period where she
18   just faded in and out.
19       Q.    Did there come a time, though,
20   that she had stopped engaging in these
21   meetings with you?
22       A.    Yes.  And, if memory serves
23   me, it was around the time that Bill

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 42 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 157 to 160)

Page 157

1  McLennan was hired.
2      Q.    So when Bill McLennan was
3  hired Patrice Daniels was no longer
4  participating in these weekly staff
5  meetings? Or you may not have said they
6  were weekly, but these staff meetings?
7      A.    Yes, that's what it appeared.
8  There was nothing official said as to
9  she's with us, she's no longer with us,
10  she's involved, she's not involved. She
11  just stopped participating.
12      Q.    So when Bill McLennan starts
13  Patrice Daniels is no longer stopping you
14  or giving you the hand; is that correct?
15      A.    Yeah, she was no longer
16  present.
17      Q.    And I apologize if I have
18  asked you this already. When did Bill
19  McLennan start or come on board?
20      A.    Summer of 2004. And he left
21  in -- on or around February of 2005, if
22  I'm not mistaken.
23      Q.    So the meeting that you were

Page 158

1  telling me about earlier about the WMS
2  system and the Mass 200 system, that
3  would have been before Bill McLennan came
4  on board?
5      A.    Yes.
6      Q.    Have you now told me
7  everything regarding Patrice Daniels shut
8  you down and give you the hand as relates
9  to your claims of race discrimination?
10      A.    Other than that I witnessed
11  her doing it to other of my peers in
12  addition to me. That would be it.
13      Q.    And this is all in the same
14  time frame before Bill McLennan comes on
15  board?
16      A.    Yes, ma'am.
17      Q.    How, if at all, did Patrice
18  Daniels' treatment of you affect your
19  employment with Piknik?
20      A.    Well, in addition to the
21  statement she made about telling me I
22  basically had no credibility, I didn't
23  know what I was talking about, I wasn't

Page 159

1  an expert and instantly shutting me down,
2  it made it clear to me that the treatment
3  of us was, myself, was different than it
4  was toward minorities at that company,
5  and that it was clear it was going to
6  continue to be that way and that I
7  probably needed to start keeping my eyes
8  and ears open because the end probably
9  wasn't that far away.
10      Q.    Any other way in which Patrice
11  Daniels' treatment of you affected your
12  employment?
13      A.    No.
14      Q.    I want to talk to you now
15  about the fourth way in which you believe
16  you were treated differently because of
17  your race. And in my notes you were
18  talking about you and Bert Mayer
19  recommended a preventative maintenance
20  program and you were asked to provide
21  justification on why the purchase was a
22  business necessity?
23      A.    Correct.

Page 160

1      Q.    When did this occur?
2      A.    I'm going to say the first
3  half of 2004.
4      Q.    So somewhere between January
5  and June of 2004?
6      A.    I believe so. I'm not really
7  clear, but in that time frame.
8      Q.    And what was the preventative
9  maintenance program you were
10  recommending?
11      A.    PMC 5000 I think it was
12  called.
13      Q.    What was it for?
14      A.    It was designed to track
15  maintenance needs and to recommend, based
16  on OEM standards for our equipment, when
17  certain maintenance should be done in a
18  preventative manner versus in a reactive
19  manner, which is all designed to
20  increasing production line up-time, which
21  would improve our scheduled adherence and
22  improve our revenue and cash flow. It
23  was approximately five hundred dollars

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Page 161

1    for that software.
2       Q.   Five hundred?
3       A.   Yes.
4       Q.   Is it a software program?
5       A.   Yes.
6       Q.   And you said it's designed to
7    track when equipment needs to be --
8    strike that. It's designed to track when
9    equipment needs to be maintained, like
10   you said, on the front end as opposed to
11   the background?
12      A.   Yes. Proactively versus
13   reactively. Proactive maintenance
14   statistically has much less line downtime
15   planned associated with it because it's a
16   planned event, versus reactive downtime
17   is an unplanned event and costs more and
18   takes more time.
19      Q.   And you recommended that this
20   PMC 5000 software be purchased?
21      A.   Bert and I recommended it be
22   purchased and installed on our
23   maintenance manager's computer or ideally

Page 162

1    on the network so other sites could use
2    it as well.
3       Q.   Who did you make the
4    recommendation to?
5       A.   To Chris Day and Patrice
6    during one of the peer review meetings,
7    the staff meetings.
8       Q.   So this --
9       A.   Bert was really spearheading
10   it. I was pushing Bert to get it because
11   of the way the line downtime was
12   affecting my department's performance,
13   schedules, adherence, that sort of thing.
14      Q.   So this also would have
15   occurred before Bill McLennan came on
16   board?
17      A.   I believe so.
18      Q.   Did you have a meeting with
19   Patrice Daniels and Chris Day, or did you
20   just submit something?
21      A.   We verbally discussed the
22   software, what it could do, what the cost
23   was and what the benefits would be and

Page 163

1    why we needed it, because we didn't have
2    anything like that in the company, and
3    reactive downtime was a major
4    contributing factor to our loss
5    production time and revenue potential.
6       Q.   So there was no preventative
7    maintenance program in place at the time?
8       A.   Correct.
9       Q.   So you discussed it with Chris
10   Day and Patrice Daniels?
11      A.   Yes.
12      Q.   What did Chris Day say?
13      A.   Why this particular software.
14   He asked why this particular software.
15   We said that our maintenance manager had
16   used it in a previous job, it was very
17   low cost and had all the buzzes and
18   whistles, for lack of a better term, that
19   we needed versus some other extremely
20   expensive programs that were out.
21      Q.   Anything else that Chris Day
22   said?
23      A.   He would refer it to Athenia

Page 164

1    and she would take up the matter, Athenia
2    Figgs.
3       Q.   Is that because Athenia Figgs
4    was the IT head?
5       A.   She was still responsible for
6    IT. I don't know if she was running the
7    department or if Mike Osborne was under
8    her guidance at that time. I'm not clear
9    what her role was at the time this
10   occurred. But she was still involved.
11      Q.   What, if anything, else did
12   Chris Day say besides telling you that it
13   would be referred to Athenia Figgs?
14      A.   That was it.
15      Q.   What, if anything, did Patrice
16   Daniels say?
17      A.   I think she commented after
18   Chris said he would refer it to Athenia,
19   she said, yes, Athenia would be the best
20   person to assess whether that was needed.
21      Q.   What is the next thing you can
22   recall about preventative maintenance
23   software?

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 44 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 165 to 168)

Page 165

1    A.    I believe it was an e-mail I
2    got from Athenia saying she wanted to
3    talk with Bert and I about the program
4    and wanted to set up a meeting.
5        Q.    Was there a meeting?
6        A.    Yes. I was not present. I
7    was not able to attend the meeting. She
8    met with Bert directly.
9        Q.    So you were not in the
10   meeting?
11       A.    Correct.
12       Q.    So you don't know what was
13   said during that meeting?
14       A.    I know from what Bert told me
15   was said.
16       Q.    You have no first-hand
17   knowledge?
18       A.    Correct.
19       Q.    What did Bert tell you was
20   said during this meeting?
21       A.    Said you need to do --
22   according to Athenia we need to do a
23   business justification on why this is

Page 166

1    needed, what the benefits would be. And
2    she recommended a process and a format
3    that she sent to us, which was a fifteen-
4    to twenty-page document on all the
5    business justification reasons that
6    needed to be documented.
7        And Bert asked me for my
8    input, can I help him with this document,
9    could I give him some of the business
10   justifications and why we needed to do
11   this as far as reasons for my department
12   versus why he needed it for his
13   department. I said we certainly could.
14       I sent him -- I don't recall
15   if we sat down and we walked through it
16   or if I actually sent an e-mail. I think
17   we sat down and I walked him through it
18   with me. He filled out the form. He
19   filled it in. He kind of spearheaded it
20   from there. To my understanding it was
21   -- he had several individual meetings
22   with Athenia.
23       Q.    Were you present during the

Page 167

1    individual meeting with Athenia?
2        A.    No. There were several
3    meetings with Athenia to go through it,
4    and then it was brought up at two
5    subsequent senior staff meetings as to
6    what the business justifications were,
7    and almost an entire staff meeting was
8    devoted for this one subject.
9        Q.    Were you present for the two
10   staff meetings?
11       A.    Yes. And half of another
12   staff meeting was devoted to it.
13       Q.    Two and a half staff meetings?
14       A.    Yes. Sorry. One and a half.
15   The first one was a full staff and the
16   second was half the staff was spent on
17   that. Basically Athenia said it wasn't
18   needed, there are better programs out
19   there. We disagreed and said they are a
20   bunch more expensive and don't do
21   anything more than what this program
22   does, and, oh, by the way, and our
23   engineering manager is very familiar with

Page 168

1    this and there will be no learning curve.
2    They said, sorry, we just can't approve
3    this.
4        Q.    So in the end the request for
5    capital to purchase the PMC 5000 was
6    denied?
7        A.    Yes.
8        Q.    And Athenia Figgs had made the
9    decision that the PMC 5000 program was
10   not needed?
11       A.    I believe she made the
12   recommendation to Patrice and Chris.
13       Q.    Do you know if she made a
14   recommendation to Patrice and Chris, or
15   is that your assumption?
16       A.    Based on Chris and Patrice's
17   statement at staff. They said according
18   to Athenia this is not needed, there are
19   better programs out there, this should be
20   further evaluated at a later time.
21       Q.    So the decision was that the
22   PMC 5000 program specifically was not
23   needed; correct?

JERRY MACCARTNEY, ET AL.-TFM     Document 74     Filed 10/29/2007     Page 45 of 138
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 169 to 172)

Page 169

1    A.   I believe the decision was the
2  PMC software was not -- preventative
3  maintenance software program was not
4  needed at that time. Not specifically
5  that one.
6    Q.   I'm sorry?
7    A.   Not specifically that one
8  wasn't needed. A preventative
9  maintenance software wasn't needed at
10 that time.
11   Q.   But there was a belief that
12 better programs existed and that further
13 evaluation needed to be done?
14   A.   Yes, at a later time.
15   Q.   So they didn't rule it out
16 completely?
17   A.   It was never allowed to be put
18 back on the table.
19   Q.   Did you try?
20   A.   Bert and I tried in several
21 staff meetings, and we were told, we've
22 already discussed this and we've already
23 stated it's not something we're going to

Page 170

1  do.
2    Q.   With respect to the PMC 5000
3  program in particular?
4    A.   With respect to preventative
5  maintenance software program.
6    Q.   Generally, any preventative
7  maintenance program, they said it had
8  already been discussed and they weren't
9  going to take it up at that time?
10   A.   Yes.
11   Q.   Why do you believe that that
12 decision to not pursue any preventative
13 maintenance software was because of your
14 race?
15   A.   Two reasons.
16   Q.   Okay. Number one?
17   A.   That for such a small piece of
18 software, around five hundred dollars, it
19 was going to give us such a big benefit
20 and help us achieve better line
21 utilization and better production
22 scheduling which would create better
23 revenue performance, there was an

Page 171

1  unbelievable amount of scrutiny for
2  something that was so clearly needed.
3  And because not long before then I had
4  received a similar scrutiny and told
5  basically I didn't know, I wasn't an
6  expert and had no credibility with regard
7  to the Mass 200, WMS project. That's
8  reason number one.
9    Q.   Is that the same reason?
10   A.   Yes.
11   Q.   Reason number two?
12   A.   Reason number two, within
13 thirty days of that, if I'm not mistaken,
14 within a month, very close to that same
15 time period Henry Hicks informed us we
16 are purchasing -- the company was
17 purchasing a contact manager software
18 called ACT.
19   Q.   What kind of software?
20   A.   Contact manager software
21 program called ACT. This was a thirty
22 thousand dollar program, and the decision
23 had been made to purchase it. And when

Page 172

1  asked where was our business
2  justification done, what is this going to
3  do for the business, what is this going to
4  do for revenue, what's this going to
5  do for cost reductions, they said there
6  is none, this is something we need, we're
7  doing it. And they did.
8    Q.   Did Chris Day or Patrice
9  Daniels actually say to you, Mr.
10 MacCartney, that you, quote, unquote,
11 lacked credibility, or is that your
12 feeling?
13   A.   It's the way I read it, the
14 treatment.
15   Q.   I just wanted to make clear
16 because you said they said it. But based
17 on their treatment, that's the perception
18 you had?
19   A.   Yes, ma'am.
20   Q.   So you believe that you were
21 subjected to a lot of scrutiny for such a
22 small software program that had a
23 potential for a lot of benefit to the

Page 173

1  company?
2      A.    Clear benefit, not potential.
3      Q.    It was clear to you?
4      A.    Clear to myself and Bert and
5  the rest of the staff.
6      Q.    The staff being your
7  coplaintiffs?
8      A.    Senior staff, yeah, as well as
9  other production managers prior to senior
10 staff.
11     Q.    You said approximately a month
12 later Henry Hicks purchased a contact
13 manager software program called ACT?
14     A.    Yes.
15     Q.    And you believe that program,
16 software program, cost thirty thousand
17 dollars?
18     A.    Yes.
19     Q.    How do you know that?
20     A.    Because that's what Henry said
21 it costs.
22     Q.    And you believe that no
23 justification was given for that

Page 174

1  purchase?
2      A.    Yes.
3      Q.    And you're unaware of a
4  written business justification for that
5  purchase; correct?
6      A.    Correct.
7      Q.    Do you know if the purchase
8  had been discussed prior to this meeting
9  with Henry Hicks?
10     A.    Not in any of the staff
11 meetings.
12     Q.    At least not in the staff
13 meetings that you were present?
14     A.    Correct. And I asked Bert if
15 it was discussed in any I wasn't in. He
16 said no. He said it caught us all by
17 surprise because we were told, we just
18 bought the software and you folks are all
19 going to train on it.
20     Q.    What was the purpose of ACT?
21     A.    To track and record contact
22 and conversation strings with our
23 customers.

Page 175

1      Q.    Do you know who made the
2  decision to purchase ACT?
3      A.    I don't know who made the
4  decision, who said, yes, go ahead and buy
5  it, but I believe it was Henry and/or
6  Chris. Patrice Daniels was also involved
7  at the time.
8      Q.    So you believe it could have
9  been Chris Day or Henry Hicks or Patrice
10 Daniels?
11     A.    Or collectively all of them,
12 yes.
13     Q.    Was Athenia Figgs involved in
14 that decision at all, do you know?
15     A.    I don't know.
16     Q.    And you don't know if Henry
17 Hicks had provided any kind of
18 justification verbally to Chris Day,
19 Henry Hicks or Patrice Daniels?
20     A.    I do not know if there was any
21 verbal justification, no.
22     Q.    And the ACT program was
23 installed?

Page 176

1      A.    Yes.
2      Q.    And it was used?
3      A.    For thirty days.
4      Q.    What happened after the thirty
5  days?
6      A.    Everybody lost interest in it,
7  including Henry.
8      Q.    Why do you say that everybody
9  lost interest in it?
10     A.    Because folks stopped updating
11 it with their contacts with the
12 customers, including Henry. He said it
13 was just too much work and wasn't worth
14 it.
15     Q.    Is this a program that you had
16 to use as well?
17     A.    If I made contact with the
18 customers, I was required to record it in
19 there.
20     Q.    Is this one of those programs
21 that anybody can log into it and search
22 under a customer name and see who has
23 talked to a customer and what the

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 47 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 177 to 180)

Page 177

1 discussion was about?
2 A. Similar to that, yes.
3 Q. Kind of like a diary?
4 A. It's a contact tracker kind of
5 tool.
6 Q. Have you now told me
7 everything that you can recall about this
8 PMC 5000 issue versus the ACT issue as it
9 relates to your discrimination claim?
10 A. No.
11 Q. What else?
12 A. When I asked what was the
13 business justification for this, what is
14 this going to do for revenue or
15 bottom-line cost improvements he said,
16 it's pretty much a tool for me so if I
17 walk into a customer or I talk to a
18 customer on the phone I can look in the
19 system and be up to speed to what's going
20 on so I don't look like a fool. And
21 myself and Bert both questioned him and
22 said, so what does that do for the
23 company's bottom line or our

Page 178

1 profitability, and his answer was, I
2 guess it doesn't do anything. That's it.
3 Q. And Henry Hicks was the VP of
4 Sales?
5 A. Sales and marketing I believe
6 it was.
7 Q. I'm sorry?
8 A. Sales and marketing I believe
9 was his title.
10 Q. Prior to the ACT program being
11 installed how was contact with customers
12 tracked?
13 A. Henry would hold weekly --
14 actually, Henry and Bob Winter would hold
15 weekly meetings as far as the status of
16 the different projects with the different
17 customers, which Bob would document and
18 send out in an e-mail documenting the
19 minutes of a meeting so there was record
20 of all contacts and what the latest
21 status of all our projects with the
22 customers were.
23 Q. And the ACT program was

Page 179

1 something that information about the
2 communication with the customer could be
3 entered on a daily basis?
4 A. It was a computerized storage
5 method for all that data, yes. It was
6 all on one place.
7 Q. And so that you wouldn't have
8 to wait until the weekly staff meeting to
9 know what was going on with that
10 customer; you could go in before the
11 meeting and see what had happened?
12 A. No, I don't think it was so
13 much you wouldn't have to wait for the
14 next staff meeting --
15 Q. But you could?
16 A. You had documentation of the
17 last meeting and what the status was.
18 Q. But between last week's
19 meeting and the meeting that is coming up
20 this week could you look into that
21 program and see what the client
22 information and content had been?
23 A. That's what it was designed to

Page 180

1 do, yes.
2 Q. Have you now told me
3 everything about the PMC 5000 and the ACT
4 issue as it relates to your claim of
5 discrimination?
6 A. Yes, ma'am.
7 Q. Mr. MacCartney, I now want to
8 talk about the fifth way in which you
9 believe you were discriminated against
10 because of your race. And it has to do
11 with Anthony Barber and paint; right?
12 A. Yes.
13 Q. If you can tell me about that?
14 A. Somewhere between the middle
15 of May and the first of June to the best
16 of my memory --
17 Q. Of what year?
18 A. 2005. Anthony had come into
19 the office, my office at Alatex Road,
20 which had been repainted with the
21 available paint we had on hand after
22 striping the lanes in the warehouse,
23 which was white paint, standard in all

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 181 to 184)

Page 181

1  warehouses.
2     Q.  Okay.  Anthony Barber comes
3  into your office at the Alatex facility.
4  At this time you are the plant manager of
5  Alatex?
6     A.  Yes.
7     Q.  What do you say, what does he
8  say?
9     A.  He started off by saying, this
10  looks much better.  And I said, yes, the
11  other one was well overdue for a coat of
12  paint.  And that's when he proceeded to
13  make the statement I told you earlier
14  about, this is what you're all about,
15  you're all about white.
16     Q.  Okay.  You're going to have to
17  walk through this slowly.  Tell me
18  exactly what he said and what, if
19  anything, you ever said in response.  So
20  he walks in.  He says this looks much
21  better.  You say, yeah, it's been long
22  overdue for a new coat of paint?
23     A.  Yes.

Page 182

1     Q.  What happens next?
2     A.  And he said, well, let me tell
3  you something -- or something along those
4  lines -- is this what you're all about;
5  are you all about white.  He said,
6  because me and white don't work; I'm not
7  about white; I don't work good with
8  white; I'm more about color; color and me
9  work together much better.  Along those
10  lines, not exactly verbatim, but pretty
11  darn close to those words.  And he
12  proceeded to say, do I make myself clear,
13  and I said loud and clear.
14     Q.  He says let me tell you
15  something, is that what you're all about,
16  you're all about white; I'm not about
17  white; I'm all about color?
18     A.  Me and white don't work well,
19  I'm all about color; I don't work well
20  with white.  I'm not sure the precise
21  sequence he made those statements, but he
22  referred to how much him and white don't
23  work well together and he's not about

Page 183

1  white and proceeded to tell me about how
2  much he's more about color and he works
3  much better with color.  The conversation
4  was split into those two halves, all
5  about how him and white didn't work
6  together and he wasn't about white.  The
7  second half was about how much he's more
8  about color and how much him and color
9  work better together or work well
10  together than white.
11     Q.  And what else was said?
12     A.  He said, do I make myself
13  clear, and I said perfectly clear, or
14  something to that extent, perfectly or
15  absolutely or something like that.
16     Q.  Was the office ever repainted?
17     A.  No.
18     Q.  What was your interpretation
19  of those comments?
20     A.  He was making it very clear
21  that I was white, he does not work well
22  with white, he prefers to work with
23  nonwhite people, and that he was trying

Page 184

1  to make himself very clear.
2     Q.  Was he yelling?
3     A.  No.
4     Q.  Just normal --
5     A.  A little animated.
6     Q.  Who was present?
7     A.  The person that was still
8  doing most of the touch-up on the
9  baseboard was an employee named Lamar.  I
10  believe the last name was Ranson or
11  Ransom.  I'm not exactly sure of the
12  spelling, but somewhere around that
13  pronunciation.  And there was another
14  temp employee that I don't know the name
15  of that was helping him.
16     Q.  They were in the office
17  when --
18     A.  They were still doing some
19  work on some of the baseboards, getting
20  some of paint and tape off the baseboard
21  when they finished taping it.
22     Q.  So these two individuals were
23  in the office when Anthony Barber -- when

JERRY MACCARTNEY ET AL. vs.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM     Document 74     Filed 10/29/2007     Page 49 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 185 to 188)

Page 185

1  you say Anthony Barber made those
2  comments to you?
3      A.   Yes.  Just outside the door
4  was Bill Boykin, the warehouse manager
5  for the Alatex facility.
6      Q.   Was someone else present?
7      A.   No.
8      Q.   Did you ever talk with Lamar
9  Ransom about that comment?
10     A.   No.
11     Q.   Did you ever talk with the
12 temp employee about it?
13     A.   No.
14     Q.   Well, first of all, have you
15 told me everything about that -- about
16 what happened, what was said?
17     A.   Only after I told him it was
18 perfectly clear, I said we used the only
19 pain that was available, that was on
20 hand, I didn't want to spend any money at
21 this time given the financial condition
22 of the company.
23     Q.   And what --

Page 186

1      A.   And he didn't respond.
2      Q.   Anything else that was said?
3      A.   No.
4      Q.   Do you know if Bill Boykin
5  heard the comment?
6      A.   Yes.  He told me he heard most
7  of it.
8      Q.   Tell me about your
9  conversation with Bill Boykin about it.
10 Who approached whom?
11     A.   After I had done a walk of the
12 production line with Anthony and Anthony
13 left the facility, Bill said, did I hear
14 what I thought I heard.  And I said,
15 well, I'm still not sure I believe it
16 myself, but, yes, you heard what you
17 thought you heard.
18     Q.   And did he say what he thought
19 he heard?
20     A.   No, not during that
21 discussion.
22     Q.   Well, I want to concentrate on
23 this first discussion with Bill Boykin

Page 187

1  first before we move on.  Bill Boykin
2  asks you did I hear what I thought I
3  heard, and you say --
4      A.   Yes, you heard what you
5  thought you heard; I still can't believe
6  it myself, but, yes, you heard what you
7  thought you heard.
8      Q.   Was there any further
9  discussion with Bill Boykin at that time?
10     A.   Not on that subject, no.
11     Q.   Did you have a subsequent
12 discussion with Bill Boykin about it?
13     A.   Yes.
14     Q.   When was that?
15     A.   Within ninety days of being
16 terminated.
17     Q.   Within ninety days after you
18 left Piknik?
19     A.   Yes.
20     Q.   Tell me what happened.  Was it
21 a phone call or in person?
22     A.   It was a phone call.
23     Q.   Who called whom?

Page 188

1      A.   He had called me because prior
2  to that I had called him and asked if he
3  wouldn't mind packing up the personal
4  stuff in my office that I was not allowed
5  to take with me, and he called me to say
6  I've got all that stuff packed, you can
7  come get it whenever you want.
8      Q.   What else happened during this
9  phone call?
10     A.   We discussed how his son was
11 doing with his Crohn's disease and other
12 personal stuff. I said, do you recall
13 that conversation. He said, yes, I do.
14     Q.   How did he know what
15 conversation you were referring to?
16     A.   Because I said that
17 conversation with Anthony Barber in my
18 office about the paint.
19     Q.   You asked Bill Boykin do you
20 recall the conversation in my office with
21 Anthony Barber about the paint?
22     A.   Not in that particular
23 statement.  The conversation with Anthony

Page 189

1  Barber about the white and him not being
2  about white. He said, yes, I do.
3      Q.   What else was said?
4      A.   On that subject at that time,
5  nothing.
6      Q.   Did you have another
7  conversation with Bill about it?
8      A.   Yeah, probably about a year
9  later. I asked if he still remembered
10 it. And I had to refresh his memory, and
11 he said, oh yeah, I remember, now I
12 remember that. That was it.
13     Q.   Your first phone call with
14 Bill Boykin, which was approximately --
15 or was within ninety days of your
16 departure with Piknik, why did you bring
17 that topic up with Bill Boykin?
18     A.   Because I had contacted an
19 attorney and decided to proceed with the
20 EEOC case.
21     Q.   Did you tape record that phone
22 call with Bill Boykin?
23     A.   No.

Page 190

1      Q.   Did you ask him if he would
2  provide you with a written statement?
3      A.   No.
4      Q.   And you said you had another
5  phone call with Bill approximately a year
6  later?
7      A.   Yes.
8      Q.   A year later from that first
9  phone call?
10     A.   Approximately.
11     Q.   And why did you call him at
12 that time and ask him about --
13     A.   He actually called me. He was
14 looking for a reference because he was
15 changing jobs. He wanted a reference
16 with the hiring manager because he knew I
17 knew the person, had connection with the
18 person. I told him I would be glad to,
19 we got to talking, and he asked me what
20 was up with the case, he hadn't heard
21 much about it. I told him it was still
22 proceeding and if he still remembered
23 that one piece that I thought he could

Page 191

1  help me with. And after jogging his
2  memory he said he remembered it.
3      Q.   Did you tape record that
4  conversation?
5      A.   No.
6      Q.   Did you ask him if he would
7  provide you with a written statement?
8      A.   No.
9      Q.   Have you since then asked him
10 if he would provide you with a written
11 statement about it?
12     A.   No.
13     Q.   Have you asked Bill Boykin to
14 testify at trial if this case goes to
15 trial?
16     A.   No.
17     Q.   Did you speak with Chris Day
18 about Anthony Barber's statement?
19     A.   No.
20     Q.   Did you speak with Jeff Larry
21 about Anthony Barber's statement?
22     A.   No.
23     Q.   Did you speak with Henry

Page 192

1  Hicks --
2      A.   No.
3      Q.   About Anthony Barber's
4  statement?
5      A.   No. Sorry.
6      Q.   Did you speak with Brenda
7  Sellers about it?
8      A.   I need to think about that
9  one. No, I did not.
10     Q.   Have you contacted Lamar
11 Ransom?
12     A.   No.
13     Q.   And I assume you haven't
14 contacted the temporary employee, because
15 you can't remember who it is?
16     A.   That's correct.
17     Q.   Have you now told me
18 everything about your allegation that
19 Anthony Barber -- about the conversation
20 or the statement that he made?
21     A.   Yes.
22     Q.   And you interpreted that
23 statement to be referring to race as

JERRY MACCARTNEY, ET AL.
Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 51 of 138
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 193 to 196)

Page 193

1  opposed to paint color?
2      A.   Yes.
3      Q.   Did he ever ask you to repaint
4  the office?
5      A.   No.
6      Q.   I'm going to go a little bit
7  out of order.  I want to talk about the
8  Bob Gross incident.  When did this occur?
9      A.   I believe Spring 2005.
10     Q.   Where did it occur?
11     A.   In the manager conference room
12 in Day Street.
13     Q.   Who was present?
14     A.   Henry Hicks, Chris Day, and it
15 was either Patrice or Jeff.  I'm not sure
16 which, but one of them was there.  All I
17 know is that they were sitting in the far
18 right chair from me, and I don't remember
19 which one it was.
20     Q.   So Patrice Daniels had come
21 back?
22     A.   It was either Patrice or Jeff
23 at the meeting.  I'm not sure.

Page 194

1      Q.   Who else?
2      A.   Shannon McGlon, Bert Mayer,
3  Bob Winter, Brenda and I believe Robert
4  Lampert.
5      Q.   What was Bob Gross' role?
6      A.   He was in sales for the
7  condiments division.
8      Q.   Is this just one of those
9  weekly staff meetings?
10     A.   No.  I believe this was a
11 meeting that was more focused on sales in
12 Brundidge, trying to drive more volume to
13 that plant.
14     Q.   So there was discussion on
15 increasing the volume at the Brundidge
16 plant?
17     A.   Yes.
18     Q.   And what does Bob Gross say?
19     A.   The subject was around if
20 these contracts they thought they were
21 going to get with these customers landed,
22 where would they get all the people they
23 needed so quickly was the question that

Page 195

1  was on table.  And Bob blurted out, out
2  of turn, hell, why don't we go hire a
3  bunch of Mexicans, they work dirt cheap.
4      Q.   Did anyone say anything in
5  response?
6      A.   Say anything, no.
7      Q.   I'm sorry?
8      A.   No one said anything.  But
9  Chris, Henry and, whether it was Jeff or
10 Patrice, got a pretty good chuckle out of
11 it.
12     Q.   Who got a good chuckle out of
13 it?
14     A.   Henry, whoever was present,
15 whether it was Jeff or Patrice, I'm not
16 clear, and Chris.
17     Q.   Did you see Shannon laugh?
18     A.   No.  Actually, I believe
19 Shannon's eyes kind of opened wide up
20 like I can't believe somebody said that.
21     Q.   Did you see Bert laugh?
22     A.   No.  Bert was behind me to my
23 left.  I didn't hear him laugh, but I

Page 196

1  didn't see him laugh either.
2      Q.   What about Bob Winter?
3      A.   No, he did not.
4      Q.   Brenda?
5      A.   No.
6      Q.   Bob Lampert?
7      A.   No.
8      Q.   Did you?
9      A.   No.
10     Q.   Did you tell Bob Gross you
11 felt that was an inappropriate comment?
12     A.   No.  I just looked at him eyes
13 wide open, disbelief, and I think he knew
14 what I meant, like, holy crap, I can't
15 believe you just said that.
16     Q.   What happened next?
17     A.   I believe Henry said, we don't
18 think we can find any of those around
19 here, we're in the Southeast not the
20 Southwest.  And the meeting proceeded,
21 and that was the last discussion on it
22 during that meeting.
23     Q.   Henry Hicks said that he

JERRY MACCARTNEY ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Document 74     Filed 10/29/2007     Page 52 of 138
JERRY MACCARTNEY
August 17, 2007

(Pages 197 to 200)

Page 197

1 didn't think we could find any of those
2 around here?
3     A.   Yes.
4     Q.   "Those" being Mexicans?
5     A.   Yes.
6     Q.   And that was the end of that
7 discussion?
8     A.   Yes. Something to the effect
9 of we're in the Southeast, not the
10 Southwest.
11     Q.   What happened next, if
12 anything?
13     A.   During the meeting, nothing.
14 There was no more discussion on that
15 subject during that meeting.
16     Q.   Did anything happen after the
17 meeting?
18     A.   It was either the same day or
19 the next day I ran in to Henry and said,
20 I'm a little confused about your reaction
21 and the rest of Onyx's folks' reaction to
22 Bob Gross' comments.
23     Q.   Did you state specifically

Page 198

1 which of Bob Gross' comments you were
2 referring to?
3     A.   When he said what do you mean,
4 I said when Bob mentioned we should get a
5 bunch of Mexicans and you all thought
6 that was very funny. And he said, yeah,
7 you're right that probably wasn't
8 appropriate. And I said, well, I have to
9 ask you a question, Henry; if he had said
10 something about blacks, what kind of
11 reaction do you think we would have had
12 in the meeting. And he chuckled and
13 said, well, what do you think. That was
14 it. I dropped it.
15     Q.   Did you say anything to Chris
16 Day about it?
17     A.   No.
18     Q.   Did you say anything to Jeff
19 Larry about it?
20     A.   No.
21     Q.   Did you say anything to
22 Patrice Daniels about it?
23     A.   No.

Page 199

1     Q.   Did you mention it to Brenda
2 Sellers?
3     A.   Yes.
4     Q.   What did you say to Brenda
5 Sellers?
6     A.   That I thought it was awful
7 strange how a company that was so about
8 race and discrimination and protecting
9 the rights of minorities could laugh at
10 something like that, but had the comments
11 have been about blacks it would not have
12 been nearly as funny and he probably
13 would have been summarily fired on the
14 spot and that I thought it was despicable
15 that Henry actually got a laugh out of it
16 and did nothing about it. Her comment
17 was, that's just Bob Gross; everybody
18 knows Bob Gross; nobody pays attention to
19 him.
20     Q.   What else was said?
21     A.   That was it.
22     Q.   Well, Henry Hicks didn't tell
23 you that if the comment had been about

Page 200

1 African-Americans that he would have been
2 summarily dismissed, I think was the term
3 you used?
4     A.   No, he did not say that.
5     Q.   That's just your impression of
6 what would have happened?
7     A.   Yes, based on what had
8 happened to Clyde Luster.
9     Q.   You don't know if Henry Hicks
10 was aware of the Clyde Luster incident;
11 correct?
12     A.   I do not know directly, no.
13 All I know is Onyx -- I was told that
14 Onyx made the decision that Clyde had to
15 be terminated based on a second-hand
16 comment versus this was a direct comment.
17     Q.   Now, you're saying in that
18 meeting when Bob Gross made this comment
19 that you observed Henry Hicks and Chris
20 Day and either Patrice Daniels or Jeff
21 Larry chuckle?
22     A.   It was a pretty good chuckle
23 out of it, almost a belly laugh.

JERRY MACCARTNEY ET AL. -TFM    Document 74    Filed 10/29/2007    Page 53 of 138
ONYX CAPITAL VENTURES, LLC, ET AL.                                    JERRY MACCARTNEY
                                                                     August 17, 2007

(Pages 201 to 204)

Page 201

1    Q.    And at the same time that
2  you're seeing them chuckle you're also
3  noticing Shannon kind of open her eyes
4  widely?
5    A.    Yes.
6    Q.    And you're noticing that Bob
7  Winter is not chuckling?
8    A.    Correct.
9    Q.    You are also noticing at the
10 same time that Brenda Sellers isn't
11 chuckling?
12   A.    Correct.
13   Q.    And that Bob Lampert is not
14 chuckling?
15   A.    Correct.
16   Q.    You don't know what Bert is
17 doing behind you?
18   A.    Correct.
19   Q.    Have you now told me
20 everything regarding Bob Gross' statement
21 as it relates to your claims in this
22 lawsuit?
23   A.    Yes.

Page 202

1    Q.    You also told me earlier that
2  it was stated that it was Onyx's vision
3  to place African-Americans in middle and
4  senior management?
5    A.    Yes.
6    Q.    Who do you say made that
7  statement?
8    A.    Chris Day said it on more than
9  one occasion. Henry Hicks said it on
10 more than one occasion. Henry Hicks sent
11 letters to our customers indicating that
12 was their intention. Jeff Larry made
13 that statement in addressing the
14 employees shortly after the acquisition,
15 majority acquisition of the company.
16 Patrice Daniels made reference to it
17 during her addresses to the employees,
18 the employee population, at the same
19 meetings. And it was mentioned on and
20 off during several staff meetings.
21        When we'd bring in customers
22 that we were trying to court or trying to
23 get their business, they would put up

Page 203

1  slides and talk about what their mission
2  and vision was, and then they would talk
3  about specifics about Piknik's
4  capabilities. Several presentations the
5  majority of the slides were around Onyx
6  and their vision and what they were all
7  about and what they wanted to do. And
8  the remainder of the meetings usually
9  usually focus around Piknik's technical
10 capabilities on the production lines. It
11 was a predominant theme.
12   Q.    Did Chris Day ever say he
13 hated being white?
14   A.    No.
15   Q.    You said Chris Day said it
16 more than once?
17   A.    Yes.
18   Q.    Tell me about the first time
19 you recall Chris Day saying anything
20 along those lines.
21   A.    One of his first visits
22 there -- I don't recall whether it was
23 when he was put at the helm when Mike

Page 204

1  O'Connell was booted out or before then.
2  It was when he was addressing the senior
3  staff and talking about Onyx and their
4  vision and mission and during subsequent
5  walk-arounds through the plant and
6  through the warehouse. The first walk
7  started off with Bert and I where he made
8  those comments. And then I tailed off to
9  do something else, and he continued on
10 with Bert.
11   Q.    Tell me exactly what you can
12 recall Chris Day saying.
13   A.    That it's one of Onyx's
14 intention -- their vision is to place
15 minorities in middle and senior
16 management positions and basically make
17 Piknik a breeding ground for
18 African-Americans to grow and achieve
19 management positions.
20   Q.    Chris Day said it was Onyx's
21 intention to place African-Americans in
22 management positions?
23   A.    Middle and senior management

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 54 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 205 to 208)

Page 205

1 positions.
2     Q.    And he said what else about a
3 breeding ground?
4     A.    Their intention, part of their
5 vision, was Piknik to be a breeding
6 ground for African-Americans to be able
7 to grow into management and middle
8 management positions.
9     Q.    Who was present when Chris Day
10 allegedly made this statement?
11     A.    Which time?
12     Q.    I'm just trying to talk to you
13 about the first time that you say Chris
14 Day made that statement?
15     A.    That would have been in a
16 staff meeting in the Day Street
17 production conference room, and the Onyx
18 team was there and the senior staff
19 meeting team was there.
20     Q.    Who is the senior staff
21 meeting team?
22     A.    Robert Lampert, Bob Winter,
23 Shannon McGlon, Bert Mayer, and I don't

Page 206

1 recall if Brenda Sellers was there. I
2 don't believe she was at the senior level
3 at that point. She was still kind of HR
4 person. She wasn't at director level.
5 So she wasn't at some of the early
6 meetings. She started attending later.
7 And then it was Chris, Jeff and Henry.
8     Q.    Do you have notes from that
9 meeting?
10     A.    No.
11     Q.    Do you know if at that time
12 Piknik was hiring?
13     A.    There wasn't any open position
14 at the senior level I was aware of.
15     Q.    What about positions below
16 senior staff levels?
17     A.    There was open positions on
18 the production lines and at maintenance.
19     Q.    What about in middle
20 management positions?
21     A.    I believe they were looking
22 for a maintenance supervisor as well at
23 the time.

Page 207

1     Q.    Do you know if Piknik was
2 considering creating new positions at the
3 time?
4     A.    Not to my knowledge.
5     MR. NELMS: I know I'm
6 breaking up one of your points, one of
7 your nine points, but I need a break.
8     MS. MCGAHEY: Okay.
9     (Whereupon, a break was taken
10 from 2:26 to 2:32 p.m.)
11     Q.    (BY MS. MCGAHEY:) Before the
12 break, Mr. MacCartney, you were telling
13 me about the first instance when you
14 heard Chris Day mention that it was
15 Onyx's intention to place
16 African-Americans in middle and senior
17 management positions?
18     A.    Yes.
19     Q.    Have you told me everything
20 you can recall about that instance when
21 you heard Chris Day make that comment the
22 first time?
23     A.    Yes.

Page 208

1     Q.    Did you say anything?
2     A.    No. As I mentioned, I had to
3 peel off the walk-through of the plant
4 and go take care of something. He
5 continued on with Bert, so I didn't say
6 anything at that time.
7     Q.    But you heard it before you
8 walked off?
9     A.    Yes.
10     Q.    And Chris Day said it was
11 Onyx's intention to place
12 African-Americans in the middle and
13 senior management positions and not to
14 replace management positions with
15 African-Americans; correct?
16     A.    That's correct.
17     Q.    And he said it was Onyx's
18 intention or part of Onyx's vision to
19 have Piknik be a place for
20 African-Americans to grow into management
21 and middle management positions?
22     A.    Yes. An incubation or
23 breeding ground, something along those

JERIC... CASE 2:05-cr-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 55 of 138 ...TNEY
ONYX CAPITAL VENTURES, LLC, ET AL.                                          August 17, 2007

(Pages 209 to 212)

---

Page 209

1 lines were his words.
2    Q.   Tell me about the next time
3 that you heard Chris Day make a statement
4 along those lines.
5    A.   It was within two to three
6 days after that Chris started having
7 one-on-one meetings with each of the
8 managers to learn more about them and to
9 tell us what he expected. And that was
10 in my office at Day Street.
11    Q.   Is this when you were Director
12 of Logistics?
13    A.   Yes.
14    Q.   Who else was present?
15    A.   No one.
16    Q.   So this was two to three days
17 after the first time that you heard Chris
18 Day make that comment?
19    A.   Yes.
20    Q.   Do you recall when it was, the
21 first time that Chris Day made that
22 statement?
23    A.   Recall what was it?

---

Page 210

1    Q.   When that occurred?
2    A.   The date, no, I don't recall
3 the date.
4    Q.   Do you recall generally what
5 time of year it was?
6    A.   I believe it was summer.
7    Q.   Do you recall what year?
8    A.   2003.
9    Q.   So two or three days later
10 you're having a one-on-one meeting in
11 your office with Chris Day?
12    A.   Yes.
13    Q.   What was said, who said it?
14    A.   I asked him about that
15 statement, and I asked if I needed to be
16 worried about my job. I said, if so, I
17 would appreciate a heads-up because I
18 just moved here and I'm not well
19 networked and if I need to be networking
20 I'd like to know. And his statement was,
21 no, that's our vision, our mission, but
22 it will be through attrition. And he
23 further said you have nothing to worry

---

Page 211

1 about, everything I have heard about you
2 and what I can tell from talking with
3 you, you're pretty buttoned up on the
4 ball and have your S-H-I-T together.
5    Q.   Anything else that was said?
6    A.   On that subject, no.
7    Q.   Did you believe Chris Day was
8 being sincere?
9    A.   Yes.
10    Q.   Did you talk with anyone about
11 your one-on-one discussion with Chris
12 Day?
13    A.   No.
14    Q.   What is the next occasion that
15 you heard Chris Day make a statement
16 along those lines?
17    A.   I'm not a hundred percent sure
18 on the next one. It was either at a
19 staff meeting that they called or it was
20 at the general population meeting they
21 called. I don't know which came next.
22 They were fairly close together.
23    Q.   You just don't recall which

---

Page 212

1 one came first?
2    A.   Correct.
3    Q.   Well, let's talk about the
4 staff meeting.
5    A.   They come in and basically
6 said they had a chance to meet us all. I
7 believe Mike O'Connell was still involved
8 at that point. Had a chance to meet us
9 all, talked about things the great things
10 they were going to do, they had a great
11 influence over banking and they worked
12 with bankers all their life, so they knew
13 how to work the bankers and they've got a
14 lot of experience at business development
15 and consumer packaged goods industry and
16 that they were going to bring a lot of
17 business our way and Piknik was going to
18 became a very popular company and we're
19 going to all prosper and it's going to be
20 a great place to work.
21        And part of that -- they
22 articulated that part of that vision and
23 how they were going to get there as well

---

JERRY ASA ACQUINEY OF MHT-TFM    Document 74    Filed 10/29/2007    JERRY MAC CARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.    August 17, 2007

(Pages 213 to 216)

Page 213

1　is they wanted to place African-Americans
2　in middle management and senior
3　management positions. And continued to
4　talk about the incubation or breeding
5　ground, whichever term he used, Piknik
6　as a breeding ground for
7　African-Americans.
8　　　Q. Was this Chris Day making
9　these comments or is it Mike O'Connell
10　saying that?
11　　　A. Chris Day.
12　　　Q. What else was said during that
13　staff meeting?
14　　　A. I believe Jeff Larry said
15　that -- he chimed in and said, again, we
16　want to remind you folks it's going to be
17　through attrition; we don't want to alarm
18　anybody. And he kind of cut Chris off
19　and made those statement.
20　　　Q. I'm sorry. He did what?
21　　　A. He kind of cut Chris off
22　before Chris had finished and chimed in
23　with that.

Page 214

1　　　Q. What else, if anything else,
2　said during that staff meeting?
3　　　A. With regard to placing
4　African-Americans in management positions
5　I don't believe there was any further
6　discussion at that meeting.
7　　　Q. Did Jeff Larry explain what he
8　meant that it was going to happen through
9　attrition?
10　　　A. No, he didn't explain.
11　　　Q. And Chris Day didn't say that
12　the intention was to replace management
13　or middle management with
14　African-Americans; is that correct?
15　　　A. Correct. He did not say
16　replace. He said place.
17　　　Q. Tell me about the general
18　population meeting. What do you mean by
19　general population, first of all?
20　　　A. They brought in everybody on
21　that shift I believe from both the Alatex
22　and Day Street facility into the
23　maintenance conference room, which is the

Page 215

1　largest of the conference rooms.
2　　　Q. Is that the Day Street
3　facility?
4　　　A. Yes. And Patrice Daniels and
5　Jeff Larry addressed everybody.
6　Introduced themselves, basically said
7　they had acquired 51 percent ownership or
8　interest, whatever the terms were used,
9　in Piknik and that Piknik was in the
10　process of being sold; nobody's jobs were
11　in jeopardy; we're not changing any of
12　our customers; we have talked to all the
13　customers.
14　　　　And they proceeded to say that
15　part of their vision as an MBA
16　organization was to make Piknik a
17　breeding ground for African-Americans in
18　middle management and senior management
19　positions throughout the company. And
20　there was a handout that they gave at
21　that meeting that talked about what is an
22　MBE and who is Onyx.
23　　　Q. Do you have that handout?

Page 216

1　　　A. No.
2　　　Q. What did you do with it?
3　　　A. I think I left it in the
4　conference room. It was given to all the
5　employees.
6　　　Q. What did the handout contain?
7　　　A. Information about minority
8　business enterprise, information about
9　Onyx. But I don't believe there was
10　anything in the handout that said
11　anything about their vision. That wasn't
12　actually in writing in that handout. It
13　was more around how MBE certification
14　would entice customers to do business
15　with us because of government tax
16　incentives and other things they would
17　get by doing business with an MBE
18　enterprise.
19　　　Q. You mentioned that Patrice and
20　Jeff Larry were at that general
21　population?
22　　　A. They addressed the team, yes,
23　they both stood up and addressed

JERRY MACCARTNEY ET AL. -TFM    Document 74    Filed 10/29/2007    Page 57 of 138
ONYX CAPITAL VENTURES, LLC, ET AL.                                              JERRY MACCARTNEY
                                                                               August 17, 2007

(Pages 217 to 220)

Page 217

1    everybody.
2        Q.    Chris Day was there?
3        A.    He was there, but he didn't
4    talk. He was sitting.
5        Q.    What is the next occasion you
6    can recall when Onyx's intention of
7    placing African-Americans was discussed?
8        A.    There were several of them.
9    The next one that I can remember clearly
10   was in the senior management staff
11   conference room. There was two or three
12   representatives from a customer -- and I
13   do not recall the customer's name --
14   which is the first time we saw the
15   presentation that Onyx had developed
16   about Piknik and what they were about,
17   which was predominantly focused on MBE
18   and what MBE meant, what their intentions
19   of an MBE was. And then followed up by,
20   as I mentioned previously, the technical
21   slides on Piknik and the capability.
22       Q.    Do you know when this
23   occurred?

Page 218

1        A.    I precisely believe it was
2    within two months of the general
3    population meeting.
4        Q.    Do you have any notes from
5    this meeting?
6        A.    Yes, I believe I do.
7        Q.    Have you provided those notes
8    to your lawyer?
9        A.    No. My notes were specific to
10   technical aspects I was required to
11   follow up on.
12       Q.    Would these be notes that you
13   kept in that journal that we were talking
14   about earlier?
15       A.    Yes.
16       Q.    So there was a presentation
17   given by whom?
18       A.    I'm trying to recall if Henry
19   had come on at that time or if it was
20   actually Chris and Patrice. I believe it
21   was Chris and Patrice. I don't believe
22   Henry had quite come on board yet.
23       Q.    So just Chris and Patrice?

Page 219

1        A.    And senior staff excluding
2    Brenda and excluding Robert Lampert.
3        Q.    And the presentation, is it a
4    PowerPoint?
5        A.    Yes.
6        Q.    And it's about Onyx, what Onyx
7    is?
8        A.    Basically trying to sell the
9    customer on Piknik. And the primary
10   slides were about Piknik's minority
11   business classification and the benefits
12   and what Onyx's vision for Piknik was.
13   And in those slides it stated placing
14   minorities, African-American minorities,
15   in middle management and senior
16   management positions.
17       Q.    Do you have a copy of that
18   presentation?
19       A.    No.
20       Q.    You can't recall who the
21   customer was?
22       A.    It was a Montgomery customer,
23   not a condiments customer.

Page 220

1        Q.    Meaning it was a beverage
2    customer?
3        A.    Yes, I believe it was one of
4    those vita-type waters, nutrient enhanced
5    kind of water type products. I don't
6    remember the name of the customer.
7        Q.    And you were present during
8    this presentation?
9        A.    Yes.
10       Q.    What is the next time that you
11   can recall anyone saying anything about
12   Onyx's vision being to place
13   African-Americans in management
14   positions?
15       A.    The next one I can remember
16   clearly. There were several more, but I
17   don't remember specifics of where they
18   were and in what setting. The next was
19   in an e-mail that Henry Hicks forwarded
20   to the Montgomery senior staff, which is
21   a recap of a meeting with April Blackmore
22   and the folks at PepsiCo/Quaker
23   Corporation where they had discussed some

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 58 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 221 to 224)

Page 221

1   potential projects.
2         And in that e-mail it stated
3   that they discussed Onyx's and Piknik's
4   intention to place minorities in senior
5   management positions -- not middle. It
6   said senior management positions
7   throughout the company. And I believe
8   that meeting -- also in that e-mail were
9   some folks at Pepsi. It was April
10  Blackmore, Ken Shelly and their finance
11  guy. I don't recall his name.
12        Q.   What else can you recall about
13  that e-mail?
14        A.   It stated that PepsiCo or
15  April mentioned some potential sources of
16  good minority candidates that they could
17  go to find to achieve that mission and
18  that Henry would be following up I
19  believe.
20        (Whereupon, Defendant's
21        Exhibit 4 was marked
22        for identification.)
23        Q.   I'm handing you what has been

Page 222

1   marked as Defendant's Exhibit 4 to your
2   deposition.
3         A.   (Examining document.) Yes,
4   that's it.
5         Q.   Have you had a chance to read
6   Defendant's Exhibit 4?
7         A.   Yes.
8         Q.   Is this the e-mail that you
9   were referring to from Henry Hicks to
10  April Blackmore that you were just
11  telling me about?
12        A.   Actually, Henry Hicks to the
13  Montgomery staff.
14        Q.   Regarding April Blackmore and
15  a meeting he had with April Blackmore?
16        A.   And the Pepsi -- some other
17  Pepsi folks.
18        Q.   First page of Defendant's
19  Exhibit 4 do you see that note that says
20  "Attachment A. Note the underlined
21  sentences that refer to our claim of
22  discrimination"?
23        A.   Yes, I see that.

Page 223

1         Q.   Did you type that up?
2         A.   No, I did not.
3         Q.   Turn to the last page of
4   Defendant's Exhibit 4. Do you see the
5   underlined sentences?
6         A.   Yes.
7         Q.   Did you underline that?
8         A.   No, I did not.
9         Q.   And this e-mail is summarizing
10  a meeting that Jeff Larry and Henry Hicks
11  had with April Blackmore at PepsiCo?
12        A.   Yes.
13        Q.   And the e-mail discusses some
14  action items for work to be done for
15  Pepsi?
16        A.   Yes.
17        Q.   And on the last page it says
18  "we discussed our desire to recruit
19  talented minorities in operating roles
20  within the company;" correct?
21        A.   Yes.
22        Q.   It doesn't say anything about
23  placing minorities in senior management

Page 224

1   positions, does it?
2         A.   That's what I infer operating
3   to mean.
4         Q.   What is your interpretation of
5   "operating roles"?
6         A.   Operators of the company,
7   senior staff.
8         Q.   That's how you interpreted
9   that phrase "operating roles"?
10        A.   Yes. They often referred to
11  us as we're the operators. We're the
12  operation managers as they deemed us.
13        Q.   Are you aware that -- do you
14  know whether Pepsi has a policy or
15  program in place to do business with
16  minority-owned businesses?
17        A.   I do not know if they do, but
18  I believe they do because it was
19  referenced in the other discussions in
20  meetings regarding Pepsi and that they
21  had an MBE program, as most publically
22  held companies do.
23        Q.   What is the next occasion that

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 225 to 228)

Page 225

1  you recall hearing anyone from Onyx
2  stating it was Onyx's intention to place
3  African-Americans in management roles?
4      A.    There was a meeting in
5  Brundidge which Chris Day was present and
6  Henry Hicks.  And I'm trying to remember
7  the venue and what the subject of the
8  meeting was.  The Brundidge staff was
9  there.  At the time I still had the
10  responsibility for logistics and supply
11  chain at the Brundidge facility.
12      I believe the discussion was
13  around Bill McLennan's departure and what
14  we're going to do about replacing him and
15  reiterated their position and their
16  intentions and visions regarding
17  African-Americans.  I don't recall the
18  specific words, just it was the division
19  was referred to again in that meeting.
20      Q.    Who made the statement?
21      A.    Chris Day.
22      Q.    Was Bill McLennan replaced?
23      A.    I'm not sure if they directly

Page 226

1  replaced him.  Anthony Barber appeared
2  shortly afterwards.
3      Q.    But you don't know if Anthony
4  Barber replaced Bill McLennan?
5      A.    No.  It's hard to say because
6  Anthony had responsibility at the
7  Montgomery facility.  The Brundidge
8  facility had already been closed.  So I
9  don't know if that meant he was a direct
10  replacement.  He did not have the same
11  responsibilities, as there was only two
12  facilities now and not three.
13      Q.    What is the next occasion in
14  which you heard Onyx's intention to place
15  African-Americans in management
16  positions?
17      A.    I believe that was it, that I
18  can recall.
19      Q.    And you told me about one
20  instance when you followed up with Chris
21  Day about what he meant by his first
22  statement?
23      A.    Yes.

Page 227

1      Q.    Did you ever follow up again
2  with Chris Day about Onyx's intention to
3  place African-Americans in management
4  positions?
5      A.    With Chris Day, no.
6      Q.    What about with Jeff Larry?
7      A.    Yes.
8      Q.    When did you follow up with
9  Jeff Larry?
10      A.    I believe it was within a
11  month of the acquisition.  Jeff came down
12  to meet the senior staff and took some
13  time to walk around and sit down and talk
14  with each of us one-on-one in our
15  offices, very informal meet-and-greet.
16      And I asked him again about
17  that vision and mission for regarding
18  African-Americans and if our jobs were in
19  jeopardy, if we needed to be looking
20  elsewhere, and, if so, there would be no
21  hard feeling by me if it was done
22  immediately, but I would at least
23  appreciate him letting me know in advance

Page 228

1  so I wouldn't be caught off guard.
2      And he said there's no
3  intention, reiterated what Chris Day said
4  about my performance and said it would
5  all be done over time and through
6  attrition.
7      Q.    Anything else that was said
8  during that one-on-one meeting with Jeff
9  Larry?
10      A.    No.
11      Q.    So that conversation during
12  your one-on-one meeting with Jeff Larry
13  was almost identical to your one-on-one
14  discussion with Chris Day?
15      A.    The focus was different, but
16  pretty much the same, yes.
17      Q.    Did you ask Jeff Larry what he
18  meant about it was going to be done over
19  time by attrition?
20      A.    No.  It was pretty clear what
21  I thought attrition meant.
22      Q.    What did you --
23      A.    As people left the company,

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Document 74        Filed 10/29/2007        Page 60 of 138
JERRY MACCARTNEY
August 17, 2007

(Pages 229 to 232)

Page 229

1   either on their own or other means, they
2   would be replaced, if possible, with
3   African-Americans.
4       Q.   Did you ever follow up with
5   Jeff Larry again about Onyx's intention
6   to place African-Americans in management
7   positions?
8       A.   No.
9       Q.   Did you ever follow up with
10  Henry Hicks about it?
11      A.   I believe there was a time
12  shortly after he brought in Letitia
13  Strowbridge -- which was a newly created
14  position that Onyx created for a beverage
15  business development manager.  Because
16  she was African-American and did not have
17  experience in beverage development but
18  had experience as a quality control
19  person in her background, I asked Henry
20  why this position was created and why was
21  an African-American who didn't seem to
22  have the experience, and he said -- made
23  it pretty clear that's Onyx's vision and

Page 230

1   part of what we needed to do in selling
2   our MBE is have black people in the
3   management positions to be able to sell
4   our MBE to our customers.  I believe that
5   was it.
6       Q.   Do you know what Letitia
7   Strowbridge's background was?
8       A.   My understanding is quality
9   control.
10      Q.   What is that understanding
11  based upon?
12      A.   Her statements.
13      Q.   Did you have any other
14  discussions with Henry Hicks?
15      A.   No.
16      Q.   Who was present during that
17  conversation with Henry Hicks?
18      A.   It was either Bob Winter or
19  Bert Mayer.  I'm not sure.  I think it
20  was Bert.  I just recall where in the
21  corridor it took place, but I don't
22  recall who else was standing to my left.
23      Q.   When did this occur?

Page 231

1       A.   Couple of weeks after he
2   brought Letitia on board, which I believe
3   was middle of 2004.  I'm guessing.
4   Somewhere in that time frame.
5       Q.   Do you know if Letitia
6   Strowbridge's position was subsequently
7   eliminated?
8       A.   Yes, it was.
9       Q.   What is Letitia Strowbridge's
10  race?
11      A.   African-American.
12      Q.   Have you now told me about
13  every instance that you can recall
14  hearing someone from Onyx saying that it
15  was Onyx's intention to place
16  African-Americans in management
17  positions?
18      A.   There were some other
19  statements by Athenia, but I'm not clear
20  enough on the details to go on the record
21  with it.
22      Q.   You don't recall what her
23  statements were?

Page 232

1       A.   They were referencing the Onyx
2   vision of that, but I don't recall the
3   context.  I know it was regarding some IT
4   meeting with an outside consulting firm
5   she brought in to try to reimplement the
6   Mass system.  I don't recall the details
7   of it, but there was a reference made in
8   that meeting about Onyx, in the kick-off
9   meeting, and what their mission was, but
10  I don't know her exact words.
11      Q.   And, actually, I think we
12  talked about this, but Mike Osborne was
13  brought in as IT manager after Onyx came
14  on board; right?
15      A.   Yeah, after Athenia replaced
16  Daniel Edwards.  She hired Mike Osborne.
17      Q.   And Mike Osborne is white?
18      A.   Yes.
19      Q.   So you have now told me about
20  every occasion in which you recall it
21  being expressed that Onyx wanted to place
22  African-Americans in management
23  positions?

JERRY MACCARTNEY, ET AL.-TFM    Document 74    Filed 10/29/2007    Page 61 of 138

JERRY MACCARTNEY, ET AL.-TFM    Document 74    Filed 10/29/2007    JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.

August 17, 2007

(Pages 233 to 236)

Page 233

1     A.    Yes.
2     Q.    And you have now also told me
3  every occasion in which you followed up
4  with Jeff Larry or Chris Day or Henry
5  Hicks about Onyx's expressed intention?
6     A.    Yes.
7     Q.    Besides Mike Osborne, were
8  other Caucasian employees hired after
9  Onyx took control?
10    A.    Chris McLennan was hired.
11    Q.    Is that someone different than
12 Bill McLennan?
13    A.    Sorry. Bill McLennan. Chris
14 is someone I used to work with.
15    Q.    So Bill McLennan was hired?
16    A.    Bill McLennan was hired. He
17 was someone that Chris Day had worked
18 with previously with Ira Donnelly.
19    Q.    Do you recall anybody else?
20    A.    There was a plant manager for
21 Brundidge, but I don't recall the name.
22 He was only there for a couple of months
23 before it closed.

Page 234

1     Q.    And Bill McLennan was in
2  senior management?
3     A.    He was COO.
4     Q.    So that would be senior
5  management?
6     A.    Yes.
7     Q.    Or above senior management?
8     A.    It was always unclear whether
9  he was an Onyx employee or Piknik
10 employee.
11    Q.    Do you remember an individual
12 named Carl Bleier?
13    A.    That was the one from
14 Brundidge, yes. Thank you.
15    Q.    He was the plant manager for
16 Brundidge?
17    A.    Brundidge.
18    Q.    Is that a yes?
19    A.    Yes.
20    Q.    Are there any other Caucasian
21 employees that you recall being hired
22 after Onyx came on board?
23    A.    That was hired by Onyx or was

Page 235

1  just hired period?
2     Q.    Well, let's talk about hired
3  by Onyx.
4     A.    Okay.
5     Q.    Besides the individuals we
6  have spoken about, do you recall any
7  other Caucasian employees that were
8  hired?
9     A.    Anthony Hale was hired after
10 Onyx took acquisition of the company.
11    Q.    What was Anthony Hale's
12 position?
13    A.    He was a maintenance manager
14 for Day Street.
15    Q.    Do you know who made that
16 hiring decision?
17    A.    Bert Mayer.
18    Q.    Do you know who made the
19 decision to hire Carl Bleier?
20    A.    If memory serves me, it was
21 right around the time between Bill
22 McLennan leaving and Chris coming in, and
23 I think it was Bill. I could be wrong,

Page 236

1  though. I'm just basing it on the time
2  frame and the sequence of events I recall
3  around that exchange.
4     Q.    Do you know who made a
5  decision to hire Bill McLennan?
6     A.    Chris Day. Actually, and Jeff
7  Larry. Jeff addressed the senior staff
8  regarding Bill before Bill came on board.
9     Q.    Are there any other Caucasian
10 employees that you recall being hired
11 after Onyx took control of Piknik?
12    A.    I'm trying to think of all
13 three facilities. There was a lot of
14 people coming and going. I don't believe
15 so. There was another African-American
16 they hired, though.
17    Q.    I want to talk about when you
18 became plant manager of the Alatex
19 facility.
20    A.    Okay.
21    Q.    How did that come about?
22    A.    I can't remember the exact
23 sequence of events. I'm trying to

JERRY CASE MACCARTNEY, ET AL. 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 62 of 138 JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.                                                                            August 17, 2007

(Pages 237 to 240)

Page 237

1    remember if it was Bill McLennan was
2    still there or Chris. Let me tell you
3    the events as I remember them unfolding.
4         A month before Bill McLennan
5    informed us he was leaving and they were
6    considering a replacement from within
7    because Chris Day could not continue to
8    perform his duties as an Onyx employee
9    and Piknik employee, Bill McLennan
10   approached me and told me that he and
11   Onyx were recommending me for his
12   position.
13        I asked him why they felt
14   that. He told me that he felt I was more
15   proactive, buttoned up, professional,
16   showed excellent leadership in all the
17   projects they had given me and I was the
18   only obvious choice.
19        There since a meeting
20   within one week of that happening at the
21   Capital City Club to discuss the critical
22   challenges facing the company in the next
23   six months, and I was told to attend to

Page 238

1    provide input.
2         One week after that Bill
3    informed me that based on some
4    preliminary actions and maneuvers, as he
5    called it, being taken by the bank they
6    decided not to make any change at the
7    time and leave people in the positions
8    they were and that Chris Day would remain
9    on until they found somebody and
10   straightened out the -- or, in their
11   words, get beyond that situation with the
12   bank.
13        Bill left. Chris came in.
14   And shortly thereafter I was informed
15   that my position was being eliminated and
16   that they wanted me to be plant manager
17   for the Alatex facility because that
18   facility had the biggest challenges
19   coming up with the customer potential
20   that was coming on board and it was going
21   to need some high level focused
22   leadership to get that plant to the level
23   it needed to be for those products that

Page 239

1    were planning on coming in from the
2    referenced Exhibit 4 Pepsi meeting
3    discussion.
4         I told him I would be glad to
5    and asked them what was to become of the
6    logistics responsibilities I'd had. He
7    said, you still need to keep an eye on
8    those and make sure everything gets taken
9    care of. They moved me to Alatex. I
10   moved out of my Day Street office and
11   moved to the Alatex facility and made the
12   mistake of painting the office. I think
13   the pay decrease came after that. That's
14   about it.
15        Q.   So Chris Day tells you that
16   your Director of Logistics position was
17   going to be eliminated?
18        A.   It was Chris and Anthony or
19   just Chris. I don't recall which.
20        Q.   Did Chris or Anthony ask you
21   if you were interested in being the plant
22   manager for Alatex?
23        A.   They said there was an

Page 240

1    opportunity to manage the Alatex facility
2    or Carl Bleier wanted me to go down and
3    run -- he requested me personally to go
4    down and run -- be the plant manager
5    for -- the operation manager for the
6    Brundidge facility.
7         I said I preferred to run --
8    the beverages has a lot more potential, a
9    lot more contribution can be made in that
10   position versus what I thought the
11   potential in Brundidge was and I
12   preferred to take the Alatex. I said if
13   my position is being eliminated that
14   would be my choice, and they said, okay,
15   that's what we were hoping you would say,
16   as Chris told me.
17        Q.   So you accepted the Alatex
18   position?
19        A.   I'm not sure if you say
20   accepted because I wasn't actually
21   officially told it was a change in title.
22   I was just told I was going to be
23   responsible for running that plant and I

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 63 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 241 to 244)

Page 241

1  needed to move over there and continue to
2  have my logistics responsibilities. So
3  I'm not sure I would say I accepted
4  anything as it was described to me.
5          (Whereupon, Defendant's
6          Exhibit 5 was marked
7          for identification.)
8      Q.   I'm handing you what has been
9  marked as Exhibit 5 to your deposition.
10     A.   (Examining document.) Okay.
11     Q.   Have you seen this document
12 before?
13     A.   I don't recall it being signed
14 or having Jeff Larry's name on it.
15     Q.   But you recall generally
16 seeing a similar document?
17     A.   Yes.
18     Q.   And this is an organizational
19 announcement; correct?
20     A.   Yes.
21     Q.   It's dated April 15, 2005?
22     A.   Yes.
23     Q.   And reflects you were going to

Page 242

1  assume the role of plant manager at the
2  Alatex facility; correct?
3      A.   Yes.
4      Q.   And at the bottom it relates
5  that Bob Gross' position was being
6  eliminated?
7      A.   Yes.
8      Q.   Do you recall his position
9  being eliminated?
10     A.   Yes.
11     Q.   And also says that Letitia
12 Strowbridge's position was eliminated.
13 We've already talked about that; correct?
14     A.   Yes.
15     Q.   And also said that Clarice
16 Crosby's position was being eliminated?
17     A.   Yes.
18     Q.   What is Clarice Crosby's race?
19     A.   She's African-American.
20     Q.   At this time was there some
21 restructuring going on within Piknik, do
22 you recall?
23     A.   Yes.

Page 243

1      Q.   What do you recall the
2  restructuring that was going on?
3      A.   That Chris was going to assume
4  more responsibilities with his Onyx
5  duties, and they brought in Anthony
6  Barber and Carl Bleier. Anthony was over
7  Montgomery and Carl over Brundidge.
8      Q.   Do you know if the positions
9  for Carl Bleier and Anthony Barber were
10 newly created positions?
11     A.   Hard to say, because Bill
12 McLennan had left and they replaced him
13 with two people. So don't know if they
14 were both replacing him or if one was new
15 or not and they decided to split the
16 role.
17     Q.   So either Anthony Barber or
18 Chris Day, or perhaps both of them, tell
19 you that your Director of Logistics is
20 being eliminated but inquire if you're
21 interested in the plant manager of Alatex
22 position?
23     A.   Yes.

Page 244

1      Q.   And you said that you would be
2  glad to take on the Alatex plant manager
3  position?
4      A.   Yes.
5      Q.   It's your position that even
6  after you took on the Alatex plant
7  manager job you were still acting as
8  Director of Logistics?
9      A.   I don't know if I would call
10 it acting. Anthony Barber told me I was
11 still responsible for those functions.
12     Q.   Did you still perform the job
13 duties of Director of Logistics?
14     A.   Yes.
15     Q.   To the same extent to when you
16 became plant manager of the Alatex
17 facility?
18     A.   Not the same devotion of time.
19 The time was split.
20     Q.   I think earlier when you were
21 listing all the reasons or the ways in
22 which you were discriminated against
23 because of your race, one of the ways was

JERRY A. MACCARTNEY, ET AL. HT-TFM    Document 74    Filed 10/29/2007    Page 64 of 138    JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.
August 17, 2007

(Pages 245 to 248)

Page 245

1  you said that Chris Day told you that
2  your job was being eliminated but Anthony
3  Barber took over your duties?
4      A.   Yes, sometime after I was made
5  plant manager for Alatex. I believe it
6  was approximately two weeks before I was
7  terminated Anthony told me I didn't need
8  to worry about those functions anymore,
9  he would take care of them.
10     Q.   Is this before your salary was
11 reduced?
12     A.   No. This was after, well
13 after.
14     Q.   Well, at that time did you
15 relinquish whatever job duties you were
16 still doing for the Director of Logistics
17 job?
18     A.   Yes.
19     Q.   Did Anthony Barber start
20 performing the duties of Director of
21 Logistics?
22     A.   Not that I witnessed. Mostly
23 Don and Bill continued to call me and ask

Page 246

1  for direction because they said they were
2  not getting any from Anthony.
3      Q.   Who?
4      A.   Bill Boykin and Don Mitchell.
5      Q.   So you don't know if Anthony
6  Barber took on the Director of Logistics
7  duties?
8      A.   That's correct.
9      Q.   Do you know what Anthony
10 Barber's job duties were?
11     A.   I believe he was responsible
12 for manufacturing operations for the
13 Montgomery facilities. All operations,
14 basically.
15     Q.   When you were Director of
16 Logistics were you responsible for the
17 manufacturing of all operations for
18 Montgomery?
19     A.   No. I was Supply Chain
20 Manager of Logistics.
21     Q.   Is it your claim that your
22 Director of Logistics position was
23 eliminated because of your race?

Page 247

1      A.   No.
2      Q.   Is it your claim that Chris
3  Day lied to you about your job being
4  eliminated?
5      A.   In hindsight, yeah, I guess
6  so, because after I saw this memo I asked
7  Anthony about the logistics
8  responsibility because this said they are
9  now reporting to him. He said, oh, no,
10 that's what it says in there, but you
11 still need to make sure that everything
12 is taken care of. So I guess the job was
13 eliminated but the responsibilities
14 weren't.
15     Q.   I wasn't following that. Let
16 me first turn to that document.
17     A.   Exhibit 5.
18     Q.   Okay. You recall receiving
19 something along the lines of Defendant's
20 Exhibit 5?
21     A.   Yes.
22     Q.   Now, tell me what you were
23 saying about --

Page 248

1      A.   And when I noticed in here in
2  Paragraph 3 where it said that Don
3  Mitchell and Bill Boykin now report
4  directly to Anthony, I asked if that
5  meant I didn't need to worry about
6  logistics anymore. He said, oh, no, you
7  still need to make sure you take care of
8  logistics.
9      Q.   Actually, that --
10     A.   I said, well, this is what
11 that says. I know what that says, but
12 you still need to make sure you take care
13 of that. It wasn't until two, maybe two
14 and a half months later that he told me I
15 didn't need to worry about it anymore.
16     Q.   So your job responsibilities
17 as Director of Logistics phased out over
18 two, two and a half month time frame?
19     A.   I'm not sure you say phased
20 out. He just mentioned to me one day
21 that I didn't need to worry about it, he
22 would take care of it.
23     Q.   I'm just trying to figure out

JERRY R. MACCARTNEY, ET AL.-TFM    Document 74    Filed 10/29/2007    Page 65 of 138
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 249 to 252)

Page 249

1  how or if you are saying that anything
2  relating to that was because of your
3  race?
4      A.    My position as Director of
5  Logistics?  I never claimed that was
6  because of race.  When I was terminated
7  as the plant manager of Alatex and
8  replaced by an African-American, that was
9  race related.
10      Q.    Okay.  So you're not claiming
11  that your becoming plant manager was
12  related to your race?
13      A.    No.
14      Q.    Okay.  I just want to make
15  sure I'm clear.
16      A.    Just trying to think what I
17  could have said that might have inferred
18  that.
19      Q.    Well, you mentioned earlier
20  that you thought of a ninth reason or a
21  ninth way in which you believe you were
22  terminated.
23      A.    Discriminated against.

Page 250

1      Q.    Excuse me.  You're right.  I
2  think I said terminated.
3      A.    It wasn't referencing the job
4  being eliminated.  It was I said my pay
5  got cut even though I had all the
6  responsibilities.
7      Q.    Okay.  And we have talked
8  about your pay reduction?
9      A.    Yes.
10      Q.    And why you believe that was
11  based on your race?
12      A.    Yes.
13      Q.    Speaking of the pay reduction,
14  did you have any meeting with your Alatex
15  employees regarding your pay reduction?
16      A.    There was not a meeting
17  regarding -- we had a regular morning
18  operations shift-start meeting the same
19  day they were all notified that their pay
20  had been cut, and it was the primary
21  thing they wanted to talk about and get
22  off their chest.  They were all very
23  angry, very upset.  And I told them if it

Page 251

1  makes you feel any better, senior
2  management has all been cut and by a much
3  greater percentage than yours have been
4  cut, so we know how you feel, but let's
5  get on, we have a lot of work to do.
6      Q.    Did you criticize Mr. Day at
7  all --
8      A.    No.
9      Q.    -- during that meeting?
10      A.    No.
11      Q.    Did you criticize any of the
12  company's management during that meeting
13  with your Alatex employees?
14      A.    No.
15      Q.    Did you mention the extent of
16  your salary reduction?
17      A.    No.
18      Q.    I want to talk about your
19  termination now.  I think, but please
20  correct me if I'm wrong, that you believe
21  your termination was based on your race
22  because you believe you were replaced by
23  Joe Yates who was African-American?

Page 252

1      A.    Yes.
2      Q.    Tell me about your
3  termination.
4      A.    Brenda Sellers called me on my
5  cell phone and asked me to come to my
6  office where she was waiting for me.  And
7  I told her, I said, well, I wondered when
8  you were finally going to call me.  And I
9  told her -- actually, her question was
10  what do you mean.  I said, well, there's
11  been an African-American sitting in my
12  chair since I have been back from my
13  mom's funeral doing my job, and that's
14  consistent with everything Onyx said they
15  wanted to do and now they're doing it.
16  She said, I'm very sorry, and she handed
17  me the letter to read.
18      Q.    Okay.  Sounds like there were
19  two separate conversations.  One, there
20  was a call on your telephone from Brenda
21  Sellers asking you to go to your office?
22      A.    Yes.
23      Q.    Is it also during that phone

63

Page 253

1    call that you said that you wondered
2    why --
3       A.   No.
4       Q.   You wondered when she was
5    going to finally call?
6       A.   No. When I got to the office
7    I said to that her.
8       Q.   So the call on your cell phone
9    was just asking you to meet her in your
10   office?
11      A.   Yes.
12      Q.   Anything else during that
13   phone call?
14      A.   No.
15      Q.   By this time that you received
16   this phone call did you know if Bert
17   Mayer had already been let go?
18      A.   Yes. I believe it was one to
19   two weeks afterwards.
20      Q.   Do you know if Bob Winter had
21   already been let go?
22      A.   Yes. It was less than a week
23   afterward.

Page 254

1      Q.   Do you know if Shannon McGlon
2   had already been let go?
3      A.   When the phone call happened I
4   don't recall. They were within hours of
5   each other from my understanding. I
6   don't recall if I got a call from Shannon
7   saying she was let go or if I got a call
8   afterward. I don't recall.
9      Q.   So this is in the morning that
10   you're getting this phone call from
11   Brenda Sellers?
12      A.   Mid to late morning I believe.
13      Q.   And you were out of the
14   office?
15      A.   I was in the back of the plant
16   in the production line, yes.
17      Q.   So you meet her in your
18   office?
19      A.   Yes.
20      Q.   Is anyone else present?
21      A.   No.
22      Q.   Tell me what she said and what
23   you said to the best that you can recall.

Page 255

1      A.   I started it by saying I was
2   wondering when you were going to call me,
3   finally get around to calling me,
4   something along those lines. She said,
5   what do you mean. I said, well, Brenda
6   there's been an African-American -- I
7   said Joe has been sitting in my chair
8   since I got back from my mom's funeral.
9   It's pretty clear what was happening
10   here. She said, what do you mean. I
11   said, well, this is pretty consistent
12   with Onyx's vision, what they said they
13   were going to do and now they're doing it
14   and they're doing it pretty quickly
15   between Bert, Bob, myself -- and I don't
16   know if I referenced Shannon or not. And
17   she said, I'm very sorry, and she said, I
18   need to give you this letter.
19      Q.   What else, if anything, was
20   said?
21      A.   I read the letter and told her
22   I would like to talk to Anthony Barber
23   about this and Chris Day because I would

Page 256

1    like to hear it directly from them as to
2   why this was happening, and she said that
3   is not going to be possible, you need to
4   leave immediately. And I said, why is
5   this all happening. She said, all I'm
6   allowed to tell you is your services are
7   no longer needed. I said was it
8   something I did, was my performance not
9   adequate. I'm only allowed to tell you
10   that your services are no longer needed
11   she said. I asked her if I could get my
12   personal stuff. She said, no,
13   unfortunately you need to leave. I
14   didn't give her my cell phone because I
15   forgot it and grabbed my keys and my
16   briefcase and I left.
17      Q.   Do you remember what day this
18   was?
19      A.   June 29th. It was a Tuesday
20   or a Wednesday, if I'm not mistaken,
21   2005.
22      Q.   Do you know if Chris Day and
23   Anthony Barber were actually out of town

JERRY CASEY v. ONYX CAPITAL VENTURES, LLC, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 67 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 257 to 260)

Page 257

1 that day?
2    A.   I believe they were both at
3 the Day Street facility that day.
4    Q.   What makes you believe that?
5    A.   I believe I received an e-mail
6 from Chris and talked with Anthony
7 already that morning about the status of
8 the plant.
9    Q.   Do you know if they were still
10 at the Day Street facility when you had
11 your meeting with Brenda Sellers?
12    A.   No, I do not know that for a
13 fact.
14    Q.   What was the letter that you
15 received?
16    A.   Basically said my services are
17 no longer required effective that date.
18 I actually did not keep a copy, or not
19 been able to locate a copy.  Something
20 about we regret to inform you that your
21 services are no longer required and
22 something due to lack of confidence.  And
23 I have not been able to find a copy.  I'm

Page 258

1 sure Brenda has it on file.
2    Q.   You recall there being
3 something mentioned about a lack of
4 confidence in you?
5    A.   Yes.
6    Q.   Anything else that you can
7 recall being stated in that letter?
8    A.   No.
9    Q.   Anything else you can recall
10 being said during your meeting with
11 Brenda Sellers?
12    A.   I think she said, good luck,
13 wish this didn't have to happen, I'm
14 going to miss you.
15    Q.   Anything else?
16    A.   No.
17    Q.   Did you try calling Anthony
18 Barber and talking with him about it?
19    A.   Yes, I did.
20    Q.   Were you able to talk with
21 him?
22    A.   No.  It went to voicemail, and
23 he never returned the call.

Page 259

1    Q.   Did you try to contact Chris
2 Day?
3    A.   Yes.
4    Q.   Did you talk with him?
5    A.   No.
6    Q.   Did you try to contact Henry
7 Hicks and talk with him about your
8 termination?
9    A.   No.
10    Q.   Did you try to contact Jeff
11 Larry?
12    A.   No.  I sent an e-mail to
13 Chris.  I didn't talk to him.
14         (Whereupon, Defendant's
15         Exhibit 6 was marked
16         for identification)
17    Q.   I'm handing to you what has
18 been marked as Defendant's Exhibit 6 to
19 your deposition.
20    A.   That is the e-mail I sent
21 Chris.
22    Q.   Defendant's Exhibit 6 is the
23 e-mail that you sent to Chris Day?

Page 260

1    A.   Yes.
2    Q.   You said that you wanted to
3 drop a line to let him know that you were
4 disappointed with the position Onyx had
5 taken with your employment; correct?
6    A.   Yes.
7    Q.   You go on to say that you
8 understood the circumstances and intended
9 course Piknik is on?
10    A.   Yes.
11    Q.   What did you mean by -- what
12 circumstances are you referring to?
13    A.   That they were following up
14 with their intentions to replace -- or
15 sorry.  Place African-Americans in senior
16 management roles.  I mean, that's clearly
17 the course they were on.
18    Q.   So that's what you're
19 referring to when you say "I understand
20 the circumstances and intended course
21 Piknik is on"?
22    A.   Yes.  It was quite clear.
23    Q.   You go on to say that you were

Page 261

1   optimistic that your paths would cross
2   again?
3       A.   "May cross again."
4       Q.   Were you being sarcastic?
5       A.   No.
6       Q.   In fact, your paths are going
7   to cross again because you filed this
8   lawsuit; right?
9       A.   Yes.
10      Q.   Do you think Chris Day has
11  something against white people?
12          MR. NELMS:  If you can answer.
13      A.   If I can answer.  Yes, I do.
14      Q.   What do you base that on?
15      A.   The disparity in the treatment
16  I saw him make towards white manager
17  employees versus the treatment of the
18  African-American employees they brought
19  in.
20      Q.   That's what you have already
21  told me about; correct?
22      A.   Yes.
23      Q.   Any other reason?

Page 262

1       A.   No.
2       Q.   Did Chris Day reply to your
3   e-mail that is Defendant's Exhibit 6?
4       A.   Yes.
5       Q.   What did his reply say?
6       A.   He said he's very sorry that
7   the bank forced him to take the actions
8   they were taking and forced him to let go
9   of some really good people like myself
10  and wished me all the luck and felt I
11  would do very good in the local market
12  and someone with my skill would not have
13  trouble finding employment, something to
14  that extent.
15      Q.   Do you have a copy of that
16  e-mail?
17      A.   Not with me.  My attorney
18  does.
19      Q.   I just haven't seen it.
20      A.   I think some of my stuff might
21  have been lost.
22      Q.   I'm sorry?
23      A.   I think some of my stuff might

Page 263

1   have been lost.
2       Q.   By you?
3       A.   No.  But I still have a copy
4   electronically.
5       Q.   Did you think that Chris Day
6   was being untruthful in his e-mail?
7       A.   Absolutely.
8       Q.   You thought he was lying?
9       A.   Yes.  Completely contradicted
10  the reasons they gave me in my severance
11  package as to -- sorry.  My severance
12  letter as to why I was being terminated.
13      Q.   You received a severance
14  letter?
15      A.   The letter that Brenda Sellers
16  gave me saying why I was terminated.
17      Q.   Do you have a copy of that
18  severance letter?
19      A.   No.
20      Q.   I take it you did not sign or
21  accept the severance package that was
22  being offered to you?
23      A.   There was no severance

Page 264

1   package.
2       Q.   Oh, okay.
3       A.   Severance letter I meant to
4   say.  I'm sorry.  Severance letter,
5   termination letter.
6           MR. NELMS:  This is the same
7   letter he referred to earlier when Brenda
8   Sellers met him in his office.
9           MS. MCGAHEY:  Just the
10  reference to severance caught me off
11  guard.
12      A.   Sorry.
13          MR. NELMS:  And that letter
14  was from Chris Day; right?
15      A.   Yes, to the best of my
16  knowledge.
17      Q.   (BY MS. MCGAHEY:)  Who is Joe
18  Yates?
19      A.   Joe Yates was a colleague of
20  Anthony Barber that he worked with in a
21  previous life.  Had worked with PepsiCo
22  in a carbonated plant I believe.
23      Q.   When did Joe Yates arrive?

66

JERRY MACCARTNEY, ET AL. -TFM    Document 74    Filed 10/29/2007    Page 69 of 138

JERRY MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 265 to 268)

Page 265

1    A.    Sometime during the period of
2    June 11th and June whatever that
3    following Monday was, while I was out
4    taking care of the affairs of my mom
5    after she passed. When I came back he
6    was there.
7        Q.    What, if anything, do you know
8    about the circumstances of Joe Yates
9    showing up at Piknik?
10       A.    Anthony Barber told me he was
11   a consultant and he was just there to
12   help us out and that I had nothing to
13   worry about, was not here to replace me.
14   And I asked Anthony why does he have a
15   Piknik e-mail account and why is he
16   drawing a Piknik salary paycheck on
17   Piknik letterhead like all other
18   employees.
19       Q.    Well, have you seen paychecks
20   or checks that were sent to other
21   consultants?
22       A.    Yes.
23       Q.    Are they not on Piknik checks?

Page 266

1        A.    Not payroll checks, no. They
2    were bank checks.
3        Q.    What is the difference? I
4    mean, are you saying that payroll checks
5    aren't coming from the bank?
6        A.    Payroll checks are printed off
7    an ADT system. Not ADT. It's whatever
8    that payroll service is that prints off
9    your checks, stuff them and put them in
10   envelopes. They have Piknik letterhead.
11   They show all your year-to-date earnings,
12   accrued vacation, accrued sick time,
13   Social Security, medical reductions, all
14   that kind of stuff, year-to-date earnings
15   versus a check like you and I might write
16   out of our checkbook.
17       MR. NELMS: Did you say ADT?
18       A.    Not ADT. It was a service
19   that you send your payroll to. They do
20   all the checks. They print them. They
21   stuff them. They send them to you. I
22   forget the service that Piknik used.
23       Q.    Did you see a check that was

Page 267

1    issued to Joe Yates?
2        A.    Yes.
3        Q.    Was it in an envelope?
4        A.    Yes.
5        Q.    Did you open the envelope?
6        A.    No.
7        Q.    How did you see that it was a
8    regular payroll check?
9        A.    The window that was on the
10   envelopes that all salary or all payroll
11   checks were issued in.
12       Q.    What could you see in the
13   window?
14       A.    Joe Yates' name.
15       Q.    Besides that?
16       A.    There was other specific
17   information: Employee ID code, that sort
18   of thing. Same thing every other
19   employee had printed in that window.
20       Q.    So you believe that Joe Yates
21   was a Piknik employee as opposed to a
22   consultant?
23       A.    Yes.

Page 268

1        Q.    And you base that belief on
2    seeing part of a check that was issued to
3    Joe Yates?
4        A.    Not part of a check. All the
5    checks for that building were given to me
6    weekly to disburse to department heads.
7        Q.    Correct. And it was in an
8    envelope; correct?
9        A.    Correct.
10       Q.    And you could only see what
11   was in the window; correct?
12       A.    Same format, same font, same
13   paper stock, same envelope as all other
14   Piknik payroll, and it came with the
15   payroll. It was clearly not a bank
16   check. This was written for accounts
17   payables reasons.
18       Q.    So based on that reason,
19   that's one reason you believe that Joe
20   Yates was a Piknik employee?
21       A.    Yes.
22       Q.    And the other reason you
23   thought Joe Yates was a Piknik employee

Case 2:05-cv-01207-MHT-TFM   Document 74   Filed 10/29/2007   Page 70 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 269 to 272)

Page 269

1  was because he had a Piknik e-mail
2  address?
3      A.   Yes.  All the other
4  consultants in the past had their own
5  e-mail address, and all correspondence
6  with them was through them or their
7  company's e-mail address, not Piknik
8  e-mail address.
9      Q.   Is there any other basis for
10 your belief that Joe Yates was a Piknik
11 employee as opposed to a consultant?
12     A.   He addressed one of the
13 individuals on the Alatex staff -- and I
14 don't know exactly what day.  But the
15 second-hand information was he told us he
16 was here to replace you.
17     Q.   Repeat that, please.
18     A.   He told a member of the staff
19 team at Alatex while I was still absent
20 during my mom's death before I returned
21 that -- he told them he was there to
22 replace me.
23     Q.   You didn't hear him make that

Page 270

1  statement?
2      A.   No, I did not.
3      Q.   You heard it second-hand?
4      A.   Yes.
5      Q.   From whom?
6      A.   It was either Tina Sanders or
7  Barbara Williams.  I'm not sure which one
8  it was.
9      Q.   Did you observe what Joe Yates
10 did on a daily basis?
11     A.   Yes.
12     Q.   What did you observe Joe Yates
13 doing?
14     A.   Conducting start-up meetings,
15 meeting with the maintenance department,
16 meeting with my staff, sitting at my
17 desk, using my computer, company-assigned
18 computer, and reading and sending e-mails
19 and making regular phone calls to Anthony
20 Barber with updates on the production
21 quotas for the day for the plant.
22     Q.   Were you sharing your office
23 with Joe Yates during this time?

Page 271

1      A.   Yes.
2      Q.   You said he conducted shift
3  start-up meetings?
4      A.   Yes.
5      Q.   Were you present for those?
6      A.   Once I found out he was doing
7  them I made myself present.
8      Q.   How many did you attend?
9      A.   I believe four to five of
10 them.
11     Q.   Were shift start-up meetings
12 usually something that you did?
13     A.   Yes.  Me and/or the department
14 heads.
15     Q.   What did Joe Yates cover
16 during the four or five shift start-up
17 meetings that you attended?
18     A.   The standard agenda.
19     Q.   What is the standard agenda?
20     A.   What we're running for that
21 day, what machines need to be started up
22 and prepped and warmed up, any
23 change-over requirements, any specific

Page 272

1  challenges we're having that day on any
2  equipment and any special attention we're
3  going to be giving them, what the quota
4  was, what time we expected shift to
5  change, what was left over from the shift
6  before, the standard daily start-up.
7      Q.   Did you attend any meetings
8  that Joe Yates had with the maintenance
9  department?
10     A.   No.  I only found out about it
11 after he had it.
12     Q.   So you have no first-hand
13 knowledge of what was covered during any
14 maintenance department meeting that Joe
15 Yates conducted?
16     A.   First-hand, no.
17     Q.   Do you have second-hand
18 knowledge?
19     A.   Yes.
20     Q.   What is your second-hand
21 knowledge of what was covered during
22 meetings with the maintenance
23 department --

JERRY MACCARTNEY, ET AL. -MHT-TFM    Document 74    Filed 10/29/2007    Page 71 of 138
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 273 to 276)

Page 273

1      A.   The maintenance --
2      Q.   -- and Joe Yates?
3      A.   Eugene, I think his last name
4  was Wilson, pretty much asked me what the
5  heck's going on, why is he asking me all
6  those questions and telling me to do
7  these things. And I just asked him what
8  did he ask you to do. If it was
9  consistent with what I was expecting to
10  get done, I told him don't worry about
11  it, just do it.
12      Q.   That's all you can recall
13  about the meeting that was held between
14  the maintenance department and Joe Yates,
15  which you didn't attend but you heard
16  through second-hand?
17      A.   Through Eugene, yes.
18      Q.   That's all you can recall?
19      A.   Yes.
20      Q.   Did you attend any of the
21  meetings that Joe Yates may have had with
22  your staff?
23      A.   No.

Page 274

1      Q.   Did you hear about them?
2      A.   Yes.
3      Q.   What did you hear?
4      A.   That he had a meeting with
5  either the first-shift production manager
6  or the second-shift production manager.
7  And, actually, Joe told me directly he
8  had the meeting. I asked him what was
9  covered, and it was just the standard
10  stuff, nothing you need to worry about.
11      Q.   Did he say anything more
12  specific than "just the standard stuff"?
13      A.   I believe he discussed some of
14  the staffing needs, whatever we were
15  facing at the time.
16      Q.   Anything else?
17      A.   No.
18      Q.   Do you know how long Joe Yates
19  was at Piknik?
20      A.   I don't know how long after I
21  left that he was still there. Somewhere
22  between then and when the company finally
23  ceased operations.

Page 275

1      Q.   When did the company cease
2  operations?
3      A.   End of July, August I believe.
4  I'm not a hundred percent clear.
5      Q.   Of 2005?
6      A.   Yes.
7      Q.   It is your position that Joe
8  Yates was doing your job duties?
9      A.   Yes.
10      Q.   Every single one of them?
11      A.   Yes.
12      Q.   You filed a charge with the
13  EEOC; is that correct?
14      A.   Yes.
15          (Whereupon, Defendant's
16          Exhibit 7 was marked
17          for identification)
18      Q.   I've handed you what has been
19  marked as Defendant's Exhibit 7 to your
20  deposition. Is that your signature on
21  the bottom of Page 1?
22      A.   Yes.
23      Q.   Is that your signature on the

Page 276

1  second page of Defendant's Exhibit 7?
2      A.   Yes.
3      Q.   Is this the charge that you
4  filed with the EEOC?
5      A.   Yes.
6      Q.   Turn to the second page,
7  please. And in your EEOC charge you are
8  complaining about your termination;
9  correct?
10      A.   Yes.
11      Q.   And you recount what was said
12  during the termination meeting with
13  Brenda Sellers; correct?
14      A.   Yes.
15      Q.   It says it was on or about
16  June 27, 2005. I think earlier you told
17  me it was June 29th. Do you recall one
18  way or another what day it was?
19      A.   No, because I do not have my
20  termination letter. I was not able to
21  find it.
22      Q.   Have you already told me
23  everything that you can recall about your

69

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 277 to 280)

Page 277

1 termination meeting?
2 A. Yes.
3 Q. Have you already told me
4 everything that you can recall that
5 relates to your claim that you were
6 terminated because of your race?
7 A. Did we get through all nine
8 points?
9 Q. I hope so. I'll follow up,
10 though. I will list the nine points
11 again just to make sure.
12 A. If we did, then yes.
13 MR. NELMS: I'll say we did.
14 A. Okay.
15 MR. NELMS: I checked them off
16 as we went.
17 Q. (BY MS. MCGAHEY:) Were you
18 involved in a group that was trying to
19 purchase Piknik?
20 A. Involved in a group that was
21 trying to purchase Piknik? No.
22 Q. Were you involved in a group
23 that was trying find a potential

Page 278

1 purchaser for Piknik?
2 A. No. I was aware of
3 discussions, but I was not involved.
4 Q. Who is Mike Mulrane?
5 A. Mike Mulrane is CFO of Polar
6 Beverages.
7 Q. Do you recall setting up a
8 call with you, Bob Winter and Mike
9 Mulrane?
10 A. Yes.
11 Q. What was that call about?
12 A. At the time I believe when the
13 bank started taking action against Piknik
14 and it was clear it was going to be going
15 to bankruptcy. And I believe we
16 discussed with Chris Day and the staff --
17 they had discussed they were looking --
18 entertaining any potential buyers that
19 might be interested in helping or getting
20 ownership of the company to try to offset
21 the action being taken by the bank, the
22 anticipated action being maneuvered by
23 the bank.

Page 279

1 Q. Did you tell Chris Day or
2 anyone else that you were in contact with
3 Mike Mulrane?
4 A. No. I didn't feel I needed to
5 bother him until it materialized into
6 something.
7 Q. So what were you going to
8 see -- or what were you going to discuss
9 with Mike Mulrane? Actually, strike
10 that. Did you end up having a call with
11 Mike Mulrane and Bob Winter?
12 A. Yes.
13 Q. Tell me what was discussed
14 during that call.
15 A. The situation with Piknik and
16 entertaining any buyers at that time
17 based on some of the actions the bank was
18 taking and whether or not there would be
19 any interest on Polar Beverages' part in
20 having an ownership in a hot-fill
21 company, hot-fill beverage plant.
22 Q. What was his response, if any?
23 A. He said he didn't think it fit

Page 280

1 into the model that Ralph, the owner of
2 the company, was looking for. Hot fill
3 is not something they wanted to have
4 ownership in, but he would discuss it
5 with Ralph and let us know if he was
6 interested.
7 Q. During that call with Mike
8 Mulrane were you critical of Onyx
9 management?
10 A. I don't recall.
11 Q. You don't recall if you were
12 critical of Chris Day?
13 A. I don't recall.
14 Q. You don't recall if you were
15 critical of Henry Hicks?
16 A. No, I don't recall.
17 Q. And you don't recall if you
18 were critical of Jeff Larry?
19 A. No, I don't recall any
20 discussions in that meeting revolving
21 around any of the Onyx folks. It was
22 around Polar's interest in an ownership
23 position in Piknik. And that's about all

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM     Document 74     Filed 10/29/2007     Page 73 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 281 to 284)

Page 281

1  I remember from the meeting.
2     Q.   Were you involved in
3  discussions with Bob Winter and Scott
4  McGlon regarding finding a purchaser or
5  finding an entity to purchase Piknik?
6     A.   I don't remember that. It
7  sounds vaguely familiar, but I don't
8  remember specifically.
9     Q.   Did you have a Hotmail e-mail
10 address or an MSN e-mail address?
11    A.   Yes.
12    Q.   Is it Maccartney@msn.com?
13    A.   Yes.
14         (Whereupon, Defendant's
15         Exhibit 8 was marked
16         for identification.)
17    Q.   I'm going to show you what has
18 been marked as Defendant's Exhibit 8 to
19 your deposition.
20    A.   (Examining document.)
21    Q.   Do you recall receiving these
22 e-mails?
23    A.   I don't recall this specific

Page 282

1  one. I recall getting several from Bob
2  Winter after he left. And he stated he
3  was working with Ricky to try to find M&A
4  folks to try to salvage it.
5     Q.   With Ricky Loeb?
6     A.   Yes. At Ricky's request I
7  believe is what he said. Ricky requested
8  his help in doing something to try to
9  salvage it.
10    Q.   How did you get involved?
11    A.   I didn't. I was just copied
12 on e-mails.
13    Q.   I'm sorry?
14    A.   I was just copied on these
15 e-mails.
16    Q.   For no -- it was not explained
17 to you why you were copied on the
18 e-mails?
19    A.   I assumed it was because Bob
20 was giving us an FYI, all hope is not
21 lost, there's some efforts trying to save
22 it before it went under.
23    Q.   You never discussed it with

Page 283

1  Bob, why he was sending you these
2  e-mails?
3     A.   No, I never asked him why he
4  was sending them to me.
5     Q.   Did you give a reply to any of
6  these e-mails about this issue?
7     A.   I don't remember.
8     Q.   This is dated June 22nd?
9     A.   Yes.
10    Q.   And this is before you left
11 Piknik?
12    A.   Yes.
13    Q.   Before you left Piknik, in the
14 week or two weeks before your termination
15 did you copy a lot of files from your
16 laptop onto a CD or a disk?
17    A.   I backed up my e-mail, what's
18 called a PST file to a disk based on
19 recommendations from our IT manager, Mike
20 Osborne, that we should do this at least
21 once a month in the event of data
22 corruption loss or server crash. I
23 performed that regularly on a regular

Page 284

1  basis, approximately once a month,
2  sometimes longer. But I tried to do it
3  once a month based on his recommendation.
4     Q.   Whenever you backed up your
5  PST files to a disk what did you do with
6  the disk?
7     A.   Put it in my desk.
8     Q.   Do you recall backing up your
9  PST file in June of 2005?
10    A.   Yes.
11    Q.   And did you back up your
12 e-mails onto a disk like you had done
13 before?
14    A.   Yes.
15    Q.   What did you do with that
16 disk?
17    A.   The one from June 2005 was
18 left in the desk. As I stated, I was not
19 given an opportunity to collect my
20 personal belongings before I left.
21    Q.   Besides backing up your PST
22 files onto a disk, did you copy other
23 files?

JERRY A. MACCARTNEY, ET AL.                    Document 74     Filed 10/29/2007     Page 74 of 138
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 285 to 288)

Page 285

1    A.    To a disk?
2    Q.    From your laptop or in any
3  manner?
4    A.    I downloaded files from the
5  network shared drive in support of two
6  initiatives and directive I was given by
7  Anthony Barber. I backed up and
8  downloaded them from the share network
9  drive to my laptop hard drive.
10   Q.    What were the two initiatives?
11   A.    The two initiatives was first
12  given to me by Anthony Barber that I
13  needed to get Carpedia metrics
14  implemented at the Alatex facility.
15  Carpedia was a consulting company who had
16  been in previously on efficiency and
17  productivity. And those metrics had not
18  previously been in place before I took
19  over Alatex, and I was told I needed to
20  get them up and running. So I downloaded
21  files and reports to format to my hard
22  drive so I could begin studying and
23  rolling out that plan.

Page 286

1    Q.    What was the second
2  initiative?
3    A.    I was told I had an AIB, which
4  is American Institute of Bakery I believe
5  it is, which basically they are a
6  standard now for food safety. One of our
7  major customers -- I don't recall if it
8  was Craft or Pepsi in relation to some of
9  the planned work, had requested an ABI
10  audit of the Alatex facility, which is
11  all about food safety, cleanliness,
12  manufacturing quality, pure pasteurize,
13  all that other kind of stuff.
14        So I was told in preparation
15  for that audit -- in preparation I needed
16  to get the plant ready. So I contacted
17  Shannon McGlon, asked her what the best
18  way to get ready was. She said, well,
19  let's start by downloading all the
20  quality programs and files and reports
21  and I will meet with you on a regular
22  basis and your staff to get ready for
23  that activity. So I downloaded those

Page 287

1  files onto my hard drive so I could begin
2  studying while at work and while away
3  from work in preparation for that audit.
4    Q.    What was the shared network
5  drive? Was there a letter? Was it like
6  a J Drive?
7    A.    I believe it was different on
8  everybody's machine based on other drives
9  they had.
10   Q.    What was it on yours?
11   A.    I don't remember. M maybe.
12   Q.    What did you say?
13   A.    M maybe. I don't exactly
14  recall. It would have been mapped on my
15  machine when the machine was given to me.
16  I never really paid much attention to the
17  letter. I just knew I had a shortcut on
18  the desktop how to get there.
19        (Whereupon, Defendant's
20        Exhibit 9 was marked
21        for identification)
22   Q.    I'm going to show you what I'm
23  marking as Defendant's Exhibit 9 to your

Page 288

1  deposition. I will represent to you that
2  these are snapshots on your laptop from
3  June 21, 2005. And take the time to flip
4  through that.
5    A.    (Examining document.)
6        MS. MCGAHEY: And just for
7  record, these are snapshots of Mr.
8  MacCartney's laptop from June 21, 2005
9  from 12:40 p.m. to 1:02 p.m.
10   Q.    (BY MS. MCGAHEY:) Have you
11  had a chance to look at or look through
12  Defendant's Exhibit 9?
13   A.    Yes.
14   Q.    The first couple of pages it
15  reflects that you're deleting files?
16   A.    Yes. I was trying to make
17  room on my hard drive for the stuff I
18  needed to download.
19   Q.    So you were erasing those
20  files from your hard drive?
21   A.    Yes.
22   Q.    And then starting on the
23  document that is up at the top dated June

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 75 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 289 to 292)

Page 289

1   21, 2005 at 12:51 p.m. -- and, I
2   apologize, they are not Bates labeled --
3       A.    12:51. Copying pictures to my
4   laptop, yes.
5       Q.    Does it indicate that you are
6   copying -- you're copying pictures to
7   your laptop?
8       A.    Yes. I was adding those to my
9   laptop so I could use them as desktop
10  images. Those are pictures of my mom.
11      Q.    And if you keep turning, you
12  get to the page that is June 21, 2005 at
13  12:56 p.m. It indicates that you are
14  copying files; is that correct?
15      A.    Yes. I was copying from a CD
16  to the hard drive.
17      Q.    You had a CD of files --
18      A.    Right, from the WMS project
19  from a previous job.
20      Q.    -- and you are copying that to
21  your hard drive?
22      A.    Yes.
23      Q.    Is that what the "finished

Page 290

1   goods inventory SOP 18.0.doc" is?
2       A.    Yes.
3       Q.    And then the next page,
4   "MSA_PiknikProducts_0625031.pdf," is that
5   also on that CD?
6       A.    No, that looks like it would
7   have been the beginning of the files that
8   were in the Carpedia folder.
9       Q.    But that's something that
10  you're copying onto your hard drive?
11      A.    From the network drive to the
12  hard drive, yes.
13      Q.    What about the next document,
14  that --
15      A.    I believe I took all the files
16  on my hard drive from the security
17  project I was asked to implement
18  throughout all three facilities, and I
19  was moving them up to the network drive
20  to free up room on my hard drive.
21      Q.    The file that is titled
22  "revimplstrategy.doc" is something you
23  were taking from your hard drive and

Page 291

1   saving it onto the network?
2       A.    Yes. I created a folder on
3   the network call Security, somewhere on
4   the logistics I believe. And I moved
5   those files off the hard drive to the
6   network drive to make room on my laptop
7   for the Carpedia files I needed to
8   download.
9       Q.    And then the next minute it
10  looks like something is being copied, a
11  file called "vendor spend totals.xls"?
12      A.    Yes. Again, I was moving them
13  off my hard drive up to the network
14  drive.
15      Q.    Defendant's Exhibit 9 does not
16  indicate you downloading files onto a
17  disk or a CD?
18      A.    No. Actually, I don't see
19  here where it shows a screenshot of where
20  I backed up my PST files to a CD, which I
21  believe I did that same day or around
22  that same time. This was moving stuff
23  off my hard drive to make room for stuff

Page 292

1   I need to bring down from the network
2   drive.
3           (Whereupon, Defendant's
4           Exhibit 10 was marked
5           for identification.)
6       Q.    I'm handing to you what has
7   been marked as Defendant's Exhibit 10 to
8   your deposition. It's that same day,
9   June 21, 2005; correct?
10      A.    Yes, ma'am.
11      Q.    This is more of the same?
12      A.    I don't recall where I moved
13  that folder to or from. I do recall
14  moving it. I don't know if I pushed that
15  one up to the network drive or if I
16  pulled it back down. I do recall moving
17  that folder, though, but I don't remember
18  which direction I moved it.
19      Q.    Take a look at the four pages
20  that make up Defendant's Exhibit 10.
21      A.    (Examining document.)
22      Q.    This is a composite exhibit.
23  If you could look at all the pages.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 76 of 138
JERRY MACCARTNEY ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 293 to 296)

Page 293

1    A.    (Examining document.) Okay.
2    Q.    Do any of the pages in
3  Defendant's Exhibit 10 reflect you
4  copying files onto a CD?
5    A.    No.  They reflect me copying
6  files from one folder to another folder
7  of the same name.  I do not recall in
8  which direction I copied these, either
9  from the network down to my hard drive or
10  from my hard drive onto the network.
11    Q.    But, regardless, it was not
12  from your hard drive or the network to
13  some other storage device; is that
14  correct?
15    A.    It does not appear to say
16  that, no.  Files with one name to a file
17  with the same name.
18    Q.    It's your testimony that you
19  don't recall moving any of the files
20  reflected in Defendant's Exhibit 10 onto
21  a CD or disk?
22    A.    I don't recall that, no.
23         (Whereupon, Defendant's

Page 294

1         Exhibit 11 was marked
2         for identification.)
3    Q.    I'm handing you what has been
4  marked as Defendant's Exhibit 11.  If you
5  could please take a look at Defendant's
6  Exhibit 11.
7    A.    (Examining document.)
8    Q.    Have you had a chance to look
9  at Defendant's Exhibit 11?
10    A.    Yes.
11    Q.    Do you recall if any of the
12  files that are reflected in Defendant's
13  Exhibit 11 you were saving onto a disk or
14  CD or some other storage device?
15    A.    I don't recall, but it
16  looks -- it does not appear that from
17  here, based on my knowledge of computers,
18  which is extensive.  If I was moving them
19  to a CD, the removable disk E would have
20  been highlighted as a subfolder, and it's
21  not on any of these.
22    Q.    Okay.
23    A.    Although, I do not recall

Page 295

1  exactly, again, whether I was pushing
2  these off my machine to the network to
3  make room or if I was bringing these
4  down.
5    Q.    Okay.
6    A.    Based on looking at the files
7  themselves, I would tend to think I was
8  moving them off.
9    Q.    Well, if you turn to the third
10  from the last page, at the top it says
11  June 21, 2005 at 2:21 p.m.  You see the
12  removable disk, the E drive, is
13  highlighted?
14    A.    Yes.
15    Q.    Does that refresh your
16  recollection on whether or not you were
17  saving anything onto a disk or a CD?
18    A.    To my recollection during that
19  day what I would have backed up to disk
20  is what I mentioned before, my PST files.
21    Q.    And that's your e-mails?
22    A.    Yes.
23         (Whereupon, Defendant's

Page 296

1         Exhibit 12 was marked
2         for identification.)
3    Q.    Hand to you what has been
4  marked as Defendant's Exhibit 12 to your
5  deposition.
6    A.    (Examining document.)
7    Q.    Have you had a chance to
8  review Defendant's Exhibit 12?
9    A.    Yes.
10    Q.    And is this a snapshot of what
11  you were doing on your laptop on June 23,
12  2005 from 7:19 a.m. until 7:38 a.m.?
13    A.    Yes, it appears to be.
14    Q.    And what does Defendant's
15  Exhibit 12 reflect?
16         MR. NELMS:  You said June 25.
17    Q.    Does Defendant's Exhibit 12
18  reflect what you were doing on your
19  laptop on June 23, 2005 from 7:19 a.m.
20  until 7:38 a.m.?
21    A.    What this shows I recall doing
22  on the same day, on 6/21 not 6/23.
23    Q.    What does Defendant's Exhibit

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 77 of 138

JERRY MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 297 to 300)

Page 297

1  12 reflect?
2      A.   The previously referred to
3  mention of backing up my PST files from
4  Outlook. And it further shows me
5  deleting temporary internet files, which
6  consume a lot of storage space. As I
7  said, I was trying to make room for the
8  files I needed to download to do my job.
9      Q.   Does Defendant's Exhibit 12
10 reflect you saving anything besides your
11 e-mails to a CD or a disk or other
12 storage device?
13     A.   Let me look again. (Examining
14 document.) This exhibit does not appear
15 to indicate any copying of files. It
16 merely shows a file path of selecting
17 files. Doesn't appear to reflect any
18 deleting or copying, just browsing though
19 subfiles and selecting files. Unless I
20 missed it, I don't see anywhere where it
21 says copied or copying.
22         (Whereupon, Defendant's
23         Exhibit 13 was marked

Page 298

1          for identification.)
2      Q.   I'm now handing you what has
3  been marked as Defendant's Exhibit 13 to
4  your deposition, if you can flip through
5  that.
6      A.   (Examining document.)
7      Q.   Have you had an opportunity to
8  review Defendant's Exhibit 13?
9      A.   Yes.
10     Q.   Does this reflect activity on
11 your laptop on June 23, 2005 from 8:07
12 a.m. until 8:51 a.m.?
13     A.   It appears to. Though, as I
14 stated, I believe that took place on
15 6/21. I could be wrong. I thought it
16 was all the same day that I did all that
17 work.
18     Q.   And what does Defendant's
19 Exhibit 13 reflect?
20     A.   It shows me selecting my PST
21 file from Outlook, compressing it so it
22 would fit on CD. A CD would only hold
23 seven hundred and fifteen megabytes. The

Page 299

1  file was over one gig, so I compressed it
2  down so it could be written to the CD as
3  recommended by our IT department manager.
4  It also shows me synchronizing my Palm
5  OS3 PDA to my calendar.
6      Q.   So where it says -- when you
7  get to the section about CD Writing
8  Wizard, does that reflect the copying of
9  your PST files or your e-mails to a CD?
10     A.   Yes.
11     Q.   And nothing else, no other
12 files but your PST files?
13     A.   Yes. I don't think anything
14 else would fit, if I recall.
15     Q.   Have you described for me all
16 the ways that you believe Chris Day
17 treated you differently because of your
18 race?
19     A.   Yes.
20     Q.   Have you described for me all
21 the ways in which you believe Jeff Larry
22 treated you differently because of your
23 race?

Page 300

1      A.   Yes.
2      Q.   Have you identified or
3  described for me all of the ways in you
4  which you believe Henry Hicks treated you
5  differently because of your race?
6      A.   Yes.
7      Q.   And you, in your lawsuit, are
8  seeking to hold these three individuals
9  personally liable; correct?
10     A.   I'm not sure of the legal
11 terminology. But them and/or Piknik's
12 acquisition company, Onyx Capital
13 Ventures. I'm not sure exactly how it
14 was filed.
15     Q.   Do you know who made the
16 decision to terminate your employment?
17     A.   I was told it was Chris Day.
18     Q.   Do you know if he consulted
19 with anyone in reaching a decision to
20 terminate your employment, assuming it
21 was Chris Day?
22     A.   Based on the follow-up e-mail
23 that he sent to me after I sent him that

JERRY MACCARTNEY ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 78 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 301 to 304)

Page 301

1  e-mail, he indicated that he was sorry
2  the bank forced him and Onyx to make some
3  of those decisions. So, yes, I believe
4  he did.
5      Q.   Well, do you believe that
6  Chris Day consulted with anyone in
7  reaching the decision to terminate your
8  employment?
9      A.   Yes.
10     Q.   Who do you think he consulted?
11     A.   I believe he consulted with
12  Onyx.
13     Q.   Who at Onyx?
14     A.   I don't know.
15         (Whereupon, Mr. Anthony Bush
16         enters the deposition.)
17     Q.   And you don't know how long
18  Joe Yates was at Piknik?
19     A.   No, I do not. I believe it
20  was until the end, but that's second-hand
21  information.
22     Q.   I'm sorry?
23     A.   I believe it was until Piknik

Page 302

1  ceased operation, but that is based on
2  second-hand information.
3      Q.   You were terminated at the end
4  of June 2005?
5      A.   Yes.
6      Q.   When did you start working
7  again?
8      A.   August 16th or 19th.
9      Q.   Of 2005?
10     A.   Yes.
11     Q.   Where did you start working?
12     A.   ArvinMeritor.
13     Q.   ArvinMeritor?
14     A.   Yes.
15     Q.   Between your departure from
16  Piknik and your starting work at
17  ArvinMeritor what, if anything, did you
18  do to find work?
19     A.   I direct marketed myself to
20  all the companies I felt could benefit
21  from my services and skills by going
22  through the Chamber of Commerce's list of
23  companies, researching their profile and

Page 303

1  their core business and then proceeded on
2  a marketing campaign with direct mail and
3  follow-up phone calls.
4      Q.   Did you submit resumes?
5      A.   Yes.
6      Q.   Who did you submit resumes to?
7      A.   Dozens. I don't recall all of
8  them exactly.
9      Q.   Who?
10     A.   Dozens of them.
11     Q.   Did you receive any
12  interviews?
13     A.   Yes.
14     Q.   Who did you receive interviews
15  from?
16     A.   Glovis Alabama, All State
17  Beverages and ArvinMeritor.
18     Q.   Did you receive a job offer
19  from Glovis Alabama?
20     A.   Yes.
21     Q.   When did you receive the job
22  offer from Glovis Alabama?
23     A.   Second week of August, first

Page 304

1  part of August. I don't remember the
2  exact date.
3      Q.   Before you got -- or before
4  you started at ArvinMeritor?
5      A.   Yes.
6      Q.   What was the job offer for?
7      A.   Operations manager.
8      Q.   Do you know how much the
9  salary was?
10     A.   Eighty thousand dollars per
11  year.
12     Q.   Did you turn down the offer?
13     A.   Yes.
14     Q.   Why did you turn down the
15  offer?
16     A.   Because I had a better offer.
17     Q.   Is that from ArvinMeritor?
18     A.   Yes.
19     Q.   You interviewed with All State
20  Beverages?
21     A.   Yes.
22     Q.   Did you receive a job offer
23  from All State Beverages?

JERRY MACCARTNEY 2:05-CV-01012-MHT-TFM    Document 74    Filed 10/29/2007    Page 79 of 138 JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.                                                    August 17, 2007

(Pages 305 to 308)

Page 305

1    A.    Yes.
2    Q.    When did you receive a job
3  offer from All State Beverages?
4    A.    It was the week before I
5  received an offer from Glovis.
6    Q.    What was the position that you
7  received an offer for?
8    A.    Director of Logistics.
9    Q.    Do you recall what the salary
10  was going to be?
11    A.    Seventy thousand dollars per
12  year.
13    Q.    Did you reject that offer?
14    A.    Not initially. I waited, told
15  them I needed to wait.
16    Q.    I'm sorry?
17    A.    I told them I needed to wait
18  until I heard from Glovis, and then I
19  rejected it.
20    Q.    So when you received your job
21  offer from Glovis Alabama you rejected
22  the job offer from All State Beverages?
23    A.    After trying to renegotiate

Page 306

1  it, yes.
2    Q.    Trying to renegotiate with?
3    A.    All State Beverages.
4    Q.    And I take it the negotiations
5  broke down at some point?
6    A.    Yeah. They couldn't match the
7  offer I had on the table from Glovis.
8    Q.    All State was not going to
9  match the eighty thousand dollars that
10  you received from Glovis?
11    A.    They were not going to meet
12  the total compensation package.
13    Q.    And you started working at
14  ArvinMeritor in August of 2005?
15    A.    Yes.
16    Q.    What position were you hired
17  for?
18    A.    Logistics manager.
19    Q.    At what salary?
20    A.    Eighty-five thousand.
21    Q.    Are you still with
22  ArvinMeritor?
23    A.    No.

Page 307

1    Q.    How long did you stay at
2  ArvinMeritor?
3    A.    Until May, roughly the 10th,
4  of 2006.
5    Q.    Did you have benefits at
6  ArvinMeritor?
7    A.    Medical, dental, 401-K, yes,
8  all the standard stuff.
9    Q.    How much did you have to pay
10  for your medical coverage?
11    A.    I don't recall. I believe
12  total benefits were approximately 28
13  percent.
14    Q.    You mean your contribution for
15  all your benefits was 28 percent of what?
16    A.    No. I'm sorry. I don't
17  recall what it was per week. I think it
18  was between medical and dental -- we were
19  paid biweekly. I think it was eighty to
20  ninety every pay period.
21    Q.    And that is for medical and
22  dental?
23    A.    Yes.

Page 308

1    Q.    And you had a 401-K program at
2  ArvinMeritor?
3    A.    They had a program, yes.
4    Q.    Did you participate?
5    A.    No.
6    Q.    Why not?
7    A.    I didn't like their funds.
8    Q.    What did you do after --
9  strike that. Was your salary ever
10  increased from eighty-five thousand when
11  you were at ArvinMeritor?
12    A.    No.
13    Q.    So when you left ArvinMeritor
14  your salary was still eighty-five
15  thousand?
16    A.    Yes.
17    Q.    Why did you leave
18  ArvinMeritor?
19    A.    I was recruited by another
20  company.
21    Q.    What company were you
22  recruited by?
23    A.    Integrated Transport.

JERRY MACCARTNEY et al v.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 309 to 312)

Page 309

1    Q.   Is that the corporation or the
2  LLC?
3    A.   LLC.
4    Q.   So that's the entity owned by
5  Shannon McGlon, if you know?
6    A.   I think she is the owner, yes.
7  I know she owns one of them.
8    Q.   Tell me how you came about to
9  start working at Integrated Transport.
10   A.   The operator and owner,
11 president, I'm not sure, Scott McGlon,
12 contacted me and said he needed a general
13 manager.  The business was expanding very
14 quickly and it was more than he could do
15 on his own, and he needed a general
16 manager to help grow that business and
17 manage it.
18   Q.   And Scott McGlon is Shannon
19 McGlon's husband?
20   A.   Yes.
21   Q.   When did you start at
22 Integrated Transport?
23   A.   May 15, 2006.

Page 310

1    Q.   What was your starting salary?
2    A.   Ninety thousand.
3    Q.   And you were general manager?
4    A.   Yes.
5    Q.   Are you still employed by
6  Integrated Transports?
7    A.   Yes.
8    Q.   Are you still general manager?
9    A.   Yes.
10   Q.   Have you received any increase
11 from your ninety thousand dollar salary?
12   A.   Yes.
13   Q.   When did you receive a pay
14 increase?
15   A.   May 15th.
16   Q.   2007?
17   A.   2007.
18   Q.   What is your salary currently?
19   A.   A hundred and five.
20   Q.   Do you have health benefits
21 through Integrated Transport?
22   A.   Yes.
23   Q.   What health benefits do you

Page 311

1  have?
2    A.   United Healthcare, Delta
3  Dental and 401-K.
4    Q.   So you have medical benefits
5  and dental benefits?
6    A.   Yes.
7    Q.   How much do you have to pay
8  for those benefits?
9    A.   Don't know.  I would have to
10 call my wife.  It's kind of expensive.  I
11 remember that.  Approximately the same as
12 ArvinMeritor, if I recall.
13   Q.   And they have a 401-K program?
14   A.   Yes.
15   Q.   Do you participate?
16   A.   Yes.
17   Q.   Does Integrated Transport make
18 any contribution to your 401-K?
19   A.   Yes.
20   Q.   Do you know what the matching
21 program is?
22   A.   Not off the top of my head,
23 but it's not very good.

Page 312

1    Q.   At the time that you left
2  Piknik what benefits did you have?
3    A.   I believe it was just
4  unemployment benefits.
5    Q.   I'm sorry.  At the time --
6  your last day of employment at Piknik
7  were you a participant in their
8  healthcare benefits program?
9    A.   I believe I was notified in
10 that letter, which I don't have, that it
11 would run through the remainder of the
12 month.
13   Q.   So before then you had
14 received insurance benefits for medical
15 coverage through Piknik?
16   A.   Yes.
17   Q.   What about dental?
18   A.   Yes.
19   Q.   And how much did you have to
20 pay for those benefits?
21   A.   I don't recall.  Approximately
22 the same.  They were all pretty common
23 plans.

JERRY MACCARTNEY ET AL. -TFM    Document 74    Filed 10/29/2007    Page 81 of 138
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 313 to 316)

Page 313

1    Q.    Did you have a 401-K when you
2    were with Piknik?
3        A.    Yes.
4        Q.    Did you participate?
5        A.    Yes.
6        Q.    Was Piknik making
7    contributions to the 401-K account at the
8    time of your termination?
9        A.    I don't recall the details.
10   It was a complicated plan.  It was put
11   into escrow for a year, and then based on
12   performance they had to do something.
13   But I think during the last year there
14   the escrow performed poorly, so we had to
15   give money back, in which we get
16   penalized on taxes.  So I don't remember
17   the details of whether they actually
18   matched or not.
19       Q.    Did you file a claim for
20   unemployment?
21       A.    Yes.
22       Q.    Did you receive any
23   unemployment benefits?

Page 314

1        A.    Yes.
2        Q.    In what amount?
3        A.    I knew I should have studied.
4        Q.    I just don't have the benefit
5    of having any documents in front of me.
6        A.    Whatever the maximum allowable
7    was based on your salary when you left.
8    Two thirty-three sound right?
9            MR. NELMS: It actually does.
10       A.    I think it was two
11   thirty-three a week approximately.  It
12   could be.  I think that was it.
13       Q.    So did you receive
14   unemployment benefits until the time you
15   started working at ArvinMeritor?
16       A.    Yes.  I think there was a
17   waiting period before the benefits began.
18   I don't recall if that was two weeks or
19   four weeks.
20       Q.    Between the time of your
21   departure at Piknik and your starting at
22   ArvinMeritor did you obtain replacement
23   health insurance?

Page 315

1        A.    No.
2        Q.    You went without health
3    insurance coverage during that time?
4        A.    No.  My wife was carrying it
5    with her employer as well.
6        Q.    So during the time that you
7    were unemployed you were on your wife's
8    policy?
9        A.    Yes.
10       Q.    What does your wife do?
11       A.    She works at -- she doesn't
12   work right now.
13       Q.    What was she doing at the
14   time?
15       A.    She was a consumer loan
16   officer for Max Credit Union.
17       Q.    For who?
18       A.    Max Credit Union.
19       Q.    Is Scott McGlon your boss
20   currently?
21       A.    Yes.
22       Q.    Do you know if Onyx left
23   Piknik at any point?

Page 316

1        A.    If Onyx left Piknik at any
2    point?  Not to my knowledge.
3        Q.    You believe Onyx was still in
4    place until the time that Piknik stopped
5    operating?
6            MR. NELMS:  What was the
7    question?
8        A.    Onyx was still what?
9            MS. MCGAHEY:  Can you repeat
10   it?
11           (Record read.)
12       A.    In place, yes.
13       Q.    Are you seeking damages for
14   emotional distress?
15       A.    Yes.
16       Q.    Describe for me, please, the
17   emotional distress that you claim you
18   suffered as a result of the alleged
19   discrimination against you because of
20   your race.
21       A.    Well, it was the first time
22   that I had been fired.  It clearly wasn't
23   for not doing a good job.  It was clearly

JERRY MACCARTNEY ET AL. -TFM    Document 74    Filed 10/29/2007    PETER MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.    August 17, 2007

(Pages 317 to 320)

Page 317

1    for other reasons.
2        Q.    The question is describe for
3    me the emotional distress that you
4    endured as a result of the alleged
5    discrimination that you say you suffered.
6        A.    I was angry, depressed,
7    despondent, just distant from my family
8    for quite a while.  That probably sums it
9    up.
10       Q.    I'm sorry?
11       A.    That probably sums it up.
12       Q.    When did you start to notice
13   your anger?  When did that start?
14       A.    When I walked out the door at
15   Piknik.
16       Q.    At any point did you notice
17   that your anger subsided?
18       A.    Yeah, probably several months
19   after I started working at ArvinMeritor.
20       Q.    Were there any physical
21   manifestation of your anger, if that
22   makes sense?
23       A.    My anger?  I was probably a

Page 318

1    lot more short-tempered with my family
2    than I usually have ever been.
3        Q.    You said you were depressed;
4    is that correct?
5        A.    Yes.
6        Q.    Describe for me, please, the
7    symptoms of your being depressed.
8        A.    I couldn't sleep.  I felt
9    demoralized, demotivated.
10       Q.    What was that last thing?
11       A.    Demotivated.  And I just felt
12   like I needed to withdraw from everybody,
13   just wanted to stay away from everybody,
14   including my family.
15       Q.    Did you seek any medical
16   treatment for your depression?
17       A.    No.
18       Q.    Did you seek any treatment for
19   the anger you were experiencing?
20       A.    You mean -- what do you mean
21   by treatment?
22       Q.    Did you see a doctor?
23       A.    No.

Page 319

1        Q.    Did you see any kind of
2    professional about it?
3        A.    Professional, no.
4        Q.    I'm sorry?
5        A.    No.
6        Q.    Did you see a counselor?
7        A.    No.
8        Q.    You said you could not sleep.
9    Before your termination how much were you
10   sleeping per night on average?
11       A.    Eight to nine hours.
12       Q.    Eight to nine hours?
13       A.    (Witness nodding.)
14       Q.    After your termination how
15   much were you sleeping per night on
16   average?
17       A.    Two or three at best.
18       Q.    Was that every night or just
19   sporadically or how often?
20       A.    Most of the time.
21       Q.    How do you describe most of
22   the time?
23       A.    I was able to sleep pretty

Page 320

1    good on Sundays after going to church.
2        Q.    Are you saying the other six
3    nights of the week you only slept two to
4    three hours a night?
5        A.    On average.
6        Q.    Did you seek any treatment for
7    your sleeplessness?
8        A.    No.
9        Q.    Did you take any medication to
10   try to help you sleep?
11       A.    Yes.
12       Q.    What did you take?
13       A.    Melatonin.  It's an
14   over-the-counter sleep aid.
15       Q.    Did it help?
16       A.    No.
17       Q.    Did you ever try taking
18   something else?
19       A.    No.
20       Q.    How long did you take
21   Melanotonin?
22       A.    About a week until I realized
23   it didn't work.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 83 of 138

JERRY E. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 321 to 324)

Page 321

1    Q.    Did there come a point in time
2  when you started sleeping eight to nine
3  hours again on average?
4    A.    Yeah.  Probably I would say
5  October or November of that year.
6    Q.    Of 2005?
7    A.    Yes.
8    Q.    You were also telling me that
9  you were despondent and distant from your
10  family.  When did that start?
11    A.    Within a few days of leaving
12  Piknik.
13    Q.    At some point in time did the
14  despondency that you felt go away?
15    A.    Yes.
16    Q.    When did it go away?
17    A.    Probably within a few weeks of
18  starting the other job.
19    Q.    At?
20    A.    ArvinMeritor.
21    Q.    Did you seek any counseling?
22    A.    No.
23    Q.    Did you seek treatment from

Page 322

1  any medical professional?
2    A.    No.
3    Q.    At the time that you say you
4  were suffering this emotional distress
5  did you have any other stresses going on
6  in your life?
7    A.    No.
8    Q.    I understand you lost your
9  mother sometime in June of 2005?
10    A.    Yes.
11    Q.    Was that an added source of
12  your depression or your despondency or
13  your distance from the family?
14    A.    No.  That was actually a
15  relief because she had suffered a long
16  time.
17    Q.    Did you ever hear Chris Day
18  say anything derogatory about Caucasians?
19    A.    Derogatory, no.
20    Q.    Did you ever hear Henry Hicks
21  say anything derogatory about Caucasians?
22    A.    No.
23    Q.    Did you ever hear Jeff Larry

Page 323

1  say anything derogatory about Caucasians?
2    A.    No.
3    Q.    Did you ever hear Henry Hicks
4  use any racial slurs about Caucasians?
5    A.    Yes.
6    Q.    What did you hear -- what
7  racial slur did you hear Henry Hicks use
8  about Caucasians?
9    A.    The word he used was crackers.
10    Q.    How often did you hear Henry
11  Hicks use the term crackers?
12    A.    Once.
13    Q.    Tell me about that occasion.
14    A.    It was the beginning of a
15  senior staff meeting when Henry was
16  complaining to the staff about the
17  spelling of the word Piknik, the
18  company's name Piknik.
19    Q.    Tell me exactly what was said
20  to the best that you can recall.
21    A.    He said does this bother
22  anybody that Piknik is spelled with two
23  K's instead of C's.  And we said, we

Page 324

1  don't know what you're talking about.  He
2  said, well, it should be spelled with C's
3  not K's where I come from.  We said we
4  still don't know that you're talking
5  about.
6          He said, well, some people
7  have told me that Piknik got its name --
8  Piknik meant pick-a-nigger were his
9  words.  He was told that that's what
10  Piknik meant.  And he was expressing this
11  to the senior staff.
12          We said, where did you ever
13  hear this, and he said from his friends
14  in the Atlanta area, they said that's
15  what them crackers call it is what his
16  words were.
17    Q.    Is that what he said that his
18  friends had said about the term Piknik?
19    A.    Yes.  That's what the crackers
20  call it.
21    Q.    Was anything else said?
22    A.    No.
23    Q.    Who was present?

JERRY MACCARTNEY CASE 2:05-CV-01:07-MHT-TFM   Document 74   Filed 10/29/2007   Page 84 of 138   JERRY MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.
August 17, 2007

(Pages 325 to 328)

Page 325

1    A.   Senior staff. I believe Bob
2 Lampert and Brenda Sellers were there as
3 well. I believe -- somebody from Onyx
4 was on the phone. I believe it was Chris
5 was on the conference phone.
6    Q.   Was there any response to
7 Henry Hicks' statement?
8    A.   Yes.
9    Q.   What was the response?
10    A.   I told him I had only been
11 there a short time but I had never heard
12 anything like that. And the rest of the
13 staff echoed the same, that they had
14 never heard that.
15    Q.   What else, if anything, was
16 said either by you or anyone else in the
17 meeting or Henry Hicks or whoever was on
18 the phone?
19    A.   Henry said, don't you think we
20 should change the name of Piknik to a
21 more recognizable spelling and people
22 know what it means. It was the question
23 that he was addressing to the staff.

Page 326

1    Q.   And then what happened?
2    A.   We said, no, we do not believe
3 that would be wise, the brand has been
4 around since, I forget how long, the
5 1940s I believe it was, and the brand had
6 recognition that people were accustomed
7 to. Somebody said they had memories of
8 growing up with Piknik mayonnaises since
9 they were kids.
10      And the point was there that
11 there is brand recognition on the
12 spelling of the word Piknik, and we felt
13 it should be left the same and we had
14 never heard that phrase pick-a-nigger
15 before until he said that. He said, you
16 guys have never heard that. We said, no,
17 never heard that before in my life.
18 Everybody pretty much echoed the same
19 thing.
20    Q.   What happened next?
21    A.   He dropped it and we got into
22 other stuff.
23    Q.   And Piknik's name was never

Page 327

1 changed?
2    A.   No.
3    Q.   Is that correct?
4    A.   That's correct.
5    Q.   When did you decide to pursue
6 a legal claim?
7    A.   Shortly after I left Piknik
8 and realized what had happened and how
9 quickly it happened, the consistency in
10 which the actions took place, that not
11 only myself but others had been let go
12 and replaced by minorities in which was
13 consistent with what they said they were
14 going to do all along, and then they did
15 it. I realized we had been wronged and
16 they had committed a criminal act. And
17 we did not want that to happen to anybody
18 else again, especially given their
19 mission to acquire other companies.
20    Q.   What do you allege to be the
21 criminal act?
22    A.   Racial discrimination,
23 terminated us based on our race.

Page 328

1    Q.   Who approached you about
2 filing an EEOC claim?
3    A.   I believe it was Shannon.
4    Q.   Did she call you?
5    A.   I don't believe -- I can't
6 recall if she called me or we talked
7 face-to-face. It wasn't an e-mail. It
8 was a call I believe.
9    Q.   Well, tell me about your
10 discussion.
11    A.   We discussed what had
12 happened, how it was consistent and how
13 Onyx had talked about doing this all
14 along and then did it. They were
15 actually very bold about it, talked about
16 it openly, put it in writing and then did
17 it, and that we had all been racially
18 discriminated against.
19      And I said, well, that's very
20 interesting, what do you think we should
21 do about it. Her comment was that she
22 was aware of an attorney named Andy Nelms
23 who had represented similar cases and we

JERRCASE205ARTNE30ETMLT-TFM    Document 74    Filed 10/29/2007    Page 85 of 138 PTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.                                    JERRY MACCARTNEY

August 17, 2007

(Pages 329 to 332)

Page 329

1  should probably go talk to him and see if
2  we have a case. I said, you know, that
3  sounds right, because I was still angry.
4  So we went and talked to Andy.
5      Q.  Do you know if Bob Winter had
6  already signed up at that time?
7      A.  I don't know if he had signed
8  up at that time or not.
9      Q.  What about Bert Mayer -- I'm
10  sorry.
11     A.  When I talked to Shannon I
12  don't know if he had signed up or not.
13     Q.  What about Bert Mayer?
14     A.  I don't believe he had.
15     Q.  Did you ever approach anyone
16  else that used to work at Piknik about
17  joining your lawsuit?
18     A.  No.
19     Q.  Do you know if any of your
20  coplaintiffs ever did that?
21     A.  I don't believe so.
22     Q.  You don't believe so?
23     A.  Not to the best of my

Page 330

1  knowledge.
2      Q.  To whom have you spoken about
3  your claims in this lawsuit other than
4  your lawyer?
5      A.  My wife, my uncle Roger and my
6  father-in-law, the other plaintiffs, and
7  I referenced it, just the fact that there
8  was a case, to Bill Boykin.
9      Q.  And you have already told me
10  about your conversation with Bill Boykin
11  and your lawsuit?
12     A.  Yes. I believe I also
13  mentioned it to Clyde Luster.
14     Q.  When did you speak to Clyde
15  Luster?
16     A.  I don't think I mentioned it
17  to him until the Spring of 2006.
18     Q.  Did you call him, did he call
19  you, did you run into him?
20     A.  He was working at the
21  warehouse in ArvinMeritor when I started
22  there -- shortly after I started there.
23  He was with another company that managed

Page 331

1  a warehouse in the same building for
2  ArvinMeritor.
3      Q.  Who brought up the lawsuit?
4      A.  I did after he mentioned he
5  never got the money that Piknik owed him
6  for some work he had done for them as a
7  contractor.
8      Q.  And what was said about your
9  lawsuit?
10     A.  I told him basically we had a
11  racial discrimination suit and it's
12  moving along. That's all I told him.
13     Q.  What is your father-in-law's
14  name?
15     A.  William Wisniewski,
16  W-I-S-N-I-E-W-S-K-I.
17     Q.  And what have you told your
18  father-in-law about your lawsuit?
19     A.  Just the existence of it, what
20  it's based off of.
21     Q.  Is he a lawyer?
22     A.  No.
23     Q.  You have spoken with your

Page 332

1  uncle Roger about your lawsuit?
2      A.  Yes.
3      Q.  What is Roger's last name?
4      A.  Sliter.
5      Q.  Is he here in Birmingham?
6      A.  Montgomery.
7      Q.  In Montgomery. He is here in
8  Montgomery?
9      A.  Yes.
10     Q.  S-L-I-T-E-R?
11     A.  Yes.
12     Q.  What have you told your uncle
13  Roger about your lawsuit?
14     A.  I believe I told him a few
15  months after I left Piknik that we're
16  proceeding with it because he was
17  wondering what happened, you know, how it
18  ever turned out. I told him that we had
19  a lawsuit, a reverse discrimination
20  lawsuit. I think he asked me a few
21  months ago again what was up with it, and
22  I told him it was still proceeding.
23  That's about it.

JERRY MACCARTNEY, ET AL. v.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 86 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 333 to 336)

Page 333

1    Q.   I want to talk with you about
2  what you and your coplaintiffs have
3  discussed outside the presence of your
4  lawyer. First of all, do y'all meet
5  periodically to discuss your case?
6    A.   No.
7    Q.   Tell me about your
8  discussions, if any, with Bob Winter
9  about this lawsuit.
10    A.   Most of the discussions have
11  been regarding the merits of the case,
12  what they did, what we know, what they
13  know and whether our evidence -- we feel
14  our evidence is strong enough based on
15  the evidence we have.
16    Q.   Can you recall anything more
17  specifically than that?
18    A.   Other than I told him I think
19  the only strong piece of evidence, other
20  than a lot of verbal discussions we have
21  had, and a lot of other people witnessed
22  it besides us, was that letter from Henry
23  Hicks regarding the April Blackmore/Pepsi

Page 334

1  meeting.
2    Q.   Is that the e-mail that we
3  discussed earlier today that is
4  Defendant's Exhibit --
5    A.   4.
6    Q.   -- 4 to your deposition?
7    A.   Yes.
8    Q.   Anything else more specific
9  that you can recall about your
10  discussions with Bob Winter?
11    A.   He mentioned there was a
12  PowerPoint presentation that Henry had
13  given some customers indicating something
14  of the same nature, but I have not seen
15  it.
16    Q.   Are you aware that Bob Winter
17  has Henry Hicks' laptop in his
18  possession?
19    A.   No, I'm not aware of that.
20    Q.   Anything else that you can
21  recall more specifically about any
22  discussions you have had with Bob Winter
23  about your lawsuit?

Page 335

1    A.   Other than him just kind of
2  reiterating that he had the same
3  impression we did about why Henry Hicks
4  was hired.
5    Q.   Say that again?
6    A.   He discussed with me basically
7  his opinion of why Henry Hicks was hired.
8    Q.   What did Mr. Winters say his
9  opinion was as to why Mr. Hicks was
10  hired?
11    A.   Mr. Hicks was hired to replace
12  Bob once Bob finished training him.
13    Q.   Anything else you can recall
14  about any discussions you've had with Bob
15  Winter about this lawsuit?
16    A.   Not other than his statement
17  that I concur with that we are anxious to
18  stare across the table at Onyx and see
19  them stand in account for their actions
20  when it gets to a court of law.
21    Q.   Anything else?
22    A.   No.
23    Q.   Tell me about your discussions

Page 336

1  with Shannon McGlon about this lawsuit.
2    A.   We discussed Letitia
3  Strowbridge being brought in. I don't
4  recall if it was her opinion or mine that
5  she was brought in to replace Shannon
6  based on her prior experience as quality
7  manager with a failed hot-fill beverage
8  company, and then when she found out she
9  couldn't perform and hold her weight they
10  had to let her go. And when that didn't
11  work they finally let her go and gave her
12  responsibilities to Anthony Barber.
13       And pretty much the same
14  e-mail we discussed, Exhibit 4, and
15  discussions about how Onyx was very open
16  about discussing their intention and then
17  acted on them. That's pretty much the
18  gist of most of the discussions.
19   .  Q.   Tell me about your discussions
20  with Bert Mayer about the claims in this
21  lawsuit.
22    A.   I think I have only talked to
23  Bert about it shortly after he signed his

JERRY MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 87 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 337 to 340)

Page 337

1  EEOC claim. And he was kind of
2  tongue-in-cheek stating he probably had
3  the best case of all because the day
4  after he left they had a replacement
5  already on site doing his job. I don't
6  think I have discussed anything further
7  with him than that. Other than I think
8  he said the same statement, he can't wait
9  to stare across the table at Onyx and see
10 them stand in account for their actions.
11     Q.   See their what?
12     A.   Stand in account for their
13 actions.
14     Q.   Do you socialize with Bert
15 Mayer?
16     A.   No.
17     Q.   Do you socialize with Shannon
18 McGlon?
19     A.   No.
20     Q.   What about her husband, Scott?
21     A.   Only at work.
22     Q.   Do you socialize with Bob
23 Winter?

Page 338

1     A.   Through e-mail mostly and at
2  work.
3     Q.   That's right, because he works
4  now at Integrated Transport. Or works at
5  Online Commerce Group.
6     A.   Yes.
7     Q.   Do y'all work in the same
8  office?
9     A.   Yes.
10    Q.   Have you spoken with Ricky
11 Loeb about your lawsuit?
12    A.   No.
13    Q.   Have you provided your lawyer
14 with all the documents that you have that
15 you believe relate to your discrimination
16 claims?
17    A.   Mostly electronic and hard
18 copy with the exception of my journal.
19    Q.   You have given your lawyer all
20 hard copies of documents that you believe
21 relate to your lawsuit with the exception
22 of your journal?
23    A.   Yes.

Page 339

1     Q.   And you have electronically
2  stored information that relates to your
3  claims in this lawsuit?
4     A.   Yes.
5     Q.   What are those electronically
6  stored pieces of information?
7     A.   My PST files that I backed up
8  previously to the June date that were in
9  my briefcase when I left.
10    Q.   Those PST files are just your
11 e-mail files?
12    A.   Yes.
13    Q.   How many CDs or disks are
14 there?
15    A.   One.
16    Q.   Do you know what time frame of
17 the e-mails that's on that CD or disk?
18    A.   I believe it was from my hire
19 date until April of 2005.
20    Q.   Prior to April of 2005 had you
21 not backed up your e-mails?
22    A.   Yes, I did.
23    Q.   After you back up your e-mails

Page 340

1  do you delete them from your e-mail
2  system?
3     A.   No.
4     Q.   So the backup that you did of
5  your e-mails in June of 2005 would have
6  been from your hire date through whatever
7  date that you backed up your e-mails?
8     A.   Yes.
9     Q.   Do you have any other
10 electronically stored information that
11 you believe relates to your claims in
12 this case?
13    A.   No.
14    Q.   Do you have any e-mails from
15 your MSN.com account that you believe
16 relate to your claims in this lawsuit?
17    A.   No. Oh, I'm sorry. Sorry.
18 The e-mail that Chris Day responded to,
19 the exhibit that you gave me.
20    Q.   And you've provided a copy of
21 that e-mail to your lawyer?
22    A.   Yes.
23        (Whereupon, Defendant's

Page 341

1          Exhibit 14 was marked
2          for identification.)
3     Q.   I'm handing you what has been
4   marked as Defendant's Exhibit 14 to your
5   deposition.  If you could turn to the
6   last page.  Is that your signature?
7     A.   Yes.
8     Q.   Is this Piknik's Internet,
9   E-mail, Telephone Use Police?
10    A.   (Examining document.) This
11  looks like patched together documents of
12  different documents.  There's two
13  signature pages.  One is blank.  The last
14  one is signed.  The first three pages
15  relate to the policy I wrote when I was
16  in charge of the IT department.
17    Q.   You drafted this policy?
18    A.   Yes.
19    Q.   You drafted the first three
20  pages?
21    A.   Yes.
22    Q.   Well, do you see at the bottom
23  footer says "Page 1 of 5 E-mail Internet

Page 342

1   Policy.doc - Effective 7/2004"?
2     A.   Yes.
3     Q.   Do you see that the subsequent
4   pages are Page 2 of 5, 3 of 5, 4 of 5 and
5   5 of 5?
6     A.   Yes.  And I see half a blank
7   page.  That looks like cutting and
8   pasting to me.
9     Q.   But you are familiar with at
10  least the first three pages of the
11  policy; correct?
12    A.   Yes.
13    Q.   Because you drafted it?
14    A.   Yes.
15         (Whereupon, Defendant's
16         Exhibit 15 was marked
17         for identification.)
18    Q.   I'm handing you what has been
19  marked as Defendant's Exhibit 15 to your
20  deposition.
21    A.   (Examining document.)
22    Q.   Have you seen this document
23  before?

Page 343

1     A.   I have seen pieces of this in
2   other documents.
3     Q.   Did you prepare any of the
4   pieces that are in Defendant's Exhibit
5   15?
6     A.   No.
7     Q.   Do you know who prepared any
8   of the pieces that are in Defendant's
9   Exhibit 15?
10    A.   Yes.
11    Q.   Who?
12    A.   Robert Winter.
13    Q.   Do you know when he prepared
14  it?
15    A.   Fall of 2002.
16    Q.   Before you started?
17    A.   Yes.
18    Q.   Do you know what the purpose
19  of this job description is?
20    A.   This is a piece of an e-mail
21  that he sent me when he was in charge of
22  recruiting me to Piknik explaining what
23  the job would entail.  As I mentioned,

Page 344

1   Mike O'Connell later took over those
2   efforts and finished the recruiting
3   process.
4     Q.   So when you were being
5   recruited to join Piknik is when you saw
6   part of this document that is Defendant's
7   Exhibit 15?
8     A.   These are pieces of what I
9   saw, yes.
10    Q.   Do you recall what pieces you
11  saw?
12    A.   "Longer term plans."
13    Q.   On the second page?
14    A.   Yes.
15    Q.   The whole section under
16  "longer term plans"?
17    A.   Yes.
18    Q.   Anything else?
19    A.   I don't recall the first
20  paragraph.
21    Q.   Under "Inventory Control"?
22    A.   Yes.  I don't recall it being
23  under that same e-mail that Bob sent me

Case 2:05-cv-01207-MHT-TFM     Document 74     Filed 10/29/2007     Page 89 of 138

JERRY MACCARTNEY et al.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 345 to 348)

Page 345

1    on duties. Pretty irrelevant, but I just
2    don't recall it.
3        Q.   Anything else that you can
4    recall ever seeing?
5        A.   The "Measurement" section I
6    remember seeing.
7        Q.   On the second page?
8        A.   Yes. It was in an e-mail he
9    sent me outlining what the job would
10   entail that they were trying to recruit
11   me for.
12       Q.   Anything else that you recall
13   seeing before in this document, before
14   today?
15       A.   Anything else I recall seeing?
16       Q.   Is there anything else in
17   Defendant's Exhibit 15 that you recall
18   seeing before today?
19       A.   As I stated, with the
20   exception of the first paragraph I recall
21   seeing this document.
22       Q.   I see. You have seen this
23   whole document except for the "Inventory

Page 346

1    Control" section?
2        A.   I've seen the -- I believe
3    these were not all in this one document.
4    They were pieces of separate e-mails that
5    appear to have been put together in this
6    one document.
7        Q.   I'm with you.
8        (Whereupon, Anthony Bush
9        departs the deposition.)
10       (Whereupon, Defendant's
11       Exhibit 16 was marked
12       for identification.)
13       Q.   I'm handing to you what has
14   been marked as Defendant's Exhibit 16.
15   Have you seen this document before?
16       A.   (Examining document.) Yes.
17       Q.   And what is Defendant's
18   Exhibit 16?
19       A.   It's a form that was given to
20   us -- don't remember if it was Bill
21   McLennan or Brenda Sellers. I don't
22   recall who gave it to us. Said fill this
23   out so we can properly do a review for

Page 347

1    you.
2        Q.   Is there anything in
3    Defendant's Exhibit 16 that relates to
4    your claims of discrimination?
5        A.   Yes. Page 3, Point 10-A.
6        Q.   Page 3, Item 10-A?
7        A.   Yes.
8        Q.   Number 10 is "Other
9    topics/concerns to be discussed." Item A
10   is "what the long-term potential for
11   myself or my role in the short and
12   long-term given the recent acquisition."
13       A.   Yes.
14       Q.   How does that relate to your
15   claims in this lawsuit?
16       A.   As it states, as early as 2004
17   we're voicing a concern for our positions
18   given the statements that Onyx
19   continually made about placing
20   African-Americans in middle and senior
21   management roles.
22       Q.   And you have told me all you
23   can recall about those statements being

Page 348

1    made?
2        A.   Yes.
3        (Whereupon, Defendant's
4        Exhibit 17 was marked
5        for identification.)
6        Q.   I'm handing you what has been
7    marked as Defendant's Exhibit 17 to your
8    deposition. Look at the last page. Is
9    that your signature?
10       A.   Yes.
11       Q.   And this is a confidentiality
12   agreement that you signed?
13       A.   Yes.
14       MS. MCGAHEY: Do you have
15   discovery responses for Mr. MacCartney?
16   Is that a no? Counsel is shaking his
17   head, yes, that there are no discovery
18   responses for Mr. MacCartney.
19       MR. NELMS: Not on me.
20       MS. MCGAHEY: I'm sorry?
21       MR. NELMS: I don't have any
22   on me. Are you asking me if I have them?
23       MS. MCGAHEY: Yes.

Case 2:05-cv-01207-MHT-TFM     Document 74     Filed 10/29/2007     Page 90 of 138
JERRY MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 349 to 352)

Page 349

1    MR. NELMS: The answer is, no,
2  I don't have them on me.
3    MS. MCGAHEY: Do you have them
4  anywhere?
5    MR. NELMS: I have no idea. I
6  don't even have my file.
7    MS. MCGAHEY: The only reason
8  I mention it is that I have never
9  received any of them, and I have not
10  received any documents that have been
11  produced by Mr. MacCartney.
12    MR. NELMS: We gave you
13  everything in our Rule 26 Disclosure that
14  he pretty much had.
15    MS. MCGAHEY: I don't think we
16  received any Rule 26 Disclosures from
17  him.
18    MR. NELMS: Maybe he didn't
19  have anything.
20    MS. MCGAHEY: Well, he says he
21  has CDs --
22    MR. NELMS: He didn't give
23  them to me.

Page 350

1    MS. MCGAHEY: -- of e-mails
2  and an e-mail reply --
3    MR. NELMS: It's 5:25 on
4  Friday. Are you finished?
5    Q.  (BY MS. MCGAHEY:) Mr.
6  MacCartney, have you provided your lawyer
7  with documents in electronically stored
8  information that relate to your claims in
9  this lawsuit?
10    A.  Yes.
11    Q.  Besides Mr. Nelms, have you
12  contacted any other lawyer regarding your
13  claims in this lawsuit?
14    A.  No.
15    Q.  Have you now told me
16  everything that you can recall that
17  relate to your claims in this lawsuit?
18    A.  Other than by reading these
19  two documents, confidentiality and
20  internet e-mail, it talks about
21  information that is identified as
22  confidential not to be disclosed or
23  retained.

Page 351

1  Internet use policy does not
2  say anything about e-mail being
3  confidential information and having
4  general umbrella of coverage as
5  confidential information. The CD I have
6  in my procession was in my briefcase, and
7  I didn't realize it until I left, nor did
8  I realize it until several months after I
9  left Piknik.
10    Q.  Anything else that you have
11  not already told me that relates to your
12  claims in this lawsuit?
13    A.  This is the wrapping up part
14  where I think about everything and make
15  sure I didn't miss anything?
16    Q.  Well, take your time.
17    A.  I believe we covered
18  everything.
19    Q.  Do you recall receiving a
20  document that lists a bunch of questions
21  for you to answer and another document to
22  ask if you have a bunch of different
23  documents and things and to provide

Page 352

1  responses? Do you understand my
2  question?
3    A.  No.
4    Q.  Do you recall receiving a
5  document, you know, entitled
6  interrogatories?
7    A.  Yes.
8    Q.  Or request for production?
9    A.  Yes.
10    Q.  Did you provide responses to
11  those?
12    A.  Yes.
13    Q.  Did you give them to your
14  lawyer?
15    A.  Yes.
16    Q.  How long ago, if you can
17  recall?
18    A.  It was very cold out, January,
19  February, somewhere in there.
20    Q.  Of 2007?
21    A.  Yes.
22    MS. MCGAHEY: Andy, I think
23  that's all I have for now.

JERRY MACCARTNEY
Case 2:05-cv-01047-MHT-TFM     Document 74     Filed 10/29/2007     Page 91 of 138
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

(Pages 353 to 356)

Page 353

EXAMINATION BY MR. NELMS:
Q. Jerry, were there any particular concerns at Piknik at any time during the tenure of your employment regarding proprietary information, leaving the Piknik campus that you can recall?
A. No.
Q. Why was it important that a confidentiality agreement or statement be made for employees to sign?
A. Regarding any proprietary technology we had specifically that positioned us competitively within the hot-fill beverage industry.
Q. Who were your immediate competitors in this geographic area?
A. Whitfield Foods in Montgomery.
Q. How did Whitfield Foods compete with Piknik Products?
A. They competed directly. Had the same customers, same capabilities, similar technologies and employees with

Page 354

similar skill sets.
Q. Who were the Whitfields?
A. Don't know. Privately held company I believe.
Q. So Whitfields own Whitfield Foods?
A. I believe so. I'm not sure if it's still in their possession. It was started by somebody named Whitfield.
Q. And prior to Onyx becoming interested in some degree in Piknik, who, if you know, owned Piknik Products?
A. Ricky Loeb.
Q. And before Ricky Loeb, if you know, who owned Piknik Products?
A. Ricky Loeb's dad. I don't recall his first name. I think it might have been Ricky as well.
Q. So Piknik was a family owned business?
A. Yes.
Q. And Whitfield Foods was a family owned business?

Page 355

A. Yes.
Q. Both of these families lived in the Montgomery area?
A. Yes.
Q. And they competed directly with each other?
A. Not for the entire period. Only when Piknik began to undertake hot fill of beverage. Their primary focus prior to that, which is approximately, what I have been told, in the '80s was mostly condiments. Whitfield was mostly beverages with a little bit of condiments.
Q. Do you have any information or knowledge as to whether or not employees would go from Whitfield to Piknik and vice versa?
A. Yes.
Q. Was that something you considered common?
A. Yes.
Q. Would there be a concern at

Page 356

Piknik that proprietary information used and learned by an employee at Piknik might be transferred to Whitfield Foods?
A. Yes.
Q. Would that be a reason or cause for developing this confidentiality agreement?
A. I believe so, possibly, yes.
Q. You were talking about an unfortunate incident regarding your mother and her cancer illness?
A. Uh-huh.
Q. Where was your mother at this time that she was ill?
A. She lived in my home.
Q. Here in Montgomery?
A. Yes.
Q. Did you miss much work because of her illness?
A. I missed -- in the year 2005 I believe I missed, my guess, about seven to eight days, which were covered by my sick and vacation allowable time.

JERIGASEMACCARTNEXT2MAIT-TFM    Document 74    Filed 10/29/2007    Page 92 of 138 JERRIE MACCARTNEY
ONYX CAPITAL VENTURES, LLC, ET AL.                                                    August 17, 2007

(Pages 357 to 360)

Page 357

1    Q.   Was Brenda Sellers aware that
2  your mother was ill?
3    A.   Yes.
4    Q.   Did you ever make application
5  for FMLA?
6    A.   Yes.
7    Q.   When did you make FMLA
8  application?
9    A.   When I learned -- when she was
10  actually diagnosed with cancer.
11    Q.   Was that in 2005?
12    A.   2004.
13    Q.   Okay.  How many days did you
14  miss of work due to your mother's illness
15  in 2004?
16    A.   I believe only about two.
17    Q.   And I'm sorry to bring up
18  things that I know must be painful to
19  you.  What was the date of your mother's
20  passing?
21    A.   June 11, 2005.
22    Q.   June 11?
23    A.   Yes.

Page 358

1    Q.   And what was the date of your
2  termination?
3    A.   June 27th, 29th.  I think the
4  document said 27th.  On or about June
5  27th or 29th.
6    Q.   How many days, if any, did you
7  take off the week of June 11th or
8  thereabout?
9    A.   I took that entire week.  I
10  believe June 11th was a Sunday.  And
11  after calling and talking to Brenda
12  Sellers she said she would talk to
13  Anthony.  Anthony Barber called me and
14  said take as much time as you need, take
15  two or more weeks if you need it.  I said
16  I can take care of business in one, and I
17  will be back on Monday, which I did.
18    Q.   So that was approximately the
19  20th, 19th?
20    A.   Somewhere in there, yes.
21    Q.   And is this the day that you
22  showed up and there was a new person in
23  the office?

Page 359

1    A.   Yes.
2    Q.   Did you learn how long -- I
3  believe his name was Joe Yates?
4    A.   Yes.
5    Q.   Did you learn how long Mr.
6  Yates had been at Piknik, in whatever
7  capacity he was there -- I mean, check
8  that.  Had he been there prior to June
9  11, the best of your knowledge?
10    A.   Yes.
11    Q.   He had?
12    A.   Yes.
13    Q.   When did he first show up?
14    A.   It was the Tuesday or
15  Wednesday -- the Tuesday before from what
16  I was told.
17    Q.   From what you were told?
18    A.   Yes.
19    Q.   You didn't notice him being
20  there?
21    A.   I wasn't there.  That was the
22  week I was off for my mom's death.
23    Q.   I believe you said -- I'm

Page 360

1  trying to make the timeline.
2    A.   She died on June 11th, which
3  was a Sunday I believe.  I was off that
4  coming Monday through Friday.  He showed
5  up that Tuesday I was out.
6    Q.   Did you take any time off
7  before the 11th?
8    A.   There was days I missed for
9  her surgery and other events, yes.
10    Q.   But continuous days before the
11  11th, like the Friday, Thursday and
12  Wednesday before the Sunday of your
13  mother's death?
14    A.   The week before her death I
15  believe I took one day.
16    Q.   But it's your belief that Joe
17  Yates showed up at Piknik for the first
18  time the Tuesday after your mother's
19  passing?
20    A.   Yes.
21    Q.   Okay.  So did you know that he
22  was there that Tuesday, Wednesday,
23  Thursday and Friday of that work week?

Page 361

1    A.    No, not until I came back to
2  work.
3    Q.    The following Monday?
4    A.    Yes.
5    Q.    And forgive me if we have
6  covered this already, but what was your
7  first reaction when you saw him there?
8    A.    I was wondering, first of all,
9  why was he in my chair using my computer
10  and had a Piknik e-mail account and
11  conducting a meeting with my staff, which
12  was happening when I walked in.
13    Q.    You had a laptop computer that
14  we have seen the exhibits here?
15    A.    Yes.
16    Q.    Did you also have a desk
17  computer?
18    A.    No.
19    Q.    So when you say he was using
20  your computer, was he using that laptop?
21    A.    Yes.
22    Q.    So did you get an explanation
23  as to why Joe was there?

Page 362

1    A.    I asked him what was the deal,
2  who was he. He said he was a consultant
3  that was brought in per Anthony Barber
4  and Onyx.
5    Q.    Did you indicate -- and Onyx?
6    A.    Yes.
7    Q.    Did he indicate that he worked
8  for any particular consulting firm?
9    A.    He said he was an independent
10  consultant.
11    Q.    Did he give you a business
12  card?
13    A.    No.
14    Q.    Did you ask for one?
15    A.    I did not. But a contractor,
16  engineering contractor, came in to
17  discuss some piping replacement.
18  Somebody asked him for one, and he said
19  he didn't have one.
20    Q.    Did you ever know him to have
21  a Piknik business card?
22    A.    No.
23    Q.    Did he ever at any time

Page 363

1  produce for you a business card related
2  to his consulting business?
3    A.    No.
4    Q.    Did you have an opportunity to
5  inquire where he lived?
6    A.    Yes.
7    Q.    Did he indicate to you where
8  he did live?
9    A.    Was out of state. You're
10  taxing my memory, but I think it was
11  Texas. I could be wrong.
12    Q.    Have any idea where he was
13  staying in the Montgomery area while he
14  worked at Piknik?
15    A.    I believe he said it was at
16  one of those furnished studio apartments
17  on Carmichael.
18    Q.    Did you talk to him any about
19  his personal life?
20    A.    Yes. He mentioned he had some
21  children. I do not recall their ages.
22  They were close to my children's ages.
23    Q.    Did he express any intent to

Page 364

1  move to the Montgomery area?
2    A.    I asked if he was planning on
3  it, and he said it was too soon to tell.
4    Q.    Too soon to tell?
5    A.    Too soon to tell was his
6  words.
7    Q.    The Monday when you returned
8  to work and you saw Joe Yates in your
9  office and you had the reaction that you
10  had, did you make any inquires to a third
11  party as to Joe's presence, why he was
12  there?
13    A.    I asked Bill Boykin, and he
14  said all he had been told is Joe was here
15  as a consultant to help with line
16  efficiencies.
17    Q.    Did you ask Anthony Barber?
18    A.    Yes. I called Anthony that
19  morning.
20    Q.    And his response was what?
21    A.    He said, he's just a
22  consultant I brought in to help you;
23  you've got a weak staff over there and we

JERRY R. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM     Document 74     Filed 10/29/2007     Page 94 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 365 to 368)

## Page 365

1 realize you need all the help you can get
2 over there.
3     Q.   Did you, in fact, have a weak
4 staff?
5     A.   We had a very weak engineering
6 manager and maintenance manger, yes.
7     Q.   Had there ever been any
8 discussion with Mr. Barber about the
9 prospect of bringing in some kind of
10 consultant to assist?
11     A.   No.
12     Q.   Have you ever hired
13 consultants before in any capacity for
14 Piknik?
15     A.   Yes.
16     Q.   What kind of roles do
17 consultants typically take on, in your
18 experience?
19     A.   Evaluation, providing advice,
20 making recommendations and, if necessary,
21 providing technical specification on
22 documents.
23     Q.   And what kind of roles or

## Page 366

1 duties was Mr. Yates taking on, in your
2 experience?
3     A.   In my opinion it was roles of
4 plant manager.
5     Q.   I know you mentioned in your
6 deposition earlier that he was doing
7 morning start-up meetings?
8     A.   Yes.
9     Q.   Who would be in those
10 meetings?
11     A.   Tina Sander --
12     Q.   I mean generally what type of
13 person?
14     A.   Production supervisors,
15 managers, maintenance.
16     Q.   And I believe you had an
17 opportunity to attend at least one of
18 those?
19     A.   Yes.
20     Q.   Where Mr. Yates was in charge
21 of the meeting?
22     A.   Yes.
23     Q.   And what kind of things was he

## Page 367

1 discussing with the staffing personnel?
2     A.   As I stated earlier, the
3 typical things that we covered in morning
4 start-up meetings.
5     Q.   Did he seem to be information
6 gathering?
7     A.   No. He was giving directions.
8     Q.   Was he giving advice?
9     A.   He was giving direction and
10 handing out assignments.
11     Q.   Is that something that a
12 consultant would typically do, in your
13 experience?
14     A.   Not in my experience.
15     Q.   Is it appropriate or accurate
16 to say he was filling your job role?
17     A.   That is my belief.
18     Q.   Well, from what you observed
19 was he fulfilling your job role?
20     A.   Yes.
21     MR. NELMS:  Okay.  Nothing
22 further.
23

## Page 368

1 REEXAMINATION BY MS. MCGAHEY:
2     Q.   Mr. MacCartney, before you
3 left Piknik had you already started
4 looking for other employment?
5     A.   Yes.
6     Q.   Did you submit resumes to
7 other companies?
8     A.   I don't recall. I sent some
9 letters I believe. I'm not sure if I
10 sent resumes. I sent letters.
11     Q.   Did you register with
12 Monster.com?
13     A.   I have been registered with
14 Monster.com since 1999 when I left
15 Digital Equipment Corporation.
16     Q.   Did you have any interviews
17 with any companies before you left
18 Piknik?
19     A.   No.
20     Q.   Did you ever ask Joe why he
21 was at Piknik?
22     A.   Yes.
23     Q.   What did he say?

JERRY MACCARTNEY ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM     Document 74     Filed 10/29/2007     Page 95 of 138

JERRY MACCARTNEY
August 17, 2007

(Pages 369 to 371)

Page 369

1    A.    I'm here to help out Anthony.
2
3    REEXAMINATION BY MR. NELMS:
4    Q.    Jerry, in your mind why were
5    you fired?
6    A.    Because a minority business
7    enterprise purchased a company that
8    voiced on several occasions their intent
9    to place African-Americans in senior
10   manager roles, and they acted on it for
11   me, as well as other individuals. I was
12   replaced because they wanted to fill
13   their vision and mission of putting
14   African-Americans in jobs.
15   Q.    Can you think of any other
16   reason why anyone at Piknik would wish
17   that you not work there any longer?
18   A.    No. Several months before
19   that they were recommending me for COO
20   before the bank started maneuvering.
21        MR. NELMS: Thank you.
22        MS. MCGAHEY: Nothing further.
23        (Whereupon, the deposition

Page 370

1        was concluded at 5:43 p.m.)
2
3        FURTHER THE DEPONENT SAITH NOT
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 371

1        C E R T I F I C A T E
2
3
4    STATE OF ALABAMA)
5    JEFFERSON COUNTY)
6
7        I hereby certify that the
8    above and foregoing deposition was taken
9    down by me in stenotypy, and the
10   questions and answers thereto were
11   reduced to typewriting under my
12   supervision, and that the foregoing
13   represents a true and correct transcript
14   of the deposition given by said witness
15   upon said hearing.
16       I further certify that I am
17   neither of counsel nor of kin to the
18   parties to the action, nor am I in
19   anywise interested in the result of said
20   cause.
21
22
23       COMMISSIONER - NOTARY PUBLIC

| A | | | | |
|---|---|---|---|---|
| **abandoned** | acting | **265:4** | 285:19 286:10 | 121:18 122:8 123:14 |
| 132:17 135:14,23 138:6 | 6:3 244:7,10 | **affect** | **Albuterol** | 124:16 125:10,21 126:8 |
| **ABI** | **action** | 11:7,11 143:22 158:18 | 11:1 | 126:16 127:1 128:5 |
| 286:9 | 1:5 102:12 223:14 278:13 | **African–American** | **allegation** | 180:11,18 181:2 184:23 |
| **abilities** | 278:21,22 371:18 | 100:9 107:21 110:12,21 | 192:18 | 185:1 186:12,12 188:17 |
| 81:3 87:3 | **actions** | 128:1 219:14 229:16,21 | **allege** | 188:21,23 191:18,21 |
| **ability** | 97:13 98:16,17 101:19,20 | 231:11 236:15 242:19 | 327:20 | 192:3,19 226:1,3,6 |
| 11:11 63:20 64:7,10 87:3 | 102:11 115:1 238:4 | 249:8 251:23 252:11 | **alleged** | 235:9,11 239:18,20 |
| 95:19 126:3 | 262:7 279:17 327:10 | 255:6 261:18 | 316:18 317:4 | 243:5,6,9,17 244:10 |
| **able** | 335:19 337:10,13 | **African–Americans** | **allegedly** | 245:2,7,19 246:2,5,9 |
| 67:14 90:21 97:11 141:20 | **actively** | 69:13 111:17 112:2 121:9 | 205:10 | 247:7 248:4 255:22 |
| 165:7 205:6 230:3 | 156:4 | 121:15 126:17 156:1 | **Allen** | 256:23 257:8 258:17 |
| 257:19,23 258:20 | **activities** | 200:1 202:3 204:18,21 | 118:2,3 | 264:20 265:10,14 |
| 276:20 319:23 | 127:1 | 205:6 207:16 208:12,15 | **allowable** | 270:19 285:7,12 301:15 |
| **abruptly** | **activity** | 208:20 213:1,7 214:4,14 | 314:6 356:23 | 336:12 346:8 358:13,13 |
| 152:6 | 77:21 101:22 102:3 | 215:17 217:7 220:13 | **allowed** | 362:3 364:17,18 369:1 |
| **absent** | 286:23 298:10 | 225:3,17 226:15 227:3 | 109:2 111:7 146:20 169:17 | **anticipated** |
| 269:19 | **Adams** | 227:18 229:3,6 231:16 | 188:4 256:6,9 | 278:22 |
| **absolutely** | 6:8 | 232:22 260:15 347:20 | **amenable** | **anxious** |
| 183:15 263:7 | **add** | 369:9,14 | 113:1 | 335:17 |
| **accept** | 142:12 152:4 | **afterward** | **American** | **anybody** |
| 263:21 | **added** | 253:23 254:8 | 24:12 286:4 | 83:6 103:10 176:21 |
| **accepted** | 322:11 | **agenda** | **Amitriptyline** | 213:18 233:19 323:22 |
| 42:4 240:17,20 241:3 | **adding** | 85:20 271:18,19 | 9:13,14 10:13,16 | 327:17 |
| **account** | 289:8 | **ages** | **amount** | **anymore** |
| 110:14 265:15 313:7 | **addition** | 363:21,22 | 171:1 314:2 | 124:18,20 126:9 245:8 |
| 335:19 337:10,12 | 72:1 158:12,20 | **ago** | **ample** | 248:6,15 |
| 340:15 361:10 | **additional** | 7:7 10:7 332:21 352:16 | 108:11 | **anyone's** |
| **accounting** | 25:6 42:17 124:13 126:12 | **agree** | **Amy** | 35:20 66:12 |
| 50:11 90:23 133:17,17 | **address** | 122:16 | 3:19 | **anyway** |
| **accounts** | 20:2,5 269:2,5,7,8 281:10 | **agreed** | **analyst** | 62:8 73:15 154:23 |
| 57:13 268:16 | 281:10 | 2:3 58:1,2 63:6 142:20 | 27:9 | **anywise** |
| **accrued** | **addressed** | **agreement** | **Anderson** | 371:19 |
| 266:12,12 | 215:5 216:22,23 236:7 | 116:20 121:22 348:12 | 3:4 | **apartments** |
| **accurate** | 269:12 | 353:10 356:7 | **Andy** | 363:16 |
| 367:15 | **addresses** | **ahead** | 328:22 329:4 352:22 | **APICS** |
| **accustomed** | 202:17 | 175:4 | **and/or** | 24:9 25:8 |
| 326:6 | **addressing** | **AIB** | 29:20 175:5 271:13 | **Apollo** |
| **achieve** | 202:13 204:2 325:23 | 286:3 | 300:11 | 104:11,21 |
| 132:20 133:21 134:8 | **adequate** | **aid** | **anger** | **apologetic** |
| 170:20 204:18 221:17 | 59:5 62:16 107:10 137:13 | 320:14 | 317:13,17,21,23 318:19 | 118:20 |
| **achieved** | 256:9 | **al** | **angry** | **apologize** |
| 132:23 | **adherence** | 1:7,10 117:21 | 250:23 317:6 329:3 | 157:17 289:2 |
| **Aciphex** | 67:7 154:12 160:21 | **Alabama** | **animated** | **appear** |
| 9:12,16,21 | 162:13 | 1:2 3:8,15 6:3,5,9 303:16 | 184:5 | 293:15 294:16 297:14,17 |
| **acquire** | **admitted** | 303:19,22 305:21 371:4 | **announcement** | 346:5 |
| 327:19 | 107:15 135:19 | **alarm** | 241:19 | **appeared** |
| **acquired** | **ado** | 213:17 | **answer** | 73:20 157:7 226:1 |
| 26:22 215:7 | 143:12 | **Alatex** | 8:6,11 116:14 117:5 127:5 | **appears** |
| **acquisition** | **adopted** | 45:4,6,12 68:23 71:13 | 178:1 261:12,13 349:1 | 296:13 298:13 |
| 101:9 102:3 202:14,15 | 19:7 | 76:12 77:7 84:19,21 | 351:21 | **application** |
| 227:11 235:10 300:12 | **ADT** | 86:3 88:4 109:11 | **answers** | 357:4,8 |
| 347:12 | 266:7,7,17,18 | 120:10 123:20 124:4,8 | 371:10 | **appreciate** |
| **act** | **advance** | 124:15 126:2 127:13 | **Anthony** | 210:17 227:23 |
| 109:4 149:17 171:18,21 | 227:23 | 129:4 180:19 181:3,5 | 3:18 7:12,14 16:4 49:2,4 | **approach** |
| 173:13 174:20 175:2,22 | **advanced** | 185:5 214:21 236:18 | 49:13,14 76:9 77:3 | 329:15 |
| 177:8 178:10,23 180:3 | 134:4 | 238:17 239:9,11,22 | 78:22 79:2 81:10,12,21 | **approached** |
| 327:16,21 | **advice** | 240:1,12,17 242:2 | 82:16 85:11,14 86:22 | 57:23 61:11 186:10 |
| **acted** | 365:19 367:8 | 243:21 244:2,6,16 | 87:21 88:11 89:1,13 | 237:10 328:1 |
| 336:17 369:10 | **affairs** | 245:5 249:7 250:14 | 101:1 103:20 109:19 | **approaches** |
| | | 251:13 269:13,19 285:14 | 110:14 113:22 118:11 | 61:19 |

appropriate
198:8 367:15
approval
36:21,22 145:5 148:7
approve
103:22 168:2
approved
54:20 142:16 143:2,7,11
143:20 145:9
approximately
10:7 39:15 65:8,14
160:23 173:11 189:14
190:5,10 245:6 284:1
307:12 311:11 312:21
314:11 355:10 358:18
April
38:6,8 43:2 46:6 220:21
221:9,15 222:10,14,15
223:11 241:21 333:23
339:19,20
Arant
3:13
area
16:15 17:8 18:3 20:20
63:18 82:7,8 324:14
353:17 355:3 363:13
364:1
argument
66:17
arrested
20:12
arrive
264:23
arrived
81:20 134:15
articulated
121:5 212:22
ArvinMeritor
302:12,13,17 303:17
304:4,17 306:14,22
307:2,6 308:2,11,13,18
311:12 314:15,22 317:19
321:20 330:21 331:2
asked
13:2 57:23 63:5,11 75:2
75:4,5 83:15 88:16
96:9,16 97:6,19,21,22
100:13 109:13 111:4,15
112:4 115:23 116:6,12
117:4,12 119:3 125:8
131:16,19,21 140:20
157:18 159:20 163:14
166:7 172:1 174:14
177:12 188:2,19 189:9
190:19 191:9,13 210:14
210:15 227:16 229:19
237:13 239:5 247:6
248:4 252:5 256:11
265:14 273:4,7 274:8
283:3 286:17 290:17
332:20 362:1,18 364:2

asking
8:3,9 14:13 76:16 78:13
98:3 101:16 252:21
253:9 273:5 348:22
asks
63:1 64:3 187:2
aspect
31:23
aspects
79:8 218:10
assertion
135:11
assess
164:20
assessment
54:18 55:8,12 56:2,20
57:1 58:1,5,6,22 59:1
59:17 61:1 63:7,16
131:6
assessments
57:4
assign
2:21
assigned
29:13,14,17
assignments
367:10
assist
365:10
associated
161:15
assume
9:2 28:1 66:3 67:14
192:13 242:1 243:3
assumed
65:15 124:1 282:19
assuming
300:20
assumption
143:8 168:15
asthma
9:18 10:1,10
Athenia
53:23 54:1,14,15,22 56:9
58:7 60:8 61:11,19
62:11,21 64:2 65:1,6,14
106:3,15,19 107:12,18
127:2 131:1 132:14
134:1 135:6,10 137:1,11
137:12,23,23 138:9,14
139:8,18 142:14 146:16
147:1,3 148:6 150:22
163:23 164:1,3,13,18,19
165:2,22 166:22 167:1,3
167:17 168:8,18 175:13
231:19 232:15
Atlanta
56:11,13 57:7 324:14
Attachment
222:20

attempt
102:17 152:23
attempted
135:14
attempting
59:13
attempts
132:14
attend
22:4,14,16 23:21 24:14
165:7 237:23 271:8
272:7 273:15,20 366:17
attendance
23:12 37:10,12,19
attended
271:17
attending
206:6
attention
61:9 199:18 272:2 287:16
attorney
3:5,12 189:19 262:17
328:22
attributed
73:23
attrition
112:6 210:22 213:17
214:9 228:6,19,21
audibly
8:6
audit
286:10,15 287:3
August
1:18 6:9 275:3 302:8
303:23 304:1 306:14
authority
27:19,21 28:1 52:20,23
53:2
available
109:15 112:17 180:21
185:19
Avenue
3:14 6:8
average
319:10,16 320:5 321:3
aw
89:3
aware
42:8 90:4,12,14 104:7
105:5 116:23 200:10
206:14 224:13 278:2
328:22 334:16,19 357:1
awful
199:6
a.m
6:10 71:17 296:12,12,19
296:20 298:12,12

4:9 5:1
back
77:16 79:6 115:3,7 127:3
129:9 169:18 193:21
252:12 254:15 255:8
265:5 284:11 292:16
313:15 339:23 358:17
361:1
backed
283:17 284:4 285:7
291:20 295:19 339:7,21
340:7
background
60:12 63:17 82:12 161:11
229:19 230:7
backing
284:8,21 297:3
backup
340:4
Bakery
286:4
ball
211:4
bank
94:8 96:13,20,23 99:6
101:11,14,19 102:2,4,11
102:16,19 115:1,6 129:6
238:5,12 262:7 266:2,5
268:15 278:13,21,23
279:17 301:2 369:20
bankers
212:12,13
banking
212:11
bankruptcy
21:20 278:15
bar
133:7
Barbara
270:7
Barber
7:12,14 16:4 49:2,4,13,14
76:9 77:3 86:22 87:21
88:11 89:13 101:1
103:20 109:19 110:14
113:22 118:11 121:18
122:8 124:16 125:10,21
126:16 127:2 128:5
180:11 181:2 184:23
185:1 188:17,21 189:1
192:19 226:1,4 243:6,9
243:17 244:10 245:3,19
246:6 255:22 256:23
258:18 264:20 265:10
270:20 285:7,12 336:12
358:13 362:3 364:17
365:8
Barber's
191:18,21 192:3 246:10
base
261:14 268:1

baseboard
184:9,20
baseboards
184:19
based
30:4,10 57:2 114:23 121:3
121:7,23 141:1 160:15
168:16 172:16 200:7,15
230:11 238:3 250:11
251:21 268:18 279:17
283:18 284:3 287:8
294:17 295:6 300:22
302:1 313:11 314:7
327:23 331:20 333:14
336:6
basic
133:18
basically
91:6 95:17 133:16 144:8
145:7 146:19 148:4
158:22 167:17 171:5
204:16 212:5 215:6
219:8 246:14 257:16
286:5 331:10 335:6
basing
74:23 236:1
basis
179:3 269:9 270:10 284:1
286:22
Bates
289:2
Becky
40:20 41:5,7
becoming
44:9 122:21 249:11
354:10
began
314:17 355:8
beginning
290:7 323:14
behalf
102:11 118:21
behavior
66:18 148:3
belief
139:10 140:3,9 169:11
268:1 269:10 360:16
367:17
believe
31:6 38:10 43:22 44:2
45:15 46:6 48:21,21
57:4,6 59:23 63:12,15
64:20 65:1,3 69:4,9,12
71:6 76:7 78:5 83:6,14
89:22 91:16 92:8,19
99:6 103:19 105:16
114:2,4,7,23 115:4 116:4
118:15 121:2,6,7,11,16,23
122:23 123:18 127:15
128:2,15 129:22 130:9
130:16 131:8 134:3

B

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 98 of 138
JERRY McCARTNEY ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

138:7,15,16 139:6,23
140:5 141:16 144:1
146:11,13 148:2,23
149:8 150:10 151:1,5,7
151:10 159:15 160:6
162:17 165:1 168:11
169:1 170:11 172:20
173:15,22 175:5,8 178:5
178:8 180:9 184:10
186:15 187:5 193:9
194:3,10 195:18,20
196:15,17 206:2,21
210:6 211:7 212:7
213:14 214:5,21 216:9
218:1,6,20,21 220:3
221:7,19 224:18 225:12
226:17 227:10 229:11
230:4 231:2 236:14
245:5 246:11 249:21
250:10 251:20,22
253:18 254:12 257:2,4
257:5 264:22 267:20
268:19 271:9 274:13
275:3 278:12,15 282:7
286:4 287:7 290:15
291:4,21 298:14 299:16
299:21 300:4 301:3,5,11
301:19,23 307:11 312:3
312:9 316:3 325:1,3,4
326:2,5 328:3,5,8
329:14,21,22 330:12
332:14 338:15,20
339:18 340:11,15 346:2
351:17 354:4,7 356:8
356:21 357:16 358:10
359:3,23 360:3,15
363:15 366:16 368:9

**believed**
95:18 99:9
**belly**
200:23
**belong**
129:9
**belongings**
284:20
**benefit**
146:3 170:19 172:23
173:2 302:20 314:4
**benefits**
162:23 166:1 219:11
307:5,12,15 310:20,23
311:4,5,8 312:2,4,8,14
312:20 313:23 314:14,17
**Bert**
11:17 97:6,22,22 98:4
100:14,22 108:12,17,18
111:22 118:11,12 130:14
144:17 159:18 161:21
162:9,10 165:3,8,14,19
166:7 169:20 173:4
174:14 177:21 194:2

195:21,22 201:16 204:7
204:10 205:23 208:5
230:19,20 235:17
253:16 255:15 329:9,13
336:20,23 337:14
**best**
14:20 164:19 180:15
254:23 264:15 286:17
319:17 323:20 329:23
337:3 359:9
**better**
40:8 61:16 91:5 163:18
167:18 168:19 169:12
170:20,21,22 181:10,21
182:9 183:3,9 251:1
304:16
**beverage**
50:20 122:13 220:1
229:14,17 279:21 336:7
353:15 355:9
**beverages**
30:9,14 31:4,10,13 32:4
32:15 33:8,17 35:13
36:1 37:23 38:2 45:7
123:16 240:8 278:6
279:19 303:17 304:20
304:23 305:3,22 306:3
355:13
**beyond**
238:11
**big**
111:14 117:22 170:19
**biggest**
238:18
**Bill**
47:23 48:3,13 49:3
117:21 156:23 157:2,12
157:18 158:3,14 162:15
185:4 186:4,9,13,23
187:1,9,12 188:19 189:7
189:14,17,22 190:5
191:13 225:13,22 226:4
233:12,13,15,16 234:1
235:21,23 236:5,8,8
237:1,4,9 238:2,13
243:11 245:23 246:4
248:3 330:8,10 346:20
364:13
**Birmingham**
3:15 332:5
**birth**
16:9
**bit**
193:6 355:13
**biweekly**
307:19
**black**
66:22 230:2
**Blackmore**
220:21 221:10 222:10,14
222:15 223:11

**Blackmore/Pepsi**
333:23
**blacks**
198:10 199:11
**blank**
341:13 342:6
**Bleier**
234:12 235:19 240:2
243:6,9
**blurted**
195:1
**board**
40:13 48:4 65:22 69:5
127:2 157:19 158:4,15
162:16 218:22 231:2
232:14 234:22 236:8
238:20
**Bob**
11:20,23 12:17,18 13:13
14:6 15:5 33:22,23
34:3,6 38:13 39:2,18
100:23 111:10,12 118:8
118:10 130:15 178:14,17
193:8 194:3,5,18 195:1
196:2,6,10 197:22 198:1
198:4 199:17,18 200:18
201:6,13,20 205:22
230:18 242:5 253:20
255:15 278:8 279:11
281:3 282:1,19 283:1
325:1 329:5 333:8
334:10,16,22 335:12,12
335:14 337:22 344:23
**Bob's**
15:1
**bold**
328:15
**bonus**
141:16 142:1
**booted**
204:1
**boss**
33:20 34:9 47:6,8,17,22
48:5,14,17,20,23 49:5
49:11,15 315:19
**bother**
279:5 323:21
**bottling**
32:1
**bottom**
177:23 242:4 275:21
341:22
**bottom-line**
177:15
**bought**
55:15 174:18
**Box**
3:7
**Boykin**
117:21 185:4 186:4,9,23
187:1,9,12 188:19
**budget**

189:14,17,22 191:13
246:4 248:3 330:8,10
364:13
**Bradley**
3:13
**brand**
326:3,5,11
**break**
9:6,8 68:13 71:15,16,19
150:15,18 207:7,9,12
**breaking**
207:6
**breeding**
204:17 205:3,5 208:23
213:4,6 215:17
**Brenda**
16:1 72:11,18 73:4 74:4,8
74:19 75:4,5 84:12,16
84:20 85:8 86:2,18
87:10,14,17 88:1,3 101:2
105:22 111:2 113:21
114:3,7,15 115:15 117:2
117:8 118:7,19 119:3,16
121:17 122:6 123:1
126:16 128:4,8 130:16
153:9,10,12 154:2 192:6
194:3 196:4 199:1,4
201:10 206:1 219:2
252:4,20 254:11 255:5
257:11 258:1,11 263:15
264:7 276:13 325:2
346:21 357:1 358:11
**briefcase**
256:16 339:9 351:6
**bring**
189:16 202:21 212:16
292:1 357:17
**bringing**
295:3 365:9
**Brittany**
19:6,8
**broke**
306:5
**brother**
16:18 17:9
**brought**
56:11,13,23 61:2 122:9
129:5 135:18 153:8
167:4 214:20 229:12
231:2 232:5,13 243:5
261:18 331:3 336:3,5
362:3 364:22
**browsing**
297:18
**Brundidge**
51:2 71:6,7 118:4 120:22
127:7,15,16,21 194:12,15
225:5,8,11 226:7
233:21 234:14,16,17
240:6,11 243:7

140:20,23 141:4,8 144:12
**budgets**
132:20,21
**building**
88:13 110:18 132:10
268:5 331:1
**bully**
12:13
**bunch**
167:20 195:3 198:5
351:20,22
**Bush**
3:18 301:15 346:8
**business**
23:7 55:5 59:6 70:10
86:12 108:19,21,23
109:5 152:21 159:22
165:23 166:5,9 167:6
172:1,3 174:4 177:13
202:23 212:14,17 216:8
216:14,17 219:11 224:15
229:15 303:1 309:13,16
354:20,23 358:16
362:11,21 363:1,2 369:6
**businesses**
224:16
**buttoned**
211:3 237:15
**buy**
55:20 109:3,16 175:4
**buyers**
278:18 279:16
**buzzes**
163:17

## C

**c**
3:1 371:1,1
**Caitlin**
19:6,6,10
**calendar**
299:5
**call**
8:10 85:1 90:20 91:8,10
95:14 96:6 97:10 101:11
103:3 124:23 126:18
187:21,22 188:9 189:13
189:22 190:5,9,11 244:9
245:23 252:8,20 253:1
253:5,8,13,16 254:3,6,7
254:10 255:2 258:23
278:8,11 279:10,14
280:7 291:3 311:10
324:15,20 328:4,8
330:18,18
**called**
.96:20 109:4 160:12
171:18,21 173:13 187:23
188:1,2,5 190:13 211:19
211:21 238:5 252:4

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 99 of 138

JERRY Pat MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

283:18 291:11 328:6
358:13 364:18
calling
99:16 126:23 255:3
258:17 358:11
calls
270:19 303:3
campaign
303:2
campus
353:6
cancer
356:11 357:10
candidates
66:5 221:16
cannon
85:21
capabilities
134:21 137:14 203:4,10
353:22
capability
91:2 144:5 217:21
capacity
123:17 359:7 365:13
capital
1:10 90:16 130:10 131:11
131:17,22 142:14,23
143:15 145:2,18 146:17
147:4 168:5 237:21
300:12
capitalists
42:14
carbonated
31:15,18 32:4,10 264:22
card
55:5 362:12,21 363:1
care
152:8,9 208:4 239:9
245:9 247:12 248:7,12
248:22 265:4 358:16
Carl
234:12 235:19 240:2
243:6,7,9
Carmichael
363:17
Carpedia
285:13,15 290:8 291:7
carry
98:20 101:21
carrying
315:4
case
14:21 108:21 120:13 125:1
189:20 190:20 191:14
329:2 330:8 333:5,11
337:3 340:12
cases
89:5,10 109:5 328:23
cash
40:13,14 98:10 160:22
catch

79:2
Caucasian
233:8 234:20 235:7
236:9
Caucasians
69:14 108:7 146:12
322:18,21 323:1,4,8
caught
174:16 228:1 264:10
cause
6:11 111:4 356:6 371:20
CD
283:16 289:15,17 290:5
291:17,20 293:4,21
294:14,19 295:17 297:11
298:22,22 299:2,7,9
339:17 351:5
CDs
339:13 349:21
cease
275:1
ceased
274:23 302:1
cell
252:5 253:8 256:14
cement
78:20 81:17,20 82:20
88:19
CEO
40:2,22
certain
78:8,9 160:17
certainly
112:22 113:1 166:13
certificate
24:3,6 25:1
certificates
25:3
certification
24:10 216:13
Certified
25:6
certify
6:4 371:7,16
CFO
41:4 278:5
chain
26:23 27:3,11 29:8,11
38:17 43:13,18,20 44:8
44:15 225:11 246:19
chair
193:18 252:12 255:7
361:9
challenges
237:22 238:18 272:1
Chamber
302:22
chance
212:6,8 222:5 288:11
294:8 296:7
change

99:8 102:17 123:11,12
238:6 240:21 272:5
325:20
changed
40:5 327:1
change-over
271:23
changing
190:15 215:11
charge
21:22 22:2 33:6 44:23
275:12 276:3,7 341:16
343:21 366:20
cheap
195:3
check
110:20 266:15,23 267:8
268:2,4,16 359:7
checkbook
266:16
checked
277:15
checks
110:17 265:20,23 266:1,2
266:4,6,9,20 267:11
268:5
chest
250:22
Chicago
127:4 138:23
children
19:1 363:21
children's
363:22
chimed
213:15,22
choice
80:18,22 237:18 240:14
chose
38:19
Chris
7:8 15:14 34:11,12 46:5
46:19 47:10,17,21 48:15
48:16,19 54:14,20 60:15
60:17 61:7 67:9,19
72:19 74:6,20 84:3
96:3 97:7,17,19 99:11
100:6,13 101:1 111:20
114:22 119:19 125:4
128:21 130:13 138:21,22
139:17 148:16 149:5
150:21 154:5,18,22
162:5,19 163:9,12,21
164:12,18 168:12,14,16
172:8 175:6,9,18 191:17
193:14 195:9,16 198:15
200:19 202:8 203:12,15
203:19 204:12,20 205:9
205:13 206:7 207:14,21
208:10 209:3,6,17,21
210:11 211:7,11,15 213:8

213:11,18,21,22 214:11
217:2 218:20,21,23
225:5,21 226:20 227:2
227:5 228:3,14 233:4
233:10,13,17 235:22
236:6 237:2,7 238:8,13
239:15,18,19,20 240:16
243:3,18 245:1 247:2
255:23 256:22 257:6
259:1,13,21,23 261:10
262:2 263:5 264:14
278:16 279:1 280:12
299:16 300:17,21 301:6
322:17 325:4 340:18
chuckle
111:15 195:10,12 200:21
200:22 201:2
chuckled
198:12
chuckling
201:7,11,14
church
320:1
circumstances
72:9 260:8,12,20 265:8
CIRM
25:7
City
237:21
Civil
1:5 6:6
claim
22:1 128:19 131:13 142:10
147:21 148:9 177:9
180:4 222:21 246:21
247:2 277:5 313:19
316:17 327:6 328:2
337:1
claimed
249:5
claiming
105:8 249:10
claims
78:5 150:7 158:9 201:21
330:3 336:20 338:16
339:3 340:11,16 347:4
347:15 350:8,13,17
351:12
Clarence
66:15 68:17
Clarence's
66:21
Clarice
242:15,18
classification
219:11
cleanliness
286:11
clear
99:1 110:9 112:14 116:7,13
127:9 154:15 156:15

159:2,5 160:7 164:8
172:15 173:2,3,4 182:12
182:13 183:13,13,20
184:1 185:18 195:16
229:20 229:23 231:19
249:15 255:9 260:22
275:4 278:14
clearly
102:9 111:22 140:23 171:2
217:9 220:16 260:16
268:15 316:22,23
clench
10:19
client
179:21
clients
82:16
Clinton
22:6,13 25:21,23
close
99:2 118:16 171:14 182:11
211:22 363:22
closed
127:16 226:8 233:23
closer
79:15
Club
237:21
Clyde
72:6,7,21 73:8,11 200:8
200:10,14 330:13,14
Coast
31:17 35:1
coat
181:11,22
code
133:7 267:17
cold
352:18
colleague
264:19
collect
284:19
collectively
175:11
college
22:14,16,17 23:13,17,19,22
24:15 64:19
color
110:6,6 182:8,8,17,19
183:2,3,8,8 193:1
come
31:9 38:19 39:4 61:8
68:9 88:13 114:15 127:17
138:1 156:8,19 157:19
180:18 188:7 193:20
212:5 218:19,22 236:21
252:5 321:1 324:3
comes
48:4 58:4 60:22 63:1
64:3 68:10 73:4 79:6

115:16 158:14 181:2
coming
50:6 96:12 179:19 235:22
236:14 238:19,20 239:1
266:5 360:4
commencing
6:9
commensurate
120:14
comment
73:9,22 74:18 75:13
111:13,16 149:5 185:9
186:5 196:11 199:16,23
200:16,16,18 207:21
209:18 328:21
commented
164:17
comments
72:13 148:19 183:19
185:2 197:22 198:1
199:10 204:8 213:9
Commerce
338:5
Commerce's
302:22
Commissioner
6:4 371:23
commissioning
79:9
committed
54:18 327:16
commodities
29:13,14
common
152:2 312:22 355:21
communication
179:2
communications
105:2
companies
224:22 302:20,23 327:19
368:7,17
company
21:17 25:21 26:21 39:10
40:5 42:9,10 47:12
48:7 55:10,16,21 56:15
59:13 62:3,19 64:8
101:9 102:1 112:3 118:21
134:16 159:4 163:2
171:16 173:1 185:22
199:7 202:15 212:18
215:19 221:7 223:20
224:6 228:23 235:10
237:22 274:22 275:1
278:20 279:21 280:2
285:15 300:12 308:20
308:21 330:23 336:8
354:4 369:7
company's
104:14 177:23 251:12
269:7 323:18

company-assigned
270:17
Compaq
26:22 29:4,19
compensation
116:21 121:21 306:12
compete
353:20
competed
353:21 355:5
competitively
353:14
competitors
353:17
complain
84:3,6,9,12,15 154:2,5
155:12,16
complaining
145:1,6 276:8 323:16
complaint
154:8
complete
23:2
completely
90:11 108:7,9 169:16
263:9
compliance
2:13
complicated
313:10
composite
292:22
compressed
299:1
compressing
298:21
computer
26:22 110:13 161:23
270:17,18 361:9,13,17
361:20
computerized
179:4
computers
27:14 294:17
concentrate
186:22
concern
137:12 347:17 355:23
concerns
353:3
concluded
86:12 370:1
concur
335:17
concurred
149:9
concurring
149:10
condiments
45:8 194:7 219:23 355:12
355:14

condition
11:11 39:10 40:4 185:21
conduct
37:13 61:13,16 62:4
conducted
36:22 73:19 271:2 272:15
conducting
270:14 361:11
conference
97:10 130:23 193:11
205:17 214:23 215:1
216:4 217:11 325:5
confidence
257:22 258:4
confidential
350:22 351:3,5
confidentiality
348:11 350:19 353:10
356:6
confused
85:11 197:20
connection
21:23 190:17
consider
117:17 118:5 141:3
considered
123:8 140:21 355:21
considering
207:2 237:6
consistency
327:9
consistent
252:14 255:11 273:9
327:13 328:12
consultant
55:2 110:16 131:6 136:13
136:15 265:11 267:22
269:11 362:2,10 364:15
364:22 365:10 367:12
consultants
56:23 135:17,21 136:3,6
137:1,10,11 138:1 265:21
269:4 365:13,17
consulted
300:18 301:6,10,11
consulting
56:17 58:4 59:17,19 60:6
81:2 232:4 285:15
362:8 363:2
consume
297:6
consumer
212:15 315:15
contact
171:17,20 173:12 174:21
176:17 177:4 178:11
259:1,6,10 279:2
contacted
38:13,21 39:3,16 189:18
192:10,14 286:16 309:12
350:12

contacts
176:11 178:20
contain
78:4 216:6
content
179:22
contention
127:10 149:4
context
232:3
continually
347:19
continue
101:21 112:15,23 124:2
125:8 126:5 159:6
237:7 241:1
continued
144:1 204:9 208:5 213:3
245:23
continuing
5:1 98:20
continuous
360:10
contract
116:20
contractor
331:7 362:15,16
contracts
32:20 39:13 40:10 194:20
contradicted
263:9
contributing
163:4
contribution
240:9 307:14 311:18
contributions
126:3 313:7
control
24:13 26:20 27:2 51:2
101:10 134:21 142:2
229:18 230:9 233:9
236:11 344:21 346:1
controller
41:9
controls
133:4
conversation
15:1,14,18,21 16:1,4
174:22 183:3 186:9
188:13,15,17,20,23
189:7 191:4 192:19
228:11 230:17 330:10
conversations
252:19
COO
40:2,22 48:6 234:3
369:19
copied
282:11,14,17 291:10 293:8
297:21
copies

contacts
338:20
coplaintiff
34:1
coplaintiffs
173:7 329:20 333:2
copy
46:21 58:11,14 78:15
219:17 257:18,19,23
262:15 263:3,17 283:15
284:22 338:18 340:20
copying
289:3,6,6,14,15,20 290:10
293:4,5 297:15,18,21
299:8
core
303:1
corporation
26:10,14,16,22 27:13,16
28:11,15 29:5,22 30:4,7
77:12,15 220:23 309:11
368:15
correct
15:15,16,19,22 28:22 42:2
60:5,6 64:4 71:22
75:13,14 76:15,23 78:15
94:4 95:6 103:3,4,9
105:12 115:18 120:7,8
120:15 121:18,22 122:18
127:22 130:3,4 137:21
138:11 142:6,19 143:16
145:13,20 146:1 147:16
147:19 149:22,23 150:3
153:13 157:14 159:23
163:8 165:11,18 168:23
174:5,6,14 192:16
200:11 201:8,12,15,18
208:15,16 212:2 214:14
214:15 223:20 241:19
242:2,13 246:8 251:20
260:5 261:21 268:7,8,9
268:11 275:13 276:9,13
289:14 292:9 293:14
300:9 318:4 327:3,4
342:11 371:13
correctly
44:3 65:4
correspondence
269:5
corridor
230:21
corruption
283:22
cost
46:14 108:15 136:1 143:19
162:22 163:17 172:5
173:16 177:15
costs
32:20 161:17 173:21
counsel
2:5,17,19 6:7 348:16
371:17

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 101 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

counseling
321:21
counselor
319:6
count
125:2 132:22 134:9
counts
141:9,21
COUNTY
371:5
couple
48:21 135:20 231:1
233:22 288:14
course
25:9,11 116:8 260:9,17,20
courses
24:23 64:19,19,21
court
1:1,22 2:7,14 6:1 14:16,21
21:9 202:22 335:20
courting
91:4
cover
271:15
coverage
307:10 312:15 315:3
351:4
covered
78:1 272:13,21 274:9
351:17 356:22 361:6
367:3
CPIM
24:7,8
CQE
25:4
crack
82:19
cracked
78:21
crackers
323:9,11 324:15,19
Craft
286:8
crap
196:14
crash
283:22
create
170:22
created
229:13,14,20 243:10
291:2
creating
207:2
credibility
107:22 135:9,10 138:10
139:2,7,11,23 140:4,10
140:14,18 144:3,6 145:8
146:14 148:5 149:11
158:22 171:6 172:11
Credit

315:16,18
credits
23:9 25:6
criminal
327:16,21
critical
237:21 280:8,12,15,18
criticize
251:6,11
Crohn's
188:11
Crosby
74:18 117:20 128:15
Crosby's
75:10 242:16,18
cross
34:18,20,21,22,23 261:1,3
261:7
Crowley
34:11,12
current
95:21 120:14
currently
9:8 10:23 11:7 25:10
310:18 315:20
curriculum
25:8
curve
168:1
customer
39:13 40:10 46:15 85:13
176:22,23 177:17,18
179:2,10 217:12 219:9
219:21,22,23 220:2,6
238:19
customers
40:12 42:18 83:7 88:23
91:3 96:12 98:6,8
174:23 176:12,18 178:11
178:17,22 194:21 202:11
202:21 215:12,13 216:14
230:4 286:7 334:13
353:22
customer's
217:13
cut
105:21 106:7 113:5,7,11,14
113:19 114:20 115:18
116:7,13,18 117:9,13
118:14 119:5,17 121:16
126:13 127:11 128:2
129:16,19 213:18,21
250:5,20 251:2,4
cutbacks
105:3
cuts
103:13
cutting
103:7 342:7
C's
323:23 324:2

|   D   |

D
4:1
dad
354:16
daily
77:20 179:3 270:10
272:6
damages
316:13
dance
152:8
Daniel
53:11,18,19 54:4,7 57:16
57:19 60:1,9 61:9 62:1
62:12 63:2,7,13 64:4,6
65:21 66:10 68:17
151:11 232:16
Daniels
97:9 108:4 126:21 130:13
131:20 135:1 138:12
140:6 148:1,2,10,12
152:11 153:11,14,19
155:2,13,17,21 156:3
157:3,13 158:7,18
159:11 162:19 163:10
164:16 172:9 175:6,10
175:19 193:20 198:22
200:20 202:16 215:4
Daniel's
61:17 65:15
darn
182:11
Darren
118:3
data
179:5 283:21
date
6:4 16:9 55:23 210:2,3
257:17 304:2 339:8,19
340:6,7 357:19 358:1
dated
92:5 119:21 241:21 283:8
288:23
dates
24:1
daughter
19:7
daughters
20:1
day
7:8 13:15 15:14 46:5,19
47:10,17,21 48:15,16,19
51:15 54:14,20 60:15,17
61:7 67:9,19 72:19 73:1
74:6 78:22 79:3,7 84:3
84:17,21 85:15 87:1,22
87:23 88:18 95:2 96:3
97:8,17,19 99:11 100:6
100:13 101:1 109:17

110:17,22 114:22 117:12
119:19 120:18 125:4
128:22 130:13,22 138:21
138:22 139:17 148:16
150:22 154:5 162:5,19
163:10,12,21 164:12
172:8 175:9,18 191:17
193:12,14 197:18,19
198:16 200:20 202:8
203:12,15,19 204:12,20
205:9,14,16 207:14,21
208:10 209:3,10,18,21
210:11 211:7,12,15 213:8
213:11 214:11,22 215:2
217:2 225:5,21 226:21
227:2,5 228:3,14 233:4
233:17 235:14 236:6
237:7 238:8 239:10,15
243:18 245:1 247:3
248:20 250:19 251:6
255:23 256:17,22 257:1
257:3,3,10 259:2,23
261:10 262:2 263:5
264:14 269:14 270:21
271:21 272:1 276:18
278:16 279:1 280:12
291:21 292:8 295:19
296:22 298:16 299:16
300:17,21 301:6 312:6
322:17 337:3 340:18
358:21 360:15
days
94:19 116:11 171:13 176:3
176:5 187:15,17 189:15
209:6,16 210:9 321:11
356:22 357:13 358:6
360:8,10
Day's
111:20 149:5
deal
362:1
death
269:20 359:22 360:13,14
debt
39:12 42:15 90:2,9,22
91:5 95:19
decide
39:8 327:5
decided
39:6 90:19 91:8 101:11
102:4 189:19 238:6
243:15
decision
28:19 36:14 37:2 54:9,11
57:16 58:2 61:12 64:5
69:20 72:20 74:9,20
91:10 95:14 96:5,8,23
99:7,10 102:10 103:2
136:19 146:11 148:17
149:2,5 168:9,21 169:1
170:12 171:22 175:2,4

175:14 200:14 235:16,19
236:5 300:16,19 301:7
decisions
301:3
declared
23:4,6
decrease
121:10 239:13
deemed
224:12
DEFENDANT
3:10
Defendants
1:11
Defendant's
4:11,12,13,14,15,16,17,18,19
4:20,21,22,23 5:4,5,6,7
91:19,23 92:20 93:16
93:20 95:5 119:7,11
121:5 221:20 222:1,6,18
223:4 241:5 247:19
259:14,18,22 262:3
275:15,19 276:1 281:14
281:18 287:19,23
288:12 291:15 292:3,7
292:20 293:3,20,23
294:4,5,9,12 295:23
296:4,8,14,17,23 297:9
297:22 298:3,8,18
334:4 340:23 341:4
342:15,19 343:4,8
344:6 345:17 346:10,14
346:17 347:3 348:3,7
degree
23:10 354:11
delete
340:1
deleting
288:15 297:5,18
deliver
37:3 54:6 74:12
delivery
34:18 35:5,7 46:16
Delta
311:2
demonstrating
148:3
demoralized
318:9
demoted
83:20
demotivated
318:9,11
denied
72:14 73:12 168:6
dental
307:7,18,22 311:3,5
312:17
department
50:1 52:7 55:8 57:13
60:7 62:3,18 65:8,10

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 102 of 138

JERRY MACCARTNEY
August 17, 2007

66:19 68:3,6 117:20
131:18,23 132:3,6
142:23 145:13,23 164:7
166:11,13 268:6 270:15
271:13 272:9,14,23
273:14 299:3 341:16

**departments**
124:22 126:6

**department's**
142:13 146:3 162:12

**departs**
346:9

**departure**
72:10 74:16 189:16
225:13 302:15 314:21

**depending**
11:4

**DEPONENT**
370:3

**deposition**
1:15 2:5,10,11,22 7:17
11:18,21 12:1 13:19 92:1
92:21 93:21 112:16
119:12 222:2 241:9
259:19 275:20 281:19
288:1 292:8 296:5
298:4 301:16 334:6
341:5 342:20 346:9
348:8 366:6 369:23
371:8,14

**depositions**
2:15 13:22

**depressed**
317:6 318:3,7

**depression**
318:16 322:12

**derogatory**
322:18,19,21 323:1

**describe**
82:14 316:16 317:2 318:6
319:21

**described**
155:22 241:4 299:15,20
300:3

**description**
343:19

**designed**
160:14,19 161:6,8 179:23

**desire**
223:18

**desk**
110:13 270:17 284:7,18
361:16

**desktop**
287:18 289:9

**despicable**
199:14

**despondency**
321:14 322:12

**despondent**
317:7 321:9

**detail**
13:4 105:19

**detailed**
77:23

**details**
14:13 99:2,2 231:20
232:6 313:9,17

**detail-oriented**
61:5

**developed**
217:15

**developing**
356:6

**development**
212:14 229:15,17

**device**
293:13 294:14 297:12

**devices**
133:7,7

**devoted**
167:8,12

**devotion**
244:18

**diagnosed**
357:10

**diary**
177:3

**dictated**
121:21

**died**
360:2

**difference**
12:15 32:7 44:4 266:3

**different**
27:1 31:22,23 92:14 94:11
96:13 98:11 116:10
123:17,21 159:3 178:16
178:16 222:15 233:11
287:7 341:12 351:22

**differently**
105:9,16 121:12 129:23
150:10 151:8 159:16
299:17,22 300:5

**difficult**
154:17 156:6

**difficulty**
86:2

**Digital**
26:9,14,15 27:12,16 28:11
28:14 29:3,5,19,21 30:3
30:7 31:11 368:15

**diminished**
140:10,13,18 144:5

**direct**
34:17 35:4,6 200:16
226:9 302:19 303:2

**direction**
70:3 246:1 292:18 293:8
367:9

**directions**
367:7

**directive**
285:6

**directly**
36:2,4,8,13 37:6 48:7,10
52:16 141:15 165:8
200:12 225:23 248:4
256:1 274:7 353:21
355:5

**director**
41:23 43:10,13,14,18,20,21
44:13,15,17 45:20,23
47:6,18 49:1,6,19 50:15
51:12 52:9,13,19 53:6
66:11 67:2 68:19 70:14
71:3,21 75:17,19 76:17
76:22 120:7 122:7,17
123:2,6,22 124:1,11,21
125:14 127:11,17 132:3
206:4 209:11 239:16
243:19 244:8,13 245:16
245:20 246:6,15,22
248:17 249:4 305:8

**dirt**
195:3

**disagree**
62:11 137:5

**disagreed**
72:16 137:3 167:19

**disappointed**
260:4

**disbelief**
196:13

**disburse**
110:18 268:6

**disciplinary**
140:22 141:5

**discipline**
27:23 53:3 64:14,17 76:4

**disciplined**
75:20 76:21 77:2 140:16

**disclosed**
350:22

**Disclosure**
349:13

**Disclosures**
349:16

**discovery**
348:15,17

**discriminated**
107:21 180:9 244:22
249:23 328:18

**discrimination**
111:9 128:19 131:14 138:8
142:10 146:12 147:22
148:10 150:7 158:9
177:9 180:5 199:8
222:22 316:19 317:5
327:22 331:11 332:19
338:15 347:4

**discriminatory**
121:8 148:3 149:7,13

**discuss**
87:20 92:23 118:23 119:4
130:10 237:21 279:8
280:4 333:5 362:17

**discussed**
12:19 72:19 74:5 93:9
94:7,15 97:1 104:14
115:15 143:10 151:2
154:7 162:21 163:9
169:22 170:8 174:8,15
188:10 217:7 220:23
221:3 223:18 274:13
278:16,17 279:13
282:23 328:11 333:3
334:3 335:6 336:2,14
337:6 347:9

**discusses**
223:13

**discussing**
93:2 152:20 154:10
336:16 367:1

**discussion**
13:13 14:6 15:2,5 79:8
86:13 89:13 114:5 129:5
142:17 143:14 152:3,4
154:9 177:1 186:21,23
187:9,12 194:14 196:21
197:7,14 211:11 214:6
225:12 228:14 239:3
328:10 365:8

**discussions**
103:1,6,16,19 104:3,8,10
105:6 117:8 224:19
230:14 278:3 280:20
281:3 333:8,10,20
334:10,22 335:14,23
336:15,18,19

**disease**
188:11

**disk**
283:16,18 284:5,6,12,16
284:22 285:1 291:17
293:21 294:13,19
295:12,17,19 297:11
339:17

**disks**
339:13

**dismissed**
36:10 200:2

**disparity**
261:15

**displayed**
100:2

**distance**
322:13

**distant**
317:7 321:9

**distress**
316:14,17 317:3 322:4

**distribute**
31:14 33:13

**distributed**
29:20 32:18 33:9 94:23

**distribution**
33:7

**DISTRICT**
1:1,2

**divided**
37:12 68:1,4

**division**
1:3 12:14 123:17 194:7
225:18

**docked**
83:23

**docks**
34:19,21,22,23

**doctor**
10:18 318:22

**document**
92:2,4,5,6,18 119:12
166:4,8 178:17 222:3
241:10,11,16 247:16
281:20 288:5,23 290:13
292:21 293:1 294:7
296:6 297:14 298:6
341:10 342:21,22 344:6
345:13,21,23 346:3,6,15
346:16 351:20,21 352:5
358:4

**documentation**
179:16

**documented**
166:6

**documenting**
108:20 178:18

**documents**
314:5 338:14,20 341:11,12
343:2 349:10 350:7,19
351:23 365:22

**doing**
8:7 107:10 127:11 129:6
135:7 137:13 153:3
158:11 172:7 184:8,18
188:11 201:17 216:17
245:16 252:13,15
255:13,14 270:13 271:6
275:8 282:8 296:11,18
296:21 315:13 316:23
328:13 337:5 366:6

**dollar**
108:22 109:3 144:11
171:22 310:11

**dollars**
43:8 45:19 108:16,17
115:2 135:21 139:20
160:23 170:18 173:17
304:10 305:11 306:9

**Don**
245:23 246:4 248:2

**Donnelly**
233:18

**door**

JERRY MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

108:1 185:3 317:14
**download**
288:18 291:8 297:8
**downloaded**
285:4,8,20 286:23
**downloading**
286:19 291:16
**downtime**
161:14,16 162:11 163:3
**dozen**
151:22
**Dozens**
303:7,10
**drafted**
341:17,19 342:13
**drawing**
265:16
**drill**
112:10
**drinks**
31:15,19 32:10
**drive**
19:13,18 194:12 285:5,9,9
285:22 287:1,5,6
288:17,20 289:16,21
290:10,11,12,16,19,20,23
291:5,6,13,14,23 292:2
292:15 293:9,10,12
295:12
**driver**
70:16
**drivers**
53:13
**drives**
287:8
**drop**
137:8 260:3
**dropped**
10:5 89:9 198:14 326:21
**due**
68:23 95:17 257:22
357:14
**duly**
6:16
**duties**
44:14 49:18 60:10 65:15
67:14,21,23 68:4 110:19
123:12 124:3,12 125:6
125:14,21 126:11,11,13
127:12,13,18 237:8
243:5 244:13 245:3,15
245:20 246:7,10 275:8
345:1 366:1

---

**E**

E
3:1,1 4:1,9 5:1 294:19
295:12 371:1,1
**earlier**
144:11 158:1 181:13 202:1

218:14 244:20 249:19
264:7 276:16 334:3
366:6 367:2
**early**
23:23 24:17 38:8 55:23
206:5 347:16
**earnings**
265:11,14
**ears**
159:8
**easier**
8:8,16
**East**
31:16 35:1
**echoed**
148:21 325:13 326:18
**Eddie**
74:18,19 75:9,10 117:20
128:15
**education**
23:14 24:19 63:17 64:1,13
**educational**
60:12
**Edwards**
53:11,18,19 54:4,7 57:16
57:19 60:2 61:9 62:1,13
63:2,7,13 64:4,6 65:21
66:10 68:17 232:16
**EEOC**
21:22 22:1 189:20 275:13
276:4,7 328:2 337:1
**effect**
2:12 197:8
**effective**
257:17 342:1
**effects**
9:17
**efficiencies**
364:16
**efficiency**
69:1 137:16 285:16
**efforts**
93:3 141:23 282:21 344:2
**eight**
69:9,11,20 70:22 71:10
90:10 108:16 319:11,12
321:2 356:22
**eighty**
304:10 306:9 307:19
**eighty-five**
35:11 306:20 308:10,14
**either**
40:22 75:21 76:21 95:9
108:16 113:21 193:15,22
196:1 197:18 200:20
211:18 229:1 230:18
243:17 270:6 274:5
293:8 325:16
**elderly**
67:5
**electives**

23:11
**electronic**
338:17
**electronically**
58:17 263:4 339:1,5
340:10 350:7
**Eleven**
18:20 19:9
**eliminate**
28:19 69:20 71:2
**eliminated**
28:16 37:23 68:23 69:3,8
70:5,23 71:11 125:5,12
125:17,19 126:1,1,12
231:7 238:15 239:17
240:13 242:6,9,12,16
243:20 245:2 246:23
247:4,13 250:4
**embarrassed**
82:17,22
**emotional**
316:14,17 317:3 322:4
**employed**
17:3,19 310:5
**employee**
46:17 54:22 55:4,6 65:6
66:19 72:13 73:8 85:16
110:16 184:9,14 185:12
192:14 202:18 234:9,10
237:8,9 267:17,19,21
260:20,23 269:11 356:2
**employees**
35:16 36:20 37:3 52:12
53:3,6,14,17 68:2,5
104:6 118:23 128:1
202:14,17 216:5 233:8
234:21 235:7 236:10
250:15 251:13 261:17,18
265:18 353:11,23
355:16
**employee's**
28:6 37:16
**employer**
315:5
**employment**
25:15 28:6,10,14 29:1
35:20,23 37:6,17 66:12
139:5,13 140:8 143:23
158:19 159:12 260:5
262:13 300:16,20 301:8
312:6 353:4 368:4
**encompassed**
132:5
**encompasses**
44:14
**encompassing**
44:11
**endured**
317:4
**engaging**
76:8 156:20

**engineering**
167:23 362:16 365:5
**engineers**
77:11,13
**England**
31:16 35:1
**enhanced**
220:4
**enjoy**
61:3
**enrollment**
25:13
**entail**
343:23 345:10
**entered**
179:3
**entering**
42:7
**enterprise**
216:8,18 369:7
**enters**
39:21 301:16
**entertaining**
278:18 279:16
**entice**
216:14
**entire**
18:21 38:16 49:15 77:22
167:7 355:7 358:9
**entitled**
352:5
**entity**
281:5 309:4
**envelope**
267:3,5 268:8,13
**envelopes**
266:10 267:10
**equally**
117:13 121:14
**equipment**
26:9,14,16 27:12,16 28:11
28:15 29:3,5,22 30:3,7
160:16 161:7,9 272:2
368:15
**erasing**
288:19
**ERP**
59:4
**escrow**
313:11,14
**especially**
85:12 88:23 327:18
**et**
1:7,10
**Eugene**
273:3,17
**evaluated**
168:20
**evaluation**
169:13 365:19
**event**

101:13 161:16,17 283:21
**events**
13:5 96:10,13,17,21 98:11
98:14 115:5 118:17
143:17 236:2,23 237:3
360:9
**eventually**
39:20
**everybody**
117:13 176:6,8 199:17
214:20 215:5 217:1
318:12,13 326:18
**everybody's**
287:8
**evidence**
2:23 138:8 333:13,14,15
333:19
**evidenced**
146:11
**exact**
24:1 31:21 51:7 55:14,23
102:6 122:11 232:10
236:22 304:2
**exactly**
50:23 81:9 181:18 182:10
184:11 204:11 269:14
287:13 295:1 300:13
303:8 323:19
**examination**
4:3 6:11 7:1 353:1
**examined**
6:16
**Examining**
92:4 222:3 241:10 281:20
288:5 292:21 293:1
294:7 296:6 297:13
298:6 341:10 342:21
346:16
**example**
46:17
**excellent**
237:16
**exception**
127:14 338:18,21 345:20
**exchange**
236:3
**excluding**
219:1,2
**Excuse**
56:6 250:1
**execute**
87:4,6
**executed**
124:6
**exemplary**
46:13,17 85:15
**exhibit**
4:11,12,13,14,15,16,17,18,19
4:20,21,22,23 5:4,5,6,7
91:20,23 92:20 93:17
93:20 95:5 119:8,11

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MACCARTNEY, ET AL v.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 104 of 138

JERRY MACCARTNEY
August 17, 2007

121:5 221:21 222:1,6,19
223:4 239:2 241:6,9
247:17,20 259:15,18,22
262:3 275:16,19 276:1
281:15,18 287:20,23
288:12 291:15 292:4,7
292:20,22 293:3,20
294:1,4,6,9,13 296:1,4,8
296:15,17,23 297:9,14
297:23 298:3,8,19
334:4 336:14 340:19
341:1,4 342:16,19 343:4
343:9 344:7 345:17
346:11,14,18 347:3
348:4,7

**exhibits**
361:14

**existed**
169:12

**existence**
331:19

**existing**
68:1

**expanding**
309:13

**expansion**
42:16

**expected**
137:17 209:9 272:4

**expecting**
273:9

**expenditures**
90:16

**expensive**
163:20 167:20 311:10

**experience**
151:17 212:14 229:17,18
229:22 336:6 365:18
366:2 367:13,14

**experiencing**
318:19

**expert**
106:3,16 107:13 135:7
146:21 159:1 171:6

**experts**
136:23 137:7,9,10,18
152:7,18

**expired**
25:4

**explain**
46:10 135:3 214:7,10

**explained**
85:10 86:15,16 282:16

**explaining**
343:22

**explanation**
361:22

**express**
363:23

**expressed**
99:12,15 137:12 232:21

233:5

**expressing**
324:10

**extend**
101:20

**extending**
98:19

**extension**
102:1

**extensive**
294:18

**extent**
74:22 183:14 244:15
251:15 262:14

**extremely**
163:19

**ex-wife's**
20:17

**eye**
155:9 239:7

**eyes**
140:11 159:7 195:19
196:12 201:3

**e-mail**
59:2 93:22 94:2 108:19
110:14 142:16 143:1
145:3,19 156:13 165:1
166:16 178:18 220:19
221:2,8,13 222:8 223:9
223:13 257:5 259:12,20
259:23 262:3,16 263:6
265:15 269:1,5,7,8
281:9,10 283:17 300:22
301:1 328:7 334:2
336:14 338:1 339:11
340:1,18,21 341:9,23
343:20 344:23 345:8
350:2,20 351:2 361:10

**e-mails**
156:12 270:18 281:22
282:12,15,18 283:2,6
284:12 295:21 297:11
299:9 339:17,21,23
340:5,7,14 346:4 350:1

_____ F _____

**F**
371:1

**face**
60:22

**facets**
59:14

**face-to-face**
328:7

**facilitate**
132:15

**facilities**
45:1 50:6,9,17,19,20 51:11
124:7,9 145:17 226:12
236:13 246:13 290:18

**facility**
33:1 44:23 45:3,6,9,12
51:2 71:12 77:8 88:5
120:10,18,22 123:20
124:8 129:4 138:23
181:3 185:5 186:13
214:22 215:3 225:11
226:7,8 236:19 238:17
238:18 239:11 240:1,6
242:2 244:17 257:3,10
285:14 286:10

**facing**
237:22 274:15

**fact**
57:2 95:18 141:1 144:2
257:13 261:6 330:7
365:3

**factor**
163:4

**facts**
12:21 57:8 78:12 141:2
144:7

**faded**
156:18

**failed**
132:17 135:13 138:5
336:7

**fair**
9:4

**fairly**
211:22

**Fall**
25:13 343:15

**falling**
145:20

**falls**
60:22

**familiar**
92:17 167:23 281:7 342:9

**familiarity**
61:17

**families**
355:2

**family**
16:14 17:7 112:20 317:7
318:1,14 321:10 322:13
354:19,23

**far**
8:7 14:14 59:20 64:9,18
90:6 149:19 159:9
166:11 178:15 193:17

**father-in-law**
330:6 331:18

**father-in-law's**
331:13

**February**
157:21 352:19

**feel**
62:1,12 64:7,14 97:12
138:9 139:3 251:1,4
279:4 333:13

**feeling**
139:1 172:12 227:21

**felt**
14:20 61:16 62:16 63:19
64:10 67:11,20 79:12
82:17,22 99:15 102:12
107:20 125:5 134:13
135:8 144:3 152:4 153:1
196:11 237:13,14 262:10
302:20 318:8,11 321:14
326:12

**female**
54:2,3

**fifteen**
166:3 298:23

**fifth**
3:14 180:8

**fifty**
52:16

**Figgs**
53:2,3 54:1,14,15,22 56:9
58:7 60:8,11 64:2 65:2
65:6 106:3,16,19 107:12
127:2 131:1 132:14
134:1 137:23 138:9,14
142:15 146:17 147:1,4
150:22 164:2,3,13 168:8
175:13

**figure**
155:4 248:23

**file**
83:3 141:7 258:1 283:18
284:9 290:21 291:11
293:16 297:16 298:21
299:1 313:19 349:6

**filed**
7:10 21:19,23 22:1 261:7
275:12 276:4 300:14

**files**
283:15 284:5,22,23 285:4
285:21 286:20 287:1
288:15,20 289:14,17
290:7,15 291:5,7,16,20
293:4,6,16,19 294:12
295:6,20 297:3,5,8,15
297:17,19 299:9,12,12
339:7,10,11

**filing**
328:2

**fill**
32:2,5,8,9 280:2 346:22
355:9 369:12

**filled**
166:18,19

**filling**
76:11 77:6 367:16

**final**
58:9,12,15

**finally**
107:15 135:19 252:8
253:5 255:3 274:22

336:11

**finance**
90:15 221:10

**financial**
89:18 90:22 185:21

**financials**
152:21

**financing**
103:8

**find**
196:1 197:1 221:17
257:23 276:21 277:23
282:3 302:18

**finding**
70:9 262:13 281:4,5

**finish**
25:9

**finished**
29:2 184:21 213:22
289:23 335:12 344:2
350:4

**fire**
112:10

**fired**
53:21 199:13 316:22
369:5

**firefighter**
17:23

**firing**
27:21 52:22

**firm**
56:10,11,12,17 57:5,7,9
58:4 59:19 232:4
362:8

**firms**
133:18

**firm's**
59:17

**first**
6:16 26:18 36:4 41:14
61:2 63:22 92:14
100:12 111:20 113:5,6
160:2 167:15 180:15
185:14 186:23 187:1
189:13 190:8 203:18,21
204:6 205:13 207:13,22
209:17,21 212:1 214:19
217:14 222:18 226:21
247:16 285:11 288:14
303:23 316:21 333:4
341:14,19 342:10 344:19
345:20 354:17 359:13
360:17 361:7,8

**first-hand**
165:16 272:12,16

**first-shift**
274:5

**fit**
279:23 298:22 299:14

**Fitchburg**
22:17,19 23:13 24:14

**five**
10:14 36:7 37:15 108:16
108:22 112:12,15 160:23
161:2 170:18 271:9,16
310:19
**fixed**
88:20
**flaking**
109:13
**flat**
60:22
**flip**
288:3 298:4
**floor**
109:23
**flow**
40:14,14 98:10 160:22
**FMLA**
357:5,7
**focus**
87:4 203:9 228:15 355:9
**focused**
194:11 217:17 238:21
**folder**
290:8 291:2 292:13,17
293:6,6
**folks**
67:13 72:2 111:14 118:4
129:9 174:18 176:10
197:21 213:16 220:22
221:9 222:17 280:21
282:4
**follow**
85:17 87:17 218:11 227:1
227:8 229:4,9 277:9
**followed**
38:23 41:17 153:19
217:19 226:20 233:3
**following**
6:12 109:20 113:2 221:18
247:15 260:13 265:3
361:3
**follows**
6:17
**follow-up**
300:22 303:3
**font**
268:12
**food**
82:20 286:6,11
**Foods**
353:18,19 354:6,22 356:3
**fool**
177:20
**footer**
341:23
**footing**
78:19
**force**
2:12
**forced**

**262**:7,8 301:2
**forecasts**
152:21
**foregoing**
6:6 371:8,12
**forget**
266:22 326:4
**forgive**
361:5
**forgot**
52:11 256:15
**forklift**
26:3 53:13 70:16
**form**
2:18 166:18 346:19
**formal**
23:14 24:19 63:17,18,23
64:13,16
**formally**
16:8 126:22
**format**
166:2 268:12 285:21
**forty**
52:16
**forward**
7:21 95:20
**forwarded**
220:19
**foul**
66:17
**found**
66:3 238:9 271:6 272:10
336:8
**four**
19:19 23:3 34:18 36:5,13
37:5,11 65:14 90:10
271:9,16 292:19 314:19
**fourth**
159:15
**four-inch**
82:19
**frame**
55:15 141:22 158:14
160:7 231:4 236:2
248:18 339:16
**free**
290:20
**Friday**
350:4 360:4,11,23
**friends**
324:13,18
**front**
74:18 83:7 85:13 88:23
161:10 314:5
**fulfill**
63:8,14
**fulfilling**
367:19
**full**
2:12 7:3 137:15 167:15
**function**

**38**:17
**functionalities**
133:19
**functionality**
132:16
**functions**
244:11 245:8
**fund**
103:17
**funding**
42:15
**funds**
104:5 308:7
**funeral**
95:12 110:11 252:13
255:8
**funny**
111:18 198:6 199:12
**furnished**
363:16
**furniture**
109:17
**further**
89:12 143:12 168:20
169:12 187:8 210:23
214:5 297:4 337:6
367:22 369:22 370:3
371:16
**FYI**
282:20

---

**G**

**gains**
50:13 137:16
**Gardner**
23:20
**Gates**
118:4
**gathering**
367:6
**general**
81:6 211:20 214:17,19
216:20 218:2 309:12,15
310:3,8 351:4
**generally**
80:1 170:6 210:4 241:15
366:12
**geographic**
353:17
**gesture**
155:3
**getting**
32:22 86:10 113:14
184:19 246:2 254:10
278:19 282:1
**gig**
299:1
**gist**
336:18
**give**

**108**:8 155:2,8 158:8
166:9 170:19 255:18
256:14 283:5 313:15
349:22 352:13 362:11
**given**
7:11,17 21:11 46:9 49:23
50:23 52:6 58:11 60:8
62:16 64:11 73:16 87:2
103:20 107:22,23
108:10 111:2 125:8
126:12 135:9,10 138:9
139:2,7,8,9,11,22 145:8
146:16 148:6 173:23
185:21 216:4 218:17
237:17 268:5 284:19
285:6,12 287:15 327:18
334:13 338:19 346:19
347:12,18 371:14
**gives**
115:20 154:19
**giving**
148:4 153:21 157:14
272:3 282:20 367:7,8,9
**glad**
190:18 239:4 244:2
**Global**
26:23 27:2,10 29:8,10
**Glovis**
303:16,19,22 305:5,18,21
306:7,10
**go**
7:19,21 14:16,21 25:14
30:1,2 40:15 57:16
60:9 70:13 74:10 89:4
108:18 114:16 156:12
167:3 175:4 179:10
193:6 195:2 208:4
221:17 231:20 240:2,3
252:21 253:17,21 254:2
254:7 260:7,23 262:8
321:14,16 327:11 329:1
336:10,11 355:17
**goes**
191:14
**going**
8:9 9:2 12:13,22 39:11
42:7 50:8 61:9,23 65:5
65:7 68:9 81:1 89:5,10
90:8,20 93:4,7 96:12
99:5 101:14 105:18
109:1 112:12 117:3
126:10 130:8 132:20
136:7,20 141:9 142:3
144:4 146:4 150:12
159:5 160:2 169:23
170:9,19 172:2,3,4
174:19 177:14,19 179:9
181:16 193:6 194:21
212:10,16,17,19,19,23
213:16 214:8 225:14
228:18 236:14 238:20

**239**:17 240:22 241:23
242:21 243:2,3 252:8
253:5 255:2,13 256:3
258:14 261:6 272:3
273:5 278:14,14 279:7
279:8 281:17 287:22
302:21 305:10 306:8,11
320:1 322:5 327:14
**good**
10:21 68:12 80:18,21
154:16 182:7 195:10,12
200:22 221:16 258:12
262:9,11 311:23 316:23
320:1
**goods**
212:15 290:1
**gotten**
95:7
**government**
216:15
**grabbed**
256:15
**grade**
25:19
**graduate**
22:7,22 24:2
**great**
8:5,7 212:9,10,20
**greater**
251:3
**Gross**
111:10,12 193:8 194:5,18
196:10 197:22 198:1
199:17,18 200:18
201:20 242:5
**ground**
7:20 204:17 205:3,6
208:23 213:5,6 215:17
**grounds**
2:21
**group**
41:12,17 104:10,11 277:18
277:20,22 338:5
**grow**
32:11 204:18 205:7
208:20 309:16
**growing**
326:8
**growth**
42:16
**guard**
228:1 264:11
**guess**
124:23 149:14 178:2
247:5,12 356:21
**guessing**
231:3
**guidance**
164:8
**guy**
117:22 221:11

**guys**
326:16

**H**

H
4:9 5:1
**Hale**
235:9
**Hale's**
235:11
**half**
160:3 167:11,13,14,16
183:7 248:14,18 342:6
**halves**
183:4
**hand**
80:9 108:8 109:15 135:5
151:13 154:19 155:2,4,7
157:14 158:8 180:21
185:20 296:3
**handed**
252:16 275:18
**handing**
91:22 93:19 119:10
221:23 241:8 259:17
292:6 294:3 298:2
341:3 342:18 346:13
348:6 367:10
**handle**
42:17 59:12
**handling**
59:5 127:20
**handout**
215:20,23 216:6,10,12
**happen**
93:12 94:19 141:17 151:20
197:16 214:8 258:13
327:17
**happened**
13:5,6 78:18 85:10 86:5
86:14 88:11 96:17 145:7
151:23 153:23 176:4
179:11 185:16 187:20
188:8 196:16 197:11
200:6,8 254:3 326:1,20
327:8,9 328:12 332:17
**happening**
55:18,19 237:20 255:9
256:2,5 361:12
**happens**
114:17 182:1
**happy**
9:8
**hard**
226:5 227:21 243:11
285:9,21 287:1 288:17
288:20 289:16,21
290:10,12,16,20,23
291:5,13,23 293:9,10,12
338:17,20

**hardware**
143:18
**hated**
203:13
**head**
8:13 132:22 134:8 141:9
141:21 164:4 311:22
348:17
**headaches**
10:17
**heads**
268:6 271:14
**heads-up**
210:17
**health**
310:20,23 314:23 315:2
**healthcare**
311:2 312:8
**hear**
186:13 187:2 195:23
256:1 269:23 274:1,3
322:17,20,23 323:3,6,7
323:10 324:13
**heard**
85:23 116:15 186:5,6,14
186:16,17,19 187:3,4,5,6
187:7 190:20 207:14,21
208:7 209:3,17 211:1,15
226:14 270:3 273:15
305:18 325:11,14 326:14
326:16,17
**hearing**
104:13,23 225:1 231:14
371:15
**hearsay**
91:2
**heated**
66:17
**Heather**
1:21 2:7 6:1 8:8,17
**heck's**
273:5
**held**
27:16 224:22 273:13
354:3
**hell**
195:2
**helm**
203:23
**help**
38:18 42:14 166:8 170:20
191:1 265:12 282:8
309:16 320:10,15
364:15,22 365:1 369:1
**helping**
184:15 278:19
**Henry**
7:8 15:21 84:6 97:7,17,19
99:11 100:8,12 101:1
102:22 105:23 108:10
109:2 111:15 116:3,21

118:7 121:17,20 122:1,2
122:20 126:15 128:4
129:18 130:14 149:15,17
149:20 155:16 171:15
173:12,20 174:9 175:5,9
175:16,19 176:7,12
178:3,13,14 191:23
193:14 195:9,14 196:17
196:23 197:19 198:9
199:15,22 200:9,19
202:9,10 206:7 218:18
218:22 220:19 221:18
222:9,12 223:10 225:6
229:10,19 230:14,17
233:4 259:6 280:15
300:4 322:20 323:3,7
323:10,15 325:7,17,19
333:22 334:12,17 335:3
335:7
**Henry's**
116:13,17,17
**Hicks**
7:8 15:21 84:7 97:7,17,19
99:11 100:8,13 101:2
105:23 108:10 109:2
111:16 116:3,22 121:17
121:21 122:2,20 126:15
128:4 129:19 130:14
149:15,17,21 155:17
171:15 173:12 174:9
175:9,17,19 178:3 192:1
193:14 196:23 199:22
200:9,19 202:9,10
220:19 222:9,12 223:10
225:6 229:10 230:14,17
233:5 259:7 280:15
300:4 322:20 323:3,7
323:11 325:7,17 333:23
334:17 335:3,7,9,11
**high**
22:4,11,13 25:17,18 26:6
87:2 238:21
**highlighted**
294:20 295:13
**hindsight**
247:5
**hire**
195:2 235:19 236:5
237:18 340:6
**hired**
30:15 34:4 47:23 48:6
49:2 50:22 51:5 57:8
65:13 137:22,23 157:1,3
232:16 233:8,10,15,16
234:21,23 235:1,2,8,9
236:10,16 306:16 335:4
335:7,10,11 365:12
**hires**
86:10
**hiring**
27:19 52:19 190:16

206:12 235:16
**Hispanic**
69:16
**historical**
101:19
**history**
25:15 60:14 96:11 97:11
98:22
**hold**
80:8 178:13,14 298:22
300:8 336:9
**holy**
196:14
**home**
18:16 356:15
**hope**
129:8 277:9 282:20
**hopefully**
57:14 112:9
**hoping**
240:15
**hot**
32:2,5,8,9 280:2 355:8
**Hotmail**
281:9
**hot-fill**
45:7 279:20,21 336:7
353:15
**hourly**
53:14
**hours**
87:7 254:4 319:11,12
320:4 321:3
**Houston**
29:23 30:2
**HR**
47:4 206:3
**human**
122:7 123:3,6,7
**hundred**
43:8 45:19 46:7 106:5
107:18 108:16,17,22
113:10 135:20 139:19
160:23 161:2 170:18
211:17 275:4 298:23
310:19
**husband**
309:19 337:20

**I**

**ID**
267:17
**idea**
90:6 349:5 363:12
**ideally**
161:23
**identical**
228:13
**identification**
91:21 93:18 119:9 221:22

241:7 259:16 275:17
281:16 287:21 292:5
294:2 296:2 298:1
341:2 342:17 346:12
348:5
**identified**
300:2 350:21
**identify**
105:15
**ill**
356:14 357:2
**illness**
356:11,19 357:14
**images**
289:10
**immediate**
47:22 48:5 49:5 353:16
**immediately**
107:23 227:22 256:4
**implement**
134:17 290:17
**implemented**
142:5 145:16 285:14
**important**
353:9
**impression**
200:5 335:3
**improve**
70:9 160:21,22
**improvements**
69:1 177:15
**inabilities**
134:19
**inadequate**
79:12
**inappropriate**
196:11
**inbound**
32:20 33:4
**incentives**
216:16
**incident**
83:11,18,21 84:1,4,7,10,13
87:21 88:22 89:14
144:22 193:8 200:10
356:10
**include**
32:22
**included**
49:21 50:5 132:2,22
**including**
103:23 116:2,3 152:16
176:7,12 318:14
**incoming**
49:21
**increase**
45:23 46:4,5,10 310:10,14
**increased**
46:7,15 308:10
**increasing**
160:20 194:15

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM     Document 74     Filed 10/29/2007     Page 107 of 138

JERRY MACCARTNEY
August 17, 2007

incubation
208:22 213:4
independent
362:9
indicate
101:7 289:5 291:16
297:15 362:5,7 363:7
indicated
101:8 301:1
indicates
289:13
indicating
155:10 202:11 334:13
indirectly
36:2,6,9,18 37:1,16 52:17
individual
21:17 34:6 41:10,14 60:18
60:20 64:20 72:3
166:21 167:1 234:11
individually
148:13
individuals
41:11 71:20 184:22 235:5
269:13 300:8 369:11
industry
44:10 212:15 353:15
infer
224:2
inferred
249:17
influence
212:11
info
98:2
inform
257:20
informal
227:15
information
56:5,7,8 78:4 93:8 95:22
96:1,9 97:14,21 98:3,5
98:7,21 100:13 179:1,22
216:7,8 267:17 269:15
301:21 302:2 339:2,6
340:10 350:8,21 351:3
351:5 353:5 355:15
356:1 367:5
informed
61:1 72:11 88:18 113:22
117:12 171:15 237:5
238:3,14
infrastructure
54:19 55:10,13 56:2
58:22 59:2 64:9
inhaler
10:9 11:1,2
inhalers
10:5
initially
39:2 50:18,21 136:9
305:14

initiative
286:2
initiatives
285:6,10,11
input
96:16 148:16 152:3,23
153:15,20 166:8 238:1
inquire
243:20 363:5
inquires
364:10
insight
154:13
insincere
129:12
installed
161:22 175:23 178:11
instance
81:12 207:13,20 226:20
231:13
instances
152:15
instant
107:22 138:10 139:2,8,9
instantly
135:9 159:1
Institute
286:4
instructed
103:12
insurance
312:14 314:23 315:3
Integrated
308:23 309:9,22 310:6,21
311:17 338:4
intended
102:16 137:16 260:8,20
intent
363:23 369:8
intention
202:12 204:14,21 205:4
207:15 208:11,18 214:12
217:6 221:4 225:2
226:14 227:2 228:3
229:5 231:15 233:5
336:16
intentions
217:18 225:16 260:14
interaction
98:12
interest
14:20 176:6,9 215:8
279:19 280:22
interested
239:21 243:21 278:19
280:6 354:11 371:19
interesting
328:20
internet
297:5 341:8,23 350:20
351:1

interpretation
183:18 224:4
interpreted
192:22 224:8
interrogatories
352:6
interrupted
152:6
interval
48:1 51:7
intervened
15:1
interview
40:16,18 41:12
interviewed
39:6 304:19
interviewing
41:22 42:22 65:23 66:5
interviews
41:11,15,17 303:12,14
368:16
Introduced
55:5 215:6
inventory
24:12 26:20 27:2,7 29:12
32:18 133:5 134:20
290:1 344:21 345:23
investigation
73:19 74:22 137:14
investment
42:13
investors
42:9
involved
28:21 56:1 57:15,23
89:16 102:23 103:5
104:9 149:21 157:10,10
164:10 175:6,13 277:7
277:18,20,22 278:3
281:2 282:10
involvement
56:4 101:23 156:16
Ira
233:18
irrelevant
345:1
irritation
9:19
issue
141:14 142:8 147:23
149:17 150:6 177:8,8
180:4 283:6
issued
76:5 267:1,11 268:2
issues
37:12,13,20 59:21
issuing
50:12
item
113:6 347:6,9
items

32:19 132:11 143:7
223:14

---

**J**

J
3:11 287:6
January
47:15 67:17 160:4 352:18
Jay
3:6
Jeff
7:9 15:18 84:9 96:3
126:16 129:1,15 150:1
155:12 191:20 193:15,22
195:9,15 198:18 200:20
202:12 206:7 213:14
214:7 215:5 216:20
223:10 227:6,9,11
228:8,12,17 229:5
233:4 236:6,7 241:14
259:10 280:18 299:21
322:23
JEFFERSON
371:5
Jennifer
3:11 7:6 63:5
Jenny
67:3,8,16,20 68:7,18
Jenny's
68:4 69:17
jeopardy
215:11 227:19
Jerry
1:7,17 2:6 6:10,15 7:4
16:7 353:2 369:4
job
8:7 26:13,19 29:23 34:14
41:19 42:1,2 49:18
67:21,23 70:6,7 79:13
79:14 80:3,17,18,21,22
81:18 113:15 123:12
163:16 210:16 244:7,12
245:2,15,17 246:10
247:3,12 248:16 250:3
252:13 275:8 289:19
297:8 303:18,21 304:6
304:22 305:2,20,22
316:23 321:18 337:5
343:19,23 345:9 367:16
367:19
jobs
26:17 27:1 28:16,19
37:23 112:5 190:15
215:10 227:18 369:14
Joe
110:12,20,21,23 251:23
255:7 264:17,19,23
265:8 267:1,14,20
268:3,19,23 269:10
270:9,12,23 271:15

272:8,14 273:2,14,21
274:7,18 275:7 301:18
359:3 360:16 361:23
364:8,14 368:20
Joe's
364:11
jogging
191:1
join
344:5
joining
329:17
journal
77:21,23 78:4,10,14,16
218:13 338:18,22
July
275:3
jumping
156:14
June
45:15 76:3 77:2 91:16
94:3,16,23 95:8 109:9
119:21 120:2 160:5
180:15 256:19 265:2,2
276:16,17 283:8 284:9
284:17 288:3,8,23
289:12 292:9 295:11
296:11,16,19 298:11
302:4 322:9 339:8
340:5 357:21,22 358:3
358:4,7,10 359:8 360:2
justification
108:19 143:2,4,5 145:5,10
146:18 147:8,12 148:6,7
159:21 165:23 166:5
172:2 173:23 174:4
175:18,21 177:13
justifications
108:20 109:5 142:17
166:10 167:6
justified
143:8

---

**K**

K
3:4
keep
17:5 25:5 68:9 125:9
239:7 257:18 289:11
keeping
159:7
Ken
221:10
Kenneth
16:18
kept
77:23 218:13
keys
256:15
kick-off

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

232:8
kids
326:9
kin
371:17
kind
12:13 76:4 81:6 83:12
98:2,7 116:20 121:22
166:19 171:19 175:17
177:3,4 195:19 198:10
201:3 206:3 213:18,21
220:5 266:14 286:13
311:10 319:1 335:1
337:1 365:9,16,23
366:23
knew
106:22 130:2 190:16,17
196:13 212:12 287:17
314:3
know
8:20 9:7 10:20 17:2,4,21
23:8 40:1 42:19 47:1
55:14,22 56:18 57:22
60:11,14 64:1,22 65:20
66:2 68:10 69:19 73:18
73:22 80:17,20 83:11
85:22 87:14,16 89:21
89:22 90:2,18 92:5
95:13 102:18 103:11,14
104:20 106:1,13 112:11
116:19 118:22 120:17,21
121:20 122:5,11,20
123:2,14 126:20 128:7
128:10 138:12 143:14
147:3,6,7,17 148:18
150:21 151:21 152:7
154:20 158:23 164:6
165:12,14 168:13 171:5
173:19 174:7 175:1,3,14
175:15,16,20 179:9
184:14 186:4 188:14
193:17 200:9,12,13
201:16 206:11 207:1,5
210:20 211:21 217:22
224:14,17 226:3,9
227:23 230:6 231:5
232:3,10 235:15,18
236:4 243:8,13 244:9
246:5,9 248:11 251:4
253:16,20 254:1 255:16
256:22 257:9,12 260:3
265:7 269:14 274:18,20
280:5 292:14 300:15,18
301:14,17 304:8 309:5
309:7 311:9,20 315:22
324:1,4 325:22 329:2,5
329:7,12,19 332:17
333:12,13 339:16 343:7
343:13,18 352:5 354:3
354:12,15 357:18
360:21 362:20 366:5

knowledge
63:20 64:18 74:21 75:1
76:19 119:2 138:19,20
145:4 165:17 207:4
264:16 272:13,18,21
294:17 316:2 330:1
355:16 359:9
known
34:3
knows
199:18
K's
323:23 324:3

L

L
2:1
labeled
289:2
lack
163:18 257:22 258:3
lacked
63:16,23 67:11,20 146:13
172:11
lacks
64:7,12
lady
67:5
laid
143:17
Lamar
184:9 185:8 192:10
Lampert
40:20 41:3 100:22 118:7
130:14 194:4 196:6
201:13 205:22 219:2
325:2
landed
194:21
lanes
180:22
language
66:17
lapses
11:15
laptop
283:16 285:2,9 288:2,8
289:4,7,9 291:6 296:11
296:19 298:11 334:17
361:13,20
Large
6:3
largest
215:1
Larry
7:9 15:18 84:9 96:3
126:17 129:2,15 150:1
155:13 191:20 198:19
200:21 202:12 213:14
214:7 215:5 216:20

223:10 227:6,9 228:9
228:12,17 229:5 233:4
236:7 259:11 280:18
299:21 322:23
Larry's
241:14
laser
133:13
late
130:8 254:12
latest
59:4 178:20
laugh
195:17,21,23 196:1 199:9
199:15 200:23
laughed
111:18
law
3:5,6,12 335:20
laws
2:13
lawsuit
7:9 21:16 78:6 105:9
201:22 261:8 300:7
329:17 330:3,11 331:3,9
331:18 332:1,13,19,20
333:9 334:23 335:15
336:1,21 338:11,21
339:3 340:16 347:15
350:9,13,17 351:12
lawyer
78:11 218:8 330:4 331:21
333:4 338:13,19 340:21
350:6,12 352:14
lawyers
7:7
lead
85:17
leadership
81:3 87:3 237:16 238:22
leading
2:19
learn
113:18 209:8 359:2,5
learned
113:13 356:2 357:9
learning
168:1
leave
26:11 29:21 112:14 238:7
256:4,13 308:17
leaving
235:22 237:5 321:11
353:6
left
23:9 26:21 30:6 31:11
35:13 47:12 48:11,13
65:21 82:16 157:20
186:13 187:18 195:23
216:3 228:23 230:22
238:13 243:12 256:16

272:5 274:21 282:2
283:10,13 284:18,20
308:13 312:1 314:7
315:22 316:1 326:13
327:7 332:15 337:4
339:9 351:7,9 368:3,14
368:17
legacy
133:12,14,15
legal
300:10 327:6
lend
144:2
lender
89:21 90:4
Letitia
229:12 230:6 231:2,5,9
242:11 336:2
letter
43:23 44:2 46:18,22
114:3,11,21,22,23 115:12
115:20,22 119:15 141:18
252:17 255:18,21
257:14 258:7 263:12,14
263:15,18 264:3,4,5,7
264:13 276:20 287:5,17
312:10 333:22
letterhead
265:17 266:10
letters
202:11 368:9,10
letting
227:23
let's
26:18 36:3 71:14 89:4
113:4 150:15 212:3
235:2 251:4 286:19
level
28:23 87:7 115:7 206:2,4
206:14 238:21,22
levels
206:16
Lewis
3:6
liable
300:9
lied
110:15 247:3
life
212:12 264:21 322:6
326:17 363:19
Lindsey
3:19
line
50:12 76:12 77:7 79:9
86:11 88:17 117:19
160:20 161:14 162:11
170:20 177:23 186:12
254:16 260:3 364:15
lines
42:11 50:14 79:22 80:2

115:9 182:4,10 203:10
203:20 206:18 209:1,4
211:15 247:19 255:4
list
105:17,19 143:6 277:10
302:22
listed
132:11
listing
244:21
lists
351:20
little
86:1 126:15 184:5 193:6
197:20 355:13
live
16:22 17:16 18:2,7 19:12
20:19 363:8
lived
19:17,20 20:1,4 355:2
356:15 363:5
LLC
1:10 309:2,3
loan
315:15
local
262:11
locate
257:19
Loeb
40:19 41:1 282:5 338:11
354:13,14
Loeb's
354:16
log
176:21
logistics
30:17,22 31:2 32:21 33:4
34:7,10,15 35:10,15
38:16,16 41:23 43:11,15
43:22 44:10,13,18
45:20 46:1,14 47:6,19
49:1,6,19 50:15 51:1,12
52:14,19 53:7 66:11
67:2 68:20 70:14 71:4
71:22 75:17,20 76:17
76:22 120:7 122:17
123:22 124:1,11,21
125:14 127:12,18 132:3
209:12 225:10 239:6,16
241:2 243:19 244:8,13
245:16,21 246:6,16,20
246:22 247:7 248:6,8
248:17 249:5 291:4
305:8 306:18
long
9:20 10:3,12 13:15 18:18
19:17 26:4 30:18 31:1
34:3 43:10 45:11 47:21
48:9,19 108:21 150:21
156:3 171:3 181:21

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 109 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

274:18,20 301:17 307:1
320:20 322:15 326:4
352:16 359:2,5
**longer**
61:15 62:6 67:13 111:3,6
120:7 157:3,9,13,15
256:7,10 257:17,21
284:2 344:12,16 369:17
**longstanding**
91:6
**long-term**
39:12 42:15 90:9,20
115:6 347:10,12
**look**
70:4 77:16 85:13 87:12
92:16,17 155:9 177:18
177:20 179:20 288:11,11
292:19,23 294:5,8
297:13 348:8
**looked**
58:18 87:15 109:21
196:12
**looking**
42:13 95:20 112:5 155:11
190:14 206:21 227:19
278:17 280:2 295:6
368:4
**looks**
181:10,20 290:6 291:10
294:16 341:11 342:7
**loose**
85:20
**loss**
67:6 163:4 283:22
**losses**
50:13
**lost**
176:6,9 262:21 263:1
282:21 322:8
**lot**
12:22 13:4 64:20 81:4
90:1 98:22,23 101:18
134:21 172:21,23 212:14
212:16 236:13 240:8,9
251:5 283:15 297:6
318:1 333:20,21
**loud**
82:6,7,8,9 110:8 182:13
**low**
163:17
**luck**
258:12 262:10
**lunch**
150:16,18
**Luster**
72:6,8 73:8,11,15,23
74:10,13 200:8,10
330:13,15
**Luster's**
72:10,21 74:16
**lying**

263:8

**M**

**M**
287:11,13
**MacCartney**
1:7,17 2:6 6:10,15 7:4,5
15:10 16:7,19 20:11
71:19 105:8 150:21
172:10 180:7 207:12
348:15,18 349:11 350:6
368:2
**MacCartney's**
288:8
**Maccartney@msn.com**
281:12
**machine**
287:8,15,15 295:2
**machines**
82:10,11 271:21
**mail**
303:2
**Main**
59:1
**maintain**
126:5
**maintained**
124:11 161:9
**maintaining**
40:13 125:9
**maintenance**
108:14 132:11 144:17,22
159:19 160:9,15,17
161:13,23 163:7,15
164:22 169:3,9 170:5,7
170:13 206:18,22
214:23 235:13 270:15
272:8,14,22 273:1,14
365:6 366:15
**major**
23:4,6 163:3 286:7
**majority**
202:15 203:5
**makeup**
69:10
**making**
35:9,12 73:12 113:9
120:19,23 183:20 213:8
270:19 313:6 365:20
**male**
54:1
**manage**
29:17 32:19 34:16 60:8
134:20 240:1 309:17
**managed**
29:12 35:2 330:23
**management**
23:7 27:17 29:1 43:14,19
44:8,15 59:7,10 104:12
104:21 107:2 112:3

114:19 115:17 117:14,15
117:18 118:6 126:18
127:7 130:22 132:13,19
133:1,2 134:7,18 135:2
142:1 153:6 202:4
204:16,19,22,23 205:7,8
206:20 207:17 208:13
208:14,20,21 213:2,3
214:4,12,13 215:18,18
217:10 219:15,16 220:13
221:5,6 223:23 225:3
226:15 227:3 229:6
230:3 231:16 232:22
234:2,5,7 251:2,12
260:16 280:9 347:21
**manager**
26:23 27:3,8,10,11 29:8
29:11 30:16,19 32:14
33:21 34:5 43:21 44:21
44:22 45:12 48:17 49:9
49:12,16 53:20 65:2,16
65:23 76:14 113:16
117:21 118:1 120:9,18,22
122:18 123:5,20 124:3
124:12,14 126:2 127:13
135:8 163:15 167:23
171:17,20 173:13 181:4
185:4 190:16 193:11
229:15 232:13 233:20
234:15 235:13 236:18
238:16 239:22 240:4,5
242:1 243:21 244:2,7
244:16 245:5 246:20
249:7,11 261:16 274:5,6
283:19 299:3 304:7
306:18 309:13,16 310:3
310:8 336:7 365:6
366:4 369:10
**managers**
36:19 37:4 116:1 117:11
117:20 173:9 209:8
224:12 366:15
**manager's**
161:23
**managing**
32:16 50:10 60:23
**maneuvered**
278:22
**maneuvering**
369:20
**maneuvers**
238:4
**manger**
365:6
**manifestation**
317:21
**manner**
79:19 140:17 160:18,19
285:3
**manufacture**
31:14 32:17 33:8,16

**manufactured**
29:19 45:5
**manufacturers**
33:11,13
**manufacturing**
32:23 33:18 50:6,9
122:10 246:12,17 286:12
**manufacturing's**
143:21
**mapped**
287:14
**March**
31:6,7 46:6
**marked**
91:20,23 93:17,20 119:8
119:11 221:21 222:1
241:6,9 259:15,18
275:16,19 281:15,18
287:20 292:4,7 294:1,4
296:1,4 297:23 298:3
341:1,4 342:16,19
346:11,14 348:4,7
**market**
262:11
**marketed**
302:19
**marketing**
122:4,21 178:5,8 303:2
**marking**
287:23
**marriage**
21:1,2
**married**
18:5,19 20:14,15 21:3
**Mass**
59:4,12,14 106:2,14 107:5
107:6 130:3 132:15
133:10,11,20 134:5,11,19
135:2,4,12,15 136:7,10
136:17,21 137:21 138:2
140:7,19 141:14 142:9
142:15 143:1 145:3,19
147:23 148:8,18 149:20
150:6 151:3 152:17
158:2 171:7 232:6
**Massachusetts**
20:22 22:6,20 23:20
30:4,5,11
**master**
27:7
**match**
306:6,9
**matched**
109:22 313:18
**matching**
311:20
**material**
50:11 51:1
**materialized**
141:19 279:5
**materials**

27:8 32:23 33:16 49:22
50:5,8 51:20 52:1
**matter**
74:5 152:9 164:1
**Max**
315:16,18
**maximum**
314:6
**Mayer**
11:18 97:6 98:4 100:14,22
108:13 118:11,13 130:14
144:18 159:18 194:2
205:23 230:19 235:17
253:17 329:9,13 336:20
337:15
**Maynard**
30:5
**mayonnaises**
326:8
**ma'am**
158:16 172:19 180:6
292:10
**MBA**
215:15
**MBE**
56:17,18 96:18 101:11,14
215:22 216:13,17 217:17
217:18,19 224:21 230:2
230:4
**McGahey**
3:11 4:3,5 6:22 7:1,6
63:10,21 68:14,16 71:14
71:18 112:11,18,22 113:4
146:4,8,10 150:14,17,20
207:8,11 264:9,17
277:17 288:6,10 316:9
348:14,20,23 349:3,7,15
349:20 350:1,5 352:22
368:1 369:22
**McGlon**
13:19,22 14:3,11 15:4
77:12 101:1 118:10
130:16 194:2 205:23
254:1 281:4 286:17
309:5,11,18 315:19
336:1 337:18
**McGlon's**
309:19
**McLennan**
47:23 48:3,13 49:3 157:1
157:2,12,19 158:3,14
162:15 225:22 226:4
233:10,12,13,15,16 234:1
235:22 236:5 237:1,4,9
243:12 346:21
**McLennan's**
225:13
**mean**
24:11 29:15 33:3 36:8,17
101:17 112:4 198:3
214:18 224:3 252:10

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 110 of 138

JERRY A. MaCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

255:5,10 260:11,16
266:4 307:14 318:20,20
359:7 366:12
meaning
110:7,8 220:1
means
229:1 325:22
meant
149:10 196:14 214:8
217:18 226:9,21 228:18
228:21 248:5 264:3
324:8,10
Measurement
345:5
measures
129:8
medical
11:10 266:13 307:7,10,18
307:21 311:4 312:14
318:15 322:1
medication
320:9
medications
9:9,11 10:22
medicines
11:6
meet
212:6,8 227:12 253:9
254:17 286:21 306:11
333:4
meeting
61:14,17 62:5,23 64:2
77:21 88:9 90:6 92:23
93:2,10,14 94:1,3,6,9,11
94:14,17 95:4,23 96:2
97:2 98:1 100:3,4,12,18
111:10 114:12,14 116:6
118:19 130:6,7,20
131:10 132:8 134:23
136:2 139:4,13 140:6
142:19 143:4,9,11 147:5
147:9,11,15,18 148:20
149:16 150:2 151:1
152:17 157:23 162:18
165:4,5,7,10,13,20 167:1
167:7,12 174:8 178:19
179:8,11,14,17,19,19
193:23 194:11 196:20,22
197:13,15,17 198:12
200:18 205:16,19,21
206:9 210:10 211:19,20
212:4 213:13 214:2,6,18
215:21 218:3,5 220:21
221:8 222:15 223:10
225:4,8,19 228:8,12
232:4,8,9 237:19 239:2
250:14,16,18 251:9,12
257:11 258:10 270:15,16
272:14 273:13 274:4,8
276:12 277:1 280:20
281:1 323:15 325:17

334:1 361:11 366:21
meetings
57:18 60:1,5 78:1,8 90:1
108:4 126:23 130:10
139:16 151:11 152:20
155:14,18 156:8,9,21
157:5,6 162:6,7 166:21
167:3,5,10,13 169:21
174:11,13 178:15 194:9
202:19,20 203:8 206:6
209:7 224:20 270:14
271:3,11,17 272:7,22
273:21 366:7,10 367:4
meet-and-greet
227:15
megabytes
298:23
Melanotonin
320:21
Melatonin
320:13
member
103:21 148:15 269:18
members
87:6
memo
91:13,13 92:11 94:14,22
95:8 247:6
memories
326:7
memory
11:8,14 43:23 44:3 57:9
65:3 90:9 99:1 118:15
156:22 180:16 189:10
191:2 235:20 363:10
mention
199:1 207:14 251:15
297:3 349:8
mentioned
90:1 113:6 132:12 198:4
202:19 208:2 216:19
217:20 221:15 248:20
249:19 258:3 295:20
330:13,16 331:4 334:11
343:23 363:20 366:5
merely
297:16
merits
333:11
message
54:7
Messenger
40:20 41:6,7,8
met
7:6 85:2,5 108:23 165:8
264:8
metal
25:20
method
32:10 179:5
metrics

285:13,17
Mexicans
111:13 195:3 197:4 198:5
Michael
65:13,21 66:6
micromanaged
79:15 80:6,8
Mid
254:12
middle
1:2 109:9 112:2 114:19
115:17 117:14,18 180:14
202:3 204:15,23 205:7
206:19 207:16 208:12
208:21 213:2 214:13
215:18 219:15 221:5
231:3 347:20
Mike
38:23 39:20,23 40:19,21
47:7,8,11 65:12 164:7
203:23 212:7 213:9
232:12,16,17 233:7
278:4,5,8 279:3,9,11
280:7 283:19 344:1
military
21:6
million
90:11
mind
99:8 102:17 188:3 369:4
mine
336:4
minor
83:8
minorities
57:3 153:3,5 159:4 199:9
204:15 219:14,14 221:4
223:19,23 327:12
minority
53:23 56:11,19,22 57:5,7
57:9 102:15 144:4
216:7 219:10 221:16
369:6
minority-owned
224:16
minuscule
108:22
minute
7:6 291:9
minutes
178:19
misconduct
37:10,19
missed
297:20 356:20,21 360:8
mission
112:1 203:1 204:4 210:21
221:17 227:17 232:9
327:19 369:13
mistake
239:12

mistaken
157:22 171:13 256:20
Mitchell
246:4 248:3
model
280:1
modernized
59:3
mom
95:1 265:4 289:10
mom's
17:9 95:12 110:11 252:13
255:8 269:20 359:22
Monday
265:3 358:17 360:4
361:3 364:7
money
107:11 185:20 313:15
331:5
Monster.com
368:12,14
Montgomery
3:8 6:8 16:15,22 17:8,16
17:18 18:2,8 20:20
50:18 124:9 219:22
220:20 222:13 226:7
243:7 246:13,18 332:6
332:7,8 353:18 355:3
356:16 363:13 364:1
month
11:3 60:9 65:4 156:12
171:14 173:11 227:11
237:4 248:18 283:21
284:1,3 312:12
months
48:2,11,22 50:22 51:4,7
55:17,18 65:14 101:23
106:17 107:14 108:18
125:22 126:8 131:7
218:2 233:22 237:23
248:14 317:18 332:15,21
351:8 369:18
morning
250:17 254:9,12 257:7
364:19 366:7 367:3
mother
20:7 322:9 356:11,13
357:2
mother's
357:14,19 360:13,18
Mount
23:17,18,21
move
187:1 241:1 364:1
moved
24:17 29:23 109:16,19
127:3 142:21 210:18
239:9,10,11 291:4
292:12,18
movement
133:5

moving
137:19 148:22 149:1,3,6
152:19 290:19 291:12,22
292:14,16 293:19
294:18 295:8 331:12
MSA_PiknikProducts_062...
290:4
MSN
281:10
MSN.com
340:15
Mulrane
278:4,5,9 279:3,9,11
280:8
multiple
44:23
M&A
282:3

━━━━ N ━━━━

N
2:1 3:1 4:1
name
7:3,5 16:7,19 17:12 18:10
20:17 22:11 56:14 57:11
66:16 67:4,5 68:8
70:17 77:17 89:23
104:14,23 117:23 176:22
184:10,14 217:13 220:6
221:11 233:21 241:14
267:14 273:3 293:7,16
293:17 323:18 324:7
325:20 326:23 331:14
332:3 354:17 359:3
named
104:11 110:12 184:9
234:12 328:22 354:9
names
19:5
nature
74:2 334:14
near
76:11 77:6
nearly
199:12
necessary
2:16 62:14 67:21 125:6
365:20
necessity
159:22
Nedavulsky
100:23 118:8 130:15
need
9:6 62:4,8 64:1 70:10
81:4 82:7,18 92:3
107:16 112:4,14,23
124:17,19 132:12,18
135:1 141:8 143:18
154:14 165:21,22 172:6
192:8 207:7 210:19

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 111 of 138

JERRY A. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

238:21 239:7 245:7
247:11 248:5,7,12,15,21
255:18 256:3,13 271:21
274:10 292:1 358:14,15
365:1
**needed**
11:3 36:20 38:17 42:17
59:2,8,11 61:13 62:19
67:13 72:14 78:21
79:15 80:5,7 106:18,19
107:13 111:3,6 114:21
115:8 134:14 136:7,10
139:21 143:5,6 145:15
146:22 152:4,22 153:1
159:7 163:1,19 164:20
166:1,6,10,12 167:18
168:10,18,23 169:4,8,9
169:13 171:2 194:23
210:15 227:19 230:1
238:23 241:1 256:7,10
279:4 285:13,19 286:15
288:18 291:7 297:8
305:15,17 309:12,15
318:12
**needs**
59:6,13 62:3 64:8 80:8
109:1 130:11 131:12,17
131:22 143:21 160:15
161:7,9 274:14
**negative**
116:4 117:6
**negotiate**
32:20
**negotiations**
306:4
**neither**
371:17
**Nelms**
3:4 4:4,6 6:21 7:13 12:17
63:4,12 68:12 112:9,13
112:19 113:3 146:2,6
150:12,15 207:5 261:12
264:6,13 266:17 277:13
277:15 296:16 314:9
316:6 328:22 348:19,21
349:1,5,12,18,22 350:3
350:11 353:1 367:21
369:3,21
**nervous**
15:7
**network**
162:1 285:5,8 287:4
290:11,19 291:1,3,6,13
292:1,15 293:9,10,12
295:2
**networked**
210:19
**networking**
210:19
**never**
58:17 102:23 103:9 109:6

126:22 141:18 142:5
153:11,23 156:15 169:17
249:5 258:23 282:23
283:3 287:16 325:11,14
326:14,16,17,23 331:5
349:8
**new**
31:16 35:1 40:12 65:16
86:10 181:22 207:2
243:14 358:22
**newly**
229:13 243:10
**news**
37:3 74:12
**newspaper**
31:12
**nice**
12:12
**night**
24:17 319:10,15,18 320:4
**nights**
320:3
**nighttime**
10:17
**nine**
19:11 51:7 125:1,3,4
207:7 277:7,10 319:11
319:12 321:2
**ninety**
187:15,17 189:15 307:20
310:2,11
**ninety-day**
70:18
**ninety-six**
43:7 45:18
**ninth**
249:20,21
**nobody's**
215:10
**nodding**
8:13 319:13
**noncarbonated**
31:15,18 32:2,5
**noncritical**
82:20
**nonwhite**
183:23
**normal**
184:4
**North**
3:14
**NORTHERN**
1:3
**Notary**
1:23 2:7 6:2 371:23
**note**
90:20 91:8,11 95:15 96:6
96:20 98:16,18 99:16
101:12,15,21 102:4
103:3 222:19,20
**notes**

77:17,18,20,21 78:3,11
159:17 206:8 218:4,7,9
218:12
**notice**
317:12,16 359:19
**noticed**
79:10 248:1
**noticing**
201:3,6,9
**notified**
250:19 312:9
**November**
321:5
**number**
16:12 19:15 124:23 125:1
125:3,4 144:14 151:22
170:16 171:8,11,12
347:8
**Numerous**
152:1
**nutrient**
220:4

---

**O**

**O**
2:1
**oath**
8:1
**objected**
62:5
**objection**
62:7
**objections**
2:17,20
**obligation**
112:20,21
**observe**
155:23 270:9,12
**observed**
200:19 367:18
**obtain**
23:9 314:22
**obtained**
25:3 95:23
**obtaining**
24:5
**obvious**
237:18
**obviously**
79:14 81:4
**occasion**
108:12 202:9,10 211:14
217:5 224:23 226:13
232:20 233:3 323:13
**occasions**
28:9 75:23 108:2,6
138:17 152:1 153:18
369:8
**occur**
76:10 160:1 193:8,10

230:23
**occurred**
51:10 94:19 120:2 162:15
164:10 210:1 217:23
**October**
321:5
**OEM**
160:16
**offer**
41:19 42:2 43:23 44:2
141:18 303:18,22 304:6
304:12,15,16,22 305:3,5
305:7,13,21,22 306:7
**offered**
2:22 263:22
**office**
51:14 61:12,20 88:8,12,14
109:8,12,17,18,20 114:15
114:16,18 115:16 127:3
138:22 180:19,19 181:3
183:16 184:16,23 188:4
188:18,20 193:4 209:10
210:11 239:10,12 252:6
252:21 253:6,10 254:14
254:18 264:8 270:22
338:8 358:23 364:9
**officer**
315:16
**offices**
3:6 227:15
**official**
157:8
**officially**
240:21
**offset**
9:17 278:20
**off-color**
111:13
**oftentimes**
152:5
**oh**
9:22 86:13 167:22 189:11
247:9 248:6 264:2
340:17
**okay**
7:15,16,22 8:15,22,23
44:7 63:21 86:1 92:15
106:11 125:3 126:14
132:9 139:10 143:20
146:8 150:17 151:9,18
170:16 181:2,16 207:8
235:4 236:20 240:14
241:10 247:18 249:10,14
250:7 252:18 264:2
277:14 293:1 294:22
295:5 357:13 360:21
367:21
**old**
19:8,10 109:13
**once**
11:3 28:12 76:1 109:19

154:7 203:16 271:6
283:21 284:1,3 323:12
335:12
**ones**
153:7
**one-on-one**
209:7 210:10 211:11
227:14 228:8,12,13
**Online**
338:5
**Onyx**
1:10 14:14,19 53:23 54:12
54:13,17,23 55:3,4,5,6
55:15,20 65:6 69:5
90:5 91:3,13,14 93:4
94:7 95:23 96:2,7,18
102:3,13,14 111:14 127:3
138:23 142:2 148:11,15
153:8 200:13,14 203:5
204:3 205:17 215:22
216:9 217:15 219:6,6
225:1 229:14 231:14
232:1,8,13,21 233:9
234:9,22,23 235:3,10
236:11 237:8,11 243:4
252:14 260:4 280:8,21
300:12 301:2,12,13
315:22 316:1,3,8 325:3
328:13 335:18 336:15
337:9 347:18 354:10
362:4,5
**Onyx's**
101:23 111:23 197:21
202:2 204:13,20 207:15
208:11,17,18 217:6
219:12 220:12 221:3
225:2 226:14 227:2
229:5,23 231:15 233:5
255:12
**on-time**
46:16
**open**
86:9,10 159:8 196:13
201:3 206:13,17 267:5
336:15
**opened**
195:19
**openly**
111:22 328:16
**operating**
223:19 224:2,5,9 316:5
**operation**
224:12 240:5 302:1
**operations**
49:20 50:3 122:11 123:15
156:4 246:12,13,17
250:18 274:23 275:2
304:7
**operator**
309:10
**operators**

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 112 of 138

JERRY S. MACCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

224:6,11
opinion
14:14,22 335:7,9 336:4
366:3
opportunity
26:13 73:17 108:11 240:1
284:19 298:7 363:4
366:17
opposed
8:13 121:4 161:10 193:1
267:21 269:11
optimistic
261:1
oral
6:11
order
81:19 193:7
organization
104:16,19 136:18 215:16
organizational
241:18
Osborne
65:12,13,22 66:6 164:7
232:12,16,17 233:7
283:20
OS3
299:5
outdated
44:9
outgoing
49:21
outlined
97:14
outlining
345:9
Outlook
297:4 298:21
outrage
85:12
outside
24:23 185:3 232:4 333:3
overall
55:9,12 93:3
overdue
181:11,22
overhead
78:20
overruled
62:8
oversaw
50:2 51:22
oversee
49:20 124:6,16
over-the-counter
320:14
owed
331:5
owned
309:4 354:12,15,19,23
owner
34:13 41:2 280:1 309:6

309:10
ownership
55:16 96:19 102:15 215:7
278:20 279:20 280:4
280:22
owns
309:7
O'Connell
38:23 39:20 40:19,22
47:7,9,11 204:1 212:7
213:9 344:1
O'Connell's
39:23

P

P
2:1 3:1,1
package
263:11,21 264:1 306:12
packaged
212:15
packages
104:6
packed
188:6
packing
188:3
page
4:2 5:3 7:21 92:14 94:18
222:18 223:3,17 275:21
276:1,6 289:12 290:3
295:10 341:6,23 342:4
342:7 344:13 345:7
347:5,6 348:8
pages
92:16,20 93:1,6,8 288:14
292:19,23 293:2 341:13
341:14,20 342:4,10
paid
57:14 287:16 307:19
pain
185:19
painful
357:18
paint
109:12,15,16,21 110:1
180:11,21,23 181:12,22
184:20 188:18,21 193:1
painting
25:21 239:12
Palm
299:4
Pamela
20:18 21:2
paper
268:13
paragraph
93:11 94:18 248:2 344:20
345:20
part

57:1 60:4 70:7 92:17
110:19 205:4 208:18
212:21,22 215:15 230:1
268:2,4 279:19 304:1
344:6 351:13
participant
312:7
participate
308:4 311:15 313:4
participating
156:4 157:4,11
particular
120:13 154:11 163:13,14
170:3 188:22 353:3
362:8
parties
2:4,20 371:18
party
364:11
part-time
25:19
passed
95:1 265:5
passing
357:20 360:19
pasteurization
32:9
pasteurize
286:12
pasting
342:8
patched
341:11
path
297:16
paths
261:1,6
Patrice
97:8 108:4 126:21 130:13
131:20,21 135:1 136:20
138:12 139:17 140:6
148:1,2,10,12,22 149:9
151:11 152:11 153:11,14
153:19 154:19 155:1,13
155:17,20 156:3 157:3
157:13 158:7,17 159:10
162:5,19 163:10 164:15
168:12,14 172:8 175:6,9
175:19 193:15,20,22
195:10,15 198:22
200:19 202:16 215:4
216:19 218:20,21,23
Patrice's
168:16
pay
45:22 46:4,10 83:23
90:22 105:21 106:6
113:5,7,11,14,19 115:1
116:13,17 117:9 118:14
119:5,17 120:13 121:9,16
126:13 127:11 128:2,8

129:16,19 141:13 239:13
250:4,8,13,15,19 307:9
307:20 310:13 311:7
312:20
payable
57:13
payables
103:22 268:17
paycheck
265:16
paychecks
265:19
payroll
103:18,23 110:17,20 266:1
266:4,6,8,19 267:8,10
268:14,15
pays
199:18
PDA
299:5
peel
208:3
peeling
109:13
peer
162:6
peers
158:11
penalized
313:16
people
12:12 56:19,23 60:23
65:23 70:10 74:2 78:7
108:10 127:6 183:23
194:22 228:23 230:2
236:14 238:7 243:13
261:11 262:9 324:6
325:21 326:6 333:21
Pepsi
221:9 222:16,17 223:15
224:14,20 239:2 286:8
PepsiCo
221:14 223:11 264:21
PepsiCo/Quaker
220:22
perceived
140:13,17
percent
55:16,20 106:5 107:18
117:15 211:17 215:7
275:4 307:13,15
percentage
251:3
perception
172:17
perfectly
183:13,14 185:18
perform
237:8 244:12 336:9
performance
46:13 162:12 170:23

228:4 256:8 313:12
performed
283:23 313:14
performing
245:20
period
66:7 70:2,18,19 134:6
152:20 156:17 171:15
235:1 265:1 307:20
314:17 355:7
periodically
333:5
periods
156:11
perseveratives
32:11
person
12:4,5 36:11 84:23 114:1
114:2 164:20 184:7
187:21 190:17,18 206:4
229:19 358:22 366:13
personal
188:3,12 256:12 284:20
363:19
personally
240:3 300:9
personnel
59:20 83:13 103:13 105:3
109:14 367:1
person's
72:17
pertains
150:6
phased
248:17,19
phone
12:3 85:1 97:9 113:23
156:7,10 177:18 187:21
187:22 188:9 189:13,21
190:5,9 252:5,23 253:8
253:13,16 254:3,10
256:14 270:19 303:3
325:4,5,18
phrase
224:9 326:14
physical
317:20
physically
155:3,6
pick-a-nigger
324:8 326:14
picture
39:21
pictures
289:3,6,10
piece
88:19 109:3 170:17
190:23 333:19 343:20
pieces
339:6 343:1,4,8 344:8,10
346:4

**Piknik**
13:5 18:22 19:21 31:22
38:3,5,12,14,15 39:4,16
42:8,20 50:17 54:16
65:22 77:22 90:3,15,21
95:18,20 96:19 101:9,10
101:13 102:13,14 103:12
103:16,22 104:3,6 105:3
105:4 110:14,20 118:22
119:5 133:12 134:10
136:20 137:20,22
138:18 156:5 158:19
187:18 189:16 204:17
205:5 206:12 207:1
208:19 212:17 213:5
215:9,9,16 217:16,21
219:9,12 234:9 236:11
237:9 242:21 260:9,21
265:9,15,16,17,23
266:10,22 267:21
268:14,20,23 269:1,7,10
274:19 277:19,21 278:1
278:13 279:15 280:23
281:5 283:11,13 301:18
301:23 302:16 312:2,6
312:15 313:2,6 314:21
315:23 316:1,4 317:15
321:12 323:17,18,22
324:7,8,10,18 325:20
326:8,12 327:7 329:16
331:5 332:15 343:22
344:5 351:9 353:3,6,20
354:11,12,15,19 355:8,17
356:1,2 359:6 360:17
361:10 362:21 363:14
365:14 368:3,18,21
369:16

**Piknik's**
89:17,21 96:11 203:3,9
219:10 221:3 300:11
326:23 341:8

**pipeline**
42:18

**piping**
362:17

**place**
13:23 94:1 96:10 112:1
116:20 127:1 130:21
133:12 141:18 142:2
144:22 163:7 179:6
202:3 204:14,21 207:15
208:11,19 212:20 213:1
214:16 220:12 221:4
224:15 225:2 226:14
227:3 229:6 230:21
231:15 232:21 260:15
285:18 298:14 316:4,12
327:10 369:9

**placing**
214:3 217:7 219:13
223:23 347:19

**PLAINTIFF**
3:3

**plaintiffs**
1:8 330:6

**plan**
141:16 142:1 285:23
313:10

**planned**
161:15,16 286:9

**planner**
27:7

**planning**
239:1 364:2

**plans**
42:16 312:23 344:12,16

**plant**
44:21,22 45:11 48:17
49:8,12,15 76:13 111:21
113:16 120:9,17,21
122:18 123:20 124:3,12
124:14 126:1 127:12
181:4 194:13,16 204:5
208:3 233:20 234:15
236:18 238:16,22
239:21 240:4,23 242:1
243:21 244:2,6,16
245:5 249:7,11 254:15
257:8 264:22 270:21
279:21 286:16 366:4

**plants**
52:15

**please**
7:2 8:12,19 9:7 12:9
14:18 105:14 106:12
116:9 251:19 269:17
276:7 294:5 316:16
318:6

**plenty**
63:19 148:5

**plus**
127:12 153:9,10

**PMC**
160:11 161:20 168:5,9,22
169:2 170:2 177:8
180:3

**point**
51:9 90:13 99:22 154:15
154:16 206:3 212:8
306:5 315:23 316:2
317:16 321:1,13 326:10
347:5

**points**
91:13 92:11 94:14 95:8
207:6,7 277:8,10

**Polar**
30:8,13 31:4,10,13 32:4
32:15 33:7,17 34:5
35:13 36:1 37:22 38:2
278:5 279:19

**Polar's**
280:22

**Police**
341:9

**policy**
118:23 224:14 315:8
341:15,17 342:11 351:1

**Policy.doc**
342:1

**poorly**
313:14

**popular**
212:18

**population**
202:18 211:20 214:18,19
216:21 218:3

**position**
40:1 41:21 44:14,20 66:1
67:12 72:22 120:14
122:3,22 123:4 124:10
125:5,18,20,23 206:13
225:15 229:14,20 231:6
235:12 237:12 238:15
239:16 240:10,13,18
242:5,8,12,16 243:22
244:3,5 246:22 249:4
260:4 275:7 280:23
305:6 306:16

**positioned**
353:14

**positions**
27:17 44:5 68:22 69:3,8
69:11,21 70:4,23 71:2
71:10 86:9,11 112:3
126:19 127:8 204:16,19
204:22 205:1,8 206:15
206:17,20 207:2,17
208:13,14,21 213:3
214:4 215:19 219:16
220:14 221:5,6 224:1
226:16 227:4 229:7
230:3 231:17 232:23
238:7 243:8,10 347:17

**positive**
40:14 97:8 117:6

**possession**
334:18 354:8

**possible**
115:10 129:10 229:2
256:3

**possibly**
68:18 101:2 356:8

**posting**
31:12

**potential**
42:10 163:5 172:23 173:2
221:1,15 238:19 240:8
240:11 277:23 278:18
347:10

**PowerPoint**
100:2,19 101:4 219:4
334:12

**praises**

**87:2**

**precise**
182:20

**precisely**
67:17 79:23 150:23 218:1

**predominant**
203:11

**predominantly**
44:12 217:17

**preferred**
240:7,12

**prefers**
183:22

**preliminary**
238:4

**preparation**
286:14,15 287:3

**prepare**
343:3

**prepared**
13:9 343:7,13

**prepped**
271:22

**presence**
333:3 364:11

**present**
3:17 13:7 14:8 57:3
75:12 77:10,14 78:8
95:1,3 97:2 99:6
100:21 102:16 108:5
111:14 130:12 131:1
147:8,11,14 153:4
157:16 165:6 166:23
167:9 174:13 184:6
185:6 193:13 195:14
205:9 209:14 220:7
225:5 230:16 254:20
271:5,7 324:23

**presentation**
217:15 218:16 219:3,18
220:8 334:12

**presentations**
203:4

**presented**
90:5 100:19 102:19
147:18

**president**
30:17,22 31:2 122:4,10
309:11

**pretty**
14:23 62:7 77:23 97:13
177:16 182:10 195:10
200:22 211:3 228:16,20
229:23 255:9,11,14
273:4 312:22 319:23
326:18 336:13,17 345:1
349:14

**preventative**
108:14 144:16,21 159:19
160:8,18 163:6 164:22
169:2,8 170:4,6,12

**prevents**
10:20

**previous**
40:5 138:20 163:16
264:21 289:19

**previously**
217:20 233:18 285:16,18
297:2 339:8

**primary**
89:21 219:9 250:20
355:9

**print**
266:20

**printed**
266:6 267:19

**prints**
266:8

**prior**
2:23 10:8 94:20,21,22
96:11,18 98:22 120:15
138:13,18 143:9,14
145:4 173:9 174:8
178:10 188:1 336:6
339:20 354:10 355:10
359:8

**Privately**
354:3

**proactive**
161:13 237:15

**Proactively**
161:12

**probably**
9:22 159:7,8 189:8 198:7
199:12 317:8,11,18,23
321:4,17 329:1 337:2

**probation**
70:18,19

**Procedure**
6:6

**proceed**
189:19

**proceeded**
79:11 81:23 181:12 182:12
183:1 196:20 215:14
303:1

**proceeding**
190:22 332:16,22

**proceedings**
6:12

**process**
28:22 40:16 42:7 69:1
166:2 215:10 344:3

**procession**
351:6

**produce**
363:1

**produced**
45:6,8 46:15 349:11

**product**
29:16 33:12 134:21

**production**

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                                  http://www.TylerEaton.com

JERRY MACCARTNEY ET AL vs.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 114 of 138

JERRY MACCARTNEY
August 17, 2007

24:12 27:6,7 32:1,3
49:22 50:12,14 52:4
67:7 86:11 160:20
163:5 170:21 173:9
186:12 203:10 205:17
206:18 254:16 270:20
274:5,6 352:8 366:14
productivity
285:17
products
29:18 32:17 33:7,17
220:5 238:23 353:20
354:12,15
professional
237:15 319:2,3 322:1
profile
302:23
profitability
178:1
program
24:4,10 108:15 133:8
159:20 160:9 161:4
163:7 165:3 167:21
168:9,22 169:3 170:3,5
170:7 171:21,22 172:22
173:13,15,16 175:22
176:15 178:10,23 179:21
224:15,21 308:1,3
311:13,21 312:8
programs
25:1 163:20 167:18
168:19 169:12 176:20
286:20
progress
88:16
progressive
26:17
project
59:7,11 60:7 79:9 132:17
135:13,23 138:5 171:7
289:18 290:17
projections
141:11
projects
60:19,20,21 178:16,21
221:1 237:17
promised
141:17
promoted
30:16,21 34:7
pronunciation
184:13
proof
72:16
proper
17:17
properly
62:17,19 134:20 346:23
proposal
147:4
proposed

59:7,10 142:14
proprietary
353:5,12 356:1
prospect
365:9
prosper
212:19
protecting
199:8
proven
106:4,17 107:14
provide
42:15 98:21,23 104:5
159:20 190:2 191:7,10
238:1 351:23 352:10
provided
62:18 78:10,12 175:17
218:7 338:13 340:20
350:6
providing
8:4 56:5,7 153:15,20
365:19,21
PST
283:18 284:5,9,21 291:20
295:20 297:3 298:20
299:9,12 339:7,10
Public
1:23 2:18 6:2 371:23
publically
224:21
puff
11:4
pull
101:14 102:4
pulled
292:16
purchase
108:22 144:16,18 159:21
168:5 171:23 174:1,5,7
175:2 277:19,21 281:5
purchased
29:5 109:7 149:18 161:20
161:22 173:12 369:7
purchaser
42:10 278:1 281:4
purchasing
27:9,10 30:16,18 32:14,16
33:10,12,15,21 34:5
49:22 51:17,19,23
108:14 171:16,17
pure
286:12
purpose
147:10 174:20 343:18
pursuant
6:5
pursue
39:6,9 170:12 327:5
pushed
292:14
pushing

162:10 295:1
put
81:18 91:14 96:15 97:6,11
97:20,22 99:19 100:15
115:7 132:20 141:7,18
142:2 152:23 155:3,6
169:17 202:23 203:23
266:9 284:7 313:10
328:16 346:5
putting
369:13
p.m
94:4 150:19 207:10 288:9
288:9 289:1,13 295:11
370:1
P.O
3:7

## Q

Quaker
77:11,14 79:9 82:17,21
qualified
63:8,13,15,19 64:15
qualifies
111:9
quality
25:7 117:21 118:1 229:18
230:8 286:12,20 336:6
question
8:21 9:2,3 63:6 93:6
116:2 140:1,2,4 194:23
198:9 252:9 316:7
317:2 325:22 352:2
questioned
177:21
questions
2:18,19 8:3,5,10,19 12:23
13:2,4 14:13 273:6
351:20 371:10
quickly
194:23 255:14 309:14
327:9
quite
82:6 218:22 260:22
317:8
quota
272:3
quotas
270:21
quote
172:10

## R

R
3:1 371:1
race
54:4 65:18 66:21 69:10
69:17 73:2 75:10 99:17
105:10,17 121:4,7,13
128:19 129:23 138:8

150:7,11 151:8 155:22
158:9 159:17 170:14
180:10 192:23 199:8
231:10 242:18 244:23
246:23 249:3,6,9,12
250:11 251:21 277:6
299:18,23 300:5 316:20
327:23
race-based
99:7,10
racial
323:4,7 327:22 331:11
racially
328:17
racist
72:13 73:9
racist-based
96:8,22 102:10
Ralph
280:1,5
ran
26:3 197:19
Ransom
184:11 185:9 192:11
Ranson
184:10
rate
120:13
raw
32:23 33:15 51:19,23
reaching
300:19 301:7
reaction
197:20,21 198:11 361:7
364:9
reactive
160:18 161:16 163:3
reactively
161:13
read
58:19 92:3 93:6 114:11,21
115:21,22 172:13 222:5
252:17 255:21 316:11
reading
2:10 270:18 350:18
ready
286:16,18,22
real
110:6
realistic
141:1,10
realize
10:18 351:7,8 365:1
realized
320:22 327:8,15
really
44:9 149:21 156:15 160:6
162:9 262:9 287:16
reason
9:7 14:23 46:9 82:23
83:2 107:20 111:2,5

121:4 171:8,9,11,12
249:20 261:23 268:18
268:19,22 349:7 356:5
369:16
reasons
37:7,9,17 135:4 166:5,11
170:15 244:21 263:10
268:17 317:1
recall
13:13 15:4 25:2 28:8
35:22 37:7 43:17 46:3
47:14 48:1 51:6 53:9
55:11 56:14 57:11 58:21
59:16,22 64:22 67:15
69:2,7,10 70:12 71:8,9
72:3 74:1,16 75:15
76:20 77:2,17 80:1,12
82:13 83:4 91:15 92:10
92:12,13 93:9,21 94:13
95:10 96:5 98:14,17
99:3 100:11 102:6,9
104:14,18,22 112:8
113:20 117:8 118:18
127:6 128:17 129:14
134:21 148:20 152:14
164:22 166:14 177:7
188:12,20 203:19,22
204:12 206:1 207:20
209:20,23 210:2,4,7
211:23 217:6,13 218:18
219:20 220:11 221:11,12
225:1,17 226:18 230:20
230:22 231:13,22 232:2
232:6,20 233:19,21
234:21 235:6 236:2,10
239:19 241:13,15 242:8
242:22 243:1 247:18
254:4,6,8,23 258:2,7,9
273:12,18 276:17,23
277:4 278:7 280:10,11
280:13,14,16,17,19
281:21,23 282:1 284:8
286:7 287:14 292:12,13
292:16 293:7,19,22
294:11,15,23 296:21
299:14 303:7 305:9
307:11,17 311:12 312:21
313:9 314:18 323:20
328:6 333:16 334:9,21
335:13 336:4 344:10,19
344:22 345:2,4,12,15,17
345:20 346:22 347:23
350:16 351:19 352:4,17
353:7 354:17 363:21
368:8
recalls
90:9
recap
220:21
receive
23:13 45:22 46:18 121:9

JERRY McCARTNEY et al. -TFM     Document 74     Filed 10/29/2007     Page 115 of 138
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MACCARTNEY
August 17, 2007

121:16 128:2 303:11,14
303:18,21 304:22 305:2
310:13 313:22 314:13
**received**
24:20 42:2 46:4 70:5
93:23 110:17 119:16
171:4 253:15 257:5,15
263:13 305:5,7,20
306:10 310:10 312:14
349:9,10,16
**receiving**
35:4 247:18 281:21
351:19 352:4
**recognition**
326:6,11
**recognizable**
325:21
**recollection**
97:18 120:2 295:16,18
**recommend**
108:13 160:15
**recommendation**
134:16 137:4 162:4
168:12,14 284:3
**recommendations**
59:20 153:21 283:19
365:20
**recommended**
54:19 139:19 159:19
161:19,21 166:2 299:3
**recommending**
107:17 160:10 237:11
369:19
**record**
56:15 112:14 146:9 174:21
176:18 178:19 189:21
191:3 231:20 288:7
316:11
**recorded**
15:11
**recording**
15:20,23 16:3
**recordings**
15:13,17
**records**
47:4 90:23
**recount**
276:11
**recruit**
38:18,22 223:18 345:10
**recruited**
308:19,22 344:5
**recruiting**
38:23 39:21 86:9 343:22
344:2
**redo**
140:20 141:4
**reduced**
114:9 115:2 128:9 245:11
371:11
**reduction**

121:3 128:18,22 129:2
132:22 141:12,21 250:8
250:13,15 251:16
**reductions**
134:9 172:5 266:13
**REEXAMINATION**
4:4,5,6 368:1 369:3
**refer**
163:23 164:18 222:21
**reference**
190:14,15 202:16 232:7
264:10
**referenced**
93:14 94:10 95:4 224:19
239:2 255:16 330:7
**references**
94:2
**referencing**
232:1 250:3
**referred**
164:13 182:22 224:10
225:19 264:7 297:2
**referring**
98:15 188:15 192:23
198:2 222:9 260:12,19
**refinancing**
39:12 98:19
**reflect**
293:3,5 296:15,18 297:1
297:10,17 298:10,19
299:8
**reflected**
293:20 294:12
**reflects**
241:23 288:15
**refresh**
120:1 189:10 295:15
**refusing**
90:15
**regard**
144:16 147:22 171:6
214:3
**regarding**
74:16 94:17 98:5,8,16,18
103:17 104:4 105:3
116:21 119:16 142:8
158:7 201:20 222:14
224:20 225:16 227:17
232:3 236:8 250:15,17
281:4 333:11,23 350:12
353:5,12 356:10
**regardless**
144:7 293:11
**regards**
90:8 129:16
**register**
368:11
**registered**
368:13
**regret**
257:20

**regular**
82:4 110:19 130:10
250:17 267:8 270:19
283:23 286:21
**regularly**
283:23
**reimplement**
132:14 135:22 136:17,21
137:20 138:1 232:5
**reiterated**
225:15 228:3
**reiterating**
335:2
**reject**
305:13
**rejected**
305:19,21
**relate**
78:5 101:12 338:15,21
340:16 341:15 347:14
350:8,17
**related**
141:16 154:12 249:9,12
363:1
**relates**
128:18 142:10 147:21
148:9 150:5 158:8
177:9 180:4 201:21
242:4 277:5 339:2
340:11 347:3 351:11
**relating**
2:14 98:11 102:9 106:6
249:2
**relation**
96:11 286:8
**relationship**
98:12 138:13,21
**relationships**
32:19
**relatives**
18:2
**relax**
12:11
**relief**
322:15
**relinquish**
245:15
**remain**
238:8
**remainder**
203:8 312:11
**remained**
140:1,4
**remaining**
31:3
**remember**
12:20 14:12 23:23 50:23
66:16 67:4,4 70:17
104:13 117:22,23 120:4
189:11,12 192:15 193:18
217:9 220:6,15,17

225:6 234:11 236:22
237:1,3 256:17 281:1,6
281:8 283:7 287:11
292:17 304:1 311:11
313:16 345:6 346:20
**remembered**
189:9 190:22 191:2
**remind**
213:16
**reminded**
139:17
**removable**
294:19 295:12
**renegotiate**
305:23 306:2
**repaint**
109:14 193:3
**repainted**
180:20 183:16
**repair**
132:11
**repay**
95:19
**repeat**
14:18 58:3 106:11 269:17
316:9
**repeated**
137:7
**rephrase**
8:20
**replace**
49:3 208:14 214:12,16
260:14 265:13 269:16
269:22 335:11 336:5
**replaced**
53:22 54:21 60:10 78:21
78:23 79:4 110:23
225:22 226:1,4 229:2
232:15 243:12 249:8
251:22 327:12 369:12
**replacement**
226:10 237:6 314:22
337:4 362:17
**replacing**
225:14 243:14
**reply**
262:2,5 283:5 350:2
**report**
48:9 58:9,12,15,19,23
65:6 88:16 248:3
**reported**
1:21 48:7 52:13 62:6
74:3,19,20
**Reporter**
1:22 2:7 6:2,19
**reporting**
35:16 61:15 67:6 247:9
**reports**
285:21 286:20
**represent**
288:1

**representatives**
82:21 103:2,7 217:12
**represented**
328:23
**representing**
7:8
**represents**
371:13
**reprimand**
79:11 81:23 85:18 87:8
88:22
**request**
141:3 142:13,22 143:15
145:18 146:17 168:4
282:6 352:8
**requested**
36:21 108:18 240:3 282:7
286:9
**requests**
56:9
**required**
108:23 152:3 176:18
218:10 257:17,21
**requirements**
271:23
**requisition**
145:2
**rescue**
11:2
**research**
137:13
**researching**
302:23
**resides**
16:15 17:7
**resource**
133:5 134:22
**resources**
62:17 64:11 122:7 123:3,6
123:7
**respect**
78:7 131:13 155:8 170:2,4
**respective**
2:5
**respond**
8:12 117:6 186:1
**responded**
31:12 116:3 340:18
**responding**
56:8
**response**
85:21 93:4 181:19 195:5
279:22 325:6,9 364:20
**responses**
8:4,9,17 348:15,18 352:1
352:10
**responsibilities**
32:14 34:15 52:7 70:8
79:13 123:19,21 124:14
124:22 125:10 226:11
239:6 241:2 243:4

JERRY MACCARTNEY, ET AL V.
ONYX CAPITAL VENTURES, LLC, ET AL.

Case 2:05-cv-01207-MHT-TFM    Document 74    Filed 10/29/2007    Page 116 of 128

JERRY MACCARTNEY
August 17, 2007

247:13 248:16 250:6
336:12
**responsibility**
50:1,16 51:1,10 52:4
123:23 125:11 126:6,10
225:10 226:6 247:8
**responsible**
51:17,23 124:5 164:5
240:23 244:11 246:11,16
**rest**
47:18 49:5 51:11 85:16
87:5 117:10 173:5
197:21 325:12
**restructuring**
242:21 243:2
**result**
141:13,20 316:18 317:4
371:19
**resulting**
140:18
**resumes**
303:4,6 368:6,10
**retained**
350:23
**retired**
17:20,22
**retroactive**
115:3
**retroactively**
105:21
**returned**
95:11 110:10 258:23
269:20 364:7
**returning**
81:18
**revenue**
154:13 160:22 163:5
170:23 172:4 177:14
**reverse**
332:19
**review**
83:15 131:11 162:6 296:8
298:8 346:23
**revimplstrategy.doc**
290:22
**revolving**
280:20
**Ricky**
40:19 41:1 282:3,5,7
338:10 354:13,14,16,18
**Ricky's**
282:6
**right**
25:11 85:2 106:23 107:7
107:16 136:22 149:2
180:11 193:18 198:7
232:14 235:21 250:1
261:8 264:14 289:18
314:8 315:12 329:3
338:3
**rights**

199:9
**Road**
45:4,6 76:12 109:11
180:19
**Robert**
40:20 41:3 100:22,23
118:7,8 130:14,15 194:3
205:22 219:2 343:12
**Roger**
17:13 330:5 332:1,13
**Roger's**
332:3
**role**
63:8,14 164:9 194:5
242:1 243:16 347:11
367:16,19
**roles**
223:19 224:5,9 225:3
260:16 347:21 365:16
365:23 366:3 369:10
**roll**
156:16
**rolling**
285:23
**room**
108:5 130:23 193:11
205:17 214:23 216:4
217:11 288:17 290:20
291:6,23 295:3 297:7
**rooms**
215:1
**Rose**
3:13
**roughly**
52:12 69:7 307:3
**routine**
131:9
**rule**
6:5 169:15 349:13,16
**rules**
2:14 6:5 7:20
**run**
62:19 70:11 89:5,11 240:3
240:4,7 312:11 330:19
**running**
65:7,10 88:18 164:6
240:23 271:20 285:20

**— S —**

**S**
2:1 3:1 4:9 5:1
**safety**
52:10,11 286:6,11
**SAITH**
370:3
**salaried**
53:17
**salaries**
114:20 115:17 119:1
**salary**

43:5 46:7 114:8 115:7
117:3 121:3 128:18,22
129:2 245:10 251:16
265:16 267:10 304:9
305:9 306:19 308:9,14
310:1,11,18 314:7
**salarywise**
35:10
**sales**
178:4,5,8 194:6,11
**salvage**
282:4,9
**Sander**
366:11
**Sanders**
270:6
**sarcastic**
261:4
**sat**
36:10,22 166:15,17
**satisfaction**
46:16
**save**
282:21
**saving**
291:1 294:13 295:17
297:10
**savings**
46:14
**saw**
86:6 92:9,18 153:11
217:14 247:6 261:16
344:5,9,11 361:7 364:8
**saying**
8:12,13 15:4 56:16 129:15
136:5 149:12 152:12
165:2 181:9 200:17
203:19 204:12 213:10
220:11 231:14 247:23
249:1 254:7 255:1
263:16 266:4 320:2
**says**
10:18 61:22 94:18 107:12
115:16 120:12,16 135:6
181:20 182:14 222:19
223:17 242:11 247:10
248:11,11 276:15 295:10
297:21 299:6 341:23
349:20
**schedule**
154:12
**scheduled**
160:21
**scheduler**
27:6,8
**schedules**
162:13
**scheduling**
49:23 50:14 52:4 67:7
170:22
**school**

22:5,12,13 25:17,18,19
26:6
**scope**
137:15
**Scott**
13:21 14:2,10 15:4 281:3
309:11,18 315:19 337:20
**screaming**
82:2
**screen**
102:9
**screenshot**
291:19
**scrutinized**
147:1,5
**scrutiny**
143:3 145:10 146:16,16,18
171:1,4 172:21
**search**
176:21
**searching**
42:8
**second**
48:20 66:20 68:15 70:15
129:22 167:16 183:7
276:1,6 286:1 303:23
344:13 345:7
**second-hand**
116:15,16 128:13 200:15
269:15 270:3 272:17,20
273:16 301:20 302:2
**second-shift**
274:6
**section**
299:7 344:15 345:5
346:1
**secure**
42:14
**secured**
39:14 40:11
**security**
16:11 266:13 290:16
291:3
**see**
27:15 39:3 81:1 176:22
179:11,21 195:17,21
196:1 222:19,23 223:4
266:23 267:7,12 268:10
279:8 291:18 295:11
297:20 318:22 319:1,6
329:1 335:18 337:9,11
341:22 342:3,6 345:22
**seeing**
92:10,12,13 93:21 99:4
201:2 241:16 268:2
345:4,6,13,15,18,21
**seek**
318:15,18 320:6 321:21,23
**seeking**
300:8 316:13
**seen**

92:1,6,19 119:12 154:19
241:11 262:19 265:19
334:14 342:22 343:1
345:22 346:2,15 361:14
**selecting**
297:16,19 298:20
**sell**
219:8 230:3
**Sellers**
16:1 72:11 73:4 74:4,8
75:4,5 84:13,16,20 85:9
86:3,19 87:10,14,17
88:1 101:2 105:22 111:2
113:21 114:8 117:2,9
118:19 119:4,16 121:17
122:6 123:1 126:16
128:5,8 130:16 153:9,10
153:12 154:3 192:7
199:2,5 201:10 206:1
252:4,21 254:11 257:11
258:11 263:15 264:8
276:13 325:2 346:21
357:1 358:12
**selling**
230:1
**Semantics**
44:6
**send**
178:18 266:19,21
**sending**
270:18 283:1,4
**senior**
87:5 96:9 112:2 114:19
115:16 117:15 118:6
126:18 127:7 134:17
153:6 167:5 173:8,9
202:4 204:2,15,23
205:18,20 206:2,14,16
207:16 208:13 213:2
215:18 217:10 219:1,15
220:20 221:4,6 223:23
224:7 227:12 234:2,4,7
236:7 251:1 260:15
323:15 324:11 325:1
347:20 369:9
**sense**
317:22
**sent**
97:22 98:3 100:14 103:21
166:3,14,16 202:10
259:12,20,23 265:20
300:23,23 343:21
344:23 345:9 368:8,10
368:10
**sentences**
222:21 223:5
**sentiment**
99:13
**separate**
106:9,10 108:3,12 144:13
144:19 252:19 346:4

sequence
182:21 236:2,23
serious
38:17 81:2 112:20
seriously
79:14 80:3 140:10
served
21:5
server
283:22
serves
43:23 44:3 57:9 65:3
118:16 156:22 235:20
service
266:8,18,22
services
111:3,6 256:6,10 257:16
257:21 302:21
set
46:17 165:4
sets
29:16 354:1
setting
220:18 278:7
seven
24:16 298:23 356:21
seventy
113:12,14 115:2 305:11
severance
104:5 263:10,11,13,18,21
263:23 264:3,4,10
shaking
348:16
Shannon
13:18 15:6 77:12 83:5
100:23 118:10 130:15
194:2 195:17 201:3
205:23 254:1,6 255:16
286:17 309:5,18 328:3
329:11 336:1,5 337:17
Shannon's
195:19
share
117:3 285:8
shared
138:22 285:5 287:4
sharing
270:22
sharp
60:18,20
Shea
20:18 21:2
Shelly
221:10
shift
66:20 70:16 214:21 271:2
271:11,16 272:4,5
shift-start
250:18
shipping
34:17 35:3

shirked
79:13
short
148:7 325:11 347:11
shortcomings
134:19
shortcut
287:17
shortly
55:15 95:9 101:8 102:2
202:14 226:2 229:12
238:14 327:7 330:22
336:23
short-tempered
318:1
show
90:23 96:14 266:11
281:17 287:22 359:13
showed
99:4 101:4,17,18,22
146:13 237:16 358:22
360:4,17
showing
96:16 265:9
shown
90:21
shows
291:19 296:21 297:4,16
298:20 299:4
shut
108:7,9 151:12 153:2
158:7
shuts
154:20
shutting
148:4 159:1
sick
117:23 266:12 356:23
side
73:17
sign
25:21 83:15 263:20
353:11
Signal
25:22
signature
2:9 275:20,23 341:6,13
348:9
signed
25:12 241:13 329:6,7,12
336:23 341:14 348:12
signs
90:21
similar
43:16 171:4 177:2 241:16
328:23 353:23 354:1
sincere
211:8
single
275:10
Singulair

9:12,18,23 10:4,6,8
sit
227:13
site
337:5
sites
162:1
sitting
110:12 193:17 217:4
252:11 255:7 270:16
situation
91:1,4 94:7 95:20,21
238:11 279:15
six
23:11 43:7 45:19 48:1,11
51:7 55:17 106:16
107:14 237:23 320:2
skill
262:12 354:1
skills
62:2,13 67:12 126:3
302:21
sleep
10:19 318:8 319:8,23
320:10,14
sleeping
319:10,15 321:2
sleeplessness
320:7
slept
320:3
slides
203:1,5 217:21 219:10,13
Sliter
17:13 332:4
slowly
181:17
slur
323:7
slurs
323:4
small
88:22 170:17 172:22
smirk
116:5
snapshot
296:10
snapshots
288:2,7
Social
16:11 266:13
socialize
337:14,17,22
society
24:13
soft
31:15 32:10
software
108:15,23 109:4 143:19
144:12,17,22 145:15
149:18 161:1,4,20

162:22 163:13,14 164:23
169:2,3,9 170:5,13,18
171:17,19,20 172:22
173:13,16 174:18
sold
215:10
somebody
195:20 238:9 325:3
326:7 354:9 362:18
someone's
28:10 35:23 37:6
son
188:10
soon
81:19 100:17 115:9 129:9
364:3,4,5
SOP
290:1
sorry
7:11,15 44:1 52:10 56:21
63:4 76:18 79:5 80:19
85:4 104:17 107:15
121:19 167:14 168:2
169:6 178:7 192:5
195:7 213:20 233:13
252:16 255:17 260:15
262:6,22 263:11 264:4
264:12 282:13 301:1,22
305:16 307:16 312:5
317:10 319:4 329:10
340:17,17 348:20
357:17
sort
98:9 162:13 267:17
sound
314:8
sounds
252:18 281:7 329:3
source
322:11
sources
221:15
Southeast
196:19 197:9
SouthTrust
89:17,20 90:3,8,14 91:10
93:3 95:14 97:12 98:13
99:16 103:1,10,12,16,17
103:21 104:3,4 105:2
SouthTrust's
89:23 96:5 103:6
Southwest
196:20 197:10
space
297:6
speak
8:19 11:23 14:2 154:14,23
191:17,20,23 192:6
330:14
speaking
42:20 97:16 250:13

spearheaded
166:19
spearheading
162:9
special
272:2
specialist
27:9
specific
12:22 13:10 64:19 98:21
105:19 152:14 156:14
218:9 225:18 267:16
271:23 274:12 281:23
334:8
specifically
42:19 80:13 96:3 168:22
169:4,7 197:23 281:8
333:17 334:21 353:13
specification
365:21
specifics
13:3 113:21 203:3 220:17
speech
155:5
speed
177:19
spelled
323:22 324:2
spelling
184:12 323:17 325:21
326:12
spend
107:11 137:13 185:20
291:11
spending
130:11 131:11,17,22 135:20
139:19 142:23 143:7,15
145:2,9,19 146:17 147:4
147:12
spent
167:16
Spier
1:21 2:7 6:1
split
183:4 243:15 244:19
spoke
87:23 88:2
spoken
11:17,20 13:18,21 235:6
330:2 331:23 338:10
sporadically
319:19
spot
199:14
Spring
55:22,23 67:18 193:9
330:17
staff
51:21,22 94:3 95:4 96:10
103:22 108:3 117:11
130:10 131:10 134:17

JERRY A. MacCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

JERRY MacCARTNEY
August 17, 2007

151:11 152:19 153:6
154:14,18 155:14,18
157:4,6 162:7 167:5,7
167:10,12,13,15,16
168:17 169:21 173:5,6,8
173:10 174:10,12 179:8
179:14 194:9 202:20
204:3 205:16,18,20
206:16 211:19 212:4
213:13 214:2 217:10
219:1 220:20 222:13
224:7 225:8 227:12
236:7 269:13,18 270:16
273:22 278:16 286:22
323:15,16 324:11 325:1
325:13,23 361:11
364:23 365:4
**staffing**
86:8 274:14 367:1
**stamping**
25:20
**stand**
78:20 335:19 337:10,12
**standard**
180:23 271:18,19 272:6
274:9,12 286:6 307:8
**standards**
160:16
**standing**
230:22
**stare**
335:18 337:9
**start**
26:18 157:19 159:7
245:19 286:19 302:6,11
309:9,21 317:12,13
321:10
**started**
38:5 43:2 45:18 47:5
89:9 181:9 204:7 206:6
209:6 255:1 271:21
278:13 304:4 306:13
314:15 317:19 321:2
330:21,22 343:16 354:9
368:3 369:20
**starting**
43:5 288:22 302:16 310:1
314:21 321:18
**starts**
114:15 157:12
**start-up**
270:14 271:3,11,16 272:6
366:7 367:4
**state**
6:3 7:2 22:17 23:13
24:15 197:23 303:16
304:19,23 305:3,22
306:3,8 363:9 371:4
**stated**
44:3 96:2 101:17 111:23
112:5 114:19,22 121:6

125:7 128:11 169:23
202:2 219:13 221:2,14
258:7 282:2 284:18
298:14 345:19 367:2
**statement**
102:6,7 109:21 132:18
158:21 168:17 181:13
188:23 190:2 191:7,11
191:18,21 192:4,20,23
201:20 202:7,13 205:10
205:14 209:3,22 210:15
210:20 211:15 213:19
225:20 226:22 270:1
325:7 335:16 337:8
353:10
**statements**
80:2 122:1 182:21 230:12
231:19,23 347:18,23
**states**
1:1 347:16
**stating**
96:7 145:7 225:2 337:2
**station**
76:11 77:7
**statistically**
161:14
**status**
89:18 126:21 178:15,21
179:17 257:7
**stay**
18:16 307:1 318:13
**staying**
363:13
**stenotypy**
371:9
**step**
123:9
**STIPULATED**
2:3
**stipulation**
6:7
**stipulations**
6:20
**stock**
268:13
**stomach**
9:18
**stood**
216:23
**stop**
153:14 155:3
**stopped**
85:6 88:14 126:23 152:6
156:20 157:11 176:10
316:4
**stopping**
157:13
**storage**
179:4 293:13 294:14
297:6,12
**store**

34:17 35:4,6
**stored**
339:2,6 340:10 350:7
**story**
73:17
**straightened**
238:10
**strange**
199:7
**strategy**
90:7
**street**
19:15 51:15 73:1 109:17
120:18 130:22 193:12
205:16 209:10 214:22
215:2 235:14 239:10
257:3,10
**stresses**
322:5
**stretched**
70:1
**strike**
28:13 90:13 122:5 161:8
279:9 308:9
**strings**
174:22
**stripes**
109:23
**striping**
180:22
**strong**
333:14,19
Strowbridge
229:13 336:3
Strowbridge's
230:7 231:6,9 242:12
**structure**
62:17
**studied**
314:3
**studio**
363:16
**studying**
285:22 287:2
**stuff**
25:7 188:4,6,12 256:12
262:20,23 266:9,14,21
274:10,12 286:13
288:17 291:22,23 307:8
326:22
**subfiles**
297:19
**subfolder**
294:20
**subject**
83:12 106:10 108:3 152:9
156:14 167:8 187:10
189:4 194:19 197:15
211:6 225:7
**subjected**
82:18 83:1,2 88:21 172:21

**submit**
162:20 303:4,6 368:6
**submitted**
142:20
**subsequent**
100:4,18 139:16 167:5
187:11 204:4 342:3
**subsequently**
96:20 125:7,11 231:6
**subsided**
317:17
**substance**
81:7 93:7
**suburb**
17:17
**sued**
21:14,17
**suffer**
141:12
**suffered**
316:18 317:5 322:15
**suffering**
322:4
**sufficient**
64:11 67:11
**suggestion**
136:16
**suit**
331:11
**suited**
61:16
**summarily**
199:13 200:2
**summarizing**
223:9
**summary**
102:5,7
**summer**
55:23 69:4,23 71:1,11
130:8 151:4 157:20
210:6
**sums**
317:8,11
Sunday
358:10 360:3,12
Sundays
320:1
**supervision**
79:16 371:12
**supervisor**
72:23 206:22
**supervisors**
117:19 366:14
**supply**
26:23 27:3,10 29:8,11
32:19 38:17 43:13,18,20
44:8,15 225:10 246:19
**support**
285:5
**supposed**
78:2 133:21,23

**sure**
29:2 40:2 47:3 51:8
57:12 68:11 89:23
95:10 101:3 111:8 112:18
124:5 154:15,18 182:20
184:11 186:15 193:15,23
211:17 225:23 230:19
239:8 240:19 241:3
247:11 248:7,12,19
249:15 258:1 270:7
277:11 300:10,13 309:11
351:15 354:7 368:9
**surgery**
360:9
**surprise**
174:17
**surrounding**
72:10
**suspended**
83:17 140:12
**sworn**
6:16 21:11
**symptoms**
318:7
**synchronizing**
299:4
**system**
59:5,11,12,15 107:6,12
109:6 132:13,16,19
133:1,3,4,10,11,12,13,15
133:17,20,22 134:3,5,7
134:11,18,20 135:2,12,15
135:16,22 136:1,6,10,10
136:12,17,21 137:21
138:2 139:20,21 140:7
140:19 141:13,14 142:9
142:9,15 144:17 145:15
145:19 147:23 148:8,9
149:20 158:2,2 177:19
232:6 266:7 340:2
**systems**
106:2,14,15,15,22 107:1,3
107:4,17,19 130:2,3,3
132:15 142:16 143:1
145:3 150:6 151:3
S-H-I-T
211:4
S-L-I
17:14
S-L-I-T-E-R
332:10

**T**

T
2:1,1 4:9 5:1 371:1,1
**table**
169:18 195:1 306:7
335:18 337:9
**tailed**
204:8

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

take
8:8,17 9:6,8,16 10:6,15
11:4 14:15 19:23 25:17
35:15 62:2 64:7 65:7
71:14 79:14 92:2 93:5
105:20 126:10 129:7
130:20 152:8,9 164:1
170:9 188:5 208:4
240:12 244:2 245:9
248:7,12,22 262:7
263:20 288:3 292:19
294:5 306:4 320:9,12
320:20 351:16 358:7,14
358:14,16 360:6 365:17
taken
2:6 13:23 71:16 94:1
96:10 97:13 101:20
102:12,13 115:1 150:19
207:9 238:5 239:8
247:12 260:5 278:21
371:8
takes
161:18
talented
223:19
talk
36:3 82:7 85:6,22 89:4
105:18 108:9,11 113:4
115:14 126:14 128:21
129:1,18,21 151:6,14,16
159:14 165:3 177:17
180:8 185:8,11 193:7
203:1,2 205:12 211:10
212:3 213:4 217:4
227:13 235:2 236:17
250:21 251:18 255:22
258:20 259:4,7,13
329:1 333:1 358:12
363:18
talked
75:3,6,8 86:8 103:9
155:10 176:23 212:9
215:12,21 232:12 242:13
250:7 257:6 328:6,13
328:15 329:4,11 336:22
talking
82:4 89:10 90:7 91:13
92:11 94:14 95:7
104:15,18 125:13 158:23
159:18 190:19 204:3
211:2 218:13 258:18
324:1,4 356:9 358:11
talks
350:20
tape
15:11 184:20 189:21 191:3
353:4
taping
184:21
tax
216:15
taxes

taxing
363:10
teach
64:21
team
85:16 87:5,6 205:18,19,21
216:22 269:19
technical
60:21 61:4 62:13 64:13
79:8 133:8 203:9
217:20 218:10 365:21
technologies
353:23
technology
59:4 62:2 353:13
teeth
10:19
telephone
252:20 341:9
tell
9:1 12:9,11 13:1,8,9 25:15
36:17 37:9 38:11 60:17
61:22 78:18 79:11 81:17
97:4 110:3 111:7 113:13
114:14 130:5 131:15
151:23 154:9 165:19
180:13 181:17 182:2,14
183:1 186:8 187:20
196:10 199:22 203:18
204:11 209:2,9 211:2
214:17 237:2 243:18
247:22 252:2 254:22
256:6,9 279:1,13 309:8
323:13,19 328:9 333:7
335:23 336:19 364:3,4
364:5
telling
71:20 144:10,20 158:1,21
164:12 207:12 222:11
273:6 321:8
tells
73:7 239:15
temp
184:14 185:12
temporary
192:14 297:5
ten
9:22 125:1
tend
295:7
tenth
25:19 144:14
tenure
18:21 27:15 70:13 71:3
353:4
term
44:9 151:12 163:18 200:2
213:5 323:11 324:18
344:12,16
terminate

28:5,9 35:19,23 36:15
37:2,6 53:5,10,16 63:1
64:3,6 66:12 67:1,8
68:19 71:21 72:15 73:14
75:16 300:16,20 301:7
terminated
36:20 37:16 45:13,14
61:10 67:16 110:23 111:1
124:15 187:16 200:15
245:7 249:6,22 250:2
263:12,16 277:6 302:3
327:23
terminating
57:19 60:1 62:1
termination
36:23 54:7,20 61:14 62:5
251:19,21 252:3 259:8
264:5 276:8,12,20
277:1 283:14 313:8
319:9,14 358:2
terminations
37:11
terminology
300:11
terms
62:12 63:23 90:15 127:17
137:9 215:8
testified
6:17
testify
11:12 21:8 146:5 191:14
testimony
21:12 293:18
Texas
30:2 363:11
Thank
113:3 234:14 369:21
theme
152:2 203:11
thereabout
358:8
thereto
2:23 371:10
thing
31:21 37:18 43:14 106:14
133:21,22 162:13 164:21
250:21 267:18,18 318:10
326:19
things
78:9 87:4 106:18 124:5
126:4 129:7 134:6,8
135:12 136:23 137:6
144:5 212:9,9 216:16
273:7 351:23 357:18
366:23 367:3
think
14:13 38:20,21,22 63:10
68:8 69:15 70:21 71:5
74:1 89:5 94:15 111:19
116:5,11 122:9 129:3,11
141:19 143:13 148:21

150:2 151:12 154:8,11
155:20 160:11 164:17
166:16 179:12 192:8
196:13,18 197:1 198:11
198:13 200:2 216:3
230:19 232:11 235:23
236:12 239:12 244:20
249:16 250:2 251:19
258:12 261:10 262:20
262:23 263:5 273:3
276:16 279:23 295:7
299:13 301:10 307:17
307:19 309:6 313:13
314:10,12,16 325:19
328:20 330:16 332:20
333:18 336:22 337:6,7
349:15 351:14 352:22
354:17 358:3 363:10
369:15
thinking
80:16
third
150:9 151:6 295:9 364:10
thirty
94:19 109:3 144:11 171:13
171:21 173:16 176:3,4
thirty-three
314:8,11
thought
107:19 186:14,17,18 187:2
187:5,7 190:23 194:20
198:5 199:6,14 228:21
240:10 249:20 263:8
268:23 298:15
thousand
35:11 43:7 45:19 46:8
109:3 113:10,12,15 115:2
135:21 139:19 144:11
171:22 173:16 304:10
305:11 306:9,20 308:10
308:15 310:2,11
three
12:14,16 14:8 31:3 34:18
34:20,22,23 51:11 52:15
55:17,18 56:19,22 57:3
115:4 145:17 209:5,16
210:9 217:11 226:12
236:13 290:18 300:8
319:17 320:4 341:14,19
342:10
three-month
70:2
Thursday
360:11,23
tie
96:21
time
2:21,22 8:10,10 21:3 23:8
28:16 29:7 35:13 38:19
39:7,9,11 40:1,4 42:6
42:21 47:18 48:20 49:5

49:15 51:12 52:18 54:16
55:14 63:22 65:21 66:6
67:1 68:12 71:21 77:1
77:22 90:13 92:2 93:5
109:2 112:7 113:16
116:10 118:12 120:6
126:19,20 127:10,15
129:3 132:5,7,7 134:10
137:13 141:22 145:13,14
153:4,7,16 156:17,19,23
158:14 160:7 161:18
163:5,7 164:8,9 168:20
169:4,10,14 170:9
171:15 175:7 181:4
185:21 187:9 189:4
190:12 201:1,10 203:18
205:11,13 206:11,23
207:3,22 208:6 209:2
209:17,21 210:5 217:14
218:19 220:10 225:9
227:13 228:5,19 229:11
231:4 235:21 236:1
238:7 242:20 244:18,19
245:14 248:18 253:15
266:12 270:23 272:4
274:15 278:12 279:16
288:3 291:22 312:1,5
313:8 314:14,20 315:3,6
315:14 316:4,21 319:20
319:22 321:1,13 322:3
322:16 325:11 329:6,8
339:16 351:16 353:3
356:14,23 358:14 360:6
360:18 362:23
timeline
96:15 97:7,15,20,23 99:3
99:4,18,20,23 100:15,19
101:5,16,18 102:8 360:1
times
27:17 35:22 36:5,6,13
37:5,15 71:1 151:19
152:2 154:21 156:7
Tina
270:6 366:11
title
43:18 44:11 122:12 123:10
123:16 178:9 240:21
titled
93:11 290:21
today
7:21 11:5,12 94:3 112:10
334:3 345:14,18
told
42:12 43:21 46:12 58:2
60:15 61:7 62:7,20
64:9 67:9,19 72:2,12,14
72:15,18 73:14 74:4,8
75:7 78:22 79:3 85:11
86:18 91:7,12 95:15
102:20,21 105:22 106:1
106:13,21 107:9 110:15

111:5 114:8 123:11 124:4
125:16,23 126:8,22
128:10,12,14,16 130:1,1
135:1,5 137:18 142:3,7
145:10 146:19 147:20
150:4 158:6 165:14
169:21 171:4 174:17
177:6 180:2 181:13
185:15,17 186:6 190:18
190:21 192:17 200:13
201:19 202:1 207:19
226:19 231:12 232:19
233:2 237:10,14,23
239:4 240:16,21,22
244:10 245:1,7 248:14
250:23 252:7,9 255:21
261:21 265:10 269:15,18
269:21 273:10 274:7
276:16,22 277:3 285:19
286:3,14 300:17 305:14
305:17 324:7,9 325:10
330:9 331:10,12,17
332:12,14,18,22 333:18
347:22 350:15 351:11
355:11 359:16,17 364:14

**tongue-in-cheek**
337:2

**tongue-lashing**
76:6,8 77:4,19 82:14

**tool**
177:5,16

**tools**
62:18

**top**
288:23 295:10 311:22

**topic**
13:10 150:13 154:11
189:17

**topics/concerns**
347:9

**total**
306:12 307:12

**totals.xls**
291:11

**touch**
17:5

**touch-up**
184:8

**town**
256:23

**track**
67:6 160:14 161:7,8
174:21

**tracked**
178:12

**tracker**
177:4

**tracking**
50:13 133:5

**train**
174:19

**training**
24:22 63:18 64:13,16
67:12,20 335:12

**transcript**
371:13

**transferred**
356:3

**Transport**
308:23 309:9,22 310:21
311:17 338:4

**transportation**
34:17 35:4

**Transports**
310:6

**treat**
155:23

**treated**
83:7 105:9,16 121:12,14
129:23 150:10 151:7
159:16 299:17,22 300:4

**treatment**
155:13,17,21 158:18 159:2
159:11 172:14,17 261:15
261:17 318:16,18,21
320:6 321:23

**trends**
152:22

**trial**
2:21 191:14,15

**tried**
38:18,22 135:3 137:20
169:20 284:2

**trouble**
106:20 262:13

**true**
371:13

**truth**
12:12

**truthfully**
11:12

**try**
8:20 12:20 135:14 139:23
169:19 232:5 258:17
259:1,6,10 278:20
282:3,4,8 320:10,17

**trying**
14:12 71:5 96:14,21
101:12 107:11 108:13
113:20 127:6 135:22
136:11 144:18 148:20
183:23 194:12 202:22
202:22 205:12 218:18
219:8 225:6 236:12,23
248:23 249:16 277:18
277:21,23 282:21
288:16 297:7 305:23
306:2 345:10 360:1

**Tuesday**
256:19 359:14,15 360:5
360:18,22

**turn**

195:2 223:3 247:16
276:6 295:9 304:12,14
341:5

**turned**
332:18

**turning**
289:11

**twelfth**
25:20

**twelve**
87:7

**twenty-page**
166:4

**twice**
11:3

**two**
10:7 19:4 20:1 38:21
39:15 40:6 44:5 77:11
77:13 82:16 96:21 115:3
125:22 126:8 139:19
167:4,9,13 170:15 171:11
171:12 183:4 184:22
209:5,16 210:9 217:11
218:2 226:11 243:13
245:6 248:13,13,18,18
252:19 253:19 283:14
285:5,10,11 314:8,10,18
319:17 320:3 323:22
341:12 350:19 357:16
358:15

**type**
220:5 223:1 366:12

**types**
13:1

**typewriting**
371:11

**typical**
367:3

**typically**
365:17 367:12

**T-E-R**
17:15

**U**
2:1

**Uh-huh**
28:2 356:12

**uh-uh**
8:14,14

**ultimately**
138:3

**umbrella**
351:4

**unacceptable**
66:18

**unaware**
66:4,8 103:15 104:2
105:1 174:3

**unbelievable**

**171:1**

**uncle**
17:10,11 330:5 332:1,12

**unclear**
9:2 63:5 234:8

**underline**
223:7

**underlined**
222:20 223:5

**understand**
7:23 8:18,21 72:1 74:17
85:19 86:22 87:9
88:20 112:23 137:15
260:19 322:8 352:1

**understanding**
86:2 91:9 105:7 106:21
166:20 230:8,10 254:5

**understood**
9:3 260:8

**undertake**
355:8

**underway**
59:8

**unemployed**
315:7

**unemployment**
312:4 313:20,23 314:14

**unfolded**
143:17

**unfolding**
237:3

**unfortunate**
356:10

**unfortunately**
256:13

**Union**
315:16,18

**United**
1:1 311:2

**unplanned**
161:17

**unprofessional**
85:14

**unquote**
172:10

**untruthful**
263:6

**updates**
270:20

**updating**
176:10

**upgrade**
134:13 142:15 143:1 145:3

**upgraded**
59:3

**upset**
250:23

**up-time**
160:20

**use**
80:10 133:6 134:14

148:17 162:1 176:16
289:9 323:4,7,11 341:9
351:1

**Usual**
6:19

**usually**
152:19 155:7 203:9
271:12 318:2

**utilization**
133:6 134:22 170:21

**utilize**
59:14

---
**V**
---

**vacation**
266:12 356:23

**vaguely**
281:7

**valued**
126:2

**various**
27:17

**vendor**
291:11

**venture**
42:13

**Ventures**
1:10 300:13

**venue**
225:7

**verbal**
88:21 175:21 333:20

**verbally**
8:6 75:21 76:21 162:21
175:18

**verbatim**
182:10

**versa**
355:18

**versus**
32:2 36:9 140:7 142:9
160:18 161:12,16 163:19
166:12 177:8 200:16
240:10 261:17 266:15

**vice**
30:17,22 31:1 122:4,10
355:18

**Vicksburg**
22:18

**view**
126:11

**vision**
111:23 202:2 203:2,6
204:4,14 205:5 208:18
210:21 212:22 215:15
216:11 219:12 220:12
227:17 229:23 232:2
255:12 369:13

**visions**
225:16

JERRY MACCARTNEY, ET AL. V.
ONYX CAPITAL VENTURES, LLC, ET AL.

Document 74    Filed 10/29/2007    Page 121 of 138

JERRY MACCARTNEY
August 17, 2007

visit
111:20

visits
203:21

vita-type
220:4

vocational
24:22

voice
82:5

voiced
62:15 369:8

voicemail
258:22

voicing
347:17

volume
98:9 194:12,15

VP
34:7,10,15 35:9,15 122:21
123:15 178:3

vs
1:9

---

**W**

Wachusett
23:17,18,22

wait
179:8,13 305:15,17 337:8

waited
305:14

waiting
252:6 314:17

waived
2:11

walk
177:17 181:17 186:11
204:6 227:13

walked
107:23 111:21 166:15,17
208:8 317:14 361:12

walking
85:2,5 86:6

walks
181:20

walk-arounds
204:5

walk-through
208:3

wall
109:22 144:9

Walters
118:2,3

want
25:14,16 30:2 115:14
125:2 129:21 151:6,16
159:14 180:7 185:20
186:22 188:7 193:7
213:16,17 236:17 249:14
251:18 327:17 333:1

wanted
14:15,15 30:1 116:12 126:1
126:5 165:2,4 172:15
190:15 203:7 213:1
232:21 238:16 240:2
250:21 252:15 260:2
280:3 318:13 369:12

warehouse
25:22 26:2,12 27:8
49:20 50:2 59:7,10
68:22 72:23 84:19,21
85:3,6 86:3 107:2
109:14,23 111:21 132:13
132:19,23 133:2 134:7
134:17 135:2 180:22
185:4 204:6 330:21
331:1

warehouses
34:18 145:16 181:1

warehousing
34:16 35:2,3

warmed
271:22

wasn't
28:23 57:22 63:18 83:15
99:1,1 117:2 118:12
136:7 139:7,20 141:6
143:6 146:20,21 149:21
158:23 159:9 167:17
169:8,9 171:5 174:15
176:13 183:6 198:7
206:4,5,13 216:11
240:20 247:15 248:13
250:3 316:22 328:7
359:21

watch
125:9 126:7

watching
143:16

water
220:5

waters
220:4

way
14:16,21 86:13 128:7
129:22 139:12 140:5
150:9 151:7 156:1 159:6
159:10,15 162:11 167:22
172:13 180:8 212:17
249:21 276:18 286:18

ways
70:9 105:15 139:3 244:21
244:23 299:16,21 300:3

weak
364:23 365:3,5

weather
11:4

Wednesday
94:3 256:20 359:15
360:12,22

week

---

13:23 89:6,11 95:1
100:20 110:22 124:15
179:20 237:20 238:2
253:22 283:14 303:23
305:4 307:17 314:11
320:3,22 358:7,9
359:22 360:14,23

weekly
157:4,6 178:13,15 179:8
194:9 268:6

weeks
115:4 231:1 245:6 253:19
283:14 314:18,19 321:17
358:15

week's
179:18

weight
336:9

Wendy
18:11,14,18 20:15 21:2

went
10:6 30:8 38:2,14,15
99:3 115:3 122:16,21
123:2,5,14 143:20
258:22 277:16 282:22

weren't
28:21 80:3,18,21 103:5
126:11 145:12,22 170:8
247:14

Wetumpka
19:14

we'll
112:16 126:14 149:19
152:8,9

we're
61:23 89:5,10 90:7 99:5
105:18 112:12,13 132:19
135:7 137:19 143:20
148:22 149:1,3,6 152:6
152:18,19,20 169:23
172:6 196:19 197:9
212:18 215:11 224:11,11
225:14 227:20 272:1,2
332:15 347:17

we've
97:11 152:8 169:21,22
242:13

whatsoever
109:6

whichever
90:3 213:5

whistles
163:18

white
3:13 54:5 65:19 69:18
73:3 75:11 100:6
109:22 110:1,2,4,5
135:8 180:23 181:15
182:5,6,7,8,16,17,18,20
182:22 183:1,5,6,10,21

---

183:22 189:1,2 203:13
232:17 261:11,16

Whitfield
353:18,19 354:5,9,22
355:12,17 356:3

Whitfields
354:2,5

wide
195:19 196:13

widely
201:4

wife
18:7 19:23 311:10 315:4
315:10 330:5

wife's
315:7

William
331:15

Williams
270:7

Wilson
273:4

Winding
19:13,18

window
267:9,13,19 268:11

Winter
11:21 12:1 13:14 14:6
33:22,23 34:6 38:13
39:2,18 100:23 118:8,10
130:15 178:14 194:3
196:2 201:7 205:22
230:18 253:20 278:8
279:11 281:3 282:2
329:5 333:8 334:10,16
334:22 335:15 337:23
343:12

Winters
335:8

wireless
133:6

wise
326:3

wish
129:6 258:13 369:16

wished
87:5 115:5 262:10

Wisniewski
331:15

withdraw
318:12

witness
2:10 6:10 153:2 319:13
371:14

witnessed
158:10 245:22 333:21

witnessing
83:6

Wizard
299:8

WMS

---

106:15 107:2,4,12 130:2
132:16 133:22 134:3,14
135:15 136:1,6,9,12
137:15 139:20 140:7,19
141:13 142:9 147:22
148:8,18 149:20 150:5
151:2 152:17 158:1
171:7 289:18

wondered
252:7 253:1,4

wondering
255:2 332:17 361:8

Wood
19:13,18

word
72:17 323:9,17 326:12

words
79:17,20,23 80:10 81:5,8
83:3 89:3 102:7 117:16
182:11 209:1 225:18
232:10 238:11 324:9,16
364:6

work
12:6 18:14 25:1 26:4
30:8 31:9 38:3,11 60:14
81:4 95:11 110:4,5,6
136:8 138:4 176:13
182:6,7,9,18,19,23 183:5
183:9,9,21,22 184:19
195:3 212:13,20 223:14
233:14 251:5 286:9
287:2,3 298:17 302:16
302:18 315:12 320:23
329:16 331:6 336:11
337:21 338:2,7 356:18
357:14 360:23 361:2
364:8 369:17

worked
19:21 25:16,18,22 26:9
138:17 150:22 212:11
233:17 264:20,21 362:7
363:14

working
28:11 54:16,17 61:3
138:13,20 282:3 302:6
302:11 306:13 309:9
314:15 317:19 330:20

works
10:21 183:2 315:11 338:3
338:4

world
135:11 146:19

worldwide
29:12

worried
210:16

worry
89:4 112:7 124:17,19
126:9 210:23 245:8
248:5,15,21 265:13
273:10 274:10

worse
91:1 95:21
worth
176:13
wouldn't
116:14 129:7 156:9 179:7
179:13 188:3 228:1
wrapping
351:13
write
266:15
write-up
83:12
writing
75:21 76:21 108:20 144:8
216:12 299:7 328:16
written
141:7 174:4 190:2 191:7
191:10 268:16 299:2
wrong
90:11 106:5,19 107:16,18
118:17 235:23 251:20
298:15 363:11
wronged
327:15
wrote
341:15
W-I-S-N-I-E-W-S-K-I
331:16

## X

X
4:1,9 5:1

## Y

Y
18:12,13
Yates
110:12,20,21,23 251:23
264:18,19,23 265:8
267:1,14,20 268:3,20,23
269:10 270:9,12,23
271:15 272:8,15 273:2
273:14,21 274:18 275:8
301:18 359:3,6 360:17
364:8 366:1,20
yeah
15:6 24:3 38:9 51:6
150:14 151:15 157:15
173:8 181:21 189:8,11
198:6 232:15 247:5
306:6 317:18 321:4
year
22:9 26:5 30:20 35:11
38:14 45:19 91:17
109:10 132:21,22 180:17
189:8 190:5,8 210:5,7
304:11 305:12 313:11,13
321:5 356:20
years

9:22 10:7,14 18:20 19:19
23:1 24:16 38:21 39:15
40:6 96:18
year-to-date
266:11,14
yelling
184:2
Yesterday
12:2 14:4
yield
67:6
yields
50:13
y'all
151:2 333:4 338:7

## Z

Zare's
25:22 26:1,11
zero
144:2
zone
82:20

## O

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
16:13
03
43:3
04
151:4

## 1

1
4:11 91:20,23 92:20
275:21 341:23
1st
38:9
1:02
288:9
1:15
150:19
10
4:20 117:14 292:4,7,20
293:3,20 347:8
10th
307:3
10-A
347:5,6
10:17
71:17
10:26
71:17
11
4:21 294:1,4,6,9,13
357:21,22 359:9
11th
265:2 358:7,10 360:2,7
360:11
119

4:13
12
4:22 296:1,4,8,15,17
297:1,9
12:02
150:19
12:40
288:9
12:51
289:1,3
12:56
289:13
13
4:23 297:23 298:3,8,19
14
5:4 341:1,4
15
5:5 94:3 241:21 309:23
342:16,19 343:5,9
344:7 345:17
15th
94:23 95:8 310:15
16
5:6 346:11,14,18 347:3
16th
302:8
17
1:18 5:7 6:9 348:4,7
18.0.doc
290:1
1819
3:14
19th
302:8 358:19
1940s
326:5
1979
22:10
1980
26:10
1999
26:10 31:5 368:14

## 2

2
4:12 93:17,20 95:5 342:4
2nd
38:9
2/17/61
16:10
2:05CV1207-MHT
1:5
2:21
295:11
2:26
207:10
2:32
207:10
20th
358:19

200
59:4,12,14 106:2,15 107:5
107:6 130:3 132:15
133:10,11,20 134:5,11,20
135:3,4,12,15 136:7,10
136:17,21 137:21 138:2
140:7,19 141:14 142:9
142:15 143:1 145:3,19
147:23 148:8,18 149:20
150:6 151:3 152:17
158:2 171:7
2000
38:20 39:3
2001
38:20 39:3
2002
343:15
2003
31:5,7 38:6 55:22 210:8
2004
47:15 67:17,18 69:4,23
71:1,11 90:13 130:9
157:20 160:3,5 231:3
347:16 357:12,15
2005
43:12 44:18 45:16 46:7
76:3 77:3 89:20 90:13
91:18 94:4,16 109:11
113:8 119:22 120:3
157:21 180:18 193:9
241:21 256:21 275:5
276:16 284:9,17 288:3
288:8 289:1,12 292:9
295:11 296:12,19 298:11
302:4,9 306:14 321:6
322:9 339:19,20 340:5
356:20 357:11,21
2006
307:4 309:23 330:17
2007
1:18 6:9 310:16,17 352:20
21
288:3,8 289:1,12 292:9
295:11
22nd
283:8
221
4:14
23
296:11,19 298:11
241
4:15
25
296:16
259
4:16
26
349:13,16
27
276:16
27th

358:3,4,5
275
4:17
28
307:12,15
281
4:18
287
4:19
29
45:15
29th
256:19 276:17 358:3,5
292
4:20
294
4:21
296
4:22
297
4:23

## 3

3
4:13 92:16,20 93:1,6,8
94:18 119:8,11 121:5
248:2 342:4 347:5,6
30
6:5
341
5:4
342
5:5
346
5:6
348
5:7
35203
3:15
353
4:4
36103
3:8
368
4:5
369
4:6

## 4

4
4:14 92:16,20 93:1,6,8
94:4 221:21 222:1,6,19
223:4 239:2 334:5,6
336:14 342:4
401
6:8
401-K
307:7 308:1 311:3,13,18
313:1,7

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                    http://www.TylerEaton.com

| 5 | 93 |
|---|---|
| **5** | 4:12 |
| 4:15  92:16,20  93:1,6,8 | **96.6** |
| 117:14  241:6,9  247:17 | 43:6 |
| 247:20  341:23  342:4,4 | |
| 342:4,5,5 | |
| **5:25** | |
| 350:3 | |
| **5:43** | |
| 370:1 | |
| **50/50** | |
| 69:12 | |
| **5000** | |
| 160:11  161:20  168:5,9,22 | |
| 170:2  177:8  180:3 | |
| **5059** | |
| 3:7 | |
| **51** | |
| 55:16,20  215:7 | |

| 6 |
|---|
| **6** |
| 4:16  259:15,18,22  262:3 |
| **6/21** |
| 296:22  298:15 |
| **6/23** |
| 296:22 |

| 7 |
|---|
| **7** |
| 4:3,17  275:16,19  276:1 |
| **7/2004** |
| 342:1 |
| **7:19** |
| 296:12,19 |
| **7:38** |
| 296:12,20 |

| 8 |
|---|
| **8** |
| 4:18  281:15,18 |
| **8:07** |
| 298:11 |
| **8:51** |
| 298:12 |
| **80s** |
| 355:11 |
| **832** |
| 19:16,17 |

| 9 |
|---|
| **9** |
| 4:19  287:20,23  288:12 |
| 291:15 |
| **9:05** |
| 6:10 |
| **90s** |
| 23:23  24:17  25:5 |
| **91** |
| 4:11 |



*For Limited Internal Distribution Only - Do Not Copy or Share with External Constituents*

## Piknik Products Company
## External Communications
### *Recapitalization Talking Points*

| SUMMARY: | The growth that Piknik Products (the "Company") is experiencing in its beverage division requires the Company to invest significant new capital in its operations. The Company's bank has declined to finance this new capital and has rejected financing proposals by third parties, thereby causing the company to seek a recapitalization. As part of this process, the company may be placed up for sale with the goal of emerging as a company that is much stronger financially and operationally. Piknik has not filed for bankruptcy protection. |
|---|---|
| SHORT TERM EFFECTS | Operations in the Company's beverage division will not be materially affected. Some management changes are being made and capital projects delayed, but the business will continue to operate and pursue operational improvements required to meet our customer's needs.<br><br>The operations in the Company's condiments division will be indefinitely suspended with the exception of tolling/co packing business. The will be effective immediately. |
| PERSONELL CHANGES | The beverage division will continue to make necessary staffing changes to improve its operating efficiencies. Bert Mayer has left the company and has been replaced as Day Street Plant Manager by Annissia Hayward, a veteran of PepsiCo and Propter & Gamble with maintenance, quality and engineering experience.<br><br>Regretfully, this challenge will require that most of the employees in our condiments business will be furloughed. We will maintain a crew of employees to continue limited production, address customer and vendor concerns, and manage logistics for shipping and the warehouse. |



*Please direct all inquiries on this matter to the contacts listed in the CONTACTS section of this document. Do not respond to external inquiry unless approved by one of the persons listed in this section.*

*For Limited Internal Distribution Only – Do Not Copy or Share with External Constituents*

| RECAPITALIZATION | Over the last 4 months the Company has presented to its bank (SouthTrust) proposals for refinancing the Company's debt and injecting additional equity into the Company. The bank has rejected each of those offers. |
|---|---|
| | The inability to reach agreement on this matter has resulted in a cash shortage to operate the full-case-costed, private label condiments business. (This business is cash flow intensive, versus the capital intensive nature of the beverage business.) Piknik has not filed for bankruptcy protection. |
| | Recapitalization negotiations continue, however it is likely that a sale process will be undertaken on an expedited basis. In any even, full resolution will take place in the next 45 to 90 days. |
| | Hopefully this will mean that customers will observe no degradation in operational attention, continuity in management and a swift conclusion to this distraction from managing and growing the business. |
| | It is not likely that the condiments business will return in it current form. It is likely to be more palatable to the bank and investors that the condiments business proceeds under a tolling/co pack model similar to the beverage business. This will require reduced working capital to manage and to grow the Company and fit better with Piknik's/Onyx's strategy of partnering with leading consumer packaged goods companies to address their supply chain challenges. |
| | We will work closely with condiments customers to fill orders out of inventory and to transition their business to other suppliers. This will include providing them with their printed labels and copies of proprietary formulas if requested. We want to discuss the option of a tolling/co pack agreement with those customers who wish to do so. |
| **PLANT LOCATIONS** | The Company's Day Street and Alatex plants will remain open and operate normally. Discussions continue with current and prospective customers about adding additional production lines in the Alatex plant. |
| | The Brundidge plant will remain open and operate a limited production schedule. |

*Please direct all inquiries on this matter to the contacts listed in the CONTACTS section of this document. Do not respond to external inquiry unless approved by one of the persons listed in this section.*



*External Constituents*
*Recapitalization Summary*

| FREQUENTLY ASKED QUESTIONS | **What is happening?**<br><br>The growth that Piknik Products is experiencing in its beverage division requires the Company to invest significant new capital in its operations. The Company's bank has declined to finance this new capital and has rejected financing proposals by third parties, thereby causing the company to seek a recapitalization. Operations in the Company's beverage division will not be materially affected. Some management changes are being made and capital projects delayed, but the business will continue to operate and pursue operational improvements required to meet our customer's needs.<br><br>The operations in the Company's condiments division will be indefinitely suspended with the exception of tolling/co-packing business. This will be effective immediately.<br><br>**How did this happen?**<br><br>Our historic bank (SouthTrust) decided that it no longer wanted to be the Company's financial institution. The bank prevented the Company from bringing in any additional capital to fund the growth that we've been experiencing.<br><br>**Is condiments closed for good?**<br><br>The condiments business is not closed. We will operate under a co packing model in the short term. We are hopeful to preserve a presence in the condiments business, but are unlikely to return to our historical business model.<br><br>**Is Piknik bankrupt?**<br><br>No. Management believes that it has a viable path through this process to avoid bankruptcy, and believes that it is in the best interests of customers and vendors to avoid the bankruptcy process. However, Piknik does not control all elements of this process. Staying out of bankruptcy requires continued cooperation from vendors and the bank while we negotiate the recapitalization. |

### *External Constituents*
### *Recapitalization Summary*

| | |
|---|---|
| | **Is Piknik up for sale?**<br><br>As part of the transition to a new capital structure an expedited sale process may need to occur. |
| | **How long will this process take?**<br><br>We expect that the recapitalization will be completed within 45 – 90 days.<br><br>**What does that mean for condiments customers?**<br><br>We will no longer be producing product for most condiments customers. We will continue to produce co packed products. We will sell any products that are in our finished goods inventory. Piknik will work cooperatively with affected customers to assist them in this transition. We will make labels and proprietary formulas available to customers upon request.<br><br>**What does that mean for condiments vendors?**<br><br>The Company will be unable to pay outstanding invoices at this time.<br><br>**What does that mean for condiments employees?**<br><br>Piknik will maintain a small staff to continue co pack production and handle the customer transition. All other employees will furloughed until further notice.<br><br>**What does that mean for beverage customers?**<br><br>Operations in the Company's beverage division will not be materially affected.<br><br>**What does that mean for beverage vendors?**<br><br>Unlike the condiments business, Piknik does not pay for the packaging and raw ingredient product inputs. These are provided by our customers, making it much easier to continue operations during this transition. Piknik will work with its other beverage vendors to meet necessary obligations. |

*External Constituents*
*Recapitalization Summary*

| | |
|---|---|
| | **What does that mean for beverage employees?**<br><br>The beverage division will continue to make necessary staffing changes to improve its operations efficiencies.  The team will continue working together to deliver for our customers.<br><br>**What if I get asked a question other than these?**<br><br>Please refer any questions that you are not equipped to accurately answer to one of the contacts listed below. |

| **CONTACTS** | |
|---|---|
| **Customers** | Chris Day, President<br>cday@piknikproducts.com                    334-265-1567<br><br>Ann Anderson, Condiments Customer Service<br>aanderson@piknikproducts.com          800-300-8557 x101 |
| **Employees** | Henry Hicks, VP Sales & Marketing<br>hhicks@piknikproducts.com               404-313-6669<br><br>Brenda Sellers, Director of Human Resources<br>bsellers@piknikproducts.com            334-265-1567 x206 |
| **Vendors** | Robert Lampert, VP Finance<br>rlampert@piknikproducts.com            334-265-1567 x218 |
| **Media** | Henry Hicks, VP Sales & Marketing<br>hhicks@piknikproducts.com               404-313-6669 |

*Please direct all inquiries on this matter to the persons listed in the CONTACTS section of this document.*    5

Piknik Business Update - Message [HTML Spector Pro 4.3 Snapshot Recording for jmaccartney on 06/20/05 08:13 A

File   Edit   View   Insert   Format   Tools   Actions   Help

Reply | Reply to All | Forward |

From:     Anthony Barber [abarber@pliniqproducts.com]
Sent:     Wed 6/15/2005 12:59 PM
To:       BillaEyva). Rene Roberson; tsanchez@pieknikproducts.com; Kisser; Sam Cly R5C (RTS) RL; bwilliams@pliniqproducts.com; Eugene Young; Annissa Harvard R1; ine Boughton; Anthony Hide; nhkp@pliniqproducts.com; Dawn Mitchel; Robert Taylor; Alan Walters; whitehead@pliniqproducts.com
Cc:       jmaccartney@pliniqmediods.com
Subject:  Piknik Business Update

All,

There will be a mandatory staff meeting today, Wednesday, June 15, 2005, at 4pm in the Day Street Maintenance conference room. This meeting is intended only for information exchange to update the leadership team on our business.

Thanks in advance for your attendance and cooperation.

Anthony U. Barber



Date:    June 15, 2005

To:    Jerry MacCartney

From:  Chris Day

Re:    Salary Adjustment

Jerry, I regret that the current circumstances at Piknik necessitate imposing salary reductions. In your particular case, we must pay you a rate commensurate with your current position rather than your prior one. Effective with this pay period, your rate of salary will be $70,000 per year until further notice. I am hopeful that we can emerge from this bank-induced situation before too long and increase pay rates again, but until then we have to make painful choices to keep the company operating. Please accept my apologies.


Chris


Cc:    Jeffery Larry, CEO
       Brenda Sellers, HR



Attachment A.

Note the underlined sentences that refer to our claim of discrimination.

-----Original Message-----
> From: Henry Hicks [mailto:hhicks@piknikproducts.com]
> Sent: Wednesday, February 16, 2005 1:08 PM
> To: Shannon McGlon (E-mail); Chris Day (E-mail); Robert Lampert
> (E-mail); Bert Mayer (E-mail); Jerry MacCartney (E-mail); Bob Winter
> (E-mail)
> Cc: Sales Group (E-mail); Jeffery Larry (E-mail); Brenda Sellers
> (E-mail)
> Subject: Call Summary - PepsiCo
>
>
> On January 15th, 2005 Jeff Larry and I met with April Blackmore at
> PepsiCo's
> offices in Chicago. Following is a summary of the call.
>
> _____
>
> 20oz business is done! We should begin producing in Pepsi's period 4
> and
> they will take all that we can give them through period 9. Annual
> estimate
> is 3mm 24 pack cases annually. Pepsi will fund all capital. She also
> asked
> that we look at the possibility of installing a Hi-Cone machine on the
> end
> of Line 301. The idea is that this would drive even more volume our
> way.
> Our pricing is fine, and at those rates they will try to keep us full.
> In
> fact, April strongly hinted that we might consider raising our price a
> bit.
> Action: Bob W. we should look at the tolling to see if we want to take
> the
> price up, or eliminate the teiring.
>
> If the 34oz product does as well as hoped, she would want to put this on
> line 301 and this would have them on there year-round.
>
> On the 20oz, April wanted to get Tim Olson down to walk Line 301 and
> make
> sure that there is no needed capital that has been overlooked. We need
> to
> provide them with lead times, a project plan and estimated production
> dates.
>
> 500ml Propel may be the next product that they look at Line 301 for.
> The
> new And 1 product will also be in the same package. They will know in
> May
> which direction they want to go in for the Propel.
>
> Regarding the Season's Best and Twister products that we mentioned in



> our
> proposal, she suggested that we stay away from them. The business is
> not
> growing. Gatorade and cans are where its at, she said. She mentioned
> that
> 11 plants make the 15.2oz trop product - so price is the driver on this
> business.
>
> Pepsi would be interested in Line 302 for the And 1 product. This
> allergen
> based product will be in the 500ml Propel bottle, bliss box with roll
> fed
> labels. They will be making a decision on this project in May/June of
> this
> year, and may be interested in participating in the capitalization of
> the
> new line. Action: Henry and Bob W. to follow up with April and with
> Unilever to include them on the cost of constructing the line.
>
> Regarding the gallon production, she indicated that the business is
> growing
> 7-8% per year. She also said that there has been some discussion of
> putting
> Propel in the Lenny bottle.
>
> We discussed the tight schedule that we have this year given that we
> have
> added a new customer. She was concerned that we were displacing them in
> favor of Arizona. I assured her that this was not the case. She did
> ask
> that we quickly move to 48 or 72 hour CIP if possible to get more
> capacity
> out of the line. Action: Bert and Shannon - please let Henry know if
> we
> have written authorization from Pepsi to CIP every 48 or 72 hours. If
> not,
> I will ask April and Ken to have someone take the steps needed to offer
> that
> approval.
>
> I indicated that we were installing a bulk depal system this season and
> asked for a price increase to $1.25 per case. She agreed. She also
> indicated that they should have been accruing for the difference between
> the
> tolling that we billed in 2004 and the agreed to price of $1.20. She
> was
> very pleased with this investment and is hopeful that we will see
> increased
> volumes and efficiencies as a result.
>
> PepsiCo's canned energy drink business (Sobe Adrenaline Rush, Mountain
> Dew
> Amp) is growing at more than 70% per year. They are actively looking
> for
> capacity to manufacture these products. There is a particular need on
> for

> this on the west coast. It may make sense to put a can line in Alatex.
>
> Whitlock (OK), PriPack (IN) and Creir (WI), as well as Mark Ocean Spray
> (NV) - which manufactures 12, 24 and 64oz Gatorade, have each been, are
> or
> are rumored to be for sale. Dean Foods in Benton Harbor, MI
> manufactured
> aseptic packaging, but they closed the plant.
>
> April is interested in moving to a master PepsiCo contract with Piknik
> that
> will cover all Gatorade and Tropicana business. She will discuss this
> with
> Sharon and report back next steps.
>
> We discussed our desire to recruit talented minorities in operating
> roles
> within the company. April suggested using diversity.com as a search
> site
> and suggested cultivating a relationship with NC A&T University. She
> said
> that they have a great engineering school, where the students have good
> co-op experience. She said that Ford get the tope tier of students
> there,
> but that we could get 2nd tier candidates and be very pleased.
>
> April suggested that we invite their supplier diversity person, Ernest
> Freeman, down to Piknik. She said that we are the only MBE in their
> system,
> with the exception of a woman owned business in Mass. that does water
> for
> them.
>
> The meeting ended something like 3 hours later...
>
> Henry
>
> H. Beecher Hicks, III
> Vice President, Sales and Marketing
> Piknik Products Company
> 404/653-8914 office
> 334/265-1567 x217 office
> 404/313-6669 cell
> 509/471-8561 efax
> www.piknikproducts.com

**From:** Brenda Sellers [mailto:bsellers@piknikproducts.com]
**Sent:** Friday, April 15, 2005 11:39 AM
**To:** Piknik All
**Cc:** cday12345@aol.com; Chris Day
**Subject:** FW: Reorganization Announcement

Hello Everyone,

Please read the following attachment in regard to the reorganization of certain members of the company and some additional personnel moves.

Thanks

Brenda Sellers

HR Manager





## ORGANIZATIONAL ANNOUNCEMENTS

April 15, 2005

As you know, Team Piknik was fortunate to add two world-class players recently to its senior management team ... Anthony Barber, as Vice President and General Manager of the Beverage Division, and Carl Bleier, as Vice President and General Manager of the Condiments Division. With these two additions, we have all the pieces in place on our senior management team to continue to bring the focus and intensity to move Piknik forward on all fronts.

To maximize this effort and continue the significant improvements we are seeing in our business, we have reassigned certain members of our organization and made some additional personnel moves. In the **Condiments Division**, **Eddie Crosby** is moving to Condiments as Production Manager in Brundidge, reporting to Carl. Eddie will be responsible for production, maintenance and sanitation. We are extremely excited to have a proven leader from within Piknik move to join Condiments, and we are confident that he will help speed the improvements to our business in Brundidge.

In the **Beverage Division**, **Bert Mayer** will assume the role of Plant Manager, Day Street, reporting to Anthony Barber. Bert will assume leadership over the team that had been reporting to Eddie Crosby at Day Street. **Jerry MacCartney** will assume the role of Plant Manager, Alatex, also reporting to Anthony. All of the Alatex personnel will report to Jerry. As a result of the above assignments, **Jimmy Whitehead, Dawn Mitchell and Bill Boykin** will now report directly to Anthony Barber.

Similar to Condiments, the QA Managers in Beverages will now report directly to the plant managers of the facility in which they work, with a dotted line to **Shannon McGlon**. Shannon remains QA Director in charge of the overall Piknik quality systems, and **Allen Walters, Barbara Williams and Jessica Daniel** remain accountable for implementing the system at their respective plants.

In Beverage Sales, **Bob Winter** becomes Director of Customer Planning, reporting to Henry Hicks, to reflect his vital role in onboarding and interfacing with our customers.

Regretfully, with change sometimes come departures. In Condiments Sales, we are changing our emphasis from a geographic focus to a market focus, and as a result we are eliminating the positions of **Bob Gross and Letitia Strowbridge**. In administration, we are eliminating the receptionist position held by **Clarice Crosby**. We want to thank Bob, Letitia and Clarice for their service and wish them well in their future endeavors.

We are confident that these moves will greatly enhance our ability to deliver results across all areas of the company. We are grateful for your continuing efforts and support.

Jeffery Larry
Chairman & CEO

**From:**     Jerry Maccartney [maccartney@msn.com]
**Sent:**     Tuesday, July 05, 2005 3:08 PM
**To:**       cday12345@aol.com
**Subject:**  Tenure at Piknik Products Co.

Hi Chris,

 I just wanted to drop you a line to let you know that although I am disappointed with the position Onyx has taken with my continued employment at Piknik Products Co., I understand the circumstances and intended course Piknik is on.
I hope that my tenure with you and Piknik has left a favorable impression of my abilities and contributions and I am optimistic our paths may cross again at some point in the future.

Please wish everyone at Onyx and Piknik the best of luck for me, and all the success in your endeavor to convert Piknik Products Co. to a company consistent with Onyx's vision and mission.

Best Regards
Jerry MacCartney



# CHARGE OF DISCRIMINATION

| | CHARGE NUMBER |
|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA ☒ EEOC  130-2005-05521 |

_____ and EEOC
*State or local Agency, if any*

| NAME (Indicate Mr., Ms, Mrs.) Jerry A. MacCartney | HOME TELEPHONE (Include Area Code) (334) 567-6474 |
|---|---|
| STREET ADDRESS 132 Winding Wood Drive | CITY, STATE AND ZIP CODE Wetumpka, AL 36093 | DATE OF BIRTH 02/17/1961 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME Onyx Capital Ventures D/B/A Piknik Products Company | NUMBER OF EMPLOYEES, MEMBERS 250+ | TELEPHONE (Include Area Code) (334) - 265-1567 |
|---|---|---|
| STREET ADDRESS 306 Day Street | CITY, STATE AND ZIP CODE Montgomery, Alabama 36108 | COUNTY Montgomery |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box (es)

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER (Specify)

| DATE OF DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST 06/27/05 |
| ☐ CONTINUING ACTION | |

See the attached Addendum.

RECEIVED
EEOC

JUL 1 8 2005

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for State and Local Requirements) |
|---|---|
| | I swear of affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty or perjury that the foregoing is true and correct | SIGNATURE OF COMPLAINANT |
| _signature_ 7/14/05 Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) 7/14/05 |

## ADDENDUM TO THE CHARGE OF DISCRIMINATION OF
## JERRY A. MacCARTNEY

"My name is Jerry A. MacCartney. I was employed by Piknik Products Company. I had been a regular employee since about March 31, 2003. In my job I was considered plant manager. I am a white male.

"During my tenure with Piknik I worked at the 4300 Alatex Road, Montgomery, Alabama location. My immediate supervisor was Anthony Barber, a black male. On or about June 27, 2005, Ms. Brenda Sellers, human resources manager came into my office informing me that my employment was terminated. I was not give reason or cause for the termination. I was replaced by a black male, Joseph Yates. I always considered myself a valuable employee. I was never reprimanded nor written-up for poor performance. Mr. Barber never complained about the quality of my work.

"I believe I am the victim of discrimination on the basis of my race, white."

Jerry A. MacCartney

SWORN TO and SUBSCRIBED before me this 14th day of July, 2005.

NOTARY PUBLIC State at Large

My Commission Expires: 9/19/07

**RECEIVED**
**EEOC**

JUL 1 8 2005

BIRMINGHAM DISTRICT OFFICE