# Exhibit 6

## In The Matter Of:

## JERRY A. MCCARTNEY, ET AL.
v.
## ONYX CAPITAL VENTURES, LLC, ET AL.

## NO. 2:05CV1207-MHT

---

## SHANNON MCGLON
### August 15, 2007

---



TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING



EXHIBIT

6

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:05CV1207-MHT

JERRY A. MACCARTNEY, et al.,
        Plaintiffs,
vs.
ONYX CAPITAL VENTURES, LLC, et al.,
        Defendants.


DEPOSITION
OF
SHANNON MCGLON
August 15, 2007


REPORTED BY:  Heather Spier
        Court Reporter and
        Notary Public

## Page 2

### S T I P U L A T I O N

1   IT IS STIPULATED AND AGREED,
2   by and between the parties, through their
3   respective counsel, that the deposition
4   of SHANNON MCGLON may be taken before
5   Heather Spier, Court Reporter, and Notary
6   Public;
7       That the signature to and
8   reading of the deposition by the witness
9   is waived, the deposition to have the
10  same force and effect as if full
11  compliance had been had with all laws and
12  rules of Court relating to the taking of
13  depositions;
14      That it shall not be necessary
15  for any objections to be made by counsel
16  to any questions, except as to form or
17  leading questions, and that counsel for
18  the parties may make objections and
19  assign grounds at the time of trial, or
20  at the time said deposition is offered in
21  evidence, or prior thereto.

## Page 3

### A P P E A R A N C E S

FOR THE PLAINTIFF:
    Mr. K. Anderson Nelms
    Attorney at Law
    Law Offices of Jay Lewis
    P.O. Box 5059
    Montgomery, Alabama 36103

FOR THE DEFENDANT:
    Ms. Jennifer J. McGahey
    Attorney at Law
    Bradley, Arant, Rose & White
    1819 Fifth Avenue North
    Birmingham, Alabama 35203

OTHERS PRESENT:
    Ms. Amy Lindsey

## Page 4

### I N D E X

                                    PAGE:
EXAMINATION BY MS. MCGAHEY............  6

### E X H I B I T S

Defendant's Exhibit 1................ 127
Defendant's Exhibit 2................ 129
Defendant's Exhibit 3................ 152
Defendant's Exhibit 4................ 153
Defendant's Exhibit 5................ 213
Defendant's Exhibit 6................ 216
Defendant's Exhibit 7................ 218
Defendant's Exhibit 8................ 237
Defendant's Exhibit 9................ 248
Defendant's Exhibit 10.............. 293
Defendant's Exhibit 11.............. 329
Defendant's Exhibit 12.............. 366
Defendant's Exhibit 13.............. 372
Defendant's Exhibit 14.............. 373
Defendant's Exhibit 15.............. 376
Defendant's Exhibit 16.............. 377
Defendant's Exhibit 17.............. 379
Defendant's Exhibit 18.............. 381
Defendant's Exhibit 19.............. 399

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 5 to 8)

Page 5

1      I, Heather Spier, a Court
2  Reporter and a Notary Public for the
3  State of Alabama at Large, acting as
4  Commissioner, certify that on this date,
5  pursuant to Rule 30 of the Alabama Rules
6  of Civil Procedure and the foregoing
7  stipulation of counsel, there came before
8  me at 401 Adams Avenue, Montgomery,
9  Alabama, on August 15, 2007, commencing
10  at 9:13 a.m., SHANNON MCGLON, witness in
11  the above cause, for oral examination,
12  whereupon the following proceedings were
13  had:
14
15      SHANNON MCGLON,
16  being first duly sworn, was examined and
17  testified as follows:
18
19      THE REPORTER:  Usual
20  stipulations?
21      MR. NELMS:  Yes.
22      MS. MCGAHEY:  That's fine.
23

Page 6

1  EXAMINATION BY MS. MCGAHEY:
2      Q.   Good morning, Ms. McGlon.
3      A.   Hi.
4      Q.   And can you please state your
5  full name?
6      A.   Yes.  Shannon Leigh Ayers
7  McGlon.
8      Q.   Can you spell -- is Ayers your
9  maiden name?
10      A.   Maiden name, uh-huh.
11      Q.   Can you spell that for the
12  court reporter, please?
13      A.   Yes.  A-Y-E-R-S.
14      Q.   Is Leigh L-E-E, L-E-I-G-H?
15      A.   L-E-I-G-H.
16      Q.   Well, Ms. McGlon, you and I
17  just met a few moments ago.  My name is
18  Jennifer McGahey, and I am one of the
19  lawyers who is representing Chris Day,
20  Henry Hicks and Jeff Larry in the lawsuit
21  that you have filed against them.  Have
22  you ever given a deposition before?
23      A.   No.

Page 7

1      Q.   Well, I think it is a good
2  idea for you and I to be on the same
3  page, so I'm going to go over a couple of
4  ground rules as we go forward.  Do you
5  understand that you are under oath today?
6      A.   Yes.
7      Q.   I'm going to be asking you
8  questions, and you're hopefully going to
9  be answering my questions.  Sometimes my
10  questions call for yes-no answers.  If
11  you could please respond with a yes or a
12  no versus nodding your head or saying
13  uh-huh or uh-uh.  It's just easier for
14  Heather to take down your response if you
15  answer with a yes or no answer.
16      A.   Okay.
17      Q.   If you do not understand one
18  of my questions or any of my questions,
19  please let me know and I will do my best
20  to rephrase.  If you don't tell me that
21  my question was unclear, I will assume
22  that you understood the question; is that
23  fair?

Page 8

1      A.   Yes.
2      Q.   If you need to take a break
3  for any reason, just let me know.
4      A.   Okay.
5      Q.   I'm happy to take a break.
6  Are you currently on any medication?
7      A.   Yes.
8      Q.   What medications are you
9  currently on?
10      A.   I'm on Lexapro.
11      Q.   What is Lexapro?
12      A.   It's a medicine for stress.
13      Q.   How long have you been on
14  Lexapro?
15      A.   Approximately a year.
16      Q.   So since August of '06,
17  thereabouts?
18      A.   Roughly.  I don't remember the
19  exact date.
20      Q.   Sure.  Who prescribed Lexapro
21  initially for you?
22      A.   My general practitioner.
23      Q.   Who is your general

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 9 to 12)

Page 9

1  practitioner?
2      A.    Leon Casals.
3      Q.    Are you on any other
4  medication?
5      A.    No.  A multivitamin.  I don't
6  know if that's medication.
7      Q.    Does Lexapro affect your
8  memory?
9      A.    No.
10      Q.    Have you had any recent memory
11  lapses?
12      A.    No.
13      Q.    Have you had or do you have
14  any health condition that may affect your
15  ability to testify truthfully today?
16      A.    No.
17      Q.    Did you speak with Bob Winter
18  yesterday?
19      A.    Yes.
20      Q.    Did you speak with him about
21  his deposition?
22      A.    Yes.
23      Q.    Please tell me about that

Page 10

1  conversation.
2      A.    It was a very brief
3  conversation.  The only thing I can
4  recall is that he said it lasted most of
5  the day and that he thought I would do
6  fine.  Then he proceeded to give me the
7  phone number of someone that could keep
8  my three year old for me today.
9      Q.    Anything else that you can
10  recall from your conversation yesterday
11  with Bob Winter?
12      A.    No.  Very brief.
13      Q.    Was it over the phone?
14      A.    Yes.
15      Q.    Did he call you or did you
16  call him?
17      A.    He called me.
18      Q.    Ms. McGlon, what is your date
19  of birth?
20      A.    June 30, 1969.
21      Q.    What is your Social Security
22  number?
23      A.    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.

Page 11

1      Q.    Are you married?
2      A.    Yes.
3      Q.    What is your husband's name?
4      A.    Scott McGlon.
5      Q.    How long have you been married
6  to Scott?
7      A.    Eleven -- just over eleven
8  years.
9      Q.    Have you ever been married any
10  other time?
11      A.    No.
12      Q.    What does your husband do?
13      A.    He owns his own business.
14      Q.    And what is that business?
15      A.    We have three.  Two are
16  trucking companies, and one is -- I guess
17  you could call it -- we import teak from
18  Indonesia and make custom sunbrella
19  cushions and umbrellas.  We supply
20  resorts and residential applications.
21      Q.    The two trucking companies,
22  what are the names of those companies?
23      A.    ITL, Incorporated is one, and

Page 12

1  IT, LLC is the other.
2      Q.    What does ITL stand for?
3      A.    Integrated Transport
4  Logistics.
5      Q.    Is that what ITL stands for
6  for both the corporation and the LLC?
7      A.    IT is Integrated Transport.
8      Q.    Is it --
9      A.    They are two separate
10  companies.  One's an LLC.  One is
11  incorporated.  IT, LLC is under my name.
12  I'm the owner of IT, LLC.  My husband is
13  the owner of ITL, Incorporated.
14      Q.    Do the companies do different
15  things?
16      A.    They do.  ITL is a longhaul,
17  cross-country.
18      Q.    ITL, Inc.?
19      A.    Uh-huh.
20      Q.    Is that yes?
21      A.    Yes.
22      Q.    Is a longhaul --
23      A.    Longhaul trucking.  Primarily

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 13 to 16)

Page 13

1    flatbed freight, and we haul to different
2    points across the United States.
3        Q.    Does ITL own the flatbeds or
4    is it an owner-lease program?
5        A.    Yes. We do not own the
6    flatbeds. It's a -- in trucking industry
7    terms brokerage is not the right term,
8    but for lack of a better word, it's a
9    type of brokerage term. We're an agent
10   for large trucking companies. We provide
11   freight, and the trucking companies
12   provide the equipment.
13       Q.    How many trucks does ITL,
14   Inc., have?
15       A.    None.
16       Q.    None?
17       A.    Uh-huh.
18       Q.    How many employees does ITL,
19   Inc., have?
20       A.    I'm not sure right now.
21       Q.    Do you have a rough estimate?
22       A.    Maybe five. It changes. And
23   I'm not in the business right now, so I

Page 14

1    don't know.
2        Q.    When was ITL, Inc., formed, if
3    you know?
4        A.    1998.
5        Q.    Has ITL, Inc., operated
6    continuously since 1998?
7        A.    Yes.
8        Q.    And you have no ownership
9    interest in ITL, Inc.?
10       A.    I don't know. I'm married to
11   the owner. He's listed as the sole
12   proprietor. So I don't know in the state
13   of Alabama if that gives me rights as an
14   owner or not. I don't know. But my
15   husband is listed as the sole owner of
16   ITL, Inc.
17       Q.    Let's talk about IT, LLC.
18   What does that do?
19       A.    IT, LLC is a local trucking
20   company that transports auto parts from
21   tier one suppliers to Hyundai.
22       Q.    Is ITL, Inc., a nationwide
23   business?

Page 15

1        A.    Yes.
2        Q.    And is it IT, LLC?
3        A.    Yes.
4        Q.    So it's Integrated Transport,
5    LLC?
6        A.    Yes.
7        Q.    And that company provides
8    local service only?
9        A.    Yes. We are intrastate, not
10   interstate.
11       Q.    What are the three states?
12       A.    Intrastate.
13       Q.    Oh, Intra. I'm sorry. I
14   thought you said in tristate.
15       A.    No. Intrastate versus
16   interstate.
17       Q.    I'm with you now. And when
18   was IT, LLC formed?
19       A.    November 2005.
20       Q.    And you are a member of the
21   LLC; correct?
22       A.    Yes.
23       Q.    Are there any other members or

Page 16

1    owners in the LLC?
2        A.    No.
3        Q.    How many employees does IT,
4    LLC have currently?
5        A.    I don't know. My guess would
6    be roughly thirty.
7        Q.    And has IT, LLC been operating
8    continuously since November of 2005?
9        A.    Yes.
10       Q.    You said there is also a
11   business that imports teak furniture and
12   supplies sunbrellas?
13       A.    Sunbrella -- custom cushions
14   and custom umbrellas for residential and
15   commercial applications.
16       Q.    What is the name of that
17   business?
18       A.    OCG, LLC, Online Commerce
19   Group, LLC.
20       Q.    Are you an owner or member of
21   that LLC?
22       A.    I don't think so. No, I'm
23   not.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 17 to 20)

Page 17

1    Q.   Is your husband?
2    A.   Yes.
3    Q.   And when was OCG, LLC formed?
4    A.   I'm not sure.
5    Q.   Since it has been formed has
6    there been any break in operation?
7    A.   No.
8    Q.   So it's operated continuously
9    since it's been formed?
10   A.   Yes.
11   Q.   And do you know how many
12   employees Online Commerce Group has?
13   A.   Not exactly, but my guess
14   would be ten.
15   Q.   And one of those employees is
16   Bob Winter?
17   A.   I believe so, yes.
18   Q.   Is Bert Mayer employed there
19   as well?
20   A.   No.
21   Q.   Is Bert Mayer employed in any
22   of the companies in which you or your
23   husband own?

Page 18

1    A.   No.
2    Q.   What about Jerry MacCartney?
3    A.   Yes.
4    Q.   Which company does Jerry
5    MacCartney work for?
6    A.   OCG.
7    Q.   What does Jerry MacCartney do
8    for OCG?
9    A.   He's a general manager.
10   Q.   Do you or your husband also
11   own a business called Highland Tailor
12   doing business as Umbrella Source?
13   A.   That's a division of OCG.
14   Q.   Does the Highland Tailor
15   business have its own employees and OCG
16   has its separate employees?
17   A.   Not anymore.  All employees
18   fall under OCG now.
19   Q.   When did that -- well, your
20   answer suggests that at one point the two
21   entities had separate employees?
22   A.   No.  What happened is we
23   started Highland Tailor initially as a

Page 19

1    business.  Then we divided off into
2    Umbrella Source as a part of Highland
3    Tailor.  And then as the business grew it
4    became OCG, and Highland Tailor and
5    Umbrella Source were absorbed into OCG.
6    Q.   So all employee paychecks
7    would come from OCG now?
8    A.   I assume they do.  I don't
9    work in that business right now, so I
10   don't know all the details of how the
11   business is structured.  I'm not sure how
12   that's relevant to my employment and my
13   discrimination at Piknik.
14       MR. NELMS:  Just answer her
15   question.
16   Q.   Ms. McGlon, do you have any
17   children?
18   A.   Yes.
19   Q.   How many?
20   A.   Two.
21   Q.   What are their ages?
22   A.   Ten and three and a half.
23   Q.   What is your current address?

Page 20

1    A.   3568 Pike Road.
2    Q.   How long have you lived at
3    3568 Pike Road?
4    A.   We purchased the house in
5    March.
6    Q.   Of what year?
7    A.   2007.
8    Q.   Did you also move into the
9    house in March of 2007?
10   A.   No.  We moved in in April.
11   Q.   Is that in Wetumpka or
12   Montgomery?
13   A.   Pike Road, Alabama.
14   Q.   What is your Zip Code?
15   A.   36064.
16   Q.   And I take it your husband and
17   your children live there with you?
18   A.   Yes.
19   Q.   Does anyone else live there
20   with you?
21   A.   No.
22   Q.   Before you lived at 3568 Pike
23   Road where did you live?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 21 to 24)

Page 21

1     A.    1610 Emerald Mountain Parkway.
2     Q.    Emerald Mountain?
3     A.    Yes.
4     Q.    Is that in Pike Road as well?
5     A.    That's Wetumpka. 36093.
6     Q.    How long did you live at 1610
7   Emerald Mountain Parkway?
8     A.    Seven years.
9     Q.    So throughout your employment
10   with Piknik you lived at 1610 Emerald
11   Mountain Parkway?
12    A.    Yes.
13    Q.    I take it your husband and
14   your children lived with you at that
15   address?
16    A.    Yes.
17    Q.    Did anyone else ever live with
18   you at that address?
19    A.    No.
20    Q.    I know you said you've never
21   been deposed before?
22    A.    Yes.
23    Q.    Have you ever testified in

Page 22

1   court before?
2     A.    No. When I worked for a
3   company in Atlanta I had -- I don't know
4   what you call it, but I had to go
5   before -- I don't know what you call it,
6   Andy. One of my employees was falsifying
7   documents, and I had to go testify
8   against him in an unemployment hearing.
9   He was filing for unemployment. But it
10   wasn't in a courtroom. It was in a room
11   like this with his attorney and the
12   company's attorney. I guess I was what
13   you would call a witness for the company
14   that I worked for.
15    Q.    And that was in Georgia?
16    A.    It was.
17    Q.    And you were under oath when
18   you gave that testimony?
19    A.    Yes.
20    Q.    Have you ever -- besides that
21   occasion, have you ever given sworn
22   testimony before?
23    A.    No.

Page 23

1     Q.    Besides this litigation have
2   you ever been involved in any other
3   lawsuit?
4     A.    No.
5     Q.    You've never been sued?
6     A.    No.
7     Q.    And you've never sued anyone
8   or any entity?
9     A.    Right. No, I have not.
10    Q.    And besides the unemployment
11   hearing you were telling me about that
12   occurred in Georgia, have you been a
13   witness in any litigation?
14    A.    No. I served jury duty once,
15   but, no, I haven't been a witness.
16    Q.    And other than the EEOC charge
17   that you filed in this case, have you
18   filed any other EEOC charge?
19    A.    No.
20    Q.    Have you ever filed for
21   bankruptcy?
22    A.    No.
23    Q.    Have you ever served in the

Page 24

1   military?
2     A.    No.
3     Q.    Have you ever been arrested?
4     A.    No
5     Q.    Ms. McGlon, have you ever
6   taped a conversation with anyone?
7     A.    Yes.
8     Q.    How many times?
9     A.    Once. No, twice. I have
10   taped two conversations.
11    Q.    And did you tape two -- strike
12   that. Tell me about the first time you
13   taped a conversation. Who was present?
14    A.    Bob Gross, Henry Hicks, Brenda
15   Sellers and myself.
16    Q.    And that was during your
17   employment with Piknik?
18    A.    Yes.
19    Q.    Did those individuals know
20   that you were taping the conversation?
21    A.    Yes.
22    Q.    Have you provided a copy of
23   that tape to your lawyer?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 25 to 28)

Page 25

1    A.    No.
2    Q.    Do you recall the time frame
3    that you taped the conversation?
4    A.    It would have been roughly
5    December 2004.  May have been January.
6    Q.    May have been January 2005?
7    A.    Yes.
8    Q.    Do you still have the tape?
9    A.    Yes.
10   Q.    Have you given anyone copies
11   of the tape?
12   A.    No.
13   Q.    Tell me about the second
14   occasion that you have taped a
15   conversation.
16   A.    When Brenda Sellers terminated
17   me.
18   Q.    Did you tell Ms. Sellers that
19   you were taping the meeting?
20   A.    No.
21   Q.    Do you still have the tape?
22   A.    No.
23   Q.    Where is it?

Page 26

1    A.    I gave it to Andy's office.
2    Q.    Besides giving the tape to
3    your lawyer's office, have you given
4    copies of the tape to anyone?
5    A.    No.
6    Q.    Why did you tape that
7    conversation or tape that meeting?
8    A.    Because I felt at the time,
9    and I still feel, it was a wrongful
10   termination, that I was being
11   discriminated against.
12   Q.    Besides those two occasions,
13   have you taped any other conversation
14   with anyone?
15   A.    No.
16   Q.    Where did you attend high
17   school?
18   A.    Emma Sampson in Gadsden,
19   Alabama.
20   Q.    Did you graduate?
21   A.    Yes.
22   Q.    What year did you graduate?
23   A.    1987.

Page 27

1    Q.    Did you go on to college?
2    A.    Yes.
3    Q.    Where did you attend college?
4    A.    My freshman year I went to
5    Brunel College in Gainesville, Florida,
6    and my sophomore year I went to Auburn
7    University.
8    Q.    Did you finish up at Auburn?
9    A.    Yes.
10   Q.    Did you receive a degree?
11   A.    Yes.
12   Q.    What was your degree in?
13   A.    Bachelor of science in animal
14   and dairy sciences.
15   Q.    Were you wanting to be a
16   veterinarian?
17   A.    I thought about it, but the
18   lifestyle was not something I really
19   wanted to pursue.  But I was interested
20   in working in the food industry.  And
21   started in the meat industry, and that
22   was a good degree to have to go into that
23   field.

Page 28

1    Q.    When did you finish up at
2    Auburn?
3    A.    1992.
4    Q.    Did you pursue any
5    postgraduate work?
6    A.    I did.  I entered graduate
7    school, but I didn't finish.
8    Q.    Where did you enter graduate
9    school?
10   A.    Auburn.
11   Q.    How many years did you
12   complete?
13   A.    I completed two quarters.
14   Q.    Did you go on to grad school
15   right after graduating from Auburn
16   undergrad, or was there a break?
17   A.    There was a break.
18   Q.    Did you work during that
19   quarter?
20   A.    I did.  I worked for the
21   University.
22   Q.    What did you do for the
23   University?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 29 to 32)

Page 29

1     A.    I did research on meat cuts
2  for a professor.  It was primarily lab
3  work, working in a lab with laboratory
4  instruments and results from those
5  instruments.
6     Q.    So you worked for that
7  quarter, and then you entered the
8  graduate program at Auburn; right?
9     A.    Yes.
10    Q.    Was there a specific program
11 that you were doing?
12    A.    Well, I initially entered in
13 adult education because my thought was I
14 was going to go work for -- I was
15 interested in working as a county
16 extension agent or the county extension
17 program through Auburn.  But I determined
18 that that was not a career path that I
19 wanted to take, so I took classes in the
20 food science program.
21    Q.    How long is the food science
22 program?
23    A.    It's a two-year thesis degree.

Page 30

1     Q.    Besides the two quarters of
2  graduate school that you completed at
3  Auburn, did you receive any other
4  postgraduate education?
5     A.    No.
6     Q.    You have told me that you
7  worked for Auburn for a quarter after you
8  graduated from Auburn for undergraduate
9  work and then that you went on to
10 complete some postgraduate work.  After
11 you completed the two quarters of
12 postgraduate work did you enter the
13 workforce?
14    A.    I did.
15    Q.    What was your first job?
16    A.    Food safety administrator at
17 Harry's Farmers Market.
18    Q.    Was that out of Atlanta?
19    A.    Alpheretta, Georgia.
20    Q.    Would this have been around
21 1994 or so that you started at --
22    A.    1993.
23    Q.    And how long were you at

Page 31

1  Harry's Farmers Market?
2     A.    Twenty-three months.
3     Q.    So until about 1995?
4     A.    Yes.
5     Q.    And you started out as a food
6  safety administrator?
7     A.    Yes.
8     Q.    How long were you food safety
9  administrator?
10    A.    Over a year.
11    Q.    What were your job duties as
12 food safety administrator?
13    A.    Initially I worked at one
14 store.  These were megafood stores,
15 large, maybe the size of like a Sam's
16 Club.  So it was not like a small grocery
17 store.  It was a very large store.  And
18 initially my job was to ensure food
19 safety in all products in the market.  I
20 did that by administering programs that
21 were written by the food safety director.
22       My other chief job was to be a
23 liaison with the U.S. Department of

Page 32

1  Commerce in their seafood program.
2  Harry's was the first audited seafood
3  HACCP program in the United States.  And
4  my job was to administer that program in
5  the store where I worked.
6       So I worked very closely with
7  the U.S. Department of Commerce.  Also
8  worked with the health department and the
9  Georgia Department of Agriculture to
10 implement our food safety systems and
11 meat, deli, seafood, dairy, any food
12 sections that were considered perishable.
13    Q.    And after you were food safety
14 administrator for approximately one year,
15 what was the next job that you held?
16    A.    I became Senior Food Safety
17 Administrator, and I worked at all three
18 stores to help administer the program and
19 standardize the program across three
20 stores.  Because we had such a successful
21 template at the store where I worked,
22 they wanted me to adapt it to the other
23 three stores.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

Page 33

1    Q.    Okay.  So when you were Food
2    Safety Administrator for that one year
3    you were focused on just one store?
4    A.    Yes.
5    Q.    Then you were made Senior Food
6    Safety Administrator, and you covered
7    three stores?
8    A.    Yes.
9    Q.    And that was a promotion to
10   Senior Food Safety Administrator?
11   A.    Yes.  It was a created
12   position.  They had not done that before.
13   Q.    And did you -- or were you
14   Senior Food Administrator for the rest of
15   your tenure at Harry's Farmers Market?
16   A.    No, I wasn't.  I was promoted
17   into management.
18   Q.    Tell me how long you were
19   Senior Food Safety Administrator.
20   A.    My guess would be four, five,
21   six months.
22   Q.    And then you were promoted to
23   management?

Page 34

1    A.    Yes.
2    Q.    What were you managing?
3    A.    The entire store.
4    Q.    So when you're promoted to
5    manager, your focus is back to just one
6    store?
7    A.    It is, but it's a broader
8    focus within that one store.
9    Q.    Broader focus than just food
10   safety?
11   A.    Absolutely.  Marketing,
12   finance, hiring, human resources,
13   sanitation, sales.
14   Q.    Did you make hiring and firing
15   decisions?
16   A.    Yes.
17   Q.    Did you ever have to fire
18   someone?
19   A.    Yes.
20   Q.    Do you recall how many people
21   you have had to fire or that you had to
22   fire when you were manager at Harry's
23   Farmers Market?

Page 35

1    A.    Not many.
2    Q.    And how long were you a
3    manager at Harry's Farmers Market?
4    A.    Six months.
5    Q.    Was that the last job you held
6    with Harry's Farmers Market?
7    A.    Yes.  Harry's was unique
8    because I was able to work with people
9    from twenty-seven different ethic
10   backgrounds.  It was a very diverse work
11   environment.  Most of my employees were
12   nonAmericans.
13   Q.    Did you keep track of the
14   different ethic backgrounds of your
15   employees?
16   A.    I didn't.  The human resource
17   department did.
18   Q.    Is that where you got the
19   twenty-seven number?
20   A.    Yes.
21   Q.    In the occasions where you had
22   to terminate someone's employment, was
23   there an occasion that you had to

Page 36

1    terminate one of the folks who was of the
2    twenty-seven different ethic background?
3    A.    The only person that I recall
4    specifically sitting in the room and
5    being a part of the termination was the
6    gentleman that I had to go to the
7    unemployment hearing, and he was a white
8    American male.
9         I had supervisors that
10   reported to me, and they would handle
11   terminations of their hourly employees.
12   So I had salaried supervisors that
13   reported to me, and I did not have to
14   terminate any of my salaried supervisors.
15   Q.    As far as the hourly
16   employees, they reported to the salaried
17   supervisors?
18   A.    Yes.
19   Q.    And there were occasions where
20   hourly employees were terminated?
21   A.    Yes.
22   Q.    Could your salaried
23   supervisors make that decision without

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 37 to 40)

Page 37

1  any input from you?
2      A.   Yes.
3      Q.   So you leave Harry's Farmers
4  Market sometime in 1995; correct?
5      A.   October.
6      Q.   October.  Why did you leave?
7      A.   I got engaged.  My fiance was
8  living in Houston, Texas, so I moved to
9  Houston.
10     Q.   What's the next job that you
11 had?
12     A.   Well, I worked some odd jobs
13 while I looked for a career position.  I
14 did different things.
15     Q.   In Houston?
16     A.   In Houston.  I worked for a
17 temp agency.  I did a lot of typing.
18 Just different things that were
19 insignificant.  And then once we got
20 settled in Houston I began my job search
21 for a career position, and I took a job
22 with International Trading Company.
23     Q.   That was the name of the

Page 38

1  company, International Trading Company?
2      A.   Yes.
3      Q.   And that was in Houston?
4      A.   Yes.
5      Q.   And when did you start working
6  at International Trading Company?
7      A.   January 1997.
8      Q.   And how long did you work
9  there?
10     A.   Nine months.  Well, eight and
11 a half.
12     Q.   And what did you do for
13 International Trading Company?
14     A.   My title was assistant meat
15 buyer, and I worked with the procurement
16 department.  I worked with our suppliers
17 on the quality of the raw materials we
18 purchased.
19          International Trading Company
20 was very interested in me because I had
21 both business background and I had food
22 safety background, and they felt like
23 both of those elements were very

Page 39

1  important to their procurement department
2  and to their business.
3      Q.   What was International Trading
4  Company procuring?
5      A.   Ham, pork, raw pork.
6      Q.   Were you the assistant meat
7  buyer for the duration of your employment
8  at International Trading Company?
9      A.   Yes.
10     Q.   And you left around August,
11 September of 1997?
12     A.   I left in August, the day my
13 daughter was born.  I worked through my
14 pregnancy, and my last day at work was
15 the day before I gave birth.
16     Q.   What was the next
17 out-of-the-home job that you had?
18     A.   I did some consulting for a
19 supplier to International Trading Company
20 called King's Food Service.  They were
21 implementing HACCP, and they needed
22 somebody to consult them on that program.
23 So I would go to their facility a couple

Page 40

1  of days a week and work with their staff
2  on implementing a HACCP program for their
3  business.
4      Q.   You're going to have to repeat
5  that for me.  The HACCP program?
6      A.   Yes.  H-A-C-C-P.  It's a
7  government food quality program.
8      Q.   Was this consulting work your
9  own business or was it through another
10 business that you were --
11     A.   It was through me.
12     Q.   And you were consulting for
13 King's Food Services?
14     A.   Yes.
15     Q.   Which was a supplier to
16 International Trading Company?
17     A.   Yes.
18     Q.   Is it through your work with
19 International Trading Company how you got
20 into contact with King's Food Services?
21     A.   Yes.  I was recommended by my
22 former employer.
23     Q.   And how long were you

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 41 to 44)

Page 41

1  consulting?
2      A.   Honestly, I don't remember.
3  Several months.  It was a project basis.
4  So I would go in and help them, and then
5  once they met the goal of that meeting,
6  they would call me and we would set the
7  next goal.  So I worked with them until
8  their goals were met.
9      Q.   Kind of on an as-needed basis?
10      A.   Yes.  And my guess would be
11  maybe two or three months.
12      Q.   After your daughter was born
13  in August of 1997, did you take some time
14  off before you started consulting?
15      A.   Yes, but I don't recall how
16  much time it was.
17      Q.   For your consulting work for
18  King's Food Services were you paid by the
19  hour or --
20      A.   Yes.
21      Q.   Do you recall what your hourly
22  rate was?
23      A.   I don't.

Page 42

1      Q.   After your consulting work
2  with -- well, strike that.  Did you do
3  any consulting work for anyone other than
4  King's Food Services?
5      A.   I did.  For a company TSI,
6  Training Solutions Interactive.  I did
7  some consulting work prior to my
8  employment at International Trading
9  Company.
10      My former boss from Harry's
11  Farmers Market left Harry's to start his
12  own business, and he hired me as a
13  consultant.  And I did some work for him.
14  I did some projects for him on a
15  short-term basis.  He needed some
16  projects done, and I hammered the
17  projects out for him.  And that was the
18  end of the relationship.
19      Q.   Is that while you were in
20  Texas and Harry's was in Georgia?
21      A.   Yes.
22      Q.   What was TSI?
23      A.   Training Solutions

Page 43

1  Interactive.  It was a company my former
2  boss started with another capital -- he
3  got someone to invest some capital in his
4  business.  Basically they were working on
5  training modules for food companies so
6  that a food company that needed to
7  conduct food safety training or implement
8  food safety training systems could
9  purchase a CD-ROM type system and conduct
10  training on the computer for -- food
11  safety training on the computer for their
12  employees.
13      Q.   And you did that consulting
14  work after your consulting work for
15  King's Food Services?
16      A.   No.  It was before
17  International Trading Company.  So it
18  was -- I worked for Harry's until October
19  of 1995, and then I worked for TSI like
20  in April or May of -- that would have
21  been 1996.  Right after I got married.
22      Q.   And for TSI were you charging
23  by the hour?

Page 44

1      A.   No.  They paid me a flat fee
2  to do a project.
3      Q.   What about for Harry's, flat
4  fee or hourly?
5      A.   I was a salaried employed for
6  Harry's.
7      Q.   When you were doing the
8  consulting work?
9      A.   I didn't consult for Harry's.
10      Q.   Well, okay.  Is TSI, was that
11  consulting work your former boss from
12  Harry's?
13      A.   Yes.  And he had left Harry's
14  to start his own company, and he called
15  me.
16      Q.   Okay.  I'm with you now.
17  After your consulting work for King's
18  Food Services what was your next job
19  outside of the home?
20      A.   Piknik.
21      Q.   And you started at Piknik --
22      A.   March 1, 2001.
23      Q.   Was there a break in time in

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 45 to 48)

Page 45

1  your working outside the home between the
2  consulting work you did for King's Food
3  Services and your joining Piknik?
4      A.   Yes.
5      Q.   About how long were you out of
6  the workforce?
7      A.   Couple of years.
8      Q.   Had you had your second
9  daughter by then --
10     A.   No.
11     Q.   -- or second child?
12     A.   No, I had not.  In that time
13  period we started ITL in Houston, so I
14  helped my husband start that business.
15  We ran it out of our home.  I also did
16  work training and riding horses
17  professionally, which is something I've
18  done since I was small.  So I wasn't
19  idle.  I did things, but they're not
20  relevant to my -- you know, so relevant
21  to my work at Piknik.
22         Our trucking company started
23  doing well enough that we decided my

Page 46

1  husband could quit his corporate job.
2  And we decided to run the business closer
3  to home.  In Houston we didn't have
4  family, and our family is in Alabama,
5  Georgia, Southeast.  So we moved to
6  Montgomery to be near Auburn, because we
7  graduated from Auburn, both graduated
8  from Auburn, and we wanted to be closer.
9      Q.   During your employment with
10  Harry's Farmers Market did you ever
11  receive any discipline for any reason?
12     A.   No.
13     Q.   During your employment with
14  International Trading Company did you
15  ever receive any discipline for any
16  reason?
17     A.   No.
18     Q.   Have you ever been terminated
19  from a job other than Piknik?
20     A.   No.
21     Q.   Have you ever been asked to
22  resign in lieu of termination?
23     A.   No.

Page 47

1      Q.   So you and your family moved
2  back to Montgomery to be closer to
3  family?
4      A.   Yes.
5      Q.   You started working at Piknik
6  on March 1, 2001 I believe?
7      A.   Yes.
8      Q.   How did it come about that you
9  started working for Piknik?
10     A.   Well, I started looking for a
11  job.  My daughter was old enough to go to
12  preschool, and our business was stable
13  enough- -- we were running it out of our
14  home.  Our business was stable enough
15  that we thought it would be a good
16  opportunity for me to work again.  I like
17  to work, and I love what I do, and I'm
18  good at it.  So I started looking for
19  opportunities to utilize my abilities.  I
20  found an ad for employment in Montgomery
21  at a job that to me sounded challenging
22  and dynamic, and I applied for it.  And
23  that was the job at Piknik.

Page 48

1      Q.   What was the job that you
2  applied for?
3      A.   Quality Assurance Manager.
4      Q.   Did you submit an employment
5  application?
6      A.   I did.  I submitted my resume.
7      Q.   Did you have an interview?
8      A.   Yes.
9      Q.   Who did you interview with?
10     A.   Mike O'Connell and Ricky Loeb,
11  and a gentleman named Robert Adare.
12     Q.   Robert Adare?
13     A.   Yes.
14     Q.   Was it just one interview or
15  were there several interviews?
16     A.   I recall two interviews.
17  There may have been three, but I
18  specifically recall two.
19     Q.   Who was in your first
20  interview?
21     A.   Mike O'Connell and Teresa
22  Cascio.
23     Q.   Do you know what Mike

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 49 to 52)

Page 49

1  O'Connell's position was at the time?
2      A.   I believe it was CEO.
3      Q.   What about Teresa Cascio?
4      A.   She was his administrative
5  assistant.  That may not have been her
6  title, but that was her capacity.
7      Q.   Do you recall a second
8  interview?
9      A.   Yes.  The second interview was
10  with Mike O'Connell, Ricky Loeb and
11  Robert Adare.
12      Q.   Days after your first
13  interview, weeks, months?
14      A.   It would have been within two
15  weeks.  It was on a Saturday.
16      Q.   And you've told me that you
17  believe Mike O'Connell was the CEO?
18      A.   Yes.
19      Q.   What was Ricky Loeb's
20  position?
21      A.   Owner.
22      Q.   Owner?
23      A.   (Witness nodding.)

Page 50

1      Q.   What about Robert Adare?
2      A.   He was the plant manager.
3  Piknik had three facilities, and I was
4  applying for quality assurance manager at
5  the Day Street facility.  Robert Adare
6  was the plant manager of the Day Street
7  facility.
8      Q.   During the second interview
9  was a job offer extended?
10      A.   I don't recall if it was on
11  that interview.  I believe it was on a
12  subsequent event where I was called in,
13  Mike O'Connell offered me the job, and we
14  negotiated my salary.
15      Q.   You accepted a job?
16      A.   Yes.
17      Q.   What was your starting salary?
18      A.   Forty-seven thousand.  Plus in
19  addition to the forty-seven thousand we
20  received health care at no cost.
21      Q.   Is that family coverage?
22      A.   Yes.  And dental and vision.
23      Q.   And you're saying at no cost.

Page 51

1  You didn't have to pay any portion of the
2  cost to the company to provide that
3  insurance coverage?
4      A.   Correct.  I did not have to
5  pay any contribution to the premium.
6      Q.   So you started out as quality
7  assurance manager at the Day Street
8  facility?
9      A.   Yes.
10      Q.   How long were you the quality
11  assurance manager at Day Street?
12      A.   Until September of that year,
13  2001.  And then I was given
14  responsibility for the Altex facility as
15  well.
16      Q.   Were you still a quality
17  assurance manager?
18      A.   Yes.  I believe they -- they
19  may have called me senior quality
20  assurance manager.  I don't know if they
21  put that in a document in human
22  resources.  You know, I didn't get any
23  business card.  It wasn't a big formal

Page 52

1  thing.  I did get a pay increase.
2      Q.   So when you became Senior
3  Quality Assurance Manager were you still
4  in charge of quality assurance of the Day
5  Street facility?
6      A.   Yes.
7      Q.   And you acquired some quality
8  assurance responsibilities over the Altex
9  facility?
10      A.   Yes.
11      Q.   And you were Senior Quality
12  Assurance Manager from September 2001
13  until when?
14      A.   January of 2002 at which time
15  I became the Quality Assurance Director.
16      Q.   Let me back up for a second.
17  When you became Senior Quality Assurance
18  Manager you said that came with a pay
19  increase?
20      A.   Yes.
21      Q.   Do you recall what your salary
22  was increased to?
23      A.   I believe it was fifty-five.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 53 to 56)

Page 53

1    Q.    And you become Quality
2  Assurance Director in January of 2002?
3    A.    Yes.
4    Q.    Did that come with a pay
5  increase?
6    A.    It did.  I don't -- it was
7  either -- I can't remember if it was
8  sixty-five or seventy.  I got bumped to
9  sixty-five at some point.  I got bumped
10 to seventy-seven at another point, and
11 then I got bumped to eighty-five.  And I
12 don't recall all the situations where the
13 bumps were associated with.  Piknik
14 didn't do things that formally.
15    Q.    Well, I will represent to you
16 I've seen documents that indicate that
17 your salary was increased to sixty-five
18 thousand in January of 2002.
19    A.    Okay.
20    Q.    So does that sound about
21 right?
22    A.    Yes.
23    Q.    And that's when you became

Page 54

1  Quality Assurance Director?
2    A.    Yes.
3    Q.    And you were a Quality
4  Assurance Director from January of 2002
5  until when?
6    A.    The time they terminated me.
7    Q.    And I think we agree you
8  started out at sixty-five thousand
9  dollars a year as Quality Assurance
10 Director?
11    A.    Yes.
12    Q.    You said you were at one point
13 bumped up to a higher salary level?
14    A.    Yes.
15    Q.    What was that salary?
16    A.    I believe it was seventy-seven
17 thousand.
18    Q.    And then there came a point
19 when you were bumped up more?
20    A.    Yes, to eighty-five.
21    Q.    Did you receive any additional
22 bumps or increases in your salary?
23    A.    No.  Received a pretty big

Page 55

1  decrease.
2    Q.    We'll talk about that.
3        MR. NELMS:  Is it time for a
4  break?
5        (Whereupon, a break was taken
6        from 10:08 a.m. 10:22 a.m.)
7    Q.    (BY MS. MCGAHEY:)  Ms. McGlon,
8  before the break you were walking me
9  through your various positions with
10 Piknik.
11    A.    Yes.
12    Q.    And I wanted to follow up on
13 some of those.
14    A.    Okay.
15    Q.    As you've mentioned, you
16 started out as quality assurance manager
17 of the Day Street facility?
18    A.    Yes.
19    Q.    Were you reporting to Robert
20 Adare?
21    A.    No.  I reported to Mike
22 O'Connell.  It's very important in the
23 food industry that quality assurance and

Page 56

1  management report separately into the
2  leader of the company.
3    Q.    Why is it very important, that
4  structure?
5    A.    Because production can
6  compromise quality.  Production is
7  evaluated based on output.  Quality does
8  not need to be held back from the job it
9  needs to do because production wants to
10 get its numbers.  So it's highly
11 important in the food industry; and all
12 good food companies have quality
13 assurance report in separately into
14 production.  Quality assurance needs a
15 direct line to the leadership of the
16 company to communicate what's necessary
17 without having to worry about your job
18 being in jeopardy.
19    Q.    Why do you believe that your
20 job would be in jeopardy if you were
21 reporting to production?
22    A.    I didn't say specifically I
23 thought my job was in jeopardy.  It's

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 57 to 60)

Page 57

1    just general in the food industry. If
2    quality assurance puts half the
3    production day on hold because there's a
4    problem with it and your boss is the
5    production manager, then that's not going
6    to always work well. Some quality
7    assurance managers have a soft enough
8    demeanor that they are not going to have
9    the bravery to do that.
10       Q.    So it is your belief that it
11   is good business practice for quality
12   assurance to report directly to
13   management and not to production so as to
14   avoid any kind of conflict of interest
15   between production and quality assurance?
16       A.    Yes.
17       Q.    So as quality assurance
18   manager at the Day Street facility you
19   reported to Mike O'Connell?
20       A.    Yes.
21       Q.    And did you report to Mr.
22   O'Connell the entire time that you were
23   quality assurance manager at the Day

Page 58

1    Street facility?
2        A.    No.
3        Q.    At some point there came a
4    change in your reporting structure?
5        A.    Yes.
6        Q.    And when did that occur?
7        A.    They hired Bill Rodman as
8    production manager over Day Street and
9    Alatex facilities, and I began reporting
10   to him. I believe he started working at
11   Piknik in June of 2001, so roughly three
12   months after I started working there.
13       Q.    So you were -- at that point,
14   around June of 2001, when Bill Rodman
15   comes on board you are now reporting to
16   production?
17       A.    Yes.
18       Q.    As opposed to management?
19       A.    Yes.
20       Q.    And then you -- well, let me
21   back up. Did you report to Bill Rodman
22   for the rest of the --
23       A.    Wait a minute, no. Let's back

Page 59

1    up. No. I'm sorry. This has been a
2    long time. I'm sorry. No. In May of
3    2001 they hired a Quality Assurance
4    Director named Pearce Dreaden.
5        Q.    Pearce?
6        A.    Dreaden, D-R-E-A-D-E-N. And I
7    started reporting to him, and he had
8    responsibility at Alatex and Day Street.
9    They also hired Bill Rodman I believe,
10   like I told you before, in June of 2001
11   as production manager. Then Pearce was
12   terminated in September, at which point I
13   was given the responsibility you and I
14   spoke of earlier, responsibility for
15   quality of the two facilities. And that
16   is when I began reporting to Bill Rodman.
17   It was September 29, 2001.
18       Q.    Okay. So just to make sure
19   that I'm clear --
20       A.    Sure.
21       Q.    -- so you first come on board
22   as quality assurance manager at the Day
23   Street facility in March of 2001;

Page 60

1    correct?
2        A.    Yes.
3        Q.    From March until about May of
4    2001 you're reporting to Mike O'Connell?
5        A.    Yes.
6        Q.    And Mike O'Connell you believe
7    was the CEO?
8        A.    Yes.
9        Q.    And then starting in May of
10   2001 you were reporting to Pearce
11   Dreaden?
12       A.    Yes.
13       Q.    Who was the Quality Assurance
14   Director?
15       A.    Yes.
16       Q.    Before Mr. Dreaden came on
17   board had their not been a Quality
18   Assurance Director?
19       A.    Correct, there had not. But
20   the business was growing, and it was in
21   serious need of good technical people.
22   Piknik had had a long history of not
23   bringing in good technical people in a

Tyler Eaton Morgan Nichols & Pritchett, Inc.

15

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 61 to 64)

Page 61

1  technical field.  And when you work with
2  Fortune 100 food companies you've got to
3  have people that are educated and that
4  know what they're doing.  And that was
5  the reason I was initially brought in.
6      Q.   And then you become Senior
7  Quality Assurance Manager September 29,
8  2001; correct?
9      A.   Yes.
10     Q.   And it's at that point that
11 you have responsibilities at the Day
12 Street facility and the Alatex facility?
13     A.   Yes.
14     Q.   And you start reporting to
15 Bill Rodman?
16     A.   Yes.
17     Q.   And Mr. Rodman was production
18 manager?
19     A.   Yes.
20     Q.   And he was a production
21 manager over the Day --
22     A.   Well, plant manager.  He was
23 plant manager, and he had responsibility

Page 62

1  at Alatex and Day Street.  He wasn't the
2  Alatex plant manager, but he had
3  production responsibility there.  And I
4  don't know the particulars of his work
5  agreement with the company.
6          He had a background in
7  quality, and that's why the company felt
8  like it would be -- it would not hurt the
9  company to have myself reporting to him,
10 because he started his career in quality
11 assurance.  So his experience allowed him
12 to be objective in making good decisions.
13     Q.   Were you involved in the
14 hiring of Mr. Rodman?
15     A.   No.
16     Q.   And you were Senior Quality
17 Assurance Manager from September 29, 2001
18 until January 2002; correct?
19     A.   Yes.
20     Q.   And during that time period
21 were you always reporting to Bill Rodman?
22     A.   Yes.
23     Q.   When Mr. Dreaden was let go in

Page 63

1  September of 2001 was he not replaced?
2      A.   No.
3      Q.   Were his job duties
4  disseminated amongst employees?
5      A.   No.
6      Q.   Did the company just eliminate
7  the position?
8      A.   No.  Pearce was hired based on
9  personal reasons within the company.  The
10 Loeb family has long owned Piknik, and
11 the Whitfield family has long owned
12 Whitfield.  And they were -- they have
13 gone through spells of hiring each
14 other's employees.  Pearce was hired as a
15 vendetta against Whitfield.
16     Q.   Was Pearce a former Whitfield
17 employee?
18     A.   Yes.  He was hired from
19 Whitfield.  And it was told to Piknik
20 that if Piknik hired Pearce away from
21 Whitfield it would damage Whitfield's
22 relationship with one of their customers.
23 So Pearce was hired for that reason.

Page 64

1      Q.   How do you know?
2      A.   I know just like anybody else
3  knew.  It was just talked about.
4      Q.   Was it rumor?
5      A.   Well, I guess you could say it
6  was rumor because I didn't read a
7  document that said that, but --
8      Q.   And you weren't involved in
9  the hiring of Mr. Dreaden?
10     A.   No, absolutely not.  I was not
11 involved in any of that.  I was doing my
12 job, and there was plenty of job for me
13 to do.  Piknik was a disaster when I
14 started there.  It was an absolute
15 disaster.
16         So when Pearce started at
17 Piknik he had some responsibilities, but
18 they were very narrow.  He didn't really
19 do a whole lot.  So when you ask who took
20 over his responsibilities, there really
21 wasn't much to take over.
22     Q.   What did he do?  What were his
23 responsibilities?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 65 to 68)

Page 65

1    A.   I don't know what they were.
2    His responsibility was quality at both
3    plants, but he did very little.  He never
4    went on the production floor.  He never
5    held meetings with his staff.  He never
6    gave direction for the company.  He never
7    met with customers.  So he sat in an
8    office and worked on a computer a lot.
9        Q.   So you don't know what he was
10   doing?
11       A.   I don't know what he was
12   doing.  He was doing stuff on the
13   computer.  I do believe he was doing some
14   work on yields and efficiencies with the
15   juice products, and I do believe he was
16   doing something with sanitation.  Other
17   than that -- I had my plate full.  I had
18   a lot to do and, you know, really wasn't
19   my place to follow my boss around and
20   find out what he was doing.  I reported
21   issues to him.  I worked with him,
22   communicated with him as necessary, and I
23   did my job.

Page 66

1        Q.   When you were quality
2    assurance manager at Day Street did you
3    have employees that reported to you?
4        A.   I did.
5        Q.   Who reported to you?
6        A.   The microbiologist and two
7    supervisors, quality assurance
8    supervisors.
9        Q.   Anyone else?
10       A.   There was an assistant
11   manager.
12       Q.   Anyone else?
13       A.   The hourly employees reported
14   to the supervisors.
15       Q.   The hourly employees reported
16   to the two supervisors who reported to
17   you?
18       A.   Yes.  So overall a staff of
19   roughly twenty-one to twenty-four total.
20       Q.   And so getting back to what we
21   were talking about with respect to Pearce
22   Dreaden.  You're unaware of his job
23   duties or his job responsibilities being

Page 67

1    allocated to other employees after his
2    departure?
3        A.   Right.  I continued to do the
4    job that I had been doing and had
5    additional responsibilities added at the
6    other plant, but I don't know
7    specifically what he was doing.  The
8    company was in a metamorphosis at the
9    time.
10           And, as you can see, by
11   bringing on Bill Rodman as a plant
12   manager and Mike O'Connell as CEO, and he
13   was giving more daily responsibilities to
14   Bill Rodman, there were a lot of changes,
15   and the company was in a lot of trouble.
16   It was the middle of beverage season,
17   which is extremely busy.  And the company
18   had a number of issues at every level.
19           So it's not a work environment
20   like you work in.  It's a plant
21   manufacturing environment that's
22   extremely dynamic with customers, outside
23   customers, that have high demands.

Page 68

1    They're Fortune 100 companies.  They were
2    worried about their products.
3        MS. MCGAHEY:  Off the record.
4        (Off-the-record discussion.)
5        A.   You know, in a manufacturing
6    environment you have the same
7    responsibilities in the middle of the
8    night that you have during the daytime.
9    So it's very dynamic, and there's so many
10   things that can change in a short period
11   of time, especially when a company is in
12   trouble, and Piknik was in trouble.
13       Q.   Then in January of 2002 you
14   become Quality Assurance Director?
15       A.   Yes.
16       Q.   And who were you reporting to?
17       A.   Bill Rodman.
18       Q.   Did you always report to Bill
19   Rodman when you were Quality Assurance
20   Director?
21       A.   No.
22       Q.   At what point did you stop
23   reporting to Mr. Rodman?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 69 to 72)

Page 69

1    A.    When he was terminated in June
2  of two thousand -- I guess that would
3  have been three, 2003.
4    Q.    And after Mr. Rodman left the
5  company who did you start reporting to?
6    A.    Mike O'Connell again.
7    Q.    Do you believe that Mike
8  O'Connell was still CEO at the time?
9    A.    For a short period of time he
10 was, and then Onyx Capital Ventures
11 acquired the company the following month
12 in July of 2003, so we were told.
13   Q.    So after Mike O'Connell who
14 were you reporting to?
15   A.    Well, Mike O'Connell was
16 terminated in January of 2004, and then I
17 began reporting to Chris Day.
18   Q.    So from June of 2003 until
19 January 2004 you were reporting to Mr.
20 O'Connell?
21   A.    Yes.
22   Q.    And then starting in June of
23 2004 you started reporting to Chris Day?

Page 70

1    A.    Yes.
2    Q.    How long did you report to
3  Chris Day?
4    A.    Until he hired Bill McLennan,
5  and I don't remember the dates of his
6  hiring. It was in the summer. And I
7  started reporting to Bill McLennan.
8  August, September, maybe.
9    Q.    Of 2004?
10   A.    Yes.
11   Q.    How long did you report to Mr.
12 McLennan?
13   A.    Until he departed the company
14 in December of 2004.
15   Q.    After Mr. McLennan left the
16 company who did you report to?
17   A.    Chris Day.
18   Q.    And you reported to Chris Day
19 from December of 2004 until when?
20   A.    Anthony Barber was hired in --
21 I guess April is when he started of 2005.
22   Q.    So you reported again to Chris
23 Day from December of 2004 until April

Page 71

1  2005?
2    A.    Roughly, yes.
3    Q.    And then from April 2005 until
4  your departure from the company you
5  reported to Anthony Barber?
6    A.    Yes.
7    Q.    When you were Quality
8  Assurance Director did you have employees
9  report to you?
10   A.    Yes.
11   Q.    Who reported to you?
12   A.    Well, it was different people
13 at different times. Pretty much the
14 whole time was the microbiologist. The
15 quality assurance supervisors reported to
16 me for that duration.
17   Q.    Were there two quality
18 assurance supervisors?
19   A.    At one time there were, and
20 then we got down to one at Day Street and
21 one at Alatex. Initially there were two
22 at Day Street and one at Alatex. But
23 through restructuring and cost reductions

Page 72

1  and improvement of systems we were able
2  to eliminate a lot of redundant labor.
3  We put in some very good systems that
4  allowed us to make better use and
5  efficiencies in the employees we had.
6        There were no job descriptions
7  when I started. I wrote my job
8  description. I wrote all the other job
9  descriptions in the department. And
10 through the job description process we
11 were able to allocate work tasks to
12 different employees to improve efficiency
13 in the staff.
14       Also for a period of time the
15 sanitation manager reported to me, so I
16 had responsibility for sanitation at two
17 plants. During Bill McLennan's tenure I
18 was given responsibility for quality
19 assurance at the Brundidge facility and
20 with that also responsibility in
21 reporting for the research and
22 development department.
23       So at the time I departed

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 73 to 76)

Page 73

1  Piknik the quality assurance managers at
2  three plants, the microbiology department
3  at two plants and the research and
4  development department all reported to
5  me.
6          This is consistent with a
7  title called Director of Technical
8  Services. They didn't change my title,
9  but in other food companies my peers were
10 directors of technical services, because
11 it encompassed more than just quality
12 assurance.
13     Q.   So at the time that you left
14 Piknik you had reporting to you two
15 microbiologists?
16     A.   Well, no, because a couple of
17 weeks before I departed Piknik they shut
18 down the Brundidge plant. So there was
19 no more R&D department, there was no QA
20 manager there, and there was no
21 microbiology department.
22     Q.   For the Brundidge plant?
23     A.   Right.

Page 74

1      Q.   But the Day Street plant was
2  still operating?
3      A.   Yes, as was Alatex.
4      Q.   So at the time of your
5  departure who were the microbiologists
6  reporting to you?
7      A.   I had one microbiologist,
8  Katie Pribisko.
9      Q.   Can you spell her last name,
10 please.
11     A.   Oh, she got married. Walters,
12 Katie Walters.
13     Q.   Is that her married name?
14     A.   Yes. She got married during
15 her employment with Piknik.
16     Q.   So at the time that you left
17 you only had Katie Walters as the
18 microbiologist who was reporting to you?
19     A.   Yes.
20     Q.   And at the time of your
21 departure did you still have quality
22 assurance supervisors reporting to you?
23     A.   No. They were reporting to

Page 75

1  production.
2      Q.   What about the sanitation
3  manager?
4      A.   No.
5      Q.   Was not reporting to you?
6      A.   No. That ended with Bill
7  Rodman's tenure with the company. When
8  Bill Rodman left the company they put
9  sanitation back under production because
10 they wanted me to use my time on other
11 things. When a sanitation department
12 reports to you you do have to go in in
13 the middle of the night and meet with
14 them on a regular basis, and they wanted
15 my expertise elsewhere.
16     Q.   And at the time of your
17 departure you didn't have any
18 responsibilities for quality assurance at
19 Brundidge because that facility had been
20 shut down?
21     A.   Correct.
22     Q.   And you didn't have any R&D
23 responsibilities at Brundidge either for

Page 76

1  the same reason?
2      A.   Correct.
3      Q.   And R&D is research and
4  development?
5      A.   Yes.
6      Q.   Did you still have R&D
7  responsibilities for the Day Street and
8  Alatex facilities?
9      A.   They didn't do R&D. We did
10 "D", we did development for other
11 companies. You know, Tropicana would
12 bring their research team in, and we
13 would help them develop the product in
14 our facility. But we didn't have --
15 during the four and a half years I was at
16 Piknik we didn't have research and
17 development in that section of the
18 business.
19     Q.   Okay.
20     A.   We didn't produce our own
21 products, so we didn't need it.
22     Q.   You were mentioning earlier
23 that at one point you had quality

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 77 to 80)

Page 77

1   assurance supervisors reporting to you?
2       A.    Yes.
3       Q.    Initially you had two quality
4   assurance supervisors at the Day Street
5   facility reporting to you?
6       A.    Yes.
7       Q.    And who were those two
8   supervisors?
9       A.    Barbara Williams and John
10  Belizio, and I can't remember how to
11  spell it.
12      Q.    Can you pronounce it again,
13  please?
14      A.    Belizio.
15      Q.    And at some point in time you
16  were able to go down to just one quality
17  assurance supervisor --
18      A.    Yes.
19      Q.    -- at the Day Street facility?
20      A.    Yes.  As we were improving
21  operations and structure within the
22  department -- John resigned.  He was
23  getting married.  He was our second shift

Page 78

1   supervisor.  And he wanted to have a life
2   where he was at home with his family at
3   nighttime.  So at the time he resigned we
4   were able to restructure the department
5   to where we didn't need a supervisor at
6   nighttime.
7       Q.    So you just kept Barbara
8   Williams as the day-shift quality
9   assurance supervisor?
10      A.    Yes.
11      Q.    And you had also one quality
12  supervisor at the Alatex facility?
13      A.    Yes.
14      Q.    Who was that?
15      A.    Brinda Nixon.
16      Q.    Brinda?
17      A.    Yes.  B-R-I-N-D-A Nixon.
18      Q.    And did there come a point in
19  time where --
20      A.    Brinda resigned, and she was
21  offered a job at Whitfield.  It was one
22  of those, you know, where it swung the
23  other way.  So we had an hourly employee

Page 79

1   in the quality assurance department.  She
2   was having some problems with alcoholism.
3   So she was having some attendance
4   problems.  And I can't remember if she
5   resigned or was terminated because she
6   reported to Barbara.  So Barbara handled
7   her, you know, departure first-hand.
8             This employee, who was a good
9   employee, but alcohol changes things --
10  this good employee went to Whitfield.
11  And then, as typical, started calling
12  people at Piknik, hey, I got a job at
13  Whitfield, why don't y'all come over.  So
14  Brinda Nixon was one of people that left
15  Piknik to go back to Whitfield.  She had
16  worked at Whitfield years before, went
17  over with the group to, you know, Piknik.
18  So she went back.
19      Q.    And was Brinda Nixon replaced?
20      A.    She was with Barbara Williams.
21      Q.    Okay.  So Barbara Williams
22  then assumed quality assurance duties
23  over the Day Street facility and the

Page 80

1   Alatex facility?
2       A.    We just moved her to Alatex.
3   So we had her leave Day Street and we
4   moved her to Alatex.
5       Q.    Did you have anybody come in
6   and replace Barbara Williams at Day
7   Street?
8       A.    What we did, we restructured
9   the job responsibilities that Barbara
10  had, and we had created a new position
11  that was a step above a QA technician.
12  It was sort of -- what we were trying to
13  do is create a structure where employees
14  that came in as hourly employees could be
15  groomed into becoming supervisors.
16            So we created an interim
17  position between a QA technician and a
18  supervisor, and it was called the income
19  and ingredient technician.  They were
20  able to do some testing.  It was a little
21  more sophisticated.  They worked with
22  management a little closer.  And so we
23  put some of Barbara's responsibilities

20

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 81 to 84)

Page 81

1 onto this income and ingredient
2 technician, and then the QA manager
3 assumed some of the other
4 responsibilities.
5     Q.  So with Brinda Nixon's
6 departure there came a bit of
7 reorganization and restructuring of
8 quality assurance duties?
9     A.  Yes. But we had a really good
10 system. We had very good structure in
11 the department. We had clear reports and
12 reporting mechanisms, so it wasn't a big
13 traumatic event. We managed it.
14     Q.  Now, earlier you said that
15 during the time that you were reporting
16 to Bill McLennan, which was August or
17 September of 2004 until December of 2004,
18 you were given responsibilities over the
19 Brundidge facility?
20     A.  Yes.
21     Q.  When did the Brundidge
22 facility cease operating?
23     A.  It was May or June of 2005.

Page 82

1     Q.  Up until May or June of 2005
2 were you still having responsibilities
3 for quality assurance at Brundidge?
4     A.  Yes.
5     Q.  Prior to your assuming
6 responsibilities at the Brundidge
7 facility in August or September of 2004,
8 had your work primarily been on the Day
9 Street and Alatex facilities?
10     A.  Yes. Occasionally they would
11 call me to Brundidge to help them with
12 systems or help them prepare for an
13 audit, a customer audit. But my main
14 focus was in Montgomery.
15     Having Fortune 100 customers
16 that interact a lot with the company,
17 they wanted a technical person to work
18 closely with them. Brundidge customers
19 was a lot of mom-and-pop -- Brundidge had
20 hundreds of customers, but they were
21 small companies and they didn't require
22 the attention that the technical
23 companies did in Montgomery.

Page 83

1     Q.  Did Brundidge only -- was the
2 focus at Brundidge the condiments
3 business?
4     A.  Yes.
5     Q.  No beverages at Brundidge?
6     A.  No.
7     Q.  And the Day Street and Alatex
8 facilities were solely beverage?
9     A.  Yes. And some syrup, Hershey
10 syrup, which is, you know --
11     Q.  And the Brundidge, Day Street
12 and Alatex facilities were the only three
13 facilities for Piknik?
14     A.  Yes.
15     Q.  As Director of Quality
16 Assurance what were your job duties?
17     A.  Have you received a copy of my
18 job description? It's been supplied.
19     Q.  Well, why don't you just tell
20 me.
21     A.  Okay. I was responsible for
22 overall quality of all finished product
23 in three plants, to meet or exceed

Page 84

1 expectations and requirements of the FDA,
2 the health department and our customers
3 to ensure the safety of the food; to
4 manage the finances of the department; to
5 verify that our systems worked, to work
6 with customers on improving and
7 maintaining our system, and to maintain a
8 technical staff that executed their job.
9 I was also to work with management and
10 customers on a new product that they
11 brought to the facility and to safeguard
12 the health of the company by preventing
13 recalls or food safety issues.
14     Q.  You mentioned that there is a
15 job description for this position; right?
16     A.  Yes.
17     Q.  Did you prepare the job
18 description?
19     A.  Yes.
20     Q.  When did you prepare it?
21     A.  Well, I initially prepared
22 it -- I don't know when I initially
23 prepared it. But it changed, so it was

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 85 to 88)

Page 85

1  revised at different times.
2      Q.   Do you recall when the last
3  time you revised it was?
4      A.   I do not.  Revising and
5  updating our documents based on a change
6  in business was part of my job.  You
7  know, I did that pretty regularly.  So I
8  don't remember the last time that I did
9  that.
10     Q.   Give me a second.  I'm looking
11  at the documents you produced.
12     A.   I'm looking at the headers
13  because I'll point it out if I see it.
14     Q.   Did you provide a copy to your
15  lawyer?
16     A.   I believe I did.  But this has
17  been going on so long.  There are so many
18  documents.  I can easily provide it.
19  That's not a problem.  Plus Chris Day or
20  Jeff Larry should be able to provide it
21  as well.
22     Q.   Did you give Chris Day or Jeff
23  Larry a copy of it?

Page 86

1      A.   They had access to all company
2  documents.
3      Q.   But you don't recall giving
4  them a copy, though?
5      A.   I'm sure I gave one to Chris
6  Day.  I would not doubt that one bit.
7  Anthony Barber would have one.
8      Q.   Do you have a specific
9  recollection of giving your job
10  description to Chris Day?
11     A.   Yes, I do.
12     Q.   You said you were responsible
13  for the overall quality of the finished
14  product?
15     A.   Yes.
16     Q.   And part of your
17  responsibility was to meet and exceed the
18  requirements of the FDA?
19     A.   Yes.
20     Q.   In the health administration?
21     A.   Health department, Alabama
22  Health Department, Department of Public
23  Health.  They are the same type of people

Page 87

1  that do the restaurants, that put the
2  numbers in the restaurants.  And they
3  inspected our facilities.
4      Q.   And you were responsible for
5  verifying that systems worked?
6      A.   Yes.
7      Q.   Are those quality control
8  systems?
9      A.   Quality assurance systems.
10  Quality assurance and quality control are
11  different.
12     Q.   What is the difference between
13  quality assurance and quality control?
14     A.   Quality control is more you're
15  measuring and taking data, and then you
16  make decisions against that data or you
17  make controls against that data.  And
18  quality assurance is more preventative.
19  You're preventing the problems from ever
20  occurring.  You put systems in place to
21  identify problems early in the process so
22  that they don't occur.  Quality control
23  is determining a problem has occurred

Page 88

1  and --
2      Q.   After the fact?
3      A.   After the fact.  And
4  controlling, damage control, if you will.
5  Defense versus offense, if you will.
6      Q.   And what kind of problems are
7  you trying to prevent?  Give me some
8  examples.
9      A.   Well, adulteration of the
10  product.  Customers give us
11  specifications.  It's similar to the
12  white line and the yellow line on a road
13  when you're driving.  These are the
14  parameters under which you can
15  manufacture our product, and you have to
16  stay within those parameters.  So we do a
17  number of tests on the product through
18  the process to make sure we're staying
19  within those parameters.
20         What you don't want to do is
21  manufacture all day long and then test
22  your product at the end of the day and
23  find out it was wrong.  So we would do

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

Page 89

1  certain tests throughout the process.
2  And you don't want to drive on the white
3  line or the yellow line. You want to
4  stay between them.
5      So if we started -- the value
6  started steering towards one line or
7  another, we could make adjustments in the
8  process to prevent the problem from ever
9  happening.
10      It still happened. Problems
11  still occurred. We worked in a
12  manufacturing environment that did not
13  have overly sophisticated equipment.
14  Most of our equipment was older, and it
15  was not necessarily put together very
16  well. So oftentimes the equipment had
17  very much difficulty staying within the
18  parameters that the customers set. So
19  that was a big challenge at Piknik, old,
20  antiquated equipment that was not
21  necessarily put together using good
22  engineering technique.
23      Q.   You also said that one of your

Page 90

1  job responsibilities was to maintain the
2  technical staff?
3      A.   Yes.
4      Q.   And those are the folks who
5  you have listed for me earlier?
6      A.   Yes.
7      Q.   That reported to you?
8      A.   Right. So if somebody
9  resigned or was terminated, then part of
10  my responsibility was to work with human
11  resources to get a replacement, an
12  adequate replacement. And because our
13  business fluctuated -- we were very, very
14  busy in the summertime and in the
15  wintertime not so much -- the staffing
16  needs changed.
17      So we had to work -- sometimes
18  we would identify good production
19  employees and promote them into quality
20  assurance. But we had to -- we tried
21  different strategies because, you know,
22  you would increase your staff in beverage
23  season, but then unfortunately we would

Page 91

1  have to decrease outside of beverage
2  season. So that was a challenge of that
3  business.
4      Q.   When you had to decrease your
5  staff, I take it you were having to
6  terminate employees?
7      A.   No. We would lay people off.
8  Or if they were good employees that the
9  company wanted to maintain and the
10  employee wanted to stay with the company,
11  we would try to find, you know, other
12  work for them within the company.
13      Q.   When you had to lay off
14  employees, were you having to make the
15  call on which employees to lay off?
16      A.   Not necessarily, no. Quality
17  assurance did not lay off that many
18  employees. We laid off -- I don't recall
19  laying off many employees at all.
20  Production was the department that
21  primarily had to. And often very good
22  quality employees, we would find
23  additional work for them during those

Page 92

1  slow times. When you get good technical
2  people that are good at what they do in
3  Montgomery, Alabama you don't let them
4  go. You keep them. And we would do our
5  best to keep good employees.
6      Q.   You also said that another job
7  responsibility of yours as Director of
8  Quality Assurance was to work on new
9  product?
10      A.   Yes.
11      Q.   Is that what you were telling
12  me earlier about the development side in
13  the beverage business?
14      A.   Well, that's one thing, yes.
15  When our customers brought in a new
16  product -- for example, Tropicana
17  Smoothie was a particularly difficult
18  product to work with. And I would work
19  with their technical people on solutions,
20  or we would provide them with information
21  so they could make decisions about their
22  product.
23      Q.   You also said another one of

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 93 to 96)

Page 93

1 your job responsibilities as Director of
2 Quality Assurance was to safeguard the
3 company by preventing recalls or food
4 safety issues?
5     A.    Yes.
6     Q.    And that goes back to what you
7 were explaining what quality assurance
8 is?
9     A.    Yes.
10    Q.    Did I leave any of the job
11 duties -- did I omit any that you said?
12    A.    I don't think so.
13    Q.    When you were a Quality
14 Assurance Director what kind of hours
15 were you working initially?
16    A.    Initially fifty, sixty hours
17 weeks.  Sometimes I would work during the
18 day.  Sometimes I would work during the
19 night, weekends, whatever it took to get
20 the job done.  I worked from home then.
21 I worked from home the entire time I was
22 at Piknik.
23    Q.    At some point did there come a

Page 94

1 time where you had a reduced work
2 schedule?
3     A.    Yes.
4     Q.    When did that come about?
5     A.    March of 2004.
6     Q.    Is that when you had your
7 second child?
8     A.    Yes.
9     Q.    Little girl or little boy?
10    A.    Boy.
11    Q.    So in March of 2004 you take a
12 reduced work schedule?
13    A.    Yes.
14    Q.    What were your hours?
15    A.    Well, they varied from day to
16 day, but three days a week I left the
17 office at 2:30, and then two days a week
18 I left the office at 5.
19    Q.    Is that with an 8 o'clock
20 start time?
21    A.    7:45 to 8.
22    Q.    So you were working full days
23 two days a week?

Page 95

1     A.    Yes.
2     Q.    And partial days three days
3 out of the week?
4     A.    Yes, as was not unusual at the
5 time in Piknik.  It was encouraged.
6 There were other employees that did the
7 same thing.  Bert's replacement worked
8 just a few days a week, and she was only
9 in the office a couple of hours a week.
10    Q.    Did you ask for the reduced
11 schedule?
12    A.    I did.
13    Q.    Who did you ask?
14    A.    Chris Day and then Bill
15 McLennan and then Anthony Barber, and
16 they all agreed to it.  And I did work
17 from home.  I did a lot of work from
18 home; e-mails, phone calls, computer work
19 on documents.
20    Q.    So from March 2004 you're on
21 this reduced work schedule that you
22 described to me?
23    A.    Yes.

Page 96

1     Q.    Did that schedule ever change
2 again?
3     A.    No.
4     Q.    So from March 2004 until you
5 left Piknik you were working on this
6 reduced schedule that you just described?
7     A.    Yes.
8         MR. NELMS:  Good time for a
9 break?
10        MS. MCGAHEY:  Let me finish up
11 this section.
12    Q.    And so you initially asked
13 Chris Day to go on reduced schedule?
14    A.    Yes.
15    Q.    Is he the first person that
16 you asked about it?
17    A.    Yes.
18    Q.    Is that because you were
19 reporting to him at the time?
20    A.    It was.  And it's because he
21 basically asked me what do you feel like
22 you can do coming back to work.  And I
23 told him, and he agreed to it.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 97 to 100)

Page 97

1      Q.   He didn't give you any
2   pushback about it?
3      A.   None, none whatsoever.  And I
4   told him on numerous occasions if it's a
5   problem, let's talk about it and we'll
6   see what we can do, because at no point
7   did I want to jeopardize anything about
8   the company.  I'm a very up-front,
9   honest, straightfoward person.  I don't
10  like problems behind my back.  I like
11  them in front of my face.  And if it was
12  an issue for Chris Day, I made it very
13  clear, let's talk about it.  And he said
14  it was absolutely no issue whatsoever, as
15  did Bill McLennan, as did Anthony Barber.
16     Q.   So after you stopped reporting
17  to Chris Day the first time around and
18  you start reporting to Bill McLennan did
19  you have to ask Bill McLennan's
20  permission to work a reduced schedule?
21     A.   I did not have to ask him.
22  But on our initial meeting as an employee
23  I said, Bill, you need to know this about

Page 98

1   me, and if this is a problem, let's see
2   what we can do to work it out.  Tell me
3   what you need from me.
4      Q.   And he didn't have any problem
5   with it?
6      A.   None whatsoever.
7      Q.   And then when you started
8   reporting to Anthony Barber did you have
9   a similar conversation with him?
10     A.   Yes, absolutely.
11     Q.   And he had no problem with
12  your --
13     A.   No problem.
14     Q.   -- reduced schedule?
15     A.   None whatsoever.  And they
16  knew I was available.  If there was an
17  issue that I needed to be there outside
18  those hours, I could negotiate my life to
19  be there.  That was not a problem.  If I
20  needed to be there in the middle of the
21  night, if I needed to be there at five in
22  the morning, if I needed to stay until
23  eight at night, I could do that.

Page 99

1      Q.   Do you know if Piknik -- after
2   you decide to go on the reduced work
3   schedule do you know if Piknik hired some
4   additional quality assurance personnel to
5   help fill in some of the duties so that
6   you could stay home with your children?
7      A.   No, I did not drop any of my
8   duties.
9      Q.   Do you know if Piknik hired
10  additional quality assurance personnel?
11     A.   Piknik did not.
12     Q.   So from the time in March 2004
13  when you go on a reduced work schedule,
14  no new quality assurance employees were
15  hired?
16     A.   No.
17     Q.   Is that correct?
18     A.   We hired new people to replace
19  people that left, but no additional
20  positions were added to the department to
21  compensate for my reduced work schedule
22  at any time.
23          We had a structure within the

Page 100

1   department that worked.  And through
2   attrition or whatever circumstances that
3   caused an opening, we would work to
4   replace that person.  But at no time did
5   we add additional positions because of my
6   circumstances.
7      Q.   Was there a point in time
8   where you were only working four hours a
9   day?
10     A.   Never.
11          MS. MCGAHEY:  This is a good
12  breaking point if you want to take one.
13          (Whereupon, a break was taken
14          from 10:08 to 10:22 a.m.)
15     Q.   (BY MS. MCGAHEY:)  Ms. McGlon,
16  were there other people in the quality
17  assurance department who were working a
18  reduced schedule?
19     A.   Not in quality assurance that
20  I'm aware of or recall.
21     Q.   Do you have any idea the
22  salaries of the other quality assurance
23  employees?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 101 to 104)

Page 101

1    A.    I had an idea -- I knew
2    exactly what they were at that time.  I
3    don't know that I could recall them
4    specifically right now.
5        Q.    So as you sit here today you
6    can't recall what their salaries were?
7        A.    No.
8        Q.    How would you describe your
9    relationship with the employees who
10   reported to you?
11       A.    Excellent.
12       Q.    No friction?
13       A.    There was only friction with
14   one employee.  His name was Allen
15   Walters.
16       Q.    What was Allen Walters?
17       A.    He was the quality assurance
18   manager at Day Street.  But all my other
19   employees and I had an excellent
20   relationship.
21       Q.    When was Allen Walters the
22   quality assurance manager at Day Street?
23       A.    He was at the time I was

Page 102

1    terminated.
2        Q.    Is that the same thing as
3    quality assurance supervisor?
4        A.    No.
5        Q.    Quality assurance managers at
6    this time were reporting to the plant
7    managers directly?
8        A.    Yes.
9        Q.    So Allen Walters was quality
10   assurance manager at Day Street?
11       A.    Yes.
12       Q.    At one point was he reporting
13   to you?
14       A.    Yes.
15       Q.    What was going on between you
16   and Mr. Walters?
17       A.    Nothing was going on.  He had
18   a problem with me.  Allen was hired --
19   Allen was what you would call a big fish
20   in a very small pond.  He had worked
21   directly for the owner of a small company
22   when we recruited him, and he had a lot
23   of different tasks that he did with that

Page 103

1    company.  He was an expert in none.  He
2    was a generalist in all.  He would do the
3    production schedule for the production
4    department.  He would do some quality
5    documents.  He did a lot of different
6    things.  He didn't really have a quote,
7    unquote, job description.  So he was kind
8    of used to being the go-to guy and the
9    save-the-day guy.
10       And one of our concerns on
11   interviewing him was, Allen, you're going
12   to have a defined role at Piknik and
13   you're going to have to execute against
14   this role.  And he did not adjust well to
15   that environment.  He did not adjust well
16   to showing up for meetings.  He just
17   wouldn't show up.  He didn't adjust well
18   to filling a defined role in a company
19   that needed him in a defined role, and
20   that caused some friction because I had a
21   very clearly defined department.
22       He was the type of person that
23   if he quote, unquote, felt it was okay,

Page 104

1    then he would do it even if it was
2    against an SOP or against a procedure.
3    He sort of was that type of employee.
4    And it worked fine where he came from,
5    but it didn't work well at our company.
6        Q.    SOP is standard operating
7    procedure?
8        A.    Yes.
9        Q.    So your perception of Mr.
10   Walters was he was a bit of a cowboy?
11       A.    Yeah, you could say that.
12   Allen, personally I believe, was a lonely
13   person and probably obtained more from
14   work than people that have a life outside
15   of work.  He had moved here from the
16   north.  He didn't have any friends.
17   Outside of work he didn't do anything.
18       I believe that a lot of his
19   emotional and personal fulfillment came
20   from feeling important at work, and
21   sometimes in those situations you can
22   make more of work than it is.  This was
23   my impression of Allen.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 105 to 108)

Page 105

1    I personally didn't have a
2 problem with him.  He was a nice man, but
3 professionally he didn't execute against
4 our needs, and that was what concerned
5 me.
6    Q.    You had in mind a very narrow
7 and specific role that he was to take on
8 as quality assurance manager?
9    A.    I wouldn't call it very
10 narrow, but I would say it was specific.
11 He had a job description, and I expected
12 him to fulfill his job description.
13    Q.    And you felt that he was not
14 fulfilling that job description?
15    A.    Correct.  In some ways yes and
16 in some ways no.  He had room for
17 improvement.
18    Q.    As we all do?
19    A.    We all do, yes, we do.  You're
20 right.
21    Q.    Earlier when you were talking
22 about some of your job responsibilities
23 as Quality Assurance Director you

Page 106

1 mentioned that you should have been given
2 a title of Director of Technical
3 Services?
4    A.    I don't know that I should
5 have been, but that's typical in the
6 industry for someone that has those
7 different departments.  I didn't feel
8 entitled, that they needed to change it.
9 My job was my job, and I was going to do
10 it.  But typically my peers in other
11 companies had that title.
12    Q.    Did you ask for your job title
13 to be changed?
14    A.    I mentioned it, that it was
15 typical in other companies.  But, no, I
16 didn't specifically ask to change it
17 because I'm not really hung up on titles.
18 You know, if this is your job, you do
19 your job, and that was fine with me.
20    Q.    Kind of like substance over
21 form?
22    A.    Yes.
23    Q.    Who did you mention that the

Page 107

1 job duties that you were doing were, you
2 know, in other companies were called a
3 Director of Technical Services?
4    A.    Bill McLennan I know I
5 mentioned it to.  I don't recall
6 mentioning it to anyone else, because it
7 wasn't a hang-up for me.
8    Q.    Sure.  Earlier you also
9 mentioned that Piknik was a, quote,
10 unquote, disaster when you arrived?
11    A.    It was.
12    Q.    And you also said the company
13 was in, quote, unquote, a lot of trouble?
14    A.    Yes.
15    Q.    Tell me about that.  You come
16 in in March of 2001, and the company is a
17 disaster at that time?
18    A.    Yes.
19    Q.    What do you mean by that?
20    A.    Well, there were a lot of
21 different ways, and I'll try to just
22 paint a picture for you as best I can.
23 One thing is that our customers were

Page 108

1 threatening to leave because the quality
2 of the product was not reliable.  It was
3 -- we were evaluated by our customers
4 based on several things.  One was
5 consumer complaints.
6    So, for example, if a consumer
7 bought a bottle of Gatorade in Milwaukee
8 and they called Quaker's 1-800 line with
9 a complaint and the code on the bottle
10 indicated it was made at Piknik, well,
11 they rated us on that.  And we were the
12 lowest in their entire copack network for
13 consumer complaints.  And that was an
14 alarm to Quaker Oats.
15    Another huge alarm and the
16 reason I was hired is because Piknik had
17 never, not once, passed a quality
18 assurance audit from a customer.  They
19 had failed every single one.  And my
20 expertise coming from Harry's Farmers
21 Market and coming from International
22 Trading Company was preparing for and
23 executing against audits.  And my HACCP

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 109 to 112)

Page 109

1  background was one of the big pluses
2  because I had worked in the only
3  government audited HACCP arena at the
4  time.
5       Q.   Remind me, what is HACCP?
6       A.   Hazard Analysis Critical
7  Control Point. It's a government program
8  for food safety. It was created by NASA
9  in the '60s.
10      Q.   And you mentioned that before
11 you arrived Piknik had never passed a
12 quality assurance audit?
13      A.   Correct.
14      Q.   And what is a quality
15 assurance audit?
16      A.   Well, each customer has
17 quality assurance standards that they
18 expect a copacker -- we were a
19 copacker -- to execute against. And
20 you're given the test ahead of time. You
21 know what the requirements are because
22 the customer wants you to succeed.
23      So occasionally, once a year,

Page 110

1  twice a year, whatever frequency the
2  customer sets forth, they will send in an
3  independent team to conduct a thorough
4  audit. Typically it's a two- to
5  three-day audit. And they look for
6  objective evidence to show that you're
7  following their quality assurance
8  standards. And Piknik had failed every
9  one to the point that the customers had
10 sent employees to work in the Piknik
11 facility full-time.
12      Quaker Oats would not
13 manufacture Gatorade without Ken Shelly
14 being present in the manufacturing
15 facility because the quality assurance
16 technicians weren't trained. They didn't
17 know what to look for. They were pencil
18 whipping documents. So that is one
19 aspect of the problems going on.
20      The staff was three times too
21 large in quality assurance, and employees
22 worked the schedule they wanted to work.
23 We were running 40 percent overtime. And

Page 111

1  they would clock in, and they would leave
2  the plant and go home, and then they
3  would come back and clock out. So, you
4  know, that's a little bit of the
5  landscape of the quality assurance
6  department.
7       The other thing is that when
8  you're a copacker one week you may make
9  Hershey's, and the next week you may make
10 Gatorade, and the next week you may do
11 something for Tropicana. And they were
12 having a very difficult time shifting
13 gears between those customers. So, in
14 other words, they would do the
15 requirements for Hershey on Hershey week.
16 They do would do the requirements for
17 Gatorade on Gatorade week. And they
18 varied. They were different.
19      So the employees never got in
20 a work rhythm. You know, and you're
21 looking at employees that weren't very
22 well trained to begin with; a department
23 that was poorly organized, secondly; and

Page 112

1  then they were having to shift gears
2  constantly.
3       Instrumentation that did not
4  work reliably. They didn't know how to
5  calibrate it. They didn't know how to
6  challenge their equipment. You had a
7  production department that was putting
8  out fires left and right.
9       And so the first thing I did
10 was say why don't we do Piknik quality
11 instead of all this quality for all these
12 other companies. So I took the best in
13 class of each of the customers, and I
14 developed thirteen quality systems. So
15 as long as we did Piknik quality we
16 satisfied and exceeded all the
17 requirements of all the customers.
18      And I wrote those systems, and
19 I maintained those systems. And lot of
20 that work was done at Piknik, and at lot
21 of it was done from home. Because I
22 spent so much time in the plant, I
23 couldn't afford to sit at a computer.

28

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 113 to 116)

Page 113

1    So I know this will come up
2  later, but my entire tenure at Piknik I
3  worked from home. I worked in the plant.
4  I worked on the floor, and I worked at
5  home.
6    Q.  You have mentioned the term
7  copacker a couple of times?
8    A.  Yes.
9    Q.  Can you tell me what copacking
10 is?
11   A.  Copacking is a part of the
12 food industry where a food company, a
13 branded food company, contracts, has a
14 contract, with a manufacturing facility
15 to produce their brand.
16   Q.  Now, you were telling me
17 why -- or the basis for your statement
18 that when you arrived at Piknik it was a
19 disaster. And you were telling me that
20 customers were threatening to leave
21 because product was unreliable; correct?
22   A.  Yes.
23   Q.  And you had a low rating --

Page 114

1  Piknik had the lowest rating in terms of
2  customer complaints?
3    A.  In the Quaker system it did.
4  Every customer evaluated us using
5  different metrics. My job was not so
6  much to be responsible for all those
7  metrics, but my initial focus was to pass
8  audits. You know, the audits in these
9  Fortune 100 companies go to the top. So
10 they were highly visible audits. And, in
11 particular, Quaker Oats was our largest
12 customer, Gatorade. That was Piknik's
13 largest customer, and it was the one that
14 Piknik was in the biggest jeopardy of
15 losing. So my initial focus was audits
16 in general but Quaker Oats specifically.
17   Q.  And another aspect of your
18 feeling that the company was a disaster
19 when you came in was the fact that Piknik
20 had never passed a quality assurance
21 audit before you arrived?
22   A.  Correct.
23   Q.  There was another concern that

Page 115

1  the staff was too large and employees
2  just weren't working?
3    A.  Correct.
4    Q.  And that there were issues
5  with the quality assurance equipment?
6    A.  Quality assurance and
7  manufacturing equipment.
8    Q.  And the production department
9  was spending a lot of time putting out
10 fires?
11   A.  Yes.
12   Q.  As opposed to engaging in
13 production?
14   A.  Yes.
15   Q.  Anything else that contributed
16 to your belief that Piknik was a disaster
17 when you arrived?
18   A.  Well, I assumed that because
19 the quality assurance department was so
20 poorly managed and the labor and the
21 employee discipline was so poor, I
22 assumed that that was probably an issue
23 in the rest of the company as well. But

Page 116

1  I had my hands full in quality assurance.
2    Q.  So you concentrated on quality
3  assurance?
4    A.  Yeah. I believe in working
5  with your area of responsibility and
6  controlling what you can control. I
7  thought I would make the biggest impact
8  there.
9    Q.  Did you have any understanding
10 about the financial condition of Piknik
11 when you arrived?
12   A.  I understood that if it lost
13 Quaker Oats that it would be very
14 detrimental to the company's finances.
15 Mike O'Connell told me on my initial
16 interview that the company was having
17 financial problems. The nature of that
18 conversation came up because he said that
19 he was going to put me on a bonus plan,
20 and I said how do you -- how did the
21 bonus plan work. And he said, well,
22 you'll share in the profits of the
23 company. And I said, well, how

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 117 to 120)

Page 117

1  profitable is the company, and that's
2  when he told me for the past five years
3  it had not been. So my hopes of a bonus
4  program kind of went up in smoke in that
5  conversation. But that was on interview.
6  I knew that going in.
7      Q.   So for the past five years --
8  and this is from the time that you're
9  interviewing --
10     A.   Yes.
11     Q.   -- Mike O'Connell tells you
12 that they had been unprofitable for the
13 last five years?
14     A.   Yes, since -- I think 1996 --
15 my understanding was 1996 the last
16 profitable year.
17     Q.   Did he tell you anything about
18 why that was?
19     A.   Yes. They overextended
20 themselves in purchase and capital. They
21 did an expansion to the Alatex facility
22 and they went a hundred percent over
23 budget in installing that facility, and

Page 118

1  then the production they expected to get
2  wasn't there to support it. And I saw
3  evidence after I had been there that that
4  was a true statement.
5      Q.   After you started at Piknik
6  did the company start to turn around in
7  terms of becoming profitable?
8      A.   It did.
9      Q.   How soon after your arrival?
10     A.   I would say 2004 was the --
11 I'm sorry. Wait a minute. 2002 was a
12 turn-around year where we really got a
13 team in place and started executing
14 against the plan. 2003 was a very
15 promising year. 2003 was the year we
16 were expecting to be profitable and were
17 on track to be profitable.
18     2001 was a -- this is the way
19 I see it. 2001 was a let's get the fires
20 under control year. Let's put out the
21 big fires and get control and start
22 turning the Titanic. 2002 was
23 straightening up and executing against

Page 119

1  the plan, and 2003 we started to benefit
2  from that plan.
3      Q.   Do you know if Piknik was
4  profitable in 2002?
5      A.   I believe it was not, but I
6  don't know for sure. I've seen the
7  numbers, I just don't remember them.
8      Q.   Sitting here today you can't
9  recall?
10     A.   I can't recall, but I believe
11 that it was not. There was a year
12 that -- I believe it was 2002 that Piknik
13 would have been profitable, but there was
14 some type of old debt or a bank
15 write-down or some insurance claim or
16 something that came in right at the end
17 of the fiscal year that -- so from an
18 operating, production, manufacturing
19 standpoint, we would have been
20 profitable. But some kind of higher
21 finance type issue occurred that caused
22 the balance sheet to show a negative
23 number.

Page 120

1      Q.   Were you involved in those
2  higher finance issues?
3      A.   No, I was not.
4      Q.   When we talk about
5  profitability, does that include both the
6  beverage and condiment side of the
7  business or just one side of the
8  business?
9      A.   Well, that's a good question.
10 At sometimes it did and sometimes it
11 didn't. The two companies operated as
12 completely separate entities for a period
13 of time. And you'll see that my career
14 sort of follows those changes where I was
15 just in the beverage part. And then at
16 some point Onyx put us as one company,
17 and then we started looking at the
18 finances of all three.
19     But for so long, especially
20 when Ricky Loeb was involved, he wanted
21 the Montgomery employees solely focused
22 on -- it's like he had two children, you
23 know, and he didn't want the children

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 121 to 124)

Page 121

1   talking to each other.  He was very
2   territorial about that, and I'm not sure
3   why.  But he wanted Brundidge left alone.
4   You know, the Montgomery people don't
5   bother Brundidge, and the Brundidge
6   people don't bother Montgomery.  He kept
7   them very separate.
8         So we did not see Brundidge
9   financial numbers for a very long time.
10  Probably it was into 2004 before I
11  started seeing financial numbers from
12  Brundidge.  It may have even been closer
13  to 2005.  It was quite a while.
14       Q.    And you said that in 2003 you
15  believed that the expectation for that
16  year was that Piknik was going to be
17  profitable?
18       A.    Yes.
19       Q.    Were you involved in any
20  discussions about bringing in an investor
21  or maybe a purchaser of Piknik in the
22  2003 time frame?
23       A.    Well, they talked about that,

Page 122

1   and it was generally understood that
2   that's what Mike O'Connell was doing,
3   that he -- Ricky clearly and verbally did
4   not want to be involved in the business.
5   He did not feel comfortable, you know, in
6   that type of arena.  He wanted out of the
7   operations.  He just did not want to be
8   involved.  It was generally understood
9   that Mike O'Connell was looking for an
10  investment firm to either completely
11  purchase the company or some type of
12  group to acquire it.  So that was
13  generally understood.
14       And there were occasions where
15  he would bring people in suits through,
16  and we would assume that they were the
17  investment type or people looking to
18  purchase it.  Occasionally he would have
19  us -- different key members either talk
20  to them or give them a tour.  But as far
21  as the decisions go, no, I was not
22  involved in the decisions.  I was just
23  somebody that would provide information

Page 123

1   at times.
2        Q.    You said it was generally
3   understood that Mike O'Connell was
4   wanting to find an investment firm or
5   find a potential purchaser?
6        A.    Uh-huh.
7        Q.    Did you ever have
8   conversations with Mike O'Connell about
9   that?
10       A.    Not really, no.  That's not
11  the type of conversation he and I would
12  have, no.
13       Q.    And what is your understanding
14  of why Mike O'Connell was looking for an
15  investment firm or looking for a
16  purchaser?
17       A.    My understanding is that Ricky
18  as the owner of the company asked him to.
19       Q.    And what do you base that
20  understanding on?
21       A.    Conversations with Ricky.
22       Q.    What did Ricky Loeb tell you?
23       A.    I don't specifically remember

Page 124

1   what he told me, but I know that he -- he
2   did not enjoy being involved in the
3   business.  He wanted other people to run
4   the company or take over the company.
5   And he felt like he had a great team
6   assembled that was running the company
7   well and it would be to our benefit.
8        Q.    It would be to the company's
9   benefit for him to get out of the
10  day-to-day operations?
11       A.    It would be to the company's
12  benefit to have investors that could fix
13  some of the equipment or provide money to
14  improve the business.  Marketing was
15  something that was difficult.  You know,
16  we didn't have money for advertising or
17  marketing.  And he felt like if an
18  investor group came in they could, first
19  of all, invest back in Piknik some money
20  that Ricky didn't have, and then promote
21  the company for new business.
22       Q.    Did you have any understanding
23  that Piknik was looking for investors or

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 125 to 128)

Page 125

1  purchasers because there was some concern
2  about the financial status of the
3  company?
4      A.    Well, sure, there was always
5  concern about the finances at Piknik.  We
6  thought that 2003 was going to be a good
7  year, but it wasn't going to be a year
8  to, you know, win the lottery.  You know,
9  it was going to be hard.  It was still
10  going to be hard.  It was hard work
11  getting it there.  And margins in the
12  copacking business are small.  It's not a
13  luxurious business, and it's a tough
14  business.  So no, there was no grandiose
15  dreams that we had made it.  Yeah, it was
16  pretty generally understood that the
17  company had gone through some serious
18  financial problems.
19      Q.    Before the deal between Onyx
20  and Piknik came about did Onyx
21  representatives come to Montgomery or to
22  Brundidge?
23      A.    I don't know.  I assume they

Page 126

1  did.
2      Q.    You didn't -- you weren't
3  involved in any meetings with anybody
4  from Onyx?
5      A.    No.  I don't recall being
6  involved in any, no.
7      Q.    And were you involved in the
8  decision to strike a deal with Onyx?
9      A.    No.
10          MR. NELMS:  Housekeeping.
11  What do you want to do about the
12  schedule?
13          (Off-the-record discussion.)
14          (Whereupon, a lunch break was
15          taken from 11:53 to 1:21 p.m.)
16      Q.    (BY MS. MCGAHEY:)  Ms. McGlon,
17  earlier you were telling me that you
18  spoke with Bob Winter yesterday about his
19  deposition?
20      A.    Yeah, I guess you could say.
21  It was more along the lines of he was
22  helping me get a baby-sitter.  So that
23  was the main reason.  He called to give

Page 127

1  me an idea of how much time I would need
2  and the phone number.
3      Q.    Did he tell you the kinds of
4  questions that I asked him yesterday?
5      A.    No, he didn't.  We didn't talk
6  about that, no, because I didn't think it
7  was going to be relevant.  You're going
8  to talk to him about something different
9  than you're going to talk to me about.  I
10  had a different experience.
11          (Whereupon, Defendant's
12          Exhibit 1 was marked
13          for identification.)
14      Q.    I'm handing you what has been
15  marked as Defendant's Exhibit 1 to your
16  deposition.  Is that your signature on
17  the bottom of Defendant's Exhibit 1?
18      A.    Uh-huh, it is.
19      Q.    And you acknowledged receiving
20  Piknik's Internet, E-mail, Telephone Use
21  Policy?
22      A.    Uh-huh, yes.
23      Q.    Kind of in the middle of that

Page 128

1  paragraph you were acknowledging that you
2  understood and agreed "that abuse of the
3  internet/e-mail/telephone system or use
4  of the system for purposes other than
5  those benefitting Piknik Products Company
6  is grounds for disciplinary action up to
7  and including termination of employment
8  on the first offense."
9      A.    I never abused the system.
10          MR. NELMS:  Just answer the
11  question.
12      Q.    My question is is that what
13  you understood the policy to be?
14      A.    Yes.
15      Q.    You understood that that was
16  the policy?
17      A.    Yes.
18      Q.    And that is dated March 1,
19  2001?
20      A.    Yes.
21      Q.    And that's when you started at
22  Piknik; correct?
23      A.    Yes.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 129 to 132)

Page 129

1    (Whereupon, Defendant's
2    Exhibit 2 was marked
3    for identification.)
4    Q.    Now I'm handing you what has
5    been marked as Defendant's Exhibit 2 to
6    your deposition.  If you could turn to
7    the third page of that document.  Is that
8    your signature?
9    A.    It is.
10    Q.    And it's dated 6-28-4?
11    A.    Uh-huh.
12    Q.    Does that mean June 28, 2004?
13    A.    Yes.
14    Q.    Just left off the zero?
15    A.    It means June 28, 2004.
16    Q.    Okay.  Just wanted to make
17    sure.  A lot of times you use the "04"
18    right there.  And in Paragraph 4 of this
19    document you understood and agreed "that
20    abuse of Piknik's internet, e-mail and
21    telephone systems or use of these systems
22    for purposes other than those benefitting
23    Piknik Products Company is grounds for

Page 130

1    disciplinary action up to and including
2    termination of employment on the first
3    offense."
4    A.    Yes.  I've never used the
5    system for anything other than the
6    benefit of Piknik.
7    Q.    You understood that Number 4,
8    if you violated that policy, that was
9    grounds for termination?
10    A.    I understood that, and I have
11    never violated that.  I have never abused
12    it.
13    Q.    If you turn to Page 5, is that
14    your signature?
15    A.    It is.
16    Q.    Before the lunch break we were
17    talking about the financial condition of
18    Piknik Products?
19    A.    Uh-huh.
20    Q.    And you made a statement that
21    you were always concerned about Piknik's
22    financial status or something along those
23    lines; correct?

Page 131

1    A.    Any company I work for I'm
2    concerned about the financial status.  A
3    healthy company is good for all
4    employees.
5    Q.    Do you know who was Piknik's
6    primary bank?
7    A.    Yes.
8    Q.    Who?
9    A.    SouthTrust.
10    Q.    Do you know if Piknik had
11    outstanding debt with SouthTrust?
12    A.    It did, yes.
13    Q.    Do you know the amount of that
14    debt in the 2004, 2005 time frame?
15    A.    I do not.
16    Q.    Were you ever involved in
17    discussions with SouthTrust
18    representatives about the financial
19    status of Piknik?
20    A.    No.
21    Q.    Were you involved in any
22    discussions with SouthTrust about
23    SouthTrust's decision to no longer

Page 132

1    finance Piknik?
2    A.    No.
3    Q.    Were you involved in any
4    discussions with SouthTrust regarding
5    personnel cutbacks at Piknik?
6    A.    No.
7    Q.    Were you involved in any
8    discussions with SouthTrust regarding
9    whether SouthTrust would provide money to
10    be used for severance packages for Piknik
11    employees?
12    A.    No.
13    Q.    Were you involved in any
14    discussions with SouthTrust
15    representatives regarding whether
16    SouthTrust would continue funding payroll
17    for Piknik employees?
18    A.    No.
19    Q.    Are you aware that in the late
20    2004, sometime in 2005 time frame that
21    several Piknik customers were asking
22    Piknik to make some major capital
23    investment?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 133 to 136)

Page 133

1    A.    Yes.
2    Q.    Do you know which customers?
3    A.    I believe -- now, this is my
4  memory going back, but I want to say it
5  was Tropicana and Craft.  That would be
6  my memory.
7    Q.    Do you recall the extent of
8  the capital investment that was being
9  requested by Tropicana and Craft?
10   A.    I do not.
11   Q.    Are you aware of Arizona Iced
12  Tea asking Piknik to make over a million
13  dollar capital investment?
14   A.    I was aware that we were in
15  discussions with Arizona Iced Tea about
16  manufacturing for them.  I was aware that
17  they asked us to make a capital
18  investment.  I was not -- I don't
19  remember what the amount was.
20   Q.    What about for Gatorade, were
21  you aware that Gatorade -- or I guess
22  it's Quaker?
23   A.    Well, at the time it was

Page 134

1  PepsiCo.  PepsiCo bought Quaker.
2    Q.    Okay.  Were you aware that
3  PepsiCo or Gatorade had asked Piknik to
4  make a capital investment in excess of a
5  million dollars?
6    A.    I don't recall that, but it
7  doesn't surprise me either.
8    Q.    Pretty routine in the
9  industry?
10   A.    It is.
11   Q.    What about Nestle, were you
12  aware that Nestle had also asked Piknik
13  to make a capital investment in excess of
14  a million dollars?
15   A.    No.  But, again, if Nestle
16  wanted to do business with us --
17  typically when you bring in a new
18  customer there are capital requirements,
19  and they generally ask you to partner on
20  those capital requirements.
21   Q.    Were you involved in any
22  discussions with anyone about how Piknik
23  could finance that capital investment

Page 135

1  that was being asked of it?
2    A.    No.
3    Q.    Have you ever had any
4  discussions with anyone from Apollo
5  Management?
6    A.    No.
7    Q.    Do you know who Apollo
8  management is?
9    A.    No.
10   Q.    What, if anything, do you know
11  what -- strike that.  What, if anything,
12  do you know about any decision made by
13  SouthTrust to no longer finance Piknik?
14   A.    I don't.  I know SouthTrust
15  was acquired by Wachovia, and we
16  anticipated that the relationship would
17  change with Piknik.
18   Q.    Why did you anticipate that?
19   A.    Because Wachovia didn't have
20  the long-term relationship with Piknik
21  SouthTrust had.  So it's just a general
22  business assumption.  You know, Wachovia
23  is a bigger company.  They acquired

Page 136

1  SouthTrust.  So I just assumed the
2  relationship would change in some form.
3  What form, I didn't know.  I assumed
4  there would be less leniency with Piknik.
5    Q.    Did the relationship change?
6    A.    I don't know.
7    Q.    Were you aware in the middle
8  of 2005, you know, Piknik checks
9  bouncing?
10   A.    Yes.
11   Q.    What do you know about that?
12   A.    Well, the day that Mike
13  Osborne walked in my office and was
14  dishonest with me and took my computer I
15  walked down to the CFO's office where my
16  boss was and asked to speak to my boss.
17  And the moment I walked in just happened
18  to coincide with the moment they had
19  discovered that the checks were bouncing.
20  So, needless to say, he didn't want to
21  talk to me about my computer.  He was
22  more concerned about the fact that the
23  company was bouncing checks.  And he said

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 137 to 140)

Page 137

1 he would meet with me the next week.
2     Q.    Who was the CFO?
3     A.    The CFO was Bob Lampert.
4     Q.    You said CFO I thought?
5     A.    Well, my boss, Anthony Barber,
6 happened to be in the CFO's office.  When
7 Mike Osborne came into my office and said
8 I need to look at your computer, there's
9 something wrong with it, I didn't think
10 anything about that.  It didn't disturb
11 me.  It didn't concern me.  But then when
12 he -- myself and two other people watched
13 him going through my things, and then he
14 called me in the office and closed the
15 door and started questioning me, I became
16 concerned because I have never been
17 treated that way before.  I've always
18 been a good, honest employee.  Never been
19 under that type of treatment.  So he said
20 if I had any questions, I could go ask my
21 boss.  So I found my boss in the CFO's
22 office.
23     Q.    And it's when you went into

Page 138

1 the CFO's office is when you heard that
2 checks were bouncing?
3     A.    Yes.  I walked in, and that's
4 what they were discussing.  They saw me
5 walk in.  They didn't try to hide it from
6 me.
7     Q.    Do you recall what was said?
8     A.    No, I don't.
9     Q.    Do you recall around what time
10 this was occurring?
11     A.    It was in the afternoon.
12     Q.    Around -- you know, it was in
13 June of 2005 or --
14     A.    Well, the 28th was on a
15 Tuesday, so it was the previous Wednesday
16 or Thursday.  I believe it was the
17 previous Thursday.
18     Q.    You're saying June 28th of
19 2005 was a Wednesday?
20     A.    No.  June 28, 2005 was a
21 Tuesday, and this event we're discussing
22 occurred the previous Wednesday or
23 Thursday.  I believe it was Thursday.

Page 139

1     Q.    Who is Mike Osborne?
2     A.    Mike Osborne was the IT
3 manager.
4     Q.    And he came to your office and
5 asked for your computer?
6     A.    He did.  He said something was
7 wrong with my laptop, which didn't bother
8 me.  He said he needed to see it, and
9 then he proceeded to walk in my office --
10 I was standing outside my office.
11 There's a window on a door next to my
12 office, and I could see what he was
13 doing, as could two other people, through
14 the window, his reflection in the window.
15 And he secured my computer, and then he
16 started going through my desk and my
17 personal things in my drawers.
18     Q.    Who were the other two people
19 who could see?
20     A.    Katie Walters and Paul
21 Holland.
22     Q.    Who was Paul Holland?
23     A.    Our pest control operator.

Page 140

1     Q.    Independent contractor, or is
2 he a Piknik employee?
3     A.    Independent contractor.
4     Q.    Who was he with?
5     A.    Century Exterminating.
6     Q.    And you said that you could
7 see what he was doing?
8     A.    Yes.
9     Q.    What was he doing on your
10 laptop?
11     A.    He took my laptop.  He was
12 going through my desk drawers and my
13 filing cabinet, which I thought was very
14 strange for an IT person.
15     Q.    Did you ask him to stop?
16     A.    No.  I watched what he was
17 doing.  And then he called me in my
18 office, and he closed the door.
19     Q.    When he called you into your
20 office and closed the door what happened?
21     A.    He said I want your zip drive.
22 I told him I didn't have a zip drive.  He
23 accused me of lying and told me I did

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 141 to 144)

Page 141

1  have a zip drive, and I told him I did
2  not have a zip drive.
3      Q.   What happened next?
4      A.   I said, I want to know what's
5  going on.  And he said, if you want to
6  know what's going on you need to ask your
7  supervisor.  I said, okay, what I have
8  done wrong.  He said, if you want to know
9  anything you need to ask your supervisor.
10  So I went to ask my supervisor.
11          I said, Anthony, are you
12  aware -- he was in the CFO's office.  I
13  said, Anthony, are you aware that they
14  just confiscated my computer.  He said,
15  no, I'm not.  Anthony, what have I done
16  wrong.  You haven't done anything wrong.
17  I said, well, why are they taking my
18  computer; he's acting like he thinks I
19  have done something wrong, that I have
20  copied files or done something wrong,
21  what have I done wrong.
22      Q.   He being Mike Osborne?
23      A.   Yes.  Mike Osborne was not

Page 142

1  working on his own direction.  He was
2  working under Chris Day's direction.  He
3  told me that.
4      Q.   How do you know that?
5      A.   He told me.
6      Q.   During your conversation with
7  Mike in your office?
8      A.   Yes.
9      Q.   Let's go back to that
10  conversation in the office.  I want to
11  make sure I know everything that was
12  said.
13      A.   Well, I don't know that I
14  remember everything that was said.  It
15  didn't last long.
16      Q.   Okay.  But he told you at some
17  point that he was acting under Chris
18  Day's direction?
19      A.   Yes.
20      Q.   Anything else that you can
21  recall?
22      A.   Not of significant importance.
23      Q.   Well, why don't you tell me --

Page 143

1  something that might not be significant
2  or important to you may be significant or
3  important to me.
4      A.   Right, I understand.
5      Q.   Just do the best that you can
6  to, you know, recall that conversation
7  that you had with Mr. Osborne.
8      A.   I did.  I told you everything
9  I remember.
10      Q.   Okay.
11          MR. NELMS:  Excuse me.  Just
12  so I'm clear.  You're talking about the
13  conversation she had in her office -- you
14  asked who asked him to come in your
15  office?
16      A.   I said why are you doing this.
17          MR. NELMS:  How did you find
18  out Chris Day instructed him?
19      A.   He told me.
20          MR. NELMS:  Oh, so you did ask
21  him?
22      A.   Yes.  I don't remember my
23  exact wording, but Chris Day -- under

Page 144

1  Chris Day's direction he came and
2  confiscated my computer.
3          MR. NELMS:  Okay.  I was
4  confused.
5      Q.   (BY MS. MCGAHEY:) Did he say
6  anything else about what Chris Day's
7  instructions may have been?
8      A.   No.  He was very nervous.
9      Q.   What gave you the impression
10  that Mike Osborne was very nervous?
11      A.   His mannerisms.
12      Q.   Describe his mannerisms.
13      A.   He wouldn't look me in the
14  eye.  He stood near the door.  You can
15  tell when somebody is nervous.  You know,
16  he just looked uncomfortable.  I would
17  look him straight in the face and ask him
18  a question, and, you know, he -- I could
19  tell that he was uncomfortable.  Mike was
20  typically a laid back kind of quiet guy,
21  and it appeared to me that he was being
22  asked to do something that made him
23  uncomfortable.  That is my impression.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 145 to 148)

Page 145

1    Q.   Did Mike Osborne take anything
2  out of your filing cabinets or your
3  drawers?
4    A.   Don't know.
5    Q.   Well, you were watching him
6  through the window; correct?
7    A.   Right.
8    Q.   Did you see him take anything?
9    A.   I didn't notice anything
10 missing, other than my computer.
11   Q.   And the laptop is Piknik
12 property; correct?
13   A.   Yes.
14   Q.   And you would agree that under
15 Piknik's Internet, E-mail and Telephone
16 Use Policy that Piknik has the right too
17 look at your laptop?
18   A.   Absolutely. I worked under
19 the assumption that they looked at
20 everything I did. I worked under the
21 assumption that they listened to my phone
22 calls when they wanted to. I worked
23 under the assumption that they read my

Page 146

1  e-mail. I worked under the assumption
2  that my actions were watched.
3    Q.   And so you went from this
4  conversation with Mike Osborne in your
5  office to the CFO's office?
6    A.   Yes.
7    Q.   To talk with Anthony Barber?
8    A.   Yes.
9    Q.   And you've told me everything
10 about your conversation with Anthony
11 Barber that you can recall?
12   A.   Yes. And the general idea
13 that came from Anthony's -- the
14 conversation with Anthony is, Anthony,
15 what I have done wrong? Nothing.
16 Anthony, why did they take my computer?
17 They told him there was something wrong
18 with my computer. That's what he told
19 me. Shannon, there's something wrong
20 with your computer, don't worry about it.
21 Anthony, he's acting like I've done
22 something wrong. You haven't done
23 anything wrong, Shannon, don't worry

Page 147

1  about; I'll talk to you next week,
2  because he and I had a meeting scheduled
3  for Tuesday at 10 o'clock.
4         So I could tell based on what
5  he and the CFO were going through it
6  appeared to me that -- this was my
7  personal summary of the situation, that
8  Mike Osborne was working under the
9  direction of Chris Day to confiscate my
10 computer. Anthony Barber didn't know
11 anything about it and didn't know
12 anything about I had done anything wrong.
13 Anthony said I had not done anything
14 wrong.
15        Bob Lampert -- I said, Bob,
16 are you aware of what's going on, and he
17 just looked at me, because that was his
18 personality. He just stared at me. Bob,
19 have I done anything wrong? No, you
20 haven't, Shannon. So what's the problem?
21 There's not a problem, Shannon, don't
22 worry about it.
23   Q.   Did you have reason to believe

Page 148

1  they were lying to you?
2    A.   No.
3    Q.   And so this was on a Thursday
4  you believe; correct?
5    A.   Yes.
6    Q.   And if June 28th was a
7  Tuesday --
8    A.   Yes.
9    Q.   -- would you agree that
10 Thursday was June 23rd?
11   A.   Yes, I believe that --
12   Q.   And this was after Bob Winter
13 had announced his resignation?
14   A.   I don't think Bob announced a
15 resignation. It was after he was gone.
16   Q.   It was after he left the
17 company?
18   A.   Yes.
19   Q.   And do you know if this was
20 after Mr. Winter had gone to the Day
21 Street facility and downloaded
22 proprietary information?
23   A.   I have no idea what Bob

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 149 to 152)

Page 149

1  Winter's actions were. But it was not
2  unusual for any of us to take information
3  home and work on it. When I say take, I
4  mean copy. I don't mean take, delete.
5  But that was what we did the whole time
6  we were there.
7      Q.   Well --
8      A.   We worked from home.
9      Q.   Sure. Would you think it was
10  unusual if an individual had made up in
11  his mind that he was going to leave the
12  company, and after that decision was made
13  and before it was announced to the
14  company --
15      MR. NELMS: Go ahead. Don't
16  answer.
17      Q.   -- go back to the Day Street
18  facility or go back to a facility and
19  download proprietary information?
20      MR. NELMS: Don't answer the
21  question. Object to the form. I'm
22  instructing you not to answer the
23  question.

Page 150

1      MS. MCGAHEY: On what grounds?
2      MR. NELMS: It's such rank
3  speculation I don't know how she can have
4  a formulated opinion as to what a third
5  party would do under such extrapolated
6  circumstances.
7      MS. MCGAHEY: Well, you've
8  objected to the form. I think the
9  stipulations are you can preserve that
10  objection, and I would like for Ms.
11  McGlon to answer the question.
12      MR. NELMS: Answer the
13  question.
14      A.   I don't know what is usual or
15  unusual for Bob Winter's conduct under
16  termination --
17      MR. NELMS: She asked about a
18  third person unnamed.
19      A.   I don't know.
20      Q.   You don't have an opinion one
21  way or another?
22      A.   I wouldn't do it. My opinion
23  of myself is I wouldn't do it. But my

Page 151

1  question is if I've been terminated, why
2  do I have access to the facility?
3      MR. NELMS: That wasn't her
4  question. Her question was if a third
5  person had made up their mind that they
6  were no longer going to work at a
7  corporation or a company --
8      Q.   (BY MS. MCGAHEY:) And had not
9  announced that decision to the company
10  yet but still went and downloaded
11  proprietary information --
12      A.   Do I think that's unusual?
13      Q.   Correct.
14      A.   No, I don't think that's
15  unusual.
16      MR. NELMS: Same objection.
17      Q.   Do you recall a meeting around
18  June 15, 2005 for the salaried employees
19  regarding Piknik's relationship with
20  SouthTrust?
21      A.   I remember there were some
22  meetings regarding the status of the
23  company that Chris Day gave to the

Page 152

1  company. I don't remember the dates or,
2  you know, on June 15 this was the subject
3  matter. I remember several unpleasant
4  meetings toward the end of my tenure
5  there regarding the status of the
6  company.
7      Q.   Do you recall about how many
8  meetings there were?
9      A.   I don't.
10      Q.   Do you recall the meeting in
11  which a talking points memo was
12  distributed?
13      A.   Yes.
14          (Whereupon, Defendant's
15          Exhibit 3 was marked
16          for identification.)
17      Q.   Handing you what has been
18  marked as Defendant's Exhibit 3 to your
19  deposition. Have you seen this document
20  before?
21      A.   I don't recall, but my name is
22  on it and it doesn't look like an unusual
23  document. So, yes, I possibly received

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 153 to 156)

Page 153

1    this.
2        Q.    Do you have any specific
3    recollection about the mandatory staff
4    meeting that was "intended only for
5    information exchange to update the
6    leadership team on our business"?
7        A.    I don't recall the meeting,
8    no.
9            (Whereupon, Defendant's
10           Exhibit 4 was marked
11           for identification.)
12       Q.    I am going to hand you what
13   has been marked as Defendant's Exhibit 4
14   to your deposition. Have you seen this
15   document before?
16       A.    I believe so.
17       Q.    Can you identify what this
18   document is? If you need to take the
19   time to read it, by all means go ahead.
20       A.    (Examining document.) Well,
21   this one says that Brundidge is going to
22   remain open. So the meeting that I
23   specifically remember is after that, the

Page 154

1    meeting where they shut Brundidge down
2    and announced that. But I do remember
3    seeing something similar to this, if not
4    this exactly.
5        Q.    If you look in the summary
6    box, were you aware that Piknik's bank
7    had declined to finance new capital and
8    had rejected financing proposals by third
9    parties?
10       A.    I knew that the relationship
11   between the bank and Onyx was not going
12   well, and I knew that part of the reason
13   Onyx was brought into the company was
14   that they were supposed to bring capital
15   and that that was not happening. So
16   that's in line with what this statement
17   says.
18       Q.    Do you recall when this
19   document was distributed?
20       A.    No. But the June time frame
21   would be, you know --
22       Q.    Consistent with your
23   recollection?

Page 155

1        A.    Yes.
2        Q.    In the Short Term Effects
3    section y'all were made aware that some
4    management changes were going to be made?
5        A.    I guess so. You know, I
6    wasn't involved in those management
7    changes. They weren't discussed with me.
8    But it said it wouldn't be materially
9    affected, and I would argue that changing
10   your Quality Assurance Director
11   materially does affect your business in a
12   copacking situation.
13       Q.    In Personnel Changes, that
14   bottom box, y'all were informed that the
15   beverage division was going to "continue
16   to make necessary staffing changes to
17   improve its operating efficiencies;"
18   correct?
19       A.    That's what it says. But I
20   will add that Anthony Barber continually
21   told me that I was his quality assurance
22   leader, that I was a part of his team and
23   that he depended on me. So based on his

Page 156

1    positive verbal affirmations towards me,
2    I didn't in any way expect or suspect
3    that I would be involved in management
4    changes. I had a flawless record at
5    Piknik.
6        Q.    You received one of your
7    raises of your salary after Onyx came on
8    board, isn't that correct?
9        A.    I don't recall.
10       Q.    Do you recall after Onyx came
11   on board there was an analysis of your
12   job position?
13       A.    Yes.
14       Q.    And that it was determined
15   that at the time they didn't think that
16   you were being paid what you should be
17   being paid?
18       A.    No, that didn't happen. What
19   I do recall is that I was pregnant, that
20   Mike O'Connell -- I was reporting to Mike
21   O'Connell, and he wanted to ensure that I
22   was going to come back to the company
23   after my pregnancy. He wanted to make

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 157 to 160)

Page 157

1 that attractive to me, so he bumped me up
2 to eighty-five thousand a year. And I
3 did not receive any more increases after
4 that.
5    Q.   So you deny that there was an
6 analysis of your job position and that a
7 decision was made that they didn't think
8 you were being paid enough?
9    A.   I don't deny that there was an
10 analysis made. I was told about the
11 analysis. And the only two people in the
12 quality assurance department that
13 received raises were Katie Walters, the
14 microbiologist, and Barbara Williams,
15 quality assurance supervisor. And it was
16 determined by them that my salary was
17 adequate.
18    Q.   Determined by whom?
19    A.   Chris Day's father was
20 involved in the analysis. I don't know
21 if Chris Day or his father or who exactly
22 determined that my salary was adequate.
23 I wasn't seeking a raise. I wasn't

Page 158

1 seeking an increase, and I was satisfied
2 with my salary.
3    Q.   Nobody says you were seeking
4 an increase.
5    A.   I think the two individuals
6 that received increases deserved them.
7    Q.   Your claim in this lawsuit is
8 that you were treated differently because
9 of your race; correct?
10    A.   Correct.
11    Q.   Identify the ways that you
12 believe you were treated differently
13 because of your race. Just list them in
14 whichever order you want to list them.
15    A.   First and foremost, when it
16 came to my attention that there might be
17 an issue there is when Bob Gross was
18 Henry Hick's employee. Bob Gross
19 received a disciplinary action from Henry
20 Hicks. The details of the disciplinary
21 action leaked out throughout the company,
22 and I was falsely accused of being a part
23 of that leak. When an independent

Page 159

1 research was conducted it was found that
2 Henry Hicks was the one that had leaked
3 out the information. But they were
4 trying to pin it on me.
5    That caused me a great deal of
6 concern, and I discussed it with Bill
7 McLennan, my supervisor. And I
8 discussed -- and I sent an e-mail to Jeff
9 Larry, and Jeff Larry would not respond
10 to me at all after he had encouraged us
11 to communicate with him. So right then I
12 thought there could be an issue.
13    Q.   Okay. We're going to talk
14 about that issue in painstaking detail.
15 What is the next way in which you believe
16 you were treated differently because of
17 your race?
18    A.   I was terminated and told that
19 Anthony Barber would assume my
20 responsibilities, someone that had no
21 experience doing what I did, who was not
22 qualified, who didn't understand the
23 systems, someone that had been meeting

Page 160

1 with me for two months prior asking me
2 questions about my job, wanting
3 information about what I did and how I
4 did it.
5    Q.   What else?
6    A.   An e-mail that Henry Hicks
7 sent to one of our customers and copied
8 me on stated that their goal was to put
9 in key management positions minorities
10 through opportunities, through attrition
11 or whatever opportunities presented
12 themselves.
13    Q.   Anything else?
14    A.   Yes. I was strongly
15 encouraged to hire a minority at a higher
16 salary than we had ever hired a QA
17 manager by Chris Day.
18    Q.   Again, I'm asking ways in
19 which you were treated differently.
20    A.   I was treated that way.
21    Q.   That you feel because of your
22 race?
23    A.   I was -- I was pressured into

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 161 to 164)

Page 161

1 making a hiring decision because they
2 were trying to put minorities in a
3 management position. So it was pressure
4 that I went under to make a hiring
5 decision.
6    Q. Anything else?
7    A. Chris Day sent me an e-mail
8 during a conflict with a rabbi, and
9 basically the e-mail said you can tell
10 the rabbi we are no longer a Jewish led
11 company, we are an African-American
12 company and we will not be quiet about
13 it.
14    Q. Anything else?
15    A. When Bill McLennan started,
16 shortly after he had been with us he held
17 a staff meeting of key management people.
18 I don't remember everybody in that
19 meeting, but I know that Henry Hicks and
20 Bill McLennan, Bob Lampert and myself
21 were in that meeting. More than likely
22 Jerry MacCartney, Bob Mayer and Bob
23 Winter were in that meeting.

Page 162

1    And Henry said that he was
2 offended by the name of Piknik, that his
3 friends were offended by the name of the
4 company Piknik and that he was offended
5 by the name of the company Piknik, and he
6 felt like we should consider changing the
7 name of the company because it looked too
8 much like pick-an-N, and I don't want to
9 use that word.
10    Q. Anything else?
11    A. No.
12    Q. Just to make sure that I have
13 my list straight, I have identified -- or
14 you have identified what I have counted
15 to be six ways in which you believe you
16 were treated differently because of your
17 race?
18    A. Uh-huh.
19    Q. Number one is the issues
20 surrounding Bob Gross and some
21 disciplinary action that he received;
22 correct?
23    A. Yes.

Page 163

1    Q. Number two was your
2 termination?
3    A. Yes.
4    Q. And, number three, you
5 received an e-mail from Henry Hicks
6 about, quote, unquote, key management
7 positions being filled by minorities?
8    A. Yes.
9    Q. Number four, you were strongly
10 encouraged to hire a minority at a higher
11 salary for quality assurance manager
12 position?
13    A. Yes.
14    Q. And you felt pressured by
15 Chris Day to make that hiring decision?
16    A. Yes.
17    Q. Number five, Chris Day sent an
18 e-mail about the conflict with a rabbi?
19    A. Uh-huh.
20    Q. Is that a yes?
21    A. Yes.
22    Q. Number six, a staff meeting in
23 which Henry Hicks said he was offended by

Page 164

1 the name of Piknik?
2    A. Yes.
3    Q. Anything else?
4    A. Yes, one other thing. In
5 June --
6    Q. Of what year?
7    A. -- 2005 a decision was made to
8 make pay decreases in the company. These
9 pay decreases were retroactive. In other
10 words, we found out on a certain day that
11 for the past ten days you've been working
12 at a reduced rate. Most of the company
13 received a 5 to 10 percent decrease. My
14 decrease was 40 percent.
15    Q. You believe that decision was
16 because of your race?
17    A. Yes.
18    Q. Anything else?
19    A. No.
20    Q. We'll just take them in order.
21 Tell me --
22    MR. NELMS: Do you --
23    MS. MCGAHEY: I'm sorry?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 165 to 168)

Page 165

1    MR. NELMS: Do you want a
2  break?
3    A.   I'll need one at some point.
4    MR. NELMS: You're going to
5  come back and enumerate each one of the
6  seven I imagine?
7    MS. MCGAHEY: We're going to
8  talk in detail about the seven instances
9  she believes she was discriminated
10  against because of her race.
11    MR. NELMS: Let's take a
12  break.
13    MS. MCGAHEY: How long have we
14  been going?
15    MR. NELMS: About an hour.
16    THE REPORTER: 30 minutes, 35
17  minutes.
18    A.   I'm okay.
19    Q.   (BY MS. MCGAHEY:) Do you need
20  a break?
21    A.   I will before we get through
22  all seven.
23    Q.   Well, maybe I won't take them

Page 166

1  in order. Maybe I'll take some of what I
2  believe to be the shorter issues first.
3    A.   Okay.
4    Q.   Let's talk about staff meeting
5  with Bill McLennan that you were telling
6  me about.
7    A.   Okay.
8    Q.   Do you recall when the staff
9  meeting was?
10    A.   It was shortly after Bill came
11  on with us. I don't recall when exactly
12  it was.
13    Q.   Where was the meeting?
14    A.   It was in our conference room.
15  We had two conference rooms. We had an
16  executive conference room, and we had a
17  plant conference room. And the
18  difference was our executive conference
19  room was about this size, and the plant
20  conference room was probably three or
21  four times this size to accommodate
22  larger groups of people.
23    Q.   Was this a preplanned meeting

Page 167

1  or a spur of the moment meeting?
2    A.   Preplanned.
3    Q.   Did you know ahead of time
4  what the meeting was going to be about?
5    A.   I don't recall. But meetings
6  were not unusual at Piknik.
7    Q.   Who was present during this
8  meeting?
9    A.   I believe it was our executive
10  staff: Bill McLennan, Bob Winter, Bob
11  Lampert, Henry Hicks, Jerry MacCartney,
12  Bert Mayer and myself, potentially
13  others. Those are the ones that were
14  typically present in these meetings.
15    Q.   Sitting here today you cannot
16  recall specifically who else, though?
17    A.   No.
18    Q.   Is that correct?
19    A.   Correct, I cannot recall who
20  else at this time.
21    Q.   Do you remember what time of
22  day the meeting occurred, before lunch,
23  after lunch?

Page 168

1    A.   It would have been either just
2  before lunch or just after because that's
3  usually when those type of meetings
4  occurred.
5    Q.   What was discussed during the
6  meeting?
7    A.   Bill McLennan coming on board
8  and what he was going to do with the
9  company. It was just a -- it was a
10  typical meeting that a leader of the
11  company would have with the staff.
12    Q.   Was this maybe Bill McLennan's
13  first day on the job?
14    A.   I don't recall that it was his
15  first day. I do remember that it was at
16  the beginning of his -- it was one of his
17  first meetings with us as a group. We
18  had weekly meetings such as this, so they
19  were pretty commonplace.
20    Q.   So it was discussed about Bill
21  McLennan coming on board. What else was
22  discussed?
23    A.   I don't recall.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 169 to 172)

Page 169

1    Q.    But you recall Henry Hicks
2  saying something during the meeting?
3    A.    It was a shocking statement.
4    Q.    Tell me what Henry Hicks said.
5    A.    He said that he had -- some of
6  his friends and he had become offended by
7  the name of the company Piknik and that
8  he would like to share that with us and
9  that he thought we should consider
10 changing the name. We could not
11 understand how in the world you could be
12 offended by the name Piknik, and then he
13 explained to us how he was offended by
14 it, and his friends.
15   Q.    And what did he explain?
16   A.    He said that it looked and
17 sounded like pick-a-N.
18   Q.    I'm not asking you to say the
19 word that I think you're referencing when
20 you use the term "N." Am I correct in
21 assuming that it is a derogatory term
22 used to refer to African-Americans?
23   A.    Yes.

Page 170

1    Q.    Did Henry say anything else?
2    A.    No. I believe that Bill
3  McLennan said, thank you, Henry, for
4  sharing that with us; we will consider it
5  in due time, and moved on with the
6  meeting.
7    Q.    Did you say anything?
8    A.    No. It disturbed me. It
9  bothered me.
10   Q.    Why did it disturb you?
11   A.    That he would think that way.
12   Q.    Henry Hicks is
13 African-American?
14   A.    Yes.
15   Q.    Were you offended by his
16 comment?
17   A.    I was. I thought it was
18 unnecessary.
19   Q.    Did anybody else say anything?
20   A.    No.
21   Q.    Was the name Piknik ever
22 changed?
23   A.    No.

Page 171

1    Q.    You said that statement
2  disturbed you?
3    A.    It did.
4    Q.    And that it offended you?
5    A.    Yes.
6    Q.    And it offended you because
7  you thought it was unnecessary?
8    A.    I did.
9    Q.    Why?
10   A.    Because it's a very sensitive
11 subject, and I felt like that he was
12 reading something very bad and negative
13 into a simple name of a company. And I
14 felt like he was trying to make an issue
15 where there wasn't one. Nobody to my
16 knowledge within the company gave him any
17 reason to believe that the company felt
18 badly towards African-Americans, and it
19 offended me that he would say that in an
20 accusatory manner.
21   Q.    Well, he didn't say that he
22 thought Piknik employees felt ill about
23 African-American employees, did he?

Page 172

1    A.    No. He was offended and his
2  friends were offended by the name.
3    Q.    Just by the name Piknik?
4    A.    Yes.
5    Q.    Did Mr. Hicks' statement
6  affect you in any other way?
7    A.    No.
8    Q.    Did you complain to anyone in
9  management that you thought that
10 statement was unnecessary or that you
11 were offended by it?
12   A.    I did not.
13   Q.    Would you agree that his --
14 that Mr. Hicks' comment about the name
15 Piknik has nothing to do with Caucasian
16 people?
17       MR. NELMS: Object to the
18 form.
19   A.    I think it does.
20   Q.    Why?
21       MR. NELMS: Noted.
22   A.    Because it shows that he
23 was -- to me it shows that's what he felt

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 173 to 176)

Page 173

1  about the company and he felt a division
2  between himself and the company.
3      Q.   Did he say that?
4      A.   No. But for him to make that
5  kind of statement I believe is evidence
6  that he had certain feelings.
7      Q.   So from his statement that he
8  didn't like the name Piknik because it
9  looked too much like pick-a-N, you
10 inferred that --
11     A.   I didn't understand why in a
12 business meeting he would make an issue
13 out of that in front of an executive
14 staff, a staff that did not have the
15 power to change the name of the company.
16 It seemed to me like it was a comment, if
17 he was truly offended, that maybe he
18 should discuss with human resources or
19 personnel or the owner of company, but
20 not with an executive staff that had no
21 control over the name of the company nor
22 any control over changing the name of the
23 company.

Page 174

1      Q.   Well, the folks who were in
2  this meeting were top management,
3  correct, of Piknik?
4      A.   Of Piknik. But Onyx had
5  control of Piknik, and Onyx was calling
6  the shots not Piknik management.
7      Q.   Did Henry Hicks ask for anyone
8  else's opinion on the issue?
9      A.   No. Bill McLennan moved on
10 quickly past the subject.
11     Q.   So was this all in all a very
12 brief --
13     A.   Yes.
14     Q.   -- topic that was discussed?
15     A.   Yes, brief.
16     Q.   Anything else you can recall
17 from that meeting?
18     A.   No.
19     Q.   Did the subject ever come up
20 again?
21     A.   Not that I recall.
22     Q.   Tell me about how you felt
23 pressured to make a hiring decision.

Page 175

1  First of all, who is the person you were
2  being asked to hire?
3      A.   Mavis Richardson.
4      Q.   Mavis?
5      A.   Mavis, M-A-V-I-S.
6      Q.   She had interviewed or she had
7  applied for a quality assurance manager
8  position?
9      A.   Yes.
10     Q.   What is her race?
11     A.   African-American.
12     Q.   Was she hired?
13     A.   She was.
14     Q.   What facility was she working
15 at?
16     A.   Day Street.
17     Q.   When was she hired?
18     A.   I don't recall. I believe it
19 was 2004.
20     Q.   Tell me what you can recall
21 from the beginning. Did you have an open
22 position?
23     A.   We did.

Page 176

1      Q.   Were you replacing somebody
2  who had left?
3      A.   Yes, we were replacing
4  somebody. I'm trying to remember who it
5  was. I believe we were moving -- we had
6  three facilities, and we had a strong QA
7  manager at Day Street. Day Street was
8  running very well. I was getting
9  responsibility for Brundidge, which
10 needed to improve drastically. A
11 decision was made to take our strong QA
12 manager from Day Street and move him to
13 Brundidge. He knew the systems. He knew
14 how to manage change. We moved him down
15 there, and we hired a QA manager to come
16 in and replace that at Day Street.
17     Q.   Who was the QA manager who was
18 being moved from Day Street to Brundidge?
19     A.   David Rohn.
20         (Court reporter interruption.)
21     A.   R-O-H-N, Rohn.
22     Q.   So David Rohn was being
23 transferred from the Day Street facility

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 177 to 180)

Page 177

1  to Brundidge?
2      A.  Yes.
3      Q.  So you needed to find someone
4  to fill the Day Street quality assurance
5  manager?
6      A.  Yes.
7      Q.  Was an ad placed in the paper
8  announcing a job opening?
9      A.  No.  We worked with
10 headhunters, recruiting, employment firm.
11     Q.  Do you recall how many people
12 applied?
13     A.  I don't.
14     Q.  More than one?
15     A.  Yes.
16     Q.  What was your role, if any, in
17 the interview process or in the
18 decision-making process?
19     A.  I had influence in the
20 decision-making process, and I conducted
21 the interviews.  I managed the
22 distribution of the resume, and I managed
23 the schedule of the applicants.

Page 178

1      Q.  So you interviewed candidates?
2      A.  Yes.
3      Q.  You distributed candidates'
4  resumes?
5      A.  Yes, to people that also were
6  going to conduct the interviews.
7      Q.  And you said you managed the
8  schedules?
9      A.  Yes, the flight schedules,
10 when they would fly in, who they would
11 meet with at what hour, which plant they
12 were interviewing, plant tours, things
13 like that, dinner with the candidates.
14     Q.  And you don't recall how many
15 people applied for the position; correct?
16     A.  I don't.  There were several
17 times where we had openings.  We had an
18 R&D opening at the same time,
19 microbiologist not too long before that.
20 So it wasn't unusual for us to be
21 interviewing different people.  I was
22 instrumental in interviewing people for
23 other positions in other departments.  So

Page 179

1  the process of interviewing people was
2  not uncommon.
3      Q.  Do you recall how many people
4  interviewed for this QA manager position?
5      A.  I do not.  Not many.  When I
6  say not many, less than fifteen.
7      Q.  Do you recall the racial
8  makeup of the fifteen candidates or the
9  less than fifteen candidates?
10     A.  I believe that Mavis was the
11 only African-American.
12     Q.  Do you recall who interviewed
13 Mavis?
14     A.  Well, Mavis was different in
15 that Chris Day met us for breakfast and
16 participated in the interview.
17     Q.  Do you recall who interviewed
18 Mavis?
19     A.  Brenda Sellers also
20 interviewed Mavis.
21     Q.  Brenda Sellers was the HR
22 manager?
23     A.  Yes.

Page 180

1      Q.  You interviewed Mavis?
2      A.  Yes.
3      Q.  Chris Day interviewed Mavis?
4      A.  Yes.
5      Q.  Bill Rodman?
6      A.  I don't recall.  I don't think
7  Bill was there.  Bill was not there.  He
8  was not.  They let him go right before
9  Onyx started.
10     Q.  Anyone else you can recall who
11 interviewed Mavis?
12     A.  I don't recall.
13     Q.  Do you recall if it was just
14 one day of interviews or several
15 interviews?
16     A.  It would have been --
17 typically what we did was a phone
18 interview, an initial phone interview,
19 then a follow-up phone interview, and
20 then we would bring them in usually one
21 time.
22     Q.  Is what that occurred in
23 Mavis' situation?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 181 to 184)

Page 181

1      A.    I believe so.
2      Q.    Did you conduct the first
3   phone interview?
4      A.    Yes.
5      Q.    Do you know who conducted the
6   next phone interview?
7      A.    I don't recall.
8      Q.    It wasn't you, though?
9      A.    I don't recall.
10      Q.    And then Mavis was brought to
11   Montgomery?
12      A.    Yes.
13      Q.    For an office interview?
14      A.    Yes.
15      Q.    Did you interview her during
16   that office interview?
17      A.    Yes.
18      Q.    Is that when Chris Day also
19   interviewed her?
20      A.    Yes.
21      Q.    Is that also when Brenda
22   Sellers interviewed her?
23      A.    Yes.

Page 182

1      Q.    Do you recall Mavis'
2   background?
3      A.    Yes.  She had been with
4   Cargill.
5      Q.    Cargill?
6      A.    Uh-huh.  In Tennessee for some
7   time.  She had worked her way up into a
8   supervisor position.  She had not been in
9   a manager position before.  She had a
10   bachelor's and a master's from University
11   of Tennessee.  So she exhibited strong
12   technical skill, but she had not had
13   experience in management.
14      Q.    Although she had been a
15   supervisor?
16      A.    She had been a supervisor.
17      Q.    Was there someone that you
18   felt was more qualified than Mavis?
19      A.    I felt like we hadn't found
20   the right candidate yet.
21      Q.    How long had the position
22   remained open before Mavis was hired?
23      A.    Well, it wasn't open yet.  We

Page 183

1   were trying to schedule at least a
2   two-week to one-month cross training
3   position.  So David Rohn was still in the
4   position.  It wasn't open.  And the plan
5   was to move him to the other facility
6   after a period of cross training
7   occurred.
8      Q.    Did you have any understanding
9   as to a timeline that Piknik wanted to
10   get that cross training started?
11      A.    Well, we wanted to do it as
12   soon as reasonably possible, but at the
13   same time, you know, if you don't have
14   the time to do things right the first
15   time, you certainly don't have the time
16   to do them over again.  So we were
17   wanting to get the position filled.  We
18   had some objectives.  We had work we
19   wanted to do.  It's a distraction when
20   you have a job opening and you're
21   interviewing a lot of people.  But at the
22   same time, there wasn't like a set date,
23   by such and such date you have to do

Page 184

1   this.  We were getting to the end of
2   beverage season, so things were starting
3   to slow down.
4      Q.    Did you have discussions with
5   Chris Day about the hiring of Mavis
6   Richardson?
7      A.    Yes.
8      Q.    How many discussions?
9      A.    At least one.
10      Q.    Tell me about that discussion.
11   When did it occur?
12      A.    I don't recall.  After she
13   left.
14      Q.    After her office interview?
15      A.    Not that afternoon, but, you
16   know, on a following day or the next day
17   after that or something.  It would have
18   been a different day.
19      Q.    Where did the discussion take
20   place?
21      A.    In his office.
22      Q.    Who was present?
23      A.    Chris Day and myself.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 185 to 188)

Page 185

1    Q.    Was anyone else there?
2    A.    I don't recall anyone else
3  being there.
4    Q.    What was said?  What did he
5  say and what did you say?
6    A.    I felt like Mavis potentially
7  could do the job with an awful lot of
8  help.  I felt like she was a weak
9  candidate.  And he felt like it would be
10  a benefit to have her come in because she
11  could grow in the company.  It would be a
12  great opportunity for her to grow as an
13  employee, and he felt like it was a
14  benefit to have an African-American in
15  that management role.
16    Q.    Anything else that you can
17  recall?
18    A.    I recall that when the
19  decision was made to hire her I proposed
20  what I felt like was a fair starting
21  salary, and he increased it by ten
22  thousand dollars, eight or ten thousand.
23  I can't remember if it was eight or ten

Page 186

1  thousand dollars.
2    Q.    In this meeting you proposed a
3  starting salary?
4    A.    Not in that meeting, no.
5    Q.    Let's just concentrate on this
6  meeting for now.
7    A.    Okay.  That's all I remember.
8    Q.    So in this meeting you told
9  Chris Day that you felt like Mavis could
10  do the job?
11    A.    No.  I told Chris Day I
12  thought she was a weak candidate.
13    Q.    But that she could do the job?
14    A.    I wasn't sure if she could do
15  the job because I felt like she was a
16  weak candidate.  Sometimes you can take a
17  chance on an employee that is weak and
18  you have a lot structure around them and
19  you can build them up and groom them and
20  help them grow in the position.
21  Sometimes it doesn't work.  It didn't
22  work with Mavis.
23    Q.    You felt she was a weak

Page 187

1  candidate because she had not had any
2  management experience?
3    A.    That is one of the reasons.
4  The other reason was her interview
5  process.  She was not -- I felt like from
6  her personality she was not assertive and
7  strong enough to handle all the demands
8  that would come at her in that role.
9    Q.    Any other reason?
10    A.    No.
11    Q.    And that's the impression that
12  you had during the interview process?
13    A.    Yes.
14    Q.    So you tell Chris Day that
15  you're unsure if Mavis can do the job
16  because you think she's a weak candidate?
17    A.    Yes.
18    Q.    Did you explain to him why you
19  thought she was a weak candidate?
20    A.    I'm sure I did.  I don't
21  recall specifically what I would have
22  said, but I didn't have any problem
23  explaining myself to Chris Day.  So

Page 188

1  whatever was on my mind at the time, I
2  have no doubt that I explained it to him.
3    Q.    But sitting here today you
4  have no specific recollection whether you
5  expressed the specifics of your
6  reluctance about Mavis?
7    A.    I'm sure I expressed them.  I
8  just don't remember, you know, in quotes
9  what I said.
10    Q.    And Chris Day told you that he
11  felt that Mavis could grow within the
12  company?
13    A.    Yes.
14    Q.    And grow as an employee?
15    A.    Yes.
16    Q.    And he told you that he
17  thought it would be beneficial to have an
18  African-American in that role?
19    A.    Yes.
20    Q.    Anything else that you can
21  recall from that discussion?
22    A.    No.
23    Q.    At that point at the end of

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 189 to 192)

Page 189

1　that conversation had a decision already
2　been made as to who was going to be
3　hired?
4　　A.　Not that -- no, not that I'm
5　aware of.
6　　Q.　What is the next discussion
7　you can recall having with Chris Day
8　about hiring Mavis?
9　　A.　The next discussion that I
10　recall is discussing what her salary was
11　going to be.
12　　Q.　By that time had a decision
13　been made to hire Mavis?
14　　A.　Yes.
15　　Q.　Do you know who made the
16　decision to hire Mavis?
17　　A.　Chris Day strongly encouraged
18　me to hire Mavis.
19　　Q.　Are you saying it was
20　ultimately your call to make the hiring
21　decision?
22　　A.　I didn't feel like it was.
23　　Q.　So did Chris Day make the

Page 190

1　hiring decision?
2　　A.　I felt like Chris Day
3　pressured me to make the hiring decision.
4　　Q.　In the past had you made
5　hiring decisions about quality assurance
6　managers?
7　　A.　Yes.
8　　Q.　Between the discussion that
9　you told me about where you voiced your
10　concern about Mavis and the discussion
11　about her salary, were there discussions
12　in that interim?
13　　A.　I'm sure there were, but I
14　don't recall them.
15　　Q.　And you say Chris Day strongly
16　encouraged you to hire Mavis?
17　　A.　Yes.
18　　Q.　Tell me about the discussion
19　about the salary.
20　　A.　I recommended that she be
21　started at fifty-five.  And when I saw
22　the offer letter go out, it came from
23　him, and it was -- I can't remember if it

Page 191

1　was sixty-three or sixty-five.  And we
2　had never paid a QA manager that much
3　before.
4　　Q.　I want to talk about the
5　discussion you had, though, with Chris
6　Day about the salary.  Is it just that
7　you recommended that she start out at
8　fifty-five thousand dollars?
9　　A.　Yes.
10　　Q.　Did he have any response to
11　that?
12　　A.　I don't recall.
13　　Q.　The next thing you can recall
14　is seeing an offer letter to Mavis saying
15　that her salary was somewhere between
16　sixty-three and sixty-five thousand?
17　　A.　Yes.
18　　Q.　And you said the offer letter
19　was from Chris Day?
20　　A.　Yes.  I didn't create an offer
21　letter with those amounts.
22　　Q.　Do you know if Chris Day
23　consulted with anyone else about whether

Page 192

1　to hire Mavis?
2　　A.　I do not know.
3　　Q.　During this meeting that you
4　had with Chris Day discussing a starting
5　salary for Mavis, where did that take
6　place?
7　　A.　It was a cell phone call.
8　　Q.　Do you know if anyone besides
9　you and Chris Day was on the line?
10　　A.　I don't.  I don't know where
11　he was or what he was doing.
12　　Q.　Were you at the office?
13　　A.　No.  I was in the grocery
14　store parking lot.
15　　Q.　Was he calling you from his
16　cell phone?
17　　A.　I don't recall.
18　　Q.　And at the time the decision
19　was made you weren't aware of any
20　candidates at that time that you thought
21　were more qualified than Mavis?
22　　A.　Right.
23　　Q.　You felt the decision should

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 193 to 196)

Page 193

1  be postponed to look at more candidates?
2      A.    Yes.
3      Q.    Did Chris Day ever threaten
4  you in any way that if you don't hire
5  Mavis that something would happen to you?
6      A.    No.
7      Q.    Did you ever talk with anyone
8  in management that you thought hiring
9  Mavis was the wrong decision?
10     A.    I talked to Brenda Sellers,
11  the HR manager, about it.
12     Q.    What did Ms. Sellers say?
13  Tell me about that conversation.
14     A.    Well, Brenda Sellers was one
15  of the people that interviewed Mavis, and
16  Brenda thought that Mavis would be a good
17  addition to the staff, and she encouraged
18  me as well to hire Mavis.
19     Q.    Anything else you can recall
20  about your conversation with Brenda
21  Sellers about hiring Mavis?
22     A.    No.
23     Q.    Was your conversation with

Page 194

1  Brenda Sellers after your conversation
2  with Chris Day about the salary or before
3  that?
4      A.    It would have been before the
5  salary. It would have been shortly after
6  Brenda interviewed her.
7      Q.    Did Chris Day ever say
8  anything along the lines that if you
9  didn't hire Mavis you're going to be let
10  go?
11     A.    No.
12     Q.    Did Chris Day ever say
13  anything along the lines of if you don't
14  hire Mavis you're going to be disciplined
15  in any way?
16     A.    No. He didn't threaten.
17     Q.    And Chris Day never said
18  anything along the lines of if you don't
19  hire Mavis, you know, I'm going to
20  decrease your salary?
21     A.    No.
22     Q.    And at the time Chris Day was
23  running the company?

Page 195

1      A.    I believe I was reporting to
2  Chris Day at the time.
3      Q.    You said that you also had an
4  R&D opening at the time?
5      A.    I believe so. I don't
6  remember how exactly they coincided. We
7  went through a period of time where there
8  was a lot of openings.
9      Q.    Did you fill somebody for the
10  R&D opening?
11     A.    Yes, I did.
12     Q.    Who did you put in that
13  position?
14     A.    Her name was Kari. I can't
15  recall her last name right now, but
16  that's what led into the whole Bob Gross
17  problem, Henry Hicks/Bob Gross problem,
18  that employee did.
19     Q.    Were you pressured into or did
20  you feel like you were pressured into
21  hiring Kari for the R&D?
22     A.    I didn't. I feel like she's
23  one of the best hires I have made in my

Page 196

1  entire career.
2      Q.    What was her race or what is
3  her race?
4      A.    Caucasian.
5      Q.    You said you also had an
6  opening for a microbiologist?
7      A.    Yes, but that was in two
8  thousand -- we hired Katie in the
9  beginning of 2004 I believe. Maybe it
10  was the beginning of 2003. She started
11  in February or March. It must have been
12  2003. Yes, Katie was hired, the
13  microbiologist was hired, in 2003.
14     Q.    After Onyx came on board?
15     A.    It was before.
16     Q.    Before Onyx came on board?
17     A.    Yes.
18     Q.    Onyx came in July of '03?
19     A.    Yes. Although, we really
20  didn't see very much of them until
21  January of '04.
22         MS. MCGAHEY: I promise we're
23  getting close to a stopping point.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 197 to 200)

Page 197

1    Q.   (BY MS. MCGAHEY:)  Going back
2  to the decision to hire Mavis Richardson.
3  And I know you believe that you felt
4  pressured to hire her.  What was the
5  impact of that on you?
6    A.   The impact?
7    Q.   How did it affect your
8  employment?
9    A.   The pressure, how did the
10  pressure affect my employment?  It
11  didn't.  I continued to do my job.  And I
12  felt that if Chris Day that strongly
13  wanted Mavis in there, that I would do
14  the best I could to help Mavis succeed,
15  but, bless her heart, she just couldn't
16  do it.
17    Q.   Did she try hard?
18    A.   She did.  She really did.  I
19  will give that lady credit.  She worked
20  very hard.  She failed, but she worked
21  very hard.  And I gave her all the
22  support I could give her.  It was what
23  you would call a bad misfit.  She wasn't

Page 198

1  a misfit, but the job and her abilities
2  was a bad match.
3    Q.   Did she have quality assurance
4  background?
5    A.   She did.
6    Q.   Is that through Cargill?
7    A.   Yes.
8    Q.   What is Cargill?
9    A.   Cargill, they are a huge
10  company, but they manufacture corn syrup.
11    Q.   Now I can see the package on
12  the grocery store shelf.
13    A.   Big company.  And when you
14  work for a big company you have a lot of
15  degreed technical smart people all around
16  you with big HR departments, and, you
17  know, you've got a lot of structure
18  within a company.
19    Piknik was a small company, so
20  you didn't have a whole lot of support,
21  and you got a lot of curve balls thrown
22  at you.  You had to multitask, you had to
23  work quickly and make decisions on your

Page 199

1  feet.
2    I believe it was just too much
3  for Mavis.  You know, she's the kind of
4  person that I would hire if I needed some
5  detail work done in a narrow focus.  But
6  she sort of had to be a
7  jack-of-all-trades and jump in there, you
8  know, in a crazy environment, and it was
9  way too much for her.
10    Q.   Did she eventually leave the
11  company?
12    A.   She did.
13    Q.   Was she asked to leave?
14    A.   No.  She resigned.
15    Q.   How soon after -- how long did
16  she work there?
17    A.   I want to say it was six to
18  eight months.  She gave it a good go, and
19  she resigned with dignity.  She resigned
20  with notice.  And, you know, I was
21  willing to give her a good reference
22  based on the fact that she tried so hard.
23    Q.   She resigned voluntarily?

Page 200

1    A.   Yes, she did.  She was not
2  pressured to resign.
3    Q.   Was her position filled after
4  she left?
5    A.   It was.  But it was some time
6  before it was filled.
7    Q.   Do you recall who filled it?
8    A.   Yes, Allen Walters.
9    Q.   White male?
10    A.   Yes.
11    Q.   Did you make that hiring
12  decision?
13    A.   I did, in conjunction with
14  some other people.  The quality assurance
15  manager is such a very important role in
16  a company, especially at the plant level.
17  So many different people work with this
18  individual.  You know, they come in
19  contact with every department, that it
20  couldn't just be me, a unilateral
21  decision.  Everybody else had to vote in
22  whether or not they wanted him there.
23    Q.   Do you know who else made the

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 201 to 204)

Page 201

1    decision in conjunction with you?
2        A.    I don't recall.
3        Q.    Do you recall if Chris Day
4    would have been involved?
5        A.    He interviewed Allen Walters.
6    I did remember that he interviewed him.
7        Q.    Brenda Sellers, would that be
8    typical?
9        A.    Yeah, that would be typical.
10   Whoever the production manager was at
11   that point would have interviewed him.
12   Possibly Jerry MacCartney because the QA
13   manager worked closely with the materials
14   department.
15       Q.    Do you recall what Allen
16   Walters' starting salary was?
17       A.    I don't.  It was not in the
18   sixties.  Maybe it was in the fifties.
19       Q.    Do you know what his
20   pre-Piknik experience was?
21       A.    He was a quality assurance
22   manager for -- he's the gentleman that we
23   discussed earlier.  He was the quality

Page 202

1    assurance manager for a small company.
2    He reported directly to the owner.  But
3    he's the one that did a lot of different
4    things, production, scheduling.  He did a
5    lot of things outside of quality
6    assurance.  He was sort of a big-fish,
7    small-pond situation.
8        Q.    Do you know what his
9    educational background was?
10       A.    I know he had a bachelor's of
11   science.  I don't recall if it was food
12   science or chemistry.  It may have been
13   chemistry or biology.  But it was a
14   bachelor of science in some type of field
15   like that.
16       Q.    Did he have a master's?
17       A.    No.
18       Q.    Did you ever get your laptop
19   back?
20       A.    No.  I didn't need it.  They
21   let me go.
22       Q.    I'm sorry?
23       A.    I didn't need it.  They let me

Page 203

1    go.
2        MS. MCGAHEY:  Do you want to
3    take a break now?
4        MR. NELMS:  Yes.
5        (Whereupon, a break was taken
6         from 2:44 to 2:59 p.m.)
7        Q.    (BY MS. MCGAHEY:)  Ms. McGlon,
8    I would like to move on to the next way
9    in which you feel you were treated
10   differently because of your race.  Well,
11   let me back up for a second.  Back to the
12   hiring of Mavis.  Are you aware of any
13   other individuals who you believe Chris
14   Day pressured into hiring someone, or are
15   you the only one?
16       A.    I didn't talk about it, so --
17       Q.    But you're unaware if anyone
18   else was pressured into making a hiring
19   decision?
20       A.    Right, I'm not aware.
21       Q.    Let's talk about the e-mail
22   that Chris Day sent about a conflict with
23   a rabbi.  What is that about?

Page 204

1        A.    Well, when you manufacture
2    food products you can have a choice as to
3    whether or not certain products are
4    kosher, and our customers made that
5    decision about their own products.  And
6    they felt like it was a benefit because
7    if you have a kosher product it opens you
8    up to a market that you might not have
9    had before.  In Brundidge at that
10   manufacturing facility some of Piknik's
11   branded products were kosher, and then
12   some of our customers' products in that
13   facility were also kosher.
14       When you have kosher products
15   they fall under the supervision of, in
16   our case, the Orthodox Union.  There are
17   other kosher supervisions, but we worked
18   with the Orthodox Union.  They are the
19   largest, based out of New York.
20       And there is a period of time
21   during Passover in the Spring where you
22   cannot manufacture kosher product.  These
23   are rabbinical laws.  I don't completely

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 205 to 208)

Page 205

1　understand all of these laws because they
2　don't quite make sense to me.
3　　　　But Ricky is a Jewish man, and
4　because he was a Jewish man with a
5　facility that had kosher product, there
6　was some issue about his ownership in the
7　company during Passover. And they were
8　going to shut down the manufacturing
9　facility, no manufacturing of any kosher
10　product during Passover.
11　　　　And this is something that
12　happens every year, but I had not had
13　responsibility for that facility in the
14　past, so I had not been involved in
15　whatever they do. So this was presenting
16　itself to be a pretty big problem, to
17　shut down a whole manufacturing facility
18　for the period of Passover.
19　　Q.　And this is only with respect
20　to the Brundidge facility?
21　　A.　Yes, yes, with respect to
22　Brundidge, at which time I had some
23　authority there. And I presented the

Page 206

1　issue to Chris Day because -- I guess I
2　was reporting to him at the time. I
3　don't remember what year it was. It must
4　have been 2004, maybe 2005. It was
5　either 2004 or 2005. But I presented the
6　issue to Chris Day because the rabbis
7　were being so strong about it we needed
8　to do something, and Chris Day had sent
9　out an e-mail saying that we were not
10　allowed to communicate with Ricky at all.
11　He did not want certain people in the
12　company, anybody in the company, to
13　communicate with Ricky Loeb whatsoever.
14　Pretty aggressive e-mail.
15　　　　So I couldn't get in touch
16　with Ricky to talk to him about it, so I
17　had to get in touch with Chris Day. And
18　I explained to Chris that we had an issue
19　and that we were going to need Ricky's
20　involvement if we were going to get
21　around the issue.
22　　　　The rabbi proposed a solution.
23　If Ricky would sign over his portion of

Page 207

1　the company to a nonJewish person during
2　the season of Passover, then we could go
3　on business as usual. I know this sounds
4　crazy, but it's the Orthodox Union. It's
5　religious based, so it's a little bit
6　different than what you might expect.
7　　　　So I sent this e-mail to Chris
8　Day and copied Jeff Larry because I felt
9　like it would have a significant
10　financial impact on the company. It was
11　a very relevant issue.
12　　　　Chris Day sent an e-mail back
13　to me saying that he didn't want me to be
14　pushed around by any rabbi and that I
15　needed to let that rabbi know we no
16　longer had a lingering Jewish interest in
17　the company, that we are an
18　African-American company and that we are
19　not going to be silent about it.
20　　Q.　Anything else you recall?
21　　A.　Jeff Larry responded to that
22　e-mail and said, why don't -- he overrode
23　Chris, and he said, why don't we hear

Page 208

1　what the rabbi's solution is; it sounds
2　reasonable enough, and then if we can
3　work with the rabbi, let's do that.
4　　　　And the end result was that we
5　followed the rabbi's suggestion, and
6　Ricky signed his portion of the company
7　over to a nonJewish person during that
8　period of time.
9　　Q.　Who was the nonJewish person?
10　　A.　Pat Saint.
11　　Q.　Was Pat Saint a Piknik
12　employee?
13　　A.　She was. She was Mr. Loeb's,
14　Rick Loeb's father, Mr. Loeb's, I guess,
15　executive secretary. She did work for
16　the company, but she also did personal
17　things for the Loebs.
18　　Q.　After Passover did Pat Saint
19　return to Mr. Loeb his ownership
20　interest?
21　　A.　Ricky Loeb, yes. My part of
22　that was not one of decision-making so
23　much as it was I was a negotiator between

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                        http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 209 to 212)

Page 209

1  the two. I was a liaison between the
2  Orthodox Union and Piknik, as was my
3  position a lot of times with our
4  customers.
5      Q.    Okay.
6      A.    To work with the Orthodox
7  Union on a solution that would help
8  Piknik and help the Orthodox Union.
9      Q.    Let me make sure that I
10 understand what's going on. I'm going to
11 try to break it up into smaller bits.
12     A.    Okay.
13     Q.    I understand that we are only
14 focusing on the Brundidge facility for
15 this issue; correct?
16     A.    Yes.
17     Q.    And the Brundidge facility
18 bottles kosher products or packages
19 kosher products?
20     A.    Yes.
21     Q.    And is the Orthodox Union the
22 entity that oversees the process to make
23 sure that Piknik is complying with the

Page 210

1  requirements of being kosher?
2      A.    Yes.
3      Q.    It's not like the Orthodox
4  Union had products that it was having
5  Piknik package?
6      A.    Correct, they're not. They
7  allow you to use that circle you see on
8  the back -- you might even see it on your
9  Coke.
10     Q.    Almost like a seal of
11 approval?
12     A.    Yes. And they allow you to --
13 that's funny, because I thought Coke was
14 kosher. They will allow you -- because
15 they'll go down and kosherize the bubbles
16 that go into Coke, and I'm not kidding.
17 The rabbi that we worked with kosherized
18 Coke bubbles. But they allowed you the
19 use of that. And if you don't use it
20 properly, then they can come in your
21 facility and confiscate all your labels.
22 So every --
23     Q.    All your Orthodox Union

Page 211

1  labels?
2      A.    Yes. So, you know, you may
3  have eighty thousand dollars worth of
4  label stock in your stockroom, and they
5  can physically come into your facility
6  and seize those. So, you know, it's a
7  financial concern. And you sign that
8  agreement when you decide to use their
9  emblem.
10     Q.    So per the Orthodox Union's
11 rules, Piknik was not permitted to
12 manufacture kosher products during
13 certain times of the year?
14     A.    During Passover. Passover
15 was, you know, an extraspecial time. I
16 guess -- I don't know if it had something
17 to do with the leavening or nonleavening.
18 But for some reason based on their kosher
19 law Passover was a specifically special
20 time.
21     Q.    And in the past the Brundidge
22 facility had just shut down during
23 Passover?

Page 212

1      A.    No. I think Ricky had
2  negotiated this document in the past.
3  The difference this year was that Chris
4  Day said we couldn't communicate with
5  Ricky at all. So I had to -- you know, I
6  got more involved than I had in the past.
7      Q.    And you referenced an e-mail
8  that Chris Day sent to everyone saying,
9  you know, do not communicate with Ricky
10 Loeb?
11     A.    Yes.
12     Q.    And that was sent to all the
13 employees?
14     A.    No. It was sent to people
15 that he perceived communicated with Ricky
16 Loeb.
17     Q.    And that included Caucasian
18 and African-Americans?
19     A.    I don't recall. I was
20 surprised I got it because I didn't
21 communicate with Ricky Loeb very often at
22 all, but I was included on the e-mail. I
23 do remember it was Bob Winter, myself,

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 213 to 216)

Page 213

1  Jimmy Whitehead.  Those are the three
2  people I remember.
3     Q.   Do you recall Brenda Sellers
4  being on the list?
5     A.   No, I don't.  Well, she may
6  have been.  She was the human resource
7  manager.  It would make sense you would
8  copy a human resource manager on
9  something like that.
10       (Whereupon, Defendant's
11        Exhibit 5 was marked
12        for identification.)
13     Q.   I'm going to show you what has
14  been marked as Defendant's Exhibit 5 to
15  your deposition.  Is this the e-mail that
16  you're referring to?
17     A.   Yeah, this is.  And, like I
18  said, I was surprised that I got it
19  because I didn't communicate with Ricky
20  much at all.  But it was in Chris Day's
21  perception that I was some kind of threat
22  or something.
23     Q.   And you would agree that the

Page 214

1  e-mail is addressed to Brenda Sellers?
2     A.   Yes.  I assume because she's
3  human resource manager.
4     Q.   Well, if you look in the
5  second paragraph it says, "although this
6  applies everyone at Piknik, this is
7  directed at the six of you since you have
8  been around the longest and are on the
9  list of people Ricky feels comfortable
10  calling."
11     A.   Uh-uh.
12     Q.   So going back to the Orthodox
13  Union issue.  So it's my understanding
14  that there's supposed to be no -- there
15  was a way to get around the Passover
16  issue and being prohibited from
17  manufacturing product?
18     A.   Yes.
19     Q.   And the solution was for Ricky
20  Loeb to temporarily transfer his rights
21  to Piknik to a nonJewish person?
22     A.   Yes.  And he chose someone
23  that he trusted.

Page 215

1     Q.   And in this instance Ricky
2  Loeb transferred his ownership interest
3  to Pat Saint?
4     A.   Yes, I believe that's who he
5  chose, because he couldn't choose his
6  wife.
7     Q.   And there was a change of
8  control agreement to that effect;
9  correct?
10     A.   There was a document.  And my
11  part was to -- you know, they e-mailed me
12  the document.  My part was to make sure
13  Ricky signed it and make sure I delivered
14  it to the rabbi upon an approved date
15  that the rabbi wanted to come see it.  So
16  I was sort of like a, you know, executrix
17  on that.
18     Q.   Okay.  And I misspoke.  It's
19  not a change of control agreement.  It's
20  a contract of sale.
21     A.   Okay.  I don't recall much
22  about it other than I had to get him to
23  sign it.

Page 216

1     Q.   So it was brought to your
2  attention by a rabbi with the Orthodox
3  Union that there was this issue that the
4  Brundidge facility was not going to be
5  able to manufacture product during
6  Passover?
7     A.   Yes.
8     Q.   And then you presented the
9  issue to Chris Day?
10     A.   Yes, because I couldn't
11  communicate with Ricky.
12     Q.   Did you communicate by phone
13  or by e-mail?
14     A.   I'm sure it was by e-mail, but
15  it may have been a collection of phone
16  calls and e-mail.  You know, it could
17  have been both.  That was a -- that's the
18  kind of thing I would have communicated
19  to him anyway.  That was to me a pretty
20  big deal if they were going to shut down
21  one of our plants.
22       (Whereupon, Defendant's
23        Exhibit 6 was marked

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 217 to 220)

Page 217

1    for identification.)
2    Q.   Handing to you what has been
3    marked as Defendant's Exhibit 6 to your
4    deposition. Have you seen this document
5    before?
6    A.   Uh-huh, I have.
7    Q.   Who is Norm1099@aol.com?
8    A.   That's the rabbi.
9    Q.   This is the rabbi with the
10   Orthodox Union that you were dealing
11   with?
12   A.   One of them.
13   Q.   And in this e-mail he is
14   explaining to you what the issue is that
15   you have already explained to me;
16   correct?
17   A.   Yes.
18   Q.   Did you forward this document
19   or forward this e-mail to anyone?
20   A.   I might have. I don't recall,
21   but I might have.
22   Q.   So you e-mail Chris Day about
23   the issue with the Orthodox Union?

Page 218

1    A.   I believe so.
2    Q.   Do you recall what you said in
3    that e-mail?
4    A.   No.
5    Q.   I'd show it to you if I had
6    it. I just don't have it.
7    A.   Yeah. I don't know. This is
8    the type thing that I may have called him
9    on the phone, and he may have said, will
10   you forward to me. It's the type thing
11   we may have talked about over the phone.
12   Typically we communicated either e-mail
13   or phone calls, so it could have been a
14   little of both.
15   Q.   And did Chris Day respond to
16   you?
17   A.   The only response I recall is
18   the e-mail that I mentioned, which I
19   thought was a pretty aggressive e-mail
20   based on the fact that I was trying to
21   help, not deter the process.
22        (Whereupon, Defendant's
23        Exhibit 7 was marked

Page 219

1    for identification.)
2    Q.   I'm going to show you what I
3    have marked as Defendant's Exhibit 7 to
4    your deposition. Have you seen this
5    document before?
6    A.   Yes. This is the e-mail, the
7    one that I felt like was strong.
8    Q.   Now, there are two e-mails in
9    this string; correct?
10   A.   Yes.
11   Q.   And the first e-mail is dated
12   April 6, 2005 at 9:28 a.m., from Chris
13   Day; correct?
14   A.   Yes.
15   Q.   It's addressed to you and
16   Ricky Loeb?
17   A.   Yes.
18   Q.   And Chris Day, Jeff Larry,
19   Carl Bleier and Ricky Loeb are in the CC
20   section?
21   A.   Yes.
22   Q.   And you felt that Chris Day's
23   response in this e-mail was aggressive?

Page 220

1    A.   Yes, I thought it was -- as I
2    wrote there a note it's completely blown
3    out of proportion.
4    Q.   So the handwriting that is on
5    Defendant's Exhibit 7 is your
6    handwriting?
7    A.   It is.
8    Q.   Identify for me, please what
9    sections you felt were aggressive.
10   A.   Down at the bottom where it's
11   number one, that he labeled number one.
12   Q.   You thought that Item Number 1
13   that says "Piknik is no longer Jewish
14   owned and it will not be discriminated
15   against because of its lingering Jewish
16   stake. That means we insist on being
17   held to the kosher standards of every
18   other nonJewish food company. Kosher
19   manufacturing processes are kosher
20   manufacturing processes. We will view
21   any special requirements that don't apply
22   to nonJewish firms (such as Southern
23   Classics) as blatant discrimination

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 221 to 224)

Page 221

1 because we are now African-American owned
2 and we will not be silent been it."
3    A.    Yes.
4    Q.    You thought that Item Number 1
5 was aggressive?
6    A.    I thought it was out of
7 proportion to the issue.  I didn't
8 understand why he would make those
9 references.  It was not an
10 African-American issue.  It was we signed
11 an agreement with the Orthodox Union, and
12 we were being held to the same standard
13 we had been held every year we had been
14 in business with them.
15    Q.    Did you believe he was
16 directing Item Number 1 towards you?
17    A.    The e-mail is towards me, yes.
18 He was insinuating that I was letting
19 them push us around, and I wasn't.
20    Q.    Where is he insinuating that
21 the Orthodox Union is pushing you around?
22        MR. NELMS:  You want to take a
23 minute to read the entire e-mail?

Page 222

1    A.    Okay.  (Examining document.)
2 In Point 2, "we do not take kindly to
3 threats."  At no time did I feel like we
4 were being threatened as a company.  I
5 felt like we were being held to a
6 standard that we agreed to when we signed on
7 with the Orthodox Union.
8    Q.    The question is where in Chris
9 Day's e-mail does it suggest that you
10 were being pushed around?
11    A.    I think by him telling me how
12 to handle the situation he felt like I
13 was in -- it appears to me for some
14 reason that he was giving me an awful lot
15 of direction on an issue that I had
16 already proposed a solution.
17    Q.    Did you think he was just
18 offering suggestions given that Ricky
19 Loeb had dealt with the issue for the
20 most part before this time?
21    A.    Well, Ricky -- I didn't
22 involve Ricky in it.
23    Q.    Correct.

Page 223

1    A.    I involved Chris.
2    Q.    Correct.
3    A.    Because he wouldn't let me --
4 he involved Ricky.
5    Q.    And this instance in 2005 was
6 the first time that you had to be
7 involved in it; correct?
8    A.    Correct.
9    Q.    Is it possible that Chris Day
10 was just giving suggestions with the
11 understanding that this was your first
12 time to have to deal with the Orthodox
13 Union?
14    A.    Maybe, but it was also his
15 first time in dealing with this issue as
16 well.
17    Q.    And then the last page he, in
18 fact, compliments you, doesn't he?
19    A.    He does, two months before he
20 cut my knees off.
21    Q.    He says that "hopefully you
22 can use your wonderful executive presence
23 to keep the meeting productive and steer

Page 224

1 it away from confrontation;" correct?
2    A.    Yes.
3    Q.    Does that suggest to you that
4 he had confidence you?
5    A.    It could be perceived that
6 way, but --
7    Q.    And, in fact --
8    A.    At this point --
9    Q.    Go ahead.  I didn't mean to
10 interrupt you.
11    A.    This is two months before he
12 terminated me, and he -- you know,
13 looking back, he's just blowing smoke at
14 me I think.  That's my opinion.
15    Q.    That's your opinion.  And on
16 the first paragraph he says that he can't
17 be available for this call with the
18 Orthodox Union, but, you know, you should
19 run it without him; correct?
20    A.    Right.
21    Q.    And he trusted you to run the
22 meeting without him; correct?
23    A.    Uh-huh, and I did it.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 225 to 228)

Page 225

1    Q.    Your note says "Chris blew
2  this completely out of proportion."
3    A.    It is.
4    Q.    And have you already told me
5  how you believe that Chris Day blew the
6  situation completely out of proportion?
7    A.    Yes, number one.
8    Q.    There is a second e-mail in
9  the string dated April 6, 2005 at 1:16
10 a.m.?
11   A.    Correct.
12   Q.    That's the e-mail from Jeff
13 Larry?
14   A.    Yes.
15   Q.    And Jeff suggests that it may
16 be a good idea for Ricky just to go ahead
17 and sign over his interest to someone
18 else?
19   A.    Well, at the time they were
20 suggesting Jamie, but then Ricky ended up
21 signing it over to Pat Saint.
22   Q.    Who is Jamie?
23   A.    His wife.

Page 226

1    Q.    Whose wife?
2    A.    Ricky's wife.
3    Q.    At some point was there talk
4  about Ricky signing over his interest to
5  you?
6    A.    Yes, I believe that was
7  mentioned by the rabbi.
8    Q.    Any reason why it wasn't
9  signed over to you?
10   A.    I wasn't comfortable with
11 that.  I didn't really want to be that
12 involved.  I didn't know exactly what it
13 meant, but I didn't want to be perceived
14 that it had anything to do with me.
15   Q.    And I think we've already
16 talked about in the end the solution was
17 that Mr. Loeb signed over his interest to
18 Pat Saint?
19   A.    Yes.
20   Q.    And the Brundidge facility was
21 able to manufacture through Passover?
22   A.    Yes.
23   Q.    You have some handwritten

Page 227

1  notes up at the top right-hand corner.
2  It says, "notice there are different
3  e-mail addresses they used
4  interchangeably."
5    A.    That was my note to Andy when
6  I gave him a copy of the document.
7    Q.    Is there any significance in
8  that in your lawsuit?
9    A.    There is because they had
10 maintained that they weren't involved
11 with Piknik at the time, and they
12 e-mailed us from their Onyx e-mail
13 addresses.  They e-mailed us from their
14 Piknik addresses.  They e-mailed us from
15 their personal addresses.
16   Q.    What do you mean by "they have
17 maintained they were not involved in
18 Piknik at all"?
19   A.    Well, when we initially
20 started in this suit process Chris and
21 Jeff Larry and Henry indicated in one of
22 their responses that they didn't even
23 know we had been terminated, that they

Page 228

1  weren't involved in the operations at
2  Piknik and that that was not a decision
3  that they had made and they were unaware
4  of it.
5    Q.    You're saying these are some
6  legal documents that have been filed with
7  the Court that you're referring to?
8    A.    I don't -- Andy, do you
9  remember?  I don't know what those --
10 okay.  I'm sorry.  I don't know.  I just
11 know I haven't reviewed them myself, and
12 I don't understand the legal process
13 enough to know if it was a legal document
14 in the court.  But I had to provide some
15 information to my attorney based on some
16 responses they gave, and one of those
17 responses was that they didn't even know
18 we had been terminated.
19   Q.    So your note about using
20 different e-mail addresses
21 interchangeably would signify that
22 sometimes they were using Onyx e-mail
23 addresses and sometimes they were using

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 229 to 232)

Page 229

1  Piknik e-mail addresses?
2      A.   One of their assertions was
3  that Chris Day was involved at Piknik as
4  a Piknik employee, not as an Onyx
5  employee. But, in fact, Jeff Larry was
6  never a Piknik employee, and it was not
7  unusual for him to get involved in areas
8  of the daily matters of the operation.
9          And my impression or my
10 objective evidence for that conclusion
11 was that they e-mailed us, they called us
12 from Onyx offices in Chicago, they
13 e-mailed us from Onyx e-mail addresses.
14 So it was not always discernible on our
15 end who they were working for. It didn't
16 appear that there was a difference
17 between Piknik and Onyx for much of the
18 time.
19     Q.   From what you could tell, you
20 couldn't tell a difference between what
21 was Onyx and what was Piknik?
22     A.   Right. And I didn't know who
23 collected a paycheck from what company.

Page 230

1  So they just kind of blended together.
2      Q.   You have another note that
3  says Jeff ("Onyx") overruled Chris
4  ("Piknik" or "Onyx"?).
5      A.   Yes.
6      Q.   What is the significance, if
7  any, of that statement to your claim?
8      A.   Basically what I just told
9  you, that Jeff Larry never presented him
10 as a Piknik employee. He always
11 presented himself as an Onyx employee.
12 Chris presented him sometimes as a Piknik
13 employee, sometimes as an Onyx employee.
14 And I couldn't tell if Chris in this
15 case, because he e-mailed me from his
16 personal e-mail address, was he in the
17 capacity of a Piknik employee or an Onyx
18 employee, whereas clearly Jeff Larry was
19 in the capacity of an Onyx employee.
20 And, again, if you go back --
21     Q.   Solely because of his e-mail
22 address?
23     A.   Yes. I was basing that on the

Page 231

1  e-mail address. If you're not an Onyx
2  employee, why would you have an Onyx
3  e-mail address.
4      Q.   Were there any further e-mail
5  communications about the Orthodox Union
6  that we've been discussing?
7      A.   Potentially there may have
8  been a follow-up e-mail that they sent,
9  Shannon, how did things go, or I
10 potentially may have sent a proactive
11 e-mail that said, you know, things have
12 been negotiated, they went fine.
13     Q.   Anything further arise out of
14 those e-mail communications?
15     A.   No.
16     Q.   I'm trying to understand how
17 this relates to your claim.
18     A.   I'm not an African-American
19 and "we are an African-American owned
20 company and we will not be silent about
21 it," and I didn't see where that had
22 anything to do with the issue.
23     Q.   How did receiving this e-mail

Page 232

1  affect your employment?
2      A.   It made me uncomfortable. It
3  didn't affect my job. I continued to do
4  my job.
5      Q.   What in the e-mail made you
6  feel uncomfortable?
7      A.   I felt like it was an e-mail
8  based on exclusivity. We are an
9  African-American owned company, and we're
10 not going to be quiet about it. And I
11 don't know why that's something that you
12 have to be noisy about. We're a good
13 company, we're an ethical company, we're
14 going to do business the right way, we're
15 going to work with our suppliers, we're
16 going to work with our customers. But
17 why say that we're an African-American
18 owned company and we're not going to be
19 quiet about it. What has that got to do
20 with the issue at hand and the business?
21 Nothing. We have negotiated this issue
22 ever year with the Orthodox Union
23 quietly, and all of a sudden this year

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 233 to 236)

Page 233

1  that had to be brought up. I did not
2  understand that.
3      Q.   Did you ask Chris Day about
4  it?
5      A.   I did not. He pretty much put
6  down right here what he felt about it.
7      Q.   Did you talk to Brenda Sellers
8  about it?
9      A.   I did not.
10     Q.   Did you talk to anyone in
11 management about it?
12     A.   No. I did my job. Who am I
13 going to talk to?
14     Q.   And point one is under a
15 heading that says "(In case threats get
16 out of hand): HOWEVER:", and there are
17 some talking points that got suggested;
18 correct?
19     A.   Well, he put it as threats.
20 They weren't threats. It was a business
21 contract between the Orthodox Union and
22 Piknik. I don't understand why threats
23 would be brought up. It was not a

Page 234

1  threatening situation.
2      Q.   Do you know if Chris Day was
3  in communication with anyone with the
4  Orthodox Union?
5      A.   Not that I'm aware of. I was
6  the liaison for the company.
7      Q.   So he may have just
8  interpreted things as threatening and you
9  interpreted them as nonthreatening?
10     A.   Correct.
11     Q.   Fair to say?
12     A.   Yes.
13     Q.   And he may have felt or
14 interpreted the Orthodox Union's actions
15 or statements as being discriminatory
16 whereas you did not; correct?
17     A.   I believe that Chris Day
18 lacked experience in the food industry
19 and basically didn't understand it and
20 was leading a company that is food
21 specific and he didn't understand a lot
22 of the issues.
23     Q.   My question was Chris Day may

Page 235

1  have interpreted actions or statements by
2  the Orthodox Union as being
3  discriminatory and you interpreted them
4  in a different way; correct?
5          MR. NELMS:  Object to the
6  form.
7      A.   I don't know what Chris Day
8  thought.
9      Q.   And you don't know what he was
10 thinking when he wrote this e-mail;
11 correct?
12     A.   I assume he was thinking what
13 he wrote.
14     Q.   Anything else about the
15 Orthodox Union issue as it relates to
16 your claim of race discrimination?
17     A.   No.
18     Q.   Do you know if Chris Day sent
19 similar e-mails to other employees?
20     A.   I don't.
21     Q.   You were also telling me you
22 believe you were discriminated against or
23 treated differently because of your race

Page 236

1  because of an e-mail that Henry Hicks
2  sent regarding, quote, key management
3  decisions?
4      A.   Yes, to PepsiCo.
5      Q.   To who?
6      A.   PepsiCo.
7      Q.   Who at PepsiCo?
8      A.   I believe it was April
9  Blackmore.
10     Q.   Tell me what you can recall
11 about that e-mail.
12     A.   What I recall was that he
13 communicated to her that their intention
14 was to put African-Americans in key
15 management positions.
16     Q.   Anything else you can recall?
17     A.   No.
18     Q.   Did you reply to the e-mail?
19     A.   I don't remember replying to
20 it, no. I was copied on it. It wasn't
21 an e-mail addressed to me. It was an
22 e-mail I was copied on.
23     Q.   Was the whole point of the

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 237 to 240)

Page 237

1 e-mail to communicate an intention to put
2 African-Americans in key management
3 positions?
4     A.   I don't remember if it was the
5 whole point. It was one of the key
6 points. I don't remember if it was the
7 entire e-mail.
8         (Whereupon, Defendant's
9         Exhibit 8 was marked
10         for identification.)
11     Q.   I have just handed you what is
12 going to be marked as Defendant's Exhibit
13 8 to your deposition. Have you seen this
14 document before?
15     A.   I believe so.
16     Q.   Is this the e-mail that you
17 are referring to that Henry Hicks sent to
18 the PepsiCo person? And take your time
19 if you need to read it.
20     A.   Yeah, I do need to read it.
21 (Examining document.)
22     Q.   Is Defendant's Exhibit 8 the
23 e-mail that you're referring to that

Page 238

1 Henry Hicks sent?
2     A.   I believe so.
3     Q.   At the top of Defendant's
4 Exhibit 8 it says "Attachment A. Note
5 the underlined sentences that refer to
6 our claim of discrimination." Did you
7 type that up?
8     A.   I did not.
9     Q.   If you turn to the third page,
10 you will see some underlining?
11     A.   Yes.
12     Q.   Did you underline that?
13     A.   I did not.
14     Q.   And this is an e-mail from
15 Henry Hicks summarizing a call that he
16 had with April Blackmore at PepsiCo;
17 correct?
18     A.   Yes.
19     Q.   And the majority of it is
20 action items and business related topics
21 about production?
22     A.   Yes.
23     Q.   And the underlined section on

Page 239

1 the third page of Defendant's Exhibit 8
2 says "we discussed our desire to recruit
3 talented minorities in operating roles
4 within the company."
5     A.   Yes.
6     Q.   It doesn't say they are trying
7 to -- there's no reference to, quote,
8 unquote, key positions; correct?
9     A.   Operating roles are key
10 positions.
11     Q.   There's no reference to,
12 quote, unquote, key positions?
13     A.   Not that it's quoted. But in
14 my mind an operating role is a key
15 position.
16     Q.   What was your interpretation
17 of the phrase "operating roles"?
18     A.   People that manage the
19 business.
20     Q.   That's how you interpreted
21 "operating roles"?
22     A.   Have you seen the demographics
23 on Piknik?

Page 240

1     Q.   Is that how you interpreted
2 "operating roles"?
3     A.   Yes. If you look at the
4 demographics of Piknik's employees when
5 Onyx was in charge, there are
6 African-Americans at the very top of
7 Onyx. There were African-Americans at
8 the supervisor levels and below. There
9 were very few African-Americans at the
10 manager, director and vice president
11 level.
12     So if you're going "to recruit
13 talented minorities in operating roles,"
14 the only thing they could be referring to
15 is the management, director levels
16 because those are the only levels that
17 weren't mostly minority employees.
18     Q.   Do you know if there were
19 openings around this time?
20     A.   There weren't yet.
21     Q.   You're unaware of any
22 openings?
23     A.   At that time.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 241 to 244)

Page 241

1    Q.   Are you aware that PepsiCo had
2  a policy in place to do business with
3  minority- and with women-owned
4  businesses?
5    A.   I knew that they had an
6  incentive to.
7    Q.   Have you ever looked at
8  Pepsi's website?
9    A.   I have.
10   Q.   Have you looked at their
11 diversity program that is explained on
12 their website?
13   A.   It's been a while, but I have.
14   Q.   Would you agree there is no
15 reference in this e-mail about replacing
16 your position with a minority?
17   A.   It doesn't mention me
18 specifically, no.
19   Q.   It's your belief that this
20 e-mail was motivated by an anti-Caucasian
21 sentiment on behalf of Henry Hicks?
22   A.   No.  I believe it was
23 motivated by the agenda of Onyx to put

Page 242

1  minorities in key operating positions.
2    Q.   What, if anything, did you do
3  with this e-mail after you received it?
4    A.   I don't recall doing anything
5  with it.
6    Q.   Did you forward it to anyone?
7    A.   Who would I have forwarded it
8  to?  They copied all the key people.
9    Q.   So the answer is no?
10   A.   I don't remember.
11   Q.   And you didn't reply to Mr.
12 Hicks?
13   A.   I don't remember.  I may have
14 said congratulations on a great meeting.
15 That would not have been unusual, but I
16 don't recall.
17   Q.   How did this e-mail affect
18 your employment?
19   A.   I believe it partially led to
20 my termination.
21   Q.   How did this e-mail partially
22 lead to your termination?
23   A.   Because they were going to

Page 243

1  recruit minorities in operating roles,
2  and I had an operating role.
3    Q.   Any other way in which you
4  feel this e-mail impacted your
5  employment?
6    A.   No.
7    Q.   After Onyx came on board was
8  anyone hired in what you considered to be
9  key operating roles?
10   A.   I don't think I understand
11 your question.  We hired people -- as I
12 told you before, it's just a process of
13 the manufacturing business.  We would
14 lose a position, and we would hire
15 people.
16   Q.   Are there specific positions
17 that you, in your mind, consider to be
18 key operating roles?
19   A.   Yes.
20   Q.   Identify those positions for
21 me, please.
22   A.   Managers and directors.
23   Q.   In the time that -- or after

Page 244

1  Onyx took control of Piknik were any
2  managers hired?
3    A.   Yes.
4    Q.   Who?
5    A.   Mavis Richardson.
6    Q.   And we have talked about Mavis
7  Richardson who was hired as quality
8  assurance?
9    A.   Yes.
10   Q.   And I guess Allen Walters?
11   A.   Yes, Allen Walters.
12   Q.   Who else?
13   A.   Peg -- I forgot her last name.
14 Whitney.  Peg Whitney was hired as an R&D
15 manager of Brundidge.  I felt like that
16 was a key role.  Annissia Hanyard was
17 hired at Day Street.  That was a key
18 role.  Anthony Barber, Letitia
19 Strowbridge.
20   Q.   Any other managers?
21   A.   There was a gentleman hired to
22 run Alatex.
23   Q.   What was his name?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 245 to 248)

Page 245

1     A.    I forgot.
2     Q.    Was Carl Bleier hired?
3     A.    He was.  I believe he was
4  hired as a consultant, though.  It was
5  not my impression that Carl was an
6  employee of Piknik.  It was my impression
7  that he was a consultant because he did
8  not live in Alabama.  He lived in
9  Georgia.
10    Q.    Did Carl Bleier have a Piknik
11 e-mail account?
12    A.    I believe he did.
13    Q.    Anyone else that was hired as
14 a manager?
15    A.    I don't recall anyone else.
16    Q.    What about directors, any
17 directors hired after Onyx took control
18 of Piknik?
19    A.    Not anybody with the title of
20 director that I'm aware of.  Anthony
21 Barber was over the directors, but I
22 believe his title -- I don't know what
23 his title was.  General manager maybe.  I

Page 246

1  don't remember.
2     Q.    Was Anthony Barber a Piknik
3  employee or was he a consultant?
4     A.    I believe he was a Piknik
5  employee.
6     Q.    And we've already established
7  that Mavis -- Richards?
8     A.    Richardson.
9     Q.    Is African-American?
10    A.    Yes.
11    Q.    And Allen Walters is
12 Caucasian?
13    A.    Yes.
14    Q.    What about Peg Whitney?
15    A.    Caucasian.
16    Q.    Annissia Hanyard?
17    A.    Yes, African-American.
18    Q.    Anthony Barber?
19    A.    African-American.
20    Q.    Letitia Strowbridge?
21    A.    African-American.
22    Q.    What was her position?
23    A.    She was the Director of

Page 247

1  Quality Assurance at In Zone, and she --
2  Henry hired her.  And I'm not sure what
3  her title was.  She did work for Henry.
4  She worked out of our facility, but she
5  did things for Henry.
6     Q.    Are you aware that she was
7  eventually terminated?
8     A.    No.  But the general
9  impression was there was a personal
10 relationship between her and Henry
11 because they were seen outside of work
12 together quite a bit.
13    Q.    Is that just rumor?
14    A.    Yes.
15    Q.    But you don't know one way or
16 another if she was terminated from
17 Piknik?
18    A.    She wasn't terminated from
19 Piknik.  At some point she went on to
20 work for Onyx.  She was very excited.
21 She was being put in the Onyx
22 organization to do something I believe in
23 Chicago, and she was very excited about

Page 248

1  it.  And that's the last time I ever
2  talked to her.
3           MR. NELMS:  Jennifer, she's
4  got her kids with a baby-sitter and needs
5  to check on them.
6           (Whereupon, a break was taken
7           from 3:53 p.m. to 4:02 p.m.)
8           (whereupon, Defendant's
9           Exhibit 9 was marked
10          for identification.)
11    Q.    (BY MS. MCGAHEY:)  I'm handing
12 you a document that we're going to mark
13 as Defendant's Exhibit 9 to your
14 deposition.
15          MS. MCGAHEY:  Andy, it's
16 Defendant's Exhibit 7 to Bob Winter's
17 deposition.
18    Q.    Do you recall receiving this
19 e-mail?
20    A.    Let's see.  (Examining
21 document.)  Vaguely.  I remember these
22 events happening more than I remember
23 this piece of paper.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 249 to 252)

Page 249

1    Q.    If you look to the
2  second-to-last paragraph --
3    A.    Yes.
4    Q.    -- it says "we are eliminating
5  the positions of Bob Gross and Letitia
6  Strowbridge."
7    A.    Yes.
8    Q.    Does that refresh your
9  recollection as to whether or not she was
10  let go?
11    A.    No, because she told me that
12  she was moving into the Onyx organization
13  to do work with them.
14    Q.    So you disagree with what's
15  going to be marked as Defendant's Exhibit
16  9 to your deposition?
17    A.    I don't necessarily disagree
18  with it, but my recollection is -- they
19  may have eliminated her position, but to
20  me that doesn't mean she was terminated
21  if they offered her a better, more
22  exciting position in Onyx, which is what
23  she told me they did.

Page 250

1    Q.    Do you know if Bob Gross was
2  offered a better and more exciting
3  position with Onyx?
4    A.    No, he was not.
5    Q.    You're positive about that?
6    A.    I'm positive.
7    Q.    Do you know if Clarice Crosby
8  was offered a better and more exciting
9  job with Onyx?
10    A.    My impression was that, no,
11  she was not.
12    Q.    Carl Bleier, what is his race?
13    A.    He was Caucasian.  But my
14  impression of Carl was not that -- the
15  reason I say I don't believe he was a
16  Piknik employee is because he didn't have
17  his house for sale.  He didn't leave
18  South Georgia, and, you know, he was just
19  there during the week.
20    Q.    But he had a Piknik e-mail
21  address?
22    A.    He did.
23    Q.    So based on the e-mail that

Page 251

1  will be marked as Defendant's Exhibit 8
2  to your deposition that we were
3  discussing earlier, it is your belief
4  that that e-mail evidences or indicates
5  that you were going to be let go because
6  of your race?
7    A.    I believe that it's an
8  indication that their intention was to
9  put African-Americans in key operating
10  positions, and I believe that my position
11  was a key operating position
12    Q.    I want to talk about this Bob
13  Gross incident now.  Why don't you tell
14  me about that, please.
15    A.    Bob Gross was a salesman in
16  the condiments division.  He had been
17  with Piknik for, my impression, was a
18  while.
19    Q.    Was he there before you got
20  there?
21    A.    He was.  I don't know how
22  long.  He and Ricky were close.  Bob, to
23  me, was a used car salesman type

Page 252

1  personality.  You know, not very
2  polished, sort of good old boy, kind of,
3  you know, I'll take you out drinking if
4  you buy mayonnaise from me kind of guy.
5    (Off-the-record discussion.)
6    A.    You understand the stereotype.
7  At any rate, Bob, he would do things --
8  he was the type of person that he didn't
9  care what the rules and regulations were,
10  you know, just get it done, come on and
11  let's go drink a beer together kind of
12  guy.
13    Henry Hicks had responsibility
14  for sales in the condiment division, and
15  basically for a period of time he
16  couldn't do his job without Bob.  Bob
17  knew all the customers.  Many of them
18  liked him very much, and so Henry needed
19  Bob.  Bob had some personnel problems
20  that were pretty darn serious that I was
21  not aware of.
22    MR. NELMS:  Personnel
23  problems?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 253 to 256)

Page 253

1    A.   Yes, personnel, as in he was
2  doing things within the company that were
3  real bad.  And I'll get to that in a
4  minute.  The reason I got involved is
5  Kari, this research and development
6  manager that I hired.  Bob would at times
7  work closely with my research and
8  development manager.
9        I hired Kari to put systems in
10 place for the research and development
11 department because it was a big red ink
12 department.  It was not making money.  It
13 was not doing well, not producing new
14 product, and it needed some controls put
15 in place.
16       Kari started organizing the
17 department, doing a really good job.  And
18 one day Bob got frustrated with her, and
19 he cussed her out.  He just flat cussed
20 her out, and it upset her tremendously.
21    Q.   Did you observe this?
22    A.   I did not observe it, but it
23 was generally regarded as having

Page 254

1  happened.  Kari filed a complaint with
2  human resources.  Human resources went to
3  Henry Hicks, and Bob Gross was
4  disciplined.
5        I was aware of Bob's
6  discipline because Kari was my employee
7  and it upset her very much the way she
8  was treated, and she talked to me about
9  it.  I spoke with Henry, and Henry said
10 that Bob was given a five-day suspension
11 without pay as his discipline for cussing
12 out an R&D manager that was following
13 procedures.
14       I was working in the facility
15 the week that Bob Gross was suspended
16 without pay.  I was working in the
17 quality assurance lab.  And they started
18 paging someone over the phone, Bob
19 Gross -- you have a call on line such and
20 such from Bob Gross, you have a phone
21 call on such and such line from Bob
22 Gross.  And I thought, he's suspended
23 this week, why is he calling into the

Page 255

1  plant.
2        So I called Henry.  I said,
3  Henry, I just wanted to make you aware
4  that Bob Gross is calling the plant this
5  week, the week that you said he was
6  suspended.  Henry told me that, yeah, he
7  had told Bob it was not a good idea that
8  he work this week, but if he really
9  wanted to work he couldn't stop him.
10       I said, Henry, I think that is
11 wrong.  I think that sends a mixed
12 message to an employee you're trying to
13 discipline.  Henry said, yeah, I think
14 you're probably right, but I need Bob and
15 I need the sales, and, you know, I'm
16 going to just kind of turn a blind eye to
17 it.  Well, that bothered me, but I left
18 it alone.
19       A couple of weeks later Bill
20 McLennan asked me and the other executive
21 team members to go to Brundidge and do a
22 presentation about the direction we were
23 taking Piknik.  Part of what I had to do

Page 256

1  that day was stand up in front of
2  management from Day Street, management
3  from corporate and management from
4  Brundidge and talk about the thirteen
5  quality systems I had developed and my
6  vision for Piknik.
7        Bob Gross was standing in the
8  back of the room making faces at me the
9  whole time, which I did not understand.
10 He then proceeded to go out in the hall
11 and call me names that you don't call
12 women in business, that you don't call
13 people in business.  And Henry Hicks and
14 Brenda Sellers sat there and let him do
15 it to everybody, verbally, loudly.
16       I didn't know about that at
17 the time.  I drove home that evening.  I
18 called Brenda Sellers, and I said,
19 Brenda, Bob Gross was particularly
20 confrontational with me today and I don't
21 understand what's going on.  And she
22 said, well, he's getting ready to sue
23 you.  I said, sue me for what, what have

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 257 to 260)

Page 257

1  I done to Bob Gross.
2         She said, well, there's a
3  rumor going around about his suspension
4  and why he is suspended and what
5  happened, and he thinks you started the
6  rumor. And I said, well, I'm requesting
7  that a thorough research be done on that
8  because I haven't spoken -- I don't know
9  why Bob was suspended completely and I
10  haven't spoken about it to anyone.
11         So I spoke with Henry Hicks
12  and I spoke with Brenda. They pulled me
13  into an office. They pulled me into Bob
14  Cantley's office, the safety office. And
15  they said, Shannon, you need to know that
16  Bob Gross is in a lot of trouble, really
17  really bad trouble that goes far beyond
18  what happened with cussing out your R&D
19  manager. I said, I don't want to know
20  about it. All I need to know is how is
21  this going to affect me that he's about
22  to sue me, what has this got to do with
23  me.

Page 258

1         Long story short, Bob Gross
2  had been caught with child pornography on
3  his computer, and Henry and Brenda had
4  spoken about it in the company, and
5  that's how the rumor got out. I didn't
6  breathe a word about it to anybody. They
7  did.
8         I requested a meeting to be
9  held. I talked to my supervisor, Bill
10  McLennan. I told him I was uncomfortable
11  working with Bob Gross, who was about to
12  sue me for something I had not done. I
13  requested a thorough investigation, and I
14  wanted it to go on record that I had done
15  nothing wrong.
16         Bill told me that if I didn't
17  play along -- no, Henry. I'm sorry.
18  Henry told me in a meeting between the
19  two of us, Shannon, you better let this
20  one go or you may not have a job. Henry,
21  you work in sales, are you threatening my
22  job? Do you have responsibility for my
23  job? Shannon, I'm telling you you better

Page 259

1  let this one alone or you're not going to
2  have a job.
3         I talked to Brenda Sellers
4  about it. I talked to Bill McLennan
5  about it, and I sent an e-mail to Jeff
6  Larry about it. Jeff Larry would not
7  respond to me. Bill McLennan told me to
8  leave it alone.
9         So when you're insinuating
10  that I did something wrong with my
11  computer and you showed me that document,
12  Bob Gross did child pornography on
13  company computers and he was not
14  terminated for it. And I don't know what
15  could be worse than that.
16         When I requested a meeting
17  between Henry Hicks, Brenda Sellers and
18  Bob Gross I tape recorded that meeting
19  for my own protection. And during the
20  course of that meeting Bob Gross realized
21  that I had not spoken a word about him
22  and that I had not done any harm to him
23  and that it had come from Brenda and

Page 260

1  Henry. And then he dropped it.
2     Q.   Anything else?
3     A.   I think it was horribly
4  mishandled. It was a horribly mismanaged
5  situation, and it caused me a great deal
6  of stress and a lot of lost sleep at a
7  time where I needed to be 150 percent
8  focused on my job. And I was extremely
9  disappointed that the people above me at
10  Piknik and Onyx didn't support me. That
11  was crushing to me after what I did done
12  for the company.
13     Q.   Anything else?
14     A.   That's all.
15     Q.   We're going to have to take
16  that bit by bit as well. That's a lot of
17  information you just gave me. Bob Gross
18  was in sales in the condiment division?
19     A.   Yes.
20     Q.   He had some kind of verbal
21  disagreement with Kari, the R&D manager?
22     A.   Yes.
23     Q.   You were not present for that

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 261 to 264)

Page 261

1  verbal disagreement; correct?
2      A.   Correct.
3      Q.   You heard about it after the
4  fact?
5      A.   Yes.
6      Q.   Who told you about it?
7      A.   Brenda Sellers and Kari and
8  Henry Hicks.  I don't remember which
9  order it was in.
10     Q.   So it was not the three of
11  them together?
12     A.   No.  I called Kari.  Either
13  Brenda or Henry Hicks contacted me to
14  tell me what happened, and they suggested
15  I call Kari because she was very upset.
16  She ended up resigning her position and
17  moving back to Ohio over the situation.
18  But I called her to talk to her.
19     Q.   So it first comes to your
20  attention not from Kari?
21     A.   Correct.  Kari went to Brenda
22  Sellers first.  She went to the human
23  resource manager.  Brenda would go to

Page 262

1  Brundidge one day a week and handle human
2  resources issues in that facility because
3  it's an hour away.  So I'm sure Kari
4  would have spoken to her on a day that
5  Brenda was there.
6      Q.   You don't have specific
7  knowledge about that, though?
8      A.   No, I don't have specific
9  knowledge.
10     Q.   You believe that Kari went to
11  Brenda Sellers and told her about the
12  incident with Bob Gross?
13     A.   Yes.
14     Q.   And Brenda Sellers then
15  contacts you?
16     A.   Brenda contacted me and so did
17  Henry Hicks.  I don't remember --
18     Q.   The same call?
19     A.   No, I don't believe so.  And I
20  don't remember what order it was in.  But
21  they both felt obligated to make me aware
22  that it had happened to my direct report.
23     Q.   How long after the incident

Page 263

1  occurred were you contacted by Brenda or
2  Henry?
3      A.   I would say within a day or
4  two, but I don't recall.
5      Q.   What did Brenda tell you?
6      A.   I don't remember.  I do
7  remember one of the things she told me
8  was I needed to talk to Kari because she
9  was very upset.  I feel confident she
10  would have told me that they were going
11  to handle it, handle the situation with
12  Bob.
13     Q.   But you have no specific
14  recollection of Brenda saying that?
15     A.   No.
16     Q.   You just feel that that would
17  have happened?
18     A.   Right.  Either she or Henry
19  said that.
20     Q.   What did Henry Hicks tell you
21  when he contacted you about the incident?
22     A.   I can't remember that he said
23  anything than what Brenda said, that the

Page 264

1  incident had occurred, that Kari was very
2  upset, that I needed to talk to her and
3  that Bob was going to be disciplined and
4  that I didn't need to be worried about
5  it.
6      Q.   Did Brenda or Henry go into
7  the details of what had occurred?
8      A.   I don't recall that they did.
9      Q.   So after you speak with Brenda
10  and Henry is the next thing you do is to
11  call Kari?
12     A.   Yes.
13     Q.   Or talk with Kari?
14     A.   Shortly thereafter I would
15  have, yes.
16     Q.   Was it in person or over the
17  phone?
18     A.   It would have been over the
19  phone.
20     Q.   So you spoke with Kari over
21  the phone about the Bob Gross incident?
22     A.   Yes.  And I told her that they
23  had assured me that he would be

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 265 to 268)

Page 265

1 disciplined over the incident.
2     Q.    Did Kari tell you what
3 happened?
4     A.    She did, but I don't recall
5 what it was.
6     Q.    You just recall generally that
7 there was some cussing involved?
8     A.    Yes.
9     Q.    And that Kari was upset about
10 it?
11    A.    Yes.
12    Q.    Do you recall what you said to
13 Kari?
14    A.    I don't. Well, I do recall
15 that I communicated to her I had been
16 told that Bob Gross would be disciplined
17 and that it would not -- it should not
18 happen again. I told her she did the
19 right thing by standing by our
20 procedures.
21    Q.    What procedures are you
22 talking about?
23    A.    The reason Bob was cussing out

Page 266

1 Kari is he wanted her to go around some
2 procedures. I don't remember what the
3 procedures were, but he wanted her to go
4 outside some procedures on behalf of
5 himself or one of his customers.
6     Q.    Is that something Kari told
7 you?
8     A.    Yes.
9     Q.    During your initial call with
10 her?
11    A.    Yes.
12    Q.    So you have this phone call
13 with Kari. And you communicated to her
14 that Bob Gross was going to be
15 disciplined?
16    A.    I told her that it had been
17 communicated to me that Bob Gross would
18 be disciplined.
19    Q.    Anything else you can recall
20 from that conversation?
21    A.    No.
22    Q.    And Bob Gross was disciplined?
23    A.    He was.

Page 267

1     Q.    He was suspended for five days
2 without pay?
3     A.    Yes.
4     Q.    Were you informed of the
5 precise discipline that was going to be
6 issued to Bob Gross?
7     A.    I knew that he was suspended
8 for five days. I don't recall being told
9 the pay issue because that would have
10 been none of my business.
11    Q.    Who told you that Bob Gross
12 was going to be disciplined for five
13 days?
14    A.    Henry Hicks.
15    Q.    Was that over the phone?
16    A.    I don't recall if it was over
17 the phone or in person.
18    Q.    Do you recall anything else
19 about that conversation in which you
20 learned that Bob Gross was going to be
21 disciplined by being suspended for five
22 days?
23    A.    No, I don't recall anything

Page 268

1 else.
2     Q.    The next thing that occurs is
3 that you're working one day and you start
4 hearing some pages for Bob Gross?
5     A.    I heard pages that Bob Gross
6 was calling someone.
7     Q.    Do you recall who he was
8 having paged?
9     A.    I don't.
10    Q.    And do you know why he was
11 having someone paged?
12    A.    To talk to them. That's all I
13 assume.
14    Q.    And you don't know what they
15 were going to talk about?
16    A.    No, absolutely not.
17    Q.    So you hear the pages that Bob
18 Gross was calling someone?
19    A.    Somebody in the plant. You
20 know, it wasn't like a human resource
21 person. It would have been a plant type
22 person.
23    Q.    So you call Henry Hicks

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 269 to 272)

Page 269

1  immediately?
2      A.    I did because I felt like Bob
3  was being insubordinate to Henry's
4  discipline.
5      Q.    But you didn't know if Bob
6  Gross was calling about something work
7  related or maybe inviting somebody to go
8  to lunch for all you knew?
9      A.    No, I didn't.  But I felt like
10  his supervisor -- if I had been in
11  Henry's position and I had suspended an
12  employee and they are calling into the
13  plant, I would want to know.
14      Q.    So you take it upon yourself
15  to call Henry Hicks to let him know?
16      A.    Yes.
17      Q.    And you told him that Bob
18  Gross was calling the plant?
19      A.    Yes.
20      Q.    And Henry Hicks says that he
21  couldn't stop him from doing that.  Tell
22  me about that conversation.  I kind of
23  lost you there.

Page 270

1      A.    Well, what Henry said was
2  that, yeah, I know Bob's suspended, but I
3  told him that if he wanted to work I
4  couldn't stop him.  That was not at all
5  the response that I thought Henry would
6  have given me.  I was anticipating Henry
7  possibly saying maybe it's a personal
8  call or possibly saying, oh, I'm not
9  aware, he's not supposed to be working
10  this week.  But instead Henry said, I
11  told the guy I couldn't stop him from
12  working if he wanted to.  And I thought
13  that was a mixed message.
14      Q.    And Henry Hicks was Bob Gross'
15  boss?
16      A.    Yes.
17      Q.    Bob Gross didn't report to
18  you?
19      A.    No.
20      Q.    Did you tell Henry Hicks you
21  didn't think it was a good idea and that
22  it was sending a mixed message?
23      A.    Yes.

Page 271

1      Q.    What, if anything, did Henry
2  Hicks say?
3      A.    He agreed with me.
4      Q.    Anything else during that
5  conversation that you can recall?
6      A.    Uh-uh.
7      Q.    Is that a no?
8      A.    No.
9      Q.    Next thing you know it's a
10  couple of weeks later and you're going to
11  Brundidge?
12      A.    Yes.
13      Q.    And you're going to give a
14  presentation in front of the Brundidge
15  facility and the Day Street facility
16  management?
17      A.    Yes, management and some
18  supervisor level people at Brundidge.
19  Bill McLennan was there, Brenda Sellers.
20      Q.    And this was a presentation
21  regarding the thirteen point system that
22  you had developed?
23      A.    Yes.  Well, what was happening

Page 272

1  is Bill McLennan had not been with Piknik
2  long, and he wanted to make -- we talked
3  about this earlier.  Brundidge had kind
4  of been set off aside as a completely
5  different company.  Bill wanted to make
6  it one Piknik, one company.  And part of
7  that is he felt like the people with
8  executive presence in Montgomery should
9  have the same executive presence at
10  Brundidge.  I mean, it's a company of
11  less than a thousand employees.  We're
12  not Coca-Cola.  It's a small company.
13      So, at any rate, this was, you
14  know, kind of a roll-out day.  It was a
15  big, exciting day.  We were all going to
16  Brundidge, and we were going to support
17  them and move them into, you know, the
18  new processes, and we were going to help
19  that business grow, and we were going to
20  give them support they had never had
21  before.  So from a management standpoint
22  it was an exciting day.
23      And my part in the process was

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 273 to 276)

Page 273

1  to present the thirteen quality systems I
2  had developed and show them this is the
3  direction we're going to go with quality
4  assurance in Brundidge.
5      Q.    This was a meeting that
6  occurred on October 13, 2004?
7      A.    Yes.
8      Q.    You said Bill McLennan was
9  there?
10     A.    Yes.
11     Q.    Brenda Sellers was there?
12     A.    Yes.
13     Q.    You said Henry Hicks was
14  there?
15     A.    Yes.
16     Q.    Bob Gross was there?
17     A.    Yes.
18     Q.    Chris Day?
19     A.    No.
20     Q.    Jeff Larry?
21     A.    No.
22     Q.    Anthony Barber?
23     A.    No, Anthony wasn't hired yet.

Page 274

1      Q.    And so you start making your
2  presentation?
3      A.    Yes.
4      Q.    And Bob Gross is making faces
5  at you?
6      A.    Yes.
7      Q.    What kind of faces?
8      A.    Snickers at me in the back of
9  the room. Or I would make statements and
10  he would, you know, (indicating), faces,
11  smart-alecky faces.
12     Q.    Kind of wrinkle up his face?
13     A.    Yes. He rolled his eyes
14  several times. At the end of the
15  presentation he said something ugly about
16  Auburn, because everyone was aware that I
17  was an Auburn fan and Bob was an Alabama
18  fan. And, you know, he made some kind of
19  ugly snide comment about Auburn.
20     Q.    That couldn't have been the
21  first time you heard something snide
22  about Auburn from an Alabama fan?
23     A.    No, it's not. But in context

Page 275

1  with the meeting -- first of all, it was
2  inappropriate. And, second of all, with
3  all the other faces he had been making,
4  it kind of made me say what's going on
5  with this guy.
6      Q.    Did you ask him to stop?
7      A.    No. I just kept doing what I
8  was focused on. I thought maybe he was
9  having a problem with something else. At
10  the time I had no idea he had a problem
11  with me.
12     Q.    And he leaves the room?
13     A.    Well, the meeting adjourned.
14  It's a room about this size, and
15  everybody kind of moves outside. I
16  stayed inside because I had a smaller
17  meeting with myself and one or two other
18  people afterwards. So I stayed back, and
19  people went out in the hall. And that's
20  when he started calling me some really
21  horrible things.
22     Q.    What was he calling you?
23     A.    I didn't hear. I was just

Page 276

1  told by some men that they would not like
2  to repeat it, that they were really bad
3  words.
4      Q.    Who told you?
5      A.    Bob Winter, Jerry MacCartney,
6  Bert Mayer, Brenda Sellers and Henry
7  Hicks.
8      Q.    All of them told you?
9      A.    Yes. All of them heard it,
10  and all of them told me.
11     Q.    Did they tell you collectively
12  as a group or one by one?
13     A.    One by -- well, what happened
14  is nobody told me anything right then. I
15  left that day, and I called Brenda
16  Sellers on the phone. We all left for
17  the day going home. It's an hour drive,
18  and I'm thinking on the drive, you know,
19  something's going on with Bob, he's
20  acting really strange. And it was more
21  strange towards me than anybody else, so
22  I called Brenda --
23     Q.    Based on the faces he was

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 277 to 280)

Page 277

1    making at you?
2        A.    Yeah.  And then after the
3    meeting he came back in and interrupted
4    my little meeting and said some things
5    that were pretty aggressive.  I don't
6    remember what they are.  They were
7    business related.  But it was a red flag
8    that made me realize this guy's got --
9    he's real unhappy with me for some
10   reason.
11           So I called Brenda Sellers,
12   and I said, Brenda, I got the impression
13   today that Bob has a problem with me,
14   what do you think I should do.  And she
15   said, oh, he's got a huge problem with
16   you.  I said, what's going on, I don't
17   understand.  And that's when she told me
18   that he felt like I had talked about the
19   problems he was having in the company.  I
20   said, I don't know what his problems are.
21   But that's when she explained to me that
22   he was getting ready to file a lawsuit
23   against me.

Page 278

1        Q.    Did she say what the basis of
2    his lawsuit was going to be?
3        A.    Yes, that I had talked about
4    his discipline within the company.
5        Q.    What else did Brenda say
6    during that phone call as you're driving
7    back from Brundidge?
8        A.    Well, she assured me they
9    would look into it.  She assured me that
10   the company would protect me and she
11   wanted me to come talk to her about it.
12       Q.    In terms of the allegations
13   that Bob Gross was going to file a
14   lawsuit against you?
15       A.    Yes.
16       Q.    So she didn't tell you during
17   that phone call that he had been calling
18   you names?
19       A.    No, she did not.  But in
20   subsequent days -- people would say,
21   what's wrong with Bob Gross towards you,
22   and I would say, I have no idea.  Well,
23   he was saying some pretty ugly things

Page 279

1    about you.
2        Q.    So you don't hear about the
3    fact -- or you don't hear from anyone
4    that day, which is October 13, 2004, that
5    Bob Gross had been saying something about
6    you?
7        A.    I don't recall hearing it that
8    day, no.
9        Q.    But you find out subsequently?
10       A.    Yes.
11       Q.    From Bob Winter?
12       A.    Yes.
13       Q.    And from Jerry MacCartney?
14       A.    Yes.
15       Q.    And from Bert Mayer?
16       A.    Yes.
17       Q.    Brenda Sellers eventually
18   tells you?
19       A.    Yes.
20       Q.    And Henry Hicks?
21       A.    Yes.  Now, Bert, Jerry and Bob
22   didn't tell me for quite a while, and the
23   reason -- I don't know why they didn't

Page 280

1    tell me.  But I didn't talk to them about
2    it because I was told not to discuss it
3    with anybody, and I didn't.
4        Q.    You were told not to discuss
5    what with anybody?
6        A.    The situation -- the conflict
7    between Bob Gross and myself.
8        Q.    This is before you hear that
9    he has making some -- calling you names?
10       A.    Right.
11       Q.    But at some point you learn
12   that he's calling you names?
13       A.    Right.  At some point I
14   learned that.
15       Q.    At some point you speak with
16   Henry Hicks and Brenda Sellers in Bob
17   Cantley's office?
18       A.    Yes.
19       Q.    By the time of that meeting
20   had you found out or heard that Bob Gross
21   had been calling you names?
22       A.    I don't recall.  You know, the
23   name calling didn't bother me so much as

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 281 to 284)

Page 281

1  the fact that Brenda and Henry knew that
2  he was calling me names, and Brenda,
3  especially as the human resource manager,
4  let him do it knowing that these issues
5  were on the table.
6      Q.   How do you know that she
7  didn't ask him to stop?
8      A.   I asked her.
9      Q.   And she said no?
10     A.   Right.
11     Q.   Tell me about the conversation
12 you had with Brenda Sellers when y'all
13 are discussing the name calling.
14     A.   Well, I asked her if it
15 happened, and she said yes. I asked her
16 if she heard it, and she said she did.
17 And I said, Brenda, why didn't you pull
18 him out of there right there and, Brenda,
19 why didn't you discipline him or do
20 something, why did you allow that to
21 happen. And she said, well, he just
22 quit, he just stopped. And people
23 weren't really paying attention to him,

Page 282

1  so she just said she didn't want to make
2  a big thing with it because he was so
3  volatile at that time. He was an
4  employee that was very volatile, and they
5  didn't want to rock the boat with him.
6      Q.   Anything else you can recall
7  from your discussion with Brenda Sellers
8  about that?
9      A.   No.
10     Q.   Tell me about your discussion
11 with Henry Hicks.
12     A.   I don't recall it being any
13 different than Brenda. You know, Henry
14 explained why Bob -- he felt like Bob was
15 upset with me. He needed Bob at that
16 time, and, you know, he disciplined him,
17 but he still needed him to do his job.
18 And I said, well, why didn't y'all stop
19 him. He didn't want to make a big scene;
20 you know, Bob rattles off at the mouth
21 and nobody really listens to Bob.
22     Q.   Again, you didn't hear Bob --
23     A.   No, I didn't hear him.

Page 283

1      Q.   So you speak with Henry Hicks
2  and Brenda Sellers in Bob Cantley's
3  office?
4      A.   Yes.
5      Q.   Who is Bob Cantley?
6      A.   Bob Cantley was the safety
7  director. He was not in my office.
8  But, you know, we've got one of those
9  hallways, and it was one of those deals
10 where they pulled me in there and closed
11 the door kind of thing.
12     Q.   And tell me what was said
13 during that discussion. What did you
14 say, what did Henry say, what did Brenda
15 say?
16     A.   Well, all I remember about
17 that discussion is that they both
18 indicated that Bob Gross was in a whole
19 lot more trouble than the situation
20 involving me. And I said I don't want to
21 know about it.
22     Q.   Situation involving you?
23     A.   Yeah, you know, that he was

Page 284

1  going to sue me. There was a whole lot
2  more to the story than him cussing out
3  Kari. There was a lot of situations
4  involving him that didn't involve me or
5  my department. And I said, well, I don't
6  want to know about that. And they said,
7  well, it's real bad. I don't want to
8  know about that. I just want to know
9  that I'm protected. And Brenda assured
10 me the company was going to protect me
11 and that they were working on it.
12     Q.   Was there any discussion on
13 what was meant by the fact that the
14 company was going to protect you?
15     A.   Well, Brenda just said I would
16 be represented by the company if it came
17 down to a lawsuit because she did an
18 independent research and found that I
19 hadn't said anything to anybody.
20     Q.   So by the time you have this
21 meeting with Henry Hicks and Brenda
22 Sellers in Bob Cantley's office there has
23 already been an investigation?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 285 to 288)

Page 285

1    A.    Yes.
2    Q.    Of whether or not you had told
3  people in the office or in the plant
4  about his five days of suspension?
5    A.    Correct.
6    Q.    Did Brenda Sellers -- do you
7  know what that investigation entailed?
8    A.    I do.  She interviewed a
9  number of different people and asked if
10  they were aware of what was going on with
11  Bob Gross, and she asked whether or not I
12  had talked to them about it.
13    Q.    Did Brenda Sellers follow up
14  with you about her investigation?
15    A.    She did.
16    Q.    What did she say?
17    A.    She said that I had not talked
18  to anybody.  She found I had not said
19  anything and that I had not done anything
20  wrong.
21    Q.    Did she say she had found out
22  who had said something, if any person
23  had?

Page 286

1    A.    No.  Well, at some point it
2  came out -- and I don't remember the
3  details -- that Bob Gross had told Ricky
4  Loeb what had happened, and that Henry
5  Hicks and Brenda Sellers had told some
6  people what had happened.
7    Q.    You didn't hear Henry Hicks
8  tell anybody what had happened; correct?
9    A.    Gosh, no.  No.
10    Q.    And you didn't hear Brenda
11  Sellers telling folks what had happened?
12    A.    No.  But there's plenty of
13  folks that would testify that Brenda
14  Sellers and Henry Hicks told them
15  directly what had happened.
16    Q.    And when you're referring to
17  what had happened, are you referring
18  to --
19    A.    Child pornography.
20    Q.    Who would be willing to
21  testify that they heard the news from
22  Brenda Sellers or Henry Hicks?
23    A.    Jimmy Whitehead, Bob Winter,

Page 287

1  Bert Mayer.
2    Q.    Jerry MacCartney?
3    A.    I don't know.
4    Q.    Anyone else?
5    A.    Not that I'm aware.  Probably
6  Ricky Loeb.  I don't know, but my
7  understanding is he heard it from Bob
8  Gross.
9    Q.    So you have, again, this
10  meeting with Henry Hicks and Brenda
11  Sellers in Bob Cantley's office.  Besides
12  what you have already told me, can you
13  recall anything else that was said during
14  that discussion?
15    A.    No.
16    Q.    What is the next thing you can
17  recall happening after that meeting in
18  Bob Cantley's office?
19    A.    Chronologically I don't
20  remember.  I know that Henry and I had a
21  conversation about it, and he told me I
22  needed to drop it or somebody wasn't
23  going to work there.  And I said you mean

Page 288

1  somebody like me, and he said possibly.
2  And I said, you've got the authority to
3  do that?  He said you just need to know
4  that if you don't drop this, somebody is
5  not going to work here.
6    Q.    Did you complain to Brenda
7  Sellers about that?
8    A.    Sure.
9    Q.    What did you tell her?
10    A.    I don't remember.  I talked to
11  Brenda and Henry, you know, thoroughly
12  and openly during the process.
13    Q.    I'm talking about did you say
14  anything to Brenda about Henry Hicks
15  saying to you that somebody was going
16  to --
17    A.    Not work here?  I don't know.
18  I may have, but I don't recall that
19  specific conversation.  It was an
20  extremely stressful time for me.  It was
21  very stressful.  I had a very aggressive
22  agenda.  I had a new boss.  I had a new
23  manufacturing facility and a new

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON McGLON
August 15, 2007

(Pages 289 to 292)

Page 289

1  department to run, and I didn't need that
2  as a distraction.
3      Q.   After you talk with Henry
4  Hicks and he tells you you better let it
5  go or you may not have a job, or words to
6  that effect, what is the next thing you
7  can recall happening with regard to this
8  issue?
9      A.   I feel confident I talked to
10  Bill McLennan who told me I was going to
11  have to work with Bob Gross, that I
12  didn't have a choice if I wanted to
13  continue working there.  I remember
14  sending an e-mail to Jeff Larry as to
15  what was going on because, you know, he
16  had encouraged us to communicate with
17  him, and I felt like, you know, this was
18  a pretty rough spot for me.  And that's
19  all I recall.  Bill wanted Bob Gross and
20  Henry and Brenda and I to all get
21  together and talk, which we eventually
22  did.  And after that Bob was fine towards
23  me.

Page 290

1      Q.   So there came a point in time
2  where Bob Gross was fine towards you; is
3  that what you said?
4      A.   Yes.  That was my feeling.
5      Q.   And you didn't have any
6  further problems with Bob Gross?
7      A.   No.
8      Q.   Is that correct?
9      A.   I don't believe I did.  You
10  know, we maintained a professional
11  relationship, but not more than we had
12  to.
13      Q.   What were you wanting to see
14  happen?
15      A.   I felt like he was an employee
16  that was completely out of line, and I
17  felt like they should have disciplined
18  him like they would have disciplined
19  anybody else.  I felt like he was
20  protected because Henry needed him.  I
21  felt it was very unfair that he was
22  allowed in front of my peers and
23  subordinates and superiors to say the

Page 291

1  things he did about me without any
2  consequences whatsoever.
3      Q.   But you don't know what he
4  said?
5      A.   I was told what he said.
6      Q.   I thought you told me earlier
7  that nobody would tell you what they
8  said?
9      A.   They didn't want to say the
10  words, just like I don't want to say some
11  bad words.
12      Q.   Well, I ask that you tell me
13  what was said or what you heard that Bob
14  Gross said?
15      A.   Well, I heard that he called
16  me a bitch.
17      Q.   Anything else?
18      A.   That's the only word that I
19  remember, an F'ing bitch.
20      Q.   And you don't believe that Bob
21  Gross was disciplined?
22      A.   He wasn't disciplined for
23  that.

Page 292

1      Q.   How do you know?  Did you ask
2  him?
3      A.   I didn't ask him.  I asked
4  Brenda and Henry.
5      Q.   And they said he wasn't going
6  to be disciplined?
7      A.   Correct.
8      Q.   Did they say why?
9      A.   There was a whole bunch of
10  issues surrounding Bob Gross and they
11  were having to tread very carefully, and
12  there were a whole lot bigger issues than
13  that.
14      Q.   Do you know what the bigger
15  issues were?
16      A.   Later I found out it was child
17  pornography.  So when you show me your
18  internet policy, that's why I laugh.  I
19  think it's laughable because you can look
20  at stuff like that and not be terminated,
21  but --
22      Q.   What is Bob Gross' race?
23      A.   He's white.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON McGLON
August 15, 2007

(Pages 293 to 296)

Page 293

1    Q.    Did you ever see child
2    pornography on Bob Gross' computer?
3    A.    No.
4    Q.    So what you were wanting to
5    see happen was that Bob Gross receive
6    some sort of discipline for calling you
7    names?
8    A.    Potentially, yes.
9    Q.    But at some point everything
10   was smoothed over between you and Bob
11   Gross in your mind?
12   A.    In my mind it was. And I was
13   pretty much told that I had to work with
14   him or I wasn't going to have a job.
15   Q.    And Bob Gross never sued you?
16   A.    No, he did not.
17        (Whereupon, Defendant's
18        Exhibit 10 was marked
19        for identification.)
20   Q.    I am going to hand you what I
21   have marked as Defendant's Exhibit 10 to
22   your deposition. And it's a length
23   document, so if you need to take the time

Page 294

1    to read it, by all means, take the time.
2    Just let me know after you have read.
3    A.    (Examining document.) Okay.
4    Q.    Have you had a chance to read
5    Defendant's Exhibit 10?
6    A.    I didn't read the whole thing
7    but I looked at it enough to familiarize
8    myself with it.
9    Q.    Did you prepare this document?
10   A.    I did.
11   Q.    And this is a memo that you
12   sent to Jeff Larry and Bill McLennan?
13   A.    Yes.
14   Q.    Summarizing the events
15   regarding the Bob Gross incident?
16   A.    Yes.
17   Q.    First paragraph you say that
18   you were "made aware that Robert Gross
19   was making accusations (later determined
20   to be false) concerning myself on October
21   14, 2004."
22   A.    Okay.
23   Q.    You were made aware of the

Page 295

1    accusations on October 14, 2004?
2    A.    Yes.
3    Q.    And the accusations that
4    you're referring to are that you had told
5    people at Piknik about his five-day
6    suspension?
7    A.    Yes.
8    Q.    And you were made aware of
9    that by Brenda Sellers?
10   A.    Yes.
11   Q.    You go on to say "this was a
12   result of his strong verbal language to
13   me directly and about me to many
14   individuals at a company meeting on
15   October 13, 2004."
16   A.    Yes.
17   Q.    What are you referring to when
18   you say "his strong verbal language to me
19   directly"?
20   A.    This document explains it.
21   Q.    Well, if you could just
22   verbalize it to me, please. What strong
23   verbal language was he using at you

Page 296

1    directly?
2    A.    I don't recall what he said.
3    But, as it says here, I was having a
4    meeting between Henry Hicks, Peg Whitney
5    and myself. "He interrupted the meeting
6    to add his input and became upset with me
7    when I attempted to explain the position
8    of the product development department."
9    And he aggressively said "that if we made
10   requirements on submitting work into the
11   department, he would just make sure all
12   the requirements were met on paper to get
13   his work in."
14   Q.    So you're just reading from
15   the third paragraph of this document?
16   A.    I am, because I wrote this
17   when the memory was much fresher than it
18   is now.
19   Q.    You said he made some strong,
20   verbal personal attacks against you to
21   folks in Brundidge. And you have already
22   told me about what you know about those
23   strong, verbal personal attacks?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 297 to 300)

Page 297

1     A.   Yes.
2     Q.   You say that he made attacks
3  towards you in two meetings that same
4  day.  Have you already told me about --
5     A.   Yes.
6     Q.   -- the attacks he made on you
7  in the two meetings that same day?
8     A.   Yes.
9     Q.   You say that he insulted your
10 husband several times?
11    A.   Then he did, yes.
12    Q.   Do you recall what you believe
13 were insults, what was said?
14    A.   I don't recall.  My husband
15 had done some consulting work for the
16 Brundidge facility.  And some of the
17 research that came out of it was that
18 some of Bob Gross' accounts were costing
19 us more money in freight than the account
20 was bringing in income, and Bob didn't
21 like that.
22    Q.   You go on to say that he made
23 insulting remarks about Auburn, where you

Page 298

1  went to school?
2     A.   Yes.
3     Q.   And you've told me what you
4  can recall about that; correct?
5     A.   Yes.
6     Q.   "He had been told Brenda
7  Sellers and Bill McLennan were
8  researching his complaints against me."
9  How do you know what he had been told?
10    A.   They told me that.
11    Q.   Who is they?
12    A.   Brenda Sellers and Bill
13 McLennan.
14    Q.   "He proceeded to take matters
15 upon himself to make extreme personal
16 remarks against me at a time I was
17 charged with building a team to
18 dramatically change the culture of
19 Brundidge operations."  The extreme
20 personal remarks against you, you have
21 already told me about those remarks?
22    A.   Yes.
23    Q.   You say "nothing was done to

Page 299

1  advise him to control his actions other
2  than Brenda telling him to be quiet one
3  time."  So Brenda did ask him to stop
4  what he was doing?
5     A.   Evidently, yes.
6     Q.   "He left the room and began in
7  another with an additional audience."  Is
8  that when he walks out of the meeting?
9     A.   Yes, that would be when he
10 walked out of the meeting and said the
11 things that he said.
12    Q.   Says "he later became inflamed
13 against me during a meeting between Henry
14 Hicks, Peg Whitney and myself."  Is that
15 some other meeting?  Is that when he came
16 back in?
17    A.   Yes, that's when he came back
18 in.
19    Q.   And you told me what happened
20 to the best of your recollection?
21    A.   Right.
22    Q.   It goes on to say that he
23 interrupted, and you've already read that

Page 300

1  part?
2     A.   Right.
3     Q.   In the fifth paragraph you say
4  "Brenda Sellers and Henry Hicks have both
5  made comments to me that if this is not
6  resolved 'someone won't be working
7  here.'"  And you interpreted the someone
8  who wouldn't be working there to be you?
9     A.   Well, I asked.  I said do mean
10 me, and the answer was possibly.
11    Q.   But you didn't write it in
12 your memo?  You didn't write that part in
13 your memo, did you?
14    A.   No.
15    Q.   Is there a reason why you
16 didn't write that in the memo?
17    A.   I wrote a whole bunch of other
18 stuff.  I probably didn't -- you know,
19 this is a lot to write.
20    Q.   You were trying to be
21 thorough?
22    A.   Right, I was.  And I just
23 maybe left that out for whatever reason.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 301 to 304)

Page 301

1    Not intentionally is what I mean.
2    Q.   You said Mr. Gross accused you
3    of telling people in Brundidge that he
4    was disciplined for pornographic
5    activity?
6    A.   I guess that's what he was
7    accusing me of, yes.
8    Q.   Okay.  So it's not that he was
9    alleging that you had told other
10   employees about his five-day suspension?
11   A.   I don't remember sitting here
12   right now on, you know, August the
13   whatever this is.  I don't remember.  But
14   this document was accurate for what
15   occurred.  I'm in quality assurance.  I
16   do things accurately.  I try to, to the
17   best of my ability.  Today I didn't
18   remember that I knew about the
19   pornography at that time, but evidently I
20   did.
21   Q.   You mentioned that you were
22   counseled by Brenda Sellers around
23   November 15th.  What is that about?

Page 302

1    A.   Well, I had been in Brundidge
2    for employee appreciation day, and Bob
3    Gross was paging me over the -- or having
4    the receptionist come get me.  And Bill
5    McLennan had asked me and some others to
6    go to employee appreciation day and
7    participate because he wanted to show the
8    Brundidge employees that the people who
9    worked in Montgomery cared about them and
10   were involved.
11       So I was serving food to the
12   hourly employees, you know, at this
13   banquet that we did every year.  And the
14   receptionist comes out and says, Bob
15   Gross has to talk to you, and he's got to
16   talk to you right now.  And I looked at
17   Bill.  I said, Bill, Bob Gross is on the
18   phone for me.  And he says, you're not to
19   leave the employee appreciation day.  And
20   I told the receptionist, tell him I'll
21   call him back when this is over.
22       Well, Bob Gross calls Brenda
23   Sellers and says, I'm calling down to

Page 303

1    Brundidge to talk to Shannon and she
2    won't talk to me.  So Brenda called
3    me -- I guess it was a few days later.
4    Brenda called me into her office to say,
5    why aren't you talking to Bob Gross.  She
6    didn't have all the facts.
7    Q.   So you explained it to her?
8    A.   I explained it to her, yes.
9    Q.   Now, at this time you still
10   had the belief that Bob Gross was going
11   to sue you?
12   A.   Yes, that had not been
13   resolved at that point.  And I was still,
14   even on that day, uncomfortable talking
15   to him, but I did call him back.
16   Q.   Were you wanting Piknik
17   somehow to talk him out of suing you?
18   A.   Well, I didn't think I needed
19   to be sued.  I hadn't done anything
20   wrong.
21   Q.   I mean, were you expecting
22   Piknik to remedy that situation?
23   A.   I expected Piknik to handle it

Page 304

1    professionally in a human resource
2    capacity.
3    Q.   In terms of disciplining him?
4    A.   In terms of disciplining him,
5    and I felt like he needed to act like a
6    professional and treat me like a
7    professional because I hadn't done
8    anything wrong.  And the situation went
9    on and on and on.
10       It appeared to me that there
11   was a huge double standard in the
12   company, that certain people could
13   grossly neglect their conduct in business
14   and abuse other people and not be held
15   accountable.
16       And then at a later date, not
17   that much later, I was terminated for
18   some reason about my computer that I
19   don't know what it was about.  And this
20   guy is doing pornography.  I mean, what
21   kind of double standard is that.
22       I didn't want Bob Gross in the
23   future threatening myself or threatening

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 305 to 308)

Page 305

1  my employees or jeopardizing some of the
2  things we were trying to do in the
3  facility. The facility was not operating
4  under all the FDA regulations. There
5  were some extreme liabilities within this
6  facility. And some of the things that we
7  were putting in place were to protect the
8  company. And someone like Bob Gross
9  could not continue to go around the
10  systems that we were putting in place
11  without jeopardizing the company.
12      So it wasn't so much that I
13  had this great expectation that the
14  company do something. But from
15  everything I had been told, Jeff Larry
16  and Chris Day and Henry Hicks were trying
17  to move the company into a day and age
18  where people didn't behave this way.
19      Q.   You go on to say that on
20  November 29, 2004 you learned from Brenda
21  Sellers that Henry Hicks was trying to
22  arrange a meeting with you, Bob Gross,
23  herself and Henry Hicks?

Page 306

1      A.   Okay.
2      Q.   You asked her what the meeting
3  was about, and Brenda tells you that she
4  would have to find out from Henry Hicks?
5      A.   Right.
6      Q.   And then it appears that you
7  had a conversation with Henry Hicks later
8  on?
9      A.   Uh-huh.
10      Q.   And he told you that the only
11  thing they were trying to do was to get
12  you and Bob Gross talking again?
13      A.   Yes.
14      Q.   And that Henry Hicks went on
15  to say that "someone would not work here
16  if it didn't get resolved, that being
17  probably Mr. Gross"?
18      A.   Yes.
19      Q.   That's what Mr. Hicks said?
20      A.   At that time that's what he
21  said.
22      Q.   The next paragraph you go on
23  to say you're uncomfortable doing a

Page 307

1  presentation before a sales group that
2  consisted of Bob Gross, Mr. Grey and Ms.
3  Oliver?
4      A.   Yes.
5      Q.   And you say that Ms. Oliver
6  used to work for Hooters. Or "Ms. Oliver
7  whom Henry tells us 'used to work for
8  Hooters.'"
9      A.   Yes. Henry would tell
10  everybody that Ms. Oliver is the one he
11  hired and she used to work for Hooters.
12      Q.   Did you hear him say that?
13      A.   Yes.
14      Q.   You asked for a letter of
15  apology from Bob Gross?
16      A.   Yes.
17      Q.   Addressed to you and to the
18  company?
19      A.   Yes.
20      Q.   Did you ever get a letter of
21  apology?
22      A.   No.
23      Q.   Do you know if the company

Page 308

1  ever got a letter of apology?
2      A.   No.
3      Q.   You asked for Bob Gross to
4  apologize to the people he insulted on
5  October 13, 2004 in Brundidge regarding
6  you?
7      A.   Yes.
8      Q.   And people that he insulted
9  were?
10      A.   It looks like he said it in
11  front of Mr. Grey, Bob Winter, Jerry
12  MacCartney, Bert Mayer, Brenda Sellers
13  and Henry Hicks.
14      Q.   And all of those folks told
15  you they were insulted by what had been
16  said?
17      A.   Yes. Well, I don't know if
18  Henry was insulted. Brenda agreed that
19  it was wrong. Henry agreed that it was
20  wrong. I don't know if they were
21  insulted.
22      Q.   And you asked for an agreement
23  that Bob Gross not contact you directly

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 309 to 312)

Page 309

1   other than through e-mail for the rest of
2   y'alls employment?
3       A.   Yes.
4       Q.   Was there ever such an
5   agreement?
6       A.   No.
7       Q.   Did y'all continue to
8   communicate verbally?
9       A.   Yes.
10      Q.   Was that a problem for you?
11      A.   It was a concern for me, yes.
12      Q.   You talk about, the very last
13  paragraph, a proposed meeting that is
14  scheduled for December 8, 2004?
15      A.   Yes.
16      Q.   Is that with respect to an
17  additional -- or the other quality
18  presentation before the sales group?
19      A.   No.  I requested a meeting
20  with Bill McLennan to talk about it, but
21  he never came.  He never showed up.
22      Q.   Well, who else was going to be
23  in the meeting on December 8th?

Page 310

1       A.   Oh, I'm sorry.  No.  Yeah,
2   that was Brenda Sellers, Henry Hicks, Bob
3   Gross and myself.
4       Q.   And Bill McLennan could not
5   attend that meeting?
6       A.   Right, he could not attend
7   that.  So I said in this that I was going
8   to tape record the meeting for my
9   protection.
10      Q.   Did you tape record the
11  meeting?
12      A.   I did.  I had a tape in the
13  middle of the table, and everyone agreed
14  that it was there and introduced
15  themselves on it.
16      Q.   Have you given that tape to
17  your lawyer?
18      A.   No.
19      Q.   What occurred during this
20  meeting?
21      A.   What I recall is that Bob
22  voiced his concerns and what he was upset
23  about.  He was either led to believe or

Page 311

1   believed that I had discussed the case
2   with him -- with other people about him.
3   And I explained to him my position and
4   that I had not.
5           He felt like I was trying to
6   harm him personally by not allowing him
7   to work that week.  And I explained to
8   him I did not suspend him.  I didn't even
9   decide on his suspension.  I was simply
10  notifying Henry that Bob was working on a
11  week that I knew he wasn't supposed to be
12  and that I would have expected Henry to
13  do the same thing if one of my
14  employees -- Bob explained to me why he
15  was working, that he made money off
16  commissions and that he wasn't going to
17  sit home and not make commissions that
18  week.  I told him that was none of my
19  business.
20          He wanted to know who I had
21  talked to.  And when he learned I had not
22  talked to anybody, really did not regard
23  the situation as that big of a deal --

Page 312

1   you know, he verbally attacked my
2   employee, and I told him that's where my
3   concern was, plus the fact that he kept
4   trying to go around the system that I was
5   trying to put in place to protect the
6   company.  So once he understood my
7   motivations, he didn't have any more
8   aggression towards me at all.
9       Q.   Anything else that you can
10  recall being said during that meeting?
11      A.   No, not at this point, no.
12      Q.   Did Henry Hicks say anything
13  that you can recall?
14      A.   He said something.  Brenda
15  said something.  I don't remember what it
16  was.
17      Q.   And was that the last of --
18  that meeting on December 8th, was that
19  the last of that issue?
20      A.   Pretty much.  And shortly
21  thereafter Bill McLennan left the
22  company, so there really wasn't much else
23  to say.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 313 to 316)

Page 313

1    Q.    And on the front of
2  Defendant's Exhibit 10 is that your
3  handwriting at the top?
4    A.    It is.
5    Q.    You said "this communication
6  never received even a peep of a response
7  from anyone"?
8    A.    Correct.  File X.
9    Q.    I'm sorry?
10    A.    It went into file X I'm
11  assuming.
12    Q.    Do you believe that there were
13  African-American employees who endured a
14  similar situation that you endured but
15  the situation was handled differently?
16    A.    I'm not aware of anybody else
17  enduring that.
18    Q.    Do you believe that the
19  situation was handled in such a way that
20  it was handled because of your race?
21    A.    Yes.
22    Q.    What makes you think that?
23    A.    Because I believe Henry and

Page 314

1  Brenda were sticking together to cover
2  themselves because they are the ones that
3  talked about it.
4    Q.    I'm sorry.  I don't follow how
5  that connects to your race?
6    A.    They are African-American and
7  I'm not.
8    Q.    So just the fact that they are
9  African-American makes you believe that
10  the way that the situation was handled
11  was racially motivated?
12    A.    I don't think if I had been an
13  African-American it would have been
14  handled that way.
15    Q.    What makes you think that?
16    A.    Because I think they would
17  have aggressively pursued Bob Gross
18  against talking bad about me.  And I
19  think because Bob Gross was white and I
20  was white, it wasn't a high concern of
21  theirs, and they didn't view it -- Henry
22  made concessions for Bob because he
23  needed him.

Page 315

1    Q.    What makes you believe that
2  because you are white and Bob Gross was
3  white that nothing more was done?
4    A.    I just do.  Because nothing
5  more was done.  Jeff Larry blew it off.
6  Bill McLennan blew it off.  This is a
7  company that was supposed to take the
8  high, moral, ethical road, and they
9  completely -- Jeff Larry, Brenda Sellers
10  and Henry Hicks pretty much brushed it
11  aside.
12    Q.    And you think this is because
13  you are Caucasian because that's just the
14  feeling that you had?
15    A.    Yes.  I might not have had
16  that feeling had not these other things
17  occurred.  Any one of these by
18  themselves, other than the pay decrease
19  and the termination, I wouldn't have
20  thought of as discrimination, any one of
21  them by themselves.  But when you add
22  them all up, to me it displays a pattern
23  that ended in my termination.

Page 316

1    Q.    You may have already answered
2  this.  Is Bill McLennan white?
3    A.    Yes.  Now, I will tell you
4  that I didn't feel racially discriminated
5  against at the time this occurred, but I
6  believe that this was an event that led
7  up to these others.
8    Q.    And you're pointing to
9  Defendant's Exhibit 10?
10    A.    I am.
11    Q.    You're saying that when the
12  issue regarding Bob Gross was going on
13  you didn't have a feeling at that time
14  that it was racially motivated?
15    A.    I didn't have a strong
16  feeling, no.
17    Q.    Well, did you have a feeling?
18    A.    Maybe a small one, not a big
19  enough one to make a deal about it.  I
20  had a question mark in my mind.  I'll say
21  that.
22    Q.    And it's your testimony that
23  the question mark was removed after

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 317 to 320)

Page 317

1   your -- once you were terminated?
2      A.   Yes.
3      Q.   Anything else regarding the
4   Bob Gross incident as it relates to your
5   claim of discrimination that you have not
6   already told me about?
7      A.   No.
8      Q.   Let's talk about the reduction
9   in your salary.
10        MR. NELMS:  Let's take a break
11   first.
12        (Whereupon, a break was taken
13        from 5:09 to 5:20 p.m.)
14      Q.   (BY MS. MCGAHEY:)  Ms. McGlon,
15   now I want to talk about an additional
16   reason in which you believe you were
17   discriminated against because of your
18   race in that it was your reduction in
19   salary?
20      A.   Yes.
21      Q.   Tell me about that.  How does
22   it come to your attention that your
23   salary is going to be reduced?

Page 318

1      A.   I was brought in to Brenda
2   Sellers' office with Anthony Barber.
3   They told me they had bad news, that the
4   company was having to reduce everyone's
5   salary.  And they handed me an envelope
6   of a memo from Chris Day, and they told
7   me the amount my salary would be reduced.
8        I asked them who came up with
9   that determination, and they said Chris
10   Day.  I asked if it was proportionate to
11   everyone else's.  They said everyone
12   else's was irrelevant to me and that they
13   didn't know how long it would last.  I
14   asked them when it would take effect, and
15   they said it took effect ten days ago.
16        And I said I'm going to
17   have -- and they wanted to know if I
18   would continue as an employee there, and
19   I told them that, you know, I really
20   needed to digest that and think about it,
21   that I had some questions for them and
22   could I meet with Anthony to talk to him
23   about it.  And he said, yes, the

Page 319

1   following Tuesday, which was the day they
2   terminated me.  So Anthony and I had a 10
3   o'clock meeting on Tuesday, June 28th,
4   that we set at that discussion.
5      Q.   Okay.  So you are brought in
6   to Brenda Sellers' office?
7      A.   Yes.
8      Q.   Was Anthony Barber already
9   there?
10      A.   Yes.
11      Q.   Did Brenda give you advance
12   notice of this meeting, or was it spur of
13   the moment?
14      A.   Spur of the moment.
15      Q.   What time of day was it?
16      A.   I believe it was toward the
17   end of the day.
18      Q.   Do you recall what day it was?
19      A.   I think it was June 22nd or
20   June 21st.  It was just a few days before
21   they took my laptop.  It all sort of
22   happened right together.
23      Q.   So Brenda comes to your office

Page 320

1   and tells you -- asks you to come to her
2   office for a meeting?
3      A.   I don't remember.  I think she
4   probably just called me on the phone and
5   said, Shannon, I need to talk to you.
6   And I didn't think anything about it.
7   She talked to me about a lot of things.
8      Q.   She didn't give you any
9   indication during that initial contact
10   what the meeting was going to be about?
11      A.   No.
12      Q.   And tell me as best you can
13   recall how the meeting progressed, who
14   said what, what you said.
15      A.   I don't really remember.  I
16   mean, I pretty much told you everything I
17   remember.  I believe Anthony probably
18   gave some sad talk about, you know, the
19   company is doing badly and, you know,
20   everybody is hurting and -- I made a joke
21   in that meeting.  I walked in and I said,
22   uh-oh, is this when y'all let me go.  And
23   Anthony laughed.  He said, absolutely

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON McGLON
August 15, 2007

(Pages 321 to 324)

Page 321

1    not, you're on my team, I need you,
2    nobody is letting you go. And I said,
3    well, this isn't good, is it? And one of
4    them said, no, this is not good.
5        Q.   And one of them said that
6    there was some bad news to be delivered?
7        A.   Yes.
8        Q.   And that they were having to
9    reduce your salary?
10       A.   Yes.
11       Q.   Did they say how much your
12   salary was going to be reduced by?
13       A.   They didn't give me a
14   percentage. They gave me a dollar
15   amount.
16       Q.   What was the dollar amount?
17       A.   I don't recall. I do know it
18   was a 40 percent reduction. So that's
19   roughly a thirty-five thousand dollar
20   reduction.
21       Q.   What was your salary at that
22   time?
23       A.   Eighty-five thousand.

Page 322

1        Q.   And it was a 40 percent --
2        A.   I believe they took it down to
3    fifty thousand.
4        Q..  And Anthony Barber handed you
5    an envelope?
6        A.   Yes. There was a memo from
7    Chris Day.
8        Q.   Did you open it during that
9    meeting?
10       A.   I don't recall if I did or
11   not.
12       Q.   And you asked -- my notes are
13   unclear. You asked whether everyone was
14   being -- their salaries were being
15   reduced?
16       A.   I asked if my reduction was
17   proportionate to everyone else's, because
18   whether it was a verbal or written I
19   acknowledged that my reduction was quite
20   a bit. And in my mind I was thinking of
21   my employees, not of myself. I was
22   thinking how in the world are my
23   employees going to live with that type of

Page 323

1    reduction. And I said is mine
2    proportionate to everyone else, and they
3    said -- I don't remember what they said,
4    but they basically said they weren't
5    going to discuss anyone else with me.
6    That was the long and short of it, that
7    everyone was taking a hit.
8        Q.   So you were told they were not
9    going to discuss other people's salaries
10   with you?
11       A.   At that point they weren't.
12   You know, I left the meeting with the
13   understanding that they were having the
14   meeting with me to address mine, and not
15   other people's. And that's one of the
16   reasons I wanted to think about it
17   because that didn't make sense to me.
18   Being a leader in the company a lot of
19   people trusted me. A lot of people had
20   devoted a lot of their hard work for me,
21   and a lot of people didn't trust what was
22   going on, and they didn't trust the
23   leadership of the company at that point.

Page 324

1        Q.   And you asked who made the
2    decision to reduce your salary?
3        A.   Yes.
4        Q.   And you were told that it was
5    Chris Day who made the decision?
6        A.   Yes.
7        Q.   Did they offer any other
8    explanation for your salary reduction?
9        A.   No.
10       Q.   Besides what you've told me?
11       A.   None. I asked how long it
12   would be and would we be compensated if
13   we stayed through the difficult times,
14   and they couldn't promise a compensation,
15   but they hoped it would be restored
16   within a period of time. And I believe
17   the period of time they mentioned was
18   congruent with this document that we
19   looked at earlier, the talking points
20   document.
21       Q.   Which is Defendant's
22   Exhibit --
23       A.   This one says 4.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 325 to 328)

Page 325

1    Q.    4, okay.
2    A.    And in this document it said
3  something about full resolution will take
4  place in the next forty-five to ninety
5  days.  So there was some indication that
6  we were going to go through up to a
7  ninety-day very uncomfortable process,
8  and I felt like my pay reduction was part
9  of that process.  So in my mind I
10 thought, okay, we're all going to suffer
11 for about ninety days.  It did not make
12 sense to me because at the end of ninety
13 days we would be at the end of beverage
14 season, and I didn't see any financial
15 relief in sight.  So it didn't gel what
16 they were saying, but that's how they
17 explained it.
18   Q.    Did you understand from that
19 talking points document as well that they
20 were looking for someone to buy the
21 company as well at that time?
22   A.    No.  No, I don't recall seeing
23 that in that document.  I can look at it.

Page 326

1  But Onyx was the one that had just bought
2  the company.
3    Q.    Two years prior?
4    A.    Yes.
5    Q.    But you just don't recall one
6  way or the other if the idea of finding a
7  new investor or company to purchase
8  Piknik was discussed?
9    A.    I don't remember purchase.
10 I'm sure they were looking for investors.
11 I don't doubt that a bit.
12   Q.    And so you -- they indicated
13 to you that they didn't know how long the
14 salary reduction was going to be put in
15 place?
16   A.    Correct.
17   Q.    And you said that you had some
18 questions for them?
19   A.    I said I'm sure that I would
20 have some questions.  I wanted to think
21 about it.  I, of course, wanted to
22 discuss it with my husband because it was
23 going to affect our family significantly.

Page 327

1        As a working mother you have a
2  certain cost associated with going to
3  work that is higher than a female that
4  works that doesn't have children.  There
5  is a higher cost associated with that.
6  And it cost me a certain amount just to
7  walk out the door every day.  So I needed
8  to discuss that with my husband.
9        So I told Anthony I would like
10 to talk to him again about it.  And he
11 was having to deliver this news to a
12 whole bunch of people that day.  So, you
13 know, there wasn't any point in us
14 sitting there and talking for hours.
15 There wasn't much to say.  So I asked him
16 if I could talk to my husband or go home
17 and think about it, or however I phrased
18 it, and could we meet again.  He said
19 yes.  And he wanted to know if I was
20 committed.  And we set up a meeting for
21 10 o'clock the following Tuesday.
22   Q.    Did Anthony Barber seem upset
23 to have to deliver that bad news to you?

Page 328

1    A.    He did.
2    Q.    You said Anthony Barber had to
3  deliver that same message to several
4  folks.  Do you know who else he had to
5  give that message too?
6    A.    I would assume it was his
7  direct reports.  I don't recall at this
8  time who all his direct reports were, but
9  that would be -- that would be sensible.
10   Q.    And you said that you had made
11 a joke when you came into the meeting
12 about whether this was the time that you
13 were going to be let go or something
14 along those lines?
15   A.    Yes.
16   Q.    And Anthony Barber said,
17 absolutely not, you're on the team,
18 nobody was letting you go, or words to
19 that effect?
20   A.    Right.
21   Q.    Do you have reason to believe
22 that Anthony Barber was lying to you at
23 that time?

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON McGLON
August 15, 2007

(Pages 329 to 332)

Page 329

1    A.    No. I don't think Anthony
2    Barber did -- Anthony Barber didn't make
3    the decision to terminate me. Chris Day
4    did.
5         (Whereupon, Defendant's
6         Exhibit 11 was marked
7         for identification.)
8    Q.    I'm going to hand you what has
9    been marked as Defendant's Exhibit 11 to
10   your deposition. Have you seen this
11   document before?
12   A.    Yes, this is what I was
13   handed.
14   Q.    In the envelope during the
15   meeting in which you learned that your
16   salary was going to be reduced?
17   A.    Yes.
18   Q.    And it says "Shannon, I regret
19   that the current circumstances at Piknik
20   necessitate imposing salary reduction."
21   Did you know what was meant by the
22   current circumstances at Piknik? Did you
23   have an understanding what that meant?

Page 330

1    A.    My understanding came from
2    this talking points document, that they
3    were having these issues.
4    Q.    The talking points document
5    that is Defendant's Exhibit 4?
6    A.    Yes.
7    Q.    And they inform you your
8    salary is going to be fifty thousand
9    dollars per year until further notice?
10   A.    Yes.
11   Q.    The letter goes on to say "I'm
12   hopeful that we can emerge from this
13   bank-induced situation before too long
14   and increase pay rates again, but until
15   then we have to make painful choices to
16   keep the company operating." Do you know
17   what was meant by the bank-induced
18   situation?
19   A.    Well, Chris Day had the
20   perception that Wachovia was not friendly
21   to minority businesses and he felt like
22   the bank was being unreasonably stringent
23   on the fact that the company couldn't pay

Page 331

1    back the loan or whatever the financial
2    situation was of the bank. He had blamed
3    Wachovia taking over SouthTrust as the
4    demise of Piknik.
5    Q.    Did he have those discussions
6    with you?
7    A.    I don't recall a specific
8    intimate discussion about it. I recall
9    him saying those things. He may have
10   said them in this meeting or some similar
11   meeting. But that's the way he felt, and
12   he expressed it at some point.
13   Q.    And when you received this
14   letter that's Defendant's Exhibit 11
15   during the meeting with Anthony Barber
16   and Brenda Sellers, you're not told
17   you're going to be terminated; correct?
18   A.    I was told specifically I
19   wasn't going to be terminated.
20   Q.    Just your salary was being
21   reduced?
22   A.    Correct.
23   Q.    And it is your belief that

Page 332

1    your salary was reduced because of your
2    race?
3    A.    Yes.
4    Q.    And why do you believe it was
5    based because of your race -- based on
6    your race?
7    A.    Because I was in a key
8    management role, and their strategy was
9    to bring in minorities in key management
10   roles. And I believe my salary was
11   disproportionately reduced so that I
12   would leave and they could replace me
13   with a minority.
14   Q.    And is that belief based on
15   the e-mail that we talked about earlier
16   from Henry Hicks?
17   A.    Yes.
18   Q.    Which was I believe
19   Defendant's Exhibit 8 to your deposition?
20   A.    Yes. I believe they were
21   using this as an opportunity to run me
22   out the door.
23   Q.    Any other reason you believe

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON McGLON
August 15, 2007

(Pages 333 to 336)

Page 333

1 that your salary reduction was based on
2 your race?
3      A.   Because no -- to my knowledge
4 no one else at my level that was
5 African-American took a hit at the same
6 level I did.
7      Q.   And who would you consider to
8 be someone who was African-American at
9 your level?
10      A.   Anthony Barber, Henry Hicks,
11 Annissia Hanyard.
12      Q.   Anyone else?
13      A.   Annissia Hanyard.  And that's
14 all I can think of.
15      Q.   Anthony Barber, he was vice
16 president and general manager of the
17 beverages division?
18      A.   I believe so.
19      Q.   And he was your boss?
20      A.   Yes.
21      Q.   Do you know how much he was
22 making?
23      A.   I don't.

Page 334

1      Q.   Do you know if his salary was
2 cut at all?
3      A.   I don't.
4      Q.   And Henry Hicks was vice
5 president of sales and marketing?
6      A.   I believe so.
7      Q.   Do you know what Henry Hicks
8 was making, his salary?
9      A.   I have heard that it was over
10 three hundred thousand a year.  I got
11 that piece of information from the
12 bankruptcy hearing.  I don't recall what
13 the exact number was, but it was
14 significant.
15      Q.   Do you know if he had a
16 contract, an employment contract?
17      A.   I don't.
18      Q.   Do you know if that amount
19 included any bonus?
20      A.   I don't.
21      Q.   Do you know if his salary was
22 reduced in any way?
23      A.   It wasn't reduced 40 percent

Page 335

1 because he wouldn't have stuck around.  I
2 don't know what his percentage was, if
3 any.  There's a lot of ways to compensate
4 people.  You can --
5           MR. NELMS:  Just tell her what
6 you know.
7      A.   Okay.
8      Q.   Is Henry Hicks part of the
9 senior management team?
10      A.   Yes.
11      Q.   Remind me what Annissia
12 Hanyard's position was?
13      A.   She was the plant manager at
14 Day Street that replaced Bert.
15      Q.   Do you know what her salary
16 was?
17      A.   I don't know.
18      Q.   Do you know if her salary was
19 reduced?
20      A.   I don't.
21      Q.   But you have a general feeling
22 that those three individuals' salaries
23 were not reduced in the same kind of

Page 336

1 proportion as your salary was reduced?
2      A.   Correct.
3      Q.   Did you ever speak with anyone
4 about the reduction in your salary?
5      A.   Yes.
6      Q.   Who did you speak with about
7 that?
8      A.   My husband.
9      Q.   Anyone else?
10      A.   Yes, but I don't recall who.
11      Q.   Piknik employees?
12      A.   Probably.  Brenda Sellers for
13 sure.  Anthony Barber for sure.  This was
14 a time when the talking points document
15 came out.  They shut down a plant, and
16 then they reduced everyone's salary all
17 within a month.  People were talking
18 about everything.  People were panicking.
19 They were stressed out.  People like Bob
20 and myself and --
21      Q.   Bob Winter?
22      A.   Bob Winter, Brenda Sellers,
23 Eddie Crosby, we had been with the

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON McGLON
August 15, 2007

(Pages 337 to 340)

Page 337

1  company for a while, and people were
2  scared. They didn't understand what was
3  going on. It was very dramatic. And
4  they weren't getting a whole lot of
5  communication as to what was going on.
6  And so everybody was talking about
7  everything. You know, there was a lot of
8  people coming to us wanting direction
9  because they were used to coming to us
10  for direction. Of course, we couldn't
11  tell them anything. This is all we had
12  (indicating Defendant's Exhibit 4).
13      Q.  Did you tell Bob Winter that
14  your salary had been reduced to fifty
15  thousand?
16      A.  I would not have told Bob
17  Winter the amount of my salary. I would
18  not have discussed that with Bob. He may
19  have known what my salary was because at
20  one time he was intimate enough with the
21  financials that he probably could have
22  figured it out. But I would not have
23  told Bob Winer what my salary was.

Page 338

1      Q.  Did you talk with Jerry
2  MacCartney about the reduction in your
3  salary?
4      A.  No.
5      Q.  Did you talk with Bert Mayer
6  about the reduction in your salary?
7      A.  Bert was not there anymore.
8      Q.  Did you talk with him about
9  it, though?
10      A.  No.
11      Q.  Besides Anthony Barber and
12  Brenda Sellers, who else did you speak
13  with about the reduction in your salary?
14      A.  Other people came to me to
15  discuss their reductions in salary, so I
16  spoke to them about their reductions.
17      Q.  But not about yours?
18      A.  No.
19      Q.  Were you ever instructed not
20  to speak about your salary reduction with
21  employees?
22      A.  I don't recall that.
23      Q.  Just so that I'm clear, so far

Page 339

1  you have told me two reasons why you
2  think your salary reduction was based on
3  your race; correct?
4      A.  Uh-huh. Yes.
5      Q.  Number one is based on that
6  earlier February 2005 e-mail from Henry
7  Hicks that is Defendant's Exhibit 8 to
8  your deposition that you have told me
9  about; correct?
10      A.  Yes.
11      Q.  And the second reason is your
12  belief that Anthony Barber, Henry Hicks
13  and Annissia Hanyard were at your same
14  level but did not have their salaries
15  reduced in the same proportion as yours?
16      A.  Correct.
17      Q.  Any other reason you believe
18  it was based on your race?
19      A.  No.
20      Q.  Have you told me about --
21  strike that. Did you tape record your
22  meeting with Anthony Barber and Brenda
23  Sellers?

Page 340

1      A.  No.
2      Q.  Have you told me everything
3  about your claim that your salary
4  reduction was based on your race?
5      A.  Yes, everything I can recall.
6      Q.  Let's talk about your
7  termination.
8          MR. NELMS:  Can I have about
9  two minutes with my client because
10  there's going to be some attorney-client
11  privilege stuff come up?
12          MS. McGAHEY:  Certainly.
13          (Whereupon, a break was taken
14          from 5:43 to 5:46 p.m.)
15      Q.  (BY MS. McGAHEY:)  Ms. McGlon,
16  I want to talk about your termination,
17  and I understand there may be some
18  attorney-client privilege communications.
19  I am not entitled to know what you have
20  discussed with your lawyer.
21      A.  Okay.
22      Q.  So if you start telling me
23  something, I'm going to do my best to

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 341 to 344)

Page 341

1  stop you, and I know Andy will certainly
2  quash it as well.
3      A.   Okay.
4      Q.   Tell me about your
5  termination.  What is the first thing
6  that you can recall happening?
7      A.   Well, Brenda -- on Sunday, the
8  Sunday prior to them terminating me, I
9  went -- I was very upset over the weekend
10  based on Mike Osborne going in my office
11  and taking my laptop and the manner in
12  which he did it.  I was disappointed that
13  I couldn't talk to my boss about it.
14      So over the weekend I was a
15  little bit stressed out.  And on Sunday I
16  picked up a friend of mine that had just
17  had a baby and I took her to a church
18  event that Sunday morning.  The ladies in
19  my church group were having a retreat at
20  the lake.  So she and I drove up to the
21  lake together to go to bible study with
22  this group of women.
23      And, you know, we got there

Page 342

1  late, and they had all this food out, and
2  I ate some of the barbecue, and I got
3  sick.  Not like sick, sick, but sick
4  enough that I didn't really feel like
5  going in to work the next day.  Some of
6  it could have been nerves and stress from
7  what was going on and some of it was the
8  food.  But I was sick enough that I
9  couldn't go into work the next day.
10      I got a phone call from Brenda
11  Sellers that evening, and she wanted to
12  know if I was going to be in the work the
13  next day, and I told her I thought so.
14  And she said, well, you need to come
15  straight to my office.  And I said,
16  Brenda, is this when you terminate me.
17  And she said, you need to come straight
18  to my office and you need to be here at 8
19  o'clock.  And I told her that I wasn't
20  going to be there at 8 o'clock to be
21  terminated, that I would get up, and I
22  would get there when I got there.
23      And I told her that I wanted

Page 343

1  Anthony Barber to be present, that he was
2  my boss and I had some questions and I
3  thought it only fair that I talk to my
4  boss.  She said, okay, she would try to
5  have him there.  We had a meeting at 10
6  o'clock anyway, so he was planning on
7  meeting with me at 10.
8      I called Anthony at that
9  point, and he didn't answer the phone, so
10  I left a message:  Anthony, I understand I
11  have a meeting with Brenda in the morning
12  and I'm requesting that you be there.
13  And I didn't hear from him.  So on my way
14  into the office the next morning to be
15  terminated I called him again:  Anthony,
16  I know you're in town, I know you're
17  here, I'm requesting that you be there,
18  if nothing else as a professional to
19  professional I would like for you be
20  there.  And he wasn't.
21      Brenda was, and I tape
22  recorded her terminating me.  And I asked
23  her some questions that I felt were

Page 344

1  important for me to understand, and that
2  is what had I done wrong, and she told me
3  nothing.  Why was I being terminated?
4  She told me Chris Day told her to
5  terminate me.  I asked her if there was
6  anything negative about my employment in
7  my file.  She said no.  She handed me a
8  piece of paper that said I could get two
9  weeks' severance if I would sign it, and
10  I didn't.  We had never given two weeks'
11  severance as a company to someone that
12  had been there as long as I did.
13  Typically we gave two weeks for every
14  year served.
15      Then I told her I wanted to
16  get my things, and she said that she
17  would get some people to help me get my
18  things.  So some of the people I had
19  worked with went with me to my office and
20  I got what few things I had left in
21  there, and then I left.
22      Q.   Is that everything that you
23  can recall happening during that meeting?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 345 to 348)

Page 345

1    A.    That's it.
2    Q.    In that Monday --
3    A.    Yes, that's in a nutshell for
4  me.
5    Q.    Before this time had Piknik
6  been on the verge of filing bankruptcy?
7    A.    I don't know. I believe they
8  had in the past, yes, at other times.
9    Q.    While you were employed there?
10    A.    When I first was employed
11  there. Not after 2003.
12    Q.    And I think you answered this
13  already, but were you involved in any
14  discussions with SouthTrust
15  representatives about whether SouthTrust
16  was going to fund monies to be used for
17  severance packages?
18    A.    No.
19    Q.    So you get a call from Brenda
20  Sellers on Monday evening?
21    A.    Yes.
22    Q.    Would that have been June
23  27th?

Page 346

1    A.    Yes.
2    Q.    And she asked you to come
3  straight to her office the next day?
4    A.    Yes.
5    Q.    Well, she first asks you if
6  you're going to be at work on Tuesday?
7    A.    Yes.
8    Q.    And you tell her yes?
9    A.    Yes, I was planning on it,
10  yes.
11    Q.    And she asked you to come
12  straight to her office at 8 o'clock in
13  the morning?
14    A.    Yes.
15    Q.    And you asked if this is the
16  time that you're going to be terminated?
17    A.    Yes.
18    Q.    And Brenda just says come to
19  my office at 8 o'clock in the morning?
20    A.    Yes.
21    Q.    And you told her that you
22  weren't going to be at the office at 8
23  o'clock in the morning to be terminated?

Page 347

1    A.    Yes.
2    Q.    During that phone call did you
3  ask that Anthony Barber -- did you ask
4  Brenda Sellers to make sure that Anthony
5  Barber was present?
6    A.    Yes.
7    Q.    Did she say she would --
8    A.    Try.
9    Q.    So you arrived at work the
10  following Tuesday, which was June 28th?
11    A.    Yes.
12    Q.    And did you go straight to
13  Brenda Sellers' office?
14    A.    I did.
15    Q.    And Anthony Barber was not
16  there?
17    A.    Correct.
18    Q.    So you called him?
19    A.    I called him on my way into
20  the office, because I hadn't heard from
21  him, and told him that I was going into
22  the office to meet with Brenda Sellers,
23  that I felt like I knew what it was for

Page 348

1  and I would like for him to be there as a
2  professional.
3    Q.    Did you leave that on a
4  voicemail?
5    A.    Yes.
6    Q.    And he didn't call you back?
7    A.    No.
8    Q.    Did you call him again?
9    A.    I don't recall calling him
10  again because they would have taken my
11  cell phone.
12    Q.    So it was a company owned cell
13  phone?
14    A.    Yes.
15    Q.    Was Anthony Barber even in
16  town that day?
17    A.    He had a 10 o'clock meeting
18  scheduled with me.
19    Q.    So you had reason to believe
20  that he was planning on being in town
21  that day?
22    A.    Yes.
23    Q.    Is that a yes?

87

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 349 to 352)

Page 349

1    A.    Yes.
2    Q.    Now, between the time that you
3 received a call from Brenda Sellers on
4 Monday evening and the time that you go
5 into the office on Tuesday the 28th did
6 you talk to a lawyer?
7    A.    No.
8    Q.    Did you talk to Bob Winter?
9    A.    I don't recall talking to Bob
10 Winter.
11    Q.    Did you talk to Bert Mayer?
12    A.    No, I don't recall talking to
13 Bert.
14    Q.    Did you talk to Jerry
15 MacCartney?
16    A.    No, I don't recall talking to
17 Jerry. She called I want to say it was
18 like six on a Monday evening. I had
19 until the next morning. And I had not
20 been feeling well. I was too upset. I
21 didn't want to talk to anybody. I knew
22 what was coming. I knew what was going
23 to happen. I talked to my husband.

Page 350

1    Q.    What did you tell your
2 husband?
3    A.    I don't recall. But I was
4 very upset.
5    Q.    Do you recall what your
6 husband said, if anything?
7    A.    I'm sure he told me to be
8 strong and do the right thing. I was
9 very upset. I didn't sleep much that
10 night. We had two kids to take care of.
11 I don't talk on the phone much at all.
12 I've got two kids. I've got a pretty
13 busy life and a husband with our own
14 businesses. But I just remember being
15 very upset and not sleeping well.
16    Q.    And you made a decision to
17 bring a tape recorder into that meeting
18 with Brenda Sellers on Tuesday?
19    A.    Yes.
20    Q.    Was it hidden?
21    A.    Yes.
22    Q.    Where did you have it hidden?
23    A.    In my purse.

Page 351

1    Q.    And you didn't tell Brenda
2 Sellers that you were tape recording the
3 conversation?
4    A.    No.
5    Q.    And when you get into the
6 meeting with Brenda Sellers on that
7 Tuesday morning what did she say?
8    A.    I don't recall. I was very
9 upset.
10    Q.    But you recall that you asked
11 some questions?
12    A.    Yes, I recall a few questions
13 that I asked.
14    Q.    Had you formulated a list of
15 questions to ask?
16    A.    Yes.
17    Q.    Did you have it on a piece of
18 paper?
19    A.    I'm sure I did.
20    Q.    Do you still have that piece
21 of paper?
22    A.    I doubt it.
23    Q.    Did you take any notes during

Page 352

1 the termination meeting?
2    A.    I'm sure I did on that same
3 sheet of paper. I remember listing a
4 couple of questions I wanted to make sure
5 I asked, and I would have written down
6 her answers, because it was a stressful
7 and emotional time for me, and I wanted
8 make sure when my emotions settled down
9 that I could look at it objectively and
10 understand what had happened.
11    Q.    And you don't think you have
12 those notes?
13    A.    I don't think I do.
14    Q.    You asked what you had done
15 wrong?
16    A.    Correct.
17    Q.    And Ms. Sellers said nothing?
18    A.    Yes.
19    Q.    Not nothing, but she said that
20 she didn't know of anything you had done
21 wrong?
22    A.    Correct, she did not know of
23 anything I had done wrong.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 353 to 356)

Page 353

1    Q.    And you asked why you were
2  being terminated?
3    A.    Yes.
4    Q.    And she said she didn't know,
5  Chris Day just told her to do it?
6    A.    Correct.  She was told by
7  Chris Day that my services were no longer
8  needed.
9    Q.    And you asked if you had
10  anything negative in your personnel file?
11    A.    Right.
12    Q.    And she said there was nothing
13  negative in your personnel file?
14    A.    Correct.
15    Q.    And she handed you a piece of
16  paper with a two-week severance package
17  offer?
18    A.    Yes.
19    Q.    And did you take the piece of
20  paper?
21    A.    I did.  I told her I wanted to
22  look at it.  I asked her who would be
23  assuming my job duties, and she said -- I

Page 354

1  said, Brenda, you've got to be kidding
2  me, you know my job is important here,
3  and you understand what I do.  You can't
4  tell me that my services are no longer
5  needed at this company.  Of course, she
6  had no response to that.  I said, well,
7  who's going to be doing my job, and she
8  said Anthony Barber.
9    Q.    Do you still have that
10  document offering you a two-week
11  severance package?
12    A.    No, because I returned it to
13  her.  I came back to get my COBRA papers
14  or whatever I had to do in the process,
15  and I had some questions about it.  One
16  of the things it stated in there is that
17  if I signed it I agreed that I was
18  ineligible for rehire.  And I asked her
19  about that statement.  I said, Brenda,
20  you told me I had done nothing wrong.
21  You told me there was nothing in my
22  personnel file, so why does it say I'm
23  ineligible for rehire.  And she said, let

Page 355

1  me ask Chris Day about that.  So she
2  talked to Chris Day.  She redrafted the
3  document to say that I was eligible for
4  rehire.  I still did not sign it.
5    Q.    Do you have the revised
6  severance package offer?
7    A.    I'm not sure.
8    Q.    The conversation with Brenda
9  Sellers about the severance document, was
10  that over the phone or in person?
11    A.    I think it was over the phone.
12  I think I called her after she gave me
13  the document, and I asked her about it.
14  And it seems to me that I had to go back
15  to Piknik to turn in something.  I gave
16  her my keys that day.  But it seems like
17  I had like a cell phone charger or
18  something that I had to take back.  And I
19  believe that she gave me the revised
20  document at that time, and I believe that
21  there was something -- oh, she gave me I
22  think some COBRA papers.
23    Q.    Have you told me now

Page 356

1  everything that you can recall about the
2  conversation or the discussion that took
3  place during the termination meeting?
4    A.    Yes.
5    Q.    Have you told me everything
6  that you can recall about the
7  posttermination discussions you had with
8  Brenda Sellers?
9    A.    Yes.
10    Q.    After you left Piknik did you
11  talk with Chris Day at all about your
12  termination?
13    A.    No.
14    Q.    Did you talk with Anthony
15  Barber about your termination?
16    A.    No.  He wouldn't call me back.
17    Q.    Did you talk with Jeff Larry
18  about your termination?
19    A.    No.
20    Q.    Did you talk with Henry Hicks
21  about your termination?
22    A.    No.
23    Q.    You said that you had asked

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 357 to 360)

Page 357

1    Brenda Sellers who was going to be
2    assuming your job duties?
3        A.    Yes.
4        Q.    And she said Anthony Barber?
5        A.    Yes.
6        Q.    Do you know for a fact whether
7    Anthony Barber took on your job duties?
8        A.    No, I don't know that for a
9    fact. He couldn't do my job. I think it
10   would have been a stretch for him to
11   attempt it.
12       Q.    Do you know if your job duties
13   were divided amongst other quality
14   assurance employees?
15       A.    No, I do not. But if they
16   were -- there wasn't anybody qualified to
17   do my job duties.
18       Q.    And you believe that your
19   termination was motivated by your
20   Caucasian race; correct?
21       A.    Yes.
22       Q.    And tell me why you believe
23   that your termination was racially

Page 358

1    motivated?
2        A.    Because I believe Onyx had an
3    agenda to put minorities in key operating
4    positions. I believe that my position
5    was a key operating position, and I
6    believe they used the circumstances and
7    manipulated the circumstances to get rid
8    of me so that they could replace me with
9    a minority.
10       Q.    It's your contention that
11   Anthony Barber replaced you?
12       A.    That's what I was told when I
13   was terminated.
14       Q.    And you said that you believe
15   Onyx had an agenda to place
16   African-American -- or minorities in key
17   operating positions?
18       A.    Yes.
19       Q.    And that's based on
20   Defendant's Exhibit 8, which is the
21   e-mail from Henry Hicks?
22       A.    Yes, that's one of the things.
23   And I think that Chris Day's statement

Page 359

1    that we're an African-American company
2    and we're not going to be silent about it
3    I think is another indicator.
4        Q.    And that statement was made in
5    connection with the Orthodox Union issue?
6        A.    It was.
7        Q.    And you also believe that your
8    termination was racially motivated
9    because you thought the circumstances
10   were being manipulated?
11       A.    Yes, I think that they needed
12   to make salary reductions. I think they
13   did mine disproportionate to run me off.
14   When it didn't run me off they terminated
15   me. And they used whatever circumstance
16   surrounding my computer as evidence.
17   That to me is evident because you're
18   handing me computer documents.
19       MR. NELMS:  Haven't we covered
20   all this?
21       MS. MCGAHEY:  Can you repeat
22   what her answer was?
23       (Record read.)

Page 360

1        A.    My job performance at Piknik
2    was flawless. It was stellar. I did an
3    excellent job. I worked well with the
4    customers, and I busted my tail for that
5    company. I put in a tremendous amount of
6    work to do my job well, to communicate
7    effectively throughout the organization
8    to people at every level. You don't
9    treat good employees the way they treated
10   me.
11       MR. NELMS:  Just answer her
12   question.
13       Q.    A lot of people put in a lot
14   of sweat to Piknik?
15       A.    They did. But a lot of people
16   weren't treated the way I was.
17       MR. NELMS:  Let her ask
18   questions.
19       Q.    And you never spoke with Chris
20   Day about the reason for your
21   termination; correct?
22       A.    No.
23       Q.    Is that correct?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 361 to 364)

Page 361

1    A.    That's correct.  No, I did
2  not.
3    Q.    Have you now told me all of
4  the ways in which you believe you were
5  treated differently because of your race?
6    A.    I believe so.
7    Q.    Do you have anything else to
8  add?
9    A.    I do not.
10    Q.    Do you know if Chris Day
11  consulted or conferred with anyone in
12  deciding to terminate your employment?
13    A.    I do not.
14    Q.    Were you part of a group of
15  individuals trying to purchase Piknik?
16    A.    No.
17    Q.    Were you part of a group of
18  individuals who was trying to put
19  together or find investors to buy Piknik?
20    A.    No.
21    Q.    Bob Winter never approached
22  you about that?
23    A.    No.  I wouldn't put my money

Page 362

1  in Piknik.
2    Q.    Were you seeking other
3  individuals or other companies or other
4  businesses to get them to put their money
5  into Piknik?
6    A.    Absolutely not.  If I was
7  going to do that, I would seek it for my
8  own business not for Piknik.
9    Q.    Do you have any of Piknik's
10  proprietary information currently?
11    MR. NELMS:  Do you understand
12  the question?
13    A.    Not really.
14    Q.    After you left Piknik did you
15  still have in your possession information
16  about Piknik customers or pricing issues
17  or processing issues, things along those
18  lines?
19    A.    No.
20    MR. NELMS:  You mean other
21  than in her head?
22    MS. MCGAHEY:  Correct.
23    A.    I did a lot work from home.  I

Page 363

1  did a lot of work from home the whole
2  time I was at Piknik.  So the work I did
3  from home is still at home.
4    Q.    Did you download any
5  electronic data from your computer at
6  work -- strike that.  Remind me when your
7  laptop was taken by Mike Osborne?
8    A.    It was the Thursday before I
9  was terminated.  I believe that was June
10  23rd we decided.
11    Q.    On June 22nd did you copy a
12  bunch of files from your laptop onto a
13  disk?
14    A.    I did.
15    Q.    What kind of files did you
16  copy to a disk?
17    A.    I copied quality documents
18  that I needed to work on.  We had some
19  audits coming up that summer.  It was
20  typical any time we had an audit
21  approaching that I would copy documents,
22  work on them at home, bring revisions
23  back to work.  I did that the whole time

Page 364

1  I was there.  A lot of documents I
2  created at home.  But the problem was at
3  home they were all piecemeal and I was
4  having a hard time working on the entire
5  program because it was piecemeal.
6    So on the 22nd I was thinking
7  towards the audit.  Anthony and I had a
8  meeting approaching the following week.
9  I wanted to brief him on where we were,
10  so I did copy some documents to work on
11  from home.  I didn't download and remove
12  them.  I just copied them.
13    Q.    And Piknik is no longer
14  operating; is that correct?
15    A.    That's my understanding.
16    Q.    Do you know when Piknik
17  stopped operating?
18    A.    My understanding was sometime
19  later that year, December or January.  I
20  know that Piknik still had employees into
21  the next year, but I don't know the
22  details of how that all worked out.
23    Q.    Do you know how far into 2006

91

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON McGLON
August 15, 2007

(Pages 365 to 368)

Page 365

1    Piknik had employees?
2        A.    I heard it was into the
3    summer.
4        Q.    And if that was true, at some
5    point in the Summer of 2006 Piknik had no
6    employees?
7        A.    I assume that at some point
8    they had no employees.  I don't know when
9    that point was.
10        Q.    So if you had stayed on at
11    Piknik, you would have been out of a job
12    sometime in the Summer of 2006?  And I
13    know you're guessing Summer of 2006.
14        A.    Well, it's my belief that if I
15    had stayed on at Piknik I would have
16    helped turn the company around and we
17    wouldn't have gotten in that spot.
18        Q.    Well, in fact, you were
19    offered to come back to Piknik; correct?
20        A.    Yes.
21        Q.    And you declined it?
22        A.    I did not decline it.
23        Q.    Did you go back to work there?

Page 366

1        A.    I did not.
2        Q.    But there was an offer for you
3    to come back to Piknik as a QA manager?
4        A.    Yes.
5        Q.    And you didn't go back as a QA
6    manager; correct?
7        A.    Well, I had some questions.  I
8    wanted to meet with Brenda and find out
9    exactly what they expected of me.  And
10    when we were in a position to set up that
11    meeting she called me and said, don't
12    worry about it, Ricky Loeb hired somebody
13    else.  Somebody else who had been caught
14    with pornography on their computer at one
15    point in the company.
16        Q.    Who was that?
17        A.    David Rohn.
18        Q.    Did you see the pornography on
19    his computer?
20        A.    I did.  Mike Osborne showed it
21    to me.
22            (Whereupon, Defendant's
23            Exhibit 12 was marked

Page 367

1            for identification.)
2        Q.    Show you what has been marked
3    as Defendant's Exhibit 12 to your
4    deposition.  Have you seen this string of
5    e-mails before?
6        A.    Yes, this is familiar to me.
7        Q.    And if you turn to Page 2,
8    it's the beginning of the e-mail string
9    dated July 6, 2005.  So it's just a few
10    weeks after your termination, correct,
11    just a week later?
12        A.    Yeah, looks like it was a week
13    later.
14        Q.    And you said you were checking
15    with Brenda's schedule now that she's
16    back from vacation and you wanted come by
17    Friday around lunch or slightly before.
18    Why were you wanting to meet with Brenda?
19        A.    Well, she had talked to me
20    about the job, but she didn't have any
21    details.  And I wanted to understand what
22    they wanted from me specifically because
23    it was a difficult situation, and I

Page 368

1    wanted to meet -- I guess one of us
2    suggested let's meet in person.  And
3    because of the financial situation of the
4    company -- I knew they were bouncing
5    checks -- I wanted to make sure that if I
6    got paid I got paid.
7        Q.    So as of July 6, 2005 was it
8    your understanding there was an opening
9    for you?
10        A.    Yes.
11        Q.    By this time was Onyx gone?
12        A.    I assume they were.
13        Q.    And Brenda responds to you and
14    says that there is a position available
15    in the quality assurance department at
16    the Day Street facility and she
17    immediately thought of you?
18        A.    Well, that was the first
19    e-mail.  For some reason the way it's
20    printed -- she e-mailed me first, and
21    then I e-mailed back saying Friday around
22    lunch.
23        Q.    Okay.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 369 to 372)

Page 369

1     A.    Please contact me by 11:30 if
2  you're interested, and then I said Friday
3  at lunch.
4     Q.    Okay.  Then if you turn to the
5  first page, which is an e-mail from you
6  to Brenda, that is after all the
7  e-mailing on the second page; right?
8     A.    Yes.  This says August 15th.
9  And this would have been after some
10  conversations that occurred during the
11  month of July and August.  I don't know
12  what transpired during that time.  I
13  don't recall.  I do recall when I sent
14  this to Brenda -- I don't remember
15  sending this e-mail, but obviously I
16  did --
17     Q.    Sending the August 15, 2005
18  e-mail?
19     A.    Right.  I don't remember doing
20  that, but evidently I did.  She called me
21  and said that Ricky Loeb had given the
22  job to David Rohn, an employee that had a
23  file that said ineligible to rehire.

Page 370

1     Q.    Did you see his file?
2     A.    I put the ineligible to rehire
3  in there and so did Chris Day.  And I
4  mentioned that to Brenda, and she said,
5  yes, that was right, she was upset about
6  it.  She was upset with Ricky about it.
7     Q.    But that's a decision Ricky
8  Loeb had made?
9     A.    Correct.
10     MR. NELMS:  Counsel, I've got
11  to leave at 6:30.
12     MS. MCGAHEY:  Okay.  Well, let
13  me keep going, then.
14     Q.    You said that after speaking
15  on the phone with her you thought the
16  salary range was too low; correct?
17     A.    I don't even know that we --
18  yeah, I guess so.
19     Q.    But you offered to come on as
20  a short-term consultant?
21     A.    Yeah, offered to come in and
22  fill a gap.
23     Q.    You said you had another offer

Page 371

1  on the table at that time?
2     A.    Yes.
3     Q.    What was that offer?
4     A.    I don't recall.  I had
5  interviewed for several things.  Two
6  different consulting firms were talking
7  to me about some work with them.  I had
8  an interview -- or I applied for a job
9  here in town.  So I'm not sure which one
10  that was.
11     Q.    Did you have any job offers?
12     A.    Not at that time, no.
13     Q.    At any point did you receive
14  any job offers?
15     A.    No.
16     Q.    No job offers for jobs that
17  may have required you to travel?
18     A.    No, not without relocating.
19     Q.    When, if at all, did you go
20  back to work?
21     A.    Well, I worked for my
22  husband's businesses.
23     Q.    Other than working for your

Page 372

1  husband's businesses have you worked
2  anywhere else?
3     A.    No.  The food industry is
4  pretty limited in Montgomery.
5     Q.    Were you solely looking at the
6  food industry?
7     A.    Yes.
8     Q.    And you submitted resumes to
9  all of the food businesses in town?
10     A.    Not all of them.
11     Q.    Did there come a point in time
12  when you stopped submitting resumes?
13     A.    I'm sure there was.
14     Q.    I'm sorry?
15     A.    I'm sure there was.
16     Q.    Do you know when was that?
17     A.    No.
18     (Whereupon, Defendant's
19     Exhibit 13 was marked
20     for identification.)
21     Q.    I'm going to show you what is
22  being mark as Defendant's Exhibit 13 to
23  your deposition.  Is that your signature

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 373 to 376)

Page 373

1  on the first page?
2      A.   It is.
3      Q.   And if you turn to the second
4  page, is that your signature?
5      A.   It is.
6      Q.   Is this the EEOC charge that
7  you submitted?
8      A.   Yes.
9      Q.   And you describe your
10  termination meeting; correct?
11      A.   Yes.
12      Q.   Do you have anything else to
13  add regarding your termination other than
14  what you have already told me and what's
15  in Defendant's Exhibit 13?
16      A.   No.
17          (Whereupon, Defendant's
18          Exhibit 14 was marked
19          for identification.)
20      Q.   Show you what has been marked
21  as Defendant's Exhibit 14 to your
22  deposition.  Is that your handwriting on
23  Defendant's Exhibit 14?

Page 374

1      A.   It is.
2      Q.   On both pages?
3      A.   It is.
4      Q.   It appears this was initially
5  Jerry MacCartney's EEOC charge that you
6  marked up and added your own language;
7  correct?
8      A.   That's what it looks like.
9      Q.   How did you come to get a copy
10  of the EEOC charge?
11      A.   I assume because we were using
12  the same attorney.
13      Q.   Whose idea was it to file an
14  EEOC claim?
15      A.   Mine.
16      Q.   Did you ask Bob Winter to
17  join?
18      A.   I don't recall asking Bob
19  Winter to join.  I recall telling Bob
20  Winter that I had an attorney and I felt
21  like he was a good one and would he like
22  to talk to him.  And Bob decided he
23  wanted to talk to him.  I gave Bob Andy's

Page 375

1  contact information, and Bob decided to
2  use Andy based on his own interview with
3  him.
4      Q.   What about Bert Mayer and
5  Jerry MacCartney, same kind of thing?
6      A.   Same kind of thing.
7      Q.   You approached Bert Mayer,
8  though?
9      A.   I don't recall approaching
10  Bert.  I assume that probably Bob did.  I
11  don't talk to Bert.  Bert and I are not
12  close.
13      Q.   How did you find Andy Nelms,
14  your lawyer?
15      A.   Through personal connection.
16  I know a lot of attorneys.
17      Q.   Was he your first person that
18  you went to?
19      A.   He was.  Well, we went to an
20  attorney we know in Birmingham who does
21  not work in these type of cases, and he
22  referred us to Andy.
23      Q.   Who was that attorney?

Page 376

1      A.   Ryan Stewart.
2          (Whereupon, Defendant's
3          Exhibit 15 was marked
4          for identification.)
5      Q.   I'm going to show you what I'm
6  marking as Defendant's Exhibit 15, which
7  is a document that your lawyer has
8  produced in this litigation.  And I just
9  want to know what, if anything, does this
10  document have to do with your claims of
11  discrimination?  And if it doesn't have
12  anything to do with it, you can tell me
13  that and I will move along.
14      A.   It pertains to this letter I
15  sent to Jeff Larry concerning the Bob
16  Gross incident and that Bill McLennan and
17  Jeff Larry neither one responded to that.
18  "You and I both believe that the issue of
19  the letter should best be discussed in a
20  personnel meeting."  So Bill McLennan,
21  who at the time was my boss, wanted to
22  meet with me to discuss that and never
23  did.  He stood me up.

94

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 377 to 380)

Page 377

1    Q.   Well, he couldn't make it to
2    that December 8th meeting; correct?
3    A.   Correct.
4    Q.   Anything else that this
5    document -- any other way in which this
6    document relates to your claims of
7    discrimination?
8    A.   I believe it relates to the
9    fact that the company was not responding
10   to my need to talk to somebody.
11   Q.   Any other way in which you
12   believe that Defendant's Exhibit 15
13   relates to your claim of discrimination?
14   A.   No.
15        MS. MCGAHEY:  I'm trying to
16   hurry, Andy.
17        (Whereupon, Defendant's
18        Exhibit 16 was marked
19        for identification.)
20   Q.   I'm going to show you what's
21   being marked as Defendant's Exhibit 16.
22   If you can please tell me how, if at all,
23   this document relates to your claims of

Page 378

1    discrimination?
2    A.   Well, this is a food company,
3    and a food company has a serious
4    concern -- the Director of Quality
5    Assurance has a serious concern about a
6    food safety issue with one of its
7    products.  And because Henry Hicks wanted
8    this customer and had some reason for
9    giving them preferential treatment, the
10   company turned a blind eye to some
11   potentially huge problems with a juice
12   product that was manufactured for
13   children.
14   Q.   How does this document relate
15   to your claim of race discrimination?
16   A.   The company turned a blind eye
17   to a huge problem because Henry Hicks was
18   a minority and they were wanting to go
19   with whatever Henry Hicks wanted to do.
20   Q.   So is it your claim that they
21   ignored your concerns because you were
22   white?
23   A.   Yes.

Page 379

1    Q.   Why do you believe that?
2    A.   Because they did.
3    Q.   Just because the simple fact
4    that whatever your sentiments were
5    expressed in this e-mail weren't followed
6    through or your suggestions?
7    A.   It's pretty serious.  In the
8    food industry, pretty serious.
9    Q.   But that's why you believe
10   it's evidence of discrimination is
11   because it was ignored?
12   A.   Yes.
13   Q.   Any other reason?
14   A.   No.
15        (Whereupon, Defendant's
16        Exhibit 17 was marked
17        for identification.)
18   Q.   I'm going to show you a
19   document that I've marked as Defendant's
20   Exhibit 17 to your deposition.  Same
21   question.  How, if at all, does this
22   document relate to your claims of
23   discrimination?

Page 380

1    A.   I believe that this was a
2    period of time where Chris Day was trying
3    to position himself to push me out the
4    door.  You know, he was using any type of
5    conflict or any type of disagreement.  He
6    was completely overreacting and getting
7    very emotional about them.  And I think
8    he used those as reasons to terminate
9    me -- to support his termination of me.
10   He wanted to terminate me because I was
11   white, because I didn't fit in with the
12   program, but he overreacted to basic
13   business interactions to try to push me
14   out the door.
15   Q.   How do you know he was trying
16   to push you out the door?
17   A.   I think it's pretty evident
18   when you cut somebody's pay by 40 percent
19   and you didn't do it to other people and
20   then you terminate them based on some
21   little copy of a document when you've got
22   men running around the company doing
23   pornography and they weren't terminated

Tyler Eaton Morgan Nichols & Pritchett, Inc.

95

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 381 to 384)

Page 381

1  or disciplined for it.
2       Q.    So you're saying it was just
3  obvious to you?
4       A.    Yes.
5       Q.    And you thought that Chris Day
6  was overreacting to the e-mail that you
7  had sent to Carl Bleier?
8       A.    Yes.
9       Q.    And you think he was
10 overreacting just because you were white?
11      A.    I think if I was black he
12 wouldn't have responded to me that way.
13      Q.    Do you know of any black
14 employees who engaged in similar activity
15 that's reflected in Defendant's Exhibit
16 17 who were treated differently than you?
17      A.    No.
18           (Whereupon, Defendant's
19           Exhibit 18 was marked
20           for identification.)
21      Q.    Let me show you what I am
22 going to mark as Defendant's Exhibit 18
23 to your deposition.  And tell me what, if

Page 382

1  any, significance this document has to
2  your claims of race discrimination.
3       A.    These are some of the issues
4  that I identified with some things going
5  on in the company, and I wanted to
6  communicate that with management so I
7  could gain their support to work on it.
8           Quality assurance was not
9  reporting to me at this time.  That was a
10 decision by Chris Day.  And I wanted to
11 document that I was aware of what the
12 issues were and have his understanding
13 that I was not in a position to fix the
14 issues.  I was covering myself.
15           Chris Day removed a lot of my
16 authority from the quality department,
17 and I wanted it known that I understood
18 what the issues still were and that I
19 could identify them, but that he had tied
20 my hands in repairing them.
21           It was my opinion that in
22 April when he wrote this aggressive
23 e-mail and the other rabbinical

Page 383

1  aggressive e-mail -- that was the time
2  period where he changed the reporting
3  structure.  And it is my opinion that
4  that is the point where he decided he was
5  going to push me out the door and he was
6  going to look for opportunities to do it
7  and that he was going to replace me with
8  a minority.
9       Q.    Do you know why he changed the
10 reporting structure?
11      A.    No.
12      Q.    Did you ever hear Chris Day
13 use any derogatory language about
14 Caucasians?
15      A.    No.
16      Q.    Did you ever hear Henry Hicks
17 use any derogatory language about
18 Caucasians?
19      A.    No.
20      Q.    Did you ever hear Jeff Larry
21 use any derogatory language about
22 Caucasians?
23      A.    No.

Page 384

1           MR. NELMS:  Off the record.
2           (Off-the-record discussion.)
3       Q.    (BY MS. MCGAHEY:)  So after
4  you left Piknik you have not gone back to
5  work other than working for the companies
6  in which you and your husband own?
7       A.    Correct.
8       Q.    But you submitted resumes to
9  companies?
10      A.    I did.
11      Q.    And you never got a job offer?
12      A.    Correct.
13      Q.    You filed a claim for
14 unemployment compensation?
15      A.    Yes.
16      Q.    In fact, you filed your claim
17 on June 26, 2005 before you were
18 terminated; correct?
19      A.    No.
20      Q.    You didn't file it before your
21 termination?
22      A.    No.
23      Q.    Do you disagree with the

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 385 to 388)

Page 385

1  Department of Industrial Relations'
2  records?  If it says you filed a claim on
3  June 26th, you would disagree with that?
4      A.    Yes.  June 26th was a
5  Saturday.
6      Q.    You received five thousand,
7  seven hundred and twenty dollars in
8  unemployment compensation; correct?
9      A.    Something like that, yes.
10      Q.    You don't have any reason to
11  disagree with that amount?
12      A.    No.
13      Q.    Are you seeking lost benefits
14  as part of your damages in this case?
15      A.    I don't know.
16      Q.    Do you know what I mean by
17  lost benefits?
18      A.    The amount I would have made
19  if I would have stayed there; correct?
20      Q.    You believe that you should
21  recover a certain amount of money that
22  you would have been paid had you remained
23  employed at Piknik; correct?

Page 386

1      A.    Yes.
2      Q.    What do you think that amount
3  is?
4      A.    I don't know.
5      Q.    How would you go about
6  calculating it?
7      A.    I don't know.
8      Q.    Are you seeking to recover
9  damages for lost insurance benefits?
10      A.    I would.
11      Q.    Did you have health insurance
12  benefits at the time of your termination?
13      A.    I did.
14      Q.    Family coverage?
15      A.    Yes.
16      Q.    Health and dental?
17      A.    Yes.
18      Q.    Vision?
19      A.    Yes.
20      Q.    Did you have to make special
21  contributions for that insurance
22  coverage?
23      A.    Yes.

Page 387

1      Q.    How much?
2      A.    I don't recall.
3      Q.    Did you eventually obtain
4  replacement insurance coverage?
5      A.    Yes.
6      Q.    Through whom?
7      A.    I did COBRA for one month,
8  which was a ridiculous amount of money,
9  and then I went and found insurance for
10  our family elsewhere the following month.
11      Q.    Who did you get health
12  insurance through?
13      A.    I believe it was Blue Cross
14  Blue Shield.
15      Q.    And you said you had COBRA for
16  one month.  How much did you have to pay
17  for COBRA?
18      A.    Just under nine hundred
19  dollars.
20      Q.    For that one month?
21      A.    Yes.
22      Q.    And then immediately
23  thereafter you signed up with Blue Cross

Page 388

1  Blue Shield?
2      A.    Yes.
3      Q.    Is that still who you have
4  your insurance coverage through?
5      A.    No.
6      Q.    How much did you have to pay
7  for Blue Cross Blue Shield coverage?
8      A.    I don't remember.  I think it
9  was around four hundred a month.
10      Q.    Do you know how long you had
11  Blue Cross Blue Shield?
12      A.    Until February of 2006.
13      Q.    And when did you have COBRA
14  coverage?
15      A.    August of 2005.
16      Q.    So from September of 2005
17  until September of 2006 you had Blue
18  Cross Blue Shield?
19      A.    Yes.
20      Q.    And starting in March of 2006
21  you had United Health?
22      A.    Yes.
23      Q.    And you still have United

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 389 to 392)

Page 389

1  Health?
2      A.   Yes.
3      Q.   How much do you have a pay for
4  coverage through United Health?
5      A.   I don't know.  I don't
6  remember.  I think it is fifty-two
7  dollars a week.  That number rings a
8  bell.
9      Q.   So there has been no time that
10 you have been without insurance coverage?
11     A.   Correct.
12     Q.   Any other benefits or lost
13 benefits that you're seeking to recover?
14     A.   401-K contribution.
15     Q.   Piknik made a contribution to
16 your 401-K?
17     A.   Yes.
18     Q.   Even at the time of your
19 termination they were still making a
20 contribution?
21     A.   Yes.
22     Q.   What was the contribution?
23     A.   I don't recall.

Page 390

1      Q.   Was it a percentage?
2      A.   Yes, it was a percentage.
3      Q.   But you don't recall what the
4  percentage was?
5      A.   No.
6      Q.   Do you know if Piknik
7  continued making 401-K contributions
8  after your termination?
9      A.   I know they did not continue
10 making them to me.
11     Q.   Because you were no longer
12 employed?
13     A.   Correct.
14     Q.   But do you know if
15 contributions were still being made to
16 employees who were working there?
17     A.   I would not have that
18 information, no.
19     Q.   Did you roll over your 401-K
20 or did you leave it in place?
21     A.   I rolled it over.
22     Q.   Any other lost benefits you
23 are seeking to recover damages for?

Page 391

1      A.   No, not that I can think of
2  right now.
3      Q.   Are you seeking damages for
4  emotional distress?
5      A.   Yes.
6      Q.   Tell me your symptoms of
7  emotional distress.
8      A.   Sleepless nights, stress at
9  home, mental anguish, stress it put on my
10 family to go through that, for my kids to
11 watch me go through that.
12     Q.   What, if anything, else?
13     A.   That's all I can think of.
14     Q.   When did you start
15 experiencing sleepless nights?
16     A.   Before I was terminated.
17     Q.   How soon before?
18     A.   I don't know how soon before.
19 When the stress started increasing and it
20 became obvious that things were going
21 very poorly.  Probably in April.  April I
22 believe is the time that --
23     Q.   April of 2005?

Page 392

1      A.   Yes.
2      Q.   Before April 2005 how much
3  sleep did you get on average?
4      A.   Seven, eight hours a night.
5      Q.   Starting in April 2005 how
6  much sleep were you getting?
7      A.   Less than that.
8      Q.   How much less?
9      A.   Enough less that it caused me
10 stress.
11     Q.   Can you give me an estimate?
12     A.   No.
13     Q.   How long did your sleepless
14 nights continue?
15     A.   I don't know, but it was a
16 while.
17     Q.   And you eventually went to see
18 Dr. Casals about it; correct?
19     A.   I went to see him for chest
20 pains.
21     Q.   And you also complained to him
22 about sleeping issues; correct?
23     A.   Probably.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 393 to 396)

Page 393

1    Q.   Are you back to normal in
2 terms of your sleeping habits currently?
3    A.   I'm not where I was before all
4 this happened, but I sleep better than I
5 did in 2005.
6    Q.   Still, as of today you're not
7 sleeping seven or eight hours?
8    A.   No.
9    Q.   Do you know on average how
10 much you're sleeping now?
11    A.   Some nights I sleep eight
12 hours. Some nights I sleep four.
13    Q.   Did you seek or get any
14 medication?
15    A.   No. I'm not going to take
16 medicine for sleeping, absolutely not.
17 He offered me some, but, no, I'm not
18 going to take that.
19    Q.   Tell me about the stress that
20 you experienced at home.
21    A.   Well, it was a shock to our
22 family. I had always been an outstanding
23 performer at every job I had ever held.

Page 394

1 I have always done extremely well. And
2 to be discriminated against was painful
3 to me as a person. It was difficult for
4 my husband to watch me go through. But
5 we needed the salary, so I had to bite my
6 lip and stick it out.
7    I had a baby-sitter that kept
8 my son, and it was very stressful for her
9 because she didn't know from day to day
10 if she was going to have a job based on
11 me not knowing if I was going to have a
12 job. You know, I was distracted. I was
13 trying to do my job, but at the same time
14 it was constantly on my mind whether or
15 not I was going to have one. It was a
16 huge distraction.
17    Q.   Are you claiming that that
18 stress at home started in April of 2005
19 as well?
20    A.   It started I believe before
21 that. It started with the Bob Gross
22 incident.
23    Q.   And has that stress subsided?

Page 395

1    A.   Yes.
2    Q.   When did it go back to normal
3 or what you found to be normal?
4    A.   In the Fall following this
5 event, termination event. So in the Fall
6 of 2005.
7    Q.   You said that there was stress
8 on family. Is that the same thing you
9 just told me about?
10    A.   Yes.
11    Q.   Is there any other physical
12 symptoms of emotional distress that you
13 claim besides your sleepless nights?
14    A.   No.
15    Q.   It was your idea to pursue a
16 legal claim?
17    A.   Yes.
18    Q.   Have you and your coplaintiffs
19 had discussions about your claims outside
20 the presence of your lawyer?
21    A.   I don't think so, no. We have
22 said things to each other like, have you
23 heard from Andy. But Andy typically

Page 396

1 communicates to us with e-mail, and he
2 copies everybody. We don't have
3 one-on-one conversations so much.
4    Q.   To whom have you talked to
5 about your lawsuit besides your lawyer?
6    A.   My family, my husband's
7 family.
8    Q.   Anyone else?
9    A.   Some friends, some close
10 friends.
11    Q.   Who are your close friends you
12 have spoken to about it?
13    A.   You need their names?
14    Q.   Yes, please.
15    A.   Elizabeth Haygood. Elizabeth
16 Johnson. That's it.
17    Q.   What have you told Elizabeth
18 Haygood about your lawsuit?
19    A.   The fact that I have one and
20 what it's about.
21    Q.   Just general --
22    A.   General. Nothing specific.
23 She wouldn't understand specifics of this

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 397 to 400)

Page 397

1    case.  There are too many intricacies.
2        Q.    What about with Elizabeth
3    Johnson?
4        A.    She knows I was in deposition
5    today because she was trying to help me
6    find a baby-sitter.
7        Q.    You said earlier that you know
8    a lot of attorneys.  Besides Andy and the
9    other gentleman in Birmingham that you
10   told me about that you had spoken with
11   earlier, have you spoken with any of the
12   other lawyers that you know about your
13   claims?
14       A.    No, not about the claims.
15   They are not employment lawyers.  They
16   are attorneys that were in my Sunday
17   school class.  For some reason our Sunday
18   school class have a number of attorneys
19   in it.  Probably our age, or who knows
20   what.  But I would not discuss this with
21   them, no.
22       Q.    Have you spoken with Ricky
23   Loeb about your claims?

Page 398

1        A.    No.
2        Q.    Have you asked Ricky Loeb to
3    be a witness on your behalf if this case
4    goes to trial?
5        A.    I think I listed him as a
6    witness.
7        Q.    Did you keep any kind of
8    journal or calendar with notes?
9        A.    I did.  I had a notebook that
10   I used daily the whole time I was there,
11   and I would write down different things
12   that I had to do that day and check them
13   off when they were done or things I
14   needed to remember.
15       Q.    Does that notebook contain
16   anything that relates to your claims in
17   this lawsuit?
18       A.    I doubt it.
19       Q.    Do you still have the
20   notebook?
21       A.    I do.
22       Q.    Have you given it to your
23   lawyer?

Page 399

1        A.    No.
2            (Whereupon, Defendant's
3        Exhibit 19 was marked
4        for identification.)
5        Q.    Hand you what has been marked
6    as Defendant's Exhibit 19 to your
7    deposition.
8            MS. MCGAHEY:  Andy, do you
9    have verified responses?  If anything
10   changes in substance of her responses,
11   then we will need to address that.  But
12   I'm going to proceed asking her about
13   these.
14       Q.    Have you seen this document
15   before?
16       A.    I think I created part of this
17   document.
18       Q.    In response to Number 8 you
19   indicated that in 2005 your gross income
20   was one hundred twenty-eight thousand,
21   eight hundred ten dollars; correct?
22       A.    Okay.
23       Q.    Do you have any reason to

Page 400

1    believe that that's not accurate?
2        A.    No.
3        Q.    Do you know what your gross
4    income was for 2006?
5        A.    No.  We filed an extension.
6        Q.    Have you since filed your 2006
7    income taxes?
8        A.    Not that I'm aware of.
9        Q.    Do you plan on it?
10       A.    Oh sure, absolutely, we're
11   going to.  But our personal expenses are
12   affected by the business, so the business
13   expenses have to be finished before the
14   personal can.  And I don't know where
15   they are in that process because I'm not
16   at work.
17       Q.    In Number 10 you're unaware of
18   any written or oral statements that
19   relate to the claims in your lawsuit
20   other than the audio tapes that you and I
21   have previously discussed; correct?
22       A.    (Examining document.)
23       Q.    In Number 10.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 401 to 404)

Page 401

1    A.    Taken statements from any
2  person -- no, I have not done that.
3    Q.    And in Number 11 you claim
4  that you were terminated from the
5  position of Director of Quality Assurance
6  because of your race?
7    A.    Yes.
8    Q.    And you have told me
9  everything that you know about that
10 claim; correct?
11   A.    Yes.
12   Q.    Number 13, you identify Chris
13 Day, Henry Hicks and Jeff Larry as the
14 individuals who discriminated against you
15 because of your race?
16   A.    Yes.
17   Q.    And you have told me every way
18 in which you believe that those three
19 individuals treated you differently
20 because of your race?
21   A.    Yes.
22   Q.    You have nothing else to add?
23   A.    No.

Page 402

1    Q.    Number 14, you list several
2  folks who have knowledge of the mental
3  and emotional anguish for which you are
4  seeking damages.  You list Scott McGlon,
5  who is your husband?
6    A.    Yes.
7    Q.    And what does he know?
8    A.    He lived with me.  He has
9  first-hand knowledge of what I went
10 through.  He understands me better than
11 anybody does and what it meant to me.
12   Q.    Who is Judy Ayers?  Is that
13 your mother?
14   A.    It is.
15   Q.    And what does she know about
16 your mental and emotional anguish?
17   A.    Everything a mother could
18 know.
19   Q.    Could you be a little more
20 specific?
21   A.    She knows how it affected me
22 and how it hurt me and she knows how much
23 effort and work I put into Piknik.

Page 403

1    Q.    Who is Elgi Sims Dunn?
2    A.    She is my baby-sitter that
3  worked for us full-time keeping Patrick
4  while I worked.
5    Q.    And did you talk to her about
6  the emotional distress that you were
7  suffering?
8    A.    I talked to her about it, and
9  she watched it.  She saw it.  She saw it
10 when I left for work every morning and
11 she saw it when I came home every day.
12   Q.    Barbara Williams is a Piknik
13 employee, former Piknik employee?
14   A.    She is.
15   Q.    Is she white or black?
16   A.    She is black.
17   Q.    Have you asked Barbara
18 Williams to testify on your behalf if
19 this case goes to trial?
20   A.    Not personally, but she would.
21   Q.    You haven't asked her
22 personally to testify on your behalf?
23   A.    Right.

Page 404

1    Q.    Do you know if she has been
2  asked to testify on your behalf?
3    A.    I don't know.
4    Q.    Katie Pribisko, she was the --
5    A.    Microbiologist.
6    Q.    And what is the basis of her
7  knowledge about your emotional distress?
8    A.    She watched me going under
9  emotional distress before I was
10 terminated.
11   Q.    Have you asked Ms. Walters to
12 testify on your behalf if this case goes
13 to trial?
14   A.    I haven't personally, but I
15 have forewarned her that I might need her
16 help.
17   Q.    So you have talked with her
18 about her lawsuit?
19   A.    She understands that I have
20 one.  She does not know the details.
21   Q.    What about Emily Sproull
22 Hutcheson, who is she?
23   A.    She was my husband's

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 405 to 408)

Page 405

1    administrative assistant at the time I
2    was terminated.
3        Q.    Did she work at your house?
4        A.    She worked at our office.
5        Q.    Which is at your house?
6        A.    Not anymore.
7        Q.    Was it at the time?
8        A.    No.
9        Q.    What is the basis of her
10   knowledge?
11       A.    Well, she watched me every day
12   as well.
13       Q.    And Bob Winter is one of your
14   coplaintiffs?
15       A.    Yes.
16       Q.    Have you been discussing with
17   Bob Winter your claims in this lawsuit?
18       A.    Not past what I have already
19   mentioned to you.
20       Q.    What about Jerry MacCartney?
21       A.    Same.
22       Q.    Teresa Cascio?
23       A.    No.

Page 406

1        Q.    You have not talked with
2    Teresa Cascio?
3        A.    No.
4        Q.    She is a former Piknik
5    employee?
6        A.    She is.
7        Q.    And it is your belief she
8    observed you go through emotional
9    distress?
10       A.    We had conversations about
11   what I was going through.
12       Q.    During your employment there?
13       A.    During and after.
14       Q.    Have you asked Teresa Cascio
15   to testify on behalf at your trial?
16       A.    I haven't yet, but I will.
17       Q.    Number 17 you were asked to
18   identify documents that relate to the
19   alleged discrimination against you. You
20   identify an e-mail from Henry Hicks.
21   Have we already talked about that e-mail?
22       A.    Yes.
23       Q.    You mention an e-mail from

Page 407

1    Chris Day?
2        A.    Yes.
3        Q.    Have we talked about the
4    e-mail from Chris Day?
5        A.    Yes.
6        Q.    Is that the one about the
7    rabbi?
8        A.    Yes.
9        Q.    You mention an e-mail from
10   Jeff Larry?
11       A.    Yes.
12       Q.    Is that his response to Chris
13   Day's e-mail about the rabbi situation?
14       A.    Yes.
15       Q.    You also mention a memo from
16   Chris Day?
17       A.    Yes.
18       Q.    Is that the memo about your
19   salary reduction?
20       A.    I think so.
21       Q.    Are you aware of any other
22   memos that you believe relate to your
23   claim of alleged discrimination?

Page 408

1        A.    No.
2        Q.    When you were at Piknik at the
3    time of your departure did you have
4    vacation and sick time?
5        A.    I did.
6        Q.    How much vacation and sick
7    time did you have?
8        A.    I had been given three weeks'
9    vacation when they promoted me to
10   director.  And sick time I believe was
11   two weeks.
12       Q.    So five weeks total?
13       A.    Yes.
14       Q.    Paid?
15       A.    Yes.
16       Q.    And you're salaried, though,
17   so you were paid regardless?
18       A.    Right.
19       Q.    Did you use any of your
20   vacation or sick time in 2005?
21       A.    I believe I used a few days.
22   I don't recall how much, four or five.
23       Q.    In response to Number 22 you

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Pages 409 to 412)

Page 409

1  describe the efforts you made to find
2  employment after you left Piknik. You
3  applied with Graham Bottling but were not
4  hired; correct?
5      A.  Yes, that's correct.
6      Q.  And we talked about the offer
7  from Brenda Sellers to come back to
8  Piknik as a QA manager; correct?
9      A.  Yes.
10     Q.  And you said that you declined
11 the position due to the pay?
12     A.  Yes.  I don't remember what
13 the pay was.
14     Q.  You had discussions with Karen
15 Lioce?
16     A.  Lioce.
17     Q.  L-I-O-C-E, to consult with her
18 in the food industry?
19     A.  Yes.
20     Q.  Did she make you an offer?
21     A.  No.  We just discussed
22 possibilities.
23     Q.  And I take it it didn't really

Page 410

1  come to fruition?
2      A.  Right.
3      Q.  You said you could not travel
4  extensively?
5      A.  It pretty much required that I
6  be away from home four or five days a
7  week.
8      Q.  Is that how you define
9  extensively?
10     A.  Yes.
11     Q.  You also had discussions with
12 Dr. Randolph?
13     A.  Yes.
14     Q.  Was that in the food industry?
15     A.  Yes.
16     Q.  And was there any job offer?
17     A.  No.  But it was, again, the
18 same situation.  He wanted me to come up
19 and talk to him, but I can't travel four
20 to five days a week, and that's what he
21 wanted me to do.
22     (Off the record from
23     6:57 p.m. to 7:00 p.m.)

Page 411

1      Q.  (BY MS. MCGAHEY:)  Take a look
2  at this.  It seems to be an incomplete
3  document.  There are only two of the
4  three pages attached.  Do you have the
5  third page?
6      A.  I don't know.  It probably
7  means the third page wasn't relevant.
8      Q.  Can you check if you have that
9  third page?
10     A.  I can.
11     Q.  If you do, can you give it to
12 your lawyer?  Do you socialize with Mr.
13 Winter?
14     A.  No.
15     Q.  Do you socialize with Jerry
16 MacCartney?
17     A.  No.
18     Q.  But they both work for one of
19 your companies or your husband's company?
20     A.  They do now.
21     Q.  Do you socialize with Bert
22 Mayer?
23     A.  No.

Page 412

1      Q.  Do you own horses?
2      A.  I do.
3      Q.  How many horses do you own?
4      A.  Two.
5      Q.  Is there anything else that we
6  have not discussed today that relates to
7  your claims of discrimination?
8      A.  I don't think so.
9      MS. MCGAHEY:  Okay.  Thank
10 you.
11     (Whereupon, the deposition
12     was completed at 7:02 p.m.)
13
14     FURTHER THE DEPONENT SAITH NOT
15
16
17
18
19
20
21
22
23

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

(Page 413)



Page 413

```
 1          C E R T I F I C A T E
 2
 3
 4     STATE OF ALABAMA)
 5     JEFFERSON COUNTY)
 6
 7          I hereby certify that the
 8     above and foregoing deposition was taken
 9     down by me in stenotypy, and the
10     questions and answers thereto were
11     reduced to typewriting under my
12     supervision, and that the foregoing
13     represents a true and correct transcript
14     of the deposition given by said witness
15     upon said hearing.
16          I further certify that I am
17     neither of counsel nor of kin to the
18     parties to the action, nor am I in
19     anywise interested in the result of said
20     cause.
21
22
23          COMMISSIONER - NOTARY PUBLIC
```

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

**A**

abilities
47:19 198:1
ability
9:15 301:17
able
35:8 72:1,11 77:16 78:4
80:20 85:20 216:5
226:21
absolute
64:14
absolutely
34:11 64:10 97:14 98:10
145:18 268:16 320:23
328:17 362:6 393:16
400:10
absorbed
19:5
abuse
128:2 129:20 304:14
abused
128:9 130:11
accepted
50:15
access
86:1 151:2
accommodate
166:21
account
245:11 297:19
accountable
304:15
accounts
297:18
accurate
301:14 400:1
accurately
301:16
accusations
294:19 295:1,3
accusatory
171:20
accused
140:23 158:22 301:2
accusing
301:7
acknowledged
127:19 322:19
acknowledging
128:1
acquire
122:12
acquired
52:7 69:11 135:15,23
act
304:5
acting
5:3 141:18 142:17 146:21
276:20
action

1:5 128:6 130:1 158:19,21
162:21 238:20 413:18
actions
146:2 149:1 234:14 235:1
299:1
activity
301:15 381:14
ad
47:20 177:7
Adams
5:8
adapt
32:22
Adare
48:11,12 49:11 50:1,5
55:20
add
100:5 155:20 296:6
315:21 361:8 373:13
401:22
added
67:5 99:20 374:6
addition
50:19 193:17
additional
54:21 67:5 91:23 99:4,10
99:19 100:5 299:7
309:17 317:15
address
19:23 21:15,18 230:16,22
231:1,3 250:21 323:14
399:11
addressed
214:1 219:15 236:21
307:17
addresses
227:3,13,14,15 228:20,23
229:1,13
adequate
90:12 157:17,22
adjourned
275:13
adjust
103:14,15,17
adjustments
89:7
administer
32:4,18
administering
31:20
administration
86:20
administrative
49:4 405:1
administrator
30:16 31:6,9,12 32:14,17
33:2,6,10,14,19
adult
29:13
adulteration
88:9

advance
319:11
advertising
124:16
advise
299:1
affect
9:7,14 155:11 172:6 197:7
197:10 232:1,3 242:17
257:21 326:23
affirmations
156:1
afford
112:23
African-American
161:11 170:13 171:23
175:11 179:11 185:14
188:18 207:18 221:1,10
231:18,19 232:9,17
246:9,17,19,21 313:13
314:6,9,13 333:5,8
358:16 359:1
African-Americans
169:22 171:18 212:18
236:14 237:2 240:6,7,9
251:9
afternoon
138:11 184:15
age
305:17 397:19
agency
37:17
agenda
241:23 288:22 358:3,15
agent
13:9 29:16
ages
19:21
aggression
312:8
aggressive
206:14 218:19 219:23
220:9 221:5 277:5
288:21 382:22 383:1
aggressively
296:9 314:17
ago
6:17 318:15
agree
54:7 145:14 148:9 172:13
213:23 241:14
agreed
2:3 95:16 96:23 128:2
129:19 222:6 271:3
308:18,19 310:13 354:17
agreement
62:5 211:8 215:8,19
221:11 308:22 309:5
Agriculture
32:9
ahead

109:20 149:15 153:19
167:3 224:9 225:16
al
1:7,10
Alabama
1:2 3:8,15 5:3,5,9 14:13
20:13 26:19 46:4 86:21
92:3 245:8 274:17,22
413:4
alarm
108:14,15
Alatex
58:9 59:8 61:12 62:1,2
71:21,22 74:3 76:8
78:12 80:1,2,4 82:9
83:7,12 117:21 244:22
alcohol
79:9
alcoholism
79:2
allegations
278:12
alleged
406:19 407:23
alleging
301:9
Allen
101:14,16,21 102:9,18,19
103:11 104:12,23 200:8
201:5,15 244:10,11
246:11
allocate
72:11
allocated
67:1
allow
210:7,12,14 281:20
allowed
62:11 72:4 206:10 210:18
290:22
allowing
311:6
Alpheretta
30:19
Altex
51:14 52:8
American
36:8
amount
131:13 133:19 318:7
321:15,16 327:6 334:18
337:17 360:5 385:11,18
385:21 386:2 387:8
amounts
191:21
Amy
3:18
analysis
109:6 156:11 157:6,10,11
157:20
Anderson

3:4
Andy
22:6 227:5 228:8 248:15
341:1 375:2,13,22
377:16 395:23,23 397:8
399:8
Andy's
26:1 374:23
anguish
391:9 402:3,16
animal
27:13
Annissia
244:16 246:16 333:11,13
335:11 339:13
announced
148:13,14 149:13 151:9
154:2
announcing
177:8
answer
7:15,15 18:20 19:14
128:10 149:16,20,22
150:11,12 242:9 300:10
343:9 359:22 360:11
answered
316:1 345:12
answering
7:9
answers
7:10 352:6 413:10
Anthony
70:20 71:5 86:7 95:15
97:15 98:8 137:5 141:11
141:13,15 146:7,10,14,14
146:16,21 147:10,13
155:20 159:19 244:18
245:20 246:2,18
273:22,23 318:2,22
319:2,8 320:17,23
322:4 327:9,22 328:2
328:16,22 329:1,2
331:15 333:10,15 336:13
338:11 339:12,22 343:1
343:8,10,15 347:3,4,15
348:15 354:8 356:14
357:4,7 358:11 364:7
Anthony's
146:13
anticipate
135:18
anticipated
135:16
anticipating
270:6
antiquated
89:20
anti-Caucasian
241:20
anybody
64:2 80:5 126:3 170:19

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

206:12 245:19 258:6
276:21 280:3,5 284:19
285:18 286:8 290:19
311:22 313:16 349:21
357:16 402:11
**anymore**
18:17 338:7 405:6
**anyway**
216:19 343:6
**anywise**
413:19
**Apollo**
135:4,7
**apologize**
308:4
**apology**
307:15,21 308:1
**appear**
229:16
**appeared**
144:21 147:6 304:10
**appears**
222:13 306:6 374:4
**applicants**
177:23
**application**
48:5
**applications**
11:20 16:15
**applied**
47:22 48:2 175:7 177:12
178:15 371:8 409:3
**applies**
214:6
**apply**
220:21
**applying**
50:4
**appreciation**
302:2,6,19
**approached**
361:21 375:7
**approaching**
363:21 364:8 375:9
**approval**
210:11
**approved**
215:14
**approximately**
8:15 32:14
**April**
20:10 43:20 70:21,23
71:3 219:12 225:9
236:8 238:16 382:22
391:21,21,23 392:2,5
394:18
**Arant**
3:13
**area**
116:5
**arena**

109:3 122:6
**argue**
155:9
**Arizona**
133:11,15
**arrange**
305:22
**arrested**
24:3
**arrival**
118:9
**arrived**
107:10 109:11 113:18
114:21 115:17 116:11
347:9
**aside**
272:4 315:11
**asked**
46:21 96:12,16,21 123:18
127:4 133:17 134:3,12
135:1 136:16 139:5
143:14,14 144:22 150:17
175:2 199:13 255:20
281:8,14,15 285:9,11
292:3 300:9 302:5
306:2 307:14 308:3,22
318:8,10,14 322:12,13,16
324:1,11 327:15 343:22
344:5 346:2,11,15
351:10,13 352:5,14
353:1,9,22 354:18
355:13 356:23 398:2
403:17,21 404:2,11
406:14,17
**asking**
7:7 132:21 133:12 160:1
160:18 169:18 374:18
399:12
**asks**
320:1 346:5
**aspect**
110:19 114:17
**assembled**
124:6
**assertions**
229:2
**assertive**
187:6
**assign**
2:21
**assistant**
38:14 39:6 49:5 66:10
405:1
**associated**
53:13 327:2,5
**assume**
7:21 19:8 122:16 125:23
159:19 214:2 235:12
268:13 328:6 365:7
368:12 374:11 375:10
**assumed**

79:22 81:3 115:18,22
136:1,3
**assuming**
82:5 169:21 313:11
353:23 357:2
**assumption**
135:22 145:19,21,23 146:1
**assurance**
48:3 50:4 51:7,11,17,20
52:3,4,8,12,15,17 53:2
54:1,4,9 55:16,23 56:13
56:14 57:2,7,12,15,17,23
59:3,22 60:13,18 61:7
62:11,17 66:2,7 68:14
68:19 71:8,15,18 72:19
73:1,12 74:22 75:18
77:1,4,17 78:9 79:1,22
81:8 82:3 83:16 87:9
87:10,13,18 90:20 91:17
92:8 93:2,7,14 99:4,10
99:14 100:17,19,22
101:17,22 102:3,5,10
105:8,23 108:18 109:12
109:15,17 110:7,15,21
111:5 114:20 115:5,6,19
116:1,3 155:10,21 157:12
157:15 163:11 175:7
177:4 190:5 198:3
200:14 201:21 202:1,6
244:8 247:1 254:17
273:4 301:15 357:14
368:15 378:5 382:8
401:5
**assured**
264:23 278:8,9 284:9
**as-needed**
41:9
**ate**
342:2
**Atlanta**
22:3 30:18
**attached**
411:4
**Attachment**
238:4
**attacked**
312:1
**attacks**
296:20,23 297:2,6
**attempt**
357:11
**attempted**
296:7
**attend**
26:16 27:3 310:5,6
**attendance**
79:3
**attention**
82:22 158:16 216:2
261:20 281:23 317:22
**attorney**

3:5,12 22:11,12 228:15
374:12,20 375:20,23
**attorneys**
375:16 397:8,16,18
**attorney-client**
340:10,18
**attractive**
157:1
**attrition**
100:2 160:10
**Auburn**
27:6,8 28:2,10,15 29:8,17
30:3,7,8 46:6,7,8
274:16,17,19,22 297:23
**audience**
299:7
**audio**
400:20
**audit**
82:13,13 108:18 109:12,15
110:4,5 114:21 363:20
364:7
**audited**
32:2 109:3
**audits**
108:23 114:8,8,10,15
363:19
**August**
1:18 5:9 8:16 39:10,12
41:13 70:8 81:16 82:7
301:12 369:8,11,17
388:15
**authority**
205:23 288:2 382:16
**auto**
14:20
**available**
98:16 224:17 368:14
**Avenue**
3:14 5:8
**average**
392:3 393:9
**avoid**
57:14
**aware**
100:20 132:19 133:11,14
133:16,21 134:2,2,12
136:7 141:12,13 147:16
154:6 155:3 189:5
192:19 203:13,20 234:5
241:1 245:20 247:6
252:21 254:5 255:3
262:21 270:9 274:16
285:10 287:5 294:18,23
295:8 313:16 382:11
400:8 407:21
**awful**
185:7 222:14
**Ayers**
6:6,8 402:12
A-Y-E-R-S

6:13
**a.m**
5:10 55:6,6 100:14
219:12 225:10

**— B —**

**B**
4:4
**baby**
341:17
**baby-sitter**
126:22 248:4 394:7
397:6 403:2
**bachelor**
27:13 202:14
**bachelor's**
182:10 202:10
**back**
34:5 47:2 52:16 56:8
58:21,23 66:20 75:9
79:15,18 93:6 96:22
97:10 111:3 124:19
133:4 142:9 144:20
149:17,18 156:22 165:5
197:1 202:19 203:11,11
207:12 210:8 214:12
224:13 230:20 256:8
261:17 274:8 275:18
277:3 278:7 299:16,17
302:21 303:15 331:1
348:6 354:13 355:14,18
356:16 363:23 365:19
365:23 366:3,5 367:16
368:21 371:20 384:4
393:1 395:2 409:7
**background**
36:2 38:21,22 62:6 109:1
182:2 198:4 202:9
**backgrounds**
35:10,14
**bad**
171:12 197:23 198:2
253:3 257:17 276:2
284:7 291:11 314:18
318:3 321:6 327:23
**badly**
171:18 320:19
**balance**
119:22
**balls**
198:21
**bank**
119:14 131:6 154:6,11
330:22 331:2
**bankruptcy**
23:21 334:12 345:6
**bank-induced**
330:13,17
**banquet**
302:13

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

Barbara
77:9  78:7  79:6,6,20,21
80:6,9  157:14  403:12,17
Barbara's
80:23
barbecue
342:2
Barber
70:20  71:5  86:7  95:15
97:15  98:8  137:5  146:7
146:11  147:10  155:20
159:19  244:18  245:21
246:2,18  273:22  318:2
319:8  322:4  327:22
328:2,16,22  329:2,2
331:15  333:10,15  336:13
338:11  339:12,22  343:1
347:3,5,15  348:15
354:8  356:15  357:4,7
358:11
base
123:19
based
56:7  63:8  85:5  108:4
147:4  155:23  199:22
204:19  207:5  211:18
218:20  228:15  232:8
250:23  276:23  332:5,5
332:14  333:1  339:2,5
339:18  340:4  341:10
358:19  375:2  380:20
394:10
basic
380:12
basically
43:4  96:21  161:9  230:8
234:19  252:15  323:4
basing
230:23
basis
41:3,9  42:15  75:14  113:17
278:1  404:6  405:9
becoming
80:15  118:7
beer
252:11
began
37:20  58:9  59:16  69:17
299:6
beginning
168:16  175:21  196:9,10
367:8
behalf
241:21  266:4  398:3
403:18,22  404:2,12
406:15
behave
305:18
belief
57:10  115:16  241:19  251:3
303:10  331:23  332:14

339:12  365:14  406:7
believe
17:17  47:6  49:2,17  50:11
51:18  52:23  54:16
56:19  58:10  59:9  60:6
65:13,15  69:7  85:16
104:12,18  116:4  119:5,10
119:12  133:3  138:16,23
147:23  148:4,11  153:16
158:12  159:15  162:15
164:15  166:2  167:9
170:2  171:17  173:5
175:18  176:5  179:10
181:1  195:1,5  196:9
197:3  199:2  203:13
215:4  218:1  221:15
225:5  226:6  234:17
235:22  236:8  237:15
238:2  241:22  242:19
245:3,12,22  246:4
247:22  250:15  251:7,10
262:10,19  290:9  291:20
297:12  310:23  313:12,18
313:23  314:9  315:1
316:6  317:16  319:16
320:17  322:2  324:16
328:21  332:4,10,18,20
332:23  333:18  334:6
339:17  345:7  348:19
355:19,20  357:18,22
358:2,4,6,14  359:7
361:4,6  363:9  376:18
377:8,12  379:1,9  380:1
385:20  387:13  391:22
394:20  400:1  401:18
407:22  408:10,21
believed
121:15  311:1
believes
165:9
Belizio
77:10,14
bell
389:8
beneficial
188:17
benefit
119:1  124:7,9,12  130:6
185:10,14  204:6
benefits
385:13,17  386:9,12
389:12,13  390:22
benefitting
128:5  129:22
Bert
17:18,21  167:12  276:6
279:15,21  287:1  308:12
335:14  338:5,7  349:11
349:13  375:4,7,10,11,11
411:21
Bert's

95:7
best
7:19  92:5  107:22  112:12
143:5  195:23  197:14
299:20  301:17  320:12
340:23  376:19
better
13:8  72:4  249:21  250:2,8
258:19,23  289:4  393:4
402:10
beverage
67:16  83:8  90:22  91:1
92:13  120:6,15  155:15
184:2  325:13
beverages
83:5  333:17
beyond
257:17
bible
341:21
big
51:23  54:23  81:12  89:19
102:19  109:1  118:21
198:13,14,16  205:16
216:20  253:11  272:15
282:2,19  311:23  316:18
bigger
135:23  292:12,16
biggest
114:14  116:7
big-fish
202:6
Bill
58:7,14,21  59:9,16  61:15
62:21  67:11,14  68:17,18
70:4,7  72:17  75:6,8
81:16  95:14  97:15,18,19
97:23  107:4  159:6
161:15,20  166:5,10
167:10  168:7,12,20
170:2  174:9  180:5,7,7
255:19  258:9,16  259:4
259:7  271:19  272:1,5
273:8  289:10,19  294:12
298:7,12  302:4,17,17
309:20  310:4  312:21
315:6  316:2  376:16,20
biology
202:13
Birmingham
3:15  375:20  397:9
birth
10:19  39:15
bit
81:6  86:6  104:10  111:4
207:5  247:12  260:16,16
322:20  326:11  341:15
bitch
291:16,19
bite
394:5

bits
209:11
black
381:11,13  403:15,16
Blackmore
236:9  238:16
blamed
331:2
blatant
220:23
Bleier
219:19  245:2,10  250:12
381:7
blended
230:1
bless
197:15
blew
225:1,5  315:5,6
blind
255:16  378:10,16
blowing
224:13
blown
220:2
Blue
387:13,14,23  388:1,7,7,11
388:11,17,18
board
58:15  59:21  60:17  156:8
156:11  168:7,21  196:14
196:16  243:7
boat
282:5
Bob
9:17  10:11  17:16  24:14
126:18  137:3  147:15,15
147:18  148:12,14,23
150:15  158:17,18  161:20
161:22,22  162:20  167:10
167:10  195:16  212:23
248:16  249:5  250:1
251:12,15,22  252:7,16
252:16,19,19  253:6,18
254:3,10,15,18,20,21
255:4,7,14  256:7,19
257:1,9,13,16  258:1,11
259:12,18,20  260:17
262:12  263:12  264:3,21
265:16,23  266:14,17,22
267:6,11,20  268:4,5,17
269:2,5,17  270:14,17
273:16  274:4,17  276:5
276:19  277:13  278:13
278:21  279:5,11,21
280:7,16,20  282:14,14
282:15,20,21,22  283:2,5
283:6,18  284:22  285:11
286:3,23  287:7,11,18
289:11,19,22  290:2,6
291:13,20  292:10,22

293:2,5,10,15  294:15
297:18,20  302:2,14,17
302:22  303:5,10
304:22  305:8,22
306:12  307:2,15  308:3
308:11,23  312:21
311:10,14  314:17,19,22
315:2  316:12  317:4
336:19,21,22  337:13,16
337:18,23  349:8,9
361:21  374:16,18,19,22
374:23  375:1,10  376:15
394:21  405:13,17
Bob's
254:5  270:2
bonus
116:19,21  117:3  334:19
born
39:13  41:12
boss
42:10  43:2  44:11  57:4
65:19  136:16,16  137:5
137:21,21  270:15
288:22  333:9  341:13
343:2,4  376:21
bother
121:5,6  139:7  280:23
bothered
170:9  255:17
bottle
108:7,9
bottles
209:18
Bottling
409:3
bottom
127:17  155:14  220:10
bought
108:7  134:1  326:1
bouncing
136:9,19,23  138:2  368:4
box
3:7  154:6  155:14
boy
94:9,10  252:2
Bradley
3:13
brand
113:15
branded
113:13  204:11
bravery
57:9
break
8:2,5  17:6  28:16,17
44:23  55:4,5,8  96:9
100:13  126:14  130:16
165:2,12,20  203:3,5
209:11  248:6  317:10,12
340:13
breakfast

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

179:15
breaking
100:12
breathe
258:6
Brenda
24:14 25:16 179:19,21
181:21 193:10,14,16,20
194:1,6 201:7 213:3
214:1 233:7 256:14,18
256:19 257:12 258:3
259:3,17,23 261:7,13,21
261:23 262:5,11,14,16
263:1,5,14,23 264:6,9
271:19 273:11 276:6,15
276:22 277:11,12 278:5
279:17 280:16 281:1,2
281:12,17,18 282:7,13
283:2,14 284:9,15,21
285:6,13 286:5,10,13,22
287:10 288:6,11,14
289:20 292:4 295:9
298:6,12 299:2,3 300:4
301:22 302:22 303:2,4
305:20 306:3 308:12,18
310:2 312:14 314:1
315:9 318:1 319:6,11,23
331:16 336:12,22
338:12 339:22 341:7
342:10,16 343:11,21
345:19 346:18 347:4,13
347:22 349:3 350:18
351:1,6 354:1,19 355:8
356:8 357:1 366:8
367:18 368:13 369:6,14
370:4 409:7
Brenda's
367:15
brief
10:2,12 174:12,15 364:9
Brinda
78:15,16,20 79:14,19 81:5
bring
76:12 122:15 134:17
154:14 180:20 332:9
350:17 363:22
bringing
60:23 67:11 121:20
297:20
broader
34:7,9
brokerage
13:7,9
brought
61:5 84:11 92:15 154:13
181:10 216:1 233:1,23
318:1 319:5
Brundidge
72:19 73:18,22 75:19,23
81:19,21 82:3,6,11,18,19
83:1,2,5,11 121:3,5,5,8

121:12 125:22 153:21
154:1 176:9,13,18 177:1
204:9 205:20,22
209:14,17 211:21 216:4
226:20 244:15 255:21
256:4 262:1 271:11,14
271:18 272:3,10,16
273:4 278:7 296:21
297:16 298:19 301:3
302:1,8 303:1 308:5
Brunel
27:5
brushed
315:10
bubbles
210:15,18
budget
117:23
build
186:19
building
298:17
bumped
53:8,9,11 54:13,19 157:1
bumps
53:13 54:22
bunch
292:9 300:17 327:12
363:12
business
11:13,14 13:23 14:23 16:11
16:17 18:11,12,15 19:1,3
19:9,11 38:21 39:2 40:3
40:9,10 42:12 43:4
45:14 46:2 47:12,14
51:23 57:11 60:20
76:18 83:3 85:6 90:13
91:3 92:13 120:7,8
122:4 124:3,14,21
125:12,13,14 134:16
135:22 153:6 155:11
173:12 207:3 221:14
232:14,20 233:20
238:20 239:19 241:2
243:13 256:12,13
267:10 272:19 277:7
304:13 311:19 362:8
380:13 400:12,12
businesses
241:4 330:21 350:14
362:4 371:22 372:1,9
busted
360:4
busy
67:17 90:14 350:13
buy
252:4 325:20 361:19
buyer
38:15 39:7
B-R-I-N-D-A
78:17

|  | C |
| --- | --- |

C
3:1 413:1,1
cabinet
140:13
cabinets
145:2
calculating
386:6
calendar
398:8
calibrate
112:5
call
7:10 10:15,16 11:17 22:4
22:5,13 41:6 82:11
91:15 102:19 105:9
189:20 192:7 197:23
224:17 238:15 254:19
254:21 256:11,11,12
261:15 262:18 264:11
266:9,12 268:23 269:15
270:8 278:6,17 302:21
303:15 342:10 345:19
347:2 348:6,8 349:3
356:16
called
10:17 18:11 39:20 44:14
50:12 51:19 73:7 80:18
107:2 108:8 126:23
137:14 140:17,19 218:8
229:11 255:2 256:18
261:12,18 276:15,22
277:11 291:15 303:2,4
320:4 343:8,15 347:18
347:19 349:17 355:12
366:11 369:20
calling
79:11 174:5 192:15 214:10
254:23 255:4 268:6,18
269:6,12,18 275:20,22
278:17 280:9,12,21,23
281:2,13 293:6 302:23
348:9
calls
95:18 145:22 216:16
218:13 302:22
candidate
182:20 185:9 186:12,16
187:1,16,19
candidates
178:1,3,13 179:8,9 192:20
193:1
Cantley
283:5,6
Cantley's
257:14 280:17 283:2
284:22 287:11,18
capacity
49:6 230:17,19 304:2

capital
1:10 43:2,3 69:10 117:20
132:22 133:8,13,17
134:4,13,18,20,23 154:7
154:14
car
251:23
card
51:23
care
50:20 252:9 350:10
cared
302:9
career
29:18 37:13,21 62:10
120:13 196:1
carefully
292:11
Cargill
182:4,5 198:6,8,9
Carl
219:19 245:2,5,10 250:12
250:14 381:7
Casals
9:2 392:18
Cascio
48:22 49:3 405:22 406:2
406:14
case
23:17 204:16 230:15
233:15 311:1 385:14
397:1 398:3 403:19
404:12
cases
375:21
Caucasian
172:15 196:4 212:17
246:12,15 250:13 315:13
357:20
Caucasians
383:14,18,22
caught
258:2 366:13
cause
5:11 413:20
caused
100:3 103:20 119:21
159:5 260:5 392:9
CC
219:19
CD-ROM
43:9
cease
81:22
cell
192:7,16 348:11,12 355:17
Century
140:5
CEO
49:2,17 60:7 67:12 69:8
certain

89:1 164:10 173:6 204:3
206:11 211:13 304:12
327:2,6 385:21
certainly
183:15 340:12 341:1
certify
5:4 413:7,16
CFO
137:2,3,4 147:5
CFO's
136:15 137:6,21 138:1
141:12 146:5
challenge
89:19 91:2 112:6
challenging
47:21
chance
186:17 294:4
change
58:4 68:10 73:8 85:5
96:1 106:8,16 135:17
136:2,5 173:15 176:14
215:7,19 298:18
changed
84:23 90:16 106:13
170:22 383:2,9
changes
13:22 67:14 79:9 120:14
155:4,7,13,16 156:4
399:10
changing
155:9 162:6 169:10
173:22
charge
23:16,18 52:4 240:5
373:6 374:5,10
charged
298:17
charger
355:17
charging
43:22
check
248:5 398:12 411:8
checking
367:14
checks
136:8,19,23 138:2 368:5
chemistry
202:12,13
chest
392:19
Chicago
229:12 247:23
chief
31:22
child
45:11 94:7 258:2 259:12
286:19 292:16 293:1
children
19:17 20:17 21:14 99:6

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

120:22,23 327:4 378:13
choice
204:2 289:12
choices
330:15
choose
215:5
chose
214:22 215:5
Chris
6:19 69:17,23 70:3,17,18
70:22 85:19,22 86:5,10
95:14 96:13 97:12,17
142:2,17 143:18,23
144:1,6 147:9 151:23
157:19,21 160:17 161:7
163:15,17 179:15 180:3
181:18 184:5,23 186:9
186:11 187:14,23 188:10
189:7,17,23 190:2,15
191:5,19,22 192:4,9
193:3 194:2,7,12,17,22
195:2 197:12 201:3
203:13,22 206:1,6,8,17
206:18 207:7,12,23
212:3,8 213:20 216:9
217:22 218:15 219:12,18
219:22 222:8 223:1,9
225:1,5 227:20 229:3
230:3,12,14 233:3
234:2,17,23 235:7,18
273:18 305:16 318:6,9
322:7 324:5 329:3
330:19 344:4 353:5,7
355:1,2 356:11 358:23
360:19 361:10 370:3
380:2 381:5 382:10,15
383:12 401:12 407:1,4
407:12,16
Chronologically
287:19
church
341:17,19
circle
210:7
circumstance
359:15
circumstances
100:2,6 150:6 329:19,22
358:6,7 359:9
Civil
1:5 5:6
claim
119:15 158:7 230:7
231:17 235:16 238:6
317:5 340:3 374:14
377:13 378:15,20
384:13,16 385:2 395:13
395:16 401:3,10 407:23
claiming
394:17

claims
376:10 377:6,23 379:22
382:2 395:19 397:13,14
397:23 398:16 400:19
405:17 412:7
Clarice
250:7
class
112:13 397:17,18
classes
29:19
Classics
220:23
clear
59:19 81:11 97:13 143:12
338:23
clearly
103:21 122:3 230:18
client
340:9
clock
111:1,3
close
196:23 251:22 375:12
396:9,11
closed
137:14 140:18,20 283:10
closely
32:6 82:18 201:13 253:7
closer
46:2,8 47:2 80:22 121:12
Club
31:16
COBRA
354:13 355:22 387:7,15
387:17 388:13
Coca-Cola
272:12
code
20:14 108:9
coincide
136:18
coincided
195:6
Coke
210:9,13,16,18
collected
229:23
collection
216:15
collectively
276:11
college
27:1,3,5
come
19:7 47:8 53:4 59:21
78:18 79:13 80:5 93:23
94:4 107:15 111:3 113:1
125:21 143:14 156:22
165:5 174:19 176:15
185:10 187:8 200:18

210:20 211:5 215:15
252:10 259:23 278:11
302:4 317:22 320:1
340:11 342:14,17 346:2
346:11,18 365:19 366:3
367:16 370:19,21 372:11
374:9 409:7 410:1,18
comes
58:15 261:19 302:14
319:23
comfortable
122:5 214:9 226:10
coming
96:22 108:20,21 168:7,21
337:8,9 349:22 363:19
commencing
5:9
comment
170:16 172:14 173:16
274:19
comments
300:5
Commerce
16:18 17:12 32:1,7
commercial
16:15
Commissioner
5:4 413:23
commissions
311:16,17
committed
327:20
commonplace
168:19
communicate
56:16 159:11 206:10,13
212:4,9,21 213:19
216:11,12 237:1 289:16
309:8 360:6 382:6
communicated
65:22 212:15 216:18
218:12 236:13 265:15
266:13,17
communicates
396:1
communication
234:3 313:5 337:5
communications
231:5,14 340:18
companies
11:16,21,22 12:10,14 13:10
13:11 17:22 43:5 56:12
61:2 68:1 73:9 76:11
82:21,23 106:11,15
107:2 112:12 114:9
120:11 362:3 384:5,9
411:19
company
14:20 15:7 18:4 22:3,13
37:22 38:1,1,6,13,19
39:4,8,19 40:16,19 42:5

42:9 43:1,6,17 44:14
45:22 46:14 51:2 56:2
56:16 62:5,7,9 63:6,9
65:6 67:8,15,17 68:11
69:5,11 70:13,16 71:4
75:7,8 82:16 84:12
86:1 91:9,10,12 93:3
97:8 102:21 103:1,18
104:5 107:12,16 108:22
113:12,13 114:18 115:23
116:16,23 117:1 118:6
120:16 122:11 123:18
124:4,4,6,21 125:3,17
128:5 129:23 131:1,3
135:23 136:23 148:17
149:12,14 151:7,9,23
152:1,6 154:13 156:22
158:21 161:11,12 162:4,5
162:7 164:8,12 168:9,11
169:7 171:13,16,17 173:1
173:2,15,19,21,23 185:11
188:12 194:23 198:10,13
198:14,18,19 199:11
200:16 202:1 205:7
206:12,12 207:1,10,17,18
208:6,16 220:18 222:4
229:23 231:20 232:9,13
232:13,18 234:6,20
239:4 253:2 258:4
259:13 260:12 272:5,6
272:10,12 277:19 278:4
278:10 284:10,14,16
295:14 304:12 305:8,11
305:14,17 307:18,23
312:6,22 315:7 318:4
320:19 323:18,23
325:21 326:2,7 330:16
330:23 337:1 344:11
348:12 354:5 359:1
360:5 365:16 366:15
368:4 377:9 378:2,3,10
378:16 380:22 382:5
411:19
company's
22:12 116:14 124:8,11
compensate
99:21 335:3
compensated
324:12
compensation
324:14 384:14 385:8
complain
172:8 288:6
complained
392:21
complaint
108:9 254:1
complaints
108:5,13 114:2 298:8
complete
28:12 30:10

completed
28:13 30:2,11 412:12
completely
120:12 122:10 204:23
220:2 225:2,6 257:9
272:4 290:16 315:9
380:6
compliance
2:13
compliments
223:18
complying
209:23
compromise
56:6
computer
43:10,11 65:8,13 95:18
112:23 136:14,21 137:8
139:5,15 141:14,18
144:2 145:10 146:16,18
146:20 147:10 258:3
259:11 293:2 304:18
359:16,18 363:5 366:14
366:19
computers
259:13
concentrate
186:5
concentrated
116:2
concern
114:23 125:1,5 137:11
159:6 190:10 211:7
309:11 312:3 314:20
378:4,5
concerned
105:4 130:21 131:2
136:22 137:16
concerning
294:20 376:15
concerns
103:10 310:22 378:21
concessions
314:22
conclusion
229:10
condiment
120:6 252:14 260:18
condiments
83:2 251:16
condition
9:14 116:10 130:17
conduct
43:7,9 110:3 150:15 178:6
181:2 304:13
conducted
159:1 177:20 181:5
conference
166:14,15,16,17,18,20
conferred
361:11

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

confidence
224:4
confident
263:9 289:9
confiscate
147:9 210:21
confiscated
141:14 144:2
conflict
57:14 161:8 163:18
203:22 280:6 380:5
confrontation
224:1
confrontational
256:20
confused
144:4
congratulations
242:14
congruent
324:18
conjunction
200:13 201:1
connection
359:5 375:15
connects
314:5
consequences
291:2
consider
162:6 169:9 170:4 243:17
333:7
considered
32:12 243:8
consisted
307:2
consistent
73:6 154:22
constantly
112:2 394:14
consult
39:22 44:9 409:17
consultant
42:13 245:4,7 246:3
370:20
consulted
191:23 361:11
consulting
39:18 40:8,12 41:1,14,17
42:1,3,7 43:13,14 44:8
44:11,17 45:2 297:15
371:6
consumer
108:5,6,13
contact
40:20 200:19 308:23
320:9 369:1 375:1
contacted
261:13 262:16 263:1,21
contacts
262:15

contain
398:15
contention
358:10
context
274:23
continually
155:20
continue
132:16 155:15 289:13
305:9 309:7 318:18
390:9 392:14
continued
67:3 197:11 232:3 390:7
continuously
14:6 16:8 17:8
contract
113:14 215:20 233:21
334:16,16
contractor
140:1,3
contracts
113:13
contributed
115:15
contribution
51:5 389:14,15,20,22
contributions
386:21 390:7,15
control
87:7,10,13,14,22 88:4
109:7 116:6 118:20,21
139:23 173:21,22 174:5
215:8,19 244:1 245:17
299:1
controlling
88:4 116:6
controls
87:17 253:14
conversation
10:1,3,10 24:6,13,20 25:3
25:15 26:7,13 98:9
116:18 117:5 123:11
142:6,10 143:6,13 146:4
146:10,14 189:1 193:13
193:20,23 194:1 266:20
267:19 269:22 271:5
281:11 287:21 288:19
306:7 351:3 355:8
356:2
conversations
24:10 123:8,21 369:10
396:3 406:10
copack
108:12
copacker
109:18,19 111:8 113:7
copacking
113:9,11 125:12 155:12
copied
141:20 160:7 207:8

236:20,22 242:8
363:17 364:12
copies
25:10 26:4 396:2
coplaintiffs
395:18 405:14
copy
24:22 83:17 85:14,23
86:4 149:4 213:8 227:6
363:11,16,21 364:10
374:9 380:21
corn
198:10
corner
227:1
corporate
46:1 256:3
corporation
12:6 151:7
correct
15:21 37:4 51:4 60:1,19
61:8 62:18 75:21 76:2
99:17 105:15 109:13
113:21 114:22 115:3
128:22 130:23 145:6,12
148:4 151:13 155:18
156:8 158:9,10 162:22
167:18,19 169:20 174:3
178:15 209:15 210:6
215:9 217:16 219:9,13
222:23 223:2,7,8 224:1
224:19,22 225:11
233:18 234:10,16 235:4
235:11 238:17 239:8
261:1,2,21 285:5 286:8
290:8 292:7 298:4
313:8 326:16 331:17,22
336:2 339:3,9,16
347:17 352:16,22 353:6
353:14 357:20 360:21
360:23 361:1 362:22
364:14 365:19 366:6
367:10 370:9,16 373:10
374:7 377:2,3 384:7,12
384:18 385:8,19,23
389:11 390:13 392:18
392:22 399:21 400:21
401:10 409:4,5,8 413:13
cost
50:20,23 51:2 71:23
327:2,5,6
costing
297:18
counsel
2:5,17,19 5:7 370:10
413:17
counseled
301:22
counted
162:14
county

29:15,16 413:5
couple
7:3 39:23 45:7 73:16
95:9 113:7 255:19
271:10 352:4
course
259:20 326:21 337:10
334:5
court
1:1,22 2:7,14 5:1 6:12
22:1 176:20 228:7,14
courtroom
22:10
cover
314:1
coverage
50:21 51:3 386:14,22
387:4 388:4,7,14 389:4
389:10
covered
33:6 359:19
covering
382:14
cowboy
104:10
Craft
133:5,9
crazy
199:8 207:4
create
80:13 191:20
created
33:11 80:10,16 109:8
364:2 399:16
credit
197:19
Critical
109:6
Crosby
250:7 336:23
cross
183:2,6,10 387:13,23
388:7,11,18
cross-country
12:17
crushing
260:11
culture
298:18
current
19:23 329:19,22
currently
8:6,9 16:4 362:10 393:2
curve
198:21
cushions
11:19 16:13
cussed
253:19,19
cussing
254:11 257:18 265:7,23

284:2
custom
11:18 16:13,14
customer
82:13 108:18 109:16,22
110:2 114:2,4,12,13
134:18 378:8
customers
63:22 65:7 67:22,23
82:15,18,20 84:2,6,10
88:10 89:18 92:15
107:23 108:3 110:9
111:13 112:13,17 113:20
132:21 133:2 160:7
204:4,12 209:4 232:16
252:17 266:5 360:4
362:16
cut
223:20 334:2 380:18
cutbacks
132:5
cuts
29:1

---

D

D
4:1 76:10
daily
67:13 229:8 398:10
dairy
27:14 32:11
damage
63:21 88:4
damages
385:14 386:9 390:23
391:3 402:4
dam
252:20
data
87:15,16,17 363:5
date
5:4 8:19 10:18 183:22,23
215:14 304:16
dated
128:18 129:10 219:11
225:9 367:9
dates
70:5 152:1
daughter
39:13 41:12 45:9 47:11
David
176:19,22 183:3 366:17
369:22
day
6:19 10:5 39:12,14,15
50:5,6 51:1,17 52:4
55:17 57:3,18,23 58:8
59:8,22 61:11,21 62:1
66:2 69:17,23 70:3,17
70:18,23 71:20,22 74:1

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

76:7 77:4,19 79:23
80:3,6 82:8 83:7,11
85:19,22 86:6,10 88:21
88:22 93:18 94:15,16
95:14 96:13 97:12,17
100:9 101:18,22 102:10
136:12 143:18,23 147:9
148:20 149:17 151:23
157:21 160:17 161:7
163:15,17 164:10 167:22
168:13,15 175:16 176:7
176:7,12,16,18,23 177:4
179:15 180:3,14 181:18
184:5,16,16,18,23 186:9
186:11 187:14,23 188:10
189:7,17,23 190:2,15
191:6,19,22 192:4,9
193:3 194:2,7,12,17,22
195:2 197:12 201:3
203:14,22 206:1,6,8,17
207:8,12 212:4,8 216:9
217:22 218:15 219:13,18
223:9 225:5 229:3
233:3 234:2,17,23
235:7,18 244:17 253:18
256:1,2 262:1,4 263:3
268:3 271:15 272:14,15
272:22 273:18 276:15
276:17 279:4,8 297:4,7
302:2,6,19 303:14
305:16,17 318:6,10
319:1,15,17,18 322:7
324:5 327:7,12 329:3
330:19 335:14 342:5,9
342:13 344:4 346:3
348:16,21 353:5,7
355:1,2,16 356:11
360:20 361:10 368:16
370:3 380:2 381:5
382:10,15 383:12 394:9
394:9 398:12 401:13
403:11 405:11 407:1,4
407:16

**days**
40:1 49:12 94:16,17,22,23
95:2,2,8 164:11 267:1,8
267:13,22 278:20
285:4 303:3 318:15
319:20 325:5,11,13
408:21 410:6,20

**daytime**
68:8

**Day's**
142:2,18 144:1,6 157:19
213:20 219:22 222:9
358:23 407:13

**day-shift**
78:8

**day-to-day**
124:10

**deal**

125:19 126:8 159:5
216:20 223:12 260:5
311:23 316:19

**dealing**
217:10 223:15

**deals**
283:9

**dealt**
222:19

**debt**
119:14 131:11,14

**December**
25:5 70:14,19,23 81:17
309:14,23 312:18
364:19 377:2

**decide**
99:2 211:8 311:9

**decided**
45:23 46:2 363:10
374:22 375:1 383:4

**deciding**
361:12

**decision**
36:23 126:8 131:23
135:12 149:12 151:9
157:7 161:1,5 163:15
164:7,15 174:23 176:11
185:19 189:1,12,16,21
190:1,3 192:18,23 193:9
197:2 200:12,21 201:1
203:19 204:5 228:2
324:2,5 329:3 350:16
370:7 382:10

**decisions**
34:15 62:12 87:16 92:21
122:21,22 190:5 198:23
236:3

**decision-making**
177:18,20 208:22

**decline**
365:22

**declined**
154:7 365:21 409:10

**decrease**
55:1 9:1,4 164:13,14
194:20 315:18

**decreases**
164:8,9

**DEFENDANT**
3:10

**Defendants**
1:11

**Defendant's**
4:5,6,7,8,9,10,11,12,13,14
4:15,16,17,18,19,20,21
4:22,23 127:11,15,17
129:1,5 152:14,18 153:9
153:13 213:10,14 216:22
217:3 218:22 219:3
220:5 237:8,12,22
238:3 239:1 248:8,13

248:16 249:1S 251:1
293:17,21 294:5 313:2
316:9 324:21 329:5,9
330:5 331:14 332:19
337:12 339:7 358:20
366:22 367:3 372:18,22
373:15,17,21,23 376:2,6
377:12,17,21 379:15,19
381:15,18,22 399:2,6

**Defense**
88:5

**define**
410:8

**defined**
103:12,18,19,21

**degree**
27:10,12,22 29:23

**degreed**
198:15

**delete**
149:4

**deli**
32:11

**deliver**
327:11,23 328:3

**delivered**
215:13 321:6

**demands**
67:23 187:7

**demeanor**
57:8

**demise**
331:4

**demographics**
239:22 240:4

**dental**
50:22 386:16

**deny**
157:5,9

**departed**
70:13 72:23 73:17

**department**
31:23 32:7,8,9 35:17
38:16 39:1 72:9,22
73:2,4,19,21 75:11
77:22 78:4 79:1 81:11
84:2,4 86:21,22,22
91:20 99:20 100:1,17
103:4,21 111:6,22 112:7
115:8,19 157:12 200:19
201:14 253:11,12,17
284:5 289:1 296:8,11
368:15 382:16 385:1

**departments**
106:7 178:23 198:16

**departure**
67:2 71:4 74:5,21 75:17
79:7 81:6 408:3

**depended**
155:23

**DEPONENT**

412:14

**deposed**
21:21

**deposition**
1:15 2:5,10,11,22 6:22
9:21 126:19 127:16
129:6 152:19 153:14
213:15 217:4 219:4
237:13 248:14,17
249:16 251:2 293:22
329:10 332:19 339:8
367:4 372:23 373:22
379:20 381:23 397:4
399:7 412:11 413:8,14

**depositions**
2:15

**derogatory**
169:21 383:13,17,21

**describe**
101:8 144:12 373:9 409:1

**described**
95:22 96:6

**description**
72:8,10 83:18 84:15,18
86:10 103:7 105:11,12
105:14

**descriptions**
72:6,9

**deserved**
158:6

**desire**
239:2

**desk**
139:16 140:12

**detail**
159:14 165:8 199:5

**details**
19:10 158:20 264:7 286:3
364:22 367:21 404:20

**deter**
218:21

**determination**
318:9

**determined**
29:17 156:14 157:16,18,22
294:19

**determining**
87:23

**detrimental**
116:14

**develop**
76:13

**developed**
112:14 256:5 271:22
273:2

**development**
72:22 73:4 76:4,10,17
92:12 253:5,8,10 296:8

**devoted**
323:20

**difference**

87:12 166:18 212:3
229:16,20

**different**
12:14 13:1 35:9,14 36:2
37:14,18 71:12,13 72:12
85:1 87:11 90:21
102:23 103:5 106:7
107:21 111:18 114:5
122:19 127:8,10 178:21
179:14 184:18 200:17
202:3 207:6 227:2
228:20 235:4 272:5
282:13 285:9 371:6
398:11

**differently**
158:8,12 159:16 160:19
162:16 203:10 235:23
313:15 361:5 381:16
401:19

**difficult**
92:17 111:12 124:15
324:13 367:23 394:3

**difficulty**
89:17

**digest**
318:20

**dignity**
199:19

**dinner**
178:13

**direct**
56:15 262:22 328:7,8

**directed**
214:7

**directing**
221:16

**direction**
65:6 142:1,2,18 144:1
147:9 222:15 255:22
273:3 337:8,10

**directly**
57:12 102:7,21 202:2
286:15 295:13,19 296:1
308:23

**director**
31:21 52:15 53:2 54:1,4
54:10 59:4 60:14,18
68:14,20 71:8 73:7
83:15 92:7 93:1,14
105:23 106:2 107:3
155:10 240:10,15
245:20 246:23 283:7
378:4 401:5 408:10

**directors**
73:10 243:22 245:16,17
245:21

**disagree**
249:14,17 384:23 385:3
385:11

**disagreement**
260:21 261:1 380:5

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

disappointed
260:9 341:12
disaster
64:13,15 107:10,17 113:19
114:18 115:16
discernible
229:14
disciplinary
128:6 130:1 158:19,20
162:21
discipline
46:11,15 115:21 254:6,11
255:13 267:5 269:4
278:4 281:19 293:6
disciplined
194:14 254:4 264:3 265:1
265:16 266:15,18,22
267:12,21 282:16
290:17,18 291:21,22
292:6 301:4 381:1
disciplining
304:3,4
discovered
136:19
discriminated
26:11 165:9 220:14
235:22 316:4 317:17
394:2 401:14
discrimination
19:13 220:23 235:16
238:6 315:20 317:5
376:11 377:7,13 378:1
378:15 379:10,23 382:2
406:19 407:23 412:7
discriminatory
234:15 235:3
discuss
173:18 280:2,4 323:5,9
326:22 327:8 338:15
376:22 397:20
discussed
155:7 159:6,8 168:5,20
168:22 174:14 201:23
239:2 311:1 326:8
337:18 340:20 376:19
400:21 409:21 412:6
discussing
138:4,21 189:10 192:4
231:6 251:3 281:13
405:16
discussion
68:4 126:13 184:10,19
188:21 189:6,9 190:8,10
190:18 191:5 252:5
282:7,10 283:13,17
284:12 287:14 319:4
331:8 356:2 384:2
discussions
121:20 131:17,22 132:4,8
132:14 133:15 134:22
135:4 184:4,8 190:11

331:5 345:14 356:7
395:19 409:14 410:11
dishonest
136:14
disk
363:13,16
displays
315:22
disproportionate
359:13
disproportionately
332:11
disseminated
63:4
distracted
394:12
distraction
183:19 289:2 394:16
distress
391:4,7 395:12 403:6
404:7,9 406:9
distributed
152:12 154:19 178:3
distribution
177:22
DISTRICT
1:1,2
disturb
137:10 170:10
disturbed
170:8 171:2
diverse
35:10
diversity
241:11
divided
19:1 357:13
division
1:3 18:13 155:15 173:1
251:16 252:14 260:18
333:17
document
51:21 64:7 129:7,19
152:19,23 153:15,18,20
154:19 212:2 215:10,12
217:4,18 219:5 222:1
227:6 228:13 237:14,21
248:12,21 259:11
293:23 294:3,9 295:20
296:15 301:14 324:18
324:20 325:2,19,23
329:11 330:2,4 336:14
354:10 355:3,9,13,20
376:7,10 377:5,6,23
378:14 379:19,22
380:21 382:1,11 399:14
399:17 400:22 411:3
documents
22:7 53:16 85:5,11,18
86:2 95:19 103:5
110:18 228:6 359:18

363:17,21 364:1,10
406:18
doing
18:12 29:11 44:7 45:23
61:4 64:11 65:10,12,12
65:13,16,20 67:4,7
107:1 122:2 139:13
140:7,9,17 143:16
159:21 192:11 242:4
253:2,13,17 269:21
275:7 299:4 304:20
306:23 320:19 354:7
369:19 380:22
dollar
133:13 321:14,16,19
dollars
54:9 134:5,14 185:22
186:1 191:8 211:3 330:9
385:7 387:19 389:7
399:21
door
137:15 139:11 140:18,20
144:14 283:11 327:7
332:22 380:4,14,16
383:5
double
304:11,21
doubt
86:6 188:2 326:11 351:22
398:18
download
149:19 363:4 364:11
downloaded
148:21 151:10
Dr
392:18 410:12
dramatic
337:3
dramatically
298:18
drastically
176:10
drawers
139:17 140:12 145:3
Dreaden
59:4,6 60:11,16 62:23
64:9 66:22
dreams
125:15
drink
252:11
drinking
252:3
drive
89:2 140:21,22 141:1,2
276:17,18
driving
88:13 278:6
drop
99:7 287:22 288:4
dropped

260:1
drove
256:17 341:20
due
170:5 409:11
duly
5:16
Dunn
403:1
duration
39:7 71:16
duties
31:11 63:3 66:23 79:22
81:8 83:16 93:11 99:5,8
107:1 353:23 357:2,7
357:12,17
duty
23:14
dynamic
47:22 67:22 68:9
D-R-E-A-D-E-N
59:6

———————— E ————————
E
3:1,1 4:1,4 413:1,1
earlier
59:14 76:22 81:14 90:5
92:12 105:21 107:8
126:17 201:23 251:3
272:3 291:6 324:19
332:15 339:6 397:7,11
early
87:21
easier
7:13
easily
85:18
Eddie
336:23
educated
61:3
education
29:13 30:4
educational
202:9
EEOC
23:16,18 373:6 374:5,10
374:14
effect
2:12 215:8 289:6 318:14
318:15 328:19
effectively
360:7
Effects
155:2
efficiencies
65:14 72:5 155:17
efficiency
72:12

effort
402:23
efforts
409:1
eight
38:10 98:23 185:22,23
199:18 392:4 393:7,11
399:21
eighty
211:3
eighty-five
53:11 54:20 157:2 321:23
either
53:7 75:23 122:10,19
134:7 168:1 206:5
218:12 261:12 263:18
310:23
electronic
363:5
elements
38:23
eleven
11:7,7
Elgi
403:1
eligible
355:3
eliminate
63:6 72:2
eliminated
249:19
eliminating
249:4
Elizabeth
396:15,15,17 397:2
else's
174:8 318:11,12 322:17
emblem
211:9
Emerald
21:1,2,7,10
emerge
330:12
Emily
404:21
Emma
26:18
emotional
104:19 352:7 380:7 391:4
391:7 395:12 402:3,16
403:6 404:7,9 406:8
emotions
352:8
employed
17:18,21 44:5 345:9,10
385:23 390:12
employee
19:6 63:17 78:23 79:8,9
79:10 91:10 97:22
101:14 104:3 115:21
137:18 140:2 158:18

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031    http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

185:13 186:17 188:14
195:18 208:12 229:4,5
229:6 230:10,11,13,13,17
230:18,19 231:2 245:6
246:3,5 250:16 254:6
255:12 269:12 282:4
290:15 302:2,6,19
312:2 318:18 369:22
403:13,13 406:5
**employees**
13:18 16:3 17:12,15 18:15
18:16,17,21 22:6 35:11
35:15 36:11,16,20 43:12
63:4,14 66:3,13,15 67:1
71:8 72:5,12 80:13,14
90:19 91:6,8,14,15,18,19
91:22 92:5 95:6 99:14
100:23 101:9,19 110:10
110:21 111:19,21 115:1
120:21 131:4 132:11,17
151:18 171:22,23 212:13
235:19 240:4,17 272:11
301:10 302:8,12 305:1
311:14 313:13 322:21,23
336:11 338:21 357:14
360:9 364:20 365:1,6,8
381:14 390:16
**employer**
40:22
**employment**
19:12 21:9 24:17 35:22
39:7 42:8 46:9,13
47:20 48:4 74:15 128:7
130:2 177:10 197:8,10
232:1 242:18 243:5
309:2 334:16 344:6
361:12 397:15 406:12
409:2
**encompassed**
73:11
**encouraged**
95:5 159:10 160:15
163:10 189:17 190:16
193:17 289:16
**ended**
75:6 225:20 261:16
315:23
**endured**
313:13,14
**enduring**
313:17
**engaged**
37:7 381:14
**engaging**
115:12
**engineering**
89:22
**enjoy**
124:2
**ensure**
31:18 84:3 156:21

**entailed**
285:7
**enter**
28:8 30:12
**entered**
28:6 29:7,12
**entire**
34:3 57:22 93:21 108:12
113:2 196:1 221:23
237:7 364:4
**entities**
18:21 120:12
**entitled**
106:8 340:19
**entity**
23:8 209:22
**enumerate**
165:5
**envelope**
318:5 322:5 329:14
**environment**
35:11 67:19,21 68:6 89:12
103:15 199:8
**equipment**
13:12 89:13,14,16,20 112:6
115:5,7 124:13
**especially**
68:11 120:19 200:16
281:3
**established**
246:6
**estimate**
13:21 392:11
**et**
1:7,10
**ethic**
35:9,14 36:2
**ethical**
232:13 315:8
**evaluated**
56:7 108:3 114:4
**evening**
256:17 342:11 345:20
349:4,18
**event**
50:12 81:13 138:21 316:6
341:18 395:5,5
**events**
248:22 294:14
**eventually**
199:10 247:7 279:17
289:21 387:3 392:17
**everybody**
161:18 200:21 256:15
275:15 307:10 320:20
337:6 396:2
**everyone's**
318:4 336:16
**evidence**
2:23 110:6 118:3 173:5
229:10 359:16 379:10

**evidences**
251:4
**evident**
359:17 380:17
**evidently**
299:5 301:19 369:20
**exact**
8:19 143:23 334:13
**exactly**
17:13 101:2 154:4 157:21
166:11 195:6 226:12
366:9
**examination**
4:3 5:11 6:1
**examined**
5:16
**Examining**
153:20 222:1 237:21
248:20 294:3 400:22
**example**
92:16 108:6
**examples**
88:8
**exceed**
83:23 86:17
**exceeded**
112:16
**excellent**
101:11,19 360:3
**excess**
134:4,13
**exchange**
153:5
**excited**
247:20,23
**exciting**
249:22 250:2,8 272:15,22
**exclusivity**
232:8
**Excuse**
143:11
**execute**
103:13 105:3 109:19
**executed**
84:8
**executing**
108:23 118:13,23
**executive**
166:16,18 167:9 173:13,20
208:15 223:22 255:20
272:8,9
**executrix**
215:16
**Exhibit**
4:5,6,7,8,9,10,11,12,13,14
4:15,16,17,18,19,20,21
4:22,23 127:12,15,17
129:2,5 152:15,18
153:10,13 213:11,14
216:23 217:3 218:23
219:3 220:5 237:9,12

237:22 238:4 239:1
248:9,13,16 249:15
251:1 293:18,21 294:5
313:2 316:9 324:22
329:6,9 330:5 331:14
332:19 337:12 339:7
358:20 366:23 367:3
372:19,22 373:15,18,21
373:23 376:3,6 377:12
377:18,21 379:16,20
381:15,19,22 399:3,6
**exhibited**
182:11
**expansion**
117:21
**expect**
109:18 156:2 207:6
**expectation**
121:15 305:13
**expectations**
84:1
**expected**
105:11 118:1 303:23
311:12 366:9
**expecting**
118:16 303:21
**expenses**
400:11,13
**experience**
62:11 127:10 159:21
182:13 187:2 201:20
234:18
**experienced**
393:20
**experiencing**
391:15
**expert**
103:1
**expertise**
75:15 108:20
**explain**
169:15 187:18 296:7
**explained**
169:13 188:2 206:18
217:15 241:11 277:21
282:14 303:7,8 311:3,7
311:14 325:17
**explaining**
93:7 187:23 217:14
**explains**
295:20
**explanation**
324:8
**expressed**
188:5,7 331:12 379:5
**extended**
50:9
**extension**
29:16,16 400:5
**extensively**
410:4,9

**extent**
133:7
**Exterminating**
140:5
**extrapolated**
150:5
**extraspecial**
211:15
**extreme**
298:15,19 305:5
**extremely**
67:17,22 260:8 288:20
394:1
**eye**
144:14 255:16 378:10,16
**eyes**
274:13
**e-mail**
127:20 129:20 145:15
146:1 159:8 160:6 161:7
161:9 163:5,18 203:21
206:9,14 207:7,12,22
212:7,22 213:15 214:1
216:13,14,16 217:13,19
217:22 218:3,12,18,19
219:6,11,23 221:17,23
222:9 225:8,12 227:3
227:12 228:20,22 229:1
229:13 230:16,21 231:1
231:3,4,8,11,14,23 232:5
232:7 235:10 236:1,11
236:18,21,22 237:1,7,16
237:23 238:14 241:15
241:20 242:3,17,21
243:4 245:11 248:19
250:20,23 251:4 259:5
289:14 309:1 332:15
339:6 358:21 367:8
368:19 369:5,15,18
379:5 381:6 382:23
383:1 396:1 406:20,21
406:23 407:4,9,13
**e-mailed**
215:11 227:12,13,14
229:11,13 230:15
368:20,21
**e-mailing**
369:7
**e-mails**
95:18 219:8 235:19 367:5

---

**F**

**F**
413:1
**face**
97:11 144:17 274:12
**faces**
256:8 274:4,7,10,11
275:3 276:23
**facilities**

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

50:3 58:9 59:15 76:8
82:9 83:8,12,13 87:3
176:6
facility
39:23 50:5,7 51:8,14
52:5,9 55:17 57:18
58:1 59:23 61:12,12
72:19 75:19 76:14 77:5
77:19 78:12 79:23 80:1
81:19,22 82:7 84:11
110:11,15 113:14 117:21
117:23 148:21 149:18,18
151:2 175:14 176:23
183:5 204:10,13 205:5
205:9,13,17,20 209:14
209:17 210:21 211:5,22
216:4 226:20 247:4
254:14 262:2 271:15,15
288:23 297:16 305:3,3
305:6 368:16
fact
88:2,3 114:19 136:22
199:22 218:20 223:18
224:7 229:5 261:4
279:3 281:1 284:13
312:3 314:8 330:23
357:6,9 365:18 377:9
379:3 384:16 396:19
facts
303:6
failed
108:19 110:8 197:20
fair
7:23 185:20 234:11 343:3
fall
18:18 204:15 395:4,5
false
294:20
falsely
158:22
falsifying
22:6
familiar
367:6
familiarize
294:7
family
46:4,4 47:1,3 50:21
63:10,11 78:2 326:23
386:14 387:10 391:10
393:22 395:8 396:6,7
fan
274:17,18,22
far
36:15 122:20 257:17
338:23 364:23
Farmers
30:17 31:1 33:15 34:23
35:3,6 37:3 42:11
46:10 108:20
father

157:19,21 208:14
FDA
84:1 86:18 305:4
February
196:11 339:6 388:12
fee
44:1,4
feel
26:9 96:21 106:7 122:5
160:21 189:22 195:20
195:22 203:9 222:3
232:6 243:4 263:9,16
289:9 316:4 342:4
feeling
104:20 114:18 290:4
315:14,16 316:13,16,17
335:21 349:20
feelings
173:6
feels
214:9
feet
199:1
felt
26:8 38:22 62:7 103:23
105:13 124:5,17 162:6
163:14 171:11,14,17,22
172:23 173:1 174:22
182:18,19 185:6,8,9,13
185:20 186:9,15,23
187:5 188:11 190:2
192:23 197:3,12 204:6
207:8 219:7,22 220:9
222:5,12 232:7 233:6
234:13 244:15 262:21
269:2,9 272:7 277:18
282:14 289:17 290:15
290:17,19,21 304:5
311:5 325:8 330:21
331:11 343:23 347:23
374:20
female
327:3
fiance
37:7
field
27:23 61:1 202:14
fifteen
179:6,8,9
fifth
3:14 300:3
fifties
201:18
fifty
93:16 322:3 330:8
337:14
fifty-five
52:23 190:21 191:8
fifty-two
389:6
figured

337:22
file
277:22 278:13 313:8,10
344:7 353:10,13 354:22
369:23 370:1 374:13
384:20
filed
6:21 23:17,18,20 228:6
254:1 384:13,16 385:2
400:5,6
files
141:20 363:12,15
filing
22:9 140:13 145:2 345:6
fill
99:5 177:4 195:9 370:22
filled
163:7 183:17 200:3,6,7
filling
103:18
finance
34:12 119:21 120:2 132:1
134:23 135:13 154:7
finances
84:4 116:14 120:18 125:5
financial
116:10,17 121:9,11 125:2
125:18 130:17,22 131:2
131:18 207:10 211:7
325:14 331:1 368:3
financials
337:21
financing
154:8
find
65:20 88:23 91:11,22
123:4,5 143:17 177:3
279:9 306:4 361:19
366:8 375:13 397:6
409:1
finding
326:6
fine
5:22 10:6 104:4 106:19
231:12 289:22 290:2
finish
27:8 28:1,7 96:10
finished
83:22 86:13 400:13
fire
34:17,21,22
fires
112:8 115:10 118:19,21
firing
34:14
firm
122:10 123:4,15 177:10
firms
220:22 371:6
first
5:16 24:12 30:15 32:2

48:19 49:12 59:21
96:15 97:17 112:9
124:18 128:8 130:2
158:15 166:2 168:13,15
168:17 175:1 181:2
183:14 219:11 223:6,11
223:15 224:16 261:19
261:22 274:21 275:1
294:17 317:11 341:5
345:10 346:5 368:18,20
369:5 373:1 375:17
first-hand
79:7 402:9
fiscal
119:17
fish
102:19
fit
380:11
five
13:22 33:20 98:21 117:2
117:7,13 163:17 267:1,8
267:12,21 285:4 385:6
408:12,22 410:6,20
five-day
254:10 295:5 301:10
fix
124:12 382:13
flag
277:7
flat
44:1,3 253:19
flatbed
13:1
flatbeds
13:3,6
flawless
156:4 360:2
flight
178:9
floor
65:4 113:4
Florida
27:5
fluctuated
90:13
fly
178:10
focus
34:5,8,9 82:14 83:2
114:7,15 199:5
focused
33:3 120:21 260:8 275:8
focusing
209:14
folks
36:1 90:4 174:1 286:11,13
296:21 308:14 328:4
402:2
follow
55:12 65:19 285:13 314:4

followed
208:5 379:5
following
5:12 69:11 110:7 184:16
254:12 319:1 327:21
347:10 364:8 387:10
395:4
follows
5:17 120:14
follow-up
180:19 231:8
food
27:20 29:20,21 30:16
31:5,8,12,18,21 32:10,11
32:13,16 33:1,5,10,14,19
34:9 38:21 39:20 40:7
40:13,20 41:18 42:4
43:5,6,7,8,10,15 44:18
45:2 55:23 56:11,12
57:1 61:2 73:9 84:3,13
93:3 109:8 113:12,12,13
202:11 204:2 220:18
234:18,20 302:11 342:1
342:8 372:3,6,9 378:2
378:3,6 379:8 409:18
410:14
force
2:12
foregoing
5:6 413:8,12
foremost
158:15
forewarned
404:15
forgot
244:13 245:1
form
2:18 106:21 136:2,3
149:21 150:8 172:18
235:6
formal
51:23
formally
53:14
formed
14:2 15:18 17:3,5,9
former
40:22 42:10 43:1 44:11
63:16 403:13 406:4
formulated
150:4 351:14
forth
110:2
Fortune
61:2 68:1 82:15 114:9
forty-five
325:4
forty-seven
50:18,19
forward
7:4 217:18,19 218:10

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

242:6
forwarded
242:7
found
47:20 137:21 159:1
164:10 182:19 280:20
284:18 285:18,21
292:16 387:9 395:3
four
33:20 76:15 100:8 163:9
166:21 388:9 393:12
408:22 410:6,19
frame
25:2 121:22 131:14
132:20 154:20
freight
13:1,11 297:19
frequency
110:1
fresher
296:17
freshman
27:4
friction
101:12,13 103:20
Friday
367:17 368:21 369:2
friend
341:16
friendly
330:20
friends
104:16 162:3 169:6,14
172:2 396:9,10,11
front
97:11 173:13 256:1 271:14
290:22 308:11 313:1
fruition
410:1
frustrated
253:18
fulfill
105:12
fulfilling
105:14
fulfillment
104:19
full
2:12 6:5 65:17 94:22
116:1 325:3
full-time
110:11 403:3
fund
345:16
funding
132:16
funny
210:13
furniture
16:11
further

231:4,13 290:6 330:9
412:14 413:16
future
304:23
F'ing
291:19

## G

Gadsden
26:18
gain
382:7
Gainesville
27:5
gap
370:22
Gatorade
108:7 110:13 111:10,17,17
114:12 133:20,21 134:3
gears
111:13 112:1
gel
325:15
general
8:22,23 18:9 57:1 114:16
135:21 146:12 245:23
247:8 333:16 335:21
396:21,22
generalist
103:2
generally
122:1,8,13 123:2 125:16
134:19 253:23 265:6
gentleman
36:6 48:11 201:22 244:21
397:9
Georgia
22:15 23:12 30:19 32:9
42:20 46:5 245:9
250:18
getting
66:20 77:23 125:11 176:8
184:1 196:23 256:22
277:22 337:4 380:6
392:6
girl
94:9
give
10:6 85:10,22 88:7,10
97:1 122:20 126:23
197:19,22 199:21 271:13
272:20 319:11 320:8
321:13 328:5 392:11
411:11
given
6:22 22:21 25:10 26:13
51:13 59:13 72:18 81:18
106:1 109:20 222:18
254:10 270:6 310:16
344:10 369:21 398:22

408:8 413:14
gives
14:13
giving
26:2 67:13 86:3,9 222:14
223:10 378:9
go
7:3,4 22:4,7 27:1,22
28:14 29:14 36:6 39:23
41:4 47:11 62:23 75:12
77:16 79:15 92:4 96:13
99:2,13 111:2 114:9
122:21 137:20 142:9
149:15,17,18 153:19
180:8 190:22 194:10
199:18 202:21 203:1
207:2 210:15,16 224:9
225:16 230:20 231:9
249:10 251:5 252:11
255:21 256:10 258:14
258:20 261:23 264:6
266:1,3 269:7 273:3
289:5 295:11 297:22
302:6 305:9,19 306:22
312:4 320:22 321:2
325:6 327:16 328:13,18
341:21 342:9 347:12
349:4 355:14 365:23
365:5 371:19 378:16
386:5 391:10,11 394:4
395:2 406:8
goal
41:5,7 160:8
goals
41:8
goes
93:6 257:17 299:22
330:11 398:4 403:19
404:12
going
7:3,7,8 29:14 40:4 57:5
57:8 85:17 102:15,17
103:11,13 106:9 110:19
116:19 117:6 121:16
125:6,7,9,10 127:7,7,9
133:4 137:13 139:16
140:12 141:5,6 147:5,16
149:11 151:6 153:12,21
154:11 155:4,15 156:22
159:13 165:4,7,14 167:4
168:8 178:6 189:2,11
194:9,14,19 197:1 205:8
206:19,20 207:19
209:10,10 213:13 214:12
216:4,20 219:2 232:10
232:14,15,16,18 233:13
237:12 240:12 242:23
248:12 249:15 251:5
255:16 256:21 257:3,21
259:1 260:15 263:10
264:3 266:14 267:5,12

267:20 268:15 271:10
271:13 272:15,16,18,19
273:3 275:4 276:17,19
277:16 278:2,13 284:1
284:10,14 285:10
287:23 288:5,15 289:10
289:15 292:5 293:14,20
303:10 309:22 310:7
311:16 316:12 317:23
318:16 320:10 321:12
322:23 323:5,9,22
325:6,10 326:14,23
327:2 328:13 329:8,16
330:8 331:17,19 337:3
337:5 340:10,23 341:10
342:5,7,12,20 345:16
346:6,16,22 347:21
349:22 354:7 357:1
359:2 362:7 370:13
372:21 376:5 377:20
379:18 381:22 382:4
383:5,6,7 391:20
393:15,18 394:10,11,15
399:12 400:11 404:8
406:11
good
6:2 7:1 27:22 47:15,18
56:12 57:11 60:21,23
62:12 72:3 79:8,10
81:9,10 89:21 90:18
91:8,21 92:1,2,5 96:8
100:11 120:9 125:6
131:3 137:18 193:16
199:18,21 225:16 232:12
252:2 253:17 255:7
270:21 321:3,4 360:9
374:21
Gosh
286:9
gotten
365:17
government
40:7 109:3,7
go-to
103:8
grad
28:14
graduate
26:20,22 28:6,8 29:8
30:2
graduated
30:8 46:7,7
graduating
28:15
Graham
409:3
grandiose
125:14
great
124:5 159:5 185:12
242:14 260:5 305:13

grew
19:3
Grey
307:2 308:11
grocery
31:16 192:13 198:12
groom
186:19
groomed
80:15
gross
24:14 158:17,18 162:20
195:16,17 249:5 250:1
251:13,15 254:3,15,19
254:20,22 255:4 256:7
256:19 257:1,16 258:1
258:11 259:12,18,20
260:17 262:12 264:21
265:16 266:14,17,22
267:6,11,20 268:4,5,18
269:6,18 270:14,17
273:16 274:4 278:13,21
279:5 280:7,20 283:18
285:11 286:3 287:8
289:11,19 290:2,6
291:14,21 292:10,22
293:2,5,11,15 294:15,18
297:18 301:2 302:3,15
302:17,22 303:5,10
304:22 305:8,22
306:12,17 307:2,15
308:3,23 310:3 314:17
314:19 315:2 316:12
317:4 376:16 394:21
399:19 400:3
grossly
304:13
ground
7:4
grounds
2:21 128:6 129:23 130:9
150:1
group
16:19 17:12 79:17 122:12
124:18 168:17 276:12
307:1 309:18 341:19,22
361:14,17
groups
166:22
grow
185:11,12 186:20 188:11,14
272:19
growing
60:20
guess
11:16 16:5 17:13 22:12
33:20 41:10 64:5 69:2
70:21 126:20 133:21
155:5 206:1 208:14
211:16 244:10 301:6
303:3 368:1 370:18

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

guessing
365:13
guy
103:8,9 144:20 252:4,12
270:11 275:5 304:20
guy's
277:8

**H**

H
4:4
habits
393:2
HACCP
32:3 39:21 40:2,5 108:23
109:3,5
half
19:22 38:11 57:2 76:15
hall
256:10 275:19
hallways
283:9
Ham
39:5
hammered
42:16
hand
153:12 232:20 233:16
293:20 329:8 399:5
handed
237:11 318:5 322:4
329:13 344:7 353:15
handing
127:1 129:4 152:17
217:2 248:11 359:18
handle
36:10 187:7 222:12 262:1
263:17,11 303:23
handled
79:6 313:15,19,20 314:10
314:14
hands
116:1 382:20
handwriting
220:4,6 313:3 373:22
handwritten
226:23
hang-up
107:7
Hanyard
244:16 246:16 333:11,13
339:13
Hanyard's
335:12
happen
156:18 193:5 265:18
281:21 290:14 293:5
349:23
happened
18:22 89:10 136:17 137:6

140:20 141:3 254:1
257:5,18 261:14 262:22
263:17 265:3 276:13
281:15 286:4,6,8,11,15
286:17 299:19 319:22
352:10 393:4
happening
89:9 154:15 248:22
271:23 287:17 289:7
341:6 344:23
happens
205:12
happy
8:5
hard
125:9,10,10 197:17,20,21
199:22 323:20 364:4
harm
259:22 311:6
Harry's
30:17 31:1 32:2 33:15
34:22 35:3,6,7 37:3
42:10,11,20 43:18 44:3
44:6,9,12,13 46:10
108:20
haul
13:1
Haygood
396:15,18
Hazard
109:6
head
7:12 362:21
headers
85:12
headhunters
177:10
heading
233:15
health
9:14 32:8 50:20 84:2,12
86:20,21,22,23 386:11
386:16 387:11 388:21
389:1,4
healthy
131:3
hear
207:23 268:17 275:23
279:2,3 280:8 282:22
282:23 286:7,10 307:12
343:13 383:12,16,20
heard
138:1 261:3 268:5 274:21
276:9 280:20 281:16
286:21 287:7 291:13,15
334:9 347:20 365:2
395:23
hearing
22:8 23:11 36:7 268:4
279:7 334:12 413:15
heart

197:15
Heather
1:21 2:7 5:1 7:14
held
32:15 35:5 56:8 65:5
161:16 220:17 221:12,13
222:5 258:9 304:14
393:23
help
32:18 41:4 76:13 82:11,12
99:5 185:8 186:20
197:14 209:7,8 218:21
272:18 344:17 397:5
404:16
helped
45:14 365:16
helping
126:22
Henry
6:20 24:14 158:18,19
159:2 160:6 161:19
162:1 163:5,23 167:11
169:1,4 170:1,3,12 174:7
195:17 227:21 236:1
237:17 238:1,15 241:21
247:2,3,5,10 252:13,18
254:3,9,9 255:2,3,6,10
255:13 256:13 257:11
258:3,17,18,20 259:17
260:1 261:8,13 262:17
263:2,18,20 264:6,10
267:14 268:23 269:15
269:20 270:1,5,6,10,14
270:20 271:1 273:13
276:6 279:20 280:16
281:1 282:11,13 283:1
283:14 284:21 286:4,7
286:14,22 287:10,12
288:11,14 289:3,20
290:20 292:4 296:4
299:13 300:4 305:16,21
305:23 306:4,7,14
307:7,9 308:13,18,19
310:2 311:10,12 312:12
313:23 314:21 315:10
332:16 333:10 334:4,7
335:8 339:6,12 356:20
358:21 378:7,17,19
383:16 401:13 406:20
Henry's
269:3,11
Hershey
83:9 111:15,15
Hershey's
111:9
hey
79:12
Hi
6:3
Hicks
6:20 24:14 158:20 159:2

160:6 161:19 163:5,23
167:11 169:1,4 170:12
172:5,14 174:7 236:1
237:17 238:1,15 241:21
242:12 252:13 254:3
256:13 257:11 259:17
261:8,13 262:17 263:20
267:14 268:23 269:15
269:20 270:14,20 271:2
273:13 276:7 279:20
280:16 282:11 283:1
284:21 286:5,7,14,22
287:10 288:14 289:4
296:4 299:14 300:4
305:16,21,23 306:4,7,14
306:19 308:13 310:2
312:12 315:10 332:16
333:10 334:4,7 335:8
339:7,12 356:20 358:21
378:7,17,19 383:16
401:13 406:20
Hicks/Bob
195:17
Hick's
158:18
hidden
350:20,22
hide
138:5
high
26:16 67:23 314:20 315:8
higher
54:13 119:20 120:2
160:15 163:10 327:3,5
Highland
18:11,14,23 19:2,4
highly
56:10 114:10
hire
160:15 163:10 175:2
185:19 189:13,16,18
190:16 192:1 193:4,18
194:9,14,19 197:2,4
199:4 243:14
hired
42:12 58:7 59:3,9 63:8
63:14,18,20,23 70:4,20
99:3,9,15,18 102:18
108:16 160:16 175:12,17
176:15 182:22 189:3
196:8,12,13 243:8,11
244:2,7,14,17,21 245:2
245:4,13,17 247:2
253:6,9 273:23 307:11
366:12 409:4
hires
195:23
hiring
34:12,14 62:14 63:13
64:9 70:6 161:1,4
163:15 174:23 184:5

189:8,20 190:1,3,5
193:8,21 195:21 200:11
203:12,14,18
history
60:22
hit
323:7 333:5
hold
57:3
Holland
139:21,22
home
44:19 45:1,15 46:3 47:14
78:2 93:20,21 95:17,18
99:6 111:2 112:21 113:3
113:5 149:3,8 256:17
276:17 311:17 327:16
362:23 363:1,3,3,22
364:2,3,11 391:9
393:20 394:18 403:11
410:6
honest
97:9 137:18
Honestly
41:2
Hooters
307:6,8,11
hoped
324:15
hopeful
330:12
hopefully
7:8 223:21
hopes
117:3
horrible
275:21
horribly
260:3,4
horses
45:16 412:1,3
hour
41:19 43:23 165:15 178:11
262:3 276:17
hourly
36:11,15,20 41:21 44:4
66:13,15 78:23 80:14
302:12
hours
93:14,16 94:14 95:9
98:18 100:8 327:14
392:4 393:7,12
house
20:4,9 250:17 405:3,5
Housekeeping
126:10
Houston
37:8,9,15,16,20 38:3
45:13 46:3
HR
179:21 193:11 198:16

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

huge
108:15 198:9 277:15
   304:11 378:11,17 394:16
human
34:12 35:16 51:21 90:10
   173:18 213:6,8 214:3
   254:2,2 261:22 262:1
   268:20 281:3 304:1
hundred
117:22 316:10 385:7
   387:18 388:9 399:20,21
hundreds
82:20
hung
106:17
hurry
377:16
hurt
62:8 402:22
hurting
320:20
husband
11:12 12:12 14:15 17:1,23
   18:10 20:16 21:13 45:14
   46:1 297:10,14 326:22
   327:8,16 336:8 349:23
   350:2,6,13 384:6 394:4
   402:5
husband's
11:3 371:22 372:1 396:6
   404:23 411:19
Hutcheson
404:22
Hyundai
14:21
H-A-C-C-P
40:6

_____ I _____

Iced
133:11,15
idea
7:2 100:21 101:1 127:1
   146:12 148:23 225:16
   255:7 270:21 275:10
   278:22 326:6 374:13
   395:15
identification
127:13 129:3 152:16
   153:11 213:12 217:1
   219:1 237:10 248:10
   293:19 329:7 367:1
   372:20 373:19 376:4
   377:19 379:17 381:20
   399:4
identified
162:13,14 382:4
identify
87:21 90:18 153:17 158:11
   220:8 243:20 382:19

401:12 406:18,20
idle
45:19
ignored
378:21 379:11
ill
171:22
imagine
165:6
immediately
269:1 368:17 387:22
impact
116:7 197:5,6 207:10
impacted
243:4
implement
32:10 43:7
implementing
39:21 40:2
import
11:17
importance
142:22
important
39:1 55:22 56:3,11
   104:20 143:2,3 200:15
   244:1 354:2
imports
16:11
imposing
329:20
impression
104:23 144:9,23 187:11
   229:9 245:5,6 247:9
   250:10,14 251:17 277:12
improve
72:12 124:14 155:17
   176:10
improvement
72:1 105:17
improving
77:20 84:6
inappropriate
275:2
incentive
241:6
incident
251:13 262:12,23 263:21
   264:1,21 265:1 294:15
   317:4 376:16 394:22
include
120:5
included
212:17,22 334:19
including
128:7 130:1
income
80:18 81:1 297:20 399:19
   400:4,7
incomplete
411:2

incorporated
11:23 12:11,13
increase
52:1,19 53:5 90:22 158:1
   158:4 330:14
increased
52:22 53:17 185:21
increases
54:22 157:3 158:6
increasing
391:19
independent
110:3 140:1,3 158:23
   284:18
indicate
53:16
indicated
108:10 227:21 283:18
   326:12 399:19
indicates
251:4
indicating
274:10 337:12
indication
251:8 320:9 325:5
indicator
359:3
individual
149:10 200:18
individuals
24:19 158:5 203:13
   295:14 335:22 361:15
   361:18 362:3 401:14,19
Indonesia
11:18
Industrial
385:1
industry
13:6 27:20,21 55:23
   56:11 57:1 106:6 113:12
   134:9 234:18 372:3,6
   379:8 409:18 410:14
ineligible
354:18,23 369:23 370:2
inferred
173:10
inflamed
299:12
influence
177:19
inform
330:7
information
92:20 122:23 148:22
   149:2,19 151:11 153:5
   159:3 160:3 228:15
   260:17 334:11 362:10,15
   375:1 390:18
informed
155:14 267:4
ingredient

80:19 81:1
initial
97:22 114:7,15 116:15
   180:18 266:9 320:9
initially
8:21 18:23 29:12 31:13,18
   61:5 71:21 77:3 84:21
   84:22 93:15,16 96:12
   227:19 374:4
ink
253:11
input
37:1 296:6
inside
275:16
insignificant
37:19
insinuating
221:18,20 259:9
insist
220:16
inspected
87:3
installing
117:23
instance
215:1 223:5
instances
165:8
instructed
143:18 338:19
instructing
149:22
instructions
144:7
instrumental
178:22
Instrumentation
112:3
instruments
29:4,5
insubordinate
269:3
insulted
297:9 308:4,8,15,18,21
insulting
297:23
insults
297:13
insurance
51:3 119:15 386:9,11,21
   387:4,9,12 388:4
   389:10
integrated
12:3,7 15:4
intended
153:4
intention
236:13 237:1 251:8
intentionally
301:1

interact
82:16
interactions
380:13
interactive
42:6 43:1
interchangeably
227:4 228:21
interest
14:9 57:14 207:16 208:20
   215:2 225:17 226:4,17
interested
27:19 29:15 38:20 369:2
   413:19
interim
80:16 190:12
International
37:22 38:1,6,13,19 39:3,8
   39:19 40:16,19 42:8
   43:17 46:14 108:21
internet
127:20 129:20 145:15
   292:18
internet/e-mail/telephone
128:3
interpretation
239:16
interpreted
234:8,9,14 235:1,3
   239:20 240:1 300:7
interrupt
224:10
interrupted
277:3 296:5 299:23
interruption
176:20
interstate
15:10,16
interview
48:7,9,14,20 49:8,9,13
   50:8,11 116:16 117:5
   177:17 179:16 180:18,18
   180:19 181:3,6,13,15,16
   184:14 187:4,12 371:8
   375:2
interviewed
175:6 178:1 179:4,12,17
   179:20 180:1,3,11 181:19
   181:22 193:15 194:6
   201:5,6,11 285:8 371:5
interviewing
103:11 117:9 178:12,21,22
   179:1 183:21
interviews
48:15,16 177:21 178:6
   180:14,15
intimate
331:8 337:20
Intra
15:13
intrastate

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

15:9,12,15
intricacies
397:1
introduced
310:14
invest
43:3 124:19
investigation
258:13 284:23 285:7,14
investment
122:10,17 123:4,15 132:23
133:8,13,18 134:4,13,23
investor
121:20 124:18 326:7
investors
124:12,23 326:10 361:19
inviting
269:7
involve
222:22 284:4
involved
23:2 62:13 64:8,11 120:1
120:20 121:19 122:4,8
122:22 124:2 126:3,6,7
131:16,21 132:3,7,13
134:21 155:6 156:3
157:20 201:4 205:14
212:6 223:1,4,7 226:12
227:10,17 228:1 229:3
229:7 253:4 265:7
302:10 345:13
involvement
206:20
involving
283:20,22 284:4
irrelevant
318:12
issue
97:12,14 98:17 115:22
119:21 158:17 159:12,14
171:14 173:12 174:8
205:6 206:1,6,18,21
207:11 209:15 214:13,16
216:3,9 217:14,23 221:7
221:10 222:15,19 223:15
231:22 232:20,21
235:15 267:9 289:8
312:19 316:12 359:5
376:18 378:6
issued
267:6
issues
65:21 67:18 84:13 93:4
115:4 120:2 162:19
166:2 234:22 262:2
281:4 292:10,12,15
330:3 362:16,17 382:3
382:12,14,18 392:22
item
220:12 221:4,16
items

238:20
ITL
11:23 12:2,5,13,16,18 13:3
13:13,18 14:2,5,9,16,22
45:13

_____ J _____

J
3:11
jack-of-all-trades
199:7
Jamie
225:20,22
January
25:5,6 38:7 52:14 53:2
53:18 54:4 62:18 68:13
69:16,19 196:21 364:19
Jay
3:6
Jeff
6:20 85:20,22 159:8,9
207:8,21 219:18 225:12
225:15 227:21 229:5
230:3,9,18 259:5,6
273:20 289:14 294:12
305:15 315:5,9 356:17
376:15,17 383:20
401:13 407:10
JEFFERSON
413:5
Jennifer
3:11 6:18 248:3
jeopardize
97:7
jeopardizing
305:1,11
jeopardy
56:18,20,23 114:14
Jerry
1:7 18:2,4,7 161:22
167:11 201:12 276:5
279:13,21 287:2 308:11
338:1 349:14,17 374:5
375:5 405:20 411:15
Jewish
161:10 205:3,4 207:16
220:13,15
Jimmy
213:1 286:23
job
30:15 31:11,18,22 32:4,15
35:5 37:10,20,21 39:17
44:18 46:1,19 47:11,21
47:23 48:1 50:9,13,15
56:8,17,20,23 63:3
64:12,12 65:23 66:22
66:23 67:4 72:6,7,8,10
78:21 79:12 80:9 83:16
83:18 84:8,15,17 85:6
86:9 90:1 92:6 93:1,10

93:20 103:7 105:11,12
105:14,22 106:9,9,12,18
106:19 107:1 114:5
156:12 157:6 160:2
168:13 177:8 183:20
185:7 186:10,13,15
187:15 197:11 198:1
232:3,4 233:12 250:9
252:16 253:17 258:20
258:22,23 259:2 260:8
282:17 289:5 293:14
353:23 354:2,7 357:2,7
357:9,12,17 360:1,3,6
365:11 367:20 369:22
371:8,11,14,16 384:11
393:23 394:10,12,13
410:16
jobs
37:12 371:16
John
77:9,22
Johnson
396:16 397:3
join
374:17,19
joining
45:3
joke
320:20 328:11
journal
398:8
Judy
402:12
juice
65:15 378:11
July
69:12 196:18 367:9 368:7
369:11
jump
199:7
June
10:20 58:11,14 59:10 69:1
69:18,22 81:23 82:1
129:12,15 138:13,18,20
148:6,10 151:18 152:2
154:20 164:5 319:3,19
319:20 345:22 347:10
363:9,11 384:17 385:3
385:4
jury
23:14

_____ K _____

K
3:4
Karen
409:14
Karl
195:14,21 253:5,9,16
254:1,6 260:21 261:7,12

261:15,20,21 262:3,10
263:8 264:1,11,13,20
265:2,9,13 266:1,6,13
284:3
Katie
74:8,12,17 139:20 157:13
196:8,12 404:4
keep
10:7 35:13 92:4,5 223:23
330:16 370:13 398:7
keeping
403:3
Ken
110:13
kept
78:7 121:6 275:7 312:3
394:7
key
122:19 160:9 161:17 163:6
236:2,14 237:2,5 239:8
239:9,12,14 242:1,8
243:9,18 244:16,17
251:9,11 332:7,9 358:3
358:5,16
keys
355:16
kidding
210:16 354:1
kids
248:4 350:10,12 391:10
kin
413:17
kind
41:9 57:14 88:6 93:14
103:7 106:20 117:4
119:20 127:23 144:20
173:5 199:3 213:21
216:18 230:1 252:2,4,11
255:16 260:20 269:22
272:3,14 274:7,12,18
275:4,15 283:11 304:21
335:23 363:15 375:5,6
398:7
kindly
222:2
kinds
127:3
King's
39:20 40:13,20 41:18
42:4 43:15 44:17 45:2
knees
223:20
knew
64:3 98:16 101:1 117:6
154:10,12 176:13,13
241:5 252:17 267:7
269:8 281:1 301:18
311:11 347:23 349:21,22
368:4
know
7:19 8:3 9:6 14:1,3,10,12

14:14 16:5 17:11 19:10
21:20 22:3,5 24:19
45:20 48:23 51:20,22
61:4 62:4 64:1,2 65:1,9
65:11,18 67:6 68:5
76:11 78:22 79:7,17
83:10 84:22 85:7 90:21
91:11 97:23 99:1,3,9
101:3 106:4,18 107:2,4
109:21 110:17 111:4,20
112:4,5 113:1 114:8
119:3,6 120:23 121:4
122:5 124:1,15 125:8,8
125:23 131:5,10,13
133:2 135:7,10,12,14,22
136:3,6,8,11 138:12
141:4,6,8 142:4,11,13
143:6 144:15,18 145:4
147:10,11 148:19 150:3
150:14,19 152:2 154:21
155:5 157:20 161:19
167:3 181:5 183:13
184:16 188:8 189:15
191:22 192:2,8,10
194:19 197:3 198:17
199:3,8,20 200:18,23
201:19 202:8,10 207:3
207:15 211:2,6,15,16
212:5,9 215:11,16
216:16 218:7 224:12,18
226:12 227:23 228:9,10
228:11,13,17 229:22
231:11 232:11 234:2
235:7,9,18 240:18
245:22 247:15 250:1,7
250:18 251:21 252:1,3
252:10 255:15 256:16
257:8,15,19,20 259:14
268:10,14,20 269:5,13
269:15 270:2 271:9
272:14,17 274:10,18
276:18 277:20 279:23
280:22 281:6 282:13,16
282:20 283:8,21,23
284:6,8,8 285:7 287:3
287:6,20 288:3,11,17
289:15,17 290:10 291:3
292:1,14 294:2 296:22
298:9 300:18 301:12
302:12 304:19 307:23
308:17,20 311:20 312:1
318:13,17,19 320:18,19
321:17 323:12 326:13
327:13,19 328:4 329:21
330:16 333:21 334:1,7
334:15,18,21 335:2,6,15
335:17,18 337:7 340:19
341:1,23 342:12 343:16
343:16 345:7 352:20
352:22 353:4 354:2
357:6,8,12 361:10

800.458.6031

http://www.TylerEaton.com

Case 2:05-cv-01207-MHT-TFM    Document 75    Filed 10/29/2007    Page 121 of 187
JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

364:16,20,21,23  365:8
365:13  369:11  370:17
372:16  375:16,20  376:9
380:4,15  381:13  383:9
385:15,16  386:4,7
388:10  389:5  390:6,9
390:14  391:18  392:15
393:9  394:9,12  397:7
397:12  400:3,14  401:9
402:7,15,18  404:1,3,20
411:6
**knowing**
281:4  394:11
**knowledge**
171:16  262:7,9  333:3
402:2,9  404:7  405:10
**known**
337:19  382:17
**knows**
397:4,19  402:21,22
**kosher**
204:4,7,11,13,14,17,22
205:5,9  209:18,19  210:1
210:14  211:12,18  220:17
220:18,19
**kosherize**
210:15
**kosherized**
210:17

_____
           L
_____
**L**
2:1
**lab**
29:2,3  254:17
**label**
211:4
**labeled**
220:11
**labels**
210:21  211:1
**labor**
72:2  115:20
**laboratory**
29:3
**lack**
13:8
**lacked**
234:18
**ladies**
341:18
**lady**
197:19
**laid**
91:18  144:20
**lake**
341:20,21
**Lampert**
137:3  147:15  161:20
167:11

**landscape**
111:5
**language**
295:12,18,23  374:6
383:13,17,21
**lapses**
9:11
**laptop**
139:7  140:10,11  145:11,17
202:18  319:21  341:11
363:7,12
**large**
5:3  13:10  31:15,17  110:21
115:1
**larger**
166:22
**largest**
114:11,13  204:19
**Larry**
6:20  85:20,23  159:9,9
207:8,21  219:18  225:13
227:21  229:5  230:9,18
259:6,6  273:20  289:14
294:12  305:15  315:5,9
356:17  376:15,17
383:20  401:13  407:10
**lasted**
10:4
**late**
132:19  342:1
**laugh**
292:18
**laughable**
292:19
**laughed**
320:23
**law**
3:5,6,12  211:19
**laws**
2:13  204:23  205:1
**lawsuit**
6:20  23:3  158:7  227:8
277:22  278:2,14  284:17
396:5,18  398:17  400:19
404:18  405:17
**lawyer**
24:23  85:15  310:17
340:20  349:6  375:14
376:7  395:20  396:5
398:23  411:12
**lawyers**
6:19  397:12,15
**lawyer's**
26:3
**lay**
91:7,13,15,17
**laying**
91:19
**lead**
242:22
**leader**

56:2  155:22  168:10
323:18
**leadership**
56:15  153:6  323:23
**leading**
2:19  234:20
**leak**
158:23
**leaked**
158:21  159:2
**learn**
280:11
**learned**
267:20  280:14  305:20
311:21  329:15
**leave**
37:3,6  80:3  93:10  108:1
111:1  113:20  149:11
199:10,13  250:17  259:8
302:19  332:12  348:3
370:11  390:20
**leavening**
211:17
**leaves**
275:12
**led**
161:10  195:16  242:19
310:23  316:6
**left**
39:10,12  42:11  44:13  69:4
70:15  73:13  74:16  75:8
79:14  94:16,18  96:5
99:19  112:8  121:3
129:14  148:16  176:2
184:13  200:4  255:17
276:15,16  299:6  300:23
312:21  323:12  343:10
344:20,21  356:10
362:14  384:4  403:10
409:2
**legal**
228:6,12,13  395:16
**Leigh**
6:6,14
**length**
293:22
**leniency**
136:4
**Leon**
9:2
**Letitia**
244:18  246:20  249:5
**letter**
190:22  191:14,18,21
307:14,20  308:1  330:11
331:14  376:14,19
**letting**
221:18  321:2  328:18
**let's**
14:17  58:23  97:5,13  98:1
118:19,20  142:9  165:11

166:4  186:5  203:21
208:3  248:20  252:11
317:8,10  340:6  368:2
**level**
54:13  67:18  200:16
240:11  271:18  333:4,6,9
339:14  360:8
**levels**
240:8,15,16
**Lewis**
3:6
**Lexapro**
8:10,11,14,20  9:7
**liabilities**
305:5
**liaison**
31:23  209:1  234:6
**lieu**
46:22
**life**
78:1  98:18  104:14  350:13
**lifestyle**
27:18
**liked**
252:18
**limited**
372:4
**Lindsey**
3:18
**line**
56:15  88:12,12  89:3,3,6
108:8  154:16  192:9
254:19,21  290:16
**lines**
126:21  130:23  194:8,13,18
328:14  362:18
**lingering**
207:16  220:15
**Lioce**
409:15,16
**lip**
394:6
**list**
158:13,14  162:13  213:4
214:9  351:14  402:1,4
**listed**
14:11,15  90:5  398:5
**listened**
145:21
**listens**
282:21
**listing**
352:3
**litigation**
23:1,13  376:8
**little**
65:3  80:20,22  94:9,9
111:4  207:5  218:14
277:4  341:15  380:21
402:19
**live**

20:17,19,23  21:6,17  245:8
322:23
**lived**
20:2,22  21:10,14  245:8
402:8
**living**
37:8
**LLC**
1:10  12:1,6,10,11,12  14:17
14:19  15:2,5,18,21  16:1
16:4,7,18,19,21  17:3
**loan**
331:1
**local**
14:19  15:8
**Loeb**
48:10  49:10  63:10  120:20
123:22  206:13  208:19
208:21  212:10,16,21
214:20  215:2  219:16,19
222:19  226:17  286:4
287:6  366:12  369:21
370:8  397:23  398:2
**Loebs**
208:17
**Loeb's**
49:19  208:13,14,14
**Logistics**
12:4
**lonely**
104:12
**long**
8:13  11:5  20:2  21:6
29:21  30:23  31:8  33:18
35:2  38:8  40:23  45:5
51:10  59:2  60:22  63:10
63:11  70:2,11  85:17
88:21  112:15  120:19
121:9  142:15  165:13
178:19  182:21  199:15
251:22  258:1  262:23
272:2  318:13  323:6
324:11  326:13  330:13
344:12  388:10  392:13
**longer**
131:23  135:13  151:6
161:10  207:16  220:13
353:7  354:4  364:13
390:11
**longest**
214:8
**longhaul**
12:16,22,23
**long-term**
135:20
**look**
110:5,17  137:8  144:13,17
145:17  152:22  154:5
193:1  214:4  240:3
249:1  278:9  292:19
325:23  352:9  353:22

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

383:6 411:1
**looked**
37:13 144:16 145:19
147:11 162:7 169:16
173:9 241:7,10 294:7
302:16 324:19
**looking**
47:10,18 85:10,12 111:21
120:17 122:9,17 123:14
123:15 124:23 224:13
325:20 326:10 372:5
**looks**
308:10 367:12 374:8
**lose**
243:14
**losing**
114:15
**lost**
116:12 260:6 269:23
385:13,17 386:9 389:12
390:22
**lot**
37:17 64:19 65:8,18
67:14,15 72:2 82:16,19
95:17 102:22 103:5
104:18 107:13,20 112:19
112:20 115:9 129:17
183:21 185:7 186:18
192:14 195:8 198:14,21
198:20,21 202:3,5
209:3 222:14 234:21
257:16 260:6,16 283:19
284:1,3 292:12 300:19
320:7 323:18,19,20,21
335:3 337:4,7 360:13
360:13,15 362:23 363:1
364:1 375:16 382:15
397:8
**lottery**
125:8
**loudly**
256:15
**love**
47:17
**low**
113:23 370:16
**lowest**
108:12 114:1
**lunch**
126:14 130:16 167:22,23
168:2 269:8 367:17
368:22 369:3
**luxurious**
125:13
**lying**
140:23 148:1 328:22
**L-E-E**
6:14
**L-E-I-G-H**
6:14,15
**L-I-O-C-E**

409:17

**M**

**MacCartney**
1:7 18:2,5,7 161:22
167:11 201:12 276:5
279:13 287:2 308:12
338:2 349:15 375:5
405:20 411:16
**MacCartney's**
374:5
**maiden**
6:9,10
**main**
82:13 126:23
**maintain**
84:7 90:1 91:9
**maintained**
112:19 227:10,17 290:10
**maintaining**
84:7
**major**
132:22
**majority**
238:19
**makeup**
179:8
**making**
62:12 161:1 203:18
253:12 256:8 274:1,4
275:3 277:1 280:9
294:19 333:22 334:8
389:19 390:7,10
**male**
36:8 200:9
**man**
105:2 205:3,4
**manage**
84:4 176:14 239:18
**managed**
81:13 115:20 177:21,22
178:7
**management**
33:17,23 56:1 57:13
58:18 80:22 84:9 135:5
135:8 155:4,6 156:3
160:9 161:3,17 163:6
172:9 174:2,6 182:13
185:15 187:2 193:8
233:11 236:2,15 237:2
240:15 256:2,2,3
271:16,17 272:11 332:8
332:9 335:9 382:6
**manager**
18:9 34:5,22 35:3 48:3
50:2,4,6 51:7,11,17,20
52:3,12,18 55:16 57:5
57:18,23 58:8 59:11,22
61:7,18,21,22,23 62:2,17
66:2,11 67:12 72:15

73:20 75:3 81:2 101:18
101:22 102:10 105:8
139:3 160:17 163:11
175:7 176:7,12,15,17
177:5 179:4,22 182:9
191:2 193:11 200:15
201:10,13,22 202:1
213:7,8 214:3 240:10
244:15 245:14,23 253:6
253:8 254:12 257:19
260:21 261:23 281:3
333:16 335:13 366:3,6
409:8
**managers**
57:7 73:1 102:5,7 190:6
243:22 244:2,20
**managing**
34:2
**mandatory**
153:3
**manipulated**
358:7 359:10
**manner**
171:20 341:11
**mannerisms**
144:11,12
**manufacture**
88:15,21 110:13 198:10
204:1,22 211:12 216:5
226:21
**manufactured**
378:12
**manufacturing**
67:21 68:5 89:12 110:14
113:14 115:7 119:18
133:16 204:10 205:8,9
205:17 214:17 220:19
220:20 243:13 288:23
**March**
20:5,9 44:22 47:6 59:23
60:3 94:5,11 95:20
96:4 99:12 107:16
128:18 196:11 388:20
**margins**
125:11
**mark**
248:12 316:20,23 372:22
381:22
**marked**
127:12,15 129:2,5 152:15
152:18 153:10,13 213:11
213:14 216:23 217:3
218:23 219:3 237:9,12
248:9 249:15 251:1
293:18,21 329:6,9
366:23 367:2 372:19
373:18,20 374:6 376:3
377:18,21 379:16,19
381:19 399:3,5
**market**
30:17 31:1,19 33:15 34:23

35:3,6 37:4 42:11
46:10 108:21 204:8
**marketing**
34:11 124:14,17 334:5
**marking**
376:6
**married**
11:1,5,9 14:10 43:21 74:11
74:13,14 77:23
**master's**
182:10 202:16
**match**
198:2
**materially**
155:8,11
**materials**
38:17 201:13
**matter**
152:3
**matters**
229:8 298:14
**Mavis**
175:3,4,5 179:10,13,14,18
179:20 180:1,3,11,23
181:10 182:1,18,22
184:5 185:6 186:9,22
187:15 188:6,11 189:8
189:13,16,18 190:10,16
191:14 192:1,5,21 193:5
193:9,15,16,18,21 194:9
194:14,19 197:2,13,14
199:3 203:12 244:5,6
246:7
**Mayer**
17:18,21 161:22 167:12
276:6 279:15 287:1
308:12 338:5 349:11
375:4,7 411:22
**mayonnaise**
252:4
**McGahey**
3:11 4:3 5:22 6:1,18 55:7
68:3 96:10 100:11,15
126:16 144:5 150:1,7
151:8 164:23 165:7,13
165:19 196:22 197:1
203:2,7 248:11,15
317:14 340:12,15 359:21
362:22 370:12 377:15
384:3 399:8 411:1
412:9
**McGlon**
1:17 2:6 5:10,15 6:2,7,16
10:18 11:4 14:6 24:5
55:7 100:15 126:16
150:11 203:7 317:14
340:15 402:4
**McLennan**
70:4,7,12,15 81:16 95:15
97:15,18 107:4 159:7
161:15,20 166:5 167:10

168:7,21 170:3 174:9
255:20 258:10 259:4,7
271:19 272:1 273:8
289:10 294:12 298:7,13
302:5 309:20 310:4
312:21 315:6 316:2
376:16,20
**McLennan's**
72:17 97:19 168:12
**mean**
107:19 129:12 149:4,4
224:9 227:16 249:20
272:10 287:23 300:9
301:1 303:21 304:20
320:16 362:20 385:16
**means**
129:15 153:19 220:16
294:1 411:7
**meant**
226:13 284:13 329:21,23
330:17 402:11
**measuring**
87:15
**meat**
27:21 29:1 32:11 38:14
39:6
**mechanisms**
81:12
**medication**
8:6 9:4,6 393:14
**medications**
8:8
**medicine**
8:12 393:16
**meet**
75:13 83:23 86:17 137:1
178:11 318:22 327:18
347:22 366:8 367:18
368:1,2 376:22
**meeting**
25:19 26:7 41:5 97:22
147:2 151:17 152:10
153:4,7,22 154:1 159:23
161:17,19,21,23 163:22
166:4,9,13,23 167:1,4,8
167:22 168:6,10 169:2
170:6 173:12 174:2,17
186:2,4,6,8 192:3
223:23 224:22 242:14
258:8,18 259:16,18,20
273:5 275:1,13,17
277:3,4 280:19 284:21
287:10,17 295:14 296:4
296:5 299:8,10,13,15
305:22 306:2 309:13,19
309:23 310:5,8,11,20
312:10,18 319:3,12
320:2,10,13,21 322:9
323:12,14 327:20
328:11 329:15 331:10,11
331:15 339:22 343:5,7

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

343:11  344:23  348:17
350:17  351:6  352:1
356:3  364:8  366:11
373:10  376:20  377:2
**meetings**
65:5  103:16  126:3  151:22
152:4,8  167:5,14  168:3
168:17,18  297:3,7
**megafood**
31:14
**member**
15:20  16:20
**members**
15:23  122:19  255:21
**memo**
152:11  294:11  300:12,13
300:16  318:6  322:6
407:15,18
**memory**
9:8,10  133:4,6  296:17
**memos**
407:22
**men**
276:1  380:22
**mental**
391:9  402:2,16
**mention**
106:23  241:17  406:23
407:9,15
**mentioned**
55:15  84:14  106:1,14
107:5,9  109:10  113:6
218:18  226:7  301:21
324:17  370:4  405:19
**mentioning**
76:22  107:6
**message**
255:12  270:13,22  328:3,5
343:10
**met**
6:17  41:5,8  65:7  179:15
296:12
**metamorphosis**
67:8
**metrics**
114:5,7
**microbiologist**
66:6  71:14  74:7,18  157:14
178:19  196:6,13  404:5
**microbiologists**
73:15  74:5
**microbiology**
73:2,21
**middle**
1:2  67:16  68:7  75:13
98:20  127:23  136:7
310:13
**Mike**
48:10,21,23  49:10,17
50:13  55:21  57:19  60:4
60:6  67:12  69:6,7,13,15

116:15  117:11  122:2,9
123:3,8,14  136:12  137:7
139:1,2  141:22,23  142:7
144:10,19  145:1  146:4
147:8  156:20,20  341:10
363:7  366:20
**military**
24:1
**million**
133:12  134:5,14
**Milwaukee**
108:7
**mind**
105:6  149:11  151:5  188:1
239:14  243:17  293:11,12
316:20  322:20  325:9
394:14
**mine**
323:1,14  341:16  359:13
374:15
**minorities**
160:9  161:2  163:7  239:3
240:13  242:1  243:1
332:9  358:3,16
**minority**
160:15  163:10  240:17
241:3,16  330:21  332:13
358:9  378:18  383:8
**minute**
58:23  118:11  221:23
253:4
**minutes**
165:16,17  340:9
**misfit**
197:23  198:1
**mishandled**
260:4
**mismanaged**
260:4
**missing**
145:10
**misspoke**
215:18
**mixed**
255:11  270:13,22
**modules**
43:5
**moment**
136:17,18  167:1  319:13,14
**moments**
6:17
**mom-and-pop**
82:19
**Monday**
345:2,20  349:4,18
**money**
124:13,16,19  132:9  253:12
297:19  311:15  361:23
362:4  385:21  387:8
**monies**
345:16

**Montgomery**
3:8  5:8  20:12  46:6  47:2
47:20  82:14,23  92:3
120:21  121:4,6  125:21
181:11  272:8  302:9
372:4
**month**
69:11  336:17  369:11
387:7,10,16,20  388:9
**months**
31:2  33:21  35:4  38:10
41:3,11  49:13  58:12
160:1  199:18  223:19
224:11
**moral**
315:8
**morning**
6:2  98:22  341:18  343:11
343:14  346:13,19,23
349:19  351:7  403:10
**mother**
327:1  402:13,17
**motivated**
241:20,23  314:11  316:14
357:19  358:1  359:8
**motivations**
312:7
**Mountain**
21:1,2,7,11
**mouth**
282:20
**move**
20:8  176:12  183:5  203:8
272:17  305:17  376:13
**moved**
20:10  37:8  46:5  47:1
80:2,4  104:15  170:5
174:9  176:14,18
**moves**
275:15
**moving**
176:5  249:12  261:17
**multitask**
198:22
**multivitamin**
9:5
**M–A–V–I–S**
175:5

| N |
|---|

**N**
2:1  3:1  4:1  169:20
**name**
6:5,9,10,17  11:3  12:11
16:16  37:23  74:9,13
101:14  152:21  162:2,3,5
162:7  164:1  169:7,10,12
170:21  171:13  172:2,3
172:14  173:8,15,21,22
195:14,15  244:13,23

280:23  281:13
**named**
48:11  59:4
**names**
11:22  256:11  278:18
280:9,12,21  281:2
293:7  396:13
**narrow**
64:18  105:6,10  199:5
**NASA**
109:8
**nationwide**
14:22
**nature**
116:17
**near**
46:6  144:14
**necessarily**
89:15,21  91:16  249:17
**necessary**
2:16  56:16  65:22  155:16
**necessitate**
329:20
**need**
8:2  56:8  60:21  76:21
78:5  97:23  98:3  127:1
137:8  141:6,9  153:18
165:3,19  202:20,23
206:19  237:19,20
255:14,15  257:15,20
264:4  288:3  289:1
293:23  320:5  321:1
342:14,17,18  377:10
396:13  399:11  404:15
**needed**
39:21  42:15  43:6  98:17
98:20,21,22  103:19
106:8  139:8  176:10
177:3  199:4  206:7
207:15  252:18  253:14
260:7  263:8  264:2
282:15,17  287:22
290:20  303:18  304:5
314:23  318:20  327:7
353:8  354:5  359:11
363:18  394:5  398:14
**needless**
136:20
**needs**
56:9,14  90:16  105:4
248:4
**negative**
119:22  171:12  344:6
353:10,13
**neglect**
304:13
**negotiate**
98:18
**negotiated**
50:14  212:2  231:12
232:21

**negotiator**
208:23
**neither**
376:17  413:17
**Nelms**
3:4  5:21  19:14  55:3  96:8
126:10  128:10  143:11,17
143:20  144:3  149:15,20
150:2,12,17  151:3,16
164:22  165:1,4,11,15
172:17,21  203:4  221:22
235:5  248:3  252:22
317:10  335:5  340:8
359:19  360:11,17  362:11
362:20  370:10  375:13
384:1
**nerves**
342:6
**nervous**
144:8,10,15
**Nestle**
134:11,12,15
**network**
108:12
**never**
21:20  23:5,7  65:3,4,5,6
100:10  108:17  109:11
111:19  114:20  128:9
130:4,11,11  137:16,18
191:2  194:17  229:6
230:9  272:20  293:15
309:21,21  313:6  344:10
360:19  361:21  376:22
384:11
**new**
80:10  84:10  92:8,15
99:14,18  124:21  134:17
154:7  204:19  253:13
272:18  288:22,22,23
326:7
**news**
286:21  318:3  321:6
327:11,23
**nice**
105:2
**night**
68:8  75:13  93:19  98:21
98:23  350:10  392:4
**nights**
391:8,15  392:14  393:11,12
395:13
**nighttime**
78:3,6
**nine**
38:10  387:18
**ninety**
325:4,11,12
**ninety-day**
325:7
**Nixon**
78:15,17  79:14,19

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

Nixon's
81:5
nodding
7:12 49:23
noisy
232:12
nonAmericans
35:12
nonJewish
207:1 208:7,9 214:21
220:18,22
nonleavening
211:17
nonthreatening
234:9
normal
393:1 395:2,3
Norm1099@aol.com
217:7
north
3:14 104:16
NORTHERN
1:3
Notary
1:23 2:7 5:2 413:23
note
220:2 225:1 227:5
228:19 230:2 238:4
notebook
398:9,15,20
Noted
172:21
notes
227:1 322:12 351:23
352:12 398:8
notice
145:9 199:20 227:2
319:12 330:9
notifying
311:10
November
15:19 16:8 301:23 305:20
number
10:7,22 35:19 67:18
88:17 119:23 127:2
130:7 162:19 163:1,4,9
163:17,22 220:11,11,12
221:4,16 225:7 285:9
334:13 339:5 389:7
397:18 399:18 400:17
400:23 401:3,12 402:1
406:17 408:23
numbers
56:10 87:2 119:7 121:9,11
numerous
97:4
nutshell
345:3

O

O
2:1
oath
7:5 22:17
Oats
108:14 110:12 114:11,16
116:13
Object
149:21 172:17 235:5
objected
150:8
objection
150:10 151:16
objections
2:17,20
objective
62:12 110:6 229:10
objectively
352:9
objectives
183:18
obligated
262:21
observe
253:21,22
observed
406:8
obtain
387:3
obtained
104:13
obvious
381:3 391:20
obviously
369:15
occasion
22:21 25:14 35:23
occasionally
82:10 109:23 122:18
occasions
26:12 35:21 36:19 97:4
122:14
occur
58:6 87:22 184:11
occurred
23:12 87:23 89:11 119:21
138:22 167:22 168:4
180:22 183:7 263:1
264:1,7 273:6 301:15
310:19 315:17 316:5
369:10
occurring
87:20 138:10
occurs
268:2
OCG
16:18 17:3 18:6,8,13,15,18
19:4,5,7
October
37:5,6 43:18 273:6 279:4
294:20 295:1,15 308:5

odd
37:12
offended
162:2,3,4 163:23 169:6,12
169:13 170:15 171:4,6
171:19 172:1,2,11 173:17
offense
88:5 128:8 130:3
offer
50:9 190:22 191:14,18,20
324:7 353:17 355:6
366:2 370:23 371:3
384:11 409:6,20 410:16
offered
2:22 50:13 78:21 249:21
250:2,8 365:19 370:19
370:21 393:17
offering
222:18 354:10
offers
371:11,14,16
office
26:1,3 65:8 94:17,18
95:9 136:13,15 137:6,7
137:14,22 138:1 139:4,9
139:10,12 140:18,20
141:12 142:7,10 143:13
143:15 146:5,5 181:13
181:16 184:14,21 192:12
257:13,14,14 280:17
283:3,7 284:22 285:3
287:11,18 303:4 318:2
319:6,23 320:2 341:10
342:15,18 343:14
344:19 346:3,12,19,22
347:13,20,22 349:5
405:4
offices
3:6 229:12
Off-the-record
68:4 126:13 252:5 384:2
oftentimes
89:16
oh
15:13 74:11 143:20 270:8
277:15 310:1 355:21
400:10
Ohio
261:17
okay
7:16 8:4 33:1 44:10,16
53:19 55:14 59:18
76:19 79:21 83:21
103:23 129:16 134:2
141:7 142:16 143:10
144:3 159:13 165:18
166:3,7 186:7 209:5,12
215:18,21 222:1 228:10
294:3,22 301:8 306:1
319:5 325:1,10 335:7
340:21 341:3 343:4

368:23 369:4 370:12
399:22 412:9
old
10:8 47:11 89:19 119:14
252:2
older
89:14
Oliver
307:3,5,6,10
omit
93:11
once
23:14 24:9 37:19 41:5
108:17 109:23 312:6
317:1
ones
167:13 314:2
One's
12:10
one-month
183:2
one-on-one
396:3
Online
16:18 17:12
Onyx
1:10 69:10 120:16 125:19
125:20 126:4,8 154:11
154:13 156:7,10 174:4,5
180:9 196:14,16,18
227:12 228:22 229:4,12
229:13,17,21 230:3,4,11
230:13,17,19 231:1,2
240:5,7 241:23 243:7
244:1 245:17 247:20,21
249:12,22 250:3,9
260:10 326:1 358:2,15
368:11
open
153:22 175:21 182:22,23
183:4 322:8
opening
100:3 177:8 178:18
183:20 195:4,10 196:6
368:8
openings
178:17 195:8 240:19,22
openly
288:12
opens
204:7
operated
14:5 17:8 120:11
operating
16:7 74:2 81:22 104:6
119:18 155:17 239:3,9
239:14,17,21 240:2,13
242:1 243:1,2,9,18
251:9,11 305:3 330:16
358:3,5,17 364:14,17
operation

17:6 229:8
operations
77:21 122:7 124:10 228:1
298:19
operator
139:23
opinion
150:4,20,22 174:8 224:14
224:15 382:21 383:3
opportunities
47:19 160:10,11 383:6
opportunity
47:16 185:12 332:21
opposed
58:18 115:12
oral
5:11 400:18
order
158:14 164:20 166:1
261:9 262:20
organization
247:22 249:12 360:7
organized
111:23
organizing
253:16
Orthodox
204:16,18 207:4 209:2,6
209:8,21 210:3,23
211:10 214:12 216:2
217:10,23 221:11,21
222:7 223:12 224:18
231:5 232:22 233:21
234:4,14 235:2,15
359:5
Osborne
136:13 137:7 139:1,2
141:22,23 143:7 144:10
145:1 146:4 147:8
341:10 363:7 366:20
other's
63:14
output
56:7
outside
44:19 45:1 67:22 91:1
98:17 104:14,17 139:10
202:5 247:11 266:4
275:15 395:19
outstanding
131:11 393:22
out-of-the-home
39:17
overall
66:18 83:22 86:13
overextended
117:19
overly
89:13
overreacted
380:12

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

overreacting
380:6 381:6,10
overrode
207:22
overruled
230:3
oversees
209:22
overtime
110:23
owned
63:10,11 220:14 221:1
231:19 232:9,18 348:12
owner
12:12,13 14:11,14,15 16:20
49:21,22 102:21 123:18
173:19 202:2
owners
16:1
ownership
14:8 205:6 208:19 215:2
owner-lease
13:4
owns
11:13
o'clock
94:19 147:3 319:3 327:21
342:19,20 343:6 346:12
346:19,23 348:17
O'Connell
48:10,21 49:10,17 50:13
55:22 57:19,22 60:4,6
67:12 69:6,8,13,15,20
116:15 117:11 122:2,9
123:3,8,14 156:20,21
O'Connell's
49:1

P

P
2:1 3:1,1
package
198:11 210:5 353:16
354:11 355:6
packages
132:10 209:18 345:17
page
4:2 7:3 129:7 130:13
223:17 238:9 239:1
367:7 369:5,7 373:1,4
411:5,7,9
paged
268:8,11
pages
268:4,5,17 374:2 411:4
paging
254:18 302:3
paid
41:18 44:1 156:16,17
157:8 191:2 368:6,6

385:22 408:14,17
painful
330:15 394:2
pains
392:20
painstaking
159:14
paint
107:22
panicking
336:18
paper
177:7 248:23 296:12
344:8 351:18,21 352:3
353:16,20
papers
354:13 355:22
paragraph
128:1 129:18 214:5
224:16 249:2 294:17
296:15 300:3 306:22
309:13
parameters
88:14,16,19 89:18
parking
192:14
Parkway
21:1,7,11
part
19:2 36:5 85:6 86:16
90:9 113:11 120:15
154:12 155:22 158:22
208:21 215:11,12 222:20
255:23 272:6,23 300:1
300:12 325:8 335:8
361:14,17 385:14 399:16
partial
95:2
partially
242:19,21
participate
302:7
participated
179:16
particular
114:11
particularly
92:17 256:19
particulars
62:4
parties
2:4,20 154:9 413:18
partner
134:19
parts
14:20
party
150:5
pass
114:7
passed

108:17 109:11 114:20
Passover
204:21 205:7,10,18 207:2
208:18 211:14,14,19,23
214:15 216:6 226:21
Pat
208:10,11,18 215:3 225:21
226:18
path
29:18
Patrick
403:3
pattern
315:22
Paul
139:20,22
pay
51:1,5 52:1,18 53:4 164:8
164:9 254:11,16 267:2,9
315:18 325:8 330:14,23
380:18 387:16 388:6
389:3 409:11,13
paycheck
229:23
paychecks
19:6
paying
281:23
payroll
132:16
Pearce
59:4,5,11 60:10 63:8,14
63:16,20,23 64:16
66:21
peep
313:6
peers
73:9 106:10 290:22
Peg
244:13,14 246:14 296:4
299:14
pencil
110:17
people
34:20 35:8 60:21,23 61:3
71:12 79:12,14 86:23
91:7 92:2,19 99:18,19
100:16 104:14 121:4,6
122:15,17 124:3 137:12
139:13,18 157:11 161:17
166:22 172:16 177:11
178:5,15,21,22 179:1,3
183:21 193:15 198:15
200:14,17 206:11 212:14
213:2 214:9 239:18
242:8 243:11,15 256:13
260:9 271:18 272:7
275:18,19 278:20
281:22 285:3,9 286:6
295:5 301:3 302:8
304:12,14 305:18 308:4

308:8 311:2 323:19,19
323:21 327:12 335:4
336:17,18,19 337:1,8
338:14 344:17,18 360:8
360:13,15 380:19
people's
323:9,15
PepsiCo
134:1,1,3 236:4,6,7
237:18 238:16 241:1
Pepsi's
241:8
perceived
212:15 224:5 226:13
percent
110:23 117:22 164:13,14
260:7 321:18 322:1
334:23 380:18
percentage
321:14 335:2 390:1,2,4
perception
104:9 213:21 330:20
performance
360:1
performer
393:23
period
45:13 62:20 68:10 69:9
72:14 120:12 183:6
195:7 204:20 205:18
208:8 252:15 324:16,17
380:2 383:2
perishable
32:12
permission
97:20
permitted
211:11
person
36:3 82:17 96:15 97:9
100:4 103:22 104:13
140:14 150:18 151:5
175:1 199:4 207:1
208:7,9 214:21 237:18
252:8 264:16 267:17
268:21,22 285:22
355:10 368:2 375:17
394:3 401:2
personal
63:9 104:19 139:17 147:7
208:16 227:15 230:16
247:9 270:7 296:20,23
298:15,20 375:15
401:1,14
personality
147:18 187:6 252:1
personally
104:12 105:1 311:6
403:20,22 404:14
personnel
99:4,10 132:5 155:13

173:19 252:19,22 253:1
353:10,13 354:22
376:20
pertains
376:14
pest
139:23
phone
10:7,13 95:18 127:2
145:21 180:17,18,19
181:3,6 192:7,16 216:12
216:15 218:9,11,13
254:18,20 264:17,19,21
266:12 267:15,17
276:16 278:6,17 302:18
320:4 342:10 343:9
347:2 348:11,13 350:11
355:10,11,17 370:15
phrase
239:17
phrased
327:17
physical
395:11
physically
211:5
picked
341:16
pick-an-N
162:8
pick-a-N
169:17 173:9
picture
107:22
piece
248:23 334:11 344:8
351:17,20 353:15,19
piecemeal
364:3,5
Pike
20:1,3,13,22 21:4
Piknik
19:13 21:10 24:17 44:20
44:21 45:3,21 46:19
47:5,9,23 50:3 53:13
55:10 58:11 60:22
63:10,19,20 64:13,17
68:12 73:1,14,17 74:15
76:16 79:12,15,17 83:13
89:19 93:22 95:5 96:5
99:1,3,9,11 103:12 107:9
108:10,16 109:11 110:8
110:10 112:10,15,20
113:2,18 114:1,14,19
115:16 116:10 118:5
119:3,12 121:16,21
124:19,23 125:5,20
128:5,22 129:23 130:6
130:18 131:10,19 132:1,5
132:10,17,21,22 133:12
134:3,12,22 135:13,17

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

135:20 136:4,8 140:2
145:11,16 156:5 162:2,4
162:5 164:1 167:6 169:7
169:12 170:21 171:22
172:3,15 173:8 174:3,4
174:5,6 183:9 198:19
208:11 209:2,8,23
210:5 211:11 214:6,21
220:13 227:11,14,18
228:2 229:1,3,4,6,17,21
230:4,10,12,17 233:22
239:23 244:1 245:6,10
245:18 246:2,4 247:17
247:19 250:16,20
251:17 255:23 256:6
260:10 272:1,6 295:5
303:16,22,23 326:8
329:19,22 331:4 336:11
345:5 355:15 356:10
360:1,14 361:15,19
362:1,5,8,14,16 363:2
364:13,16,20 365:1,5,11
365:15,19 366:3 384:4
385:23 389:15 390:6
402:23 403:12,13 406:4
408:2 409:2,8

**Piknik's**
114:12 127:20 129:20
130:21 131:5 145:15
151:19 154:6 204:10
240:4 362:9

**pin**
159:4

**place**
65:19 87:20 118:13
184:20 192:6 241:2
253:10,15 305:7,10
312:5 325:4 326:15
356:3 358:15 390:20

**placed**
177:7

**PLAINTIFF**
3:3

**Plaintiffs**
1:8

**plan**
116:19,21 118:14 119:1,2
183:4 400:9

**planning**
343:6 346:9 348:20

**plant**
50:2,6 61:22,23 62:2
67:6,11,20 73:18,22
74:1 102:6 111:2 112:22
113:3 166:17,19 178:11
178:12 200:16 255:1,4
268:19,21 269:13,18
285:3 335:13 336:15

**plants**
65:3 72:17 73:2,3 83:23
216:21

**plate**
65:17

**play**
258:17

**please**
6:4,12 7:11,19 9:23 74:10
77:13 220:8 243:21
251:14 295:22 369:1
377:22 396:14

**plenty**
64:12 286:12

**plus**
50:18 85:19 312:3

**pluses**
109:1

**point**
18:20 53:9,10 54:12,18
58:3,13 59:12 61:10
68:22 76:23 77:15
78:18 85:13 93:23 97:6
100:7,12 102:12 109:7
110:9 120:16 142:17
165:3 188:23 196:23
201:11 222:2 224:8
226:3 233:14 236:23
237:5 247:19 271:21
280:11,13,15 286:1
290:1 293:9 303:13
312:11 323:11,23 327:13
331:12 343:9 365:5,7,9
366:15 371:13 372:11
383:4

**pointing**
316:8

**points**
13:2 152:11 233:17 237:6
324:19 325:19 330:2,4
336:14

**policy**
127:21 128:13,16 130:8
145:16 241:2 292:18

**polished**
252:2

**pond**
102:20

**poor**
115:21

**poorly**
111:23 115:20 391:21

**pork**
39:5,5

**pornographic**
301:4

**pornography**
258:2 259:12 286:19
292:17 293:2 301:19
304:20 366:14,18
380:23

**portion**
51:1 206:23 208:6

**position**

33:12 37:13,21 49:1,20
63:7 80:10,17 84:15
156:12 157:6 161:3
163:12 175:8,22 178:15
179:4 182:8,9,21 183:3
183:4,17 186:20 195:13
200:3 209:3 239:15
241:16 243:14 246:22
249:19,22 250:3 251:10
251:11 261:16 269:11
296:7 311:3 335:12
358:4,5 366:10 368:14
380:3 382:13 401:5
409:11

**positions**
55:9 99:20 100:5 160:9
163:7 178:23 236:15
237:3 239:8,10,12
242:1 243:16,20 249:5
251:10 358:4,17

**positive**
156:1 250:5,6

**possession**
362:15

**possibilities**
409:22

**possible**
183:12 223:9

**possibly**
152:23 201:12 270:7,8
288:1 300:10

**postgraduate**
28:5 30:4,10,12

**postponed**
193:1

**posttermination**
356:7

**potential**
123:5

**potentially**
167:12 185:6 231:7,10
293:8 378:11

**power**
173:15

**practice**
57:11

**practitioner**
8:22 9:1

**precise**
267:5

**preferential**
378:9

**pregnancy**
39:14 156:23

**pregnant**
156:19

**premium**
51:5

**prepare**
82:12 84:17,20 294:9

**prepared**

84:21,23
**preparing**
108:22

**preplanned**
166:23 167:2

**preschool**
47:12

**prescribed**
8:20

**presence**
223:22 272:8,9 395:20

**present**
3:17 24:13 110:14 167:7
167:14 184:22 260:23
273:1 343:1 347:5

**presentation**
255:22 271:14,20 274:2
274:15 307:1 309:18

**presented**
160:11 205:23 206:5
216:8 230:9,11,12

**presenting**
205:15

**preserve**
150:9

**president**
240:10 333:16 334:5

**pressure**
161:3 197:9,10

**pressured**
160:23 163:14 174:23
190:3 195:19,20 197:4
200:2 203:14,18

**pretty**
54:23 71:13 85:7 125:16
134:8 168:19 205:16
206:14 216:19 218:19
233:5 252:20 277:5
278:23 289:18 293:13
312:20 315:10 320:16
350:12 372:4 379:7,8
380:17 410:5

**prevent**
88:7 89:8

**preventative**
87:18

**preventing**
84:12 87:19 93:3

**previous**
138:15,17,22

**previously**
400:21

**pre-Piknik**
201:20

**Pribisko**
74:8 404:4

**pricing**
362:16

**primarily**
12:23 29:2 82:8 91:21

**primary**

131:6

**printed**
368:20

**prior**
2:23 42:7 82:5 160:1
326:3 341:8

**privilege**
340:11,18

**proactive**
231:10

**probably**
104:13 115:22 121:10
166:20 255:14 287:5
300:18 306:17 320:4,17
336:12 337:21 375:10
391:21 392:23 397:19
411:6

**problem**
57:4 85:19 87:23 89:8
97:5 98:1,4,11,13,19
102:18 105:2 147:20,21
187:22 195:17,17 205:16
275:9,10 277:13,15
309:10 364:2 378:17

**problems**
79:2,4 87:19,21 88:6
89:10 97:10 110:19
116:17 125:18 252:19,23
277:19,20 290:6 378:11

**procedure**
5:6 104:2,7

**procedures**
254:13 265:20,21 266:2,3
266:4

**proceed**
399:12

**proceeded**
10:6 139:9 256:10 298:14

**proceedings**
5:12

**process**
72:10 87:21 88:18 89:1,8
177:17,18,20 179:1
187:5,12 209:22 218:21
227:20 228:12 243:12
272:23 288:12 325:7,9
354:14 400:15

**processes**
220:19,20 272:18

**processing**
362:17

**procurement**
38:15 39:1

**procuring**
39:4

**produce**
76:20 113:15

**produced**
85:11 376:8

**producing**
253:13

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

product
76:13 83:22 84:10 86:14
88:10,15,17,22 92:9,16
92:18,22 108:2 113:21
204:7,22 205:5,10
214:17 216:5 253:14
296:8 378:12
production
56:5,6,9,14,21 57:3,5,13
57:15 58:8,16 59:11
61:17,20 62:3 65:4
75:1,9 90:18 91:20
103:3,3 112:7 115:8,13
118:1 119:18 201:10
202:4 238:21
productive
223:23
products
31:19 65:15 68:2 76:21
128:5 129:23 130:18
204:2,3,5,11,12,14
209:18,19 210:4 211:12
378:7
professional
290:10 304:6,7 343:18,19
348:2
professionally
45:17 105:3 304:1
professor
29:2
profitability
120:5
profitable
117:1,16 118:7,16,17 119:4
119:13,20 121:17
profits
116:22
program
13:4 29:8,10,17,20,22
32:1,3,4,18,19 39:22
40:2,5,7 109:7 117:4
241:11 364:5 380:12
programs
31:20
progressed
320:13
prohibited
214:16
project
41:3 44:2
projects
42:14,16,17
promise
196:22 324:14
promising
118:15
promote
90:19 124:20
promoted
33:16,22 34:4 408:9
promotion

33:9
pronounce
77:12
properly
210:20
property
145:12
proportion
220:3 221:7 225:2,6
336:1 339:15
proportionate
318:10 322:17 323:2
proposals
154:8
proposed
185:19 186:2 206:22
222:16 309:13
proprietary
148:22 149:19 151:11
362:10
proprietor
14:12
protect
278:10 284:10,14 305:7
312:5
protected
284:9 290:20
protection
259:19 310:9
provide
13:10,12 51:2 85:14,18,20
92:20 122:23 124:13
132:9 228:14
provided
24:22
provides
15:7
Public
1:23 2:8 5:2 86:22
413:23
pull
281:17
pulled
257:12,13 283:10
purchase
43:9 117:20 122:11,18
326:7,9 361:15
purchased
20:4 38:18
purchaser
121:21 123:5,16
purchasers
125:1
purposes
128:4 129:22
purse
350:23
pursuant
5:5
pursue
27:19 28:4 395:15

pursued
314:17
push
221:19 380:3,13,16 383:5
pushback
97:2
pushed
207:14 222:10
pushing
221:21
put
51:21 72:3 75:8 80:23
87:1,20 89:15,21 116:19
118:20 120:16 160:8
161:2 195:12 233:5,19
236:14 237:1 241:23
247:21 251:9 253:9,14
312:5 326:14 358:3
360:5,13 361:18,23
362:4 370:2 391:9
402:23
puts
57:2
putting
112:7 115:9 305:7,10
p.m
126:15 203:6 248:7,7
317:13 340:14 410:23
410:23 412:12
P.O
3:7

---

| Q |
| --- |

QA
73:19 80:11,17 81:2
160:16 176:6,11,15,17
179:4 191:2 201:12
366:3,5 409:8
Quaker
108:14 110:12 114:3,11,16
116:13 133:22 134:1
Quaker's
108:8
qualified
159:22 182:18 192:21
357:16
quality
38:17 40:7 48:3 50:4
51:6,10,16,19 52:3,4,7
52:11,15,17 53:1 54:1,3
54:9 55:16,23 56:6,7,12
56:14 57:2,6,11,15,17,23
59:3,15,22 60:13,17
61:7 62:7,10,16 65:2
66:1,7 68:14,19 71:7,15
71:17 72:18 73:1,11
74:21 75:18 76:23 77:3
77:16 78:8,11 79:1,22
81:8 82:3 83:15,22
86:13 87:7,9,10,10,13,13

87:14,18,22 90:19 91:16
91:22 92:8 93:2,7,13
99:4,10,14 100:16,19,22
101:17,22 102:3,5,9
103:4 105:8,23 108:1,17
109:12,14,17 110:7,15,21
111:5 112:10,11,14,15
114:20 115:5,6,19 116:1
116:2 155:10,21 157:12
157:15 163:11 175:7
177:4 190:5 198:3
200:14 201:21,23 202:5
244:7 247:1 254:17
256:5 273:1,3 301:15
309:17 357:13 363:17
368:15 378:4 382:8,16
401:5
quarter
28:19 29:7 30:7
quarters
28:13 30:1,11
quash
341:2
question
7:21,22 19:15 120:9
128:11,12 144:18 149:21
149:23 150:11,13 151:1,4
151:4 222:8 234:23
243:11 316:20,23
360:12 362:12 379:21
questioning
137:15
questions
2:18,19 7:8,9,10,18,18
127:4 137:20 160:2
318:21 326:18,20 343:2
343:23 351:11,12,15
352:4 354:15 360:18
366:7 413:10
quickly
174:10 198:23
quiet
144:20 161:12 232:10,19
299:2
quietly
232:23
quit
46:1 281:22
quite
121:13 205:2 247:12
279:22 322:19
quote
103:6,23 107:9,13 163:6
236:2 239:7,12
quoted
239:13
quotes
188:8

---

| R |
| --- |

R
3:1 413:1
rabbi
161:8,10 163:18 203:23
206:22 207:14,15 208:3
210:17 215:14,15 216:2
217:8,9 226:7 407:7,13
rabbinical
204:23 382:23
rabbis
206:6
rabbi's
208:1,5
race
158:9,13 159:17 160:22
162:17 164:16 165:10
175:10 196:2,3 203:10
235:16,23 250:12 251:6
292:22 313:20 314:5
317:18 332:2,5,6 333:2
339:3,18 340:4 357:20
361:5 378:15 382:2
401:6,15,20
racial
179:7
racially
314:11 316:4,14 357:23
359:8
raise
157:23
raises
156:7 157:13
ran
45:15
Randolph
410:12
range
370:16
rank
150:2
rate
41:22 164:12 252:7
272:13
rated
108:11
rates
330:14
rating
113:23 114:1
rattles
282:20
raw
38:17 39:5
read
64:6 145:23 153:19
221:23 237:19,20 294:1
294:2,4,6 299:23
359:23
reading
2:10 171:12 296:14
ready

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

256:22 277:22
**real**
253:3 277:9 284:7
**realize**
277:8
**realized**
259:20
**really**
27:18 64:18,20 65:18
81:9 103:6 106:17
118:12 123:10 196:19
197:18 226:11 253:17
255:8 257:16,17 275:20
276:2,20 281:23 282:21
311:22 312:22 318:19
320:15 342:4 362:13
409:23
**reason**
8:3 46:11,16 61:5 63:23
76:1 108:16 126:23
147:23 154:12 171:17
187:4,9 211:18 222:14
226:8 250:15 253:4
265:23 277:10 279:23
300:15,23 304:18
317:16 328:21 332:23
339:11,17 348:19
360:20 368:19 378:8
379:13 385:10 397:17
399:23
**reasonable**
208:2
**reasonably**
183:12
**reasons**
63:9 187:3 323:16 339:1
380:8
**recall**
10:4,10 25:2 34:20 36:3
41:15,21 48:16,18 49:7
50:10 52:21 53:12 85:2
86:3 91:18 100:20
101:3,6 107:5 119:9,10
126:5 133:7 134:6
138:7,9 142:21 143:6
146:11 151:17 152:7,10
152:21 153:7 154:18
156:9,10,19 166:8,11
167:5,16,19 168:14,23
169:1 174:16,21 175:18
175:20 177:11 178:14
179:3,7,12,17 180:6,10
180:12,13 181:7,9 182:1
184:12 185:2,17,18
187:21 188:21 189:7,10
190:14 191:12,13 192:17
193:19 195:15 200:7
201:2,3,15 202:11
207:20 212:19 213:3
215:21 217:20 218:2,17
236:10,12,16 242:4,16

245:15 248:18 263:4
264:8 265:4,6,12,14
266:19 267:8,16,18,23
268:7 271:5 279:7
280:22 282:6,12 287:13
287:17 288:18 289:7,19
296:2 297:12,14 298:4
310:21 312:10,13 319:18
320:13 321:17 322:10
325:22 326:5 328:7
331:7,8 334:12 336:10
338:22 340:5 341:6
344:23 348:9 349:9,12
349:16 350:3,5 351:8
351:10,12 356:1,6
369:13,13 371:4 374:18
374:19 375:9 387:2
389:23 390:3 408:22
**recalls**
84:13 93:3
**receive**
27:10 30:3 46:11,15 54:21
157:3 293:5 371:13
**received**
50:20 54:23 83:17
152:23 156:6 157:13
158:6,19 162:21 163:5
164:13 242:3 313:6
331:13 349:3 385:6
**receiving**
127:19 231:23 248:18
**receptionist**
302:4,14,20
**recollection**
86:9 153:3 154:23 188:4
249:9,18 263:14 299:20
**recommended**
40:21 190:20 191:7
**record**
68:3 156:4 258:14 310:8
310:10 339:21 359:23
384:1 410:22
**recorded**
259:18 343:22
**recorder**
350:17
**recording**
351:2
**records**
385:2
**recover**
385:21 386:8 389:13
390:23
**recruit**
239:2 240:12 243:1
**recruited**
102:22
**recruiting**
177:10
**red**
253:11 277:7

**redrafted**
355:2
**reduce**
318:4 321:9 324:2
**reduced**
94:1,12 95:10,21 96:6,13
97:20 98:14 99:2,13,21
100:18 164:12 317:23
318:7 321:12 322:15
329:16 331:21 332:1,11
334:22,23 335:19,23
336:1,16 337:14 339:15
413:11
**reduction**
317:8,18 321:18,20 322:16
322:19 323:1 324:8
325:8 326:14 329:20
333:1 336:4 338:2,6,13
338:20 339:2 340:4
407:19
**reductions**
71:23 338:15,16 359:12
**redundant**
72:2
**refer**
169:22 238:5
**reference**
199:21 239:7,11 241:15
**referenced**
212:7
**references**
221:9
**referencing**
169:19
**referred**
375:22
**referring**
213:16 228:7 237:17,23
240:14 286:16,17 295:4
295:17
**reflected**
381:15
**reflection**
139:14
**refresh**
249:8
**regard**
289:7 311:22
**regarded**
253:23
**regarding**
132:4,8,15 151:19,22
152:5 236:2 271:21
294:15 308:5 316:12
317:3 373:13
**regardless**
408:17
**regret**
329:18
**regular**
75:14

**regularly**
85:7
**regulations**
252:9 305:4
**rehire**
354:18,23 355:4 369:23
370:2
**rejected**
154:8
**relate**
378:14 379:22 400:19
406:18 407:22
**related**
238:20 269:7 277:7
**relates**
231:17 235:15 317:4
377:6,8,13,23 398:16
412:6
**relating**
2:14
**Relations**
385:1
**relationship**
42:18 63:22 101:9,20
135:16,20 136:2,5
151:19 154:10 247:10
290:11
**relevant**
19:12 45:20,20 127:7
207:11 411:7
**reliable**
108:2
**reliably**
112:4
**relief**
325:15
**religious**
207:5
**relocating**
371:18
**reluctance**
188:6
**remain**
153:22
**remained**
182:22 385:22
**remarks**
297:23 298:16,20,21
**remedy**
303:22
**remember**
8:18 41:2 53:7 70:5
77:10 79:4 85:8 119:7
123:23 133:19 142:14
143:9,22 151:21 152:1,3
153:23 154:2 161:18
167:21 168:15 176:4
185:23 186:7 188:8
190:23 195:6 201:6
206:3 212:23 213:2
228:9 236:19 237:4,6

242:10,13 246:1 248:21
248:22 261:8 262:17,20
263:6,7,22 266:2 277:6
283:16 286:2 287:20
288:10 289:13 291:19
301:11,13,18 312:15
320:3,15,17 323:3
326:9 350:14 352:3
369:14,19 388:8 389:6
398:14 409:12
**Remind**
109:5 335:11 363:6
**remove**
364:11
**removed**
316:23 382:15
**reorganization**
81:7
**repairing**
382:20
**repeat**
40:4 276:2 359:21
**rephrase**
7:20
**replace**
80:6 99:18 100:4 176:16
332:12 358:8 383:7
**replaced**
63:1 79:19 335:14 358:11
**replacement**
90:11,12 95:7 387:4
**replacing**
176:1,3 241:15
**reply**
236:18 242:11
**replying**
236:19
**report**
56:1,13 57:12,21 58:21
68:18 70:2,11,16 71:9
262:22 270:17
**reported**
1:21 36:10,13,16 55:21
57:19 65:20 66:3,5,13
66:15,16 70:18,22 71:5
71:11,15 72:15 73:4
79:6 90:7 101:10 202:2
**reporter**
1:22 2:7 5:2,19 6:12
165:16 176:20
**reporting**
55:19 56:21 58:4,9,15
59:7,16 60:4,10 61:14
62:9,21 68:16,23 69:5
69:14,17,19,23 70:7
72:21 73:14 74:6,18,22
74:23 75:5 77:1,5
81:12,15 96:19 97:16,18
98:8 102:6,12 156:20
195:1 206:2 382:9
383:2,10

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

reports
75:12 81:11 328:7,8
represent
53:15
representatives
125:21 131:18 132:15
345:15
represented
284:16
representing
6:19
represents
413:13
requested
133:9 228:8,13 259:16
309:19
requesting
257:6 343:12,17
require
82:21
required
371:17 410:5
requirements
84:1 86:18 109:21 111:15
111:16 112:17 134:18,20
210:1 220:21 296:10,12
research
29:1 72:21 73:3 76:3,12
76:16 159:1 253:5,7,10
257:7 284:18 297:17
researching
298:8
residential
11:20 16:14
resign
46:22 200:2
resignation
148:13,15
resigned
77:22 78:3,20 79:5 90:9
199:14,19,19,23
resigning
261:16
resolution
325:3
resolved
300:6 303:13 306:16
resorts
11:20
resource
35:16 213:6,8 214:3
261:23 268:20 281:3
304:1
resources
34:12 51:22 90:11 173:18
254:2,2 262:2
respect
66:21 205:19,21 309:16
respective
2:5
respond

7:11 159:9 218:15 259:7
responded
207:21 376:17 381:12
responding
377:9
responds
368:13
response
7:14 191:10 218:17 219:23
270:5 313:6 354:6
399:18 407:12 408:23
responses
227:22 228:16,17 399:9
399:10
responsibilities
52:8 61:11 64:17,20,23
66:23 67:5,13 68:7
75:18,23 76:7 80:9,23
81:4,18 82:2,6 90:1
93:1 105:22 159:20
responsibility
51:14 59:8,13,14 61:23
62:3 65:2 72:16,18,20
86:17 90:10 92:7 116:5
176:9 205:13 252:13
258:22
responsible
83:21 86:12 87:4 114:6
rest
33:14 58:22 115:23 309:1
restaurants
87:1,2
restored
324:15
restructure
78:4
restructured
80:8
restructuring
71:23 81:7
result
208:4 295:12 413:19
results
29:4
resume
48:6 177:22
resumes
178:4 372:8,12 384:8
retreat
341:19
retroactive
164:9
return
208:19
returned
354:12
reviewed
228:11
revised
85:1,3 355:5,19
Revising

85:4
revisions
363:22
rhythm
111:20
Richards
246:7
Richardson
175:3 184:6 197:2 244:5
244:7 246:8
Rick
208:14
Ricky
48:10 49:10,19 120:20
122:3 123:17,21,22
124:20 205:3 206:10,13
206:16,23 208:6,21
212:1,5,9,15,21 213:19
214:9,19 215:1,13 216:11
219:16,19 222:18,21,22
223:4 225:16,20 226:4
251:22 286:3 287:6
366:12 369:21 370:6,7
397:22 398:2
Ricky's
206:19 226:2
rid
358:7
ridiculous
387:8
riding
45:16
right
13:7,20,23 19:9 23:9
28:15 29:8 43:21 53:21
67:3 73:23 84:15 90:8
101:4 105:20 112:8
119:16 129:18 143:4
145:7,16 159:11 180:8
182:20 183:14 192:22
195:15 203:20 224:20
229:22 232:14 233:6
255:14 263:18 265:19
276:14 280:10,13
281:10,18 299:21 300:2
300:22 301:12 302:16
306:5 310:6 319:22
328:20 350:8 353:11
369:7,19 370:5 391:2
403:23 408:18 410:2
rights
14:13 214:20
right-hand
227:1
rings
389:7
road
20:1,3,13,23 21:4 88:12
315:8
Robert
48:11,12 49:11 50:1,5

55:19 294:18
rock
282:5
Rodman
58:7,14,21 59:9,16 61:15
61:17 62:14,21 67:11,14
68:17,19,23 69:4 75:8
180:5
Rodman's
75:7
Rohn
176:19,21,22 183:3 366:17
369:22
role
103:12,14,18,19 105:7
177:16 185:15 187:8
188:18 200:15 239:14
243:2 244:16,18 332:8
roles
239:3,9,17,21 240:2,13
243:1,9,18 332:10
roll
390:19
rolled
274:13 390:21
roll-out
272:14
room
22:10 36:4 105:16 166:14
166:16,17,19,20 256:8
274:9 275:12,14 299:6
rooms
166:15
Rose
3:13
rough
13:21 289:18
roughly
8:18 16:6 25:4 58:11
66:19 71:2 321:19
routine
134:8
Rule
5:5
rules
2:14 5:5 7:4 211:11 252:9
rumor
64:4,6 247:13 257:3,6
258:5
run
46:2 124:3 224:19,21
244:22 289:1 332:21
359:13,14
running
47:13 110:23 124:6 176:8
194:23 380:22
Ryan
376:1
R&D
73:19 75:22 76:3,6,9
178:18 195:4,10,21

244:14 254:12 257:18
260:21
R-O-H-N
176:21

———— S ————

S
2:1 3:1 4:4
sad
320:18
safeguard
84:11 93:2
safety
30:16 31:6,8,12,19,21
32:10,13,16 33:2,6,10,19
34:10 38:22 43:7,8,11
84:3,13 93:4 109:8
257:14 283:6 378:6
Saint
208:10,11,18 215:3 225:21
226:18
SAITH
412:14
salaried
36:12,14,16,22 44:5
151:18 408:16
salaries
100:22 101:6 322:14
323:9 335:22 339:14
salary
50:14,17 52:21 53:17
54:13,15,22 156:7
157:16,22 158:2 160:16
163:11 185:21 186:3
189:10 190:11,19 191:6
191:15 192:5 194:2,5,20
201:16 317:9,19,23
318:5,7 321:9,12,21
324:2,8 326:14 329:16
329:20 330:8 331:20
332:1,10 333:1 334:1,8
334:21 335:15,18 336:1
336:4,16 337:14,17,19
337:23 338:3,6,13,15,20
339:2 340:3 359:12
370:16 394:5 407:19
sale
215:20 250:17
sales
34:13 252:14 255:15
258:21 260:18 307:1
309:18 334:5
salesman
251:15,23
Sampson
26:18
Sam's
31:15
sanitation
34:13 65:16 72:15,16

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

75:2,9,11
**sat**
65:7 256:14
**satisfied**
112:16 158:1
**Saturday**
49:15 385:5
**save-the-day**
103:9
**saw**
118:2 138:4 190:21 403:9
403:9,11
**saying**
7:12 50:23 138:18 169:2
189:19 191:14 206:9
207:13 212:8 228:5
263:14 270:7,8 278:23
279:5 288:15 316:11
325:16 331:9 368:21
381:2
**says**
153:21 154:17 155:19
158:3 214:5 220:13
223:21 224:16 225:1
227:2 230:3 233:15
238:4 239:2 249:4
269:20 296:3 299:12
302:14,18,23 324:23
329:18 346:18 368:14
369:8 385:2
**scared**
337:2
**scene**
282:19
**schedule**
94:2,12 95:11,21 96:1,6,13
97:20 98:14 99:3,13,21
100:18 103:3 110:22
126:12 177:23 183:1
367:15
**scheduled**
147:2 309:14 348:18
**schedules**
178:8,9
**scheduling**
202:4
**school**
26:17 28:7,9,14 30:2
298:1 397:17,18
**science**
27:13 29:20,21 202:11,12
202:14
**sciences**
27:14
**Scott**
11:4,6 402:4
**seafood**
32:1,2,11
**seal**
210:10
**search**

37:20
**season**
67:16 90:23 91:2 184:2
207:2 325:14
**second**
25:13 45:8,11 49:7,9
50:8 52:16 77:23 85:10
94:7 203:11 214:5
225:8 275:2 339:11
369:7 373:3
**secondly**
111:23
**second-to-last**
249:2
**secretary**
208:15
**section**
76:17 96:11 155:3 219:20
238:23
**sections**
32:12 220:9
**secured**
139:15
**Security**
10:21
**see**
67:10 85:13 97:6 98:1
118:19 120:13 121:8
129:17 139:8,12,19
140:7 145:8 196:20
198:11 210:7,8 215:15
231:21 238:10 248:20
290:13 293:1,5 325:14
366:18 370:1 392:17,19
**seeing**
121:11 154:3 191:14
325:22
**seek**
362:7 393:13
**seeking**
157:23 158:1,3 362:2
385:13 386:8 389:13
390:23 391:3 402:4
**seen**
53:16 119:6 152:19 153:14
217:4 219:4 237:13
239:22 247:11 329:10
367:4 399:14
**seize**
211:6
**Sellers**
24:15 25:16,18 179:19,21
181:22 193:10,12,14,21
194:1 201:7 213:3 214:1
233:7 256:14,18 259:3
259:17 261:7,22 262:11
262:14 271:19 273:11
276:6,16 277:11 279:17
280:16 281:12 282:7
283:2 284:22 285:6,13
286:5,11,14,22 287:11

288:7 295:9 298:7,12
300:4 301:22 302:23
305:21 308:12 310:2
315:9 318:2 319:6
331:16 336:12,22
338:12 339:23 342:11
345:20 347:4,13,22
349:3 350:18 351:2,6
352:17 355:9 356:8
357:1 409:7
**send**
110:2
**sending**
270:22 289:14 369:15,17
**sends**
255:11
**senior**
32:16 33:5,10,14,19 51:19
52:2,11,17 61:6 62:16
335:9
**sense**
205:2 213:7 323:17
325:12
**sensible**
328:9
**sensitive**
171:10
**sent**
110:10 159:8 160:7 161:7
163:17 203:22 206:8
207:7,12 212:8,12,14
231:8,10 235:18 236:2
237:17 238:1 259:5
294:12 369:13 376:15
381:7
**sentences**
238:5
**sentiment**
241:21
**sentiments**
379:4
**separate**
12:9 18:16,21 120:12
121:7
**separately**
56:1,13
**September**
39:11 51:12 52:12 59:12
59:17 61:7 62:17 63:1
70:8 81:17 82:7 388:16
388:17
**serious**
60:21 125:17 252:20
378:3,5 379:7,8
**served**
23:14,23 344:14
**service**
15:8 39:20
**services**
40:13,20 41:18 42:4
43:15 44:18 45:3 73:8

73:10 106:3 107:3
353:7 354:4
**serving**
302:11
**set**
41:6 89:18 183:22 272:4
319:4 327:20 366:10
**sets**
110:2
**settled**
37:20 352:8
**seven**
21:8 165:6,8,22 385:7
392:4 393:7
**seventy**
53:8
**seventy-seven**
53:10 54:16
**severance**
132:10 344:9,11 345:17
353:16 354:11 355:6,9
**Shannon**
1:17 2:6 5:10,15 6:6
146:19,23 147:20,21
231:9 257:15 258:19,23
303:1 320:5 329:18
**share**
116:22 169:8
**sharing**
170:4
**sheet**
119:22 352:3
**shelf**
198:12
**Shelly**
110:13
**Shield**
387:14 388:1,7,11,18
**shift**
77:23 112:1
**shifting**
111:12
**shock**
393:21
**shocking**
169:3
**short**
68:10 69:9 155:2 258:1
323:6
**shorter**
166:2
**shortly**
161:16 166:10 194:5
264:14 312:20
**short-term**
42:15 370:20
**shots**
174:6
**show**
103:17 110:6 119:22
213:13 218:5 219:2

273:2 292:17 302:7
367:2 372:21 373:20
376:5 377:20 379:18
381:21
**showed**
259:11 309:21 366:20
**showing**
103:16
**shows**
172:22,23
**shut**
73:17 75:20 154:1 205:8
205:17 211:22 216:20
336:15
**sick**
342:3,3,3,3,8 408:4,6,10
408:20
**side**
92:12 120:6,7
**sight**
325:15
**sign**
206:23 211:7 215:23
225:17 344:9 355:4
**signature**
2:9 127:16 129:8 130:14
372:23 373:4
**signed**
208:6 215:13 221:10
222:6 226:9,17 354:17
387:23
**significance**
227:7 230:6 382:1
**significant**
142:22 143:1,2 207:9
334:14
**significantly**
326:23
**signify**
228:21
**signing**
225:21 226:4
**silent**
207:19 221:2 231:20
359:2
**similar**
88:11 98:9 154:3 235:19
313:14 331:10 381:14
**simple**
171:13 379:3
**simply**
311:9
**Sims**
403:1
**single**
108:19
**sit**
101:5 112:23 311:17
**sitting**
36:4 119:8 167:15 188:3
301:11 327:14

JERRY A. MCCARTNEY, ET AL.    SHANNON MCGLON
ONYX CAPITAL VENTURES, LLC, ET AL.    August 15, 2007

situation
  147:7 155:12 180:23
  202:7 222:12 225:6
  234:1 260:5 261:17
  263:11 280:6 283:19,22
  303:22 304:8 311:23
  313:14,15,19 314:10
  330:13,18 331:2 367:23
  368:3 407:13 410:18
situations
  53:12 104:21 284:3
six
  33:21 35:4 162:15 163:22
  199:17 214:7 349:18
sixties
  201:18
sixty
  93:16
sixty-five
  53:8,9,17 54:8 191:1,16
sixty-three
  191:1,16
size
  31:15 166:19,21 275:14
skill
  182:12
sleep
  260:6 350:9 392:3,6
  393:4,11,12
sleeping
  350:15 392:22 393:2,7,10
  393:16
sleepless
  391:8,15 392:13 395:13
slightly
  367:17
slow
  92:1 184:3
small
  31:16 45:18 82:21 102:20
  102:21 125:12 198:19
  202:1 272:12 316:18
smaller
  209:11 275:16
small-pond
  202:7
smart
  198:15
smart-alecky
  274:11
smoke
  117:14 224:13
smoothed
  293:10
Smoothie
  92:17
Snickers
  274:8
snide
  274:19,21
Social

10:21
socialize
  411:12,15,21
soft
  57:7
sole
  14:11,15
solely
  83:8 120:21 230:21 372:5
solution
  206:22 208:1 209:7
  214:19 222:16 226:16
solutions
  42:6,23 92:19
somebody
  39:22 90:8 122:23 144:15
  176:1,4 195:9 268:19
  269:7 287:22 288:1,4
  288:15 366:12,13
  377:10
somebody's
  380:18
someone's
  35:22
something's
  276:19
son
  394:8
soon
  118:9 183:12 199:15
  391:17,18
SOP
  104:2,6
sophisticated
  80:21 89:13
sophomore
  27:6
sorry
  15:13 59:1,2 18:11
  164:23 202:22 228:10
  258:17 310:1 313:9
  314:4 372:14
sort
  80:12 104:3 120:14 199:6
  202:6 215:16 252:2
  293:6 319:21
sound
  53:20
sounded
  47:21 169:17
sounds
  207:3 208:1
Source
  18:12 19:2,5
South
  250:18
Southeast
  46:5
Southern
  220:22
SouthTrust

131:9,11,17,22 132:4,8,9
  132:14,16 135:13,14,21
  136:1 151:20 331:3
  345:14,15
SouthTrust's
  131:23
speak
  9:17,20 136:16 264:9
  280:15 283:1 336:3,6
  338:12,20
speaking
  370:14
special
  211:19 220:21 386:20
specific
  29:10 86:8 105:7,10
  153:2 188:4 234:21
  243:16 262:6,8 263:13
  288:19 331:7 396:22
  402:20
specifically
  36:4 48:18 56:22 67:7
  101:4 106:16 114:16
  123:23 153:23 167:16
  187:21 211:19 241:18
  331:18 367:22
specifications
  88:11
specifics
  188:5 396:23
speculation
  150:3
spell
  6:8,11 74:9 77:11
spells
  63:13
spending
  115:9
spent
  112:22
Spier
  1:21 2:7 5:1
spoke
  59:14 126:18 254:9
  257:11,12 264:19
  338:16 360:19
spoken
  257:8,10 258:4 259:21
  262:4 396:12 397:10,11
  397:22
spot
  289:18 365:17
Spring
  204:21
Sproull
  404:21
spur
  167:1 319:12,14
stable
  47:12,14
staff

40:1 65:5 66:18 72:13
  84:8 90:2,22 91:5
  110:20 115:1 153:3
  161:17 163:22 166:4,8
  167:10 168:11 173:14,14
  173:20 193:17
staffing
  90:15 155:16
stake
  220:16
stand
  12:2 256:1
standard
  104:6 221:12 222:6
  304:11,21
standardize
  32:19
standards
  109:17 110:8 220:17
standing
  139:10 256:7 265:19
standpoint
  119:19 272:21
stands
  12:5
stared
  147:18
start
  38:5 42:11 44:14 45:14
  61:14 69:5 94:20 97:18
  118:6,21 191:7 268:3
  274:1 340:22 391:14
started
  18:23 27:21 30:21 31:5
  41:14 43:2 44:21 45:13
  45:22 47:5,9,10,18 51:6
  54:8 55:16 58:10,12
  59:7 62:10 64:14,16
  69:23 70:7,21 72:7
  79:11 89:5,6 98:7 118:5
  118:13 119:1 120:17
  121:11 128:21 137:15
  139:16 161:15 180:9
  183:10 190:21 196:10
  227:20 253:16 254:17
  257:5 275:20 391:19
  394:18,20,21
starting
  50:17 60:9 69:22 184:2
  185:20 186:3 192:4
  201:16 388:20 392:5
state
  5:3 6:4 14:12 413:4
stated
  160:8 354:16
statement
  113:17 118:4 130:20
  154:16 169:3 171:1
  172:5,10 173:5,7 230:7
  354:19 358:23 359:4
statements

234:15 235:1 274:9
  400:18 401:1
states
  1:1 13:2 15:11 32:3
status
  125:2 130:22 131:2,19
  151:22 152:5
stay
  88:16 89:4 91:10 98:22
  99:6
stayed
  275:16,18 324:13 365:10
  365:15 385:19
staying
  88:18 89:17
steer
  223:23
steering
  89:6
stellar
  360:2
stenotypy
  413:9
step
  80:11
stereotype
  252:6
Stewart
  376:1
stick
  394:6
sticking
  314:1
STIPULATED
  2:3
stipulation
  5:7
stipulations
  5:20 150:9
stock
  211:4
stockroom
  211:4
stood
  144:14 376:23
stop
  68:22 140:15 255:9
  269:21 270:4,11 275:6
  281:7 282:18 299:3
  341:1
stopped
  97:16 281:22 364:17
  372:12
stopping
  196:23
store
  31:14,17,17 32:5,21 33:3
  34:3,6,8 192:14 198:12
stores
  31:14 32:18,20,23 33:7
story

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

258:1 284:2
straight
144:17 162:13 342:15,17
346:3,12 347:12
straightening
1:18:23
straightfoward
97:9
strange
140:14 276:20,21
strategies
90:21
strategy
332:8
Street
50:5,6 51:7,11 52:5 55:17
57:18 58:1,8 59:8,23
61:12 62:1 66:2 71:20
71:22 74:1 76:7 77:4
77:19 79:23 80:3,7
82:9 83:7,11 101:18,22
102:10 148:21 149:17
175:16 176:7,7,12,16,18
176:23 177:4 244:17
256:2 271:15 335:14
368:16
stress
8:12 260:6 342:6 391:8,9
391:19 392:10 393:19
394:18,23 395:7
stressed
336:19 341:15
stressful
288:20,21 352:6 394:8
stretch
357:10
strike
24:11 42:2 126:8 135:11
339:21 363:6
string
219:9 225:9 367:4,8
stringent
330:22
strong
176:6,11 182:11 187:7
206:7 219:7 295:12,18
295:22 296:19,23
316:15 350:8
strongly
160:14 163:9 189:17
190:15 197:12
Strowbridge
244:19 246:20 249:6
structure
56:4 58:4 77:21 80:13
81:10 99:23 186:18
198:17 383:3,10
structured
19:11
stuck
335:1

study
341:21
stuff
65:12 292:20 300:18
340:11
subject
152:2 171:11 174:10,19
submit
48:4
submitted
48:6 372:8 373:7 384:8
submitting
296:10 372:12
subordinates
290:23
subsequent
50:12 278:20
subsequently
279:9
subsided
394:23
substance
106:20 399:10
succeed
109:22 197:14
successful
32:20
sudden
232:23
sue
256:22,23 257:22 258:12
284:1 303:11
sued
23:5,7 293:15 303:19
suffer
325:10
suffering
403:7
suggest
222:9 224:3
suggested
233:17 261:14 368:2
suggesting
225:20
suggestion
208:5
suggestions
222:18 223:10 379:6
suggests
18:20 225:15
suing
303:17
suit
227:20
suits
122:15
summarizing
238:15 294:14
summary
147:7 154:5
summer

70:6 363:19 365:3,5,12
365:13
summertime
90:14
sunbrella
11:18 16:13
sunbrellas
16:12
Sunday
341:7,8,15,18 397:16,17
superiors
290:23
supervision
204:15 413:12
supervisions
204:17
supervisor
77:17 78:1,5,9,12 80:18
102:3 141:7,9,10 157:15
159:7 182:8,15,16 240:8
258:9 269:10 271:18
supervisors
36:9,12,14,17,23 66:7,8,14
66:16 71:15,18 74:22
77:1,4,8 80:15
supplied
83:18
supplier
39:19 40:15
suppliers
14:21 38:16 232:15
supplies
16:12
supply
11:19
support
118:2 197:22 198:20
260:10 272:16,20 380:9
382:7
supposed
154:14 214:14 270:9
311:11 315:7
sure
8:20 13:20 17:4 19:11
59:18,20 86:5 88:18
107:8 119:6 121:2 125:4
129:17 142:11 149:9
162:12 186:14 187:20
188:7 190:13 209:9,23
215:12,13 216:14 247:2
262:3 288:8 296:11
326:10,19 336:13,13
347:4 350:7 351:19
352:2,4,8 355:7 368:5
371:9 372:13,15 400:10
surprise
134:7
surprised
212:20 213:18
surrounding
162:20 292:10 359:16

suspect
156:2
suspend
311:8
suspended
254:15,22 255:6 257:4,9
267:1,7,21 269:11 270:2
suspension
254:10 257:3 285:4
295:6 301:10 311:9
sweat
360:14
sworn
5:16 22:21
swung
78:22
symptoms
391:6 395:12
syrup
83:9,10 198:10
system
43:9 81:10 84:7 114:3
128:3,4,9 130:5 271:21
312:4
systems
32:10 43:8 72:1,3 82:12
84:5 87:5,8,9,20 112:14
112:18,19 129:21,21
159:23 176:13 253:9
256:5 273:1 305:10

---
T
---

T
2:1,1 4:4 413:1,1
table
281:5 310:13 371:1
tail
360:4
Tailor
18:11,14,23 19:3,4
take
7:14 8:2,5 20:16 21:13
29:19 41:13 64:21 91:5
94:11 100:12 105:7
124:4 145:1,8 146:16
149:2,3,4 153:18 164:20
165:11,23 166:1 176:11
184:19 186:16 192:5
203:3 221:22 222:2
237:18 252:3 260:15
269:14 293:23 294:1
298:14 315:7 317:10
318:14 325:3 350:10
351:23 353:19 355:18
393:15,18 409:23 411:1
taken
2:6 55:5 100:13 126:15
203:5 248:6 317:12
340:13 348:10 363:7
401:1 413:8

talented
239:3 240:13
talk
14:17 55:2 97:5,13 120:4
122:19 127:5,8,9 136:21
146:7 147:1 159:13
165:8 166:4 191:4 193:7
203:16,21 206:16 226:3
233:7,10,13 251:12
256:4 261:18 263:8
264:2,13 268:12,15
278:11 280:1 289:3,21
302:15,16 303:1,2,17
309:12,20 317:8,15
318:22 320:5,18 327:10
327:16 338:1,5,8 340:6
340:16 341:13 343:3
349:6,8,11,14,21 350:11
356:11,14,17,20 374:22
374:23 375:11 377:10
403:5 410:19
talked
64:3 121:23 193:10 218:11
226:16 244:6 248:2
254:8 258:9 259:3,4
272:2 277:18 278:3
285:12,17 288:10 289:9
311:21,22 314:3 320:7
332:15 349:23 355:2
367:19 396:4 403:8
404:17 406:1,21 407:3
409:6
talking
66:21 105:21 121:1 130:17
143:12 152:11 233:17
265:22 288:13 303:5,14
306:12 314:18 324:19
325:19 327:14 330:2,4
336:14,17 337:6 349:9
349:12,16 371:6
tape
24:11,23 25:8,11,21 26:2
26:4,6,7 259:18 310:8
310:10,12,16 339:21
343:21 350:17 351:2
taped
24:6,10,13 25:3,14 26:13
tapes
400:20
taping
24:20 25:19
tasks
72:11 102:23
taxes
400:7
Tea
133:12,15
teak
11:17 16:11
team
76:12 110:3 118:13 124:5

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

153:6 155:22 255:21
298:17 321:1 328:17
335:9
**technical**
60:21,23 61:1 73:7,10
82:17,22 84:8 90:2
92:1,19 106:2 107:3
182:12 198:15
**technician**
80:11,17,19 81:2
**technicians**
110:16
**technique**
89:22
**telephone**
127:20 129:21 145:15
**tell**
7:20 9:23 24:12 25:13,18
33:18 83:19 98:2
107:15 113:9 117:17
123:22 127:3 142:23
144:15,19 147:4 161:9
164:21 169:4 174:22
175:20 184:10 187:14
190:18 193:13 229:19,20
230:14 236:10 251:13
261:14 263:5,20 265:2
269:21 270:20 276:11
278:16 279:22 280:1
281:11 282:10 283:12
286:8 288:9 291:7,12
302:20 307:9 316:3
317:21 320:12 335:5
337:11,13 341:4 346:8
350:1 351:1 354:4
357:22 376:12 377:22
381:23 391:6 393:19
**telling**
23:11 92:11 113:16,19
126:17 166:5 222:11
235:21 258:23 286:11
299:2 301:3 340:22
374:19
**tells**
117:11 279:18 289:4
306:3 307:7 320:1
**temp**
37:17
**template**
32:21
**temporarily**
214:20
**ten**
17:14 19:22 164:11 185:21
185:22,23 318:15
399:21
**Tennessee**
182:6,11
**tenure**
33:15 72:17 75:7 113:2
152:4

**Teresa**
48:21 49:3 405:22 406:2
406:14
**term**
13:7,9 113:6 155:2 169:20
169:21
**terminate**
35:22 36:1,14 91:6 329:3
342:16 344:5 361:12
380:8,10,20
**terminated**
25:16 36:20 46:18 54:6
59:12 69:1,16 79:5
90:9 102:1 151:1 159:18
224:12 227:23 228:18
247:7,16,18 249:20
259:14 292:20 304:17
317:1 319:2 331:17,19
342:21 343:15 344:3
346:16,23 353:2 358:13
359:14 363:9 380:23
384:18 391:16 401:4
404:10 405:2
**terminating**
341:8 343:22
**termination**
26:10 36:5 46:22 128:7
130:2,9 150:16 163:2
242:20,22 315:19,23
340:7,16 341:5 352:1
356:3,12,15,18,21
357:19,23 359:8 360:21
367:10 373:10,13 380:9
384:21 386:12 389:19
390:8 395:5
**terminations**
36:11
**terms**
13:7 114:1 118:7 278:12
304:3,4 393:2
**territorial**
121:2
**test**
88:21 109:20
**testified**
5:17 21:23
**testify**
9:15 22:7 286:13,21
403:18,22 404:2,12
406:15
**testimony**
22:18,22 316:22
**testing**
80:20
**tests**
88:17 89:1
**Texas**
37:8 42:20
**thank**
170:3 412:9
**theirs**

314:21
**thereabouts**
8:17
**thereto**
2:23 413:10
**thesis**
29:23
**thing**
10:3 52:1 92:14 95:7
102:2 107:23 111:7
112:9 164:4 191:13
216:18 218:8,10 240:14
264:10 265:19 268:2
271:9 282:2 283:11
287:16 289:6 294:6
306:11 311:13 341:5
350:8 375:5,6 395:8
**things**
12:15 37:14,18 45:19
53:14 68:10 75:11 79:9
103:6 108:4 137:13
139:17 178:12 183:14
184:2 202:4,5 208:17
231:9,11 234:8 247:5
252:7 253:2 263:7
275:21 277:4 278:23
291:1 299:11 301:16
305:2,6 315:16 320:7
331:9 344:16,18,20
354:16 358:22 362:17
371:5 382:4 391:20
395:22 398:11,13
**think**
7:16 16:22 54:7 93:12
117:14 127:6 137:9
148:14 149:9 150:8
151:12,14 156:15 157:7
158:5 169:19 170:11
172:19 180:6 187:16
212:1 222:11,17 224:14
226:15 243:10 255:10,11
255:13 260:3 270:21
277:14 292:19 303:18
313:22 314:12,15,16,19
315:12 318:20 319:19
320:3,6 323:16 326:20
327:17 329:1 333:14
339:2 345:12 352:11,13
355:11,12,22 357:9
358:23 359:3,11,12
380:7,17 381:9,11 386:2
388:8 389:6 391:1,13
395:21 398:5 399:16
407:20 412:8
**thinking**
235:10,12 276:18 322:20
322:22 364:6
**thinks**
141:18 257:5
**third**
129:7 150:4,18 151:4

154:8 238:9 239:1
296:15 411:5,7,9
**thirteen**
112:14 256:4 271:21
273:1
**thirty**
16:6
**thirty-five**
321:19
**thorough**
110:3 257:7 258:13
300:21
**thoroughly**
288:11
**thought**
10:5 15:14 27:17 29:13
47:15 56:23 116:7
125:6 137:4 140:13
159:12 169:9 170:17
171:7,22 172:9 186:12
187:19 188:17 192:20
193:8,16 210:13 218:19
220:1,12 221:4,6 235:8
254:22 270:5,12 275:8
291:6 315:20 325:10
342:13 343:3 359:9
368:17 370:15 381:5
**thousand**
50:18,19 53:18 54:8,17
69:2 157:2 185:22,22
186:1 191:8,16 196:8
211:3 272:11 321:19,23
322:3 330:8 334:10
337:15 385:6 399:20
**threat**
213:21
**threaten**
193:3 194:16
**threatened**
222:4
**threatening**
108:1 113:20 234:1,8
258:21 304:23,23
**threats**
222:3 233:15,19,20,22
**three**
10:8 11:15 15:11 19:22
32:17,19,23 33:7 41:11
48:17 50:3 58:11 69:3
73:2 83:12,23 94:16
95:2 110:20 120:18
163:4 166:20 176:6
213:1 261:10 334:10
335:22 401:18 408:8
411:4
**three-day**
110:5
**thrown**
198:21
**Thursday**
138:16,17,23,23 148:3,10

363:8
**tied**
382:19
**tier**
14:21
**time**
2:21,22 11:10 24:12 25:2
26:8 41:13,16 44:23
45:12 49:1 52:14 54:6
55:3 57:22 59:2 62:20
67:9 68:11 69:8,9 71:14
71:19 72:14,23 73:13
74:4,16,20 75:10,16
77:15 78:3,19 81:15
85:3,8 93:21 94:1,2,20
95:5 96:8,19 97:17
99:12,22 100:4,7 101:2
101:23 102:6 107:17
109:4,20 111:12 112:22
115:9 117:8 120:13
121:9,22 127:1 131:14
132:20 133:23 138:9
149:5 153:19 154:20
156:15 167:3,20,21
170:5 178:18 180:21
182:7 183:13,14,15,15,22
188:1 189:12 192:18,20
194:22 195:2,4,7 200:5
204:20 205:22 206:2
208:8 211:15,20 222:3
222:20 223:6,12,15
225:19 227:11 229:18
237:18 240:19,23
243:23 248:1 252:15
256:9,17 260:7 274:21
275:10 280:19 282:3,16
284:20 288:20 290:1
293:23 294:1 298:16
299:3 301:19 303:9
306:20 316:5,13 319:15
321:22 324:16,17
325:21 328:8,12,23
336:14 337:20 345:5
346:16 349:2,4 352:7
355:20 363:2,20,23
364:4 368:11 369:12
371:1,12 372:11 376:21
380:2 382:9 383:1
386:12 389:9,18 391:22
394:13 398:10 405:1,7
408:3,4,7,10,20
**timeline**
183:9
**times**
24:8 71:13 85:1 92:1
110:20 113:7 123:1
129:17 166:21 178:17
209:3 211:13 253:6
274:14 297:10 324:13
345:8
**Titanic**

118:22
**title**
38:14 49:6 73:7,8 106:2
  106:11,12 245:19,22,23
  247:3
**titles**
106:17
**today**
7:5 9:15 10:8 101:5 119:8
  167:15 188:3 256:20
  277:13 301:17 393:6
  397:5 412:6
**told**
30:6 49:16 59:10 63:19
  69:12 96:23 97:4
  116:15 117:2 124:1
  140:22,23 141:1 142:3,5
  142:16 143:8,19 146:9
  146:17,18 155:21 157:10
  159:18 186:8,11 188:10
  188:16 190:9 225:4
  230:8 243:12 249:11,23
  255:6,7 258:10,16,18
  259:7 261:6 262:11
  263:7,10 264:22 265:16
  265:18 266:6,16 267:8
  267:11 269:17 270:3,11
  276:1,4,8,10,14 277:17
  280:2,4 285:2 286:3,5
  286:14 287:12,21
  289:10 291:5,6 293:13
  295:4 296:22 297:4
  298:3,6,9,10,21 299:19
  301:9 302:20 305:15
  306:10 308:14 311:18
  312:2 317:6 318:3,6,19
  320:16 323:8 324:4,10
  327:9 331:16,18 337:16
  337:23 339:1,8,20
  340:2 342:13,19,23
  344:2,4,4,15 346:21
  347:21 350:7 353:5,6
  353:21 354:20,21
  355:23 356:5 358:12
  361:3 373:14 395:9
  396:17 397:10 401:8,17
**top**
114:9 174:2 227:1 238:3
  240:6 313:3
**topic**
174:14
**topics**
238:20
**total**
66:19 408:12
**touch**
206:15,17
**tough**
125:13
**tour**
122:20

**tours**
178:12
**town**
343:16 348:16,20 371:9
  372:9
**track**
35:13 118:17
**Trading**
37:22 38:1,6,13,19 39:3,8
  39:19 40:16,19 42:8
  43:17 46:14 108:22
**trained**
110:16 111:22
**training**
42:6,23 43:5,7,8,10,11
  45:16 183:2,6,10
**transcript**
413:13
**transfer**
214:20
**transferred**
176:23 215:2
**transpired**
369:12
**Transport**
12:3,7 15:4
**transports**
14:20
**traumatic**
81:13
**travel**
371:17 410:3,19
**tread**
292:11
**treat**
304:6 360:9
**treated**
137:17 158:8,12 159:16
  160:19,20 162:16 203:9
  235:23 254:8 360:9,16
  361:5 381:16 401:19
**treatment**
137:19 378:9
**tremendous**
360:5
**tremendously**
253:20
**trial**
2:21 398:4 403:19 404:13
  406:15
**tried**
90:20 199:22
**tristate**
15:14
**Tropicana**
76:11 92:16 111:11 133:5,9
**trouble**
67:15 68:12,12 107:13
  257:16,17 283:19
**trucking**
11:16,21 12:23 13:6,10,11

14:19 45:22
**trucks**
13:13
**true**
118:4 365:4 413:13
**truly**
173:17
**trust**
323:21,22
**trusted**
214:23 224:21 323:19
**truthfully**
9:15
**try**
91:11 107:21 138:5 197:17
  209:11 301:16 343:4
  347:8 380:13
**trying**
80:12 88:7 159:4 161:2
  171:14 176:4 183:1
  218:20 231:16 239:6
  255:12 300:20 305:2,16
  305:21 306:11 311:5
  312:4,5 361:15,18
  377:15 380:2,15 394:13
  397:5
**TSI**
42:5,22 43:19,22 44:10
**Tuesday**
138:15,21 147:3 148:7
  319:1,3 327:21 346:6
  347:10 349:5 350:18
  351:7
**turn**
118:6 129:6 130:13 238:9
  255:16 355:15 365:16
  367:7 369:4 373:3
**turned**
378:10,16
**turning**
118:22
**turn-around**
118:12
**twenty**
385:7
**twenty-eight**
399:20
**twenty-four**
66:19
**twenty-one**
66:19
**twenty-seven**
35:9,19 36:2
**Twenty-three**
31:2
**twice**
24:9 110:1
**two**
11:15,21 12:9 18:20 19:20
  24:10,11 26:12 28:13
  30:1,11 41:11 48:16,18

49:14 59:15 66:6,16
  69:2 71:17,21 72:16
  73:3,14 77:3,7 94:17,23
  110:4 120:11,22 137:12
  139:13,18 157:11 158:5
  160:1 163:1 166:15
  196:7 209:1 219:8
  223:19 224:11 258:19
  263:4 275:17 297:3,7
  326:3 339:1 340:9
  344:8,10,13 350:10,12
  371:5 408:11 411:3
  412:4
**two-week**
183:2 353:16 354:10
**two-year**
29:23
**type**
13:9 43:9 86:23 103:22
  104:3 119:14,21 122:6,11
  122:17 123:11 137:19
  168:3 202:14 218:8,10
  238:7 251:23 252:8
  268:21 322:23 375:21
  380:4,5
**typewriting**
413:11
**typical**
79:11 106:5,15 168:10
  201:8,9 363:20
**typically**
106:10 110:4 134:17
  144:20 167:14 180:17
  218:12 344:13 395:23
**typing**
37:17

**U**

**U**
2:1
**ugly**
274:15,19 278:23
**uh-huh**
6:10 7:13 12:19 13:17
  123:6 127:18,22 129:11
  130:19 162:18 163:19
  182:6 217:6 224:23
  306:9 339:4
**uh-oh**
320:22
**uh-uh**
7:13 214:11 271:6
**ultimately**
189:20
**Umbrella**
18:12 19:2,5
**umbrellas**
11:19 16:14
**unaware**
66:22 203:17 228:3

240:21 400:17
**unclear**
7:21 322:13
**uncomfortable**
144:16,19,23 232:2,6
  258:10 303:14 306:23
  325:7
**uncommon**
179:2
**undergrad**
28:16
**undergraduate**
30:8
**underline**
238:12
**underlined**
238:5,23
**underlining**
238:10
**understand**
7:5,17 143:4 159:22
  169:11 173:11 205:1
  209:10,13 221:8 228:12
  231:16 233:2,22 234:19
  234:21 243:10 252:6
  256:9,21 277:17 325:18
  337:2 340:17 343:10
  344:1 352:10 354:3
  362:11 367:21 396:23
**understanding**
116:9 117:15 123:13,17,20
  124:22 183:8 214:13
  223:11 287:7 323:13
  329:23 330:1 364:15,18
  368:8 382:12
**understands**
402:10 404:19
**understood**
7:22 116:12 122:1,8,13
  123:3 125:16 128:2,13
  128:15 129:19 130:7,10
  312:6 382:17
**unemployment**
22:8,9 23:10 36:7 384:14
  385:8
**unfair**
290:21
**unfortunately**
90:23
**unhappy**
277:9
**unilateral**
200:20
**Union**
204:16,18 207:4 209:2,7
  209:8,21 210:4,23
  214:13 216:3 217:10,23
  221:11,21 222:7 223:13
  224:18 231:5 232:22
  233:21 234:4 235:2,15
  359:5

JERRY A. MCCARTNEY, ET AL.                                          SHANNON MCGLON
ONYX CAPITAL VENTURES, LLC, ET AL.                                  August 15, 2007

Union's
211:10 234:14
unique
35:7
United
1:1 13:2 32:3 388:21,23
389:4
University
27:7 28:21,23 182:10
unnamed
150:18
unnecessary
170:18 171:7 172:10
unpleasant
152:3
unprofitable
117:12
unquote
103:7,23 107:10,13 163:6
239:8,12
unreasonably
330:22
unreliable
113:21
unsure
187:15
unusual
95:4 149:2,10 150:15
151:12,15 152:22 167:6
178:20 229:7 242:15
update
153:5
updating
85:5
upset
253:20 254:7 261:15
263:9 264:2 265:9
282:15 296:6 310:22
327:22 341:9 349:20
350:4,9,15 351:9 370:5
370:6
up-front
97:8
use
72:4 75:10 127:20 128:3
129:21 145:16 162:9
169:20 210:7,19,19
211:8 223:22 375:2
383:13,17,21 408:19
usual
5:19 150:14 207:3
usually
168:3 180:20
utilize
47:19
U.S
31:23 32:7

—————————————
V
—————————————
vacation

Vaguely
248:21
value
89:5
varied
94:15 111:18
various
55:9
vendetta
63:15
Ventures
1:10 69:10
verbal
156:1 260:20 261:1
295:12,18,23 296:20,23
322:18
verbalize
295:22
verbally
122:3 256:15 309:8 312:1
verge
345:6
verified
399:9
verify
84:5
verifying
87:5
versus
7:12 15:15 88:5
veterinarian
27:16
vice
240:10 333:15 334:4
view
220:20 314:21
violated
130:8,11
visible
114:10
vision
50:22 256:6 386:18
voiced
190:9 310:22
voicemail
348:4
volatile
282:3,4
voluntarily
199:23
vote
200:21
vs
1:9

—————————————
W
—————————————
Wachovia
135:15,19,22 330:20
331:3

Wait
58:23 118:11
waived
2:11
walk
138:5 139:9 327:7
walked
136:13,15,17 138:3 299:10
320:21
walking
55:8
walks
299:8
Walters
74:11,12,17 101:15,16,21
102:9,16 104:10 139:20
157:13 200:8 201:5,16
244:10,11 246:11 404:11
want
88:20 89:2,3 97:7 100:12
120:23 122:4,7 126:11
133:4 136:20 140:21
141:4,5,8 142:10 158:14
162:8 165:1 191:4
199:17 203:2 206:11
207:13 221:22 226:11,13
251:12 257:19 269:13
282:1,5,19 283:20
284:6,7,8 291:9,10
304:22 317:15 340:16
349:17,21 376:9
wanted
27:19 29:19 32:22 46:8
55:12 75:10,14 78:1
82:17 91:9,10 110:22
124:3 129:16 134:16
145:22 156:21,23 183:9
183:11,19 197:13 200:22
215:15 255:3,9 258:14
266:1,3 270:3,12 272:2
272:5 278:11 289:12,19
302:7 311:20 318:17
323:16 326:20,21
327:19 342:11,23
344:15 352:4,7 353:21
364:9 366:8 367:16,21
367:22 368:1,5 374:23
376:21 378:7,19 380:10
382:5,10,17 410:18,21
wanting
27:15 123:4 160:2 183:17
290:13 293:4 303:16
337:8 367:18 378:18
wants
56:9 109:22
wasn't
22:10 33:16 45:18 51:23
62:1 64:21 65:18 81:12
107:7 118:2 125:7 151:3
155:6 157:23,23 171:15

178:20 181:8 182:23
183:4,22 186:14 197:23
221:19 226:8,10 236:20
247:18 268:20 273:23
287:22 291:22 292:5
293:14 305:12 311:11,16
312:22 314:20 327:13
327:15 331:19 334:23
342:19 343:20 357:16
411:7
watch
391:11 394:4
watched
137:12 140:16 146:2
403:9 404:8 405:11
watching
145:5
way
78:23 118:18 137:17
150:21 156:2 159:15
160:20 170:11 172:6
182:7 193:4 194:15
199:9 203:8 214:15
224:6 232:14 235:4
243:3 247:15 254:7
305:18 313:19 314:10,14
326:6 331:11 334:22
343:13 347:19 360:9,16
368:19 377:5,11 381:12
401:17
ways
105:15,16 107:21 158:11
160:18 162:15 335:3
361:4
weak
185:8 186:12,16,17,23
187:16,19
website
241:8,12
Wednesday
138:15,19,22
week
40:1 94:16,17,23 95:3,8,9
111:8,9,10,15,17 137:1
147:1 250:19 254:15,23
255:5,5,8 262:1 270:10
311:7,11,18 364:8
367:11,12 389:7 410:7
410:20
weekend
341:9,14
weekends
93:19
weekly
168:18
weeks
49:13,15 73:17 93:17
255:19 271:10 344:9,10
344:13 367:10 408:8,11
408:12
went

27:4,6 30:9 65:4 79:10
79:16,18 117:4,22
137:23 141:10 146:3
151:10 161:4 195:7
231:12 247:19 254:2
261:21,22 262:10
275:19 298:1 304:8
306:14 313:10 341:9
344:19 375:18,19 387:9
392:17,19 402:9
weren't
64:8 110:16 111:21 115:2
126:2 155:7 192:19
227:10 228:1 233:20
240:17,20 281:23 323:4
323:11 337:4 346:22
360:16 379:5 380:23
Wetumpka
20:11 21:5
we'll
55:2 97:5 164:20
we're
13:9 88:18 138:21 159:13
165:7 196:22 232:9,12
232:13,13,14,15,17,18
248:12 260:15 272:11
273:3 325:10 359:1,2
400:10
we've
226:15 231:6 246:6
283:8
whatsoever
97:3,14 98:6,15 206:13
291:2
whichever
158:14
whipping
110:18
white
3:13 36:7 88:12 89:2
200:9 292:23 314:19,20
315:2,3 316:2 378:22
380:11 381:10 403:15
Whitehead
213:1 286:23
Whitfield
63:11,12,15,16,19,21 78:21
79:10,13,15,16
Whitfield's
63:21
Whitney
244:14,14 246:14 296:4
299:14
wife
215:6 225:23 226:1,2
Williams
77:9 78:8 79:20,21 80:6
157:14 403:12,18
willing
199:21 286:20
win

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

125:8
**window**
139:11,14,14 145:6
**Winer**
337:23
**Winter**
9:17 10:11 17:16 126:18
148:12,20 161:23 167:10
212:23 276:5 279:11
286:23 308:11 336:21
336:22 337:13,17 349:8
349:10 361:21 374:16,19
374:20 405:13,17 411:13
**wintertime**
90:15
**Winter's**
149:1 150:15 248:16
**witness**
2:10 5:10 22:13 23:13,15
49:23 398:3,6 413:14
**women**
256:12 341:22
**women-owned**
241:3
**wonderful**
223:22
**word**
13:8 162:9 169:19 258:6
259:21 291:18
**wording**
143:23
**words**
111:14 164:10 276:3
289:5 291:10,11 328:18
**work**
18:5 19:9 28:5,18 29:3,14
30:9,10,12 35:8,10 38:8
39:14 40:1,8,18 41:17
42:1,3,7,13 43:14,14
44:8,11,17 45:2,16,21
47:16,17 57:6 61:1 62:4
65:14 67:19,20 72:11
82:8,17 84:5,9 90:10,17
91:12,23 92:8,18,18
93:17,18 94:1,12 95:16
95:17,18,21 96:22
97:20 98:2 99:2,13,21
100:3 104:5,14,15,17,20
104:22 110:10,22 111:20
112:4,20 116:21 125:10
131:1 149:3 151:6
183:18 186:21,22 198:14
198:23 199:5,16 200:17
208:3,15 209:6 232:15
232:16 247:3,11,20
249:13 253:7 255:8,9
258:21 269:6 270:3
287:23 288:5,17 289:11
293:13 296:10,13
297:15 306:15 307:6,7
307:11 311:7 323:20

327:3 342:5,9,12 346:6
347:9 360:6 362:23
363:1,2,6,18,22,23
364:10 365:23 371:7,20
375:21 382:7 384:5
400:16 402:23 403:10
405:3 411:18
**worked**
22:2,14 28:20 29:6 30:7
31:13 32:5,6,8,17,21
37:12,16 38:15,16 39:13
41:7 43:18,19 65:8,21
79:16 80:21 84:5 87:5
89:11 93:20,21 95:7
100:1 102:20 104:4
109:2 110:22 113:3,3,4
113:4 145:18,20,22
146:1 149:8 177:9 182:7
197:19,20 201:13
204:17 210:17 247:4
302:9 344:19 360:3
364:22 371:21 372:1
403:3,4 405:4
**workforce**
30:13 45:6
**working**
27:20 29:3,15 38:5 43:4
45:1 47:5,9 58:10,12
93:15 94:22 96:5 100:8
100:17 115:2 116:4
142:1,2 147:8 164:11
175:14 229:15 254:14,16
258:11 268:3 270:9,12
284:11 289:13 300:6,8
311:10,15 327:1 364:4
371:23 384:5 390:16
**works**
327:4
**world**
169:11 322:22
**worried**
68:2 264:4
**worry**
56:17 146:20,23 147:22
366:12
**worse**
259:15
**worth**
211:3
**wouldn't**
103:17 105:9 144:13
150:22,23 155:8 223:3
300:8 315:19 335:1
356:16 361:23 365:17
381:12 396:23
**wrinkle**
274:12
**write**
300:11,12,16,19 398:11
**write-down**
119:15

**written**
31:21 322:18 352:5
400:18
**wrong**
88:23 137:9 139:7 141:8
141:16,16,19,20,21
146:15,17,19,22,23
147:12,14,19 193:9
255:11 258:15 259:10
278:21 285:20 303:20
304:8 308:19,20 344:2
352:15,21,23 354:20
**wrongful**
26:9
**wrote**
72:7,8 112:18 220:2
235:10,13 296:16
300:17 382:22

──────── X ────────

**X**
4:1,4 313:8,10

──────── Y ────────

**yeah**
104:11 116:4 125:15
126:20 201:9 213:17
218:7 237:20 255:6,13
270:2 277:2 283:23
310:1 367:12 370:18,21
**year**
8:15 10:8 20:6 26:22
27:4,6 31:10 32:14
33:2 51:12 54:9 109:23
110:1 117:16 118:12,15,15
118:20 119:11,17 121:16
125:7,7 157:2 164:6
205:12 206:3 211:13
212:3 221:13 222:22,23
302:13 330:9 334:10
344:14 364:19,21
**years**
11:8 21:8 28:11 45:7
76:15 79:16 117:2,7,13
326:3
**yellow**
88:12 89:3
**yesterday**
9:18 10:10 126:18 127:4
**yes-no**
7:10
**yields**
65:14
**York**
204:19
**y'all**
79:13 155:3,14 281:12
282:18 309:7 320:22
**y'alls**
309:2

──────── Z ────────

**zero**
129:14
**zip**
20:14 140:21,22 141:1,2
**Zone**
247:1

──────── 0 ────────

**03**
196:18
**09**
129:17 196:21
**06.**
8:16

──────── 1 ────────

**1**
4:5 44:22 47:6 127:12,15
127:17 128:18 220:12
221:4,16
**1-800**
108:8
**1:16**
225:9
**1:21**
126:15
**10**
4:14 147:3 164:13 293:18
293:21 294:5 313:2
316:9 319:2 327:21
343:5,7 348:17 400:17
400:23
**10:08**
55:6 100:14
**10:22**
55:6 100:14
**100**
61:2 68:1 82:15 114:9
**11**
4:15 329:6,9 331:14
401:3
**11:30**
369:1
**11:53**
126:15
**12**
4:16 366:23 367:3
**127**
4:5
**129**
4:6
**13**
4:17 273:6 279:4 295:15
308:5 372:19,22 373:15
401:12
**14**
4:18 294:21 295:1 373:18
373:21,23 402:1
**15**

**1:18** 4:19 5:9 151:18
152:2 369:17 376:3,6
377:12
**15th**
301:23 369:8
**150**
260:7
**152**
4:7
**153**
4:8
**16**
4:20 377:18,21
**1610**
21:1,6,10
**17**
4:21 379:16,20 381:16
406:17 .
**18**
4:22 381:19,22
**1819**
3:14
**19**
4:23 399:3,6
**1969**
10:20
**1987**
26:23
**1992**
28:3
**1993**
30:22
**1994**
30:21
**1995**
31:3 37:4 43:19
**1996**
43:21 117:14,15
**1997**
38:7 39:11 41:13
**1998**
14:4,6

──────── 2 ────────

**2**
4:6 129:2,5 222:2 367:7
**2:0SCV1207-MHT**
1:5
**2:30**
94:17
**2:44**
203:6
**2:59**
203:6
**2001**
44:22 47:6 51:13 52:12
58:11,14 59:3,10,17,23
60:4,10 61:8 62:17 63:1
107:16 118:18,19 128:19
**2002**

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

SHANNON MCGLON
August 15, 2007

| | | |
|---|---|---|
| 52:14  53:2,18  54:4 | 138:14,18  148:6  319:3 | 10:23 |
| 62:18  68:13  118:11,22 |   347:10  349:5 | |
| 119:4,12 | **29** | **5** |
| **2003** | 59:17  61:7  62:17  305:20 | **5** |
| 69:3,12,18  118:14,15  119:1 | **293** | 4:9  94:18  130:13  164:13 |
| 121:14,22  125:6  196:10 | 4:14 |   213:11,14 |
| 196:12,13  345:11 | | **5:09** |
| **2004** | **3** | 317:13 |
| 25:5  69:16,19,23  70:9,14 | **3** | **5:20** |
| 70:19,23  81:17,17  82:7 | 4:7  152:15,18 | 317:13 |
| 94:5,11  95:20  96:4 | **3:53** | **5:43** |
| 99:12  118:10  121:10 | 248:7 | 340:14 |
| 129:12,15  131:14  132:20 | **30** | **5:46** |
| 175:19  196:9  206:4,5 | 5:5  10:20  165:16 | 340:14 |
| 273:6  279:4  294:21 | **329** | **5059** |
| 295:1,15  305:20  308:5 | 4:15 | 3:7 |
| 309:14 | **35** | |
| **2005** | 165:16 | **6** |
| 15:19  16:8  25:6  70:21 | **35203** | **6** |
| 71:1,3  81:23  82:1 | 3:15 | 4:3,10  216:23  217:3 |
| 121:13  131:14  132:20 | **3568** |   219:12  225:9  367:9 |
| 136:8  138:13,19,20 | 20:1,3,22 |   368:7 |
| 151:18  164:7  206:4,5 | **36064** | **6–28–4** |
| 219:12  223:5  225:9 | 20:15 | 129:10 |
| 339:6  367:9  368:7 | **36093** | **6:30** |
| 369:17  384:17  388:15 | 21:5 | 370:11 |
| 388:16  391:23  392:2,5 | **36103** | **6:57** |
| 393:5  394:18  395:6 | 3:8 | 410:23 |
| 399:19  408:20 | **366** | **60s** |
| **2006** | 4:16 | 109:9 |
| 364:23  365:5,12,13 | **372** | |
| 388:12,17,20  400:4,6 | 4:17 | **7** |
| **2007** | **373** | **7** |
| 1:18  5:9  20:7,9 | 4:18 | 4:11  218:23  219:3  220:5 |
| **21st** | **376** |   248:16 |
| 319:20 | 4:19 | **7:00** |
| **213** | **377** | 410:23 |
| 4:9 | 4:20 | **7:02** |
| **216** | **379** | 412:12 |
| 4:10 | 4:21 | **7:45** |
| **218** | **381** | 94:21 |
| 4:11 | 4:22 | |
| **22** | **399** | **8** |
| 408:23 | 4:23 | **8** |
| **22nd** | | 4:12  94:19,21  237:9,13,22 |
| 319:19  363:11  364:6 | **4** |   238:4  239:1  251:1 |
| **23rd** | **4** |   309:14  332:19  339:7 |
| 148:10  363:10 | 4:8  129:18  130:7  153:10 |   342:18,20  346:12,19,22 |
| **237** |   153:13  324:23  325:1 |   358:20  399:18 |
| 4:12 |   330:5  337:12 | **8th** |
| **248** | **4:02** | 309:23  312:18  377:2 |
| 4:13 | 248:7 | |
| **26** | **40** | **9** |
| 384:17 | 110:23  164:14  321:18 | **9** |
| **26th** |   322:1  334:23  380:18 | 4:13  248:9,13  249:16 |
| 385:3,4 | **401** | **9:13** |
| **27th** | 5:8 | 5:10 |
| 345:23 | **401–K** | **9:28** |
| **28** | 389:14,16  390:7,19 | 219:12 |
| 129:12,15  138:20 | 421–78–2245 | |
| **28th** | | |

# Piknik Products Company

## Internet, E-mail, Telephone Use Policy

I hereby request access to the Internet/E-mail/telephone communications. I **understand and agree** that such access is to be used for Piknik Products Company purposes only. I further **understand and agree** that my approved access to the internet/e-mail/telephone communications system is neither private nor secured. It may be monitored by the designated personnel or systems in place at the request of Piknik Products Company or its designee. I further **understand and agree** that abuse of the internet/e-mail/telephone system or use of system for purposes other that those benefiting Piknik Products Company is grounds for disciplinary action up to and including termination of employment on the first offense. I further **understand and agree** that my acceptance of the terms and conditions of this policy is a condition of my continued access to the internet/e-mail/telephone communication systems. I also **acknowledge having read and understood** Piknik Products Company internet/e-mail/telephone communication system policy.

Employee: Shannon A. McGh          Date: 3-1-01

Supervisor:_____          Date:_____

HR:_____          Date: 3-1-01





# Internet, E-mail, Telephone Use Policy

Reliance on computers for communications has grown to such an extent that it would be difficult to function without this tool.   However, the emergence of electronic mail (e-mail), voice mail and the Internet as tools in communicating information creates a number of potential concerns.  If these tools are improperly used, not only is it a waste of Piknik resources, but it can expose both Piknik as well as individual employees to liability for antitrust and/or copyright violations for improper receipt, downloading or dissemination of information.  In addition, Piknik must continue to protect trade secrets and proprietary information that could be improperly disseminated internally or externally through e-mail, voice mail or the Internet.

Therefore, in order to assure the utmost protection from liability resulting from misuse of its computers, Piknik is implementing a policy describing the proper use of electronic communications systems such as e-mail, voice mail and the Internet.

**Communications must be business related:** The use of e-mail and the Internet are to be used in the course and scope of the users performing their duties for the company. Occasional personal use is acceptable if the employee's manager has approved such use and the company's computer resources are being used in a manner consistent with the spirit and intent of this policy.   Company computer resources may not be used for personal gain or profit and may not result in misuse of work-time.  Similarly, company computer resources may not be used in a manner that is unprofessional or unethical or in any way compromises the company or its business reputation.    Use of company electronic communications systems in a manner inconsistent with this policy may subject the user to severe discipline up to and including termination.

**The Company May Audit and Review all E-mail Communications, Telephone and Internet Usage:** All e-mail, telephone communications and information accessed through the internet by means of the company provided computers are the property of the company.  Piknik reserves the right to retrieve and review any electronic messages composed, sent, received or stored through company provided computer communication systems without notice to employees for any purpose or as required by law.  Internet access and usage through company provided computers is subject to review by the company without notice to the employee.

## EMPLOYEE RESPONSIBILITIES

**General:** Electronic communications may survive long after they are composed, sent or received.  Electronic communications can have the same impact legally as formal written



DEFENDANT'S
EXHIBIT
2

reports, letters and memos. Therefore, such messages should be as carefully and thoughtfully composed as written communications sent by another means of transmission. Accordingly, when drafting an electronic communication, employees should think about the following:

**Prohibition on Illegal or Harassing Communications:** Participating in online gambling, chatting, chain letter distribution or accessing or disseminating pornographic material is strictly prohibited. In addition, sending messages with sexual content, overtones or messages that would tend to disparage or harass others on the basis of gender, race, age, disability, religion, sexual orientation or national origin is strictly prohibited. (These are simply examples of prohibited uses and are not meant to be exhaustive.)

**Compliance with Other Company Policies:** Electronic communications must be written, communicated and stored in a manner consistent with all other applicable policies.

**Proper Disclosure or Dissemination:** Employees may disclose electronic communications or information contained in electronic communications only to authorized employees or vendors. This is especially important with respect to legal and proprietary information. Therefore, posting confidential or proprietary information regarding the company, its products or its customers on Internet sites such as bulletin boards is strictly prohibited.

**Use of Proper Legends:** All computer-based communications containing technical or proprietary information must be marked "Company-Confidential & Proprietary."

Any employee found to have misused, acquired without approval or unlawfully breached the security or integrity of the system as it is intended would be subject to discipline up to and including termination.

**Compliance with Copyright Laws:** Employees may not download or distribute copyrighted software or material available through computer networks without authorization from the Information Technology department or the employee's immediate supervisor. Any personal software that is being installed by the employee requires written approval from the Director of Information Technology. In addition, employees are not allowed to distribute or remove software that had been licensed to the company.

**Solicitation of Outside Business Ventures:** Employees may not use company computer/telephone communication systems to solicit on behalf of outside business interests or charitable organizations without first receiving written approval from their manager and member of senior management.

**Anti-Virus Procedure:** Employees may not download, use or distribute software or executable programs from computer networks without first verifying their operational

integrity. Any software that is being installed by an employee should be approved by their manager and the Director of Information Technology.

**Reporting Misuse of Computer Networks or Phone Systems:** Any employee having knowledge of the use of company computer/telephone communications systems in a manner inconsistent with this policy should immediately notify their immediate supervisor, manager, or human resources.

<u>**Violation of any of the foregoing rules may result in discipline up to and including discharge.**</u>

My signature below indicates that:

1) I have <u>read and understood</u> the internet, e-mail, telephone communication policy of Piknik Products Company

2) I <u>agree</u> to conduct my behavior in accordance with that policy.

3) I further <u>understand and accept</u> that this policy is a condition of my continued access to the internet/e-mail/telephone communication systems as well as my continued employment at Piknik Products Company.

4) I <u>understand and agree</u> that abuse of Piknik's internet, e-mail and telephone systems or use of these systems for purposes other that those benefiting Piknik Products Company is grounds for disciplinary action up to and including termination of employment on the first offense.


Employee: _Shannon M Sll_          Date: _6-28-4_


Supervisor:_____          Date:_____


HR:_____          Date:_6/28/04_

# Piknik Products Company

# Internet, E-mail, Telephone Use Policy

I hereby request access to the Internet/E-mail/telephone communications. I **understand and agree** that such access is to be used for Piknik Products Company purposes only. I further **understand and agree** that my approved access to the internet/e-mail/telephone communications system is neither private nor secured. It may be monitored by the designated personnel or systems in place at the request of Piknik Products Company or its designee. I further **understand and agree** that abuse of the internet/e-mail/telephone

system or use of system for purposes other that those benefiting Piknik Products Company is grounds for disciplinary action up to and including termination of employment on the first offense. I further **understand and agree** that my acceptance of the terms and conditions of this policy is a condition of my continued access to the internet/e-mail/telephone communication systems. I also **acknowledge having read and understood** Piknik Products Company internet/e-mail/telephone communication system policy.

Employee: _Shannon McGill_    Date: _6-28-4_

Supervisor: _____    Date: _____

HR: _B.S. Sill_    Date: _6/98/04_



From: Anthony Barber [Barber@pikaproducts.com]

Sent: Wed 6/15/2005 12:54 PM

To: Bi Rockwell Dane [danis-n_sanderson@pikaingredients.com]; Yasser Sam [cevAT-OATS]Pri]; [william.o@pikaproducts.com]; Ruben Yoon; Anasta [francisco_ind_s.broughton]; Anthony Hale; Simpson [pikaproducts.com]; Dawn [Mitchell; Robert Taylor; [Alan Walkes]; whitehead@pikaproducts.com

Cc: [macartney@pikaproducts.com]

Subject: Piknik Business Update

All,

There will be a mandatory staff meeting today, Wednesday, June 15, 2005, at 4pm in the Day Street Maintenance conference room. This meeting is intended only for information exchange to update the leadership team on our business.

Thanks in advance for your attendance and cooperation.

Anthony U. Barber

DEFENDANT'S
EXHIBIT
3
McGTON



*For Limited Internal Distribution Only – Do Not Copy or Share with External Constituents*

## Piknik Products Company
## External Communications
### *Recapitalization Talking Points*

| | |
|---|---|
| **SUMMARY:** | The growth that Piknik Products (the "Company") is experiencing in its beverage division requires the Company to invest significant new capital in its operations. The Company's bank has declined to finance this new capital and has rejected financing proposals by third parties, thereby causing the company to seek a recapitalization. As part of this process, the company may be placed up for sale with the goal of emerging as a company that is much stronger financially and operationally. Piknik has not filed for bankruptcy protection. |
| **SHORT TERM EFFECTS** | Operations in the Company's beverage division will not be materially affected. Some management changes are being made and capital projects delayed, but the business will continue to operate and pursue operational improvements required to meet our customer's needs.<br><br>The operations in the Company's condiments division will be indefinitely suspended with the exception of tolling/co packing business. The will be effective immediately. |
| **PERSONELL CHANGES** | The beverage division will continue to make necessary staffing changes to improve its operating efficiencies. Bert Mayer has left the company and has been replaced as Day Street Plant Manager by Annissia Hanyard, a veteran of PepsiCo and Procter & Gamble with maintenance, quality and engineering experience.<br><br>Regretfully, this challenge will require that most of the employees in our condiments business will be furloughed. We will maintain a crew of employees to continue limited production, address customer and vendor concerns, and manage logistics for shipping and the warehouse. |



*For Limited Internal Distribution Only – Do Not Copy or Share with External Constituents*

| **RECAPITALIZATION** | Over the last 4 months the Company has presented to its bank (SouthTrust) proposals for refinancing the Company's debt and injecting additional equity into the Company. The bank has rejected each of those offers. |
|---|---|
| | The inability to reach agreement on this matter has resulted in a cash shortage to operate the full-case-costed, private label condiments business. (This business is cash flow intensive, versus the capital intensive nature of the beverage business.) Piknik has not filed for bankruptcy protection. |
| | Recapitalization negotiations continue, however it is likely that a sale process will be undertaken on an expedited basis. In any even, full resolution will take place in the next 45 to 90 days. |
| | Hopefully this will mean that customers will observe no degradation in operational attention, continuity in management and a swift conclusion to this distraction from managing and growing the business. |
| | It is not likely that the condiments business will return in it current form. It is likely to be more palatable to the bank and investors that the condiments business proceeds under a tolling/co pack model similar to the beverage business. This will require reduced working capital to manage and to grow the Company and fit better with Piknik's/Onyx's strategy of partnering with leading consumer packaged goods companies to address their supply chain challenges. |
| | We will work closely with condiments customers to fill orders out of inventory and to transition their business to other suppliers. This will include providing them with their printed labels and copies of proprietary formulas if requested. We want to discuss the option of a tolling/co pack agreement with those customers who wish to do so. |
| **PLANT LOCATIONS** | The Company's Day Street and Alatex plants will remain open and operate normally. Discussions continue with current and prospective customers about adding additional production lines in the Alatex plant. |
| | The Brundidge plant will remain open and operate a limited production schedule. |



### *External Constituents*
### *Recapitalization Summary*

| FREQUENTLY ASKED QUESTIONS | **What is happening?**<br><br>The growth that Piknik Products is experiencing in its beverage division requires the Company to invest significant new capital in its operations. The Company's bank has declined to finance this new capital and has rejected financing proposals by third parties, thereby causing the company to seek a recapitalization. Operations in the Company's beverage division will not be materially affected. Some management changes are being made and capital projects delayed, but the business will continue to operate and pursue operational improvements required to meet our customer's needs.<br><br>The operations in the Company's condiments division will be indefinitely suspended with the exception of tolling/co-packing business. This will be effective immediately.<br><br>**How did this happen?**<br><br>Our historic bank (SouthTrust) decided that it no longer wanted to be the Company's financial institution. The bank prevented the Company from bringing in any additional capital to fund the growth that we've been experiencing.<br><br>**Is condiments closed for good?**<br><br>The condiments business is not closed. We will operate under a co packing model in the short term. We are hopeful to preserve a presence in the condiments business, but are unlikely to return to our historical business model.<br><br>**Is Piknik bankrupt?**<br><br>No. Management believes that it has a viable path through this process to avoid bankruptcy, and believes that it is in the best interests of customers and vendors to avoid the bankruptcy process. However, Piknik does not control all elements of this process. Staying out of bankruptcy requires continued cooperation from vendors and the bank while we negotiate the recapitalization. |

*External Constituents*
*Recapitalization Summary*

| | |
|---|---|
| | **Is Piknik up for sale?**<br><br>As part of the transition to a new capital structure an expedited sale process may need to occur. |
| | **How long will this process take?**<br><br>We expect that the recapitalization will be completed within 45 – 90 days.<br><br>**What does that mean for condiments customers?**<br><br>We will no longer be producing product for most condiments customers. We will continue to produce co packed products. We will sell any products that are in our finished goods inventory. Piknik will work cooperatively with affected customers to assist them in this transition. We will make labels and proprietary formulas available to customers upon request.<br><br>**What does that mean for condiments vendors?**<br><br>The Company will be unable to pay outstanding invoices at this time.<br><br>**What does that mean for condiments employees?**<br><br>Piknik will maintain a small staff to continue co pack production and handle the customer transition. All other employees will furloughed until further notice.<br><br>**What does that mean for beverage customers?**<br><br>Operations in the Company's beverage division will not be materially affected.<br><br>**What does that mean for beverage vendors?**<br><br>Unlike the condiments business, Piknik does not pay for the packaging and raw ingredient product inputs. These are provided by our customers, making it much easier to continue operations during this transition. Piknik will work with its other beverage vendors to meet necessary obligations. |

*External Constituents*
*Recapitalization Summary*

| | |
|---|---|
| | **What does that mean for beverage employees?**<br><br>The beverage division will continue to make necessary staffing changes to improve its operations efficiencies. The team will continue working together to deliver for our customers.<br><br>**What if I get asked a question other than these?**<br><br>Please refer any questions that you are not equipped to accurately answer to one of the contacts listed below. |

| CONTACTS | | |
|---|---|---|
| | Chris Day, President<br>cday@piknikproducts.com | 334-265-1567 |
| **Customers** | Ann Anderson, Condiments Customer Service<br>aanderson@piknikproducts.com | 800-300-8557 x101 |
| | Henry Hicks, VP Sales & Marketing<br>hhicks@piknikproducts.com | 404-313-6669 |
| **Employees** | Brenda Sellers, Director of Human Resources<br>bsellers@piknikproducts.com | 334-265-1567 x206 |
| **Vendors** | Robert Lampert, VP Finance<br>rlampert@piknikproducts.com | 334-265-1567 x218 |
| **Media** | Henry Hicks, VP Sales & Marketing<br>hhicks@piknikproducts.com | 404-313-6669 |



*Redacted*
*Atty/Client Priv.*

**From:** CDay12345@aol.com [mailto:CDay12345@aol.com]
**Sent:** Friday, 10:15 AM
**To:** bwinter@piknikproducts.com; ecrosby@piknikproducts.com; bmayer@piknikproducts.com; bsellers@piknikproducts.com; smcglon@piknikproducts.com; jwhitehead@piknikproducts.com
**Cc:** cbleier@piknikproducts.com; abarber@piknikproducts.com; hhicks@piknikproducts.com; rlampert@piknikproducts.com; jmaccartney@piknikproducts.com; jlarry@onyxcapitalventures.com
**Subject:** Policy on Communications with Ricky

Bob/Eddie/Bert/Shannon/Jimmy/Brenda:

In the interest of protecting you and the company from unnecessary distractions, please cease all business conversations with Ricky Loeb. Whether you choose to see Ricky outside of work is up to you, but if you do please refrain from discussing Piknik and its business.

Although this applies to everyone at Piknik, this is directed at the 6 of you since you have been around the longest and are on the list of people Ricky feels comfortable calling. Given your relationship with Ricky, I understand how hard it is to say no. This email gives you a specific policy to remove the awkwardness of turning Ricky down. The Mike Ellis resignation fiasco is just the most recent of the countless episodes where Ricky inserted himself, thanks to phone calls to and from some of you, that turned the place upside down and required hours and hours of wasted time trying to put things back together - with no added value.

Part of what made the old Piknik a poor performing company and an unpleasant place to work was the culture of gossip and politics emanating from Ricky. As wonderful a person as he is (and I genuinely like him), Ricky has an inadvertently destructive way of gathering and reacting to information. To succeed at changing to an analysis-based, action and accountability-driven company, we have to cut out the remaining vestiges of the gossip culture. As painful as it is to acknowledge, it won't succeed without cutting off Ricky's communication channels.

Jeff communicated to Ricky back in March that Onyx would honor information requests commensurate with Ricky's status as a board member, but that **all information requests must come through Jeff.** This is to protect the rest of the management team, including me, from spending time on non-value-added activities initiated by Ricky. **Jeff will be the decision maker on what gets said and done regarding Ricky - it is not for you or me to decide if it's a harmless question or not. If you receive a phone call or email from Ricky, please refer to this policy and gently direct him to Jeff.**

This includes calls without a direct request - "hey, I heard that this is going on..." **Please don't respond.** Some of you may not want to do this - getting a call from Ricky may make you feel powerful and important - but I have to insist. Your "innocent" comments to Ricky will never be kept in confidence - it will ALWAYS wind up impacting many other people.

The hiring of Anthony and Carl gives us a permanent, living-in-Alabama leadership that we've needed to complete the culture transformation at Piknik. Now that we have that leadership, I will take every step necessary to support it. If another grapevine fiasco occurs and I can trace it back to anyone, I will deal with it severely. We've had almost 2 years to get used to Onyx' ownership - it's time to cut the cord and be who we are going to be.

DEFENDANT'S
EXHIBIT
5

7/25/2005

Please call me directly if you have any questions or want any clarifications.

Chris

# Shannon McGlon

**From:** Norm1099@aol.com
**Sent:** Tuesday, March 29, 2005 5:59 PM
**To:** smcglon@piknikproducts.com
**Cc:** BistricerD@ou.org
**Subject:** explanation of Passover sale

DEFENDANT'S
EXHIBIT
McGlon

Dear Shannon

In the interest of full disclosure and of saving time, I have taken it upon myself to try and put on paper exactly what the issues are regarding the sale for Passover.

Firstly, let me translate a term that I will be using in my explanation:

Chometz - any leavening type of product that is forbidden on Passover

According to Jewish Law, Members of the Jewish faith are forbidden by Biblical commandment to partake of any Chometz foods or items from the Eve of Passover ( this year Friday April 22) until after Passover (this year May 1). Since the Jewish calendar is based both on a solar as well as a lunar cycle the actual times of Passover may vary from the end of March to the end of April.

The prohibition of Chometz applies not only to its consumption but also to having any ownership or benefit from Chometz products. Jewish Law makes no distinction whatsoever as to the affiliation (Orthodox, Conservative or Reform) or observance level of the Jewish person.

Such being the case, let us now apply the above to the case of Piknik products. Ricky Loeb owns 49% of the company. Even though he is a minority owner with under 50% ownership, he is still looked upon from our standpoint as being an important factor. Accordingly, no products containing Chometz (partially owned by Ricky) can be produced and if produced not bear an OU for sale to Jewish consumers even after Passover.

In fact, any Chometz ingredients in the plant would not be able to be used in any OU products until such time that those ingredients are depleted and new supplies acquired.

Therefore, we have two ways to remedy the situation. By far the easiest and most uncomplicated is for Ricky to sell his interest in Piknik products in accordance with Jewish Law. Although any non-Jewish person could be the buyer, the OU figured that you would be the most accessible and logical choice.

As you can see from the Contract of Sale which Rabbi Bistricer sent you, this is a legally binding sale and as such would render all ingredients and products in Piknik Products inventory as being non-Jewishly owned. Piknik would be able to do business as usual. The Passover strictures and the ensuing sale only affects Ricky and should be of no concern or interest to the other owners involved.

The other alternative would be to seal up all Piknik or private company labels for products that bear an OU. These labels would be sealed and the products could not be produced at all from Thursday April 21 until Monday May 2. Any breach of those conditions would severely jeopardize the relationship between Piknik Products and the OU. This is not a threat it is simply stating conditions as they must be executed.

I hope this brief explanation helps you to better understand the situation and the reasons behind the OU's sistence that this matter be taken care of ASAP.

I am traveling quite extensively over the next two weeks but I would be able to be in Montgomery, Brundidge or anywhere else that would be convenient for both you and Ricky next Thursday April 7th. If at all possible let's

try and set something up for that date.

Please feel free to call or contact Rabbi Bistricer or myself for questions or comments that you may have.

Rabbi Norman Schloss
*Rabbinic Field Representative*

**Orthodox Union – Kashruth Division**

1099 Rogeretta Drive NE
Atlanta, Georgia 30329-3815
Tel: 404-633-8259
Fax: 404-633-8259
Cell: 404-386-9317
e-mail: norm1099@aol.com

Shannon McGlon

**From:** Jeffery Larry [jlarry@onyxcapitalventures.com]
**Sent:** Wednesday, April 06, 2005 11:16 AM
**To:** CDay12345@aol.com; smcglon@piknikproducts.com; rloeb3@juno.com
**Cc:** cday@onyxcapitalventures.com; jlarry@piknikproducts.com; cbleier@piknikproducts.com; rloeb@piknikproducts.com;

*notice there are different email addresses they used interchangeably*

**Subject:** Re: Passover and Brundidge Manufacturing

There seem to be a number of reasonable fixes for this issue. Ricky has indicated his willingness to address the issue by signing over his interest to Jamie. If that works, that's fine, end of story. In any event, we don't need to get into any fight with these guys.

Let's get the document they want us to sign ahead of time and go from there. Thanks.

JL

*Jeff ("Onyx") over ruled Chris ("Piknik" or "Onyx"?)*


DEFENDANT'S EXHIBIT
McGlon

—— Original Message ——
**From:** CDay12345@aol.com
**To:** smcglon@piknikproducts.com ; rloeb3@juno.com
**Cc:** cday@onyxcapitalventures.com ; jlarry@piknikproducts.com ; cbleier@piknikproducts.com ;
rloeb@piknikproducts.com
**Sent:** Wednesday, April 06, 2005 9:28 AM
**Subject:** Re: Passover and Brundidge Manufacturing

*Chris blew this completely out of proportion*

Shannon:

Thanks for keeping us informed. I understand April 7 is the only good day for the Orthodox Union, but it is no good for ANY of the leadership of Piknik on this issue – not me, not Jeff, not Carl. If you can move it to another time outside the 12-3pm CDT timeframe then I'd be happy to dial in; otherwise you should assume you are running the meeting. And you should make it clear that you will not be signing any documents without consultation with me, Jeff and Carl

By way of background, I had numerous high level interactions with the Chief Rabbinate in Israel when I was Director of Middle East for the Office of the US Trade Representative in 1995, so I am familiar with their methods. I was called in several times when the US Rabbinate got out of control and we needed to appeal to their HQ in Tel Aviv to get them back in line. The US group is often VERY heavy handed and threatening, and their enforcement is uneven, so don't be afraid to push back gently on their demands - assume everything you hear is negotiable. And that's what this is - a negotiation.

Here are a few talking points for you:

Overall: Piknik wishes to be a good Kosher manufacturer and our very conversation with the Rabbi indicates our sincerity. We are committed to working TOGETHER with the Rabbinate to accomplish this. It is in their interest for us and others to be successful at improving our kosher compliance, and we truly want to understand how to make this situation work.

(In case threats get out of hand):HOWEVER:
1)Piknik is no longer Jewish owned, and it will not be discriminated against because of its lingering Jewish stake. That means we insist on being held to the kosher standards of every other non-Jewish food company Kosher manufacturing processes are Kosher manufacturing processes. We will view any special requirements that don't apply to non-Jewish firms (such as Southern Classics) as blatant discrimination because we are now African-American owned. And we will not be silent about it.

2) NO ONE confiscates our labels or any Piknik property without compensation. The Rabbi and any associates are to be kept away from our label room or finished product inventory. If they want to view anything we can bring out a sample of a label, etc. Brundidge needs to know that the Rabbinate does not get access to the plant without being accompanied by Carl or an officer of the Company being present in the future. We do not take kindly to threats.

OBJECTIVE: Hopefully you can use your wonderful executive presence to keep the meeting productive and steer it away from confrontation. When you hear threats, try to steer it back to how we want to work together and consider workable alternatives to their sometimes ridiculous demands. Sign nothing, and let's debrief when the meeting is over.

Thanks,
Chris

Attachment A.

Note the underlined sentences that refer to our claim of discrimination.

```
-----Original Message-----
> From: Henry Hicks [mailto:hhicks@piknikproducts.com]
> Sent: Wednesday, February 16, 2005 1:08 PM
> To: Shannon McGlon (E-mail); Chris Day (E-mail); Robert Lampert
> (E-mail); Bert Mayer (E-mail); Jerry MacCartney (E-mail); Bob Winter
> (E-mail)
> Cc: Sales Group (E-mail); Jeffery Larry (E-mail); Brenda Sellers
> (E-mail)
> Subject: Call Summary - PepsiCo
>
>
> On January 15th, 2005 Jeff Larry and I met with April Blackmore at
> PepsiCo's
> offices in Chicago. Following is a summary of the call.
>
> _____
>
> 20oz business is done! We should begin producing in Pepsi's period 4
> and
> they will take all that we can give them through period 9. Annual
> estimate
> is 3mm 24 pack cases annually. Pepsi will fund all capital. She also
> asked
> that we look at the possibility of installing a Hi-Cone machine on the
> end
> of Line 301. The idea is that this would drive even more volume our
> way.
> Our pricing is fine, and at those rates they will try to keep us full.
> In
> fact, April strongly hinted that we might consider raising our price a
> bit.
> Action: Bob W. we should look at the tolling to see if we want to take
> the
> price up, or eliminate the teiring.
>
> If the 34oz product does as well as hoped, she would want to put this on
> line 301 and this would have them on there year-round.
>
> On the 20oz, April wanted to get Tim Olson down to walk Line 301 and
> make
> sure that there is no needed capital that has been overlooked. We need
> to
> provide them with lead times, a project plan and estimated production
> dates.
>
> 500ml Propel may be the next product that they look at Line 301 for.
> The
> new And 1 product will also be in the same package. They will know in
> May
> which direction they want to go in for the Propel.
>
> Regarding the Season's Best and Twister products that we mentioned in
```


DEFENDANT'S
EXHIT
McGlon

> our
> proposal, she suggested that we stay away from them. The business is
> not
> growing. Gatorade and cans are where its at, she said. She mentioned
> that
> 11 plants make the 15.2oz trop product - so price is the driver on this
> business.
>
> Pepsi would be interested in Line 302 for the And 1 product. This
> allergen
> based product will be in the 500ml Propel bottle, bliss box with roll
> fed
> labels. They will be making a decision on this project in May/June of
> this
> year, and may be interested in participating in the capitalization of
> the
> new line. Action: Henry and Bob W. to follow up with April and with
> Unilever to include them on the cost of constructing the line.
>
> Regarding the gallon production, she indicated that the business is
> growing
> 7-8% per year. She also said that there has been some discussion of
> putting
> Propel in the Lenny bottle.
>
> We discussed the tight schedule that we have this year given that we
> have
> added a new customer. She was concerned that we were displacing them in
> favor of Arizona. I assured her that this was not the case. She did
> ask
> that we quickly move to 48 or 72 hour CIP if possible to get more
> capacity
> out of the line. Action: Bert and Shannon - please let Henry know if
> we
> have written authorization from Pepsi to CIP every 48 or 72 hours. If
> not,
> I will ask April and Ken to have someone take the steps needed to offer
> that
> approval.
>
> I indicated that we were installing a bulk depal system this season and
> asked for a price increase to $1.25 per case. She agreed. She also
> indicated that they should have been accruing for the difference between
> the
> tolling that we billed in 2004 and the agreed to price of $1.20. She
> was
> very pleased with this investment and is hopeful that we will see
> increased
> volumes and efficiencies as a result.
>
> PepsiCo's canned energy drink business (Sobe Adrenaline Rush, Mountain
> Dew
> Amp) is growing at more than 70% per year. They are actively looking
> for
> capacity to manufacture these products. There is a particular need on
> for

> this on the west coast. It may make sense to put a can line in Alatex.
>
> Whitlock (OK), PriPack (IN) and Creir (WI), as well as Mark Ocean Spray
> (NV) - which manufactures 12, 24 and 64oz Gatorade, have each been, are
> or
> are rumored to be for sale. Dean Foods in Benton Harbor, MI
> manufactured
> aseptic packaging, but they closed the plant.
>
> April is interested in moving to a master PepsiCo contract with Piknik
> that
> will cover all Gatorade and Tropicana business. She will discuss this
> with
> Sharon and report back next steps.
>
> We discussed our desire to recruit talented minorities in operating
> roles
> within the company. April suggested using diversity.com as a search
> site
> and suggested cultivating a relationship with NC A&T University. She
> said
> that they have a great engineering school, where the students have good
> co-op experience. She said that Ford get the tope tier of students
> there,
> but that we could get 2nd tier candidates and be very pleased.
>
> April suggested that we invite their supplier diversity person, Ernest
> Freeman, down to Piknik. She said that we are the only MBE in their
> system,
> with the exception of a woman owned business in Mass. that does water
> for
> them.
>
> The meeting ended something like 3 hours later...
>
> Henry
>
> H. Beecher Hicks, III
> Vice President, Sales and Marketing
> Piknik Products Company
> 404/653-8914 office
> 334/265-1567 x217 office
> 404/313-6669 cell
> 509/471-8561 efax
> www.piknikproducts.com

**From:** Brenda Sellers [mailto:bsellers@piknikproducts.com]
**Sent:** Friday, April 15, 2005 11:39 AM
**To:** Piknik All
**Cc:** cday12345@aol.com; Chris Day
**Subject:** FW: Reorganization Announcement

Hello Everyone,

Please read the following attachment in regard to the reorganization of certain members of the company and some additional personnel moves.

Thanks

Brenda Sellers

HR Manager





## ORGANIZATIONAL ANNOUNCEMENTS

April 15, 2005

As you know, Team Piknik was fortunate to add two world-class players recently to its senior management team ... Anthony Barber, as Vice President and General Manager of the Beverage Division, and Carl Bleier, as Vice President and General Manager of the Condiments Division. With these two additions, we have all the pieces in place on our senior management team to continue to bring the focus and intensity to move Piknik forward on all fronts.

To maximize this effort and continue the significant improvements we are seeing in our business, we have reassigned certain members of our organization and made some additional personnel moves. In the **Condiments Division**, **Eddie Crosby** is moving to Condiments as Production Manager in Brundidge, reporting to Carl. Eddie will be responsible for production, maintenance and sanitation. We are extremely excited to have a proven leader from within Piknik move to join Condiments, and we are confident that he will help speed the improvements to our business in Brundidge.

In the **Beverage Division**, **Bert Mayer** will assume the role of Plant Manager, Day Street, reporting to Anthony Barber. Bert will assume leadership over the team that had been reporting to Eddie Crosby at Day Street. **Jerry MacCartney** will assume the role of Plant Manager, Alatex, also reporting to Anthony. All of the Alatex personnel will report to Jerry. As a result of the above assignments, **Jimmy Whitehead, Dawn Mitchell and Bill Boykin** will now report directly to Anthony Barber.

Similar to Condiments, the QA Managers in Beverages will now report directly to the plant managers of the facility in which they work, with a dotted line to **Shannon McGlon**. Shannon remains QA Director in charge of the overall Piknik quality systems, and **Allen Walters, Barbara Williams and Jessica Daniel** remain accountable for implementing the system at their respective plants.

In Beverage Sales, **Bob Winter** becomes Director of Customer Planning, reporting to Henry Hicks, to reflect his vital role in onboarding and interfacing with our customers.

Regretfully, with change sometimes come departures. In Condiments Sales, we are changing our emphasis from a geographic focus to a market focus, and as a result we are eliminating the positions of **Bob Gross and Letitia Strowbridge**. In administration, we are eliminating the receptionist position held by **Clarice Crosby**. We want to thank Bob, Letitia and Clarice for their service and wish them well in their future endeavors.

We are confident that these moves will greatly enhance our ability to deliver results across all areas of the company. We are grateful for your continuing efforts and support.

Jeffery Larry
Chairman & CEO

*This communication never received even a peep of a response from anyone.*



**PIKNIK**
PRODUCTS COMPANY

To:        Jeffrey Larry; CEO, Onyx Capital Ventures
           Bill McLennan; President & COO, Piknik Products Company

From:      Shannon McGlon; Director of Quality Assurance, Piknik Products Company

Date:      December 3, 2004

Subject:   Robert Gross's Behavior and Accusations

I would like to clarify my position regarding Robert Gross. I was made aware that Robert Gross was making accusations (later determined to be false) concerning myself on October 14, 2004. This was a result of his strong verbal language to me directly, and about me to many individuals, at a company meeting on October 13, 2004. When I inquired to HR as to why he was acting towards me in a personal and uncalled for manner, I learned that he was accusing me of things I had not said, and was threatening litigation against the company and myself.

His direct supervisor was given two weeks to bring closure to this matter. A meeting was supposed to be held between Mr. Gross, Mr. Hicks (his supervisor), Brenda Sellers, and myself. The objective was to bring closure to this issue and move beyond it.

In the interim, Mr. Gross made strong verbal personal attacks against me to many people in Brundidge on October 13, 2004. These comments were both unprofessional and unwarranted. He made attacks towards me in two meetings that same day. He insulted my husband several times who had done some consulting for Piknik. He made insulting remarks about the school I attended (Auburn University) in a room where I was present, looking over my shoulder at me after he made the remarks to ensure I had heard them. He had been told Brenda Sellers and Bill McLennan were researching his complaints against me. He proceeded to take matters upon himself to make extreme personal remarks against me at a time that I was charged with building a team to dramatically change the culture of Brundidge operations. Bill McLennan, Brenda Sellers, and Henry Hicks were all aware during these meetings Oct 13, that Mr. Gross had an agenda to sue me personally, as well as the company. Yet nothing was done to advise him to control his actions other than Brenda telling him to be quiet one time. He left the room and began in another, with an additional audience. He later became inflamed against me during a meeting between Henry Hicks, Peg Whitney and myself. He interrupted the meeting to add his input and became upset with me when I attempted to explain the position of the Product Development Department. He said that if we made requirements on submitting work into the department, he would just make sure all of the requirements were met on paper to get his work in.    *witnessed by Bob Winter, Jerry MacCarth & Bert Mayer*

I have expressed a willingness to cooperate in any way reasonable to bring closure to this issue. However, Mr. Gross has proven himself hostile and the proposed conclusion is unacceptable. Mr. Gross has a history of verbally intimidating professionals in this company, and primarily women.

Brenda Sellers and Henry Hicks have both made comments to me that if this is not resolved, "someone won't be working here". While this comment may not have the intention of being a threat, it is by nature threatening. I would expect this to be communicated from my direct supervisor if it were true. I don't believe, by any standard, I have done anything that would even remotely threaten my employment.

I have done nothing wrong. Mr. Gross accused me of telling people in Brundidge that he was disciplined or pornographic activities. I had several conversations with Henry Hicks and Brenda Sellers about Mr. Gross's behavior relating to verbally attacking my employee, Kari Alderman. He also violated a company Policy & Procedure in the R&D Department. These subjects were the extent of my knowledge of his

DEFENDANT'S
EXHIBIT
10

discipline until Henry Hicks emailed a copy of the documentation to me. Contained in it was a paragraph concerning the pornographic material for which Mr. Gross was being disciplined and the extent of his discipline (suspension). At a later date, I was working in the Brundidge facility. I followed up with my employee, Kari Alderman, that her issue with Mr. Gross had been addressed aggressively and I assured her that I firmly believed it would not occur again. This (Mr. Gross's treatment) was a large factor in Kari's decision to leave the company after only three months of employment. I did not communicate the details of his discipline, nor did I in any way reference the pornography. Upon the same day of work in Brundidge, Mr. Gross was making calls into the plant and paging people. I informed Henry that Mr. Gross was working while on suspension. Mr. Hicks informed me that he had indeed suspended Mr. Gross that week but had told him "I can't stop you from working from home". I told Mr. Hicks I thought this was sending a very dangerous mixed message and that I found it to be wrong.

After Brenda Sellers informed me on October 14, 2004 that Mr. Gross had communicated a desire to proceed with litigation against myself and this company, she also informed me that she was conducting a thorough interview process of employees in Brundidge to ascertain how Mr. Gross obtained the idea that I had spread rumors about him. I asked her if she felt I should discuss these matters with my husband and she said no. I asked this question simply because I wanted to discover how seriously she was taking this matter. I told her that I was uncomfortable communicating with Mr. Gross in a manner that did not have a witness (group conversation) or was not over email (documentation of the communication) until it was resolved. She told me Bill McLennan said it should be resolved within two weeks. Resolution should be met with a discussion between Bill, Henry, Brenda and Mr. Gross. In that meeting, Bill McLennan told Mr. Gross he needed to have a conversation with me because I was the only person in this whole matter that he had not talked to, nor attempted to talk to. That conversation was to happen within two weeks. Mr. Gross was also informed that his allegations had been thoroughly researched and found to be false with no basis. Brenda attempted to arrange a meeting for several weeks with no success from Mr. Gross. I maintained that I was uncomfortable working directly with him until it had been settled.

On November 11, 2004 I attended Employee Appreciation Day in Brundidge. The receptionist called me out of the event to tell me Mr. Gross was very upset and wanted to speak to me immediately. She had tried to explain that everyone was in a meeting and that I would call him back. I gave her the same direction: that I would call him back in one hour when the event was over. I told Brenda Sellers that Mr. Gross was upsetting the receptionist and demanding to speak to me. She said she couldn't do anything about it at that time because of the event. When the event was over at 1:00 pm, I asked the receptionist for a number where I could reach Mr. Gross. She said he told her "never mind". I received an email from him the next day requesting information about an audit, to which I responded.

From this exchange, Brenda was left with the idea that I would not talk to Mr. Gross. I was brought into her office and councelled on November 15. I reminded her that this situation had not been resolved, and as far as I was concerned I had to assume Mr. Gross's threats of litigation were real. He had not retracted that threat nor had he spoken to me since October 13. I therefore, was uncomfortable speaking to him directly without a witness (with other professionals on a conference call or meeting) or over email. I reminded Brenda that this company had not protected the rights of employees in such matters in the past and I was not trying to be difficult, but to use discretion and caution when approaching a volatile situation with a person that himself had proven to be volatile.

Mr. Gross did not want to talk to me until he had a chance to talk to Bob Winter. In the meantime, several of my peers (and others) have approached me since October 13, 2004, warning me of comments Mr. Gross made about me and advising me to be careful about him due to the extreme nature. Several people have also, since that time, told me that they had heard Mr. Gross had gotten into trouble for "other things". I have not discussed anything about my situation with Mr. Gross to anyone at Piknik (other than Brenda & Henry), including my direct supervisor, as Brenda Sellers had told me not to. Apparently many others knew about it from some source. Brenda asked me not to speak to Bill McLennan about this, because he wanted her to handle it. I followed her request until December 3, 2004 when I became increasingly concerned about how this was being handled. I have always had an

excellent relationship with my direct supervisor, at any company for which I have worked. I felt it very important that Bill McLennan hear from me directly what was transpiring, as he had not heard my version of any of these events prior to December 3, 2004 at Brenda's request.

On November 29, 2004, Brenda Sellers informed me that Henry Hicks was trying to arrange a meeting with Mr. Gross, Brenda Sellers, Henry Hicks, and myself. I asked about the nature of this meeting and what was expected of me. She said she would have to find out from Henry. Henry later called me into his office to say that there was no agenda other than to "get you and Bob talking again". He went on to say someone would not work here if it didn't get resolved, that being probably Mr. Gross. He said he viewed it that Mr. Gross and I were "fighting" and that "it takes two to fight". I reminded him that I had been falsely accused, verbally attacked, inconvenienced, and distracted from my job over this and I in no way saw it as a "disagreement", "misunderstanding", or "fight" and that I resented it being described as such.

Since this time, Henry Hicks has asked me to make another quality presentation before his sales group. I am not comfortable doing so because the group consists of the following: Mr. Gross, Mr. Grey (to whom was witness to Mr. Gross's language on October 13, 2004), and Ms. Oliver whom Henry tells us "used to work for Hooters". I will be glad to provide a written summary of the Quality Assurance and Product Development activities, or participate in another fashion.

To summarize my position, Mr. Gross has harassed me without warrant since October 13, 2004 at least. I have been accussed of spreading true information, that I have not. Mr. Gross is spreading untrue information about me, verbally attacking me in front of open groups, and threatening litigation against myself and this company. I am very disappointed in how this situation has been handled. I disagree with the course of action that has been requested of me. Bill McLennan has asked me to take the moral high road and listen to Mr. Gross and move on. I believe Bill has asked this of me because he doesn't know all of the details I have described in this memo. I believe, because the situation has not been handled well, that this is not possible. Mr. Gross has a pattern of verbally intimidating professionals in this organization and I will not tolerate that at any level.

I am requesting the following: a letter of apology from Mr. Gross addressed to myself and to this company, an apology to the people that he insulted on October 13, 2004 in Brundidge regarding myself, an agreement that Mr. Gross is not to contact me directly other than email communication for the rest of the term of our employment at Piknik Products Company (or any other name under which this organization conducts business). I am willing to work verbally with Mr. Gross on conference calls or meetings that are in a controlled environment unless that agreement is abused.

I will add that several professionals in this company are very concerned about the nature of Mr. Gross's behavior. These individuals have expressed a willingness to discuss their concerns within the company (to Mr. McLennan) or by other means.

I wish no harm to anyone or this company. But I will not allow myself to be put into a bad position for the convenience of those that have not handled this responsibly. I will not allow a temporary resolution that will permit this to reoccur.

I have an impeccable record at this company, as an employee and as a leader. I try my very best in all situations to conduct myself with integrity and professionalism, granting respect to everyone regardless of who they are. I have been given the responsibility to lead changes that will further improve the quality and safety of our products and I take that responsibility very seriously. At a time when I need to be acutely focused on my projects, this entire situation has been a huge burden and distraction, both to myself and to my family.

Because Bill McLennan cannot be present in the proposed meeting scheduled for December 8, 2004 at 8:00 am, I will tape record the meeting for my protection.



Date:   June 20, 2005

To:     Shannon McGlon

From:   Chris Day

Re:     Salary Adjustment


Shannon, I regret that the current circumstances at Piknik necessitate imposing salary reductions. Effective with this pay period, your rate of salary will be $50,000 per year until further notice. I am hopeful that we can emerge from this bank-induced situation before too long and increase pay rates again, but until then we have to make painful choices to keep the company operating. Please accept my apologies.


Chris


Cc:     Jeffery Larry, CEO
        Brenda Sellers, HR



**From:**
**Sent:**
**To:**
**Subject:**



*Redacted*
*Atty/Client Priv.*

-----Original Message-----
From: Shannon McGlon [mailto:goldendiv@yahoo.com]
Sent: Monday, August 15, 2005 10:21 AM
To: bsellers@piknikproducts.com
Subject: RE: Schedule

Brenda -
It was nice to hear from you and I really appreciate
your thinking of me for this position (and in
general!).

After speaking with you on the phone, I believe the
salary range is too low for the challenge for which
I'd be faced.  Operating as a QA Manager with limited
funds and no corporate support (QA Director) would be
extremely difficult.  It is an essential position for
the business and I appreciate your sense of urgency in
trying to fill it (I have been in such a position at
Piknik before!).

Because I value my relationship with you and with
Piknik, I would like to offer a solution:  I could
operate as a short term consultant until you fill the
position.  This could be mutually beneficial to both
Piknik and myself.  If Piknik would like to pursue
this option, let me know and I'd be glad to negotiate
something with you.

Just to let you know, I have another offer on the
table that I'll need to make a decision about in the
next week (and an interview Wed).  This is a great
week to have these discussions since it's "decision
time" for me.  I'll do what I can for you.



DEFENDANT'S
EXHIBIT
12
McGlon

1

Best Regards,
Shannon


--- Brenda Sellers <bsellers@piknikproducts.com>
wrote:

> Shannon hi,
>
> Great news Piknik Products has a position available
> in the QA Dept. at Day
> St. I immediately thought of you. The position is QA
> Manager. I think you
> would be a great fit; the schedule for this position
> 7.30 to 5.00 Monday -
> Friday. Please contact me by 11.30 am today if you
> are interested.
>
> I will do a follow up on this offer of employment
> with a telephone call.
>
> Sincerely,
> Brenda Sellers
> HR Manager
>
> -----Original Message-----
> From: Shannon McGlon [mailto:goldendiv@yahoo.com]
> Sent: Wednesday, July 06, 2005 4:52 PM
> To: bsellers@piknikproducts.com
> Subject: Schedule
>
> Brenda -
> I wanted to check your schedule now that you are
> back
> from vacation.  My preference would be to come by on
> Friday around lunch (or slightly before).  Can you
> let
> me know how that looks for you?
>
> Thanks,
> Shannon
>

2

>
>
>
> Do you Yahoo!?
> Make Yahoo! your home page
> http://www.yahoo.com/r/hs
>
>


Do You Yahoo!?
Tired of spam?  Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 130-2005-05523 |

_____ and EEOC

*State or local Agency, if any*

| NAME (Indicate Mr., Ms, Mrs.) | |
|---|---|
| Shannon A. McGlon | HOME TELEPHONE *(Include Area Code)* (334) 514-2011 |

| STREET ADDRESS 1610 Emerald Mountain Pkwy. | CITY, STATE AND ZIP CODE Wetumpka, AL 36093 | DATE OF BIRTH 06/30/1969 |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME Onyx Capital Ventures D/B/A Piknik Products Company | NUMBER OF EMPLOYEES, MEMBERS 250+ | TELEPHONE *(Include Area Code)* (334) - 265-1567 |
|---|---|---|

| STREET ADDRESS 3806 Day Street | CITY, STATE AND ZIP CODE Montgomery, Alabama 36108 | COUNTY Montgomery |
|---|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box (es)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify)

| DATE OF DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| | 06/28/05 |
| ☐ CONTINUING ACTION | |

See the attached Addendum.

RECEIVED
EEOC

BIRMINGHAM DISTRICT OFFICE

DEFENDANT'S
EXHIBIT
13
MCGLON

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for State and Local Requirements) |
|---|---|
| | I swear of affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty or perjury that the foregoing is true and correct | SIGNATURE OF COMPLAINANT |
| July 14, 2005          *Shannon A. McGl* | *Shannon A. McGl* |
| Date          Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year)  July 14, 2005 |

EOC FORM 5 (Rev. 07/99)

## ADDENDUM TO THE CHARGE OF DISCRIMINATION OF
## SHANNON A. McGLON

"My name is Shannon A. McGlon. I was employed by Piknik Products Company. I had been a regular employee since March 1, 2001. In my job I was considered Director of Quality Assurance. I am a white female.

"During my tenure with Piknik I worked at the 3806 Day Street, Montgomery, Alabama location. My immediate supervisor was Anthony Barber, a black male. On or about June 28, 2005, Ms. Brenda Sellers, human resources manager called me into her office informing me that my employment was terminated. The reason I was given is that my services are no longer needed. I was replaced by a black male, Anthony Barber. I always considered myself a valuable employee. I was never reprimanded nor written-up for poor performance. Mr. Barber never complained about the quality of my work.

"I believe I am the victim of discrimination on the basis of my race, white."

_Shannon A. McGlon_
SHANNON A. McGLON

SWORN TO and SUBSCRIBED before me this _14th_ day of July, 2005.

_Nana B English_
NOTARY PUBLIC State at Large

My Commission Expires: _9/19/07_

RECEIVED
EEOC

JUL 18 2005

BIRMINGHAM DISTRICT OFFICE

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☐ EEOC | |

_____ and EEOC

*State or local Agency, if any*

NAME (Indicate Mr., Ms, Mrs.)
~~Jerry A. MacCartney~~ Shannon A McGlon

HOME TELEPHONE (Include Area Code)
(334) ~~567-8474~~ 514-2011

STREET ADDRESS ~~1610 Emerald Mnt~~ Pkwy ~~32 Winding Wood Drive~~

CITY, STATE AND ZIP CODE
Wetumpka, AL 36093

DATE OF BIRTH
~~02/17/1961~~ 6-30-1969

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

NAME
Onyx Capital Ventures D/B/A Piknik Products Company

NUMBER OF EMPLOYEES, MEMBERS
250+

TELEPHONE (Include Area Code)
(334) - 265-1567

STREET ADDRESS
306 Day Street

CITY, STATE AND ZIP CODE
Montgomery, Alabama 36108

COUNTY
Montgomery

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box (es)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify)

DATE OF DISCRIMINATION TOOK PLACE
EARLIEST          LATEST

☐ CONTINUING ACTION    06/27/05  28

See the attached Addendum.

*Draft*

DEFENDANT'S EXHIBIT
McGlon

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty or perjury that the foregoing is true and correct

Charging Party *(Signature)*

NOTARY - (When necessary for State and Local Requirements)

I swear of affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year)

## ADDENDUM TO THE CHARGE OF DISCRIMINATION OF

~~JERRY~~ A. ~~MacCARTNEY~~
Shannon    McGlon

"My name is ~~Jerry A. MacCartney~~. I was employed by Piknik Products Company. I had
Shannon    McGlon
been a regular employee since ~~about~~ March ~~31, 2003~~.  In my job I was considered ~~plant manager~~.
                                                                    1, 2001              Director of Quality Assurance
I am a white ~~male~~.
            female

"During my tenure with Piknik I worked at the ~~4300 Alatex Road~~, Montgomery, Alabama
                                                      3806 Day Str
location. My immediate supervisor was Anthony Barber, a black male. On or about June 2~~7~~8, 2005,
Ms. Brenda Sellers, human resources ~~director came into my~~ office informing me that my
                                          manager, called me into her
employment was terminated. ~~I was not give reason or cause for the termination.~~ I was replaced by
                                                                              Anthony Barber,
a black male, ~~Joseph Yates~~.  I always considered myself a valuable employee.  I was never
reprimanded nor written-up for poor performance.  Mr. Barber never complained about the quality
of my work.

"I believe I am the victim of discrimination on the basis of my race, white."


                                        _____
                                        ~~JERRY A. MacCartney~~
                                        Shannon   A.   McGlon

SWORN TO and SUBSCRIBED before me this _____ day of July, 2005.


                                        _____
                                        NOTARY PUBLIC State at Large

                                        My Commission Expires: _____


The reason I was given is that my services
are no longer needed.

Shannon McGlon

**From:** Shannon McGlon [smcglon@piknikproducts.com]
**Sent:** Tuesday, December 28, 2004 11:55 AM
**To:** 'bmclennan@piknikproducts.com'
**Subject:** Meeting & Schedule

Bill -

After I called you on Thursday, December 16, we concluded our discussion with your planning a trip to Montgomery beginning December 28. You and I were going to meet to discuss several issues including audit preparations in Brundidge, the CEM fat/moisture analyzer replacement ($58K), continued resource issues in projects, and the letter I sent to you and Jeff Larry to which neither of you responded. You and I both believed that the issue of the letter (at least) should best be discussed in a personal meeting.

I rearranged my schedule to be in Montgomery today, canceling Brundidge meetings, so that we could discuss. I did not hear from you that your plans had changed. Would you please let me know a date that we can meet and discuss that is reliable? I understand everyone's time is valuable, as is my own. I would appreciate a reliable time to discuss so that we do not interfere with others' schedules again.

Thank you,
Shannon

*He never responded to this — his resignation was*
*announced a few weeks later.*


DEFENDANT'S
EXHIBIT
15
McGLON

*"the company" chose to manufacture the product*                    Page 1 of 3

## Shannon McGlon

**From:** Shannon McGlon [smcglon@piknikproducts.com]
**Sent:** Friday, December 10, 2004 1:31 PM
**To:** 'hhicks@piknikproducts.com'; 'bwinter@piknikproducts.com'; 'Bert Mayer'; 'Jerry MacCartney'
**Cc:** 'Robert Lampert'; 'Robert Niedbalski'; 'Bill McLennan'
**Subject:** RE: Production run in January

Henry -

We are already open for legal action in my estimation. We are manufacturing a 100% juice product under FDA scrutiny and our target consumer is small children. We have repeated yeast and mold contamination that In Zone "tests until it passes" and most recently have live fruit fly larvae in finished product that has never had the caps removed. We are distributing this to the largest distribution chain in the world. I am uncomfortable with the exposure and I do not believe we should proceed UNDER ANY CIRCUMSTANCES.

Business is not more important than people. There are people consuming the product. Every time I go into a Wal-Mart I go inspect the TT product. I advise people I know not to purchase it. I am very concerned that it is not being managed properly. I don't see how we can afford to continue. They have already had a Class I Recall for the same issue in a non-regulated product with a target consumer in a low risk category. Small children are a high risk category.

I honestly can't believe it is even a question as to whether or not we are going to produce in January. We are a FOOD company and the Quality Director saying we have a huge problem and you think we need to have another cussion? What is there to discuss? If we had given them the notice when we first discussed it, it would have h well outside of 30 days. Now the clock is ticking and we are still sitting on it.

Shannon

**From:** Henry Hicks [mailto:hhicks@piknikproducts.com]
**Sent:** Friday, December 10, 2004 9:41 AM
**To:** smcglon@piknikproducts.com; bwinter@piknikproducts.com; 'Bert Mayer'; 'Jerry MacCartney'
**Cc:** 'Robert Lampert'; 'Robert Niedbalski'
**Subject:** RE: Production run in January

Shannon -

support your sentiment. I am concerned however about timing. It is probably wise to give them some sort of otice before indicating that we will cease production as indicated in our letter. (I just sent the attorney's omments to you and Bert.) Giving them less than 30 days notice that we will not produce for them could have a naterial adverse impact" on their business and open us up for legal action in the near term.

ou. Bert and I should discuss timing and delivery of this letter and whether or not we should agree to produce for em in January.

:nry

cher Hicks, III
President, Sales and Marketing
nik Products Company
/653-8914 office



DEFENDANT'S
EXHIBIT
16
McGlon

334/265-1567 x217 office
)04/313-6669 cell
509/471-8561 efax
www.piknikproducts.com

-----Original Message-----
**From:** Shannon McGlon [mailto:smcglon@piknikproducts.com]
**Sent:** Friday, December 10, 2004 9:24 AM
**To:** bwinter@piknikproducts.com; 'Henry Hicks'; 'Bert Mayer'; 'Jerry MacCartney'
**Cc:** 'Robert Lampert'; 'Robert Niedbalski'; 'Amy Styron'
**Subject:** RE: Production run in January

I in no way support running In Zone under any circumstances at this time. We are putting ourselves in a position of exposure that bears extreme risk to this company. We have not resolved quality issues from the last runs. We have on-going critical issues. It is a HUGE mistake to schedule anything further until we are satisfied the consumer will be protected.

On a related note - when is the letter going to them? I have seen no feedback from Mark.

**From:** Bob Winter [mailto:bwinter@piknikproducts.com]
**Sent:** Thursday, December 09, 2004 4:35 PM
**To:** Henry Hicks; Bert Mayer; Shannon McGlon; Jerry MacCartney
**Cc:** Robert Lampert; Robert Niedbalski; Amy Styron
**Subject:** FW: Production run in January

Team,
I realize we have made special small runs for In-Zone this last year. We certainly can continue to support their launch of Tummy Ticklers by packing this small 8,333 case run. The $2.13 pricing was based on two week runs (i.e. ten days) or 82,500 cases. It also assumed 1mm cases p/year. We do have language in the agreement that states runs less than two weeks will carry a $1,200 p/hour change-over fee, not to exceed $9,600.

Given that line 101 is idle, I do believe we should complete the run. The combination of tolling and change over fee will result in $27,349 in revenue.

Henry, if you choose to impose the change over fee, you will want to remind In Zone of the fee in advance of the run. I'm not sure if this charge has been consistently applied in the recent past.

On a related note, have we resolved internally the risk we are exposing ourselves to regarding quality concerns with In Zone?

Bob Winter

**From:** Dawn Mitchell [mailto:dmitchell@piknikproducts.com]
**Sent:** Thursday, December 09, 2004 3:18 PM
**To:** Bob Winter
**Subject:** FW: Production run in January

-----Original Message-----
**From:** Jason Lilly [mailto:jason.lilly@in-zone.com]
**Sent:** Thursday, December 09, 2004 2:31 PM
**To:** dmitchell@piknikproducts.com
**Cc:** bburnham@in-zone.com
**Subject:** Production run in January

# Shannon McGlon

**From:** Christopher Day [cday12345@nextel.blackberry.net]
**Sent:** Friday, April 29, 2005 5:06 PM
**To:** Shannon McGlon
**Subject:** Re: ADS Meeting

*Again, Chris over reacted and threw his weight into an issue he helped create*

Shannon-
I saw your response to Carl, and I am disappointed. Putting in a dig about what happens when quality reports to operations was out of line. Frankly it was the fact that Jessica reports to Carl that enabled this decision - the right decision - to be made. $1300 in training is meaningless at this moment in Brundidge. We are critically short production staff and have trailerloads of obsolete product in the yard and 179 palette positions more in the warehouse. A significant writeoff now, while I'm negotiating with banks to fund our new equipment and have a future, would be devastating. We have important challenges right now, and $1300 in unused training isn't one of them.

*↳ this was communicated to us as an Onyx function - one of their areas of expertise*

I was expecting to see a "we're all in this together, we'll work it out" response to this minor training issue, and what you gave Carl was a "hell with the larger issue, you messed up my area" response. That's not executive behavior. If you want to be treated like a senior leader, you need to always keep the larger issues first and your department second.

It's a stressful time for everyone. Stop the potshots and help your teammates.

Chris

-----Original Message-----
From: "Shannon McGlon" <smcglon@piknikproducts.com>
Date: Fri, 29 Apr 2005 09:41:32
To:<cbleier@piknikproducts.com>
   abarber@piknikproducts.com>, "'Chris Day'" <cday@piknikproducts.com>
Subject: RE: ADS Meeting

Carl -
  understand what being short staffed is about. I believe these type of compromises are
made when Quality reports to Operations. I believe there are other options that could
have been explored. Barbara, Katie, and myself have all worked in Brundidge filling in
when there was no QA Manager. I have managed both departments in the past. Merle is an
effective decision maker about production as she has had to fill that role before.

Jessica is the strongest technical person and leader we have at the plant level. For her
to miss a technical meeting that would pay dividends in her job, to assist with
operations, is really hard to accept. Because she is such a good person, she has complied
and will be a good sport about it. We have a challenge at Piknik in getting & keeping
good people, and she is extremely stressed right now as it is. She feels like she has R&D
which she didn't sign up for, and is having to help out in areas that take her away from
what should be her focus.

I believe that you made what you see as a good decision. I think you are going to do
great things for Brundidge. I am just disappointed that you didn't at least discuss
options with me before the decision was made and we
wasted $1300.

Shannon

-----Original Message-----
From: Carl Bleier [mailto:cbleier@piknikproducts.com]
Sent: Friday, April 29, 2005 8:59 AM
To:  mcglon@piknikproducts.com
     barber@piknikproducts.com; 'Chris Day'
Subject: RE: ADS Meeting

Shannon -
  of our supervisors (Billy Allen) is in the hospital with back surgery; Eddie is on

DEFENDANT'S EXHIBIT

McGlon

Vacation & Mike Ellis our one remaining supervisor resigned on Wednesday.
I am the production supervisor & Jessica is my assistant until Eddie returns on Tuesday.

Ok with Anthony, I recommend you or Chris's recommendation Katie attend?

Carl

-----Original Message-----
From: Shannon McGlon [mailto:smcglon@piknikproducts.com]
Sent: Friday, April 29, 2005 8:45 AM
To: cbleier@piknikproducts.com
Cc: abarber@piknikproducts.com; 'Chris Day'
Subject: RE: ADS Meeting

Carl -
Who do you recommend attend?  This is a technical meeting.  There are only 5 technical
people in the whole company, and only two associated with the condiments business (I'm not
including myself).  It would not benefit us to send beverage people, who are unavailable
anyway.

Shannon

-----Original Message-----
From: Carl Bleier [mailto:cbleier@piknikproducts.com]
Sent: Thursday, April 28, 2005 2:18 PM
To: smcglon@piknikproducts.com
Cc: abarber@piknikproducts.com; Chris Day
Subject: RE: ADS Meeting

Shannon -

I strongly encourage that someone in the Piknik Company attend this meeting.
I have requested Jessica to cancel her trip due to an unusual management coverage issue
that just developed.
It would be wasteful for us as a company not to attend since the registration/admission
fee is paid.

Carl

-----Original Message-----
From: Shannon McGlon [mailto:smcglon@piknikproducts.com]
Sent: Thursday, April 28, 2005 1:54 PM
To: jdaniel@piknikproducts.com
Cc: 'Carl Bleier (E-mail)'
Subject: RE: ADS Meeting

Is there no one else that can go in your place?  Now we've paid for another training trip
that we will receive no benefit from.

-----Original Message-----
From: Jessica Daniel [mailto:jdaniel@piknikproducts.com]
Sent: Thursday, April 28, 2005 1:48 PM
To: Shannon McGlon (E-mail)
Cc: Carl Bleier (E-mail)
Subject: ADS Meeting

Shannon,

You asked me to cancel my trip to the ADS Meeting because it's not a good time for me to
go away.  We have several projects that need my attention right now.  I tried to get a
refund on the registration fee but no fees are refunded after April 19th.  I also
tried to get it applied to a class or meeting in the future and it can't be done.  The
plane ticket should still be good for a year with a fee for changing the flight.

Regards,
Jessica

Christopher Day
Onyx Capital Ventures
(312) 902-5483 office
(334) 549-6483 mobile
cday@onyxcapitalventures.com

**Piknik Operational Risks**
**May 18, 2005**

HOLD Program Failures

- Juicy Juice product at Alatex without official HOLD tags
- Juicy Juice commissioning product that has no flavor in it, but looks normal, is in Alatex HOLD area without HOLD tags – awaiting disposition
- The two Juicy Juice products are very difficult to discern from each other – they should be clearly labeled w/HOLD tags with unique HOLD numbers
- Change parts & obsolete equipment in Day Street HOLD area – has been corrected
- AriZona product with 6 day old production date stored on Line 101 without HOLD tags – has been corrected
- Receipt of expired concentrate – was not placed on HOLD, variance not obtained from customer – was used in production – final product consequently on HOLD
- Who is auditing the HOLD Log against actual HOLD inventory?
- No clear labeling procedure on product that has been dispositioned to Destroy
- HOLD product being communicated to warehouse by pallet ID instead of finished product time – susceptible to pallet ID numbers corresponding to time, which doesn't always happen
- Gallon Gatorade & Smoothie both had HOLDs from the same day – whse told that part would be put on HOLD (# of cases that needed to go on HOLD), the pallet id tags didn't match the total cases, no one at the whse could sort it, and the whse couldn't determine which pallets should be on HOLD and which were released – product was almost shipped – trucks were waiting on the product

Process Failures

- Line 102 Cut In/Cut Out procedure documented as failed but line commenced to manufacture on May 16, 2005
- Set points for Product HTST Exit Temp were incorrect at Line 102 start up May 16, 2005 – were they put in the program incorrectly, were they changed (if so, by whom because this should be password protected)
- Do the operators have the correct information on the floor to determine if something is in or out of spec (ie. QMP)
- Line 301 HTST chart was recording temperatures too low on May 14, 2005 – digital readout was in spec as was the filling room panel view – but the chart is our legal record – product on HOLD – waiting for Jeff to download the PLC history for review

DEFENDANT'S
EXHIBIT
8
McGlonl

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JERRY A. MacCARTNEY, )
BERT MAYER, SHANNON A. McGLON, )
and )
ROBERT A. WINTER, )
    Plaintiffs, )
     )   Civil Action No.: 2:05cv1207-MHT
v. )
     )
PIKNIK ACQUISITION CORP., L.L.C., et al., )
    Defendants. )

## PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST INTERROGATORIES

COMES NOW, Shannon A. McGlon, in response to Defendant's First Interrogatories pursuant to Rule 33 of the Federal Rules of Civil Procedure and states as follows:

1.    State you full name, current address, social security number, date of birth, spouse's name (if applicable) and the name and address of your current employer.

**RESPONSE: Shannon A. McGlon, 1610 Emerald Mnt. Pkwy., Wetumpka, Alabama; 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;DOB June 30, 1969; Scott Edward McGlon; OCG and ITL, Inc.**

2.    Outline your educational background giving the full name of the educational institution, the dates of attendance, and the degrees earned for each high school, vocational or trade school, college or university, and graduate or professional school.

**RESPONSE: Auburn University-graduate school, 1993, did not graduate. Auburn University-Animal and Dairy Sciences; double minor in Visual Arts, 1992. Emma Sansom High School - graduated 1987.**

3.    Identify all of your relatives, by blood or marriage, over the age of seventeen who live in the Middle District of Alabama and provide their address and current employer.

DEFENDANT'S EXHIBIT

**RESPONSE:** Scott Edward McGlon; 1610 Emerald Mnt. Pkwy., Wetumpka, Alabama; OCG and ITL, Inc.

4.     Identify every employer or company that has ever employed you. If you have been self-employed, please indicate. As part of your identification, describe the job title, the duties you performed, the name of your immediate supervisor, the dates you held the job, your hours of work, your rate of pay, and the circumstances surrounding your departure (e.g., voluntary termination, lay off, etc.).

**RESPONSE: Harry's Farmer's Market, Alpharetta, GA-Nov. 1993 to Oct. 1995 Hired as Food Safety Administrator of Gwinnett Megastore, reporting to Dave Logan, Director of Food Safety-worked 7am-5pm, 5 days a week making $23,000/yr plus benefits-promoted to Sr. Food Safety Administrator in 1994 with responsibility at 3 stores. Promoted to Area Manager of Gwinnett Megasore in April 1995-reported to Stuart Jones, General Manager-responsible for $16,000,000 plus in Annual Sales of Food Safety critical food areas (Deli, Seafood, Meat, Cheese, Dairy, etc...) earned $39,000/yr plus benefits. Departed Harry's due to getting married and relocating to Houston, TX.**

**International Trading Company, Houston, TX-Meat Buyer-Jan. 1997 to Aug. 1997-worked 7am to 4pm, 5 days a week making $33,000/yr plus benefits-reported to Fred Payne, Driector of Procurement. Departed due to birth of daughter, Aug. 1997.**

**Self-employed-consulting for customer of International Trading Company in HACCP and pre-requisite systems.**

In March 1998, formed own company called ITL-truckload carrier company-helped in business start-up and daily operations while staying at home with daughter.

Piknik Products Company-Montgomery, Alabama-Quality Assurance Manager-March 1, 2001 reporting to Mike O'Connell (CEO) making $47,000/annually plus benefits. Worked 50-60 hours per week.

Sr. Quality Assurance Manager promotion in September 2001-reported to Bill Rodman and made $55,000 annually plus benefits.

Director of Quality Assurance-Jan. 2002 making $65,000 a year plus benefits with added responsibility of Alatex facility.

Sometime that spring, raised to $77,000 annually-added responsibility of Sanitation Department at Day Street and Alatex Road.

Oct. 2003-raise to $85,000 annually plus benefits-added responsibilities of Brudidge facility, all Microbiology, and Research Y Development department-title should have been called "Director of Technical Services" as this is industry norm for someone with these responsibilities.

5.     Describe your involvement as a witness or a party in any past legal proceedings, civil or criminal.  List the name, style, case number, jurisdiction, and date filed for each proceeding described.

RESPONSE: No prior involvement in any past legal proceedings, civil or criminal.

6.     State the name, and address of each and every physician, psychiatrist, psychologist or counselor with whom you consulted or who rendered any diagnosis, treatment or other medical care to you during the last three (3) years and the nature of your illness or condition.

**RESPONSE: Dr. Leon Casal, General Practitioner-September, 2005- Stress diagnosis.**

7.      State the name and address of each and every institution, hospital or clinic, in which you have received treatment, or in which you were confined or hospitalized during the last three (3) years. With respect to each facility you have listed in this interrogatory, state the dates that you were hospitalized or received treatment, the name(s) of your attending physician(s) and the nature of your illness or condition.

**RESPONSE: No treatment has been required.**

8.      State whether you filed state and federal income tax returns for each of the following years: 2004, 2005 and 2006.  State the amount of your gross income for each calendar year from 2004 to 2006.

**RESPONSE: Taxes were filed. 2004 - $138,797 ; 2005 - $128,810 ; 2006- extension has been filed**

9.      State the amount of income you have earned , from any source, in 2007 as of the date of your response to these interrogatories. This interrogatory includes without limitation any unemployment compensation or social security benefits you may have received.

**RESPONSE: This information is being calculated and will be provided once determined.**

10.     If you or anyone acting on your behalf has taken statements (oral, written or recorded) from any person concerning the incidents which are the subject6 matter of this lawsuit, identify the individuals from whom such statement was taken, who took the statement and when, and who has possession of that statement.

**RESPONSE: I know of no statements taken.**

11.     State the position you claim you were terminated from because of your race. In you answer, include the position title and, if the position was filled after your departure from Piknik Products,

when the position was filled and to whom the position was awarded.

**RESPONSE: Director of Quality Assurance; the name of the individual that replaced me is in the possession of the Defendant.**

12. Identify each person whom you expect to call as an expert witness at trial. For each expert witness identified, provide the information required by Federal Rules of Civil Procedure Rule 26, including the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, a summary of the grounds for each opinion, and the person's education, experience, or other background that qualifies that person to testify as an expert witness in this case.

**RESPONSE: Will submit in accordance with the Federal Rules of Civil Procedure.**

13. Identify any and all employees or former employees of Piknik Products Company, Onyx Capital Ventures LLC, or Piknik Acquisition Corp LLC who you contend participated in any allegedly discriminatory acts or omissions towards you because of race and describe fully the details of any act or omission in which they participated.

**RESPONSE: Chris Day, Henry Hicks, Jeff Larry. I am compiling the description of the details which will be supplemented once completed.**

14. Describe anyone who has knowledge of the mental and emotional anguish for which you are seeking damages and, for each person identified, state the subject matter of their knowledge and the basis for such knowledge.

**RESPONSE: Scott McGlon; Judy Ayers; Elgie Sims Dunn; Barbara Williams; Katie Pribisko Walters; Emily Sproull Hutcheson; Bob Winter; Jerry MacCartney; Teresa Cascio. I am compiling the description of the details which will be supplemented once completed.**

15. If you believe you have been discriminated against by any other employer, other that Piknik

Products, state all particulars relating to the alleged incidents of discrimination including names of employers, dates, names of participants, and whether or not you complained to the Equal Employment Opportunity Commission or any other governmental (federal or state) agency or private agency receiving complaints of employment discrimination.

**RESPONSE: None.**

16.    Identify by name, last known address, telephone number, employer, and synopsis of expected testimony, each and every person you may call as a witness at trial. You are reminded of your obligation to supplement your response to this interrogatory under Federal Rule of Civil Procedure 26(e).

**RESPONSE: Will submit in accordance with Rules of Civil Procedure.**

17.    Identify any written notes, photographs, diaries, calendars, letters, documents, records (including any computerized records), audio or video tapes or recordings of any kind which describe, reflect, or relate in any way to alleged discrimination against you.

**RESPONSE: There is an e-mail from Henry Hicks; email from Chris Day; email from Jeff Larry; memo from Chris Day which reflect to the discrimination.**

18.    Describe the compensatory damages you are claiming from Hicks, Larry and/or Day and state each calculation you performed in determining this amount in sufficient detail so that the Defendants can duplicate those calculations.

**RESPONSE: I feel I am entitled to an amount the jury feels appropriate for the discrimination.**

19.    Describe any other monetary loss(es) you are claiming as a result of the alleged actions of Hicks, Larry and/or Day, and state each calculation you performed in determining this amount in sufficient detail so that the Defendant can duplicate those calculations.

**RESPONSE: I have lost the following benefits as a result of the Defendant's discrimination: annual salary; 401k contribution; Cobra Healthcare costs; retroactive pay reduction; loss of vacation and sick time upon dismissal.**

20.    State any and all facts and alleged facts that support your claims for punitive damages in this case.

**RESPONSE: I feel I am entitled to an amount the jury feels appropriate for the discrimination.**

21.    State whether you have ever filed a petition for bankruptcy. If you have filed a petition for bankruptcy, please identify the case by court, case number, and year.

**RESPONSE: No.**

22.    Describe all efforts you have made to find employment since the time you left the employment of Piknik Products. Identify each employer with which you have sought employment, the date of such attempt, and the result of the inquiry.

**RESPONSE: 1. Graham Bottling, Montgomery, Alabama-applied-was not hired.**

**2. Piknik Products Company-offered a QA Manager position to me when Onyx was removed from the company by Wachovia Bank-declined due to pay (offered by Brenda Sellers and Ricky Loeb).**

**3. Discussions with Karen Lioce to independently consult with her in the food industry-would require extensive travel and I cannot travel extensively at this time.**

**4. Discussions with Dr. Randolph of Randolph & Associates in Birmingham, Alabama to consult-would require extensive travel and I cannot travel extensively at this time.**

23.    Identify any offers of employment you have declined since the termination of your employment with Piknik Products and the reasons therefore, and any conditions you have placed

upon prospective employment.

**RESPONSE: See response to Interrogatory 22 herein.**

Dated this the _____ day of April, 2007.

_____
SHANNON McGLON

SWORN TO AND SUBSCRIBED before me on this the _____ day of April, 2007.

(SEAL)

_____
NOTARY PUBLIC
My Commission Expires:_____

RESPECTFULLY submitted this the ___4___ day of April, 2007.

_____
K. ANDERSON NELMS (NEL022)

OF COUNSEL:

Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that an exact copy of the foregoing has been served on counsel of record listed below by placing same in the United States Mail, postage prepaid, and properly addressed on this the ___11___ day of April, 2007:

Bill McGowin
George Parker
Bob Poundstone
Bradley Arant Rose & White LLP
Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104