# Exhibit 7

In The Matter Of:

## JERRY A. MCCARTNEY, ET AL.
### v.
## ONYX CAPITAL VENTURES, LLC, ET AL.

## NO. 2:05CV1207-MHT

---

## BERT MAYER
## August 16, 2007

---



**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

EXHIBIT

7

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 1 to 4)

---

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
   NORTHERN DIVISION

3  CIVIL ACTION NO. 2:05CV1207-MHT

   JERRY A. MACCARTNEY, et al.,
        Plaintiffs,
   vs.
   ONYX CAPITAL VENTURES, LLC, et al.,
        Defendants.


   DEPOSITION
   OF
   BERT MAYER
   August 16, 2007


   REPORTED BY:  Heather Spier
                 Court Reporter and
                 Notary Public

---

**Page 2**

1         S T I P U L A T I O N
2
3         IT IS STIPULATED AND AGREED,
4  by and between the parties, through their
5  respective counsel, that the deposition
6  of BERT MAYER may be taken before Heather
7  Spier, Court Reporter, and Notary Public;
8         That the signature to and
9  reading of the deposition by the witness
10 is waived, the deposition to have the
11 same force and effect as if full
12 compliance had been had with all laws and
13 rules of Court relating to the taking of
14 depositions;
15        That it shall not be necessary
16 for any objections to be made by counsel
17 to any questions, except as to form or
18 leading questions, and that counsel for
19 the parties may make objections and
20 assign grounds at the time of trial, or
21 at the time said deposition is offered in
22 evidence, or prior thereto.
23

---

**Page 3**

1         A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4     Mr. K. Anderson Nelms
5     Attorney at Law
6     Law Offices of Jay Lewis
7     P.O. Box 5059
8     Montgomery, Alabama 36103
9
10 FOR THE DEFENDANT:
11    Ms. Jennifer J. McGahey
12    Attorney at Law
13    Bradley, Arant, Rose & White
14    1819 Fifth Avenue North
15    Birmingham, Alabama 35203
16
17 OTHERS PRESENT:
18    Mr. Anthony Bush
19    Ms. Amy Lindsey
20
21
22
23

---

**Page 4**

1         I N D E X
2
3                        PAGE:
3  EXAMINATION BY MS. MCGAHEY........... 6
4  EXAMINATION BY MR. NELMS............. 274
5  REEXAMINATION BY MS. MCGAHEY......... 292
6  REEXAMINATION BY MR. NELMS........... 292
7
8
9         E X H I B I T S
10
11 Defendant's Exhibit 1................. 94
12 Defendant's Exhibit 2................. 95
13 Defendant's Exhibit 3................. 102
14 Defendant's Exhibit 4................ 103
15 Defendant's Exhibit 5................ 162
16 Defendant's Exhibit 6................ 200
17 Defendant's Exhibit 7................ 239
18 Defendant's Exhibit 8................ 244
19
20 Plaintiff's Exhibit 1................ 277
21 Plaintiff's Exhibit 2................ 287
22
23

---

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 5 to 8)

---

Page 5

1      I, Heather Spier, a Court
2 Reporter and a Notary Public for the
3 State of Alabama at Large, acting as
4 Commissioner, certify that on this date,
5 pursuant to Rule 30 of the Alabama Rules
6 of Civil Procedure and the foregoing
7 stipulation of counsel, there came before
8 me at 401 Adams Avenue, Montgomery,
9 Alabama, on August 16, 2007, commencing
10 at 9:09 a.m., BERT MAYER, witness in the
11 above cause, for oral examination,
12 whereupon the following proceedings were
13 had:
14
15      BERT MAYER,
16 being first duly sworn, was examined and
17 testified as follows:
18
19      THE REPORTER:  Usual
20 stipulations?
21      MR. NELMS:  Yes.
22      MS. MCGAHEY:  That's fine.
23

---

Page 6

1 EXAMINATION BY MS. MCGAHEY:
2      Q.   Could you please state your
3 full name?
4      A.   Bert W. Mayer.
5      Q.   What does the W stand for?
6      A.   Wendell.
7      Q.   And is Bert short for Norbert?
8      A.   Yes, ma'am.
9      Q.   Mr. Mayer, my name is Jennifer
10 McGahey.  We met just a few moments ago,
11 and I am one of the lawyers who is
12 representing Chris Day, Jeff Larry and
13 Henry Hicks in the lawsuit that you have
14 filed against them.  We are here for your
15 deposition today.  Have you ever given a
16 deposition before?
17      A.   Yes, ma'am.
18      Q.   How many depositions have you
19 given?
20      A.   I think two.
21      Q.   Well, before we really start I
22 would like to go over some ground rules
23 with you so that you and I are on the

---

Page 7

1 same page.
2      A.   Okay.
3      Q.   First of all, you're doing
4 well so far.  You're answering verbally
5 as opposed to nodding your head, so
6 please keep that up.
7      A.   Will do.
8      Q.   I will be asking you questions
9 that sometimes call for a yes or a no
10 answer, if you could please respond by
11 saying yes or no instead of uh-uh or
12 uh-huh.  That way Heather has an easier
13 time taking down your response.
14      A.   Okay.
15      Q.   Do you understand that you are
16 under oath today?
17      A.   I do.
18      Q.   If you do not understand any
19 of the questions that I ask you, please
20 let me know.
21      A.   Sure.
22      Q.   And I will do my best to
23 rephrase my question.  If you don't speak

---

Page 8

1 up and tell me that my question was
2 unclear, I will assume that you
3 understood my question.
4      A.   Okay.
5      Q.   Is that fair?
6      A.   That's fair.
7      Q.   If you need to take a break
8 for any reason, just let me know.  I'm
9 happy to take a break.
10      A.   Okay.
11      Q.   Are you currently on any
12 medications?
13      A.   Yes.
14      Q.   What medications are you
15 currently taking?
16      A.   I'm on two different blood
17 pressure, cholesterol.
18      Q.   Do you know the name?
19      A.   Yeah, Altace.
20      Q.   Altace?
21      A.   Yeah.
22      Q.   A-L-T-A-C-E?
23      A.   I believe that's correct.

---

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 9 to 12)

Page 9

1    Q.    And what is that medication
2  for?
3    A.    Blood pressure.  Toprol, which
4  is blood pressure.  Crestor.
5    Q.    Crestor?
6    A.    Yes, ma'am.
7    Q.    C-R-E-S-T-O-R?
8    A.    I believe so.  Cholesterol.  I
9  take aspirin.  I think I'm missing
10  something, but it's all heart related.
11    Q.    How long have you been taking
12  Altace?
13    A.    Since December 4th of 2006.
14    Q.    What about Toprol?
15    A.    December 4th of 2006.
16    Q.    What about --
17    A.    All of them.
18    Q.    All of them?
19    A.    I had a heart attack, and I
20  started taking them.
21    Q.    Do any of the medications that
22  you have listed for me have any effect on
23  your memory?

Page 10

1    A.    No.
2    Q.    Do you have any health
3  condition that may affect your ability to
4  testify truthfully today?
5    A.    No.
6    Q.    Have you ever tape recorded a
7  conversation with anyone?
8    A.    No.  Yes.
9    Q.    You have?
10    A.    On a cell phone.
11    Q.    You have recorded
12  conversations you have had a cell phone?
13    A.    Yes.
14    Q.    How many times have you
15  recorded a conversation on your cell
16  phone?
17    A.    Twice.
18    Q.    I want to talk about the first
19  instance when you recorded a conversation
20  on your cell phone.  Who was on the other
21  end?
22    A.    Brenda Sellers.
23    Q.    Do you recall the date of that

Page 11

1  conversation?
2    A.    I don't remember the date.
3    Q.    Did you tell Ms. Sellers that
4  you were recording the call?
5    A.    I did not.
6    Q.    Do you have a tape of that
7  call?
8    A.    No, I don't.
9    Q.    Is it still saved on your cell
10  phone?
11    A.    No.
12    Q.    Why did you record that
13  telephone call with Brenda Sellers?
14    A.    She was communicating to me
15  that Onyx had decided they weren't going
16  to pay me any more of my severance.
17    Q.    Did you delete that recording?
18    A.    Yes.
19    Q.    When did you delete it?
20    A.    A month later.
21    Q.    Why did you delete the
22  recording?
23    A.    I didn't think it was

Page 12

1  relevant.
2    Q.    Did you delete the recording
3  after you had filed your EEOC charge?
4    A.    In that same time frame.
5    Q.    Did you ever have that
6  recording transcribed?
7    A.    No.
8    Q.    Did you make any notes during
9  that telephone call?
10    A.    No.
11    Q.    Was anyone else on the line
12  besides you and Brenda Sellers?
13    A.    No.
14    Q.    Did you forward that recording
15  to anyone?
16    A.    No, I did not.
17    Q.    Tell me about the second
18  occasion when you recorded a conversation
19  on your cell phone.
20    A.    Once again it was with Brenda
21  Sellers, and it was related to a
22  communication from Onyx that she was
23  passing on.  I don't remember if it was a

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 13 to 16)

Page 13

1  follow-up to the first conversation.
2  There was two different occasions where
3  she was -- had called me and was telling
4  me something, and I put the phone on
5  record. And the only person that ever
6  heard it was me.
7      Q.   On the second occasion when
8  you recorded your telephone call with
9  Brenda Sellers did you tell her that you
10 were recording the call?
11     A.   No, I did not.
12     Q.   Why not?
13     A.   I didn't think it was
14 relevant. If I told her I was recording,
15 I didn't think she'd say something -- she
16 might watch what she was saying if she
17 knew she was being recorded.
18     Q.   Do you still have that
19 recording?
20     A.   No, I do not.
21     Q.   Did you delete it from your
22 cell phone?
23     A.   Yes, I did.

Page 14

1      Q.   When did you delete it?
2      A.   At the same time I deleted the
3  other one.
4      Q.   And for the same reason?
5      A.   Same reason. I just -- you
6  know, nothing -- she communicated that
7  they weren't going to pay me. They
8  didn't pay me, so I, you know --
9      Q.   Have you ever been arrested?
10     A.   Yes.
11     Q.   How many times?
12     A.   Once.
13     Q.   When was it?
14     A.   1984.
15     Q.   Why were you arrested?
16     A.   I was drunk and disorderly.
17     Q.   Where were you?
18     A.   Minot, North Dakota.
19     Q.   Was there a trial?
20     A.   No.
21     Q.   Did you enter a plea
22 agreement?
23     A.   No.

Page 15

1      Q.   What happened to the case?
2      A.   I got court marshalled, letter
3  of discipline.
4      Q.   Is this when you were in the
5  military?
6      A.   Yes.
7      Q.   How long were you in the
8  military?
9      A.   Five and a half years.
10     Q.   From when to when?
11     A.   July of '81 to December of
12 '85.
13     Q.   What branch of the military?
14     A.   Air Force.
15     Q.   Did you fly planes?
16     A.   No.
17     Q.   What did you do?
18     A.   I was a security guard,
19 military police.
20     Q.   Were you discharged from the
21 Air Force?
22     A.   Yes, I was.
23     Q.   Honorable discharge?

Page 16

1      A.   Honorable discharge.
2      Q.   And you were stationed at one
3  point in Minot, North Dakota?
4      A.   Yes, ma'am.
5      Q.   Where else were you stationed?
6      A.   Anderson Air Force Base in
7  Guam.
8      Q.   Anywhere else?
9      A.   That was it.
10     Q.   What is your date of birth?
11     A.   June 18th.
12     Q.   What year?
13     A.   Every year.
14     Q.   What is the year of your
15 birth?
16     A.   '63.
17     Q.   What is your Social Security
18 number?
19     A.   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.
20     Q.   Mr. Mayer, did you talk with
21 Shannon McGlon yesterday or this morning?
22     A.   No, I did not.
23     Q.   Did you talk with Bob Winter

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 17 to 20)

Page 17

1  about his deposition?
2      A.   I talked to Bob Winter
3  about -- yes, I did.
4      Q.   When did you speak with Bob
5  Winter?
6      A.   This morning.
7      Q.   Tell me about that
8  conversation.
9      A.   Basically just asked -- he
10 called and, you know, told me it was my
11 day to go and nothing to worry about, and
12 he said -- kind of walked me through the
13 process.
14     Q.   Tell me what he said.
15     A.   He said that you would be
16 asking me questions. He said they'll
17 just go on and on and on and on. He
18 said, you know -- he said it's relaxed.
19 There's no pressure. He said, I was
20 there -- I think he said nine hours, but
21 it didn't seem like he was there that
22 long. It went pretty smooth. Nothing to
23 worry about. Go tell the truth.

Page 18

1      Q.   Did Mr. Winter tell you what
2  kind of questions he was asked?
3      A.   No, he didn't
4      Q.   Is there anything else that
5  you can recall about your conversation
6  with Bob Winter this morning?
7      A.   No.
8      Q.   Did he call you or did you
9  call him?
10     A.   He called me.
11     Q.   Did you speak with Jerry
12 MacCartney this morning?
13     A.   No.
14     Q.   Have you spoken with Jerry
15 MacCartney at all about your deposition?
16     A.   No, I haven't.
17     Q.   Or about his deposition that
18 is coming up?
19     A.   No, I have not.
20     Q.   You mentioned that you have
21 given two other depositions before today?
22     A.   Yes.
23     Q.   Tell me about the first

Page 19

1  deposition. When was it?
2      A.   I don't remember the year. It
3  was a lawsuit regarding some equipment
4  when I was at Whitfield Foods. And I
5  don't remember if I actually went to
6  depositions or I just met with our
7  lawyers and they asked me questions. I
8  don't know which it was. It eventually
9  went to trial, but I wasn't involved.
10     Q.   You didn't testify at trial?
11     A.   No, I did not.
12     Q.   You don't recall a court
13 reporter like Heather being there and
14 taking down what you were saying?
15     A.   Not that time.
16     Q.   What about the next occasion?
17     A.   The next time was Whitfield
18 Foods was suing an equipment
19 manufacturer. And I was working for
20 Piknik at the time, so it would have
21 been -- I think I started there in
22 2000 -- 2001 or 2002. And that was a
23 deposition because there was a court

Page 20

1  reporter.
2      Q.   And you were testifying as a
3  fact witness?
4      A.   Yeah, I believe so.
5      Q.   And I know you had already
6  left Whitfield Foods by that time?
7      A.   Yes. I was working at Piknik
8  at the time.
9      Q.   Did that case go to trial?
10     A.   Yes, it did.
11     Q.   Did you testify in court?
12     A.   No, I didn't. I didn't
13 testify in court, no. I don't know if it
14 went to trial or it was settled, but I
15 know that Whitfield Foods had prevailed
16 in the suit.
17     Q.   Have you given sworn testimony
18 in any other occasion besides what you've
19 told me?
20     A.   Not that I recall.
21     Q.   Have you ever been sued
22 before?
23     A.   No.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 21 to 24)

Page 21

1   Q.   Besides this lawsuit have you
2   ever sued anyone or any entity before?
3       A.   No.
4       Q.   You go by Bert; correct?
5       A.   Yes.
6       Q.   Have you gone by any other
7   names?
8       A.   No.
9       Q.   Are you married?
10      A.   I am.
11      Q.   What is your wife's name?
12      A.   Debbie.
13      Q.   D-E-B-B-I-E?
14      A.   Yes.
15      Q.   How long have you and Debbie
16  been married?
17      A.   Nineteen years.
18      Q.   Do you have any children with
19  Debbie?
20      A.   Yes and no.  We didn't have
21  children together.  She had two, and I
22  had two.
23      Q.   So Debbie has two children?

Page 22

1       A.   Yes.
2       Q.   Do they live with you?
3       A.   They do.  One of them does.
4       Q.   What are their names?
5       A.   William and Marie.
6       Q.   Does William live with you?
7       A.   William lives with me, yes.
8       Q.   How old is William?
9       A.   Seventeen.
10      Q.   Marie does not live with you?
11      A.   She's at the University of
12  Alabama.
13      Q.   How old is she?
14      A.   She is twenty-one.
15      Q.   Have you been married before?
16      A.   I have.
17      Q.   Who were you married to
18  before?
19      A.   Lisa Boykin was her maiden
20  name.
21      Q.   Any relation to Bill Boykin?
22      A.   No.  I wouldn't wish that on
23  him.

Page 23

1       Q.   How long were you and Lisa
2   married?
3       A.   Four years.
4       Q.   When did you get divorced?
5       A.   '84.  Maybe it was '85.
6       Q.   Is she the mother of your two
7   children?
8       A.   Yes.
9       Q.   And what are the names of your
10  two children?
11      A.   Michael and Danielle.
12      Q.   Michael and?
13      A.   Danielle.
14      Q.   How old is Michael?
15      A.   Michael is twenty-five.  He'll
16  be twenty-six here at the end of the
17  month.
18      Q.   Where does Michael live?
19      A.   In San Antonio, Texas.
20      Q.   How old is Danielle?
21      A.   Danielle is twenty-four.  I'm
22  sorry.  Twenty-three.  She's in San
23  Antonio.

Page 24

1       Q.   Does Lisa live in San Antonio
2   as well?
3       A.   I assume so.  I believe she
4   does.
5       Q.   Have you been married any
6   other time?
7       A.   No.
8       Q.   Do you have any other
9   children?
10      A.   No.
11      Q.   Where do you live?
12      A.   In Montgomery.
13      Q.   What is your address?
14      A.   2313 Sage Wood Drive.
15      Q.   And that's in Montgomery?
16      A.   Yes.
17      Q.   How long have you lived at
18  2313 Sage Wood Drive?
19      A.   Four years, five years.
20      Q.   So throughout your employment
21  at Piknik did you live at 2313 Sage Wood
22  Drive?
23      A.   No.  I moved there probably a

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 25 to 28)

Page 25

1  year and a half prior to my leaving
2  Piknik.
3      Q.    And who lived with you at 2313
4  Sage Wood Drive?
5      A.    My wife Debbie and my two
6  children, William and Marie.
7      Q.    Before you lived at 2313 Sage
8  Wood Drive where did you live?
9      A.    3128 Milan Drive.
10     Q.    Milan as in the city?
11     A.    As in the city.
12     Q.    Is that in Montgomery?
13     A.    Montgomery.
14     Q.    How long did you live at 3128
15 Milan Drive?
16     A.    Ten, twelve years.
17     Q.    And who lived with you at that
18 address?
19     A.    My wife and two children.
20     Q.    Debbie, William and Marie?
21     A.    Yes.
22     Q.    Has anyone else ever lived
23 with you at 3128 Milan Drive?

Page 26

1      A.    My oldest son.
2      Q.    Michael?
3      A.    Michael.
4      Q.    When did he live with you?
5      A.    I was working at Piknik, so it
6  was 2001, 2002.
7      Q.    So Michael lived with you at
8  3128 Milan Drive at some point when you
9  were working at Piknik?
10     A.    Yes.
11     Q.    Besides the folks that you've
12 told me about already, did anyone else
13 live with you at any time at 2313 Sage
14 Wood Drive?
15     A.    No.
16     Q.    Where did you go to high
17 school?
18     A.    I went to two different high
19 schools. I went to Hahn High School in
20 Germany.
21     Q.    Hahn, H-A-H-N?
22     A.    Yes. And I went to Jefferson
23 Davis High School in Montgomery, Alabama.

Page 27

1      Q.    Did you graduate from
2  Jefferson Davis?
3      A.    Yes.
4      Q.    What year?
5      A.    '81.
6      Q.    After you graduated from high
7  school did you go immediately to college?
8      A.    Went in the military.
9      Q.    And you finished your
10 commitment with the military in December
11 of 1985?
12     A.    Yes.
13     Q.    After you finished your
14 commitment with the military did you go
15 on to college?
16     A.    No.
17     Q.    What did you do?
18     A.    I went to Ft. Walton Beach,
19 Florida, lived with a friend of mine,
20 found a job and lived there for about a
21 year.
22     Q.    What did you do in Ft. Walton
23 Beach?

Page 28

1      A.    Irrigation, sprinkler systems.
2      Q.    Was it your own company?
3      A.    No. I worked for a company.
4      Q.    What's the name of the
5  company?
6      A.    AMS Irrigation & Pump Supply.
7      Q.    What did you do for AMS
8  Irrigation & Pump Supply?
9      A.    Retail and commercial sales,
10 design, a little bit of installation.
11     Q.    So you worked for AMS
12 Irrigation & Pump Supply from 1985 to
13 1986 or so?
14     A.    Yeah.
15     Q.    Was that job more of a manual
16 labor job?
17     A.    No, I wouldn't say manual. I
18 mean, I worked behind a counter.
19     Q.    Were you calling on customers?
20     A.    They came. We had a retail
21 counter and a contractor counter, and so
22 they'd come and place their orders, and
23 we pull the stuff.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 29 to 32)

Page 29

1      Q.    Were you like a clerk?
2      A.    Basically, yes.
3      Q.    You said you had some design
4    responsibilities.  What were you --
5      A.    We designed sprinkler systems
6    for either a retailer or commercial.
7      Q.    And that you had installation
8    responsibilities?
9      A.    We did do a few installations.
10     Q.    You would go out and install
11   the sprinkler system?
12     A.    Install the system in
13   somebody's yard, yes.  And that was
14   manual labor.
15     Q.    What did you do after AMS
16   Irrigation & Pump Supply?
17     A.    Went to work for Whitfield
18   Foods.
19     Q.    Why did you leave AMS
20   Irrigation & Pump Supply?
21     A.    Needed help raising my two
22   children, so I moved home to be close to
23   my mother.

Page 30

1      Q.    Is Whitfield Foods here in --
2      A.    Montgomery, yes.
3      Q.    So did you start at Whitfield
4    Foods around 1986?
5      A.    '87, somewhere.
6      Q.    How long did you work for
7    Whitfield Foods?
8      A.    Fourteen or fifteen years.
9      Q.    So until 2001 or 2002?
10     A.    I think I went to Piknik in
11   2000.
12     Q.    So 1987 to 2000 you worked at
13   Whitfield --
14     A.    Whitfield Foods, yes.  Is that
15   twelve years?
16     Q.    When you got to Whitfield
17   Foods what was your job?
18     A.    I was a quality technician.
19     Q.    How long were you a quality
20   technician?
21     A.    About a year.
22     Q.    What did you do as a quality
23   technician?

Page 31

1      A.    I ensured that the products
2    that Whitfield Foods produced met the
3    quality specifications that were given to
4    us by our customers.
5      Q.    What does Whitfield Foods do?
6      A.    Co-manufacture food and
7    beverages.  Same thing Piknik does, did.
8      Q.    So Whitfield Foods
9    manufactured and packaged condiments and
10   beverages?
11     A.    Fruit juices and syrups.
12     Q.    So you were a quality
13   technician for approximately one year
14   with Whitfield Foods?
15     A.    Yes.
16     Q.    Did that require scientific or
17   technical background?
18     A.    Yes.  A lot of testing, a lot
19   of chemistry.
20     Q.    Had you received any training
21   from Whitfield Foods?
22     A.    Yes.
23     Q.    You received scientific and

Page 32

1    technical training from Whitfield Foods
2    so you could do your quality technician
3    job?
4      A.    Yes.
5      Q.    Did Whitfield Foods send you
6    somewhere else to get the training or was
7    it all in-house?
8      A.    In-house.
9      Q.    What did you do next after you
10   were a quality technician?
11     A.    I was a quality control
12   supervisor.
13     Q.    Is that a promotion?
14     A.    Yes.
15     Q.    How long were you quality
16   control supervisor?
17     A.    Two years.
18     Q.    What did you do as quality
19   control supervisor?
20     A.    I managed the quality control
21   technicians.
22     Q.    How many quality control
23   technicians did you have below you?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 33 to 36)

Page 33

1    A.   Three I think.
2    Q.   Did you ever have to
3    discipline any of your quality control
4    technicians?
5    A.   Yes.
6    Q.   What kind of discipline did
7    you have to do?
8    A.   Verbal, written, suspension,
9    termination.
10    Q.   Performance issues?
11    A.   Performance issues.
12    Q.   Attendance issues?
13    A.   Attendance.
14    Q.   How many employees did you
15    have to terminate?
16    A.   I don't really remember.
17    Q.   Can you recall the racial
18    makeup of your quality control
19    technicians?
20    A.   It changed, I mean, fairly
21    often.  People were promoted and moved
22    back and forth between jobs.  I know at
23    one time I had a guy named Amaja.  I

Page 34

1    believe he was Middle Eastern.  Had
2    blacks.  I think there was a white.
3    Q.   Did you ever have to
4    discipline any of your African-American
5    employees?
6    A.   I don't specifically remember,
7    but I'm sure that --
8    Q.   You recall generally having to
9    issue discipline when you were a quality
10    control supervisor?
11    A.   Yes.
12    Q.   You just can't recall the
13    specific instances?
14    A.   No.
15    Q.   Is that correct?
16    A.   That's correct.
17    MR. NELMS:  I'm going to
18    instruct you not to guess.  Just tell her
19    what you know and what you can remember.
20    A.   Okay.
21    Q.   Who did you report to when you
22    were quality control supervisor?
23    A.   The quality control manager.

Page 35

1    Q.   Do you recall what you were
2    making when you were quality control
3    supervisor?
4    A.   I do not.
5    Q.   Were you salaried?
6    A.   I was salaried.
7    Q.   After you were quality control
8    supervisor for roughly two years what was
9    your next job?
10    A.   Production supervisor.
11    Q.   How long were you production
12    supervisor?
13    A.   Approximately two years.
14    Q.   Did Whitfield Foods only have
15    one plant?
16    A.   One plant.
17    Q.   What were your job duties as
18    production supervisor?
19    A.   I managed the production line
20    and the blending area where the products
21    were made.
22    Q.   Were there other production
23    supervisors over different areas?

Page 36

1    A.   Yes.
2    Q.   How many employees did you --
3    well, I take it you had employees who
4    worked for you?
5    A.   Yes.
6    Q.   Do you recall how many
7    employees you had working for you?
8    A.   I believe there was fifteen on
9    the production line, and there was three
10    in the blending area, so eighteen.
11    Q.   When you were production
12    supervisor did you ever have to
13    discipline any of your employees?
14    A.   Yes.
15    Q.   Do you recall any specific
16    instances?
17    A.   I do not.
18    Q.   Did you ever have to lay off
19    any employees?
20    A.   I don't recall.  Not at that
21    time I don't remember.  I have in my past
22    had to lay people off, but never -- I
23    mean, I don't know which job I had.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 37 to 40)

Page 37

1    Q.    You've had to lay off
2    employees, though, at some point during
3    your tenure at Whitfield Foods?
4    A.    Yes.
5    Q.    What was the cause of the
6    layoffs?
7    A.    I think business was slow and
8    there just wasn't enough volume to need
9    all the people we had.
10    Q.    And that was just a function
11    of the business?
12    A.    Yes.
13    Q.    Business decision was made to
14    lay off some employees?
15    A.    Yes.
16    Q.    Did you make the call on which
17    employees to lay off?
18    A.    No.  Whitfield Foods was a
19    union plant, so the guidelines were all
20    laid out.
21    Q.    Who did you report to when you
22    were production supervisor?
23    A.    The plant manager.

Page 38

1    Q.    Who was that?
2    A.    I don't recall.
3    Q.    Do you recall what you were
4    making as production supervisor?
5    A.    Tom Kinman.
6    Q.    I'm sorry?
7    A.    Tom Kinman.
8    Q.    Was your plant manager?
9    A.    Yes.
10    Q.    Do you recall what you were
11    making as a production supervisor?
12    A.    I do not.
13    Q.    You were a salaried employee?
14    A.    I was a salaried employee.
15    Q.    When you were a quality
16    technician were you a member of the
17    union?
18    A.    No.
19    Q.    Have you ever been a member of
20    the union at Whitfield Foods?
21    A.    No.
22    Q.    After your two years as
23    production supervisor at Whitfield Foods

Page 39

1    what was your next position?
2    A.    Materials manager.
3    Q.    How long were you materials
4    manager?
5    A.    Roughly two years.
6    Q.    What were your job
7    responsibilities as materials manager?
8    A.    I managed all the materials
9    coming into the plant, issued them to the
10    production lines as they needed them.
11    Q.    When you're talking about
12    materials that are coming into the plant,
13    is that the raw materials that are used
14    to make the food product?
15    A.    Correct.
16    Q.    Did you have employees who
17    worked for you?
18    A.    Yes.
19    Q.    How many?
20    A.    I had three material planners
21    and several materials -- I don't know
22    what you call them.  Forklift drivers.
23    Q.    Did you ever have to

Page 40

1    discipline any of your employees when you
2    were materials manager?
3    A.    I believe I did.
4    Q.    Ever have to terminate one of
5    your employees when you were materials
6    manager?
7    A.    Yes.
8    Q.    How many times?
9    A.    I don't recall.
10    Q.    Do you recall any of the
11    specifics of the discipline or the
12    termination that you administered when
13    you were materials manager?
14    A.    No.
15    Q.    Were those employees unionized
16    as well?
17    A.    Some were.
18    Q.    Some were?
19    A.    Yeah.
20    Q.    Did you still report to the
21    plant manager?
22    A.    I did.
23    Q.    Is that still Tom Kinman?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 41 to 44)

Page 41

1   A.   No. It was Robert Adare.
2   Q.   Did Robert Adare later go on
3   to work at Piknik?
4   A.   He did.
5   Q.   Do you recall what you were
6   making as materials manager salarywise?
7   A.   I do not. I'm sure my wife
8   could tell you.
9   Q.   What was your next job after
10  materials manager?
11  A.   Production manager.
12  Q.   How long were you production
13  manager?
14  A.   The duration of my stay at
15  Whitfield Foods.
16  Q.   Again, was this production
17  just at one plant?
18  A.   Yes.
19  Q.   What were your job duties as
20  production manager?
21  A.   I managed the production
22  supervisors and the sanitation
23  supervisor.

Page 42

1   Q.   How many employees did you
2   have reporting to you?
3   A.   Would have been seven.
4   Q.   Did you ever have to
5   discipline any of those seven employees?
6   A.   Yes.
7   Q.   Do you recall the specifics of
8   any of those instances?
9   A.   I do not.
10  Q.   Did you ever have to terminate
11  any of those employees?
12  A.   No, I did not.
13  Q.   Were you still reporting to
14  the plant manager?
15  A.   I was.
16  Q.   Was that still --
17  A.   Robert.
18  Q.   Robert Adare?
19  A.   Yes.
20  Q.   Was it Robert Adare until you
21  left Whitfield Foods?
22  A.   Robert left a little bit
23  before I did, and it was a small

Page 43

1   two-month period where I reported to
2   another plant manager.
3   Q.   Do you recall what you were
4   making as production manager?
5   A.   I don't.
6   Q.   You don't recall what your
7   salary was when you left Whitfield Foods?
8   A.   It was forty-five.
9   Q.   Forty-five thousand?
10  A.   Yes.
11  Q.   Why did you leave Whitfield
12  Foods?
13  A.   I was offered an opportunity
14  at Piknik Products.
15  Q.   Did you seek out Piknik or
16  were you recruited?
17  A.   I was recruited.
18  Q.   Who recruited you?
19  A.   Chuck Carraway.
20  Q.   Is Chuck Carraway now with
21  Southern Classic Foods?
22  A.   He was.
23  Q.   Was Chuck Carraway an employee

Page 44

1   of Piknik?
2   A.   He was an employee of Piknik.
3   Q.   What was he at the time?
4   A.   President.
5   .Q.  Besides the scientific and
6   technical training you received at
7   Whitfield Foods, did you receive any
8   other kind of training during your
9   employment at Whitfield Foods?
10  A.   Yeah, a lot of training.
11  Q.   Like course work?
12  A.   Well, I got my education while
13  I was working there.
14  Q.   So you were working at
15  Whitfield Foods and going to school at
16  the same time?
17  A.   Yes, I was.
18  Q.   Were you going to night
19  school?
20  A.   Night school.
21  Q.   Where did you go to night
22  school?
23  A.   Auburn University in

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 45 to 48)

Page 45

1    Montgomery.
2        Q.    Did you graduate?
3        A.    I did.
4        Q.    What year did you graduate?
5        A.    I believe it was '94.
6        Q.    What was your degree in?
7        A.    Accounting.
8        Q.    Besides your degree in
9    accounting from Auburn University at
10   Montgomery did you go on to -- strike
11   that. After you finished at Auburn
12   University at Montgomery did you pursue
13   any further education?
14       A.    I studied for the CPA exam.
15       Q.    Is there a class that you take
16   to study for the CPA exam?
17       A.    I took a class, yes.
18       Q.    And did you sit for the CPA
19   exam?
20       A.    I did.
21       Q.    I take it you passed?
22       A.    I did.
23       Q.    Any other education?

Page 46

1        A.    No.
2        Q.    So you left Whitfield Foods
3    because you were offered an opportunity
4    at Piknik?
5        A.    Yes.
6        Q.    And you say you were recruited
7    by Chuck Carraway?
8        A.    Correct.
9        Q.    Had you previously worked with
10   Chuck?
11       A.    No.
12       Q.    Did you know Chuck?
13       A.    I did not.
14       Q.    So tell me how it worked.  How
15   did you come about to work at Piknik?
16       A.    Chuck Carraway wanted somebody
17   who -- he knew that I knew the production
18   floor, how the beverage industry operated
19   and worked. And he wanted a cost
20   accountant, somebody that could come in
21   and study the floor and show them where
22   he was losing his money, where he could
23   save money, how he could improve his

Page 47

1    processes.
2            He knew my extensive
3    background in manufacturing and in the
4    beverage industry at Whitfield.  Had
5    found out that I had my accounting
6    degree, so I understood that side of it,
7    and he came and asked me to go to work
8    for him.
9        Q.    Do you know how he found out
10   about you?
11       A.    I'm sure it was through Robert
12   Adare.
13       Q.    You believe Robert Adare told
14   Chuck Carraway about you?
15       A.    Yes, I do.
16       Q.    So did Mr. Carraway call you?
17       A.    Yes.
18       Q.    Did he do a phone interview
19   with you at that time?
20       A.    No. He called me and asked me
21   to meet him, and so we met and talked.
22       Q.    And your understanding was it
23   was for a cost accountant position?

Page 48

1        A.    Correct.
2        Q.    Did you meet with anyone else
3    before you started working at Piknik?
4        A.    I did not.
5        Q.    When you met and spoke with
6    Chuck Carraway did he make you a job
7    offer at that time?
8        A.    He did.
9        Q.    Did you accept it on the spot?
10       A.    I did.
11       Q.    Did you put in two weeks'
12   notice at Whitfield?
13       A.    I did.
14       Q.    And you accepted a job offer
15   at Piknik to be a cost accountant?
16       A.    Yes.
17       Q.    And that was around 2000?
18       A.    Yes.
19       Q.    Do you know if this was a
20   newly created position or if you were
21   replacing someone?
22       A.    No. It was a new position.
23       Q.    So at this time Robert Adare

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 49 to 52)

Page 49

1    was already at Piknik?
2        A.    Yes.
3        Q.    What was your salary when you
4    started?
5        A.    Forty-six, forty-seven.
6        Q.    Thousand?
7        A.    Yeah. Yes. I don't recall
8    exactly.
9        Q.    Who was your boss when you
10   were the cost accountant?
11       A.    Chuck Carraway.
12       Q.    So you reported directly to
13   the president?
14       A.    I did.
15       Q.    How long were you the cost
16   accountant?
17       A.    Six months.
18       Q.    Was there any other cost
19   accountant or were you the only one?
20       A.    I was the only one.
21       Q.    So tell me again what were
22   your job responsibilities or job duties
23   as the cost accountant?

Page 50

1        A.    I was to identify ways to save
2    money on the production floor, identify
3    what it costs to do certain processes and
4    propose ways to cut those costs, or
5    improve the process.
6        Q.    When you were the cost
7    accountant for that six-month time frame
8    were you always reporting directly to
9    Chuck Carraway?
10       A.    Yes. Well, Chuck left, and
11   there was a short period where I reported
12   to Steve Alexander, who was hired in as
13   the new CFO. And he promoted me, so it
14   was --
15       Q.    So around the same time that
16   Chuck Carraway left and Steve
17   Alexander -- wait. Does Steve
18   Alexander -- he didn't replace Chuck
19   Carraway, did he?
20       A.    Chuck Carraway left, and three
21   people were brought in.
22       Q.    Steve Alexander being one of
23   them?

Page 51

1        A.    Steve being one, Bob Winter
2    being one and Mike O'Connell being the
3    third.
4        Q.    And Steve Alexander was
5    brought in as the chief financial
6    officer?
7        A.    He was.
8        Q.    What was Mike O'Connell
9    brought in as?
10       A.    I believe his title was COO,
11   chief operating officer. Maybe it was
12   CEO.
13       Q.    So were Chuck Carraway's
14   duties kind of divided amongst those
15   three individuals?
16       A.    Yes.
17       Q.    So there was a short while
18   that you were reporting to Steve
19   Alexander when you were the cost
20   accountant?
21       A.    Yes. Then I was promoted to
22   financial manager just shortly after the
23   three of them came in.

Page 52

1        Q.    And Steve Alexander promoted
2    you?
3        A.    Steve, Bob and Mike O'Connell.
4        Q.    Was the financial manager
5    position a newly created position or were
6    you replacing someone?
7        A.    It was a newly created
8    position.
9        Q.    Was there any other financial
10   manager, or were you the only one?
11       A.    I was the only one.
12       Q.    How long were you financial
13   manager?
14       A.    Three years, including that
15   six months at cost, so two and a half.
16       Q.    So until sometime in 2003,
17   does that sound about right?
18       A.    Yeah.
19       Q.    And what were your job duties
20   as financial manager?
21       A.    Basically the same as they
22   were with the cost accountant. I still
23   identified costs, tracked costs, but on

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 53 to 56)

Page 53

1  top of that I, you know, did some
2  financial analysis.
3      Q.   So you maintained your cost
4  accountant duties, but some financial
5  analysis duties were added?
6      A.   Correct.
7      Q.   Did you receive a raise?
8      A.   I did.
9      Q.   What did your salary increase
10  to?
11      A.   I don't recall.
12      Q.   Does fifty-three thousand
13  dollars sound about right?
14      A.   Sounds about right.
15          MR. NELMS:  Good time to take
16  a break?
17          MS. MCGAHEY:  Just one minute.
18  Let me get through the positions.
19      Q.   I think you said fifty-three
20  thousand sounded about right?
21      A.   Yes.
22      Q.   Did you have people who
23  reported to you when you were financial

Page 54

1  manager?
2      A.   In that whole process
3  eventually, yes.  Financial is over AP,
4  accountants payable and receivable, and
5  they reported to me.
6      Q.   So during your tenure as
7  financial manager, there came a time when
8  you took over accounts payable and
9  accounts receivable?
10      A.   Yes.
11      Q.   And that's when you started
12  having employees reporting to you?
13      A.   Yes.
14      Q.   Do you recall how many
15  employees were --
16      A.   Two. Three. Four.
17      Q.   Did you make the hiring
18  decisions for --
19      A.   I did.
20      Q.   Did you ever have to terminate
21  anyone when you were financial manager?
22      A.   No.
23      Q.   Did you ever have to

Page 55

1  discipline any of your employees when you
2  were financial manager?
3      A.   I don't believe so.
4      Q.   Who did you report to?
5      A.   To the CFO, which was Bob.
6      Q.   Lampert?
7      A.   Lampert, yes, ma'am.
8      Q.   Initially were you reporting
9  to Steve Alexander?
10      A.   I was.
11      Q.   And at some point Steve
12  Alexander left?
13      A.   Yes.
14      Q.   And Bob Lampert replaced Steve
15  Alexander as CFO?
16      A.   Correct.
17      Q.   And then did you report to Bob
18  Lampert the rest of the time you were
19  financial manager?
20      A.   Yes.
21          MS. MCGAHEY:  Want to take a
22  break, Andy?
23          (Whereupon, a break was taken

Page 56

1  from 10:04 to 10:15 a.m.).
2      Q.   (BY MS. MCGAHEY:)  Mr. Mayer
3  you were earlier telling me about the two
4  phone calls you taped with Brenda
5  Sellers.
6      A.   Yes.
7      Q.   Do you know when those calls
8  occurred?
9      A.   Shortly after I was let go.
10      Q.   What do you mean by shortly
11  after?
12      A.   Within a week, two weeks.
13  Maybe a month.
14      Q.   Besides the EEOC charge you
15  filed in this lawsuit, or, excuse me,
16  filed regarding your claims here, have
17  you ever filed any other EEOC charge?
18      A.   No.
19      Q.   Have you ever filed for
20  bankruptcy?
21      A.   No.
22      Q.   You were telling me before the
23  break about your job as financial manager

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 57 to 60)

Page 57

1    at Piknik?
2        A.    Yes.
3        Q.    And you were there until about
4    2003, correct, as financial manager?
5        A.    Yes, roughly three years.
6        Q.    What was your next job?
7        A.    Director of Operations.
8        Q.    How did it come about that you
9    became Director of Operations?
10       A.    Mike O'Connell came to me
11   and -- I worked with a consulting firm
12   for six months while I was in the
13   financial manager role. And at the end
14   of that the Director of Operations left,
15   and Mike O'Connell asked me to step in
16   and take on that role.
17       Q.    Who was the Director of
18   Operations that left?
19       A.    I'm terrible with names. My
20   mind is blank. Rodman.
21       Q.    Bill Rodman?
22       A.    Bill Rodman.
23       Q.    What do you mean by you were

Page 58

1    working with a consulting firm for six
2    months? Was this another job you had?
3        A.    It was an additional duty. A
4    consulting firm came in to help us
5    streamline our processes. They wanted an
6    onsite coordinator, liaison, between them
7    and the other managers. And so I
8    actually took on a role as a consultant
9    doing the same thing they were doing so
10   that after they left we could sustain the
11   processes.
12       Q.    Okay. Can you restate that
13   again? A consulting firm came in to
14   streamline the processes at Piknik?
15       A.    Yes, improve efficiency, cut
16   costs.
17       Q.    Do you recall the name of the
18   consulting firm?
19       A.    I do. Carpedia International.
20       Q.    So the consulting firm, which
21   was Carpedia International, was analyzing
22   Piknik's processes for that six-month
23   time frame?

Page 59

1        A.    Yes.
2        Q.    And you were working with
3    Carpedia in their project?
4        A.    Yes.
5        Q.    And what was your role with
6    respect to Carpedia's work?
7        A.    I actually performed work with
8    them doing the same processes they did,
9    them teaching me their systems so that
10   after they left we could continue with
11   the improvements.
12       Q.    When Carpedia was there had
13   you already been named Director of
14   Operations?
15       A.    No.
16       Q.    You were still the financial
17   manager?
18       A.    Correct.
19       Q.    Were you still performing your
20   financial manager duties?
21       A.    Yes.
22       Q.    You just had the added
23   responsibility of working with this

Page 60

1    consulting firm?
2        A.    Yes. Now, my duties as
3    financial manager were limited. They
4    took a lot of what I was doing, and it
5    was absorbed by other people. You know,
6    some of the things I was still doing,
7    because the consulting firm, it took a
8    long time.
9        Q.    So some of your financial
10   manager duties were reassigned to other
11   employees?
12       A.    Correct.
13       Q.    Did Carpedia International
14   present some kind of final report about
15   the processes in place at Piknik?
16       A.    They did.
17       Q.    Did it provide some
18   recommendations?
19       A.    It did. A lot of the
20   recommendations were implemented during
21   the process. It was a six-month process.
22   They weren't -- they weren't studying
23   everything and then come in and say, this

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 61 to 64)

Page 61

1  is it. I mean, it started right from the
2  beginning. They were implementing, and
3  we tracked on a weekly basis our savings
4  and our improvements.
5      Q.   So is it after Carpedia
6  finishes its six-month project that you
7  became the Director of Operations?
8      A.   Yes. I don't know if they
9  were completely finished. It was at the
10 tail-end of the project, though.
11     Q.   Do you know why Bill Rodman
12 left?
13     A.   I think he was asked to leave.
14     Q.   Do you know if it had anything
15 to do with the Carpedia work?
16     A.   I would suspect that it
17 probably did.
18     Q.   Had you previously expressed
19 an interest in going into the operations
20 side?
21     A.   No, I did not.
22     Q.   So Mike O'Connell approaches
23 you and asks you if you're interested in

Page 62

1  becoming Director of Operations?
2      A.   He kind of told me that's what
3  I was going to do. I didn't feel like I
4  had a choice. He said I knew the plant
5  floor, I knew the processes. You know, I
6  had been in the industry for a long time.
7  I knew our customers and relationships
8  with them.
9      Q.   And was this happening after
10 Onyx took control?
11     A.   No, this was prior to Onyx.
12     Q.   When you were financial
13 manager reporting to Bob Lampert were you
14 ever disciplined?
15     A.   No.
16     Q.   Counseled?
17     A.   No.
18     Q.   Are you saying that nothing
19 was ever brought to your attention about
20 your performance --
21     A.   No.
22     Q.   -- as financial manager?
23     A.   No.

Page 63

1      Q.   What was your relationship
2  like with Bob Lampert?
3      A.   I felt it was very good. I
4  like him and thought he liked me. It was
5  a mutual respect.
6      Q.   Did you think he was critical
7  of your work?
8      A.   I didn't, no. I had -- other
9  than the incident in the military -- and
10 it was not job related. It was after
11 hours. Other than that one incident in
12 the military I have never been
13 disciplined.
14         MR. NELMS: Are you referring
15 to the disorderly conduct, public
16 intoxication?
17     A.   Yes. That was after. I was
18 off duty.
19     Q.   (BY MS. MCGAHEY:) So Mike
20 O'Connell tells you that you're going to
21 become Director of Operations?
22     A.   Yes.
23     Q.   What did you think about that?

Page 64

1      A.   I wasn't thrilled. I liked
2  the financial side of the business.
3  That's why I got my degree in accounting.
4  But then at the same time I was kind of
5  looking forward to the challenge.
6      Q.   Did you feel that you were
7  qualified for the position of Director of
8  Operations?
9      A.   Yes, I did. I think at that
10 time there wasn't anybody else that knew
11 both the financial side of the business
12 and the production floor, understood it
13 the way I did.
14     Q.   I take it you accepted the
15 Director of Operations position?
16     A.   I did.
17     Q.   Did that come with a pay
18 increase?
19     A.   It did.
20     Q.   Did that make you happy?
21     A.   I'm sorry?
22     Q.   Did that make you happy?
23     A.   It did. It made my wife real

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 65 to 68)

Page 65

1   happy.
2       Q.    What was your salary increased
3   to?
4       A.    Seventy-five with a promise
5   that it would be reevaluated after -- I
6   don't remember what the tame frame was.
7   Six months. I don't remember.
8       Q.    What were your
9   responsibilities as Director of
10  Operations?
11      A.    Manage the operations at both
12  the Day Street and the Alatex plant.
13      Q.    So you were involved in the
14  beverages side of the business only?
15      A.    Correct.
16      Q.    You didn't have any
17  responsibility over the condiment
18  division?
19      A.    I did not, not at that time,
20  no.
21      Q.    How long were you Director of
22  Operations?
23      A.    Until I was let go.

Page 66

1       Q.    Was there a time when you
2   became a plant manager?
3       A.    I don't recall being -- well,
4   these titles got -- everybody had a
5   different title. Just before I was let
6   go Anthony Barber was brought in. I
7   don't know what his title was. I think
8   it was Director of Operations. And then
9   under him they pushed quality and the
10  warehouse, which wasn't part of my
11  responsibilities, and I was told that my
12  focus would be on the Day Street plant.
13      Q.    Okay. So once Anthony Barber
14  comes in there is a reorganization?
15      A.    Basically, yes.
16      Q.    And at that point you're asked
17  to concentrate solely on the Day Street
18  facility?
19      A.    Yes.
20      Q.    Up until that time had your
21  focus been on the Day Street and Alatex
22  facility?
23      A.    And, for a time, the Brundidge

Page 67

1   facility.
2       Q.    When were you Director of
3   Operations for all three facilities?
4       A.    Mike O'Connell left and Bill
5   McLennan was brought in, and he gave me
6   responsibilities in the Brundidge plant.
7       Q.    So whenever Bill McLennan came
8   in is when you took on the Brundidge
9   facility as well?
10      A.    Yes.
11      Q.    When you first become Director
12  of Operations who was your immediate
13  boss?
14      A.    Mike O'Connell.
15      Q.    I think you said earlier he
16  was either COO or CEO?
17      A.    Yeah. May have been both,
18  CEO, COO.
19      Q.    And did you report to Mike
20  O'Connell until he left the company?
21      A.    Yes.
22      Q.    Do you recall that being
23  sometime in January of '04?

Page 68

1       A.    That sounds right.
2       Q.    And then after Mike O'Connell
3   left Piknik who did you report to?
4       A.    Bill McLennan.
5       Q.    Did he replace Mike O'Connell?
6       A.    Yes. Onyx was involved then,
7   so it was kind of --
8       Q.    Okay.
9           MR. NELMS:  Kind of what?
10      A.    I think Onyx took -- actually
11  kind of -- at some point during that deal
12  Mike O'Connell agreed to step aside.
13  Onyx kind of said they were going to run
14  the company, and then it was a short time
15  after that they brought in Bill McLennan.
16  And then he kind of basically took on
17  that role, but Onyx was still kind of
18  floating out there. I don't think they
19  really made any decisions, but --
20      Q.    After Bill McLennan left who
21  did you report to?
22      A.    Chris Day.
23      Q.    And then did you start

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 69 to 72)

Page 69

1 reporting to Anthony Barber after Chris
2 Day?
3 A. Correct.
4 Q. When I asked you earlier what
5 your job duties were as Director of
6 Operations you said that you managed the
7 operations of Day Street and Alatex; is
8 that correct?
9 A. That's correct.
10 Q. And then I understand at some
11 point when Bill McLennan came on board
12 you took on the Brundidge facility as
13 well?
14 A. Correct.
15 Q. Can you describe for me more
16 specifically what managing the operations
17 entails?
18 A. Working with the production
19 managers, or plant manager depending on
20 the plant, and their supervisors, you
21 know, working on track -- you know, the
22 labor efficiencies, production
23 efficiencies, dealing with the customers

Page 70

1 and the customers' wants, testing,
2 whatever they required. Basically just
3 managing the production operation of the
4 three plants.
5 Q. And as the Director of
6 Operations you had people reporting to
7 you?
8 A. I did.
9 Q. Who reported to you? And I
10 understand it may change from time to
11 time. So if we can break it down into
12 periods, if that makes sense to you,
13 whatever is easiest for you or makes more
14 sense.
15 A. Jimmy Whitehead, Eddie Crosby.
16 Do you want their titles?
17 Q. That would be helpful.
18 A. Okay. Jimmy was the engineer.
19 Q. Was he solely in the beverages
20 division?
21 A. No, because he was involved in
22 the Brundidge facility as well.
23 Q. Eddie Crosby?

Page 71

1 A. Eddie Crosby was the
2 production manager at the Day Street
3 plant. I had two production supervisors
4 and a maintenance manager at the Alatex
5 facility.
6 Q. Who were your two production
7 supervisors at the Alatex facility?
8 A. Sam Wheeler. That may not be
9 right. Don't hold me to that. I don't
10 know.
11 Q. Who was your maintenance --
12 A. Maintenance manager was -- I
13 don't remember. Sam Ellis was the plant
14 manager at Brundidge.
15 Q. Sam Ellis?
16 A. Sam Ellis.
17 Q. Any other positions that
18 reported to you as Director of
19 Operations?
20 A. Sanitation manager did, Robert
21 Taylor; and the maintenance manager at
22 the Day Street plant.
23 Q. Any other positions?

Page 72

1 A. I think that's it.
2 Q. So you had an engineer who
3 reported to you the entire tenure that
4 you were Director of Operations?
5 A. Yes.
6 Q. And the production manager of
7 the Day Street facility reported to you
8 during your entire tenure as Director of
9 Operations?
10 A. Yes.
11 Q. The two production supervisors
12 at Alatex reported to you throughout your
13 tenure as Director of Operations?
14 A. Yes.
15 Q. Except when you --
16 A. Except right there when
17 Anthony Barber came in.
18 Q. When you were told to focus
19 solely on the Day Street facility?
20 A. Yes.
21 Q. And same thing for the
22 maintenance manager at the Alatex
23 facility?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 73 to 76)

Page 73

1    A.    Yes.
2    Q.    And the plant manager at
3 Brundidge reported to you only from the
4 time that Bill McLennan came in and until
5 Anthony Barber came in?
6    A.    Yes.
7    Q.    And the sanitation manager was
8 Robert Taylor. What facility was he at?
9    A.    At both Alatex and Day Street.
10    Q.    So did he report to you during
11 your entire tenure as Director of
12 Operations?
13    A.    Yes.
14    Q.    And there was a maintenance --
15    A.    He may have reported to
16 Shannon for a while.
17    Q.    And then there was a
18 maintenance manager at the Day Street
19 facility?
20    A.    Yes.
21    Q.    And that position reported to
22 you during your entire tenure as Director
23 of Operations?

Page 74

1    A.    Yes.
2    Q.    When Anthony Barber comes in
3 how does it change?
4    A.    I don't know.
5        MR. NELMS: Do you understand
6 the question?
7    A.    No.
8    Q.    After Anthony Barber comes in
9 there was some sort of restructuring, as
10 I understand from your previous
11 testimony?
12    A.    Yes.
13    Q.    What was the restructuring?
14    A.    Anthony Barber took on --
15 Shannon reported to him from the quality
16 side. Jerry MacCartney reported to him
17 from the logistics side, warehousing,
18 logistics. I reported to him. And I
19 don't know if Brundidge reported to him
20 or not.
21    Q.    Was Alatex reporting to him?
22    A.    Yes, Alatex.
23    Q.    Before Anthony Barber came on

Page 75

1 quality assurance did not report to you?
2    A.    No, they did not.
3    Q.    And logistics did not report
4 to you?
5    A.    No, they did not. Three of us
6 were a team and reported to the, you
7 know, whoever -- Mike O'Connell or Bill
8 McLennan.
9    Q.    Are there any other positions
10 that you held at Piknik that you have not
11 already told me about?
12    A.    No.
13    Q.    Were you involved in any
14 discussions with SouthTrust
15 representatives about the financial
16 status of Piknik?
17    A.    I was never involved in the
18 conversations with the bank; although, I
19 did talk to Andy Raines. And I was
20 involved in putting together the
21 financial data and information, but I did
22 not negotiate or speak with them myself.
23    Q.    What did you speak with Andy

Page 76

1 Raines about?
2    A.    About some of the
3 requirements that we were -- you know,
4 the covenants that the company was in
5 violation of and some of the reporting
6 that they were going to require.
7    Q.    Was it pre-Onyx or post-Onyx?
8    A.    Both.
9    Q.    Both?
10    A.    Well, no. I'd say pre-Onyx.
11    Q.    Before Onyx came in was Piknik
12 coming across hard times financially?
13    A.    Oh, yeah. Yes.
14    Q.    Were you involved in seeking
15 out investors or venture capitalists or
16 purchasers for Piknik before Onyx came
17 in?
18    A.    No, I wasn't.
19    Q.    Before Onyx came in had you
20 met with any of the members of Onyx?
21    A.    No.
22    Q.    When did Onyx come on board?
23    A.    I really don't recall the

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 77 to 80)

Page 77

1  month.
2      Q.   Do you recall the year?
3      A.   It was about eighteen months
4  before they let me go, maybe two years.
5  The process was kind of -- it wasn't just
6  a, boom, Onyx is there. It was, you
7  know, Onyx took over, and Mike O'Connell
8  was still in his role. And that went on
9  for a while, and then that transitioned.
10 So it kind of transitioned. You know, it
11 wasn't like a fine line, here's --
12     Q.   At some point were you told
13 that Onyx was going to be coming in?
14     A.   Yes.
15     Q.   Who told you?
16     A.   Ricky Loeb.
17     Q.   Was it a one-on-one meeting?
18     A.   No, I think it was a -- no, I
19 take that back. Ricky Loeb told us about
20 the others. It must have been Mike
21 O'Connell. I don't recall.
22     Q.   Do you recall what was said
23 about Onyx coming in?

Page 78

1      A.   I do not.
2      Q.   Was there any explanation
3  given for why Onyx was going to be coming
4  to Piknik?
5      A.   Ricky Loeb said that he just
6  was tired of running the business and he
7  wanted to kind of get some of that
8  responsibility off to somebody else.
9      Q.   At that time when Ricky Loeb
10 was saying he wanted to get out or he was
11 tired of running the business and he
12 wanted to give that responsibility to
13 someone else, was Piknik in kind of a
14 financial dire straits?
15     A.   Piknik was -- there was
16 financial difficulties the entire time I
17 was there. You know, the industry was
18 struggling I would say. But while I was
19 there we made payroll every week. We
20 paid all our bills. Sometimes we had to
21 stretch them out a little bit, but we
22 always paid our bills. And we were
23 surviving.

Page 79

1      Q.   Did you understand that
2  SouthTrust was Piknik's --
3      A.   Oh, yes. Yeah, I understood
4  that relationship real well.
5      Q.   What did you understand the
6  relationship to be between Piknik and
7  SouthTrust?
8      A.   Prior to Onyx it was a good
9  relationship.
10     Q.   Was SouthTrust the holder of
11 Piknik's debt?
12     A.   Yes.
13     Q.   Do you know how much the debt
14 was before Onyx came in?
15     A.   I don't recall. I have those
16 numbers. I don't recall what it was off
17 the top of my head.
18     Q.   So sitting here today you just
19 can't recall?
20     A.   I can't, no.
21     Q.   Were you involved in any
22 discussions with SouthTrust
23 representatives about any decision by

Page 80

1  SouthTrust to no longer finance Piknik?
2      A.   No.
3      Q.   Were you involved in any
4  discussions with SouthTrust
5  representatives regarding personnel
6  cutbacks to be made at Piknik?
7      A.   No.
8      Q.   Are you aware that SouthTrust
9  at some point decided to no longer
10 finance Piknik?
11     A.   Yes.
12     Q.   You are aware of that?
13     A.   I am.
14     Q.   What do you know about that?
15     A.   I know they told us that they
16 wanted to end the relationship and they
17 wanted us to find another financing
18 institution to take on our debt.
19     Q.   Do you know around what time
20 that occurred?
21     A.   It would have been -- I was in
22 the Director of Operations role, but I
23 don't recall.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 81 to 84)

Page 81

1    Q.    Was it after Onyx came on
2 board?
3    A.    I would say it's in that time
4 frame.
5    Q.    It was before you left Piknik,
6 though?
7    A.    Yes.
8    Q.    Do you have any estimation of
9 how soon it was --
10    A.    Onyx was --
11    Q.    How soon before you left
12 Piknik that you found out about
13 SouthTrust wanting to end the
14 relationship with Piknik?
15    A.    I believe it was fairly early
16 on when Onyx took over, because Patrice
17 Daniels was working on trying to find
18 some alternative financing, and questions
19 were being thrown back and forth at that
20 time.
21    Q.    Were the Onyx folks who were
22 working at Piknik always trying to find
23 alternative financing?

Page 82

1    A.    I don't know what they were
2 doing all the time. I know Bill McLennan
3 met with SouthTrust on several occasions,
4 and I know that I helped him put together
5 some information.
6    Q.    You said that you were aware
7 that SouthTrust wanted to end the
8 relationship with Piknik. How did you
9 become aware of that?
10    A.    I was told.
11    Q.    By whom?
12    A.    It would have been either the
13 CFO or Bill McLennan.
14    Q.    Was the CFO still Bob Lampert
15 at the time?
16    A.    Yes, Bob Lampert. It possibly
17 could have been Ricky Loeb.
18    Q.    What, if anything, else do you
19 know about SouthTrust's decision to no
20 longer finance Piknik?
21    A.    I don't know. Once that came
22 out Onyx kind of put a clamp on all the
23 information that was disseminated.

Page 83

1    Q.    Were you ever involved in any
2 discussions with SouthTrust
3 representatives regarding SouthTrust
4 would fund monies to be used in severance
5 packages for Piknik employees?
6    A.    No.
7    Q.    Were you ever involved in any
8 discussions with SouthTrust
9 representatives regarding whether
10 SouthTrust would fund payroll for Piknik
11 employees?
12    A.    No.
13    Q.    Were you ever involved in any
14 discussions with a group named Apollo
15 Management?
16    A.    No. Name sounds familiar.
17    Q.    Did you ever hear about
18 SouthTrust making a decision to not fund
19 any severance packages for Piknik
20 employees?
21    A.    I was told mine was no longer
22 going to be honored, but I was told by
23 Onyx, Onyx was not going to honor my

Page 84

1 severance package. And that was one of
2 the phone calls that I had recorded.
3    Q.    That may have been a month
4 after you left?
5    A.    Roughly.
6    Q.    Do you know if Onyx was still
7 in control?
8    A.    Yes, they were.
9    Q.    How do you know?
10    A.    Because Chris Day was still
11 there on a daily basis.
12    Q.    How do you know?
13    A.    Talking to people that worked
14 there.
15    Q.    Who?
16    A.    Bob Winter, Jerry MacCartney,
17 Shannon McGlon, Ricky Loeb, Eddie Crosby.
18 I talked to -- Eugene Young was the
19 maintenance manager at Alatex. I spoke
20 to him almost daily. He'd call letting
21 me know what was going on and wanted me
22 to help him find work because he was
23 worried that he was going to lose his

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 85 to 88)

Page 85

1  job.
2      Q.    Just so I'm understanding,
3  it's your belief that whenever you were
4  told by Brenda Sellers that your
5  severance was ending that Onyx was still
6  in control of the company?
7      A.    Yes.
8      Q.    Do you know whether the
9  decision to stop paying your severance
10 payments was made by Chris Day?
11     A.    Brenda told me that the
12 company was struggling, and she said,
13 we're really having a tough time, she
14 said, and Onyx has decided that they
15 can't honor your severance package. I
16 don't think she said Chris Day. I think
17 I -- I believe she said Onyx. She may
18 have said Chris Day, but I specifically
19 remember Onyx being the term used.
20     Q.    Do you know if SouthTrust gave
21 specific instructions that severance
22 packages were not to be paid to
23 employees?

Page 86

1      A.    I was not aware of that.
2          MR. NELMS:  Is it about break
3  time?
4          MS. MCGAHEY:  Sure.
5          (Whereupon, a lunch break
6          was taken from 11:55 a.m.
7          to 12:38 p.m.)
8      Q.    (BY MS. MCGAHEY:)  Mr. Mayer,
9  one thing I wanted to straighten out is
10 after you were finance manager is there a
11 time that you were plant manager of just
12 the Day Street facility?
13     A.    No.
14     Q.    You went straight to being
15 Director of Operations?
16     A.    Yes.
17     Q.    In charge of all three --
18     A.    Two.
19     Q.    Or at least the Day Street and
20 Alatex facility?
21     A.    Correct.
22     Q.    And you were Director of
23 Operations over those facilities until

Page 87

1  Bill McLennan arrived?
2      A.    Yes.
3      Q.    And at that point you took on
4  all three facilities, Day Street, Alatex
5  and Brundidge?
6      A.    That is correct.
7      Q.    And you were Director of
8  Operations over those three facilities
9  until Anthony Barber arrived?
10     A.    Yes.
11     Q.    And then you became focused
12 solely on Day Street?
13     A.    Yes.
14     Q.    And you think your title still
15 was Director of Operations at that time?
16     A.    I don't know what my title was
17 at that time.
18     Q.    When did Anthony Barber
19 arrive?
20     A.    Six weeks before I got fired,
21 maybe. Time enough for him to try to
22 catch on.
23     Q.    When you were Director of

Page 88

1  Operations at some point did you become
2  interested in going back into finance?
3      A.    I had always been interested
4  in going back to finance.
5      Q.    Did you talk with anyone about
6  the possibility of leaving the Director
7  of Operations role and going back into
8  finance?
9      A.    Chris Day.
10     Q.    When did you speak with Chris
11 Day about that?
12     A.    I don't remember the time
13 frame.
14     Q.    Tell me about that
15 conversation.
16     A.    He asked me which job I
17 preferred, which one I enjoyed more, and
18 I said I enjoy the finance side of the
19 business more than I do the operations
20 side. And at that time I told him, I
21 said, you know, I'm a team player and I'm
22 going to do whatever job, you know, I
23 have to to help this company survive.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 89 to 92)

Page 89

1    And at the time it was the Director of
2    Operations, so that's what I did.
3         Q.   What, if anything, did Chris
4    Day say in response?
5         A.   From day one he was telling me
6    that he was holding a place for me in the
7    finance department.
8         Q.   Did Chris Day also say that to
9    you during this conversation in which he
10   asked you which job you preferred?
11        A.   Yes.
12        Q.   Anything else you can recall
13   from that conversation?
14        A.   No.
15        Q.   Where did this conversation
16   take place?
17        A.   I think it was in the upstairs
18   office.
19        Q.   Whose office was it?
20        A.   I think it was Chris Day's.
21        Q.   Who was present?
22        A.   Chris Day and myself.
23        Q.   Just the two of you?

Page 90

1         A.   I believe so.
2         Q.   Did you and Chris Day
3    discuss -- strike that. At any point did
4    you tell Chris Day that you felt the
5    stress of being in the operations role
6    was too much for you?
7         A.   No. I can imagine that I said
8    it was stressful, because it was, but I
9    never would have said it was too much.
10        Q.   Did you ever tell anyone that
11   you thought that the operations role
12   was --
13        A.   Stressful, yes.
14        Q.   Was too stressful for you?
15        A.   No.
16        Q.   You deny ever saying that to
17   anyone?
18        A.   Yes. Had I felt that way, I
19   would have gone to Chris Day or whoever I
20   was reporting to at the time and told him
21   it was too much, I want out.
22        Q.   So you felt you could approach
23   Chris Day about that?

Page 91

1         A.   I would have, that or I would
2    have quit on my own. But I didn't feel
3    that way.
4         Q.   Did you have any discussions
5    with Chris Day about what your salary
6    would be if you went back to a finance
7    position?
8         A.   Yes.
9         Q.   Is that the same conversation?
10        A.   Yes.
11        Q.   Tell me about that.
12        A.   When Mike O'Connell promoted
13   me to Director of Operations my salary
14   went to seventy-five thousand I think,
15   and he said we'll review you in six
16   months or whatever that was. And I don't
17   recall what that agreement was. And then
18   Mike O'Connell left.
19        And at one point I went to
20   Chris Day and I said, you know, okay,
21   it's been however much time that it's
22   been since I came into this role, Mike
23   O'Connell told me he wanted me to take on

Page 92

1    this role and I would be evaluated after
2    a given number of months and then he
3    would, you know, adjust my salary or move
4    me back to finance, you know, if I wasn't
5    working out. And I said, you know, now
6    that he's gone, you know, what are you
7    going to do.
8         And Chris told me, he said,
9    well, I'm going to pay you, and he
10   increased my salary to ninety-four
11   thousand. And he said, but I don't want
12   you to get used to it because when we
13   move you back to finance you're going to
14   go back to seventy-five thousand.
15        Q.   What else was said?
16        A.   That was basically the
17   conversation. And I think the next pay
18   period I started getting paid ninety-four
19   thousand.
20        Q.   So Chris Day increased your
21   salary?
22        A.   Yes, he did.
23        Q.   As you requested?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 93 to 96)

Page 93

1    A.    I just asked that it be
2    renegotiated, and he went and got with
3    Mike O'Connell and Bill McLennan --
4    Q.    I thought Mike O'Connell left?
5    A.    He had left, but he was on the
6    board of directors representing Ricky.
7    And Mike O'Connell, Bill McLennan -- he
8    said, I'm going to talk to them and then
9    I'll get back to you.  It was like the
10   next week or whatever and he called me up
11   there and said, you know, I talked to
12   them; we all feel it's appropriate that
13   you make ninety-four thousand.
14   Q.    So Chris Day increased your
15   salary to ninety-four thousand?
16   A.    That's correct.  Gave me a
17   letter.
18   Q.    What is Chris Day's race?
19   A.    Huh?
20   Q.    What is Chris Day's race?
21   A.    What is Chris Day's race?
22   Q.    Race, R-A-C-E.
23   A.    Oh, Caucasian.

Page 94

1          (Whereupon, Defendant's
2          Exhibit 1 was marked
3          for identification.)
4    Q.    Hand you what has been marked
5    as Defendant's Exhibit 1 to your
6    deposition.  Have you seen this document
7    before?
8    A.    I believe so.
9    Q.    And this reflects that as of
10   January 12, 2004 Mike O'Connell had left
11   Piknik?
12   A.    That's correct.
13   Q.    And that his responsibilities
14   were being divided between Chris Day and
15   Patrice Daniels?
16   A.    That's correct.
17   Q.    And that at the time you were
18   Director of Operations still?
19   A.    Yes.
20   Q.    And that you were going to be
21   reporting to Chris Day?
22   A.    Yes.
23   Q.    So were you reporting to Chris

Page 95

1    Day for a time and then you started
2    reporting to Bill McLennan?
3    A.    Yes, I believe that's correct.
4    Q.    And then did you --
5    A.    I think when Mike left -- and
6    it's coming back to me now -- then Chris
7    kind of took over until he found Bill
8    McLennan, and then Bill McLennan kind of
9    took on that role.
10   Q.    And then when Bill McLennan
11   left --
12   A.    Then Chris Day came back.
13   Q.    And then when Anthony Barber
14   came in you were reporting to Anthony
15   Barber?
16   A.    Yes.
17         (Whereupon, Defendant's
18         Exhibit 2 was marked
19         for identification.)
20   Q.    I'm going to show you what's
21   been marked as Defendant's Exhibit 2 to
22   your deposition.  Have you seen this
23   document before?

Page 96

1    A.    Yes.
2    Q.    And earlier you mentioned you
3    had received a letter, when we were
4    discussing your conversations with Chris
5    Day, about your salary.  Is this the
6    letter you were referring to?
7    A.    Yes.  I thought it was
8    ninety-four thousand, but it's
9    ninety-seven, whatever.
10   Q.    So he bumped up your salary
11   even more than you had expected; right?
12   A.    Yeah.
13   Q.    First paragraph says indicates
14   that he had approached you last month
15   about what department you wanted to work
16   in for the long-term?
17   A.    Yes.
18   Q.    Is that the conversation you
19   were telling me about earlier?
20   A.    Yes, it is.
21   Q.    And would that conversation
22   have been around sometime in April of
23   2004?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 97 to 100)

Page 97

1    A.    Yeah, I suppose.
2    Q.    You don't have any reason to
3  disagree with that?
4    A.    No, I don't.
5    Q.    And you told him that your
6  preference would be to go back to
7  finance; is that correct?
8    A.    Yes.
9    Q.    And that's consistent with
10  your recollection of what was said during
11  that conversation?
12    A.    That's correct.
13    Q.    And the memo goes on to say
14  that he had created a placeholder
15  position in finance that was earmarked
16  for you. Did Chris Day explain that to
17  you before you received this letter?
18    A.    Yeah. We had this
19  conversation, and then I got the letter.
20    Q.    And during your initial
21  conversation with Chris Day when he's
22  asking you what your preference was as
23  far as the position for the long-term, he

Page 98

1  also told you that he had created a
2  placeholder position in finance for you?
3    A.    Told me he was going to hold
4  open a job in finance.
5    Q.    Did you have any reason to
6  believe that he wasn't being truthful?
7    A.    No.
8    Q.    And was it your understanding
9  that once a replacement was found for you
10  in the Director of Operations role you
11  could return to finance?
12    A.    That was my understanding,
13  yes.
14    Q.    Says "the position is being
15  defined more specifically by Bob as we
16  speak." The position, is that referring
17  to the position in finance?
18    A.    Correct.
19    Q.    And who is Bob?
20    A.    Bob Lampert, the CFO.
21    Q.    Next paragraph goes on to say
22  that the market pay rate for the finance
23  position was about fifty-three thousand

Page 99

1  dollars per year. Did you agree with
2  that?
3    A.    I suppose. That's what I was
4  making.
5    Q.    But at the time you were
6  making seventy-three thousand; correct?
7    A.    Yes.
8    Q.    And that was your salary as of
9  May 4, 2004 as Director of Operations;
10  correct?
11    A.    Correct.
12    Q.    But Chris Day was not going to
13  ask you to take a pay cut if you -- when
14  you went back to the finance position?
15    A.    Correct.
16    Q.    But he goes on to explain that
17  because seventy-three thousand dollars is
18  over the market value for a finance
19  position you would essentially stay at
20  that position for a while, that salary
21  range; correct?
22    A.    Yeah.
23    Q.    Did you have any disagreement

Page 100

1  with that?
2    A.    No.
3    Q.    He goes on to say that your
4  current salary at seventy-three thousand
5  dollars for the Director of Operations
6  position was below market rate; correct?
7    A.    Correct.
8    Q.    And that he wanted to give you
9  a salary that reflected the actual market
10  rate for your job; correct?
11    A.    Yeah.
12    Q.    But he wanted to bump up your
13  salary in such a way that whenever you
14  went back to the finance position you
15  wouldn't have to suffer a big pay cut;
16  correct?
17    A.    Correct.
18    Q.    Did you have any disagreement
19  with that?
20    A.    No.
21    Q.    In fact, would you agree that
22  it was for your benefit?
23    A.    Yeah.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 101 to 104)

Page 101

1  Q.   And so Chris Day offered to
2  provide you with a unique compensation
3  arrangement, didn't he?
4  A.   Yes.
5  Q.   And he explained that starting
6  April 1 of 2004, Piknik was going to
7  start accruing two thousand per month
8  that would be paid to you whenever you
9  left the Director of Operations job;
10  correct?
11  A.   Correct.
12  Q.   And he was applying it
13  retroactively; correct?
14  A.   Back to April 1st, yes.
15  Q.   Correct.
16  A.   Okay.  Not back to when I took
17  on the role.
18  Q.   Correct.  And so this would
19  have the result of you being compensated
20  at a ninety-seven thousand dollars per
21  year salary, correct?
22  A.   (Witness nodding.)
23  Q.   Is that a yes?

Page 102

1  A.   Yes, yes.
2  Q.   So at this time were you
3  wanting to leave the Director of
4  Operations position?
5  A.   I wasn't necessarily wanting
6  to leave.  I was going to do whatever job
7  I had to to keep that company going and
8  staying afloat.  If given a choice
9  between jobs I would prefer to do, I
10  would prefer to do the finance job.  I
11  didn't mind doing the Director of
12  Operations job.
13  Q.   Did you feel that your
14  skill-set and qualifications were better
15  suited for a finance job?
16  A.   No.  I think I was equally
17  qualified for both positions.
18  Q.   Did you receive that payout of
19  the two thousand dollars per month that
20  was accruing?
21  A.   I assume I did.
22       (Whereupon, Defendant's
23       Exhibit 3 was marked

Page 103

1       for identification.)
2  Q.   I'm handing you what has been
3  marked as Defendant's Exhibit 3 to your
4  deposition.  Have you seen this document
5  before?
6  A.   I think I may have even
7  composed it.
8  Q.   What is this document?
9  A.   I'm sorry?
10  Q.   What is this document?
11  A.   This is my resume.
12  Q.   Is this a resume that you
13  submitted to Piknik?
14  A.   I believe it is, yes.
15  (Examining document.)  Yes, that's it.
16       (Whereupon, Defendant's
17       Exhibit 4 was marked
18       for identification.)
19  Q.   I'm handing you what has been
20  marked as Defendant's Exhibit 4 to your
21  deposition.  Have you seen this document
22  before?
23  A.   I don't remember, but I

Page 104

1  suppose I have.  I don't have any reason
2  to say I didn't.
3  Q.   If you need to take the time
4  to read it, by all means, please, do so.
5  A.   (Examining document.)  I
6  remember this, yes.
7  Q.   You remember this document?
8  A.   Yes.
9  Q.   Does this refresh your
10  recollection as to when Anthony Barber
11  came on board?
12  A.   Yes.
13  Q.   Around April?
14  A.   Okay.
15  Q.   And he was named vice
16  president and general manager of the
17  beverage division; do you agree with
18  that?
19  A.   I have no reason to say no.
20  Q.   Do you know if that was a
21  newly created position?
22  A.   Yes.
23  Q.   It was a newly created

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
*August 16, 2007*

(Pages 105 to 108)

Page 105

1    position?
2        A.    Yes.
3        Q.    Was there a restructuring such
4    that the beverages and condiments
5    division were --
6        A.    Separated.
7        Q.    Separated more?
8        A.    Yeah.
9        Q.    Is that true?
10       A.    Yes.
11       Q.    And so Anthony Barber was
12    going to head up the beverage division?
13       A.    Yes.
14       Q.    And Carl Bleier was --
15       A.    I guess. I didn't even
16    remember him until I read this.
17       Q.    In the third paragraph it
18    indicates that "in the beverage division
19    Bert Mayer will assume the role of plant
20    manager, Day Street, reporting to Anthony
21    Barber"?
22       A.    Yes.
23       Q.    And this is consistent with

Page 106

1    your recollection of what happened?
2        A.    Yeah. I've never been one
3    hung up on job titles.
4        Q.    Sure.
5        A.    So I didn't remember what I
6    was called.
7        Q.    And it says that you were
8    going to assume leadership over the team
9    that had been reporting to Eddie Crosby
10    at Day Street?
11       A.    Right.
12       Q.    Had Eddie Crosby been the
13    plant manager at Day Street?
14       A.    He was the production manager
15    at Day Street.
16       Q.    Is production manager above
17    plant manager or below plant manager?
18       A.    Below.
19       Q.    And Eddie Crosby was moving to
20    Brundidge?
21       A.    Yes.
22       Q.    Was a new production manager
23    brought in to replace Eddie Crosby?

Page 107

1        A.    No.
2        Q.    You just assumed his duties?
3        A.    Yes. But I remember at the
4    time we were trying to do a start-up
5    project at Alatex, and Anthony Barber
6    didn't know what he was doing, didn't
7    understand the processes and equipment.
8    So I spent -- up until the day I left I
9    spent an awful lot of time at Alatex
10    trying to get that plant start-up done.
11       Q.    Wasn't Jerry MacCartney the
12    plant manager at Alatex?
13       A.    Yeah. Jerry had no
14    manufacturing experience. Wonderful in
15    the warehouse. Couldn't find a finer
16    manager in the warehouse. He just never
17    had any production experience.
18       Q.    So Jerry MacCartney may not
19    have been the most qualified person to
20    assume the plant manager at the Alatex
21    facility?
22       A.    I think he would have done a
23    fine job if they'd have let him. But,

Page 108

1    you know, in the short term trying to
2    take on that role with a plant start-up
3    and a new product, you know, and the
4    customer there visiting, you know, he
5    didn't feel comfortable doing it without,
6    you know -- so I was kind of helping out
7    there. Jerry would have done fine.
8        Q.    He just needed some time?
9        A.    Needed -- yes.
10       Q.    So initially Jerry MacCartney
11    didn't really know kind of what was going
12    on at Alatex just for the start-up?
13       A.    He knew what was going on. He
14    wasn't involved in how the line and the
15    equipment operated. As a manager, he was
16    a wonderful manager. It was the
17    equipment side of how the line processes
18    operated that he didn't quite understand.
19       Q.    So he needed some start-up
20    time to learn the process; is that fair?
21       A.    Yeah, that's fair.
22       Q.    Anthony Barber too needed some
23    start-up time to learn the process?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 109 to 112)

Page 109

1    A.    Exactly.
2    Q.    And so you were called on to
3  help out at Alatex?
4    A.    Yeah.  I spent a lot of time
5  there.
6    Q.    At the bottom it indicates
7  that there were some jobs that had been
8  eliminated.  Do you know anything about
9  Bob Gross?
10    A.    Yes, I do.
11    Q.    About his job being
12  eliminated?
13    A.    I do.
14    Q.    Tell me about his job being
15  eliminated and what you know.
16    A.    How specific am I supposed to
17  get?
18    Q.    Well, you tell me what you
19  know.
20    A.    I know they found some
21  inappropriate materials on his laptop.  I
22  know he had been confrontational with
23  other managers, and they let him go.

Page 110

1    Q.    You know that Bob Gross had
2  some inappropriate materials on his
3  laptop; correct?
4    A.    Yes.
5    Q.    And that he had been
6  confrontational with other managers?
7    A.    Yes.
8    Q.    And that is why he was let go?
9    A.    That was my understanding,
10  yes.
11    Q.    What is the basis of your
12  understanding that there was
13  inappropriate materials on Bob Gross'
14  laptop?
15    A.    Will you ask that again?
16    Q.    What is the basis of your
17  understanding that there were
18  inappropriate materials on Bob Gross'
19  laptop?
20    A.    What was on it or --
21    Q.    What is the basis of your
22  understanding --
23    MR. NELMS:  Are you asking how

Page 111

1  did he come to know?
2    MS. MCGAHEY:  What is the
3  basis of his knowledge.
4    A.    I was told.
5    Q.    By whom?
6    A.    I don't recall.  I believe it
7  was Henry Hicks, who Bob Gross worked for
8  Henry Hicks, but I can't swear to that.
9    Q.    Sitting here today you don't
10  know one way or the other who told you?
11    A.    No.
12    Q.    Is that correct?
13    A.    That's correct.
14    Q.    And what is the basis of your
15  understanding that Bob Gross had been
16  confrontational with other managers?
17    A.    I was there.
18    Q.    Who were the managers he was
19  confrontational with?
20    A.    Specifically Shannon McGlon.
21    Q.    What did you observe?
22    A.    I observed her giving a
23  presentation, him arguing with her during

Page 112

1  the presentation.  Upon completion of it
2  she walked out the door, and he made a
3  very inappropriate comment.
4    Q.    And you heard the
5  inappropriate comment?
6    A.    I did.  I was standing right
7  there.
8    Q.    What was the improper comment?
9    A.    He said F'ing bitch.
10    Q.    Anything else he said?
11    A.    He went on, and I had -- Bob
12  Winter was standing there and confronted
13  him, and I walked off to keep from saying
14  something that would have been
15  inappropriate on my behalf.
16    Q.    And what is Bob Gross' race?
17    A.    I'm sorry?
18    Q.    What is Bob Gross' race?
19    A.    Caucasian.
20    Q.    Do you know anything about
21  Letitia Strowbridge's departure from
22  Piknik?
23    A.    Yes.  My understanding is she

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 113 to 116)

Page 113

1  went to work for Onyx.
2      Q.    In what capacity?
3      A.    I'm not sure.
4      Q.    What do you base your
5  understanding on?
6      A.    That's what I was told.
7      Q.    By whom?
8      A.    I don't recall whether it was
9  Henry Hicks or Bob Winter.
10     Q.    What is Letitia Strowbridge's
11 race?
12     A.    African-American.
13     Q.    What, if anything, do you know
14 about Clarice Crosby's departure from
15 Piknik?
16     A.    She was let go.
17     Q.    Do you know why she was let
18 go?
19     A.    No, I don't.
20     Q.    What is Clarice Crosby's race?
21     A.    African-American.
22     Q.    I want to talk about when you
23 were asked to focus on the Day Street

Page 114

1  facility after Anthony Barber comes on
2  board.
3      A.    Yes.
4      Q.    Okay.  During that time would
5  Anthony Barber come to you for updates on
6  operational issues at the Day Street
7  facility?
8      A.    At times I think he did.
9      Q.    What about Chris Day, would
10 he?
11     A.    Don't think he did.
12     Q.    Can you just not recall any
13 specific instance where Chris Day --
14     A.    I don't remember talking with
15 Chris Day about operations in the plant.
16 I do remember talking to Anthony Barber
17 about issues.
18     Q.    Did you encounter difficulties
19 or problems with the operations of the
20 Day Street facility?
21     A.    At that time, yes.
22     Q.    What were those difficulties
23 or issues or problems?

Page 115

1      A.    We had some equipment issues.
2  We were trying to do a line start-up, and
3  we redesigned and implemented a whole
4  line with used equipment, and we were
5  running a tough package to run given good
6  equipment much less used equipment that
7  we had to install and try to run it.  It
8  was a challenge, and we were working
9  through those issues.
10     Q.    So you had issues with the
11 equipment at the Day Street facility?
12     A.    Yes.
13     Q.    Any other difficulties,
14 challenges, issues, problems?
15     A.    I mean, yes, of course, there
16 were other issues.  But, you know, the
17 predominant one at the time that I recall
18 was trying to get that line started up.
19     Q.    What are some of the other
20 issues that you encountered besides the
21 equipment issues?
22     A.    Other equipment issues in the
23 plant.  Because we were financially

Page 116

1  struggling we didn't do some of the
2  repairs and maintenance that should have
3  been done but wasn't because the money
4  just wasn't available.  So we had -- you
5  know, we had issues just trying to get by
6  with the equipment.
7      Q.    Anything else that you can
8  recall?
9      A.    No.
10     Q.    So it was mainly just
11 equipment issues?
12     A.    Predominantly.
13     Q.    Was equipment breaking down?
14     A.    Yes.
15     Q.    Were you ever asked to find
16 out why the equipment was breaking down?
17     A.    I usually knew.
18     Q.    You usually knew?
19     A.    Yes, what the issue was.
20     Q.    My question, though, was were
21 you ever asked why the equipment was
22 breaking down?
23     A.    I don't remember specifically.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 117 to 120)

Page 117

1  I'm sure it was in a conversation between
2  myself and Mr. Barber.
3      Q.   But you felt that if you were
4  asked, you always knew the answer?
5      A.   Yes.  I had a meeting every
6  morning with our people, and we reviewed
7  the previous day's results and what
8  issues we had and what the game plan was
9  to correct them.  And every day it was
10  listed out, and the person responsible
11  was assigned.  Yes, I knew what was going
12  on in that plant.
13      Q.   Well, that's a little
14  different.  My question was -- well, I'll
15  just ask it differently.  You felt that
16  you always knew the reason why the
17  equipment was breaking down?
18      A.   Yes.
19      Q.   You had an explanation?
20      A.   I believe so, yes.
21      Q.   Would you have a solution for
22  the equipment breakdown?
23      A.   We would have a game plan,

Page 118

1  yes.  Every morning we met and we talked
2  about it.  It was all listed out, all the
3  equipment that had any downtime at all,
4  what the reasons were and what we had
5  planned on doing, who was assigned
6  responsibility for fixing it and, you
7  know, a timeline on when it was going to
8  be accomplished.
9      Q.   So you had an idea or you had
10  already in mind a specific fix for the
11  equipment breakdown?
12      A.   Yes, we had a game plan.
13      Q.   Who is we?  You said "we had a
14  game plan."
15      A.   Me and the other managers.  We
16  met at the operations meeting every
17  morning, and we went over -- we had a
18  chart, and it was all listed out, the
19  issues we had and downtime, the results
20  from the previous day, what issues they
21  had.  And we assigned responsibility and
22  came up with a game plan; myself, the
23  supervisors, the maintenance manager, the

Page 119

1  engineering manager.
2      Q.   Was Anthony Barber part of
3  those daily operational meetings?
4      A.   He didn't show up at them, no.
5      Q.   He did not show up?
6      A.   I don't remember seeing him at
7  the meetings, no.  He got a copy of the
8  sheet every day, though.
9      Q.   Did Mr. Barber ever talk with
10  you about any performance issues that he
11  thought you had?
12      A.   No, he didn't.
13      Q.   Never did?
14      A.   (Witness shaking head.)
15          MR. NELMS:  Say it out loud.
16      A.   No.
17      Q.   Never had any counseling
18  sessions with you?
19      A.   The only time that I can say
20  that he actually talked to me at all was
21  about some issue, and I asked him, I
22  said, do you want me just to fire the
23  person, you know.  And he said, you got

Page 120

1  to do what you got to do.  I said, are
2  you telling me to fire the person or not.
3          And that was the only -- and I
4  don't remember what the specific incident
5  was, but he wanted somebody fired for
6  something, an infraction.  And the
7  employee in my opinion had done a good
8  job, and an isolated incident shouldn't
9  be -- and I think the employee was an
10  asset.  They made a stupid decision, and,
11  yes, discipline was warranted.  And I had
12  done the discipline, but he wanted the
13  person fired.
14      Q.   What came of that employee?
15      A.   They stayed.  That's the
16  only -- other than that, the only other
17  conversation was him trying to get me to
18  do to his bible study.
19      Q.   Those are the only times that
20  you and Mr. Barber talked?
21      A.   No.  We talked.  But the
22  conversation generally revolved around
23  the bible study he was in and what he

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 121 to 124)

Page 121

1 learned that day and the night before and
2 asked me if I read the bible and talked
3 down to me.
4     Q.   He talked down to you?
5     A.   Yeah, always like he was so
6 much better than I was.
7     Q.   In what way?
8     A.   Just the feeling I got in the
9 conversations we had.
10     Q.   Was it his tone of voice?
11     A.   It was more of an arrogance.
12 It was kind of like, I'm here to fix
13 everything; I'm the man; I can do all
14 this. And he really did not understand
15 that industry.
16     Q.   In your opinion?
17     A.   In my opinion. And I was -- I
18 expected different I suppose.
19     Q.   So you felt his demeanor was
20 arrogant?
21     A.   I did, yes.
22     Q.   And you interpreted that to
23 mean that he was talking down to you?

Page 122

1     A.   Yes, I did, in the way he
2 would ask questions, the same question
3 over and over and over, like, well what
4 do you mean, what do you mean, you know.
5 I don't know how to describe it.
6     Q.   Can you give me examples?
7     A.   Back to the employee that he
8 wanted fired. I saw -- I was the one
9 that pointed out the incident to him to
10 start with.
11     Q.   Pointed the incident out to
12 Mr. Barber?
13     A.   Yeah. We were mixing some
14 concentrates down in a hallway, and the
15 pump had sprung a leak and sprayed juice
16 concentrate on the floor. Well, it was
17 time for them to go, so the supervisor
18 had them clean it up, just push
19 everything up in a pile, and then they
20 all left.
21     They didn't mop the floors and
22 clean like they should have. So I had
23 written the supervisor up and, you know,

Page 123

1 talked to her, took her out there, showed
2 her what she had done wrong. She had
3 left. I did that the following morning.
4     That evening I got Anthony and
5 showed him, hey, look, this is the mess;
6 I know about it; I'm going to have them
7 clean it up first thing in the morning as
8 soon as they get back in here. I wanted
9 him to be aware of it. And he said,
10 well, what are you going to do about it,
11 and I told him. He said, well, I think
12 she should be -- or does she deserve to
13 keep her job or something. I said, yeah,
14 of course, she's a good supervisor; she
15 was just obviously in a hurry, you know,
16 or whatever.
17     He said, well, what are you
18 doing to do about it. I said, I'm going
19 to write her up. He said, no, what are
20 you going to do about it, we can't have
21 this; this is -- you know, he kept going
22 and going. Well, what do you want me to
23 do, do you want me to fire her? You got

Page 124

1 to decide what you want to do; you got to
2 decide, but it better be the right
3 decision. What is the right decision?
4 You better figure it out; if you don't
5 know -- you know, it was just really
6 demeaning the way I was talked to.
7     Q.   Anything else?
8     A.   There were several incidents
9 like that. That's the one that I
10 remember.
11     Q.   And you decided not to fire
12 the supervisor; correct?
13     A.   He never told me to. He never
14 told me not to. He left it up to me.
15     Q.   And you made the decision not
16 to fire her?
17     A.   And I made a decision not to
18 fire her.
19     Q.   What was her race?
20     A.   African-American. Betty
21 Robinson was her name.
22     Q.   What are the other instances
23 when you felt you were being talked down

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 125 to 128)

Page 125

1  to by Anthony Barber?
2      A.   Every time I talked to him.
3  Jerry had to paint an office for him over
4  in the Alatex building.  He wanted to
5  move in an office, and he wanted it
6  painted before he moved it.  Well, Jerry
7  took the paint he had available, painted
8  the room.  And the next morning Anthony
9  Barber comes in and says, it's painted
10  white; I don't like white; I like color.
11  He got all mad and told him to repaint
12  it.
13      Q.   Were you there for that?
14      A.   No.  I heard about that.
15      Q.   Who did you hear it from?
16      A.   I heard it from Jerry.
17      Q.   You heard from Jerry
18  MacCartney that Anthony Barber did not
19  like the paint color that was used to
20  paint his office walls?
21      A.   Correct.
22      Q.   Was his office repainted?
23      A.   I don't remember.

Page 126

1      Q.   Well, I want to talk about the
2  instances in which you were talked down
3  to, as you claim you were talked down to,
4  by Anthony Barber?
5      A.   I don't recall specific
6  instances other than the one that I
7  described.  But every conversation I had
8  with him was very similar to that in
9  its -- it was always you better do what's
10  right and make things happen, but I'm not
11  going to tell you how I want it done, you
12  better figure it out.
13      Q.   So he trusted your judgement?
14      MR. NELMS:  Object to the
15  form.
16      A.   I didn't take it that way.  I
17  took it as he was leading me out there so
18  he could hang me later, you know.
19      MR. NELMS:  Good time for a
20  break?
21      MS. MCGAHEY:  How long have we
22  been on?
23      THE REPORTER:  Forty-four

Page 127

1  minutes.
2      MS. MCGAHEY:  Let's go a whole
3  hour.
4      MR. NELMS:  Do you need a
5  break?
6      A.   I could use one.
7      MS. MCGAHEY:  Let me just
8  finish this topic, and then we'll take a
9  break.
10      Q.   (BY MS. MCGAHEY:)  Did you
11  ever tell Chris Day that you did not know
12  how to correct the problems in the Day
13  Street facility?
14      A.   I don't believe so.
15      Q.   You just don't recall one way
16  or the other?
17      A.   I don't recall, no.  I don't
18  think I would have ever said I don't know
19  how to fix it.  It may have been a
20  specific incident that was regarding,
21  hey, you know, this machine is not
22  working; why isn't it working?  I really
23  don't know yet, you know, we're looking

Page 128

1  into it; we haven't found the problem
2  yet.  I mean, something like that could
3  have been said.  But it wouldn't have
4  been overall, because I know I can fix
5  it.  The plant was running better than it
6  ever had.
7      Q.   Did you ever tell Mr. Barber
8  that you did not know how to correct any
9  of the problems in the Day Street
10  facility?
11      MR. NELMS:  Object to the
12  form.
13      Q.   You can answer.
14      MR. NELMS:  If you understand
15  the question, answer.
16      A.   My answer is the same.  It may
17  have been on specific pieces of
18  equipment, but I knew how to fix that
19  plant.
20      Q.   Did you ever tell Brenda
21  Sellers that you did not know how to
22  correct the problems in the Day Street
23  plant?

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 129 to 132)

Page 129

1     A.    I never --
2           MR. NELMS:  Object to the
3     form.
4     Q.    You can answer.
5     A.    I never would have talked to
6  Brenda Sellers about that.
7     Q.    Why not?
8     A.    Why not?  I didn't think she
9  was qualified in her role as HR manager.
10    Q.    Did you ever tell Mr. Day that
11 you felt that you had done all you could
12 to get the Day Street facility
13 operational?
14    A.    No.
15    Q.    Did you ever tell Mr. Barber
16 that you felt that you had done everything you
17 could to get the Day Street facility
18 operational?
19    A.    No.
20    Q.    Or anything along those lines?
21    A.    No.
22    Q.    And based on your prior
23 responses, you wouldn't have talked about

Page 130

1  any kind of issue like that with Brenda
2  Sellers?
3     A.    No, I would not have.
4     Q.    During your employment either
5  with Piknik or your prior employment
6  would you ever have to negotiate
7  contracts on behalf of the company?
8     A.    Yes.
9     Q.    Were you ever asked to execute
10 contracts on behalf of the company?
11    A.    You mean actually sign?  No.
12 I was involved in the negotiations and
13 everything leading up to that.
14    Q.    Would you review the contracts
15 before they were signed, though?
16    A.    A lot of times, yes.
17          MS. MCGAHEY:  Okay.  We can
18 take a break.
19          (Whereupon, a break was
20          taken at 1:26 to 1:37 p.m.)
21    Q.    (BY MS. MCGAHEY:)  Mr. Mayer,
22 it's my understanding that you are
23 claiming that you were treated

Page 131

1  differently because of your race; is that
2  correct?
3     A.    That is correct.
4     Q.    I would like for you to list
5  for me, please, the ways in which you
6  believe you were treated differently
7  because of your race.
8     A.    Specifically, Chris Day told
9  me one day that it was Onyx's intention
10 to replace all of us senior managers and
11 managers with African-Americans, that
12 they were an MBA -- MBE, I'm sorry.  MBE,
13 and they were going to have blacks as
14 managers.  And the treatment I got from
15 the Onyx group always -- it was obvious
16 that some of us were singled out.
17    Q.    Could you be more specific, or
18 are you just saying in general you were
19 treated -- I understand that you claim
20 that you were treated differently because
21 of your race.  I'm trying to identify the
22 ways in which you were treated
23 differently because of your race.

Page 132

1     A.    I lost my job because of my
2  race.  I mentioned before that, you know,
3  the only -- I have never been counseled
4  on my job performance.  I have never been
5  written up for any job performance.  I've
6  been in the workforce for a number of
7  years now, and my work has always been
8  impeccable.  I've been promoted in every
9  position I have ever had.
10          The company I'm with now I
11 have been promoted three times in
12 eighteen months, and it's a Fortune 500
13 company, seventeen billion dollar
14 company.  If I'm not capable and
15 qualified, why is a company like that
16 promoting me?  The only time I've ever
17 had any trouble was because I was white
18 at Piknik Products.
19    Q.    Are there any other ways in
20 which you believe you were treated
21 differently because of your race?
22    A.    No.
23    Q.    So your termination is one

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 133 to 136)

Page 133

1  way; correct?
2      A.   Yes.
3      Q.   And then Chris Day's --
4      A.   Specifically said that was
5  their intentions.
6      Q.   Let me ask the question,
7  please.
8      A.   Okay. I'm sorry. I'm sorry.
9      Q.   The second way you claim you
10 were treated differently because of your
11 race was when Chris Day told you that
12 Onyx intended to replace senior managers
13 and managers with African-Americans?
14     A.   He did say that, yes.
15     Q.   Any other ways besides those
16 two in which you believe you were treated
17 differently because of your race?
18     A.   No.
19     Q.   I want to talk about those two
20 events in detail.
21     A.   Okay.
22     Q.   Let's talk about your claim
23 that Chris Day told you that Onyx

Page 134

1  intended to replace senior managers and
2  managers with African-Americans.
3      A.   Okay.
4      Q.   When did that occur?
5      A.   It was not too long after Onyx
6  took over, had acquired 51 percent
7  ownership in the company. I won't say it
8  was in the first month. It may have been
9  the first two months, somewhere in there.
10 And we were in a meeting in the upstairs
11 conference room in the front office, and
12 after the meeting Chris asked if I would
13 take him out on the floor and show him
14 the floor.
15          And so we were walking
16 down -- there's a little hallway that
17 runs along the waste water area. It's
18 small, as you enter in the building. And
19 we were in there, and we were walking.
20 He was telling me how he was a
21 founding -- he was the founding member --
22 one of the founding members of Onyx and
23 how it was basically his idea and he was

Page 135

1  running -- you know, it was his concept.
2  And we went on.
3          Chris Day being Caucasian, I
4  asked, you know, a question, you know,
5  you're Caucasian, what's the MBE thing.
6  He said, oh, I think there's a lot, you
7  know, of opportunity there for business,
8  and he kind of elaborated on that. And
9  then I said, so, you know, how does that
10 work with you being Caucasian and being
11 the MBE. He said, well, their intention
12 is to replace all the managers, senior
13 managers and managers with
14 African-Americans. I think he said
15 blacks.
16          I stopped. I said, well, does
17 that mean I need to look for a job. And
18 he said, no, no, don't worry about it,
19 and then we walked on into the plant.
20 But it struck me as -- it was profound
21 when I heard it.
22     Q.   So this occurred within a few
23 months after Onyx purchased majority

Page 136

1  ownership of Piknik?
2      A.   I would say within the first
3  couple of months. I don't remember the
4  exact timeline.
5      Q.   There was a meeting in a
6  conference room upstairs?
7      A.   Yes.
8      Q.   Who was present during that
9  meeting?
10     A.   Probably all the senior
11 managers. Patrice Daniels was probably
12 there. I don't know specifically, so
13 I'm -- but the meetings we had up there
14 it was usually the same group. It would
15 have been Chris Day, Patrice Daniels, Bob
16 Winter, Jerry MacCartney, Shannon McGlon,
17 myself. Bob Lampert would have been
18 there. I think that's probably it.
19     Q.   What was the purpose of the
20 meeting?
21     A.   Like a staff meeting.
22     Q.   That was a common occurrence?
23     A.   Yes. Weekly I believe.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 137 to 140)

Page 137

1    Q.   And then the meeting ends, and
2  Chris Day asks you to take him onto the
3  floor?
4    A.   The production floor.
5    Q.   Where are you, the Day Street
6  facility?
7    A.   Day Street facility, yes.
8    Q.   And he asked you to show him
9  the production floor?
10    A.   Yeah.  He wanted a tour of the
11  production floor, yes.
12    Q.   And you take him on that tour
13  immediately, or does some time pass?
14    A.   No.  We walked out on the
15  floor.  We stood there and talked with
16  Eddie Crosby for a while, and I walked
17  him back to the entrance, and he went
18  back to the front office.
19    Q.   Was anyone else going on this
20  walking tour with you and Chris?
21    A.   Well, when we went into the
22  plant it was just the two of us.  And
23  then Eddie Crosby was there and came up,

Page 138

1  and he went on part of the tour with us.
2  Basically when -- I remember when Eddie
3  got there we kind of just stood up on top
4  of the backside of the lines there.
5        We were standing there just
6  talking, and he was telling us about
7  himself.  He mentioned that he had been
8  adopted.  We said how much he looked like
9  one of our customers.  He said, really,
10  you know, that's interesting.  Yeah,
11  you're a spitting image of him.
12    Q.   That Chris Day looked like one
13  of your customers?
14    A.   Chris Day looked like one of
15  our customers.  He said, well, that's
16  funny; I was adopted; I don't know who my
17  parents are; I would like to meet him.
18    Q.   So was Eddie Crosby present
19  during the conversation with Chris about
20  how he was a founding member of Onyx?
21    A.   I don't think so.  I think
22  Chris told me that -- everything was in
23  that hallway going into the plant,

Page 139

1  because I stopped when he said that.  And
2  I said, does that mean I need to look for
3  a job.
4    Q.   Okay.  So before you get into
5  the plant is when --
6    A.   When he said that, yes.  Now,
7  he may have talked again in front of
8  Eddie about, you know, the founding and
9  the partnership and what it all meant
10  because it was fairly -- Onyx had just
11  taken over, you know, within a short
12  period of time, and none of us really
13  knew who they were and what they were.
14  Everything was still fresh, you know, who
15  are they, what is their real intentions.
16  And everyone was kind of nervous.
17    Q.   I want you to tell me as best
18  as you can exactly what was said, who
19  said what when y'all are walking down
20  that hall.
21    A.   When we're walking down the
22  hall?  I said it.  We were walking down
23  the hall.  He was explaining to me about

Page 140

1  Onyx.  He mentioned that it was Onyx's
2  first acquisition and that his equity in
3  Onyx would be derived off of how Piknik
4  performed, that he was -- if Piknik
5  performed well, then he had the
6  opportunity to gain equity in the Onyx
7  organization.
8        And then he mentioned how he
9  was a founding member.  And, you know, I
10  think I asked about, you know, him being,
11  Caucasian and them basing their platform
12  on being an MBE, you know, how that all
13  worked.  And then he said, you know, it's
14  Onyx's intention to replace all the
15  managers with African-Americans or
16  blacks.  I forget exactly which term he
17  used.  And then I asked him -- I stopped,
18  because we were walking -- I stopped and
19  said, you know, are you telling me I need
20  to look for a job.  He said, no, no,
21  let's just go, or don't worry about it.
22  I forgot how he worded it.  We went in
23  the plant, and I showed him around the

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 141 to 144)

Page 141

1  plant.
2      Q.    Anything else you can recall
3  being said?
4      A.    Not on that day.
5      Q.    So you're saying that Chris
6  Day told you that it was Onyx's intention
7  to replace all managers with blacks or
8  African-Americans?
9      A.    Yes.
10     Q.    Did he mention anything about
11 your job specifically?
12     A.    I asked about mine. I said,
13 does that mean I need to look for a job.
14     Q.    And he said no?
15     A.    He said no.
16     Q.    Did you tell anybody about the
17 statement that you heard Chris Day make?
18     A.    I don't remember. I would
19 assume that I did because it -- I mean,
20 it --
21     Q.    Sitting here today you don't
22 recall telling anyone about it?
23     A.    I don't recall telling

Page 142

1  anybody, but I am sure that I did because
2  it floored me. I was --
3      Q.    Did you go to HR and report
4  it?
5      A.    No, I did not.
6      Q.    Did you have any subsequent
7  conversations with Chris Day about that
8  topic?
9      A.    No, I did not.
10     Q.    That was the end of it?
11     A.    Yes.
12     Q.    Did you ever talk with Jeff
13 Larry about the statement that Chris Day
14 had made?
15     A.    No, I didn't.
16     Q.    Did you talk with --
17     A.    I did compose a letter to Jeff
18 Larry. I think the four of us did.
19 Shannon McGlon, Jerry, Bob, myself all
20 wrote a letter to Jeff Larry.
21     Q.    The same letter, you are all
22 signatories to it?
23     A.    I don't know.

Page 143

1      Q.    Or were there four different
2  letters?
3      A.    I wrote my own letter, and
4  I --
5      Q.    Did you send it?
6      A.    -- never sent it.
7      Q.    Do you have that letter?
8      A.    No, I do not.
9      Q.    What did you do with it?
10     A.    I guess it's on my laptop.
11     Q.    Do you believe it's still
12 saved on your laptop?
13     A.    I mean, I don't know what they
14 did with my --
15     Q.    On your work laptop?
16     A.    Yeah.
17     Q.    Why didn't you send it?
18     A.    Because Bob sent his, and the
19 response that he got back made me think
20 that I would be subjecting myself to more
21 abuse versus any good. I didn't get the
22 feeling that sending that letter would
23 have been taken to heart.

Page 144

1      Q.    You're saying that Bob Winters
2  sent a letter?
3      A.    Bob did send a letter.
4      Q.    Have you seen it?
5      A.    Yeah. I think we all read
6  each other's and critiqued them before
7  we --
8      Q.    Do you have a copy of it?
9      A.    No.
10     Q.    I've never seen it.
11     A.    I don't, no.
12     Q.    What was contained in your
13 letter that you wrote?
14     A.    Just some of the decisions
15 that were being made by Chris and Patrice
16 and some of the things they were doing
17 and how --
18     Q.    Tell me as specifically as you
19 can what was in your letter.
20     A.    Gosh, I don't remember. It
21 would have alluded to the fact that Chris
22 and Patrice were making decisions and
23 Henry Hicks was, you know, on the sales

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 145 to 148)

Page 145

1  side. He was turned loose, and he was
2  making some very poor decisions, and we
3  were losing customers.
4      Q.  It was your opinion that Henry
5  Hicks was making poor decisions?
6      A.  It was my opinion, yes.
7      Q.  Based on?
8      A.  Based on the feedback I was
9  getting from the plant manager at
10  Brundidge.
11      Q.  So this letter that you wrote
12  but never sent to Jeff Larry was listing
13  instances in which you thought was poor
14  decision-making on behalf of Chris Day,
15  Patrice Daniels and Henry Hicks?
16      A.  Yes. And how I, you know, in
17  the staff meetings had mentioned that,
18  you know, these are the things that I
19  think we should do or this is, you know,
20  how, you know, this industry typically
21  works and they are working outside that
22  box and, you know, customers are getting
23  upset and, you know, I'm getting calls

Page 146

1  every day from the Brundidge plant
2  manager and we're losing business because
3  of pricing issues that Henry was being
4  authorized to make and do. You know,
5  instead of gaining business and gaining a
6  foothold in a financially struggling
7  organization, we were losing ground fast.
8  Kind of looking for Jeff to step in and,
9  you know, make a decision because it was
10  going back and forth, do it this way, no,
11  do it that way.
12      Q.  But you never sent the letter?
13      A.  I never did send the letter.
14      Q.  Did the letter that you
15  drafted mention anything about your
16  belief that you were being discriminated
17  against because of your race?
18      A.  No, I don't think I would have
19  mentioned that to Jeff.
20      Q.  Did Shannon McGlon send her
21  letter?
22      A.  I don't think so.
23      Q.  Did Jerry MacCartney send his

Page 147

1  letter?
2      A.  I don't think so.
3      Q.  Besides the four of --
4      A.  Jerry may have.
5      Q.  Besides the four of you, did
6  you have anyone else that was
7  participating in this letter writing?
8      A.  No. Before Onyx came in the
9  four of us basically ran that company.
10  We were trying to turn it around. Of
11  course, the CFO was there to, you know,
12  make the general decisions, you know.
13  But we were kind of -- Bob negotiated all
14  the contracts with the customers, and
15  Shannon, you know, basically headed up
16  the quality. So when Onyx came in they
17  kind of --
18      Q.  They were taking charge?
19      A.  Yeah. And instead of --
20      Q.  So instead of the four of
21  y'all running the company, the Onyx folks
22  were running the company?
23      A.  I won't say we were running

Page 148

1  the company. We put fourth our -- how do
2  I say it. We would make recommendations,
3  and Mike O'Connell would say, yeah,
4  that's a good idea, let's go with it. Or
5  he would say, no, we're not going to do
6  that, we're going to do this.
7      But, you know, when Onyx came
8  in they didn't even want to hear
9  basically what we were -- our
10  recommendations. They were just calling
11  shots, and things were happening around
12  us that -- you know, standing there you
13  could see that it was --
14      Q.  So the management style was
15  different. Onyx's management style was
16  different from what you had experienced
17  before they came in; is that fair to say?
18      A.  Or nonexistent, yes. There
19  really wasn't a style. I mean, it was
20  shoot from the hip.
21      Q.  When you say that you heard
22  Chris Day say that it was Onyx's
23  intention to replace the managers with

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 149 to 152)

Page 149

1  African-Americans or blacks, what
2  positions did you believe that he was
3  referring to?
4      A.    I was thinking down through --
5  basically -- I interpreted it as meaning
6  all the salaried employees.
7      Q.    Besides asking Chris Day if
8  you needed to look for another job, did
9  you ask Chris Day what he meant by that
10  comment?
11      A.    No, I did not.
12      Q.    Have you told me now
13  everything about your conversation with
14  Chris Day in which you claim he said that
15  it was Onyx's intention to replace all
16  managers with blacks?
17      A.    As far as I recall, yes.
18      Q.    Now I want to turn your
19  attention to your departure from Piknik.
20  Tell me about that.
21      A.    I was at work.  Brenda Sellers
22  came and told me Chris Day wanted to see
23  me in his office, and we walked up there.

Page 150

1  I sat down.  He started telling me
2  something -- I don't remember exactly
3  what he was saying.  He was going on and
4  on and on.  And I remember saying, Chris,
5  you know, let's get to the point here,
6  and he said you're fired.  Then Brenda
7  Sellers walked with me up to my office,
8  and I packed up my personal items and I
9  left.
10      Q.    Is that all you can recall?
11      A.    Shock.
12      Q.    About what was said during
13  that meeting?
14      A.    Yes.
15      Q.    You don't recall anything else
16  more specific?
17      A.    He handed me something and
18  said -- I don't even remember.  I don't.
19  I don't remember what was said.
20      Q.    Was there a discussion --
21      A.    I was shocked.
22      Q.    -- about a severance offer?
23      A.    Yes.

Page 151

1      Q.    Tell me what that discussion
2  was.
3      A.    I don't think it was a
4  discussion.  He handed me a letter.
5  Maybe there was a discussion.  I was in
6  utter shock.  I remember telling him I
7  wasn't going to sign it until I had time
8  to go home and think it over.  And I
9  think he gave me, I don't know, a day,
10  twenty-four hours, to bring it back or
11  whatever.
12      Q.    And this meeting was held on
13  June 9, 2005?
14      A.    That's correct.
15      Q.    Brenda Sellers comes to you
16  and tells you that Chris Day wants to see
17  you in his office?
18      A.    That's correct.
19      Q.    Did she tell you what the
20  meeting was going to be about?
21      A.    No.
22      Q.    Was anyone present when Brenda
23  Sellers was telling you that Chris Day

Page 152

1  wanted to see you in his office?
2      A.    I don't believe so.
3      Q.    Were you in your office at the
4  time?
5      A.    I was in my office.
6      Q.    What time of day was this?
7      A.    Fairly early in the morning.
8      Q.    Before lunch?
9      A.    Before lunch.
10      Q.    And did you go immediately to
11  Chris Day's office?
12      A.    Yeah.  Brenda walked with me.
13      Q.    Did Brenda stay in during the
14  meeting?
15      A.    Yes, she did.
16      Q.    Was anyone else present
17  besides you, Brenda and Chris Day?
18      A.    No.
19      Q.    Did you tape record that
20  meeting?
21      A.    No.
22      Q.    You said that Chris Day was
23  saying some things, but you don't recall

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 153 to 156)

Page 153

1  what he was saying?
2      A.   It was kind of like, you're a
3  great guy; you're going to go far in
4  life.  I said, you know, what's the point
5  of this, and then he said you're fired.
6      Q.   He just said you're fired?
7      A.   I do not recall the exact
8  words.  The way he was talking it like
9  hit me.  I knew what was happening, so
10  after that I don't -- I didn't remember
11  anything.
12      Q.   Did he seem upset to have to
13  deliver the news to you?
14      A.   Oh, I do remember him saying
15  that it was really going to -- I, of all
16  people, was going to be a hard one for
17  him to do.  I forgot how he said it.
18  This is really going to hurt me to have
19  to do this.
20      Q.   So he seemed upset to you?
21      A.   No, he didn't seem upset.  He
22  said that.
23      Q.   You thought he was lying?

Page 154

1      A.   Not lying.  Just, I thought it
2  was a token gesture, you know, a polite
3  comment, you know, not a -- I think he
4  was trying to make it as painless as he
5  could, but, you know you know, as
6  terminations go, that was a --
7      Q.   I mean, you've had to
8  terminate employees before; right?
9      A.   Yes, I have.
10      Q.   It's not a pleasant
11  experience; would you agree?
12      A.   It's not a pleasant -- it's
13  not.  It is not.
14      Q.   Did Brenda Sellers say
15  anything during the meeting?
16      A.   I don't think she opened her
17  mouth, no.
18      Q.   And you were handed a letter
19  during the meeting?
20      A.   I believe so, or a package.
21  Maybe she mailed -- I don't know.
22      Q.   Did you open it?  Was it in an
23  envelope?

Page 155

1      A.   Honestly I don't remember.
2      Q.   Do you recall reading it
3  during the meeting?
4      A.   Not during the meeting, I
5  don't remember reading it.  Not to say I
6  didn't.  They may have read it to me.  I
7  don't --
8      Q.   Do you have a copy of the
9  letter?
10      A.   Oh, yes.
11      Q.   Have you provided it --
12      A.   To my counsel I'm sure.
13      Q.   You've provided a copy of that
14  letter?
15      A.   Probably.
16      Q.   What did the letter say?
17      A.   Basically a severance.
18      Q.   Is this the severance
19  agreement?
20      A.   I think so.
21      Q.   Okay.  And there may have been
22  discussion about the severance package
23  that was being offered, you just don't

Page 156

1  recall one way or another sitting here
2  today?
3      A.   Yeah.  I was in shock, yeah.
4      Q.   Was any explanation given for
5  your termination?
6      A.   No.
7      Q.   Did you ask for one?
8      A.   I assumed it was because I was
9  white.  I mean, told me, you know,
10  replacing everybody with blacks.  The
11  next day my replacement showed up and was
12  African-American.
13      Q.   So your termination came the
14  very next day after your conversation
15  with Chris Day; is that what you're
16  saying?  You just said --
17      A.   He terminated me on June 9th.
18  My replacement started on June 10th.
19      Q.   Who was your replacement?
20      A.   I don't know her name.
21      Q.   Did you ever meet her?
22      A.   No, never have.
23      Q.   Do you know what her

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 157 to 160)

Page 157

1  qualifications are?
2      A.   I do not.
3      Q.   How did you find out about the
4  person who you believe replaced you?
5      A.   Employees at Piknik Products
6  called and told me.
7      Q.   Who?
8      A.   Several of them.  Specifically
9  I don't recall who, but I got several
10  calls.
11      Q.   Did you ever tell Chris Day
12  you understood why the decision was being
13  made to let you go?
14      A.   No.
15      Q.   Did you ever tell Brenda
16  Sellers that you understood why you were
17  being let go?
18      A.   No.  I still don't understand
19  why I was let go.  Efficiencies in all
20  three plants were better than they had
21  ever been.  Operational costs were down
22  further than they had ever been.  On a
23  per-case-unit plant was performing at its

Page 158

1  best.  All three plants were performing
2  better than they had been.
3      Q.   I think you testified
4  previously you didn't know anything about
5  the negotiations between Piknik and
6  SouthTrust?
7      A.   No, I did not.
8      Q.   Is that correct?
9      A.   That's correct.
10      Q.   At any point did you tell
11  Chris Day that you knew you weren't
12  getting the job done or something along
13  those lines?
14      A.   No.  Told you the plants were
15  running better than they ever had and we
16  were continuing to improve.
17      Q.   And you don't know anything
18  about the individual who you believe
19  replaced you?
20      A.   No, I don't.
21      Q.   You ultimately signed or
22  accepted the severance offer?
23      A.   Yes.

Page 159

1      Q.   And what was your
2  understanding of the severance package
3  that was being offered to you?
4      A.   I don't remember.  I knew it
5  was a letter, and they told me they would
6  pay me certain amount for a certain
7  number of weeks or something if signed
8  this agreement.
9      Q.   Do you recall how many weeks
10  you would be paid?
11      A.   I don't.  I have a copy of the
12  letter, but off the top of my head I
13  don't recall.
14      Q.   Did you read the agreement
15  before you signed it?
16      A.   Oh, yeah.
17      Q.   Did you consult a lawyer about
18  the agreement?
19      A.   Probably.
20      Q.   Do you recall who you
21  consulted?
22      A.   Yes, I know.
23      Q.   Who?

Page 160

1      A.   I would prefer not to say.
2  They are family members.
3      Q.   If you could please tell me
4  who you consulted.
5      A.   My father.
6      Q.   Is your father a lawyer?
7      A.   He is.  My sister.
8      Q.   What is your father's name?
9      A.   My father is Bill Mayer.  My
10  sister's name is Mara, M-A-R-A, Mayer,
11  and she is an attorney as well.  My
12  wife's uncle is in Enterprise.  His name
13  is Price, Bobby Price.  He's a lawyer
14  here in the state of Alabama.  I
15  consulted with him.  I have an uncle in
16  Chicago and a cousin in Chicago that are
17  both attorneys, and I consulted with both
18  of them as well.
19      Q.   What kind of lawyer is your
20  dad?
21      A.   Criminal.
22      Q.   Is he here in Montgomery?
23      A.   He was.  Yes, he's here.  He

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 161 to 164)

Page 161

1  is retired now.
2      Q.   What about your sister, Mara?
3      A.   She's in North Carolina.
4      Q.   What kind of lawyer is your
5  sister?
6      A.   Civil, tort law, defendants.
7      Q.   What about Bobby Price, what
8  kind of lawyer is he?
9      A.   I think he just -- I'm not
10  sure.  General --
11      Q.   A little bit of everything?
12      A.   Yeah.
13      Q.   What about the folks in
14  Chicago?
15      A.   One is a -- both of them are
16  corporate lawyers, my uncle and my
17  cousin.
18      Q.   So you consulted those five
19  individuals about your severance
20  agreement?
21      A.   No.  Just in general about the
22  whole, you know, situation.  I talked
23  to -- I know I talked to my dad about

Page 162

1  severance.  I know I talked to my sister,
2  and, you know, all of them about the
3  circumstances surrounding the whole thing
4  at different points.  But I don't think I
5  had that much time between the time --
6      Q.   Did you ever have anyone
7  review the severance agreement?
8      A.   No.
9          (Whereupon, Mr. Anthony Bush
10          and Amy Lindsey entered
11          the deposition.)
12      Q.   (BY MS. MCGAHEY:)  And you
13  don't recall the specifics of the
14  severance offer?
15      A.   No, I don't.
16      Q.   And you accepted the severance
17  package; correct?
18      A.   I believe I did.
19      Q.   You signed the agreement?
20      A.   I think so.
21          (Whereupon, Defendant's
22          Exhibit 5 was marked
23          for identification.)

Page 163

1      Q.   I am handing to you what has
2  been marked as Defendant's Exhibit 5 to
3  your deposition.  If you will turn to
4  Page 7 of the agreement and let me know
5  if that is your signature on Page 7?
6      A.   Yes.
7      Q.   If you turn to Exhibit A of
8  the agreement, the last two pages, is
9  that your handwriting on the bottom of
10  Page 1 of Exhibit A?
11      A.   Down here (indicating)?
12      Q.   Yes.
13      A.   Does not look like it.
14      Q.   If you turn to Page 2 is that
15  your signature on Page 2 of Exhibit A?
16      A.   Yes, I believe it is.
17      Q.   Do you recall if the
18  handwriting on Page 1 of Exhibit A was
19  already on there when you signed the
20  severance agreement?
21      A.   I don't recall, but I don't
22  write my N's like that.  I don't think
23  that's my writing.

Page 164

1      Q.   But you don't recall one way
2  or another if that was already on the
3  document when you signed it?
4      A.   No, I don't.
5      Q.   If you look at Exhibit A,
6  please -- well, first of all, is this the
7  severance agreement that we have been
8  discussing?  And if you want to take the
9  time to read it --
10      A.   I believe so.  I mean, I don't
11  have any reason to --
12      Q.   Exhibit A indicates that you
13  were going to be receiving five weeks of
14  severance pay; does that sound right?
15      A.   Yeah.  I don't have to dispute
16  that.  I mean, I don't have any -- I
17  don't remember.
18      Q.   Did you receive any severance
19  pay?
20      A.   Yes, I did receive a little
21  bit.
22      Q.   Can you -- I didn't hear you.
23      A.   I think I got two weeks, and

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 165 to 168)

Page 165

1  then they stopped.
2      Q.  Did you get two checks?
3      A.  I don't recall.
4      Q.  But you believe you only
5  received two weeks of severance pay?
6      A.  I believe that's correct.
7      Q.  Did you cash those checks?
8      A.  Yes.
9      Q.  Who do you bank with?
10     A.  RBC.
11     Q.  Is that who you were banking
12 with in 2005?
13     A.  It was either Regions or
14 AmSouth one.
15     Q.  Now they're the same?
16     A.  They're all owned -- yeah.
17     Q.  And you signed this agreement
18 on June 14, 2005?
19     A.  I don't remember.  I know it
20 was after June 9th.
21     Q.  If you turn to Page 4 of the
22 agreement.
23     A.  Okay.

Page 166

1      Q.  In Item Number 4 did you
2  understand that you were allowed
3  twenty-one days to decide whether or not
4  to accept the severance package?
5      A.  That's what it says.  I
6  remember there was a deadline on it.  I
7  thought it was sooner than that.
8      Q.  And in Paragraph 5 did you
9  understand that even after you signed the
10 agreement you had seven days to rescind
11 it?
12     A.  Yeah, it says that.
13     Q.  No one told you otherwise?
14     A.  No.
15     Q.  Is that correct?
16     A.  Yeah.
17     Q.  And you read the agreement
18 before you signed it; correct?
19     A.  I suppose I probably did, yes.
20     Q.  And did you understand that by
21 signing this agreement you were releasing
22 any legal claims regarding the
23 termination of your employment?

Page 167

1      A.  I think it alludes to that.
2      Q.  So you had that understanding
3  when you signed the agreement?
4      A.  I believe I did, yes.
5      Q.  And if you look at Paragraph 2
6  on Page 2, you acknowledge that you were
7  specifically releasing any and all claims
8  arising from or relating to your
9  employment or the termination of your
10 employment; correct?
11     A.  That's what it says.
12     Q.  And you were releasing any
13 claim of alleged violation of federal
14 law, if you look at Paragraph 2(b)?
15     A.  Yeah.
16     Q.  The agreement references that
17 you resigned.  Do you dispute that you
18 resigned?
19     A.  Yes.
20     Q.  That's what I thought.  Just
21 wanted to make sure.  Did you sign this
22 agreement voluntarily?
23     A.  My family needed to eat.

Page 168

1      Q.  So is that yes?
2      A.  I mean, did I have a choice?
3  No, I didn't feel like I had a choice,
4  you know.  I didn't have any income, and
5  my family still wanted to eat, so --
6      Q.  Did Chris Day force you to
7  sign the agreement and accept the offer?
8      A.  No.  I just -- I felt like I
9  had no choice.
10     Q.  No one pressured you to sign
11 the release, though; is that correct?
12     A.  No.
13     Q.  No that's not correct or it is
14 correct?
15     A.  That is correct.
16     Q.  Okay.
17     A.  But circumstances --
18     MR. NELMS:  Hand gestures
19 don't show up real well on paper, so if
20 you want to finish some thoughts.
21     Q.  (BY MS. MCGAHEY:)  And on Page
22 7 above the signature line in all capital
23 letters it says "PLEASE READ CAREFULLY.

Page 169

1  THIS RELEASE INCLUDES A GENERAL RELEASE
2  OF ALL KNOWN AND UNKNOWN CLAIMS THAT
3  EMPLOYEE HAS OR MAY HAVE. EMPLOYEE
4  SHOULD CONSULT AN ATTORNEY BEFORE SIGNING
5  BELOW." Correct?
6      A.  Yes.
7      Q.  Did you meet with Brenda
8  Sellers when you signed this, or did you
9  sign it and mail it back in?
10     A.  I don't recall. I don't think
11 I went back in. I may have. It would
12 have been a place I did not want to go
13 to.
14     Q.  So after June 9, 2005 you
15 don't recall going back to the facility?
16     A.  Any of them, no, I don't. I'm
17 not saying that I didn't, but I don't
18 recall.
19     Q.  Sitting here today you don't
20 recall doing that?
21     A.  I don't recall, no.
22     Q.  Now, earlier you were telling
23 me about phone conversations that you had

Page 170

1  with Brenda Sellers about your severance
2  pay?
3      A.  Yes.
4      Q.  That you recorded?
5      A.  Yes.
6      Q.  And you can't recall when
7  those phone calls were. Could have been
8  a month after you left?
9      A.  Could have been.
10     Q.  Tell me about the first call.
11 Who initiated the call?
12     A.  Brenda.
13     Q.  What did she say?
14     A.  She told me that Piknik was
15 struggling financially. I don't remember
16 her exact words. But that Piknik was
17 struggling financially and that Onyx had
18 chosen not to honor my severance
19 agreement.
20     Q.  What, if anything, did you
21 say?
22     A.  I don't remember.
23     Q.  Did she indicate why Onyx had

Page 171

1  chosen not to honor the severance
2  agreement?
3      A.  No.
4      Q.  Did you ask?
5      A.  No. I mean, she mentioned it.
6  She said we're really having trouble, or,
7  you know, about our finances. I forget
8  how she said it. She alluded to the fact
9  that they didn't have the money and they
10 weren't going to pay me.
11     Q.  Was it a quick call?
12     A.  Yes, very quick, yes.
13     Q.  Anything else you can recall
14 being said during that telephone
15 conversation?
16     A.  No.
17     Q.  Did you contact anyone at
18 Piknik about your call with Brenda
19 Sellers?
20     A.  No, I didn't.
21     Q.  Did you contact anyone with
22 Onyx about your call with Brenda Sellers?
23     A.  No, I didn't.

Page 172

1      Q.  You just accepted it?
2      A.  That's what she told me. It
3  fit their method of how they did things.
4      Q.  Tell me about your second call
5  with Brenda Sellers where you recorded
6  your telephone call. How soon after the
7  first call was it?
8      A.  It was like the next day. It
9  was basically about the same.
10     Q.  Who initiated the call?
11     A.  She did. Or I may have called
12 her back. I don't remember.
13     Q.  What was said?
14     A.  I think I called to verify --
15 or maybe she called me. I don't
16 remember. But it was regarding, are you
17 sure, you know, that they're not going to
18 pay me. If I'm not -- I had talked to a
19 lawyer. Not a family member, somebody
20 that was recommended to me. And I think
21 that attorney may have asked me to follow
22 up with the conversation.
23     Q.  So between the time that you

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 173 to 176)

Page 173

1  signed the severance agreement and your
2  second telephone call with Brenda Sellers
3  you had contacted a lawyer?
4      A.   Yes.
5      Q.   Who did you contact?
6      A.   Julian McPhillips.
7      Q.   Can you recall anything else
8  that was said during that second
9  telephone call that you recorded with
10 Brenda Sellers?
11     A.   No.  I think it was just
12 verifying that that's what they were
13 saying.
14     Q.   So it is your belief that you
15 did not receive the full five weeks of
16 severance pay?
17     A.   No.
18     Q.   No that's not your belief, or
19 no you did not receive the full five
20 weeks of severance pay?
21     A.   They stopped paying me after
22 two weeks.  Ricky Loeb got control back
23 somehow.  I don't know if the bank just

Page 174

1  gave him the opportunity to try to
2  minimize his losses.  And he wrote me a
3  check and sent it for the balance.
4      Q.   So you were eventually paid
5  the full five weeks?
6      A.   Yes.  It was four months later
7  or whatever.
8      Q.   But you received the full five
9  weeks of severance pay?
10     A.   Yes.
11     Q.   Why do you believe that you
12 were terminated because of your race?
13     A.   Onyx is an MBE.
14     Q.   What do you mean by MBE?
15     A.   Minority Business Enterprise.
16 Chris Day informed me that they had every
17 intention of replacing us with
18 African-Americans.
19     Q.   Chris Day, the comment that
20 you've told me about that Onyx's
21 intentions were to replace management
22 with African-Americans?
23     A.   Correct.

Page 175

1      Q.   Is that what you're basing it
2  on?
3      A.   Yes.
4      Q.   What else?
5      A.   The day after I was let go an
6  African-American replaced me who I have
7  been told was less qualified and had no
8  experience.  That's hearsay.  I never met
9  the person.
10     Q.   And you don't know what her
11 qualifications were?
12     A.   I have no idea what her
13 qualifications were.
14     Q.   Or what her experience was?
15     A.   Or what her -- I do not, no.
16     Q.   Who told you that your
17 replacement was less qualified or had
18 less experience than you?
19     A.   Several people.  Specifically
20 I don't remember.  I was getting calls
21 every day from people at Piknik telling
22 me what was going on, of things that were
23 transpiring, things that were said.  I

Page 176

1  mean, I got a lot of calls from numerous
2  people.
3      Q.   Sitting here today you do not
4  recall any of them?
5      A.   Specifically?
6      Q.   Correct.
7      A.   I mean, I can tell you who I
8  talked to.  I don't know who told me
9  what.
10     Q.   Sitting here today you cannot
11 recall specifically who told you that
12 they thought your replacement was less
13 qualified or had less experience?
14     A.   No, I can't.
15     Q.   In Paragraph 3 of the Release
16 Agreement that is Defendant's Exhibit 5
17 to your deposition it says "Employee
18 agrees not to file any lawsuit at any
19 time over any claims released in this
20 Release and agrees to notify Employer
21 immediately if he should do so before the
22 time he executes and delivers this
23 Release to Employer."

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 177 to 180)

Page 177

1      When you signed this Release
2  Agreement had you already consulted with
3  a lawyer by that time?
4      A.   I don't know.
5      Q.   Had you made any decision
6  whether or not you were going to file an
7  EEOC charge by the time that you executed
8  this release?
9      A.   No.
10     Q.   And at no time did you attempt
11 to revoke the release that you had
12 signed; is that correct?
13     A.   With anybody at --
14     Q.   Piknik?
15     A.   No.
16     Q.   You never rescinded this
17 agreement?
18     A.   When they stopped paying me
19 they breached their side of the contract.
20     Q.   Well, you got your full
21 severance payment, though; correct?
22     A.   Ricky Loeb paid me.
23     Q.   When he was back in charge of

Page 178

1  Piknik; correct?
2      A.   I think he had some kind of
3  control at that point, yes.
4      Q.   Is there any other reason that
5  you believe that your termination was
6  racially motivated, besides what you have
7  already told me?
8      A.   No.
9      Q.   How soon after leaving Piknik
10 did you start working again?
11     A.   A couple of months, three
12 months, four months. I don't know.
13     Q.   Why did you start working?
14     A.   I worked for Carpedia
15 International in Toronto, Canada.
16     Q.   Is that the same Carpedia
17 International that was brought in to do
18 some consulting work for Piknik?
19     A.   Yes.
20     Q.   Did you relocate to Toronto?
21     A.   I did not. I commuted.
22     Q.   What was your position at
23 Carpedia International?

Page 179

1      A.   I was a consultant.
2      Q.   Were you salaried?
3      A.   I was salaried.
4      Q.   What were you making?
5      A.   I don't remember.
6      Q.   Are you still working at
7  Carpedia?
8      A.   No, I'm not.
9      Q.   How long did you work at
10 Carpedia?
11     A.   Three or four months, a couple
12 of months. I don't know.
13     Q.   Why did you leave Carpedia?
14     A.   Because I found a job here in
15 Montgomery.
16     Q.   What job in Montgomery did you
17 find?
18     A.   I found a job with Lear
19 Corporation.
20     Q.   With who?
21     A.   Lear.
22     Q.   L-E-E-R?
23     A.   L-E-A-R.

Page 180

1      Q.   What is Lear Corporation?
2  What does Lear Corporation do?
3      A.   They manufacture automotive
4  components.
5      Q.   When did you start working at
6  Lear Corporation?
7      A.   September, October of -- I
8  guess it would have been '06.
9      Q.   You leave Piknik in June of
10 '05; correct?
11     A.   Correct.
12     Q.   And about three or four months
13 later, three months later you start
14 working at Carpedia?
15     A.   It was two months, three
16 months. I think it was September.
17     Q.   Okay. So in September --
18     A.   I went to work at Carpedia --
19     Q.   So in September of '05 you
20 start working at Carpedia?
21     A.   Yeah.
22     Q.   And you leave three or four
23 months later?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 181 to 184)

Page 181

1    A.    And a couple of months later I
2  went to work for --
3        Q.    So you started --
4        A.    I may have started for
5  Carpedia a little earlier.  I don't
6  remember the exact timeline.
7        Q.    Was there any break in
8  employment between Carpedia and Lear?
9        A.    Yes.  I went up and did a
10  project for Carpedia.  It was a one-week
11  project.  And then I didn't work again
12  for a couple of weeks until the next
13  project started, and then I went back up
14  and I was working on that project.  Got
15  an offer from Lear and went to work for
16  them.
17        Q.    So your work with Carpedia was
18  just on a project basis?
19        A.    Yes.
20        Q.    And what did you start doing
21  with Lear?
22        A.    Cost accountant.
23        Q.    What was your salary as a cost

Page 182

1  accountant?
2        A.    Sixty-five thousand.
3        Q.    Are you still working at Lear?
4        A.    Yes.
5        Q.    Still cost accountant?
6        A.    No.
7        Q.    How long were you a cost
8  accountant at Lear Corporation?
9        A.    Two months.
10        Q.    And then what happened?
11        A.    I got promoted.
12        Q.    To?
13        A.    Assistant controller.
14        Q.    What was your salary as
15  assistant controller?
16        A.    Currently?
17        Q.    Well, what did you start out
18  at?
19        A.    Sixty-six.
20        Q.    Then at some point did your
21  salary increase?
22        A.    I got a raise, yes.
23        Q.    To what was your new salary?

Page 183

1        A.    Sixty-nine.
2        Q.    Did you receive another raise
3  while you were assistant controller?
4        A.    No.
5        Q.    How long were you assistant
6  controller?
7        A.    Still.
8        Q.    You're still assistant
9  controller?
10        A.    Yes.
11        Q.    And you're still making
12  sixty-nine thousand dollars?
13        A.    Yes.
14        Q.    After you left Piknik what did
15  you do to find new employment?
16        A.    I did a lot.  I mean, I went
17  looking for a full-time job, looking for
18  employment.
19        Q.    Tell me what did you do to
20  look for full-time employment.
21        A.    I posted my resume on every
22  job -- you know, Monster.com, all the --
23  every organization that I belong to, most

Page 184

1  of them have a job -- like AICPA and
2  Alabama State Society of CPAs both have
3  websites where you can post your resume
4  and people can look.  I have contacted
5  several accounting firms, several
6  businesses.  Went on every interview that
7  I could.
8        I contacted several old
9  employers, Whitfield Foods, and Southern
10  Classics, which I didn't work for, but I
11  had worked with Chuck.  Went and
12  interviewed with both of them.  I think
13  I -- you know, just every day contacted
14  people, sending resumes out, reading the
15  papers, looking online.
16        Q.    How soon after leaving Piknik
17  did you start posting your resume and
18  contacting potential employers?
19        A.    Within two days.  I contacted
20  Whitfield Foods the next day, so --
21        Q.    Did you have any interviews?
22        A.    Yes.
23        Q.    Who did you interview with?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 185 to 188)

Page 185

1     A.    I interviewed with Whitfield
2  Foods, and I interviewed with
3  Fleischmann's Vinegar. I interviewed
4  with Southern Classic. I interviewed
5  with about every CPA firm in Birmingham
6  and Montgomery. Interviewed with Lear,
7  of course. I interviewed with Carpedia.
8     Q.    What kind of position were you
9  looking for?
10    A.    Accounting.
11    Q.    In the finance area?
12    A.    Finance, yes.
13    Q.    You weren't looking to go back
14 into operations?
15    A.    I talked to Whitfield Foods,
16 and I talked to Southern Classics. Both
17 of those jobs would have been --
18 Fleischmann's Vinegar is a production and
19 plant manager. No, predominantly I was
20 trying to get back into finance.
21    Q.    Did you receive any job offers
22 other than your job offer from Carpedia?
23    A.    I received an offer from

Page 186

1  Whitfield Foods. It wasn't a firm offer.
2  I was told that they would -- they said
3  they would do something. We never sat
4  down and talked salary or any of that.
5  We just talked the position. They
6  said if I was interested, they would find
7  a way to work it out. Southern Classics
8  I was offered a job.
9     Q.    Whitfield Foods told you that
10 they would work with you to find you a
11 position?
12    A.    Yeah.
13    Q.    Did you follow up with
14 Whitfield Foods about that?
15    A.    Oh, yes, yes.
16    Q.    What came of it?
17    A.    It was back in production,
18 operations. And, you know, I asked them
19 to give me some time, that that really
20 wasn't what I wanted to do, to give me
21 some time to look around. If I didn't
22 find something in the finance side, I
23 would come back and talk to them. So it

Page 187

1  was kind of left open.
2     Q.    Did you have -- your
3  discussions with Whitfield Foods, was
4  that in June of 2005?
5     A.    Oh, yeah. It was within a
6  couple of days of my departure.
7     Q.    Did there ever come a point
8  where you were having discussions with
9  Whitfield Foods about the salary, what
10 kind of salary you would be paid?
11    A.    No.
12    Q.    And Southern Classics you
13 received a job offer?
14    A.    Yes. And salary wasn't talked
15 about there either.
16    Q.    What was the offer from
17 Southern Classics for, what was the
18 position?
19    A.    I would say production manager
20 type position.
21    Q.    Was that in June of '05 as
22 well?
23    A.    June or July. It was fairly

Page 188

1  soon. I would say it was probably June.
2     Q.    And you declined the job
3  offer?
4     A.    Same thing I said. You know,
5  it was in Brundidge and I wasn't going to
6  move to Brundidge. So I said, you know,
7  let me look around.
8     Q.    So you declined for the time
9  being while you were looking for other
10 options?
11    A.    Yes.
12    Q.    And then the position came
13 open with Carpedia?
14    A.    Yes.
15    Q.    Is Piknik still operating?
16    A.    No.
17    Q.    Do you know when it ceased
18 operating?
19    A.    I do not. I know Ricky Loeb
20 contacted me and asked me to come back.
21    Q.    When was that?
22    A.    August probably.
23    Q.    Of '05?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 189 to 192)

Page 189

1    A.   Yeah.  Maybe September,
2  somewhere.  I know it was -- I think I
3  had already been to Canada on the first
4  thing for Carpedia.  I think it was in
5  that interim period, and he was trying to
6  get me to come back.
7    Q.   And did you decline the offer?
8    A.   Yes.  At that point it was
9  over.
10    Q.   What do you mean it was over?
11    A.   The company wasn't there.  It
12  couldn't survive at that point.  I think
13  the bank had -- he wanted me to come back
14  and help him shut it down I guess
15  basically.
16    Q.   Was there any discussion of
17  what you would make if you went back to
18  Piknik?
19    A.   No.  I was not going back.
20    Q.   Did you ever hear Jeff Larry
21  make any derogatory remarks about
22  Caucasians?
23    A.   No.

Page 190

1    Q.   Did you ever hear Henry Hicks
2  make any derogatory comments about
3  Caucasians?
4    A.   No.
5    Q.   Did you ever hear Chris Day
6  make any derogatory remarks about
7  Caucasians?
8    A.   No.
9    Q.   Do you know who made the
10  decision to terminate your employment?
11    A.   Chris Day was running the
12  place.  I assume it was him.
13    Q.   Do you know if Chris Day
14  received any input from anyone in that
15  decision making process?
16    A.   I don't know.  I would think
17  that he would have communicated that with
18  Jeff Larry.
19    Q.   Now, you have also sued Jeff
20  Larry; correct?
21    A.   Yes.
22    Q.   How did Jeff Larry treat you
23  differently because of your race?

Page 191

1    A.   I think he was involved in the
2  decision to let me go, replace me with --
3    Q.   What do you base that on?
4    A.   He was the CEO.  He was in
5  charge of Onyx.
6    Q.   So based on his position as
7  CEO you believe that he was involved in
8  the decision to terminate your
9  employment?
10    A.   Yeah, I think he knew about
11  it, yes.
12    Q.   He knew about what?
13    A.   Knew about my termination.  I
14  don't know that he directed it, but I
15  think he blessed it.
16    Q.   Why do you think he blessed
17  it?
18    A.   I believe he blessed it
19  because they wanted to replace us
20  managers with African-Americans.
21    Q.   Did you ever hear Jeff Larry
22  say that?
23    A.   No, no, I didn't.

Page 192

1    Q.   Did you ever hear anyone say
2  that Jeff Larry had made that comment?
3    A.   No.
4    Q.   And you don't know one way or
5  another if Jeff Larry had any input in
6  your termination?
7    A.   I don't know for certain, no.
8    Q.   And you've also sued Henry
9  Hicks in that lawsuit; correct?
10    A.   Yes.
11    Q.   Tell me how you believe Henry
12  Hicks treated you differently because of
13  your race?
14    A.   I think that the Onyx group,
15  those three particular individuals, they
16  were all involved in the -- I think they
17  all three were making the decisions.  I
18  think they discussed what they were
19  doing.  They came up with their game plan
20  and executed it.  I think all three of
21  them knew about it.
22    Q.   What do you base that on?
23    A.   Prior experience.  I mean,

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 193 to 196)

Page 193

1    Jeff Larry basically knew every decision
2    that was being made.  They communicated,
3    he and Chris Day, Patrice.  And that
4    communication was always there.  So he
5    was always in the loop.
6        Q.    Were you ever privy to the
7    communications between Jeff Larry and
8    Chris Day and Patrice Daniels?
9        A.    No.  Just knew that it took
10   place.
11           MR. NELMS:  Ready for a break?
12           MS. MCGAHEY:  Almost.
13       Q.    Do you know if Henry Hicks had
14   any involvement in the decision to
15   terminate your employment?
16       A.    I believe that the three of
17   them made the decision mutually.  I don't
18   know whose idea it was, but I think all
19   three of them sat down and worked out
20   the -- not just me, but, you know, all
21   the changes that they had planned on
22   making.
23       Q.    Were you ever in any meeting

Page 194

1    with those three individuals in which
2    this plan was discussed?
3        A.    No.  It wouldn't make sense
4    for them to discuss the plan to fire me
5    in front of me.
6        Q.    You don't know if there was,
7    in fact, a plan?  This is what you
8    believe -- you believe there was one,
9    though?
10       A.    I know that most of the
11   decisions that were made were made that
12   way.  When we talked about a price
13   increase at the Brundidge facility, it
14   was made with those three.
15       Q.    What about personnel
16   decisions?
17       A.    Personnel decisions, from my
18   understanding, were made based with those
19   three.
20       Q.    What is the basis of your
21   understanding?
22       A.    That usually coming out of the
23   staff meeting, hey, you know, Chris Day

Page 195

1    or Henry or somebody would say -- you
2    know, Jeff Larry wasn't there all the
3    time.  He was there some, but not like on
4    a daily basis like Chris and Henry were.
5    And Chris would say something or Henry
6    would say something like -- or Henry
7    would say something like, hey, we talked
8    to Jeff and he said we're going to
9    implement pricing at Brundidge tomorrow
10   or we're going to -- the decisions were
11   made.  You know, the comment was made
12   several times about, you know, we talked
13   to Jeff or Jeff said, you know, we're
14   going to do this or we're going in this
15   direction.
16       Q.    I'm talking specifically about
17   personnel decisions.
18       A.    The personnel decisions that
19   were made -- you know, I was the first
20   one fired out of the management ranks, so
21   I don't know that I was privy to any
22   other discussions on that other than, you
23   know, a layoff or -- you know, we have

Page 196

1    layoffs, you know, stuff like that.  But
2    those are not specific employee personnel
3    issues.  It was a general, you know, we
4    need to lay off at the Alatex plant or we
5    need to --
6        Q.    Is there anyone else that you
7    believe treated you differently because
8    of your race?
9        A.    I think, like we talked about,
10   Anthony Barber, that I didn't like the
11   way I was treated by him.
12       Q.    Are you referring to your
13   testimony about your perception that
14   Anthony Barber was arrogant?
15       A.    Yes, condescending.
16       Q.    How, if at all, did Mr.
17   Barber's arrogance or condescension
18   affect your employment?
19       A.    I don't believe his did.
20       Q.    Is there anyone else that you
21   believe treated you differently because
22   of your race?
23       A.    No.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 197 to 200)

Page 197

1     MS. MCGAHEY:  This is a good
2   breaking point, Andy.
3     MR. NELMS:  Okay.
4     (Whereupon, a break was
5       taken from 2:55 to 3:03 p.m.)
6   Q.   (BY MS. MCGAHEY:)  Mr. Mayer,
7   I want to ask you a couple of more
8   questions about Defendant's Exhibit 5,
9   which is the Release Agreement.
10     A.   Okay.
11    Q.   When you signed the agreement
12   you understood that you could have
13   consulted a lawyer before you signed it;
14   correct?
15     A.   Yes.
16    Q.   And you consulted several
17   lawyers about it; correct?
18     A.   Not specifically this, just
19   about the whole circumstance.
20    Q.   Did you discuss with any of
21   your family members the terms of the
22   Release Agreement?
23     A.   I don't recall.

Page 198

1     Q.   Did you provide a copy of the
2   Release Agreement to any of your family
3   members to review?
4     A.   I don't think so, because I
5   think I only had the one copy.  I
6   remember going to get a Xerox copy made
7   after I signed it.
8     Q.   When you signed the agreement
9   did you understand the contents of it?
10     A.   No.  I knew if I didn't sign
11   it I didn't get paid.
12    Q.   What did you not understand?
13     A.   I mean, I didn't -- it wasn't
14   a matter of whether I understood it or
15   didn't understand it.  It was a matter of
16   I had to feed my family.
17    Q.   Did you understand --
18     MR. NELMS:  Her question is
19   did you understand it?
20     A.   Sure
21    Q.   Also, Exhibit A to your
22   severance agreement mentions that in
23   addition to the five weeks of severance

Page 199

1   pay --
2     A.   Where are we at?
3     Q.   Exhibit A.  It mentions that
4   you're going to receive five weeks of
5   severance pay and five weeks of vacation.
6   Is that consistent with your
7   understanding?
8     A.   I think so.
9     Q.   And we have talked about that
10   you received the five weeks of severance
11   pay; correct?
12     A.   I don't remember how I was
13   getting paid.  I don't know if it was
14   every two weeks, which I'm assuming it
15   was.  And I probably got a check, and
16   then I got a second check, and then I got
17   a call from Brenda.  I guess I should
18   have gotten -- ten weeks of pay would
19   have been five paychecks; right?  Every
20   two weeks.  So I assume that I would have
21   gotten -- I think I got two, and then
22   they stopped.
23     Q.   Do you recall the amounts of

Page 200

1   the checks that you did receive?
2     A.   No, no.  But it would have
3   been consistent with the agreement.  It
4   would have been --
5     Q.   But you said that eventually
6   Ricky Loeb sent you a check to pay the
7   rest of the severance agreement amount;
8   correct?
9     A.   Yes.
10    Q.   Was it a single check?
11     A.   Single check, hand-written.
12    Q.   And that settled up the five
13   weeks of severance and the five weeks of
14   vacation?
15     A.   I think so.  I think Ricky was
16   doing me a favor.
17     (Whereupon, Defendant's
18       Exhibit 6 was marked
19       for identification.)
20    Q.   I'm going to show you what I
21   have marked as Defendant's Exhibit 6 to
22   your deposition.  Is that your signature
23   on the bottom of the first page?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 201 to 204)

Page 201

1    A.    Yes.
2    Q.    If you turn to the second
3  page, is that your signature?
4    A.    Yes.
5    Q.    Is this the charge of
6  discrimination that you submitted to the
7  EEOC?
8    A.    I believe it is, yes.
9    Q.    Now, on the first page you
10  checked the box for race; correct?
11    A.    Correct.
12    Q.    And that's indicating that you
13  believe you were being discriminated against
14  based on your race?
15    A.    Correct.
16    Q.    And just for the record you
17  are a Caucasian male?
18    A.    Correct, for the record.
19    Q.    You also checked that you
20  believed you were being discriminated
21  against based on your sex?
22    A.    I think I may have gotten some
23  help filling this out.

Page 202

1    Q.    Well, my --
2    A.    The race part of it I agreed
3  with. The sex part I think I was told
4  just to check. But, yes, it's checked.
5    Q.    Okay. I'm going to ask you
6  who told you to check the sex box. If
7  it's your lawyer, then don't answer the
8  question. Well --
9    A.    Can we just move on?
10    Q.    I think I know the answer to
11  that. Are you claiming in this lawsuit
12  that you were treated differently because
13  of your sex?
14    A.    I'm saying in this lawsuit
15  that I was treated differently and I was
16  terminated, my employment was terminated,
17  because of my color.
18    Q.    Because of your race?
19    A.    Correct.
20    Q.    Are you making any claims that
21  you were terminated or treated
22  differently because of your sex?
23    A.    No.

Page 203

1    Q.    That saves a lot of questions,
2  then. If you will turn to the second
3  page, please.
4    A.    Okay.
5    Q.    Says you have been a regular
6  employee since about April 24, 2000. And
7  it says in your job you were considered a
8  plant manager?
9    A.    That was the title that was on
10  that sheet you showed me.
11    Q.    So at the time of your
12  termination you were considered a plant
13  manager?
14    A.    Yes.
15    Q.    And you go on to describe the
16  meeting in which you learned that you
17  were being terminated; correct?
18    A.    Say that again.
19    Q.    In Defendant's Exhibit 6 on
20  Page 2 you describe the meeting with
21  Chris Day and Brenda Sellers --
22    A.    That I was --
23    Q.    -- in which you were

Page 204

1  terminated?
2    A.    Yes.
3    Q.    And you have already told me
4  everything that you can recall about that
5  meeting?
6    A.    Yes, which is very little.
7    Q.    There's nothing else that you
8  have to add about that meeting; correct?
9    A.    Correct.
10    Q.    Is that correct?
11    A.    That's correct.
12    Q.    And you signed this EEOC
13  charge on July 14, 2005?
14    A.    Yes.
15    Q.    And this was after you had
16  already signed the severance and release
17  agreement that's Defendant's Exhibit 5?
18    A.    Yes, that's correct.
19    Q.    By July 14, 2005 had you
20  already been in contact with a lawyer?
21    A.    Yes.
22    Q.    Is that lawyer Mr. Nelms?
23    A.    Yes.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 205 to 208)

Page 205

1    Q.    Prior to going to Mr. Nelms I
2   understand you went to see Julian
3   McPhillips?
4    A.    I didn't -- I called him.
5   Talked to him at his house.
6    Q.    Personal friend of yours?
7    A.    My wife teaches his son or
8   daughter or kid, and she said let's call
9   him and ask him, so I called him.
10    Q.    Besides speaking with Mr.
11   McPhillips and then going to see Mr.
12   Nelms, did you talk with any other
13   lawyers?
14    A.    I talked to my family that I
15   told you, mainly, you know, what's going
16   on.
17    Q.    Were you talking to your
18   family members in their capacity as your
19   family member or as lawyers?
20    A.    I would say more as a family
21   member.  Of course, you know, they're
22   lawyers, so it's kind of -- you know, I
23   don't really know about that once you

Page 206

1   call -- maybe your sister knows something
2   or, hey, call -- and my wife had me call
3   her uncle who is a lawyer.
4    Q.    You spoke with your father
5   about it; correct?
6    A.    Yes.
7    Q.    What did he say?
8    A.    He asked me how I was going to
9   feed my family, and I said I don't know
10   yet.  He said, well, then you better sign
11   the agreement.  He said, if you were
12   discriminated against, then the
13   agreement, you know, shouldn't make a
14   difference.  He said, but you got to feed
15   your family first.  And it made sense.
16    Q.    Anything else that you can
17   recall from your discussions with your
18   father about your claims?
19    A.    No.  He made a few
20   recommendations of lawyers that I should
21   contact that he felt like would be able
22   to represent me.
23    Q.    Do you recall who he

Page 207

1   recommended?
2    A.    No, I don't.
3    Q.    Did he recommend Andy?
4    A.    No.
5    Q.    What about your sister, Mara,
6   tell me about your conversations with
7   her.
8    A.    Hers were mainly just
9   conversations about the whole
10   circumstances, you know, how I got fired
11   for -- I mean, the plants, all three of
12   them were running better than they ever
13   had, they were more efficient than they
14   ever had been, and the costs were lower
15   than they ever had been.
16    Of course, money, we were
17   doing very poorly because a lot of money
18   -- we weren't making a lot, and what was
19   coming in was going right back out into
20   Onyx's pockets.  But, you know, it was
21   about the whole circumstances mainly was
22   the conversation with her.
23    Q.    Did she give you any advice --

Page 208

1    A.    No.
2    Q.    -- on what to do?
3    A.    No.
4    Q.    You made a comment that all of
5   the money that was coming into Piknik was
6   going into Onyx's pockets.  What do you
7   mean by that?
8    A.    I mean we were a struggling
9   company, and every penny counted.  And we
10   weren't spending anything, but yet Onyx
11   was paying themselves pretty healthy
12   salaries.  We were paying a management
13   fee.  We were paying all their travel and
14   entertainment expenses.  And it just, to
15   me, didn't seem prudent when a company is
16   in a position it's in --
17    MR. NELMS:  Just answer her
18   question.
19    Q.    Go ahead.  Didn't seem prudent
20   to what?
21    A.    Didn't seem prudent to act as
22   lavishly and spend money or take money
23   out of the company the way they were.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 209 to 212)

Page 209

1    Q.    How did you know what their
2  salaries were or what the management fee
3  was, the expenses and traveling expenses
4  and entertainment expenses were being
5  paid?
6    A.    I saw the agreement on the
7  management fees. The rest of it I was
8  told by Ricky Loeb.
9    Q.    So there was an agreement in
10  place that governed the management fee
11  that was to be paid to Onyx?
12    A.    Yes.
13    Q.    Did the management agreement
14  also contain provisions regarding
15  salaries to be paid to the Onyx folks?
16    A.    I don't believe there was.
17    Q.    How would you describe the
18  relationship between Ricky Loeb and the
19  Onyx representatives?
20    A.    Hostile, very hostile.
21    Q.    Was it hostile from day one?
22    A.    No, but it went that way real
23  quick. We got e-mails from Onyx saying

Page 210

1  we weren't allowed to talk to Ricky Loeb,
2  that we would be terminated if we had any
3  conversation with him.
4    Q.    And that went out to both
5  white employees and black employees;
6  correct?
7    A.    I think it went out to all.
8    Q.    What about your conversation
9  with Bobby Price, tell me about those
10  conversations with respect to your claims
11  in this lawsuit.
12    A.    I basically just outlined the
13  circumstances surrounding my termination,
14  and he said it sounds like you got a
15  case. That was pretty much the extent of
16  the conversation.
17    Q.    What about your uncle in
18  Chicago?
19    A.    He wasn't able to help me.
20  He's a corporate lawyer, my cousin as
21  well. Just basically talking to them
22  about -- of course, talking to them about
23  family, how, you know, I lost my job; if

Page 211

1  you know somebody that needs somebody,
2  you know. Hey, what happened, and you
3  explained it.
4    Q.    Did you ever ask those
5  corporate lawyers to take a look at the
6  severance agreement?
7    A.    No.
8    Q.    Why not?
9    A.    I don't know. I mean, once
10  they defaulted, you know, I think I
11  was -- it wasn't very long after that I
12  went to Andy.
13    Q.    When did Piknik default?
14    A.    It was after the -- I think I
15  got two checks, and then I got the call
16  they weren't going to pay me. So it
17  would have been maybe a month if it was
18  every two weeks.
19    Q.    Do you know when Onyx was
20  removed from Piknik?
21    A.    After I left. I don't know.
22  I want to say probably sometime in
23  August, maybe September. I know Ricky

Page 212

1  got -- was calling me asking me to come
2  back and help him, and Onyx had -- that
3  had separated, and I don't remember the
4  time frame. September, October.
5    Q.    You just can't really recall
6  specifically sitting here today?
7    A.    No.
8    Q.    Is that correct?
9    A.    Correct.
10    Q.    Are you seeking damages for
11  emotional distress? This is your
12  deposition.
13    A.    I'm going to say yes.
14    Q.    Tell me about the emotional
15  distress that you claim you suffered as a
16  result of the discrimination that you
17  believe you suffered.
18    A.    I take a lot of pride in my
19  work. I'm very detailed, success driven.
20  I'm my own worst critic. I've succeeded
21  at every job I've ever had. And to be
22  terminated from my employment and not --
23  because of my color, you know, it was a

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 213 to 216)

Page 213

1  slap in the face. And, you know, the
2  stress of, okay, now I don't have a job.
3  My family's got a certain
4  lifestyle that they have become
5  accustomed to, how am I going to provide
6  for them. I've got a daughter going to
7  college next year at the time. Right
8  behind her is my oldest son. He will be
9  in college. I've got to get them through
10  college. You know, everybody is counting
11  on me. You know, I didn't understand
12  losing my job because of my color. It
13  just, you know --
14  I can pull out financial
15  statements and I can show you that the
16  plant was run better than it ever had
17  when I was in the position of Director of
18  Operations. So my performance -- if I
19  wasn't doing a good job, our results
20  would not show up in the financial
21  statements like they did. So it's very
22  stressful, stressful time.
23  Q.   Are you saying that your level

Page 214

1  of stress increased after you left
2  Piknik?
3  A.   Oh, it was very stressful,
4  yes. I was sick to my stomach an awful
5  lot until I finally went back to work and
6  started bringing in a paycheck, and
7  worried about how I was going to feed my
8  family and take care of them. I was
9  physically sick.
10  Q.   Did that increased level of
11  stress that you felt at any point return
12  to normal, for lack of a better term?
13  A.   Return to normal? After I
14  started working again.
15  Q.   Once you started working at
16  Carpedia?
17  A.   At Lear. Carpedia I was in
18  Toronto traveling. You know, I knew I
19  couldn't do that long-term. So once I
20  got to Lear and it settled down. You
21  know, that first six months or so I was
22  probably still a little stressed. You
23  know, lost one job, am I going to lose

Page 215

1  another. Two months later probably.
2  When I got promoted. You know, they
3  recognize, hey, this guy is pretty sharp,
4  let's put him in this new role. So that
5  kind of settled me down.
6  Q.   You also said that you were
7  physically sick. Tell me the symptoms
8  that you suffered.
9  A.   I was nauseous, just sick to
10  my stomach about how I was going to, you
11  know, find a job to take care of my
12  family, how long am I going to be out,
13  how am I going to pay for the COBRA
14  payments. You know, both kids were in
15  private schools. How am I going to make
16  my private school payments. My wife is a
17  teacher at a private school. She doesn't
18  make anything really, so it wasn't
19  like -- I mean, financially we were going
20  to be devastated if I didn't find work
21  quick.
22  Q.   You said you were nauseous.
23  How often would you get these feelings of

Page 216

1  nausea?
2  A.   Just about constantly.
3  Q.   When did it start?
4  A.   At 10 o'clock on June 9th,
5  whenever -- you know, I don't remember
6  the exact time. But the minute I got
7  fired. I was distraught.
8  Q.   And the feelings of nausea
9  stayed with you pretty much twenty-four
10  hours a day?
11  A.   Off and on. It wasn't like
12  constant. You know, if I was busy and I
13  was talking on the phone to somebody
14  about setting up an interview or, you
15  know, looking on the internet for jobs
16  and stuff like that and I was
17  concentrating on that, then I wasn't
18  necessarily sick. But in the evening if
19  I stopped and take a break and go sit
20  down and, you know, watch TV or
21  something, I would start thinking, man,
22  I'm unemployed, and I would get to
23  feeling poorly. You know, in the

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 217 to 220)

Page 217

1   mornings -- I didn't sleep well at night.
2       Q.   Were you throwing up?
3       A.   I did.
4       Q.   How many times did you throw
5   up?
6       A.   Probably once, and I believe
7   it was that afternoon that I came home
8   having been terminated. I think it was
9   that day, or it may have been the very
10  next day.
11      Q.   The afternoon of June 9th?
12      A.   I would say so. I went home
13  and told my wife, and I think that's the
14  afternoon I got sick.
15      Q.   At some point did your nausea
16  go away?
17      A.   I mean, it was off and on
18  until I --
19      Q.   Are you still experiencing
20  nausea today?
21      A.   No, no. I had a heart attack.
22  It's all gone now.
23      Q.   When is the last time that you

Page 218

1   felt these feelings of nausea that you
2   believe were brought on by the alleged
3   discrimination?
4       A.   I would say probably shortly
5   after I started to work for Lear I got
6   comfortable that I was going to be okay.
7   It wasn't constant. It was when I
8   stopped and thought about it.
9       Q.   You also said that you didn't
10  sleep well at night. When did you start
11  having problems with sleeping?
12      A.   The day I got fired.
13      Q.   Before the day you got fired
14  how much were you sleeping per night?
15      A.   Eight hours.
16      Q.   After you got fired how much
17  were you sleeping at night?
18      A.   Six hours. I don't know that
19  that's the right -- you know, I would lay
20  in bed at night thinking about, you know,
21  what am I going to do. I don't know how
22  much time that really took up, but I
23  would wake up several times during the

Page 219

1   night.
2       Q.   And how long did you
3   experience this sleeplessness?
4       A.   Probably until I went to work
5   for Carpedia.
6       Q.   Were there any other physical
7   manifestations of the emotional distress
8   that you believe you suffered?
9       A.   No.
10      Q.   Are you also seeking to
11  recover lost benefits?
12      A.   Yes.
13      Q.   What benefits are you seeking
14  to recover?
15      A.   Can --
16      Q.   Do you understand my question?
17      A.   I do. I would like to kind of
18  answer in a different way, if I can.
19      Q.   Sure. It may create some more
20  follow-ups, but proceed if you would
21  like.
22      A.   What I really want out of this
23  whole thing is I want Henry Hicks, Chris

Page 220

1   Day and Jeff Larry to never treat another
2   human being the way they treated me.
3   More than anything else I want to prevent
4   them from ever doing this to somebody
5   else. And if that means getting
6   benefits, getting emotional distress,
7   getting -- whatever it takes for them to
8   learn that they cannot treat people the
9   way they did, that's what I want.
10      Q.   What do you think that would
11  take?
12      A.   I don't know.
13      Q.   Monetary damages?
14      A.   If monetary damages is what it
15  takes, then that's what I want.
16      Q.   Tell me about the lost
17  benefits you're seeking to recover.
18      A.   I'm sorry.
19      Q.   Tell me about the lost
20  benefits you're seeking to recover from
21  Jeff Larry, Henry Hicks and Chris Day.
22      A.   I paid COBRA insurance for six
23  months or whatever it was, eight hundred

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 221 to 224)

Page 221

1 dollars a month. I pulled money out of
2 my retirement that I paid penalties and
3 everything else on during my period of
4 unemployment. Not only did I take money
5 out of my retirement, but I put nothing
6 in. And then whatever gains I would have
7 earned on the money, you know, the
8 investment I did have, I didn't get
9 because I pulled my money out to pay
10 bills.
11     Q.    Anything else?
12     A.    Of benefits? I think that's
13 it.
14     Q.    You said you paid for COBRA
15 insurance coverage for roughly six
16 months?
17     A.    I don't recall how long it
18 was. I have the records. If I had to
19 reproduce them, I could.
20     Q.    We've asked for them to be
21 produced.
22     A.    Then I have probably already
23 provided them. Was that not in the

Page 222

1 interrogatories?
2     Q.    I have not received them. I'm
3 not saying you haven't given them to
4 someone. What kind of insurance coverage
5 did you have at Piknik at the time of
6 your termination?
7     A.    I want to say it was United
8 Healthcare.
9     Q.    Family coverage?
10     A.    Family coverage.
11     Q.    Did you have to contribute or
12 pay for that coverage?
13     A.    After Onyx got there, yes.
14     Q.    How much did you have to pay?
15     A.    I don't recall.
16     Q.    Did you have health insurance
17 coverage through Carpedia?
18     A.    No.
19     Q.    Was it just a benefit that was
20 not offered to you?
21     A.    No, it was not offered. They
22 are a Canadian company, and they practice
23 socialized medicine there.

Page 223

1     Q.    Do you have health insurance
2 benefits through Lear?
3     A.    I do now, yes.
4     Q.    Were you eligible for the
5 health insurance benefits when you first
6 started at Lear?
7     A.    Thirty days after. Not
8 exactly thirty days. It's the full month
9 after I started employment. So if I
10 started on the 2nd of the month, it would
11 be almost sixty days, because that first
12 month wouldn't be a whole month. Does
13 that make sense? It's kind of weird.
14 But it's the first full month that you
15 work after employment. I started like on
16 the 25th, so I waited five days and then
17 the next full month, and then my benefits
18 started.
19     Q.    So you waited two months and
20 five days?
21     A.    I waited one month and five
22 days. Had I started on the 1st, it would
23 have been sixty-nine days -- or

Page 224

1 fifty-nine days. I'm sorry.
2     Q.    And how much are you paying
3 for health insurance benefits through
4 Lear?
5     A.    I think it's a hundred and
6 fifteen dollars a month.
7     Q.    You said you pulled money out
8 of your retirement fund?
9     A.    Yes, I did.
10     Q.    It was a 401-K?
11     A.    No. It was a Roth. Not Roth.
12 An IRA.
13     Q.    When you were at Piknik were
14 you contributing to that IRA every month?
15     A.    I believe I was.
16     Q.    Did you deplete --
17     A.    The IRA, no, I was not
18 contributing monthly. I contributed
19 annually.
20     Q.    Okay.
21     A.    I had a 401-K at Piknik I
22 believe that I was contributing to.
23     Q.    Did Piknik make any

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 225 to 228)

Page 225

1  contribution to your 401-K at the time of
2  your termination?
3      A.   I don't believe so.
4      Q.   Did you roll over your 401-K?
5      A.   Yes.
6      Q.   And you were making
7  contributions to your IRA account
8  annually?
9      A.   Yes.
10     Q.   At the end of the year or
11 beginning of the year?
12     A.   15th of April.
13     Q.   So April 15, 2005 did you make
14 a contribution to your IRA?
15     A.   I don't recall. I would
16 assume that I did.
17     Q.   Do you recall if you made a
18 contribution to your IRA at any time in
19 2006?
20     A.   I haven't made a contribution
21 since I lost employment to my IRA.
22     Q.   Why not?
23     A.   I have a 401-K that is matched

Page 226

1  at Lear. It's more.
2      Q.   So you have just chosen to
3  invest in your 401-K as opposed to your
4  IRA?
5      A.   Yes. I get a larger return on
6  the 401 than I would on the IRA because
7  of the matching.
8      Q.   What kind of penalty did you
9  receive for pulling money out of your
10 IRA?
11     A.   Income tax on it, and then I
12 paid the 10 percent early withdrawal
13 penalty.
14     Q.   So you had a 10 percent
15 penalty on pulling it out early?
16     A.   Yes, plus income taxes.
17     Q.   Wouldn't you have had to pay
18 income tax on it at some point?
19     A.   At retirement.
20     Q.   So at some point you would
21 have to pay income tax?
22     A.   Sometime I would, yes.
23     Q.   How much did you pull out of

Page 227

1  your IRA?
2      A.   I don't remember. I think it
3  was eight thousand dollars roughly.
4      Q.   Did you deplete your IRA
5  account?
6      A.   No.
7      Q.   And so if it's roughly eight
8  thousand dollars that you pulled out,
9  would that be about an eight hundred
10 dollar penalty?
11     A.   Roughly. 10 percent, yeah.
12     Q.   After you left Piknik did you
13 have any other stresses going on in your
14 life?
15     A.   Other than being unemployed,
16 no.
17     Q.   Did you ever file a claim for
18 unemployment compensation?
19     A.   I did.
20     Q.   Do you recall how much you
21 received in unemployment compensation?
22     A.   I do not. I have records.
23     Q.   Have you given those records

Page 228

1  to your lawyer?
2      A.   I would assume that if he
3  asked for them I gave them to him. I
4  know I have it all documented, because I
5  documented it when the interrogatories
6  were done.
7      Q.   After the meeting on June 9,
8  2005 in which you learned that you were
9  being asked to leave Piknik, did you
10 leave immediately?
11     A.   Yes. Well, I went and packed
12 up my office and then I left, yes.
13     Q.   Did you leave your laptop?
14     A.   Yeah. It was the company's.
15     Q.   Would you agree that had you
16 remained employed at Piknik that you
17 would have been out of a job once Piknik
18 stopped operating?
19     A.   I think if Onyx hadn't been
20 there Piknik would still be operating.
21     Q.   So then your answer is no?
22     A.   No.
23     Q.   Besides the conversations or

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 229 to 232)

Page 229

1  discussions that you have already told me
2  about, who else have you talked with
3  about your lawsuit or your claims in this
4  lawsuit?
5      A.   My wife knows about it. I
6  have spoken with Bob Winter, Jerry,
7  Shannon and Bob. I talk to Andy about
8  it.
9      Q.   I don't want to know what was
10  discussed between you and Andy.
11      A.   Okay. The four of them and my
12  wife. You know, I have probably
13  mentioned to my dad and my sister. You
14  know, if they ask what's going on, I tell
15  them, but nothing in detail.
16      Q.   Tell me about your discussions
17  with Bob Winter.
18      A.   Just basically about, you
19  know -- a lot of it is, you know, talking
20  about, you know, let's put this together
21  and do you have this document, do you
22  have a copy of that e-mail, do you have
23  different things that occurred while we

Page 230

1  were there that we talk about that, you
2  know -- there was several e-mails that we
3  thought would solidify our case.
4      Q.   Was this meetings that y'all
5  had all together the four of you present?
6      A.   No. Most of it was, you know,
7  by e-mail, occasional phone call, you
8  know, between either Bob or I or Jerry,
9  occasionally maybe Shannon. I would say
10  most of it was via e-mail, hey, I'm
11  looking for this, do you remember that
12  document, do you have a copy of it. That
13  was pretty much it. Just preparing the
14  case.
15      Q.   Same thing for Jerry
16  MacCartney?
17      A.   I can't speak for him.
18      Q.   No, no, no. I'm sorry. Bad
19  question. Your conversations with Jerry
20  MacCartney, same thing, what you just
21  told me when I asked you about Bob
22  Winter?
23      A.   Yes.

Page 231

1      Q.   And same thing for Shannon
2  McGlon?
3      A.   Yes.
4      Q.   So y'all all kind of get
5  together, communicate and see about
6  getting documents together to put
7  together your case?
8      A.   Yes. And most of it happened
9  either when we initially filed the
10  lawsuit or when the interrogatories came
11  out, you know, putting those together,
12  the information in those. You know,
13  there was a few communications back and
14  forth, you know, certain documents and
15  things that we have.
16      Q.   Did you and your coplaintiffs
17  work together in putting your
18  interrogatory responses together?
19      A.   No, no. I did mine
20  individual -- you know, I communicated to
21  them about, you know, certain e-mails and
22  certain things that were said.
23      Q.   Did you review any of their

Page 232

1  interrogatory responses before they were
2  submitted?
3      A.   No, never saw them.
4      Q.   Do you socialize with any of
5  your coplaintiffs?
6      A.   No.
7      Q.   Have you ever been to any of
8  their houses?
9      A.   No.
10      Q.   Gone to dinner with any of
11  them outside of a business environment?
12      A.   No. I think I met Shannon and
13  her husband at a football game once.
14  They had a tent, and we walked by and
15  said hello.
16      Q.   Are you an Auburn fan?
17      A.   No.
18      Q.   Have you spoken with Ricky
19  Loeb about your claims in this lawsuit?
20      A.   No.
21      Q.   Have you -- I'm sorry. Go
22  head.
23      A.   Ricky asked me -- when the

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 233 to 236)

Page 233

1  lawsuit was filed he called me and asked
2  me if I was suing him. I said, no, this
3  has got nothing to do with you, Ricky.
4  That was -- so he knew that the lawsuit
5  existed, but I never discussed it with
6  him.
7      Q.    Besides your coplaintiffs and
8  Ricky Loeb, have you talked with anyone
9  else about your claims in this lawsuit
10 that used to work at Piknik?
11     A.    No.
12     Q.    You haven't spoken with Brenda
13 Sellers other than the two conversations
14 that you recorded that you told me about?
15     A.    No.
16     Q.    Who approached you about
17 filing a claim with the EEOC?
18     A.    I don't remember.
19     Q.    Was it Shannon McGlon?
20     A.    It was one of the three. I
21 don't recall which one it was.
22     Q.    Do you recall what was said,
23 regardless of who it was?

Page 234

1      A.    Not specifically.
2      Q.    What about generally?
3      A.    It was something about, hey, I
4  think we got a case here, I think we've
5  been done wrong, I think there's criminal
6  activity -- I highly suspect there was
7  criminal activity that transpired. I
8  think we got a case, how about we meet
9  about it or talk to a lawyer about it or
10 something, you know, we really want to
11 stop Onyx. I think I said, well, I'm all
12 in.
13     Q.    Did y'all meet about it
14 outside the presence of Andy?
15     MR. NELMS: Or any lawyer.
16     A.    I don't think so. I think the
17 phone conversation that started it was
18 not in the presence of a lawyer. But
19 after that I think it was, hey, we're all
20 meeting at your office.
21     Q.    Have you already told me about
22 the conversation in which it all got
23 started? You said that initially when it

Page 235

1  all got started it was outside the
2  presence of a lawyer, and I'm asking have
3  you told me about the discussion that got
4  it all started?
5      A.    Basically. You know, it was
6  criminal activity, it was discrimination
7  and --
8      Q.    You're saying the
9  discrimination was criminal activity?
10     A.    No, no, no. Separate.
11     Q.    Did you keep a diary or a
12 journal or anything along those lines
13 during your employment at Piknik?
14     A.    I did.
15     Q.    Do you still have that journal
16 or diary?
17     A.    I assume that I do.
18     Q.    Does it have any notations in
19 there that you believe relate to your
20 claims in this lawsuit?
21     A.    I would have to find it and
22 look at it.
23     Q.    Well, if you find it and look

Page 236

1  at it and see that it contains
2  information that you feel --
3      A.    I will give it to my lawyer, I
4  certainly would.
5      Q.    I believe in some of your
6  discovery responses you indicated that
7  you have a CD of e-mails; is that
8  correct?
9      A.    A sea of --
10     Q.    CD?
11     A.    I don't have a CD. I do have
12 copies of e-mails.
13     Q.    Have you given copies of those
14 e-mails to your lawyer?
15     A.    Not every e-mail, but the
16 e-mails that are pertinent to this I
17 believe I have.
18     Q.    Did you provide hard copies or
19 a CD to your lawyer?
20     A.    I don't recall.
21     Q.    Well, I don't have the benefit
22 of having those e-mails in front of me
23 today. Can you identify the e-mails that

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 237 to 240)

Page 237

1  you believe relate to your claim?
2      A.    One in particular.
3      Q.    Okay.  Tell me about it.
4      A.    Where Henry is asking -- he
5  met with Pepsi and asked one of the
6  people in a meeting about where they
7  could recruit African-Americans for
8  Piknik Products.  And the e-mail is going
9  out to the group just summarizing his
10 meeting with this person and how she had
11 said there's a university, an
12 African-American university, somewhere in
13 the Southeast.  I don't recall where it
14 was or the name of it.  But he
15 specifically says he asked her, and she
16 responded that it's a -- has a reputation
17 for putting out qualified, you know,
18 graduates.
19     Q.    Are there any other e-mails
20 that you believe relate to your claims in
21 this lawsuit besides the one you just
22 described?
23     A.    I think there's probably some

Page 238

1  e-mails that the -- depending on the
2  defense -- and I'm not a lawyer, so I
3  don't know.  Depending on what defense
4  they come back with, some of the things
5  they say, we may have some e-mails that
6  refute those claims.
7      Q.    Can you give me some examples?
8      A.    Should I --
9          MR. NELMS:  Tell her what you
10 know.
11     A.    Okay.  If they said they
12 weren't involved in the day-to-day
13 operations and making day-to-day
14 decisions about the day-to-day operations
15 at Piknik Products, I have e-mails that
16 will refute that that will show that they
17 make day-to-day operations --
18 operating --
19         MR. NELMS:  I believe her
20 question was your claims of race
21 discrimination.
22     A.    Oh, race discrimination, no.
23     Q.    You have now said that you

Page 239

1  have e-mails that could refute any
2  potential defenses that may be raised;
3  right?  I think that's what you said.
4      A.    If they said, you know -- and
5  I don't understand the law completely, so
6  you have to bear with me here.  If they
7  said we didn't fire him, we never made
8  those kind of decisions, we didn't make
9  personnel decisions or hiring or firing
10 decisions, I think I could produce an
11 e-mail or two that would show that, yes,
12 they did make those day-to-day -- you
13 know, saying that we didn't discriminate
14 because we didn't fire him, we didn't
15 make the decision to fire him.
16     Q.    I think the best way to
17 approach this is to wait until I get
18 those e-mails instead of talking in
19 abstracts.
20     A.    Okay.
21         (Whereupon, Defendant's
22         Exhibit 7 was marked
23         for identification.)

Page 240

1      Q.    I'm going to hand you what has
2  been marked as Defendant's Exhibit 7 to
3  your deposition.  Have you seen this
4  document before?
5      A.    It looks familiar.  Yeah, I
6  think this may be the document that I was
7  referring to.
8      Q.    Is this the e-mail that you
9  were talking about when you were telling
10 me that Henry Hicks met with a Pepsi
11 person and asked where to recruit
12 African-Americans for Piknik?
13     A.    Correct.
14     Q.    It says "Attachment A.  Note
15 the underlined sentences that refer to
16 our claim of discrimination."  Did you
17 type that up?
18     A.    I did not.
19     Q.    If you look at the last page,
20 do you see where there's some underlined
21 sentences?
22     A.    Yes.
23     Q.    Did you underline those

JERRY A. MCCARTNEY, ET AL.

ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER

August 16, 2007

(Pages 241 to 244)

Page 241

1   sentences?
2       A.   I did not.
3       Q.   The e-mail summarizes a call
4   that Henry Hicks had with April Blackmore
5   and Jeff Larry?
6       A.   Yes.
7       Q.   Or not a call, a meeting?
8       A.   Yes.
9       Q.   And the e-mail summarizes some
10  operational issues and lists some action
11  items to be done for Pepsi?
12      A.   Yes.
13      Q.   And the very last page
14  indicates that there was also a
15  discussion about recruiting minorities
16  for operating roles; correct?
17      A.   Correct.
18      Q.   What was your understanding of
19  the term "operating roles," if you had an
20  understanding of what that meant?
21      A.   I took this as -- we had no
22  vacancies.
23      Q.   How do you know?

Page 242

1       A.   At the time?  Because I knew
2   who was hiring and what we had.  You
3   know, we weren't up there saying, hey, I
4   need help.  So I assumed that they were
5   replacements for somebody.
6       Q.   What was your understanding of
7   "operating roles"?
8       A.   The day-to-day operation, you
9   know, managers, supervisors, the salary
10  staff that ran the plant.
11      Q.   And you had the impression
12  that that included you?
13      A.   No.  I mean, I was copied in
14  on this e-mail.
15      Q.   Correct.
16      A.   I would hope they wouldn't
17  say, hey, we're going to replace you.  I
18  think they were saying that they were --
19  that a push was coming, that they were
20  going to try to find some candidates to
21  displace some existing people.
22      Q.   But nothing in this e-mail
23  says that they are going to replace

Page 243

1   existing employees; correct?
2       A.   Nothing in the e-mail says
3   that, no.
4       Q.   Do you know if Piknik was able
5   to establish business relationships with
6   customers because of the MBE status?
7       A.   I don't think so.  We didn't
8   gain a single customer because of MBE
9   status that we wouldn't have gained
10  otherwise.
11      Q.   Do you know -- and April
12  Blackmore is with PepsiCo?
13      A.   PepsiCo, yes.
14      Q.   Do you know if PepsiCo has a
15  policy or a program in place to do
16  business with minority-owned businesses?
17      A.   They certainly do.
18      Q.   Is that common for companies
19  like PepsiCo to have such a program in
20  place?
21      A.   It's common for both points.
22          MR. NELMS:  Object to the
23  form.

Page 244

1          (Whereupon, Defendant's
2          Exhibit 8 was marked
3          for identification.)
4       Q.   I'm going to hand to you what
5   I am marking as Defendant's Exhibit 8 to
6   your deposition, which are unverified
7   responses to interrogatories.
8          MS. MCGAHEY:  And, Andy, kind
9   of similar to what I did yesterday with
10  Shannon.  I'm going to ask some questions
11  based on this even though they're not
12  verified.  If they are verified later and
13  something changes, then we'll take that
14  up at that time.
15          MR. NELMS:  Let's take a
16  break.
17          (Whereupon, a break was
18          taken from 4:00 to 4:09 p.m.)
19      Q.   (BY MS. MCGAHEY:)  Mr. Mayer,
20  we are looking at Defendant's Exhibit 8
21  to your deposition, which are the
22  unverified responses to our
23  interrogatories.  Have you seen this

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 245 to 248)

Page 245

1  document before?
2      A.    Yes.
3      Q.    And have you reviewed it
4  before today?
5      A.    When I wrote my responses. I
6  don't think this is the one I signed.
7  It's close. The information looks the
8  same, but my name is spelled wrong, and
9  that would be something I probably would
10  have got right.
11      Q.    Which part -- did I spell your
12  name wrong, or in the response --
13      A.    Where the response is.
14      Q.    Okay. If you turn to Page 2,
15  please.
16      A.    Okay.
17      Q.    And you indicate that you
18  worked at AMS Irrigation & Supply?
19      A.    Yes.
20      Q.    I assume that you were a
21  salesclerk and not a "sakes clerk"?
22      A.    Correct, that is correct. I
23  think somebody retyped my responses.

Page 246

1      Q.    And you worked at Carpedia
2  International from September of '05 to
3  October of 2005 as a consultant?
4      A.    Yes.
5      Q.    And you indicate that you
6  resigned?
7      A.    Yes.
8      Q.    Is that because you went to go
9  work for Lear Corporation?
10      A.    That is correct.
11      Q.    You also have below it "Bert
12  W. Meyer, CPA." Were you self-employed?
13      A.    I do do tax work and some
14  bookkeeping work.
15      Q.    In addition to your other job
16  at --
17      A.    Correct.
18      Q.    -- Lear Corporation?
19      A.    Correct.
20      Q.    How long have you been
21  operating your own kind of accounting
22  shop?
23      A.    Two years.

Page 247

1      Q.    Did you start it before you
2  left Piknik or after?
3      A.    No. After. I wanted to put
4  myself in a position that losing a job
5  again would never do that to me, so I
6  started that following tax season.
7      Q.    So in April of --
8      A.    January of '06 I would have
9  started.
10      Q.    Do you know how much income
11  you have received through your own
12  accounting practice?
13      A.    Minimal. I have records.
14      Q.    In response to Number 6 you
15  indicate that you suffered a heart
16  attack?
17      A.    That's correct.
18      Q.    I think in December of 2006?
19      A.    That's right. I started doing
20  taxes December of '05, because the
21  following year I was getting ready to go
22  into tax season and pick up a bunch of
23  clients and had a heart attack. And I've

Page 248

1  slowed down --
2      Q.    How are you doing these days?
3      A.    I'm doing fine now.
4      Q.    Good. Are you claiming that
5  your heart attack was brought about
6  because of your departure from Piknik?
7          MR. NELMS: Say yes.
8      A.    Yes. No.
9      Q.    Well, you're on the record.
10  We need to straighten that out.
11      A.    Let me rephrase that. No. I
12  think it was purely hereditary.
13      Q.    In response to Number 8 do you
14  know what your gross income for 2006 was?
15      A.    Not off the top of my head. I
16  filed a return, so I could get that.
17  This gross income that I have here
18  includes my wife's.
19      Q.    You file a joint tax return?
20      A.    Yes.
21      Q.    In response to Number 9, you
22  indicated that as of the date that you
23  responded to these interrogatories you

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 249 to 252)

Page 249

1  had received income in the amount of five
2  thousand, five hundred dollars. Is that
3  through your work with Lear Corporation?
4      A.   Does it have a date? April
5  11th. For '07, right?
6      Q.   Right. Does that sound right,
7  that you would have only made fifty-five
8  hundred dollars?
9      A.   By April, no, it doesn't sound
10  right.
11      Q.   You would have made more?
12      A.   It would have been more. If
13  that day is correct. This says April
14  11th.
15      Q.   In response to Number 11 you
16  were asked to identify the position you
17  claim that you were terminated from
18  because of your race, and you said that
19  you were terminated from the position of
20  Director of Operations and that Anthony
21  Barber replaced you as Director of
22  Operations?
23      A.   Yes.

Page 250

1      Q.   Is that true or -- earlier you
2  told me that you were replaced --
3      A.   That's the way I perceived it,
4  and then you showed me the document where
5  I had been demoted to Day Street plant
6  manager. Looking back on it, I always --
7  you know, Anthony showing up was
8  basically I feel like, even now, was my
9  replacement. I think he was brought in
10  to displace me, and then Annissia
11  Hanyard, whatever her name was that
12  started afterwards -- I think I saw it --
13  I think she replaced the position that I
14  was demoted to even though Anthony's role
15  was a bit expanded.
16      Q.   Let me get this straight. I'm
17  sorry. I didn't mean to interrupt you.
18  Go head.
19      A.   When Anthony came in he had
20  quality that reported to him and the
21  warehouse reported to him, which would
22  have been Shannon and Jerry. And Shannon
23  and Jerry did not report to me. We were

Page 251

1  on the same level. So his role was a bit
2  changed, but I still looked at him -- you
3  know, first they brought him in, demoted
4  me and then replaced me with somebody
5  additionally. But I think when Anthony
6  was hired I feel like I was already
7  marked, on the way out.
8      Q.   Well, I need to be clear about
9  this and make sure that I'm clear in my
10  head what your claims are now because it
11  may be a little something different than
12  what you told me before, but correct me
13  if I'm wrong.
14      A.   Okay. I think what I said
15  before is true. I know it is. And now
16  all I'm doing is saying that, you know, I
17  think Anthony came in to replace me as
18  well.
19      Q.   Are you claiming that you were
20  demoted because of your race?
21      A.   No, I'm not saying that. I
22  was demoted because they found Anthony
23  Barber to come in and take on a new role

Page 252

1  in the organization.
2      Q.   And the role that Anthony
3  Barber took on was different from the
4  role that you had --
5      A.   Yes.
6      Q.   -- as Director of Operations?
7      A.   Yes.
8      Q.   So you are not basing your
9  claim of race discrimination on you
10  leaving the Director of Operations role
11  and becoming plant manager at Day Street;
12  is that correct?
13      A.   I'm saying I was ultimately
14  terminated because of my race.
15      Q.   Correct. And you've told
16  about that.
17      A.   And I think the plan was to
18  bring Anthony in. That was step one.
19  Now they had grounds -- I mean, now they
20  had somebody in a position where they
21  could -- I think it was part of the plan.
22  Bring in Anthony, take those three, put
23  him up under them, let him learn what he

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 253 to 256)

Page 253

1  can and then systematically cut them out
2  and replace them.
3      Q.   So you believe that you were
4  replaced by Anthony Barber?
5      A.   I think that was the start of
6  the process.
7      Q.   But he didn't replace your
8  position, because I think earlier you
9  testified that it was a newly created
10  position?
11      A.   I think what they did is they
12  took Shannon, Jerry and myself and said
13  we're going to replace them with blacks,
14  and to do that we're going to need
15  Anthony Barber to come in and take on the
16  role as their superior so we reported to
17  him and then he can systematically
18  replace the three of them.  I think the
19  plan was already laid.  It had to have
20  been.  The girl started the day after I
21  left.
22      Q.   You keep talking about this
23  plan.  Did you ever hear anybody discuss

Page 254

1  this plan?
2      A.   No.  But they could not have
3  had a person hired to come in the day
4  after I was fired to take my place
5  without having had some preplanning that
6  that was the way it was going to
7  transpire.  They had to be out
8  interviewing my replacement before they
9  fired me if she started the next day.  I
10  doubt very seriously they fired me on
11  June 9th morning and interviewed her that
12  afternoon and said start tomorrow.  I
13  just don't believe that happened.
14      Q.   My understanding of the ways
15  in which you believe you were
16  discriminated against because of your
17  race were, number one, your termination;
18  is that correct?
19      A.   That's correct.
20      Q.   And that you believe that you
21  were replaced by an African-American
22  female?
23      A.   Yes.

Page 255

1      Q.   And I believe you mentioned
2  someone named Annissia Hanyard?
3      A.   Yes.
4      Q.   Is that the person who you
5  believe replaced you?
6      A.   That's correct.
7      Q.   And the second way in which
8  you believe that you were treated
9  differently because of your race was
10  Chris Day mentioning to you that Onyx
11  intended to replace senior managers and
12  managers with African-Americans; correct?
13      A.   Yes.
14      Q.   How, if at all, did hearing
15  that comment affect your employment?
16      A.   Hearing that comment affect my
17  employment?
18      Q.   Correct.
19      A.   It let me know what Onyx's
20  ultimate intentions were.  If he was
21  being factual with me -- he was telling
22  me I would be replaced by an
23  African-American.

Page 256

1      Q.   Any other way in which hearing
2  that comment affected your employment?
3      A.   No.
4      Q.   Are those the only two ways
5  that you are claiming you were treated
6  differently because of your race?
7      A.   Him saying that I would be
8  replaced -- I was ultimately fired
9  because of my race.
10      Q.   Right.  And we've talked about
11  the termination.
12      A.   Okay.  Anthony Barber I think
13  was part of the plan to replace me.  Now,
14  whether or not that is discriminatory or
15  not, I'm not saying that.  I'm not saying
16  that him replacing me was discrimination.
17  It happens that he's an African-American.
18  But I think they had to put him in place
19  before they could get rid of me.  I think
20  it was part of the plan to --
21      Q.   Thought that was part of the
22  conspiracy?
23      A.   I wouldn't say conspiracy.  I

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 257 to 260)

Page 257

1   think it's a decision that was made by
2   the Onyx team. Hey, we want to replace
3   our managers, we've got to put people in
4   place.
5       Q.   Well, just so it's clear,
6   because in Number 11 you're asked to
7   state the position you claim you were
8   terminated from because of your race and
9   in that answer state the position title,
10  whether the position was filled and who
11  the position went to. You state you were
12  terminated from Director of Operations --
13      A.   By Anthony Barber.
14      Q.   -- and Anthony Barber replaced
15  you?
16      A.   Yes.
17      Q.   But your testimony from today
18  was that you were terminated from plant
19  manager and that you were replaced by
20  Annissia Hanyard?
21      A.   Yeah. And I also told you
22  that I didn't realize I was a plant
23  manager until you showed me the e-mail

Page 258

1   saying that that was my job title. I'm
2   not hung up on job titles, never have
3   been.
4       Q.   Sure.
5       A.   When Anthony Barber came in I
6   was Director of Operations. When Anthony
7   Barber came in I was already gone.
8       Q.   In your mind you believe you
9   were already gone?
10      A.   The plan had already been put
11  in place for me to be gone at that point,
12  yes, I believe that.
13      Q.   And you have no factual basis
14  on which to base that; that was just your
15  feeling, correct?
16      A.   I know how businesses operate,
17  and I know the time it takes to find and
18  recruit talented people, and I know that
19  the plan had to be in place for the
20  timeline to fit.
21      Q.   Well, you don't know when
22  Annissia Hanyard was interviewed, do you?
23      A.   I do not know.

Page 259

1       Q.   You don't know how she was
2   recruited?
3       A.   No, I do not. But I do know
4   for her to have started the day after I
5   was terminated it had to have been going
6   on while I was there.
7       Q.   I understand.
8       A.   Okay.
9       Q.   So should the response be to
10  Number 11, though, that the position you
11  were terminated from was plant manager
12  and that you were replaced by Annissia
13  Hanyard?
14      A.   If we're going to go back to
15  the e-mail, then, yes, that's the way it
16  should be worded.
17      Q.   I just want to make sure that
18  I understand what your claims are. I'm
19  not trying to trip you up.
20      MR. NELMS: Well, in the
21  process of understanding what his claims
22  are, he has mentioned on no less than
23  three occasions that he had another role

Page 260

1   and another title, but when Anthony
2   Barber came along, who was an
3   African-American, the plaintiff was
4   displaced from that position and placed
5   in a lower position and then replaced by
6   yet another African-American
7   subsequently.
8       MS. MCGAHEY: True. And he
9   has already said, I believe, that his
10  placement in the plant manager position
11  after Anthony Barber came in, he is not
12  challenging that decision as being
13  racially motivated.
14      MR. NELMS: I believe he is --
15      A.   I am.
16      Q.   (BY MS. MCGAHEY:) So you are
17  challenging that decision?
18      A.   I think the racial motivation
19  started when the decision was made to
20  replace me either as plant manager or as
21  Director of Operations.
22      Q.   Okay. Then we need to talk
23  about this move in further detail.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 261 to 264)

Page 261

1    A.    Okay.
2    Q.    So this is a third way in
3  which you believe you were discriminated
4  against because of your race?
5    A.    I really think it's all
6  intertwined. I think I was discriminated
7  on race -- all three of them headed down
8  the same path.
9    Q.    When you left your Director of
10  Operations position and became plant
11  manager of the Day Street facility did
12  your salary decrease?
13    A.    No.
14    Q.    It's just that your job duties
15  changed; is that correct?
16    A.    Yes.
17    Q.    And that you were overseeing
18  just one plant as opposed to all three;
19  correct?
20    A.    I stopped -- at that time, the
21  day that -- I stopped going to Brundidge
22  all together. I had no contact with
23  Brundidge whatsoever. However, there

Page 262

1  were things going on at Alatex that I
2  still had to go help out with. So I
3  was --
4    Q.    Which you've already told me
5  about; correct?
6    A.    I had been to both those
7  plants.
8    Q.    But you were charged with
9  being plant manager of just the Day
10  Street facility?
11    A.    Correct. And then I was told
12  to help out at Alatex to get us through
13  the issues that were going on there.
14    Q.    Do you know who made the
15  decision to place you as plant manager?
16    A.    No.
17    Q.    Do you know who made the
18  decision to bring in Anthony Barber?
19    A.    I do not.
20    Q.    Do you know what Anthony
21  Barber's background was or is?
22    A.    I had heard at the time.
23    Q.    What did you hear?

Page 263

1    A.    I don't recall. I think he
2  was working at a FedEx or -- I think it
3  was more logistics related, you know,
4  freight out in Texas.
5    Q.    And I believe you said that
6  Anthony Barber's position was a newly
7  created position?
8    A.    Yes.
9    Q.    And there was a counterpart
10  for the condiment section that was also
11  newly created?
12    A.    Yes.
13    Q.    Does that question make sense?
14    A.    Yes. That was that Carl
15  Bleier.
16    Q.    Do you know why a decision was
17  made to restructure the company in that
18  manner?
19    A.    No. It made no sense to me.
20    Q.    Do you know who made the
21  decision to restructure the company in
22  that manner?
23    A.    I do not. It had to be Onyx.

Page 264

1    Q.    Do you know who at Onyx?
2    A.    I would assume that it would
3  be Chris Day, Jeff Larry and Henry Hicks.
4  I don't know that.
5    Q.    You're just assuming; correct?
6    A.    Well, Onyx was running the
7  company, so a decision like that would
8  have been -- come from one of them, and
9  they -- yes, I would be assuming.
10    Q.    In response to Number 13
11  you're asked to identify all of the
12  individuals who you believe treated you
13  differently because of your race, and you
14  identify Chris Day and Jeff Larry;
15  correct?
16    A.    Correct.
17    Q.    Have you told me every way in
18  which you believe Chris Day treated you
19  differently because of your race?
20    A.    Yes.
21    Q.    And with respect to Jeff
22  Larry, have you told me every way in
23  which you believe Jeff Larry treated you

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 265 to 268)

Page 265

1  differently because of your race?
2      A.    Yes.
3      Q.    And just for the record, Jeff
4  Larry, what is his race?
5      A.    African-American.
6      Q.    What about Henry Hicks, what
7  is his race?
8      A.    African-American.
9      Q.    In your response to Number 13
10  you make the statement that "the lack of
11  business was beyond plaintiff's control."
12  Do you see where I am?
13      A.    Yes.
14      Q.    On Number 13 you say "the lack
15  of business was beyond plaintiff's
16  control."
17      A.    Plaintiff being me.
18      Q.    Correct.
19      A.    Yes.
20      Q.    Was there some discussion
21  about there being lack of business?
22      A.    That was our sole focus.  We
23  were losing customers out of Brundidge

Page 266

1  like -- Brundidge was going down.  There
2  was no business.  We couldn't keep the
3  plants running because there wasn't
4  business.
5      Q.    Was there some discussion that
6  you were being let go because there was a
7  lack of business?
8      A.    No.
9      Q.    Have you asked anyone to
10  testify on your behalf if this case goes
11  to trial?
12      A.    Repeat the question.
13      Q.    Have you asked anyone to
14  testify on your behalf if this case goes
15  to trial?
16      A.    No, I have not.
17      Q.    In response to Number 19 you
18  outline the damages you are seeking to
19  recover; correct?
20      A.    Okay.
21      Q.    You said that your salary at
22  the time of your termination was
23  ninety-four thousand dollars?

Page 267

1      A.    Yes.  That's a contradiction
2  of what we saw earlier, so I'm
3  thinking that --
4      Q.    It may be off a little bit?
5      A.    Yes.
6      Q.    You have a column that says "3
7  months wages job search, $23,500.00."
8  What is that about?
9      A.    That's the three months I was
10  unemployed before I went to work for
11  Carpedia.
12      Q.    And you claim that you should
13  have received twenty-three thousand, five
14  hundred dollars?
15      A.    That's one-fourth of
16  ninety-four thousand.
17      Q.    I'm just trying to figure out
18  what this is.
19      A.    That's how I did the math when
20  I put this together.
21      Q.    You say job search expenses in
22  the amount of five thousand, four hundred
23  and seventy-one dollars.  What job search

Page 268

1  expenses did you incur?
2      A.    I hired a career counselor to
3  help me prepare for --
4      Q.    Help prepare what?
5      A.    For the job search.
6      Q.    Was that entire fee paid to
7  your career counselor, five thousand,
8  four hundred and seventy-one dollars?
9      A.    I don't recall without seeing
10  it.  It was pretty close to that.
11      Q.    When did you hire a job
12  counselor?
13      A.    I'm sure that's probably got
14  some other, you know -- I made a lot of
15  trips to Birmingham, so it's probably got
16  some of that in there.
17      Q.    Some of what, mileage?
18      A.    I believe it would probably be
19  just gas.
20      Q.    When did you hire your career
21  counselor?
22      A.    Right soon after I was
23  terminated.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 269 to 272)

Page 269

1  Q.  Who was your career counselor?
2  A.  I don't remember.  I have
3  records.  They're in Birmingham.
4  Q.  Besides the fee paid to your
5  career counselor and gas for trips to
6  Birmingham, what other items comprise the
7  job search expenses?
8  A.  I think that's what it is.
9  Q.  You've already told me about
10  your IRA withdrawal?
11  A.  Yeah, there it is there.
12  Q.  And the penalty payment that
13  you made?
14  A.  Okay.
15  Q.  Is that correct?
16  A.  Yes.
17  Q.  And that you paid income tax
18  on it?
19  A.  Correct.
20  Q.  What is this bottom section
21  regarding Contrarian fund?
22  A.  That is the average
23  performance of the fund I pulled my money

Page 270

1  out of.
2  Q.  That's your IRA account?
3  A.  Yes.  And the one year
4  performance at that time was 24 percent
5  return, and that three thousand dollars
6  is money that I would have earned had my
7  money been in the account versus me
8  paying taxes on it because I pulled it
9  out.
10  Q.  In what time frame was there a
11  24 percent return?
12  A.  I would have to pull the
13  records I pulled this off of.  It would
14  be the one year mark up to the point of
15  termination.
16  Q.  So from June 2004 to June 2005
17  you were seeing a 24 percent return?
18  A.  I think that is probably
19  correct.
20  Q.  What do the asterisks signify,
21  if anything?
22  A.  That it was a calculation.
23  The ninety-four thousand salary, I don't

Page 271

1  know if I was wrong or this paper is
2  wrong, but, you know, that was something
3  that I thought was pretty factual that
4  you would not question.  The IRA
5  withdrawal, I could prove that.  I got
6  the, you know, paperwork to prove how
7  much I pulled out.  Job expenses, I can
8  show you receipts for that.  Calculation
9  on penalty and taxes is pretty
10  straightforward.  The Contraian, I think
11  I put a asterisk there to show this is
12  something I looked up and calculated
13  myself.
14  Q.  So are you saying that had you
15  not withdrawn the eight thousand, four
16  hundred twenty-two dollars and eighteen
17  cents from your IRA, you would have
18  received an additional three thousand,
19  one hundred and five dollars and
20  twenty-six cents?
21  A.  That's correct, over the
22  eighteen month period from the time that
23  I pulled my money out until I filled this

Page 272

1  form out.
2  Q.  And you have never replaced
3  that eight thousand, four hundred and
4  twenty-two dollars and eighteen cents
5  into your IRA?
6  A.  No, I haven't.
7  Q.  Because you have instead
8  chosen to put your money into your 401-K?
9  A.  That's correct.
10  Q.  What do you mean by wage
11  differential for eighteen months?
12  A.  That's the difference between
13  what I'm making now and what I was making
14  then.
15  Q.  So over eighteen months' time
16  it added up to forty-two thousand?
17  A.  That's correct.
18  Q.  In response to Number 22,
19  you've already told me about your offer
20  of employment with Whitfield Foods?
21  A.  Yes.
22  Q.  Nothing else we need to add to
23  that?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 273 to 276)

Page 273

1    A.   No.
2    Q.   And you've already told me
3  about the job offer you received from
4  Southern Classic in June 2005; is that
5  correct?
6    A.   Correct.
7    Q.   Henry Hicks was never your
8  boss, was he?
9    A.   No.
10   Q.   Did you ever approach any
11 other Piknik employees about joining this
12 lawsuit?
13   A.   No.
14   Q.   Do you know if any of your
15 other coplaintiffs have?
16   A.   I do not, no.
17   Q.   Have you now told me
18 everything that you can recall that
19 relates to your claims in this lawsuit?
20   A.   I believe so.
21        MS. MCGAHEY:  Andy, I think
22 that's all I have for now.
23

Page 274

1  EXAMINATION BY MR. NELMS:
2    Q.   Bert, Jennifer asked you a
3  question earlier about whether or not you
4  had any proof that the defendants in this
5  lawsuit sought to replace you with an
6  African-American employee, and you
7  responded, correct me if I'm wrong, that
8  you did not have any proof.  Is that a
9  correct statement?
10   A.   I think that's what I said,
11 yes.
12   Q.   Do you have any evidence of
13 the defendants' intentions to generally
14 replace managerial personnel with
15 African-Americans?
16        MS. MCGAHEY:  Object to form.
17        MR. NELMS:  On what basis?
18        MS. MCGAHEY:  I'm objecting to
19 the form of the question.  He can answer.
20        MR. NELMS:  I have a right
21 pursuant to the rule to ask you what the
22 basis of your objection is.
23        MR. NELMS:  You're asking him

Page 275

1  about someone's intentions, which is
2  asking him to go in someone's mind.
3        MR. NELMS:  I asked him did he
4  have any evidence to demonstrate what
5  intentions the defendants had related to
6  the hiring of African-Americans in the
7  place of Caucasian employees.
8    A.   I have the knowledge that
9  Chris Day told me that Onyx's intentions
10 were to replace managers with
11 African-Americans.  It was a conversation
12 he had with me, but that's the knowledge
13 I do have.
14   Q.   So you had direct statement
15 from Chris Day of Onyx's intent to
16 replace Caucasians with
17 African-Americans?
18   A.   That is correct.
19   Q.   Do you have any other evidence
20 of their intent to perform such
21 replacement acts?
22   A.   Just the fact that both
23 Anthony Barber and Annissia are

Page 276

1  African-Americans.
2    Q.   What title did Anthony Barber
3  hold in May of 2005?
4    A.   I thought he came in as the
5  Director of Operations.  The document
6  e-mail that I saw earlier had I think his
7  actual title on it.  I assumed he was
8  called the Director of Operations.
9    Q.   Did you know him to handle any
10 role in human resources?
11   A.   I did not.
12   Q.   Regarding the evidence of the
13 intent to replace Caucasian employees
14 with African-American employees I refer
15 you to Defendant's Exhibit Premarked 7.
16        MS. MCGAHEY:  Let me flip to
17 it real quick.
18   Q.   Do you recall --
19        MS. MCGAHEY:  Can I flip to it
20 real quick?
21        MR. NELMS:  Yeah.
22        MS. MCGAHEY:  Okay.  Thank
23 you.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 277 to 280)

Page 277

1    Q.    (BY MR. NELMS:)  Direct you to
2  Page 2.  Identify this exhibit for us
3  again.
4    A.    It's an e-mail from Henry
5  Hicks to the management group discussing
6  his meeting with April Blackmore of
7  PepsiCo.
8    Q.    All right.  And is this e-mail
9  any way evidence -- or does this in any
10  way evidence the intent to replace
11  Caucasian employees with African-American
12  employees?
13    A.    I think so in the fact that he
14  approached her with a request for her
15  to -- asked her if she knew where Piknik
16  could recruit talented minorities in
17  operating roles, which I assumed was to
18  replace positions, because we had no open
19  available positions at the time.
20        (Whereupon, Plaintiff's
21        Exhibit 1 was marked
22        for identification.)
23    Q.    I'm going to show you a

Page 278

1  document that I have marked as
2  Plaintiff's Exhibit 1.  Have you ever
3  seen this documents before today?
4    A.    Before today, no.
5    Q.    What does it appear to be?
6    A.    It looks like an acceptance
7  letter.
8        MS. McGAHEY:  Looks like a
9  what?
10    A.    "Thank you for affording me
11  the opportunity to submit my resume."
12  Cover letter.
13    Q.    Let me ask you this, who does
14  the letter appear to be from?
15    A.    It looks like it's from
16  Annissia Hanyard.
17    Q.    And who is that?
18    A.    The person that replaced me
19  the day after I was terminated.
20    Q.    Do you know what her race is?
21    A.    I was told that it's
22  African-American.
23    Q.    Okay.  And who is it addressed

Page 279

1  to, Exhibit Number 1?
2    A.    Mr. Barber.
3    Q.    Anthony Barber?
4    A.    Anthony Barber.
5    Q.    Does it indicate a title for
6  Mr. Barber?
7    A.    It's Department of Human
8  Resources.
9    Q.    Do you know whether or not for
10  Piknik during May of 2005, best of your
11  knowledge, Mr. Barber ever held the
12  title, any title related to human
13  resources?
14    A.    I did not.  Was not aware of
15  anything like that.
16    Q.    And what does it give as Mr.
17  Barber's address?
18    A.    Has an Atlanta, Georgia
19  address.
20    Q.    In all the time that you
21  worked at Piknik Products are you aware
22  as to whether or not Piknik Products ever
23  had a human resources department in

Page 280

1  Atlanta?
2    A.    I was not aware of a human
3  resources department in Atlanta, Georgia.
4    Q.    Are you aware as to whether or
5  not Mr. Barber ever worked out of any
6  location in Atlanta while working for
7  Piknik in May of 2005?
8    A.    I was not aware of Anthony
9  Barber, no.
10    Q.    To the best of your knowledge,
11  during May of 2005 -- correct me if I'm
12  wrong, but you worked in accounts payable
13  at one time?
14    A.    At one time.
15    Q.    And what year was that?
16    A.    The two years prior to me --
17  2003.
18    Q.    In accounts payable would you
19  have paid rents or mortgages for any
20  locations that Piknik Products owned or
21  occupied?
22    A.    Yes.
23    Q.    Did you ever pay any bills for

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 281 to 284)

Page 281

1  an office in Atlanta, Georgia?
2      A.   Never did.
3      Q.   Okay.  Do you know of any
4  reason or cause to why Piknik Products
5  would have an office in Georgia?
6          MS. MCGAHEY:  Object to the
7  form.
8      Q.   What you know.
9      A.   I know Henry Hicks was from
10 Atlanta, Georgia and didn't like
11 commuting, and I believe he opened an
12 office in Atlanta that he and two others
13 worked out of.
14     Q.   Do you know the names of the
15 others?
16     A.   Stowbridge was one, and I
17 don't know the other one's name.
18     Q.   Ask you to review Plaintiff's
19 Exhibit 1 and the content of it, please.
20     A.   (Examining document.)
21     Q.   Read it to yourself so you're
22 familiar with it.
23     A.   (Examining document.)

Page 282

1      Q.   What does the letter appear to
2  be saying?
3      A.   Kind of outlines her
4  experience as related to the position she
5  was applying for.
6      Q.   What is the date of the
7  letter?
8      A.   May 2, 2005.
9      Q.   And, again, what was your
10 termination date?
11     A.   June 9, 2005.
12     Q.   Does the substance of the
13 letter indicate what qualifications Ms.
14 Hanyard has for the position she is
15 applying for?
16     A.   Yes, it does.
17     Q.   Are you familiar with some of
18 the qualifications she enumerates in the
19 letter?
20     A.   I am.
21     Q.   Are you familiar with the
22 qualifications that you held during May
23 of 2005 at Piknik?

Page 283

1      A.   Yes.
2      Q.   From the letter and the
3  substance of the letter as you've read it
4  and from your experience and knowledge,
5  the position that she held, would she be
6  qualified, according to her statements in
7  this letter, to fulfill the position that
8  you held at Piknik in June of 2005?
9      A.   I don't want to say no, but
10 the experiences she has -- she would not
11 have been able to hit the floor running.
12 She would have had to have some -- she
13 worked for a PepsiCo bottler, which is
14 carbonated beverages, which is completely
15 different than the hot filled beverages
16 that we make.  It's just the whole
17 process is completely different.
18         On that same token, I could
19 not go into a carbonated beverage plant
20 and hit the floor running.  They are just
21 two totally different animals.
22         So I'm not saying that she
23 could not be successful, but if I was

Page 284

1  looking for a plant manager in a
2  hot-filled beverage plant, this is not
3  the qualifications I would be looking
4  for.
5      Q.   What qualifications would be
6  important to you to fill that position?
7      A.   I would want to see somebody
8  with a little bit more on the finance
9  side so they understand cost and that
10 side of it.
11     Q.   Why is that important?
12     A.   You have to know what your
13 costs are so you can make good business
14 decisions.  And then on the other side of
15 it, I would look for somebody with some
16 hot fill experience just because it is
17 such a unique process in going from a
18 carbonated product where you're
19 pressurizing packages versus a cold fill
20 application.
21         You know, the average
22 temperature is -- I think in carbonated
23 plant it's like 50 or 60 degrees is what

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 285 to 288)

Page 285

1  they fill their products at, and we're
2  filling ours at 2000 degrees. It's
3  pasteurization process. I would look for
4  somebody with some of that experience.
5      Q.   You mentioned earlier in your
6  deposition that the equipment maintained
7  in cold fill by -- or check that. The
8  equipment maintained and owned by Piknik
9  Products was not completely modern and
10  up-to-date?
11     A.   No, it was not.
12     Q.   Because of that fact, what
13  skill requirements, if any, would a
14  person have to have in order to operate
15  such equipment?
16     A.   They would have to understand
17  the condition of the equipment, what --
18  because we were on a limited budget, you
19  had to know where you had to spend your
20  money. You weren't going to get to fix
21  everything, so you had to know that these
22  are the most critical parts of a machine
23  or machine -- most important machine on

Page 286

1  the line or process in the plant. You
2  had to know where to spend your money so
3  that you put out a quality product still
4  but yet you didn't spend more than what
5  was available.
6      Q.   Was that knowledge important
7  to the job that you held with Piknik in
8  June of 2005?
9      A.   Extremely important. In the
10  morning meeting you said I mentioned
11  earlier where we discussed our issues and
12  what we were -- our game plan for fixing
13  them. We discussed where do we spend our
14  money, you know, what's most critical,
15  what's going to hurt us.
16     Q.   Regarding that specific
17  skill-set just discussed, referring to
18  Plaintiff's Exhibit 1, can you point to,
19  if it's there, such a skill-set expressed
20  by Ms. Hanyard in her letter?
21     A.   I did not see that in the
22  letter.
23     Q.   You also talked with Jennifer

Page 287

1  earlier today about a payment that was
2  made to you by Ricky Loeb?
3      A.   Yes.
4      Q.   If I missed it, please tell me
5  again, when did that payment -- when did
6  he pay you that payment?
7      A.   Late August, September, I
8  think.
9      Q.   Did he make one lump sum
10  payment to you, or did he pick up making
11  the biweekly payments that you described?
12     A.   No. Lump sum. It was a
13  handwritten check. Hand signed by him.
14     Q.   Was it from a Piknik --
15     A.   I don't recall if it was a
16  Piknik check or another check. I don't
17  recall that. I do remember seeing that
18  it was his signed -- and at the same time
19  we were having conversations, and he was
20  asking me to come back.
21         (Whereupon, Plaintiff's
22         Exhibit 2 was marked
23         for identification.)

Page 288

1      Q.   I'm going to show you a
2  document I have marked as Plaintiff's
3  Exhibit 2 and ask you to familiarize
4  yourself with it, please.
5      A.   (Examining document.) Okay.
6      Q.   What does Plaintiff's Exhibit
7  2 appear to be to you?
8      A.   Resume of Annissia Hanyard.
9      Q.   Have you had an opportunity to
10  review her work experience as enumerated
11  in Plaintiff's Exhibit 2?
12     A.   I did.
13     Q.   What kind of experience does
14  this document report that Ms. Hanyard
15  has?
16     A.   It appears that the majority
17  of her experience is in facilities
18  management. Facilities maintenance
19  management.
20     Q.   What does that mean?
21     A.   Maintaining buildings, just
22  the day-to-day maintenance, you know, air
23  conditioners, plumbing, roofs. She

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 289 to 292)

Page 289

1   doesn't refer to that here, but it
2   appears that she was responsible for the
3   maintenance side of some buildings,
4   facilities.
5       Q.   How would such experience or
6   skills be important in the job that you
7   were doing in June of 2005 for Piknik
8   Products?
9       A.   Very, very minor.  I mean, I
10  had to deal with facilities management in
11  the fact that we just had to make sure
12  our buildings were up to, you know,
13  quality standards for processing food.
14  But other than that, it had nothing to do
15  with my job.  I believe just to take this
16  and walk out on the production floor in a
17  hot-fill beverage plant, I don't think it
18  would get you very far.
19      Q.   It does appear on Page 2 of 4
20  that she spent some time working for
21  Pepsi Cola; would you agree?
22      A.   That's correct.  In the
23  warehouse.

Page 290

1       Q.   Have you had an opportunity to
2   read the job responsibilities that
3   reportedly she had during that period of
4   time, 1996 to 1999?
5       A.   Yes.  It's all in the
6   warehouse on organizing the warehouse, on
7   transporting, loading the products for
8   distribution.  It was all warehouse
9   operations.
10      Q.   How would such skills be
11  important to the job that you were
12  maintaining with Piknik Products in June
13  of 2005?
14      A.   Not at all.
15      Q.   I note also that she spent
16  some time reportedly working for Proctor
17  & Gamble between 1991 and 1996, as
18  indicated on the bottom of Page 4.  Have
19  you had an opportunity to read that job
20  skill description?
21      MS. MCGAHEY:  On the bottom of
22  Page 4?
23      MR. NELMS:  Two of four pages,

Page 291

1   bottom of Page 2.
2       A.   Yes.  It basically appears
3   that her job duties with Proctor & Gamble
4   were that of managing capital projects
5   for facilities around the country and
6   tracking project costs, scope procurement
7   of materials.  None of it has to do with
8   the actual operation of a beverage type
9   production manufacturer.
10      Q.   Are you aware as to whether or
11  not Ms. Hanyard stayed on with Piknik for
12  an extended period of time?
13      A.   I think I recall hearing that
14  she did not.  I don't know that.
15      Q.   Do you have any knowledge as
16  to why she did not?
17      A.   No.  I got a phone call from
18  somebody saying that she had small
19  children that she had to get to daycare
20  or something and so she couldn't be at
21  work before 9 o'clock and had to leave in
22  time to go back to the daycare and pick
23  the children up or something to that

Page 292

1   effect.  I don't know if she resigned or
2   what occurred there.
3       MR. NELMS:  That's all I've
4   got.
5
6   REEXAMINATION BY MS. MCGAHEY:
7       Q.   Mr. Mayer, do you know what
8   Annissia Hanyard's salary was?
9       A.   I do not.
10      Q.   Do you know if Anthony Barber
11  had previous work experience with
12  Annissia Hanyard?
13      A.   I do not.
14      Q.   On Plaintiff's Exhibit 1 does
15  that letter indicate what position Ms.
16  Hanyard was submitting her resume for?
17      A.   It says process engineer.
18      MS. MCGAHEY:  Nothing further.
19
20  REEXAMINATION BY MR. NELMS:
21      Q.   What is a process engineer?
22      A.   My interpretation of it -- and
23  I don't know what the job description was

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

(Pages 293 to 296)

Page 293

1  there -- would be somebody that would
2  come in and engineer your processes, if
3  you had like we did.  We pasteurize
4  juice.  We have a process system that
5  took the cold product, heated it up.  And
6  a process engineer would design
7  efficiencies into that process or the
8  filling process or the capping process or
9  just engineer the processes so they were
10  more efficient.
11      Q.  Did Piknik Products have a
12  processing engineer on staff during May
13  and June of 2005?
14      A.  We had maintenance managers
15  that were capable of doing that, and we
16  had a special projects department, which
17  was an engineer and a staff that would
18  take on special projects.  If we had an
19  issue with a line, they would go in and
20  work on getting that fixed.  If we had a
21  line installation, they would take the
22  line and install the line.  They managed
23  those process systems.

Page 294

1      Q.  To the best of what you know,
2  is that what Ms. Hanyard did when she
3  came to work at Piknik Products?
4      A.  No, I think she was -- my
5  understanding is she was brought in to be
6  the plant manager of the Day Street
7  plant.
8      Q.  From what you have read in
9  Plaintiff's 1 and 2, Exhibits 1 and 2
10  that is, do you have a belief or not as
11  to whether Ms. Hanyard was qualified to
12  be a processing engineer at Piknik
13  Products?
14      A.  Based on what I saw, no.
15  Maintenance managers in the beverage
16  plants at Piknik Products and the
17  condiment plant, they did have to know
18  facilities management.  They had to keep
19  the buildings maintained.  But the
20  processes and just the equipment side of
21  that, I don't think she had the
22  experience.  And I don't want to put her
23  down, because I don't know her.  And I'm

Page 295

1  sure she is a very capable person, but I
2  would not have wanted to hire somebody
3  with these qualifications while I was at
4  Piknik.
5      MR. NELMS:  Thank you.
6  Nothing further.
7      MS. MCGAHEY:  Thank you, Mr.
8  Mayer.
9      (Whereupon, the deposition
10      was concluded at 5:10 p.m.)
11
12      FURTHER THE DEPONENT SAITH NOT

Page 296

1      C E R T I F I C A T E
2
3
4  STATE OF ALABAMA)
5  JEFFERSON COUNTY)
6
7      I hereby certify that the
8  above and foregoing deposition was taken
9  down by me in stenotypy, and the
10  questions and answers thereto were
11  reduced to typewriting under my
12  supervision, and that the foregoing
13  represents a true and correct transcript
14  of the deposition given by said witness
15  upon said hearing.
16      I further certify that I am
17  neither of counsel nor of kin to the
18  parties to the action, nor am I in
19  anywise interested in the result of said
20  cause.
21
22
23      COMMISSIONER - NOTARY PUBLIC

74

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

**A**

ability
10:3
able
206:21 210:19 243:4
283:11
absorbed
60:5
abstracts
239:19
abuse
143:21
accept
48:9 166:4 168:7
acceptance
278:6
accepted
48:14 64:14 158:22
162:16 172:1
accomplished
118:8
account
225:7 227:5 270:2,7
accountant
46:20 47:23 48:15 49:10
49:16,19,23 50:7 51:20
52:22 53:4 181:22
182:1,5,8
accountants
54:4
accounting
45:7,9 47:5 64:3 184:5
185:10 246:21 247:12
accounts
54:8,9 280:12,18
accruing
101:7 102:20
accustomed
213:5
acknowledge
167:6
acquired
134:6
acquisition
140:2
act
208:21
acting
5:3
action
1:5 241:10 296:18
activity
234:6,7 235:6,9
acts
275:21
actual
100:9 276:7 291:8
Adams
5:8
Adare

41:1,2 42:18,20 47:12,13
48:23
add
204:8 272:22
added
53:5 59:22 272:16
addition
198:23 246:15
additional
58:3 271:18
additionally
251:5
address
24:13 25:18 279:17,19
addressed
278:23
adjust
92:3
administered
40:12
adopted
138:8,16
advice
207:23
affect
10:3 196:18 255:15,16
affording
278:10
afloat
102:8
African-American
34:4 113:12,21 124:20
156:12 175:6 237:10
254:21 255:23 256:17
260:3,6 265:5,8 274:6
276:14 277:11 278:22
African-Americans
131:11 133:13 134:2
135:14 140:15 141:8
149:1 174:18,20 194:20
237:7 240:12 255:12
274:15 275:6,11,17
276:1
afternoon
217:7,11,14 254:12
ago
6:10
agree
99:1 100:21 104:17 154:11
228:15 289:21
agreed
2:3 68:12 202:2
agreement
14:22 91:17 155:19 159:8
159:14,18 161:20 162:7
162:19 163:4,8,20 164:7
165:17,22 166:10,17,21
167:3,16,22 168:7
170:19 171:2 173:1
176:16 177:2,17 197:9
197:11,22 198:2,8,22

200:3,7 204:17 206:11
206:13 209:6,9,13 211:6
agrees
176:18,20
ahead
208:19
AICPA
184:1
air
15:14,21 16:6 288:22
al
1:7,10
Alabama
1:2 3:8,15 5:3,5,9 22:12
26:23 160:14 184:2
296:4
Alatex
65:12 66:21 69:7 71:4,7
72:12,22 73:9 74:21,22
84:19 86:20 87:4 107:5
107:9,12,20 108:12
109:3 125:4 196:4
262:1,12
Alexander
50:12,17,18,22 51:4,19
52:1 55:9,12,15
alleged
167:13 218:2
allowed
166:2 210:1
alluded
144:21 171:8
alludes
167:1
Altace
8:19,20 9:12
alternative
81:18,23
Amaja
33:23
amount
159:6 200:7 249:1
267:22
amounts
199:23
AMS
28:6,7,11 29:15,19 245:18
AmSouth
165:14
Amy
3:19 162:10
analysis
53:2,5
analyzing
58:21
Anderson
3:4 16:6
Andy
55:22 75:19,23 197:2
207:3 211:12 229:7,10
234:14 244:8 273:21

animals
283:21
Annissia
250:10 255:2 257:20
258:22 259:12 275:23
278:16 288:8 292:8,12
annually
224:19 225:8
answer
7:10 117:4 128:13,15,16
129:4 202:7,10 208:17
219:18 228:21 257:9
274:19
answering
7:4
answers
296:10
Anthony
3:18 66:6,13 69:1 72:17
73:5 74:2,8,14,23 87:9
87:18 95:13,14 104:10
105:11,20 107:5 108:22
114:1,5,16 119:2 123:4
125:1,8,18 126:4 162:9
196:10,14 249:20 250:7
250:19 251:5,17,22
252:2,18,22 253:4,15
256:12 257:13,14 258:5
258:6 260:1,11 262:18
262:20 263:6 275:23
276:2 279:3,4 280:8
292:10
Anthony's
250:14
Antonio
23:19,23 24:1
anybody
64:10 141:16 142:1 177:13
253:23
anywise
296:19
AP
54:3
Apollo
83:14
appear
278:5,14 282:1 288:7
289:19
appears
288:16 289:2 291:2
application
284:20
applying
101:12 282:5,15
approach
90:22 239:17 273:10
approached
96:14 233:16 277:14
approaches
61:22
appropriate

93:12
approximately
31:13 35:13
April
96:22 101:6,14 104:13
203:6 225:12,13 241:4
243:11 247:7 249:4,9
249:13 277:6
Arant
3:13
area
35:20 36:10 134:17
185:11
areas
35:23
arguing
111:23
arising
167:8
arrangement
101:3
arrested
14:9,15
arrive
87:19
arrived
87:1,9
arrogance
121:1 196:17
arrogant
121:20 196:14
aside
68:12
asked
17:9 18:2 19:7 47:7,20
57:15 61:13 66:16 69:4
88:16 89:10 93:1
113:23 116:15,21 117:4
119:21 121:2 130:9
134:12 135:4 137:8
140:10,17 141:12 172:21
186:18 188:20 206:8
221:20 228:3,9 230:21
232:23 233:1 237:5,15
240:11 249:16 257:6
264:11 266:9,13 274:2
275:3 277:15
asking
7:8 17:16 97:22 110:23
149:7 212:1 235:2
237:4 274:23 275:2
287:20
asks
61:23 137:2
asprin
9:9
asset
120:10
assign
2:20
assigned

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

117:11 118:5,21
assistant
182:13,15 183:3,5,8
assume
8:2 24:3 102:21 105:19
106:8 107:20 141:19
190:12 199:20 225:16
228:2 235:17 245:20
264:2
assumed
107:2 156:8 242:4 276:7
277:17
assuming
199:14 264:5,9
assurance
75:1
asterisk
271:11
asterisks
270:20
Atlanta
279:18 280:1,3,6 281:1,10
281:12
Attachment
240:14
attack
9:19 217:21 247:16,23
248:5
attempt
177:10
Attendance
33:12,13
attention
62:19 149:19
attorney
3:5,12 160:11 169:4
172:21
attorneys
160:17
Auburn
44:23 45:9,11 232:16
August
1:18 5:9 188:22 211:23
287:7
authorized
146:4
automotive
180:3
available
116:4 125:7 277:19 286:5
Avenue
3:14 5:8
average
269:22 284:21
aware
80:8,12 82:6,9 86:1
123:9 279:14,21 280:2
280:4,8 291:10
awful
107:9 214:4
A-L-T-A-C-E

8:22
a.m
5:10 56:1 86:6

_____ B _____
B
4:9
back
33:22 77:19 81:19 88:2,4
88:7 91:6 92:4,13,14
93:9 95:6,12 97:6
99:14 100:14 101:14,16
122:7 123:8 137:17,18
143:19 146:10 151:10
169:9,11,15 172:12
173:22 177:23 181:13
185:13,20 186:17,23
188:20 189:6,13,17,19
207:19 212:2 214:5
231:13 238:4 250:6
259:14 287:20 291:22
background
31:17 47:3 262:21
backside
138:4
Bad
230:18
balance
174:3
bank
75:18 165:9 173:23
189:13
banking
165:11
bankruptcy
56:20
Barber
66:6,13 69:1 72:17 73:5
74:2,8,14,23 87:9,18
95:13,15 104:10 105:11
105:21 107:5 108:22
114:1,5,16 117:2 119:2,9
120:20 122:12 125:1,9
125:18 126:4 128:7
129:15 196:10,14 249:21
251:23 252:3 253:4,15
256:12 257:13,14 258:5
258:7 260:2,11 262:18
275:23 276:2 279:2,3,4
279:6,11 280:5,9
292:10
Barber's
196:17 262:21 263:6
279:17
base
16:6 113:4 191:3 192:22
258:14
based
129:22 145:7,8 191:6
194:18 201:14,21 244:11

294:14
basically
17:9 29:2 52:21 66:15
68:16 70:2 92:16
134:23 138:2 147:9,15
148:9 149:5 155:17
172:9 189:15 193:1
210:12,21 229:18 235:5
250:8 291:2
basing
140:11 175:1 252:8
basis
61:3 84:11 110:11,16,21
111:3,14 181:18 194:20
195:4 258:13 274:17,22
Beach
27:18,23
bear
239:6
becoming
62:1 252:11
bed
218:20
beginning
61:2 225:11
behalf
112:15 130:7,10 145:14
266:10,14
belief
85:3 146:16 173:14,18
294:10
believe
8:23 9:8 20:4 24:3 34:1
36:8 40:3 45:5 47:13
51:10 55:3 81:15 85:17
90:1 94:8 95:3 98:6
103:14 111:6 117:20
127:14 131:6 132:20
133:16 136:23 143:11
149:2 152:2 154:20
157:4 158:18 162:18
163:16 164:10 165:4,6
167:4 174:11 178:5
191:7,18 192:11 193:16
194:8,8 196:7,19,21
201:8,13 209:16 212:17
217:6 218:2 219:8
224:15,22 225:3 235:19
236:5,17 237:1,20
238:19 253:3 254:13,15
254:20 255:1,5,8 258:8
258:12 260:9,14 261:3
263:5 264:12,18,23
268:18 273:20 281:11
289:15
believed
201:20
belong
183:23
benefit
100:22 222:19 236:21

benefits
219:11,13 220:6,17,20
221:12 223:2,5,17
224:3
Bert
1:17 2:6 5:10,15 6:4,7
21:4 105:19 246:11
274:2
best
7:22 139:17 158:1 239:16
279:10 280:10 294:1
better
102:14 121:6 124:2,4
126:9,12 128:5 157:20
158:2,15 206:10 207:12
213:16 214:12
Betty
124:20
beverage
46:18 47:4 104:17 105:12
105:18 283:19 284:2
289:17 291:8 294:15
beverages
31:7,10 65:14 70:19
105:4 283:14,15
beyond
265:11,15
bible
120:18,23 121:2
big
100:15
Bill
22:21 57:21,22 61:11 67:4
67:7 68:4,15,20 69:11
73:4 75:7 82:2,13 87:1
93:3,7 95:2,7,8,10
160:9
billion
132:13
bills
78:20,22 221:10 280:23
Birmingham
3:15 185:5 268:15 269:3
269:6
birth
16:10,15
bit
28:10 42:22 78:21 161:11
164:21 250:15 251:1
274:4 284:8
bitch
112:9
biweekly
287:11
black
210:5
Blackmore
241:4 243:12 277:6
blacks
34:2 131:13 135:15 140:16
141:7 149:1,16 156:10

253:13
blank
57:20
Bleier
105:14 263:15
blending
35:20 36:10
blessed
191:15,16,18
blood
8:16 9:3,4
board
69:11 76:22 81:2 93:6
104:11 114:2
Bob
16:23 17:2,4 18:6 51:1
52:3 55:5,14,17 62:13
63:2 82:14,16 84:16
98:15,19,20 109:9 110:1
110:13,18 111:7,15 112:1
112:16,18 113:9 136:15
136:17 142:19 143:18
144:1,3 147:13 229:6,7
229:17 230:8,21
Bobby
160:13 161:7 210:9
bookkeeping
246:14
boom
77:6
boss
49:9 67:13 273:8
bottler
283:13
bottom
109:6 163:9 200:23
269:20 290:18,21 291:1
box
3:7 145:22 201:10 202:6
Boykin
22:19,21
Bradley
3:13
branch
15:13
breached
177:19
break
8:7,9 53:16 55:22,23
56:23 70:11 86:2,5
126:20 127:5,9 130:18
130:19 191:7 193:11
197:4 216:19 244:16,17
breakdown
117:22 118:11
breaking
116:13,16,22 117:17 197:2
Brenda
10:22 11:13 12:12,20 13:9
56:4 85:4,11 128:20
129:6 130:1 149:21

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

150:6 151:15,22 152:12
152:13,17 154:14 157:15
169:7 170:1,12 171:18
171:22 172:5 173:2,10
199:17 203:21 233:12
**bring**
151:10 252:18,22 262:18
**bringing**
214:6
**brought**
50:21 51:5,9 62:19 66:6
67:5 68:15 106:23
178:17 218:2 248:5
250:9 251:3 294:5
**Brundidge**
66:23 67:6,8 69:12
70:22 71:14 73:3 74:19
87:5 106:20 145:10
146:1 188:5,6 194:13
195:9 261:21,23 265:23
266:1
**budget**
285:18
**building**
125:4 134:18
**buildings**
288:21 289:3,12 294:19
**bump**
100:12
**bumped**
96:10
**bunch**
247:22
**Bush**
3:18 162:9
**business**
37:7,11,13 64:2,11 65:14
78:6,11 88:19 135:7
146:2,5 174:15 232:11
243:5,16 265:11,15,21
266:2,4,7 284:13
**businesses**
184:6 243:16 258:16
**busy**
216:12

---

C

**C**
3:1 296:1,1
**calculated**
271:12
**calculation**
270:22 271:8
**call**
7:9 11:4,7,13 12:9 13:8,10
18:8,9 37:16 39:22
47:16 84:20 170:10,11
171:11,18,22 172:4,6,7
172:10 173:2,9 199:17
205:8 206:1,2,2 211:15

230:7 241:3,7 291:17
**called**
13:3 17:10 18:10 47:20
93:10 106:6 109:2
157:6 172:11,14,15
205:4,9 233:1 276:8
**calling**
28:19 148:10 212:1
**calls**
56:4,7 84:2 145:23
157:10 170:7 175:20
176:1
**Canada**
178:15 189:3
**Canadian**
222:22
**candidates**
242:20
**capable**
132:14 293:15 295:1
**capacity**
113:2 205:18
**capital**
1:10 168:22 291:4
**capitalists**
76:15
**capping**
293:8
**carbonated**
283:14,19 284:18,22
**care**
214:8 215:11
**career**
268:2,7,20 269:1,5
**CAREFULLY**
168:23
**Carl**
105:14 263:14
**Carolina**
161:3
**Carpedia**
58:19,21 59:3,12 60:13
61:5,15 178:14,16,23
179:7,10,13 180:14,18,20
181:5,8,10,17 185:7,22
188:13 189:4 214:16,17
219:5 222:17 246:1
267:11
**Carpedia's**
59:6
**Carraway**
43:19,20,23 46:7,16
47:14,16 48:6 49:11
50:9,16,19,20
**Carraway's**
51:13
**case**
15:1 20:9 210:15 230:3
230:14 231:7 234:4,8
266:10,14
**cash**

165:7
**catch**
87:22
**Caucasian**
93:23 112:19 135:3,5,10
140:11 201:17 275:7
276:13 277:11
**Caucasians**
189:22 190:3,7 275:16
**cause**
5:11 37:5 281:4 296:20
**CD**
236:7,10,11,19
**ceased**
188:17
**cell**
10:10,12,15,20 11:9 12:19
13:22
**cents**
271:17,20 272:4
**CEO**
51:12 67:16,18 191:4,7
**certain**
50:3 159:6,6 192:7 213:3
231:14,21,22
**certainly**
236:4 243:17
**certify**
5:4 296:7,16
**CFO**
50:13 55:5,15 82:13,14
98:20 147:11
**challenge**
64:5 115:8
**challenges**
115:14
**challenging**
260:12,17
**change**
70:10 74:3
**changed**
33:20 251:2 261:15
**changes**
193:21 244:13
**charge**
12:3 56:14,17 86:17
147:18 177:7,23 191:5
201:5 204:13
**charged**
262:8
**chart**
118:18
**check**
174:3 199:15,16 200:6,10
200:11 202:4,6 285:7
287:13,16,16
**checked**
201:10,19 202:4
**checks**
165:2,7 200:1 211:15
**chemistry**

31:19
**Chicago**
160:16,16 161:14 210:18
**chief**
51:5,11
**children**
21:18,21,23 23:7,10 24:9
25:6,19 29:22 291:19
291:23
**choice**
62:4 102:8 168:2,3,9
**cholesterol**
8:17 9:8
**chosen**
170:18 171:1 226:2 272:8
**Chris**
6:12 68:22 69:1 84:10
85:10,16,18 88:9,10
89:3,8,20,22 90:2,4,19
90:23 91:5,20 92:8,20
93:14,18,20,21 94:14,21
94:23 95:6,12 96:4
97:16,21 99:12 101:1
114:9,13,15 127:11 131:8
133:3,11,23 134:12
135:3 136:15 137:2,20
138:12,14,19,22 141:5,17
142:7,13 144:15,21
145:14 148:22 149:7,9
149:14,22 150:4 151:16
151:23 152:11,17,22
156:15 157:11 158:11
168:6 174:16,19 190:5
190:11,13 193:3,8
194:23 195:4,5 203:21
219:23 220:21 255:10
264:3,14,18 275:9,15
**Chuck**
43:19,20,23 46:7,10,12,16
47:14 48:6 49:11 50:9
50:10,16,18,20 51:13
184:11
**circumstance**
197:19
**circumstances**
162:3 168:17 207:10,21
210:13
**city**
25:10,11
**Civil**
1:5 5:6 161:6
**claim**
126:3 131:19 133:9,22
149:14 167:3 168:7
227:17 233:17 237:1
240:16 249:17 252:9
257:7 267:12
**claiming**
130:23 202:11 248:4
251:19 256:5
**claims**

56:16 166:22 167:7 169:2
176:19 202:20 206:18
210:10 229:3 232:19
233:9 235:20 237:20
238:6,20 251:10 259:18
259:21 273:19
**clamp**
82:22
**Clarice**
113:14,20
**class**
45:15,17
**Classic**
43:21 185:4 273:4
**Classics**
184:10 185:16 186:7
187:12,17
**clean**
122:18,22 123:7
**clear**
251:8,9 257:5
**clerk**
29:1 245:21
**clients**
247:23
**close**
29:22 245:7 268:10
**COBRA**
215:13 220:22 221:14
**Cola**
289:21
**cold**
284:19 285:7 293:5
**college**
27:7,15 213:7,9,10
**color**
125:10,19 202:17 212:23
213:12
**column**
267:6
**come**
28:22 46:15,20 57:8
60:23 64:17 76:22
111:1 114:5 186:23
187:7 188:19,6,13
212:1 238:4 251:23
253:15 254:3 264:8
287:20 293:2
**comes**
66:14 74:2,8 114:1 125:9
151:15
**comfortable**
108:5 218:6
**coming**
18:18 39:9,12 76:12 77:13
77:23 78:3 95:6
194:22 207:19 208:5
242:19
**commencing**
5:9
**comment**

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

112:3,5,8 149:10 154:3
174:19 192:2 195:11
208:4 255:15,16 256:2
**comments**
190:2
**commercial**
28:9 29:6
**Commissioner**
5:4 296:23
**commitment**
27:10,14
**common**
136:22 243:18,21
**communicate**
231:5
**communicated**
14:6 190:17 193:2 231:20
**communicating**
11:14
**communication**
12:22 193:4
**communications**
193:7 231:13
**commuted**
178:21
**commuting**
281:11
**companies**
243:18
**company**
28:2,3,5 67:20 68:14
76:4 85:6,12 88:23
102:7 130:7,10 132:10
132:13,14,15 134:7
147:9,21,22 148:1
189:11 208:9,15,23
222:22 263:17,21 264:7
**company's**
228:14
**compensated**
101:19
**compensation**
101:2 227:18,21
**completely**
61:9 239:5 283:14,17
285:9
**completion**
112:1
**compliance**
2:12
**components**
180:4
**compose**
142:17
**composed**
103:7
**comprise**
269:6
**concentrate**
66:17 122:16
**concentrates**

122:14
**concentrating**
216:17
**concept**
135:1
**concluded**
295:10
**condescending**
196:15
**condescension**
196:17
**condiment**
65:17 263:10 294:17
**condiments**
31:9 105:4
**condition**
10:3 285:17
**conditioners**
288:23
**conduct**
63:15
**conference**
134:11 136:6
**confrontational**
109:22 110:6 111:16,19
**confronted**
112:12
**considered**
203:7,12
**consistent**
97:9 105:23 199:6 200:3
**conspiracy**
256:22,23
**constant**
216:12 218:7
**constantly**
216:2
**consult**
159:17 169:4
**consultant**
58:8 179:1 246:3
**consulted**
159:21 160:4,15,17 161:18
177:2 197:13,16
**consulting**
57:11 58:1,4,13,18,20 60:1
60:7 178:18
**contact**
171:17,21 173:5 204:20
206:21 261:22
**contacted**
173:3 184:4,8,13,19
188:20
**contacting**
184:18
**contain**
209:14
**contained**
144:12
**contains**
236:1

**content**
281:19
**contents**
198:9
**continue**
59:10
**continuing**
158:16
**contract**
177:19
**contractor**
28:21
**contracts**
130:7,10,14 147:14
**contradiction**
267:1
**Contraian**
271:10
**Contrarian**
269:21
**contribute**
222:11
**contributed**
224:18
**contributing**
224:14,18,22
**contribution**
225:1,14,18,20
**contributions**
225:7
**control**
32:11,16,19,20,22 33:3,18
34:10,22,23 35:2,7
62:10 84:7 85:6 173:22
178:3 265:11,16
**controller**
182:13,15 183:3,6,9
**conversation**
10:7,15,19 11:1 12:18 13:1
17:8 18:5 88:15 89:9,13
89:15 91:9 92:17 96:18
96:21 97:11,19,21 117:1
120:17,22 126:7 138:19
149:13 156:14 171:15
172:22 207:22 210:3,8
210:16 234:17,22 275:11
**conversations**
10:12 75:18 96:4 121:9
142:7 169:23 207:6,9
210:10 228:23 230:19
233:13 287:19
**COO**
51:10 67:16,18
**coordinator**
58:6
**copied**
242:13
**copies**
236:12,13,18
**coplaintiffs**
231:16 232:5 233:7

273:15
**copy**
119:7 144:8 155:8,13
159:11 198:1,5,6 229:22
230:12
**corporate**
161:16 210:20 211:5
**Corporation**
179:19 180:1,2,6 182:8
246:9,18 249:3
**correct**
8:23 21:4 34:15,16 39:15
46:8 48:1 53:6 55:16
57:4 59:18 60:12 65:15
69:3,8,9,14 86:21 87:6
93:16 94:12,16 95:3
97:7,12 98:18 99:6,10
99:11,15,21 100:6,7,10
100:16,17 101:10,11,13,15
101:18,21 110:3 111:12
111:13 117:9 124:12
125:21 127:12 128:8,22
131:2,3 133:1 151:14,18
158:8,9 162:17 165:6
166:15,18 167:10 168:11
168:13,14,15 169:5
174:23 176:6 177:12,21
178:1 180:10,11 190:20
192:9 197:14,17 199:11
200:8 201:10,11,15,18
202:19 203:17 204:8,9
204:10,11,18 206:5
210:6 212:8,9 236:8
240:13 241:16,17 242:15
243:1 245:22,22 246:10
246:17,19 247:17
249:13 251:12 252:12,15
254:18,19 255:6,12,18
258:15 261:15,19 262:5
262:11 264:5,15,16
265:18 266:19 269:15
269:19 270:19 271:21
272:9,17 273:5,6 274:7
274:9 275:18 280:11
289:22 296:13
**cost**
46:19 47:23 48:15 49:10
49:15,18,23 50:6 51:19
52:15,22 53:3 181:22
181:23 182:5,7 284:9
**costs**
50:3,4 52:23,23 58:16
157:21 207:14 284:13
291:6
**counsel**
2:5,16,18 5:7 155:12
296:17
**counseled**
62:16 132:3
**counseling**
119:17

**counselor**
268:2,7,12,21 269:1,5
**counted**
208:9
**counter**
28:18,21,21
**counterpart**
263:9
**counting**
213:10
**country**
291:5
**COUNTY**
296:5
**couple**
136:3 178:11 179:11 181:1
181:12 187:6 197:7
**course**
44:11 115:15 123:14 147:11
185:7 205:21 207:16
210:22
**court**
1:1,22 2:7,13 5:1 15:2
19:12,23 20:11,13
**cousin**
160:16 161:17 210:20
**covenants**
76:4
**Cover**
278:12
**coverage**
221:15 222:4,9,10,12,17
**Co-manufacture**
31:6
**CPA**
45:14,16,18 185:5 246:12
**CPAs**
184:2
**create**
219:19
**created**
48:20 52:5,7 97:14 98:1
104:21,23 253:9 263:7
263:11
**Crestor**
9:4,5
**criminal**
160:21 234:5,7 235:6,9
**critic**
212:20
**critical**
63:6 285:22 286:14
**critiqued**
144:6
**Crosby**
70:15,23 71:1 84:17 106:9
106:12,19,23 137:16,23
138:18
**Crosby's**
113:14,20
**current**

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

100:4
currently
8:11,15 182:16
customer
108:4 243:8
customers
28:19 31:4 62:7 69:23
70:1 138:9,13,15 145:3
145:22 147:14 243:6
265:23
cut
50:4 58:15 99:13 100:15
253:1
cutbacks
80:6
C-R-E-S-T-O-R
9:7

**D**

D
4:1
dad
160:20 161:23 229:13
daily
84:11,20 119:3 195:4
Dakota
14:18 16:3
damages
212:10 220:13,14 266:18
Danielle
23:11,13,20,21
Daniels
81:17 94:15 136:11,15
145:15 193:8
data
75:21
date
5:4 10:23 11:2 16:10
248:22 249:4 282:6,10
daughter
205:8 213:6
Davis
26:23 27:2
day
6:12 17:11 65:12 66:12,17
66:21 68:22 69:2,7
71:2,22 72:7,19 73:9,18
84:10 85:10,16,18 86:12
86:19 87:4,12 88:9,11
89:4,5,8,22 90:2,4,19
90:23 91:5,20 92:20
93:14 94:14,21 95:1,12
96:5 97:16,21 99:12
101:1 105:20 106:10,13
106:15 107:8 113:23
114:6,9,13,15,20 115:11
117:9 118:20 119:8 121:1
127:11,12 128:9,22
129:10,12,17 131:8,9
133:11,23 135:3 136:15

137:2,5,7 138:12,14
141:4,6,17 142:7,13
145:14 146:1 148:22
149:7,9,14,22 151:9,16
151:23 152:6,17,22
156:11,14,15 157:11
158:11 168:6 172:8
174:16,19 175:5,21
184:13,20 190:5,11,13
193:3,8 194:23 203:21
209:21 216:10 217:9,10
218:12,13 220:1,21
249:13 250:5 252:11
253:20 254:3,9 255:10
259:4 261:11,21 262:9
264:3,14,18 275:9,15
278:19 294:6
daycare
291:19,22
days
166:3,10 184:19 187:6
223:7,8,11,16,20,22,23
224:1 248:2
day's
89:20 93:18,20,21 117:7
133:3 152:11
day-to-day
238:12,13,14,17 239:12
242:8 288:22
deadline
166:6
deal
68:11 289:10
dealing
69:23
Debbie
21:12,15,19,23 25:5,20
debt
79:11,13 80:18
December
9:13,15 15:11 27:10
247:18,20
decide
124:1,2 166:3
decided
11:15 80:9 85:14 124:11
decision
37:13 79:23 82:19 83:18
85:9 120:10 124:3,3,15
124:17 146:9 157:12
177:5 190:10,15 191:2,8
193:1,14,17 239:15
257:1 260:12,17,19
262:15,18 263:16,21
264:7
decisions
54:18 68:19 144:14,22
145:2,5 147:12 192:17
194:11,16,17 195:10,17
195:18 238:14 239:8,9
239:10 284:14

decision-making
145:14
decline
189:7
declined
188:2,8
decrease
261:12
default
211:13
defaulted
211:10
DEFENDANT
3:10
defendants
1:11 161:6 274:4,13 275:5
Defendant's
4:11,12,13,14,15,16,17,18
94:1,5 95:17,21 102:22
103:3,16,20 162:21
163:2 176:16 197:8
200:17,21 203:19
204:17 239:21 240:2
244:1,5,20 276:15
defense
238:2,3
defenses
239:2
defined
98:15
degree
45:6,8 47:6 64:3
degrees
284:23 285:2
delete
11:17,19,21 12:2 13:21
14:1
deleted
14:2
deliver
153:13
delivers
176:22
demeaning
124:6
demeanor
121:19
demonstrate
275:4
demoted
250:5,14 251:3,20,22
deny
90:16
department
89:7 96:15 279:7,23
280:3 293:16
departure
112:21 113:14 149:19
187:6 248:6
depending
69:19 238:1,3

deplete
224:16 227:4
DEPONENT
295:12
deposition
1:15 2:5,9,10,21 6:15,16
17:1 18:15,17 19:1,23
94:6 95:22 103:4,21
162:11 163:3 176:17
200:22 212:12 240:3
244:6,21 285:6 295:9
296:8,14
depositions
2:14 6:18 18:21 19:6
derived
140:3
derogatory
189:21 190:2,6
describe
69:15 122:5 203:15,20
209:17
described
126:7 237:22 287:11
description
290:20 292:23
deserve
123:12
design
28:10 29:3 293:6
designed
29:5
detail
133:20 229:15 260:23
detailed
212:19
devastated
215:20
diary
235:11,16
difference
206:14 272:12
different
8:16 13:2 26:18 35:23
66:5 117:14 121:18
143:1 148:15,16 162:4
219:18 229:23 251:11
252:3 283:15,17,21
differential
272:11
differently
117:15 131:1,6,20,23
132:21 133:10,17 190:23
192:12 196:7,21 202:12
202:15,22 255:9 256:6
264:13,19 265:1
difficulties
78:16 114:18,22 115:13
dinner
232:10
dire
78:14

direct
275:14 277:1
directed
191:14
direction
195:15
directly
49:12 50:8
Director
57:7,9,14,17 59:13 61:7
62:1 63:21 64:7,15
65:9,21 66:8 67:2,11
69:5 70:5 71:18 72:4,8
72:13 73:11,22 80:22
86:15,22 87:7,15,23
88:6 89:1 91:13 94:18
98:10 99:9 100:5 101:9
102:3,11 213:17 249:20
249:21 252:6,10 257:12
258:6 260:21 261:9
276:5,8
directors
93:6
disagree
97:3
disagreement
99:23 100:18
discharge
15:23 16:1
discharged
15:20
discipline
15:3 33:3,6 34:4,9 36:13
40:1,11 42:5 55:1
120:11,12
disciplined
62:14 63:13
discovery
236:6
discriminate
239:13
discriminated
146:16 201:13,20 206:16
254:16 261:3,6
discrimination
201:6 212:16 218:3 235:6
235:9 238:21,22 240:16
252:9 256:16
discriminatory
256:14
discuss
90:3 194:4 197:20
253:23
discussed
192:18 194:2 229:10
233:5 286:11,13,17
discussing
96:4 164:8 277:5
discussion
150:20 151:1,4,5 155:22
189:16 235:3 241:15

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

265:20 266:5
**discussions**
75:14 79:22 80:4 83:2,8
83:14 91:4 187:3,8
195:22 206:17 229:1,16
**disorderly**
14:16 63:15
**displace**
242:21 250:10
**displaced**
260:4
**dispute**
164:15 167:17
**disseminated**
82:23
**distraught**
216:7
**distress**
212:11,15 219:7 220:6
**distribution**
290:8
**DISTRICT**
1:1,2
**divided**
51:14 94:14
**division**
1:3 65:18 70:20 104:17
105:5,12,18
**divorced**
23:4
**document**
94:6 95:23 103:4,8,10,15
103:21 104:5,7 164:3
229:21 230:12 240:4,6
245:1 250:4 276:5
278:1 281:20,23 288:2
288:5,14
**documented**
228:4,5
**documents**
231:6,14 278:3
**doing**
7:3 58:9,9 59:8 60:4,6
82:2 102:11 107:6
108:5 118:5 123:18
144:16 169:20 181:20
192:19 200:16 207:17
213:19 220:4 247:19
248:2,3 251:16 289:7
293:15
**dollar**
132:13 227:10
**dollars**
53:13 99:1,17 100:5
101:20 102:19 183:12
221:1 224:6 227:3,8
249:2,8 266:23 267:14
267:23 268:8 270:5
271:16,19 272:4
**door**
112:2

**doubt**
254:10
**downtime**
118:3,19
**drafted**
146:15
**Drive**
24:14,18,22 25:4,8,9,15
25:23 26:8,14
**driven**
212:19
**drivers**
39:22
**drunk**
14:16
**duly**
5:16
**duration**
41:14
**duties**
35:17 41:19 49:22 51:14
52:19 53:4,5 59:20
60:2,10 69:5 107:2
261:14 291:3
**duty**
58:3 63:18
**D-E-B-B-I-E**
21:13

---
E

**E**
3:1,1 4:1,9 296:1,1
**earlier**
56:3 67:15 69:4 96:2,19
169:22 181:5 250:1
253:8 267:2 274:3
276:6 285:5 286:11
287:1
**early**
81:15 152:7 226:12,15
**earmarked**
97:15
**earned**
221:7 270:6
**easier**
7:12
**easiest**
70:13
**Eastern**
34:1
**eat**
167:23 168:5
**Eddie**
70:15,23 71:1 84:17 106:9
106:12,19,23 137:16,23
138:2,18 139:8
**education**
44:12 45:13,23
**EEOC**
12:3 56:14,17 177:7 201:7

204:12 233:17
**effect**
2:11 9:22 292:1
**efficiencies**
69:22,23 157:19 293:7
**efficiency**
58:15
**efficient**
207:13 293:10
**eight**
218:15 220:23 227:3,7,9
271:15 272:3
**eighteen**
36:10 77:3 132:12 271:16
271:22 272:4,11,15
**either**
29:6 67:16 82:12 130:4
165:13 187:15 230:8
231:9 260:20
**elaborated**
135:8
**eligible**
223:4
**eliminated**
109:8,12,15
**Ellis**
71:13,15,16
**emotional**
212:11,14 219:7 220:6
**employed**
228:16
**employee**
38:13,14 43:23 44:2
120:7,9,14 122:7 169:3
169:3 176:17 196:2
203:6 274:6
**employees**
33:14 34:5 36:2,3,7,13,19
37:2,14,17 39:16 40:1,5
40:15 42:1,5,11 54:12,15
55:1 60:11 83:5,11,20
85:23 149:6 154:8
157:5 210:5,5 243:1
273:11 275:7 276:13,14
277:11,12
**Employer**
176:20,23
**employers**
184:9,18
**employment**
24:20 44:9 130:4,5
166:23 167:9,10 181:8
183:15,18,20 190:10
191:9 193:15 196:18
202:16 212:22 223:9,15
225:21 235:13 255:15
255:17 256:2 272:20
**encounter**
114:18
**encountered**
115:20

**ends**
137:1
**engineer**
70:18 72:2 292:17,21
293:2,6,9,12,17 294:12
**engineering**
119:1
**enjoy**
88:18
**enjoyed**
88:17
**ensured**
31:1
**entails**
69:17
**enter**
14:21 134:18
**entered**
162:10
**Enterprise**
160:12 174:15
**entertainment**
208:14 209:4
**entire**
72:3,8 73:11,22 78:16
268:6
**entity**
21:2
**entrance**
137:17
**enumerated**
288:10
**enumerates**
282:18
**envelope**
154:23
**environment**
232:11
**equally**
102:16
**equipment**
19:3,18 107:7 108:15,17
115:1,4,6,6,11,21,22
116:6,11,13,16,21 117:17
117:22 118:3,11 128:18
285:6,8,15,17 294:20
**equity**
140:2,6
**essentially**
99:19
**establish**
243:5
**estimation**
81:8
**et**
1:7,10
**Eugene**
84:18
**evaluated**
92:1
**evening**

123:4 216:18
**events**
133:20
**eventually**
19:8 54:3 174:4 200:5
**everybody**
66:4 156:10 213:10
**evidence**
2:22 274:12 275:4,19
276:12 277:9,10
**exact**
136:4 153:7 170:16 181:6
216:6
**exactly**
49:8 109:1 139:18 140:16
150:2 223:8
**exam**
45:14,16,19
**examination**
4:3,4 5:11 6:1 274:1
**examined**
5:16
**Examining**
103:15 104:5 281:20,23
288:5
**examples**
122:6 238:7
**excuse**
56:15
**execute**
130:9
**executed**
177:7 192:20
**executes**
176:22
**exhibit**
4:11,12,13,14,15,16,17,18
4:20,21 94:2,5 95:18,21
102:23 103:3,17,20
162:22 163:2,7,10,15,18
164:5,12 176:16 197:8
198:21 199:3 200:18,21
203:19 204:17 239:22
240:2 244:2,5,20
276:15 277:2,21 278:2
279:1 281:19 286:18
287:22 288:3,6,11
292:14
**Exhibits**
294:9
**existed**
233:5
**existing**
242:21 243:1
**expanded**
250:15
**expected**
96:11 121:18
**expenses**
208:14 209:3,3,4 267:21
268:1 269:7 271:7

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

experience
107:14,17 154:11 175:8,14
175:18 176:13 192:23
219:3 282:4 283:4
284:16 285:4 288:10,13
288:17 289:5 292:11
294:22
experiences
283:10
experiencing
217:19
explain
97:16 99:16
explained
101:5 211:3
explaining
139:23
explanation
78:2 117:19 156:4
expressed
61:18 286:19
extended
291:12
extensive
47:2
extent
210:15
Extremely
286:9
e-mail
229:22 230:7,10 236:15
237:8 239:11 240:8
241:3,9 242:14,22
243:2 257:23 259:15
276:6 277:4,8
e-mails
209:23 230:2 231:21
236:7,12,14,16,22,23
237:19 238:1,5,15 239:1
239:18

F
296:1
face
213:1
facilities
67:3 86:23 87:4,8 288:17
288:18 289:4,10 291:5
294:18
facility
66:18,22 67:1,9 69:12
70:22 71:5,7 72:7,19,23
73:8,19 86:12,20 107:21
114:1,7,20 115:11 127:13
128:10 129:12,17 137:6
137:7 169:15 194:13
261:11 262:10
fact
20:3 100:21 144:21 171:8

194:7 275:22 277:13
285:12 289:11
factual
255:21 258:13 271:3
fair
8:5,6 108:20,21 148:17
fairly
33:20 81:15 139:10 152:7
187:23
familiar
83:16 240:5 281:22
282:17,21
familiarize
288:3
family
160:2 167:23 168:5
172:19 197:21 198:2,16
205:14,18,19,20 206:9
206:15 210:23 214:8
215:12 222:9,10
family's
213:3
fan
232:16
far
7:4 97:23 149:17 153:3
289:18
fast
146:7
father
160:5,6,9 206:4,18
father's
160:8
favor
200:16
federal
167:13
FedEx
263:2
fee
208:13 209:2,10 268:6
269:4
feed
198:16 206:9,14 214:7
feedback
145:8
feel
62:3 64:6 91:2 93:12
102:13 108:5 168:3
236:2 250:8 251:6
feeling
121:8 143:22 216:23
258:15
feelings
215:23 216:8 281:1
fees
209:7
felt
63:3 90:4,18,22 117:3,15
121:19 124:23 129:11,16
168:3 206:21 214:11

218:1
female
254:22
fifteen
30:8 36:8 224:6
Fifth
3:14
fifty-five
249:7
fifty-nine
224:1
fifty-three
53:12,19 98:23
figure
124:4 126:12 267:17
filo
176:18 177:6 227:17
248:19
filed
6:14 12:3 56:15,16,17,19
231:9 233:1 248:16
filing
233:17
fill
284:6,16,19 285:1,7
filled
257:10 271:23 283:15
filling
201:23 285:2 293:8
final
60:14
finally
214:5
finance
80:1,10 82:20 86:10 88:2
88:4,8,18 89:7 91:6
92:4,13 97:7,15 98:2,4
98:11,17,22 99:14,18
100:14 102:10,15 185:11
185:12,20 186:22 284:8
finances
171:7
financial
51:5,22 52:4,9,12,20 53:2
53:4,23 54:3,7,21 55:2
55:19 56:23 57:4,13
59:16,20 60:3,9 62:12
62:22 64:2,11 75:15,21
78:14,16 213:14,20
financially
76:12 115:23 146:6
170:15,17 215:19
financing
80:17 81:18,23
find
80:17 81:17,22 84:22
107:15 116:15 157:3
179:17 183:15 186:6,10
186:22 215:11,20 235:21
235:23 242:20 258:17
fine

5:22 77:11 107:23 108:7
248:3
finer
107:15
finish
127:8 168:20
finished
27:9,13 45:11 61:9
finishes
61:6
fire
119:22 120:2 123:23
124:11,16,18 194:4
239:7,14,15
fired
87:20 120:5,13 122:8
150:6 153:5,6 195:20
207:10 216:7 218:12,13
218:16 254:4,9,10
256:8
firing
239:9
firm
57:11 58:1,4,13,18,20 60:1
60:7 185:5 186:1
firms
184:5
first
5:16 7:3 10:18 13:1 18:23
67:11 96:13 123:7 134:8
134:9 136:2 140:2
164:6 170:10 172:7
189:3 195:19 200:23
201:9 206:15 214:21
223:5,11,14 251:3
fit
172:3 258:20
five
15:9 24:19 161:18 164:13
173:15,19 174:5,8
198:23 199:4,5,10,19
200:12,13 223:16,20,21
249:1,2 267:13,22
268:7 271:19
fix
118:10 121:12 127:19
128:4,18 285:20
fixed
293:20
fixing
118:6 286:12
Fleischmann's
185:3,18
flip
276:16,19
floating
68:18
floor
46:18,21 50:2 62:5 64:12
122:16 134:13,14 137:3
137:4,9,11,15 283:11,20

289:16
floored
142:2
floors
122:21
Florida
27:19
fly
15:15
focus
66:12,21 72:18 113:23
265:22
focused
87:11
folks
26:11 81:21 147:21 161:13
209:15
follow
172:21 186:13
following
5:12 123:3 247:6,21
follows
5:17
follow-up
13:1
follow-ups
219:20
food
31:6 39:14 289:13
Foods
19:4,18 20:6,15 29:18
30:1,4,7,14,17 31:2,5,8
31:14,21 32:1,5 35:14
37:3,18 38:20,23 41:15
42:21 43:7,12,21 44:7,9
44:15 46:2 184:9,20
185:2,15 186:1,9,14
187:3,9 272:20
football
232:13
foothold
146:6
force
2:11 15:14,21 16:6 168:6
foregoing
5:6 296:8,12
forget
140:16 171:7
forgot
140:22 153:17
Forklift
39:22
form
2:17 126:15 128:12 129:3
243:23 272:1 274:16,19
281:7
forth
33:22 81:19 146:10
231:14
Fortune
132:12

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

forty–five
43:8,9
Forty–four
126:23
forty–seven
49:5
Forty–six
49:5
forty–two
272:16
forward
12:14 64:5
found
27:20 47:5,9 81:12 95:7
98:9 109:20 128:1
179:14,18 251:22
founding
134:21,21,22 138:20 139:8
140:9
four
23:3 24:19 54:16 142:18
143:1 147:3,5,9,20
174:6 178:12 179:11
180:12,22 229:11 230:5
267:22 268:8 271:15
272:3 290:23
Fourteen
30:8
fourth
148:1
frame
12:4 50:7 58:23 65:6
81:4 88:13 212:4
270:10
freight
263:4
fresh
139:14
friend
27:19 205:6
front
134:11 137:18 139:7 194:5
236:22
Fruit
31:11
Ft
27:18,22
fulfill
283:7
full
2:11 6:3 173:15,19 174:5
174:8 177:20 223:8,14
223:17
full–time
183:17,20
function
37:10
fund
83:4,10,18 224:8 269:21
269:23
funny

138:16
further
45:13 157:22 260:23
292:18 295:6,12 296:16
F'ing
112:9

---
**G**
---

gain
140:6 243:8
gained
243:9
gaining
146:5,5
gains
221:6
Gamble
290:17 291:3
game
117:8,23 118:12,14,22
192:19 232:13 286:12
gas
268:19 269:5
general
104:16 131:18 147:12
161:10,21 169:1 196:3
generally
34:8 120:22 234:2
274:13
Georgia
279:18 280:3 281:1,5,10
Germany
26:20
gesture
154:2
gestures
168:18
getting
92:18 145:9,22,23 158:12
175:20 199:13 220:5,6
220:7 231:6 247:21
293:20
girl
253:20
give
78:12 100:8 122:6 186:19
186:20 207:23 236:3
238:7 279:16
given
6:15,19 18:21 20:17 31:3
78:3 92:2 102:8 115:5
156:4 222:3 227:23
236:13 296:14
giving
111:22
go
6:22 17:11,17,23 20:9
21:4 26:16 27:7,14
29:10 41:2 44:21 45:10
47:1 56:9 65:23 66:6

77:4 92:14 97:6 109:23
110:8 113:16,18 122:17
127:2 140:21 142:3
148:4 151:8 152:10
153:3 154:6 157:13,17
157:19 169:12 175:5
185:13 191:2 203:15
208:19 216:19 217:16
232:21 246:8 247:21
250:18 259:14 262:2
266:6 275:2 283:19
291:22 293:19
goes
97:13 98:21 99:16 100:3
266:10,14
going
11:15 14:7 34:17 44:15,18
61:19 62:3 63:20 68:13
76:6 77:13 78:3 83:22
83:23 84:21,23 88:2,4
88:7,22 92:7,9,13 93:8
94:20 95:20 98:3
99:12 101:6 102:6,7
105:12 106:8 108:11,13
117:11 118:7 123:6,10,18
123:20,21,22 126:11
131:13 137:19 138:23
146:10 148:5,6 150:3
151:7,20 153:3,15,16,18
164:13 169:15 171:10
172:17 175:22 177:6
188:5 189:19 195:8,10
195:14,14 198:6 199:4
200:20 202:5 205:1,11
205:15 206:8 207:19
208:6 211:16 212:13
213:5,6 214:7,23 215:10
215:12,13,15,19 218:6,21
227:13 229:14 237:8
240:1 242:17,20,23
244:4,10 253:13,14
254:6 259:5,14 261:21
262:1,13 266:1 277:23
284:17 285:20 286:15
288:1
good
53:15 63:3 79:8 115:5
120:7 123:14 126:19
143:21 148:4 197:1
213:19 248:4 284:13
Gosh
144:20
gotten
199:18,21 201:22
governed
209:10
graduate
27:1 45:2,4
graduated
27:6
graduates

237:18
great
153:3
gross
109:9 110:1,13,18 111:7,15
112:16,18 248:14,17
ground
6:22 146:7
grounds
2:20 252:19
group
83:14 131:15 136:14
192:14 237:9 277:5
Guam
16:7
guard
15:18
guess
34:18 105:15 143:10
180:8 189:14 199:17
guidelines
37:19
guy
33:23 153:3 215:3

---
**H**
---

H
4:9
Hahn
26:19,21
half
15:9 25:1 52:15
hall
139:20,22,23
hallway
122:14 134:16 138:23
hand
94:4 168:18 240:1 244:4
287:13
handed
150:17 151:4 154:18
handing
103:2,19 163:1
handle
276:9
handwriting
163:9,18
handwritten
287:13
hand–written
200:11
hang
126:18
Hanyard
250:11 255:2 257:20
258:22 259:13 278:16
282:14 286:20 288:8,14
291:11 292:12,16 294:2
294:11
Hanyard's

292:8
happen
126:10
happened
15:1 106:1 182:10 211:2
231:8 254:13
happening
62:9 148:11 153:9
happens
256:17
happy
8:9 64:20,22 65:1
hard
76:12 153:16 236:18
head
7:5 79:17 105:12 119:14
159:12 232:22 248:15
250:18 251:10
headed
147:15 261:7
health
10:2 222:16 223:1,5
224:3
Healthcare
222:8
healthy
208:11
hear
83:17 125:15 148:8
164:22 189:20 190:1,5
191:21 192:1 253:23
262:23
heard
13:6 112:4 125:14,16,17
135:21 141:17 148:21
262:22
hearing
255:14,16 256:1 291:13
296:15
hearsay
175:8
heart
9:10,19 143:23 217:21
247:15,23 248:5
heated
293:5
Heather
1:21 2:6 5:1 7:12 19:13
held
75:10 151:12 279:11
282:22 283:5,8 286:7
hello
232:15
help
29:21 58:4 84:22 88:23
109:3 189:14 201:23
210:19 212:2 242:4
262:2,12 268:3,4
helped
82:4
helpful

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

70:17
helping
108:6
Henry
6:13 111:7,8 113:9 144:23
145:4,15 146:3 190:1
192:8,11 193:13 195:1,4
195:5,6 219:23 220:21
237:4 240:10 241:4
264:3 265:6 273:7
277:4 281:9
hereditary
248:12
hey
123:5 127:21 194:23
195:7 206:2 211:2
215:3 230:10 234:3,19
242:3,17 257:2
He'll
23:15
Hicks
6:13 111:7,8 113:9 144:23
145:5,15 190:1 192:9,12
193:13 219:23 220:21
240:10 241:4 264:3
265:6 273:7 277:5
281:9
high
26:16,18,19,23 27:6
highly
234:6
hip
148:20
hire
268:11,20 295:2
hired
50:12 251:6 254:3 268:2
hiring
54:17 239:9 242:2 275:6
hit
153:9 283:11,20
hold
71:9 98:3 276:3
holder
79:10
holding
89:6
home
29:22 151:8 217:7,12
Honestly
155:1
honor
83:23 85:15 170:18 171:1
Honorable
15:23 16:1
honored
83:22
hope
242:16
hostile
209:20,20,21

hot
283:15 284:16
hot-fill
289:17
hot-filled
284:2
hour
127:3
hours
17:20 63:11 151:10 216:10
218:15,18
house
205:5
houses
232:8
HR
129:9 142:3
Huh
93:19
human
220:2 276:10 279:7,12,23
280:2
hundred
220:23 224:5 227:9
249:2,8 267:14,22
268:8 271:16,19 272:3
hung
106:3 258:2
hurry
123:15
hurt
153:18 286:15
husband
232:13
H-A-H-N
26:21

I
idea
118:9 134:23 148:4
175:12 193:18
identification
94:3 95:19 103:1,18
162:23 200:19 239:23
244:3 277:22 287:23
identified
52:23
identify
50:1,2 131:21 236:23
249:16 264:11,14 277:2
image
138:11
imagine
90:7
immediate
67:12
immediately
27:7 137:13 152:10
176:21 228:10
impeccable

132:8
implement
195:9
implemented
60:20 115:3
implementing
61:2
important
284:6,11 285:23 286:6,9
289:6 290:11
impression
242:11
improper
112:8
improve
46:23 50:5 58:15 158:16
improvements
59:11 61:4
inappropriate
109:21 110:2,13,18 112:3,5
112:15
incident
63:9,11 120:4,8 122:9,11
127:20
incidents
124:8
included
242:12
includes
169:1 248:18
including
52:14
income
168:4 226:11,16,18,21
247:10 248:14,17 249:1
269:17
increase
53:9 64:18 182:21 194:13
increased
65:2 92:10,20 93:14
214:1,10
incur
268:1
indicate
170:23 245:17 246:5
247:15 279:5 282:13
292:15
indicated
236:6 248:22 290:18
indicates
96:13 105:18 109:6
164:12 241:14
indicating
163:11 201:12
individual
158:18 231:20
individuals
51:15 116:19 192:15 194:1
264:12
industry
46:18 47:4 62:6 78:17

121:15 145:20
information
75:21 82:5,23 231:12
236:2 245:7
informed
174:16
infraction
120:6
initial
97:20
initially
55:8 108:10 231:9 234:23
initiated
170:11 172:10
input
190:14 192:5
install
29:10,12 115:7 293:22
installation
28:10 29:7 293:21
installations
29:9
instance
10:19 114:13
instances
34:13 36:16 42:8 124:22
126:2,6 145:13
institution
80:18
instruct
34:18
instructions
85:21
insurance
220:22 221:15 222:4,16
223:1,5 224:3
intended
133:12 134:1 255:11
intent
275:15,20 276:13 277:10
intention
131:9 135:11 140:14 141:6
148:23 149:13 174:17
intentions
133:5 139:15 174:21
255:20 274:13 275:1,5
275:9
interest
61:19
interested
61:23 88:2,3 186:6
296:19
interesting
138:10
interim
189:5
International
58:19,21 60:13 178:15,17
178:23 246:2
internet
216:15

interpretation
292:22
interpreted
121:22 149:5
interrogatories
222:1 228:5 231:10 244:7
244:23 248:23
interrogatory
231:18 232:1
interrupt
250:17
intertwined
261:6
interview
47:18 184:6,23 216:14
interviewed
184:12 185:1,2,3,4,6,7
254:11 258:22
interviewing
254:8
interviews
184:21
intoxication
63:16
invest
226:3
investment
221:8
investors
76:15
involved
19:9 65:13 68:6 70:21
75:13,17,20 76:14 79:21
80:3 83:1,7,13 108:14
130:12 191:1,7 192:16
238:12
involvement
193:14
in-house
32:7,8
IRA
224:12,14,17 225:7,14,18
225:21 226:4,6,10
227:1,4 269:10 270:2
271:4,17 272:5
Irrigation
28:1,6,8,12 29:16,20
245:18
isolated
120:8
issue
34:9 116:19 119:21 130:1
293:19
issued
39:9
issues
33:10,11,12 114:6,17,23
115:1,9,10,14,16,20,21,22
116:5,11 117:8 118:19,20
119:10 146:3 196:3
241:10 262:13 286:11

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

Item
166:1
items
150:8 241:11 269:6

**J**

J
3:11
January
67:23 94:10 247:8
Jay
3:6
Jeff
6:12 142:12,17,20 145:12
146:8,19 189:20 190:18
190:19,22 191:21 192:2
192:5 193:1,7 195:2,8
195:13,13 220:1,21
241:5 264:3,14,21,23
265:3
Jefferson
26:22 27:2 296:5
Jennifer
3:11 6:9 274:2 286:23
Jerry
1:7 18:11,14 74:16 84:16
107:11,13,18 108:7,10
125:3,6,16,17 136:16
142:19 146:23 147:4
229:6 230:8,15,19
250:22,23 253:12
Jimmy
70:15,18
job
27:20 28:15,16 30:17
32:3 35:9,17 36:23
39:6 41:9,19 48:6,14
49:22,22 52:19 56:23
57:6 58:2 63:10 69:5
85:1 88:16,22 89:10
98:4 100:10 101:9
102:6,10,12,15 106:3
107:23 109:11,14 120:8
123:13 132:1,4,5 135:17
139:3 140:20 141:11,13
149:8 158:12 179:14,16
179:18 183:17,22 184:1
185:21,22 186:8 187:13
188:2 203:7 210:23
212:21 213:2,12,19
214:23 215:11 228:17
246:15 247:4 258:1,2
261:14 267:7,21,23
268:5,11 269:7 271:7
273:3 286:7 289:6,15
290:2,11,19 291:3
292:23
jobs
33:22 102:9 109:7 185:17
216:15

joining
273:11
joint
248:19
journal
235:12,15
judgement
126:13
juice
122:15 293:4
juices
31:11
Julian
173:6 205:2
July
15:11 187:23 204:13,19
June
16:11 151:13 156:17,18
165:18,20 169:14 180:9
187:4,21,23 188:1 216:4
217:11 228:7 254:11
270:16,16 273:4 282:11
283:8 286:8 289:7
290:12 293:13

**K**

K
3:4
keep
7:6 102:7 112:13 123:13
235:11 253:22 266:2
294:18
kept
123:21
kid
205:8
kids
215:14
kin
296:17
kind
17:12 18:2 33:6 44:8
51:14 60:14 62:2 64:4
68:7,9,11,13,16,17 77:5
77:10 78:7,13 82:22
95:7,8 108:6,11 121:12
130:1 135:8 138:3
139:16 146:8 147:13,17
153:2 160:19 161:4,8
178:2 185:8 187:1,10
205:22 215:5 219:17
222:4 223:13 226:8
231:4 239:8 244:8
246:21 282:3 288:13
Kinman
38:5,7 40:23
knew
13:17 46:17,17 47:2 62:4
62:5,7 64:10 108:13
116:17,18 117:4,11,16

128:18 139:13 153:9
158:11 159:4 191:10,12
191:13 192:21 193:1,9
198:10 214:18 233:4
242:1 277:15
know
7:20 8:8,18 14:6,8 17:10
17:18 19:8 20:5,13,15
33:22 34:19 36:23
39:21 46:12 47:9 48:19
53:1 56:7 60:5 61:8,11
61:14 62:5 66:7 69:21
69:21 71:10 74:4,19
75:7 76:3 77:7,10
78:17 79:13 80:14,15,19
82:1,2,4,19,21 84:6,9,12
84:21 85:8,20 87:16
88:21,22 91:20 92:3,4,5
92:6 93:11 104:20
107:6 108:1,3,4,6,11
109:8,15,19,20,22 110:1
111:1,10 112:20 113:13
113:17 115:16 116:5
118:7 119:23 122:4,5,23
123:6,15,21 124:5,5
126:18 127:11,18,21,23
127:23 128:4,8,21 132:2
135:1,4,4,7,9 136:12
138:10,16 139:8,11,14
140:9,10,12,13,19 142:23
143:13 144:23 145:16,18
145:19,20,22,23 146:4,9
147:11,12,15 148:7,12
150:5 151:9 153:4
154:2,3,5,5,21 156:9,20
156:23 158:4,17 159:22
161:22,23 162:1,2 163:4
165:19 168:4 171:7
172:17 173:23 175:10
176:8 177:4 178:12
179:12 183:22 184:13
186:18 188:4,6,17,19
189:2 190:9,13,16
191:14 192:4,7 193:13
193:18,20 194:6,10,23
195:2,11,12,13,19,21,23
195:23 196:1,3 199:13
202:10 205:15,21,22,23
206:9,13 207:10,20
209:1 210:23 211:1,2,9
211:10,19,21,23 212:23
213:1,10,11,13 214:18,21
214:23 215:2,11,14
216:5,12,15,20,23
218:18,19,20,21 220:12
221:7 228:4 229:9,12
229:14,19,19,20 230:2,6
230:8 231:11,12,14,20,21
234:10 235:5 237:17
238:3,10 239:4,13
241:23 242:3,9 243:4

243:11,14 247:10 248:14
250:7 251:3,15,16
255:19 258:16,17,18,21
258:23 259:1,3 262:14
262:17,20 263:3,16,20
264:1,4 268:14 271:1,2
271:6 273:14 276:9
278:20 279:9 281:3,8,9
281:14,17 284:12,21
285:19,21 286:2,14
288:22 289:12 291:14
292:1,7,10,23 294:1,17
294:23
knowledge
111:3 275:8,12 279:11
280:10 283:4 286:6
291:15
KNOWN
169:2
knows
206:1 229:5

**L**

L
2:1
labor
216:18 29:14 69:22
lack
214:12 265:10,14,21 266:7
laid
37:20 253:19
Lampert
55:6,7,14,18 62:13 63:2
82:14,16 98:20 136:17
laptop
109:21 110:3,14,19 143:10
143:12,15 228:13
Large
5:3
larger
226:5
Larry
6:12 142:13,18,20 145:12
189:20 190:18,20,22
191:21 192:2,5 193:1,7
195:2 220:1,21 241:5
264:3,14,22,23 265:4
Late
287:7
lavishly
208:22
law
3:5,6,12 161:6 167:14
239:5
laws
2:12
lawsuit
6:13 19:3 21:1 56:15
176:18 192:9 202:11,14
210:11 229:3,4 231:10

232:19 233:1,4,9
235:20 237:21 273:12
273:19 274:5
lawyer
159:17 160:6,13,19 161:4,8
172:19 173:3 177:3
197:13 202:7 204:20,22
206:3 210:20 228:1
234:9,15,18 235:2
236:3,14,19 238:2
lawyers
6:11 19:7 161:16 197:17
205:13,19,22 206:20
211:5
lay
36:18,22 37:1,14,17 196:4
218:19
layoff
195:23
layoffs
37:6 196:1
leadership
106:8
leading
2:18 126:17 130:13
leak
122:15
Lear
179:18,21 180:1,2,6 181:8
181:15,21 182:3,8 185:6
214:17,20 218:5 223:2
223:6 224:4 226:1
246:9,18 249:3
learn
108:20,23 220:8 252:23
learned
121:1 203:16 228:8
leave
29:19 43:11 61:13 102:3,6
179:13 180:9,22 228:9
228:10,13 291:21
leaving
25:1 88:6 178:9 184:16
252:10
left
20:6 42:21,22 43:7 46:2
50:10,16,20 55:12 57:14
57:18 58:10 59:10
61:12 67:4,20 68:3,20
81:5,11 84:4 91:18 93:4
93:5 94:10 95:5,11
101:9 107:8 122:20
123:3 124:14 150:9
170:8 183:14 187:1
211:21 214:1 227:12
228:12 247:2 253:21
261:9
legal
166:22
Letitia
112:21 113:10

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

letter
  15:2 93:17 96:3,6 97:17
  97:19 142:17,20,21
  143:3,7,22 144:2,3,13,19
  145:11 146:12,13,14,21
  147:1,7 151:4 154:18
  155:9,14,16 159:5,12
  278:7,12,14 282:1,7,13
  282:19 283:2,3,7
  286:20,22 292:15
letters
  143:2 168:23
letting
  84:20
let's
  127:2 133:22 140:21
  148:4 150:5 205:8
  215:4 229:20 244:15
level
  213:23 214:10 251:1
Lewis
  3:6
liaison
  58:6
life
  153:4 227:14
lifestyle
  213:4
liked
  63:4 64:1
limited
  60:3 285:18
Lindsey
  3:19 162:10
line
  12:11 35:19 36:9 77:11
  108:14,17 115:2,4,18
  168:22 286:1 293:19,21
  293:22,22
lines
  39:10 129:20 138:4
  158:13 235:12
Lisa
  22:19 23:1 24:1
list
  131:4
listed
  9:22 117:10 118:2,18
listing
  145:12
lists
  241:10
little
  28:10 42:22 78:21 117:13
  134:16 161:11 164:20
  181:5 204:6 214:22
  251:11 267:4 284:8
live
  22:2,6,10 23:18 24:1,11,21
  25:8,14 26:4,13
lived

24:17 25:3,7,17,22 26:7
  27:19,20
lives
  22:7
LLC
  1:10
loading
  290:7
location
  280:6
locations
  280:20
Loeb
  77:16,19 78:5,9 82:17
  84:17 173:22 177:22
  188:19 200:6 209:8,18
  210:1 232:19 233:8
  287:2
logistics
  74:17,18 75:3 263:3
long
  9:11 15:7 17:22 21:15
  23:1 24:17 25:14 30:6
  30:19 32:15 35:11 39:3
  41:12 49:15 52:12 60:8
  62:6 65:21 126:21
  134:5 179:9 182:7
  183:5 211:11 215:12
  219:2 221:17 246:20
longer
  80:1,9 82:20 83:21
long-term
  96:16 97:23 214:19
look
  123:5 135:17 139:2
  140:20 141:13 149:8
  163:13 164:5 167:5,14
  183:20 184:4 186:21
  188:7 211:5 235:22,23
  240:19 284:15 285:3
looked
  138:8,12,14 251:2 271:12
looking
  64:5 127:23 146:8 183:17
  183:17 184:15 185:9,13
  188:9 216:15 230:11
  244:20 250:6 284:1,3
looks
  240:5 245:7 278:6,8,15
loop
  193:5
loose
  145:1
lose
  84:23 214:23
losing
  46:22 145:3 146:2,7
  213:12 247:4 265:23
losses
  174:2
lost

132:1 210:23 214:23
  219:11 220:16,19 225:21
lot
  31:18,18 44:10 60:4,19
  107:9 109:4 130:16
  135:6 176:1 183:16
  203:1 207:17,18 212:18
  214:5 229:19 268:14
loud
  119:15
lower
  207:14 260:5
lump
  287:9,12
lunch
  86:5 152:8,9
lying
  153:23 154:1
L-E-A-R
  179:23
L-E-E-R
  179:22

M
MacCartney
  1:7 18:12,15 74:16 84:16
  107:11,18 108:10 125:18
  136:16 146:23 230:16
  230:20
machine
  127:21 285:22,23,23
mad
  125:11
maiden
  22:19
mail
  169:9
mailed
  154:21
maintained
  53:3 285:6,8 294:19
maintaining
  288:21 290:12
maintenance
  71:4,11,12,21 72:22 73:14
  73:18 84:19 116:2
  118:23 288:18,22 289:3
  293:14 294:15
majority
  135:23 288:16
makeup
  33:18
making
  35:2 38:4,11 41:6 43:4
  83:18 99:4,6 144:22
  145:2,5 179:4 183:11
  190:15 192:17 193:22
  202:20 207:18 225:6
  238:13 272:13,13
  287:10

male
  201:17
man
  121:13 216:21
Manage
  65:11
managed
  32:20 35:19 39:8 41:21
  69:6 293:22
management
  83:15 148:14,15 174:21
  195:20 208:12 209:2,7
  209:10,13 277:5 288:18
  288:19 289:10 294:18
manager
  34:23 37:23 38:8 39:2,4
  39:7 40:2,6,13,21 41:6
  41:10,11,13,20 42:14
  43:2,4 51:22 52:4,10,13
  52:20 54:1,7,21 55:2,19
  56:23 57:4,13 59:17,20
  60:3,10 62:13,22 66:2
  69:19 71:2,4,12,14,20,21
  72:6,22 73:2,7,18 84:19
  86:10,11 104:16 105:20
  106:13,14,16,17,17,22
  107:12,16,20 108:15,16
  118:23 119:1 129:9
  145:9 146:2 185:19
  187:19 203:8,13 250:6
  252:11 257:19,23 259:11
  260:10,20 261:11 262:9
  262:15 284:1 294:6
managerial
  274:14
managers
  58:7 69:19 109:23 110:6
  111:16,18 118:15 131:10
  131:11,14 133:12,13
  134:1,2 135:12,13,13
  136:11 140:15 141:7
  148:23 149:16 191:20
  242:9 255:11,12 257:3
  275:10 293:14 294:15
managing
  69:16 70:3 291:4
manifestations
  219:7
manner
  263:18,22
manual
  28:15,17 29:14
manufacture
  180:3
manufactured
  31:9
manufacturer
  19:19 291:9
manufacturing
  47:3 107:14
Mara

160:10 161:2 207:5
Marie
  22:5,10 25:6,20
mark
  270:14
marked
  94:2,4 95:18,21 102:23
  103:3,17,20 162:22
  163:2 200:18,21 239:22
  240:2 244:2 251:7
  277:21 278:1 287:22
  288:2
market
  98:2 99:18 100:6,9
marking
  244:5
married
  21:9,16 22:15,17 23:2
  24:5
marshalled
  15:2
matched
  225:23
matching
  226:7
material
  39:20
materials
  39:2,3,7,8,12,13,21 40:2,5
  40:13 41:6,10 109:21
  110:2,13,18 291:7
math
  267:19
matter
  198:14,15
Mayer
  1:17 2:6 5:10,15 6:4,9
  16:20 56:2 86:8 115:19
  130:21 160:9,10 197:6
  244:19 292:7 295:8
ma'am
  6:8,17 9:6 16:4 55:7
MBA
  131:12
MBE
  131:12,12 135:5,11 140:12
  174:13,14 243:6,8
McGahey
  3:11 4:3,5 5:22 6:1,10
  53:17 55:21 56:2 63:19
  86:4,8 111:2 126:21
  127:2,7,10 130:17,21
  162:12 168:21 193:12
  197:1,6 244:8,19 260:8
  260:16 273:21 274:16
  274:18 276:16,19,22
  278:8 281:6 290:21
  292:6,18 295:7
McGlon
  16:21 84:17 111:20 136:16
  142:19 146:20 231:2

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

233:19
McLennan
  67:5,7  68:4,15,20  69:11
  73:4  75:8  82:2,13  87:1
  93:3,7  95:2,8,8,10
McPhillips
  173:6  205:3,11
mean
  28:18  33:20  36:23  56:10
  57:23  61:1  115:15
  121:23  122:4,4  128:2
  130:11  135:17  139:2
  141:13,19  143:13  148:19
  154:7  156:9  164:10,16
  168:2  171:5  174:14
  176:1,7  183:16  189:10
  192:23  198:13  207:11
  208:7,8  211:9  215:19
  217:17  242:13  250:17
  252:19  272:10  288:20
  289:9
meaning
  149:5
means
  104:4  220:5
meant
  139:9  149:9  241:20
medication
  9:1
medications
  8:12,14  9:21
medicine
  222:23
meet
  47:21  48:2  138:17  156:21
  169:7  234:8,13
meeting
  77:17  117:5  118:16  134:10
  134:12  136:5,9,20,21
  137:1  150:13  151:12,20
  152:14,20  154:15,19
  155:3,4  193:23  194:23
  203:16,20  204:5,8
  228:7  234:20  237:6,10
  241:7  277:6  286:10
meetings
  119:3,7  136:13  145:17
  230:4
member
  38:16,19  134:21  138:20
  140:9  172:19  205:19,21
members
  76:20  134:22  160:2
  197:21  198:3  205:18
memo
  97:13
memory
  9:23
mention
  141:10  146:15
mentioned

18:20  96:2  132:2  138:7
  140:1,8  145:17  146:19
  171:5  229:13  255:1
  259:22  285:5  286:10
mentioning
  255:10
mentions
  198:22  199:3
mess
  123:5
met
  6:10  19:6  31:2  47:21
  48:5  76:20  82:3  118:1
  118:16  175:8  232:12
  237:5  240:10
method
  172:3
Meyer
  246:12
Michael
  23:11,12,14,15,18  26:2,3,7
Middle
  1:2  34:1
Mike
  51:2,8  52:3  57:10,15
  61:22  63:19  67:4,14,19
  68:2,5,12  75:7  77:7,20
  91:12,18,22  93:3,4,7
  94:10  95:5  148:3
Milan
  25:9,10,15,23  26:8
mileage
  268:17
military
  15:5,8,13,19  27:8,10,14
  63:9,12
mind
  57:20  102:11  118:10
  258:8  275:2
mine
  27:19  83:21  141:12  231:19
Minimal
  247:13
minimize
  174:2
minor
  289:9
minorities
  241:15  277:16
Minority
  174:15
minority-owned
  243:16
Minot
  14:18  16:3
minute
  53:17  216:6
minutes
  127:1
missed
  287:4

missing
  9:9
mixing
  122:13
modern
  285:9
moments
  6:10
monetary
  220:13,14
money
  46:22,23  50:2  116:3
  171:9  207:16,17  208:5
  208:22,22  221:1,4,7,9
  224:7  226:9  269:23
  270:6,7  271:23  272:8
  285:20  286:2,14
monies
  83:4
Monster.com
  183:22
Montgomery
  3:8  5:8  24:12,15  25:12,13
  26:23  30:2  45:1,10,12
  160:22  179:15,16  185:6
month
  11:20  23:17  56:13  77:1
  84:3  96:14  101:7
  102:19  134:8  170:8
  211:17  221:1  223:8,10
  223:12,12,14,17,21
  224:6,14  271:22
monthly
  224:18
months
  49:17  52:15  57:12  58:12
  65:7  77:3  91:16  92:2
  132:12  134:9  135:23
  136:3  174:6  178:11,12
  178:12  179:11,12  180:12
  180:13,15,16,23  181:1
  182:9  214:21  215:1
  220:23  221:16  223:19
  267:7,9  272:11,15
mop
  122:21
morning
  16:21  17:6  18:6,12  117:6
  118:1,17  123:3,7  125:8
  152:7  254:11  286:10
mornings
  217:1
mortgages
  280:19
mother
  23:6  29:23
motivated
  178:6  260:13
motivation
  260:18
mouth

154:17
move
  92:3,13  125:5  188:6
  202:9  260:23
moved
  24:23  29:22  33:21  125:6
moving
  106:19
mutual
  63:5
mutually
  193:17
M-A-R-A
  160:10

─────────── N ───────────

N
  2:1  3:1  4:1
name
  6:3,9  8:18  21:11  22:20
  28:4  58:17  83:16
  124:21  156:20  160:8,10
  160:12  237:14  245:8,12
  250:11  281:17
named
  33:23  59:13  83:14  104:15
  255:2
names
  21:7  22:4  23:9  57:19
  281:14
nausea
  216:1,8  217:15,20  218:1
nauseous
  215:9,22
necessarily
  102:5  216:18
necessary
  2:15
need
  8:7  37:8  104:3  127:4
  135:17  139:2  140:19
  141:13  196:4,5  242:4
  248:10  251:8  253:14
  260:22  272:22
needed
  29:21  39:10  108:8,9,19,22
  149:8  167:23
needs
  211:1
negotiate
  75:22  130:6
negotiated
  147:13
negotiations
  130:12  158:5
neither
  296:17
Nelms
  3:4  4:4,6  5:21  34:17
  53:16  63:14  68:9  74:5

86:2  110:23  119:15
  126:14,19  127:4  128:11
  128:14  129:2  168:18
  193:11  197:3  198:18
  204:22  205:1,12  208:17
  234:15  238:9,19  243:22
  244:15  248:7  259:20
  260:14  274:1,17,20,23
  275:3  276:21  277:1
  290:23  292:3,20  295:5
nervous
  139:16
never
  36:22  63:12  75:17  90:9
  106:2  107:16  119:13,17
  124:13,13  129:1,5  132:3
  132:4  143:6  144:10
  145:12  146:12,13  156:22
  175:8  177:16  186:3
  220:1  232:3  233:5
  239:7  247:5  258:2
  272:2  273:7  281:2
new
  48:22  50:13  106:22  108:3
  182:23  183:15  215:4
  251:23
newly
  48:20  52:5,7  104:21,23
  253:9  263:6,11
news
  153:13
night
  44:18,20,21  121:1  217:1
  218:10,14,17,20  219:1
nine
  17:20
Nineteen
  21:17
ninety-four
  92:10,18  93:13,15  96:8
  266:23  267:16  270:23
ninety-seven
  96:9  101:20
nodding
  7:5  101:22
nonexistent
  148:18
Norbert
  6:7
normal
  214:12,13
North
  3:14  14:18  16:3  161:3
NORTHERN
  1:3
Notary
  1:23  2:7  5:2  296:23
notations
  235:18
note
  240:14  290:15

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

notes
  12:8
notice
  48:12
notify
  176:20
number
  16:18 92:2 132:6 159:7
   166:1 247:14 248:13,21
   249:15 254:17 257:6
   259:10 264:10 265:9,14
   266:17 272:18 279:1
numbers
  79:16
numerous
  176:1
N's
  163:22

---
**O**

O
  2:1
oath
  7:16
Object
  126:14 128:11 129:2
   243:22 274:16 281:6
objecting
  274:18
objection
  274:22
objections
  2:16,19
observe
  111:21
observed
  111:22 148:16
obvious
  131:15
obviously
  123:15
occasion
  12:18 13:7 19:16 20:18
occasional
  230:7
occasionally
  230:9
occasions
  13:2 82:3 259:23
occupied
  280:21
occur
  134:4
occurred
  56:8 80:20 135:22
   229:23 292:2
occurrence
  136:22
October
  180:7 212:4 246:3

offer
  48:7,14 150:22 158:22
   162:14 168:7 181:15
   185:22,23 186:1 187:13
   187:16 188:3 189:7
   272:19 273:3
offered
  2:21 43:13 46:3 101:1
   155:23 159:3 186:8
   222:20,21
offers
  185:21
office
  89:18,19 125:3,5,20,22
   134:11 137:18 149:23
   150:7 151:17 152:1,3,5
   152:11 228:12 234:20
   281:1,5,12
officer
  51:6,11
Offices
  3:6
oh
  76:13 79:3 93:23 135:6
   153:14 155:10 159:16
   186:15 187:5 214:3
   238:22
okay
  7:2,14 8:4,10 34:20
   58:12 66:13 68:8 70:18
   91:20 101:16 104:14
   114:4 130:17 133:8,21
   134:3 139:4 155:21
   165:23 168:16 180:17
   197:3,10 202:5 203:4
   213:2 218:6 224:20
   229:11 237:3 238:11
   239:20 245:14,16
   251:14 256:12 259:8
   260:22 261:1 266:20
   269:14 276:22 278:23
   281:3 288:5
old
  22:8,13 23:14,20 184:8
oldest
  26:1 213:8
once
  12:20 14:12 66:13 82:21
   98:9 205:23 211:9
   214:15,19 217:6 228:17
   232:13
one's
  281:17
one-fourth
  267:15
one-on-one
  77:17
one-week
  181:10
online
  184:15

onsite
  58:6
Onyx
  1:10 11:15 12:22 62:10,11
   68:6,10,13,17 76:11,16
   76:19,20,22 77:6,7,13
   77:23 78:3 79:8,14
   81:1,10,16,21 82:22
   83:23,23 84:6 85:5,14
   85:17,19 113:1 131:15
   133:12,23 134:5,22
   135:23 138:20 139:10
   140:1,3,6 147:8,16,21
   148:7 170:17,23 171:22
   174:13 191:5 192:14
   208:10 209:11,15,19,23
   211:19 212:2 222:13
   228:19 234:11 255:10
   257:2 263:23 264:1,6
Onyx's
  131:9 140:1,14 141:6
   148:15,22 149:15 174:20
   207:20 208:6 255:19
   275:9,15
open
  98:4 154:22 187:1 188:13
   277:18
opened
  154:16 281:11
operate
  258:16 285:14
operated
  46:18 108:15,18
operating
  51:11 188:15,18 228:18,20
   238:18 241:16,19 242:7
   246:21 277:17
operation
  70:3 242:8 291:8
operational
  114:6 119:3 129:13,18
   157:21 241:10
operations
  57:7,9,14,18 59:14 61:7
   61:19 62:1 63:21 64:8
   64:15 65:10,11,22 66:8
   67:3,12 69:6,7,16 70:6
   71:19 72:4,9,13 73:12
   73:23 80:22 86:15,23
   87:8,15 88:1,7,19 89:2
   90:5,11 91:13 94:18
   98:10 99:9 100:5 101:9
   102:4,12 114:15,19
   118:16 185:14 186:18
   213:18 238:13,14,17
   249:20,22 252:6,10
   257:12 258:6 260:21
   261:10 276:5,8 290:9
opinion
  120:7 121:16,17 145:4,6
opportunity

43:13 46:3 135:7 140:6
  174:1 278:11 288:9
  290:1,19
opposed
  7:5 226:3 261:18
options
  188:10
oral
  5:11
order
  285:14
orders
  28:22
organization
  140:7 146:7 183:23 252:1
organizing
  290:6
other's
  144:6
outline
  266:18
outlined
  210:12
outlines
  282:3
outside
  145:21 232:11 234:14
   235:1
overall
  128:4
overseeing
  261:17
owned
  165:16 280:20 285:8
ownership
  134:7 136:1
o'clock
  216:4 291:21
O'Connell
  51:2,8 52:3 57:10,15
   61:22 63:20 67:4,14,20
   68:2,5,12 75:7 77:7,21
   91:12,18,23 93:3,4,7
   94:10 148:3

---
**P**

P
  2:1 3:1,1
package
  84:1 85:15 115:5 154:20
   155:22 159:2 162:17
   166:4
packaged
  31:9
packages
  83:5,19 85:22 284:19
packed
  150:8 228:11
page
  4:2 7:1 163:4,5,10,14,15

163:18 165:21 167:6
  168:21 200:23 201:3,9
  203:3,20 240:19 241:13
  245:14 277:2 289:19
  290:18,22 291:1
pages
  163:8 290:23
paid
  78:20,22 85:22 92:18
   101:8 159:10 174:4
   177:22 187:10 198:11
   199:13 209:5,11,15
   220:22 221:2,16 226:12
   268:6 269:4,17 280:19
painless
  154:4
paint
  125:3,7,19,20
painted
  125:6,7,9
paper
  168:19 271:1
papers
  184:15
paperwork
  271:6
paragraph
  96:13 98:21 105:17 166:8
   167:5,14 176:15
parents
  138:17
part
  66:10 119:2 138:1 202:2,3
   245:11 252:21 256:13
   256:20,21
participating
  147:7
particular
  192:15 237:2
parties
  2:4,19 296:18
partnership
  139:9
parts
  285:22
pass
  137:13
passed
  45:21
passing
  12:23
pasteurization
  285:3
pasteurize
  293:3
path
  261:8
Patrice
  81:16 94:15 136:11,15
   144:15,22 145:15 193:3
   193:8

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

| | | | | |
|---|---|---|---|---|
| **pay**<br>11:16 14:7,8 64:17 92:9<br>92:17 98:22 99:13<br>100:15 159:6 164:14,19<br>165:5 170:2 171:10<br>172:18 173:16,20 174:9<br>199:1,5,11,18 200:6<br>211:16 215:13 221:9<br>222:12,14 226:17,21<br>280:23 287:6<br>**payable**<br>54:4,8 280:12,18<br>**paycheck**<br>214:6<br>**paychecks**<br>199:19<br>**paying**<br>85:9 173:21 177:18<br>208:11,12,13 224:2<br>270:2<br>**payment**<br>177:21 269:12 287:1,5,6<br>287:10<br>**payments**<br>85:10 215:14,16 287:11<br>**payout**<br>102:18<br>**payroll**<br>78:19 83:10<br>**penalties**<br>221:2<br>**penalty**<br>226:8,13,15 227:10<br>269:12 271:9<br>**penny**<br>208:9<br>**people**<br>33:21 36:22 37:9 50:21<br>53:22 60:5 70:6 84:13<br>117:6 153:16 175:19,21<br>176:2 184:4,14 220:8<br>237:6 242:21 257:3<br>258:18<br>**Pepsi**<br>237:5 240:10 241:11<br>289:21<br>**PepsiCo**<br>243:12,13,14,19 277:7<br>283:13<br>**perceived**<br>250:3<br>**percent**<br>134:6 226:12,14 227:11<br>270:4,11,17<br>**perception**<br>196:13<br>**perform**<br>275:20<br>**performance**<br>33:10,11 62:20 119:10<br>132:4,5 213:18 269:23 | 270:4<br>**performed**<br>59:7 140:4,5<br>**performing**<br>59:19 157:23 158:1<br>**period**<br>43:1 50:11 92:18 139:12<br>189:5 221:3 271:22<br>290:3 291:12<br>**periods**<br>70:12<br>**person**<br>13:5 107:19 117:10 119:23<br>120:2,13 157:4 175:9<br>237:10 240:11 254:3<br>255:4 278:18 285:14<br>295:1<br>**personal**<br>150:8 205:6<br>**personnel**<br>80:5 194:15,17 195:17,18<br>196:2 239:9 274:14<br>**pertinent**<br>236:16<br>**per-case-unit**<br>157:23<br>**phone**<br>10:10,12,16,20 11:10 12:19<br>13:4,22 47:18 56:4<br>84:2 169:23 170:7<br>216:13 230:7 234:17<br>291:17<br>**physical**<br>219:6<br>**physically**<br>214:9 215:7<br>**pick**<br>247:22 287:10 291:22<br>**pieces**<br>128:17<br>**Piknik**<br>19:20 20:7 24:21 25:2<br>26:5,9 30:10 31:7 41:3<br>43:14,15 44:1,2 46:4,15<br>48:3,15 49:1 57:1 58:14<br>60:15 68:3 75:10,16<br>76:11,16 78:4,13,15<br>79:6 80:1,6,10 81:5,12<br>81:14,22 82:8,20 83:5<br>83:10,19 94:11 101:6<br>103:13 112:22 113:15<br>130:5 132:18 136:1<br>140:3,4 149:19 157:5<br>158:5 170:14,16 171:18<br>175:21 177:14 178:1,9<br>178:18 180:9 183:14<br>184:16 188:15 189:18<br>208:5 211:13,20 214:2<br>222:5 224:13,21,23<br>227:12 228:9,16,17,20<br>233:10 235:13 237:8 | 238:15 240:12 243:4<br>247:2 248:6 273:11<br>277:15 279:10,21,22<br>280:7,20 281:4 282:23<br>283:8 285:8 286:7<br>287:14,16 289:7 290:12<br>291:11 293:11 294:3,12<br>294:16 295:4<br>**Piknik's**<br>58:22 79:2,11<br>**pile**<br>122:19<br>**place**<br>28:22 60:15 89:6,16<br>169:12 190:12 193:10<br>209:10 243:15,20 254:4<br>256:18 257:4 258:11,19<br>262:15 275:7<br>**placed**<br>260:4<br>**placeholder**<br>97:14 98:2<br>**placement**<br>260:10<br>**plaintiff**<br>3:3 260:3 265:17<br>**Plaintiffs**<br>1:8<br>**plaintiff's**<br>4:20,21 265:11,15 277:20<br>278:2 281:18 286:18<br>287:21 288:2,6,11<br>292:14 294:9<br>**plan**<br>117:8,23 118:12,14,22<br>192:19 194:2,4,7 252:17<br>252:21 253:19,23 254:1<br>256:13,20 258:10,19<br>286:12<br>**planes**<br>15:15<br>**planned**<br>118:5 193:21<br>**planners**<br>39:20<br>**plant**<br>35:15,16 37:19,23 38:8<br>39:9,12 40:21 41:17<br>42:14 43:2 62:4 65:12<br>66:2,12 67:6 69:19,20<br>71:3,13,22 73:2 86:11<br>105:19 106:13,17,17<br>107:10,12,20 108:2<br>114:15 115:23 117:12<br>128:5,19,23 135:19<br>137:22 138:23 139:5<br>140:23 141:1 145:9<br>146:1 157:23 185:19<br>196:4 203:8,12 213:16<br>242:10 250:5 252:11<br>257:18,22 259:11 | 260:10,20 261:10,18<br>262:9,15 283:19 284:1<br>284:2,23 286:1 289:17<br>294:6,7,17<br>**plants**<br>70:4 157:20 158:1,14<br>207:11 262:7 266:3<br>294:16<br>**platform**<br>140:11<br>**player**<br>88:21<br>**plea**<br>14:21<br>**pleasant**<br>154:10,12<br>**please**<br>6:2 7:6,10,19 104:4 131:5<br>133:7 160:3 164:6<br>168:23 203:3 245:15<br>281:19 287:4 288:4<br>**plumbing**<br>288:23<br>**plus**<br>226:16<br>**pockets**<br>207:20 208:6<br>**point**<br>16:3 26:8 37:2 55:11<br>66:16 68:11 69:11 77:12<br>80:9 87:3 88:1 90:3<br>91:19 150:5 153:4<br>158:10 178:3 182:20<br>187:7 189:8,12 197:2<br>214:11 217:15 226:18,20<br>258:11 270:14 286:18<br>**pointed**<br>122:9,11<br>**points**<br>162:4 243:21<br>**police**<br>15:19<br>**policy**<br>243:15<br>**polite**<br>154:2<br>**poor**<br>145:2,5,13<br>**poorly**<br>207:17 216:23<br>**position**<br>39:1 47:23 48:20,22<br>52:5,5,8 64:7,15 73:21<br>91:7 97:15,23 98:2,14<br>98:16,17,23 99:14,19,20<br>100:6,14 102:4 104:21<br>105:1 132:9 178:22<br>185:8 186:5,11 187:18<br>187:20 188:12 191:6<br>208:16 213:17 247:4<br>249:16,19 250:13 | 252:20 253:8,10 257:7<br>257:9,10,11 259:10<br>260:4,5,10 261:10<br>263:6,7 282:4,14 283:5<br>283:7 284:6 292:15<br>**positions**<br>53:18 71:17,23 75:9<br>102:17 149:2 277:18,19<br>**possibility**<br>88:6<br>**possibly**<br>82:16<br>**post**<br>184:3<br>**posted**<br>183:21<br>**posting**<br>184:17<br>**post-Onyx**<br>76:7<br>**potential**<br>184:18 239:2<br>**practice**<br>222:22 247:12<br>**predominant**<br>115:17<br>**predominantly**<br>116:12 185:19<br>**prefer**<br>102:9,10 160:1<br>**preference**<br>97:6,22<br>**preferred**<br>88:17 89:10<br>**Premarked**<br>276:15<br>**prepare**<br>268:3,4<br>**preparing**<br>230:13<br>**preplanning**<br>254:5<br>**presence**<br>234:14,18 235:2<br>**present**<br>3:17 60:14 89:21 136:8<br>138:18 151:22 152:16<br>230:5<br>**presentation**<br>111:23 112:1<br>**president**<br>44:4 49:13 104:16<br>**pressure**<br>8:17 9:3,4 17:19<br>**pressured**<br>168:10<br>**pressurizing**<br>284:19<br>**pretty**<br>17:22 208:11 210:15<br>215:3 216:9 230:13 |

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

268:10 271:3,9
prevailed
20:15
prevent
220:3
previous
74:10 117:7 118:20 292:11
previously
46:9 61:18 158:4
pre-Onyx
76:7,10
price
160:13,13 161:7 194:12
210:9
pricing
146:3 195:9
pride
212:18
prior
2:22 25:1 62:11 79:8
129:22 130:5 192:23
205:1 280:16
private
215:15,16,17
privy
193:6 195:21
probably
24:23 61:17 136:10,11,18
155:15 159:19 166:19
188:1,22 199:15 211:22
214:22 215:1 217:6
218:4 219:4 221:22
229:12 237:23 245:9
268:13,15,18 270:18
problem
128:1
problems
114:19,23 115:14 127:12
128:9,22 218:11
Procedure
5:6
proceed
219:20
proceedings
5:12
process
17:13 50:5 54:2 60:21,21
77:5 108:20,23 190:15
253:6 259:21 283:17
284:17 285:3 286:1
292:17,21 293:4,6,7,8,8
293:23
processes
47:1 50:3 58:5,11,14,22
59:8 60:15 62:5 107:7
108:17 293:2,9 294:20
processing
289:13 293:12 294:12
Proctor
290:16 291:3
procurement

291:6
produce
239:10
produced
31:2 221:21
product
39:14 108:3 284:18 286:3
293:5
production
35:10,11,18,19,22 36:9,11
37:22 38:4,11,23 39:10
41:11,12,16,20,21 43:4
46:17 50:2 64:12 69:18
69:22 70:3 71:2,3,6
72:6,11 106:14,16,22
107:17 137:4,9,11
185:18 186:17 187:19
289:16 291:9
products
31:1 35:20 43:14 132:18
157:5 237:8 238:15
279:21,22 280:20 281:4
285:1,9 289:8 290:7,12
293:11 294:3,13,16
profound
135:20
program
243:15,19
project
59:3 61:6,10 107:5 181:10
181:11,13,14,18 291:6
projects
291:4 293:16,18
promise
65:4
promoted
33:21 50:13 51:21 52:1
91:12 132:8,11 182:11
215:2
promoting
132:16
promotion
32:13
proof
274:4,8
propose
50:4
prove
271:5,6
provide
60:17 101:2 198:1 213:5
236:18
provided
155:11,13 221:23
provisions
209:14
prudent
208:15,19,21
public
1:23 2:7 5:2 63:15
296:23

pull
28:23 213:14 226:23
270:12
pulled
221:1,9 224:7 227:8
269:23 270:8,13 271:7
271:23
pulling
226:9,15
pump
28:6,8,12 29:16,20 122:15
purchased
135:23
purchasers
76:16
purely
248:12
purpose
136:19
pursuant
5:5 274:21
pursue
45:12
push
122:18 242:19
pushed
66:9
put
13:4 48:11 82:4,22 148:1
215:4 221:5 229:20
231:6 247:3 252:22
256:18 257:3 258:10
267:20 271:11 272:8
286:3 294:22
putting
75:20 231:11,17 237:17
p.m
86:7 130:20 197:5 244:18
295:10
P.O
3:7

─────────────
Q
─────────────
qualifications
102:14 157:1 175:11,13
282:13,18,22 284:3,5
295:3
qualified
64:7 102:17 107:19 129:9
132:15 175:7,17 176:13
237:17 283:6 294:11
quality
30:18,19,22 31:3,12 32:2
32:10,11,15,18,20,22
33:3,18 34:9,22,23
35:2,7 38:15 66:9
74:15 75:1 147:16
250:20 286:3 289:13
question
7:23 8:1,3 74:6 116:20

117:14 122:2 128:15
133:6 135:4 198:18
202:8 208:18 219:16
230:19 238:20 263:13
266:12 271:4 274:3,19
questions
2:17,18 7:8,19 17:16 18:2
19:7 81:18 122:2 197:8
203:1 244:10 296:10
quick
171:11,12 209:23 215:21
276:17,20
quit
91:2
quite
108:18

─────────────
R
─────────────
R
3:1 296:1
race
93:18,20,21,22 112:16,18
113:11,20 124:19 131:1,7
131:21,23 132:2,21
133:11,17 146:17 174:12
190:23 192:13 196:8,22
201:10,14 202:2,18
238:20,22 249:18
251:20 252:9,14 254:17
255:9 256:6,9 257:8
261:4,7 264:13,19 265:1
265:4,7 278:20
racial
33:17 260:18
racially
178:6 260:13
Raines
75:19 76:1
raise
53:7 182:22 183:2
raised
239:2
raising
29:21
ran
147:9 242:10
range
99:21
ranks
195:20
rate
98:2 100:6,10
raw
39:13
RBC
165:10
read
104:4 105:16 121:2 144:5
155:6 159:14 164:9
166:17 168:23 281:21

283:3 290:2,19 294:8
reading
2:9 155:2,5 184:14
ready
193:11 247:21
real
64:23 79:4 139:15 168:19
209:22 276:17,20
realize
257:22
really
6:21 33:16 68:19 76:23
85:13 108:11 121:14
124:5 127:22 138:9
139:12 148:19 153:15,18
171:6 186:19 205:23
212:5 215:18 218:22
219:22 234:10 261:5
reason
8:8 14:4,5 97:2 98:5
104:1,19 117:16 164:11
178:4 281:4
reasons
118:4
reassigned
60:10
recall
10:23 18:5 19:12 20:20
33:17 34:8,12 35:1
36:6,15,20 38:2,3,10
40:9,10 41:5 42:7 43:3
43:6 49:7 53:11 54:14
58:17 66:3 67:22
76:23 77:2,21,22 79:15
79:16,19 80:23 89:12
91:17 111:6 113:8 114:12
115:17 116:8 126:5
127:15,17 141:2,22,23
149:17 150:10,15 152:23
153:7 155:2 156:1 157:9
159:9,13,20 162:13
163:17,21 164:1 165:3
169:10,15,18,20,21 170:6
171:13 173:7 176:4,11
197:23 199:23 204:4
206:17,23 212:5 221:17
222:15 225:15,17
227:20 233:21,22
236:20 237:13 263:1
268:9 273:18 276:18
287:15,17 291:13
receipts
271:8
receivable
54:4,9
receive
44:7 53:7 102:18 164:18
164:20 173:15,19 183:2
185:21 199:4 200:1
226:9
received

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

31:20,23  44:6  96:3
97:17  165:5  174:8
185:23  187:13  190:14
199:10  222:2  227:21
247:11  249:1  267:13
271:18  273:3
receiving
164:13
recognize
215:3
recollection
97:10  104:10  106:1
recommend
207:3
recommendations
60:18,20  148:2,10  206:20
recommended
172:20  207:1
record
11:12  13:5  152:19  201:16
201:18  248:9  265:3
recorded
10:6,11,15,19  12:18  13:8
13:17  84:2  170:4  172:5
173:9  233:14
recording
11:4,17,22  12:2,6,14  13:10
13:14,19
records
221:18  227:22,23  247:13
269:3  270:13
recover
219:11,14  220:17,20
266:19
recruit
237:7  240:11  258:18
277:16
recruited
43:16,17,18  46:6  259:2
recruiting
241:15
redesigned
115:3
reduced
296:11
reevaluated
65:5
REEXAMINATION
4:5,6  292:6,20
refer
240:15  276:14  289:1
references
167:16
referring
63:14  96:6  98:16  149:3
196:12  240:7  286:17
reflected
100:9
reflects
94:9
refresh

104:9
refute
238:6,16  239:1
regarding
19:3  56:16  80:5  83:3,9
127:20  166:22  172:16
209:14  269:21  276:12
286:16
regardless
233:23
Regions
165:13
regular
203:5
relate
235:19  237:1,20
related
9:10  12:21  63:10  263:3
275:5  279:12  282:4
relates
273:19
relating
2:13  167:8
relation
22:21
relationship
63:1  79:4,6,9  80:16  81:14
82:8  209:18
relationships
62:7  243:5
relaxed
17:18
release
168:11  169:1,1  176:15,20
176:23  177:1,8,11  197:9
197:22  198:2  204:16
released
176:19
releasing
166:21  167:7,12
relevant
12:1  13:14
relocate
178:20
remained
228:16
remarks
189:21  190:6
remember
11:2  12:23  19:2,5  33:16
34:6,19  36:21  65:6,7
71:13  85:19  88:12
103:23  104:6,7  105:16
106:5  107:3  114:14,16
116:23  119:6  120:4
124:10  125:23  136:3
138:2  141:18  144:20
150:2,4,18,19  151:6
153:10,14  155:1,5  159:4
164:17  165:19  166:6
170:15,22  172:12,16

175:20  179:5  181:6
198:6  199:12  212:3
216:5  227:2  230:11
233:18  269:2  287:17
removed
211:20
renegotiated
93:2
rents
280:19
reorganization
66:14
repaint
125:11
repainted
125:22
repairs
116:2
Repeat
266:12
rephrase
7:23  248:11
replace
50:18  68:5  106:23  131:10
133:12  134:1  135:12
140:14  141:7  148:23
149:15  174:21  191:2,19
242:17,23  251:17  253:2
253:7,13,18  255:11
256:13  257:2  260:20
274:5,14  275:10,16
276:13  277:10,18
replaced
55:14  157:4  158:19  175:6
249:21  250:2,13  251:4
253:4  254:21  255:5,22
256:8  257:14,19  259:12
260:5  272:2  278:18
replacement
98:9  156:11,18,19  175:17
176:12  250:9  254:8
275:21
replacements
242:5
replacing
48:21  52:6  156:10  174:17
256:16
report
34:21  37:21  40:20  55:4
55:17  60:14  67:19  68:3
68:21  73:10  75:1,3
142:3  250:23  288:14
reported
1:21  43:1  49:12  50:11
53:23  54:5  70:9  71:18
72:3,7,12  73:3,15,21
74:15,16,18,19  75:6
250:20,21  253:16
reportedly
290:3,16
reporter

1:22  2:7  5:2,19  19:13
20:1  126:23
reporting
42:2,13  50:8  51:18  54:12
55:8  62:13  69:1  70:6
74:21  76:5  90:20  94:21
94:23  95:2,14  105:20
106:9
represent
206:22
representatives
75:15  79:23  80:5  83:3,9
209:19
representing
6:12  93:6
represents
296:13
reproduce
221:19
reputation
237:16
request
277:14
requested
92:23
require
31:16  76:6
required
70:2
requirements
76:3  285:13
rescind
166:10
rescinded
177:16
resigned
167:17,18  246:6  292:1
resources
276:10  279:8,13,23  280:3
respect
59:6  63:5  210:10  264:21
respective
2:5
respond
7:10
responded
237:16  248:23  274:7
response
7:13  89:4  143:19  245:12
245:13  247:14  248:13
248:21  249:15  259:9
264:10  265:9  266:17
272:18
responses
129:23  231:18  232:1
236:6  244:7,22  245:5
245:23
responsibilities
29:4,8  39:7  49:22  65:9
66:11  67:6  94:13  290:2
responsibility

59:23  65:17  78:8,12
118:6,21
responsible
117:10  289:2
rest
55:18  200:7  209:7
restate
58:12
restructure
263:17,21
restructuring
74:9,13  105:3
result
101:19  212:16  296:19
results
117:7  118:19  213:19
resume
103:11,12  183:21  184:3,17
278:11  288:8  292:16
resumes
184:14
retail
28:9,20
retailer
29:6
retired
161:1
retirement
221:2,5  224:8  226:19
retroactively
101:13
return
98:11  214:11,13  226:5
248:16,19  270:5,11,17
retyped
245:23
review
91:15  130:14  162:7  198:3
231:23  281:18  288:10
reviewed
117:6  245:3
revoke
177:11
revolved
120:22
Ricky
77:16,19  78:5,9  82:17
84:17  93:6  173:22
177:22  188:19  200:6,15
209:8,18  210:1  211:23
232:18,23  233:3,8
287:2
rid
256:19
right
52:17  53:13,14,20  61:1
68:1  71:9  72:16  96:11
106:11  112:6  124:2,3
126:10  154:8  164:14
199:19  207:19  213:7
218:19  239:3  245:10

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

247:19 249:5,6,6,10
256:10 268:22 274:20
277:8
**Robert**
41:1,2 42:17,18,20,22
47:11,13 48:23 71:20
73:8
**Robinson**
124:21
**Rodman**
57:20,21,22 61:11
**role**
57:13,16 58:8 59:5 68:17
77:8 80:22 88:7 90:5
90:11 91:22 92:1 95:9
98:10 101:17 105:19
108:2 129:9 215:4
250:14 251:1,23 252:2
252:4,10 253:16 259:23
276:10
**roles**
241:16,19 242:7 277:17
**roll**
225:4
**roofs**
288:23
**room**
125:8 134:11 136:6
**Rose**
3:13
**Roth**
224:11,11
**roughly**
35:8 39:5 57:5 84:5
221:15 227:3,7,11
**rule**
5:5 274:21
**rules**
2:13 5:5 6:22
**run**
68:13 115:5,7 213:16
**running**
78:6,11 115:5 128:5 135:1
147:21,22,23 158:15
190:11 207:12 264:6
266:3 283:11,20
**runs**
134:17
**R-A-C-E**
93:22

___ **S** ___

**S**
2:1 3:1 4:9
**Sage**
24:14,18,21 25:4,7 26:13
**SAITH**
295:12
**sakes**
245:21

**salaried**
35:5,6 38:13,14 149:6
179:2,3
**salaries**
208:12 209:2,15
**salary**
43:7 49:3 53:9 65:2
91:5,13 92:3,10,21
93:15 96:5,10 99:8,20
100:4,9,13 101:21
181:23 182:14,21,23
186:4 187:9,10,14 242:9
261:12 266:21 270:23
292:8
**salarywise**
41:6
**sales**
28:9 144:23
**salesclerk**
245:21
**Sam**
71:8,13,15,16
**San**
23:19,22 24:1
**sanitation**
41:22 71:20 73:7
**sat**
150:1 186:3 193:19
**save**
46:23 50:1
**saved**
11:9 143:12
**saves**
203:1
**savings**
61:3
**saw**
122:8 209:6 232:3
250:12 267:2 276:6
294:14
**saying**
7:11 13:16 19:14 62:18
78:10 90:16 112:13
131:18 141:5 144:1
150:3,4 152:23 153:1,14
156:16 169:17 173:13
202:14 209:23 213:23
222:3 235:8 239:13
242:3,18 251:16,21
252:13 256:7,15,15
258:1 271:14 282:2
283:22 291:18
**says**
96:13 98:14 106:7 125:9
166:5,12 167:11 168:23
176:17 203:5,7 237:15
240:14 242:23 243:2
249:13 267:6 292:17
**school**
26:17,19,23 27:7 44:15,19
44:20,22 215:16,17

**schools**
26:19 215:15
**scientific**
31:16,23 44:5
**scope**
291:6
**sea**
236:9
**search**
267:7,21,23 268:5 269:7
**season**
247:6,22
**second**
12:17 13:7 133:9 172:4
173:2,8 199:16 201:2
203:2 255:7
**section**
263:10 269:20
**security**
15:18 16:17
**see**
148:13 149:22 151:16
152:1 205:2,11 231:5
236:1 240:20 265:12
284:7 286:21
**seeing**
119:6 268:9 270:17
287:17
**seek**
43:15
**seeking**
76:14 212:10 219:10,13
220:17,20 266:18
**seen**
94:6 95:22 103:4,21
144:4,10 240:3 244:23
278:3
**self-employed**
246:12
**Sellers**
10:22 11:3,13 12:12,21
13:9 56:5 85:4 128:21
129:6 130:2 149:21
150:7 151:15,23 154:14
157:16 169:8 170:1
171:19,22 172:5 173:2
173:10 203:21 233:13
**send**
32:5 143:5,17 144:3
146:13,20,23
**sending**
143:22 184:14
**senior**
131:10 133:12 134:1
135:12 136:10 255:11
**sense**
70:12,14 194:3 206:15
223:13 263:13,19
**sent**
143:6,18 144:2 145:12
146:12 174:3 200:6

**sentences**
240:15,21 241:1
**Separate**
235:10
**separated**
105:6,7 212:3
**September**
180:7,16,17,19 189:1
211:23 212:4 246:2
287:7
**seriously**
254:10
**sessions**
119:18
**setting**
216:14
**settled**
20:14 200:12 214:20
215:5
**seven**
42:3,5 166:10
**seventeen**
22:9 132:13
**seventy-five**
65:4 91:14 92:14
**seventy-one**
267:23 268:8
**seventy-three**
99:6,17 100:4
**severance**
11:16 83:4,19 84:1 85:5,9
85:15,21 150:22 155:17
155:18,22 158:22 159:2
161:19 162:1,7,14,16
163:20 164:7,14,18
165:5 166:4 170:1,18
171:6 173:1,16,20 174:9
177:21 198:22,23 199:5
199:10 200:7,13 204:16
211:6
**sex**
201:21 202:3,6,13,22
**shaking**
119:14
**Shannon**
16:21 73:16 74:15 84:17
111:20 136:16 142:19
146:20 147:15 229:7
230:9 231:1 232:12
233:19 244:10 250:22
250:22 253:12
**sharp**
215:3
**sheet**
119:8 203:10
**she'd**
13:15
**shock**
150:11 151:6 156:3
**shocked**
150:21

**shoot**
148:10
**shop**
246:22
**short**
6:7 50:11 51:17 68:14
108:1 139:11
**shortly**
51:22 56:9,10 218:4
**shots**
148:11
**show**
46:21 95:20 119:4,5
134:13 137:8 168:19
200:20 213:15,20
238:16 239:11 271:8,11
277:23 288:1
**showed**
123:1,5 140:23 156:11
203:10 250:4 257:23
**showing**
250:7
**shut**
189:14
**sick**
214:4,9 215:7,9 216:18
217:14
**side**
47:6 61:20 64:2,11 65:14
74:16,17 88:18,20
108:17 145:1 177:19
186:22 284:9,10,14
289:3 294:20
**sign**
130:11 151:7 167:21 168:7
168:10 169:9 198:10
206:10
**signatories**
142:22
**signature**
2:8 163:5,15 168:22
200:22 201:3
**signed**
130:15 158:21 159:7,15
162:19 163:19 164:3
165:17 166:9,18 167:3
169:8 173:1 177:1,12
197:11,13 198:7,8
204:12,16 245:6 287:13
287:18
**signify**
270:20
**signing**
166:21 169:4
**similar**
126:8 244:9
**single**
200:10,11 243:8
**singled**
131:16
**sister**

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

160:7 161:2,5 162:1
206:1 207:5 229:13
**sister's**
160:10
**sit**
45:18 216:19
**sitting**
79:18 111:9 141:21 156:1
169:19 176:3,10 212:6
**situation**
161:22
**six**
49:17 52:15 57:12 58:1
65:7 87:20 91:15
214:21 218:18 220:22
221:15
**sixty**
223:11
**Sixty-five**
182:2
**sixty-nine**
183:1,12 223:23
**Sixty-six**
182:19
**six-month**
50:7 58:22 60:21 61:6
**skill**
285:13 290:20
**skills**
289:6 290:10
**skill-set**
102:14 286:17,19
**slap**
213:1
**sleep**
217:1 218:10
**sleeping**
218:11,14,17
**sleeplessness**
219:3
**slow**
37:7
**slowed**
248:1
**small**
42:23 134:18 291:18
**smooth**
17:22
**Social**
16:17
**socialize**
232:4
**socialized**
222:23
**Society**
184:2
**sole**
265:22
**solely**
66:17 70:19 72:19 87:12
**solidify**

230:3
**solution**
117:21
**somebody**
46:16,20 78:8 120:5
172:19 195:1 211:1,1
216:13 220:4 242:5
245:23 251:4 252:20
284:7,15 285:4 291:18
293:1 295:2
**somebody's**
29:13
**someone's**
275:1,2
**son**
26:1 205:7 213:8
**soon**
81:9,11 123:8 172:6 178:9
184:16 188:1 268:22
**sooner**
166:7
**sorry**
23:22 38:6 64:21 103:9
112:17 131:12 133:8,8
220:18 224:1 230:18
232:21 250:17
**sort**
74:9
**sought**
274:5
**sound**
52:17 53:13 164:14 249:6
249:9
**sounded**
53:20
**sounds**
53:14 68:1 83:16 210:14
**Southeast**
237:13
**Southern**
43:21 184:9 185:4,16
186:7 187:12,17 273:4
**SouthTrust**
75:14 79:2,7,10,22 80:1,4
80:8 81:13 82:3,7 83:2
83:3,8,10,18 85:20
158:6
**SouthTrust's**
82:19
**speak**
7:23 17:4 18:11 75:22,23
88:10 98:16 230:17
**speaking**
205:10
**special**
293:16,18
**specific**
34:13 36:15 85:21 109:16
114:13 118:10 120:4
126:5 127:20 128:17
131:17 150:16 196:2

286:16
**specifically**
34:6 69:16 85:18 98:15
111:20 116:23 131:8
133:4 136:12 141:11
144:18 157:8 167:7
175:19 176:5,11 195:16
197:18 212:6 234:1
237:15
**specifications**
31:3
**specifics**
40:11 42:7 162:13
**spell**
245:11
**spelled**
245:8
**spend**
208:22 285:19 286:2,4,13
**spending**
208:10
**spent**
107:8,9 109:4 289:20
290:15
**Spier**
1:21 2:7 5:1
**spitting**
138:11
**spoke**
48:5 84:19 206:4
**spoken**
18:14 229:6 232:18
233:12
**spot**
48:9
**sprayed**
122:15
**sprinkler**
28:1 29:5,11
**sprung**
122:15
**staff**
136:21 145:17 194:23
242:10 293:12,17
**stand**
6:5
**standards**
289:13
**standing**
112:6,12 138:5 148:12
**start**
6:21 30:3 68:23 101:7
122:10 178:10,13 180:5
180:13,20 181:20 182:17
184:17 216:3,21 218:10
247:1 253:5 254:12
**started**
9:20 19:21 48:3 49:4
54:11 61:1 92:18 95:1
115:18 150:1 156:18
181:3,4,13 214:6,14,15

218:5 223:6,9,10,15,18
223:22 234:17,23 235:1
235:4 247:6,9,19
250:12 253:20 254:9
259:4 260:19
**starting**
101:5
**start-up**
107:4,10 108:2,12,19,23
115:2
**state**
5:3 6:2 160:14 184:2
257:7,9,11 296:4
**statement**
141:17 142:13 265:10
274:9 275:14
**statements**
213:15,21 283:6
**STATES**
1:1
**stationed**
16:2,5
**status**
75:16 243:6,9
**stay**
41:14 99:19 152:13
**stayed**
120:15 216:9 291:11
**staying**
102:8
**stenotypy**
296:9
**step**
57:15 68:12 146:8 252:18
**Steve**
50:12,16,17,22 51:1,4,18
52:1,3 55:9,11,14
**STIPULATED**
2:3
**stipulation**
5:7
**stipulations**
5:20
**stomach**
214:4 215:10
**stood**
137:15 138:3
**stop**
85:9 234:11
**stopped**
135:16 139:1 140:17,18
165:1 173:21 177:18
199:22 216:19 218:8
228:18 261:20,21
**Stowbridge**
281:16
**straight**
86:14 250:16
**straighten**
86:9 248:10
**straightforward**

271:10
**straits**
78:14
**streamline**
58:5,14
**Street**
65:12 66:12,17,21 69:7
71:2,22 72:7,19 73:9,18
86:12,19 87:4,12 105:20
106:10,13,15 113:23
114:6,20 115:11 127:13
128:9,22 129:12,17
137:5,7 250:5 252:11
261:11 262:10 294:6
**stress**
90:5 213:2 214:1,11
**stressed**
214:22
**stresses**
227:13
**stressful**
90:8,13,14 213:22,22
214:3
**stretch**
78:21
**strike**
45:10 90:3
**Strowbridge's**
112:21 113:10
**struck**
135:20
**struggling**
78:18 85:12 116:1 146:6
170:15,17 208:8
**studied**
45:14
**study**
45:16 46:21 120:18,23
**studying**
60:22
**stuff**
28:23 196:1 216:16
**stupid**
120:10
**style**
148:14,15,19
**subjecting**
143:20
**submit**
278:11
**submitted**
103:13 201:6 232:2
**submitting**
292:16
**subsequent**
142:6
**subsequently**
260:7
**substance**
282:12 283:3
**succeeded**

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

```
212:20              33:8               196:9 199:9 205:5,14   tells              188:4 189:4 219:23
success             sustain            229:2 233:8 256:10     63:20 151:16       230:15,20 231:1
212:19              58:10              286:23                 temperature        things
successful          swear              talking                284:22             60:6 126:10 144:16
283:23              111:8              39:11 84:13 114:14,16  ten                145:18 148:11 152:23
sued                sworn              121:23 138:6 153:8     25:16 199:18       172:3 175:22,23 229:3
20:21 21:2 190:19 192:8   5:16 20:17   195:16 205:17 210:21,22   tent            231:15,22 238:4 262:1
suffer              symptoms           216:13 229:19 239:18   232:14             think
100:15              215:7              240:9 253:22           tenure             6:20 9:9 11:23 13:13,15
suffered            syrups             tame                   37:3 54:6 72:3,8,13  17:20 19:21 30:10 33:1
212:15,17 215:8 219:8   31:11          65:6                   73:11,22           34:2 37:7 53:19 61:13
247:15              system             tape                   term               63:6,23 64:9 66:7
suing               29:11,12 293:4     10:6 11:6 152:19       85:19 108:1 140:16 214:12   67:15 68:10,18 72:1
19:18 233:2         systematically     taped                  241:19             77:18 85:16,16 87:14
suit                253:1,17           56:4                   terminate          89:17,20 91:14 92:17
20:16               systems            tax                    33:15 40:4 42:10 54:20   95:5 102:16 103:6
suited              28:1 29:5 59:9 293:23   226:11,18,21 246:13 247:6   154:8 190:10 191:8   107:22 114:8,11 120:9
102:15                                 247:22 248:19 269:17   193:15             123:11 127:18 129:8
sum                 _____T_____   taxes            terminated         135:6,14 136:18 138:21
287:9,12            T                  226:16 247:20 270:8    156:17 174:12 202:16,16   138:21 140:10 142:18
summarizes          2:1,1 4:9 296:1,1  271:9                  202:21 203:17 204:1   143:19 144:5 145:19
241:3,9             tail-end           Taylor                 210:2 212:22 217:8   146:18,22 147:2 151:3,8
summarizing         61:10              71:21 73:8             249:17,19 252:14 257:8   151:9 154:3,16 155:20
237:9               take               teacher                257:12,18 259:5,11   158:3 161:9 162:4,20
superior            8:7,9 9:9 36:3 45:15,21   215:17           268:23 278:19      163:22 164:23 167:1
253:16              53:15 55:21 57:16  teaches                termination        169:10 172:14,20 173:11
supervision         64:14 77:19 80:18  205:7                  33:9 40:12 132:23 156:5   178:2 180:16 184:12
296:12              89:16 91:23 99:13  teaching               156:13 166:23 167:9   189:2,4,12 190:16 191:1
supervisor          104:3 108:2 126:16  59:9                   178:5 191:13 192:6   191:10,15,16 192:14,16
32:12,16,19 34:10,22 35:3   127:8 130:18 134:13   team          203:12 210:13 222:6   192:18,20 193:18 196:9
35:8,10,12,18 36:12  137:2,12 164:8 208:22   75:6 88:21 106:8 257:2   225:2 254:17 256:11   198:4,5 199:8,21 200:15
37:22 38:4,11,23 41:23   211:5 212:18 214:8   technical        266:22 270:15 282:10   200:15 202:21 202:3,10
122:17,23 123:14 124:12   215:11 216:19 220:11   31:17 32:1 44:6   terminations    210:7 211:10,14 217:8
supervisors         221:4 244:13,15 251:23   technician         154:6              217:13 220:10 221:12
35:23 41:22 69:20 71:3,7   252:22 253:15 254:4   30:18,20,23 31:13 32:2,10   terms          224:5 227:2 228:19
72:11 118:23 242:9   289:15 293:18,21   38:16                197:21             232:12 234:4,4,5,8,11,16
Supply              taken              technicians            terrible           234:16,19 237:23 239:3
28:6,8,12 29:16,20  2:6 55:23 86:6 130:20   32:21,23 33:4,19   57:19             239:10,16 240:6 242:18
245:18              139:11 143:23 197:5   telephone            testified          243:7 245:6,23 247:18
suppose             244:18 296:8       11:13 12:9 13:8 171:14   5:17 158:3 253:9   248:12 250:9,12,13
97:1 99:3 104:1 121:18   takes           172:6 173:2,9        testify            251:5,14,17 252:17,21
166:19              220:7,15 258:17     tell                   10:4 19:10 20:11,13   253:5,8,11,18 256:12,18
supposed            talented            8:1 11:3 12:17 13:9 17:7   266:10,14        256:19 257:1 260:18
109:16              258:18 277:16      17:14,23 18:1,23 34:18   testifying         261:5,6 263:1,2 269:8
sure                talk               41:8 46:14 49:21 88:14   20:2              270:18 271:10 273:21
7:21 34:7 41:7 47:11   10:18 16:20,23 75:19   90:4,10 91:11 109:14,18   testimony    274:10 276:6 277:13
86:4 106:4 113:3 117:1   88:5 93:8 113:22 119:9   126:11 127:11 128:7,20   20:17 74:11 196:13   284:22 287:8 289:17
142:1 155:12 161:10  126:1 133:19,22 142:12   129:10,15 139:17 141:16   257:17     291:13 294:4,21
167:21 172:17 198:20   142:16 186:23 205:12   144:18 149:20 151:1,19   testing   thinking
219:19 251:9 258:4   210:1 229:7 230:1   157:11,15 158:10 160:3   31:18 70:1     149:4 216:21 218:20
259:17 268:13 289:11   234:9 260:22     170:10 172:4 176:7    Texas             267:3
295:1               talked             183:19 192:11 207:6    23:19 263:4        third
surrounding         17:2 47:21 84:18 93:11   210:9 212:14 215:7   Thank          51:3 105:17 261:2
162:3 210:13        118:1 119:20 120:20,21   220:16,19 229:14,16   276:22 278:10 295:5,7   thirty
survive             121:2,4 123:1 124:6,23   237:3 238:9 287:4   thereto         223:7,8
88:23 189:12        125:2 126:2,3 129:5,23   telling           2:22 296:10        thought
surviving           137:15 139:7 161:22,23   13:3 56:3,22 89:5 96:19   they'd      63:4 90:11 93:4 96:7
78:23               162:1 172:18 176:8   120:2 134:20 138:6   28:22 107:23       119:11 145:13 153:23
suspect             185:15,16 186:4,5   140:19 141:22,23 150:1   thing            154:1 166:7 167:20
61:16 234:6         187:14 194:12 195:7,12   151:6,23 169:22 175:21   31:7 58:9 72:21 86:9   176:12 218:8 230:3
suspension                             240:9 255:21            123:7 135:5 162:3   256:21 271:3 276:4
```

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

thoughts
168:20
thousand
43:9 49:6 53:12,20 91:14
92:11,14,19 93:13,15
96:8 98:23 99:6,17
100:4 101:7,20 102:19
182:2 183:12 227:3,8
249:2 266:23 267:13,16
267:22 268:7 270:5,23
271:15,18 272:3,16
three
33:1 36:9 39:20 50:20
51:15,23 52:14 54:16
57:5 67:3 70:4 75:5
86:17 87:4,8 132:11
157:20 158:1 178:11
179:11 180:12,13,15,22
192:15,17,20 193:16,19
194:1,14,19 207:11
233:20 252:22 253:18
259:23 261:7,18 267:9
270:5 271:18
thrilled
64:1
throw
217:4
throwing
217:2
thrown
81:19
time
2:20,21 7:13 12:4 14:2
19:15,17,20 20:6,8 24:6
26:13 33:23 36:21 44:3
44:16 47:19 48:7,23
50:7,15 53:15 54:7
55:18 58:23 60:8 62:6
64:4,10 65:19 66:1,20
66:23 68:14 70:10,11
73:4 78:9,16 80:19
81:3,20 82:2,15 85:13
86:3,11 87:15,17,21
88:12,20 89:1 90:20
91:21 94:17 95:1 99:5
102:2 104:3 107:4,9
108:8,20,23 109:4 114:4
114:21 115:17 119:19
122:17 125:2 126:19
132:16 137:13 139:12
151:7 152:4,6 162:5,5
164:9 172:23 176:19,22
177:3,7,10 186:19,21
188:8 195:3 203:11
212:4 213:7,22 216:6
217:23 218:22 222:5
225:1,18 242:1 244:14
258:17 261:20 262:22
266:22 270:4,10 271:22
272:15 277:19 279:20
280:13,14 287:18

289:20 290:4,16 291:12
291:22
timeline
118:7 136:4 181:6 258:20
times
10:14 14:11 40:8 76:12
114:8 120:19 130:16
132:11 195:12 217:4
218:23
tired
78:6,11
title
51:10 66:5,7 87:14,16
203:9 257:9 258:1
260:1 276:2,7 279:5,12
279:12
titles
66:4 70:16 106:3 258:2
today
6:15 7:16 10:4 18:21
79:18 111:9 141:21
156:2 169:19 176:3,10
212:6 217:20 236:23
245:4 257:17 278:3,4
287:1
token
154:2 283:18
told
13:14 17:10 20:19 26:12
47:13 62:2 66:11 72:18
75:11 77:12,15,19 80:15
82:10 83:21,22 85:4,11
88:20 90:20 91:23
92:8 97:5 98:1,3 111:4
111:10 113:6 123:11
124:13,14 125:11 131:8
133:11,23 138:22 141:6
149:12,22 156:9 157:6
158:14 159:5 166:13
170:14 172:2 174:20
175:7,16 176:8,11 178:7
186:2,9 202:3,6 204:3
205:15 209:8 217:13
229:1 230:21 233:14
234:21 235:3 250:2
251:12 252:15 257:21
262:4,11 264:17,22
269:9 272:19 273:2,17
275:9 278:21
Tom
38:5,7 40:23
tomorrow
195:9 254:12
tone
121:10
top
53:1 79:17 138:3 159:12
248:15
topic
127:8 142:8
Toprol

9:3,14
Toronto
178:15,20 214:18
tort
161:6
totally
283:21
tough
85:13 115:5
tour
137:10,12,20 138:1
track
69:21
tracked
52:23 61:3
tracking
291:6
training
31:20 32:1,6 44:6,8,10
transcribed
12:6
transcript
296:13
transitioned
77:9,10
transpire
254:7
transpired
234:7
transpiring
175:23
transporting
290:7
travel
208:13
traveling
209:3 214:18
treat
190:22 220:1,8
treated
130:23 131:6,19,20,22
132:20 133:10,16 192:12
196:7,11,21 202:12,15,21
220:2 255:8 256:5
264:12,18,23
treatment
131:14
trial
2:20 14:19 19:9,10 20:9
20:14 266:11,15
trip
259:19
trips
268:15 269:5
trouble
132:17 171:6
true
105:9 250:1 251:15 260:8
296:13
trusted
126:13

truth
17:23
truthful
98:6
truthfully
10:4
try
87:21 115:7 174:1 242:20
trying
81:17,22 107:4,10 108:1
115:2,18 116:5 120:17
131:21 147:10 154:4
185:20 189:5 259:19
267:17
turn
147:10 149:18 163:3,7,14
165:21 201:2 203:2
245:14
turned
145:1
TV
216:20
twelve
25:16 30:15
twenty-five
23:15
twenty-four
23:21 151:10 216:9
twenty-one
22:14 166:3
twenty-six
23:16 271:20
twenty-three
23:22 267:13
twenty-two
271:16 272:4
Twice
10:17
two
6:20 8:16 13:2 18:21
21:21,22,23 23:6,10
25:5,19 26:18 29:21
32:17 35:8,13 38:22
39:5 48:11 52:15 54:16
56:3,12 71:3,6 72:11
77:4 86:18 89:23 101:7
102:19 133:16,19 134:9
137:22 163:8 164:23
165:2,5 173:22 180:15
182:9 184:19 199:14,20
199:21 211:15,18 215:1
223:19 233:13 239:11
246:23 256:4 280:16
281:12 283:21 290:23
two-month
43:1
type
187:20 240:17 291:8
typewriting
296:11
typically

145:20

U

U
2:1
uh-huh
7:12
uh-uh
7:11
ultimate
255:20
ultimately
158:21 252:13 256:8
uncle
160:12,15 161:16 206:3
210:17
unclear
8:2
underline
240:23
underlined
240:15,20
understand
7:15,18 69:10 70:10 74:5
74:10 79:1,5 107:7
108:18 121:14 128:14
131:19 157:18 166:2,9
166:20 198:9,12,15,17,19
205:2 213:11 219:16
239:5 259:7,18 284:9
285:16
understanding
47:22 85:2 98:8,12 110:9
110:12,17,22 111:15
112:23 113:5 130:22
159:2 167:2 194:18,21
199:7 241:18,20 242:6
254:14 259:21 294:5
understood
8:3 47:6 64:12 79:3
157:12,16 197:12 198:14
unemployed
216:22 222:15 267:10
unemployment
221:4 227:18,21
union
37:19 38:17,20
unionized
40:15
unique
101:2 284:17
United
1:1 222:7
university
22:11 44:23 45:9,12
237:11,12
UNKNOWN
169:2
unverified
244:6,22

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

updates
114:5
upset
145:23 153:12,20,21
upstairs
89:17 134:10 136:6
up-to-date
285:10
use
127:6
Usual
5:19
usually
116:17,18 136:14 194:22
utter
151:6

___ V ___

vacancies
241:22
vacation
199:5 200:14
value
99:18
venture
76:15
VENTURES
1:10
Verbal
33:8
verbally
7:4
verified
244:12,12
verify
172:14
verifying
173:12
versus
143:21 270:7 284:19
vice
104:15
Vinegar
185:3,18
violation
76:5 167:13
visiting
108:4
voice
121:10
volume
37:8
voluntarily
167:22
vs
1:9

___ W ___

W
6:4,5 246:12

wage
272:10
wages
267:7
wait
50:17 239:17
waited
223:16,19,21
waived
2:10
wake
218:23
walk
289:16
walked
17:12 112:2,13 135:19
137:14,16 149:23 150:7
152:12 232:14
walking
134:15,19 137:20 139:19
139:21,22 140:18
walls
125:20
Walton
27:18,22
want
10:18 55:21 70:16 90:21
92:11 113:22 119:22
123:22,23 124:1 126:1
126:11 133:19 139:17
148:8 149:18 164:8
168:20 169:12 197:7
211:22 219:22,23 220:3
220:9,15 222:7 229:9
234:10 257:2 259:17
283:9 284:7 294:22
wanted
46:16,19 58:5 78:7,10,12
80:16,17 82:7 84:21
86:9 91:23 96:15 100:8
100:12 120:5,12 122:8
123:8 125:4,5 137:10
149:22 152:1 167:21
168:5 186:20 189:13
191:19 247:3 295:2
wanting
81:13 102:3,5
wants
70:1 151:16
warehouse
66:10 107:15,16 250:21
289:23 290:6,6,8
warehousing
74:17
warranted
120:11
wasn't
19:9 37:8 64:1,10 66:10
76:18 77:5,11 92:4
98:6 102:5 107:11
108:14 116:3,4 148:19

151:7 186:1,20 187:14
188:5 189:11 195:2
198:13 210:19 211:11
213:19 215:18 216:11,17
218:7 266:3
waste
134:17
watch
13:16 216:20
water
134:17
way
7:12 64:13 90:18 91:3
100:13 111:10 121:7
122:1 124:6 126:16
127:15 133:1,9 146:10,11
153:8 156:1 164:1 186:7
192:4 194:12 196:11
208:23 209:22 219:18
220:2,9 239:16 250:3
251:7 254:6 255:7
256:1 259:15 261:2
264:17,22 277:9,10
ways
50:1,4 131:5,22 132:19
133:15 254:14 256:4
websites
184:3
week
56:12 78:19 93:10
weekly
61:3 136:23
weeks
48:11 56:12 87:20 159:7
159:9 164:13,23 165:5
173:15,20,22 174:5,9
181:12 198:23 199:4,5
199:10,14,18,20 200:13
200:13 211:18
weird
223:13
Wendell
6:6
went
17:22 19:5,9 20:14 26:18
26:19,22 27:8,18 29:17
30:10 77:8 86:14 91:6
91:14,19 93:2 99:14
100:14 112:11 113:1
118:17 135:2 137:17,21
138:1 140:22 169:11
180:18 181:2,9,13,15
183:16 184:6,11 189:17
205:2 209:22 210:4,7
211:12 214:5 217:12
219:4 228:11 246:8
257:11 267:10
weren't
11:15 14:7 60:22,22
158:11 171:10 185:13
207:18 208:10 210:1

211:16 238:12 242:3
285:20
we'll
91:15 127:8 244:13
we're
85:13 127:23 139:21
146:2 148:5,6 171:6
195:8,10,13,14 234:19
242:17 253:13,14
259:14 285:1
we've
221:20 234:4 256:10
257:3
whatsoever
261:23
Wheeler
71:8
white
3:13 34:2 125:10,10
132:17 156:9 210:5
Whitehead
70:15
Whitfield
19:4,17 20:6,15 29:17
30:1,3,7,13,14,16 31:2,5
31:8,14,21 32:1,5 35:14
37:3,18 38:20,23 41:15
42:21 43:7,11 44:7,9,15
46:2 47:4 48:12 184:9
184:20 185:1,15 186:1,9
186:14 187:3,9 272:20
wife
25:5,19 41:7 64:23 205:7
206:2 215:16 217:13
229:5,12
wife's
21:11 160:12 248:18
William
22:5,6,7,8 25:6,20
Winter
16:23 17:2,5 18:1,6 51:1
84:16 112:12 113:9
136:16 229:6,17 230:22
Winters
144:1
wish
22:22
withdrawal
226:12 269:10 271:5
withdrawn
271:15
witness
2:9 5:10 20:3 101:22
119:14 296:14
wonderful
107:14 108:16
Wood
24:14,18,21 25:4,8 26:14
worded
140:22 259:16
words

153:8 170:16

work
29:17 30:6 41:3 44:11
46:15 47:7 59:6,7
61:15 63:7 84:22 96:15
113:1 132:7 135:10
143:15 149:21 178:18
179:9 180:18 181:2,11,15
181:17 184:10 186:7,10
212:19 214:5 215:20
218:5 219:4 223:15
231:17 233:10 246:9,13
246:14 249:3 267:10
288:10 291:21 292:11
293:20 294:3
worked
28:3,11,18 30:12 36:4
39:17 46:9,14,19 57:11
84:13 111:7 140:13
178:14 184:11 193:19
245:18 246:1 279:21
280:5,12 281:13 283:13
workforce
132:6
working
19:19 20:7 26:5,9 36:7
44:13,14 48:3 58:1
59:2,23 69:18,21 81:17
81:22 92:5 115:8
127:22,22 145:21 178:10
178:13 179:6 180:5,14
180:20 181:14 182:3
214:14,15 263:2 280:6
289:20 290:16
works
145:21
worried
84:23 214:7
worry
17:11,23 135:18 140:21
worst
212:20
wouldn't
22:22 28:17 100:15 128:3
129:23 194:3 223:12
226:17 242:16 243:9
256:23
write
123:19 163:22
writing
147:7 163:23
written
33:8 122:23 132:5
wrong
123:2 234:5 245:8,12
251:13 271:1,2 274:7
280:12
wrote
142:20 143:3 144:13
145:11 174:2 245:5

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

BERT MAYER
August 16, 2007

---

**X**

X
4:1,9
Xerox
198:6

**Y**

yard
29:13
yeah
8:19,21 20:4 28:14 40:19
  44:10 49:7 52:18 67:17
  76:13 79:3 96:12 97:1
  97:18 99:22 100:11,23
  105:8 106:2 107:13
  108:21 109:4 121:5
  122:13 123:13 137:10
  138:10 143:16 144:5
  147:19 148:3 152:12
  156:3,3 159:16 161:12
  164:15 165:16 166:12,16
  167:15 180:21 186:12
  187:5 189:1 191:10
  227:11 228:14 240:5
  257:21 269:11 276:21
year
16:12,13,14 19:2 25:1
  27:4,21 30:21 31:13
  45:4 77:2 99:1 101:21
  213:7 225:10,11 247:21
  270:3,14 280:15
years
15:9 21:17 23:3 24:19,19
  25:16 30:8,15 32:17
  35:8,13 38:22 39:5
  52:14 57:5 77:4 132:7
  246:23 280:16
yesterday
16:21 244:9
Young
84:18
y'all
139:19 147:21 230:4
  231:4 234:13

**$**

$23,500.00
267:7

**0**

04
67:23
05
180:10,19 187:21 188:23
  246:2 247:20
06
180:8 247:8
07
249:5

**1**

1
4:11,20 94:2,5 101:6
  163:10,18 277:21 278:2
  279:1 281:19 286:18
  292:14 294:9,9
1st
101:14 223:22
1:26
130:20
1:37
130:20
10
216:4 226:12,14 227:11
10th
156:18
10:04
56:1
10:15
56:1
102
4:13
103
4:14
  249:15 257:6 259:10
11th
249:5,14
11:55
86:6
12
94:10
12:38
86:7
13
264:10 265:9,14
14
165:18 204:13,19
15
225:13
15th
225:12
16
1:18 5:9
162
4:15
18th
16:11
1819
3:14
19
266:17
1984
14:14
1985
27:11 28:12
1986
28:13 30:4
1987
30:12

**1**

1991
290:17
1996
290:4,17
1999
290:4

**2**

2
4:12,21 95:18,21 163:14,15
  167:5,6 203:20 245:14
  277:2 282:8 287:22
  288:3,7,11 289:19 291:1
  294:9,9
2nd
223:10
2(b)
167:14
2:05CV1207-MHT
1:5
2:55
197:5
200
4:16
2000
19:22 30:11,12 48:17
  203:6 285:2
2001
19:22 26:6 30:9
2002
19:22 26:6 30:9
2003
52:16 57:4 280:17
2004
94:10 96:23 99:9 101:6
  270:16
2005
151:13 165:12,18 169:14
  187:4 204:13,19 225:13
  228:8 246:3 270:16
  273:4 276:3 279:10
  280:7,11 282:8,11,23
  283:8 286:8 289:7
  290:13 293:13
2006
9:13,15 225:19 247:18
  248:14
2007
1:18 5:9
22
272:18
2313
24:14,18,21 25:3,7 26:13
239
4:17
24
203:6 270:4,11,17
244
4:18
25th

**223:16**
274
4:4
277
4:20
287
4:21
292
4:5,6

**3**

3
4:13 102:23 103:3 176:15
  267:6
3:03
197:5
30
5:5
3128
25:9,14,23 26:8
35203
3:15
36103
3:8

**4**

4
4:14 99:9 103:17,20
  165:21 166:1 289:19
  290:18,22
4th
9:13,15
4:00
244:18
4:09
244:18
401
5:8 226:6
401-K
224:10,21 225:1,4,23
  226:3 272:8
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
16:19

**5**

5
4:15 162:22 163:2 166:8
  176:16 197:8 204:17
5:10
295:10
50
284:23
500
132:12
5059
3:7
51
134:6

**6**

---

6
4:3,16 200:18,21 203:19
  247:14
60
284:23
63
16:16

**7**

7
4:17 163:4,5 168:22
  239:22 240:2 276:15

**8**

8
4:18 244:2,5,20 248:13
81
15:11 27:5
84
23:5
85
15:12 23:5
87
30:5

**9**

9
151:13 169:14 228:7
  248:21 282:11 291:21
9th
156:17 165:20 216:4
  217:11 254:11
9:09
5:10
94
4:11 45:5
95
4:12

---

Page 318

Tyler Eaton Morgan Nichols & Pritchett, Inc.

## PERSONNEL ANNOUNCEMENT

January 12, 2004:

Michael O'Connell has left his position as President of Piknik Products, effective immediately. Mike will not be replaced at this time. Mike's responsibilities will be split between Chris Day and Patrice Daniels of Onyx Capital Ventures. Chris will take responsibility for operations, logistics, quality and human resources, and Patrice will take responsibility for sales, contract administration, purchasing, finance and IT. Jeffery Larry of Onyx remains Chairman and CEO of Piknik.

Reporting to Chris will be David Daneshmayeh, General Manager, Condiments; Jerry MacCartney, Director of Logistics; Bert Mayer, Director of Operations; Shannon McGlon, Director of Quality; and Brenda Sellers, Manager of Human Resources.

Reporting to Patrice will be Henry Hicks, VP Sales & Marketing; Bob Lampert, VP Finance; Bob Winter, VP Purchasing and Contract Administration, and Athenia Figgs, acting Director, Information Technology (IT).

We wish Mike every success in his future endeavors.


Patrice Daniels
EVP – Sales & Finance

Chris Day
EVP – Operations

Jeffery Larry
Chairman and CEO





**PRODUCTS COMPANY**

Date:  May 4, 2004

To:  Bert Mayer
     Director, Operations

From:  Chris Day
       EVP, Operations and Human Resources

Re:  Compensation

When I approached you last month about what department you would like to work in long term, you mentioned that your preference would be to return to Finance. As a result we created a placeholder position in Finance that is earmarked for you once we can hire a replacement for you as Director of Operations. This position is being defined more specifically by Bob as we speak, but it will be similar to the position you left when you became Director of Operations.

As we discussed, the market pay rate for this position is approximately what you were making when you left Finance or approximately $53,000 per year. In recognition of your dedication and sacrifice for the company, we will not ask you to take a pay cut from your current salary of $73,000 when you return, although your salary will effectively be frozen at that level for some time until your responsibilities match your compensation.

As for your pay in your current position, your current salary is below the market rate for that job. In order to reflect a market compensation for the job you are in, while not subjecting you to a large salary cut when you move back to Finance in the future, we will provide you with a unique compensation arrangement. Starting April 1, 2004, Piknik will begin to accrue $2,000 per month that will be paid out to you when you leave the Director of Operations job. This has the benefit of achieving an effective $97,000 per year salary rate while in your current role; receiving it in a lump sum will keep you from getting used to the extra money each month, and no salary decline will occur when you return to Finance.

I appreciate all your hard work and dedication, and I hope you feel this is a fair arrangement. Thanks again.

Chris Day
EVP, Operations & Human Resources

HR Copy



# BERT MAYER

*3128 Milan Drive • Montgomery, AL  36109 • (334) 277-1506*

424

## OBJECTIVE

Seeking a challenging management position within a professional organization requiring a strong work ethic, attention to detail, and providing the opportunity for growth.

## EXPERIENCE

WHITFIELD FOODS INC.
MONTGOMERY, ALABAMA
PRODUCTION MANAGER
1997 - PRESENT

Whitfield Foods Inc. is a manufacturer and bottler of fruit juices and syrups with national distribution. The primary business is co-pack but the company owns its proprietary table syrup line.

I am responsible for all aspects of the manufacturing and bottling of fruit juices and syrups; manage a three line, two shift production operation, including responsibility for four production supervisors and one sanitation supervisor. My other duties include hiring and terminating personnel and staff, training, oversight of safety compliance programs, and continual cost improvements.

Accomplishments: Increased cases produced per man hour by 72 %. Reduced labor per case by 42% with a reduction in overtime hours of 4.5%. Set several monthly production records. Participated in the renovation and start up of a new production line.

WHITFIELD FOODS INC.
MONTGOMERY, ALABAMA
LOGISTICS MANAGER (MATERIALS MANAGER)
1995 - 1997

I was responsible for anticipating production orders, scheduling plant production, and purchasing/ordering of raw materials to meet production requirements. Managed the receipt, storage and issue of raw materials for the plant. Maintained adequate inventory levels to support production requirements while keeping total inventories at manageable levels in order to cut cost and prevent waste. Supervised three material planners.

Accomplishments: Increased annual inventory turns from six to fifteen while reducing total inventory by 58.6%. Developed and implemented reorder points and economic order quantities, virtually eliminating stock outs. From 1995 to 1997 reduced raw material inventory variances from annual losses of $280,000 to standard gains of $150,000.

WHITFIELD FOODS INC.
MONTGOMERY, ALABAMA
PRODUCTION SUPERVISOR
1992 - 1995



I was responsible for the supervision of employees, insuring they met daily production schedules. Organized and assigned work, instructed and assisted employees toward the accomplishment of production goals. Responsible for the use of materials and quality of production.

WHITFIELD FOODS INC.
MONTGOMERY, ALABAMA
QUALITY CONTROL SUPERVISOR
1987 - 1992

I was responsible for the supervision of lab technicians and batching personnel conducting quality control testing. Conducted micro analysis, created product loss reports and product development.

AMS IRRIGATION AND PUMP SUPPLY
FT. WALTON BEACH, FLORIDA
RETAIL/WHOLESALE SALESPERSON
1986 - 1987

Dealt with customers and assisted in sales; controlled and maintained company inventory; designed and installed residential irrigation systems.

UNITED STATES AIR FORCE
Security Specialist
1981- 1986
Staff Sergeant. Assistant Flight Sergeant and Airborne Fire Team Leader. Assigned to Guam and Minot Air Force Base, North Dakota. Supervised personnel in the protection of priority national defense resources. Served under the Human Reliability Program with high security clearance. Received an Honorable Discharge.

## EDUCATION

AUBURN UNIVERSITY AT MONTGOMERY
*B.S.B.A. Accounting 1994*
Earned degree while working 50 hour weeks.

Member of APICS (American Production and Inventory Control Society) and NAPM (National Association of Purchasing Managers)

## SKILLS

Have knowledge and experience with Windows operating systems. Specific application software includes the following:  Lotus 123, MS Excel, MS Word, and WordPerfect.

**From:** Brenda Sellers [mailto:bsellers@piknikproducts.com]
**Sent:** Friday, April 15, 2005 11:39 AM
**To:** Piknik All
**Cc:** cday12345@aol.com; Chris Day
**Subject:** FW: Reorganization Announcement

Hello Everyone,

Please read the following attachment in regard to the reorganization of certain members of the company and some additional personnel moves.

Thanks

Brenda Sellers

HR Manager





## ORGANIZATIONAL ANNOUNCEMENTS

April 15, 2005

As you know, Team Piknik was fortunate to add two world-class players recently to its senior management team ... Anthony Barber, as Vice President and General Manager of the Beverage Division, and Carl Bleier, as Vice President and General Manager of the Condiments Division. With these two additions, we have all the pieces in place on our senior management team to continue to bring the focus and intensity to move Piknik forward on all fronts.

To maximize this effort and continue the significant improvements we are seeing in our business, we have reassigned certain members of our organization and made some additional personnel moves. In the **Condiments Division, Eddie Crosby** is moving to Condiments as Production Manager in Brundidge, reporting to Carl. Eddie will be responsible for production, maintenance and sanitation. We are extremely excited to have a proven leader from within Piknik move to join Condiments, and we are confident that he will help speed the improvements to our business in Brundidge.

In the **Beverage Division, Bert Mayer** will assume the role of Plant Manager, Day Street, reporting to Anthony Barber. Bert will assume leadership over the team that had been reporting to Eddie Crosby at Day Street. **Jerry MacCartney** will assume the role of Plant Manager, Alatex, also reporting to Anthony. All of the Alatex personnel will report to Jerry. As a result of the above assignments, **Jimmy Whitehead, Dawn Mitchell and Bill Boykin** will now report directly to Anthony Barber.

Similar to Condiments, the QA Managers in Beverages will now report directly to the plant managers of the facility in which they work, with a dotted line to **Shannon McGlon**. Shannon remains QA Director in charge of the overall Piknik quality systems, and **Allen Walters, Barbara Williams and Jessica Daniel** remain accountable for implementing the system at their respective plants.

In Beverage Sales, **Bob Winter** becomes Director of Customer Planning, reporting to Henry Hicks, to reflect his vital role in onboarding and interfacing with our customers.

Regretfully, with change sometimes come departures. In Condiments Sales, we are changing our emphasis from a geographic focus to a market focus, and as a result we are eliminating the positions of **Bob Gross and Letitia Strowbridge**. In administration, we are eliminating the receptionist position held by **Clarice Crosby**. We want to thank Bob, Letitia and Clarice for their service and wish them well in their future endeavors.

We are confident that these moves will greatly enhance our ability to deliver results across all areas of the company. We are grateful for your continuing efforts and support.

Jeffery Larry
Chairman & CEO

Bert   Mayer   ("Employee")   and   Piknik   Products   Company,   Inc.
("Employer")   hereby   enter   into   the   following   Release   Agreement
("Release")   concerning   the   resignation   of   Employee,   his   release
of   any   potential   claims   against   Employer   and   others   described
below,   and   the   payment   of   severance   pay   to   Employee   on   the
following   terms:

1.    Employee   generally,   fully   and   completely   releases   the
Employer   and   its   officers,   directors,   stockholders,   employees,
agents,   trustees,   fiduciaries,   representatives,   insurers,
guarantors,   indemnities,   attorneys,   subsidiaries,   affiliated
companies,   parent   companies,   predecessors,   successors   and
assigns,   and   any   and   all   persons   acting   through,   for   or   together
with   any   of   them   (collectively   referred   to   as   the   "Released
Parties")   from   any   and   all   claims   that   the   Employee   has   now   (or
may   learn   that   he   has   in   the   future)   against   the   Released
Parties   arising   out   of,   relating   to,   or   resulting   from   any   act,
event   or   thing   occurring   or   failing   to   occur   at   any   time   prior
to   the   time   Employee   executes   this   Release.    The   claims   released
by   Employee   include   but   are   not   limited   to   any   and   all   known   or
unknown   actions,   causes   of   action,   grievances,   suits,   charges,
or   complaints   before   any   and   all   federal,   state   or   local
governmental   entities   or   any   and   all   private   or   non-governmental
entities,   whether   for   reinstatement,   back   pay,   compensatory

DEFENDANT'S EXHIBIT

damages, punitive damages, liquidated damages, prejudgment interest, attorney's fees, costs, expenses, or any other relief, remedy or damages.

2. Employee acknowledges and agrees that the terms of Release set out in Paragraph 1 above specifically include the release of (a) any and all claims arising from or related to Employee's employment or the termination or Employee's employment; (b) any and all claims arising from any alleged violation of any federal, state or local law, including but not limited to alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., the Civil Rights Act of 1991, the federal Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., the Alabama Age Discrimination In Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, and the Employee Retirement Income Security Act of 1974; and (c) any and all claims of unlawful retaliation or interference associated with or related to these federal statutes or any federal, state or local law. However, nothing in this Release shall take away or reduce Employee's entitlement, if any, to benefits provided by any employee benefits plan that might have already vested in the ordinary course of Employee's employment; Employee's entitlement, if any,

to workers' compensation benefits; or any entitlement Employee or his dependents may have to continued medical coverage pursuant to Section 601 of the Employee Retirement Income Security Act of 1974.

3. Employee represents that, at the time he signs and delivers this Release to Employer, he has not filed any charge, complaint, or lawsuit over any claim(s) referred to in Paragraphs 1 and 2. Employee understands that he is permitted by law to file an agency charge, but agrees that, should any such charge or action be filed by him or on his behalf involving matters covered by this Release, he will promptly give the agency or court having jurisdiction a copy of this Release and inform them that he has fully settled any and all claims or potential claims. Employee agrees not to file any lawsuit at any time over any claims released in this Release and agrees to notify Employer immediately if he should do so before the time he executes and delivers this Release to Employer, provided, however, that this Release does not prevent Employee from filing a lawsuit challenging whether this Release is itself legal. Should Employee file such a suit and lose, he understands that he will be personally liable for any of his own legal fees and costs and for such other fees or costs as the court may award.

4.  Having read this Release in its entirety, Employee agrees that this Release is written in a manner calculated to be understood by him.  Employee further acknowledges and agrees that in exchange for his agreement to this Release, he has received consideration in addition to anything of value to which he was already entitled, and that before signing this Release he was not otherwise entitled to receive the severance payments described on Exhibit A to this Release.  Employer further advises Employee (and Employee acknowledges that he has been advised in writing) that before signing this Release he should consult with an attorney, and that he has 21 days from the date this Release has been presented to him in which to consider this Release.  Employee acknowledges that, if he executes this Release before 21 days after receiving it, he does so knowingly and voluntarily with the express intent of waiving any remaining portion of the 21-day period he has been given to consider the Release.

5.  For a period of seven (7) days following the execution of this Release, Employee may revoke this Release.  This Release shall not become effective or enforceable until this revocation period has expired.  Revocation must be made by delivering (not

mailing) a written notice of revocation to _____,
at the offices of the Employer at 3806 Day Street, Montgomery,
Alabama within seven (7) days after Employee signs this release.

6.    After the end of the seven-day revocation period,
Employer agrees to pay, as consideration for this Release, the
amounts and benefits set out and described on Exhibit A.
Employee acknowledges that such payment represents and includes
all of the benefits to which Employee is entitled under the
terms of the Release.

7.    Employee acknowledges that as of the time he executes
this Release, he has voluntarily resigned from employment with
Employer.  He further agrees and recognizes that his employment
relationship with Employer and any entity affiliated with
Employer has been permanently and irrevocably severed and that
Employer has no obligation, contractual or otherwise, to rehire,
reemploy or recall Employee in the future.  Employee also agrees
that he will not apply for reemployment with Employer in the
future.

8.    Employee agrees and acknowledges that he has read and
fully understands all of the provisions of this Release.

Employee further declares and acknowledges that no representation has been or is being made by any of the Released Parties, or by anyone on behalf of the Released Parties, concerning the validity or merit of any claim that has induced Employee to sign this Release, and that in deciding to sign this Release, Employee is voluntarily acting upon the Employee's own best judgment, belief and knowledge as to the nature and validity, if any, of any and all claims or potential claims that are or may be released.

9.   Employee further represents and warrants that Employee has not assigned to any other person or entity all or any portion of any claim whatsoever that Employee may have against the Released Parties arising at any time before he signs this Release.   Employee further agrees that the heirs, administrators, executors, successors and assigns of Employee shall be fully bound by each and every provision of this Release, just as Employee is bound.   Employee acknowledges and agrees that the provisions of this Release benefit the Released Parties and their heirs, administrators, executors, successors and assigns as well as Employee.

10. The language of all parts of this Release shall in all cases be construed as whole, according to its fair meaning, and not strictly for or against either Employee or any of the Released Parties.

11. This Release sets forth the entire agreement and fully supersedes any and all prior agreements or understandings between the Employee and the Released Parties.

12. In the event any provision, any obligation, or any consideration of the Release is determined to be illegal or unenforceable, the remainder of the Release shall be enforceable.

PLEASE READ CAREFULLY. THIS RELEASE INCLUDES A GENERAL RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS THAT EMPLOYEE HAS OR MAY HAVE. EMPLOYEE SHOULD CONSULT AN ATTORNEY BEFORE SIGNING BELOW.


Date: _14 June 05_          Employee: _[signature]_

PIKNIK PRODUCTS COMPANY, INC.


By: _[signature]_
Its: _HR Manager_

STATE OF ALABAMA )
)
_Montgomery_ COUNTY )

    I, the undersigned, hereby certify that _Bert Mayer_ ,
whose name is signed to the foregoing Release and who is known
to me, acknowledged before me on this day that, being informed
of      the      contents      of      the      Release,
_____ executed the same voluntarily
on the day the same bears date.


    Given under my hand and seal of the office this _14th_
day of _June_ , 20_05_ .

_Patsy Brent_
Notary Public


{NOTARIAL SEAL}


My Commission expires: _2/18/2006_

## EXHIBIT A

The undersigned employee, Bert Mayer, agrees to accept, as consideration for his execution of this Release, five weeks of severance pay and five weeks of vacation beginning the day of document signing.

Employee will receive severance pay in two weeks increments with normal payroll practices at his normal pay rate. Employee understands deductions required by law or court order and any deductions for benefit plans voluntarily elected by Employee, as shown below.

If the undersigned is a participant in any of the following Employee Benefit Plans (the "Plans"), he may choose to continue participation in such plans, subject to the provisions of this Release, by **checking the Plans he wishes to continue while severance pay is being paid.** All other deductions will be discontinued except those that are required by law or court order.

**Medical Insurance**_____ Single___ ✓ Family

**Dental Insurance**_____ Single ___✓ Family

**Voluntary Life Insurance** no

**401(k)** no

The undersigned acknowledges that payroll deductions of the applicable premiums for continued Plans will be paid in full and cease in three months after his termination date.  Thereafter, the undersigned agrees that continued participation in any of the above listed Plans, if permitted by the Release, the applicable continued Plan, or applicable law, shall be contingent upon the undersigned paying the applicable premiums.

_____      _____ 6/14/05 _____
Employee Signature             Date


Current Mailing Address:

2313 Sagewood Dr

Montgomery, AL 36117


Last Day Worked:  6/9/05

_____      _____ 6/14/05 _____
Manager's Signature            Date


Page -2-

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA ☒ EEOC | 130-2005-05522 |

_____ and EEOC

*State or local Agency, if any*

| NAME (Indicate Mr., Ms, Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Bert W. Mayer | (334) 277-1506 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 2313 Sagewood Drive | Montgomery, AL 36117 | 06/18/63 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Onyx Capital Ventures D/B/A Piknik Products Company | 250+ | (334) - 265-1567 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 3806 Day Street | Montgomery, Alabama 36108 | Montgomery |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box (es) | DATE OF DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify) | EARLIEST          LATEST<br>                    06/09/05<br>☐ CONTINUING ACTION |

See the attached Addendum.

RECEIVED
EEOC
JUL 1 8 2005
BIRMINGHAM DISTRICT OFFICE

DEFENDANT'S
EXHIBIT
64
Mayer

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear of affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct | SIGNATURE OF COMPLAINANT |
| 7/14/05          Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) 7/14/05 |

FORM 5 (Rev. 07/99)

## ADDENDUM TO THE CHARGE OF DISCRIMINATION OF
## BERT MAYER

"My name is Bert Mayer. I was employed by Piknik Products Company. I had been a regular employee since about April 24, 2000.   In my job I was considered plant manager.  I am a white male.

"During my tenure with Piknik I worked at the 3806 Day Street, Montgomery, Alabama location. My immediate supervisor was Anthony Barber, a black male.  On or about June 9, 2005, I was summoned to the office of Chris Day, President in the presence of Ms. Brenda Sellers, human resources managerI was informed that my employment was terminated.  I was not give reason or cause for the termination. I was replaced by a black female, Annisia Hanyard.  I always considered myself a valuable employee.  I was never reprimanded nor written-up for poor performance.  Mr. Barber never complained about the quality of my work.

"I believe I am the victim of discrimination on the basis of my race, white."

Bert W. Mayer

SWORN TO and SUBSCRIBED before me this __14__ day of July, 2005.

NOTARY PUBLIC State at Large

My Commission Expires: 9/19/07

RECEIVED
EEOC

JUL 1 8 2005

BIRMINGHAM DISTRICT OFFICE

Attachment A.

Note the underlined sentences that refer to our claim of discrimination.

-----Original Message-----
> From: Henry Hicks [mailto:hhicks@piknikproducts.com]
> Sent: Wednesday, February 16, 2005 1:08 PM
> To: Shannon McGlon (E-mail); Chris Day (E-mail); Robert Lampert
> (E-mail); Bert Mayer (E-mail); Jerry MacCartney (E-mail); Bob Winter
> (E-mail)
> Cc: Sales Group (E-mail); Jeffery Larry (E-mail); Brenda Sellers
> (E-mail)
> Subject: Call Summary - PepsiCo
>
>
> On January 15th, 2005 Jeff Larry and I met with April Blackmore at
> PepsiCo's
> offices in Chicago. Following is a summary of the call.
>
>
> _____
>
> 20oz business is done! We should begin producing in Pepsi's period 4
> and
> they will take all that we can give them through period 9. Annual
> estimate
> is 3mm 24 pack cases annually. Pepsi will fund all capital. She also
> asked
> that we look at the possibility of installing a Hi-Cone machine on the
> end
> of Line 301. The idea is that this would drive even more volume our
> way.
> Our pricing is fine, and at those rates they will try to keep us full.
> In
> fact, April strongly hinted that we might consider raising our price a
> bit.
> Action: Bob W. we should look at the tolling to see if we want to take
> the
> price up, or eliminate the teiring.
>
> If the 34oz product does as well as hoped, she would want to put this on
> line 301 and this would have them on there year-round.
>
> On the 20oz, April wanted to get Tim Olson down to walk Line 301 and
> make
> sure that there is no needed capital that has been overlooked. We need
> to
> provide them with lead times, a project plan and estimated production
> dates.
>
> 500ml Propel may be the next product that they look at Line 301 for.
> The
> new And 1 product will also be in the same package. They will know in
> May
> which direction they want to go in for the Propel.
>
> Regarding the Season's Best and Twister products that we mentioned in


DEFENDANT'S EXHIBIT

> our
> proposal, she suggested that we stay away from them. The business is
> not
> growing. Gatorade and cans are where its at, she said. She mentioned
> that
> 11 plants make the 15.2oz trop product - so price is the driver on this
> business.
>
> Pepsi would be interested in Line 302 for the And 1 product. This
> allergen
> based product will be in the 500ml Propel bottle, bliss box with roll
> fed
> labels. They will be making a decision on this project in May/June of
> this
> year, and may be interested in participating in the capitalization of
> the
> new line. Action: Henry and Bob W. to follow up with April and with
> Unilever to include them on the cost of constructing the line.
>
> Regarding the gallon production, she indicated that the business is
> growing
> 7-8% per year. She also said that there has been some discussion of
> putting
> Propel in the Lenny bottle.
>
> We discussed the tight schedule that we have this year given that we
> have
> added a new customer. She was concerned that we were displacing them in
> favor of Arizona. I assured her that this was not the case. She did
> ask
> that we quickly move to 48 or 72 hour CIP if possible to get more
> capacity
> out of the line. Action: Bert and Shannon - please let Henry know if
> we
> have written authorization from Pepsi to CIP every 48 or 72 hours. If
> not,
> I will ask April and Ken to have someone take the steps needed to offer
> that
> approval.
>
> I indicated that we were installing a bulk depal system this season and
> asked for a price increase to $1.25 per case. She agreed. She also
> indicated that they should have been accruing for the difference between
> the
> tolling that we billed in 2004 and the agreed to price of $1.20. She
> was
> very pleased with this investment and is hopeful that we will see
> increased
> volumes and efficiencies as a result.
>
> PepsiCo's canned energy drink business (Sobe Adrenaline Rush, Mountain
> Dew
> Amp) is growing at more than 70% per year. They are actively looking
> for
> capacity to manufacture these products. There is a particular need on
> for

> this on the west coast. It may make sense to put a can line in Alatex.
>
> Whitlock (OK), PriPack (IN) and Creir (WI), as well as Mark Ocean Spray
> (NV) – which manufactures 12, 24 and 64oz Gatorade, have each been, are
> or
> are rumored to be for sale. Dean Foods in Benton Harbor, MI
> manufactured
> aseptic packaging, but they closed the plant.
>
> April is interested in moving to a master PepsiCo contract with Piknik
> that
> will cover all Gatorade and Tropicana business. She will discuss this
> with
> Sharon and report back next steps.
>
> We discussed our desire to recruit talented minorities in operating
> roles
> within the company. April suggested using diversity.com as a search
> site
> and suggested cultivating a relationship with NC A&T University. She
> said
> that they have a great engineering school, where the students have good
> co-op experience. She said that Ford get the tope tier of students
> there,
> but that we could get 2nd tier candidates and be very pleased.
>
> April suggested that we invite their supplier diversity person, Ernest
> Freeman, down to Piknik. She said that we are the only MBE in their
> system,
> with the exception of a woman owned business in Mass. that does water
> for
> them.
>
> The meeting ended something like 3 hours later...
>
> Henry
>
> H. Beecher Hicks, III
> Vice President, Sales and Marketing
> Piknik Products Company
> 404/653-8914 office
> 334/265-1567 x217 office
> 404/313-6669 cell
> 509/471-8561 efax
> www.piknikproducts.com

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

JERRY A. MacCARTNEY,                      )
BERT MAYER, SHANNON A. McGLON,            )
and                                       )
ROBERT A. WINTER,                         )
      Plaintiffs,                  )
                           )      Civil Action No.: 2:05cv1207-MHT
v.                                        )
                           )
PIKNIK ACQUISITION CORP., L.L.C., et al., )
      Defendants.                  )

## PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST INTERROGATORIES

COMES NOW, Bert Mayer, in response to Defendant's First Interrogatories pursuant to Rule 33 of the Federal Rules of Civil Procedure and states as follows:

1.     State you full name, current address, social security number; date of birth, spouse's name (if applicable) and the name and address of your current employer.

**RESPONSE: Bert W. Meyer, 2313 Sagewood Dr., Montgomery, Alabama; Debbie Meyer.**

2.     Outline your educational background giving the full name of the educational institution, the dates of attendance, and the degrees earned for each high school, vocational or trade school, college or university, and graduate or professional school.

**RESPONSE: Auburn University at Montgomery, BS/BA 1994.**

3.     Identify all of your relatives, by blood or marriage, over the age of seventeen who live in the Middle District of Alabama and provide their address and current employer.

**RESPONSE: Bill Mayer; Ann Mayer - 3006 Jasmine Road.**

4.     Identify every employer or company that has ever employed you. If you have been self-employed, please indicate. As part of your identification, describe the job title, the duties



you performed, the name of your immediate supervisor, the dates you held the job, your

hours of work, your rate of pay, and the circumstances surrounding your departure (e.g.,

voluntary termination, lay off, etc.).

**RESPONSE: USAF- Security Specialist 1981-1986 - Commitment satisfied.**

**AMS- Irrigation and Pump Supply 1986-1987 - Sakes clerk - Transferred to Montgomery, AL.**

**Whitfield Foods Inc. 1987-2000- QA Technician, Production Supervisor, Logistics Manager,**

**Production manager. - Accepted position with Piknik Products.**

**Piknik Products 2000 - June 2005- Cost Accountant, Financial Manager, Director of**

**Operations- Terminated.**

**Capedia International - Sept. 2005 - Oct. 2005 - Consultant, Results Manager - Resigned**

**Bert W. Meyer, CPA.**

5.      Describe your involvement as a witness or a party in any past legal proceedings, civil or

criminal. List the name, style, case number, jurisdiction, and date filed for each proceeding

described.

**RESPONSE: I gave a deposition in Whitfield Foods v. Fogg Filler, 2001.**

6.      State the name, and address of each and every physician, psychiatrist, psychologist or

counselor with whom you consulted or who rendered any diagnosis, treatment or other

medical care to you during the last three (3) years and the nature of your illness or condition

**.RESPONSE: M. Luqman Ahmed, M.D. - River Region Cardiology, 114 Mitylene Park Lane,**

**Montgomery, AL. 36117- Heart Attack.**

7.      State the name and address of each and every institution, hospital or clinic, in which you

have received treatment, or in which you were confined or hospitalized during the last three

(3) years. With respect to each facility you have listed in this interrogatory, state the dates

that you were hospitalized or received treatment, the name(s) of your attending physician(s) and the nature of your illness or condition.

**RESPONSE: Baptist South 2105 East South Boulevard, Montgomery, AL 36116 - December 4-6 2006, heart attack. December 18 and 19, 2006 observation (heart). January 8 and 9, 2007 heart stent surgery. Dr. Ahmed.**

8.      State whether you filed state and federal income tax returns for each of the following years: 2004, 2005 and 2006. State the amount of your gross income for each calendar year from 2004 to 2006.

**RESPONSE: 2004- $88,168.68, 2005- $77,193.00, 2006.**

9.      State the amount of income you have earned , from any source, in 2007 as of the date of your response to these interrogatories.  This interrogatory includes without limitation any unemployment compensation or social security benefits you may have received.

**RESPONSE: In 2007, I have received income in the amount of $5,500.00 at the time of answering these interrogatories..**

10.     If you or anyone acting on your behalf has taken statements (oral, written or recorded) from any person concerning the incidents which are the subject6 matter os this lawsuit, identify the individuals from whom such statement was taken, who took the statement and when, and who has possession of that statement.

**RESPONSE: I know of no statements taken.**

11.     State the position you claim you were terminated from because of your race. In you answer, include the position title and, if the position was filled after your departure from Piknik Products, when the position was filled and to whom the position was awarded.

**RESPONSE: I was the Director of Operations; Anthony Barber replaced me as the Director**

**of Operations, June 2005.**

12.    Identify each person whom you expect to call as an expert witness at trial. For each expert witness identified, provide the information required by Federal Rules of Civil Procedure Rule 26, including the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, a summary of the grounds for each opinion, and the person's education, experience, or other background that qualifies that person to testify as an expert witness in this case.

**RESPONSE: Will submit in accordance with the Federal Rules of Civil Procedure.**

13.    Identify any and all employees or former employees of Piknik Products Company, Onyx Capital Ventures LLC, or Piknik Acquisition Corp LLC who you contend participated in any allegedly discriminatory acts or omissions towards you because of race and describe fully the details of any act or omission in which they participated.

**RESPONSE: Chris Day, Jeff Larry. My employment was terminated solely because of my race. The operations of plaintiff's direction were performing on a per unit basis at a rate better than at any other time during plaintiff's tenure. The lack of business was beyond plaintiff's control. Chris Day at one point stated to plaintiff " It is our (Onyz) intention that we replace all managers with blacks."**

14.    Describe anyone who has knowledge of the mental and emotional anguish for which you are seeking damages and, for each person identified, state the subject matter of their knowledge and the basis for such knowledge.

**RESPONSE: I am compiling the description of the details which will be supplemented once completed.**

15.    If you believe you have been discriminated against by any other employer, other that Piknik

Products, state all particulars relating to the alleged incidents of discrimination including names of employers, dates, names of participants, and whether or not you complained to the Equal Employment Opportunity Commission or any other governmental (federal or state) agency or private agency receiving complaints of employment discrimination.

**RESPONSE: None.**

16.     Identify by name, last known address, telephone number, employer, and synopsis of expected testimony, each and every person you may call as a witness at trial. You are reminded of your obligation to supplement your response to this interrogatory under Federal Rule of Civil Procedure 26(e).

**RESPONSE: Will Submit in accordance with Rules of Civil Procedure.**

17.     Identify any written notes, photographs, diaries, calendars, letters, documents, records (including any computerized records), audio or video tapes or recordings of any kind which describe, reflect, or relate in any way to alleged discrimination against you.

**RESPONSE: None.**

18.     Describe the compensatory damages you are claiming from Hicks, Larry and/or Day and state each calculation you performed in determining this amount in sufficient detail so that the Defendants can duplicate those calculations.

**RESPONSE: I feel I am entitled to an amount the jury feels appropriate for the discrimination.**

19.     Describe any other monetary loss(es) you are claiming as a result of the alleged actions of Hicks, Larry and/or Day, and state each calculation you performed in determining this amount in sufficient detail so that the Defendant can duplicate those calculations.

**RESPONSE:**

| | | | 3 Months Wages Job Search |
|---|---|---|---|
| Salary @ Termination Date | | | |
| $  94,000.00 | | | $23,500.00 |
| Job Search Expenses | | | $ 5,471.00 |
| IRA Withdrawal | $ | 8,422.18 | |
| Penalty | | 10% $ | 842.22 |
| Tax | | 25% $ | 2,105.55 |
| Contrarian Fund 1yr Performance * 18 months | | 24.58% $ | 3,105.26 |
| Wage Differential * 18 months | | | $42,000.00 |
| | | | $77,024.02 |

20.    State any and all facts and alleged facts that support your claims for punitive damages in this case.

**RESPONSE: I feel I am entitled to an amount the jury feels appropriate for the discrimination.**

21.    State whether you have ever filed a petition for bankruptcy. If you have filed a petition for bankruptcy, please identify the case by court, case number, and year.

**RESPONSE: No.**

22.    Describe all efforts you have made to find employment since the time you left the employment of Piknik Products. Identify each employer with which you have sought employment, the date of such attempt, and the result of the inquiry.

**RESPONSE: I posted my resume on multiple web sites and mailed it to dozens of companies. I had interviews with the following companies:**

**1. Flieschmann's Vinegar , June 2005, Gerald Glaze/ Chris Grayson, No offer.**

**2. Whitfield Foods Inc., June 2005, Les Massey/ Joe Friday, offered position.**

**3. Southern Classic Foods, June 2005, Charles Caraway, offered position.**

**4. Wilson, Price, July 2005, Bill Barranco, no offer.**

**5. BKR Borland Benefield, July 2005, Dave Crawford, no offer.**

**6. Barfield, Murphy, Shank, and Smith, July 2005, Jack Knight, no offer.**

**7. Jackson Thornton, July 2005, James Pope, no offer.**

**8. Michael J. Catt CPA, July 2005, Mike Catt, no offer.**

**9. Till, Hester, Eyer and Brown, August 2005, Marty Brown, no offer.**

**10. Carpedia International, August 2005, Jenny Link, offered position.**

**11. Culotta and Scroggins, August 2005, Joel Scroggins, no offer.**

23.    Identify any offers of employment you have declined since the termination of your

employment with Piknik Products and the reasons therefore, and any conditions you have placed

upon prospective employment.

**RESPONSE: See response to Interrogatory 22 herein.**


Dated this the _____ day of April, 2007.


                                    _____
                                    BERT MAYER


SWORN TO AND SUBSCRIBED before me on this the ____ day of April, 2007.


                                    _____
                                    NOTARY PUBLIC
(SEAL)                              My Commission Expires:_____

RESPECTFULLY submitted this the __/1__ day of April, 2007.

K. ANDERSON NELMS (NEL022)

OF COUNSEL

Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been served upon the following by placing same in the United States mail postage prepaid and properly addressed on this the __/1__ day of April, 2007:

Bill McGowin
George Parker
Bob Poundstone
Bradley Arant Rose & White LLP
Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

OF COUNSEL

**ANNISSIA HANYARD**
3135 HIGH GREEN TRAIL
ATLANTA, GEORGIA 30349
(770) 969 -1235

Anthony Barber
Department of Human Resources
68 Mitchell Street SW
Suite 2107
Atlanta, Georgia 30303

May 2, 2005

Subject:    Resume of Annissia Hanyard for Process Engineer Position

Dear Mr. Barber:

Thank you for affording me the opportunity to submit my resume for consideration for the position of Process Engineer. As you review my resume you will find that my diverse professional experience and extensive educational background provide the perfect skill set to ensure success in this role. I have substantial front line management experience in beverage manufacturing and warehousing, vast experience in capital project management, and considerable experience in general management. I have combined the aforementioned experiential skill base with my educational acumen to create a powerhouse of technical ability and professional talent.

My experience in beverage manufacturing began in 1996 with the Pepsi Cola Company. As Production Supervisor, I gained a detailed understanding of not only the operation of each production line, but as well the challenges that each equipment operator faced in executing their day to day responsibilities, which included equipment operation, work process flow, and all related peripherals associated with achieving production targets. I was then able to successfully translate those learning into effective management of the day to day accountabilities of the production and quality control departments. I was further able to combine those learnings with my engineering background to develop and implement changes to equipment and work process flow to substantially improve productivity and equipment reliability. Under my leadership our team achieved numerous awards for quality, productivity, and safety.

In my experience as Warehouse Supervisor with the Pepsi Cola Company, one of my primary responsibilities was the implementation of the core principles of M & W 2000, the primary corporate initiative to improve manufacturing and warehouse efficiency. Under my leadership these principles were successfully implemented and our team moved from failing in warehouse efficiency to the number one position in a span of eight months. This position was maintained throughout my tenure. I was again able to apply my formal engineering training with my practical, day to day beverage manufacturing and warehousing experience to achieve outstanding results.

I have ten (10) years of capital project management experience with the Procter and Gamble Company, the Cintas Corporation, and the United States Department of Defense. In that time I have managed projects ranging from $2K to $200MM, with increasing levels of responsibility. My responsibilities included managing the engineering, design, construction, and start-up of capital improvement projects in various manufacturing facilities throughout the United States. My specific responsibilities ranged from those typical of a Construction Engineer, to the full responsibility of the Project Manager role. Cost management, scope management, schedule management, and management of human resources, including contracted services and personnel, were core responsibilities in each of my assignments. I have found these skills to be a tremendous asset, and universally necessary, regardless of the industry of application.

I have worked as a General Manager with the Aramark Corporation and Sodexho USA. The skill set that I acquired in these positions round out my professional development by providing essential business management experience. This experience allows me to approach my engineering efforts with the prospective of a business manager. This is certainly an invaluable combination and lends itself to outstanding contribution to both the technical advancement and business growth.

PLAINTIFF'S
EXHIBIT

If there are questions, or if additional information is needed please contact me at your convenience at 770-969-1235 at my home or at 678-207-6430 on my mobile phone.   I look forward to talking with you soon regarding this tremendous opportunity.

Sincerely,


Annissia Hanyard

# ANNISSIA HANYARD
### 3135 HIGH GREEN TRAIL
### ATLANTA, GEORGIA 30349
### (770) 969-1235

*Dynamic engineer with excellent managerial skills, exemplary organizational skills, and incomparable people skills. BS in Electrical Engineering with extensive expertise in all phases of capital project management (engineering, design, construction, and start-up), and executive level management experience. Proven track record in developing and motivating people to achieve superior results.*

## Work Experience

**SODEXHO, USA**
**2005-PRESENT**

**Director of Facilities.** Kennessaw, Georgia
Responsible for all aspects of account management for residential juvenile treatment center. Primary account scope focuses on comprehensive maintenance for a 220,000 square foot treatment campus including all mechanical, electrical, plumbing, and electronic systems. Manage all warranty resolution issues for effected facilities. Responsibilities include managing a staff of 22 employees (2 salaried), all facilities related contract services, capital projects, profit and loss, account growth, client relationships, strategic/long range planning, and site safety. Responsible for ensuring compliance will all state and local codes as they affect facility services.

**ARAMARK FACILITY SERVICES 2002–2004**

**Facility Manager.** Atlanta, Georgia
Responsible for all aspects of account management for Correctional Facility Maintenance. Primary account scope focused on comprehensive maintenance for a 600,000 square foot correctional campus, including all mechanical, electrical, plumbing, and electronic systems. Managed capital improvement projects through all phases of project life cycle, including engineering, design, construction, and start-up. Manage staff of 25 employees (5 salaried), profit and loss responsibility, account growth, building strong client relationships, strategic/long range planning, site safety, and installation/maintenance of the computerized maintenance management system (MAXIMO). Responsible for ensuring compliance with all state and local codes as they affected the facility services operation. Contract awarded for $1.4MM.

**General Manager.** Atlanta, Georgia
Responsible for all aspects of account management for Stadium facility services. Primary account scope focuses on minor maintenance and custodial. Managed staff of 200 employees (4 salaried), profit and loss responsibility, account growth, building strong client relationships, strategic/long range planning, and safety. Responsible for ensuring compliance with all state and local codes as they affected the facility services operation. Achieved 23% revenue growth vs. prior year in fiscal 2002. Contract awarded for $1.2MM.

**Facility Engineer.** Atlanta, Georgia
Responsible for managing daily accountabilities for correctional facility maintenance organization. Correctional facility houses approx. 3000 inmates. Responsibilities included fiscal management, establishing/implementing work processes, staffing and related functions for approx. 20 employees, developing strong client relationships, and engineering/management of capital improvement and repair projects. Responsible for electrical, HVAC boiler, plumbing, electronic and all other facility mechanical systems. Developed/Implemented preventive maintenance program, including associated software. Achieved 17% revenue growth vs. prior year in 2002.



PLAINTIFF'S
EXHIBIT
2  DEPO
MAYER

Resume' of Annissia Hanyard

**Work Experience (cont.)**

**CINTAS CORPORATION 1999- 2001**

**Service Manager.** Pembroke Pines, Florida.
Responsible for managing annual uniform rental volume of $7.2M, including profit and loss, developing strong customer relationships, establishing and achieving annual operating plans/targets, and managing the requirements of the production, service, and fleet departments.

**Corporate Capital Project Manager.** Milford, Ohio.
Responsible for managing engineering, design, construction, and start up of corporate level capital projects throughout the U.S. Specific accountabilities included management of project cost, schedule, scope, and procurement systems. Defined appropriation strategy, developed project execution strategy, and managed cross-functional project interfaces. Managed salaried and hourly personnel, and on-site construction organization. Project completed on schedule and well within predicted cost. Worked extensively as part of executive team to establish long-range corporate capital project development plan; devised implementation strategy.

**PEPSI COLA COMPANY 1996-1999**

**Product Availability Management.** Orlando, Florida.
Responsible for managing daily accountabilities of warehouse organization, including cost, staffing, and all components of route, bulk, and transport loading and product distribution. Lead process owner for implementation and execution of the primary corporate initiative for 1998-99, focusing on improving overall warehouse efficiency. Responsible for the management of hourly and salaried personnel. Implemented work processes resulted in the Orlando warehouse operation achieving 1st position in national rankings. Annual volume: 27M cases.

**Production Operations Management.** Orlando, Florida.
Responsible for managing daily accountabilities of production and quality control departments including cost, staffing, product quality, waste control, safety, and auxiliary corporate initiatives related to production and quality control. Responsible for the management of hourly and salaried employees; annual facility production: 25M cases. Best in class national rankings:

  ♦ Cost/Unit: Top 3 – 1996
  ♦ Quality: 2nd – 1996, Caleb Bradham Award Recipient – 1997
  ♦ Employee Morale: 1st – 1996
  ♦ Safety: 1st – 1996, 1997

**PROCTER AND GAMBLE COMPANY 1991-1996**

**Capital Project Manager.** Kansas City, Kansas.
Responsible for managing engineering, design, construction, and start up of soap manufacturing facilities throughout the U.S. Primary responsibility included 2nd phase of $42M capital project to provide capability to produce compact liquid soaps. Specific accountabilities included management of project cost, schedule, scope, and procurement systems. Defined appropriation strategy, developed project execution strategy, and managed cross-functional project interfaces. Managed salaried employees, and an average of 300 hourly personnel. Project completed on schedule and at 65% of predicted cost.

| | |
|---|---|
| **PROCTER AND GAMBLE COMPANY (cont.)** | **Capital Project Manager.** Cincinnati, Ohio.<br>Responsible for managing engineering, design, and construction phases of $3.5M capital project to improve production efficiency of granular detergents. Specific accountabilities included management of project cost, schedule, scope, and procurement systems. Led front-end engineering effort. Designed project startup program. Managed salaried and hourly employees and on-site construction organization. Project completed on schedule and within appropriation budget.<br><br>**Area Resident Engineer.** Cincinnati, Ohio.<br>Responsible for construction staffing, warehousing, space utilization management, and overall management of on-site construction organization. Managed 12 small construction projects ($50K - $200K) including scope definition, contractor selection, scope management, and project close out. Lead startup team for $200M capital project. Responsible for resolution of extensive punch list, identifying/organizing necessary startup documentation, and overall team organization. Managed salaried employees and an average of 200 hourly personnel. Successful project startup at 17% of capital cost, 8% better than industry standard. |
| **UNITED STATES DEPARTMENT OF DEFENSE 1987-1990** | **Contracts Inspector.** Maxwell Air Force Base, Alabama.<br>Responsible for construction site inspections of multiple small government contracts ($2K – $150K) to ensure progress and completion according to specifications set forth in the contract. Responsible for project execution from contract award through final close out. Additionally, managed maintenance contracts and maintained daily projects diary. (Co-op Assignment; GS-4) |
| **Education** | Bachelor of Science, Electrical Engineering<br>Tuskegee University, Tuskegee, AL.<br>August 1991 |
| **Other Training** | ♦ Construction Strategies and Management Training, Procter and Gamble Co., Cincinnati, OH. – January 1992<br>♦ Project Cost Management Training, Procter and Gamble Co., Cincinnati, OH. April 1992<br>♦ Total Quality Management Training, Procter and Gamble Co., Cincinnati, OH. January 1993<br>♦ Advanced Project Management Course, University of Texas-Austin, Austin, TX. April 1993<br>♦ Beverage Manufacturing Quality Control Training, Pepsi Cola Co., Arlington, TX. April 1996<br>♦ CAD Certification, University of Cincinnati, Cincinnati, OH., June 1999<br>♦ General Managers' College, Cintas Corporation, Cincinnati, OH. June 2000<br>♦ Facility Services Institute, Aramark Corporation, Downers Grove, IL. January 2003 |
| **Research** | ♦ Electromagnetic Susceptibility in Automobiles. General Motors. Milford, MI.<br>♦ Stress/Strain Analysis in Metals. Tuskegee University. Tuskegee, AL. |
| **Computer Skills** | ♦ Microsoft Word, Excel, Microsoft Project, Power Point, Access, MAXIMO, CAD, Lotus |

**Honors/
Interest**

- ◆ TQM Instructor for Procter and Gamble/Tuskegee University Leadership Development Conference
- ◆ Board of Director – Human Involvement Project, Inc.
- ◆ Member:  National Association of Female Executives, Outstanding Young Women of America, National Technical Association, Alpha Kappa Alpha, Inc.
- ◆ Advisor: Junior Achievement K-6 Program, Junior Achievement Business Training Project, Central American Peace Scholarship Program
- ◆ Instructor: Intermediate Project Management Seminars, Construction Management Seminars
- ◆ Pepsi Cola Right Side Up Achievement Award
- ◆ Interests: Domestic activities, travel, and reading.

**References**

Personal and professional references will be furnished upon request.