# Exhibit 8

In The Matter Of:

## JERRY A. MCCARTNEY, ET AL.
### v.
## ONYX CAPITAL VENTURES, LLC, ET AL.

## NO. 2:05CV1207-MHT

---

## ROBERT WINTER
## August 14, 2007

---



# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

## THE HIGHEST QUALITY IN COURT REPORTING

EXHIBIT

8

ALL-STATE LEGAL®

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 1 to 4)

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:05-CV1207-MHT

JERRY A. MACCARTNEY, et al.,
        Plaintiffs,
vs.
ONYX CAPITAL VENTURES, LLC, et al.,
        Defendants.

DEPOSITION
OF
ROBERT WINTER
August 14, 2007

REPORTED BY:  Heather Spier
        Court Reporter and
        Notary Public

## Page 2

1       S T I P U L A T I O N
2       IT IS STIPULATED AND AGREED,
3  by and between the parties, through their
4  respective counsel, that the deposition
5  of ROBERT WINTER may be taken before
6  Heather Spier, Court Reporter, and Notary
7  Public;
8       That the signature to and
9  reading of the deposition by the witness
10 is waived, the deposition to have the
11 same force and effect as if full
12 compliance had been had with all laws and
13 rules of Court relating to the taking of
14 depositions;
15      That it shall not be necessary
16 for any objections to be made by counsel
17 to any questions, except as to form or
18 leading questions, and that counsel for
19 the parties may make objections and
20 assign grounds at the time of trial, or
21 at the time said deposition is offered in
22 evidence, or prior thereto.
23

## Page 3

1       A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4       Mr. K. Anderson Nelms
5       Attorney at Law
6       Law Offices of Jay Lewis, LLC
7       P.O. Box 5059
8       Montgomery, Alabama 36103
9
10 FOR THE DEFENDANT:
11      Ms. Jennifer J. McGahey
12      Attorney at Law
13      Bradley, Arant, Rose & White
14      1819 5th Avenue North
15      Birmingham, Alabama 35203
16
17 OTHERS PRESENT:
18      Allison, Law Clerk
19
20
21
22
23

## Page 4

1       I N D E X
2               PAGE:
3  EXAMINATION BY MS. MCGAHEY............  6
4
5       E X H I B I T S
6
7  Defendant's Exhibit 1................ 170
8  Defendant's Exhibit 2................ 170
9  Defendant's Exhibit 3................ 201
10 Defendant's Exhibit 4................ 216
11 Defendant's Exhibit 5................ 254
12 Defendant's Exhibit 6................ 256
13 Defendant's Exhibit 7................ 270
14 Defendant's Exhibit 8................ 279
15 Defendant's Exhibit 9................ 289
16 Defendant's Exhibit 10............... 294
17 Defendant's Exhibit 11............... 317
18 Defendant's Exhibit 12............... 323
19 Defendant's Exhibit 13............... 326
20 Defendant's Exhibit 14............... 334
21 Defendant's Exhibit 15............... 352
22 Defendant's Exhibit 16............... 358
23

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 5 to 8)

Page 5

1    I, Heather Spier, a Court
2  Reporter and a Notary Public for the
3  State of Alabama at Large, acting as
4  Commissioner, certify that on this date,
5  pursuant to Rule 30 of the Alabama Rules
6  of Civil Procedure and the foregoing
7  stipulation of counsel, there came before
8  me at 401 Adams Avenue, Montgomery,
9  Alabama, on August 14, 2007, commencing
10  at 9:04 a.m., ROBERT WINTER, witness in
11  the above cause, for oral examination,
12  whereupon the following proceedings were
13  had:
14
15    ROBERT WINTER,
16  being first duly sworn, was examined and
17  testified as follows:
18
19    THE REPORTER:  Usual
20  stipulations?
21    MR. NELMS:  Yes.
22    MS. MCGAHEY:  That's fine with
23  me.

Page 6

1  EXAMINATION BY MS. MCGAHEY:
2    Q.   Good morning, Mr. Winter.
3    A.   Good morning.
4    Q.   If you could please state your
5  full name?
6    A.   Robert Winter, Robert Allen
7  Winter.
8    Q.   And, Mr. Winter, I understand
9  you go by Bob?
10    A.   Yes.
11    Q.   Have you gone by any other
12  names?
13    A.   No, that's it.  Robert, Bob.
14    Q.   We met a few moments ago.  My
15  name is Jennifer McGahey, and I am one of
16  the lawyers representing Mr. Hicks, Mr.
17  Day and Mr. Larry in a lawsuit that you
18  have filed against them.
19    A.   Uh-huh.
20    Q.   Have you ever given a
21  deposition before?
22    A.   Uh-huh.
23    Q.   How many times?

Page 7

1    A.   Well, in terms of a deposition
2  I know at least once, maybe twice.  It
3  may be more than that.  I think it's been
4  three or four times.  I mean, I'm going
5  back in memory now.
6    Q.   Okay.  Well, I would like to
7  go over just a few ground rules so you
8  and I are on the same page.
9    A.   Okay.
10    Q.   First of all, you understand
11  that you're under oath?
12    A.   Uh-huh.
13    Q.   And one thing is that if I ask
14  you a yes-or-no question, if you could
15  please respond with yes or no versus
16  uh-huh or uh-uh.  It's just easier for
17  Heather to take down your responses.
18    A.   Yes.
19    Q.   Also, if you answer audibly so
20  that Heather could hear you, that would
21  be great.
22    A.   Okay.
23    Q.   If you don't understand a

Page 8

1  question that I ask, please let me know,
2  and I will do my best to rephrase it.  If
3  you don't tell me that you didn't
4  understand the question, I will assume
5  that you did understand it.  Is that
6  fair?
7    A.   Yes.
8    Q.   If you need to take a break
9  for any reason, please just speak up and
10  we'll be happy to take a break.
11    A.   Okay.
12    Q.   Are you on any medications
13  currently?
14    A.   I take Propecia.  Is that a
15  medication?  It's for guys that lose
16  their hair.
17    (Off-the-record discussion.)
18    Q.   Besides Propecia are you
19  taking any other medications currently?
20    A.   No.
21    Q.   Have you had any recent memory
22  lapse or experienced any loss of memory
23  recently?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 9 to 12)

Page 9

1    MR. NELMS:  Be careful.  You
2  are a married man.
3    A.    No, I have not, that I can
4  recall.
5    Q.    And does the Propecia that
6  you're taking, does that have any impact
7  on your memory?
8    A.    Not to my knowledge, no.
9    Q.    Is there any reason that you
10  are aware of that impacts your ability to
11  testify truthfully today?
12    A.    Does the Propecia impact my
13  ability?
14    Q.    Anything, be it a health
15  condition or anything else going on that
16  may affect your ability to testify
17  truthfully today?
18    A.    Well, nothing should affect my
19  ability to testify truthfully.  I have
20  dropped off three children this morning
21  and took two hours to do that at three
22  different schools.  Other than that, and
23  waking up 4 o'clock with a newborn

Page 10

1  five-week-old baby, it's been a -- it all
2  started at four for me today, so I might
3  be tired a little later on.  Other than
4  that I should always -- yes, should be
5  telling you truth.  But I might be a
6  little groggy today.  I apologize.
7    Q.    Mr. Winter, can you please
8  tell me your date of birth?
9    A.    November 11, 1957.
10    Q.    And your Social Security
11  number?
12    A.    It's 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.
13    Q.    And what is your current
14  address?
15    A.    230 Cedar Ridge Drive,
16  Wetumpka, 36093.
17    Q.    How long have you lived at 230
18  Cedar Ridge Drive in Wetumpka?
19    A.    Let's see.  It will be six
20  years and three months.
21    Q.    So since 2001 roughly?
22    A.    Yes.
23    Q.    And who lives with you at this

Page 11

1  address?
2    A.    My wife lives there.  I have a
3  newborn, five-week-old newborn.  He lives
4  there.
5    Q.    Congratulations.
6    A.    Thank you.  She has a son from
7  a first marriage that is with us five
8  nights a week, and then I have two boys
9  that are with us on average three nights
10  a week.  That's our schedule.
11    Q.    What is your wife's name?
12    A.    Anita.
13    Q.    How long have you been married
14  to Anita?
15    A.    One year ago Sunday.
16    Q.    And your stepson, how old is
17  he?
18    A.    He's nine.
19    Q.    And what about your two sons,
20  how old are they?
21    A.    They're ten and fourteen.
22    Q.    Brandon is one of them?
23    A.    Brannon.

Page 12

1    Q.    Brannon?
2    A.    B-R-A-N-N-O-N.
3    Q.    Is he the fourteen year old?
4    A.    Yes.
5    Q.    Christian --
6    A.    Christian is the ten year old,
7  yeah.
8    Q.    Who was the mother of
9  Christian and Brannon?
10    A.    Angela Winter.
11    Q.    When did y'all get divorced?
12    A.    That would have been in August
13  of 2001.
14    Q.    And where does Angela live?
15    A.    She lives in Wetumpka.
16    Q.    How long were y'all married?
17    A.    Ten years, little over ten
18  years.
19    Q.    Before you lived at 236 Cedar
20  Ridge Drive where did you live?
21    A.    Did you say 236?
22    Q.    Yes, sir.
23    A.    It's 230.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 13 to 16)

Page 13

1    Q.    Okay.
2    A.    I lived at -- for about five
3  or six months I lived in some apartments
4  because I had to relocate from
5  Massachusetts. So I was in an apartment
6  for a period of time. It's called River
7  Oaks I believe is the name of the
8  apartment complex.
9    Q.    But that has been in the 2000
10  time frame when you moved to Montgomery?
11   A.    Yeah, came down in the Fall of
12  2000. That was during our divorce.
13   Q.    Has anyone else lived with you
14  at the 230 Cedar Ridge Drive besides your
15  children, your stepson and your current
16  wife, Anita?
17   A.    No.
18   Q.    Does Anita work?
19   A.    Not currently, no.
20   Q.    Before she had her baby did
21  she work?
22   A.    Uh-huh.
23   Q.    Is that a yes?

Page 14

1    A.    Yes, I'm sorry. Yes.
2    Q.    Where did she work?
3    A.    Rushton Stakely.
4    Q.    Rushton Stakely?
5    A.    Uh-huh.
6    Q.    What did she do at Rushton
7  Stakely?
8    A.    She was in office
9  administration.
10   Q.    Does she have any legal
11  training?
12   A.    No.
13   Q.    Does she plan on going back to
14  work?
15   A.    At some point, hopefully. Not
16  any time soon, but at some point.
17   Q.    How long has she worked at
18  Rushton Stakely?
19   A.    She was there maybe -- she was
20  only there a year.
21   Q.    Did she work for another law
22  firm prior to going to Rushton Stakely?
23   A.    No.

Page 15

1    Q.    Besides your marriage to
2  Angela and Anita have you been married
3  any other time?
4    A.    No.
5    Q.    Have you ever served in the
6  military?
7    A.    No.
8    Q.    Have you ever been arrested?
9    A.    No.
10   Q.    Now, you said that you have
11  given depositions either three or four
12  other times?
13   A.    Uh-huh.
14   Q.    Let's take them in order.
15  Tell me what your first deposition was
16  about, what the nature of the case was.
17   A.    The first one I recall was
18  back in 1983 I was a witness to -- there
19  was an accident that a person from the
20  company I work for was under the
21  influence of alcohol and suspected was
22  under the influence, and I was a witness
23  to her -- what was going on leading up to

Page 16

1  the accident. So I just gave the
2  information I knew. You know, so that
3  was what I was testifying about.
4    Q.    Where was that case pending?
5    A.    Where is it pending?
6    Q.    Where was it pending?
7    A.    It was in Atlanta.
8    Q.    Were you a party to that
9  litigation or just a witness?
10   A.    Just a witness, yeah. I was
11  not a party to that.
12   Q.    Did you end up having to
13  testify in court?
14   A.    No.
15   Q.    What was the next deposition
16  that you recall?
17   A.    Well, for clarity, I mean, I
18  don't recall taking a deposition, but I
19  did testify in court. So does that
20  count? Is that a deposition?
21   Q.    We'll take any sworn testimony
22  that you've done.
23   A.    Okay. Yeah, it was a court

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 17 to 20)

Page 17

1  case in Birmingham, Alabama.  The
2  district attorney had brought suit
3  against our company for violation of a
4  law against gaming.
5          They were -- they had
6  claimed -- the DA had claimed, not that
7  it matters, but at the behest of
8  Coca-Cola that our company, Pepsi Cola,
9  was violating a law regarding games of
10  chance that required -- I forget the
11  actual term they used, but it was
12  required you have to put money down.
13  Gambling, of course, was illegal.
14          And I had to testify in that
15  case.  And we did prevail, not that it
16  matters.  I was testifying on the fact
17  that I was intimately involved in the
18  development of that promotion.
19      Q.   Were you named as an
20  individual defendant?
21      A.   No, not that I recall, not
22  that I recall.
23      Q.   What is the next time that you

Page 18

1  can recall either giving a deposition or
2  other sworn testimony?
3      A.   Yeah, that would have been
4  during the -- during my divorce.
5      Q.   And I think you said that you
6  and Angela got divorced in August of
7  2001?
8      A.   Yeah.
9      Q.   Was that divorce proceeding
10  held in Montgomery?
11      A.   Well, it never went to trial.
12  We mediated, okay.  So I'm not sure how
13  to answer that question.
14      Q.   You reached a settlement?
15      A.   We reached a settlement, yeah.
16      Q.   And you and Angela share joint
17  custody of Brannon and Christian?
18      A.   We have joint legal.  She has
19  primary physical.
20      Q.   Besides what you have already
21  told me, has there been any other
22  occasion where you have given a
23  deposition or sworn testimony?

Page 19

1      A.   Not that I recall.
2      Q.   Have you ever filed for
3  bankruptcy?
4      A.   No.
5      Q.   Have you ever taped a
6  conversation with anyone?
7      A.   I think I taped a conversation
8  with my ex one time, and I don't even
9  know what I did with the tape now.  I
10  think it was one time I did that during a
11  very heated exchange of going through the
12  divorce.  It was actually after all the
13  settlement and everything.  As I recall,
14  there was -- I think I taped a
15  conversation with a stockbroker in like
16  1987 because -- yeah, I think -- as I
17  recall, I -- but it was -- no, I don't
18  normally tape conversations, but those
19  are the two I remember, yes.
20      Q.   Have you ever taped a
21  conversation with any former employee of
22  Piknik Products?
23      A.   No.

Page 20

1      Q.   Have you ever taped a
2  conversation with Chris Day?
3      A.   No.
4      Q.   Have you ever taped a
5  conversation with Jeff Larry?
6      A.   No.
7      Q.   Have you ever taped a
8  conversation with Henry Hicks?
9      A.   Nope.
10      Q.   We're going to talk about the
11  EEOC charge that you filed in this case.
12  Setting that aside for the moment, have
13  you ever filed any other claim of
14  discrimination with the Equal Employment
15  Opportunity Commission?
16      A.   No.
17      Q.   Where did you grow up?
18      A.   Well --
19      Q.   Is that a loaded question?
20      A.   No.  This is the twenty-first
21  city I've lived in.
22      Q.   Where did you go to high
23  school?

5

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 21 to 24)

Page 21

1     MR. NELMS: Do you consider
2  yourself an adult today?
3     A.   Yes.
4        MR. NELMS: That's why it's a
5  loaded question.
6     Q.   Where did you graduate from
7  high school?
8     A.   Fox high school in Arnold,
9  Missouri.
10     Q.   What year did you graduate
11  from high school?
12     A.   1976.
13     Q.   Did you go on to college?
14     A.   Yes.
15     Q.   Where?
16     A.   At Southeast Missouri State
17  University in Cape Girardeau, Missouri.
18     Q.   Did you receive a degree from
19  Southeast Missouri State?
20     A.   Yes.
21     Q.   In what year?
22     A.   1980.
23     Q.   What was your degree in?

Page 22

1     A.   It was a bachelor of science
2  in business administration.
3     Q.   Did you pursue any further
4  education after graduating for Southeast
5  Missouri State?
6     A.   No, I didn't. I mean, I took
7  a couple of classes as I recall, but
8  nothing -- I mean, I wasn't pursuing
9  another degree, no.
10     Q.   No MBA?
11     A.   No.
12     Q.   No grad school?
13     A.   No.
14     Q.   You said you took some other
15  classes. What kind of classes did you
16  take?
17     A.   I took a computer programming
18  class.
19     Q.   Where did you take that class?
20     A.   I think it was a school in
21  Connecticut. I can't remember the name
22  of it to be honest with you.
23     Q.   Did you complete the program?

Page 23

1     A.   Uh-huh.
2     Q.   Yes?
3     A.   Yes. I'm sorry.
4     Q.   Did you get some kind of
5  degree or certificate?
6     A.   No, no. It was just a course.
7     Q.   Any other courses or classes
8  that you have taken?
9     A.   Coursework, no, not that I can
10  think of.
11     Q.   I would like to go through
12  your employment history.
13     A.   Okay.
14     Q.   I take it that you went
15  straight from high school to college; is
16  that correct?
17     A.   That's correct.
18     Q.   So why don't we talk about
19  your employment history since you
20  graduated from Southeast Missouri State.
21     A.   Okay. You want me to tell
22  you?
23     Q.   Yes, sir, please.

Page 24

1     A.   I went to a work for a company
2  called Richardson-Vicks, Incorporated.
3  It's a consumer package good company.
4     Q.   Where was Richardson-Vicks,
5  Incorporated?
6     A.   Well, they were headquartered
7  in Wilton, Connecticut. My first
8  assignment with them was between my
9  junior and senior year in college. I did
10  a summer internship in Louisiana and
11  Mississippi. And then I graduated and
12  went to their corporate office in Wilton,
13  Connecticut and worked with -- they had
14  just bought two companies, and I was
15  involved in the marketing and
16  distribution side of that business.
17     Then they, six months later,
18  promoted me to a position in Atlanta,
19  Georgia. And then I ended up going
20  through a couple of different jobs in
21  that same company. And then I got
22  recruited by PepsiCo in 1983 I think it
23  was to join their company in Atlanta.

6

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 25 to 28)

Page 25

1    Q.   Let's stop there for the
2  moment.
3    A.   Okay.
4    Q.   You say Richardson-Vicks is a
5  consumer packaging company?
6    A.   Consumer products, consumer
7  packaged goods. Consumer packaged goods.
8  It's Oil of Olay, NyQuil, Pantene,
9  Formula 44, all that stuff.
10    Q.   So does a company, just for
11  example, like Oil of Olay contract with
12  Richardson-Vicks and Richardson-Vicks
13  bottles the product?
14    A.   We own the brand. We own the
15  bottling. We own all of it, yeah.
16    Q.   And you started at
17  Richardson-Vicks in around 1980?
18    A.   1980, right.
19    Q.   And you worked there until
20  1983?
21    A.   I worked for the company until
22  '83, yes.
23    Q.   Until you moved over to

Page 26

1  PepsiCo?
2    A.   Right.
3    Q.   And that was based in Atlanta?
4    A.   Yes. I was in Atlanta at the
5  time with Richardson-Vicks.
6    Q.   How long did you work for
7  PepsiCo?
8    A.   Let's see. From 1993 --
9    Q.   1983 or 1993?
10    A.   I'm sorry. 1983 to 1991.
11    Q.   What did you do for PepsiCo?
12    A.   In Atlanta I was a sales
13  representative calling on chain
14  convenience, chain mass merchandise,
15  chain drugstores. I was only in that
16  role six months. Then I got moved.
17    Q.   What position were you moved
18  to?
19    A.   I was moved to Jacksonville,
20  Florida for two years.
21    Q.   What did you do when you were
22  in Jacksonville?
23    A.   I worked with our regional

Page 27

1  franchise bottlers. They manufactured
2  the product and sold the product, and I
3  worked with them on their -- as the
4  PepsiCo rep. I was the representative.
5  Bottled, sold and marketed their products
6  in that North Florida and South Georgia
7  territory.
8    Q.   Did you have any other
9  positions with PepsiCo?
10    A.   Yeah. Then they moved me to
11  Birmingham, Alabama.
12    Q.   What was your position?
13    A.   Similar position as the one in
14  Jacksonville, only with a much larger,
15  much larger bottler.
16    Q.   Is this with Buffalo Rock?
17    A.   Buffalo Rock, yeah.
18    Q.   Any other position that you
19  held with PepsiCo?
20    A.   Yes. Then they moved me down
21  to Montgomery, and I ran the bottling
22  operation down here.
23    Q.   You say you ran the bottling

Page 28

1  operation. Is that a Pepsi owned
2  bottling versus a Buffalo Rock kind of
3  franchise bottler?
4    A.   Good question. Yeah. Buffalo
5  Rock did not own the franchise territory.
6  PepsiCo did. So they bought the
7  operation out. And so when they bought
8  it out they moved -- you know, they moved
9  more of their own people in to head it
10  up.
11    Q.   How long were you running the
12  bottling operation for PepsiCo in
13  Montgomery?
14    A.   Probably about a year and
15  three months.
16    Q.   What happened next?
17    A.   I ended up going to work for
18  Cadbury Schweppes.
19    Q.   Why did you leave PepsiCo?
20    A.   They actually had offered me a
21  severance package to leave the company.
22    Q.   What was going on with Pepsi
23  that caused them to offer you a severance

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 29 to 32)

Page 29

1  package, if you know?
2      A.   Well, there was -- there was a
3  lot of people that were being -- at that
4  time being outplaced.  Pepsi was going
5  through a very difficult time of
6  acquiring businesses.  And myself, my
7  boss, his boss and then the president of
8  the division, all of us eventually ended
9  up getting severance packages.
10     Q.   I'm sorry?
11     A.   All of us ended up getting
12  severance packages.
13     Q.   And did you accept the --
14     A.   Yes.
15     Q.   -- severance package --
16     A.   Oh, yeah.
17     Q.   -- from PepsiCo?
18     A.   Readily, readily, yeah.  Moved
19  on.
20     Q.   Was your job being eliminated?
21     A.   No.
22     Q.   They were just downsizing?
23     A.   No.  We all didn't hit our

Page 30

1  numbers, and we all paid the price.
2      Q.   One question I should have
3  asked you about before, besides this
4  litigation that we're talking about today
5  have you ever sued anyone else or any
6  other company before?
7      A.   No.
8      Q.   Have you ever been sued?
9      A.   No, I don't think so.
10     Q.   I mean besides your divorce
11  proceeding?
12     A.   Oh, yeah, that would be a sue
13  I guess.  No.
14     Q.   Other than this litigation and
15  your divorce proceeding, you've never
16  been a party to any litigation?
17     A.   No.
18     Q.   Is that correct?
19     A.   That's correct, yes.
20     Q.   So you left PepsiCo in 1990?
21     A.   Uh-huh, 1991.
22     Q.   1991.  And you went to work
23  for Cadbury Schweppes?

Page 31

1      A.   Uh-huh.
2      Q.   When did you start working for
3  Cadbury Schweppes?
4      A.   It was sometime around May or
5  June of 1991.  I think it was May.
6      Q.   Where was Cadbury Schweppes?
7  Where were you working for them?
8      A.   That was -- I wasn't in the --
9  well, the position was in Atlanta,
10  Georgia, although I didn't live there for
11  the first five months.  I eventually
12  moved there.  Yes, the position was
13  headquartered in Atlanta.  I joined them
14  working out of the Atlanta operation.
15     Q.   I'm sorry?
16     A.   I joined them out of the
17  Atlanta operation.
18     Q.   What were you doing for
19  Cadbury Schweppes?
20     A.   I was calling on their
21  regional bottlers that bottled and
22  distributed our products.
23     Q.   Similar to what you were doing

Page 32

1  for PepsiCo when you were in Jacksonville
2  and Birmingham?
3      A.   Yes, very similar.
4      Q.   What other positions did you
5  hold with Cadbury Schweppes?
6      A.   Well, they moved me in the
7  spring -- I think March of '93 they moved
8  me to their corporate office, their U.S.
9  based office in Stanford, Connecticut.
10     Q.   And what were you doing in the
11  corporate office?
12     A.   I was their -- they called it
13  a National Sales Planning Manager.
14     Q.   What does that position
15  entail?
16     A.   Well, I mean, it's -- I was --
17  the best way to describe it is I was like
18  chief of staff for the VP of Sales and
19  then the president of the company.  So a
20  lot of direct reports.  I had a lot of
21  direct reports out of that office.
22     Q.   So you were reporting directly
23  to the VP of Sales?

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 33 to 36)

Page 33

1     A.   Yes.
2     Q.   And to the president?
3     A.   Well, VP of Sales first, and
4  then he went away and then the president.
5     Q.   So you headed up sales for all
6  of Cadbury Schweppes?
7     A.   It was -- no. They had
8  another VP of Sales brought in, but I was
9  like his right-hand person. I mean, I
10  had a lot of the internal reports were
11  reporting to me, and I was managing a lot
12  of his just administrative tasks as
13  relates to the salesforce. They reported
14  to him. They did not report to me.
15     Q.   How long were you the, quote,
16  unquote, chief of staff? Although, was
17  that your -- is that your title?
18     A.   No, no. It was what's called
19  National Sales Plan Manager. The reason
20  I use that term is you asked what does it
21  entail.
22     Q.   Sure.
23     A.   That's the best way to

Page 34

1  describe it.
2     Q.   How long were you the National
3  Planning Sales Manager?
4     A.   I think that was probably from
5  19 -- March of '93 to March of '95.
6  Yeah, two years.
7     Q.   What did you do next?
8     A.   Then our company bought Dr.
9  Pepper out of Dallas, and they sent me
10  down there to be the transition manager,
11  transition liaison, Ombudsman. I'm not
12  sure how to describe that job. But I was
13  the first person in the building from
14  this company that had just acquired them.
15  So there was a lot of nervousness, a lot
16  of tension, a lot of anxiety, and I was
17  there to help dispel some of that.
18     Q.   Was there a bottling operation
19  in Dallas?
20     A.   Oh, yeah, yeah. Cadbury
21  Schweppes at the time didn't own it, but
22  there was one there, yes.
23     Q.   So Cadbury Schweppes purchased

Page 35

1  or acquired Dr. Pepper?
2     A.   They acquired Dr. Pepper,
3  7-Up, which is the parent company for the
4  brands and owned the rights and
5  privileges to the brands. At the time --
6  at the time that -- I don't recall them
7  owning a lot of bottling facilities.
8     Q.   Okay. So you were transferred
9  to Dallas to make that transition from
10  being a Dr. Pepper owned company to a
11  Cadbury owned company go smoothly?
12     A.   Right, to help in that
13  transition, yes.
14     Q.   How long were you in Dallas?
15     A.   I was only there from March
16  until August or September. It wasn't a
17  long assignment.
18     Q.   In 1995?
19     A.   1995, yes. It was -- at the
20  time it was their largest acquisition to
21  date.
22     Q.   And what did you do next?
23     A.   Well, then after the

Page 36

1  acquisition, after all that occurred,
2  then I moved back to Stanford and headed
3  up a division, a new division. And I was
4  director of what they call the rural
5  Director of Bottling Operations. And we
6  were forming an internal consulting
7  practice to work with our bottlers to
8  help them in their operation.
9     Q.   How long were you Director of
10  Bottle Operations?
11     A.   That would have been from '95
12  to -- '95 to '99, June of '99. Yeah,
13  June of '99.
14     Q.   What happened next?
15     A.   One of the bottlers I was
16  consulting with hired me away from the
17  company.
18     Q.   And what bottler was that?
19     A.   That was -- the name of the
20  company was Polar Beverages.
21     Q.   Where was Polar Beverages?
22     A.   That were out of Worcester,
23  W-O-R-C-E-S-T-E-R, Massachusetts.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 37 to 40)

Page 37

1    Q.    Worcester.  So Polar Beverages
2  was a bottling operation?
3    A.    Yes.
4    Q.    What were you doing for Polar
5  Beverages?
6    A.    I was their VP of Logistics &
7  Strategic Planning.
8    Q.    What did you do as VP of
9  Logistics & Strategic Planning?
10    A.    Well, a couple of things.  One
11  was I was -- my first focus was on
12  integrating an acquisition they had just
13  made.  That was a very challenging
14  acquisition.  They were very unprepared
15  for it.  And then after that we absorbed
16  that, and then I started focusing my
17  attention on the inefficiencies in their
18  supply chain.
19    Q.    What do you mean by
20  inefficiencies in their supply chain?
21    A.    Well, I mean, all businesses,
22  you know, are -- all businesses have
23  business practices and business processes

Page 38

1  that have to be reviewed strategically,
2  usually by someone that's, you know, been
3  involved in a number of different prior
4  engagements or assignments.
5        And, yeah, you, through -- you
6  know, by bringing unique ideas and other
7  solutions you've worked with, you know,
8  or just you strategically think through
9  your options and you come up with a
10  better option and you ring costs out of
11  the business through process of
12  reengineering.
13        I can give you all the
14  specifics, but I don't think you want to
15  know that.  Yes, that's what I did.  And
16  I also helped them understand how to look
17  at their business from a much more
18  rigorous standpoint economically and make
19  better decisions with where to spend
20  resources.
21    Q.    How long were you VP of
22  Logistics & Strategic Planning?
23    A.    I was there -- I was there

Page 39

1  from June of '99 until I left in November
2  of 2000 because my wife at the time had
3  announced at the time she wanted a
4  divorce.
5    Q.    Was she living in Wochester at
6  the time?
7    A.    Yes.  Yeah, we were together.
8    Q.    Where did you go after you
9  left Polar Beverages in November of 2000?
10    A.    That's when I went to Piknik.
11    Q.    How did it come that you
12  relocated to Montgomery?
13    A.    Yeah.
14    Q.    Piknik was in Montgomery?
15    A.    Well, she moved ahead of me,
16  packed the kids up and brought them on
17  down to Montgomery.  So I would fly down
18  every couple of weeks to spend time with
19  the kids.  I mean, it wasn't official at
20  the time we were going to be divorced,
21  but I was working to reconcile the
22  marriage.  And during that time I was
23  traveling down here I was -- I was

Page 40

1  aggressively reaching out to companies.
2  And I was referred to Piknik Products by
3  a local banker in town that knew the
4  owner, Ricky Loeb.  So I interviewed with
5  him.  He offered me a job, and I took it
6  immediately.
7    Q.    And you started with Piknik I
8  think the end of October of 2000?
9    A.    Yeah, it was like end of
10  October, beginning of November, somewhere
11  around there.
12    Q.    Who was the local banker who
13  knew Ricky Loeb?
14    A.    A guy named Ray Petty.
15    Q.    What bank was he with?
16    A.    SouthTrust.
17    Q.    Is he still with SouthTrust or
18  Wachovia?
19    A.    No, he is not.
20    Q.    Who was Ricky Loeb?
21    A.    He was the owner of Piknik.
22    Q.    In the pre-Piknik jobs you
23  were telling me about, did you ever

10

JERRY A. MCCARTNEY, ET AL.                                        ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                August 14, 2007

(Pages 41 to 44)

Page 41

1  receive any discipline?
2      A.   In a pre-Piknik job. I don't
3  know -- you mean like a reprimand or a
4  write-up?
5      Q.   Yes.
6      A.   I don't know of any. I mean,
7  I don't know if any.
8      Q.   And during your employment
9  history before you worked at Piknik were
10  you ever terminated from a job?
11      A.   You could argue that the Pepsi
12  position was a termination. Yes, you
13  could make that argument although it was
14  packaged as a severance. They had
15  offered to move me, and I refused it.
16  They wanted to move me to Austin. I
17  didn't want to move to Austin. So I
18  don't know if that's a termination. It
19  was a package, and I left.
20      Q.   So PepsiCo offered you a
21  position in Austin, Texas instead of a
22  severance package?
23      A.   They had offered that a few

Page 42

1  months -- I mean, a couple of months
2  before and said we want to move you to
3  this other city, and I said I don't want
4  to move there. Then two months later
5  they came in and said we're going to give
6  you this package and we want you to
7  resign and go on. I mean, I guess it
8  could be technically called a
9  termination, but it was all kind of
10  packaged in a series of events.
11      Q.   Let's talk about how you come
12  to be employed at Piknik. And you've
13  already told me that Ray Petty, who was a
14  local banker with SouthTrust, had told
15  you about Ricky Loeb; correct?
16      A.   Say that to me again.
17      Q.   Sure. Why don't you tell me
18  about your conversation or conversations
19  with Ray Petty?
20      A.   Oh, okay. Went to visit Ray.
21      Q.   Did you know Ray previously?
22      A.   Yes. We weren't close
23  friends, but I knew him. And my

Page 43

1  father-in-law at the time worked for him
2  at one point. So I went to see Ray. Ray
3  called Ricky on the phone. Ricky said
4  send him on over, and I went over and
5  interviewed with Ricky that same day.
6      Q.   Did you meet with anyone else
7  besides Ricky Loeb?
8      A.   You mean at Piknik?
9      Q.   Correct. Well, I understand
10  you went -- the same day that you spoke
11  with Ray Petty you went that same day to
12  speak with Ricky Loeb; correct?
13      A.   Uh-huh.
14      Q.   Is that a yes?
15      A.   Yes, yes.
16      Q.   Did he interview you?
17      A.   Yes.
18      Q.   Was anyone else present during
19  the interview?
20      A.   For a very short period of
21  time he brought in his CPA.
22      Q.   Who?
23      A.   A gentleman named Chuck

Page 44

1  Carraway. And he was there maybe five
2  minutes for the interview.
3      Q.   Did Mr. Carraway ask you any
4  questions?
5      A.   Not that I recall. I don't
6  recall him asking any questions.
7      Q.   Was anyone else present during
8  the interview process?
9      A.   No.
10      Q.   What job were you interviewing
11  for?
12      A.   Well, Ricky was in the process
13  of replacing Chuck Carraway -- I didn't
14  know all this at the time -- and he had
15  been advised by a consulting firm he had
16  been talking to, and they were advising
17  him to bring in some talented operations
18  and beverage folks that could help him
19  run his business more effectively.
20         So that's what prompted him
21  to, you know, reach out and -- I mean,
22  Ray apparently knew -- Ray Petty
23  apparently knew Ricky's desire to either

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 45 to 48)

Page 45

1   replace Chuck or hire additional outside
2   talent or whatever. So when Ray
3   connected the dots -- he knew I wanted to
4   move to Montgomery. He knew I was going
5   through a divorce. I had beverage
6   experience, quite a bit of it. That's
7   when he connected us. Does that answer
8   your question?
9       Q.   Was Chuck Carraway -- you said
10   he was a CPA; correct?
11      A.   Yeah, he was a CPA. He was
12   introduced to me as CPA.
13      Q.   Was he somehow involved in
14   operations?
15      A.   Yes, he was.
16      Q.   At Piknik?
17      A.   Yes, he was, yes. Again, at
18   the time I didn't know that. He was just
19   introduced to me as the CPA.
20      Q.   So you interview with Ricky
21   Loeb; correct?
22      A.   Yes.
23      Q.   Did you receive a job offer

Page 46

1   that day?
2       A.   No.
3       Q.   Did you have any more
4   interviews after that initial interview
5   with Ricky Loeb?
6       A.   Uh-huh.
7           MR. NELMS: Is that a yes?
8       A.   Yes, yes. I'm sorry.
9       Q.   Who else did you interview
10   with?
11      A.   Well, there was some
12   correspondence between Ricky and I. And
13   somewhere along the way, I can't remember
14   if it was before or after this meeting in
15   the Holiday Inn, he had -- I was in town,
16   let him know I was coming, and he met --
17   he called me to meet him over at this
18   Holiday Inn off of Southern Boulevard
19   near the company.
20          And I was there
21   along -- and a gentleman named Mike
22   O'Connell joined us for the first time,
23   and a gentleman named Steve Alexander

Page 47

1   joined the discussion as well.
2           Ricky was essentially
3   offering -- talking to myself and Steve
4   Alexander about joining the company,
5   Steve in a position of CFO and me in the
6   position of VP of Operations and Sales &
7   Marketing. So we met with him and Mike
8   O'Connell who, it turned out, was his
9   consultant. And that was the last
10   interview.
11      Q.   So there's a meeting at the
12   Holiday Inn?
13      A.   Right.
14      Q.   You're present along with
15   Ricky Loeb, Steve Alexander and Mike
16   O'Connell?
17      A.   Right.
18      Q.   Mike O'Connell at the time is
19   just a consultant?
20      A.   Right.
21      Q.   He's not an employee of
22   Piknik?
23      A.   To my knowledge at the time he

Page 48

1   was not, right.
2       Q.   Steve Alexander was not an
3   employee of Piknik at the time?
4       A.   No, he was not.
5       Q.   It was your understanding that
6   he was being asked to join Piknik as the
7   CFO?
8       A.   Right, right. He was being
9   recruited as the CFO. He had actually
10   just relocated to Atlanta to take a
11   different job, and they were recruiting
12   him to stay in Alabama.
13      Q.   And did Ricky Loeb make you a
14   job offer during this meeting at the
15   meeting?
16      A.   It wasn't a, like a -- it
17   wasn't a written offer, but it was a
18   verbal we-want-you-to-join-the-company
19   type of discussion. It was -- he didn't
20   look at me and say "I want you to join
21   the company, will you join this company."
22   It was more along the lines of we've been
23   talking, you're on board, Steve, are you

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 49 to 52)

Page 49

1  board. And then the official letter came
2  later.
3      Q.    And the discussion was that
4  you would join as VP of Operations and
5  Sales & Marketing?
6      A.    I'm trying to remember the
7  actual title. I think it was VP of
8  Operations. But part of the problem was
9  it encompassed sales, marketing,
10  operations and -- I mean, it encompassed
11  a lot of things. I think the title was
12  VP of Operations, yes.
13      Q.    Did you talk about salary
14  during this meeting?
15      A.    No.
16      Q.    You said that you had some
17  correspondence with Ricky Loeb that had
18  led up to this meeting at the Holiday
19  Inn; is that correct?
20      A.    Yes.
21      Q.    Do you have copies of that
22  correspondence?
23      A.    I don't have it with me. I

Page 50

1  mean, I'm sure that that exists. But
2  basically the correspondence was things
3  like -- you know, it was -- I mean, I was
4  making a hundred and thirty-five thousand
5  dollars at the time, and I had a very
6  lucrative car allowance. And Ricky was
7  offering me eighty-five thousand to join
8  the company, and so -- but it was, you
9  know, the market economics were a little
10  different too. So I was angling for a
11  percentage of the business.
12      Q.    That's what the correspondence
13  was about?
14      A.    Well, I mean it was peppered
15  in there among other things, you know,
16  things like -- actually, it was
17  correspondence from me to him saying,
18  Ricky, here's how I think I can help your
19  company, you know, and for that here's
20  what I expect. And his correspondence
21  was, well, you know, the company can't
22  pay those kind of salaries at this point,
23  but help me recover from the situation

Page 51

1  I'm in and, you know, we'll talk about
2  that down the road.
3      Q.    So you were saying that you
4  were making a hundred and thirty-five
5  thousand at Cadbury when you left?
6      A.    No.
7      Q.    Or, I'm sorry, at Polar?
8      A.    At Polar, yeah.
9      Q.    So after this meeting at the
10  Holiday Inn you said that there was an
11  official letter stating an offer of
12  employment from Piknik; correct?
13      A.    Uh-huh. Yes, yes.
14      Q.    Do you still have that letter?
15      A.    I don't know. If I do, it's
16  probably in that big box of divorce
17  documents, because during that proceeding
18  they wanted all those documents, and I
19  provided those. And if it exists, it's
20  probably in that big stack, and I would
21  have to go look for it, yes. It wasn't
22  fancy. It was about two paragraphs.
23      Q.    And you accepted the job?

Page 52

1      A.    Uh-huh. Yes.
2      Q.    And you started late October,
3  early November 2000?
4      A.    Yes.
5      Q.    What was your title when you
6  started?
7      A.    As I recall, the title at that
8  time was VP of Operations.
9      Q.    Who did you report to?
10      A.    I reported to Ricky and to
11  Mike O'Connell.
12      Q.    Was Mike O'Connell still a
13  consultant?
14      A.    No. He had joined the company
15  at that time as the chief operating
16  officer.
17      Q.    And Ricky Loeb, was he CEO?
18      A.    I think he called himself -- I
19  think he -- yeah, I think he referred to
20  himself as president and CEO. He was the
21  owner.
22      Q.    As VP of Operations did you
23  have folks report to you?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 53 to 56)

Page 53

1    A.   Uh-huh. Yes, I did.
2    Q.   Who reported to you?
3    A.   Oh, man. You want names or
4  functions?
5    Q.   Functions.
6    A.   Quality assurance, production
7  manager, maintenance manager. There was
8  like a couple of financial
9  administration, like a financial manager
10  position. Ops financial manager position
11  reported to me. As I recall, there were
12  six positions, but off the top of my head
13  I can't think. They're not coming to me
14  right away.
15    Q.   Was there a salesforce
16  reporting to you?
17    A.   No. I was -- in that capacity
18  I was kind of the salesforce.
19    Q.   You were the one and only
20  salesperson at Piknik at that time?
21    A.   At that time I would be
22  considered the only salesperson, yes,
23  within the -- within the bottling side of

Page 54

1  the business, yes.
2    Q.   What is the other side of the
3  business besides bottling?
4    A.   There was a condiment division
5  where they did condiments, mayonnaise.
6  And they did have a salesforce, small
7  salesforce, and that was really headed up
8  by Ricky. Ricky would be considered the
9  primary salesperson representing the
10  condiments.
11    Q.   So Ricky was heading up the
12  condiments side of the business; right?
13    A.   Yeah, yeah.
14    Q.   And you were heading up the
15  beverages side of the business, or does
16  bottling entail more than beverages?
17    A.   No. Bottling was just
18  beverages, yeah. Going back a few years
19  ago, but, yeah, Ricky was -- Ricky had
20  the knowledge about the condiments,
21  pricing, the customers. He had grown up
22  in that business, so he kind of held on
23  to that part of the sales side of the

Page 55

1  business. I'd come from beverages,
2  understood that business real well. He
3  readily handed that over.
4    Q.   What was Piknik bottling
5  beveragewise?
6    A.   Beveragewise they were
7  bottling Gatorade. They were bottling
8  Tropicana Smoothies. They were
9  bottling -- are you talking about when I
10  first went there or later on?
11    Q.   Let's talk about when you
12  first got there.
13    A.   Yeah, they were bottling
14  Gatorade, Tropicana. There was a product
15  from P&G called Elations they were
16  bottling.
17    Q.   And you say P&G. Is that
18  Proctor & Gamble?
19    A.   Proctor & Gamble, right. And
20  they were bottling -- well, they weren't
21  bottling yet, but they were beginning to
22  bottle a product called Tropicana
23  Season's Best. That was it, Tropicana

Page 56

1  Season's Best. They were bottling
2  Hershey Chocolate and Aunt Jemima syrups.
3  Those aren't beverages, but they were in
4  the bottling operation that we were
5  managing.
6       MR. NELMS: Is this a good
7  time for a break?
8    A.   Yes, it is.
9       MS. MCGAHEY: Sure.
10       (Whereupon, a break was taken
11       from 9:56 to 10:08 a.m.)
12    Q.   (BY MS. MCGAHEY) Mr. Winter,
13  I think the easiest way to do things,
14  let's first just tell me all the
15  positions you held when you were with
16  Piknik. I know that you were Vice
17  President of Operations when you first
18  started; correct?
19    A.   Yes.
20    Q.   And that was in, again, late
21  October or early November of 2000;
22  correct?
23    A.   Yes.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 57 to 60)

Page 57

1  Q. How long did you have the
2  title of VP of Operations?
3  A. Well, the title or the role?
4  Q. Let's talk about the title.
5  A. Okay. The title was until
6  about -- until maybe early 2002 maybe.
7  Somewhere around 2002 the COO was
8  basically set aside, and Ricky stepped
9  back in as the president. And I had
10  the -- we had hired an operations manager
11  to head up operations, and so I took --
12  when Ricky came back in we had this
13  gentleman report directly to Ricky, and I
14  took over and focused squarely on the
15  sales, marketing, customer relations,
16  on-boarding, did financial -- held the
17  financial meetings.
18  I mean, I was doing a number
19  of roles, but the title was VP of -- I
20  think at the time they called me VP of
21  Operations and Sales & Marketing, but I
22  would have to go back and look at those
23  e-mails. Off the top of my head I can't

Page 58

1  remember. But that was probably 2002.
2  And then when Onyx took
3  control of the company in 2003 they put
4  Henry Hicks in as VP of Sales &
5  Marketing, and I think they changed my
6  title at the time to VP of -- man, I know
7  I'm going to botch this, but it was like
8  VP of Administration maybe.
9  Q. Would it be VP of Contract
10  Administration, does that sound familiar?
11  A. I don't remember if -- I mean,
12  there were so many titles under Henry I
13  have to think through them. I mean, I
14  always did the same job, but just the
15  titles kept changing. I think it was VP
16  of maybe administration. Then it was VP
17  of Purchasing and then VP of -- I may
18  have those twisted. Somewhere along
19  the -- the last title I had under Henry
20  was Director of Customer Relations I
21  think. There was about three or four
22  titles, yes.
23  Q. You were VP of Operations

Page 59

1  until early 2002; correct?
2  A. Right.
3  Q. You said the COO, which is the
4  chief operations officer, correct, was
5  set aside?
6  A. He was moved out of the
7  company, out of the day-to-day operations
8  of the company.
9  Q. Who was the COO?
10  A. That was Mike O'Connell.
11  Q. Was he terminated?
12  A. No. He was taken out of the
13  day-to-day operating role.
14  Q. Did he assume some other role?
15  A. Yeah, he was -- my
16  understanding at the time was his job was
17  to find a -- to find a buyer or an
18  investment partner or something like
19  that. He was supposed to go off and
20  either find financing or an investment
21  partner or a buyer or something,
22  something to that effect.
23  Q. Was Piknik having financial

Page 60

1  difficulties during this time?
2  A. They were having -- well, they
3  were having a lot of financial
4  difficulties when I came there, which is
5  what precipitated the removal of the
6  current senior manager.
7  We, of course, turned that
8  around in short order, but the banks were
9  -- the banks were pressuring Ricky to do
10  something to become more stable, more
11  financially stable. I think they were --
12  they were exposed to a certain amount of
13  risk for the debt that they had, so they
14  were trying to manage down that risk.
15  Q. You said that under the prior
16  senior management there were financial
17  difficulties; correct?
18  A. Yeah. When I got there they
19  were losing half a million dollars a
20  month.
21  Q. And that's what precipitated
22  the regime change?
23  A. Yes.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 61 to 64)

Page 61

1     Q.   And that's when you came on
2 board?
3     A.   Right. When O'Connell came on
4 board and Steve Alexander came on board,
5 all around the same time.
6     Q.   But in early 2002 Piknik
7 started having or was having financial
8 difficulties again?
9     A.   Well, let's back up. When I
10 got there in 2000 they had just built a
11 new beverage manufacturing facility.
12     Q.   Was that the Day Street or was
13 that --
14     A.   Alatex. And they were -- they
15 had -- they were late getting it up.
16 There was a number of issues. It was
17 before my arrival. But when I arrived
18 there we had to quickly stop the -- stop
19 the bleeding. They were losing half a
20 million dollars a month. And we were
21 able to turn that around and to break
22 even by August of the following year and
23 enable us to stay cash positive so we

Page 62

1 could continue to operate.
2     Q.   So by August 2001 the company
3 was breaking even?
4     A.   From a cash flow standpoint,
5 yes, which is the number one reason why
6 companies go bankrupt, they run out of
7 cash.
8     Q.   But the bank was still
9 pressuring Ricky to become or to make
10 Piknik a more stable company?
11     A.   My understanding was they
12 were -- they were wanting him to do
13 something, either, you know, sell it,
14 infuse additional capital into the
15 business. I mean, we were breaking even,
16 but it was -- you know, here's a bank
17 that's got fifteen million dollars --
18     Q.   They want to see the company
19 making money?
20     A.   They want to see the company
21 making a lot of money in order to --
22     Q.   Pay that debt down?
23     A.   Yes.

Page 63

1     Q.   Do you know how big the debt
2 was?
3     A.   I think it was around -- I
4 think the debt was somewhere between
5 twelve and fifteen million dollars. And
6 they had like different notes out there,
7 but I think in total it was around twelve
8 or fifteen million.
9     Q.   All through SouthTrust?
10     A.   My understanding was it was all
11 through SouthTrust.
12     Q.   Did you ever have dealings
13 with SouthTrust about the financial
14 situation of the company?
15     A.   Yeah, I had a couple of
16 meetings with them.
17     Q.   We'll talk about that. But in
18 early 2002 SouthTrust was wanting
19 something to change to make the company
20 more stable, as you say, or start having
21 positive cash flow?
22     A.   They were -- we had met with
23 them, for example, in -- we had met and

Page 64

1 presented, you know, our business plan
2 and the fact that we had turned the
3 corner and began to show a profit. And
4 when I say profit, it wasn't substantial
5 profits, but we weren't losing half a
6 million dollars anymore. We were
7 breaking even for the first time.
8     And I think they were -- they
9 were concerned because this business had
10 some ups and downs, and I think they were
11 just -- they want wanting something to be
12 done, either we, you know -- and I'm
13 working off of memory. And I'm also not
14 intimately familiar with all those
15 discussions because a lot of those were
16 between Ricky and the bank and Mike and
17 the bank at the time.
18     So I was the guy behind the
19 scenes doing all the -- creating the
20 presentation, working with the CFO to
21 create the, you know, the presentation,
22 explaining the business and the economics
23 of the business in terms of the

JERRY A. McCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                           August 14, 2007

(Pages 65 to 68)

Page 65

1  operating, not the financial side, and
2  how we were going to turn the corner.
3  And so that's the part I was intimately
4  familiar with. Not so much were they --
5       I mean, I'm a little careful
6  here trying to explain the relationship
7  with the bank because I presented to the
8  bank, but behind the scenes I don't know
9  what Ricky and the bank talked about.
10      Q.   So during this time frame you
11 met with folks from SouthTrust?
12      A.   Uh-huh. Yes, I did.
13      Q.   Was it just one meeting?
14      A.   It was several, as I recall.
15 We had several meetings with them.
16      Q.   In the meetings that you
17 attended Ricky Loeb was there?
18      A.   Uh-huh, yes.
19      Q.   Mike O'Connell was there?
20      A.   To my knowledge, yes, he was,
21 he would have been there.
22      Q.   Was Steve Alexander present?
23      A.   Yes, Steve would have been

Page 66

1  there.
2       Q.   Anyone else from Piknik?
3       A.   I would have been there and
4  probably a guy by the name of Bill Rodman
5  would have been in that room I assume.
6       Q.   Who was Bill Rodman?
7       A.   He was like the production
8  manager at the time. I don't recall him
9  being there, but I'm thinking he might
10 have been there.
11      Q.   Who from SouthTrust was
12 present?
13      A.   I don't remember their names.
14 I do remember one guy's name only because
15 it was a strange last name, a guy named
16 Wayne Durlocker. He's deceased
17 unfortunately. And, as I recall -- I
18 can't recall whether Andy Raines was
19 there or not. Andy was our main contact
20 with the bank, and I can't recall whether
21 he was in the meeting or not. It seems
22 to me it was Wayne and somebody else.
23 But there was like three people from

Page 67

1  SouthTrust. I think Wayne was in the
2  second meeting. Andy and his partner, or
3  whoever he was with, may have been in the
4  first meeting.
5       Q.   So do you recall two meetings?
6       A.   I recall two meetings, yes.
7       Q.   And you came up with a
8  presentation for the first meeting?
9       A.   Yes.
10      Q.   Was it a PowerPoint
11 presentation?
12      A.   Well, I mean, I came up with
13 part of it. Steve Alexander worked on
14 part of it, and I worked on part of it,
15 and we worked on it together.
16      Q.   Was it PowerPoint?
17      A.   Yes, it was PowerPoint.
18      Q.   Do you still have it?
19      A.   Matter of fact, it should have
20 been -- it's on the disk I gave. I'm
21 sure it's there somewhere. Yes, I'm sure
22 I've got it probably somewhere. You're
23 more than welcome to it, sure.

Page 68

1       Q.   Well, I know in your discovery
2  responses you mentioned a PowerPoint
3  presentation.
4       MS. MCGAHEY: I haven't gotten
5  a copy of it yet, Andy, and I know I sent
6  you some letters about that.
7       A.   Well, I mentioned two
8  PowerPoint presentations. Which one are
9  you referring to?
10      Q.   Well, we'll talk about your
11 interrogatory responses because we
12 haven't received responses to our request
13 for production from you. But you
14 reference a PowerPoint presentation in an
15 e-mail. But there are multiple
16 PowerPoint presentations; is that what
17 you're saying?
18      A.   Hundreds. You mean during the
19 course of my tenure there? There's tons
20 of them from Onyx and tons of them from
21 all of us, yeah.
22      Q.   But the PowerPoint
23 presentation that you submitted or you

JERRY A. McCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                             August 14, 2007

(Pages 69 to 72)

Page 69

1    showed the SouthTrust folks, that
2    summarized the business?
3       A.   Uh-huh.
4       Q.   Correct?
5       A.   Yes.
6       Q.   And did you present a plan on
7    how you -- what you said was how "to turn
8    the corner"?
9       A.   Well, by that time we had
10   turned the corner, as I recall.  It was a
11   plan more about here's where we're going.
12   And we wanted to give them a feel for,
13   you know, the fact that we had -- by that
14   time had a grasp of the issues the
15   company was dealing with and we had
16   charted out a plan from an operations
17   standpoint to return us to, you know,
18   prosperity in terms of a reasonable
19   return.
20      Q.   What was the purpose of the
21   meeting?  What was Piknik trying to
22   accomplish?
23      A.   Well, again, as I recall, the

Page 70

1    bank was -- you know, the bank had --
2    again, this is a question for other
3    people to answer.  But, I mean, the bank
4    apparently was concerned that whole year.
5    I mean, they were meeting with Mike
6    O'Connell on I think a monthly or weekly
7    basis and wanted -- you know, they were
8    looking for certain performance or
9    financial measures.  And I wasn't a part
10   of those meetings, you know, because I
11   was trying to run the operation.  I
12   wasn't worried about -- I wasn't at the
13   time concerning myself with the bank
14   relationship.
15        But they were meeting, and
16   they were concerned that, you know, we
17   were -- you know, they were wanting to
18   make sure we were progressing along
19   because they had a lot of -- it was all
20   collateralized debt, but they had a lot
21   of debt that, you know, we were carrying.
22      Q.   So the purpose of the meeting
23   was -- I mean, was Piknik trying to

Page 71

1    accomplish something?  Was it trying to,
2    you know, alleviate any concern that
3    SouthTrust had or trying to, you know,
4    talk about benchmarks?  You tell me.
5       A.   Well, as I recall, what we
6    were doing was we were presenting to the
7    bank, and it was, you know, we had felt
8    good at that point.  We had just -- you
9    know, were starting to turn the corner.
10   We were happy about the prospects of the
11   business.  We were happy about where we
12   were going.
13        And, as I recall, the bank --
14   maybe we, maybe they, I don't remember
15   exactly who -- said let's get together
16   and talk about, you know, what's going
17   on.  So we put our -- sat down and
18   cranked out some information so they
19   could see exactly what was happening, and
20   we presented it to them.
21      Q.   Was the second meeting that
22   you attended with the SouthTrust people
23   along the similar lines of what you have

Page 72

1    already explained to me?
2       A.   Well, as I recall, in that
3    meeting they expressed they -- as I
4    recall, in that meeting they told us that
5    we had been put into special accounts or
6    something like that.  It was a group
7    where -- in other words -- and you have
8    to bear with me.  I'm not a banker.  But
9    I guess when you're -- at some point it
10   they get concerned about -- you know,
11   concerned about you as a risk, they will
12   put you in a special class.
13        As I recall, that class was
14   called special accounts or special
15   something.  So it went under the banker
16   of this Wayne Durlocker gentleman.
17   Again, I remember his name because it's
18   so strange.  And he was there to let us
19   know that, you know, he managed that.
20        As I recall, he wanted us to
21   seek another financing institution to
22   take over either all or part of the note.
23   Again, I think he was there to help

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 73 to 76)

Page 73

1 figure out a way to spread the risk or
2 whatever. So they were encouraging us to
3 begin that process. And that led to a
4 consulting firm that came down right
5 after that, and that led to Mike
6 O'Connell being set aside.
7    Q. So these meetings with
8 SouthTrust all occurred before Mike
9 O'Connell was taken out of the COO role?
10    A. Yes.
11    Q. So after these meetings with
12 SouthTrust there was a decision made to
13 bring in a consulting firm to analyze
14 Piknik?
15    A. At the bank's behest we had
16 met with two or three different
17 consulting firms for the purposes of
18 coming in and giving an independent
19 assessment of the business. And so there
20 was a company, and I think the name is
21 Philip & Company or Philip and something.
22 They were out of Atlanta. I don't have
23 my records in front of me. It was a firm

Page 74

1 out of Atlanta, and they specialized in
2 this kind of work, working for banks.
3 They did turn-around work on companies
4 that were struggling. And they came in,
5 and they came in to provide just that, an
6 independent assessment of the situation
7 of the company.
8    Q. Who was the main contact from
9 Phillip & Company?
10    A. The guy's last name is
11 Phillip. What is his first name? I don't
12 remember his first name. You could
13 Google it and find it I'm sure.
14    Q. How long was Phillip & Company
15 doing their analysis of Piknik?
16    A. They came in I believe
17 around -- I don't know. Like October,
18 maybe.
19    Q. Of 2002?
20    A. October of 2001. October
21 2001. Remember, we met with the bank
22 around August. Sometime around I think
23 it was October and began their -- well,

Page 75

1 we had met with two or three different
2 firms, and then we had recommended this
3 one. We felt a better -- we felt a good
4 connection. We felt like they would be a
5 good firm.
6    Q. Did SouthTrust have to approve
7 of your selection of Phillip & Company?
8    A. As I recall, they gave us two
9 or three to look at, and then we had to
10 choose one of the three. We didn't go
11 find them on our own, no.
12    Q. So Phillip & Company comes in
13 around October 2001?
14    A. Around that time, yeah.
15    Q. And did they give you some
16 kind of report at the end?
17    A. Yeah. That report was
18 published around January, early part of
19 January.
20    Q. Of 2002?
21    A. Yeah. I mean, there was a lot
22 of reports that were generated, but the
23 official --

Page 76

1    Q. Final report?
2    A. -- here's our analysis of what
3 you need to do type of report, yeah.
4    Q. Did you receive a copy of that
5 report?
6    A. I did. And I gave it to Chris
7 Day.
8    Q. You gave it to Chris Day after
9 Chris Day came on board?
10    A. Soon after they took control
11 of the company, yeah.
12    Q. Which was in August of 2003?
13    A. Yeah. I probably gave it to
14 him somewhere around -- I can't remember
15 the exact month, but it was somewhere
16 after probably around October to December
17 of 2003. Somewhere around that period of
18 time is when I handed over those
19 documents to him.
20    Q. Well, in that final report did
21 Phillip & Company make some
22 recommendations?
23    A. Yes, they did.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 77 to 80)

Page 77

1    Q.    What were the recommendations?
2    A.    Well, first of all, as I
3    recall, and it's been a while since I
4    read the report, they had strongly
5    recommended that Ricky terminate Mike
6    O'Connell. And in that recommendation
7    was a -- they also recommended that he
8    not only terminate him but that he
9    completely remove him from the business.
10        And I think the reason that
11   was in there was because there was -- I
12   think they had maybe discussed this with
13   Ricky and he was trying to figure out a
14   way to keep him involved or keep him
15   around or something. So they had
16   recommended that he be terminated and
17   that he be removed.
18   Q.    You weren't a participant in
19   any of those discussions about Mike
20   O'Connell, though; correct?
21   A.    I was with Onyx. I mean Onyx
22   I was, but not during -- when Onyx went
23   to meet with Ricky, that was between Onyx

Page 78

1    and Ricky.
2    Q.    I'm talking about in this
3    final report that came out in January of
4    2002.
5    A.    Okay.
6    Q.    There's a recommendation that
7    Ricky Loeb terminate Mike O'Connell;
8    correct?
9    A.    Yes.
10   Q.    And Mike O'Connell was COO at
11   the time; correct?
12   A.    Yes.
13   Q.    And there was a related
14   recommendation to remove Mike O'Connell
15   completely from the business; correct?
16   A.    Yes.
17   Q.    Were you involved in any
18   discussions about getting rid of Mike
19   O'Connell around this time that the
20   recommendation is made in January of
21   2002?
22   A.    Well, to the -- okay. After
23   the meeting that I had with Ricky, Ricky

Page 79

1    said, no, I'm not going to terminate him;
2    you guys go ask him to resign.
3    Q.    You guys as Phillip & Company?
4    A.    Phillip & Company. They went
5    and met with Mike and asked him to
6    resign, and he said no. Then I heard
7    about it, and I thought, well, that's --
8    you know, what do you do.
9    Q.    So that recommendation wasn't
10   followed through?
11   A.    Well, it was to the extent
12   that he was taken out of the day-to-day
13   operations of the business, yes, and he
14   was not allowed to involve himself at
15   all, yes. The point was Ricky followed
16   the recommendation. He just didn't
17   completely remove him from the business.
18   Q.    He let him be the one that
19   went out to the banks to get more
20   funding?
21   A.    I don't know what he did,
22   quite frankly. I don't know what he did.
23   The next thing we heard about Mike

Page 80

1    O'Connell was he got hooked up with Onyx.
2    That was the next thing we heard.
3    Q.    But your understanding was his
4    job was to find a buyer or an investment
5    partner?
6    A.    My understanding was, yeah,
7    something like he was either supposed to
8    find a buyer, find an investment partner,
9    find financing, something like that.
10   Q.    Okay. So what other
11   recommendations did Phillip & Company
12   make?
13   A.    Well, they -- and, again, I
14   haven't read this report in so long.
15   But, as I recall, they were -- they had
16   given -- they had given some strong --
17   let me back up a second.
18        Somewhere along the way Steve
19   Alexander resigned, okay. And I think
20   Steve actually resigned before Phillip &
21   Company got involved. Steve on his own
22   just left, okay. And it was not anything
23   to do with he didn't like the business.

JERRY A. McCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                            August 14, 2007

(Pages 81 to 84)

Page 81

1    He was having problems with Mike. He was
2    having problems with Mike O'Connell, and
3    so he left.
4            Going back to the original
5    question was the reason I wanted to
6    insert that in there --
7        Q.   I was asking you what other
8    recommendations Phillip & Company made?
9        A.   Yeah. Well, they -- as I
10   recall, they felt -- one of the things
11   they were there to do was determine
12   whether the business was viable. In
13   other words, could this business function
14   and survive with the current customer
15   base it had, did we have the right people
16   in place to operate the business and so
17   on and so forth. That was their
18   function. They wanted to give a report
19   to the bank saying this company is either
20   stable or unstable. It's viable or not
21   viable.
22           As I recall, it was they felt
23   this business was viable. We did have

Page 82

1    the right team of people in place with
2    the exception of Mike O'Connell. I also
3    further understand that they had some
4    reservations about Ricky. They put them
5    in that report. I understand, although
6    I'm not -- you know, I don't have all
7    the -- I wasn't there when it happened.
8    But I understand Ricky wanted them to
9    revise some of the statements they made
10   about Ricky, okay. So they recommended
11   Mike go, and they recommended Ricky take
12   some kind of diminished role in the
13   business.
14           As I recall, they had some
15   issues with Bill Rodman, but Ricky felt
16   like they were trying to bring in more
17   and more of their own consultants at two
18   hundred and fifty bucks an hour. At some
19   point Ricky had to step in and say, look,
20   you know -- they had a financial
21   incentive to start bringing in more and
22   more of their people. So at some point
23   he had to look at it and make -- I think

Page 83

1    he talked to Andy.
2            I understand he talked to Andy
3    and said, Andy, you know, am I forced to
4    take the recommendations, do I have to do
5    everything they say to do. And Andy
6    instructed him, no, you need to follow
7    your own good -- you know, your judgment
8    and make good, wise decisions. I think
9    part of that was just the bank that
10   didn't want to have any liability with
11   forcing decisions down Ricky's throat.
12           So the good news is, as we all
13   believed as well -- because I did my own
14   thorough due diligence on the economics
15   because I was concerned. I had a family
16   to provide for. I was an employee. I
17   felt the business was viable. They felt
18   the business was viable. But they felt
19   like they had some leadership issues with
20   those two individuals.
21           Beyond that, you know, I mean,
22   they even wanted -- as I recall, in their
23   recommendation -- I think Chris has got

Page 84

1    the document. They had given a heads-up
2    on me. I think they were very
3    comfortable and very confident in my
4    ability in that role. I think they were
5    confident in Shannon's ability. I know
6    they were because she was very strong at
7    the time.
8            So, you know, our issue was we
9    just needed to continue to run our
10   business and do the things we were doing.
11   We had turned the corner. It was a
12   viable business.
13       Q.   Okay. But back to my
14   question.
15       A.   Okay. Sorry.
16       Q.   One recommendation we have
17   already talked about was to terminate
18   Mike O'Connell?
19       A.   Yes.
20       Q.   And that was partially
21   accomplished in that Ricky Loeb just took
22   Mike O'Connell out of the day-to-day
23   operations of the company?

21

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 85 to 88)

Page 85

1    A.   Yes.
2    Q.   Another recommendation was to
3  somehow diminish Ricky Loeb's role in the
4  company; correct?
5    A.   Yes.
6    Q.   That recommendation was not
7  followed through; correct?
8    A.   As I recall, as I recall, they
9  had not so much diminished Ricky's role,
10  but they had identified some of his
11  weaknesses in their report. Ricky wanted
12  some of those weaknesses that they
13  identified taken out of the report.
14    Q.   And there was a recommendation
15  to do something with Bill Rodman who was
16  the production manager; correct?
17    A.   Yeah, it wasn't so much do
18  something with Bill. They didn't want to
19  push Bill aside. They just wanted to
20  bring in their own operations consultant
21  to study the day-to-day running of the
22  plant. He'd study things like line
23  efficiencies, he'd look at metrics,

Page 86

1  production metrics, yields. He'd look at
2  line labor, things like that.
3    Q.   Was a consultant brought in to
4  look at those?
5    A.   He came in for a short period
6  of time to do his own quick analysis, but
7  they wanted to have him come on for an
8  extended period of time.
9    Q.   Who is they?
10    A.   They being Phillip & Company.
11    Q.   And was a decision made to let
12  the consultant come in on a longer --
13    A.   No.
14    Q.   -- basis?
15    A.   As I recall, they blocked --
16  they -- Ricky did not want to pay the
17  additional money to have this guy come
18  in.
19    Q.   What were their reservations
20  about Ricky Loeb that were identified in
21  the report?
22    A.   I didn't see the report. What
23  I'm saying to you is that I understand

Page 87

1  that they made some statements about his
2  effectiveness as a leader or something to
3  that extent. They made some comments
4  that he did not want in the final report.
5    Q.   So you got a copy of the
6  report in January of 2002 but didn't read
7  it?
8    A.   No, I read it. I got the
9  final report, not the -- there was a
10  first draft and a second draft.
11  Somewhere along in the drafts my
12  understanding is there was a comment made
13  about Ricky that he didn't feel like he
14  wanted in a report. It may have been a
15  simple -- I don't know what it was. It
16  may have been as simple as Ricky --
17    Q.   So are you saying that the
18  final report did not have anything about
19  these reservations or weaknesses that
20  were felt about Ricky Loeb; correct?
21    A.   The problem is I don't
22  remember exactly what he said about
23  Ricky, but it wasn't nothing -- it wasn't

Page 88

1  anything like Ricky needs to be removed
2  or Ricky is ineffective. It didn't say
3  that. But I don't remember it saying
4  anything glowing either. I just don't
5  remember.
6    Q.   But you did read the final
7  report in January of 2002?
8    A.   I read parts of it, yeah. I
9  probably read 50 percent of it.
10    Q.   Okay. What other
11  recommendations were made in that final
12  report?
13    A.   Well, again, as I recall, you
14  know, recommendations like we need to --
15  as I recall, let's bring in -- you know,
16  let's continue our services, let's -- oh,
17  they wanted to bring in -- they wanted to
18  bring in Beth Carbert, that was her name
19  I think, and she was going -- oh, they
20  wanted to replace Robert Lampert. Yes,
21  they wanted to replace Robert Lampert.
22    Q.   Who was Robert Lampert?
23    A.   He was the CFO.

22

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 89 to 92)

Page 89

1    Q.    Bob Lampert came in after
2  Steve Alexander left as CFO?
3    A.    Yes.
4    Q.    Were they wanting to bring in
5  Beth Carbert to replace Mr. Lampert?
6    A.    They weren't going to bring
7  her in to replace him.  They wanted him
8  out of the business, and they were going
9  to have her step in and perform his role
10  until such time they found a CFO.
11    Q.    Was Beth Carbert a consultant
12  with --
13    A.    Phillip & Company, yes.
14    Q.    Was that recommendation
15  carried through?
16    A.    No.
17    Q.    Any other recommendations that
18  you can recall in that final report?
19    A.    I seem to think that was
20  there -- I seem to remember there were
21  some recommendations about some capital
22  for, you know, projects to invest -- you
23  know, what we would call maintenance

Page 90

1  capital, some additional capital that
2  should or could be invested.  I don't
3  recall it being extensive, but -- yeah, I
4  mean, there -- you know, which is what
5  you expect, you know, you need
6  maintenance capital for these projects,
7  which any business at any state in its
8  operation you would have those.  But
9  other than that, I don't recall any major
10  themes.
11    Q.    At this time was Piknik trying
12  to acquire additional loans from
13  SouthTrust, or do you know?
14    A.    There was a loan that was
15  granted I believe around the Fall of
16  2001.  And, as I recall -- I'm sorry.
17  Matter of fact, that was one of the -- I
18  think that may have been one of the
19  reasons we had SouthTrust in in the first
20  place.  But there was some additional
21  infusion of cash we were seeking, and it
22  ended up coming in the form of a loan
23  that was collateralized by Ricky's father

Page 91

1  as I recall.  He had some stocks that he
2  had pledged against the additional debt.
3    Q.    So after y'all received this
4  report from Phillip & Company, besides
5  whatever changes you've already told me
6  about, did Piknik make any other
7  operational changes or --
8    A.    Around what time?  I mean,
9  during what period of time?
10    Q.    Well, after you get this
11  January 2002 report.  Between that time
12  and the time that Onyx takes control,
13  which was in August of 2003?
14    A.    So that would have been
15  January of 2002 and then Onyx comes in in
16  August 2003.  In terms of major changes.
17  I mean, there was obviously a lot of
18  activity going on at the customer level.
19  I mean, we were putting in new equipment.
20  We were negotiating new agreements.  We
21  were bringing on new customers.  I mean,
22  all that was going on.  That's where I
23  was spending my time.  I wasn't -- you

Page 92

1  know, I didn't have time to focus on the
2  financing too.  We were working
3  aggressively on optimizing -- all those
4  things you do to run a business
5  effectively.
6    But other -- you know, so Mike
7  goes out of the way.  Bob Lampert stays.
8  Somewhere along the way Ricky and Phillip
9  & Company get to a point where, you know,
10  they were, as I recall -- this is my
11  recollection, and I wasn't intimately
12  familiar with all the events.
13    But I do understand somewhere
14  along the way Ricky and Phillip & Company
15  were struggling over -- you know, Phillip
16  & Company was wanting to bring all these
17  people in.  Ricky was looking at the cost
18  of bringing them in.  He saw his team
19  coming together.  He saw the business
20  starting to prosper and, my
21  understanding, was talking to SouthTrust
22  about must we follow their
23  recommendations or can we -- and, of

23

JERRY A. MCCARTNEY, ET AL.                                                      ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                              August 14, 2007

(Pages 93 to 96)

| Page 93 | Page 95 |
|---|---|

**Page 93**

1  course, SouthTrust apparently was telling
2  him follow what you think is best. They
3  are there to advise.
4         And somewhere along the way
5  Phillip & Company ceased supporting or
6  ceased any consultant work at all. And I
7  think that was somewhere around, I don't
8  know, maybe March, April, somewhere
9  around that period.
10    Q.    2002?
11    A.    In 2002, yeah.
12    Q.    Did you have any involvement
13  in finding a buyer or an investment
14  partner or seeking additional financing
15  between, you know, 2002 and August of
16  2003?
17    A.    The only involvement I had was
18  I had made a presentation to an
19  investment banking firm here in
20  Montgomery. I can't remember the name of
21  it. They are right down there next to
22  Leeks or Lex, whatever they call it,
23  down the hall from them. Some investment

**Page 95**

1  or Ricky. But I had nothing to do with
2  Onyx.
3    Q.    And Onyx takes control of the
4  company in August 2003; does that sound
5  right?
6    A.    Well, they didn't really take
7  control until somewhere around September
8  or October is when they came in and
9  asserted their authority over the
10  company. They supposedly closed and had
11  a -- they had 51 percent of the shares,
12  so they effectively owned the company.
13  They controlled the board. They put Jeff
14  in as the CEO to, you know, be -- there's
15  three classifications you've got to have
16  to be certified for MBE certification.
17  You have to own, control and manage. So
18  they had to own 51 percent of the stock.
19  They had to control the board, which they
20  did, and they have to be
21  African-American. And they have to
22  also --
23    Q.    They don't necessarily have to

**Page 94**

1  firm. We made a presentation to them --
2  and I don't remember when it was. It was
3  somewhere around the Fall of 2001 or
4  2002, somewhere around there -- for the
5  purpose of seeking additional investment,
6  yeah.
7    Q.    Did they decline?
8    A.    Apparently they did because
9  they were seeking -- as I recall, they
10  were seeking -- they wanted collateral
11  against any debt. You know, we didn't
12  have anything to give them that wasn't
13  already --
14    Q.    Everything had already been
15  collateralized?
16    A.    Yeah.
17    Q.    Did you have any involvement
18  in getting Onyx to invest in the company?
19    A.    None.
20    Q.    That was all handled by Mike
21  O'Connell?
22    A.    To my knowledge I assume it
23  was handled by Mike O'Connell, either him

**Page 96**

1  be African-American; isn't that correct?
2    A.    You need to go read the
3  national --
4    Q.    It can be any minority;
5  correct?
6    A.    Yeah, there's a class of
7  minorities, right. They happen to be
8  African-American, my understanding. But
9  there's a class of minorities you have to
10  be. And then they have to also have a
11  minority manage the business, the
12  day-to-day operations, and that would
13  have been Jeff.
14    Q.    Jeff Larry?
15    A.    Yeah.
16    Q.    Is African-American?
17    A.    Uh-huh.
18    Q.    What about Chris Day?
19    A.    He's Caucasian.
20    Q.    What about Henry Hicks?
21    A.    He's African-American.
22    Q.    What was your understanding,
23  if you had an understanding, of why Onyx

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 97 to 100)

Page 97

1  was coming on board?
2      A.   Well, my understanding was
3  that they were -- my understanding was
4  that they were going to come on board --
5  one of the things all companies need to
6  grow is an infusion of capital. So my
7  understanding was they were going to
8  bring with them a couple of -- I think
9  originally it was four million and then
10  it was two million and then it was
11  nothing.
12          But they originally were going
13  to come in and be a company that was
14  going to take control, recertification as
15  an MBE and then leverage that back to the
16  customers we were doing business with in
17  order to gain more business. And, also,
18  you know, they were going to take over
19  control of the company so that the
20  decisions they made to run the business
21  were, you know, better decisions.
22      Q.   So the bigger goal was to
23  improve Piknik as a business, as an

Page 98

1  entity; correct?
2      A.   You say the bigger goal.
3      Q.   I mean, the main goal was to
4  make sure that Piknik continued
5  operating?
6      A.   No question about it, yeah,
7  yeah.
8      Q.   And that it was a successful
9  company, that was the goal?
10      A.   Yeah, I'm sure that was the
11  goal. The reason I'm struggling a little
12  bit is all of a sudden out of nowhere
13  comes Onyx. I mean, the business -- we
14  turned the corner. Yeah, the bank was a
15  little nervous about the debt we were
16  carrying and the risk of the debt.
17          But all of a sudden this
18  company Onyx comes along. And we were
19  optimistic from the standpoint, very
20  optimistic, as a matter of fact, because
21  they were a venture capital firm. We
22  felt like these people would understand
23  finance, they would understand how

Page 99

1  business -- they would bring the right
2  resources to bear on the business both
3  financial and operational if necessary.
4  And, yes, the goal would have been to
5  continue growing the business and
6  continue to insulate us from what
7  ultimately brought the company down.
8      Q.   And Henry Hicks, Jeff Larry
9  and Chris Day were all employees of Onyx?
10      A.   Well, that's a good question.
11  Jeff Larry was an employee of Onyx.
12  Chris Day was a -- he was I think a
13  little bit of both. He was an employee
14  of Onyx and he was supposedly an employee
15  of Piknik, but that was -- I don't know
16  what the -- I mean, that's what their
17  claim was, he was a little bit of both.
18  And Henry was an employee of Piknik, but
19  he was presenting himself at different
20  events as an employee of Onyx. He had
21  business cards and made presentations on
22  behalf of Onyx.
23      Q.   Earlier you were referring to

Page 100

1  the acronym MBE. What is MBE?
2      A.   It stands for Minority
3  Business Enterprise.
4      Q.   I want to go back. You were
5  VP of Operations until early 2002?
6      A.   Uh-huh.
7      Q.   And then you became VP of
8  Operations in sales and marketing,
9  correct, is that what you were telling me
10  earlier?
11      A.   Well, in terms of titles.
12      Q.   Correct.
13      A.   You were saying what your
14  title was.
15      Q.   Correct.
16      A.   And I was saying I think this
17  is what they called me then, this is what
18  they called me then.
19      Q.   Correct. Are you saying that
20  your role did not change once you became
21  VP of Operations in sales and marketing?
22  Your jobs duties were the same?
23      A.   Yeah. The expectation, what I

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 101 to 104)

Page 101

1   was called to do, yes.
2        Q.    And were you still reporting
3   to Ricky Loeb?
4        A.    I reported to Ricky Loeb up
5   until the time that Onyx took control,
6   and then I reported to one of the
7   partners. Her name was Patrice Daniels.
8        Q.    Once Onyx took control was
9   Ricky Loeb taken out of the day-to-day
10  operations of Piknik?
11       A.    Not immediately, not
12  immediately. They left him in. I think
13  they even referred to him as a
14  co-chairman of the board or something
15  like that. He wasn't immediately taken
16  out of the day-to-day. It came later.
17       Q.    Was he phased out of the
18  day-to-day operations?
19       A.    No. I remember getting a
20  letter from Chris one day to everybody
21  saying Ricky is to have no involvement in
22  the business, don't call him, don't write
23  him, don't e-mail, anything. He's to be

Page 102

1   completely avoided. That's when Ricky --
2   it was clear to everybody that Ricky was
3   then kind of tainted goods, if you will.
4        Q.    So when Onyx takes control in
5   August of 2003 your direct report becomes
6   Patrice Daniels?
7        A.    Let me think about this for a
8   second. I think it was -- okay. When
9   they took control at the time -- oh, let
10  me back up, let me back up. Ricky had --
11  no. They apparently -- Ricky had
12  apparently put Mike O'Connell back in
13  charge of the company right before the
14  acquisition. He was apparently
15  negotiating with Onyx, apparently was
16  presenting himself as the president of
17  the company to Onyx.
18           And then when Onyx took
19  control Mike was the president at the
20  time and was until January of 2004 when
21  either they or he removed himself. I'm
22  not sure how it all came -- worked out.
23           But, yes, Mike was in charge

Page 103

1   up until -- in terms of the person I
2   reported to was Mike and Ricky I guess.
3   And then I didn't report to Patrice I
4   guess until January of 2004, somewhere
5   along in there, maybe February --
6        Q.    What is Ms. Daniels' race?
7        A.    She's African-American.
8        Q.    Was she COO or was she
9   president?
10       A.    She was what they call
11  executive vice president of something.
12  It may have been something like
13  administration, executive vice president
14  of finance, something like that, because
15  Chris took the other executive vice
16  president job, and he was over
17  operations, human resources, as I recall.
18       Q.    So from January 2004 or
19  February of 2004 until when were you
20  reporting to Patrice Daniels?
21       A.    I was reporting to her --
22       Q.    That was a bad question.
23       A.    Well, I mean, it was like --

Page 104

1   let me think about this. I reported to
2   her -- and I really don't remember the
3   exact dates. I wish I did. For some
4   reason I'm drawing a blank. But I think
5   the next person I reported to I think it
6   was Henry right after her, as I recall.
7   I don't think there was an intermediate
8   person between Patrice --
9        Q.    And that's Henry Hicks?
10       A.    Yeah. Bill McLennan came in
11  there somewhere, and I can't remember if
12  I reported to him or not. I don't think
13  I ever did, though. I mean, you've got
14  to understand, Patrice was never really
15  around. She was just there, you know,
16  once a week or one day every week or two.
17       Q.    Did Patrice leave Piknik or
18  did she stop doing her work for Piknik?
19       A.    Yeah. When they hired Bill
20  McLennan to come in as the president of
21  the company Jeff was still CEO. But when
22  they hired him to be president of the
23  company, which I think was in June --

JERRY A. McCARTNEY, ET AL.                                          ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                  August 14, 2007

(Pages 105 to 108)

Page 105

1  okay. Now it's all coming back.
2          Reported to Patrice from like
3  January 2004 to maybe June. I think then
4  Bill McLennan comes in. He came in for
5  six months. He was gone by January of
6  '05. But somewhere around there then
7  Patrice moves -- yeah, that's right.
8  McLennan came in. Eventually Patrice
9  worked her way out of the company, and I
10 didn't hear from her anymore. I think
11 she still called people, but I didn't
12 have any contact with her at all.
13      Q.   And that was until June of
14 2004; right?
15      A.   Remember, I worked for her
16 from like -- again, I may have the dates
17 a little bit wrong here, but January of
18 2004 when she took -- had me report
19 directly to her until about June of 2004
20 when McLennan came in. And then she and
21 Chris both stepped out of the role of
22 day-to-day operations and put McLennan
23 in.

Page 106

1      Q.   When McLennan came in were you
2  reporting to him?
3      A.   I think I -- I think I went
4  from Patrice to Henry. I don't think I
5  ever did report to McLennan. I mean,
6  obviously he was there, you know, every
7  day so I was seeing him.
8      Q.   When you stopped reporting to
9  Patrice is that when Henry Hicks came in?
10     A.   No. Henry was there from day
11 one.
12     Q.   But around June 2004 is when
13 he becomes your boss?
14     A.   Around two -- yeah, somewhere
15 around that period is when Henry became
16 my direct supervisor.
17     Q.   Now, after Onyx takes control
18 you held various job titles; correct?
19     A.   Say that again.
20     Q.   After Onyx took control you
21 held different job titles?
22     A.   Yes, yes.
23     Q.   One of them was VP of

Page 107

1  Administration?
2      A.   Right.
3      Q.   One was VP of Purchasing?
4      A.   Right.
5      Q.   There may have been others,
6  but the last one you can recall was
7  Director of Customer Relations?
8      A.   Yes. It's director of
9  something. It was like Director of
10 Customer Contracts or Director of
11 Customer Relations.
12     Q.   And it's your position that
13 your job duties never changed. It was
14 just your job title; correct?
15     A.   There was slight
16 modifications. The main job I played
17 there, always played, was correspondence
18 with the customers, contracts, pricing,
19 on-boarding, what we call on-boarding --
20      (Reporter interruption.)
21     A.   On-boarding. That's where you
22 bring a customer in multiple visits.
23 Manage the meetings. I held the weekly

Page 108

1  financial meeting, for example. I
2  continued to hold those even though I was
3  not the CFO; although, the CFO attended.
4  It was a variety of different roles all
5  intended to focus on those things that
6  kept the business profitable and afloat
7  and focused on the right things.
8          But during that -- it wasn't
9  until -- at different times, you know,
10 like Patrice moved me into VP of
11 Purchasing, although the problem was
12 Henry -- I mean, Henry didn't have
13 experience. He never came from consumer
14 packaged goods. I mean, somebody had
15 to -- it's like me trying to come to your
16 law firm and be an attorney. I can't be
17 an attorney. I've never been an
18 attorney. I'm going to depend on you to
19 do all the attorney work.
20         So I had to perform that role.
21 I mean, I would package up the stuff and
22 give it to him, and he would re-edit it
23 and put his own -- change the colors and

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 109 to 112)

Page 109

1  the fonts. But that was pretty much what
2  was going on.
3      Q.   You were describing your job
4  duties, and you said correspondence with
5  customers?
6      A.   Correspondence with customers;
7  right.
8      Q.   Pricing?
9      A.   Pricing.
10     Q.   Were you setting prices to
11 propose to customers? Is that what you
12 mean by pricing, or you tell me what you
13 mean by pricing.
14     A.   Yeah, what I mean by that is I
15 had a pricing model that I used that I
16 would take the specs on the product, all
17 the particulars, everything, you know,
18 and figure out what it was going to cost
19 us to run that product. And then I would
20 share that internally with everyone so
21 they have a chance to review it.
22 Certainly with Onyx there they reviewed
23 all that. And then we would go forward

Page 110

1  to the customer with our proposal. But I
2  would, for example, would do all the
3  RFQs. RFQs would be a thirty- fifty-page
4  document somebody had to fill out.
5      Q.   RFQ stands for request for
6  quotation?
7      A.   Right.
8      Q.   So you would receive a request
9  for quotation from a customer?
10     A.   Uh-huh.
11     Q.   Correct?
12     A.   Yes.
13     Q.   And you and your team would
14 figure out what it would cost Piknik to
15 provide the services requested?
16     A.   Right. There was a number of
17 meetings on those; right.
18     Q.   And then you would come up
19 with something -- a price to charge the
20 customer?
21     A.   That was one of the many
22 things you did.
23     Q.   I understand. I'm greatly

Page 111

1  simplifying it.
2      A.   Okay. Yes. One of the things
3  that had to come out of it was what are
4  we going to charge the customer for the
5  service.
6      Q.   So that's the pricing aspect.
7  And you have talked about your
8  on-boarding duties?
9      A.   Uh-huh.
10     Q.   And you said that you would
11 bring in the customer and have meetings
12 with the customer?
13     A.   Uh-huh.
14     Q.   Yes?
15     A.   Yes.
16     Q.   And you held weekly financial
17 meetings?
18     A.   Uh-huh. Yes.
19     Q.   Would those be weekly
20 financial meetings with folks who
21 reported to you?
22     A.   Some were. Some reported to
23 me. Many of them didn't. I mean, the

Page 112

1  CFO came. The controller came. Who else
2  came? I mean, it was -- you know, it was
3  the key members of the organization would
4  come to those meetings.
5      Q.   In the entire time that you're
6  at Piknik are you dealing with just the
7  beverages side of the business?
8      A.   Yeah, because about four weeks
9  into the job I realized that -- I told
10 Mike O'Connell that we need to divide and
11 conquer. He needs to focus on the -- the
12 beverage business at the time was
13 suffering. It had lost five million
14 dollars that first year. It was -- you
15 know, we finished the year up -- I mean,
16 I don't know, the year finished in
17 October, November, whenever it finished
18 up. They lost six million dollars in the
19 beverages. They made a million on the
20 condiments side.
21     Q.   So in your first year there
22 the beverage side lost five million
23 dollars?

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 113 to 116)

Page 113

1    A.    Not the first year there.  I
2    got there in like October.  I think the
3    books were closed in like October or
4    November of 2000, and I think the company
5    lost five million bucks that year as I
6    recall.
7        Q.    So when you arrived --
8        A.    They were bleeding bad, big
9    time.  So the biggest opportunity was
10   beverages.  It's what I knew best.  So at
11   about four weeks into the job I told
12   Mike, Mike, I need to focus on the
13   beverages, you manage Brundidge.  And
14   that was the last I had to do with
15   Brundidge until Henry wanted me to do
16   something down there.
17       Q.    And Brundidge was where all of
18   the condiments operations took place?
19       A.    Yes.  Can I stop you guys just
20   for a second?
21            (Whereupon, a break was taken
22            from 11:02 to 11:07 a.m.)
23       Q.    (BY MS. MCGAHEY:)  So after

Page 114

1    the first four months or so of you
2    starting at Piknik your focus was
3    primarily on the beverages side of the
4    business; correct?
5        A.    A hundred percent.
6        Q.    Besides correspondence with
7    customers, pricing, on-boarding and
8    weekly financial meetings, what were your
9    job duties?
10       A.    Well, I mean for the first --
11   for the first year I was also running the
12   manufacturing -- I mean, all the
13   manufacturing team.  They all reported
14   directly to me.
15       Q.    But after the first year?
16       A.    After the first year, I mean,
17   Bill still -- you know, Bill Rodman, who
18   came in June of 2001, assumed that
19   role.  He reported to me for six months.
20   Mike O'Connell gets knocked out of the
21   way.  Ricky steps in.  Bill starts
22   reporting -- I mean, Bill didn't directly
23   report to me.  But this is a business

Page 115

1    that is very -- you know, we're all
2    working as a team.  You know, the
3    reporting lines, who reports to who, that
4    stuff starts to blur a little bit after a
5    while.  It doesn't matter.  You know,
6    we're all here to do a job.  So it's not
7    like -- I don't manage people by, you
8    know, they report to me so I tell them
9    what to do, I mean, if that makes any
10   sense.
11            I mean, we're talking a lot
12   about reporting structures and
13   relationships.  It's like, we're running
14   a business.  We're trying to keep it
15   afloat.  We're turning it around.  We're
16   all feeling good about it.  I mean, the
17   reporting lines and all that was, you
18   know, so -- I'm not answering your
19   question.
20       Q.    Well, you said -- I'm just
21   asking you based on what you said.  You
22   said for the first year you managed the
23   operations.  So my question is after that

Page 116

1    first year did you stop managing the
2    operations and did someone else manage
3    it?
4        A.    I was very much managing it
5    from a numbers standpoint and the weekly
6    financial reviews and keeping the focus
7    on the metrics, yields, efficiencies,
8    labor, you know, cash flow.  I mean, I
9    was very driven to focus on cash flow and
10   future cash flows.  Running out of cash,
11   business closes the doors.
12            You know, one of my main
13   focuses there was to simply stare reality
14   in the face and not deny it.  That's why
15   the business turned around and became
16   profitable.  The beverage side of the
17   business became profitable.  Brundidge
18   side was always profitable until Onyx got
19   there.
20       Q.    And did you keep that job
21   responsibility, what I'm going to just
22   globally call managing operations, after
23   Onyx took control?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 117 to 120)

Page 117

1    A.    After Onyx took control -- let
2    me think about this now -- then the
3    reporting structures became a little more
4    defined. That's when Chris took control
5    of operations, and it was -- well, okay.
6    Remember, Mike was put back in for a few
7    months, and then Bill reported to Mike.
8    I reported to Mike. We kind of all
9    reported to Ricky. Bill reported to
10   Mike. I reported to Mike. Shannon
11   McGlon reported to -- I think she
12   reported to Mike. The controller
13   reported to Ricky I think. That's all
14   just a little blurry. I just haven't
15   read those documents in a while in terms
16   of the organizational structure. But it
17   was -- when Mike went away and Chris and
18   Patrice came in, then it was very clearly
19   defined who reported to who.
20   Q.    I'm not at this point worried
21   about the reporting structure.
22   A.    Okay. Well, I mean, those are
23   the questions. I'm getting a lot of

Page 118

1    questions about who reports to who.
2    Q.    Right now I'm asking after
3    Onyx took control were you still, quote,
4    unquote, managing operations as you had
5    just described to me?
6    A.    I was still holding weekly
7    financial meetings. I was still holding
8    every on-boarding meeting. And, yeah, I
9    mean, I wasn't -- they didn't say you're
10   over operations, but -- how do I describe
11   this.
12        I'm having meetings with
13   everybody every day about the customers,
14   status of the projects. I'm having a
15   financial weekly meeting with them. I
16   mean, did they report to me? No. Were
17   they accountable to me? Absolutely,
18   because of the group dynamics. Does that
19   make any sense?
20   Q.    Did your job duties change
21   after Onyx took control?
22   A.    The role -- okay. Patrice
23   turns me into VP of Purchasing. Did I

Page 119

1    stop my job, what I was doing every day?
2    No. Did I begin to look more and more at
3    the purchasing role? Yes, I actually
4    took that role on. But there weren't --
5    there was a leadership void.
6        I mean, they wanted -- they
7    had exerted their role and exerted their
8    authority, but they weren't really
9    engaged. You know, they engaged and made
10   decisions and then they go away and then
11   no decisions would be made until they
12   came back. And then they would make
13   another decision. I mean, the business
14   had to go on.
15        So we were -- you know, my
16   role, it started to modify a little bit.
17   I mean, I had less and less focus on the
18   operations side, but I still had the
19   meetings. I still met every week on the
20   financials. I still met every week on
21   bringing in the customers that were
22   coming on board. I mean, our business
23   evolved around customers and bringing

Page 120

1    them on board and managing their issues.
2    So I still did the same thing I had
3    always done, yes.
4    Q.    Okay.
5    A.    I know you're struggling with
6    this, but I'm struggling with it because
7    I feel like you're asking me the question
8    did you have the authority, did Onyx come
9    in and christen you and say -- no, they
10   didn't.
11   Q.    My question is how, if at all,
12   did your job duties change from the time
13   pre-Onyx to post-Onyx? That's the
14   question.
15        MR. NELMS: During which time
16   frame?
17   Q.    I'm asking Onyx comes in in
18   August 2003; correct?
19   A.    They purchased the business in
20   August of 2003. They took effective
21   control -- they took control then, but it
22   wasn't as apparent because it was through
23   Mike and through Ricky. When they took

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 121 to 124)

Page 121

1    day-to-day operational control was in
2    January. And from that point forward my
3    role still was the same. My title was
4    different.
5        Q. So in January 2004 is when
6    Onyx effectively took control of the
7    actual operations; is that what you're
8    saying?
9        A. Where I felt their control was
10   in January of 2004.
11       Q. Okay.
12       A. They were behind the scenes
13   before that.
14       Q. Starting in January of 2004
15   did your responsibilities, your job
16   duties change once Onyx was exerting
17   control of the day-to-day operations?
18       A. On paper or in -- on paper or
19   in day-to-day -- in a real life
20   day-to-day operation?
21       Q. Is that a distinction in your
22   mind?
23       A. Yeah.

Page 122

1        Q. Okay.
2        A. On paper they said you're VP
3    of Administration.
4        Q. And on paper --
5        A. Excuse me. VP of Purchasing.
6        Q. And then on paper did your job
7    duties differ --
8        A. Yes, absolutely.
9        Q. -- from before January of
10   2004?
11       A. Yes. You're in charge of
12   purchasing.
13       Q. And then in practice -- I
14   don't know if that's the word you used --
15       A. In practice they didn't
16   change.
17           (Court reporter interruption.)
18       A. Right, in practice they did
19   not change.
20           THE REPORTER: You're getting
21   a little fast back and forth.
22       A. Oh, I'm sorry. I'm getting a
23   little annoyed.

Page 123

1        Q. Am I annoying you?
2        A. Well -- I didn't -- no, you're
3    not annoying me. I'm in a deposition.
4    I'd like to be able to be very
5    expressive, you know. There's a business
6    here. We're trying to -- you know, and I
7    don't want you come back, well, you
8    didn't do what they told you to do.
9    There's a --
10       Q. I'm just trying to figure out
11   what you're job duties were.
12       A. You ask the question. I'll
13   try to answer it as best I can without
14   getting flustered.
15       Q. That's all we're asking.
16       A. Not annoyed. Flustered is the
17   word I should have used.
18       Q. So in practice you're saying,
19   though, that your job responsibilities
20   and your actual duties did not change
21   once Onyx took control of the day-to-day
22   operations?
23       A. Yes. I just wish you would

Page 124

1    ask me why. That's part of the problem
2    I'm struggling with is why don't you ask
3    me why they didn't change.
4        Q. Well, why? You're dying to
5    tell me, so why don't you let me know?
6        A. They didn't change because
7    they brought a guy in that was going to
8    take my job over that didn't have a clue
9    about the business.
10       Q. Who was the guy who was --
11       A. Henry Hicks. And I had to
12   support this guy the whole time he was
13   there and do all of his work for him only
14   to, at the end, be brushed aside. Yeah,
15   I'm a little annoyed about that. That's
16   why we're here.
17       Q. And we'll talk about that.
18   Let's talk about the 2004-2005 time
19   frame.
20       A. Okay.
21       Q. Who were Piknik's main
22   customers on the beverage side of the
23   business?

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 125 to 128)

Page 125

1    A.    During 2004?
2    Q.    And 2005?
3    A.    Okay.  Well, there was --
4  well, there's customers, and there's
5  customers that are going through stages
6  of on-boarding, and that can take six
7  months to eighteen months, or two years
8  for that matter.  But there was -- I
9  mean, our customers during that period of
10 time were Tropicana, they were Quaker,
11 they were Nestle, they were Craft,
12 Kellogg's, Campbell's, Hershey.  Who am I
13 missing?
14   Q.    Pepsi?
15   A.    Well, Pepsi owned Quaker and
16 Tropicana.
17   Q.    Any other customers that you
18 can recall in that time frame?
19   A.    Can you repeat the ones I
20 said?
21   Q.    You said -- I'll just say
22 Pepsi, which is Tropicana and Quaker,
23 Nestle, Craft, Kellogg's, Campbell and

Page 126

1  Hershey?
2    A.    Got Craft.
3    Q.    What about Arizona Iced Tea?
4    A.    Yes, they were a new customer.
5  I mean, there was many in different
6  stages.  I haven't looked at the list in
7  a while.  I apologize.
8    Q.    Any other customers you can
9  recall?
10   A.    I mean, there was a customer
11 down in Louisiana that was a tea/coffee
12 company.  I'm trying to remember the name
13 of it.
14   Q.    Community Coffee?
15   A.    Community Coffee was one of
16 them.  I think P&G was a customer at one
17 time.  I mean, there's many, many, many
18 different people.  Some of them we were
19 packing for, some of them we were in
20 different stages of conversations with.
21 I did say Craft; right?
22   Q.    Yes, you did.
23   A.    Kellogg's.  Okay.

Page 127

1    Q.    Did you consider yourself the
2  main contact for these customers that you
3  just listed?
4    A.    Yes.  Well, up until -- up
5  until the time Onyx came in.
6    Q.    Once Onyx came in did someone
7  else become the main contact for these
8  customers?
9    A.    Well, at first it was Patrice
10 and Jeff Larry and to some extent Chris
11 and Henry.  Those were the -- you know,
12 they went around meeting all of them and,
13 you know, presenting their plan for --
14 you know, their plans for the future.
15   Q.    So once Onyx takes control of
16 the operations in January of 2004, the
17 main contact with these customers was
18 Patrice Daniels, Jeff Larry, Chris Day
19 and Henry Hicks?
20   A.    Yeah.  I mean, like they would
21 have different levels of involvement.
22 Jeff might be involved at more senior
23 level.  Henry would be involved in -- in

Page 128

1  terms of the communication, he would
2  be more -- you've got to understand.  At
3  first Henry was kind of looking after the
4  condiment side of the business, so he
5  wasn't as involved in the beverage side.
6  So Chris got more involved, and Patrice
7  got more involved, and Jeff got more
8  involved.
9          Somewhere along the way Henry,
10 for different reasons, started getting
11 more involved in the beverage side, and
12 then he started taking more and more
13 day-to-day responsibility in terms of
14 communicating with the customer and
15 essentially had been positioned as the
16 main contact to the customer, yes.
17   Q.    Do you recall who your main
18 contact at PepsiCo was?
19   A.    Oh, there was a number of
20 them.  I mean, there was --
21   Q.    What about Gatorade?
22   A.    Gatorade would have been Ken
23 Shelly.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 129 to 132)

Page 129

1    Q.   Ken Shelly?
2    A.   Ken Shelly.
3    Q.   Kent or Ken?
4    A.   Ken, K-E-N.
5    Q.   What about with Craft?
6    A.   Craft was a guy named Peter
7    Lloyd. Peter Lloyd and Rudy -- I can't
8    remember his last name. Peter was my
9    main contact.
10   Q.   Rudy Mansfield?
11   A.   Mansfield, yep, that's it.
12   Q.   So Peter Lloyd was the
13   beverages side of Craft, is what that you
14   were saying, and Rudy Mansfield was
15   condiments?
16   A.   Peter Lloyd was the contract
17   guy. He was the guy that was -- that I
18   dealt with out of Chicago that was in
19   part of procurement. So we negotiated
20   all the terms in the contract. And Rudy
21   would have been like the operations guy
22   that was handling what they call the
23   commercialization of the product where we

Page 130

1    officially go through the qualification
2    stages of qualifying to run it.
3    Q.   What about Kellogg's?
4    A.   Jeff Slabey.
5    Q.   What was the last name again?
6    A.   Slabey, S-L-A-B-E-Y. Jeff
7    Slabey was my main contact, and then
8    there was -- they came down in an army.
9    It was an army of people from Kellogg's.
10   Q.   What about Arizona Iced Tea,
11   who was the main contact there?
12   A.   There was a number people
13   there. It's been two years since I've
14   even looked at this list of names. I
15   don't recall off the top of my head. I
16   dealt with them for four years until we
17   finally got them. It was different
18   people at different stages.
19   Q.   How would you describe your
20   relationship with Ken Shelly or whoever
21   was in charge of the Gatorade line?
22   A.   My relationship?
23   Q.   Yes.

Page 131

1    A.   Like?
2    Q.   Did you get along?
3    A.   Oh, yeah.
4    Q.   Did he ever express
5    dissatisfaction with you?
6    A.   Absolutely. We got along and
7    we both expressed dissatisfaction, yes.
8    Q.   You expressed dissatisfaction
9    with him?
10   A.   Yes. Well, not with him.
11   With some of his interpretation of the
12   contracts.
13   Q.   Did you feel like you had a
14   good relationship with the folks in
15   charge of the Gatorade business?
16   A.   Well, I really dealt with Ken.
17   I didn't really deal with -- when you say
18   the folks in charge, talking about the
19   folks out of Chicago?
20   Q.   Or whoever it was that was the
21   main person at Pepsi or Gatorade who
22   was --
23   A.   Yeah, the person I dealt with

Page 132

1    was Ken Shelly, and I felt like I had a
2    very good relationship with Ken Shelly,
3    yes. We had disagreements, and we both
4    were very -- we talked very straight with
5    each other. We respected each other's
6    point of view. As far as dealing with
7    the people above him, that was Jeff Larry
8    and Ricky and Mike O'Connell and Patrice
9    Daniels and Henry. They dealt with the
10   people above. I dealt with Ken.
11   Q.   Would you say that you felt
12   you had a good relationship with all of
13   your customer contacts?
14   A.   The only one I struggled with
15   was a contact at Tropicana. Sharon
16   LaBree I think was her name. Her and I
17   struggled a little bit. We had
18   contentious discussions over the contract
19   that we renegotiated in -- somewhere
20   around 2003 we had to renegotiate a
21   contract. And it was a very difficult
22   contract to renegotiate because contracts
23   in that business was all about managing

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 133 to 136)

Page 133

1  risk. And we want as little risk as
2  possible, and they want as little risk as
3  possible. So that's part of the process
4  in contract negotiations.
5       Some people -- you know, some
6  people want to fight a little harder for,
7  you know, their -- where that line is
8  drawn in terms of risk. And she was a
9  very, very tough negotiator, very tough.
10  But other than her, I think -- I mean --
11  and I think I -- I mean, I respected her.
12  I respected her point of view. I would
13  hope she respected mine.
14       But other than that, my sense
15  is we got along -- I'm trying to go
16  through. Campbell's was very solid, very
17  solid. A guy named Tom Vanholten.
18       Q.  At Campbell's?
19       A.  At Campbell's, yeah. Had a
20  very solid relationship with Campbell's.
21  Solid relationship with Craft. Solid
22  relationship with Nestle. We struggled
23  with the Hershey account for a variety of

Page 134

1  reasons. I don't think I had a bad
2  relationship with them. In operation I
3  think we struggled with them. I'm trying
4  to remember the list. We've talked about
5  Kellogg's, Craft, Campbell.
6       Q.  Quaker?
7       A.  Quaker was Ken Shelly.
8       Q.  Nestle?
9       A.  Nestle, had a very good
10  relationship with Nestle.
11       Q.  Who was your main contact?
12       A.  Well, there's a guy named
13  Clark Rasmussen. There was -- he was
14  really Mike O'Connell's main contact.
15  There was a guy named Randy, I forget his
16  last name, QA guy that I dealt with a
17  lot. There was another gentleman, and
18  his name will come to me. I apologize.
19  I just haven't looked at these names in a
20  while. There were probably three -- oh,
21  gosh, his name is on the tip of my
22  tongue. Anyway, yeah, the Nestle deal
23  was -- you know, I mean, I think I had a

Page 135

1  very good relationship with everybody.
2  The only one I can think of that might
3  have been a little contentious would have
4  been Sharon.
5       Q.  You're unaware of any of these
6  customers ever complaining about you?
7       A.  Completely unaware of that.
8       Q.  At some point did SouthTrust
9  make a decision to no longer finance
10  Piknik?
11       A.  Not to my knowledge. When you
12  say no longer finance them, are you
13  talking about any time or when Onyx was
14  there or what?
15       Q.  After Onyx came on board?
16       A.  I am -- I know what I've been
17  told through Onyx communication. But
18  other than that, I don't know because I
19  wasn't involved in any discussions.
20       Q.  What were you told through
21  Onyx communication?
22       A.  Well, they had sent out a
23  communication that Onyx had refused to

Page 136

1  allow other investors in the business --
2       Q.  That Onyx refused?
3       A.  Excuse me. I'm sorry. That
4  the bank refused to allow other investors
5  in the business, and it was for those
6  reasons that the company was either going
7  bankrupt or heading for it or whatever.
8  That was the statement.
9       Q.  Who made the statement?
10       A.  They had something called a
11  talking points that they came out with
12  that they had passed along to customers,
13  kind of a Q&A like, you know, why are you
14  doing this or what led to this. I mean,
15  they even publically came out with it in
16  the newspaper, Brundidge and so forth.
17  Essentially, the argument was that our
18  lender has refused to allow -- support
19  our efforts in financing, so therefore
20  this has forced us to do what we've got
21  to do.
22       Q.  Do you recall if this was
23  around early to middle of June of 2005?

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 137 to 140)

Page 137

1　Does that date --
2　　A.　Well, the talking -- I
3　remember seeing the talking points. That
4　was probably around May or June,
5　somewhere around that period of 2005.
6　　　You've got to understand. Up
7　until this point we had all been
8　deceived. I mean, we were being told
9　everything is great; we've got access to
10　capital; we know what we're doing. I
11　mean, vendors were being deceived,
12　customers. Everybody was being deceived.
13　And all of a sudden, bam, overnight we --
14　things changed, I mean, literally
15　overnight. Everybody is being
16　terminated. People's salaries are being
17　cut. Vendors not being paid. I mean, it
18　was the most -- it was criminal as far as
19　I'm concerned the way it was handled.
20　　Q.　Who was engaging in the
21　deception?
22　　A.　Onyx.
23　　Q.　Who in particular at Onyx?

Page 138

1　　A.　Jeff Larry, Chris Day, Henry
2　Hicks. My impression of the way they
3　operated was that they all knew what was
4　going on all along internally. And my
5　assumption is -- I don't know this
6　because I didn't sit in discussions with
7　them -- is that Henry would have been as
8　aware of all this as Chris would have
9　been, Jeff would have been and probably
10　to some extent Patrice.
11　　Q.　And this is your assumption?
12　　A.　This is my -- this is my
13　belief that this was all -- this was a
14　clear conspiracy to defraud vendors,
15　customers, employees.
16　　Q.　Explain to me your conspiracy
17　theory to defraud.
18　　A.　Well, for example, I sat in a
19　meeting with Kellogg's in Battle Creek --
20　is it Michigan?
21　　Q.　This is your testimony.
22　　A.　I know. Battle Creek,
23　wherever it is, wherever they're

Page 139

1　headquartered. They asked them a
2　question about their relationship with
3　the bank. They told them it was a great
4　relationship with the bank.
5　　Q.　When this was meeting?
6　　A.　It was -- I think it was in
7　like -- I remember it was very cold. It
8　was in I think January or February of
9　2005, somewhere around that period.
10　Correspondence, I mean, you know, it was
11　on and on and on.
12　　Q.　Tell me about the
13　correspondence.
14　　A.　Should I get the copies of it
15　and just hand -- I mean, it was --
16　　Q.　Yeah.
17　　　MR. NELMS: Tell her what you
18　know.
19　　A.　What I know is we had --
20　remember these financial meetings that we
21　had?
22　　Q.　The weekly financial meetings?
23　　A.　Eventually they -- eventually

Page 140

1　they took me out of running the meeting.
2　They also cut off access to the financial
3　information to me and the team, okay. We
4　were the ones that were questioning them
5　on some of their decisions. Huge
6　salaries to the partners, excessive
7　expense accounts. It was -- I mean, it
8　was just a travesty. I mean, and the
9　whole time we're being told, we know what
10　we're doing.
11　　　I remember Chris one time in a
12　meeting saying, guaranteed -- guys, don't
13　you worry about the financials of this
14　company. We're looking at the financials
15　saying, look, you know, you're draining
16　money here, you're not focused on the
17　right things, you're giving discounts to
18　customers you shouldn't be, you're making
19　decisions --
20　　　I mean, the reason Piknik
21　derailed was because of Brundidge. The
22　reason Brundidge derailed was because of
23　some of the pricing decisions that Henry

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 141 to 144)

Page 141

1  was making in Brundidge. The beverage
2  business was --
3      Q.   That's your opinion; right?
4      A.   Well, look at the data. Look
5  at the financial records.
6          MR. NELMS:  Answer her
7  question.
8      A.   Yes, that's my opinion.
9      Q.   So you think there is a
10 conspiracy to defraud because in January
11 or February 2005 Kellogg's people were
12 told that they had a good relationship
13 with the bank?
14     A.   Well, that was one incident I
15 was privy to.
16     Q.   Sure. And is it your belief
17 that the relationship with the bank was
18 not -- was not a good one at that time?
19     A.   It was my belief at the time
20 that the bank was starting to -- I was
21 under the impression that there were some
22 serious problems. Well, it was -- look,
23 by that time it was a year and a half

Page 142

1  into their tenure. These people didn't
2  know what they were doing.
3          So it was my contention that
4  just on -- and I don't remember the
5  specifics. It's not like the bank called
6  me up and said what's going on. But just
7  being aware of all the discussions and
8  the financial situation it was clear to
9  me that they were in -- and they were --
10 well, excuse me. We were aware that they
11 had gone to this bank and they, you know,
12 couldn't get financing. They had gone to
13 this bank and couldn't get financing.
14         Something was adrift and I
15 didn't know what it was. But I'm sitting
16 here in a meeting, and they're telling
17 this customer that everything with the
18 bank -- the bank loves them and
19 everything with the bank is fine. I knew
20 that wasn't true. I mean, so --
21     Q.   But you weren't in direct
22 communications with SouthTrust?
23     A.   No.

Page 143

1      Q.   Is that correct?
2      A.   That's correct.
3      Q.   So this is an opinion that you
4  formed based on things that you had seen?
5      A.   Yes.
6      Q.   Are you aware that at some
7  point in time Arizona Iced Tea wanted an
8  investment of about 1.4 million, wanted
9  Piknik to invest in new equipment in the
10 range of 1.4 million?
11     A.   I don't remember that
12 specifically, but that -- yeah, that's
13 very normal where a customer wants you to
14 invest to run their product. Yes, that's
15 a very normal part of it. I have no
16 doubt that probably occurred, yes.
17     Q.   And the same kind of question,
18 are you aware that Gatorade also asked
19 for a new equipment investment in the
20 range of 1.4 million as well?
21     A.   Well, they probably asked for
22 that many, many times the investment.
23 But in the copacking world it's typical

Page 144

1  that a customer that wants a new
2  process -- that's part of the
3  negotiation, I want you to invest your
4  capital not mine. On the other side, no,
5  you want this new process, I want you to
6  invest the capital because you may or may
7  not -- this product may or may not be
8  successful. I don't want to have a
9  million dollars sunk in a product that's
10 not selling. So, yeah, those -- that's
11 common. That's ongoing. We're always
12 negotiating who invests in what.
13     Q.   In the Fall of 2004 were you
14 involved in the negotiations with
15 Gatorade about investing 1.4 million in
16 new equipment at Piknik?
17     A.   In the Fall of 2004? If
18 you've got a document I can refresh my
19 memory. I don't remember that specific
20 amount at that specific time. What I'm
21 trying to get across to you is that those
22 negotiations were always was going on.
23     Q.   That's a common thing?

36

JERRY A. MCCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                            August 14, 2007

(Pages 145 to 148)

Page 145

1    A.   That's very common in that
2 business, yes. We're always talking
3 about I want this new product, this new
4 process. Can you invest the money, no.
5    Q.   So do you have any specific
6 recollection about negotiations with
7 Nestle around the same time period asking
8 Piknik to invest about one and a half
9 million in new equipment?
10    A.   Again, if that was in 2004,
11 right? So we were in the process of
12 bringing in a product called Juicy Juice,
13 and there was some capital required to
14 bring that product in. And I'm sure in
15 that -- again, I haven't read the
16 document. You've got to remember there's
17 hundreds of e-mails on these clients.
18 I'm sure in the process of negotiating
19 who pays for what they probably requested
20 that we make an investment, yes.
21    Q.   Would you be involved in those
22 negotiations and those discussions?
23    A.   Well, at that stage I was

Page 146

1 probably -- I wouldn't -- at that stage
2 that's where Henry was more directly
3 involved in discussions with Nestle in
4 terms of negotiating like "I need
5 capital," but I was there obviously to
6 help on-board.
7        I mean, you know, he could
8 have a discussion with a customer that
9 says, I want 1.4 million. He can go back
10 to Onyx and say we've got to find this
11 capital. Then I get involved and say why
12 would you do that, you don't have to do
13 that in this business. You know, I would
14 help him through the negotiation.
15        But, I mean, I'm sure -- yes,
16 I do recall there was -- I'm sure there
17 was a negotiation around who was going to
18 invest in that equipment. And the last I
19 remember is that we had -- we had
20 secured -- we had bought -- this is
21 getting back to the whole point about
22 defrauding vendors.
23        I think -- we had a vendor

Page 147

1 come in and start installing some
2 equipment and never got paid. He
3 actually was part of the bankruptcy
4 lawsuit. I don't know what ever happened
5 to it. But he was upset because he
6 had -- obviously it had been
7 misrepresented to him, our financial
8 condition. So he didn't get paid, and he
9 invested a lot of time and money and
10 capital into our building, yes, to run
11 Juicy Juice.
12    Q.   Are you aware of
13 communications between SouthTrust and
14 Piknik about financing, you know, the
15 loans to obtain the equipment for Arizona
16 Iced Tea, for Gatorade and for Nestle?
17    A.   No. I would not have been
18 involved in negotiations with SouthTrust
19 at all.
20    Q.   Were you involved in any
21 discussions with a group called Apollo
22 Management --
23    A.   No.

Page 148

1    Q.   -- about financing the
2 purchase of that equipment?
3    A.   No.
4    Q.   Were you aware that around
5 June of 2005 Piknik's checks started
6 bouncing because of something SouthTrust
7 had done? Were you aware of that --
8    A.   What I was aware was
9 somewhere -- it happened in Brundidge
10 first. Apparently vendors weren't being
11 paid. So they actually closed up
12 operation first. And it was, I mean, two
13 or three months before it started
14 affecting the beverage side. We started
15 hearing about, you know, that vendors
16 weren't being paid and they were starting
17 to cut off shipment of raw materials,
18 which was kind of a shock to us because,
19 you know, we had been told all along
20 things were fine.
21        So, yeah, it was somewhere
22 around -- I don't know whether it was
23 June or May or April. Somewhere

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 149 to 152)

Page 149

1   around in this -- and the other thing --
2   well, yeah, somewhere around April, May
3   period, June, we just started hearing
4   that people weren't getting paid.
5       Q.   Were you hearing that from
6   vendors?
7       A.   I was hearing it from people
8   inside the company that were talking to
9   people in Brundidge.  Apparently it -- it
10  started in Brundidge, and then it started
11  bubbling up, that well, you know, they're
12  not shipping bottles anymore and they're
13  not shipping containers and they're not
14  shipping this and not shipping that.  We
15  can only run so far and then we've run
16  out of closures and so we've got to shut
17  down this line.  I mean, it was like a
18  slow death, and then eventually it was --
19  they started coming clean on what was
20  going on.
21      Q.   Who was feeding you the
22  information?
23      A.   I mean, I don't remember

Page 150

1   specifically.  I mean, I don't remember
2   specifically having a conversation, but
3   it may have been -- it may have been
4   the -- I think -- actually, I think it
5   could have been -- I forget her name.  It
6   was Anne something who was in customer
7   service in Brundidge.  It was Anne
8   something.  Because one of my jobs that
9   Henry put me in charge of was customer
10  service in Brundidge.
11      So I was only in the job for
12  short months and then this started
13  happening.  But it was Anne somebody.
14  And she started sharing that with me.
15  I'm sure she had to be the one because
16  she was the one that would know what was
17  going on down there.  I'll think of her
18  last name in a second.  I apologize.
19      Q.   I may be able to help you out
20  with that.  Were you involved in any
21  discussions with SouthTrust
22  representatives about making personnel
23  cuts at Piknik?

Page 151

1       A.   Say it to me again.
2       Q.   Were you ever involved in any
3   discussions with SouthTrust
4   representatives about making some
5   personnel cuts at Piknik?
6       A.   Personnel cuts?  No.
7       Q.   Were you involved in any
8   discussions with SouthTrust about
9   SouthTrust's willingness to fund payroll
10  for Piknik?
11      A.   No, no.
12      Q.   Were you involved in any
13  discussions with SouthTrust
14  representatives about the payment or
15  nonpayment of severance packages?
16      A.   Not to my knowledge.  Payments
17  of severance packages?
18      Q.   Correct.  Did you understand
19  the question?
20      A.   Yeah.  I mean, did I talk to
21  anybody, you know, there's a severance
22  package, there's not a severance package?
23      Q.   Okay.  Did you ever have any

Page 152

1   discussions with SouthTrust
2   representatives about whether SouthTrust
3   would provide the monies to pay severance
4   packages for Piknik?
5       A.   No, I don't recall having that
6   conversation with anybody, I mean, with
7   SouthTrust, or anybody for that matter.
8       Q.   I understand that your claim
9   in this case is race discrimination?
10      A.   Yes.
11      Q.   And it's reverse race
12  discrimination; correct?
13      A.   It's what?
14      Q.   Reverse race discrimination?
15      A.   What does reverse mean?  It's
16  either race discrimination or it's not.
17      Q.   Well, we'll talk about those.
18  You can strike that question.  That's
19  just legal jargon that you don't need to
20  worry about.  And you're Caucasian?
21      A.   I am.
22      Q.   First I want you to name the
23  individuals who you contend treated you

JERRY A. McCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                          August 14, 2007

(Pages 153 to 156)

Page 153

1  differently because of your Caucasian
2  race.
3      A.    The people who treated me
4  differently?
5      Q.    Because you were Caucasian.
6      A.    I mean, can you give me an
7  example of treated me differently?
8      Q.    Well, this is your lawsuit.
9  You filed it.
10     A.    Okay.
11         MR. NELMS:  Do you understand
12  the question?
13     A.    Well --
14     Q.    Do you understand the
15  question?
16     A.    You just told me I'm supposed
17  to know the question.
18     Q.    Well, if you don't, then I can
19  rephrase.
20     A.    Please rephrase.
21     Q.    Like I said, you claim race
22  discrimination; correct?
23     A.    Right.

Page 154

1      Q.    That you were treated
2  differently because you were white;
3  correct?
4      A.    And terminated because I was
5  white.
6      Q.    Okay.  So is the basis of your
7  race discrimination claim the
8  termination?
9      A.    Well, that's -- yeah.  That, I
10  understand, is the law that was broken.
11  But, yes, there was a whole two years
12  leading up to that where, I guess, to
13  answer your question I was treated
14  differently.  There's no question about
15  that.
16     Q.    We'll take it this way.  Tell
17  me every which way you contend you were
18  treated differently because you are
19  Caucasian.
20     A.    Okay.  The people that treated
21  me differently would be Patrice Daniels,
22  Chris Day, Jeff Larry, Henry Hicks.
23  Okay.  Where they treated me differently

Page 155

1  was the emasculation of my role in the
2  company, emasculation of me in the eyes
3  of -- yet, I was the person --
4         Remember we were talking
5  earlier that I continued to perform the
6  role even though the title charged and
7  the reporting structure changed?  Yet
8  they had -- they had a problem.  The
9  problem was they wanted to put Henry into
10  this role and they wanted me to train
11  him, but it was going to take a long time
12  to do it.  And I think they were trying
13  to avoid this EEOC claim, and I think
14  that's why they -- if you look at the
15  pattern and you look at the roles and the
16  titles and the blah, blah, you know,
17  follow the bouncing ball, you realize,
18  hey, they clearly had -- this was all
19  premeditated in terms of their plans.  It
20  was just a matter of how do we get Henry
21  up to speed and then move him out of the
22  way and avoid an EEOC claim.
23         But the quandary was they

Page 156

1  brought in a guy to take the job over
2  that didn't have the capacity to ramp up
3  as quickly as he needed to.  You don't
4  step into this job, just like I wouldn't
5  step into your job, and take it over in
6  three months.  Just don't do it.  So that
7  was the quandary.
8         And, yes, I was treated --
9  clearly treated with -- I mean, Patrice
10  would refer to me as Winter.  She
11  wouldn't call me by my first name.  It
12  was very insulting.  I would let -- I
13  talked to Henry about it.  I was afraid
14  to talk to her about it because she was
15  very -- it was clear to me she could be
16  quite vindictive and was very --
17  personally treated me with a lot of
18  disrespect in these meetings.  I think
19  she was -- I don't know why.  I can't
20  begin to answer why.
21         I would say of all of them
22  Jeff probably, at least on the surface,
23  treated me with the most respect.  Behind

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 157 to 160)

Page 157

1 the scenes, I don't know what went on
2 behind the scenes. Clearly he was
3 involved in these decisions because of
4 his role. But, at least on the surface,
5 he was respectful of me personally. And
6 I think -- I mean, Chris, of course, was
7 -- had treated me disrespectfully.
8     Q.   Anything else?
9     A.   In terms of?
10     Q.   What you contend was different
11 treatment based on your race?
12     A.   Well, you know, how do you
13 describe -- that's a good -- how do you
14 describe the feeling of race. I never
15 had been in this situation before. I
16 mean, this was a -- let's face it, you
17 know, this was a new experience for me,
18 okay. I mean, I had experienced race --
19 maybe, you know, economic racism, if you
20 will, you know, as a younger child where
21 you're not as wealthy as others. This
22 was kind of a first for me.
23     And, you know, how do you

Page 158

1 describe -- yeah, it was clear to me that
2 because of my race, you know -- and it
3 was almost like they were -- they didn't
4 want me there and they wanted to put
5 Henry in the job but they couldn't, and
6 so it was almost where they were
7 frustrated by that.
8     I mean, Patrice sends me an
9 e-mail one day and says how are you
10 coming in your -- how are you coming in
11 your VP of Purchasing job. I shot her a
12 note back and said, Patrice, I'm still
13 doing a hundred percent of the job I
14 always did. You tell me how I'm supposed
15 to disengage.
16     And eventually what they did
17 is put me under Henry, because I think
18 finally Henry must have gone to them and
19 said, look, I can't do this job, I don't
20 know this job, I've got to keep him in
21 here for a longer period of time.
22     So they put me under him, and
23 I continued to perform the job and

Page 159

1 provide him all the documentation and
2 counsel him and coach him and, you know,
3 let him go off and meet the customer and,
4 you know, make the sales pitch. I mean,
5 yeah, it was -- you know, here's a guy
6 that is doing the work; yet, it's clear
7 to me that there is a strategy to
8 ultimately remove me from this company.
9     And the worst part about it is
10 the decisions that were made that I had
11 no control over anymore like, you know,
12 let's discount this. Why? I mean,
13 you've got to run -- we tried to get them
14 to sit down and have an honest discussion
15 about the financials of the company.
16 They wouldn't do it. We knew the company
17 was heading south. I mean, they
18 essentially were draining the company of
19 funds, and when it finally went under
20 they packed up and left.
21     So, you know, during that
22 time, yeah, I was -- it was a -- it was
23 a -- how do you describe racism. It

Page 160

1 felt -- I could feel it. It's hard to
2 describe it, but, boy, you could feel it.
3     Q.   Anything else?
4     A.   Not at this time.
5     Q.   Just so that I'm clear, you
6 contend that the following individuals
7 treated you differently because you were
8 Caucasian: Patrice Daniels, Chris Day,
9 Jeff Larry and Henry Hicks; is that
10 correct?
11     A.   Well, those four definitely.
12 I'm trying to think of others. I didn't
13 sense it from others, no.
14     Q.   And you have sued Chris Day,
15 Jeff Larry and Henry Hicks individually,
16 correct?
17     A.   Yes.
18     Q.   But not Patrice Daniels?
19     A.   Yeah, I don't think we have
20 included her in the suit. But you asked
21 me the question did she treat me
22 differently. Yes.
23     Q.   Do you intend to name Patrice

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 161 to 164)

Page 161

1 Daniels as a defendant in this lawsuit?
2     A.    Potentially.  And there was
3 one other individual, yes.  And I
4 apologize.  Anthony Barber.  It was late
5 in the game, but he certainly would
6 qualify.
7     Q.    And what is Anthony Barber's
8 race?
9     A.    He's African-American.
10     Q.    I think you said Patrice
11 Daniels is African-American?
12     A.    Yes.
13     Q.    Jeff Larry is
14 African-American?
15     A.    Yes.
16     Q.    Henry Hicks is
17 African-American?
18     A.    Yes.
19     Q.    Chris Day is Caucasian?
20     A.    Yes.
21     Q.    Now, I want to make sure that
22 I'm clear on what you contend were the
23 discriminatory acts towards you.

Page 162

1     A.    Okay.
2     Q.    One, you said that there was
3 an emasculation of your role in the
4 company?
5     A.    Yes.
6     Q.    And who --
7     A.    Maybe you could define it as I
8 was marginalized.  That's maybe another
9 way to represent it.
10     Q.    We're going to talk about
11 these.  I want to make sure I have my
12 list of what your claims are.
13     A.    Okay.
14     Q.    You felt that your role was
15 marginalized, your role within the
16 company was marginalized because --
17     A.    More so within the eyes of the
18 customer.  And, yeah, within the company,
19 yeah, certainly.  I mean, everybody saw
20 it.
21     Q.    And you claim -- it's your
22 claim that your role in the eyes of the
23 company and in the eyes of the customer

Page 163

1 was marginalized because you are
2 Caucasian?
3     A.    Yes.
4     Q.    And the marginalization, if
5 that's a word, has to do with your belief
6 that Henry Hicks was placed in your role
7 and that you had to train him and all of
8 that; correct?
9     A.    That's correct.
10     Q.    And we're going to talk about
11 that in detail.
12     A.    Okay.
13     Q.    The second way that you
14 contend that you were discriminated
15 against because of your race is because
16 Patrice Daniels called you Winter?
17     A.    I use that as an illustration
18 of things that she would do that were
19 overt examples of being treated
20 differently, yes.
21     Q.    And a third way that you
22 contend you were discriminated against
23 because of your race was when Patrice

Page 164

1 Daniels sent you an e-mail asking how you
2 were coming along as Vice President of
3 Purchasing?
4     A.    Well, I mean, it was -- if you
5 want examples of how she -- I mean, in
6 meetings she would talk down to you.  She
7 would cut you short.  She would disregard
8 your point of view.  She had the power.
9 She was a partner of Onyx.  She made it
10 clear she was running the show.  We were
11 just her subjects, okay.  I mean, let's
12 cut to the chase here.  It was very -- it
13 was all about her, and we were just a
14 bunch of young -- just a bunch of
15 southern rednecks that didn't know what
16 we were doing and she was going to come
17 and save our company.  And you were
18 ignored.
19     You know, I got into a major
20 issue with Craft over a -- we told -- we
21 would be in meetings with her and tell
22 her, Patrice, you can't do that.  Well,
23 she had the authority and said, no, we're

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 165 to 168)

Page 165

1  going to do that because I'm Patrice.
2  And we end up almost -- we ended up
3  really major upsetting Craft. We had to
4  go back to them after they had been down
5  to do an on-boarding project. We told
6  Patrice we couldn't do this project
7  because it violated the Hershey terms.
8  She says to me, we'll deal with that when
9  the time comes.
10      Well, I'm not going to sit and
11  fight with her on it. I knew that was
12  going to be -- I told her it was going to
13  be a problem, but she didn't want to
14  accept that. And so, guess what, soon as
15  Hershey finds out about it they exert
16  their rights in the contract. We had to
17  go up and -- I mean, call up and ask the
18  folks at Craft how that meeting went with
19  Henry. Henry got whipped in that meeting
20  because of what they did, you know, those
21  decisions that were made. And Patrice
22  was very upset with me because I called
23  her out on it. I said, Patrice, I told

Page 166

1  you this was going to happen. So, I
2  mean, you're --
3      Q.  So, generally speaking, then,
4  you have a general claim --
5      A.  The arrogance --
6      Q.  -- that Patrice Daniels
7  treated you disrespectfully because of
8  your race?
9      A.  Because of my race.
10  There's --
11      Q.  And we'll talk about examples
12  of that. I'm trying to get some global
13  topics that we can follow up on.
14      MR. NELMS:  Can we do it after
15  lunch?
16      MS. MCGAHEY:  I'm going to go
17  through and get the list, and then we'll
18  go through the details after lunch.
19      Q.  (BY MS. MCGAHEY:)  So I guess
20  the second thing that you're contending,
21  then -- because the first thing is you
22  claim your role was marginalized in the
23  company and the eyes of the customers

Page 167

1  because you are Caucasian, correct?
2      A.  Yes.
3      Q.  Number two is that Patrice
4  Daniels --
5      A.  Let me back up a second. I
6  want you to be clear about this. Part of
7  the reason that they wanted to emasculate
8  me in the eyes of the customer is because
9  this was all planned. This was all
10  planned.
11      Q.  And we're going to talk about
12  your belief on that.
13      A.  Okay. So, you know, I mean,
14  obviously a jury will have to decide
15  this. But this was, in my point of view,
16  and I think the evidence will show, was,
17  yes, that was all planned, and it was
18  executed. It wasn't executed on their
19  original timeline, but it was eventually
20  executed, yes.
21      Q.  Number two is that Patrice
22  Daniels treated you disrespectfully
23  because you are Caucasian?

Page 168

1      A.  Yes.
2      Q.  And we're going to talk about
3  those examples after lunch.
4      A.  Okay.
5      Q.  Number three is that Chris Day
6  treated you disrespectfully because of
7  your race; right?
8      A.  Well, again, you've got to
9  understand the context or the -- what do
10  you guys call it, pretext. I mean,
11  here's this guy Winter. He's running the
12  business. He's white. We're an MBE. We
13  want this guy to take over. How do we
14  move him out and put this guy in and at
15  the same time make sure we transition in
16  such a way the business continues run.
17  So that is the context in which all of
18  this is happening. So when I say to you
19  do I think Chris Day is racist against
20  white people? No, I don't think he is.
21  But was I treated differently because of
22  the conspiracy afoot? Yes.
23      Q.  And then you claim that you

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 169 to 172)

Page 169

1  were terminated because of your race?
2      A.   Yes.
3      Q.   So those are the four kind of
4  just broader topics that I have listed.
5  Are there any broader topics that you can
6  think of?
7      A.   I don't know what else I
8  could -- I mean, I was terminated because
9  I was white. There was a conspiracy to
10  move me out because I was white. And all
11  of these other things that went on
12  between were just part of the strategy,
13  yes. So, I mean, I don't know what else
14  there could be. I mean, I was treated
15  differently and I was fired because I was
16  white.
17      Q.   Okay. I'm trying to make it
18  clear. I'm not trying to trip you up.
19      A.   Okay.
20          MS. MCGAHEY:  We can take a
21  lunch break.
22          (Whereupon, a lunch break was
23          taken from 12:02 to 1:23 p.m.)

Page 170

1          (Whereupon, Defendant's
2          Exhibit 1 was marked
3          for identification.)
4      Q.   I'm going to hand you what has
5  been marked as Defendant's Exhibit 1 to
6  your deposition. If you could please
7  turn to the third page of that document
8  and let me know if that is your
9  signature.
10      A.   It looks like it is, yes.
11      Q.   And this is "Piknik Products
12  Confidentiality Agreement"; correct?
13      A.   Correct.
14      Q.   And you executed it on January
15  22, 2001, if you turn to the first page?
16      A.   Yes, it looks like.
17          (Whereupon, Defendant's
18          Exhibit 2 was marked
19          for identification.)
20      Q.   I am now handing you what has
21  been marked as Defendant's Exhibit 2 to
22  your deposition. If you could please
23  turn to the last page of that document

Page 171

1  and let me know if that is your signature
2  on the employee line?
3      A.   Yes, that looks like my
4  signature.
5      Q.   And you executed that document
6  on July 9, 2004?
7      A.   I think so, yes.
8      Q.   And this is acknowledging that
9  you would comply with Piknik's Internet,
10  E-mail and Telephone Use Policy; correct?
11      A.   Yes.
12      Q.   Before the lunch break you
13  were telling me the ways in which you
14  believe you were treated differently
15  because of your race.
16      A.   Yes.
17      Q.   And one of the ways was in
18  your departure, your termination;
19  correct?
20      A.   Yes.
21      Q.   You claim you were terminated
22  because of your race?
23      A.   Uh-huh.

Page 172

1      Q.   And you claim that Patrice
2  Daniels treated you disrespectfully
3  because of your race?
4      A.   Yes.
5      Q.   And that your role in the eyes
6  of customers and within the company was
7  marginalized because of your race?
8      A.   Yes, it was.
9      Q.   Like I said, we're going to
10  talk about the details of those three
11  categories. But is there any other way
12  in which you believe you were treated
13  differently because of your race?
14      A.   No. I mean, at this point I
15  can't think of other -- I mean, there was
16  obviously a lot of different incidents
17  that happened that would be an example of
18  being marginalized or because of my race
19  being harassed or whatever. Yeah,
20  those --
21      Q.   And we're going to talk about
22  those examples that fall within those
23  three categories --

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 173 to 176)

Page 173

1    A.    Okay.
2    Q.    -- is that what you're saying?
3    A.    Yeah, yeah, yeah.  Okay.
4    Q.    Let's first talk about your
5  contention that Patrice Daniels treated
6  you disrespectfully because of your race.
7  Tell me how she treated you differently
8  because of your race.
9    A.    Well, she was very -- I want
10  to make sure I word this properly so it
11  conveys the situation.  But it was a --
12  it was as if there was somebody -- well,
13  this is what really didn't make sense to
14  me.  I didn't know this woman.  But it
15  was as if there was somebody in the room
16  and it's clear to everybody that this
17  person in power doesn't like them, the
18  way they look at them, the way they refer
19  to them, being totally -- ideas ignored.
20  Yeah, but we don't want to hear your
21  opinion, that kind of stuff.
22        It was clear that she had
23  early on developed an adverse opinion.

Page 174

1  It appeared to be an adverse position.
2  It wasn't clear to me until all this came
3  out, but I think she would have loved for
4  me to be frustrated and resign.  And I
5  was not going to resign because I knew
6  what I was doing.  My heart was in that
7  company and sweat equity, and I had two
8  boys to raise in Montgomery.  I couldn't
9  go find a job in Atlanta anymore.  I was
10  stuck in Montgomery.
11    Q.    So the basis for your claim
12  that Patrice Daniels treated you
13  disrespectfully because of your race was,
14  number one, the way that she looked at
15  you?
16    A.    Uh-huh.
17    Q.    Is that a yes?
18    A.    Yes.
19    Q.    Number two, the way that she
20  talked to you?
21    A.    Yes.
22    Q.    And, number three, she ignored
23  your ideas?

Page 175

1    A.    Ignored my ideas, yes.  The
2  way she referred to me as, you know,
3  Winter constantly.
4    Q.    And Winter is your last name;
5  correct?
6    A.    Yeah.  But why didn't she call
7  Hicks Hicks or Mayer Mayer or McGlon
8  McGlon.
9    Q.    Were there other Bobs working
10  at Piknik at the time?
11    A.    Yeah, Bob Lampert.  She called
12  him Bob.
13    Q.    And you think she called you
14  Winter because of your race?
15    A.    I think she terminated me
16  because of my race.  I think she called
17  me Winter because she was -- she
18  disrespected me, and in part and parcel I
19  think there was a -- you know, if I could
20  have resigned, it would have been a lot
21  easier on them.  So why not just treat --
22  I mean, this young lady here is new to
23  the law firm.  Treat her disrespectfully,

Page 176

1  maybe she will quit and go somewhere
2  else.
3    Q.    How would she look at you?
4    A.    She didn't really look at me.
5  I mean, it was always with a kind of -- I
6  mean, you know, you're -- it was a kind
7  of a -- you know, she just looked at me
8  with just -- how do you describe somebody
9  that looks at you and you feel very --
10  kind of an intimidating look.
11        I don't know how you describe
12  that.  It's a feeling, okay.  Can I offer
13  up the fact I felt all these things and
14  she looked at me in such a way that made
15  me feel very small, insignificant, I
16  don't like you, I don't want you here, I
17  need you to go away; I'm going to make
18  your life miserable; I'm in charge and
19  you're not.
20        She was the worst one, and
21  then closely behind her was Chris.  What
22  I'm describing to you was Chris, only not
23  quite as overt as Patrice, followed by

44

JERRY A. MCCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                            August 14, 2007

(Pages 177 to 180)

Page 177

1    Henry and then followed by Jeff in terms
2    of level of intensity in terms of those
3    descriptions.
4         Q.   So was she making some ugly
5    faces at you or just stern looks? I'm
6    trying to understand the looks that she
7    was directing towards you?
8         A.   I'm sorry. What's your name?
9              ALICE (Bradley Arant Law
10   Clerk): Alice.
11        A.   "Alice, you don't know what
12   you're talking about. Let's go on."
13        Q.   MR. NELMS: That's an example?
14        A.   That's an example. I'm sorry.
15             MS. MCGAHEY: Thank you for
16   clarifying because I was about to have
17   to --
18        A.   Sorry, sorry. For
19   illustration purposes only. I apologize.
20             MS. MCGAHEY: She is not being
21   paid enough to suffer.
22        Q.   (BY MS. MCGAHEY:) Well, is
23   that also an example of how she talked to

Page 178

1    you?
2         A.   Yeah. Very demeaning,
3    disrespectful. It was humiliating. I
4    mean, clearly there was an intent to --
5         Q.   Why do you say clearly there
6    was an intent? What made it so clear to
7    you?
8         A.   Why would you treat people
9    like that? I mean, she didn't treat
10   other people like that. She didn't treat
11   Henry like that. Didn't treat Chris like
12   that. Why would she treat me like that?
13   I don't know. I didn't know this woman.
14        Q.   So that's your basis for
15   saying that she treated you in a
16   demeaning and disrespectful manner is
17   because you did not see her treat Chris
18   Day or Henry Hicks like that?
19        A.   Yeah. If she treated
20   everybody like that, that's the way she
21   is. But she wasn't always that way. She
22   was very engaging and very -- could be
23   very engaging and quite entertaining with

Page 179

1    others, but in my case it was clearly not
2    the case.
3         Q.   So are you saying that she
4    used a demeaning and disrespectful tone
5    of voice with you when she talked to you?
6         A.   Yes.
7         Q.   And that she did not use that
8    tone of voice with Chris Day?
9         A.   She would not talk to Chris
10   Day like that.
11        Q.   At least not that you heard?
12        A.   Yeah, I mean, I never heard
13   her talk to him that way. I mean, other
14   than, you know, she would treat Jerry
15   that way. I mean, you'll talk to Jerry.
16   He'll give you his own point of view.
17   You know, Shannon and Bert will give you
18   their point of view on that. I'll let
19   them do the speaking themselves. But I
20   didn't see her act that way with others
21   other than those four of us.
22        Q.   And you said that she ignored
23   your ideas?

Page 180

1         A.   Not every -- I mean, when I
2    say ignored my ideas, I got the
3    impression that she was put off by the
4    fact that I was offering ideas. Like,
5    why would you think -- like, "well, I
6    know that, I know that, we'll get to that
7    that later; yeah, I'll deal with that
8    later." It was you get shut down.
9              You're trying to protect a
10   company. You're trying to build a
11   company. And the very people that are
12   supposed to be the owners are shutting
13   down the very people who understand how
14   this thing runs.
15        Q.   And was it your feeling or
16   belief that Patrice Daniels didn't know
17   how to run the company?
18        A.   I think the part she
19   understood was how to work on the
20   financial side -- not economic side. In
21   the sense of understanding how do you
22   work with banks and how do you, you
23   know -- how do you recapitalize

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 181 to 184)

Page 181

1  businesses.  I mean, that was her area of
2  expertise, not in operations.  No, she
3  didn't bring any expertise to that.
4      Q.    So she was capable in your
5  opinion to handle the financial side of
6  the business; is that correct?
7      A.    No, I wouldn't say it that
8  way.  What I said was my understanding
9  was, I was told that she was competent in
10  regards to venture capital activities
11  such as recapitalizing, purchasing
12  businesses, restructuring balance sheets,
13  things like that.  I never witnessed it.
14  I didn't have a chance to place a
15  judgment on that.  That's what I was
16  told.
17      Q.    By whom?
18      A.    By Jeff Larry, by Chris Day.
19      Q.    And it's your belief that she
20  did not have any operations experience?
21      A.    No, she did not have any
22  operations experience.
23      Q.    Do you know what her previous

Page 182

1  experience had been?
2      A.    I think she was -- I think
3  she -- actually, it was on the website
4  for a while, on the Onyx website.  She
5  had apparently been a -- had worked in
6  several merger and acquisition related
7  firms in her career.
8      Q.    But there was nothing that led
9  you to believe that she had operations
10  experience; is that correct?
11      A.    Well, certainly in her resume,
12  I didn't -- on the website I didn't see
13  anything.  But there's -- there's
14  experience and then there's judgment,
15  business judgment.  I didn't see either.
16  I didn't see the day-to-day business
17  judgment, how to deal with difficult
18  issues on an operations standpoint, nor
19  was I aware of any operations experience
20  she had had prior to coming to Piknik.
21      Q.    Have you now described for me
22  the way that she would look at you that
23  led you to believe that she didn't like

Page 183

1  you because of your race?
2      A.    The way that she looked at me?
3      Q.    Correct.
4      A.    Have we not covered that?
5      Q.    I'm just making sure there is
6  nothing else to add?
7      A.    No.  At this stage, no.  I
8  can't think of anything.
9      Q.    And have you told me about the
10  way in which she would talk to you that
11  led you to believe that she had something
12  against you because of your race?
13      A.    Yeah, I think we've covered
14  that as well.
15      Q.    Anything else to add?
16      A.    Nothing that I can think of at
17  this point.
18      Q.    And have you told me the way
19  in which you claim she would ignore your
20  ideas, as you allege, that it was because
21  of your race?   Is there anything else to
22  add to that?
23      A.    Not at this point.

Page 184

1      Q.    How many times did she ignore
2  your ideas?
3      A.    How many times?  I mean, like
4  10 percent of the time, 50 percent, 90
5  percent, two times?
6      Q.    I'll leave it up to you how
7  you want to describe it.
8      A.    If there was an idea that I
9  would have suggested and she would have
10  listened to it -- I mean, in other words,
11  it was never -- there was never positive
12  reinforcement.  In other words, hey, I
13  really -- you know, that's a great idea,
14  you know, after just chastising someone
15  at the table for a comment or whatever.
16  There was never a positive reinforcement
17  of an idea.
18          Now, whether or not that idea
19  was taken and used or discussed with
20  Henry, I don't know.  But she never -- I
21  do not recall -- I do not recall -- there
22  were several e-mails that I had sent
23  her privately about a decision she was

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 185 to 188)

Page 185

1  making -- or it may have been Jeff. I
2  think it was her. I think she was
3  involved too. They wanted to bring Mike
4  and have Mike run the financial meetings.
5      Q.   Mike O'Connell?
6      A.   Mike O'Connell. Remember, for
7  a period of time from August of 2003
8  until January of 2004 he was, quote,
9  unquote, the official COO. And at some
10 point in time, I think it was the e-mail
11 with her, she wanted to -- it had become
12 known to me that they wanted to put him
13 back in charge of the financial meetings.
14     I had been running these
15 meetings for, I don't know, three or four
16 years maybe, two or three years, and Mike
17 had never led one of these. And I was
18 arguing that I didn't think that was a
19 wise decision because, you know, those
20 meetings were a critical component in
21 our -- in our -- in our day-to-day
22 running of our operation, and we needed
23 a -- I felt that Mike was not equipped to

Page 186

1  lead those. He has not demonstrated
2  those in the past.
3      So I made an argument to her,
4  an argument through e-mail, that I didn't
5  think he was qualified to lead those
6  meetings, and she basically responded
7  back and said, well, -- you know,
8  something to the effect of, okay, I
9  appreciate your point of view, but -- and
10 that was like one of the few times I got
11 an affirmative anything from her. But
12 she basically said we're going to put
13 Mike in and see if he can survive or --
14 what was the word she used. We're going
15 to put him there and see if he can carry
16 out the role of a COO, something to that
17 effect. In other words, I can't just
18 keep him -- he is a COO, and I've got to
19 let him be a COO or he's going to fail on
20 his own. So the long and the short of it
21 is the meetings were pulled away.
22     Q.   Again, how many times, you
23 know, or if you want to talk about

Page 187

1  percentage of times, would she ignore
2  your ideas?
3      A.   It felt like most of the time.
4  Let me just say it that way. You're
5  asking me a definitive numerical number.
6  I can't give you it to you. I felt like
7  most of the time.
8      Q.   But there are occasions where
9  she would pay attention to your ideas?
10     A.   Let me give you an example of
11 you ask a question and she paid
12 attention. When she sent me an e-mail
13 and said how is it coming taking over
14 purchasing and I responded back, you
15 know, quite frankly, I've done nothing on
16 it because I'm still performing the same
17 role I always have. I recall the e-mail
18 back was not real -- that one wasn't a,
19 you know, slam on the head, which felt
20 good for a change, but it wasn't like,
21 well, hey, I understand that; maybe we
22 need to rethink your role. It wasn't any
23 of that.

Page 188

1      As I recall -- and I can't
2  recall the e-mail, but I do remember her
3  responding somehow, but the basic message
4  was, you know, at some point I need to
5  relinquish that over to Henry. Did she
6  listen to my ideas? I don't know. It
7  just felt good that she didn't slam it.
8  I don't know it.
9      Q.   What was your idea that you
10 communicated in that e-mail?
11     A.   Well, she asked me have you
12 taken over the VP of Purchasing yet. In
13 other words, have you started performing
14 that role.
15     Q.   Right.
16     A.   And while I had, I wasn't a
17 hundred percent consumed in it, and I let
18 her know that, you know, because Henry is
19 off working and selling mayonnaise and
20 somebody's got to manage -- I mean, that
21 was part -- you say did she understand
22 operations. I don't think she understood
23 the complexity and everything you had to

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 189 to 192)

Page 189

1 do and know to keep that business afloat
2 and running and efficient and getting
3 things done.
4      You don't slap somebody into a
5 position, call them a title and expect
6 them to perform that job. It doesn't
7 work that way, especially if you don't
8 have experience. So I was communicating
9 that to her on a number of occasions.
10      You know, I even had job
11 descriptions I would send them. I mean,
12 it's all coming -- you know, I gave them
13 job descriptions numerous times about
14 here's all the things I perform
15 because -- it wasn't because -- I didn't
16 expect us to be at this point. I was
17 trying to let them know this is what's
18 required and this is the areas I'm
19 focusing on and this is what needs to get
20 done, trying to appeal to them.
21      What I didn't realize at the
22 time is I'm fighting a lost battle. This
23 has already been preordained where I was

Page 190

1 going to be. And I didn't understand
2 that. So now it's all clear to me. But
3 at the time it's like I'm reaching out
4 saying, guys, what about this and what
5 about managing cash flow and what about,
6 you know, the on-boarding requirements
7 and what about -- you know, who's going
8 to put together -- who's going to run the
9 meetings on, you know, all the
10 different -- constantly hitting them with
11 are you thinking about this, who is going
12 to manage this, I need this in my job
13 description.
14      I was almost arguing with
15 them, you know, about what needed to get
16 done because they weren't -- you've got
17 to understand, they weren't there but
18 more than a day or two a week.
19      So it wasn't like they were --
20 they come in for a meeting, make
21 decisions or tell us what they are going
22 to do, and then they go away. We're all
23 trying to run a business. I mean, it

Page 191

1 runs 24-7. It doesn't just run when
2 they're there.
3      So, you know, when you say to
4 me how many times -- I was constantly
5 trying to reach out, but it's like --
6 it's like I was hitting this brick wall.
7 I didn't understand what it was.
8     Q.   So is it the ideas that you
9 were communicating was how to run the
10 business?
11     A.   How to run it, what needed to
12 be focused on, what needed to get done,
13 what we needed to be paying attention to,
14 what wasn't getting done.
15     Q.   And would you agree, though,
16 it was upper management's job to make
17 those decisions?
18     A.   It was -- okay. Upper
19 management being in this case Onyx. When
20 they -- I mean, it would have been Mike's
21 or Onyx, but it was really Onyx. Mike
22 was the COO, but it was really he was
23 reporting to Onyx.

Page 192

1      It was they had the
2 authority -- good question. They had the
3 authority to decide what people did,
4 okay, like in any company. They have the
5 authority to tell you what you need to be
6 doing. I was trying to, as a good
7 soldier, let them know what they were
8 missing and what needed to be done.
9     Q.   So you disagreed with their
10 approach?
11     A.   Oh, yes, yes, absolutely, on
12 many occasions, sure. It's very common
13 in business.
14     Q.   And you claim that Patrice
15 Daniels terminated you because of your
16 race?
17     A.   Yes. Well, Patrice Daniels at
18 the time was not -- at the time of the
19 termination she was not involved in Onyx.
20 She was -- I mean, she may have been, but
21 on the website -- she wasn't at Piknik,
22 and she wasn't on the website anymore,
23 and I just assumed she was no longer

JERRY A. McCARTNEY, ET AL.                                          ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                  August 14, 2007

(Pages 193 to 196)

Page 193

1   involved. I mean, you know, we'll figure
2   that out later. But at this stage we
3   assumed she wasn't -- early on we assumed
4   she wasn't part of it.
5       Q.   But you believe, though, she
6   was involved in the decision to terminate
7   your employment?
8       A.   She was -- she very much could
9   have been at the time of the termination.
10  But it's my contention that she certainly
11  was involved in the plan to eventually
12  terminate my position.
13      Q.   Tell me what was her
14  involvement in the quote, unquote, plan
15  to terminate your position.
16      A.   Okay. Well, she was the
17  executive vice president. She was a
18  partner in Onyx, and she took over
19  control of the sales. Let's see, sales,
20  finance. I think that was it. Maybe --
21  no, sales and finance I believe was her
22  two areas. And I'm sorry. Repeat that
23  again.

Page 194

1       Q.   You have claimed now that
2   Patrice Daniels was involved --
3       A.   Was involved, yes.
4       Q.   -- in the decision to
5   terminate your employment?
6       A.   I believe she was involved in
7   the early stages. As I said earlier, I
8   think it was something that they had
9   already -- it was -- this was a plan that
10  they came with. They were thinking
11  through this, how do we -- you know, what
12  are we going to do.
13          I mean, you know, we haven't
14  got into the whole plan that's been
15  outlined about the plan to put
16  African-Americans into the job. But what
17  I don't know is that on the day of it --
18  it happened in late June of 2005. I
19  don't know if she was consulted on that
20  day. But I think leading up -- certainly
21  during her involvement I think she was
22  aware of the plan that eventually I would
23  be pushed out of the company because of

Page 195

1   my race.
2       Q.   Let's talk about this plan
3   that you keep referring to.
4       A.   Okay.
5       Q.   What was the plan? Who was
6   involved in the plan? When was the plan
7   formulated? Tell me what you know about
8   this quote, unquote, plan.
9       A.   I mean, nobody walked in to me
10  and handed me a document and said, here's
11  our strategic plan regarding replacing
12  Winter because he's white, no.
13      Q.   Well, then, tell me what leads
14  you to believe that there was a plan to
15  terminate your employment. First of all,
16  let's back up. When did you feel that
17  there was a plan, at what point?
18      A.   I mean, I don't recall the
19  specific moment it hit me that, hey,
20  there's a plan here. I think it was when
21  I began to realize that they were not --
22  you've got to remember, I just passed
23  muster with Phillip & Company, okay.

Page 196

1   They had come in and looked at all of us
2   individually with a fine-toothed comb,
3   and I had a very strong review with them.
4          So they walked in and knew or
5   should have known that they've got a --
6   as a matter of fact, in March of 2005
7   Bill McLennan, who was their own hired
8   president, gave me a glowing, glowing
9   review and a raise, okay. I mean, so
10  some of this doesn't make sense. But why
11  would they not -- it was -- you know,
12  Henry's coming in.
13          And I understood, Jennifer, I
14  understood that -- it made sense -- what
15  I didn't understand was the law at the
16  time. So you have to bear with me. I
17  didn't understand this was even
18  something -- I didn't think it was
19  illegal. I thought they were certainly
20  entitled to do what they wanted to do
21  because they were an MBE. So I didn't
22  understand the law applied to them as
23  well.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 197 to 200)

Page 197

1    But it was -- when they
2 brought Henry in it was clear to me that
3 what they were doing was they were going
4 to be a minority business enterprise.
5 They certainly wanted to have a minority
6 person represent the company as the face
7 to the customer. That strategically made
8 sense to me. But what didn't -- you
9 know, didn't make sense is why would you
10 bring somebody with no experience, number
11 one.
12    And then that's around the
13 time that I started -- you know, when
14 Patrice first tells me, well, we're going
15 to make you, you know, VP of Purchasing.
16 I thought, man, that just doesn't make
17 sense. I mean, it was around that time
18 that things started -- I'm thinking,
19 well, they're intending to move me out,
20 you know. So it was -- I guess that was
21 around the time that I started feeling
22 that, sensing that plan.
23    Q.    So was it when you were asked

Page 198

1 to become VP of Purchasing is when you
2 started to think there was a plan to push
3 you out the door?
4    A.    I guess I would argue that's
5 probably when it started becoming more --
6 you know, we all are in -- we all go
7 through stages of denial where we don't
8 want to admit something to ourselves.
9 But it was around that period I began to
10 have to admit to myself, hey, this is
11 real, these guys aren't kidding; they're
12 going to have me train Henry and then
13 they are going to push me out the door.
14 Yes, it was around that time it started
15 crystallizing in my mind this was the
16 plan.
17    Q.    And you thought that that was
18 the plan because you were being
19 transferred to VP of Purchasing and Henry
20 Hicks was going to be the VP of Sales &
21 Marketing?
22    A.    Yes.
23    Q.    And you thought that it was

Page 199

1 the plan because you believed that Henry
2 Hicks had no experience in this industry?
3    A.    Well, no experience, but also
4 early on wasn't demonstrating a desire to
5 really under -- I mean, he didn't -- he
6 wasn't digging into the job. I mean, he
7 wasn't -- you know, he was -- at first he
8 was spending a lot of time on mayonnaise.
9    You've got to remember, Henry
10 was at least showing up for work and
11 working every day. The other people
12 weren't. I mean, I don't think they were
13 totally aware of all that was or was not
14 going on. They just weren't there
15 enough.
16    They were -- they would make
17 decisions from, you know, when they came
18 into town or when they're in Chicago, and
19 they made it clear that they ruled the
20 show. I don't think they were really as
21 aware of all that was going on.
22    They didn't go to customer
23 meetings that we had in the plant. They

Page 200

1 didn't go to our financial meetings for a
2 long time. We finally begged them to
3 come. They didn't show up to those until
4 after we started begging them to come.
5 There were just a lot of things they
6 weren't involved with.
7    So, anyway, it was around that
8 time, yes, that I started developing this
9 point of view that clearly this is --
10 there is a plan here that -- and so what
11 did I try to do? I tried to bring as
12 much value as I could to make that
13 reality a -- what's the word, not a
14 reality. I was trying to protect my job.
15    Q.    And I'm trying to make sure I
16 understand how you come up with the idea
17 that there is a plan to get rid of you.
18    A.    Okay.
19    Q.    And I understand that it's
20 around the time when you are asked to
21 become VP of Purchasing, right,
22 thereabouts?
23    A.    Thereabouts, yeah.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 201 to 204)

Page 201

1    Q.    And when would that have been?
2    A.    You know, again, if I go to a
3    document --
4    Q.    Before June of 2004 I would
5    imagine?
6    A.    Yeah, I think it was before
7    June of 2004, yes.
8    Q.    Was it when --
9    A.    You know what, it may not
10   have -- I don't remember the exact date.
11   It was sometime, and then after two --
12   you know, August 2003 maybe.  I think it
13   was in the Fall of 2003, but I can't
14   remember for sure on that.  You're
15   killing me here with this date thing.
16        (Whereupon, Defendant's
17        Exhibit 3 was marked
18        for identification.)
19   Q.    I'm going to hand you what has
20   been marked as Defendant's Exhibit 3 to
21   your deposition.  Have you seen this
22   document before?
23   A.    (Examining document.)  Okay.

Page 202

1    Yeah, that was in January of 2004.  I do
2    remember seeing something to this effect.
3    I think it was on a different letterhead
4    maybe, but, yes.
5    Q.    So was it in January of 2004
6    when you were becoming the VP of
7    Purchasing and contract administration,
8    or had you already been given that title
9    before this announcement came out?
10   A.    I think until that time -- and
11   I even researched all of these documents.
12   There's hundreds of them.  I think until
13   that time I may have -- I think Henry
14   actually was more involved on the
15   condiment side and I was still -- I think
16   I may have been exclusively focused in on
17   the beverages and he may have been more
18   focused on the condiments side.
19   Q.    So up until January 12, 2004
20   Henry had been focused on condiments and
21   you had been focused on the beverage side
22   of the business?
23   A.    From a reporting structure,

Page 203

1    yes, and an actual.  He was more involved
2    in the condiment side, yes.
3    Q.    And then in January 2004 is
4    when you take on this VP of Purchasing
5    and Contract Administration title?
6    A.    Title, yeah.  But I seem to
7    think in the Fall we moved me into VP of
8    Purchasing and contract administration.
9    Q.    So it would have been Fall of
10   '03 or early 2004 when you begin to think
11   that there was a plan to get rid of you?
12   A.    Uh-huh.  Yes.
13   Q.    Thank you.  And you base, you
14   know, your understanding of there being a
15   plan on the fact that -- well, explain to
16   me again.  I think I'm a little unclear
17   on it.  What are you basing the plan idea
18   on?
19   A.    Well, we've covered this a
20   lot, but I will try and say it again.
21   Q.    Entertain me, please.  I'll
22   help you out.  Part of it is you had
23   just, quote, unquote, passed muster with

Page 204

1    Phillip & Company, correct, and you said
2    they gave you a strong review; is that
3    correct?
4    A.    Uh-huh.
5    Q.    Was the strong review in the
6    final report in January 2002?
7    A.    Yes, it was.
8    Q.    What was their strong review
9    of you personally?
10   A.    As I recall, they felt like I
11   should be exclusively focused on the
12   sales and marketing side and that's where
13   I need to concentrate my time and energy
14   because that's where I was most valuable,
15   and they wanted to bring in their own ops
16   guy to run the place.
17   Q.    Anything else that you can
18   recall about your Phillip & Company
19   review of you in that regard?
20   A.    Well, it's not just in the
21   review.  I mean, we met a lot.  I mean,
22   you can tell whether somebody respects
23   your professionalism or not, and I got

JERRY A. MCCARTNEY, ET AL.                                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                            August 14, 2007

(Pages 205 to 208)

Page 205

1   the distinct impression -- and Phillip &
2   Company would I think attest to this. I
3   think they respected my business acumen.
4   I mean, I was one of their main contacts.
5   You know, I had a command of the facts,
6   command of the finances and command of
7   the situation. And I think the portrait
8   I painted when they came in there was
9   very consistent with what they saw, and I
10  think they respected that.
11      Q.   So you have this review of you
12  from 2002 from Phillip & Company?
13      A.   It was in the report. It was
14  not a specific review of Bob Winter. It
15  was in the report they had as what they
16  thought of the senior management team.
17      Q.   Sure, I understand. And
18  almost two years later, in the Fall of
19  2003 or in early '04, you were being
20  asked to transition into a VP of
21  Purchasing and contract administration?
22      A.   Uh-huh.
23      Q.   Correct?

Page 206

1       A.   Yes.
2       Q.   And Henry Hicks is then going
3   to become the VP of Sales & Marketing?
4       A.   Uh-huh. Yes.
5       Q.   And you felt that there was a
6   plan to push you out because Henry Hicks
7   was being brought in as VP of Sales &
8   Marketing?
9       A.   That was one of the reasons,
10  yes.
11      Q.   And you believe that Henry
12  Hicks did not have the experience for
13  that position?
14      A.   Did not, right. I believe
15  that he did not have the experience for
16  that position, that's true.
17      Q.   Was there any other basis for
18  your feeling that there was a plan to
19  terminate you?
20      A.   At what time? At 2003?
21      Q.   Or whatever else led to your
22  belief that there was this plan to
23  terminate your employment?

Page 207

1       A.   Well, I mean we were copied on
2   an e-mail correspondence from Henry about
3   a discussion he had with a contact in
4   Chicago. I think it was with Quaker.
5   Her name escapes me right now. But it
6   was she had recommended some recruiting
7   sites or recruiter, something to that
8   effect, of where he could find minority
9   candidates, minority managers.
10      Now, when that e-mail came out
11  I was obviously very concerned. At the
12  time I didn't realize it was against the
13  law, you know. We're an MBE. I thought
14  there was a -- I thought they were
15  exempt. I mean, I was very disturbed by
16  it and very concerned obviously, but, you
17  know, I didn't know there was any
18  recourse.
19      And then, of course, when I
20  saw his presentation at the -- there was
21  a contract manufacturing show in Chicago
22  in May of that year, 2005, and he
23  presented his intentions up there to

Page 208

1   attract and retain minority managers. Of
2   course, the problem was we didn't have
3   any positions open at the time, that I
4   was aware of, to put these people in.
5   And a month later I was gone. So it just
6   seemed to add up there at the very end.
7       Q.   And who was involved in the
8   plan?
9       A.   Well, I certainly wasn't
10  pulled in on any meetings, and I didn't
11  see any e-mails laying around about it.
12  But I suspect the people involved in that
13  discussion probably early on would have
14  been Jeff and Chris and Patrice and
15  Henry, and maybe later on it may have
16  involved Anthony Barber, may have
17  involved Brenda Sellers, may have
18  involved -- may have, I say may have.
19  I'm just thinking of people that it
20  appeared to me to be on the inner circle,
21  if you will, people that might have been
22  in the position to have that discussion
23  with. And may or may not have involved

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                          http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 209 to 212)

Page 209

1    Patrice. I don't know her involvement at
2    that stage. Beyond June of 2004 I didn't
3    see or hear much of her, so I assumed she
4    was disengaged completely.
5        Q.    And you never heard anyone say
6    or discuss any plan to get rid of you;
7    right?
8        A.    You mean like did I ever hear
9    anybody say "we need to get rid of Bob
10   Winter"?
11       Q.    Correct.
12       A.    No.
13       Q.    Or that there was some kind of
14   plan in place to get rid of Winter?
15       A.    Nobody -- well, there was --
16   there was a lot of internal, you know,
17   chatter, you know, among the employees.
18   But they weren't in the know, so that was
19   irrelevant. It was obvious to them
20   that -- I mean, I don't know if this is
21   even worthy of bringing up, but they used
22   to call me Henry's bitch. The employees
23   called me Henry's bitch.

Page 210

1        Q.    Who? What employees called
2    you that?
3        A.    All of them, because they knew
4    what -- they saw it too.
5        Q.    What did you take the "Henry's
6    bitch" reference to refer to?
7        A.    I was there to do his work and
8    do what he told me, and that was it.
9    They knew he didn't -- Henry didn't
10   possess the skills to do the job, so I
11   was his, you know, bitch. I did the
12   work. And it was -- you know, that
13   was -- yeah, that was part -- remember,
14   we talked a little bit about the
15   marginalization and all that. But I had
16   a higher calling, if you will. I was
17   providing for my family, so I chose to
18   endure it.
19       Q.    Did Henry ever call you his
20   bitch?
21       A.    No, he didn't ever call me his
22   bitch directly like you just did.
23       Q.    Well, did he call you his

Page 211

1    bitch indirectly?
2        A.    Are we done with Patrice or do
3    you want to go to Henry? I mean, Henry
4    was -- yeah, Henry could be quite -- he
5    could make you feel, you know, pretty
6    insignificant too. He didn't call me his
7    bitch, though. Those words never came
8    out of his mouth.
9            MR. NELMS: I bet that would
10   have been annoying.
11       A.    That would have been quite
12   annoying, yes.
13       Q.    So just to recap, the basis
14   for your believing there was a plan in
15   place, we've already talked about the
16   Phillip & Company review and that final
17   report; correct?
18       A.    Right.
19       Q.    We've also talked about the
20   fact that you were moved to VP of
21   Purchasing and contract administration
22   while Henry Hicks was being moved to VP
23   of Sales & Marketing; correct?

Page 212

1        A.    Right.
2        Q.    And that you believed that
3    Henry Hicks did not have the necessary
4    experience to be the VP of Sales &
5    Marketing; correct?
6        A.    Correct.
7        Q.    And you also mentioned an
8    e-mail from Henry Hicks about a
9    discussion with someone at Quaker about
10   some recruiting site on where to find
11   minority management; correct?
12       A.    I can't remember whether it
13   said African-American or minorities. I
14   believe the term they used was
15   African-American, but I can't recall that
16   off the top of my head.
17       Q.    And you mentioned a
18   presentation that was made during a
19   contract manufacturing show in Chicago.
20   And was it Henry Hicks' intentions, you
21   know, were announced to attract minority
22   candidates for management positions?
23       A.    Yeah. He presented in his

53

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 213 to 216)

Page 213

1  presentation -- because he was
2  representing Onyx at the time.  He wasn't
3  representing Piknik.  He was up there
4  representing Onyx.  But he was describing
5  on one of his charts the Onyx
6  organization and some of their
7  acquisitions, and their intent was to
8  attract -- I can't remember if it said
9  attract and retain or attract.
10         He certainly didn't come out
11  and say, we're going to replace all the
12  white folks with African-Americans.  He
13  did not say that.  But he did say, we're
14  going to attract, and I think he said
15  retain, something to that effect -- point
16  was we are going to go off and recruit
17  African-Americans and run our company.
18  And the word may have been minorities.  I
19  can't recall exactly the term he used.
20      Q.    You said that he was wearing
21  his Onyx hat during the presentation;
22  correct?
23      A.    Well, the presentation said

Page 214

1  Onyx.
2      Q.    And was Onyx involved in the
3  management of other companies at this
4  time, companies other than Piknik?
5      A.    I don't know if they were
6  involved in the management.  They were --
7  they had supposedly taken a majority
8  interest in two companies by that time.
9  One was in North Lake, Illinois called
10  PDI, and the other one was called Core
11  Systems out of Ohio.
12      Q.    When he was making this
13  presentation --
14      A.    By the way, I didn't see the
15  presentation.  I got a copy of it.
16      Q.    Do you have a copy of that
17  presentation?
18      A.    I don't have it in my hands,
19  but we do have it.
20      Q.    Have you provided it to your
21  lawyer?
22      A.    I'm sure I provided it to my
23  lawyer I think.  Did I not give that to

Page 215

1  you?  But I've got it, yes.
2      Q.    So you weren't there for the
3  presentation; correct?
4      A.    No, I was not there during the
5  presentation.
6      Q.    You just saw -- was it a
7  PowerPoint presentation?
8      A.    Yes, it was a PowerPoint.
9      Q.    Did the PowerPoint
10  presentation indicate that Onyx was
11  wanting to attract or retain or recruit
12  minorities or African-Americans for
13  Piknik specifically?
14      A.    I don't recall that
15  specifically.  My impressions, though,
16  were that, yes, he was referring to
17  Piknik.
18      Q.    Your impression just from
19  looking at the presentation slides?
20      A.    My impression from looking at
21  the presentation slides, because I was
22  not there to listen to what was said.  It
23  was what I was reading on the slide.

Page 216

1      Q.    And you mentioned you were
2  copied on an e-mail that was sent by
3  Henry Hicks to somebody from Quaker?
4      A.    Right.
5             (Whereupon, Defendant's
6             Exhibit 4 was marked
7             for identification.)
8      Q.    And I'm handing you what has
9  been marked as Defendant's Exhibit 4 to
10  your deposition.  If you could please,
11  Mr. Winter, take a look at that document.
12      A.    (Examining document.)
13             MR. NELMS:  Can we break while
14  he reads that?
15      A.    Do you want me to read the
16  whole thing?
17      Q.    If you would like to.
18             (Off the record from
19             2:12 to 2:13 p.m.)
20      A.    Yes.
21      Q.    Have you had an opportunity,
22  Mr. Winter, to read this e-mail or read
23  Defendant's Exhibit 4?

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 217 to 220)

Page 217

1    A.    Yes, I've had a chance to read
2  through this.
3    Q.    Is this the e-mail that you
4  were referring to that was sent by Henry
5  Hicks to someone at Quaker?
6    A.    Yeah, this looks like it.
7  It's formatted differently, but the
8  general comments back here at the back --
9  I'd have to look at the documents I have
10  seen, but I believe this is the document,
11  yes.
12    Q.    And at the top of Page 1 it
13  says, "Attachment A. Note the underlined
14  sentences that refer to our claim of
15  discrimination." Is that something that
16  you wrote or typed in?
17    A.    I don't remember.
18    Q.    On the first page?
19    A.    I don't remember writing it.
20  Could I have? Sure. I don't remember
21  writing it.
22    Q.    Do you recall underlining the
23  sentences that are underlined on the last

Page 218

1  page of Defendant's Exhibit 4?
2    A.    What I'm saying is I could
3  have. I don't recall -- I remember at
4  one point finding this document. I don't
5  recall exactly who I sent it to and what
6  I wrote on it. But could I have been the
7  one that said it? Yes, I could have
8  been.
9    Q.    And this e-mail discusses
10  summarizing a call that Henry Hicks had
11  with April Blackmore who was with
12  PepsiCo?
13    A.    Yes.
14    Q.    And it discusses some items
15  that PepsiCo was asking Piknik to do in
16  terms of work.
17    A.    It was a call report, call
18  summary of the discussion during the
19  call, yes.
20    Q.    And it had some action items
21  for various Piknik folks to do?
22    A.    Yes.
23    Q.    And on the last page there are

Page 219

1  some sentences underlined starting with
2  "we discussed." See where I am?
3    A.    Yes, I see it.
4    Q.    It says, "we discussed our
5  desire to recruit talented minorities in
6  operating roles within the company.
7  April suggested using Diversity.com as a
8  search site and suggested cultivating a
9  relationship with NC A&T University. She
10  said that they have a great engineering
11  school where the students have good co-op
12  experience. She said that Ford get the
13  tope --" T-O-P-E, although I think it's
14  supposed to be top. "-- tier of students
15  there, but that we could get second tier
16  candidates and be very pleased."
17    And it further says, "April
18  suggested that we invite their supplier
19  diversity person, Ernest Freeman, down to
20  Piknik. She said that we are the only
21  MBE in their system with the exception of
22  a woman-owned business in Mass that does
23  water for them." Did I read that

Page 220

1  correctly?
2    A.    Yeah. On my copy that's
3  exactly what it says.
4    Q.    Do you know if PepsiCo has a
5  program or policy in place with respect
6  to doing business with MBEs?
7    A.    I believe they do. I don't
8  have the specific details of that
9  program, but I believe -- yes, I believe
10  they -- I know they do. I mean, all the
11  major companies have an MBE strategy or a
12  diversity -- you know, diversity
13  representative, somebody to work with
14  companies that are minority owned.
15    Q.    And did you interpret this
16  e-mail to mean that you're going to be
17  terminated?
18    A.    Yeah. Well, this was the
19  first -- this was kind of a watershed
20  event. I mean, this was like, okay,
21  you've known it all along, it's in
22  writing, go find another job.
23    Q.    Well, in this e-mail does it

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 221 to 224)

Page 221

1  state that your position was going to be
2  eliminated or somebody else was -- or a
3  minority was going to be hired to replace
4  you?
5      A.   No, it does not state that in
6  this memo.
7      Q.   But that's what you -- that's
8  what you inferred from the e-mail?
9      A.   Yes, I inferred from this
10  e-mail that a minority was going to come
11  in -- I inferred from this e-mail that
12  minorities were going to come in and
13  replace key people, because there were no
14  open positions that I was aware of.
15      Q.   You weren't aware of any job
16  openings?
17      A.   Yeah.  "Our desire to recruit
18  talented minorities in operating roles."
19  I mean, I don't know else how you read
20  that.  I mean, it's you're an employee,
21  go find a job.  That's what that says to
22  me.  At the time I didn't know there was
23  an EEOC claim involved.  I thought it was

Page 222

1  legal.  Shows you how much I know.  Yeah,
2  that was -- this e-mail was quite
3  disconcerting.
4      Q.   And the e-mail doesn't say
5  that we're wanting to replace our white
6  employees with minority employees, isn't
7  that correct?
8      A.   It doesn't say that, no.
9      Q.   But that's the inference you
10  tack from it?
11      A.   Yeah.
12      Q.   Was there anything else or did
13  you base your belief that there was a
14  plan to terminate you on anything else
15  besides what we've talked about already?
16      A.   Not that I can think of.  I
17  think we've covered a lot.
18      Q.   How often was Henry Hicks in
19  Montgomery?
20      A.   Different at different times.
21  As we discussed, in the early going he
22  was predominantly focused on selling
23  mayonnaise with intermittent involvement

Page 223

1  on the beverage side.
2      Q.   So he would have been in
3  Brundidge for most of that time?
4      A.   No.  He spent -- you know, he
5  spent a lot of time in Atlanta because he
6  lived in Atlanta.  He had an apartment
7  here.  He did travel some, but he would
8  probably be in Montgomery maybe on
9  average a day a week, two days a week on
10  average or something like that.
11      Q.   What about once he became VP
12  of Sales & Marketing how often was he --
13      A.   Well, there came a point when
14  he started engaging more on the beverage
15  side because that was where the action
16  was.  I mean, Brundidge was starting to
17  die a little bit.  The business was
18  continuing to struggle, and I think he
19  chose to -- I think he chose to go where
20  was there light.  So he came and got more
21  and more involved in the beverage.
22      These are marque customers.
23  It's a lot more exciting to call on --

Page 224

1  you know, have people fly down on jets
2  and see you and go to big expensive
3  restaurants.  I mean, that's a lot more
4  exciting than people selling mayonnaise.
5  So he, somewhere along the way started
6  navigating more on the beverage side of
7  and it.
8      You know, up until that point
9  I was somewhat secure in my job because I
10  felt like even though he was VP of Sales
11  he was selling mayonnaise.  But when he
12  started selling soda or taking the title
13  and disengaging me from contact with, you
14  know, the people I normally dealt with,
15  didn't work -- you know, I would pass
16  along, go sell, represent.  That's
17  another time I started to sense this --
18  get the sense that, okay, this is another
19  indication -- this is another indication
20  (indicating Defendant's Exhibit 4) that
21  it's just a matter of time.
22      Q.   So there is another factor
23  that played a role in your mind to

56

JERRY A. MCCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                            August 14, 2007

(Pages 225 to 228)

Page 225

1  indicate there was a plan in place; is
2  that what you're telling me?
3      A.   Yeah.  I mean, it's like --
4  you know, it was all these little pieces
5  of evidence.  You know, you start piecing
6  them together and wow.
7      Q.   And I'm just trying to piece
8  those things together.
9      A.   Okay.
10     Q.   So now you're saying that when
11 Henry Hicks started becoming more
12 involved in the beverage side of business
13 that also furthered the idea in your mind
14 there was a plan to terminate your
15 employment?
16     A.   Yes.  And let me apologize.
17 Yes, he started spending more time in
18 Montgomery.  That was the initial
19 question.  He then started spending more
20 time in Montgomery and a lot more time
21 with me.
22     Q.   Do you recall around what time
23 this was occurring when he starts

Page 226

1  concentrating more on the beverage side
2  and --
3      A.   He probably went for --
4  sometime around when -- it was sometime
5  around in June of '04 because that's when
6  Patrice -- that's when they brought Bill
7  McLennan in.  And I can't remember if it
8  was right when McLennan came in in June
9  of '04 or not, but Patrice left and went
10 back to California and then they put me
11 under Henry to work for Henry.
12          Now, I anticipated -- so it
13 was sometime around then.  And his level
14 of engagement in the beverages started to
15 grow more and more prevalent, okay,
16 because up until that point I was pretty
17 much still doing the job.  I was VP of
18 Purchasing and contract administration
19 but still doing all the -- you know,
20 worked directly with the beverage
21 customers.
22          Then around June of 2005,
23 somewhere around that period of time he

Page 227

1  starts to get more involved in the
2  beverage side of it, working directly
3  with customers, calling on them, you
4  know, representing himself as a main
5  contact, that kind of stuff.  And that
6  was somewhere around June of 2005.  So I
7  was reporting to him, so I was --
8      Q.   June of 2005?
9      A.   June of 2004.  I'm sorry.
10     Q.   And so he was -- that's around
11 the time that he became the main customer
12 contact instead of you was around June of
13 2004?
14     A.   I think they always -- yeah, I
15 mean, these are -- you're asking me --
16 it's hard to answer that question with a
17 yes or no because at different stages --
18 early on, for example, Jeff was heavily
19 involved in calling on customers with
20 Patrice.  They did a round for a couple
21 of months, you know, and visited
22 customers.  Henry sometimes was with them
23 and sometimes he wasn't.  Chris Day in

Page 228

1  the early going I think was on some of
2  those calls.
3          Henry -- again, he was kind of
4  focused -- his general focus early on was
5  on the Brundidge side, because the
6  beverages, we were doing fine.  Business
7  was -- you know, we weren't making a ton
8  of money, but we were healthy and we
9  were -- so he went and spent some time on
10 the condiment side.  But then that all
11 started to change.  Jeff started
12 getting -- and Patrice started not
13 visiting the customers as often.  Chris
14 Day didn't visit them as often, so they
15 needed Henry to step in.
16          The point was they didn't want
17 me calling the customers.  It gets back
18 to the same plan issue.  Why would you
19 want me out calling on customers if your
20 intention is for me to go away at some
21 point.  So clearly they wanted to pull me
22 away from direct contact as the main
23 contact with the customer.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 229 to 232)

Page 229

1 The problem, of course, was
2 somebody has got to talk to them about
3 the technical side of the business.
4 Somebody has got to execute the plans to
5 bring customers on, coordinate the
6 activities, and so they -- that's why I
7 say there was -- they were in a quagmire
8 because they were dependent on me, yet
9 they couldn't -- they didn't have --
10 Henry couldn't step in and do the job.
11 So it was -- and, quite
12 frankly, I knew that, and it was my -- it
13 was why I did the best I could to hold
14 onto that job. I hoped over time they
15 would eventually say, you know what, this
16 guy's got value; he has a place here;
17 let's make sure that we -- that we make
18 him part of this company long-term.
19 Q. And the company did value you;
20 correct? I mean, wouldn't you agree they
21 did value you?
22 A. They, being -- when you say
23 the company who are you referring to?

Page 230

1 Q. Well, Chris Day. I mean, he
2 was running the show. I mean, he valued
3 your contributions, didn't he?
4 A. I think Jeff on the surface --
5 Jeff Larry on the surface valued my --
6 valued by contributions. He was -- Jeff
7 was the -- Jeff would -- Jeff was a --
8 you know, he would -- he was very
9 different from Patrice.
10 Chris was hard to explain. I
11 don't really -- I never got a good
12 feeling from Chris. I mean, Chris was
13 just very careful and guarded on how he
14 said things and how he presented himself.
15 He wasn't -- I mean, the only -- the
16 first thing I heard out of Chris's mouth
17 one day after a very solid presentation
18 was, great presentation. He thought I
19 was a little arrogant. Okay.
20 You know, we're in there
21 trying to -- you're a D.C. firm. We're
22 trying to impress you. We're going to a
23 level of detail maybe you, you know, have

Page 231

1 or haven't been exposed to. Certainly
2 don't mean to talk down to you, but we
3 know you didn't come from beverages, so
4 we're trying to do a little bit of
5 teaching as well as -- and I think they
6 perceived some of that as being a little
7 arrogant, and I certainly didn't mean it
8 to be that way. But that was the -- that
9 kind of took me by surprise, because I
10 thought even if I was arrogant, it's not
11 about -- it's are we running the business
12 right, are we doing the right things.
13 Q. Well, Chris Day gave you a
14 salary raise in March of 2005, didn't he?
15 A. Yeah.
16 Q. To a hundred thousand dollars,
17 correct?
18 A. Uh-huh.
19 Q. So earlier I was asking you
20 how often Henry Hicks was in Montgomery.
21 And you said that once he became more
22 involved in the beverage side of the
23 business his presence in Montgomery was

Page 232

1 more regular?
2 A. Well, yeah. It was a little
3 more regular in Montgomery and a lot more
4 involved in the beverage side.
5 Q. How often was Chris Day in
6 Montgomery?
7 A. He came through about two days
8 every couple of weeks.
9 Q. What about Jeff Larry?
10 A. He was there probably -- it
11 was -- again, in the early going a lot
12 more. Later on it was less. Maybe on
13 average he was there a day every couple
14 of weeks, day and a half on average.
15 Some weeks he was there a whole week. Or
16 not a whole week, but three or four days.
17 Q. What about Patrice Daniels?
18 A. Let me back up a second. For
19 a period of time Chris ran Brundidge, and
20 he was there three days a week during
21 that probably six months he was there,
22 something like that. Patrice would come
23 in every couple of weeks for a couple of

58

JERRY A. McCARTNEY, ET AL.                                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                            August 14, 2007

(Pages 233 to 236)

Page 233

1  days.
2      Q.    When you say couple of weeks,
3  like every two weeks?
4      A.    Every two weeks for a couple
5  of days.
6      Q.    Do you know what Henry Hicks'
7  background was before he --
8      A.    I think he worked at Bank of
9  America, primarily on working in their
10 diversity programs, and he was a White
11 House fellow that Chris -- I guess him
12 and Chris hooked up somewhere along the
13 way.  And he had stated to me once that
14 he ran his own little private consulting
15 practice -- and he had a name for it.  I
16 don't remember -- in Atlanta.  But other
17 than that, I don't know what he did.
18     Q.    You have no other knowledge
19 about any of his other work experience?
20     A.    Well, I asked him, you know,
21 because I was trying to understand, you
22 know, what he did.  But it was a little
23 bit evasive, so I didn't press it because

Page 234

1  I knew he was part of the Onyx group.
2  And I wasn't doing it to expose him.  I
3  was doing it because I wanted to
4  understand, you know, what he did so
5  that, you know -- just so I'd know.
6      Q.    So you're unaware of any
7  other, you know, pieces of information
8  about his employment background or
9  educational background?
10     A.    Well, he went to -- he has an
11 MBA from a university in Atlanta.  He may
12 also have his undergraduate there.
13     Q.    From where?
14     A.    I can't remember the
15 university.  It may be Morehouse.  It's
16 in Atlanta.  It may be Emory.  I
17 apologize for not knowing
18     Q.    What kind of experience did
19 you think was necessary for the VP of
20 Sales & Marketing job?
21     A.    That's a question that's going
22 to have to be answered after break.  I
23 can't answer that question briefly.

Page 235

1           MR. NELMS:  Do the best you
2  can.
3      Q.    Give it your best shot.
4      A.    You need to have some -- at
5  least have worked in a consumer package
6  goods industry or some industry where
7  you're selling consumer goods would be a
8  start.  It wouldn't be to qualify you,
9  but it would be a start.
10          It's not like going off and
11 peddling door to door, you know,
12 encyclopedias.  You have to understand
13 the business from a technical standpoint
14 or have some -- you've got to understand
15 what you're doing.  And, you know, you
16 just don't get a sales presentation and
17 go say, we make juice.
18          You've got to -- you know,
19 because you're talking to customers that
20 are going to barrage you with quality
21 people -- I know I'm going off at the
22 mouth, but she asked the question --
23 product development people, R&D people,

Page 236

1  engineers.  I mean, all these people come
2  in, and you have to have at least a
3  little bit of grasp of the industry.  I
4  mean, you're bottling -- you're making
5  food products.  I mean, you know, some
6  experience in the food industry.
7          Beyond the experience, you
8  have to have a desire to, a passion to,
9  understand the business.  If you don't
10 know it, you've got to learn it.  So with
11 the condition of the company, that was
12 not the time to train somebody in a very
13 senior role with no experience.  That was
14 not the time.
15     Q.    But that wasn't your call to
16 make; correct?
17     A.    Exactly.  I had no authority
18 to approve or disapprove his position.
19     Q.    And it's your belief that
20 Henry Hicks had not worked in the
21 consumer packaged goods industry, is that
22 correct, before coming on with Piknik?
23     A.    Well, I'm not aware of any

59

800.458.6031                                              http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 237 to 240)

Page 237

1  consumer package goods experience. And
2  if there was any, I'm not aware of any
3  depth of experience in that industry.
4      Q.    And it's your contention --
5  you don't know if Mr. Hicks had any
6  experience in the consumer goods
7  industry; correct?
8      A.    No, I'm not aware of any
9  experience.
10     Q.    Is it your contention that Mr.
11  Hicks did not understand the business or
12  did not grasp the industry?
13     A.    He, like anyone, can learn it
14  over time. And slowly he began to
15  develop an understanding enough to, you
16  know, get through a presentation. But he
17  obviously needed people like myself back
18  at the ranch doing work.
19         You know, so he could -- so,
20  yeah, we got to a point where he could go
21  off and make presentations, and he could
22  send us back e-mails like this
23  (indicating Defendant's Exhibit 4), and

Page 238

1  we could follow up on it.
2      Q.    Is it your contention Mr.
3  Hicks did not have the passion to
4  understand the business?
5      A.    That's a lot more than one
6  question, isn't it? It's hard for me to
7  answer that. I didn't see -- I didn't
8  see the passion to -- I had a family to
9  feed, okay. I didn't have a lot of
10  options. I was driven to understand this
11  business and to sweat the details. I
12  think for him it was, hey, if it works,
13  great; if it doesn't, I go on to the next
14  thing.
15         It's not like I don't think he
16  is a competent -- I think he's a
17  competent individual. I think he can
18  learn anything. I just don't -- he came
19  in with no experience, learned enough to,
20  you know, perform in a certain position
21  and put him in the role, and then it was
22  time for me to go. It's what happened.
23  It took two years, and maybe they

Page 239

1  expected it to take three months. I
2  don't know.
3         MS. MCGAHEY:  Let's take a
4  break.
5         (Whereupon, a break was taken
6         from 2:38 to 2:44 p.m.)
7      Q.    (BY MS. MCGAHEY:)  Mr. Winter,
8  you have now told me the basis for your
9  belief -- strike that. Have you now told
10  me every basis for your belief that there
11  was a plan to terminate you?
12     A.    I believe I have covered
13  everything that I can recall at this
14  time, yes.
15     Q.    Do you believe that this plan
16  was formulated -- or when do you believe
17  that the plan was formulated?
18     A.    I have no idea when it was
19  formulated.
20     Q.    But you feel certain there was
21  a plan to terminate you?
22     A.    In retrospect, with the
23  evidence and piecing it together, clearly

Page 240

1  there was a plan, yes.
2      Q.    And you have told me now every
3  way in which you believe Patrice Daniels
4  treated you differently because of your
5  race?
6      A.    All that I recall, yes.
7      Q.    I want to talk with you now
8  about your contention that your role was
9  marginalized, your role in the eyes of
10  customers and within the company. And if
11  it's something we have already covered,
12  you can tell me that. But if it's
13  something else, please feel free to tell
14  me.
15     A.    Oh, that was a question, what
16  other ways?
17     Q.    Well, tell me how -- tell me
18  the basis for your claim that your role
19  was marginalized. And if it's something
20  that we have already covered in our
21  previous discussions, you can tell me
22  that and I won't cover it again.
23     A.    Okay. Well, it was my -- I

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 241 to 244)

Page 241

1  mean, they -- you know, and they had the
2  right to do this. They presented Henry
3  as the VP of Sales & Marketing. I don't
4  know exactly what they told the
5  customers. That would have to be
6  something we would have to ask them. But
7  my belief is that they presented him as
8  the person that was in the role and
9  performing the role.
10         So it is a little frustrating
11  when you are performing the work,
12  producing the product, the product being
13  documents, proposals, doing the grunt
14  work that you've always done along with
15  working for the customer, and you're
16  giving this information to a newly
17  christened person without the experience,
18  and they'll take it and they'll change --
19  they'll present it as their work. That's
20  very frustrating.
21         You know, the way I was being
22  moved to purchasing, but -- so you got
23  this little purchasing role, but you're

Page 242

1  still doing -- having all the
2  responsibilities of -- you know, you have
3  all the responsibilities of performing
4  the work you had in the prior job, but,
5  you know, we're going to call you
6  something different.
7         You know, having to endure
8  the -- and Henry was -- Henry was --
9  Henry, he had arrived in his mind. He
10  was the man, and, you know, he was --
11  he -- I thought Henry was quite arrogant
12  and treated people, especially -- he just
13  treated people beneath him. And, you
14  know, he was the head -- you know, he had
15  Onyx's backing, and he would make
16  decisions. The problem was he would make
17  decisions about the business that
18  affected it, affected the financial
19  health of the business severely, and he
20  was -- there was no checks and balances.
21  You had no appeal.
22         I mean, Dennis Daneshmayeh --
23  I can't even say his name. Hang on a

Page 243

1  second. David Daneshmayeh confronted
2  Henry in front of Onyx one time and
3  was -- I mean, really challenged him in
4  front of everybody because he was
5  frustrated.
6         He was running Brundidge, and
7  Henry is making decisions on pricing and
8  working with customers on the condiment
9  side and not -- you know, wasn't
10  qualified to be doing -- to be making
11  those decisions and was not cognizant or
12  aware of the financial impact of some of
13  these things. And it was very
14  frustrating to David, and he called him
15  out.
16         And he was -- it was clear
17  David was stepping -- crossing the
18  boundary. You don't challenge Henry.
19  You know, now, heretofore we regularly
20  challenged each other. This was part of
21  running the business. You deal with
22  it -- you deal with issues and you deal
23  with them directly. You don't ignore

Page 244

1  them.
2         But, boy, I tell you what,
3  David got a very cool reception and
4  eventually was terminated by Chris Day
5  for some of the ways he was challenging.
6  There was an April 7th meeting that David
7  was questioning and challenging some of
8  the things that Onyx was doing, and the
9  next day he was terminated.
10    Q.   Were you present during that
11  meeting?
12    A.   Uh-huh.
13         MR. NELMS: Yes?
14    A.   Yes.
15    Q.   And it's your belief that
16  David Daneshmayeh was terminated because
17  he confronted Henry Hicks?
18    A.   Among other things.
19  Confronted -- when I say among other
20  things, he challenged the authority and
21  some of the decisions of Onyx, yes.
22    Q.   Were you a participant in the
23  decision making process?

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 245 to 248)

Page 245

1    A.    To terminate David?
2    Q.    Correct.
3    A.    No.
4    Q.    You don't know what was
5  involved in the decision to terminate Mr.
6  Daneshmayeh's employment?
7    A.    No, I was not involved in that
8  discussion.
9    Q.    So you have no knowledge why
10  he was terminated. You have no personal
11  knowledge?
12    A.    I wasn't behind the scenes
13  when they said let's terminate David and
14  here's why. No, I was not in that
15  discussion. I was in the discussion the
16  last meeting he was in, which -- which
17  also was a meeting that I had been
18  communicating with Jeff Larry on -- which
19  I had, I believe, provided. And I will
20  find it if it's not here -- that Jeff
21  encouraged me in that e-mail to speak
22  out. I want people to speak out, he
23  said. I'll find this document. I know

Page 246

1  it exists. But he encouraged us.
2    And so I was encouraging the
3  team that, hey, we've got this meeting;
4  Jeff's coming to listen, let's express
5  our concerns. Jeff says it right here,
6  people that don't speak out have
7  something to worry about; people that do,
8  I encourage that. So he spoke out, and
9  he was gone the next day.
10    Q.    And, again, you were not
11  involved in the decision to terminate
12  David Daneshmayeh's employment; correct?
13    A.    No, I was not.
14    Q.    You have your belief and your
15  assumptions as to why he was terminated,
16  though; correct?
17    A.    Yes. Oh, yeah.
18    Q.    What was David Daneshmayeh's
19  race?
20    A.    He was -- oh, man. He was
21  half Jewish, half Muslim. I believe -- I
22  believe he was from Iran.
23    Q.    Would it be fair to say that

Page 247

1  you did not agree or always agree with
2  Henry Hicks' decisions?
3    A.    Yes, that would be fair.
4    Q.    And Henry was your boss?
5    A.    At a period of time, yes.
6    Q.    And you said that Henry had
7  arrived in his mind, that he thought he
8  was the man and he treated people beneath
9  him?
10    A.    Yes, he did.
11    Q.    What is the basis for those
12  comments?
13    A.    Well, it was -- we are all in
14  this business that is -- we are sweating,
15  working, focused, trying to save money.
16  Henry's, you know, booking expensive
17  hotels. He's booking over here at the
18  Capital City Club, expensive rooms,
19  lunch --
20    Q.    Where you ate lunch today?
21    A.    Where we ate lunch today.
22    MR. NELMS: Yeah. But, see, I
23  can afford it.

Page 248

1    A.    He was, I mean, -- we would --
2  we used to -- our expense account -- we
3  were tight. We were managing. He was
4  living the high life. I mean, we didn't
5  have the money for that. It was just --
6  the problem was he had Onyx's backing.
7  He knew it.
8    We were frustrated with some
9  of the decisions I described with David
10  Daneshmayeh's pushback, but there was no
11  recourse. After David Daneshmayeh got
12  terminated the next day, I certainly
13  wasn't going to challenge anything
14  openly. That was it. It was clear they
15  were off limits.
16    MR. NELMS: Answer her
17  question.
18    Q.    It was clear what, that they
19  were all nuts?
20    A.    No. It was clear that you
21  don't openly challenge and question, you
22  know, decisions in their authority. I
23  did not say they were nuts.

JERRY A. MCCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                            August 14, 2007

(Pages 249 to 252)

Page 249

1    Q.   I clearly just misunderstood
2  you.
3         MR. NELMS:  He said off
4  limits.  Is that what you said?
5    A.   It was off limits that you
6  could challenge them.
7    Q.   Did anybody ever instruct you
8  that it was off limits to challenge them?
9    A.   The guy just got terminated
10  the very next day for openly challenging
11  them.  I mean, it's --
12    Q.   Well, you just said you don't
13  know why he was terminated.  You weren't
14  involved in the --
15    A.   No, I didn't say that.
16    Q.   You have your belief and your
17  speculation --
18    A.   You asked --
19    Q.   -- about why he was
20  terminated?
21    A.   You asked me was I involved in
22  the decision to terminate him.  I said
23  no.

Page 250

1    Q.   What is your personal
2  knowledge about the decision to terminate
3  David Daneshmayeh?
4    A.   What is my knowledge about the
5  personal decision --
6    Q.   Your personal knowledge about
7  why the decision was made?
8    A.   My personnel knowledge came
9  from the -- the evidence as -- and in
10  meetings, the one I noted where he was
11  openly challenging Henry's decisions in
12  Brundidge, his challenging some of the
13  actions and activities of Onyx in the
14  April 7, 2004 meeting.  And I remember
15  the date just because that was a date
16  that we kept talking about.
17        Yeah, watch this.  You sense
18  that he is probably, you know -- I see --
19  I get an e-mail from Jeff Larry saying,
20  oh, I want people to talk out; I'm
21  looking forward to hearing the facts and
22  the issue in the April 7th meeting.  I
23  share that with my colleagues.  I'm of --

Page 251

1  I have enough common sense to know maybe
2  he really didn't mean it, I need to keep
3  my mouth shut.
4        Apparently David felt like
5  this needs to be said.  He was a little
6  more -- he had less to lose than I did.
7  You know, he obviously had more resources
8  to fall back on.  So he took Jeff at his
9  word, and he said what he had to say.
10  And I don't recall exactly what he said,
11  but it was apparently not what they
12  wanted it hear, and that was it.
13    Q.   Did someone tell you that
14  David Daneshmayeh was terminated because
15  he challenged Henry Hicks?
16    A.   No.
17    Q.   You were earlier telling me
18  the way in which you believe your role
19  was marginalized, and you were saying
20  that Henry Hicks was contacting
21  customers, he was the main -- well,
22  strike that.  That Henry Hicks was in the
23  role of having the direct communication

Page 252

1  with customers and that you felt that you
2  were doing all the background work and
3  that Henry Hicks was presenting your work
4  as his own?
5    A.   Uh-huh.  Yes.
6    Q.   Is there any other ways in
7  which you felt your role was
8  marginalized?
9    A.   By Henry?
10    Q.   Or by any of the folks that
11  you have sued?
12    A.   I have answered these
13  questions a lot.  You're asking me is
14  there any other thing, other than we
15  discussed, ways that I was marginalized?
16        We talked about when -- maybe
17  we did or maybe we didn't talk about when
18  Patrice relieved me of responsibility to
19  conduct a financial meeting.  That
20  certainly did two things.  One, it
21  marginalized my role, and, two, we lost
22  focus on facing reality.  The financials
23  speak for themselves.

JERRY A. McCARTNEY, ET AL.                                     ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                              August 14, 2007

(Pages 253 to 256)

Page 253

1    Q.   Any other way that you feel
2  your role was marginalized?
3    A.   Not that I can think of right
4  now.
5    Q.   And previously you've already
6  told me everything that you can recall
7  about Patrice wanting to put Mike
8  O'Connell in charge of the financial
9  meetings; correct?
10   A.   We talked about it, yes.  I
11 think so, yes.
12   Q.   Is there anything else that
13 you can recall that you haven't told me
14 about that?
15   A.   I shared with you that I had
16 some private correspondence with her
17 about challenging her decision on that --
18 not challenging.  Questioning or
19 appealing to her not to do that.  Other
20 than that, no, not that I recall.
21   Q.   And you just thought that Mike
22 O'Connell wasn't equipped or qualified to
23 run those financial meetings; correct?

Page 254

1    A.   Correct.
2    Q.   Mike O'Connell, what is his
3  race?
4    A.   He's Caucasian.
5    Q.   Earlier we were talking about
6  the fact that you received a raise in
7  March of 2005; correct?
8    A.   Uh-huh.  Yes, I did.
9        (Whereupon, Defendant's
10        Exhibit 5 was marked
11        for identification.)
12   Q.   I'm going to show you what has
13 been marked as Defendant's Exhibit 5 to
14 your deposition.
15   A.   Okay.  (Examining document.)
16   Q.   Have you read the document?
17   A.   Yeah.
18   Q.   Have you seen Defendant's
19 Exhibit 5 before?
20   A.   Yes, I have.
21   Q.   And this is a letter from
22 Chris Day to you; correct?
23   A.   Uh-huh.

Page 255

1        MR. NELMS:  Yes?
2    A.   Yes, it is.
3    Q.   And he says, "Bob, I wanted to
4  acknowledge your hard work on behalf of
5  Piknik since Onyx acquired the company in
6  2003.  In the face of adversity and
7  turmoil you have worked tirelessly to
8  keep the management team focused on
9  important tasks and keep our key
10 customers happy.  You have never put
11 yourself before the company, and your
12 dedication has been an example for
13 everyone."  Did I read that correctly?
14   A.   Yes.
15   Q.   And he is praising you, isn't
16 he?
17   A.   Yes, in this document, he is.
18   Q.   And, as a result, he raised
19 your salary to a hundred thousand dollars
20 per year; correct?
21   A.   Yes.
22   Q.   What was your salary before
23 this raise?

Page 256

1    A.   I think it was ninety-two,
2  ninety-three, somewhere around there.
3    Q.   And he says that your
4  incentive or your bonus would be impacted
5  for your benefit as a result of this
6  hundred thousand dollar salary; correct?
7    A.   Correct.
8    Q.   He goes on to tell you that
9  you've been a foundational employee at
10 Piknik and that he was personally
11 grateful for all that you have done;
12 correct?
13   A.   Yes.
14   Q.   And you followed up in an
15 e-mail a couple of days later thanking
16 him; correct?
17   A.   Yes, I did.
18        (Whereupon, Defendant's
19        Exhibit 6 was marked
20        for identification.)
21   Q.   Show you what has been marked
22 as Defendant's Exhibit 6.
23   A.   You want me to read this?

JERRY A. McCARTNEY, ET AL.                                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                          August 14, 2007

(Pages 257 to 260)

Page 257

1     Q.    If you would like to.
2  Although, if you are already familiar
3  with it, then --
4     A.    Can I read it quietly to
5  refresh my memory?
6     Q.    Certainly.
7     A.    (Examining document.) Can I
8  read a portion of this for the record so
9  everybody understands?  This is --
10    Q.    Well, it's in the record.
11    A.    Okay.
12    Q.    Have you had a chance to read
13 Defendant's Exhibit 6?
14    A.    Yes, I have read it.
15    Q.    And is this the e-mail that
16 you sent in response to your raise that
17 was reflected in Defendant's Exhibit 5?
18    A.    Yes.
19    Q.    The second sentence or, excuse
20 me, the third sentence it says, "I
21 realize when Onyx arrived on the scene I
22 may have not been represented well by
23 Mike O'Connell given my longstanding

Page 258

1  concerns with his business and leadership
2  skills."  What was that about?
3     A.    Mike and I -- I didn't -- I
4  was -- I didn't agree with Mike's ability
5  to lead the company.  I didn't think he
6  was qualified.
7     Q.    Why?
8     A.    Because he didn't possess what
9  you would expect to see in a COO.  He had
10 a very limited grasp of business
11 economics, was very abrasive with people,
12 was manipulative.  Obviously, Phillip &
13 Company felt the same way, and even Onyx
14 felt the same way.  At some point they
15 put him out of the company.
16        So, I mean, how do you
17 describe somebody's inability to lead.  I
18 don't know.  He didn't possess the
19 concept of COO.  And Mike and I were at
20 odds on strategy.  And I had to go to the
21 owner and seek his authority to pursue a
22 strategy that Mike didn't agree with
23 around August.

Page 259

1         Around July, August of 2001 is
2  when I went to Ricky and said, Ricky, we
3  need to do -- we need to follow a certain
4  path.  And he allowed me to pursue that
5  because he believed in what I was telling
6  him.  And at that point Mike became
7  very -- he obviously realized that I had
8  done that, so it was very -- he was
9  offended by it.
10    Q.    Do you have any personal
11 knowledge about how Mike O'Connell may
12 have represented you to Onyx?
13    A.    No.  I wasn't there when he
14 talked with Onyx.  I had no personal
15 knowledge of e-mails or personal
16 discussions, no.
17    Q.    You go on to say, "in
18 addition, I was playing the bad cop in
19 the In Zone debacle, negotiating a
20 delicate contractual dispute with
21 Tropicana and attempting to protect
22 Piknik's interest with Quaker regarding
23 the 10 ounce delamination issue among

Page 260

1  others."
2         What do you mean you were
3  "playing the bad cop in the In Zone
4  debacle"?
5     A.    We had a dispute with In Zone
6  over an eighty thousand dollar bill.  And
7  I was with Mike O'Connell at the In Zone
8  facility and had to take a tough stance
9  with them.  And I came into the meeting
10 with the rationale why I felt they owed
11 us the money.  And Mike wanted to, you
12 know, be the good guy.  And so he
13 relieved them of the obligation to pay
14 it, and we left.
15    Q.    Mike O'Connell relieved In
16 Zone of the obligation to pay the eighty
17 thousand dollar bill?
18    A.    Yeah.
19    Q.    And what are you talking when
20 you say you were "attempting to protect
21 Piknik's interest with Quaker regarding
22 the 10 ounce delamination issue, among
23 others"?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 261 to 264)

Page 261

1    A.    There was a potential -- on
2 any kind of consumer product issue where
3 there's defects in the product everybody
4 is wanting to make sure that they protect
5 their interest as regards to liability,
6 okay.  And we felt that they were looking
7 to blame the copacker, us, for the, what
8 we call, delamination.  It's where the
9 plastic separates, and it looks terrible
10 to the consumers.  Package integrity.  It
11 just looks bad.  And it's expensive
12 because these bottles cost ten cents a
13 piece.  When you produce, you know, ten
14 million cases of it, you've got a lot of
15 expense there.
16    So we were trying to get the
17 facts on what the cause of the
18 delamination was.  We felt there wasn't
19 enough due diligence with the plastic
20 manufacturer.  And we wanted data and
21 evidence -- we wanted data, not evidence.
22 We wanted data to back up the claims that
23 we were responsible.

Page 262

1    So when I call it a "protect
2 Piknik's interest," I wanted to make sure
3 that if, in fact, we were responsible for
4 that delamination that the data supported
5 it.  What I didn't want to do is have the
6 customer come in and say, you're the
7 copacker, you did it, you pay us,
8 otherwise we're not going to do business
9 with you.
10    These people were -- you have
11 to renegotiate that very carefully
12 because they are your customer and you
13 want to maintain a good relationship.
14 But, at the same time, I've got to
15 protect -- we didn't have a quarter of a
16 million dollars to pay them.  And if we
17 were going to pay them, I wanted to make
18 sure we were liable for it.  And I wasn't
19 convinced that the data was there.  I
20 thought they were trying to get us to
21 take a liability for it without the
22 facts.
23    Q.    Okay.  So you just thought

Page 263

1 that the product that Piknik had provided
2 to Quaker was a good product and there
3 was no defect; correct?
4    A.    No.  It was defective.  We
5 just weren't sure what the root cause of
6 the defect was, whether it was us or the
7 bottle manufacturer.
8    Q.    Okay.  You go on to say, "in
9 addition, navigating the dysfunctional
10 leadership/ownership structure while
11 trying to focus the leadership team on
12 the key drivers of our business and
13 generate a profit was probably the
14 greatest challenge I have encountered."
15    What did you mean by this
16 "dysfunctional leadership/ownership
17 structure"?
18    A.    There was -- that was the
19 O'Connell leadership era.  There was a --
20 Ricky had allowed Mike to -- Mike comes
21 in.  Ricky empowers him.  Mike gets
22 pushed out.  Ricky's back in.  He's half
23 in, but he's half out.  He came to the

Page 264

1 financial meetings, thank God, but he
2 wasn't really involved in the day-to-day.
3 And Mike was on the periphery.  We didn't
4 know this at the time, but Mike was on
5 the periphery.
6    You know, Ricky was a little
7 bit, somewhat you could -- a little bit
8 manipulate -- you could manipulate him a
9 little bit, I mean, if you were -- what's
10 the word I'm looking for.  If you had ill
11 intent I guess.  Mike just could persuade
12 him.  Mike could influence him.
13    So we would be talking to
14 Ricky about a direction we wanted to go.
15 Ricky would understand it.  He would go
16 talk to Mike.  Mike was on the outside.
17 He was upset about it.  Poor Ricky was in
18 the middle trying to figure out, you
19 know, who's telling me the truth, which
20 way do I need to go.
21    So there's a little bit of
22 dysfunction going on during this period
23 of time.  And it was a struggle.  It's an

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 265 to 268)

Page 265

1  issue you deal with. You know, we were
2  still turning the company around, but it
3  was an irritating issue that you had to
4  work through. Fortunately, it
5  wasn't -- Mike didn't have control, which
6  was a good thing. So that's what I was
7  describing there.
8      Q.  In the next paragraph you say,
9  "under new ownership and the constant
10  fear of liquidation not pounding on my
11  door I was able to breathe a sense of
12  relief." When you reference the new
13  ownership are you referring to the Onyx
14  control?
15     A.  Yes.
16     Q.  And you indicated there is no
17  longer a constant fear of liquidation
18  pounding on your door?
19     A.  Right.
20     Q.  Is that because you thought
21  things had turned around financially for
22  Piknik?
23     A.  Well, the reason the fear of

Page 266

1  liquidation was pounding on the door is
2  the banks were wanting us to do
3  something. I didn't renegotiate with the
4  banks, so in my limited understanding of
5  how that works I made the assumption that
6  liquidation was around the corner. The
7  good news is the business was turning,
8  and we had presented that in August of
9  2001.
10     But the reason I said
11  liquidation not pounding on my door, Onyx
12  made it very clear they're a big company,
13  we have access to capital; we're going to
14  grow; we'll find the money, don't worry
15  about it, multiple, multiple, multiple
16  times.
17     Q.  So Onyx was painting a
18  positive picture?
19     A.  Extremely positive. And
20  that's what I was referring to. I felt a
21  sense of relief.
22     Q.  You say, "soon I realized my
23  contributions to Piknik may not have been

Page 267

1  well represented to Onyx and I may have,
2  in fact, I been maligned." Who are you
3  saying may have maligned you?
4      A.  In my sense that was from
5  Mike.
6      Q.  Mike O'Connell?
7      A.  Uh-huh.
8      Q.  Is that a yes?
9      A.  Yes. We're not going to talk
10  about paragraph three?
11     Q.  And I apologize if you have
12  already answered this. Were you involved
13  in any discussions with SouthTrust people
14  about whether or not they were going to
15  continue financing or, you know, continue
16  the line of credit for Piknik?
17     A.  Somewhere along the way -- and
18  I can't remember -- it may have been a
19  week -- I can't remember if it was before
20  or after. I think it was maybe a week or
21  two before I had left. I had -- it was
22  clear to me that, you know, we just --
23  Brundidge had just closed. All of the

Page 268

1  stuff was starting to come out. It
2  was -- and I was concerned. You know,
3  and I called Andy Raines at SouthTrust.
4  And I think I may have e-mailed him.
5      As I recall, I talked to him
6  one time. And I said, Andy, something's
7  not right down here; I think you need to
8  have another -- as I recall, the
9  conversation was you need to have another
10  Phillip & Company come in and see what's
11  going on. That was the purpose of the
12  call.
13     Q.  What else can you recall you
14  said to Andy Raines?
15     A.  It was a very short
16  conversation. I got the sense he didn't
17  want to talk to me, which I didn't
18  understand at the time. But the only
19  thing I can remember him asking me was
20  how much -- what was the cost associated
21  with Onyx's involvement. In other words,
22  you know, by them being there, what were
23  they extracting out of the business.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

67

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 269 to 272)

Page 269

1    And I told him, I said, I
2  don't know exactly what it is. I know
3  that they -- my understanding was they
4  had caused Piknik to pay the closing fee
5  of 1.4 million, and my understanding was
6  we were paying a management fee of half a
7  million a year and excessive salaries to
8  Chris, Henry, I assume Patrice -- I don't
9  remember if I said her name or not -- and
10  travel and entertainment.
11    My point was they were taking
12  cash out of the business but not bringing
13  value to it, and that was -- as I recall,
14  I think that was the one question he
15  asked, and that's how I answered it.
16    Q.   Anything else that you recall
17  that you said or Andy said during that
18  conversation?
19    A.   That's all. It was a short
20  conversation.
21    Q.   Did you have any other
22  communications with Andy Raines?
23    A.   At some point I asked him what

Page 270

1  if we find other investors. I think it
2  was Andy. I'm not sure. I think I sent
3  an e-mail to him and said, Andy, if we
4  were going to get other investors to come
5  in, how do we do it. And he referred me
6  to a consultant that I didn't -- I wasn't
7  aware at the time was -- I think they
8  were soliciting -- they were meeting with
9  Onyx or meeting with -- I forget the
10  guy's name. He was out of Florida, I
11  remember that. But he was apparently
12  meeting with Onyx to talk to them about
13  coming in and doing a similar -- the
14  similar work that Phillip & Company had
15  done. And he just referred me to him.
16    Q.   Was this after you left?
17    A.   I think that was after I was
18  gone, yes. I'm almost sure it was.
19    (Whereupon, Defendant's
20    Exhibit 7 was marked
21    for identification.)
22    Q.   I'm handing you what has been
23  marked as Defendant's Exhibit 7 to your

Page 271

1  deposition.
2    A.   Okay. (Examining document.)
3    Q.   Have you had a chance to read
4  Defendant's Exhibit 7?
5    A.   Yes.
6    Q.   Have you seen this document
7  before?
8    A.   I believe I have. I'm sure
9  I've read this.
10    Q.   And does this reflect that
11  around April 15, 2005 you became the
12  Director of Customer Planning?
13    A.   Uh-huh. Yes.
14    Q.   And you were still reporting
15  to Henry Hicks; correct?
16    A.   Yes.
17    Q.   Your salary stayed the same;
18  correct?
19    A.   Yes.
20    Q.   You were still at a hundred
21  thousand dollars annually at that time;
22  correct?
23    A.   Yes.

Page 272

1    Q.   It appears that some folks'
2  positions were eliminated; correct?
3    A.   Yes.
4    Q.   What was Bob Gross?
5    A.   He was a salesperson on the
6  condiment side.
7    Q.   What about Letitia
8  Strowbridge?
9    A.   Well, that's a little
10  confusing for me because she went to work
11  for another company owned by Onyx right
12  after that.
13    Q.   What was her position with
14  Piknik?
15    A.   I think she was -- I'm not
16  real sure. I think she came on to help
17  out with the sales. At one time she was
18  going to help me out a little bit. I
19  think at one time I think she went down
20  to Brundidge to help out the customer
21  service department. So she was like in
22  different roles for a period of time.
23    Q.   What was Bob Gross' race?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 273 to 276)

Page 273

1    A.    What was his --
2    Q.    Race?
3    A.    He was Caucasian.
4    Q.    What about Letitia
5    Strowbridge?
6    A.    African-American.
7    Q.    What about Clarice Crosby?
8    A.    She was African-American.
9    Q.    Did you have a feeling one way
10   or another whether their terminations
11   were racially motivated?
12   A.    Well, yeah, to answer the
13   question, they were somewhat.
14   Q.    Which one or which ones were
15   racially motivated?
16   A.    Well, Bob and -- I think --
17   this was a strange series of events
18   because Bob, like David Daneshmayeh,
19   became more vocal over time of some of
20   Henry's actions.  The way I read this was
21   they terminated Letitia, but they hired
22   her in another company.  So that was a
23   little bit -- to me that was a little

Page 274

1    bit -- you know, I don't know why they
2    even said that.  I think they should have
3    just come out and said we're going to
4    move her to our PDI division.
5         So you get the sense from
6    looking back -- not at the time
7    necessarily, but looking back you get the
8    sense that maybe this was all structured
9    to avoid the appearance of a racially
10   motivated termination or a termination
11   based on the fact that he was disliked.
12   I don't know the situation regarding Bob.
13   You asked me my feeling.  That was my
14   feeling, yes.
15   Q.    And this is just your
16   speculation and assumption, correct,
17   about Bob Gross' termination?
18   A.    I don't know the facts on Bob
19   Gross.  I have no -- all I know is he and
20   Henry did not get along and he challenged
21   him more and more as time went on.  And
22   my impression was that eventually brought
23   him down.

Page 275

1    Q.    And you don't know if Bob
2    Gross was offered a position in another
3    Onyx company?
4    A.    No, no.
5    Q.    You're unaware of that?
6    A.    I'm unaware of it, and I would
7    be surprised if he had been.
8    Q.    I want to talk about June 22,
9    2005.
10   A.    Okay.
11   Q.    Do you recall a meeting that
12   you attended with Brenda Sellers and
13   Henry Hicks?
14   A.    Yes.  That was the last day I
15   was there I believe, right.  June 22,
16   2005.
17        MR. NELMS:  Answer her
18   question.
19   Q.    What time of day did the
20   meeting occur?
21   A.    I think it was sometime during
22   the daytime, I don't know.  Around lunch
23   maybe or before lunch.  I don't recall.

Page 276

1    Q.    Who told you about the
2    meeting?
3    A.    Henry.  Well, it was
4    actually -- it was a regular weekly
5    financial meeting we were having, and I
6    had gone to the meeting to prepare.
7    Q.    Were there others present
8    besides you, Henry Hicks and Brenda
9    Sellers?
10   A.    No.  Let me ask you this.  I'm
11   going to need another break.  So do you
12   want to take a break now or how do you
13   want to handle it?
14   Q.    We can take a break now.
15        (Whereupon, a break was taken
16        from 3:28 to 3:35 p.m.)
17   Q.    (BY MS. MCGAHEY:)  We were
18   talking about the meeting that was held
19   on June 22, 2005.  Did someone tell you
20   about the meeting or was it just a weekly
21   scheduled meeting?  How did it come to
22   your attention?
23   A.    Well, I was in the meeting

69

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 277 to 280)

Page 277

1 room for my weekly scheduled meeting, and
2 Henry came into the room and said he
3 wanted to have another meeting before
4 that meeting.
5    Q. Was anyone else present during
6 that time that Henry Hicks was telling
7 you that he wanted to have another
8 meeting with you?
9    A. Brenda may have been there. I
10 don't recall. She did come in for the
11 discussion.
12    Q. So the meeting that Mr. Hicks
13 wanted to have with you took place at
14 that moment?
15    A. Uh-huh. Yes.
16    Q. And it was just you, Brenda
17 Sellers and Mr. Hicks?
18    A. Yes.
19    Q. And where were you, in a
20 conference room?
21    A. Yes.
22    Q. Tell me what was said as best
23 you recall.

Page 278

1    A. Best I can recall, we are
2 going to cut your salary 50 percent;
3 you're allowed to stay on with the
4 company for five weeks to assist in the
5 transition and begin looking for a job.
6    Q. Those are the words that were
7 used?
8    A. That was the general
9 discussion, yes.
10    Q. Can you recall more
11 specifically what was said, who said it?
12    A. Henry, Henry said it.
13    Q. Can you recall specifically
14 rather than generally what Henry said?
15    A. No, I cannot recall
16 specifically.
17    Q. So in general you recall Henry
18 Hicks saying that your salary was being
19 cut 50 percent; correct?
20    A. Yes.
21    Q. And that you were being
22 allowed to stay with the company for an
23 additional five weeks?

Page 279

1    A. Yes.
2    Q. And they suggest you start
3 looking for another job?
4    A. Yes.
5    Q. Were you given any kind of
6 documentation?
7    A. Yes.
8    (Whereupon, Defendant's
9    Exhibit 8 was marked
10    for identification.)
11    Q. I'm going to hand you what has
12 been marked as Defendant's Exhibit 8 to
13 your deposition. Please take a look at
14 that.
15    A. (Examining document.)
16    Q. Is this the letter that was
17 given to you during that meeting on June
18 22, 2005?
19    A. Yes.
20    Q. Was there any discussion about
21 the content of the letter during this
22 meeting?
23    A. I had asked about severance

Page 280

1 beyond this period.
2    Q. Asked about severance beyond
3 what period?
4    A. The June 29th period -- July
5 29th.
6    Q. Was it your understanding that
7 your position was being eliminated
8 effective July 29, 2005?
9    A. It states in the letter that
10 my position is being eliminated, so what
11 I took away from this was that I was no
12 longer going to be employed as of July
13 29th.
14    Q. And you asked if there was
15 going to be any severance package for the
16 time after July 29, 2005?
17    A. Yes.
18    Q. What was the response, if any?
19    A. That there would not be any
20 severance.
21    Q. Was there any explanation to
22 you that the reduction to fifty thousand
23 dollars per year and the continuation of

70

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 281 to 284)

Page 281

1  your position for an additional five
2  weeks was essentially a severance
3  package?
4      A.   Not during that meeting, no.
5  I don't recall that being discussed.
6      Q.   Was that discussed at some
7  point after the meeting?
8      A.   I don't recall that being
9  referred to as a severance, no.
10     Q.   Anything else that you can
11 recall that was said during that meeting?
12     A.   Well, I mentioned to them that
13 I didn't realize that -- something to the
14 effect, I'm shocked, guys; clearly what
15 we've been told is not what's been going
16 on, something to that effect.  I don't
17 remember exactly.
18         But it was like getting hit in
19 the forehead with a baseball bat and you
20 realize that, wow, you've just been
21 scammed.  This is real.  Up until this
22 point none of this -- other than what we
23 were hearing from the vendors out of

Page 282

1  Brundidge, none of this was being shared
2  with us that the company was in financial
3  straits.
4      Q.   Well, didn't a notice or a
5  talking points memo go out earlier about
6  SouthTrust pulling their line of credit?
7      A.   Uh-huh.
8      Q.   Is that a yes?
9      A.   Yes.
10     Q.   So did you say anything along
11 the lines that this news was a big blow
12 to you?
13     A.   I'm sure I said something
14 along that line.
15     Q.   You may not have used that
16 phrase?
17     A.   Yeah.  I was a little shocked
18 at the meeting, yes.
19     Q.   So you expressed that you were
20 surprised?
21     A.   Yes.
22     Q.   Anything else that you can
23 recall being said during that meeting?

Page 283

1      A.   That I wanted to not have the
2  meeting and I needed to go home and just
3  ponder all of this.
4      Q.   Did Brenda Sellers ever say
5  anything during the meeting?
6      A.   I don't recall if she did.
7      Q.   When you said that you wanted
8  to not have the meeting and you wanted to
9  go home and ponder things, was anything
10 said after that?
11     A.   I don't -- I don't recall.
12     Q.   Do you get a sense that Henry
13 Hicks or Brenda Sellers were willing to
14 assist you in finding new employment?
15     A.   I don't recall any
16 conversation, but I don't recall that
17 discussion being an adverse discussion.
18 It wasn't a controversial or adversarial.
19 We weren't arguing or -- there was
20 nothing like that.  I'm sure they were --
21 I don't recall it specifically, but I'm
22 sure at that point they were more than
23 happy to assist, and I'm sure they

Page 284

1  probably would have in whatever way they
2  could have.
3      Q.   Did they seem upset to have to
4  give you the news that your position was
5  going to have to be eliminated?
6      A.   No.
7      Q.   So after you told them that
8  you wanted to not have the meeting and
9  you wanted to go home and ponder things
10 did you go home?
11     A.   Uh-huh.  Yes, I did.
12     Q.   Did you talk with anyone from
13 Piknik or Onyx that day about the news
14 you had just received?
15     A.   I'm sure I did.  I don't
16 recall talking to anybody from Onyx.  I
17 may have.  I'm sure I talked to people.
18     Q.   Do you recall who?
19     A.   Who did I call that day?
20 Well, I'm sure I probably called Jerry.
21     Q.   Jerry MacCartney?
22     A.   MacCartney, right.  And I
23 probably called Shannon.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. McCARTNEY, ET AL.                                            ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                    August 14, 2007

(Pages 285 to 288)

Page 285

1    Q.   Shannon McGlon?
2    A.   Shannon McGlon.  And I
3    probably called Ricky.  I don't really
4    remember the people I called.  That was
5    not my best day, okay, because I had a
6    lot of issues I was facing financially.
7    Q.   Who else can you recall or do
8    you think you called?
9    A.   Let's see, what day was that?
10   Was that a Tuesday or a Wednesday?
11   Q.   It was a Wednesday.
12   A.   I really don't recall.  I
13   just -- I know I talked to people.  I
14   just don't remember who I talked to that
15   day.
16   Q.   Do you remember what you said
17   to whoever you spoke with?
18   A.   I'm sure I probably told them
19   that I was no longer with the company and
20   what had just happened.
21   Q.   Anything else that you can
22   recall discussing with anyone that you
23   spoke with that day?

Page 286

1    A.   Well, somewhere around that
2    time, whether it was that day or the next
3    day, realizing that now everything had
4    come clean, we were -- I was trying to
5    figure out a way to resurrect and keep
6    the company afloat.  And so I'm -- I
7    don't know whether I talked to Jerry
8    about it that day or Shannon.
9    I know I talked to Ricky about
10   it on one of those days, about what do we
11   got to do to find a company or a bank or
12   somebody to come in and be an investor or
13   infuse equity or something.  And that
14   wasn't my area of expertise.  I just
15   wanted -- I was reaching out trying to
16   find out how do we keep this company from
17   going under.
18   Clearly up to that point I had
19   believed that they were going -- they had
20   convinced us and everyone they knew what
21   they were doing and all of our
22   questioning of the financial condition of
23   the company was unwarranted.  When that

Page 287

1    happened, we believe that what we had
2    believed was in fact true.
3    Q.   Now, earlier when you were
4    telling me about the meeting with Henry
5    Hicks and Brenda Sellers you made a
6    comment along the lines of clearly what
7    had been told was going on was not what
8    was going on.  What did you mean by that?
9    A.   Well, I mean, I don't know.
10   That was in June of 2005.  So for
11   twenty-two months we had been told that
12   we are Onyx, we know what we're doing,
13   this isn't our first rodeo, or something
14   to that effect, we're experts at this, we
15   have access to capital, we know how to
16   deal with bankers, all your concerns are
17   not --
18   You know, we were still
19   looking at the cash flow of the company
20   and financial condition of the company.
21   Then around May or April of 2005 they cut
22   off access to all of the financials to
23   all of us.  So then we didn't have --

Page 288

1    that was a little disturbing because then
2    we didn't have any insight into the
3    health of the company.
4    So, yeah, it was like a
5    realization that our suspicions were
6    true, that we had been lied to and been
7    deceived and this had been a big -- they
8    had misrepresented their abilities.
9    Q.   And, again, you don't know,
10   though, what the discussions were between
11   Jeff Larry or Chris Day and Henry Hicks
12   with SouthTrust about SouthTrust's
13   willingness to continue doing business?
14   A.   No.  Was not inside on that at
15   all.
16   Q.   And you don't know when it was
17   that SouthTrust had decided to totally
18   pull the plug on Piknik?
19   A.   I was not privy to any of that
20   until it was public information.
21   Q.   So, for all you know, it could
22   have happened the day before this meeting
23   on June 22nd?

JERRY A. McCARTNEY, ET AL.                                                        ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                              August 14, 2007

(Pages 289 to 292)

Page 289

1    A.   Could have.
2    Q.   Now, at some point did you
3  decide that you were not going to accept
4  the fifty thousand dollar salary and the
5  continued employment for five weeks?
6    A.   Yes.
7    Q.   So you rejected the proposal
8  that is reflected in Defendant's Exhibit
9  8; correct?
10    A.   Yes.
11    Q.   And when did you come to that
12  decision?
13    A.   I mean, I think it was within
14  like a day. I either called or sent an
15  e-mail or something to somebody, I think
16  it was Chris, letting them know that I
17  would -- I did not want to accept that to
18  stay on at half my salary.
19        (Whereupon, Defendant's
20         Exhibit 9 was marked
21         for identification.)
22    Q.   Show you what has been marked
23  as Defendant's Exhibit 9 to your

Page 290

1  deposition.
2    A.   (Examining document.) Do I
3  need to answer a question?
4    Q.   I was just giving you an
5  opportunity to look at it.
6    A.   Yeah.
7    Q.   Have you had a chance to read
8  Defendant's 9?
9    A.   Yes.
10    Q.   Is this an e-mail that you
11  sent to Henry Hicks rejecting the offer
12  that was outlined in Defendant's Exhibit
13  8?
14    A.   Yes.
15    Q.   Was this e-mail the first
16  instance that you notified Piknik that
17  you were not going to accept the offer
18  outlined in Defendant's Exhibit 8?
19    A.   I believe it was. I believe
20  that was -- I believe -- I talked to
21  Henry at some point. It may have been
22  before this. I can't remember exactly.
23  But I did have a conversation with Henry

Page 291

1  at some point.
2    Q.   Tell me about that
3  conversation with Henry. Was it over the
4  phone?
5    A.   Yes.
6    Q.   What was said? Well, first of
7  all, who initiated the call?
8    A.   I don't recall that either. I
9  think it was Henry, but I don't recall
10  it. It was short. I think it was
11  something along the lines of -- you know,
12  it was either before or after the e-mail.
13  It was something along the lines of I'm
14  leaving immediately and why are you doing
15  this. And at some point I told him that,
16  Henry, what you're doing is illegal. And
17  he asked me what specifically I was
18  referring to, and then I said I've got to
19  go. Or maybe I said I think what you and
20  Onyx, or something to that effect, is
21  illegal.
22    Q.   And Henry asked you what you
23  were referring to, and you said you had

Page 292

1  to go?
2    A.   Yeah. I didn't answer the
3  question. I told him I just needed to
4  go. Or something like it would be best
5  for us to just end this conversation,
6  something like that.
7    Q.   Brief call?
8    A.   As I recall, it was brief.
9    Q.   Anything else you can recall
10  about that conversation?
11    A.   No.
12    Q.   And you sent this e-mail at
13  3:48 p.m.?
14    A.   Yes.
15    Q.   Had you made up your mind to
16  reject the offer, you know, much earlier
17  than 3:48 p.m.?
18    A.   Somewhere -- yeah, I mean,
19  obviously it was something I had to go
20  home and think about. I'm sure I came to
21  the conclusion before 3:48 on -- what
22  day was that, Thursday or Friday.
23  Thursday, yeah.

73

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 293 to 296)

Page 293

1    Q.   Why did you reject the offer?
2    A.   Why did I reject the offer?
3    Q.   That's outlined in Defendant's
4  Exhibit 8?
5    A.   Well, number one, I didn't --
6  I think it was clear to me at the time
7  that -- how do you say this.  You all of
8  a sudden realize that you've been had,
9  you've been scammed, this has all been a
10  lie; yet, you still want the company to
11  survive.  And it's time -- the company
12  doesn't have any more weeks under Onyx's
13  leadership to survive.  Something's got
14  to happen.  And so selling out and taking
15  this five-week severance and going off
16  and looking for another job was an
17  option, but I thought there was a better
18  option.
19    Q.   What was the better option
20  that you thought of?
21    A.   To have another company,
22  whether it was an investor or a customer
23  or somebody who had a vested interest --

Page 294

1  customer would have been one -- to come
2  in and get with the bank and find out
3  what they got to do to take over the
4  company.
5        It was clear to me that Onyx
6  had -- something was really -- something
7  was really wrong in this whole process,
8  and those suspicions were -- those
9  suspicions were validated two weeks later
10  when they were removed from Piknik by the
11  bank.
12    Q.   You received a response to
13  your e-mail that is Defendant's Exhibit
14  9; correct?  Or if you don't recall, I
15  can show you a document.
16    A.   Yeah.
17        (Whereupon, Defendant's
18        Exhibit 10 was marked
19        for identification.)
20    Q.   I'm showing you what has been
21  marked as Defendant's Exhibit 10.
22    A.   Yes, I remember this.
23    Q.   And in the e-mail Chris Day

Page 295

1  apologizes that the company's
2  circumstances had changed so quickly and
3  that he wished that he didn't have to do
4  some of the things that we've had to do;
5  is that correct?
6    A.   Yeah.  Yes.
7    Q.   And he accepts your
8  resignation?
9    A.   Yes, he did.
10    Q.   And he wished you well going
11  forward and in the future?
12    A.   Yes, he did.
13    Q.   Now, you were saying that you
14  thought there was a better option than
15  continuing to work at Piknik, and that
16  you thought the better option was to have
17  another company or a customer or someone
18  to get with the bank and take over the
19  company; right?
20    A.   Yes.
21    Q.   What steps did you take to try
22  to make that better option come to
23  fruition?

Page 296

1    A.   Well, I -- we had -- I put
2  together a letter and sent it to I think
3  it was three or four people, as I recall,
4  trying to just initially get kind of a
5  feel for an interest on behalf of, you
6  know, either investors or customers who
7  had a vested interest to let them know
8  that here are some events that have
9  happened at Piknik and I wanted to
10  see what -- I don't recall.  The memo
11  exists.  You probably have it or I've got
12  it.
13    Q.   I don't have it.
14    A.   But it exists.  Basically a
15  memo that says this is what Onyx has
16  said, this is their talking points, and
17  that I was no longer with the company and
18  that I was trying to head up a team, if
19  you will, of people to find alternate
20  sources of -- something to the extent
21  that, hey, I would like us to take a look
22  at other options to come in and -- I
23  can't remember if I said talk to the bank

Tyler Eaton Morgan Nichols & Pritchett, Inc.

74

JERRY A. McCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                            August 14, 2007

(Pages 297 to 300)

Page 297

1    or what. But the point was would you
2    have an interest in being part of an
3    investment in Piknik in order for it to
4    continue and survive, something to that
5    effect.
6        Q.    Who was the team that you put
7    together?
8        A.    Well, it was coming together
9    slowly. I mean, you know Ricky -- I
10   forget what day I talked to him about it.
11   It was around that time him and I started
12   talking about going and visiting M&A
13   attorneys. I talked to Shannon about it.
14   I talked to Jerry about it. I don't
15   remember -- I talked to Shannon's husband
16   about it.
17       Q.    What is Shannon's husband's
18   name?
19       A.    Scott McGlon.
20       Q.    Anything else?
21       A.    I don't recall. This all
22   happened in a twenty-four hour period. I
23   mean, we were trying to scramble and

Page 298

1    figure out how to save a company.
2        Q.    And who did you send the
3    letters to?
4        A.    I sent it to a guy -- I sent
5    it to David Daneshmayeh. I sent one to
6    Craft, who got it to -- I can't remember
7    his name. Somebody at Craft. The name
8    will come later.
9        Q.    Peter Lloyd?
10       A.    It probably was Peter. Yeah,
11   it probably was Peter. Sent it to a
12   contact, and again I don't remember his
13   name right now. It was at one of the --
14   it was at one of the bottling suppliers,
15   a guy I had talked to on a number of
16   occasions that was in like a VP of Sales
17   role. His name will come to me later.
18   So he was like a packaging guy that might
19   have an interest in seeing our
20   continuation. Here was Craft who was
21   investing a lot of money in our business,
22   might have an interest in seeing it
23   continue.

Page 299

1        At some point I reached out to
2    this consultant that -- I don't remember
3    if he got the letter or not. Somewhere
4    around there I talked to this guy that
5    was supposed to come in and look at the
6    health of the company. I don't remember
7    if he got the letter or not, though.
8    This is all running together. I think I
9    sent one to Kellogg's. I think the guy's
10   name was Jeff Slabey or one of his -- his
11   name is not coming to me. But those are
12   two customers who had just invested a ton
13   of money in the physical facilities and
14   would have an interest in seeing our
15   continuation.
16       Q.    Were the letters that you sent
17   to those individuals all the same?
18       A.    Same letter.
19       Q.    Like a form letter?
20       A.    Form letter.
21       Q.    Did you end up talking with
22   any of those folks?
23       A.    Yes, I did.

Page 300

1        Q.    To whom did you speak?
2        A.    Well, I talked with Vick --
3    excuse me. Victor. I'm trying to
4    remember his last name. I think it was
5    Victor at Kellogg's. And I talked with
6    Peter Lloyd at Craft. And I can't
7    remember -- I don't think David
8    Daneshmayeh called back. And I did talk
9    to the guy at Graham Packaging.
10       Q.    Grant Packaging?
11       A.    Graham. It's G-R-A-H-A-M. I
12   think it was Graham.
13       Q.    Is that the bottling supplier?
14       A.    That was the bottle supplier,
15   yes.
16       Q.    What did you tell Victor at
17   Kellogg's?
18       A.    Well, I mean, I don't recall
19   the conversation, but it was about the
20   letter. And he was -- you know, was
21   surprised or was not aware that I had
22   left and was asking me some questions
23   about it. But I was basically just

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 301 to 304)

Page 301

1  reiterating what was in the letter, that
2  I was concerned about the company, that I
3  had just been let go, a bunch of people
4  had been let go in key positions, and we
5  were a little concerned about the health
6  of the company, and we wanted to know if
7  they would have an interest, if there
8  would be any interest -- actually, I
9  think the letter said if you have an
10 interest in -- excuse me.
11        We wanted to talk to their M&A
12 folks, if they had M&A folks in the
13 company, because, again, remember,
14 they're customers, and they made a big
15 investment in capital in the building.
16 So we felt like they might have a vested
17 interest in making sure we survived. So
18 we wanted to talk to their M&A folks
19 about is there an interest and what do we
20 do to go forward.
21        At the same time Ricky and I
22 were lining up attorneys to meet with, to
23 talk about moving forward with the

Page 302

1  strategy to, you know, have investors
2  come in and ensure the company's health
3  and survival.
4     Q.   Was Victor at Kellogg's
5  interested in joining the group or
6  investing --
7     A.   In that conversation he didn't
8  express that interest.
9     Q.   Were there subsequent
10 conversations with Victor at Kellogg's?
11    A.   Not that I recall.
12    Q.   Tell me about your
13 conversation with Peter Lloyd at Craft.
14    A.   There may have been, there may
15 have been, subsequent conversations, but
16 it was a brief conversation.
17    Q.   With Victor?
18    A.   With any of these. I don't
19 remember the exact conversations. I
20 think I did talk to Victor once more and
21 told him just to put things on hold at a
22 later time -- I said let's put things on
23 hold for now. And I think I talked to --

Page 303

1  there was Peter Lloyd at Craft, Victor
2  at -- or Vick at Kellogg's.
3        The conversation was I think
4  he had called, hey, what's going on, you
5  know, got your letter, passed it on to my
6  boss. And that was pretty much it. I
7  think he was being a little reserved in
8  his conversations.
9     Q.   What about Graham Packaging,
10 what was your conversation with Graham
11 Packaging?
12    A.   Very brief. He indicated that
13 he didn't think there would be an
14 interest. It was very short.
15    Q.   Did you have any conversations
16 with these folks about the specifics of
17 your departure from Piknik?
18    A.   Not that I recall. I don't
19 recall going into the specifics. I may
20 have told them I was -- I don't recall
21 telling them anything about that to be
22 honest. I don't remember if I would have
23 had a reason why to tell them that.

Page 304

1     Q.   Now, I want to go back to
2  Wednesday, June 22, 2005. I understand
3  the meeting with Brenda Sellers and Henry
4  Hicks you recall was somewhere around
5  lunch time?
6     A.   Somewhere around noon time,
7  probably before.
8     Q.   And then after that you went
9  home?
10    A.   Uh-huh.
11    Q.   Yes?
12    A.   Yes.
13    Q.   Was your office at the Day
14 Street facility?
15    A.   Yes, it was.
16    Q.   And later that night or in the
17 early morning hours did you return to the
18 Day Street facility?
19    A.   Yes, I did.
20    Q.   What did you do when you
21 returned to the Day Street facility?
22    A.   I removed my personal effects
23 and some other documents I thought might

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 305 to 308)

Page 305

1  be useful.
2      Q.    What time did you go back to
3  the Day Street facility?
4      A.    It was late.  It was probably
5  around ten or eleven or twelve at night,
6  somewhere around there.
7      Q.    Was anybody with you?
8      A.    No.
9      Q.    Was anyone at the Day Street
10  facility when you were there?
11      A.    Yes.
12      Q.    Who?
13      A.    Well, there was a whole second
14  shift working.  They were all there.
15      Q.    Were they out in the shop or
16  in the plant?
17      A.    Yeah.  I mean, they were
18  milling around outside.  They were in the
19  break room.  You know, they were
20  everywhere.
21      Q.    Were you in the office
22  section?
23      A.    Well, my office is in the

Page 306

1  office section, so I went to my office,
2  yes.
3      Q.    Had you told anyone at Piknik
4  that you were going to be at the Day
5  Street facility that night?
6      A.    I don't recall telling anybody
7  I was going there that evening, no.
8      Q.    By this time had you already
9  made up your mind that you would not be
10  accepting the offer outlined in
11  Defendant's Exhibit 8?
12      A.    Yeah, I'm sure I did at that
13  time.  I'm sure I reached that point of
14  view.
15      Q.    So you removed your personal
16  effects?
17      A.    Uh-huh.
18      Q.    Is that a yes?
19      A.    Yes.
20      Q.    And you said you removed other
21  documents that you thought were
22  important?
23      A.    Yes.

Page 307

1      Q.    What documents were those?
2      A.    It was certain -- I don't
3  remember the exact documents, but they --
4  as I recall, I left a lot of the contract
5  information that they would need -- you
6  know, contracts that would be necessary
7  to know what the agreements were.  But
8  there were certain documents I took.
9          I mean, I took, for example,
10  my -- my journal that I -- all my
11  journals that I keep with me that I write
12  everything down in.  I think I probably
13  removed certain CDs that I had backed
14  information up on at various times.  I
15  took -- I already mentioned personal
16  stuff.  I don't remember the documents.
17  You'll have to bear with me.  But at the
18  time it was documents that I thought
19  might be useful.
20      Q.    Useful for what?
21      A.    Well, I thought there was
22  going to be -- I thought that this
23  information would be useful because I

Page 308

1  thought there was some crimes committed
2  and I wanted to have them for evidence.
3  I just didn't know which ones they were
4  at the time.
5      Q.    What kind of crimes did you
6  think were committed?
7      A.    Well, I don't know the law so
8  I didn't know exactly.  I couldn't quote
9  the statute.  But I felt there was
10  intentional misrepresentation and fraud
11  that was suffered upon vendors,
12  customers, the bank, all the
13  stakeholders, employees.  And I felt that
14  I needed to preserve those documents.
15      Q.    And you have no recollection
16  of the documents that you took?
17      A.    Well, the important stuff was
18  the -- what was on my -- on my computer,
19  which I kept.  The computer was the
20  key -- the key -- I mean, that was --
21  that was what they were after.  That's
22  why they filed an arrest warrant.  They
23  wanted that back.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 309 to 312)

Page 309

1    Q.   So you removed personal
2  effects, documents that you thought were
3  useful, were important, and the laptop?
4    A.   Yeah.
5    Q.   Did the company purchase that
6  laptop for you?
7    A.   Yes, they did.
8    Q.   Do you still have the laptop?
9    A.   I don't have it, no.
10   Q.   Did you return it to Piknik?
11   A.   I gave it to Ricky Loeb.
12   Q.   Before you gave it to Ricky
13 Loeb did you save any information that
14 was on that laptop to a disk or print
15 documents out from it?
16   A.   I saved all of it, all the
17 stuff that I thought that was relevant.
18   Q.   How did you save it?
19   A.   Backed it up on a CD.
20   Q.   Do you have that CD still?
21   A.   Yes.
22   Q.   Have you given that CD to your
23 lawyer?

Page 310

1    A.   I think I have. I think it
2  was the one with -- I gave it to -- I
3  didn't give it to you (indicating Mr.
4  Nelms). I gave it to somebody in his
5  office as I recall, as I recall. I'd
6  have to go back and --
7    Q.   I just haven't received it.
8    A.   The reason I'm struggling with
9  it is he wanted me to print it out, and I
10 was thinking maybe you could -- so I
11 don't remember what I did -- I don't
12 remember if I did give it to him or if I
13 thought I gave it -- but, yes, I have the
14 disk. If you would like it, I'm sure I
15 can bring you a copy.
16   Q.   Did you save e-mails to the
17 CD?
18   A.   Yes.
19   Q.   Did the information that you
20 stored on this CD contain information
21 about Piknik customers?
22   A.   Yes.
23   Q.   Did it contain like pricing

Page 311

1  information?
2    A.   Yes.
3    Q.   Did it contain cost
4  information?
5    A.   Yes.
6    Q.   What other kind of information
7  was included?
8    A.   Well, it was -- I mean, it was
9  correspondence we had with customers and
10 each other. You know, it was just the
11 e-mail backup. I back up my e-mail, all
12 my e-mails.
13   Q.   Why did you go to the Day
14 Street facility so late at night?
15   A.   Because I didn't want to -- I
16 didn't want to run in to Henry, and I
17 didn't want -- I wanted get my stuff and
18 get out of there, and I didn't want to
19 have to confront him.
20   Q.   By this time, though, you
21 hadn't told Henry your decision?
22   A.   No.
23   Q.   Correct?

Page 312

1    A.   Correct.
2    Q.   And your sole purpose for
3  getting this information was to preserve
4  evidence of what you thought was some
5  crime that may have been committed?
6    A.   Well, that, and it would be
7  necessary if, for example, I needed to
8  get my hands on data to present to
9  potential investors or, you know, in the
10 company. So it was really two purposes.
11   Q.   Were you trying to get Onyx
12 kicked out of control?
13   A.   Was I trying to get Onyx
14 kicked out of control?
15   Q.   Of Piknik?
16   A.   I never had -- other than
17 the -- no, I was not.
18      MR. NELMS: Sounds like they
19 were doing a pretty good job on their
20 own.
21   A.   I mean, I didn't --
22   Q.   But you were actively seeking
23 other investors to purchase Piknik?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 313 to 316)

Page 313

1    A.    That was after June 22nd.
2    Q.    It was on June 23rd?
3    A.    June 23rd is the start, yes.
4    Q.    Did you take anything else
5 from the Day Street facility?
6    A.    I took my refrigerator.  I
7 mean, I took my personal effects.  As I
8 recall, everything I took was in my
9 office.  I didn't go to anybody else's
10 office, no.
11    Q.    You said you kept a journal.
12 What kind of information did you keep in
13 this journal?
14    A.    Meetings.  You know, meetings
15 with customers, financial meetings, just
16 meetings.  It was notes I took, you know,
17 things I had to follow back up on, things
18 like that.
19    Q.    Does that journal contain any
20 notes that relate to your claim in this
21 lawsuit?
22    A.    I mean, I don't recall ever
23 writing down in a journal that, you know,

Page 314

1 clearly they've got -- that clearly
2 they're going to fire us all because
3 we're Caucasian.  This was all business.
4 These were discussions we had, who was in
5 attendance, what we talked about.  It was
6 an action item journal.  It was Bob
7 Winter's got an action item, here's what
8 he needs to do, make sure and follow up
9 on it.
10    Q.    Do you still have that
11 journal?
12    A.    Yes.
13    Q.    Have you given it to your
14 lawyer?
15    A.    I don't think I have.  Is that
16 evidence?
17    MS. MCGAHEY:  Andy, I'm going
18 to go through and figure out the
19 documents that Mr. Winter says he has
20 that I just haven't seen yet, and I will
21 follow up with you on that separately.
22    MR. NELMS:  Follow up with
23 your co-counsel too.

Page 315

1    MS. MCGAHEY:  Okay.  Are you
2 saying he already has it?
3    MR. NELMS:  I think they're
4 aware of it.
5    MS. MCGAHEY:  Can we go off
6 the record?
7    (Off-the-record discussion
8 from 4:15 to 4:16 p.m.)
9    Q.    (BY MS. MCGAHEY:)  Besides
10 your personal effects, documents that you
11 thought were important or useful, your
12 laptop, anything else that you took from
13 the Day Street facility?
14    A.    I don't -- you know, I
15 don't -- that was what I took.  If I
16 thought there was some incriminating
17 evidence -- I'm trying to think of what
18 that was.  To me it was all the -- it was
19 all the e-mail stuff because that was 95
20 percent of the communications was through
21 e-mail, of the hard evidence, you know,
22 the hard documentation.
23    Q.    What did you do with that

Page 316

1 documentation, if anything?
2    A.    Well, it stayed on the laptop.
3 Obviously, I didn't erase it from the
4 laptop.  I gave it to Ricky in a
5 couple of days.  I forget what day it
6 was.  And I kept the CD.  I still have
7 it.
8    Q.    What, if anything, have you
9 done with that CD?  Have you given it to
10 the authorities?  Have you given any of
11 the information to customers or
12 investors?
13    A.    No, not given any of it to
14 investors, not given any of it to
15 customers.  The only people that I can
16 recall giving it to would have been
17 Ricky.  I think I burned a couple of CDs
18 to Ricky.  I gave him the laptop and then
19 gave him a couple of backup CDs of that
20 e-mail file.  And I can't remember -- I
21 can't remember whether I gave it to you
22 or I was going to give it to you, or I
23 was going to print them off.  But

79

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 317 to 320)

| Page 317 | Page 319 |
|---|---|

**Page 317**

1  somewhere around that discussion about a
2  year ago -- and if I'm negligent in
3  giving you that, I will give it to you.
4      Q.    At some point did someone from
5  Piknik ask you to return all the property
6  you had taken?
7      A.    Yes, they did.
8      Q.    Was it a phone call?
9      A.    It was a letter.
10          (Whereupon, Defendant's
11          Exhibit 11 was marked
12          for identification.)
13     Q.    I'll hand to you what has been
14  marked as Defendant's Exhibit 11 to your
15  deposition.  Is this the letter that you
16  received?
17     A.    Yes, it was.
18     Q.    Did you have any conversations
19  with anyone from Piknik about the
20  contents of this letter?
21     A.    Not that I recall.
22     Q.    Did you have any conversations
23  with anyone at Piknik about returning the

**Page 318**

1  property you had taken from the Day
2  Street facility?
3      A.    I had talked to another
4  salesman that had recently been
5  terminated in Florida and told him that I
6  got this letter and said I'm hanging on
7  to my laptop, I don't want to give it
8  back to them.  He told me he's doing the
9  same thing.
10         And he supposedly called an
11  attorney or judge or somebody, and they
12  told him not to return it until he got
13  paid in full, because he had got his pay
14  cut in half without knowledge of it -- it
15  was after the fact -- and terminated.
16  And he told me he wasn't going to return
17  it.
18         So, you know, that is the only
19  conversation I recall about -- I'm sure I
20  probably talked -- of course -- I'm sure
21  I probably talked to Jerry.  I may have
22  talked to Bert about this.  I may have
23  talked to Shannon about it, probably did

**Page 319**

1  during this time.  This obviously was --
2  you know, it was a demand letter.  What
3  was the date of that, June 23rd.  Is that
4  Thursday?
5      Q.    Yes.
6      A.    I don't recall getting this
7  letter until like Friday or Saturday.
8  22nd was Wednesday, right?  Anyway, I got
9  the letter a day or two later.
10     Q.    Did you also take your cell
11  phone?
12     A.    Yes.
13     Q.    You eventually returned your
14  laptop to Ricky Loeb?
15     A.    Yes.
16     Q.    Along with some CDs of the
17  contents of the laptop?
18     A.    And some documents.  Some of
19  the documents I took I gave them to
20  Ricky.  I don't remember all of them.
21     Q.    Did you return your phone?
22     A.    Eventually I did, yes.  I
23  brought that back to Brenda.

**Page 320**

1      Q.    You formed a consulting
2  company called IntroLink?
3      A.    Yes.
4      Q.    You formed that on June 23rd
5  as well?
6      A.    Yes.
7      Q.    What kind of consulting
8  business was it, or was it a consulting
9  business?
10     A.    Yes.
11     Q.    What kind of consulting
12  business?
13     A.    Well, my first project was to
14  help Piknik survive, and after that it
15  was -- I was seeking consulting
16  assignments to work with companies on
17  similar projects I had been involved
18  with.
19     Q.    What do you mean by similar
20  projects that you had been involved with?
21     A.    Well, a lot of big companies
22  have big projects that they have going
23  on.  They need project leaders.  They

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 321 to 324)

Page 321

1 need people there onsite to manage a
2 piece of the project. So I was making my
3 credentials and availability known.
4    Q.   How did you decide to start
5 your own company?
6    A.   Well, my first project was to
7 figure out a way to keep Piknik from
8 going under, going bankrupt. So I went
9 down and filed the documents, and I was a
10 company.
11    Q.   Did you have any help in
12 filing or preparing the documents?
13    A.   Not that I recall. You mean
14 from like legal counsel?
15    Q.   Legal counsel or from anyone
16 else?
17    A.   I'm sure I probably talked to
18 somebody about, hey, I want to form an
19 S-corporation or LLC or something, what's
20 involved. I don't remember exactly who I
21 talked to. But I even recall getting
22 some information off the internet about
23 where to file, how to file. So I filed.

Page 322

1    Q.   Had you decided before June
2 23rd to form IntroLink Consulting?
3    A.   Well, I had always thought for
4 years about doing something on my own.
5 My younger brother had a recruiting
6 practice, and it was called IntroLink,
7 and him and I had talked for, I don't
8 know, months about the possibility that I
9 could, you know, do recruiting, because
10 my issue was I needed to stay in
11 Montgomery because I had kids here. I
12 was in a divorce situation. I was
13 talking to him about doing that. That
14 was even -- I'm out of a job. I'm
15 looking -- I've got to figure something
16 out quick. I was looking at a lot of
17 different options, yeah. One of them was
18 actually recruiting at the time.
19    Q.   Did you file some documents
20 with the Secretary of State?
21    A.   I don't know who it was with.
22 But it was in Wetumpka because I live in
23 Elmore County, and it was at the

Page 323

1 courthouse.
2    Q.   Is IntroLink Consulting still
3 operating?
4    A.   It's not technically
5 operating, but I believe -- I pay like a
6 hundred dollars, some kind of fee to --
7 you know, I think I get a call, you have
8 to send a hundred dollars in for some
9 kind of a license or something like that.
10    Q.   How many employees does it
11 have?
12    A.   One.
13    Q.   You?
14    A.   I'm it.
15    Q.   Are there any other owners or
16 members of the LLC?
17    A.   No.
18    Q.   Has IntroLink Consulting
19 received any income?
20    A.   No.
21       (Whereupon, Defendant's
22       Exhibit 12 was marked
23       for identification.)

Page 324

1    Q.   I will show you what has been
2 marked as Defendant's Exhibit 12 to your
3 deposition.
4    A.   I think I remember it. There
5 was a series of correspondence with
6 Brenda. That looks familiar.
7    Q.   Introlink@bellsouth.net, was
8 that one of your e-mail addresses?
9    A.   Yes.
10    Q.   You say in the second
11 paragraph the reason you "held onto the
12 equipment was due to the retroactive
13 reduction and the fact I was told I would
14 be unlikely to receive an expense check
15 for my latest expenses."
16       Did you ever receive an
17 expense check for your latest expenses?
18    A.   Yes, I did, soon after this
19 letter.
20    Q.   What did the retroactive pay
21 reduction have to do with your keeping
22 the equipment?
23    A.   Well, part of the -- well,

JERRY A. MCCARTNEY, ET AL.                                          ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                   August 14, 2007

(Pages 325 to 328)

Page 325

1  they -- I've got something of value; you
2  owe me something; let's agree to return
3  it, and I'll get a check.
4      Q.   What were you seeking in
5  return for the laptop or the equipment?
6      A.   What was I seeking?
7      Q.   Because you had already
8  declined the offer that we talked about
9  in Defendant's Exhibit 8.
10     A.   Well, I mean, I didn't need
11 the -- I held onto the equipment -- let's
12 be clear. There's a distinction. I held
13 onto the equipment because I wanted to
14 get retroactively paid.
15         I was a little offended that I
16 didn't get told until my last day of
17 employment -- which, you know, that pay
18 period ended that week, as I recall --
19 that you worked for the last two weeks
20 and we're going to pay you half of what
21 you normally earn, and, oh, by the way,
22 we're going to pay you half going
23 forward; thank you very much, go home.

Page 326

1  Well, I got my laptop. It's in my
2  possession. Give me half of my pay back,
3  and you'll get the laptop.
4      Q.   So you were using it as a
5  bargaining tool?
6      A.   Part of the reason was a
7  bargaining tool, yeah. I mean, I needed
8  it to back up the CD. By July 8th I
9  didn't need the laptop.
10         MR. NELMS:  Jennifer, I don't
11 know what you know -- off the record.
12         (Whereupon, off the record
13         from 3:48 to 3:49 p.m.)
14         (Whereupon, Defendant's
15         Exhibit 13 was marked
16         for identification.)
17     Q.   (BY MS. MCGAHEY:)  I have
18 handed to you what has been marked as
19 Exhibit 13 to your deposition.
20     A.   Yes.
21     Q.   Did you send this letter to
22 Brenda Sellers?
23     A.   Yes, I did.

Page 327

1      Q.   Did you hand-deliver it, mail
2  it, e-mail it?
3      A.   I think I e-mailed. I may
4  have hand-delivered it. I can't
5  remember, but this letter looks familiar.
6      Q.   What was the box of
7  miscellaneous Piknik materials that was
8  in your car?
9      A.   That was the -- there was
10 stuff. Remember, the personal stuff.
11 And, you know, when you're grabbing that
12 stuff it's got business stuff and it's
13 got personal stuff. So I finally kind of
14 sorted through stuff, what was my stuff
15 that was my personal stuff, and I had
16 this leftover little box. And that's
17 what I brought her that day.
18     Q.   So you eventually returned all
19 of Piknik owned equipment and documents
20 and information --
21     A.   Yes.
22     Q.   -- to Piknik?
23     A.   Yes, I returned -- except for

Page 328

1  the laptop. I gave that to Ricky.
2      Q.   You didn't keep anything;
3  correct?
4      A.   I kept copies.
5      Q.   Besides the copies; is that
6  correct?
7      A.   Not that I recall. I mean, do
8  paper clips count?
9      Q.   Had you formed IntroLink
10 Consulting, you know, had you filed those
11 documents before you informed Henry Hicks
12 that you were rejecting the offer
13 outlined in Defendant's Exhibit 8?
14     A.   I think I did. I think I was
15 there in the morning, as I recall. I
16 could be wrong about that. But it was on
17 or about the same day as when I formed
18 the -- filed the form.
19     Q.   Is Piknik still operating, do
20 you know?
21     A.   No, they are not operating.
22     Q.   Do you know when they ceased
23 operating?

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 329 to 332)

Page 329

1  A.   I think they filed bankruptcy
2  protection September of '05, and I think
3  they closed the doors in December of '05.
4  Q.   You started working at Glovis;
5  is that how you pronounce it?
6  A.   Yes.
7  Q.   In early September of 2005?
8  A.   Yes.
9  Q.   What are you currently making
10 salarywise at Glovis?
11 A.   I don't work at Glovis.
12 Q.   You no longer work there?
13 A.   No.
14 Q.   When did you leave Glovis?
15 A.   I left them around July 20th I
16 believe was my last day there.
17 Q.   2007?
18 A.   2007, yes.
19 Q.   How much were you making when
20 you left Glovis?
21 A.   My annual base salary was
22 eighty-eight, around eighty-eight
23 thousand dollars.

Page 330

1  Q.   Where are you working now?
2  A.   A company called Online
3  Commerce Group.
4  Q.   Is that a company owned by
5  Shannon and Scott McGlon?
6  A.   Yes, it is.
7  Q.   What are you doing for Online
8  Commerce Group?
9  A.   I'm their VP of contracts and
10 commercial sales.
11 Q.   When did you start working at
12 Online Commerce Group?
13 A.   July 23rd.
14 Q.   July 23rd?
15 A.   Yes. I think it was a Monday,
16 as I recall.
17 Q.   How much are you making at
18 Online Commerce Group?
19 A.   Eighty-five thousand.
20 Q.   Do you have any bonus program?
21 A.   There is a bonus plan, yes.
22 Q.   What is the bonus plan?
23 A.   It pays based on revenue and

Page 331

1  margin, and it pays out different rates
2  based on the revenue that's generated by
3  my efforts.
4  Q.   Do you get a percentage?
5  A.   Not a percentage. I get a --
6  you know, you hit a certain level, you
7  get a flat fee. You get another level,
8  you get a flat fee.
9  Q.   What about at Glovis, were you
10 eligible for any bonus program?
11 A.   Yes, I was.
12 Q.   Did you receive any bonus?
13 A.   Yes, I did.
14 Q.   What was your bonus?
15 A.   One year was five thousand and
16 the next year was six thousand.
17 Q.   Between your departure from
18 Piknik in June 2005 and your starting
19 work at Glovis in September 2005 did you
20 work in that interim time period?
21 A.   Between Piknik and before
22 Glovis? Yes, I was consulting with a
23 gentleman by the name of Tom Centauro and

Page 332

1  Ricky on how to fix Glovis -- fix Piknik.
2  Q.   Was this through your work
3  with IntroLink Consulting?
4  A.   Yes.
5  Q.   And you did not receive any
6  income from that work; correct?
7  A.   No, I did not. I did not.
8  And that's why I ceased working for them.
9  Q.   Were you seeking employment
10 elsewhere at the same time?
11 A.   Not during that time. I mean,
12 when I was working with -- as I recall,
13 when I was working with Ricky, which
14 didn't last long because I wasn't getting
15 paid -- but during that time I don't
16 recall seeking employment. I'm sure I
17 was looking at options. For example, I
18 had visited with my younger brother to
19 look at his recruiting business. So I
20 went up there for a week.
21 Q.   At one point did you start
22 actively seeking other employment?
23 A.   Yes.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 333 to 336)

Page 333

1    Q.    At what point?
2    A.    Well, as I recall, the
3  actively pursuing other employment is
4  when I realized that Piknik was not going
5  to be able to pay me because they would
6  have to go before a judge and get
7  approval.  And they learned of this EEOC
8  claim and felt there was a conflict of
9  interest.  So, long story short, they
10 made it clear to me they could not pay
11 me.  So at that point -- and it was
12 probably around July, late July, that I
13 realized, okay, it's time to cut loose of
14 Piknik and do something different.
15   Q.    And what did you do?
16   A.    Well, I did a number of
17 things.  I actually for a short period of
18 time started working on recruiting and
19 sent out letters -- at the same time I
20 sent out letters to people about --
21 different contacts I had about being able
22 to support them in project based work if
23 they had key projects going on around the

Page 334

1  company that they needed project managers
2  on.  Had begun -- somewhere around that
3  time had begun to send out e-mails and
4  correspondence to different companies I
5  thought I might -- I would be a good fit
6  with, and had several interviews.  And
7  Glovis came along and made an offer, and
8  I took it.
9         (Whereupon, Defendant's
10        Exhibit 14 was marked
11        for identification.)
12   Q.    I'm going to show you a
13 document that has been marked as
14 Defendant's Exhibit 14 to your
15 deposition.  Can you tell me what this
16 document is?
17   A.    Yeah.  This is a list of all
18 the tier one vendors in the area.
19   Q.    Is this a list of folks that
20 you submitted resumes to?
21   A.    Yep.  Yes.
22   Q.    And did you receive any
23 interviews?  Well, are there any others,

Page 335

1  any other companies that you submitted
2  resumes to that are not on this list?
3    A.    Yes.
4    Q.    Who?
5    A.    Off the top of my head I don't
6  recall all the companies, but, I mean, I
7  interviewed with Southeast Atlantic in
8  Jacksonville, Florida.  I remember that
9  interview.  I flew down there.  So
10 obviously I sent them one.  Jenkins
11 Brick, I had an interview with the owner.
12 So obviously I sent him one.  Russell, I
13 had an interview with a guy at Russell,
14 Northern Bypass.  I sent him one.  At
15 that time I was -- I'm sure I was sending
16 resumes out to a number of companies
17 trying to -- in the local market seeking
18 employment.
19   Q.    Besides Southeast Atlantic,
20 Jenkins Brick and Russell and Glovis, did
21 you interview with anyone else?
22   A.    Yeah.  One of these guys,
23 Halla Corporation.

Page 336

1    Q.    Anyone else that you
2  interviewed with?
3    A.    Between the time I left Piknik
4  and started working at Glovis?
5    Q.    Correct.
6    A.    I don't recall right now.
7    Q.    Did you receive any job offers
8  from anyone besides Glovis?
9    A.    No.
10   Q.    You filed a claim with the
11 Unemployment Division with the State?
12   A.    I believe we did, yes.
13   Q.    And you received some
14 unemployment compensation; correct?
15   A.    Yes.
16   Q.    About a thousand dollars,
17 seven hundred and -- does one thousand,
18 seven hundred and sixty dollars sound
19 about right in unemployment compensation
20 that you received?
21   A.    That sounds about right, yes.
22   Q.    Are you making a claim to
23 recover damages for emotional distress?

Case 2:05-cv-01207-MHT-TFM    Document 77    Filed 10/29/2007    Page 87 of 172
JERRY A. McCARTNEY, ET AL.                                      ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                              August 14, 2007

(Pages 337 to 340)

Page 337

1    A.   Yes.
2    Q.   Tell me the symptoms of your
3  emotional distress.
4    A.   I'm going to have to take a
5  break on this one.
6         (Whereupon, a break was
7         taken from 4:41 to 4:45 p.m.)
8    Q.   (BY MS. McGAHEY:)  Mr. Winter,
9  before we took a break I started to ask
10  you about your claim for emotional
11  distress.  Please describe the symptoms
12  of your emotional distress.
13   A.   People with children will
14  understand this.  People without may not.
15  This distress brought on me has affected
16  my relationship with my children in a
17  negative way.  It forced me to take a
18  much lower paying job.  The job required
19  Saturday work.  Turned out that was
20  Saturday of every two weeks.  I have the
21  children certain nights, but every other
22  week on a Saturday was the day I had
23  them.  And because I had to work that day

Page 338

1  and it fell on my weekend, I didn't see
2  my kids on that Saturday.
3         Emotional distress, the
4  lingering effect was the negative
5  consequences resulting from my
6  relationship with my children, which I
7  have been working very hard to repair.
8  Children don't understand why they don't
9  see their dad.  I'm a child of divorced
10  parents, so I'm sensitive to this.
11  Children don't understand why Dad's not
12  there, they just know he's not there.
13        And why would I take a job
14  that happens to be the Saturday I have
15  with my children?  Well, you know, when
16  you need -- when you're out of work and
17  it came as a complete surprise and you
18  had no, you know -- you take the first
19  thing that looks good.  You do what
20  you've got to do to provide.  But my
21  relationship with the children has
22  suffered, and I have suffered as a result
23  of that.

Page 339

1         Yes, that is -- and I don't
2  know -- you know, how do you explain a
3  year and a half, two years out of your
4  children's life to your children at a
5  vulnerable age.  I don't know.  It's more
6  than just suffering.  It's them.
7    Q.   Is it your contention that
8  your children's treatment of you or their
9  perception of you was different as a
10  result of your leaving Piknik?
11   A.   They suffered and our
12  relationship suffered obviously because,
13  you know, I was distraught during that
14  period for a couple of months.  I mean,
15  obviously, I was very concerned and
16  struggling to figure out what to do next.
17        And for the next -- one of the
18  reasons that I joined this company that I
19  joined was because it's -- I don't have
20  to worry about working Saturdays.  And I
21  had been looking for another position
22  ever since I joined Glovis knowing that
23  long-term that wasn't going to be a good

Page 340

1  fit with my family responsibilities.
2         And I know that, you know,
3  people will say, well, you got them three
4  nights a week, I mean, you know, what do
5  you expect for a divorced dad.  But, you
6  know, I used to have them seven nights a
7  week.
8    Q.   When did you have them seven
9  nights a week?
10   A.   When I was married.
11   Q.   And your work at Glovis
12  required you to work two Saturdays of
13  every month?
14   A.   Yes.
15   Q.   The whole entire time that you
16  worked at Glovis?
17   A.   Not the whole entire time, no.
18   Q.   For how long?
19   A.   They worked Saturdays, I want
20  to say, up until like November, December
21  of 2006 I think, somewhere around there.
22   Q.   Were you at some point able to
23  schedule your Saturday work to not

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 341 to 344)

Page 341

1  coincide with the Saturdays you had your
2  children?
3       A.    My ex-wife on a couple of
4  occasions did flip with me.  It may have
5  been two Saturdays out of the whole time.
6  I don't think it was more than that.
7  But, yeah, there were many Saturdays,
8  most Saturdays, I was working when they
9  were home.
10      Q.    I believe you were making
11 eighty-eight thousand at Glovis?
12      A.    Well, that's only been in the
13 last -- that was three weeks before I
14 left.
15      Q.    Last three weeks?
16      A.    Yeah, like the last three or
17 four -- last three weeks I was there they
18 took my salary from eighty thousand, four
19 hundred I think to eighty-eight I believe
20 is what they did.  It was a short time.
21      Q.    And if you had continued
22 working at Piknik, your salary would have
23 been fifty thousand?

Page 342

1       A.    If I would have continued
2  working at Piknik for the five weeks I
3  would have stayed there, would have been
4  fifty thousand, yes.
5       Q.    So your relationship with your
6  children suffered as a result of your
7  departure from Piknik.  That's what
8  you're claiming; correct?
9       A.    Yes.
10      Q.    What other emotional distress
11 did you suffer as a result of your
12 departure from Piknik?
13      A.    Well, I mean I'm not a
14 psychologist.  But, certainly, that
15 was -- I mean, we ended up at family
16 counseling.  That was certainly the most
17 traumatic and the most relevant emotional
18 distress that I felt.  Have I gone to a
19 psychologist to be psychoanalyzed, no.
20      Q.    Besides going to family
21 counseling, have you sought any other
22 treatment for your emotional distress?
23      A.    Yeah, I went to my primary

Page 343

1  physician, described some symptoms I was
2  having, so he sent me over to a
3  cardiologist.  And they did what they
4  call some kind of a 3-D nuclear something
5  to examine my heart and see if there was
6  anything wrong with it.
7       Q.    Who was your primary
8  physician?
9       A.    Dr. Mark Lindsey.
10      Q.    And who was the cardiologist
11 that he referred you to?
12      A.    I don't recall.  I don't
13 recall.
14      Q.    Does Dr. White sound familiar?
15      A.    I think White was the
16 gastroenterologist or something.
17      Q.    What symptoms did you describe
18 to Dr. Lindsey?
19      A.    It was pain in my chest.
20      Q.    And as a result of that he
21 recommended that you see a cardiologist?
22      A.    Yes.
23      Q.    What did the cardiologist tell

Page 344

1  you?
2       A.    Well, I never really talked to
3  him.  I went for my exam.  They performed
4  this procedure, and, actually, I never --
5  I never actually talked to the
6  cardiologist.  But, as I recall, the
7  doctor, when I went to visit him, he
8  didn't have the report back as of yet,
9  and he was going to seek that report, as
10 I recall.  I made the assumption that if
11 it was something in that report that was
12 serious, that they would have called me.
13 At least I hope they would have.
14      Q.    I hope so.  You can't recall
15 who that cardiologist was?
16      A.    No, I can't.  It was at
17 Baptist East, one of the offices over at
18 Baptist East.
19      Q.    And do you attribute the chest
20 pains that you were experiencing to your
21 departure from Piknik?
22      A.    I think the totality of the
23 circumstances and the issue with the

86

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 345 to 348)

| Page 345 |
|---|
| 1  children ultimately brought those pains |
| 2  on, yes. |
| 3    Q.  When did you start |
| 4  experiencing chest pains? |
| 5    A.  I mean I've had -- you know, I |
| 6  went to see -- did an EKG twenty years |
| 7  ago when I was having chest pains, but at |
| 8  the time they thought due to |
| 9  weightlifting.  But it seemed like after |
| 10  this all was going on, you know, it |
| 11  just -- you know, the pressure, the |
| 12  stress, all that tends to weigh right |
| 13  here (indicating), and you feel it.  And |
| 14  my finance at the time was concerned |
| 15  about me and she suggested I go see a |
| 16  doctor. |
| 17    Q.  Again, though, the |
| 18  cardiologist never followed up with you |
| 19  about the results of your tests? |
| 20    A.  I don't recall him ever |
| 21  sending me a report.  Maybe I need to |
| 22  call. |
| 23    Q.  Any other symptoms of |

| Page 346 |
|---|
| 1  emotional distress that you attribute to |
| 2  your departure from Piknik? |
| 3    A.  Not that I can think of right |
| 4  now. |
| 5    Q.  You said you went to family |
| 6  counseling.  Who did you see? |
| 7    A.  I went to a couple of |
| 8  counselors first to -- you know, to just |
| 9  interview them.  But the one we saw with |
| 10  the children was Molly Robertson. |
| 11    Q.  Anyone else? |
| 12    A.  As far as visiting with the |
| 13  children, no. |
| 14    Q.  How many times did you visit |
| 15  Molly Robertson? |
| 16    A.  I was in the meetings probably |
| 17  two or three times. |
| 18    Q.  Do you recall the first time |
| 19  that you saw Ms. Robertson? |
| 20    A.  Yes, I do. |
| 21    Q.  When was it? |
| 22    A.  Oh, man. |
| 23    MR. NELMS:  You look at me |

| Page 347 |
|---|
| 1  like I know these answers.  I have no |
| 2  idea. |
| 3    A.  The first time I saw her, a |
| 4  year ago. |
| 5    Q.  Some time in '06? |
| 6    A.  Yeah, I think it was '06. |
| 7    Q.  What about the second time? |
| 8    A.  It would have been a few weeks |
| 9  after the first one and then maybe a week |
| 10  or two after that.  We discontinued |
| 11  because she left the company.  She left |
| 12  the practice, and my insurance didn't |
| 13  cover where she went. |
| 14    Q.  Any other counselors or |
| 15  professionals or doctors that you sought |
| 16  treatment from? |
| 17    A.  I think I did see a Dr. White. |
| 18  I think that was for the -- |
| 19    Q.  With respect to your emotional |
| 20  distress claims? |
| 21    A.  Oh, emotional distress.  No, |
| 22  not that I can think of. |
| 23    Q.  During this time were there |

| Page 348 |
|---|
| 1  any other sources of stress in your life? |
| 2    A.  Well, my ex and I have at |
| 3  times had a contentious relationship, and |
| 4  my new employment -- she began to take a |
| 5  little advantage of the inflexibility I |
| 6  had with child care, which continued to |
| 7  exacerbate the emotional distress. |
| 8    Q.  So your relationship with your |
| 9  ex-wife contributed to your emotional |
| 10  distress? |
| 11    A.  No.  She took advantage of the |
| 12  fact that I was at a new company and had |
| 13  these Saturdays, and so she didn't |
| 14  necessarily -- wasn't flexible with me on |
| 15  adjusting those Saturdays, and that was |
| 16  frustrating.  I mean, it contributed. |
| 17    Q.  Before you left Piknik what |
| 18  was your relationship like with your |
| 19  boys? |
| 20    A.  Relationship with the boys has |
| 21  always been good. |
| 22    Q.  Was there any tension, you |
| 23  know, between you and Brannon or between |

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 349 to 352)

Page 349

1 you and Christian before you left Piknik?
2     A.    Before I left Piknik,
3 nothing --
4         (Phone ringing.)
5         MR. NELMS:  Do you mind?
6         (Whereupon, off the record
7         from 5:00 to 5:01 p.m.)
8         MS. MCGAHEY:  Remind me where
9 we were.
10         MR. NELMS:  Relationship --
11         (Record read.)
12     A.    Nothing out of the ordinary,
13 parent-son debates.
14     Q.    Before you left Piknik were
15 there times when Christian didn't want to
16 go anywhere with you?
17     A.    Sure.
18     Q.    When did you decide to pursue
19 legal action?
20     A.    When did I decide, like the
21 date?  I think it was after -- I don't
22 know, a week or two or three weeks after
23 I was terminated.

Page 350

1     Q.    Was it your idea to file a
2 claim with the EEOC?
3     A.    Yes.
4     Q.    Did you approach Shannon
5 McGlon about filing an EEOC claim as
6 well?
7     A.    Did I approach her about it?
8 I don't recall approaching her about
9 filing it.  She discussed with me that we
10 may have -- there may have been an EEOC
11 law that was violated.
12     Q.    Did you speak with Jerry
13 MacCartney or Bert Mayer about filing an
14 EEOC charge?
15     A.    Yes.
16     Q.    Tell me about those
17 discussions.
18     A.    Well, again, we were under the
19 impression that they were exempt from
20 certain civil rights, laws.
21         MR. NELMS:  These would be the
22 discussions outside the presence of
23 counsel.

Page 351

1         MS. MCGAHEY:  Of course.
2     A.    You know, they were outside --
3     Q.    I don't want to know -- I'm
4 not entitled to know about discussions
5 you had with your lawyer or in your
6 lawyer's presence.
7         MR. NELMS:  Whether was that
8 me or another lawyer.
9     A.    Shannon mentioned to me that
10 there might have been a law that was
11 violated, and I started looking into it
12 and realized that applies to me too.
13     Q.    When you say you started
14 looking into it, what did you do?
15     A.    Studied up on Title VII,
16 something, 1981 law that talks about, you
17 know, certain acts that were -- don't ask
18 me to quote scripture and verse, but when
19 I read them I realized, wow, this means
20 me too.
21     Q.    And tell me about your
22 discussions with Bert Mayer and/or Jerry
23 MacCartney outside of the presence of

Page 352

1 counsel.
2     A.    On the EEOC claim?  It was
3 basically, guys, there may have been a
4 law violated.  It looks like -- you know,
5 and I don't remember the discussion.  But
6 it was, it looks like we may have -- you
7 know, looks like they've -- this is one
8 area that they crossed the line, and we
9 might want to talk to counsel about it.
10     Q.    Did you contact Bert Mayer or
11 did he contact you?
12     A.    I don't recall whether I
13 contacted him or he contacted me.
14     Q.    Same question for Jerry
15 MacCartney?
16     A.    I don't recall who contacted
17 who.
18     Q.    You filed an EEOC charge,
19 correct?
20     A.    Yes.
21         (Whereupon, Defendant's
22         Exhibit 15 was marked
23         for identification.)

88

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                           August 14, 2007

(Pages 353 to 356)

Page 353

1    Q.    I'm handing you what has been
2    marked as Defendant's Exhibit 15 to your
3    deposition.  Is that your signature on the
4    deposition.  Is that your signature on the
5    bottom left-hand corner?
6    A.    Yes.
7    Q.    Is that your signature on the
8    second page?
9    A.    That's my signature, yes.
10   Q.    On the second page?
11   A.    Yes.
12   Q.    Is this the EEOC charge that
13   was filed by you or on your behalf?
14   A.    Yes, it was.
15   Q.    You say that "on or about June
16   22, 2005, Ms. Brenda Sellers, human
17   resources manager, and Henry Hicks, Vice
18   President of Sales & Marketing, met with
19   me to tell me my salary was retroactively
20   cut 50 percent and my position would be
21   eliminated as of July 29, 2005.  Further
22   there would not be any severance."
23       Was that during the
         discussion -- during the meeting on June

Page 354

1    22, 2005 that you've already told me
2    about?
3    A.    Yes.
4    Q.    Is there anything else that
5    you want to add or that you can recall
6    being said during that meeting besides
7    what you've told me already?
8    A.    I said or they said?
9    Q.    Both.
10   A.    I made the comment something
11   to the effect, wow, you guys are in
12   trouble.
13   Q.    Okay.  This is new.  You
14   didn't tell me that before.  You said,
15   wow, you guys are in trouble?
16   A.    Possibly before I didn't
17   recall it.  It was -- I may have said it,
18   I may have thought it.  That's going back
19   a few years.  But the thought was -- it
20   was in the context of, wow, you guys have
21   been -- you guys have been lying all
22   along.  This is -- we've been -- you've
23   misrepresented yourselves to everyone.  I

Page 355

1    may have said that.  I may have thought
2    that, but that certainly was a --
3    Q.    And you contend that your
4    "responsibilities were replaced by Henry
5    Hicks, a black male"?
6    A.    Yes.
7    Q.    And what is the basis of that
8    contention?
9    A.    That I was replaced by Henry,
10   a black male?
11   Q.    Right.
12   A.    That he continued on in that
13   role.
14   Q.    Do you know what job duties he
15   was performing after you left Piknik?
16   A.    From my understanding, he
17   carried on as VP of Sales & Marketing.
18   Q.    And what is your understanding
19   based upon?
20   A.    Well, part of it would be
21   based on conversations with Ricky Loeb.
22   Q.    Was Ricky Loeb telling you
23   what was going on after you left Piknik?

Page 356

1    A.    I was consulting with him up
2    until the time I wasn't getting paid.
3    Q.    Was Ricky Loeb involved in the
4    day-to-day operations with Piknik?
5    A.    June 23rd was my last day.  It
6    was in less than two weeks -- I don't
7    remember the exact date.  But less than
8    two weeks later the bank come in and
9    removed Onyx from the company and put
10   Ricky back in charge.  So somewhere
11   around July -- it was two weeks later.
12   Q.    Were you aware if your job
13   duties were divided among several
14   employees after you left?
15   A.    No, that was not my
16   understanding.
17   Q.    Although, you weren't present,
18   so you don't know exactly how things were
19   operating at Piknik?
20   A.    That's correct.
21   Q.    When Henry Hicks was your boss
22   did he ever have any counseling sessions
23   with you?

89

JERRY A. MCCARTNEY, ET AL.                                      ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                             August 14, 2007

(Pages 357 to 360)

Page 357

1    A.   You mean a meeting or --
2    Q.   Well, ways to improve or talk
3  about your performance or talk about
4  customer -- you know, concerns customers
5  had about you, anything along those
6  lines?
7    A.   I don't recall having meetings
8  about any -- about performance-related
9  issues.  Our meetings were about
10  strategy, about working this project, how
11  do we handle this problem.  It was never
12  a type of conversation where, you're not
13  doing what I need you to do, you're doing
14  poorly.  It wasn't those kind of
15  conversations, no.
16    Q.   Did he ever tell you about
17  concerns expressed by customers that they
18  had about you?
19    A.   Not to my knowledge, other
20  than he did express concerns that
21  Tropicana had about the -- we were in the
22  middle of a very heated contract dispute,
23  and so he expressed some reservations

Page 358

1  then.  But I don't recall -- oh, In Zone.
2  You know, In Zone I'm sure at some point
3  came out where, you know -- but it
4  wasn't -- I don't recall a lot of
5  performance-type discussions.  It was all
6  about issues of business.
7        (Whereupon, Defendant's
8        Exhibit 16 was marked
9        for identification.)
10    Q.   I'm going to hand you what has
11  been marked as Defendant's Exhibit 16 to
12  your deposition.  If you turn to the very
13  last page, is that your signature?
14    A.   Yes.
15    Q.   And these are responses to
16  interrogatories that were provided to us.
17  Have you seen these responses prior to
18  today?
19    A.   Yes.
20    Q.   If you turn to Page 2, there's
21  one thing I wanted to clarify.  At the
22  bottom you were recounting your
23  employment history with PepsiCo?

Page 359

1    A.   Right.
2    Q.   And it states you were
3  employed there from May 1993 through
4  January of 1990?
5    A.   Oh, that's wrong.  1991.
6    Q.   Well, should it have been May
7  of 1983?
8    A.   Oh, yes.  How did I miss that.
9  May of 1983.
10    Q.   To?
11    A.   January of 1991.
12    Q.   And also if you look up at
13  your description of your employment with
14  Piknik, you said that you were making a
15  hundred and thirty-five thousand dollars
16  per year?
17    A.   No.  Again, sorry.  That was
18  the rate at Polar.  At Piknik it was a
19  hundred thousand.
20    Q.   It was a hundred thousand
21  until June 22, 2005; correct?
22    A.   It was for three months,
23  March, June, yes.

Page 360

1    Q.   And in your response about
2  Piknik Products you state that you were
3  offered a severance package for five
4  weeks to work at half of your
5  compensation; is that correct?  Is that
6  accurate?
7    A.   I'm not sure why I used the
8  word severance.  But, yes, I was given
9  five weeks to work at half my
10  compensation.
11    Q.   And we've already talked about
12  that you declined that offer?
13    A.   Yes.
14    Q.   In response to Number 6 you
15  list Molly Robertson.  And we have talked
16  about the treatment that you have sought
17  from Molly Robertson; correct?
18    A.   Yeah.  I mean, there was -- we
19  also were -- another contributing factor
20  was I was going through a -- I was --
21  around that time, somewhere around that
22  time I was announcing an engagement, and
23  that was causing issues with their

90

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 361 to 364)

Page 361

1  mother, and that was being served upon
2  the kids.
3          So there was more than just --
4  the Piknik stuff was prior and during,
5  because I was working at Glovis and
6  sacrificing Saturdays, you know, with the
7  kids. And then the other issue was the
8  marriage, the pending marriage. She was
9  struggling with that. So that was all
10  part of the -- contributed.
11      Q.   When did you and Anita get
12  engaged?
13      A.   April 27, 2006.
14      Q.   And what is the relationship
15  like between your boys and Anita?
16      A.   Very good, very good.
17      Q.   If you look in your
18  response -- well, excuse me. Let's stay
19  in Number 6. What did you see Laura
20  Mattson-Shoemaker for?
21      A.   I was interviewing potential
22  family counselors. We were trying to
23  find one.

Page 362

1      Q.   Did you decide to try to use
2  Ms. Shoemaker as a family counselor?
3      A.   No. We ended up using Molly.
4      Q.   So you only had one visit with
5  Dr. Shoemaker?
6      A.   Yes, I only had one visit with
7  her.
8      Q.   What about Kathy Bonds with
9  Frazer Counseling Clinic?
10      A.   Again, I had one visit.
11      Q.   And, again, you were just
12  interviewing family counselors?
13      A.   Yes.
14      Q.   In response to Number 7 you
15  list a Dr. Kennety Wool that you saw in
16  March of 2006 for 3D imaging of your
17  heart?
18      A.   Yes.
19      Q.   Does that refresh your
20  recollection of the name of your
21  cardiologist?
22      A.   Yes, that sounds correct.
23      Q.   And in Number 10, if you turn

Page 363

1  the page, you are still unaware of any
2  statements, either written or tape
3  recorded or videotaped, of anyone that
4  relates to your claims in this lawsuit?
5      A.   Was the question am I aware of
6  anybody that has taken statements under
7  oath?
8      Q.   I don't see the words "under
9  oath" in there.
10      A.   I'm sure we've talked to a lot
11  of people. But did I record anybody?
12  No. Did I ask them to sign anything,
13  their statement? No. Did I sit and
14  write a bunch of notes about their
15  comments? No.
16      Q.   And in your response to Number
17  11 you're asked to state the position you
18  claim you were terminated from because of
19  your race.
20      A.   Yes.
21      Q.   And you said that you were
22  terminated from the Director of Customer
23  Relations position?

Page 364

1      A.   Right.
2      Q.   And you've told me all about
3  why you believe that your departure from
4  Piknik was related to your race; correct?
5      A.   Yes, I think we've covered
6  that.
7      Q.   You have nothing else to add
8  to that testimony?
9      A.   At this time, no.
10      Q.   On the next page you say
11  "plaintiff was kept there to train
12  him --" referring to Henry Hicks "-- in
13  all facets of the job."
14      A.   Where are you at?
15      Q.   At the top of the page.
16      A.   Okay. I got it.
17      Q.   Well, let's strike that. Turn
18  back to the previous page, I'm sorry, to
19  the bottom of that. You say "Henry was
20  there because he was African-American and
21  Onyx wanted an African-American
22  representing Onyx and Piknik Products
23  with the consumers." The "he" that

91

JERRY A. McCARTNEY, ET AL.                                                ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                        August 14, 2007

(Pages 365 to 368)

Page 365

1   you're referring to, is that Mr. Hicks?
2       A.   He was there.  Henry Hicks,
3   yes.  And not consumers.  That was
4   customers at the last of that sentence.
5       Q.   Did anyone ever tell you that
6   Henry Hicks was in the VP of Sales &
7   Marketing position because he was
8   African-American and Onyx wanted an
9   African-American representing Onyx and
10  Piknik Products with the customers?
11      A.   There was a conversation I had
12  with Jeff Larry where I mentioned to him,
13  Jeff, I understand -- and I remember
14  this.  It was in my office.  I don't
15  recall if there were other people there.
16  I don't recall.  I don't think there was.
17  It was just a private conversation
18  between two guys trying to understand
19  what was going on.
20      And I said, Jeff, I understand
21  why you need to have Henry in this
22  position, and I understand why -- you're
23  an MBE.  You need to have somebody that

Page 366

1   represents minority business enterprise.
2   I understand that.  But what I was
3   appealing to him was to consider that --
4   at least consider the significant role I
5   played and decide for himself.
6       And I'm trying to remember the
7   conversation, but my point was I was
8   pointing out to him I understood it, I
9   understood -- this is before I understood
10  the law.  I understood why he did it.
11  And he didn't necessarily say, yes, Bob,
12  you're absolutely right, but the sense I
13  got from that conversation was he also
14  didn't say, no, you're absolutely wrong.
15  He just didn't say anything.
16      Q.   So from that you inferred that
17  he wanted an African-American
18  representing Onyx and Piknik with
19  customers?
20      A.   Yes.
21      Q.   You go on to say that
22  "plaintiff was kept there to train him in
23  all facets of the job."  Again, the "him"

Page 367

1   that you're referring to is Henry Hicks?
2       A.   Yes.
3       Q.   Did anyone ever tell you or
4   did you ever overhear anyone say that you
5   were kept there solely to train Henry
6   Hicks?
7       A.   Well, yeah.  I mean, there
8   were many discussions about, Henry, how
9   are you coming; Henry, it seems like
10  you're picking this up.  You know, it
11  was -- did anybody come out and say, Bob,
12  your job is to train Henry and as soon as
13  you're done, you're fired?  No, nobody
14  said that.  But it was very clear my job
15  was to help train and develop Henry Hicks
16  to understand the business, yes.
17      Q.   Did anyone lay out to you,
18  though, that part of your job was to
19  train Henry Hicks?
20      A.   Like in a document?
21      Q.   Or in a conversation?
22      A.   Let me think.  I mean, we
23  would be in meetings, "Bob, go work with

Page 368

1   Henry on that, Bob, go work with Henry on
2   that.  Henry, how are you and Bob coming
3   on that."  He didn't understand this
4   business.  I mean, it was -- it was
5   common knowledge that I was there to help
6   develop -- bring him along.  I mean, we
7   were constantly communicating on numerous
8   subjects.  It was -- it was -- I mean,
9   yeah, it was talked about in discussions.
10  You know, "Henry, are you working on that
11  yet with Bob?"  You know, "how are you
12  coming on the prices?"  I there was to
13  train him.
14      Q.   So the fact that you were --
15      A.   I was there training him.
16  What I didn't know was the intent behind
17  all of it at the time.
18      Q.   So the fact that you were
19  asked to work with Henry Hicks, you
20  inferred from that you were there to
21  train him?
22      A.   Yes.
23      Q.   In response to Number 13 you

92

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                              http://www.TylerEaton.com

Page 369

1   identify Jeff Larry, Chris Day, Henry
2   Hicks and Patrice Daniels as individuals
3   who participated in the decision process
4   to end your employment?
5       A.   Yes.
6       Q.   What role did Jeff Larry play?
7   What was his involvement?
8       A.   Well, he was the CEO of
9   Piknik, and he was very involved in all
10  decisions.  So I'm sure he had -- I'm
11  sure he had to approve it.
12      Q.   But you don't know for sure?
13      A.   No.
14      Q.   What role did Chris Day have?
15      A.   He was president of Piknik.
16  And the letter I believe was from him, so
17  I assume he had involvement.
18      Q.   What involvement did Henry
19  Hicks have in the actual decision to
20  terminate your employment?
21      A.   I don't know what involvement
22  he had other than he was the one that
23  served up the --

Page 370

1       Q.   He delivered the message?
2       A.   He delivered the message.
3       Q.   And I think you've already
4   told me about Patrice Daniels?
5       A.   Yes.
6       Q.   You go on to say that "the
7   remaining three --" which I believe
8   you're referring to Jeff Larry, Chris Day
9   and Henry Hicks?
10      A.   Yes.
11      Q.   "-- conspired to use plaintiff
12  to train Henry Hicks in the VP sales
13  position."  What evidence of the
14  conspiracy do you have?
15      A.   Well, I wouldn't call it a
16  conspiracy.  I think it was more of a
17  they probably talked about it and planned
18  it and probably discussed, Henry, how
19  much time do you need and where are you
20  at, are you ready.  I'm sure that went on
21  behind the scenes.
22      Q.   Did you ever personally hear
23  any of those conversations or overhear

Page 371

1   those conversations?
2       A.   No.
3       Q.   Did you ever see any documents
4   to that effect?
5       A.   No.
6       Q.   Did you ever hear from someone
7   else that a conversation like that had
8   gone on?
9       A.   No.
10      Q.   Or that there were documents
11  to that effect?
12      A.   No.
13      Q.   The next page you say that you
14  believe that they postponed their
15  decision to terminate you early on
16  "because Mr. Hicks knew he could not
17  perform this function without plaintiff's
18  knowledge of the business, customers,
19  operations, et cetera."
20           Is it your contention that
21  there was a decision made earlier than
22  June 2005 to terminate you?
23      A.   Yes.

Page 372

1       Q.   When was that decision made?
2       A.   I don't know when it was made.
3   When the decision was made to officially
4   terminate me?
5       Q.   Well, you said that you think
6   there was a decision made to terminate
7   you earlier on?
8       A.   Yes.  I believe that they
9   intended -- when they came there I think
10  they intended at some point to have me
11  removed and have Henry assume that role.
12      Q.   And is that what you were
13  telling me earlier about the plan?
14      A.   The plan, yes.
15      Q.   Anything else that you feel
16  you need to add to the testimony that you
17  have already given today?
18      A.   At this stage, no.
19      Q.   You say "Ms. Daniels moved
20  plaintiff to VP sales purchasing,
21  plaintiff believes, to eventually have
22  him terminated but did not want to risk
23  an EEOC claim."

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 373 to 376)

Page 373

1   What is the basis for your
2   statement that Ms. Daniels did not want
3   to risk an EEOC claim?
4       A.   Well, I think they were
5   concerned with how do you -- we need to
6   move him -- we need to figure out a way
7   to move him into this VP -- I said VP
8   sales purchasing.  I believe it was VP
9   purchasing, not sales purchasing.  And I
10  believe somewhere around there there may
11  have been a tag about contracts or
12  something.
13      But my belief was that --
14  because she was pressuring me to
15  relinquish -- she was pressuring me to
16  move into this purchasing role.  And I'm
17  like, Patrice, you know, talk to Henry, I
18  mean, he's not ready.  You know, this
19  business has got -- you need somebody
20  strong enough -- she didn't understand
21  the day-to-day demands of that role or
22  the knowledge of the business in order to
23  make decisions.  And so I was arguing --

Page 374

1   you know, we were in a little debate over
2   do you really want me to go to VP of
3   Purchasing, I mean, are you sure about
4   that.
5       So, yeah, I do believe that
6   she wanted to move me there in order for
7   at some point to downsize, give the
8   position to somebody else that's not
9   African-American (sic), who knows.  But
10  at least I'm not in the same job as Henry
11  in terms of, not the title, but the --
12  I'm doing his job, okay.  So she needed
13  me out of that so that she could do what
14  she needed to do.
15      Q.   So from all of that you
16  inferred that she didn't want to risk an
17  EEOC claim?
18      A.   Right.  And I don't -- I'm
19  talking about her, but it's her -- she
20  was the one executing these
21  conversations.  I believe Jeff,
22  Chris and probably Henry, maybe not early
23  on, but certainly later, were in on that

Page 375

1   discussion.
2       Q.   But you don't know if there
3   ever was a discussion?
4       A.   I wasn't privy to any
5   discussion.
6       Q.   And nobody has told you about
7   any discussion that was had along those
8   lines?
9       A.   Not to my knowledge, no.
10      Q.   You say that "Mr. Hicks
11  prevailed in convincing Ms. Daniels and
12  Chris Day to have plaintiff work for him
13  as VP Sales Administration and continued
14  to do his job."
15      Tell me what Mr. Hicks did to
16  prevail in convincing Ms. Daniels and
17  Chris Day to have you continue working as
18  VP Sales Administration.
19      A.   Well, remember, I was in the
20  job before they got there.  I was in the
21  job for a period of time after they got
22  there because Henry was, you know,
23  selling mayonnaise.  Patrice came along

Page 376

1   and moved me to VP of Purchasing, and
2   then they moved me back.
3       So my assumption was that --
4   and I believe Henry -- at different times
5   we talked about -- he knew he didn't --
6   he knew he needed me there.  And I don't
7   recall the specific conversation, but it
8   was becoming clear to me that this was
9   going to be a problem for me not to be
10  there.
11      So, you know, Chris one days
12  says we're probably going to move you
13  back under working for Henry.  We think
14  that's where you'll be the best value.
15  So they moved me back.  Over here, then
16  back over here.
17      Q.   You say that he was "wholly
18  unqualified for the position and he knew
19  it."  Again, you're talking about Henry
20  Hicks?
21      A.   Yes.
22      Q.   You've already told me why you
23  believe Henry was unqualified for the

94

JERRY A. McCARTNEY, ET AL.

ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER

August 14, 2007

(Pages 377 to 380)

Page 377

1 position?

2     A.   Yes.

3     Q.   And you say "the customers

4 knew it too."

5     A.   Yes.

6     Q.   What customers?

7     A.   I think all the customers

8 realized that Henry could only go so deep

9 in the discussions. He focused more on

10 Onyx and the fact that they were an MBE

11 and the value to them coming out of using

12 us as a supplier because we have MBE

13 status.

14     As far as getting into the

15 details of how the business runs, you

16 know, the issues, the technical side, the

17 work of running the products, that was

18 not his domain.

19     Q.   Did you talk with customers

20 about Henry Hicks not being qualified for

21 the job?

22     A.   Oh, I'm sure we did.

23     Q.   Who did you speak with?

Page 378

1     A.   I'm sure at some point it came

2 up in conversations with every customer.

3     Q.   Do you recall who?

4     A.   I don't recall specific

5 conversations, but you're asking me a

6 question that -- did I tell everybody

7 that I'm wearing a white shirt? No, but

8 it's obvious I'm wearing one.

9     Q.   I'm just asking. You say in

10 your verified responses that "the

11 customers knew it too." And I'm just

12 trying to understand the basis for that

13 statement. How do you know the customers

14 knew it?

15     A.   It was -- I mean, he didn't --

16     MR. NELMS: Are you saying it

17 was obvious?

18     A.   It was obvious. I mean --

19     Q.   The customers didn't say

20 anything to you about Henry Hicks being

21 unqualified for the job; correct?

22     A.   Yeah. I mean, it was like

23 general conversation like, what's his

Page 379

1 role? He's VP of Sales. Where did he

2 come from? It was those kinds of

3 discussions, but we would get off or it.

4 We didn't dwell on that. It was -- I

5 mean, it was not -- we didn't sit and

6 have a Henry-bashing discussion.

7     It was a question might come

8 up like where did he come from or what

9 did he do before this. You know, it

10 was -- we got off it. We had too much

11 to talk about. But he wasn't at the

12 meetings either. I mean, he didn't come

13 to the -- you know.

14     Q.   In response to Number 17 you

15 identify two documents that you claim

16 relate to your discrimination claim?

17     A.   Yes.

18     Q.   A PowerPoint presentation.

19 And which -- is that the PowerPoint

20 presentation that we were talking about

21 earlier that was --

22     A.   Yes.

23     Q.   -- presented during a contract

Page 380

1 manufacturing meeting?

2     A.   Yeah, a contract manufacturing

3 meeting in May of '05. That was the one.

4 And the e-mail was the one that you have

5 already presented as exhibit whatever.

6 Exhibit 4.

7     Q.   Okay. Do you have any other

8 documents that you believe relate to your

9 discrimination claim?

10     A.   I don't have other documents

11 that I'm aware of that reference intent,

12 plans to recruit minorities, no.

13     Q.   Well, what about other

14 documents that may not say specifically,

15 "we have plans to recruit minorities"?

16 Do you have any other documents that you

17 believe support your claim of

18 discrimination?

19     A.   Yeah. Well, one of the

20 presentations they would do is their --

21 they would talk about their mix of, you

22 know, African-American and

23 nonAfrican-American, I believe,

95

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 381 to 384)

Page 381

1  employees. And they touted the fact that
2  they had a high concentration of
3  African-Americans at Piknik. And that
4  was a selling point that they were using
5  to the customers.
6      I thought that was a little
7  odd because -- I just thought that was a
8  little -- it's like why talk about that.
9  I mean, the customers are more concerned
10 about, you know, running the product than
11 the mix of -- I mean, they focused --
12 they dwelled a lot on that is what I'm
13 referring to.
14    Q.   And we've already discussed
15 that PepsiCo, for example, had a policy
16 in place that targeted minority-owned
17 business enterprises to do business with?
18    A.   Yes, yes.
19    Q.   Are you aware of other Piknik
20 customers who had a similar policy or
21 program?
22    A.   Yeah. I believe most. I
23 don't want to say all. But I believe

Page 382

1  most of them had a diversity program, and
2  they were seeking companies that were
3  minority business enterprise certified
4  for the purpose of recording their
5  purchases with that company.
6      Q.   In your response to Number 20
7  you mention the mental anguish you
8  suffered impacted your relationship with
9  your children, your friends and your
10 family. You've already told me how it
11 impacted your relationship with your
12 children; correct?
13    A.   Yes.
14    Q.   Do you have anything to add to
15 that testimony?
16    A.   Relationship with my children?
17    Q.   Correct.
18    A.   Not at this time.
19    Q.   How did your departure from
20 Piknik with the alleged racial
21 discrimination affect your relationship
22 with your friends?
23    A.   Well, you know, when you

Page 383

1  suffer that, it affects your -- it
2  affects you. I mean, it affects your
3  outlook on life. It affects your ability
4  to trust. You know, it ultimately
5  does -- it does bear on -- it does affect
6  all your relationships, friends,
7  children, family.
8      Q.   How did it affect your
9  relationship with your friends?
10    A.   I believe it -- I don't
11 believe I was my same -- my normal jovial
12 self. I think I was very -- it's
13 trusting people, you know. I was
14 pre-occupied with it. It's -- you know,
15 when somebody -- you know, you -- you
16 have to go through it. I think it
17 affected me, which ultimately affected
18 how I interacted with people.
19    Q.   You said that your
20 relationship with your family suffered as
21 well. Is that family besides Brannon and
22 Christian?
23    A.   I think -- well, and the

Page 384

1  family in this particular case I'm sure I
2  was thinking of the children and my
3  finance.
4      Q.   How did your relationship --
5  how was it affected -- strike that. How
6  was your relationship with Anita
7  affected?
8      A.   It put a lot of -- I mean,
9  we -- we went through a very tough time,
10 and I was going through a tough time, and
11 it was affecting -- fortunately, thank
12 God she stuck with me. That's why I
13 married her. She's a good girl.
14    Q.   Did more arguments tend to
15 arise?
16    A.   Yes.
17    Q.   Was there a difference in your
18 sexual relations with her?
19    A.   Yes.
20    Q.   Before you left -- I
21 understand it's personal, but it's your
22 claim. So if you can describe for me how
23 your relationship, your sexual

JERRY A. MCCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                            August 14, 2007

(Pages 385 to 388)

Page 385

1   relationship, changed?
2       A.   Well, I mean that's only one
3   part of the broad relationship.  That was
4   not -- I wouldn't claim that that was
5   what worried me.  I mean, I could live
6   with that.  I was -- that part was
7   affected only because I was under stress
8   and duress, but that -- I mean, that
9   part -- I love this girl, and I was
10  committed to her.  And it potentially
11  could have -- I mean, it didn't, but it
12  could have derailed that relationship.  I
13  mean, I was -- you know, but it
14  affected -- yeah, we went through a tough
15  time.
16      Q.   And is your relationship now
17  back to where it was while you were at
18  Piknik, your relationship?
19      A.   With her?  Yes, our
20  relationship at this stage is -- her and
21  my relationship is strong.  The children,
22  we're still working on that.
23      Q.   And if you can just read to

Page 386

1   yourself the next page, the rest of your
2   response to Interrogatory Number 20.  I
3   think you've already told me everything
4   about those issues, but I just want to
5   make sure you don't have anything else to
6   add?
7       A.   To Number 20?
8       Q.   Correct.
9       A.   (Examining document.)  That was
10  the major stuff other than my health that
11  I -- to this day I'm not sure if it's
12  been long-term or not.  I don't remember.
13      Q.   Who besides your lawyers have
14  you talked with about this case?
15      A.   Ricky Loeb, Bert, Shannon,
16  Jerry, my brother, my wife, my mom, my
17  dad.  I mean, people close to me.  I'm
18  sure I've at times over two years brought
19  it up to people that I was involved in an
20  EEOC suit that was pending, but I don't
21  recall everybody -- it's not something I
22  went around and broadcasted, no.  But
23  people close to me certainly I talked to.

Page 387

1           MR. NELMS:  Sorry.  May I add
2   one because I don't want you to forget
3   it?  Scott.
4       A.   Oh, yeah.
5       Q.   Scott McGlon?
6       A.   Yeah, Scott McGlon.
7           MR. NELMS:  You've already
8   mentioned his name.
9       Q.   (BY MS. MCGAHEY:)  About how
10  many times have you discussed your case
11  with Ricky Loeb?
12      A.   I don't know.  A dozen times,
13  two dozen.  I mean, ten to twenty,
14  somewhere around there.  Over the course
15  of two years, I'm sure we've --
16      Q.   You have to tell me about your
17  conversations with Ricky Loeb about your
18  claims in this lawsuit.
19      A.   Well, as it relates to Ricky,
20  the majority of that conversation had to
21  do with supporting him on action he may
22  or may not take on Onyx.
23          (Reporter interruption.)

Page 388

1       A.   On potential litigation or
2   suits, however you describe it in this
3   world.
4       Q.   I only want to know about
5   conversations you have had with any of
6   these people -- and right now we're
7   talking specifically about Ricky Loeb --
8   about your claims of race discrimination.
9       A.   Okay.  Just as it relates to
10  that?
11      Q.   Correct.
12      A.   I'm sure I've had
13  discussions -- I don't just call and say
14  let's talk race relations today.  I mean,
15  I -- we talk about a number of issues.
16  In there might be "where are you at with
17  the EEOC?"  "Filed last week; had some
18  correspondence with my attorney last
19  Thursday."  That kind of conversation.
20      Q.   Just status updates of your
21  case?
22      A.   Yes.
23      Q.   Anything about the substance

JERRY A. McCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                            August 14, 2007

(Pages 389 to 392)

Page 389

1  of your claims? And, again, we're
2  talking about your conversations with
3  Ricky Loeb.
4      A.   Yeah, I'm sure I talked about,
5  as a sounding board, what was going on
6  then and what was going on then and what
7  was going on then, trying to piece
8  together what he knew about decisions
9  that were made. But he was -- as you
10 probably know -- was kind of ejected from
11 the company. We were actually told not
12 to ever speak with him. So there was a
13 period we couldn't talk to him at all.
14     Q.   Anything else you can recall
15 about your conversations with Ricky Loeb
16 about your claim of race discrimination?
17     A.   Well, I wanted to retrieve
18 Henry -- he had Henry's laptop, and I
19 asked him if I could have it.
20     Q.   Did you get it?
21     A.   Uh-huh.
22     Q.   What did you do with it?
23     A.   I went in and looked at

Page 390

1  everything that was on it to see if I
2  could find anything.
3      Q.   Did you find anything of
4  interest to you?
5      A.   Yes.
6      Q.   What did you find?
7      A.   The presentation, the
8  PowerPoint presentation.
9      Q.   That's how you acquired the
10 presentation we were talking about
11 earlier?
12     A.   Yes.
13     Q.   Do you still have Mr. Hicks'
14 laptop?
15     A.   Yes, I do.
16     Q.   Have you downloaded all the
17 information onto a CD?
18     A.   I don't know if I have. I
19 don't if I've downloaded it. There
20 wasn't much there. I mean, it was
21 cleaned.
22     Q.   Have you erased any files on
23 that laptop?

Page 391

1      A.   No.
2      Q.   Or manipulated the hard drive
3  on that laptop in any way?
4      A.   No.
5      Q.   Have you told me about all the
6  discussions that you can recall having
7  with Ricky Loeb about your claims of race
8  discrimination?
9      A.   Well, I don't recall all the
10 conversations. What I do recall is that
11 over the course of time we have talked
12 about a series of where is he at, where's
13 the EEOC claim at, what's going on in the
14 case. And I don't recall when the
15 conversations took place. It was more
16 updates.
17         And the early-on conversation
18 was, as I recall, was what did you know
19 about this race -- you know, this is the
20 claim we're filing, and it was clear to
21 me that this was their intent all along.
22 And, you know, my recollection is that he
23 agreed. But he didn't hand me a document

Page 392

1  that says, well, yeah, they said this
2  right here.
3      Q.   Tell me about your
4  conversations with Bert Mayer about your
5  claims of race discrimination outside the
6  presence of your counsel.
7      A.   Very little outside. I don't
8  recall having -- I had very little with
9  Bert.
10     Q.   Can you recall anything about
11 any of those conversations?
12     A.   The only conversation I ever
13 had with Bert was around the initial
14 conversation when we discovered there was
15 a law that was violated and subsequent
16 updates. But I've had probably the least
17 correspondence with him.
18     Q.   What about Shannon McGlon?
19     A.   Again, at the early stages she
20 was actually the one that brought to my
21 attention that there was a violation of
22 law, which I began to investigate what
23 that was. And beyond the initial filing

JERRY A. McCCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                         August 14, 2007

(Pages 393 to 396)

Page 393

1  and just general updates where things
2  stand, outside of counsel very little.
3      Q.    What about Jerry MacCartney?
4      A.    Same. Initially, a number of
5  conversations. But you've got to
6  remember, we filed it and knew it was
7  going to be a long, lengthy process. We
8  went off, found jobs and moved on.
9      Q.    What's your brother's name?
10     A.    Jim Winter.
11     Q.    Where does he lives?
12     A.    He lives in Springfield,
13 Missouri.
14     Q.    Tell me about your
15 conversations with Jim about your lawsuit
16 or your claim.
17     A.    Probably just expressed to him
18 that -- well, let me see. I was at his
19 house when I got a call from Ricky, and
20 Ricky said, Bob, get ready, I need you
21 back. Now, I don't recall us talking to
22 an attorney. I don't recall me talking
23 to an attorney at that point. I think

Page 394

1  Shannon may have. I don't know if I
2  talked to one or not. But I remember him
3  calling saying, Bob, I need you back
4  immediately, can you get back soon. And
5  it was after that I returned to
6  Montgomery.
7      Oh, and Onyx had been removed
8  from the company by the bank. And I
9  can't go into the other stuff because it
10 had to do with an attorney discussion
11 Ricky had. But it was soon after that I
12 called him back and talked to him about
13 there may have been a violation of law
14 and this thing was starting to take a
15 number of twists. So I'm sure I informed
16 him of it. I don't think he counseled me
17 or advised me in depth about that.
18     Q.    You're talking about your
19 brother Jim?
20     A.    Jim, yeah.
21     Q.    Is he a lawyer?
22     A.    No.
23     Q.    And you can't recall the

Page 395

1  specifics of any conversation you had
2  with Jim other than what you've told me?
3      A.    Just general, yeah.
4      Q.    What about your wife, Anita?
5      A.    Yeah, I had -- she's been
6  through it all with me.
7      Q.    Can you recall any specific
8  conversations that you have had with
9  Anita about your claims in this case?
10     A.    I'm sure I've had many
11 conversations with her about this claim
12 and probably kept her up-to-date on
13 motions, filings, you know, status
14 updates, you know. And amongst all that
15 other stuff that was going on outside of
16 just the case, there was all kinds of
17 things happening. But I, you know, laid
18 out what we were doing and shared it with
19 her. I don't remember specific
20 conversations. I talk to her every day.
21     Q.    That's a good thing. What is
22 your mom's name?
23     A.    My mother is Dessie Allison.

Page 396

1      Q.    Dessie?
2      A.    Dessie.
3      Q.    D-E-S-S-I-E?
4      A.    Yes.
5      Q.    Allison with two L's?
6      A.    Yes.
7      Q.    Where does your mother live?
8      A.    She lives in Texas.
9      Q.    Where in Texas?
10     A.    Spiceland.
11     Q.    Tell me about your
12 conversation with your mother about your
13 claims in this lawsuit.
14     A.    I don't -- I'm sure I told her
15 about it. It's -- that's not her biggest
16 issue of the day. So I'm sure I've had
17 very little conversation with her other
18 than I'm involved in an EEOC claim. That
19 was probably it. She was more worried
20 about pregnancies and marriages and how
21 the kids are doing.
22     Q.    What is your father's name?
23     A.    Robert.

JERRY A. McCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

(Pages 397 to 400)

Page 397

1    Q.   Senior?
2    A.   No.
3    Q.   Is your dad also in Texas?
4    A.   No. He's in -- he lives in --
5  he's moved. He lives just south of St.
6  Louis.
7    Q.   Tell me about your
8  conversations with your father about your
9  claims in this lawsuit.
10    A.   The same to the extent of my
11  mom, just general updates.
12    Q.   And Scott McGlon is Shannon
13  McGlon's husband?
14    A.   Yes.
15    Q.   Tell me about your
16  conversations with Scott McGlon about
17  your claims in this lawsuit.
18    A.   Very little, actually, other
19  than when we first filed it and the last
20  few days.
21    Q.   Have you had conversations
22  with him in the last few days about your
23  lawsuit?

Page 398

1    A.   Yeah.
2    Q.   Tell me about those
3  conversations.
4    A.   We've got depositions next
5  week; Shannon is going on on Wednesday;
6  I'm up on Tuesday; it's finally here;
7  it's been a long path.
8    Q.   Anything else you can recall?
9    A.   And we talked, I think, about
10  whether I would be here or Scott would be
11  here. We talked about --
12    Q.   Again about your claims in the
13  lawsuit?
14    A.   Discrimination?
15    Q.   Correct.
16    A.   I mean, I don't think
17  we really -- we covered that two years
18  ago. I don't think -- I mean, everybody
19  knows why we filed. We didn't talk
20  about, well, what did he do or what
21  happened or what was the conversations
22  that you believe led to -- no, we didn't
23  talk about that.

Page 399

1    Q.   Earlier you were talking to me
2  about a salesman in Florida who says he
3  wasn't going to return his laptop until
4  he was paid in full?
5    A.   Right.
6    Q.   Who was that?
7    A.   I don't remember his name.
8  I'm sure that's easy to resurrect.
9    MR. NELMS:  Just for my
10  edification, he was a Piknik employee?
11    A.   Yes.
12    MR. NELMS:  But he lived in
13  Florida?
14    A.   And he represented the
15  condiment line.
16    Q.   (BY MS. MCGAHEY:)  Are you
17  aware of African-American employees who
18  were terminated in the 2005 range?
19    A.   Well, the only one that I'm
20  aware of is Clarice Crosby, who we --
21  well, Letitia, which was terminated from
22  Piknik. That's all I can recall right
23  now.

Page 400

1    Q.   Did you ever hear Chris Day
2  use any racial slurs?
3    A.   He one time referred to a
4  product outside the -- outside of Onyx.
5  Onyx wasn't there. Other Onyx
6  African-American partners were not there.
7  He referred to a "we can bottle black
8  people's drink."
9    Q.   Referred to a what?
10    A.   We were talking about products
11  that we could -- as a strategy to help
12  grow our business outside of the contract
13  manufacturing line, I was aggressively
14  selling them on the idea of a developing
15  a private label or our own brand type
16  product where we -- a strategy to grow
17  the business. And he referred to in this
18  meeting, "well, we could make and sell
19  black people's drink."
20    THE REPORTER:  I missed the
21  name of the bottle.
22    MS. MCGAHEY:  I did to.
23    A.   Black people's drink --

Page 401

1          (Off-the-record discussion.)
2     Q.   This is easy to clear up.
3   Tell me what is the racial slur that you
4   heard Chris Day say.
5     A.   He referred to the product as
6   a black people's drink.
7     Q.   Do you remember what the
8   product was?
9     A.   He was being facetious.
10    Q.   Do you remember what the
11  product was, though?
12    A.   No, we didn't elaborate.  I
13  was dumbfounded.
14    Q.   Did you complain to anyone --
15    A.   No, no.
16    Q.   -- that he had used that term?
17    A.   No.
18    Q.   Did you ever hear Chris Day
19  use any racial slurs about Caucasian
20  people?
21    A.   Not to my knowledge, no.
22    Q.   Did you ever hear Jeff Larry
23  use any racial slurs about Caucasian

Page 402

1   people?
2     A.   No.
3     Q.   Did you ever hear Henry Hicks
4   use racial slurs about Caucasian people?
5     A.   About Caucasians?
6     Q.   Correct.
7     A.   No.
8     Q.   You seem to suggest that he's
9   made racial slurs about other races,
10  based on your tone?
11    A.   He referenced -- he made a
12  comment in a meeting of all of us that he
13  thought the name Piknik was a racial term
14  or was believed to be a racial term.
15    Q.   Anything else that you can
16  recall?
17    A.   That's the only time I recall
18  him making ever a reference like that.
19    Q.   What did you take that comment
20  to mean that Piknik was a racial term?
21    A.   Well, he elaborated.  We were
22  a little taken back.  "What?"  I mean,
23  you don't want me to -- he apparently --

Page 403

1   and this was his words, and I quote, the
2   term Piknik refers to pick a N-word,
3   closed quote.
4     Q.   Pick a nick?
5     A.   He didn't say a pick a nick.
6   He said pick a N-word.
7     Q.   A derogatory term about
8   African-American people?
9     A.   Uh-huh.
10    Q.   Were you there during this
11  meeting?
12    A.   Uh-huh.
13    Q.   Is that a yes?
14    A.   Yes.
15    Q.   But you never heard him use
16  any derogatory comments about Caucasian
17  people?
18    A.   No, never.
19    Q.   What about Patrice Daniels?
20    A.   I don't recall her ever using
21  any derogatory statements, no.
22    Q.   About Caucasian people?
23    A.   About Caucasian or anybody for

Page 404

1   that matter.
2     Q.   What about Anthony Barber, did
3   you ever hear him use derogatory comments
4   about Caucasian people?
5     A.   Did I ever hear him?
6     Q.   Correct.
7     A.   No.
8     Q.   Did you hear about it?
9     A.   Yes.
10    Q.   Tell me about that.
11    A.   It was in a conversation with
12  Jerry MacCartney, and he was referring
13  to -- this was second-hand.  You'll have
14  to talk to Jerry about it.  He was
15  referring to a coloring of the wall, and
16  he was making comments about the fact
17  that he didn't like white.
18    Q.   He didn't like the white color
19  of the wall?
20    A.   He didn't like white.
21    Q.   And he was talking about the
22  coloring of the wall?
23    A.   Jerry's interpretation of that

101

JERRY A. McCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                           August 14, 2007

(Pages 405 to 408)

Page 405

1   was he was being subtly offensive.
2       Q.   But you weren't present for
3   that?
4       A.   No, I was not.
5       Q.   You claimed earlier that you
6   believed Anthony Barber participated in
7   discriminatory acts against you, but I
8   haven't heard you describe those.  If you
9   could please elaborate.
10      A.   Anthony was there at the very
11  tail-end.  I may have been referring to
12  he may have been aware of or participated
13  in conversations.  I was not there.  I
14  don't know.  I assume that he may have
15  been privy to the conversations about the
16  strategy about when and how to relieve
17  the white folks from the company.
18      Q.   Are you saying you are
19  presuming that?
20      A.   Uh-huh.
21      Q.   Is that yes?
22      A.   Yes.
23      Q.   Before you found Andy Nelms'

Page 406

1   office had you gone to any other lawyers
2   about --
3       A.   About the case?
4       Q.   -- about your claims?
5       A.   About this claim, no.
6       Q.   How did you find Andy?
7       A.   Shannon brought him to my
8   attention.
9       Q.   Did you know Mr. Lewis?
10      A.   No.
11      Q.   Did you ever ask Patrice
12  Daniels to stop calling you Winter?
13      A.   I believe I asked Henry Hicks
14  to talk to her about it.
15      Q.   Do you know if Henry Hicks
16  ever did?
17      A.   I don't know.
18      Q.   Did you ever complain to
19  anyone that you felt you were being
20  discriminated against because of your
21  race at Piknik or at Onyx?
22      A.   Well, yeah.
23      Q.   Management?

Page 407

1       A.   You mean Onyx?
2       Q.   Sure, let's start with Onyx.
3   Did you ever complain to anyone at Onyx
4   you felt you were being discriminated
5   against because of your race?
6       A.   Of course not.
7       Q.   Who at Piknik did you complain
8   to that you felt you were being
9   discriminated against because of your
10  race?
11      A.   Bert, Shannon, Jerry.  I know
12  I talked to those three at different
13  times.  You know, the whole concept
14  earlier we talked about, the going joke
15  was I was Henry's bitch.
16      Q.   Did you ever complain to
17  Brenda Sellers?
18      A.   No, of course not.
19      Q.   Why do you say of course not?
20      A.   She was -- she was very much
21  with Onyx.
22      Q.   Now, you claim that you were
23  discriminated against because of your

Page 408

1   race.  Is it possible that you were
2   treated a certain way because you were
3   loyal to Ricky Loeb?
4       A.   Well, the only problem with
5   that is I wasn't loyal to Ricky Loeb.  I
6   was loyal to the survival and success of
7   the company.  And it's one of the reasons
8   I talked to Jeff about problems we were
9   having -- this is after August 2003 and
10  before January 2004.  And I was afraid to
11  go to Jeff, but eventually Daneshmayeh
12  got to him, said you need to start
13  talking to people, there's things you
14  don't know.  And he came to me, and I
15  explained -- he said what do you think
16  about Ricky Loeb, and I said Ricky is not
17  qualified to run this company and you
18  need to deal with that issue, and he did.
19      Q.   Have you now told me every
20  which way you believe you were
21  discriminated against because of your
22  race?
23      A.   I think we've covered the

Case 2:05-cv-01207-MHT-TFM    Document 77    Filed 10/29/2007    Page 105 of 172
JERRY A. MCCARTNEY, ET AL.                                          ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                  August 14, 2007

(Pages 409 to 410)

Page 409

1    majority of it, yes.
2        Q.    Majority of it?  I only get
3    once chance to talk with you.
4        A.    Okay.  At this stage I can
5    think of nothing else.
6        Q.    And you are seeking to hold
7    Mr. Day, Mr. Hicks and Mr. Larry
8    personally liable, correct --
9        A.    Yes.
10       Q.    -- in this lawsuit?
11       A.    I believe that's true.  Or
12   Onyx or both.
13           MS. MCGAHEY:  I think that's
14   all I have right now, Andy.  I am going
15   to follow up, though, with you about some
16   documents and see what's in those.  So I
17   think for now we're good to go.
18           (Whereupon, the deposition was
19           concluded at 6:06 p.m.)
20
21       FURTHER THE DEPONENT SAITH NOT
22
23

Page 410

1        C E R T I F I C A T E
2
3
4    STATE OF ALABAMA)
5    JEFFERSON COUNTY)
6
7            I hereby certify that the
8    above and foregoing deposition was taken
9    down by me in stenotypy, and the
10   questions and answers thereto were
11   reduced to typewriting under my
12   supervision, and that the foregoing
13   represents a true and correct transcript
14   of the deposition given by said witness
15   upon said hearing.
16           I further certify that I am
17   neither of counsel nor of kin to the
18   parties to the action, nor am I in
19   anywise interested in the result of said
20   cause.
21
22
23       COMMISSIONER - NOTARY PUBLIC

JERRY A. MCCARTNEY, ET AL.    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.    August 14, 2007

**A**

abilities
288:8
ability
9:10,13,16,19 84:4,5
258:4 383:3
able
61:21 123:4 150:19 265:11
333:5,21 340:22
abrasive
258:11
absolutely
118:17 122:8 131:6 192:11
366:12,14
absorbed
37:15
accept
29:13 165:14 289:3,17
290:17
accepted
51:23
accepting
306:10
accepts
295:7
access
137:9 140:2 266:13
287:15,22
accident
15:19 16:1
accomplish
69:22 71:1
accomplished
84:21
account
133:23 248:2
accountable
118:17
accounts
72:5,14 140:7
accurate
360:6
acknowledge
255:4
acknowledging
171:8
acquire
90:12
acquired
34:14 35:1,2 255:5 390:9
acquiring
29:6
acquisition
35:20 36:1 37:12,14
102:14 182:6
acquisitions
213:7
acronym
100:1
act

179:20
acting
5:3
action
1:5 218:20 223:15 314:6
314:7 349:19 387:21
410:18
actions
250:13 273:20
actively
312:22 332:22 333:3
activities
181:10 229:6 250:13
activity
91:18
acts
161:23 351:17 405:7
actual
17:11 49:7 121:7 123:20
203:1 369:19
acumen
205:3
Adams
5:8
add
183:6,15,22 208:6 354:5
364:7 372:16 382:14
386:6 387:1
addition
259:18 263:9
additional
45:1 62:14 86:17 90:1,12
90:20 91:2 93:14 94:5
278:23 281:1
address
10:14 11:1
addresses
324:8
adjusting
348:15
administration
14:9 22:2 53:9 58:8,10
58:16 103:13 107:1
122:3 202:7 203:5,8
205:21 211:21 226:18
375:13,18
administrative
33:12
admit
198:8,10
adrift
142:14
adult
21:2
advantage
348:5,11
adversarial
283:18
adverse
173:23 174:1 283:17
adversity

255:6
advise
93:3
advised
44:15 394:17
advising
44:16
affect
9:16,18 382:21 383:5,8
affirmative
186:11
afford
247:23
afloat
108:6 115:15 189:1 286:6
afoot
168:22
afraid
156:13 408:10
African-American
95:21 96:1,8,16,21 103:7
161:9,11,14,17 212:13,15
273:6,8 364:20,21
365:8,9 366:17 374:9
380:22 399:17 400:6
403:8
African-Americans
194:16 213:12,17 215:12
381:3
age
339:5
aggressively
40:1 92:3 400:13
ago
6:14 11:15 54:19 317:2
345:7 347:4 398:18
agree
191:15 229:20 247:1,1
258:4,22 325:2
agreed
2:2 391:23
Agreement
170:12
agreements
91:20 307:7
ahead
39:15
al
1:7,10
Alabama
1:2 3:8,15 5:3,5,9 17:1
27:11 48:12 410:4
Alatex
61:14
alcohol
15:21
Alexander
46:23 47:4,15 48:2 61:4
65:22 67:13 80:19 89:2
Alice
177:9,10,11

allege
183:20
alleged
382:20
Allen
6:6
alleviate
71:2
Allison
3:18 395:23 396:5
allow
136:1,4,18
allowance
50:6
allowed
79:14 259:4 263:20
278:3,22
alternate
296:19
America
233:9
amount
60:12 144:20
analysis
74:15 76:2 86:6
analyze
73:13
Anderson
3:4
Andy
66:18,19 67:2 68:5 83:1
83:2,3,5 268:3,6,14
269:17,22 270:2,3
314:17 405:23 406:9
409:14
and/or
351:22
Angela
12:10,14 15:2 18:6,16
angling
50:10
anguish
382:7
Anita
11:12,14 13:16,18 15:2
361:11,15 384:6 395:4,9
Anne
150:6,7,13
announced
39:3 212:21
announcement
202:9
announcing
360:22
annoyed
122:23 123:16 124:15
annoying
123:1,3 211:10,12
annual
329:21
annually

271:21
answer
7:19 18:13 45:7 70:3
123:13 141:6 154:13
156:20 227:16 234:23
238:7 248:16 273:12
275:17 290:3 292:2
answered
234:22 252:12 267:12
269:15
answering
115:18
answers
347:1 410:10
Anthony
161:4,7 208:16 404:2
405:6,10
anticipated
226:12
anxiety
34:16
anybody
151:21 152:6,7 209:9
249:7 284:16 305:7
306:6 313:9 363:6,11
367:11 403:23
anymore
64:6 105:10 149:12 159:11
174:9 192:22
anyway
134:22 200:7 319:8
anywise
410:19
apartment
13:5,8 223:6
apartments
13:3
Apollo
147:21
apologize
10:6 126:7 134:18 150:18
161:4 177:19 225:16
234:17 267:11
apologizes
295:1
apparent
120:22
apparently
44:22,23 70:4 93:1 94:8
102:11,12,14,15 148:10
149:9 182:5 251:4,11
270:11 402:23
appeal
189:20 242:21
appealing
253:19 366:3
appearance
274:9
appeared
174:1 208:20
appears

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

272:1
applied
196:22
applies
351:12
appreciate
186:9
approach
192:10 350:4,7
approaching
350:8
approval
333:7
approve
75:6 236:18 369:11
April
93:8 148:23 149:2 218:11
219:7,17 244:6 250:14
250:22 271:11 287:21
361:13
Arant
3:13 177:9
area
181:1 286:14 334:18
352:8
areas
189:18 193:22
argue
41:11 198:4
arguing
185:18 190:14 283:19
373:23
argument
41:13 136:17 186:3,4
arguments
384:14
Arizona
126:3 130:10 143:7
147:15
army
130:8,9
Arnold
21:8
arrest
308:22
arrested
15:8
arrival
61:17
arrived
61:17 113:7 242:9 247:7
257:21
arrogance
166:5
arrogant
230:19 231:7,10 242:11
aside
20:12 57:8 59:5 73:6
85:19 124:14
asked
30:3 33:20 48:6 79:5

139:1 143:18,21 160:20
188:11 197:23 200:20
205:20 233:20 235:22
249:18,21 269:15,23
274:13 279:23 280:2,14
291:17,22 363:17
368:19 389:19 406:13
asking
44:6 81:7 115:21 118:2
120:7,17 123:15 145:7
164:1 187:5 218:15
227:15 231:19 252:13
268:19 300:22 378:5,9
aspect
111:6
asserted
95:9
assessment
73:19 74:6
assign
2:20
assignment
24:8 35:17
assignments
38:4 320:16
assist
278:4 283:14,23
associated
268:20
assume
8:4 59:14 66:5 94:22
269:8 369:17 372:11
405:14
assumed
114:18 192:23 193:3,3
209:3
assumption
138:5,11 266:5 274:16
344:10 376:3
assumptions
246:15
assurance
53:6
ate
247:20,21
Atlanta
16:7 24:18,23 26:3,4,12
31:9,13,14,17 48:10
73:22 74:1 174:9 223:5
223:6 233:16 234:11,16
Atlantic
335:7,19
Attachment
217:13
attempting
259:21 260:20
attendance
314:5
attended
65:17 71:22 108:3 275:12
attention

37:17 187:9,12 191:13
276:22 392:21 406:8
attest
205:2
attorney
3:5,12 17:2 108:16,17,18
108:19 318:11 388:18
393:22,23 394:10
attorneys
297:13 301:22
attract
208:1 212:21 213:8,9,9,14
215:11
attribute
344:19 346:1
audibly
7:19
August
1:18 5:9 12:12 18:6 35:16
61:22 62:2 74:22 76:12
91:13,16 93:15 95:4
102:5 120:18,20 185:7
201:12 258:23 259:1
266:8 408:9
Aunt
56:2
Austin
41:16,17,21
authorities
316:10
authority
95:9 119:8 120:8 164:23
192:2,3,5 236:17
244:20 248:22 258:21
availability
321:3
Avenue
3:14 5:8
average
11:9 223:9,10 232:13,14
avoid
155:13,22 274:9
avoided
102:1
aware
9:10 138:8 142:7,10 143:6
143:18 147:12 148:4,7,8
182:19 194:22 199:13,21
208:4 221:14,15 236:23
237:2,8 243:12 270:7
300:21 315:4 356:12
363:5 380:11 381:19
399:17,20 405:12
A&T
219:9
a.m
5:10 56:11 113:22

_____

B

B

4:5
baby
10:1 13:20
bachelor
22:1
back
7:5 14:13 15:18 36:2
54:18 57:9,12,22 61:9
80:17 81:4 84:13 97:15
100:4 102:10,10,12
105:1 117:6 119:12
122:21 123:7 146:9,21
158:12 165:4 167:5
185:13 186:7 187:14,18
195:16 217:8,8 226:10
228:17 232:18 237:17
237:22 251:8 261:22
263:22 274:6,7 300:8
304:1 305:2 308:23
310:6 311:11 313:17
318:8 319:23 326:2,8
344:8 354:18 356:10
364:18 376:2,13,15,16
385:17 393:21 394:3,4
394:12 402:22
backed
307:13 309:19
background
233:7 234:8,9 252:2
backing
242:15 248:6
backup
311:11 316:19
bad
103:22 113:8 134:1
259:18 260:3 261:11
balance
181:12
balances
242:20
ball
155:17
bam
137:13
bank
40:15 62:8,16 64:16,17
65:7,8,9 66:20 70:1,1,3
70:13 71:7,13 74:21
81:19 83:9 98:14 136:4
139:3,4 141:13,17,20
142:5,11,13,18,18,19
233:8 286:11 294:2,11
295:18 296:23 308:12
356:8 394:8
banker
40:3,12 42:14 72:8,15
bankers
287:16
banking
93:19
bankrupt

62:6 136:7 321:8
bankruptcy
19:3 147:3 329:1
banks
60:8,9 74:2 79:19 180:22
266:2,4
bank's
73:15
Baptist
344:17,18
Barber
161:4 208:16 402:4 405:6
Barber's
161:7
bargaining
326:5,7
barrage
235:20
base
81:15 203:13 222:13
329:21
baseball
281:19
based
26:3 32:9 115:21 143:4
157:11 274:11 330:23
331:2 333:22 355:19,21
402:10
basic
188:3
basically
50:2 57:8 186:6,12
296:14 300:23 352:3
basing
203:17
basis
70:7 86:14 154:6 174:11
178:14 206:17 211:13
239:8,10 240:18 247:11
355:7 373:1 378:12
bat
281:19
battle
138:19,22 189:22
bear
72:8 99:2 196:16 307:17
383:5
becoming
198:5 202:6 225:11 376:8
began
64:3 74:23 195:21 198:9
237:14 348:4 392:22
begged
200:2
begging
200:4
beginning
40:10 55:21
begun
334:2,3
behalf

JERRY A. MCCARTNEY, ET AL.                                              ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                                      August 14, 2007

99:22 255:4 296:5
353:12
behest
17:7 73:15
belief
138:13 141:16,19 163:5
167:12 180:16 181:19
206:22 222:13 236:19
239:9,10 241:7 244:15
246:14 249:16 373:13
believe
13:7 74:16 90:15 171:14
172:12 182:9,23 183:11
193:5,21 194:6 195:14
206:11,14 212:14 217:10
220:7,9,9 239:12,15,16
240:3 245:19 246:21,22
251:18 271:8 275:15
287:1 290:19,19,20
323:5 329:16 336:12
341:10,19 364:3 369:16
370:7 371:14 372:8
373:8,10 374:5,21
376:4,23 380:8,17,23
381:22,23 383:10,11
398:22 406:13 408:20
409:11
believed
83:13 199:1 212:2 259:5
286:19 287:2 402:14
405:6
believes
372:21
believing
211:14
benchmarks
71:4
beneath
242:13 247:8
benefit
256:5
Bert
179:17 318:22 350:13
351:22 352:10 386:15
392:4,9,13 407:11
best
8:2 32:17 33:23 55:23
56:1 93:2 113:10 123:13
229:13 235:1,3 277:22
278:1 285:5 292:4
376:14
bet
211:9
Beth
88:18 89:5,11
better
38:10,19 75:3 97:21
293:17,19 295:14,16,22
beverage
44:18 45:5 61:11 112:12
112:22 116:16 124:22

128:5,11 141:1 148:14
202:21 223:1,14,21
224:6 225:12 226:1,20
227:2 231:22 232:4
beverages
36:20,21 37:1,5 39:9
54:15,16,18 55:1 56:3
112:7,19 113:10,13 114:3
129:13 202:17 226:14
228:6 231:3
beveragewise
55:5,6
beyond
83:21 209:2 236:7 280:1
280:2 392:23
big
51:16,20 63:1 113:8 224:2
266:12 282:11 288:7
301:14 320:21,22
bigger
97:22 98:2
biggest
113:9 396:15
bill
66:4,6 82:15 85:15,18,19
104:10,19 105:4 114:17
114:17,21,22 117:7,9
196:7 226:6 260:6,17
Birmingham
3:15 17:1 27:11 32:2
birth
10:8
bit
45:6 98:12 99:13,17
105:17 115:4 119:16
132:17 210:14 223:17
231:4 233:23 236:3
264:7,7,9,21 272:18
273:23 274:1
bitch
209:22,23 210:6,11,20,22
211:1,7 407:15
black
355:5,10 400:7,19,23
401:6
Blackmore
218:11
blah
155:16,16
blame
261:7
blank
104:4
bleeding
61:19 113:8
blocked
86:15
blow
282:11
blur
115:4

blurry
117:14
board
48:23 49:1 61:2,4,4 76:9
95:13,19 97:1,4 101:14
119:22 120:1 135:15
389:5
Bob
6:9,13 89:1 92:7 175:11
175:12 205:14 209:9
255:3 272:4,23 273:16
273:18 274:12,17,18
275:1 314:6 366:11
367:11,23 368:1,2,11
393:20 394:3
Bobs
175:9
Bonds
362:8
bonus
256:4 330:20,21,22
331:10,12,14
booking
247:16,17
books
113:3
boss
29:7,7 106:13 247:4
303:6 356:21
botch
58:7
bottle
36:10 55:22 263:7
300:14 400:7,21
bottled
27:5 31:21
bottler
27:15 28:3 36:18
bottlers
27:1 31:21 36:7,15
bottles
25:13 149:12 261:12
bottling
25:15 27:21,23 28:2,12
34:18 35:7 36:5 37:2
53:23 54:3,16,17 55:4,7
55:7,9,13,16,20,21 56:1
56:4 236:4 298:14
300:13
bottom
353:4 358:22 364:19
bought
24:14 28:6,7 34:8 146:20
Boulevard
46:18
bouncing
148:6 155:17
boundary
243:18
box
3:7 15:16 327:6,16

boy
160:2 244:2
boys
11:8 174:8 348:19,20
361:15
Bradley
3:13 177:9
brand
25:14 400:15
Brandon
11:22
brands
35:4,5
Brannon
11:23 12:1,9 18:17 348:23
383:21
break
8:8,10 56:7,10 61:21
113:21 169:21,22 171:12
216:13 234:22 239:4,5
276:11,12,14,15 305:19
337:5,6,9
breaking
62:3,15 64:7
breathe
265:11
Brenda
208:17 275:12 276:8
277:9,16 283:4,13
287:5 304:3 319:23
324:6 326:22 353:15
407:17
brick
191:6 335:11,20
brief
292:7,8 302:16 303:12
briefly
234:23
bring
44:17 73:13 82:16 85:20
88:15,17,18 89:4,6
92:16 97:8 99:1 107:22
111:11 145:14 181:3
185:3 197:10 200:11
204:15 229:5 310:15
368:6
bringing
38:6 82:21 91:21 92:18
119:21,23 145:12 209:21
269:12
broad
385:3
broadcasted
386:22
broader
169:4,5
broken
154:10
brother
322:5 332:18 386:16
394:19

brother's
393:9
brought
17:2 33:8 39:16 43:21
86:3 99:7 124:7 156:1
197:2 206:7 226:6
274:22 319:23 327:17
337:15 345:1 386:18
392:20 406:7
Brundidge
113:13,15,17 116:17 136:16
140:21,22 141:1 148:9
149:9,10 150:7,10 223:3
223:16 228:5 232:19
243:6 250:12 267:23
272:20 282:1
brushed
124:14
bubbling
149:11
bucks
82:18 113:5
Buffalo
27:16,17 28:2,4
build
180:10
building
34:13 147:10 301:15
built
61:10
bunch
164:14,14 301:3 363:14
burned
316:17
business
22:2 24:16 37:23,23
38:11,17 44:19 50:11
54:1,3,12,15,22 55:1,2
62:15 64:1,9,22,23 69:2
71:11 73:19 77:9 78:15
79:13,17 80:23 81:12,13
81:16,23 82:13 83:17,18
84:10,12 89:8 90:7
92:4,19 96:11 97:16,17
97:20,23 98:13 99:1,2,5
99:21 100:3 101:22
108:6 112:7,12 114:4,23
115:14 116:11,15,17
119:13,22 120:19 123:5
124:9,23 128:4 131:15
132:23 136:1,5 141:2
145:2 146:13 168:12,16
181:6 182:15,16 189:1
190:23 191:10 192:13
197:4 202:22 205:3
219:22 220:6 223:17
225:12 228:6 229:3
231:11,23 235:13 236:9
237:11 238:4,11 242:17
242:19 243:21 247:14
258:1,10 262:8 263:12

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

266:7 268:23 269:12
288:13 298:21 314:3
320:8,9,12 327:12
332:19 358:6 366:1
367:16 368:4 371:18
373:19,22 377:15
381:17,17 382:3 400:12
400:17
businesses
29:6 37:21,22 181:1,12
buyer
59:17,21 80:4,8 93:13
Bypass
335:14
B-R-A-N-N-O-N
12:2

**C**

C
3:1 410:1,1
Cadbury
28:18 30:23 31:3,6,19
32:5 33:6 34:20,23
35:11 51:5
California
226:10
call
36:4 89:23 93:22 101:22
103:10 107:19 116:22
129:22 156:11 165:17
168:10 175:6 189:5
209:22 210:19,21,23
211:6 218:10,17,17,19
223:23 236:15 242:5
261:8 262:1 268:12
284:19 291:7 292:7
317:8 323:7 343:4
345:22 370:15 388:13
393:19
called
13:6 24:2 32:12 33:18
42:8 43:3 46:17 52:18
55:15,22 57:20 72:14
100:17,18 101:1 105:11
136:10 142:5 145:12
147:21 163:16 165:22
175:11,13,16 209:23
210:1 214:9,10 243:14
268:3 284:20,23 285:3
285:4,8 289:14 300:8
303:4 318:10 320:2
322:6 330:2 344:12
394:12
calling
26:13 31:20 210:16 227:3
227:19 228:17,19 394:3
406:12
calls
228:2
Campbell

125:23 134:5
Campbell's
125:12 133:16,18,19,20
candidates
207:9 212:22 219:16
capable
181:4
capacity
53:17 156:2
Cape
21:17
capital
1:10 62:14 89:21 90:1,1,6
97:6 98:21 137:10
144:4,6 145:13 146:5,11
147:10 181:10 247:18
266:13 287:15 301:15
car
50:6 327:8
Carbert
88:18 89:5,11
cardiologist
343:3,10,21,23 344:6,15
345:18 362:21
cards
99:21
care
348:6
career
182:7
careful
9:1 65:5 230:13
carefully
262:11
Carraway
44:1,3,13 45:9
carried
89:15 355:17
carry
186:15
carrying
70:21 98:16
case
15:16 16:4 17:1,15 20:11
152:9 179:1,2 191:19
384:1 386:14 387:10
388:21 391:14 395:9,16
406:3
cases
261:14
cash
61:23 62:4,7 63:21 90:21
116:8,9,10,10 190:5
269:12 287:19
categories
172:11,23
Caucasian
96:19 152:20 153:1,5
154:19 160:8 161:19
163:2 167:1,23 254:4
273:3 314:3 401:19,23

402:4 403:16,22,23
404:4
Caucasians
402:5
cause
5:11 261:17 263:5 410:20
caused
28:23 269:4
causing
360:23
CD
309:19,20,22 310:17,20
316:6,9 326:8 390:17
CDs
307:13 316:17,19 319:16
ceased
93:5,6 328:22 332:8
Cedar
10:15,18 12:19 13:14
cell
319:10
Centauro
331:23
cents
261:12
CEO
52:17,20 95:14 104:21
369:8
certain
60:12 70:8 238:20
239:20 259:3 307:2,8
307:13 331:6 337:21
350:20 351:17 408:2
certainly
109:22 161:5 162:19
182:11 193:10 194:20
196:19 197:5 208:9
213:10 231:1,7 248:12
252:20 257:6 342:14,16
355:2 374:23 386:23
certificate
23:5
certification
95:16
certified
95:16 382:3
certify
5:4 410:7,16
cetera
371:19
CFO
47:5 48:7,9 64:20 88:23
89:2,10 108:3,3 112:1
chain
26:13,14,15 37:18,20
challenge
243:18 248:13,21 249:6,8
263:14
challenged
243:3,20 244:20 251:15
274:20

challenging
37:13 244:5,7 249:10
250:11,12 253:17,18
chance
17:10 109:21 181:14 217:1
257:12 271:3 290:7
409:3
change
60:22 63:19 100:20
108:23 118:20 120:12
121:16 122:16,19 123:20
124:3,6 187:20 228:11
241:18
changed
58:5 107:13 137:14 155:7
295:2 385:1
changes
91:5,7,16
changing
58:15
charge
20:11 102:13,23 110:19
111:4 122:11 130:21
131:15,18 150:9 176:18
185:13 253:8 350:14
352:18 353:11 356:10
charged
155:6
charted
69:16
charts
213:5
chase
164:12
chastising
184:14
chatter
209:17
check
324:14,17 325:3
checks
148:5 242:20
chest
343:19 344:19 345:4,7
Chicago
129:18 131:19 199:18
207:4,21 212:19
chief
32:18 33:16 52:15 59:4
child
157:20 338:9 348:6
children
9:20 13:15 337:13,16,21
338:6,8,11,15,21 339:4
341:2 342:6 345:1
346:10,13 382:9,12,16
383:7 384:2 385:21
children's
339:4,8
Chocolate
56:2

choose
75:10
chose
210:17 223:19,19
Chris
20:2 76:6,8,9 83:23
96:18 99:9,12 101:20
103:15 105:21 117:4,17
127:10,18 128:6 138:1,8
140:11 154:22 157:6
160:8,14 161:19 168:5
168:19 176:21,22 178:11
178:17 179:8,9 181:18
208:14 227:23 228:13
230:1,10,12,12 231:13
232:5,19 233:11,12
244:4 254:22 269:8
288:11 289:16 294:23
369:1,14 370:8 374:22
375:12,17 376:11 400:1
401:4,18
christen
120:9
christened
241:17
Christian
12:5,6,9 18:17 349:1,15
383:22
Chris's
230:16
Chuck
43:23 44:13 45:1,9
circle
208:20
circumstances
295:2 344:23
city
20:21 42:3 247:18
civil
1:5 5:6 350:20
claim
20:13 99:17 152:8 153:21
154:7 155:13,22 162:21
162:22 166:4,22 168:23
171:21 172:1 174:11
183:19 192:14 217:14
221:23 240:18 313:20
333:8 336:10,22 337:10
350:2,5 352:2 363:18
372:23 373:3 374:17
379:15,16 380:9,17
384:22 385:4 389:16
391:13,20 393:16 395:11
396:18 406:5 407:22
claimed
17:6,6 194:1 405:5
claiming
342:8
claims
162:12 261:22 347:20
363:4 387:18 388:8

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.                                      ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                              August 14, 2007

389:1 391:7 392:5
395:9 396:13 397:9,17
398:12 406:4
Clarice
273:7 399:20
clarify
358:21
clarifying
177:16
clarity
16:17
Clark
134:13
class
22:18,19 72:12,13 96:6,9
classes
22:7,15,15 23:7
classifications
95:15
clean
149:19 286:4
cleaned
390:21
clear
102:22 138:14 142:8
156:15 158:1 159:6
160:5 161:22 164:10
167:6 169:18 173:16,22
174:2 178:6 190:2
197:2 199:19 243:16
248:14,18,20 266:12
267:22 293:6 294:5
325:12 333:10 367:14
376:8 391:20 401:2
clearly
117:18 155:18 156:9 157:2
178:4,5 179:1 200:9
228:21 239:23 249:1
281:14 286:18 287:6
314:1,1
Clerk
3:18 177:10
clients
145:17
Clinic
362:9
clips
328:8
close
42:22 386:17,23
closed
95:10 113:3 148:11
267:23 329:3 403:3
closely
176:21
closes
116:11
closing
269:4
closures
149:16

Club
247:18
clue
124:8
coach
159:2
Coca-Cola
17:8
Coffee
126:14,15
cognizant
243:11
coincide
341:1
Cola
17:8
cold
139:7
collateral
94:10
collateralized
70:20 90:23 94:15
colleagues
250:23
college
21:13 23:15 24:9
color
404:18
coloring
404:15,22
colors
108:23
comb
196:2
come
38:9 39:11 42:11 55:1
86:7,12,17 97:4,13
104:20 108:15 110:18
111:3 112:4 120:8 123:7
134:18 147:1 164:16
190:20 196:1 200:3,4,16
213:10 221:10,12 231:3
232:22 236:1 262:6
268:1,10 270:4 274:3
276:21 277:10 286:4,12
289:11 294:1 295:22
296:22 298:8,17 299:5
302:2 356:8 367:11
379:2,7,8,12
comes
75:12 91:15 98:13,18
105:4 120:17 165:9
263:20
comfortable
84:3
coming
46:16 53:13 73:18 90:22
92:19 97:1 105:1 119:22
149:19 158:10,10 164:2
182:20 187:13 189:12
196:12 236:22 246:4

270:13 297:8 299:11
367:9 368:2,12 377:11
command
205:5,6,6
commencing
5:9
comment
87:12 184:15 287:6
354:10 402:12,19
comments
87:3 217:8 247:12 363:15
403:16 404:3,16
Commerce
330:3,8,12,18
commercial
330:10
commercialization
129:23
Commission
20:15
Commissioner
5:4 410:23
committed
308:1,6 312:5 385:10
common
144:11,23 145:1 192:12
251:1 368:5
communicated
188:10
communicating
128:14 189:8 191:9
245:18 368:7
communication
128:1 135:17,21,23 251:23
communications
142:22 147:13 269:22
315:20
Community
126:14,15
companies
24:14 40:1 62:6 74:3
97:5 214:3,4,8 220:11
220:14 320:16,21 334:4
335:1,6,16 382:2
company
15:20 17:3,8 24:1,3,21,23
25:5,10,21 28:21 30:6
32:19 34:8,14 35:3,10
35:11 36:17,20 46:19
47:4 48:21,21 50:8,19
50:21 52:14 58:3 59:7
59:8 62:2,10,18,20
63:14,19 69:15 73:20,21
74:7,9,14 75:7,12 76:11
76:21 79:3,4 80:11,21
81:8,19 84:23 85:4
86:10 89:13 91:4 92:9
92:14,16 93:5 94:18
95:4,10,12 97:13,19
98:9,18 99:7 102:13,17
104:21,23 105:9 113:4

126:12 136:6 140:14
149:8 155:2 159:8,15,16
159:18 162:4,16,18,23
164:17 166:23 172:6
174:7 180:10,11,17
192:4 194:23 195:23
197:6 204:1,18 205:2,12
211:16 213:17 219:6
229:18,19,23 236:11
240:10 255:5,11 258:5
258:13,15 265:2 266:12
268:10 270:14 272:11
273:22 275:3 278:4,22
282:2 285:19 286:6,11
286:16,23 287:19,20
288:3 293:10,11,21
294:4 295:17,19 296:17
298:1 299:6 301:2,6,13
309:5 312:10 320:2
321:5,10 330:2,4 334:1
339:18 347:11 348:12
356:9 382:5 389:11
394:8 405:17 408:7,17
company's
295:1 302:2
compensation
336:14,19 360:5,10
competent
181:9 238:16,17
complain
401:14 406:18 407:3,7,16
complaining
135:6
complete
22:23 338:17
completely
77:9 78:15 79:17 102:1
135:7 209:4
complex
13:8
complexity
188:23
compliance
2:12
comply
171:9
component
185:20
computer
22:17 308:18,19
concentrate
204:13
concentrating
226:1
concentration
381:2
concept
258:19 407:13
concern
71:2
concerned

64:9 70:4,16 72:10,11
83:15 137:19 207:11,16
268:2 301:2,5 339:15
345:14 373:5 381:9
concerning
70:13
concerns
246:5 258:1 287:16
357:4,17,20
concluded
409:19
conclusion
292:21
condiment
54:4 128:4 202:15 203:2
228:10 243:8 272:6
399:15
condiments
54:5,10,12,20 112:20
113:18 129:15 202:18,20
condition
9:15 147:8 236:11 286:22
287:20
conduct
252:19
conference
277:20
confident
84:3,5
Confidentiality
170:12
conflict
333:8
confront
311:19
confronted
243:1 244:17,19
confusing
272:10
Congratulations
11:5
connected
45:3,7
Connecticut
22:21 24:7,13 32:9
connection
75:4
conquer
112:11
consequences
338:5
consider
21:1 127:1 366:3,4
considered
53:22 54:8
consistent
205:9
conspiracy
138:14,16 141:10 168:22
169:9 370:14,16
conspired

JERRY A. MCCARTNEY, ET AL.                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.            August 14, 2007

370:11

constant
265:9,17

constantly
175:3 190:10 191:4 368:7

consultant
47:9,19 52:13 85:20 86:3
86:12 89:11 93:6 270:6
299:2

consultants
82:17

consulted
194:19

consulting
36:6,16 44:15 73:4,13,17
233:14 320:1,7,8,11,15
322:2 323:2,18 328:10
331:22 332:3 356:1

consumed
188:17

consumer
24:3 25:5,6,6,7 108:13
235:5,7 236:21 237:1,6
261:2

consumers
261:10 364:23 365:3

contact
66:19 74:8 105:12 127:2
127:7,17 128:16,18
129:9 130:7,11 132:15
134:11,14 207:3 224:13
227:5,12 228:22,23
298:12 352:10,11

contacted
352:13,13,16

contacting
251:20

contacts
132:13 205:4 333:21

contain
310:20,23 311:3 313:19

containers
149:13

contend
152:23 154:17 157:10
160:6 161:2 163:14,22
355:3

contending
166:20

content
279:21

contention
142:3 173:5 193:10 237:4
237:10 238:2 240:8
339:7 355:8 371:20

contentious
132:18 135:3 348:3

contents
317:20 319:17

context
168:9,17 354:20

continuation
280:23 298:20 299:15

continue
62:1 84:9 88:16 99:5,6
267:15,15 288:13 297:4
298:23 375:17

continued
98:4 108:2 155:5 158:23
289:5 341:21 342:1
348:6 355:12 375:13

continues
168:16

continuing
223:18 295:15

contract
25:11 58:9 129:16,20
132:18,21,22 133:4
165:16 202:7 203:5,8
205:21 207:21 211:21
212:19 226:18 307:4
357:22 379:23 380:2
400:12

contracts
107:10,18 131:12 132:22
307:6 330:9 373:11

contractual
259:20

contributed
348:9,16 361:10

contributing
360:19

contributions
230:3,6 266:23

control
58:3 76:10 91:12 95:3,7
95:17,19 97:14,19 101:5
101:8 102:4,9,19 106:17
106:20 116:23 117:1,4
118:3,21 120:21,21 121:1
121:6,9,17 123:21
127:15 159:11 193:19
265:5,14 312:12,14

controlled
95:13

controller
112:1 117:12

controversial
283:18

convenience
26:14

conversation
19:6,7,15,21 20:2,5,8
42:18 150:2 152:6
268:9,16 269:18,20
283:16 290:23 291:3
292:5,10 300:19 302:7
302:13,16 303:3,10
318:19 357:12 365:11,17
366:7,13 367:21 371:7
376:7 378:23 387:20
388:19 391:17 392:12,14

395:1 396:12,17 404:11

conversations
19:18 42:18 126:20
302:10,15,19 303:8,15
317:18,22 355:21
357:15 370:23 371:1
374:21 378:2,5 387:17
388:5 389:2,15 391:10
391:15 392:4,11 393:5
393:15 395:8,11,20
397:8,16,21 398:3,21
405:13,15

conveys
173:11

convinced
262:19 286:20

convincing
375:11,16

COO
57:7 59:3,9 73:9 78:10
103:8 185:9 186:16,18
186:19 191:22 258:9,19

cool
244:3

coordinate
229:5

cop
259:18 260:3

copacker
261:7 262:7

copacking
143:23

copied
207:1 216:2

copies
49:21 139:14 328:4,5

copy
68:5 76:4 87:5 214:15,16
220:2 310:15

Core
214:10

corner
64:3 65:2 69:8,10 71:9
84:11 98:14 266:6
353:4

corporate
24:12 32:8,11

Corporation
335:23

correct
23:16,17 30:18,19 42:15
43:9,12 45:10,21 49:19
51:12 56:18,22 59:1,4
60:17 69:4 77:20 78:8
78:11,15 85:4,7,16
87:20 96:1,5 98:1
100:9,12,15,19 106:18
107:14 110:11 114:4
120:18 143:1,2 151:18
152:12 153:22 154:3
160:10,16 163:8,9 167:1

170:12,13 171:10,19
175:5 181:6 182:10
183:3 204:1,3 205:23
209:11 211:17,23 212:5
212:6,11 213:22 215:3
222:7 229:20 231:17
236:16,22 237:7 245:2
246:12,16 253:9,23
254:1,7,22 255:20
256:6,7,12,16 263:3
271:15,18,22 272:2
274:16 278:19 289:9
294:14 295:5 311:23
312:1 328:3,6 332:6
336:5,14 342:8 352:19
356:20 359:21 360:5,17
362:22 364:4 378:21
382:12,17 386:8 388:11
398:15 402:6 404:6
409:8 410:13

correctly
220:1 255:13

correspondence
46:12 49:17,22 50:2,12,17
50:20 107:17 109:4,6
114:6 139:10,13 207:2
253:16 311:9 324:5
334:4 388:18 392:17

cost
92:17 109:18 110:14
261:12 268:20 311:3

costs
38:10

counsel
2:4,16,18 5:7 159:2
321:14,15 350:23 352:1
352:9 392:6 393:2
410:17

counseled
394:16

counseling
342:16,21 346:6 356:22
362:9

counselor
362:2

counselors
346:8 347:14 361:22
362:12

count
16:20 328:8

County
322:23 410:5

couple
22:7 24:20 37:10 39:18
42:1 53:8 63:15 97:8
227:20 232:8,13,23,23
233:2,4 256:15 316:5
316:17,19 339:14 341:3
346:7

course
17:13 23:6 60:7 68:19

93:1 157:6 207:19
208:2 229:1 318:20
351:1 387:14 391:11
407:6,18,19

courses
23:7

Coursework
23:9

court
1:1,22 2:6,13 5:1 16:13,19
16:23 122:17

courthouse
323:1

cover
240:22 347:13

covered
183:4,13 203:19 222:17
239:12 240:11,20 364:5
398:17 408:23

co-chairman
101:14

co-counsel
314:23

co-op
219:11

CPA
43:21 45:10,11,12,19

Craft
125:11,23 126:2,21 129:5
129:6,13 133:21 134:5
164:20 165:3,18 298:6
298:7,20 300:6 302:13
303:1

cranked
71:18

create
64:21

creating
64:19

credentials
321:3

credit
267:16 282:6

Creek
138:19,22

crime
312:5

crimes
308:1,5

criminal
137:18

critical
185:20

Crosby
273:7 399:20

crossed
352:8

crossing
243:17

crystallizing
198:15

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                              http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

cultivating
219:8
current
10:13  13:15  60:6  81:14
currently
8:13,19  13:19  329:9
custody
18:17
customer
57:15  58:20  81:14  91:18
  107:7,10,11,22  110:1,9
  110:20  111:4,11,12  126:4
  126:10,16  128:14,16
  132:13  142:17  143:13
  144:1  146:8  150:6,9
  159:3  162:18,23  167:8
  197:7  199:22  227:11
  228:23  241:15  262:6,12
  271:12  272:20  293:22
  294:1  295:17  357:4
  363:22  378:2
customers
54:21  91:21  97:16  107:18
  109:5,6,11  114:7  118:13
  119:21,23  124:22  125:4
  125:5,9,17  126:8  127:12
  127:8,17  135:6  136:12
  137:12  138:15  140:18
  166:23  172:6  223:22
  226:21  227:3,19,22
  228:13,17,19  229:5
  235:19  240:10  241:5
  243:8  251:21  252:1
  255:10  296:6  299:12
  301:14  308:12  310:21
  311:9  313:15  316:11,15
  357:4,17  365:4,10
  366:19  371:18  377:3,6
  377:7,19  378:11,13,19
  381:5,9,20
cut
137:17  140:2  148:17
  164:7,12  278:2,19
  287:21  318:14  333:13
  353:19
cuts
150:23  151:5,6

---
**D**
---

D
4:1
DA
17:6
dad
338:9  340:5  386:17
  397:3
Dad's
338:11
Dallas
34:9,19  35:9,14

damages
336:23
Daneshmayeh
242:22  243:1  244:16
  248:11  250:3  251:14
  273:18  298:5  300:8
  408:11
Daneshmayeh's
245:6  246:12,18  248:10
Daniels
101:7  102:6  103:6,20
  127:18  132:9  154:21
  160:8,18  161:1,11  163:16
  164:1  166:6  167:4,22
  172:2  173:5  174:12
  180:16  192:15,17  194:2
  232:17  240:3  369:2
  370:4  372:19  373:2
  375:11,16  403:19  406:12
data
141:4  261:20,21,22  262:4
  262:19  312:8
date
5:4  10:8  35:21  137:1
  201:10,15  250:15,15
  319:3  349:21  356:7
dates
104:3  105:16
David
243:1,14,17  244:3,6,16
  245:1,13  246:12,18
  248:9,11  250:3  251:4,14
  273:18  298:5  300:7
day
6:17  20:2  43:5,10,11  46:1
  61:12  76:7,8,9  96:18
  99:9,12  101:20  104:16
  106:7,10  118:13  119:1
  127:18  138:1  154:22
  158:9  160:8,14  161:19
  168:5,19  178:18  179:8
  179:10  181:18  190:18
  194:17,20  199:11  223:9
  227:23  228:14  230:1,17
  231:13  232:5,13,14
  244:4,9  246:9  248:12
  249:10  254:22  275:14
  275:19  284:13,19  285:5
  285:9,15,23  286:2,3,8
  288:11,22  289:14
  292:22  294:23  297:10
  304:13,18,21  305:3,9
  306:4  311:13  313:5
  315:13  316:5  318:1
  319:9  325:16  327:17
  328:17  329:16  337:22
  337:23  356:5  369:1,14
  370:8  375:12,17  386:11
  395:20  396:16  400:1
  401:4,18  409:7
days

223:9  232:7,16,20  233:1
  233:5  256:15  286:10
  316:5  376:11  397:20,22
daytime
275:22
day-to-day
59:7,13  79:12  84:22
  85:21  96:12  101:9,16,18
  105:22  121:1,17,19,20
  123:21  128:13  182:16
  185:21  264:2  356:4
  373:21
deal
131:17  134:22  165:8
  180:7  182:17  243:21,22
  243:22  265:1  287:16
  408:18
dealing
69:15  112:6  132:6
dealings
63:12
dealt
129:18  130:16  131:16,23
  132:9,10  134:16  224:14
death
149:18
debacle
259:19  260:4
debate
374:1
debates
349:13
debt
60:13  62:22  63:1,4  70:20
  70:21  91:2  94:11  98:15
  98:16
deceased
66:16
deceived
137:8,11,12  288:7
December
76:16  329:3  340:20
deception
137:21
decide
167:14  192:3  289:3  321:4
  349:18,20  362:1  366:5
decided
288:17  322:1
decision
73:12  86:11  119:13  135:9
  184:23  185:19  193:6
  194:4  244:23  245:5
  246:11  249:22  250:2,5
  250:7  253:17  289:12
  311:21  369:3,19  371:15
  371:21  372:1,3,6
decisions
38:19  83:8,11  97:20,21
  119:10,11  140:5,19,23
  157:3  159:10  165:21

190:21  191:17  199:17
  242:16,17  243:7,11
  244:21  247:2  248:9,22
  250:11  369:10  373:23
  389:8
decline
94:7
declined
325:8  360:12
dedication
255:12
deep
377:8
defect
263:3,6
defective
263:4
defects
261:3
defendant
3:10  17:20  161:1
Defendants
1:11
Defendant's
4:7,8,9,10,11,12,13,14,15
  4:16,17,18,19,20,21,22
  170:1,5,17,21  201:16,20
  216:5,9,23  218:1
  224:20  237:23  254:9
  254:13,18  256:18,22
  257:13,17  270:19,23
  271:4  279:8,12  289:8
  289:19,23  290:8,12,18
  293:3  294:13,17,21
  306:11  317:10,14  323:21
  324:2  325:9  326:14
  328:13  334:9,14  352:21
  353:2  358:7,11
define
162:7
defined
117:4,19
definitely
160:11
definitive
187:5
defraud
138:14,17  141:10
defrauding
146:22
degree
21:18,23  22:9  23:5
delamination
259:23  260:22  261:8,18
  262:4
delicate
259:20
delivered
370:1,2
demand
319:2

demands
373:21
demeaning
178:2,16  179:4
demonstrated
186:1
demonstrating
199:4
denial
198:7
Dennis
242:22
deny
116:14
department
272:21
departure
171:18  303:17  331:17
  342:7,12  344:21  346:2
  364:3  382:19
depend
108:18
dependent
229:8
DEPONENT
409:21
deposition
1:15  2:4,9,10,21  6:21  7:1
  15:15  16:15,18,20  18:1
  18:23  123:3  170:6,22
  201:21  216:10  254:14
  271:1  279:13  290:1
  317:15  324:3  326:19
  334:15  353:3  358:12
  409:18  410:8,14
depositions
2:14  15:11  398:4
depth
237:3  394:17
derailed
140:21,22  385:12
derogatory
403:7,16,21  404:3
describe
32:17  34:1,12  118:10
  130:19  157:13,14  158:1
  159:23  160:2  176:8,11
  184:7  258:17  337:11
  343:17  384:22  388:2
  405:8
described
118:5  182:21  248:9  343:1
describing
109:3  176:22  213:4  265:7
description
190:13  359:13
descriptions
177:3  189:11,13
desire
44:23  199:4  219:5  221:17
  236:8

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

| | | | | |
|---|---|---|---|---|
| **Dessie** 395:23 396:1,2 | 32:22 57:13 105:19 114:14,22 146:2 210:22 226:20 227:2 243:23 | 150:21 151:3,8,13 152:1 240:21 259:16 267:13 288:10 314:4 350:17,22 | 112:10 **divided** 356:13 | 262:16 271:21 280:23 323:6,8 329:23 336:16 336:18 359:15 |
| **detail** 163:11 230:23 | **director** 36:4,5,9 58:20 107:7,8,9 | 351:4,22 358:5 367:8 368:9 377:9 379:3 | **division** 1:3 29:8 36:3,3 54:4 | **domain** 377:18 |
| **details** 166:18 172:10 220:8 238:11 377:15 | 107:10 271:12 363:22 **disagreed** 192:9 | 388:13 391:6 **disengage** 158:15 | 274:4 336:11 **divorce** 13:12 18:4,9 19:12 30:10 | **door** 198:3,13 235:11,11 265:11 265:18 266:1,11 |
| **determine** 8:1:11 | **disagreements** 132:3 | **disengaged** 209:4 | 30:15 39:4 45:5 51:16 322:12 | **doors** 116:11 329:3 |
| **develop** 237:15 367:15 368:6 | **disapprove** 236:18 | **disengaging** 224:13 | **divorced** 12:11 18:6 39:20 338:9 | **dots** 45:3 |
| **developed** 173:23 | **discipline** 41:1 | **disk** 67:20 309:14 310:14 | 340:5 **doctor** | **doubt** 143:16 |
| **developing** 200:8 400:14 | **disconcerting** 222:3 | **disliked** 274:11 | 344:7 345:16 **doctors** | **downloaded** 390:16,19 |
| **development** 17:18 235:23 | **discontinued** 347:10 | **dispel** 34:17 | 347:15 **document** | **downs** 64:10 |
| **die** 223:17 | **discount** 159:12 | **dispute** 259:20 260:5 357:22 | 84:1 110:4 144:18 145:16 170:7,23 171:5 195:10 | **downsize** 374:7 |
| **differ** 122:7 | **discounts** 140:17 | **disregard** 164:7 | 201:3,22,23 216:11,12 217:10 218:4 245:23 | **downsizing** 29:22 |
| **difference** 384:17 | **discovered** 392:14 | **disrespect** 156:18 | 254:15,16 255:17 257:7 271:2,6 279:15 290:2 | **dozen** 387:12,13 |
| **different** 9:22 24:20 38:3 48:11 | **discovery** 68:1 | **disrespected** 175:18 | 294:15 334:13,16 367:20 386:9 391:23 | **Dr** 34:8 35:1,2,10 343:9,14 |
| 50:10 63:6 73:16 75:1 99:19 106:21 108:4,9 | **discriminated** 163:14,22 406:20 407:4,9 | **disrespectful** 178:3,16 179:4 | **documentation** 159:1 279:6 315:22 316:1 | 343:18 347:17 362:5,15 **draft** |
| 121:4 126:5,18,20 127:21 128:10 130:17,18 | 407:23 408:21 **discrimination** | **disrespectfully** 157:7 166:7 167:22 168:6 | **documents** 51:17,18 76:19 117:15 | 87:10,10 **drafts** |
| 157:10 172:16 190:10 202:3 222:20,20 | 20:14 152:9,12,14,16 153:22 154:7 217:15 | 172:2 173:6 174:13 175:23 | 202:11 217:9 241:13 304:23 306:21 307:1,3 | 87:11 **draining** |
| 227:17 230:9 242:6 272:22 322:17 331:1 | 379:16 380:9,18 382:21 388:8 389:16 391:8 | **dissatisfaction** 131:5,7,8 | 307:8,16,18 308:14,16 309:2,15 314:19 315:10 | 140:15 159:18 **drawing** |
| 333:14,21 334:4 339:9 376:4 407:12 | 392:5 398:14 **discriminatory** | **distinct** 205:1 | 319:18,19 321:9,12 322:19 327:19 328:11 | 104:4 **drawn** |
| **differently** 153:1,4,7 154:2,14,18,21 | 161:23 405:7 **discuss** | **distinction** 121:21 325:12 | 371:3,10 379:15 380:8 380:10,14,16 409:16 | 133:8 **drink** |
| 154:23 160:7,22 163:20 168:21 169:15 171:14 | 209:6 **discussed** | **distraught** 339:13 | **doing** 31:18,23 32:10 37:4 | 400:8,19,23 401:6 **drive** |
| 172:13 173:7 217:7 240:4 | 77:12 184:19 219:2,4 222:21 252:15 281:5,6 | **distress** 336:23 337:3,11,12,15 | 57:18 64:19 71:6 74:15 84:10 97:16 104:18 | 10:15,18 12:20 13:14 391:2 |
| **difficult** 29:5 132:21 182:17 | 350:9 370:18 381:14 387:10 | 338:3 342:10,18,22 346:1 347:20,21 348:7 | 119:1 136:14 137:10 140:10 142:2 158:13 | **driven** 116:9 238:10 |
| **difficulties** 60:1,4,17 61:8 | **discusses** 218:9,14 | 348:10 **distributed** | 159:6 164:16 174:6 192:6 197:3 220:6 | **drivers** 263:12 |
| **digging** 199:6 | **discussing** 285:22 | 31:22 **distribution** | 226:17,19 228:6 231:12 234:2,3 235:15 237:18 | **dropped** 9:20 |
| **diligence** 83:14 261:19 | **discussion** 8:17 47:1 48:19 49:3 | 24:16 **district** | 241:13 242:1 243:10 244:8 252:2 270:13 | **drugstores** 26:15 |
| **diminish** 85:3 | 146:18 159:14 207:3 208:13,22 212:9 218:18 | 1:1,2 17:2 **disturbed** | 286:21 287:12 288:13 291:14,16 312:19 318:8 | **due** 83:14 261:19 324:12 |
| **diminished** 82:12 85:9 | 245:8,15,15 277:11 278:9 279:20 283:17,17 | 207:15 **disturbing** | 322:4,13 330:7 357:13 357:13 374:12 395:18 | 345:8 **duly** |
| **direct** 32:20,21 102:5 106:16 | 315:7 317:1 352:5 353:23 375:1,3,5,7 | 288:1 **diversity** | 396:21 **dollar** | 5:16 **dumbfounded** |
| 142:21 228:22 251:23 | 379:6 394:10 401:1 **discussions** | 219:19 220:12,12 233:10 382:1 | 256:6 260:6,17 289:4 **dollars** | 401:13 **duress** |
| **directing** 177:7 | 64:15 77:19 78:18 132:18 | **Diversity.com** 219:7 | 50:5 60:19 61:20 62:17 63:5 64:6 112:14,18,23 | 385:8 **Durlocker** |
| **direction** 264:14 | 135:19 138:6 142:7 145:22 146:3 147:21 | **divide** | 144:9 231:16 255:19 | 66:16 72:16 |
| **directly** | | | | |

duties
100:22 107:13 109:4 111:8
  114:9 118:20 120:12
  121:16 122:7 123:11,20
  355:14 356:13
dwell
379:4
dwelled
381:12
dying
124:4
dynamics
118:18
dysfunction
264:22
dysfunctional
263:9,16
D-E-S-S-I-E
396:3
D.C
230:21

---

**E**

E
3:1,1 4:1,5 410:1,1
earlier
99:23 100:10 155:5 194:7
  231:19 251:17 254:5
  282:5 287:3 292:16
  371:21 372:7,13 379:21
  390:11 399:1 405:5
  407:14
early
52:3 56:21 57:6 59:1
  61:6 63:18 75:18 100:5
  136:23 173:23 193:3
  194:7 199:4 203:10
  205:19 208:13 222:21
  227:18 228:1,4 232:11
  304:17 329:7 371:15
  374:22 392:19
early-on
391:17
earn
325:21
easier
7:16 175:21
easiest
56:13
East
344:17,18
easy
399:8 401:2
economic
157:19 180:20
economically
38:18
economics
50:9 64:22 83:14 258:11
edification

399:10
education
22:4
educational
234:9
EEOC
20:11 155:13,22 221:23
  333:7 350:2,5,10,14
  352:2,18 353:11 372:23
  373:3 374:17 386:20
  388:17 391:13 396:18
effect
2:11 59:22 186:8,17
  202:2 207:8 213:15
  281:14,16 287:14 291:20
  297:5 338:4 354:11
  371:4,11
effective
120:20 280:8
effectively
44:19 92:5 95:12 121:6
effectiveness
87:2
effects
304:22 306:16 309:2
  313:7 315:10
efficiencies
85:23 116:7
efficient
189:2
efforts
136:19 331:3
eighteen
125:7
eighty
260:6,16 341:18
eighty-eight
329:22,22 341:11,19
eighty-five
50:7 330:19
either
15:11 18:1 44:23 59:20
  62:13 64:12 72:22 80:7
  81:19 88:4 94:23
  102:21 136:6 152:16
  182:15 289:14 291:8,12
  296:6 363:2 379:12
ejected
389:10
EKG
345:6
elaborate
401:12 405:9
elaborated
402:21
Elations
55:15
eleven
305:5
eligible
331:10

eliminated
29:20 221:2 272:2 280:7
  280:10 284:5 353:20
Elmore
322:23
else's
313:9
emasculate
167:7
emasculation
155:1,2 162:3
Emory
234:16
emotional
336:23 337:3,10,12 338:3
  342:10,17,22 346:1
  347:19,21 348:7,9
employed
42:12 280:12 359:3
employee
19:21 47:21 48:3 83:16
  99:11,13,14,18,20 171:2
  221:20 256:9 399:10
employees
99:9 138:15 209:17,22
  210:1 222:6,6 308:13
  323:10 356:14 381:1
  399:17
employment
20:14 23:12,19 41:8 51:12
  193:7 194:5 195:15
  206:23 225:15 234:8
  245:6 246:12 283:14
  289:5 325:17 332:9,16
  332:22 333:3 335:18
  348:4 358:23 359:13
  369:4,20
empowers
263:21
enable
61:23
encompassed
49:9,10
encountered
263:14
encourage
246:8
encouraged
245:21 246:1
encouraging
73:2 246:2
encyclopedias
235:12
ended
24:19 28:17 29:8,11
  90:22 165:2 325:18
  342:15 362:3
endure
210:18 242:7
energy
204:13
evasive

engaged
119:9,9 361:12
engagement
226:14 360:22
engagements
38:4
engaging
137:20 178:22,23 223:14
engineering
219:10
engineers
236:1
ensure
302:2
entail
32:15 33:21 54:16
enterprise
100:3 197:4 366:1 382:3
enterprises
381:17
Entertain
203:21
entertaining
178:23
entertainment
269:10
entire
112:5 340:15,17
entitled
196:20 351:4
entity
98:1
Equal
20:14
equipment
91:19 143:9,19 144:16
  145:9 146:18 147:2,15
  148:2 324:12,22 325:5
  325:11,13 327:19
equipped
185:23 253:22
equity
174:7 286:13
era
263:19
erase
316:3
erased
390:22
Ernest
219:19
escapes
207:5
especially
189:7 242:12
essentially
47:2 128:15 136:17
  159:18 281:2
et
1:7,10 371:19
evasive

233:23
evening
306:7
event
220:20
events
42:10 92:12 99:20 273:17
  296:8
eventually
29:8 31:11 105:8 139:23
  139:23 149:18 158:16
  167:19 193:11 194:22
  229:15 244:4 274:22
  319:13,22 327:18
  372:21 408:11
everybody
101:20 102:2 118:13 135:1
  137:12,15 162:19 173:16
  178:20 243:4 257:9
  261:3 378:6 386:21
  398:18
evidence
2:22 167:16 225:5
  239:23 250:9 261:21,21
  308:2 312:4 314:16
  315:17,21 370:13
evolved
119:23
ex
19:8 348:2
exacerbate
348:7
exact
76:15 104:3 201:10
  302:19 307:3 356:7
exactly
71:15,19 87:22 213:19
  218:5 220:3 236:17
  241:4 251:10 269:2
  281:17 290:22 308:8
  321:20 356:18
exam
344:3
examination
4:3 5:11 6:1
examine
343:5
examined
5:16
Examining
201:23 216:12 254:15
  257:7 271:2 279:15
  290:2 386:9
example
25:11 63:23 108:1 110:2
  138:18 153:7 172:17
  177:13,14,23 187:10
  227:18 255:12 307:9
  312:7 332:17 381:15
examples
163:19 164:5 166:11 168:3

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

172:22
exception
82:2 219:21
excessive
140:6 269:7
exchange
19:11
exciting
223:23 224:4
exclusively
202:16 204:11
excuse
122:5 136:3 142:10
257:19 300:3 301:10
361:18
execute
229:4
executed
167:18,18,20 170:14 171:5
executing
374:20
executive
103:11,13,15 193:17
exempt
207:15 350:19
exert
165:15
exerted
119:7,7
exerting
121:16
exhibit
4:7,8,9,10,11,12,13,14,15
4:16,17,18,19,20,21,22
170:2,5,18,21 201:17,20
216:6,9,23 218:1
224:20 237:23 254:10
254:13,19 256:19,22
257:13,17 270:20,23
271:4 279:9,12 289:8
289:20,23 290:12,18
293:4 294:13,18,21
306:11 317:11,14 323:22
324:2 325:9 326:15,19
328:13 334:10,14
352:22 353:2 358:8,11
380:5,6
exists
50:1 51:19 246:1 296:11
296:14
expect
50:20 90:5 189:5,16
258:9 340:5
expectation
100:23
expected
239:1
expense
140:7 248:2 261:15
324:14,17
expenses

324:15,17
expensive
224:2 247:16,18 261:11
experience
45:6 108:13 157:17
181:20,22 182:1,10,14,19
189:8 197:10 199:2,3
206:12,15 212:4 219:12
233:19 234:18 236:6,7
236:13 237:1,3,6,9
238:19 241:17
experienced
8:22 157:18
experiencing
344:20 345:4
expertise
181:2,3 286:14
experts
287:14
explain
65:6 138:16 203:15
230:10 339:2
explained
72:1 408:15
explaining
64:22
explanation
280:21
expose
234:2
exposed
60:12 231:1
express
131:4 246:4 302:8
357:20
expressed
72:3 131:7,8 282:19
357:17,23 393:17
expressive
123:5
extended
86:8
extensive
90:3
extent
79:11 87:3 127:10 138:10
296:20 397:10
extracting
268:23
Extremely
266:19
ex–wife
341:3 348:9
eyes
155:2 162:17,22,23
166:23 167:8 172:5
240:9
e–mail
68:15 101:23 158:9 164:1
171:10 185:10 186:4
187:12,17 188:2,10

207:2,10 212:8 216:2
216:22 217:3 218:9
220:16,23 221:8,10,11
222:2,4 245:21 250:19
256:15 257:15 270:3
289:15 290:10,15 291:12
292:12 294:13,23 311:11
311:11 315:19,21 316:20
324:8 327:2 380:4
e–mailed
268:4 327:3
e–mails
57:23 145:17 184:22
208:11 237:22 259:15
310:16 311:12 334:3

--- F ---

F
410:1
face
116:14 157:16 197:6
255:6
faces
177:5
facetious
401:9
facets
364:13 366:23
facilities
35:7 299:13
facility
61:11 260:8 304:14,18,21
305:3,10 306:5 311:14
313:5 315:13 318:2
facing
252:22 285:6
fact
17:16 64:2 67:19 69:13
90:17 98:20 176:13
180:4 196:5 211:20
211:20 256:6 262:3
267:2 274:11 287:2
318:15 324:13 348:12
368:14,18 377:10 381:1
404:16
factor
224:22 360:19
facts
205:5 250:21 261:17
262:22 274:18
fail
186:19
fair
8:6 246:23 247:3
fall
13:11 90:15 94:3 144:13
144:17 172:22 201:13
203:7,9 205:18 251:8
familiar
58:10 64:14 65:4 92:12

257:2 324:6 327:5
343:14
family
83:15 210:17 238:8 340:1
342:15,20 346:5 361:22
362:2,12 382:10 383:7
383:20,21 384:1
fancy
51:22
far
132:6 137:18 149:15
346:12 377:14
fast
122:21
father
90:23 397:8
father's
396:22
father–in–law
43:1
fear
265:10,17,23
February
103:5,19 139:8 141:11
fee
269:4,6 323:6 331:7,8
feed
238:9
feeding
149:21
feel
69:12 87:13 120:7 131:13
160:1,2 176:9,15 195:16
211:5 239:20 240:13
253:1 296:5 345:13
372:15
feeling
115:16 157:14 176:12
180:15 197:21 206:18
230:12 273:9 274:13,14
fell
338:1
fellow
233:11
felt
71:7 75:3,3,4 81:10,22
82:15 83:17,17,18 87:20
98:22 121:9 132:1,11
160:1 162:14 176:13
185:23 187:3,6,19 188:7
204:10 206:5 224:10
251:4 252:1,7 258:13,14
260:10 261:6,18 266:20
301:16 308:9,13 333:8
342:18 406:19 407:4,8
fifteen
62:17 63:5,8
fifty
82:18 280:22 289:4
341:23 342:4
fifty–page

110:3
fight
133:6 165:11
fighting
189:22
figure
73:1 77:13 109:18 110:14
123:10 193:1 264:18
286:5 298:1 314:18
321:7 322:15 339:16
373:6
file
316:20 321:23,23 322:19
350:1
filed
6:18 19:2 20:11,13 153:9
308:22 321:9,23 328:10
328:18 329:1 336:10
352:18 353:12 388:17
393:6 397:19 398:19
files
390:22
filing
321:12 350:5,9,13 391:20
392:23
filings
395:13
fill
110:4
final
76:1,20 78:3 87:4,9,18
88:6,11 89:18 204:6
211:16
finally
130:17 158:18 159:19
200:2 327:13 398:6
finance
98:23 103:14 135:9,12
193:20,21 345:14 384:3
finances
205:6
financial
53:8,9,10 57:16,17 59:23
60:3,16 61:7 63:13 65:1
70:9 82:20 99:3 108:1
111:16,20 114:8 116:6
118:7,15 139:20,22
140:2 141:5 142:8
147:7 180:20 181:5
185:4,13 200:1 242:18
243:12 252:19 253:8,23
264:1 276:5 282:2
286:22 287:20 313:15
financially
60:11 265:21 285:6
financials
119:20 140:13,14 159:15
252:22 287:22
financing
59:20 72:21 80:9 92:2
93:14 136:19 142:12,13

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

147:14 148:1 267:15
**find**
59:17,17,20 74:13 75:11
80:4,8,8,9 146:10 174:9
207:8 212:10 220:22
221:21 245:20,23
266:14 270:1 286:11,16
294:2 296:19 361:23
390:2,3,6 406:6
**finding**
93:13 218:4 283:14
**finds**
165:15
**fine**
5:22 142:19 148:20 228:6
**fine-toothed**
196:2
**finished**
112:15,16,17
**fire**
314:2
**fired**
169:15 367:13
**firm**
14:22 44:15 73:4,13,23
75:5 93:19 94:1 98:21
108:16 175:23 230:21
**firms**
73:17 75:2 182:7
**first**
5:16 7:10 11:7 15:15,17
24:7 31:11 33:3 34:13
37:11 46:22 55:10,12
56:14,17 64:7 67:4,8
74:12 77:2 87:10 90:19
112:14,21 113:1 114:1,10
114:11,15,16 115:22 116:1
127:9 128:3 148:10,12
152:22 156:11 157:22
166:21 170:15 173:4
195:15 197:14 199:7
217:18 220:19 230:16
287:13 290:15 291:6
320:13 321:6 338:18
346:8,18 347:3,9
397:19
**fit**
334:5 340:1
**five**
11:7 13:2 31:11 44:1
112:13,22 113:5 278:4
278:23 281:1 289:5
331:15 342:2 360:3,9
**five-week**
293:15
**five-week-old**
10:1 11:3
**fix**
332:1,1
**flat**
331:7,8

**flew**
335:9
**flexible**
348:14
**flip**
341:4
**Florida**
26:20 27:6 270:10 318:5
335:8 399:2,13
**flow**
62:4 63:21 116:8,9 190:5
287:19
**flows**
116:10
**flustered**
123:14,16
**fly**
39:17 224:1
**focus**
37:11 92:1 108:5 112:11
113:12 114:2 116:6,9
119:17 228:4 252:22
263:11
**focused**
57:14 108:7 140:16 191:12
202:16,18,20,21 204:11
222:22 228:4 247:15
255:8 377:9 381:11
**focuses**
116:13
**focusing**
37:16 189:19
**folks**
44:18 52:23 65:11 69:1
111:20 131:14,18,19
165:18 213:12 218:21
252:10 272:1 299:22
301:12,12,18 303:16
334:19 405:17
**follow**
83:6 92:22 93:2 155:17
166:13 238:1 259:3
313:17 314:8,21,22
409:15
**followed**
79:10,15 85:7 176:23
177:1 256:14 345:18
**following**
5:12 61:22 160:6
**follows**
5:17
**fonts**
109:1
**food**
236:5,6
**force**
2:11
**forced**
83:3 136:20 337:17
**forcing**
83:11

**Ford**
219:12
**foregoing**
5:6 410:8,12
**forehead**
281:19
**forget**
17:10 134:15 150:5 270:9
297:10 316:5 387:2
**form**
2:17 90:22 299:19,20
321:18 322:2 328:18
**formatted**
217:7
**formed**
143:4 320:1,4 328:9,17
**former**
19:21
**forming**
36:6
**Formula**
25:9
**formulated**
195:7 239:16,17,19
**forth**
81:17 122:21 136:16
**fortunately**
265:4 384:11
**forward**
109:23 121:2 250:21
295:11 301:20,23
325:23
**found**
89:10 393:8 405:23
**foundational**
256:9
**four**
7:4 10:2 15:11 58:21
97:9 112:8 113:11 114:1
130:16 160:11 169:3
179:21 185:15 232:16
296:3 341:17,18
**fourteen**
11:21 12:3
**Fox**
21:8
**frame**
13:10 65:10 120:16 124:19
125:18
**franchise**
27:1 28:3,5
**frankly**
79:22 187:15 229:12
**fraud**
308:10
**Frazer**
362:9
**free**
240:13
**Freeman**
219:19

**Friday**
292:22 319:7
**friends**
42:23 382:9,22 383:6,9
**front**
73:23 243:2,4
**fruition**
295:23
**frustrated**
158:7 174:4 243:5 248:8
**frustrating**
241:10,20 243:14 348:16
**full**
2:11 6:5 318:13 399:4
**function**
81:13,18 371:17
**functions**
53:4,5
**fund**
151:9
**funding**
79:20
**funds**
159:19
**further**
22:3 82:3 219:17 353:20
409:21 410:16
**furthered**
225:13
**future**
116:10 127:14 295:11

**G**

**gain**
97:17
**Gamble**
55:18,19
**Gambling**
17:13
**game**
161:5
**games**
17:9
**gaming**
17:4
**gastroenterologist**
343:16
**Gatorade**
55:7,14 128:21,22 130:21
131:15,21 143:18 144:15
147:16
**general**
166:4 217:8 228:4 278:8
278:17 378:23 393:1
395:3 397:11
**generally**
166:3 278:14
**generate**
263:13
**generated**

**75:22 331:2**
**gentleman**
43:23 46:21,23 57:13
72:16 134:17 331:23
**Georgia**
24:19 27:6 31:10
**getting**
29:9,11 61:15 78:18 94:18
101:19 117:23 122:20,22
123:14 128:10 146:21
149:4 189:2 191:14
228:12 281:18 312:3
319:6 321:21 332:14
356:2 377:14
**Girardeau**
21:17
**girl**
384:13 385:9
**give**
38:13 42:5 69:12 75:15
81:18 94:12 108:22
153:6 179:16,17 187:6
187:10 214:23 235:3
284:4 310:3,12 316:22
317:3 318:7 326:2
374:7
**given**
6:20 15:11 18:22 80:16,16
84:1 202:8 257:23
279:5,17 309:22 314:13
316:9,10,13,14 360:8
372:17 410:14
**giving**
18:1 73:18 140:17 241:16
290:4 316:16 317:3
**global**
166:12
**globally**
116:22
**Glovis**
329:4,10,11,14,20 331:9,19
331:22 332:1 334:7
335:20 336:4,8 339:22
340:11,16 341:11 361:5
**glowing**
88:4 196:8,8
**go**
6:9 7:7 20:22 21:13
23:11 35:11 39:8 42:7
51:21 57:22 59:19 62:6
75:10 79:2 82:11 96:2
100:4 109:23 119:10,14
130:1 133:15 146:9
159:3 165:4,17 166:16
166:18 174:9 176:1,17
177:12 190:22 198:6
199:22 200:1 201:2
211:3 213:16 220:22
221:21 223:19 224:2,16
228:20 235:17 237:20
238:13,22 258:20

Tyler Eaton Morgan Nichols & Pritchett, Inc.

259:17 263:8 264:14,15
264:20 282:5 283:2,9
284:9,10 291:19 292:1,4
292:19 301:3,4,20
304:1 305:2 310:6
311:13 313:9 314:18
315:5 325:23 333:6
345:15 349:16 366:21
367:23 368:1 370:6
374:2 377:8 383:16
394:9 408:11 409:17
**goal**
97:22 98:2,3,9,11 99:4
**God**
264:1 384:12
**goes**
92:7 256:8
**going**
7:4 9:15 14:13,22 15:23
19:11 20:10 24:19 28:17
28:22 29:4 39:20 42:5
45:4 54:18 58:7 65:2
69:11 71:12,16 79:1
81:4 88:19 89:6,8 91:18
91:22 97:4,7,12,14,18
108:18 109:2,18 111:4
116:21 124:7 125:5
136:6 138:4 142:6
144:22 146:17 149:20
150:17 155:11 162:10
163:10 164:16 165:1,10
165:12,12 166:1,16
167:11 168:2 170:4
172:9,21 174:5 176:17
186:12,14,19 190:1,7,8,11
190:21 194:12 197:3,14
198:12,13,20 199:14,21
201:19 206:2 213:11,14
213:16 220:16 221:1,3
221:10,12 222:21 228:1
230:22 232:11 234:21
235:10,20,21 242:5
248:13 254:12 262:8,17
264:22 266:13 267:9,14
268:11 270:4 272:18
274:3 276:11 278:2
279:11 280:12,15 281:15
284:5 286:17,19 287:7
287:8 289:3 290:17
293:15 295:10 297:12
303:4,19 306:4,7
307:22 314:2,17 316:22
316:23 318:16 320:22
321:8,8 325:20,22,22
333:4,23 334:12 337:4
339:23 342:20 344:9
345:10 354:18 355:23
358:10 360:20 365:19
376:9,12 384:10 389:5
389:6,7 391:13 393:7
395:15 398:5 399:3

407:14 409:14
**good**
6:2,3 24:3 28:4 56:6
71:8 75:3,5 83:7,8,12
99:10 115:16 131:14
132:2,12 134:9 135:1
141:12,18 157:13 187:20
188:7 192:2,6 219:11
230:11 260:12 262:13
263:2 265:6 266:7
312:19 334:5 338:19
339:23 348:21 361:16
361:16 384:13 395:21
409:17
**goods**
25:7,7 102:3 108:14
235:6,7 236:21 237:1,6
**Google**
74:13
**gosh**
134:21
**gotten**
68:4
**grabbing**
327:11
**grad**
22:12
**graduate**
21:6,10
**graduated**
23:20 24:11
**graduating**
22:4
**Graham**
300:9,11,12 303:9,10
**Grant**
300:10
**granted**
90:15
**grasp**
69:14 236:3 237:12
258:10
**grateful**
256:11
**great**
7:21 137:9 139:3 184:13
219:10 230:18 238:13
**greatest**
263:14
**greatly**
110:23
**groggy**
10:6
**Gross**
272:4,23 274:17,19 275:2
**ground**
7:7
**grounds**
2:20
**group**
72:6 118:18 147:21 234:1

302:5 330:3,8,12,18
**grow**
20:17 97:6 226:15 266:14
400:12,16
**growing**
99:5
**grown**
54:21
**grunt**
241:13
**guaranteed**
140:12
**guarded**
230:13
**guess**
30:13 42:7 72:9 103:2,4
154:12 165:14 166:19
197:20 198:4 233:11
264:11
**guy**
40:14 64:18 66:4,15
86:17 124:7,10,12 129:6
129:17,17,21 133:17
134:12,15,16 156:1
159:5 168:11,13,14
204:16 249:9 260:12
298:4,15,18 299:4
300:9 335:13
**guys**
8:15 79:2,3 113:19 140:12
168:10 190:4 198:11
281:14 335:22 352:3
354:11,15,20,21 365:18
**guy's**
66:14 74:10 229:16
270:10 299:9
**G-R-A-H-A-M**
300:11

───────── H ─────────

**H**
4:5
**hair**
8:16
**half**
60:19 61:19 64:5 141:23
145:8 232:14 246:21,21
263:22,23 269:6 289:18
318:14 325:20,22 326:2
339:3 360:4,9
**hall**
93:23
**Halla**
335:23
**hand**
139:15 170:4 201:19
279:11 317:13 358:10
391:23
**handed**
55:3 76:18 195:10 326:18

**handing**
170:20 216:8 270:22
353:1
**handle**
181:5 276:13 357:11
**handled**
94:20,23 137:19
**handling**
129:22
**hands**
214:18 312:8
**hand-deliver**
327:1
**hand-delivered**
327:4
**Hang**
242:23
**hanging**
318:6
**happen**
96:7 166:1 293:14
**happened**
28:16 36:14 82:7 147:4
148:9 172:17 194:18
238:22 285:20 287:1
288:22 296:9 297:22
398:21
**happening**
71:19 150:13 168:18
395:17
**happens**
338:14
**happy**
8:10 71:10,11 255:10
283:23
**harassed**
172:19
**hard**
160:1 227:16 230:10
238:6 255:4 315:21,22
338:7 391:2
**harder**
133:6
**hat**
213:21
**head**
28:9 53:12 57:11,23
130:15 187:19 212:16
242:14 296:18 335:5
**headed**
33:5 36:2 54:7
**heading**
54:11,14 136:7 159:17
**headquartered**
24:6 31:13 139:1
**heads-up**
84:1
**health**
9:14 242:19 288:3 299:6
301:5 302:2 386:10
**healthy**

**228:8**
**hear**
7:20 105:10 173:20 209:3
209:8 251:12 370:22
371:6 400:1 401:18,22
402:3 404:3,5,8
**heard**
79:6,23 80:2 179:11,12
209:5 230:16 401:4
403:15 405:8
**hearing**
148:15 149:3,5,7 250:21
281:23 410:15
**heart**
174:6 343:5 362:17
**heated**
19:11 357:22
**Heather**
1:21 2:6 5:1 7:17,20
**heavily**
227:18
**held**
18:10 27:19 54:22 56:15
57:16 106:18,21 107:23
111:16 276:18 324:11
325:11,12
**help**
34:17 35:12 36:8 44:18
50:18,23 72:23 146:6
146:14 150:19 203:22
272:16,18,20 320:14
321:11 367:15 368:5
400:11
**helped**
38:16
**Henry**
20:8 58:4,12,19 96:20
99:8,18 104:6,9 106:4,9
106:10,15 108:12,12
113:15 124:11 127:11,19
127:23 128:3,9 132:9
138:1,7 140:23 146:2
150:9 154:22 155:9,20
156:13 158:5,17,18
160:9,15 161:16 163:6
165:19,19 177:1 178:11
178:18 184:20 188:5,18
197:2 198:12,19 199:1,9
202:13,20 206:2,6,11
207:2 208:15 210:9,19
211:3,3,4,22 212:3,8,20
216:3 217:4 218:10
222:18 225:11 226:11,11
227:22 228:3,15 229:10
231:20 233:6 236:20
241:2 242:8,8,9,11
243:2,7,18 244:17
247:2,4,6 251:15,20,22
252:3,9 269:8 271:15
274:20 275:13 276:3,8
277:2,6 278:12,12,14,17

Case 2:05-cv-01207-MHT-TFM    Document 77    Filed 10/29/2007    Page 118 of 172

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

283:12 287:4 288:11
290:11,21,23 291:3,9,16
291:22 304:3 311:16,21
328:11 353:16 355:4,9
356:21 364:12,19 365:2
365:6,21 367:1,5,8,9,12
367:15,19 368:1,1,2,10
368:19 369:1,18 370:9
370:12,18 372:11 373:17
374:10,22 375:22
376:4,13,19,23 377:8,20
378:20 389:18 402:3
406:13,15
Henry's
196:12 209:22,23 210:5
247:16 250:11 273:20
389:18 407:15
Henry-bashing
379:6
heretofore
243:19
Hershey
56:2 125:12 126:1 133:23
165:7,15
hey
155:18 184:12 187:21
195:19 198:10 238:12
246:3 296:21 303:4
321:18
He'll
179:16
Hicks
6:16 20:8 58:4 96:20
99:8 104:9 106:9
124:11 127:19 138:2
154:22 160:9,15 161:16
163:6 175:7,7 178:18
198:20 199:2 206:2,6
206:12 211:22 212:3,8
212:20 216:3 217:5
218:10 222:18 225:11
231:20 233:6 236:20
237:5,11 238:3 244:17
247:2 251:15,20,22
252:3 271:15 275:13
276:8 277:6,12,17
278:18 283:13 287:5
288:11 290:11 304:4
328:11 353:16 355:1,2
356:21 364:12 365:1,2
365:6 367:1,6,15,19
368:19 369:2,19 370:9
370:12 371:16 375:10,15
376:20 377:20 378:20
390:13 402:3 406:13,15
409:7
high
20:22 21:7,8,11 23:15
248:4 381:2
higher
210:16

hire
45:1
hired
36:16 57:10 104:19,22
196:7 221:3 273:21
history
23:12,19 41:9 358:23
hit
29:23 195:19 281:18
331:6
hitting
190:10 191:6
hold
32:5 108:2 229:13 302:21
302:23 409:6
holding
118:6,7
Holiday
46:15,18 47:12 49:18
51:10
home
283:2,9 284:9,10 292:20
304:9 325:23 341:9
honest
22:22 159:14 303:22
hooked
80:1 233:12
hope
133:13 344:13,14
hoped
229:14
hopefully
14:15
hotels
247:17
hour
82:18 297:22
hours
9:21 304:17
house
233:11 393:19
Huge
140:5
human
103:17 353:15
humiliating
178:3
hundred
50:4 51:4 82:18 114:5
158:13 188:17 231:16
255:19 256:6 271:20
323:6,8 336:17,18
341:19 359:15,19,20
hundreds
68:18 145:17 202:12
husband
297:15 397:13
husband's
297:17

I
Iced
126:3 130:10 143:7
147:16
idea
184:8,13,17,18 188:9
200:16 203:17 225:13
239:18 347:2 350:1
400:14
ideas
38:6 173:19 174:23 175:1
179:23 180:2,4 183:20
184:2 187:2,9 188:6
191:8
identification
170:3,19 201:18 216:7
254:11 256:20 270:21
279:10 289:21 294:19
317:12 323:23 326:16
334:11 352:23 358:9
identified
85:10,13 86:20
identify
369:1 379:15
ignore
183:19 184:1 187:1
243:23
ignored
164:18 173:19 174:22
175:1 179:22 180:2
ill
264:10
illegal
17:13 196:19 291:16,21
Illinois
214:9
illustration
163:17 177:19
imagine
201:5
imaging
362:16
immediately
40:6 101:11,12,15 291:14
394:4
impact
9:6,12 243:12
impacted
256:4 382:8,11
impacts
9:10
important
255:9 306:22 308:17
309:3 315:11
impress
230:22
impression
138:2 141:21 180:3 205:1
215:18,20 274:22
350:19

impressions
215:15
improve
97:23 357:2
inability
258:17
incentive
82:21 256:4
incident
141:14
incidents
172:16
included
160:20 311:7
income
323:19 332:6
Incorporated
24:2,5
incriminating
315:16
independent
73:18 74:6
indicate
215:10 225:1
indicated
265:16 303:12
indicating
224:20 237:23 310:3
345:13
indication
224:19,19
indirectly
211:1
individual
17:20 161:3 238:17
individually
160:15 196:2
individuals
83:20 152:23 160:6
299:17 369:2
industry
199:2 235:6,6 236:3,6,21
237:3,7,12
ineffective
88:2
inefficiencies
37:17,20
inference
222:9
inferred
221:8,9,11 366:16 368:20
374:16
inflexibility
348:5
influence
15:21,22 264:12
information
16:2 71:18 140:3 149:22
234:7 241:16 288:20
307:5,14,23 309:13
310:19,20 311:1,4,6

312:3 313:12 316:11
321:22 327:20 390:17
informed
328:11 394:15
infuse
62:14 286:13
infusion
90:21 97:6
initial
46:4 225:18 392:13,23
initially
296:4 393:4
initiated
291:7
Inn
46:15,18 47:12 49:19
51:10
inner
208:20
insert
81:6
inside
149:8 288:14
insight
288:2
insignificant
176:15 211:6
installing
147:1
instance
290:16
institution
72:21
instruct
249:7
instructed
83:6
insulate
99:6
insulting
156:12
insurance
347:12
integrating
37:12
integrity
261:10
intend
160:23
intended
108:5 372:9,10
intending
197:19
intensity
177:2
intent
178:4,6 213:7 264:11
368:16 380:11 391:21
intention
228:20
intentional

Case 2:05-cv-01207-MHT-TFM    Document 77    Filed 10/29/2007    Page 119 of 172

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

308:10
intentions
207:23 212:20
interacted
383:18
interest
214:8 259:22 260:21
261:5 262:2 293:23
296:5,7 297:2 298:19
298:22 299:14 301:7,8
301:10,17,19 302:8
303:14 333:9 390:4
interested
302:5 410:19
interim
331:20
intermediate
104:7
intermittent
222:23
internal
33:10 36:6 209:16
internally
109:20 138:4
internet
171:9 321:22
internship
24:10
interpret
220:15
interpretation
131:11 404:23
interrogatories
358:16
interrogatory
68:11 386:2
interruption
107:20 122:17 387:23
interview
43:16,19 44:2,8 45:20
46:4,9 47:10 335:9,11
335:13,21 346:9
interviewed
40:4 43:5 335:7 336:2
interviewing
44:10 361:21 362:12
interviews
46:4 334:6,23
intimately
17:17 64:14 65:3 92:11
intimidating
176:10
introduced
45:12,19
IntroLink
320:2 322:2,6 323:2,18
328:9 332:3
introlink@bellsouth.net
324:7
invest
89:22 94:18 143:9,14

144:3,6 145:4,8 146:18
invested
90:2 147:9 299:12
investigate
392:22
investing
144:15 298:21 302:6
investment
59:18,20 80:4,8 93:13,19
93:23 94:5 143:8,19,22
145:20 297:3 301:15
investor
286:12 293:22
investors
136:1,4 270:1,4 296:6
302:1 312:9,23 316:12
316:14
invests
144:12
invite
219:18
involve
79:14
involved
17:17 24:15 38:3 45:13
77:14 78:17 80:21
127:22,23 128:5,6,7,8,11
135:19 144:14 145:21
146:3,11 147:18,20
150:20 151:2,7,12 157:3
185:3 192:19 193:1,6,11
194:2,3,6 195:6 200:6
202:14 203:1 208:7,12
208:16,17,18,23 214:2,6
221:23 223:21 225:12
227:1,19 231:22 232:4
245:5,7 246:11 249:14
249:21 264:2 267:12
320:17,20 321:20 356:3
369:9 386:19 396:18
involvement
93:12,17 94:17 101:21
127:21 193:14 194:21
209:1 222:23 268:21
369:7,17,18,21
Iran
246:22
irrelevant
209:19
irritating
265:3
issue
84:8 164:20 228:18
250:22 259:23 260:22
261:2 265:1,3 322:10
344:23 361:7 396:16
408:18
issues
61:16 69:14 82:15 83:19
120:1 182:18 243:22
285:6 357:9 358:6

360:23 377:16 386:4
388:15
item
314:6,7
items
218:14,20

---
J
---
J
3:11
Jacksonville
26:19,22 27:14 32:1
335:8
January
75:18,19 78:3,20 87:6
88:7 91:11,15 102:20
103:4,18 105:3,5,17
121:2,5,10,14 122:9
127:16 139:8 141:10
170:14 185:8 202:1,5,19
203:3 204:6 359:4,11
408:10
jargon
152:19
Jay
3:6
Jeff
20:5 95:13 96:13,14 99:8
99:11 104:21 127:10,18
127:22 128:7 130:4,6
132:7 138:1,9 154:22
156:22 160:9,15 161:13
177:1 181:18 185:1
208:14 227:18 228:11
230:4,5,6,7,7 232:9
245:18,20 246:5 250:19
251:8 288:11 299:10
365:12,13,20 366:3,6
370:8 374:21 401:22
408:8,11
JEFFERSON
410:5
Jeff's
246:4
Jemima
56:2
Jenkins
335:10,20
Jennifer
3:11 6:15 196:13 326:10
Jerry
1:7 179:14,15 284:20,21
286:7 297:14 318:21
350:12 351:22 352:14
386:16 393:3 404:12,14
407:11
Jerry's
404:23
jets
224:1

Jewish
246:21
Jim
393:10,15 394:19,20
395:2
job
29:20 34:12 40:5 41:2,10
44:10 45:23 48:11,14
51:23 58:14 59:16 80:4
103:16 106:18,21 107:13
107:14,16 109:3 112:9
113:11 114:9 115:6
116:20 118:20 119:1
120:12 121:15 122:6
123:11,19 124:8 150:11
156:1,4,5 158:5,11,13,19
158:20,23 174:9 189:6
189:10,13 190:12 191:16
194:16 199:6 200:14
221:21 224:9 226:17
229:10,14 234:20 242:4
278:5 279:3 293:16
312:19 322:14 336:7
337:18,18 338:13
355:14 356:12 364:13
366:23 367:12,14,18
374:10,12 375:14,20,21
377:21 378:21
jobs
24:20 40:22 100:22
150:8 393:8
join
24:23 48:6,20,21 49:4
50:7
joined
31:13,16 46:22 47:1 52:14
339:18,19,22
joining
47:4 302:5
joint
18:16,18
joke
407:14
journal
307:10 313:11,13,19,23
314:6,11
journals
307:11
jovial
383:11
judge
318:11 333:6
judgment
83:7 181:15 182:14,15,17
407:11
juice
145:12 147:11 235:17
Juicy
145:12 147:11
July
171:6 259:1 280:4,8,12,16

326:8 329:15 330:13,14
333:12,12 353:20
356:11
June
31:5 36:12,13 39:1 104:23
105:3,13,19 106:12
114:18 136:23 137:4
148:5,23 149:3 194:18
201:4,7 209:2 226:5,8
226:22 227:6,8,9,12
275:8,15 276:19 279:17
280:4 287:10 288:23
304:2 313:1,2,3 319:3
320:4 322:1 331:18
353:14,23 356:5 359:21
359:23 371:22
junior
24:9
jury
167:14

---
K
---
K
3:4
Kathy
362:8
keep
77:14,14 115:14 116:20
158:20 186:18 189:1
195:3 251:2 255:8,9
286:5,16 307:11 313:12
321:7 328:2
keeping
116:6 324:21
Kellogg's
125:12,23 126:23 130:3,9
134:5 138:19 141:11
299:9 300:5,17 302:4
302:10 303:2
Ken
128:22 129:1,2,3,4 130:20
131:16 132:1,2,10 134:7
Kennety
362:15
Kent
129:3
kept
58:15 108:6 250:16
308:19 313:11 316:6
328:4 364:11 366:22
367:5 395:12
key
112:3 221:13 255:9
263:12 301:4 308:20,20
333:23
kicked
312:12,14
kidding
198:11
kids

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

39:16,19 322:11 338:2
361:2,7 396:21
killing
201:15
kin
410:17
kind
22:15 23:4 28:2 42:9
50:22 53:18 54:22
74:2 75:16 82:12 102:3
117:8 128:3 136:13
143:17 148:18 157:22
169:3 173:21 176:5,6,10
209:13 220:19 227:5
228:3 231:9 234:18
261:2 279:5 296:4
308:5 311:6 313:12
320:7,11 323:6,9
327:13 343:4 357:14
388:19 389:10
kinds
379:2 395:16
knew
16:2 40:3,13 42:23 44:22
44:23 45:3,4 113:10
138:3 142:19 159:16
165:11 174:5 196:4
210:3,9 229:12 234:1
248:7 286:20 371:16
376:5,6,18 377:4
378:11,14 389:8 393:6
knocked
114:20
know
7:2 8:1 16:2 19:9 28:8
29:1 37:22 38:2,6,7,15
41:3,6,7,18 42:21 44:14
44:21 45:18 46:16 50:3
50:9,15,19,21 51:1,15
56:16 58:6 62:13,16
63:1 64:1,12,21 65:8
68:1,5 69:13,17 70:1,7
70:10,16,17,21 71:2,3,7
71:9,16 72:10,19,19
74:17 79:8,21,22 82:6
82:20 83:3,7,21 84:5,8
87:15 88:14,15 89:22
89:23 90:4,5,13 92:1,6
92:9,15 93:8,15 94:11
95:14 97:18,21 99:15
104:15 106:6 108:9
109:17 112:2,15,16
114:17 115:1,2,5,8,18
116:8,12 119:9,15 120:5
122:14 123:5,6 124:5
127:11,13,14 133:5,7
134:23 135:16,18 136:13
137:10 138:5,22 139:10
139:18,19 140:9,15
142:2,11,15 146:7,13
147:4,14 148:15,19,22

149:11 150:16 151:21
153:17 155:16 156:19
157:1,12,17,19,20,23
158:2,20 159:2,4,5,11,21
164:15,19 165:20 167:13
169:7,13 170:8 171:1
173:14 175:2,19 176:6,7
176:11 177:11 178:13,13
179:14,17 180:6,6,16,23
181:23 184:13,14,20
185:15,19 186:7,23
187:15,19 188:4,6,8,18
188:18 189:1,10,12,17
190:6,7,9,15 191:3
192:7 193:1 194:11,13,17
194:19 195:7 196:11
197:9,13,15,20 198:6
199:7,17 201:2,9,12
203:14 205:5 207:13,17
207:17 209:1,16,17,18
209:20 210:11,12 211:5
212:21 214:5 220:4,10
220:12 221:19,22 222:1
223:4 224:1,8,14,15
225:4,5 226:19 227:4
227:21 228:7 229:15
230:8,20,23 231:3
233:6,17,20,22 234:4,5
234:5,7 235:11,15,18,21
236:5,10 237:5,16,19
238:20 239:2 241:1,4
241:21 242:2,5,7,10,14
242:14 243:9,19 245:4
245:23 247:16 248:22
249:13 250:18 251:1,7
258:18 260:12 261:13
264:4,6,19 265:1
267:15,22 268:2,22
269:2,2 274:1,1,12,18,19
275:1,22 285:13 286:7
286:9 287:9,12,15,18
288:9,16,21 289:16
291:11 292:16 296:6,7
297:9 300:20 301:6
302:1 303:5 305:19
307:6,7 308:3,7,8
311:10 312:9 313:14,16
313:23 315:14,21 318:18
319:2 322:8,9,21 323:7
325:17 326:11,11 327:11
328:10,20,22 331:6
338:12,15,18 339:2,2,5
339:13 340:2,2,4,6
345:5,10,11 346:8 347:1
348:23 349:22 351:2,3
351:4,17 352:4,7
355:14 356:18 357:4
358:2,3 361:6 367:10
368:10,11,16 369:12,21
372:2 373:17,18 374:1
375:2,22 376:11 377:16

378:13 379:9,13 380:22
381:10 382:23 383:4,13
383:14,15 385:13
387:12 388:4 389:10
390:18 391:18,19,22
394:1 395:13,14,17
405:14 406:9,15,17
407:11,13 408:14
knowing
234:17 339:22
knowledge
9:8 47:23 54:20 65:20
94:22 135:11 151:16
233:18 245:9,11 250:2
250:4,6,8 259:11,15
318:14 357:19 368:5
371:18 373:22 375:9
401:21
known
185:14 196:5 220:21
321:3
knows
374:9 398:19
K–E–N
129:4

L

L
2:1
label
400:15
labor
86:2 116:8
LaBree
132:16
lady
175:22
laid
395:17
Lake
214:9
Lampert
88:20,21,22 89:1,5 92:7
175:11
lapse
8:22
laptop
309:3,6,8,14 315:12 316:2
316:4,18 318:7 319:14
319:17 325:5 326:1,3,9
328:1 389:18 390:14,23
391:3 399:3
Large
5:3
larger
27:14,15
largest
35:20
Larry
6:17 20:5 96:14 99:8,11

127:10,18 132:7 138:1
154:22 160:9,15 161:13
181:18 230:5 232:9
245:18 250:19 288:11
365:12 369:1,6 370:8
401:22 409:7
late
52:2 56:20 61:15 161:4
194:18 305:4 311:14
333:12
latest
324:15,17
Laura
361:19
law
3:5,6,12,18 14:21 17:4,9
108:16 154:10 175:23
177:9 196:15,22 207:13
308:7 350:11 351:10,16
352:4 366:10 392:15,22
394:13
laws
2:12 350:20
lawsuit
6:17 147:4 153:8 161:1
313:21 363:4 387:18
393:15 396:13 397:9,17
397:23 398:13 409:10
lawyer
214:21,23 309:23 314:14
351:5,8 394:21
lawyers
6:16 386:13 406:1
lawyer's
351:6
lay
367:17
laying
208:11
lead
186:1,5 258:5,17
leader
87:2
leaders
320:23
leadership
83:19 119:5 258:1 263:11
263:19 293:13
leadership/ownership
263:10,16
leading
2:18 15:23 154:12 194:20
leads
195:13
learn
236:10 237:13 238:18
learned
238:19 333:7
leave
28:19,21 104:17 184:6
329:14

leaving
291:14 339:10
led
49:18 73:3,5 136:14
182:8,23 183:11 185:17
206:21 398:22
Leeks
93:22
left
30:20 39:1,9 41:19 51:5
80:22 81:3 89:2 101:12
159:20 226:9 260:14
267:21 270:16 300:22
307:4 329:15,20 336:3
341:14 347:11,11 348:17
349:1,2,14 355:15,23
356:14 384:20
leftover
327:16
left–hand
353:4
legal
14:10 18:18 152:19 222:1
321:14,15 349:19
lender
136:18
lengthy
393:7
Letitia
272:7 273:4,21 399:21
letter
49:1 51:11,14 101:20
254:21 279:16,21 280:9
296:2 299:3,7,18,19,20
300:20 301:1,9 303:5
317:9,15,20 318:6 319:2
319:7,9 324:19 326:21
327:5 369:16
letterhead
202:3
letters
68:6 298:3 299:16
333:19,20
letting
289:16
let's
10:19 15:14 25:1 26:8
42:11 55:11 56:14 57:4
61:9 71:15 88:15,16,16
124:18 157:16 159:12
164:11 173:4 177:12
193:19 195:2,16 229:17
239:3 245:13 246:4
285:9 302:22 325:2,11
361:18 364:17 388:14
407:2
level
91:18 127:23 177:2
226:13 230:23 331:6,7
levels
127:21

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

leverage
97:15
Lewis
3:6 406:9
Lex
93:22
liability
83:10 261:5 262:21
liable
262:18 409:8
liaison
34:11
license
323:9
lie
293:10
lied
288:6
life
121:19 176:18 248:4
339:4 348:1 383:3
light
223:20
limited
258:10 266:4
limits
248:15 249:4,5,8
Lindsey
343:9,18
line
85:22 86:2 130:21 133:7
149:17 171:2 267:16
282:6,14 352:8 399:15
400:13
lines
48:22 71:23 115:3,17
282:11 287:6 291:11,13
357:6 375:8
lingering
338:4
lining
301:22
liquidation
265:10,17 266:1,6,11
list
126:6 130:14 134:4
162:12 166:17 334:17,19
335:2 360:15 362:15
listed
127:3 169:4
listen
188:6 215:22 246:4
listened
184:10
literally
137:14
litigation
16:9 30:4,14,16 388:1
little
10:3,6 12:17 50:9 65:5
98:11,15 99:13,17

105:17 115:4 117:3,14
119:16 122:21,23 124:15
132:17 133:1,2,6 135:3
203:16 210:14 223:17
225:4 230:19 231:4,6
232:2 233:14,22 236:3
241:10,23 251:5 264:6
264:7,9,21 272:9,18
273:23,23 282:17 288:1
301:5 303:7 325:15
327:16 348:5 374:1
381:6,8 392:7,8 393:2
396:17 397:18 402:22
live
12:14,20 31:10 322:22
385:5 396:7
lived
10:17 12:19 13:2,3,13
20:21 223:6 399:12
lives
10:23 11:2,3 12:15 393:11
393:12 396:8 397:4,5
living
39:5 248:4
LLC
1:10 3:6 321:19 323:16
Lloyd
129:7,7,12,16 298:9
300:6 302:13 303:1
loaded
20:19 21:5
loan
90:14,22
loans
90:12 147:15
local
40:3,12 42:14 335:17
Loeb
40:4,13,20 42:15 43:7,12
45:21 46:5 47:15 48:13
49:17 52:17 65:17 78:7
84:21 86:20 87:20
101:3,4,9 309:11,13
319:14 355:21,22 356:3
386:15 387:11,17 388:7
389:3,15 391:7 408:3,5
408:16
Loeb's
85:3
Logistics
37:6,9 38:22
long
10:17 11:13 12:16 14:17
26:6 28:11 33:15 34:2
35:14,17 36:9 38:21
57:1 74:14 80:14 155:11
186:20 200:2 332:14
333:9 340:18 393:7
398:7
longer
86:12 135:9,12 158:21

192:23 265:17 280:12
285:19 296:17 329:12
longstanding
257:23
long-term
229:18 339:23 386:12
look
38:16 48:20 51:21 57:22
75:9 82:19,23 85:23
86:1,4 119:2 140:15
141:4,4,22 155:14,15
158:19 173:18 176:3,4
176:10 182:22 216:11
217:9 279:13 290:5
296:21 299:5 332:19
346:23 359:12 361:17
looked
126:6 130:14 134:19
174:14 176:7,14 183:2
196:1 389:23
looking
70:8 92:17 128:3 140:14
215:19,20 250:21 261:6
264:10 274:6,7 278:5
279:3 287:19 293:16
322:15,16 332:17
339:21 351:11,14
looks
170:10,16 171:3 176:9
177:5,6 217:6 261:9,11
324:6 327:5 338:19
352:4,6,7
loose
333:13
lose
8:15 251:6
losing
60:19 61:19 64:5
loss
8:22
lost
112:13,18,22 113:5 189:22
252:21
lot
29:3 32:20,20 33:10,11
34:15,15,16 35:7 49:11
60:3 62:21 64:15 70:19
70:20 75:21 91:17
115:11 117:23 134:17
147:9 156:17 172:16
175:20 199:8 200:5
203:20 204:21 209:16
222:17 223:5,23 224:3
225:20 232:3,11 238:5
238:9 252:13 261:14
285:6 298:21 307:4
320:21 322:16 358:4
363:10 381:12 384:8
Louis
397:6
Louisiana

24:10 126:11
love
385:9
loved
174:3
loves
142:18
lower
337:18
loyal
408:3,5,6
lucrative
50:6
lunch
166:15,18 168:3 169:21,22
171:12 247:19,20,21
275:22,23 304:5
lying
354:21
L's
396:5

_____M_____

MacCartney
1:7 284:21,22 350:13
351:23 352:15 393:3
404:12
mail
327:1
main
66:19 74:8 98:3 107:16
116:12 124:21 127:2,7
127:17 128:16,17 129:9
130:7,11 131:21 134:11
134:14 205:4 227:4,11
228:22 251:21
maintain
262:13
maintenance
53:7 89:23 90:6
major
90:9 91:16 164:19 165:3
220:11 386:10
majority
214:7 387:20 409:1,2
making
50:4 51:4 62:19,21 140:18
141:1 150:22 151:4
177:4 183:5 185:1
214:12 228:7 236:4
243:7,10 244:23 301:17
321:2 329:9,19 330:17
336:22 341:10 359:14
402:18 404:16
male
355:5,10
maligned
267:2,3
man
9:2 53:3 58:6 197:16

242:10 246:20 247:8
346:22
manage
60:14 95:17 96:11 107:23
113:13 115:7 116:2
188:20 190:12 321:1
managed
72:19 115:22
management
60:16 147:22 191:19
205:16 212:11,22 214:3
214:6 255:8 269:6
406:23
management's
191:16
manager
32:13 33:19 34:3,10 53:7
53:7,9,10 57:10 60:6
66:8 85:16 353:16
managers
207:9 208:1 334:1
managing
33:11 56:5 116:1,4,22
118:4 120:1 132:23
190:5 248:3
manipulate
264:8,8
manipulated
391:2
manipulative
258:12
manner
178:16
Mansfield
129:10,11,14
manufactured
27:1
manufacturer
261:20 263:7
manufacturing
61:11 114:12,13 207:21
212:19 380:1,2 400:13
March
32:7 34:5,5 35:15 93:8
196:6 231:14 254:7
359:23 362:16
margin
331:1
marginalization
163:4 210:15
marginalized
162:8,15,16 163:1 166:22
172:7,18 240:9,19
251:19 252:8,15,21
253:2
Mark
343:9
marked
170:2,5,18,21 201:17,20
216:6,9 254:10,13
256:19,21 270:20,23

Tyler Eaton Morgan Nichols & Pritchett, Inc.

279:9,12 289:20,22
294:18,21 317:11,14
323:22 324:2 326:15,18
334:10,13 352:22 353:2
358:8,11
**market**
50:9 335:17
**marketed**
27:5
**marketing**
24:15 47:7 49:5,9 57:15
57:21 58:5 100:8,21
198:21 204:12 206:3,8
211:23 212:5 223:12
234:20 241:3 353:17
355:17 365:7
**marque**
223:22
**marriage**
11:7 15:1 39:22 361:8,8
**marriages**
396:20
**married**
9:2 11:13 12:16 15:2
340:10 384:13
**mass**
26:14 219:22
**Massachusetts**
13:5 36:23
**materials**
148:17 327:7
**matter**
67:19 90:17 98:20 115:5
125:8 152:7 155:20
196:6 224:21 404:1
**matters**
17:7,16
**Mattson-Shoemaker**
361:20
**Mayer**
175:7,7 350:13 351:22
352:10 392:4
**mayonnaise**
54:5 188:19 199:8 222:23
224:4,11 375:23
**MBA**
22:10 234:11
**MBE**
95:16 97:15 100:1,1
168:12 196:21 207:13
219:21 220:11 365:23
377:10,12
**MBEs**
220:6
**McGahey**
3:11 4:3 5:22 6:1,15 56:9
56:12 68:4 113:23
166:16,19 169:20 177:15
177:20,22 239:3,7
276:17 314:17 315:1,5,9
326:17 337:18 349:8

351:1 387:9 399:16
400:22 409:13
**McGlon**
117:11 175:7,8 285:1,2
297:19 330:5 350:5
387:5,6 392:18 397:12
397:16
**McGlon's**
397:13
**McLennan**
104:10,20 105:4,8,20,22
106:1,5 196:7 226:7,8
**mean**
7:4 16:17 22:6,8 30:10
32:16 33:9 37:19,21
39:19 41:3,6 42:1,7
43:8 44:21 49:10 50:1
50:3,14 57:18 58:11,13
62:15 65:5 67:12 68:18
70:3,5,23 75:21 77:21
83:21 90:4 91:8,17,19
91:21 98:3,13 99:16,18
103:23 104:13 106:5
108:12,14,21 109:12,13
109:14 111:23 112:2,15
114:10,12,16,22 115:9,11
115:16 116:8 117:22
118:9,16 119:6,13,17,22
125:9 126:5,10,17
127:20 128:20 133:10,11
134:23 136:14 137:8,11
137:14,17 139:10,15
140:7,8,20 142:20
146:7,15 148:12 149:17
149:23 150:1 151:20
152:6,15 153:6 156:9
157:6,16,18 158:8 159:4
159:12,17 162:19 164:4
164:5,11 165:17 166:2
167:13 168:10 169:8,13
169:14 172:14,15 175:22
176:5,6 178:4,9 179:12
179:13,15 180:1 181:1
184:3,10 188:20 189:11
190:23 191:20 192:20
193:1 194:13 195:9,18
196:9 197:17 199:5,6,12
204:21,21 205:4 207:1
207:15 209:8,20 211:3
220:10,16,20 221:19,20
223:16 224:3 225:3
227:15 229:20 230:1,2
230:12,15 231:2,7 236:1
236:4,5 241:1 242:22
243:3 248:1,4 249:11
251:2 258:16 260:2
263:15 264:9 287:8,9
289:13 292:18 297:9,23
300:18 305:17 307:9
308:20 311:8 312:21
313:7,22 320:19 321:13

325:10 326:7 328:7
332:11 335:6 339:14
340:4 342:13,15 345:5
348:16 357:1 360:18
367:7,22 368:4,6,8
373:18 374:3 378:15,18
378:22 379:5,12 381:9
381:11 383:2 384:8
385:2,5,8,11,13 386:17
387:13 388:14 390:20
398:16,18 402:20,22
407:1
**means**
351:19
**measures**
70:9
**mediated**
18:12
**medication**
8:15
**medications**
8:12,19
**meet**
43:6 46:17 77:23 159:3
301:22
**meeting**
46:14 47:11 48:14,15
49:14,18 51:9 65:13
66:21 67:2,4,8 69:21
70:5,15,22 71:21 72:3,4
78:23 108:1 118:8,15
127:12 138:19 139:5
140:1,12 142:16 165:18
165:19 190:20 244:6,11
245:16,17 246:3 250:14
250:22 252:19 260:9
270:8,9,12 275:11,20
276:2,5,6,18,20,21,23
277:1,3,4,8,12 279:17
279:22 281:4,7,11
282:18,23 283:2,5,8
284:8 287:4 288:22
304:3 353:23 354:6
357:1 380:1,3 400:18
402:12 403:11
**meetings**
57:17 63:16 65:15,16
67:5,6 70:10 73:7,11
107:23 110:17 111:11,17
111:20 112:4 114:8 118:7
118:12 119:19 139:20,22
156:18 164:6,21 185:4
185:13,15,20 186:6,21
190:9 199:23 200:1
208:10 250:10 253:9,23
264:1 313:14,14,15,16
346:16 357:7,9 367:23
379:12
**members**
112:3 323:16
**memo**

221:6 282:5 296:10,15
**memory**
7:5 8:21,22 9:7 64:13
144:19 257:5
**mental**
382:7
**mention**
382:7
**mentioned**
68:2,7 212:7,17 216:1
281:12 307:15 351:9
365:12 387:8
**merchandise**
26:14
**merger**
182:6
**message**
188:3 370:1,2
**met**
6:14 46:16 47:7 63:22,23
65:11 73:16 74:21 75:1
79:5 119:19,20 204:21
353:17
**metrics**
85:23 86:1 116:7
**Michigan**
138:20
**middle**
1:2 136:23 264:18 357:22
**Mike**
46:21 47:7,15,18 52:11,12
59:10 64:16 65:19 70:5
73:5,8 77:5,19 78:7,10
78:14,18 79:5,23 81:1,2
82:2,11 84:18,22 92:6
94:20,23 102:12,19,23
103:2 112:10 113:12,12
114:20 117:6,7,8,10,10
117:12,17 120:23 132:8
134:14 185:3,4,5,6,16,23
186:13 191:21 253:7,21
254:2 257:23 258:3,19
258:22 259:6,11 260:7
260:11,15 263:20,20,21
264:3,4,11,12,16,16
265:5 267:5,6
**Mike's**
191:20 258:4
**military**
15:6
**milling**
305:18
**million**
60:19 61:20 62:17 63:5,8
64:6 97:9,10 112:13,18
112:19,22 113:5 143:8
143:10,20 144:9,15
145:9 146:9 261:14
262:16 269:5,7
**mind**
121:2 198:15 224:23

225:13 242:9 247:7
292:15 306:9 349:5
**mine**
133:13 144:4
**minorities**
96:7,9 212:13 213:18
215:12 219:5 221:12,18
380:12,15
**minority**
96:4,11 100:2 197:4,5
207:8,9 208:1 212:11,21
220:14 221:3,10 222:6
366:1 382:3
**minority-owned**
381:16
**minutes**
44:2
**miscellaneous**
327:7
**miserable**
176:18
**misrepresentation**
308:10
**misrepresented**
147:7 288:8 354:23
**missed**
400:20
**missing**
125:13 192:8
**Mississippi**
24:11
**Missouri**
21:9,16,17,19 22:5 23:20
393:13
**misunderstood**
249:1
**mix**
380:21 381:11
**model**
109:15
**modifications**
107:16
**modify**
119:16
**Molly**
346:10,15 360:15,17
362:3
**mom**
386:16 397:11
**moment**
20:12 25:2 195:19 277:14
**moments**
6:14
**mom's**
395:22
**Monday**
330:15
**money**
17:12 62:19,21 86:17
140:16 145:4 147:9
228:8 247:15 248:5

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

260:11 266:14 298:21
299:13
monies
152:3
Montgomery
3:8 5:8 13:10 18:10
27:21 28:13 39:12,14,17
45:4 93:20 174:8,10
222:19 223:8 225:18,20
231:20,23 232:3,6
322:11 394:6
month
60:20 61:20 76:15 208:5
340:13
monthly
70:6
months
10:20 13:3 24:17 26:16
28:15 31:11 42:1,1,4
105:5 114:1,19 117:7
125:7,7 148:13 150:12
156:6 227:21 232:21
239:1 287:11 322:8
339:14 359:22
Morehouse
234:15
morning
6:2,3 9:20 304:17 328:15
mother
12:8 361:1 395:23 396:7
396:12
motions
395:13
motivated
273:11,15 274:10
mouth
211:8 230:16 235:22
251:3
move
41:15,16,17 42:2,4 45:4
155:21 168:14 169:10
197:19 274:4 373:6,7
373:16 374:6 376:12
moved
13:10 25:23 26:16,17,19
27:10,20 28:8,8 29:18
31:12 32:6,7 36:2
39:15 59:6 108:10
203:7 211:20,22 241:22
372:19 376:1,2,15
393:8 397:5
moves
105:7
moving
301:23
multiple
68:15 107:22 266:15,15,15
Muslim
246:21
muster
195:23 203:23

M&A
297:12 301:11,12,18

**N**

N
2:1 3:1 4:1
name
6:5,15 11:11 13:7 22:21
36:19 66:4,14,15 72:17
73:20 74:10,11,12 88:18
93:20 101:7 126:12
129:8 130:5 132:16
134:16,18,21 150:5,18
152:22 156:11 160:23
175:4 177:8 207:5
233:15 242:23 269:9
270:10 297:18 298:7,7
298:13,17 299:10,11
300:4 331:23 362:20
387:8 393:9 395:22
396:22 399:7 400:21
402:13
nemed
17:19 40:14 43:23 46:21
46:23 66:15 129:6
133:17 134:12,15
names
6:12 53:3 66:13 130:14
134:19
national
32:13 33:19 34:2 96:3
nature
15:16
navigating
224:6 263:9
NC
219:9
near
46:19
necessarily
95:23 274:7 348:14
366:11
necessary
2:15 99:3 212:3 234:19
307:6 312:7
need
8:8 76:3 83:6 88:14
90:5 96:2 97:5 112:10
113:12 146:4 152:19
176:17 187:22 188:4
190:12 192:5 204:13
209:9 235:4 251:2
259:3,3 264:20 268:7,9
276:11 290:3 307:5
320:23 321:1 325:10
326:9 338:16 345:21
357:13 365:21,23
370:19 372:16 373:5,6
373:19 393:20 394:3
408:12,18

needed
84:9 156:3 185:22 190:15
191:11,12,13 192:8
228:15 237:17 283:2
292:3 308:14 312:7
322:10 326:7 334:1
374:12,14 376:6
needs
88:1 112:11 189:19 251:5
314:8
negative
337:17 338:4
negligent
317:2
negotiated
129:19
negotiating
91:20 102:15 144:12
145:18 146:4 259:19
negotiation
144:3 146:14,17
negotiations
133:4 144:14,22 145:6,22
147:18
negotiator
133:9
neither
410:17
Nelms
3:4 5:21 9:1 21:1,4 46:7
56:6 120:15 139:17
141:6 153:11 166:14
177:13 211:9 216:13
235:1 244:13 247:22
248:16 249:3 255:1
275:17 310:4 312:18
314:22 315:3 326:10
346:23 349:5,10 350:21
351:7 378:16 387:1,7
399:9,12 405:23
nervous
98:15
nervousness
34:15
Nestle
125:11,23 133:22 134:8,9
134:10,22 145:7 146:3
147:16
never
18:11 30:15 104:14 107:13
108:13,17 147:2 157:14
179:12 181:13 184:11,11
184:16,20 185:17 209:5
211:7 230:11 255:10
312:16 344:2,4,5
345:18 357:11 403:15,18
new
36:3 61:11 91:19,20,21
126:4 143:9,19 144:1,5
144:16 145:3,3,9 157:17
175:22 265:9,12 283:14

348:4,12 354:13
newborn
9:23 11:3,3
newly
241:16
news
83:12 266:7 282:11 284:4
284:13
newspaper
136:16
nick
403:4,5
night
304:16 305:5 306:5
311:14
nights
11:8,9 337:21 340:4,6,9
nine
11:18
ninety-three
256:2
ninety-two
256:1
nonAfrican-American
380:23
nonpayment
151:15
noon
304:6
Nope
20:9
normal
143:13,15 383:11
normally
19:18 224:14 325:21
North
3:14 27:6 214:9
Northern
1:3 335:14
Notary
1:23 2:6 5:2 410:23
note
72:22 158:12 217:13
noted
250:10
notes
63:6 313:16,20 363:14
notice
282:4
notified
290:16
November
10:9 39:1,9 40:10 52:3
56:21 112:17 113:4
340:20
nuclear
343:4
number
10:11 38:3 57:18 61:16
62:5 110:16 128:19
130:12 167:3,21 168:5

174:14,19,22 187:5
189:9 197:10 293:5
298:15 333:16 335:16
360:14 361:19 362:14
362:23 363:16 368:23
379:14 382:6 386:2,7
388:15 393:4 394:15
numbers
30:1 116:5
numerical
187:5
numerous
189:13 368:7
nuts
248:19,23
NyQuil
25:8
N-word
403:2,6

**O**

O
2:1
Oaks
13:7
oath
7:11 363:7,9
objections
2:16,19
obligation
260:13,16
obtain
147:15
obvious
209:19 378:8,17,18
obviously
91:17 106:6 146:5 147:6
167:14 172:16 207:11,16
237:17 251:7 258:12
259:7 292:19 316:3
319:1 335:10,12 339:12
339:15
occasion
18:22
occasions
187:8 189:9 192:12
298:16 341:4
occur
275:20
occurred
36:1 73:8 143:16
occurring
225:23
October
40:8,10 52:2 56:21 74:17
74:20,20,23 75:13
76:16 95:8 112:17 113:2
113:3
odd
381:7

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

odds
258:20
offended
259:9 325:15
offensive
405:1
offer
28:23 45:23 48:14,17
51:11 176:12 290:11,17
292:16 293:1,2 306:10
325:8 328:12 334:7
360:12
offered
2:21 28:20 40:5 41:15,20
41:23 275:2 360:3
offering
47:3 50:7 180:4
offers
336:7
office
14:8 24:12 32:8,9,11,21
304:13 305:21,23 306:1
306:1 310:5 313:9,10
365:14 406:1
officer
52:16 59:4
offices
3:6 344:17
official
39:19 49:1 51:11 75:23
185:9
officially
130:1 372:3
Off-the-record
8:17 315:7 401:1
oh
29:16 30:12 34:20 42:20
53:3 88:16,19 102:9
122:22 128:19 131:3
134:20 192:11 240:15
246:17,20 250:20
325:21 346:22 347:21
358:1 359:5,8 377:22
387:4 394:7
Ohio
214:11
Oil
25:8,11
okay
7:6,9,22 8:11 13:1 16:23
18:12 23:13,21 25:3
35:8 42:20 57:5 78:5
78:22 80:10,19,22
82:10 84:13,15 88:10
102:8 105:1 111:2 117:5
117:22 118:22 120:4
121:11 122:1 124:20
125:3 126:23 140:3
151:23 153:10 154:6,20
154:23 157:18 162:1,13
163:12 164:11 167:13

168:4 169:17,19 173:1,3
176:12 186:8 191:18
192:4 193:16 195:4,23
196:9 200:18 201:23
220:20 224:18 225:9
226:15 230:19 238:9
240:23 254:15 257:11
261:6 262:23 263:8
271:2 275:10 285:5
315:1 333:13 354:13
364:16 374:12 380:7
388:9 409:4
Olay
25:8,11
old
11:16,20 12:3,6
Ombudsman
34:11
once
7:2 100:20 101:8 104:16
121:16 123:21 127:6,15
223:11 231:21 233:13
302:20 409:3
ones
125:19 140:4 273:14
308:3
ongoing
144:11
Online
330:2,7,12,18
onsite
321:1
Onyx
1:10 58:2 68:20 77:21,21
77:22,23 80:1 91:12,15
94:18 95:2,3 96:23
98:13,18 99:9,11,14,20
99:22 101:5,8 102:4,15
102:17,18 106:17,20
109:22 116:18,23 117:1
118:3,21 120:8,17 121:6
121:16 123:21 127:5,6
127:15 135:13,15,17,21
135:23 136:2 137:22,23
146:10 164:9 182:4
191:19,21,21,23 192:19
193:18 213:2,4,5,21
214:1,2 215:10 234:1
243:2 244:8,21 250:13
255:5 257:21 258:13
259:12,14 265:13 266:11
266:17 267:1 270:9,12
272:11 275:3 284:13,16
287:12 291:20 294:5
296:15 312:11,13 356:9
364:21,22 365:8,9
366:18 377:10 387:22
394:7 400:4,5,5 406:21
407:1,2,3,21 409:12
Onyx's
242:15 248:6 268:21

293:12
on-board
146:6
on-boarding
57:16 107:19,19,21 111:8
114:7 118:8 125:6 165:5
190:6
open
208:3 221:14
openings
221:16
openly
248:14,21 249:10 250:11
operate
62:1 81:16
operated
138:3
operating
52:15 59:13 65:1 98:5
219:6 221:18 323:3,5
328:19,21,23 356:19
operation
27:22 28:1,7,12 31:14,17
34:18 36:8 37:2 56:4
70:11 90:8 121:20
134:2 148:12 185:22
operational
91:7 99:3 121:1
operations
36:5,10 44:17 45:14 47:6
49:4,8,10,12 52:8,22
56:17 57:2,10,11,21
58:23 59:4,7 69:16
79:13 84:23 85:20
96:12 100:5,8,21 101:10
101:18 103:17 105:22
113:18 115:23 116:2,22
117:5 118:4,10 119:18
121:7,17 123:22 127:16
129:21 181:2,20,22
182:9,18,19 188:22
356:4 371:19
opinion
141:3,8 143:3 173:21,23
181:5
opportunity
20:15 113:9 216:21 290:5
ops
53:10 204:15
optimistic
98:19,20
optimizing
92:3
option
38:10 293:17,18,19 295:14
295:16,22
options
38:9 238:10 296:22
322:17 332:17
oral
5:11

order
15:14 60:8 62:21 97:17
297:3 373:22 374:6
ordinary
349:12
organization
112:3 213:6
organizational
117:16
original
81:4 167:19
originally
97:9,12
other's
132:5
ounce
259:23 260:22
outlined
194:15 290:12,18 293:3
306:10 328:13
outlook
383:3
outplaced
29:4
outside
45:1 264:16 305:18
350:22 351:2,23 392:5
392:7 393:2 395:15
400:4,4,12
overhear
367:4 370:23
overnight
137:13,15
overt
163:19 176:23
owe
325:2
owed
260:10
owned
28:1 35:4,10,11 95:12
125:15 220:14 272:11
327:19 330:4
owner
40:4,21 52:21 258:21
335:11
owners
180:12 323:15
ownership
265:9,13
owning
35:7
o'clock
9:23
O'Connell
46:22 47:8,16,18 52:11,12
59:10 61:3 65:19 70:6
73:6,9 77:6,20 78:7,10
78:14,19 80:1 81:2 82:2
84:18,22 94:21,23
102:12 112:10 114:20

132:8 185:5,6 253:8,22
254:2 257:23 259:11
260:7,15 263:19 267:6
O'Connell's
134:14

---
P
---

P
2:1 3:1,1
package
24:3 28:21 29:1,15 41:19
41:22 42:6 108:21
151:22,22 235:5 237:1
261:10 280:15 281:3
360:3
packaged
25:7,7 41:14 42:10 108:14
236:21
packages
29:9,12 151:15,17 152:4
packaging
25:5 298:18 300:9,10
303:9,11
packed
39:16 159:20
packing
126:19
page
4:2 7:8 170:7,15,23
217:12,18 218:1,23
353:7,9 358:13,20
363:1 364:10,15,18
371:13 386:1
paid
30:1 137:17 147:2,8
148:11,16 149:4 177:21
187:11 318:13 325:14
332:15 356:2 399:4
pain
343:19
pains
344:20 345:1,4,7
painted
205:8
painting
266:17
Pantene
25:8
paper
121:18,18 122:2,4,6 328:8
paragraph
265:8 267:10 324:11
paragraphs
51:22
parcel
175:18
parent
35:3
parents
338:10

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031    http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

parent—son
349:13
part
49:8 54:23 65:3 67:13,14
67:14 70:9 72:22 75:18
83:9 124:1 129:19 133:13
143:15 144:2 147:3
159:9 167:6 169:12
175:18 180:18 188:21
193:4 203:22 210:13
229:18 234:1 243:20
297:2 324:23 326:6
355:20 361:10 367:18
385:3,6,9
partially
84:20
participant
77:18 244:22
participated
369:3 405:6,12
particular
137:23 384:1
particulars
109:17
parties
2:3,19 410:18
partner
59:18,21 67:2 80:5,8
93:14 164:9 193:18
partners
101:7 140:6 400:6
parts
88:8
party
16:8,11 30:16
pass
224:15
passed
136:12 195:22 203:23
303:5
passion
236:8 238:3,8
path
259:4 398:7
Patrice
101:7 102:6 103:3,20
104:8,14,17 105:2,7,8
106:4,9 108:10 117:18
118:22 127:9,18 128:6
132:8 138:10 154:21
156:9 158:8,12 160:8,18
160:23 161:10 163:16,23
164:22 165:1,6,21,23
166:6 167:3,21 172:1
173:5 174:12 176:23
180:16 192:14,17 194:2
197:14 208:14 209:1
211:2 226:6,9 227:20
228:12 230:9 232:17,22
240:3 252:18 253:7
269:8 369:2 370:4

373:17 375:23 403:19
406:11
pattern
155:15
pay
50:22 62:22 86:16 152:3
187:9 260:13,16 262:7
262:16,17 269:4 318:13
323:5 324:20 325:17
325:20,22 326:2 333:5
333:10
paying
191:13 269:6 337:18
payment
151:14
Payments
151:16
payroll
151:9
pays
145:19 330:23 331:1
PDI
214:10 274:4
peddling
235:11
pending
16:4,5,6 361:8 386:20
people
28:9 29:3 66:23 70:3
71:22 81:15 82:1,22
92:17 98:22 105:11
115:7 126:18 130:9,12
130:18 132:7,10 133:5,6
141:11 142:1 149:4,7,9
153:3 154:20 168:20
178:8,10 180:11,13
192:3 199:11 208:4,12
208:19,21 221:13 224:1
224:4,14 235:21,23,23
236:1 237:17 242:12,13
245:22 246:6,7 247:8
250:20 258:11 262:10
267:13 284:17 285:4,13
296:3,19 301:3 316:15
321:1 333:20 337:13,14
340:3 363:11 365:15
383:13,18 386:17,19,23
388:6 401:20 402:1,4
403:8,17,22 404:4
408:13
people's
137:16 400:8,19,23 401:6
Pepper
34:9 35:1,2,10
peppered
50:14
Pepsi
17:8 28:1,22 29:4 41:11
125:14,15,22 131:21
PepsiCo
24:22 26:1,7,11 27:4,9,19

28:6,12,19 29:17 30:20
32:1 41:20 128:18
218:12,15 220:4 358:23
381:15
perceived
231:6
percent
88:9 95:11,18 114:5
158:13 184:4,4,5 188:17
278:2,19 315:20 353:19
percentage
50:11 187:1 331:4,5
perception
339:9
perform
89:9 108:20 155:5 158:23
189:6,14 238:20 371:17
performance
70:8 357:3
performance-related
357:8
performance-type
358:5
performed
344:3
performing
187:16 188:13 241:9,11
242:3 355:15
period
13:6 43:20 76:17 86:5,8
91:9 93:9 106:15 125:9
137:5 139:9 145:7
149:3 158:21 185:7
198:9 226:23 232:19
247:5 264:22 272:22
280:1,3,4 297:22
325:18 331:20 333:17
339:14 375:21 389:13
periphery
264:3,5
person
15:19 33:9 34:13 103:1
104:5,8 131:21,23 155:3
173:17 197:6 219:19
241:8,17
personal
245:10 250:1,5,6 259:10
259:14,15 304:22
306:15 307:15 309:1
313:7 315:10 327:10,13
327:15 384:21
personally
156:17 157:5 204:9
256:10 370:22 409:8
personnel
150:22 151:5,6 250:8
persuade
264:11
Peter
129:6,7,8,12,16 298:9,10
298:11 300:6 302:13

303:1
Petty
40:14 42:13,19 43:11
44:22
phased
101:17
Philip
73:21,21
Phillip
74:9,11,14 75:7,12 76:21
79:3,4 80:11,20 81:8
86:10 89:13 91:4 92:8
92:14,15 93:5 195:23
204:1,18 205:1,12
211:16 258:12 268:10
270:14
phone
43:3 291:4 317:8 319:11
319:21 349:4
phrase
282:16
physical
18:19 299:13
physician
343:1,8
pick
403:2,4,5,6
picking
367:10
picture
266:18
piece
225:7 261:13 321:2 389:7
pieces
225:4 234:7
piecing
225:5 239:23
Piknik
19:22 39:10,14 40:2,7,21
41:9 42:12 43:8 45:16
47:22 48:3,6 51:12
52:10 55:4 56:16
59:23 61:6 62:10 66:2
69:21 70:23 73:14
74:15 90:11 91:6 97:23
98:4 99:15,18 101:10
104:17,18 110:14 112:6
114:2 135:10 140:20
143:9 144:16 145:8
147:14 150:23 151:5,10
152:4 170:11 175:10
182:20 192:21 213:3
214:4 215:13,17 218:15
218:21 219:20 236:22
255:5 256:10 263:1
265:22 266:23 267:16
269:4 272:14 284:13
288:18 290:16 294:10
295:15 296:9 297:3
303:17 306:3 309:10
310:21 312:15,23 317:5

317:19,23 320:14 321:7
327:7,19,22 328:19
331:18,21 332:1 333:4
333:14 336:3 339:10
341:22 342:2,7,12
344:21 346:2 348:17
349:1,2,14 355:15,23
356:4,19 359:14,18
360:2 361:4 364:4,22
365:10 366:18 369:9,15
381:3,19 382:20 385:18
399:10,22 402:13,20
403:2 406:21 407:7
Piknik's
124:21 148:5 171:9
259:22 260:21 262:2
pitch
159:4
place
81:16 82:1 90:20 113:18
181:14 204:16 209:14
211:15 220:5 225:1
229:16 277:13 381:16
391:15
placed
163:6
plaintiff
3:3 364:11 366:22 370:11
372:20,21 375:12
Plaintiffs
1:8
plaintiff's
371:17
plan
14:13 33:19 64:1 69:6,11
69:16 127:13 193:11,14
194:9,14,15,22 195:2,5,6
195:6,8,11,14,17,20
197:22 198:2,16,18
199:1 200:10,17 203:11
203:15,17 206:6,18,22
208:8 209:6,14 211:14
222:14 225:1,14 228:18
239:11,15,17,21 240:1
320:21,22 372:13,14
planned
167:9,10,17 370:17
Planning
32:13 34:3 37:7,9 38:22
271:12
plans
127:14 155:19 229:4
380:12,15
plant
85:22 199:23 305:16
plastic
261:9,19
play
369:6
played
107:16,17 224:23 366:5

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                                    http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.                                    ROBERT WINTER
ONYX CAPITAL VENTURES, LLC, ET AL.                          August 14, 2007

playing
259:18 260:3
please
6:4 7:15 8:1,9 10:7
23:23 153:20 170:6,22
203:21 216:10 240:13
279:13 337:11 405:9
pleased
219:16
pledged
91:2
plug
288:18
point
14:15,16 43:2 50:22 71:8
72:9 79:15 82:19,22
92:9 117:20 121:2
132:6 133:12 135:8
137:7 143:7 146:21
164:8 167:15 172:14
179:16,18 183:17,23
185:10 186:9 188:4
189:16 195:17 200:9
213:15 218:4 223:13
224:8 226:16 228:16,21
237:20 258:14 259:6
269:11,23 281:7,22
283:22 286:18 289:2
290:21 291:1,15 297:1
299:1 306:13 317:4
332:21 333:1,11 340:22
358:2 366:7 372:10
374:7 378:1 381:4
393:23
pointing
366:8
points
136:11 137:3 282:5
296:16
Polar
36:20,21 37:1,4 39:9
51:7,8 359:18
policy
171:10 220:5 381:15,20
ponder
283:3,9 284:9
Poor
264:17
poorly
357:14
portion
257:8
portrait
205:7
position
24:18 26:17 27:12,13,18
31:9,12 32:14 41:12,21
47:5,6 53:10,10 107:12
174:1 189:5 193:12,15
206:13,16 208:22 221:1
236:18 238:20 272:13

275:2 280:7,10 281:1
284:4 339:21 353:19
363:17,23 365:7,22
370:13 374:8 376:18
377:1
positioned
128:15
positions
27:9 32:4 53:12 56:15
208:3 212:22 221:14
272:2 301:4
positive
61:23 63:21 184:11,16
266:18,19
possess
210:10 258:8,18
possession
326:2
possibility
322:8
possible
133:2,3 408:1
Possibly
354:16
postponed
371:14
post-Onyx
120:13
potential
261:1 312:9 361:21 388:1
potentially
161:2 385:10
pounding
265:10,18 266:1,11
power
164:8 173:17
PowerPoint
67:10,16,17 68:2,8,14,16
68:22 215:7,8,9 379:18
379:19 390:8
practice
36:7 122:13,15,18 123:18
233:15 322:6 347:12
practices
37:23
praising
255:15
precipitated
60:5,21
predominantly
222:22
pregnancies
396:20
premeditated
155:19
preordained
189:23
prepare
276:6
preparing
321:12

presence
231:23 350:22 351:6,23
392:6
present
3:17 43:18 44:7 47:14
65:22 66:12 69:6
241:19 244:10 276:7
277:5 312:8 356:17
405:2
presentation
64:20,21 67:8,11 68:3,14
68:23 93:18 94:1
207:20 212:18 213:1,21
213:23 214:13,15,17
215:3,5,7,10,19,21
230:17,18 235:16
237:16 379:18,20 390:7
390:8,10
presentations
68:8,16 99:21 237:21
380:20
presented
64:1 65:7 71:20 207:23
212:23 230:14 241:2,7
266:8 379:23 380:5
presenting
71:6 99:19 102:16 127:13
252:3
preserve
308:14 312:3
president
29:7 32:19 33:2,4 52:20
56:17 57:9 102:16,19
103:9,11,13,16 104:20,22
164:2 193:17 196:8
353:17 369:15
press
233:23
pressure
345:11
pressuring
60:9 62:9 373:14,15
presuming
405:19
pretext
168:10
pretty
109:1 211:5 226:16 303:6
312:19
prevail
17:15 375:16
prevailed
375:11
prevalent
226:15
previous
181:23 240:21 364:18
previously
42:21 253:5
pre-occupied
383:14

pre-Onyx
120:13
pre-Piknik
40:22 41:2
price
30:1 110:19
prices
109:10 368:12
pricing
54:21 107:18 109:8,9,12
109:13,15 111:6 114:7
140:23 243:7 310:23
primarily
114:3 233:9
primary
18:19 54:9 342:23 343:7
print
309:14 310:9 316:23
prior
2:22 14:22 38:3 60:15
182:20 242:4 358:17
361:4
private
233:14 253:16 365:17
400:15
privately
184:23
privileges
35:5
privy
141:15 288:19 375:4
405:15
probably
28:14 34:4 51:16,20 58:1
66:4 67:22 76:13,16
88:9 134:20 137:4
138:9 143:16,21 145:19
146:1 156:22 198:5
208:13 223:8 226:3
232:10,21 250:18
263:13 284:1,20,23
285:3,18 296:11 298:10
298:11 304:7 305:4
307:12 318:20,21,23
321:17 333:12 346:16
370:17,18 374:22
376:12 389:10 392:16
393:17 395:12 396:19
problem
49:8 87:21 108:11 124:1
155:8,9 165:13 208:2
229:1 242:16 248:6
357:11 376:9 408:4
problems
81:1,2 141:22 408:8
procedure
5:6 344:4
proceeding
18:9 30:11,15 51:17
proceedings
5:12

process
38:11 44:8,12 73:3 133:3
144:2,5 145:4,11,18
244:23 294:7 369:3
393:7
processes
37:23
Proctor
55:18,19
procurement
129:19
produce
261:13
producing
241:12
product
25:13 27:2,2 55:14,22
109:16,19 129:23 143:14
144:7,9 145:3,12,14
235:23 241:12,12 261:2
261:3 263:1,2 381:10
400:4,16 401:5,8,11
production
53:6 66:7 68:13 85:16
86:1
products
19:22 25:6 27:5 31:22
40:2 170:11 236:5
360:2 364:22 365:10
377:17 400:10
professionalism
204:23
professionals
347:15
profit
64:3,4 263:13
profitable
108:6 116:16,17,18
profits
64:5
program
22:23 220:5,9 330:20
331:10 381:21 382:1
programming
22:17
programs
233:10
progressing
70:18
project
165:5,6 320:13,23 321:2
321:6 333:22 334:1
357:10
projects
89:22 90:6 118:14 320:17
320:20,22 333:23
promoted
24:18
promotion
17:18
prompted

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                    http://www.TylerEaton.com

44:20
pronounce
329:5
Propecia
8:14,18  9:5,12
properly
173:10
property
317:5  318:1
proposal
110:1  289:7
proposals
241:13
propose
109:11
prospects
71:10
prosper
92:20
prosperity
69:18
protect
180:9  200:14  259:21
260:20  261:4  262:1,15
protection
329:2
provide
74:5  83:16  110:15  152:3
159:1  338:20
provided
51:19  214:20,22  245:19
263:1  358:16
providing
210:17
psychoanalyzed
342:19
psychologist
342:14,19
public
1:23  2:7  5:2  288:20
410:23
publically
136:15
published
75:18
pull
228:21  288:18
pulled
186:21  208:10
pulling
282:6
purchase
148:2  309:5  312:23
purchased
34:23  120:19
purchases
382:5
purchasing
58:17  107:3  108:11  118:23
119:3  122:5,12  158:11
164:3  181:11  187:14

188:12  197:15  198:1,19
200:21  202:7  203:4,8
205:21  211:21  226:18
241:22,23  372:20
373:8,9,9,16  374:3
376:1
purpose
69:20  70:22  94:5  268:11
312:2  382:4
purposes
73:17  177:19  312:10
pursuant
5:5
pursue
22:3  258:21  259:4
349:18
pursuing
22:8  333:3
push
85:19  198:2,13  206:6
pushback
248:10
pushed
194:23  263:22
put
17:12  58:3  71:17  72:5,12
82:4  95:13  102:12
105:22  108:23  117:6
150:9  155:9  158:4,17,22
168:14  180:3  185:12
186:12,15  190:8  194:15
208:4  226:10  238:21
253:7  255:10  258:15
296:1  297:6  302:21,22
356:9  384:8
putting
91:19
P&G
55:15,17  126:16
p.m
169:23  216:19  239:6
276:16  292:13,17  315:8
326:13  337:7  349:7
409:19
P.O
3:7

---

**Q**

QA
134:16
quagmire
229:7
Quaker
125:10,15,22  134:6,7
207:4  212:9  216:3
217:5  259:22  260:21
263:2
qualification
130:1
qualified

186:5  243:10  253:22
258:6  377:20  408:17
qualify
161:6  235:8
qualifying
130:2
quality
53:6  235:20
quandary
155:23  156:7
quarter
262:15
question
7:14  8:1,4  18:13  20:19
21:5  28:4  30:2  45:8
70:2  81:5  84:14  98:6
99:10  103:22  115:19,23
120:7,11,14  123:12
139:2  141:7  143:17
151:19  152:18  153:12,15
153:17  154:13,14  160:21
187:11  192:2  225:19
227:16  234:21,23
235:22  238:6  240:15
248:17,21  269:14
273:13  275:18  290:3
292:3  352:14  363:5
378:6  379:7
questioning
140:4  244:7  253:18
286:22
questions
2:17,18  44:4,6  117:23
118:1  252:13  300:22
410:10
quick
86:6  322:16
quickly
61:18  156:3  295:2
quietly
257:4
quit
176:1
quite
45:6  79:22  156:16  176:23
178:23  187:15  211:4,11
222:2  229:11  242:11
quotation
110:6,9
quote
33:15  118:3  185:8  193:14
195:8  203:23  308:8
351:18  403:1,3
Q&A
136:13

---

**R**

R
3:1  410:1
race

103:6  152:9,11,14,16  153:2
153:21  154:7  157:11,14
157:18  158:2  161:8
163:15,23  166:8,9  168:7
169:1  171:15,22  172:3,7
172:13,18  173:6,8
174:13  175:14,16  183:1
183:12,21  192:16  195:1
240:5  246:19  254:3
272:23  273:2  363:19
364:4  388:8,14  389:16
391:7,19  392:5  406:21
407:5,10  408:1,22
races
402:9
racial
382:20  400:2  401:3,19,23
402:4,9,13,14,20
racially
273:11,15  274:9
racism
157:19  159:23
racist
168:19
Raines
66:18  268:3,14  269:22
raise
174:8  196:9  231:14  254:6
255:23  257:16
raised
255:18
ramp
156:2
ran
27:21,23  232:19  233:14
ranch
237:18
Randy
134:15
range
143:10,20  399:18
Rasmussen
134:13
rate
359:18
rates
331:1
rationale
260:10
raw
148:17
Ray
40:14  42:13,19,20,21  43:2
43:2,11  44:22,22  45:2
reach
44:21  191:5
reached
18:14,15  299:1  306:13
reaching
40:1  190:3  286:15
read

77:4  80:14  87:6,8  88:6,8
88:9  96:2  117:15  145:15
216:15,22,22  217:1
219:23  221:19  254:16
255:13  256:23  257:4,8
257:12,14  271:3,9
273:20  290:7  349:11
351:19  385:23
readily
29:18,18  55:3
reading
2:9  215:23
reads
216:14
ready
370:20  373:18  393:20
real
55:2  121:19  187:18  198:11
272:16  281:21
reality
116:13  200:13,14  252:22
realization
288:5
realize
155:17  189:21  195:21
207:12  257:21  281:13
281:20  293:8
realized
112:9  259:7  266:22
333:4,13  351:12,19
377:8
realizing
286:3
really
54:7  95:6  104:2,14  119:8
131:16,17  134:14  165:3
173:13  176:4  184:13
191:21,22  199:5,20
230:11  243:3  251:2
264:2  285:3,12  294:6,7
312:10  344:2  374:2
398:17
reason
8:9  9:9  33:19  62:5  77:10
81:5  98:11  104:4
140:20,22  167:7  265:23
266:10  303:23  310:8
324:11  326:6
reasonable
69:18
reasons
90:19  128:10  134:1  136:6
206:9  339:18  408:7
recall
9:4  15:17  16:16,18  17:21
17:22  18:1  19:1,13,17
22:7  35:6  44:5,6  52:7
53:11  65:14  66:8,17,18
66:20  67:5,6  69:10,23
71:5,13  72:2,4,13,20
75:8  77:3  80:15  81:10

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

81:22 82:14 83:22 85:8
85:8 86:15 88:13,15
89:18 90:3,9,16 91:1
92:10 94:9 103:17
104:6 107:6 113:6
125:18 126:9 128:17
130:15 136:22 146:16
152:5 184:21,21 187:17
188:1,2 195:18 204:10
204:18 212:15 213:19
215:14 217:22 218:3,5
225:22 239:13 240:6
251:10 253:6,13,20
268:5,8,13 269:13,16
275:11,23 277:10,23
278:1,10,13,15,17 281:5
281:8,11 282:23 283:6
283:11,15,16,21 284:16
284:18 285:7,12,22
291:8,9 292:8,9 294:14
296:3,10 297:21 300:18
302:11 303:18,19,20
304:4 306:6 307:4
310:5,5 313:8,22 316:16
317:21 318:19 319:6
321:13,21 325:18 328:7
328:15 330:16 332:12
332:16 333:2 335:6
336:6 343:12,13 344:6
344:10,14 345:20
346:18 350:8 352:12,16
354:5,17 357:7 358:1,4
365:15,16 376:7 378:3
378:4 386:21 389:14
391:6,9,10,14,18 392:8
392:10 393:21,22
394:23 395:7 398:8
399:22 402:16,17
403:20

recap
211:13
recapitalize
180:23
recapitalizing
181:11
receive
21:18 41:1 45:23 76:4
110:8 324:14,16 331:12
332:5 334:22 336:7
received
68:12 91:3 254:6 284:14
294:12 310:7 317:16
323:19 336:13,20
reception
244:3
recertification
97:14
recollection
92:11 145:6 308:15
362:20 391:22
recommendation

77:6 78:6,14,20 79:9,16
83:23 84:16 85:2,6,14
89:14
recommendations
76:22 77:1 80:11 81:8
83:4 88:11,14 89:17,21
92:23
recommended
75:2 77:5,7,16 82:10,11
207:6 343:21
reconcile
39:21
record
216:18 257:8,10 315:6
326:11,12 349:6,11
363:11
recorded
363:3
recording
382:4
records
73:23 141:5
recounting
358:22
recourse
207:18 248:11
recover
50:23 336:23
recruit
213:16 215:11 219:5
221:17 380:12,15
recruited
24:22 48:9
recruiter
207:7
recruiting
48:11 207:6 212:10 322:5
322:9,18 332:19 333:18
rednecks
164:15
reduced
410:11
reduction
280:22 324:13,21
reengineering
38:12
refer
156:10 173:18 210:6
217:14
reference
68:14 210:6 265:12
380:11 402:18
referenced
402:11
referred
40:2 52:19 101:13 175:2
270:5,15 281:9 343:11
400:3,7,9,17 401:5
referring
68:9 99:23 195:3 215:16
217:4 229:23 265:13

266:20 291:18,23
364:12 365:1 367:1
370:8 381:13 404:12,15
405:11
refers
403:2
reflect
271:10
reflected
257:17 289:8
refresh
144:18 257:5 362:19
refrigerator
313:6
refused
41:15 135:23 136:2,4,18
regard
204:19
regarding
17:9 195:11 259:22
260:21 274:12
regards
181:10 261:5
regime
60:22
regional
26:23 31:21
regular
232:1,3 276:4
regularly
243:19
reinforcement
184:12,16
reiterating
301:1
reject
292:16 293:1,2
rejected
289:7
rejecting
290:11 328:12
relate
313:20 379:16 380:8
related
78:13 182:6 364:4
relates
33:13 363:4 387:19
388:9
relating
2:13
relations
57:15 58:20 107:7,11
363:23 384:18 388:14
relationship
65:6 70:14 130:20,22
131:14 132:2,12 133:20
133:21,22 134:2,10
135:1 139:2,4 141:12,17
219:9 262:13 337:16
338:6,21 339:12 342:5
348:3,8,18,20 349:10

361:14 382:8,11,16,21
383:9,20 384:4,6,23
385:1,3,12,16,18,20,21
relationships
115:13 383:6
relevant
309:17 342:17
relief
265:12 266:21
relieve
405:16
relieved
252:18 260:13,15
relinquish
188:5 373:15
relocate
13:4
relocated
39:12 48:10
remaining
370:7
remember
19:19 22:21 46:13 49:6
58:1,11 66:13,14 71:14
72:17 74:12,21 76:14
87:22 88:3,5 89:20
93:20 94:2 101:19
104:2,11 105:15 117:6
126:12 129:8 134:4
137:3 139:7,20 140:11
142:4 143:11 144:19
145:16 146:19 149:23
150:1 155:4 185:6
188:2 195:22 199:9
201:10,14 202:2 210:13
212:12 213:8 217:17,19
217:20 218:3 226:7
233:16 234:14 250:14
267:18,19 268:19 269:9
270:11 281:17 285:4,14
285:16 290:22 294:22
296:23 297:15 298:6,12
299:2,6 300:4,7 301:13
302:19 303:22 307:3,16
310:11,12 316:20,21
319:20 321:20 324:4
327:5,10 335:8 352:5
356:7 365:13 366:6
375:19 386:12 393:6
394:2 395:19 399:7
401:7,10
Remind
349:8
removal
60:5
remove
77:9 78:14 79:17 159:8
removed
77:17 88:1 102:21 294:10
304:22 306:15,20
307:13 309:1 356:9

372:11 394:7
renegotiate
132:20,22 262:11 266:3
renegotiated
132:19
rep
27:4
repair
338:7
repeat
125:19 193:22
rephrase
8:2 153:19,20
replace
45:1 88:20,21 89:5,7
213:11 221:3,13 222:5
replaced
355:4,9
replacing
44:13 195:11
report
33:14 52:9,23 57:13
75:16,17 76:1,3,5,20
77:4 78:3 80:14 81:18
82:5 85:11,13 86:21,22
87:4,6,9,14,18 88:7,12
89:18 91:4,11 102:5
103:3 105:18 106:5
114:23 115:8 118:16
204:6 205:13,15 211:17
218:17 344:8,9,11
345:21
reported
1:21 33:13 52:10 53:2,11
101:4,6 103:2 104:1,5,12
105:2 111:21,22 114:13
114:19 117:7,8,9,9,10,11
117:12,13,19
reporter
1:22 2:6 5:2,19 107:20
122:17,20 387:23
400:20
reporting
32:22 33:11 53:16 101:2
103:20,21 106:2,8
114:22 115:3,12,17 117:3
117:21 155:7 191:23
202:23 227:7 271:14
reports
32:20,21 33:10 75:22
115:3 118:1
represent
162:9 197:6 224:16
representative
26:13 27:4 220:13
representatives
150:22 151:4,14 152:2
represented
257:22 259:12 267:1
399:14
representing

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

| | | | | |
|---|---|---|---|---|
| 6:16 54:9 213:2,3,4 | responsible | RFQs | 35:4 165:16 350:20 | Rule |
| 227:4 364:22 365:9 | 261:23 262:3 | 110:3,3 | right-hand | 5:5 |
| 366:18 | rest | Richardson–Vicks | 33:9 | ruled |
| represents | 386:1 | 24:2,4 25:4,12,12,17 26:5 | rigorous | 199:19 |
| 366:1 410:13 | restaurants | Ricky | 38:18 | rules |
| reprimand | 224:3 | 40:4,13,20 42:15 43:3,3,5 | ring | 2:13 5:5 7:7 |
| 41:3 | restructuring | 43:7,12 44:12 45:20 | 38:10 | run |
| request | 181:12 | 46:5,12 47:2,15 48:13 | ringing | 44:19 62:6 70:11 84:9 |
| 68:12 110:5,8 | result | 49:17 50:6,18 52:10,17 | 349:4 | 92:4 97:20 109:19 |
| requested | 255:18 256:5 338:22 | 54:8,8,11,19,19 57:8,12 | rick | 130:2 143:14 147:10 |
| 110:15 145:19 | 339:10 342:6,11 343:20 | 57:13 60:9 62:9 64:16 | 60:13,14 72:11 73:1 98:16 | 149:15,15 159:13 168:16 |
| required | 410:19 | 65:9,17 77:5,13,23 78:1 | 133:1,1,2,8 372:22 | 180:17 185:4 190:8,23 |
| 17:10,12 145:13 189:18 | resulting | 78:7,23,23 79:15 82:4 | 373:3 374:16 | 191:1,9,11 204:16 213:17 |
| 337:18 340:12 | 338:5 | 82:8,10,11,15,19 84:21 | River | 253:23 311:16 408:17 |
| requirements | results | 85:3,11 86:16,20 87:13 | 13:6 | running |
| 190:6 | 345:19 | 87:16,20,23 88:1,2 92:8 | road | 28:11 85:21 114:11 115:13 |
| researched | resume | 92:14,17 95:1 101:3,4,9 | 51:2 | 116:10 140:1 164:10 |
| 202:11 | 182:11 | 101:21 102:1,2,10,11 | Robert | 168:11 185:14,22 189:2 |
| reservations | resumes | 103:2 114:21 117:9,13 | 1:17 2:5 5:10,15 6:6,6,13 | 230:2 231:11 243:6,21 |
| 82:4 86:19 87:19 357:23 | 334:20 335:2,16 | 120:23 132:8 259:2,2 | 88:20,21,22 396:23 | 299:8 377:17 381:10 |
| reserved | resurrect | 263:20,21 264:6,14,15 | Robertson | runs |
| 303:7 | 286:5 399:8 | 264:17 285:3 286:9 | 346:10,15,19 360:15,17 | 180:14 191:1 377:15 |
| resign | retain | 297:9 301:21 309:11,12 | Rock | rural |
| 42:7 79:2,6 174:4,5 | 208:1 213:9,15 215:11 | 316:4,17,18 319:14,20 | 27:16,17 28:2,5 | 36:4 |
| resignation | rethink | 328:1 332:1,13 355:21 | rodeo | Rushton |
| 295:8 | 187:22 | 355:22 356:3,10 386:15 | 287:13 | 14:3,4,6,18,22 |
| resigned | retrieve | 387:11,17,19 388:7 | Rodman | Russell |
| 80:19,20 175:20 | 389:17 | 389:3,15 391:7 393:19 | 66:4,6 82:15 85:15 114:17 | 335:12,13,20 |
| resources | retroactive | 393:20 394:11 408:3,5 | role | R&D |
| 38:20 99:2 103:17 251:7 | 324:12,20 | 408:16,16 | 26:16 57:3 59:13,14 73:9 | 235:23 |
| 353:16 | retroactively | Ricky's | 82:12 84:4 85:3,9 89:9 | |
| respect | 325:14 353:18 | 44:23 83:11 85:9 90:23 | 100:20 105:21 108:20 | **S** |
| 156:23 220:5 347:19 | retrospect | 263:22 | 114:19 118:22 119:3,4,7 | S |
| respected | 239:22 | rid | 119:16 121:3 155:1,6,10 | 2:1 3:1 4:5 |
| 132:5 133:11,12,13 205:3 | return | 78:18 200:17 203:11 | 157:4 162:3,14,15,22 | sacrificing |
| 205:10 | 69:17,19 304:17 309:10 | 209:6,9,14 | 163:6 166:22 172:5 | 361:6 |
| respectful | 317:5 318:12,16 319:21 | Ridge | 186:16 187:17,22 188:14 | SAITH |
| 157:5 | 325:2,5 399:3 | 10:15,18 12:20 13:14 | 224:23 236:13 238:21 | 409:21 |
| respective | returned | right | 240:8,9,18 241:8,9,23 | salaries |
| 2:4 | 304:21 319:13 327:18,23 | 25:18 26:2 35:12 47:13 | 251:18,23 252:7,21 | 50:22 137:16 140:6 269:7 |
| respects | 394:5 | 47:17,20 48:1,8,8 53:14 | 253:2 298:17 355:13 | salary |
| 204:22 | returning | 54:12 55:19 59:2 61:3 | 366:4 369:6,14 372:11 | 49:13 231:14 255:19,22 |
| respond | 317:23 | 73:4 81:15 82:1 93:21 | 373:16,21 379:1 | 256:6 271:17 278:2,18 |
| 7:15 | revenue | 95:5 96:7 99:1 102:13 | roles | 289:4,18 329:21 341:18 |
| responded | 330:23 331:2 | 104:6 105:7,14 107:2,4 | 57:19 108:4 155:15 219:6 | 341:22 353:18 |
| 186:6 187:14 | reverse | 108:7 109:7 110:7,16,17 | 221:18 272:22 | salarywise |
| responding | 152:11,14,15 | 118:2 122:18 126:21 | room | 329:10 |
| 188:3 | review | 140:17 141:3 145:11 | 66:5 173:15 277:1,2,20 | sales |
| response | 109:21 196:3,9 204:2,5,8 | 153:23 168:7 188:15 | 305:19 | 26:12 32:13,18,23 33:3,5 |
| 257:16 280:18 294:12 | 204:19,21 205:11,14 | 200:21 206:14 207:5 | rooms | 33:8,19 34:3 47:6 49:5 |
| 360:1,14 361:18 362:14 | 211:16 | 209:7 211:18 212:1 | 247:18 | 49:9 54:23 57:15,21 |
| 363:16 368:23 379:14 | reviewed | 216:4 226:8 231:12,12 | root | 58:4 100:8,21 159:4 |
| 382:6 386:2 | 38:1 109:22 | 241:2 246:5 253:3 | 263:5 | 193:19,19,21 198:20 |
| responses | reviews | 265:19 268:7 272:11 | Rose | 204:12 206:3,7 211:23 |
| 7:17 68:2,11,12 358:15,17 | 116:6 | 275:15 284:22 295:19 | 3:13 | 212:4 223:12 224:10 |
| 378:10 | revise | 298:13 319:8 336:6,19 | roughly | 234:20 235:16 241:3 |
| responsibilities | 82:9 | 336:21 345:12 346:3 | 10:21 | 272:17 298:16 330:10 |
| 121:15 123:19 242:2,3 | re-edit | 355:11 359:1 364:1 | round | 353:17 355:17 365:6 |
| 340:1 355:4 | 108:22 | 366:12 374:18 388:6 | 227:20 | 370:12 372:20 373:8,9 |
| responsibility | RFQ | 392:2 399:5,22 409:14 | Rudy | 375:13,18 379:1 |
| 116:21 128:13 252:18 | 110:5 | rights | 129:7,10,14,20 | |

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

salesforce
  33:13 53:15,18 54:6,7
salesman
  318:4 399:2
salesperson
  53:20,22 54:9 272:5
sat
  71:17 138:18
Saturday
  319:7 337:19,20,22 338:2
  338:14 340:23
Saturdays
  339:20 340:12,19 341:1,5
  341:7,8 348:13,15 361:6
save
  164:17 247:15 298:1
  309:13,18 310:16
saved
  309:16
saw
  92:18,19 162:19 205:9
  207:20 210:4 215:6
  346:9,19 347:3 362:15
saying
  50:17 51:3 68:17 81:19
  86:23 87:17 88:3
  100:13,16,19 101:21
  121:8 123:18 129:14
  140:12,15 173:2 178:15
  179:3 190:4 218:2
  225:10 250:19 251:19
  267:3 278:18 295:13
  315:2 378:16 394:3
  405:18
says
  146:9 158:9 165:8 217:13
  219:4,17 220:3 221:21
  246:5 255:3 256:3
  257:20 296:15 314:19
  376:12 392:1 399:2
scammed
  281:21 293:9
scene
  257:21
scenes
  64:19 65:8 121:12 157:1,2
  245:12 370:21
schedule
  11:10 340:23
scheduled
  276:21 277:1
school
  20:23 21:7,8,11 22:12,20
  23:15 219:11
schools
  9:22
Schweppes
  28:18 30:23 31:3,6,19
  32:5 33:6 34:21,23
science
  22:1

Scott
  297:19 330:5 387:3,5,6
  397:12,16 398:10
scramble
  297:23
scripture
  351:18
search
  219:8
Season's
  55:23 56:1
second
  67:2 71:21 80:17 87:10
  102:8 113:20 150:18
  163:13 166:20 167:5
  219:15 232:18 243:1
  257:19 305:13 324:10
  347:7 353:7,9
second-hand
  404:13
Secretary
  322:20
section
  305:22 306:1
secure
  224:9
secured
  146:20
Security
  10:10
see
  10:19 26:8 43:2 62:18,20
  71:19 86:22 178:17
  179:20 182:12,15,16
  186:13,15 193:19 208:11
  209:3 214:14 219:2,3
  224:2 238:7,8 247:22
  250:18 258:9 268:10
  285:9 296:10 338:1,9
  343:5,21 345:6,15
  346:6 347:17 361:19
  363:8 371:3 390:1
  393:18 409:16
seeing
  106:7 137:3 202:2 298:19
  298:22 299:14
seek
  72:21 258:21 344:9
seeking
  90:21 93:14 94:5,9,10
  312:22 320:15 325:4,6
  332:9,16,22 335:17
  382:2 409:6
seen
  143:4 201:21 217:10
  254:18 271:6 314:20
  358:17
selection
  75:7
self
  383:12

sell
  62:13 224:16 400:18
Sellers
  208:17 275:12 276:9
  277:17 283:4,13 287:5
  304:3 326:22 353:15
  407:17
selling
  144:10 188:19 222:22
  224:4,11,12 235:7
  293:14 375:23 381:4
  400:14
send
  43:4 189:11 237:22 298:2
  323:8 326:21 334:3
sending
  335:15 345:21
sends
  158:8
senior
  24:9 60:6,16 127:22
  205:16 236:13 397:1
sense
  115:10 118:19 133:14
  160:13 173:13 180:21
  196:10,14 197:8,9,17
  224:17,18 250:17 251:1
  265:11 266:21 267:4
  268:16 274:5,8 283:12
  366:12
sensing
  197:22
sensitive
  338:10
sent
  34:9 68:5 135:22 164:1
  184:22 187:12 216:2
  217:4 218:5 257:16
  270:2 289:14 290:11
  292:12 296:2 298:4,4,5
  298:11 299:9,16 333:19
  333:20 335:10,12,14
  343:2
sentence
  257:19,20 365:4
sentences
  217:14,23 219:1
separately
  314:21
separates
  261:9
September
  35:16 95:7 329:2,7
  331:19
series
  42:10 273:17 324:5,
  391:12
serious
  141:22 344:12
served
  15:5 361:1 369:23

service
  111:5 150:7,10 272:21
services
  88:16 110:15
sessions
  356:22
set
  57:8 59:5 73:6
setting
  20:12 109:10
settlement
  18:14,15 19:13
seven
  336:17,18 340:6,8
severance
  28:21,23 29:9,12,15 41:14
  41:22 151:15,17,21,22
  152:3 279:23 280:2,15
  280:20 281:2,9 293:15
  353:21 360:3,8
severely
  242:19
sexual
  384:18,23
Shannon
  117:10 179:17 284:23
  285:1,2 286:8 297:13
  318:23 330:5 350:4
  351:9 386:15 392:18
  394:1 397:12 398:5
  406:7 407:11
Shannon's
  84:5 297:15,17
share
  18:16 109:20 250:23
shared
  253:15 282:1 395:18
shares
  95:11
sharing
  150:14
Sharon
  132:15 135:4
sheets
  181:12
Shelly
  128:23 129:1,2 130:20
  132:1,2 134:7
shift
  305:14
shipment
  148:17
shipping
  149:12,13,14,14
shirt
  378:7
shock
  148:18
shocked
  281:14 282:17
Shoemaker

362:2,5
shop
  305:15
short
  43:20 60:8 86:5 150:12
  164:7 186:20 268:15
  269:19 291:10 303:14
  333:9,17 341:20
shot
  158:11 235:3
show
  64:3 164:10 167:16
  199:20 200:3 207:21
  212:19 230:2 254:12
  256:21 289:22 294:15
  324:1 334:12
showed
  69:1
showing
  199:10 294:20
Shows
  222:1
shut
  149:16 180:8 251:3
shutting
  180:12
sic
  374:9
side
  24:16 53:23 54:2,12,15
  54:23 65:1 112:7,20,22
  114:3 116:16,18 119:18
  124:22 128:4,5,11
  129:13 144:4 148:14
  180:20,20 181:5 202:15
  202:18,21 203:2 204:12
  223:1,15 224:6 225:12
  226:1 227:2 228:5,10
  229:3 231:22 232:4
  243:9 272:6 377:16
sign
  363:12
signature
  2:8 170:9 171:1,4 353:3,6
  353:8 358:13
significant
  366:4
similar
  27:13 31:23 32:3 71:23
  270:13,14 320:17,19
  381:20
simple
  87:15,16
simplifying
  111:1
simply
  116:13
sir
  12:22 23:23
sit
  138:6 159:14 165:10

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

363:13 379:5
site
212:10 219:8
sites
207:7
sitting
142:15
situation
50:23 63:14 74:6 142:8
157:15 173:11 205:7
274:12 322:12
six
10:19 13:3 24:17 26:16
53:12 105:5 112:18
114:19 125:6 232:21
331:16
sixty
336:18
skills
210:10 258:2
Slabey
130:4,6,7 299:10
slam
187:19 188:7
slap
189:4
slide
215:23
slides
215:19,21
slight
107:15
slow
149:18
slowly
237:14 297:9
slur
401:3
slurs
400:2 401:19,23 402:4,9
small
54:6 176:15
Smoothies
55:8
smoothly
35:11
Social
10:10
soda
224:12
sold
27:2,5
soldier
192:7
sole
312:2
solely
367:5
soliciting
270:8
solid

133:16,17,20,21,21 230:17
solutions
38:7
somebody
66:22 108:14 110:4
150:13 173:12,15 176:8
189:4 197:10 204:22
216:3 220:13 221:2
229:2,4 236:12 286:12
289:15 293:23 298:7
310:4 318:11 321:18
365:23 373:19 374:8
383:15
somebody's
188:20 258:17
something's
268:6 293:13
somewhat
224:9 264:7 273:13
son
11:6
sons
11:19
soon
14:16 76:10 165:14
266:22 324:18 367:12
394:4,11
sorry
14:1 23:3 26:10 29:10
31:15 46:8 51:7 84:15
90:16 122:22 136:3
177:8,14,18,18 193:22
227:9 359:17 364:18
387:1
sorted
327:14
sought
342:21 347:15 360:16
sound
58:10 95:4 336:18 343:14
sounding
389:5
sounds
312:18 336:21 362:22
sources
296:20 348:1
south
27:6 159:17 397:5
Southeast
21:16,19 22:4 23:20
335:7,19
southern
46:18 164:15
SouthTrust
40:16,17 42:14 63:9,11,13
63:18 65:11 66:11 67:1
69:1 71:3,22 73:8,12
75:6 90:13,19 92:21
93:1 135:8 142:22
147:13,18 148:6 150:21
151:3,8,13 152:1,2,7

267:13 268:3 282:6
288:12,17
SouthTrust's
151:9 288:12
speak
8:9 43:12 245:21,22
246:6 252:23 300:1
350:12 377:23 389:12
speaking
166:3 179:19
special
72:5,12,14,14
specialized
74:1
specific
144:19,20 145:5 195:19
205:14 220:8 376:7
378:4 395:7,19
specifically
143:12 150:1,2 215:13,15
278:11,13,16 283:21
291:17 380:14 388:7
specifics
38:14 142:5 303:16,19
395:1
specs
109:16
speculation
249:17 274:16
speed
155:21
spend
38:19 39:18
spending
91:23 199:8 225:17,19
spent
223:4,5 228:9
Spiceland
396:10
Spier
1:21 2:6 5:1
spoke
43:10 246:6 285:17,23
spread
73:1
spring
32:7
Springfield
393:12
squarely
57:14
St
397:5
stable
60:10,11 62:10 63:20
81:20
stack
51:20
staff
32:18 33:16
stage

145:23 146:1 183:7 193:2
209:2 372:18 385:20
409:4
stages
125:5 126:6,20 130:2,18
194:7 198:7 227:17
392:19
stakeholders
308:13
Stakely
14:3,4,7,18,22
stance
260:8
stand
393:2
standpoint
38:18 62:4 69:17 98:19
116:5 182:18 235:13
stands
100:2 110:5
Stanford
32:9 36:2
stare
116:13
start
31:2 63:20 82:21 147:1
225:5 235:8,9 279:2
313:3 321:4 330:11
332:21 345:3 407:2
408:12
started
10:2 25:16 37:16 40:7
52:2,6 56:18 61:7
119:16 128:10,12 148:5
148:13,14 149:3,10,10,19
150:12,14 188:13 197:13
197:18,21 198:2,5,14
200:4,8 223:14 224:5
224:12,17 225:11,17,19
226:14 228:11,11,12
297:11 329:4 333:18
336:4 337:9 351:11,13
starting
71:9 92:20 114:2 121:14
141:20 148:16 219:1
223:16 268:1 331:18
394:14
starts
114:21 115:4 225:23
227:1
state
5:3 6:4 21:16,19 22:5
23:20 90:7 221:1,5
322:20 336:11 360:2
363:17 410:4
stated
233:13
statement
136:8,9 363:13 373:2
378:13
statements

82:9 87:1 363:2,6 403:21
states
1:1 280:9 359:2
stating
51:11
status
118:14 377:13 388:20
395:13
statute
308:9
stay
48:12 61:23 278:3,22
289:18 322:10 361:18
stayed
271:17 316:2 342:3
stays
92:7
stenotypy
410:9
step
82:19 89:9 156:4,5
228:15 229:10
stepped
57:8 105:21
stepping
243:17
steps
114:21 295:21
stepson
11:16 13:15
stern
177:5
Steve
46:23 47:3,5,15 48:2,23
61:4 65:22,23 67:13
80:18,20,21 89:2
STIPULATED
2:2
stipulation
5:7
stipulations
5:20
stock
95:18
stockbroker
19:15
stocks
91:1
stop
25:1 61:18,18 104:18
113:19 116:1 119:1
406:12
stopped
106:8
stored
310:20
story
333:9
straight
23:15 132:4
straits

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                                                                    http://www.TylerEaton.com

282:3
strange
66:15 72:18 273:17
strategic
37:7,9 38:22 195:11
strategically
38:1,8 197:7
strategy
159:7 169:12 220:11
258:20,22 302:1 357:10
400:11,16 405:16
Street
61:12 304:14,18,21 305:3
305:9 306:5 311:14
313:5 315:13 318:2
stress
345:12 348:1 385:7
strike
152:18 239:9 251:22
364:17 384:5
strong
80:16 84:6 196:3 204:2,5
204:8 373:20 385:21
strongly
77:4
Strowbridge
272:8 273:5
structure
117:16,21 155:7 202:23
263:10,17
structured
274:8
structures
115:12 117:3
struggle
223:18 264:23
struggled
132:14,17 133:22 134:3
struggling
74:4 92:15 98:11 120:5,6
124:2 310:8 339:16
361:9
stuck
174:10 384:12
students
219:11,14
Studied
351:15
study
85:21,22
stuff
25:9 108:21 115:4 173:21
227:5 268:1 307:16
308:17 309:17 311:17
315:19 327:10,10,12,12
327:13,14,14,15 361:4
386:10 394:9 395:15
subjects
164:11 368:8
submitted
68:23 334:20 335:1

subsequent
302:9,15 392:15
substance
388:23
substantial
64:4
subtly
405:1
success
408:6
successful
98:8 144:8
sudden
98:12,17 137:13 293:8
sue
30:12
sued
30:5,8 160:14 252:11
suffer
177:21 342:11 383:1
suffered
308:11 338:22,22 339:11
339:12 342:6 382:8
383:20
suffering
112:13 339:6
suggest
279:2 402:8
suggested
184:9 219:7,8,18 345:15
suit
17:2 160:20 386:20
suits
388:2
summarized
69:2
summarizing
218:10
summary
218:18
summer
24:10
Sunday
11:15
sunk
144:9
supervision
410:12
supervisor
106:16
supplier
219:18 300:13,14 377:12
suppliers
298:14
supply
37:18,20
support
124:12 136:18 333:22
380:17
supported
262:4

supporting
93:5 387:21
supposed
59:19 80:7 153:16 158:14
180:12 219:14 299:5
supposedly
95:10 99:14 214:7 318:10
sure
18:12 33:22 34:12 42:17
50:1 56:9 67:21,21,23
70:18 74:13 98:4,10
102:22 141:16 145:14,18
146:15,16 150:15 161:21
162:11 168:15 173:10
183:5 192:12 200:15
201:14 205:17 214:22
217:20 229:17 261:4
262:2,18 263:5 270:2
270:18 271:8 272:16
282:13 283:20,22,23
284:15,17,20 285:18
292:20 301:17 306:12
306:13 310:14 314:8
318:19,20 321:17 332:16
335:15 349:17 358:2
360:7 363:10 369:10,11
369:12 370:20 374:3
377:22 378:1 384:1
386:5,11,18 387:15
388:12 389:4 394:15
395:10 396:14,16 399:8
407:2
surface
156:22 157:4 230:4,5
surprise
231:9 338:17
surprised
275:7 282:20 300:21
survival
302:3 408:6
survive
81:14 186:13 293:11,13
297:4 320:14
survived
301:17
suspect
208:12
suspected
15:21
suspicions
288:5 294:8,9
sweat
174:7 238:11
sweating
247:14
swom
5:16 16:21 18:2,23
symptoms
337:2,11 343:1,17 345:23
syrups
56:2

system
219:21
Systems
214:11
S-corporation
321:19
S-L-A-B-E-Y
130:6

───────── T ─────────

T
2:1,1 4:5 410:1,1
table
184:15
tack
222:10
tag
373:11
tail-end
405:11
tainted
102:3
take
7:17 8:8,10,14 15:14
16:21 22:16,19 23:14
48:10 72:22 82:11 83:4
95:6 97:14,18 109:16
124:8 125:6 154:16
155:11 156:1,5 168:13
169:20 203:4 210:5
216:11 239:1,3 241:18
260:8 262:21 276:12,14
279:13 294:3 295:18,21
296:21 313:4 319:10
337:4,17 338:13,18
348:4 387:22 394:14
402:19
taken
2:5 23:8 56:10 59:12
73:9 79:12 85:13 101:9
101:15 113:21 169:23
184:19 188:12 224:7
239:5 276:15 317:6
318:1 337:7 363:6
402:22 410:8
takes
91:12 95:3 102:4 106:17
127:15
talent
45:2
talented
44:17 219:5 221:18
talk
20:10 23:18 42:11 49:13
51:1 55:11 57:4 63:17
68:10 71:4,16 124:17,18
151:20 152:17 156:14
162:10 163:10 164:6
166:11 167:11 168:2
172:10,21 173:4 179:9

179:13,15 183:10 186:23
195:2 229:2 231:2
240:7 250:20 252:17
264:16 267:9 268:17
270:12 275:8 284:12
296:23 300:8 301:11,18
301:23 302:20 352:9
357:2,3 373:17 377:19
379:11 380:21 381:8
388:14,15 389:13
395:20 398:19,23
404:14 406:14 409:3
talked
65:9 83:1,2 84:17 111:7
132:4 134:4 156:13
174:20 177:23 179:5
210:14 211:15,19 222:15
252:16 253:10 259:14
268:5 284:17 285:13,14
286:7,9 290:20 297:10
297:13,14,15 298:15
299:4 300:2,5 302:23
314:5 318:3,20,21,22,23
321:17,21 322:7 325:8
344:2,5 360:11,15
363:10 368:9 370:17
376:5 386:14,23 389:4
391:11 394:2,12 398:9
398:11 407:12,14 408:8
talking
30:4 44:16 47:3 48:23
55:9 78:2 92:21 115:11
131:18 135:13 136:11
137:2,3 145:2 149:8
155:4 177:12 235:19
250:16 254:5 260:19
264:13 276:18 282:5
284:16 296:16 297:12
299:21 322:13 374:19
376:19 379:20 388:7
389:2 390:10 393:21,22
394:18 399:1 400:10
404:21 408:13
talks
351:16
tape
19:9,18 363:2
taped
19:5,7,14,20 20:1,4,7
targeted
381:16
tasks
33:12 255:9
Tea
126:3 130:10 143:7
147:16
teaching
231:5
team
82:1 92:18 110:13 114:13
115:2 140:3 205:16

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

246:3  255:8  263:11
296:18  297:6
tea/coffee
126:11
technical
229:3  235:13  377:16
technically
42:8  323:4
Telephone
171:10
tell
8:3  10:8  15:15  23:21
42:17  56:14  71:4
109:12  115:8  124:5
139:12,17  154:16  158:14
164:21  173:7  190:21
192:5  193:13  195:7,13
204:22  240:12,13,17,17
240:21  244:2  251:13
256:8  276:19  277:22
291:2  300:16  302:12
303:23  334:15  337:2
343:23  350:16  351:21
353:18  354:14  357:16
365:5  367:3  375:15
378:6  387:16  392:3
393:14  396:11  397:7,15
398:2  401:3  404:10
telling
10:5  40:23  93:1  100:9
142:16  171:13  225:2
251:17  259:5  264:19
277:6  287:4  303:21
306:6  355:22  372:13
tells
197:14
ten
11:21  12:6,17,17  261:12,13
305:5  387:13
tend
384:14
tends
345:12
tension
34:16  348:22
tenure
68:19  142:1
term
17:11  33:20  212:14  213:19
401:16  402:13,14,20
403:2,7
terminate
77:5,8  78:7  79:1  84:17
193:6,12,15  194:5
195:15  206:19,23
222:14  225:14  239:11,21
245:1,5,13  246:11
249:22  250:2  369:20
371:15,22  372:4,6
terminated
41:10  59:11  77:16  137:16

154:4  169:1,8  171:21
175:15  192:15  220:17
244:4,9,16  245:10
246:15  248:12  249:9,13
249:20  251:14  273:21
318:5,15  349:23  363:18
363:22  372:22  399:18
399:21
termination
41:12,18  42:9  154:8
171:18  192:19  193:9
274:10,10,17
terminations
273:10
terms
7:1  64:23  69:18  91:16
100:11  103:1  117:15
128:1,13  129:20  133:8
146:4  155:19  157:9
165:7  177:1,2  218:16
374:11
terrible
261:9
territory
27:7  28:5
testified
5:17
testify
9:11,16,19  16:13,19  17:14
testifying
16:3  17:16
testimony
16:21  18:2,23  138:21
364:8  372:16  382:15
tests
345:19
Texas
41:21  396:8,9  397:3
thank
11:6  177:15  203:13  264:1
325:23  384:11
thanking
256:15
themes
90:10
theory
138:17
thereabouts
200:22,23
thereto
2:22  410:10
thing
7:13  79:23  80:2  120:2
144:23  149:1  166:20,21
180:14  201:15  216:16
230:16  238:14  252:14
265:6  268:19  318:9
338:19  358:21  394:14
395:21
things
37:10  49:11  50:2,15,16

56:13  81:10  84:10
85:22  86:2  92:4  97:5
108:5,7  110:22  111:2
137:14  140:17  143:4
148:20  163:18  169:11
176:13  181:13  189:3,14
197:18  200:5  225:8
230:14  231:12  243:13
244:8,18,20  252:20
265:21  283:9  284:9
295:4  302:21,22  313:17
313:17  333:17  356:18
393:1  395:17  408:13
think
7:3  18:5  19:7,10,14,16
22:20  23:10  24:22
30:9  31:5  32:7  34:4
38:8,14  40:8  49:7,11
50:18  52:18,19,19  53:13
56:13  57:20  58:5,13,15
58:21  60:11  63:3,4,7
64:8,10  67:1  70:6
72:23  73:20  74:22
77:10,12  80:19  82:23
83:8,23  84:2,4` 88:19
89:19  90:18  93:2,7
97:8  99:12  100:16
101:12  102:7,8  104:1,4,5
104:7,12,23  105:3,10
106:3,3,4  113:2,4  117:2
117:11,13  126:16  132:16
133:10,11  134:1,3,23
135:2  139:6,8  141:9
146:23  150:4,4,17
155:12,13  156:18  157:6
158:17  160:12,19  161:10
167:16  168:19,20  169:6
171:7  172:15  174:3
175:13,15,16,19  180:5,18
182:2,2  183:8,13,16
185:2,2,10,18  186:5
188:22  193:20  194:8,20
194:21  195:20  196:18
198:2  199:12,20  201:6
201:12  202:3,10,12,13,15
203:7,10,16  205:2,3,7
205:10  207:4  213:14
214:23  219:13  222:16,17
223:18,19  227:14  228:1
230:4  231:5  233:8
234:19  238:12,15,16,17
253:3,11  256:1  258:5
267:20  268:4,7  269:14
270:1,2,7,17  272:15,16
272:19,19  273:16  274:2
275:21  285:8  289:13,15
291:9,10,19  292:20
293:6  296:2  299:8,9
300:4,7,12  301:9
302:20,21,23  303:3,7,13
307:12  308:6  310:1,1

314:15  315:3,17  316:17
323:7  324:4  327:3
328:14,14  329:1,2
330:15  340:21  341:6,19
343:15  344:22  346:3
347:6,17,18,22  349:21
364:5  365:16  367:22
370:3,16  372:5,9  373:4
376:13  377:7  383:12,16
383:23  386:3  393:23
394:16  398:9,16,18
408:15,23  409:5,13,17
thinking
66:9  190:11  194:10  197:18
208:19  310:10  384:2
third
163:21  170:7  257:20
thirty
110:3
thirty-five
50:4  51:4  359:15
thorough
83:14
thought
79:7  196:19  197:16
198:17,23  205:16
207:13,14  221:23
230:18  231:10  242:11
247:7  253:21  262:20
262:23  265:20  293:17
293:20  295:14,16
304:23  306:21  307:18
307:21,22  308:1  309:2
309:17  310:13  312:4
315:11,16  322:13  345:3
345:8  354:18,19  355:1
381:6,7  402:13
thousand
50:4,7  51:5  231:16
255:19  256:6  260:6,17
271:21  280:22  289:4
329:23  330:19  331:15
331:16  336:16,17  341:11
341:18,23  342:4  359:15
359:19,20
three
7:4  9:20,21  10:20  11:9
15:11  28:15  58:21  66:23
73:16  75:1,9,10  95:15
134:20  148:13  156:6
168:5  172:10,23  174:22
185:15,16  232:16,20
239:1  267:10  296:3
340:3  341:13,15,16,17
346:17  349:22  359:22
370:7  407:12
throat
83:11
Thursday
292:22,23  319:4  388:19
tier

219:14,15  334:18
tight
248:3
time
2:20,21  13:6,10  14:16
15:3  17:23  19:8,10  26:5
29:4,5  34:21  35:5,6,20
39:2,3,6,18,20,22  43:1
43:21  44:14  45:18
46:22  47:18,23  48:3
50:5  52:8,15  53:20,21
56:7  57:20  58:6  59:16
60:1  61:5  64:7,17  65:10
66:8  69:9,14  70:13
75:14  76:18  78:11,19
84:7  86:6,8  89:10
90:11  91:8,9,11,12,23
92:1  101:5  102:9,20
112:5,12  113:9  120:12,15
124:12,18  125:10,18
126:17  127:5  135:13
140:9,11  141:18,19,23
143:7  144:20  145:7
147:9  155:11  158:21
159:22  160:4  165:9
168:15  175:10  184:4
185:7,10  187:3,7  189:22
190:3  192:18,18  193:9
196:16  197:13,17,21
198:14  199:8  200:2,8
200:20  202:10,13
204:13  206:20  207:12
208:3  213:2  214:4,8
221:22  223:3,5  224:17
224:21  225:17,20,20,22
226:23  227:11  228:9
229:14  232:19  236:12
236:14  237:14  238:22
239:14  243:2  247:5
262:14  264:4,23  268:6
268:18  270:7  271:21
272:17,19,22  273:19
274:6,21  275:19  277:6
280:16  286:2  293:6,11
297:11  301:21  302:22
304:5,6  305:2  306:8,13
307:18  308:4  311:20
319:1  322:18  331:20
332:10,11,15  333:13,18
333:19  334:3  335:15
336:3  340:15,17  341:5
341:20  345:8,14  346:18
347:3,5,7,23  356:2
360:21,22  364:9  368:17
370:19  375:21  382:18
384:9,10  385:15  391:11
400:3  402:17
timeline
167:19
times
6:23  7:4  15:12  108:9

Tyler Eaton Morgan Nichols & Pritchett, Inc.

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

143:22 184:1,3,5 186:10
186:22 187:1 189:13
191:4 222:20 266:16
307:14 346:14,17 348:3
349:15 376:4 386:18
387:10,12 407:13

**tip**
134:21

**tired**
10:3

**tirelessly**
255:7

**title**
33:17 49:7,11 52:5,7
57:2,3,4,5,19 58:6,19
100:14 107:14 121:3
155:6 189:5 202:8
203:5,6 224:12 351:15
374:11

**titles**
58:12,15,22 100:11 106:18
106:21 155:16

**today**
9:11,17 10:2,6 21:2 30:4
247:20,21 358:18
372:17 388:14

**told**
18:21 42:13,14 72:4 91:5
112:9 113:11 123:8
135:17,20 137:8 139:3
140:9 141:12 148:19
153:16 164:20 165:5,12
165:23 181:9,16 183:9
183:18 210:8 239:8,9
240:2 241:4 253:6,13
269:1 276:1 281:15
284:7 285:18 287:7,11
291:15 292:3 302:21
303:20 306:3 311:21
318:5,8,12,16 324:13
325:16 354:1,7 364:2
370:4 375:6 376:22
382:10 386:3 389:11
391:5 395:2 396:14
408:19

**Tom**
133:17 331:23

**ton**
228:7 299:12

**tone**
179:4,8 402:10

**tongue**
134:22

**tons**
68:19,20

**tool**
326:5,7

**top**
53:12 57:23 130:15
212:16 217:12 219:14
335:5 364:15

**tope**
219:13

**topics**
166:13 169:4,5

**total**
63:7

**totality**
344:22

**totally**
173:19 199:13 288:17

**tough**
133:9,9 260:8 384:9,10
385:14

**touted**
381:1

**town**
40:3 46:15 199:18

**train**
155:10 163:7 198:12
236:12 364:11 366:22
367:5,12,15,19 368:13
368:21 370:12

**training**
14:11 368:15

**transcript**
410:13

**transferred**
35:8 198:19

**transition**
34:10,11 35:9,13 168:15
205:20 278:5

**traumatic**
342:17

**travel**
223:7 269:10

**traveling**
39:23

**travesty**
140:8

**treat**
160:21 175:21,23 178:8,9
178:10,11,12,17 179:14

**treated**
152:23 153:3,7 154:1,13
154:18,20,23 156:8,9,17
156:23 157:7 160:7
163:19 166:7 167:22
168:6,21 169:14 171:14
172:2,12 173:5,7 174:12
178:15,19 240:4 242:12
242:13 247:8 408:2

**treatment**
157:11 339:8 342:22
347:16 360:16

**trial**
2:20 18:11

**tried**
159:13 200:11

**trip**
169:18

**Tropicana**

55:8,14,22,23 125:10,16
125:22 132:15 259:21
357:21

**trouble**
354:12,15

**true**
142:20 206:16 287:2
288:6 409:11 410:13

**trust**
383:4

**trusting**
383:13

**truth**
10:5 264:19

**truthfully**
9:11,17,19

**try**
123:13 200:11 203:20
295:21 362:1

**trying**
49:6 60:14 65:6 69:21
70:11,23 71:1,3 77:13
82:16 90:11 108:15
115:14 123:6,10 126:12
133:15 134:3 144:21
155:12 160:12 166:3
169:17,18 177:6 180:9
180:10 189:17,20
190:23 191:5 192:6
200:14,15 225:7 230:21
230:22 231:4 233:21
247:15 261:16 262:20
263:11 264:18 286:4,15
296:4,18 297:23 300:3
312:11,13 315:17 335:17
361:22 365:18 366:6
378:12 389:7

**Tuesday**
285:10 398:6

**turmoil**
255:7

**turn**
61:21 65:2 69:7 71:9
170:7,15,23 358:12,20
362:23 364:17

**turned**
47:8 60:7 64:2 69:10
84:11 98:14 116:15
265:21 337:19

**turning**
115:15 265:2 266:7

**turns**
118:23

**turn-around**
74:3

**twelve**
63:5,7 305:5

**twenty**
345:6 387:13

**twenty-first**
20:20

**twenty-four**
297:22

**twenty-two**
287:11

**twice**
7:2

**twisted**
58:18

**twists**
394:15

**two**
9:21 11:8,19 19:19 24:14
26:20 34:6 42:4 51:22
67:5,6 68:7 73:16 75:1
75:8 82:17 83:20 97:10
104:16 106:14 125:7
130:13 148:12 154:11
167:3,21 174:7,19 184:5
185:16 190:18 193:22
201:11 205:18 214:8
223:9 232:7 233:3,4
238:23 252:20,21
267:21 294:9 299:12
312:10 319:9 325:19
337:20 339:3 340:12
341:5 346:17 347:10
349:22 356:6,8,11
365:18 379:15 386:18
387:13,15 396:5 398:17

**type**
48:19 76:3 357:12 400:15

**typed**
217:16

**typewriting**
410:11

**typical**
143:23

**T-O-P-E**
219:13

**U**

**U**
2:1

**ugly**
177:4

**uh-huh**
6:19,22 7:12,16 13:22
14:5 15:13 23:1 30:21
31:1 43:13 46:6 51:13
52:1 53:1 65:12,18 69:3
96:17 100:6 110:10
111:9,13,18 171:23
174:16 203:12 204:4
205:22 206:4 231:18
244:12 252:5 254:8,23
267:7 271:13 277:15
282:7 284:11 304:10
306:17 389:21 403:9,12
405:20

**uh-uh**

**7:16**

**ultimately**
99:7 159:8 345:1 383:4
383:17

**unaware**
135:5,7 234:6 275:5,6
363:1

**unclear**
203:16

**undergraduate**
234:12

**underlined**
217:13,23 219:1

**underlining**
217:22

**understand**
6:8 7:10,23 8:4,5 38:16
43:9 82:3,5,8 83:2
86:23 92:13 98:22,23
104:14 110:23 128:2
137:6 151:18 152:8
153:1,1,14 154:10 168:9
177:6 180:13 187:21
188:21 190:1,17 191:7
196:15,17,22 200:16,19
205:17 233:21 234:4
235:12,14 236:9 237:11
238:4,10 264:15 268:18
304:2 337:14 338:8,11
365:13,18,20,22 366:2
367:16 368:3 373:20
378:12 384:21

**understanding**
48:5 59:16 62:11 63:10
80:3,6 87:12 92:21
96:8,22,23 97:2,3,7
180:21 181:8 203:14
237:15 266:4 269:3,5
280:6 355:16,18 356:16

**understands**
257:9

**understood**
55:2 180:19 188:22
196:13,14 366:8,9,9,10

**unemployment**
336:11,14,19

**unfortunately**
66:17

**unique**
38:6

**UNITED**
1:1

**university**
21:17 219:9 234:11,15

**unprepared**
37:14

**unqualified**
376:18,23 378:21

**unquote**
33:16 118:4 185:9 193:14
195:8 203:23

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                    http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

unstable
81:20
unwarranted
286:23
updates
388:20 391:16 392:16
393:1 395:14 397:11
upper
191:16,18
ups
64:10
upset
147:5 165:22 264:17
284:3
upsetting
165:3
up-to-date
395:12
use
33:20 163:17 171:10
179:7 362:1 370:11
400:2 401:19,23 402:4
403:15 404:3
useful
305:1 307:19,20,23 309:3
315:11
Usual
5:19
usually
38:2
U.S
32:8

V

validated
294:9
valuable
204:14
value
200:12 229:16,19,21
269:13 325:1 376:14
377:11
valued
230:2,5,6
Vanholten
133:17
variety
108:4 133:23
various
106:18 218:21 307:14
vendor
146:23
vendors
137:11,17 138:14 146:22
148:10,15 149:6 281:23
308:11 334:18
venture
98:21 181:10
VENTURES
1:10

verbal
48:18
verified
378:10
verse
351:18
versus
7:15 28:2
vested
293:23 296:7 301:16
vs
1:9
viable
81:12,20,21,23 83:17,18
84:12
vice
56:16 103:11,13,15 164:2
193:17 353:16
Vick
300:2 303:2
Victor
300:3,5,16 302:4,10,17,20
303:1
videotaped
363:3
view
132:6 133:12 164:8
167:15 179:16,18 186:9
200:9 306:14
VII
351:15
vindictive
156:16
violated
165:7 350:11 351:11
352:4 392:15
violating
17:9
violation
17:3 392:21 394:13
visit
42:20 228:14 344:7
346:14 362:4,6,10
visited
227:21 332:18
visiting
228:13 297:12 346:12
visits
107:22
vocal
273:19
voice
179:5,8
void
119:5
VP
32:18,23 33:3,8 37:6,8
38:21 47:6 49:4,7,12
52:8,22 57:2,19,20
58:4,6,8,9,15,16,17,23
100:5,7,21 106:23 107:3
108:10 118:23 122:2,5
158:11 188:12 197:15

198:1,19,20 200:21
202:6 203:4,7 205:20
206:3,7 211:20,22
212:4 223:11 224:10
226:17 234:19 241:3
298:16 330:9 355:17
365:6 370:12 372:20
373:7,7,8 374:2 375:13
375:18 376:1 379:1

W

Wachovia
40:18
waived
2:10
waking
9:23
walked
195:9 196:4
wall
191:6 404:15,19,22
want
23:21 38:14 41:17 42:2,3
42:6 48:20 53:3 62:18
62:20 64:11 83:10
85:18 86:16 87:4 100:4
123:7 133:1,2,6 144:3,5
144:5,8 145:3 146:9
152:22 158:4 161:21
162:11 164:5 165:13
167:6 168:13 173:9,20
176:16 184:7 186:23
198:8 211:3 216:15
228:16,19 240:7 245:22
250:20 256:23 262:5
262:13 268:17 275:8
276:12,13 289:17
293:10 304:1 311:15,16
311:17,18 318:7 321:18
340:19 349:15 351:13
352:9 354:5 372:22
373:2 374:2,16 381:23
386:4 387:2 388:4
402:23
wanted
39:3 41:16 45:3 51:18
69:12 70:7 72:20 81:5
81:18 82:8 83:22 85:11
85:19 86:7 87:14 88:17
88:17,20,21 89:7 94:10
113:15 119:6 143:7,8
155:9,10 158:4 167:7
185:3,11,12 196:20
197:5 204:15 228:21
234:3 251:12 255:3
260:11 261:20,21,22

262:2,17 264:14 277:3
277:7,13 283:1,7,8
284:8,9 286:15 296:9
301:6,11,18 308:2,23
310:9 311:17 325:13
358:21 364:21 365:8
366:17 374:6 389:17
wanting
62:12 63:18 64:11 70:17
89:4 92:16 215:11
222:5 253:7 261:4
266:2
wants
143:13 144:1
warrant
308:22
wasn't
22:8 31:8 35:16 39:19
48:16,17 51:21 64:4
70:9,12,12 79:9 82:7
85:17 87:23,23 91:23
92:11 94:12 101:15
108:8 118:9 120:22
128:5 135:19 142:20
167:18 174:2 178:21
187:18,20,22 188:16
189:15 190:19 191:14
192:21,22 193:3,4 199:4
199:6,7 208:9 213:2
227:23 230:15 234:2
236:15 243:9 245:12
248:13 253:22 259:13
261:18 262:18 264:2
265:5 270:6 283:18
286:14 318:16 332:14
339:23 348:14 356:2
357:14 358:4 375:4
379:11 390:20 399:3
400:5 408:5
watch
250:17
water
219:23
watershed
220:19
way
32:17 33:23 46:13 56:13
73:1 77:14 80:18 92:7
92:8,14 93:4 105:9
114:21 128:9 137:19
138:2 154:16,17 155:22
162:9 163:13,21 168:16
172:11 173:18,18 174:14
174:19 175:2 176:14
178:20,21 179:13,15,20
181:8 182:22 183:2,10
183:18 187:4 189:7
214:14 224:5 231:8
233:13 240:3 241:21
251:18 253:1 258:13,14
264:20 267:17 273:9

273:20 284:1 286:5
321:7 325:21 337:17
373:6 391:3 408:2,20
Wayne
66:16,22 67:1 72:16
ways
171:13,17 240:16 244:5
252:6,15 357:2
weaknesses
85:11,12 87:19
wealthy
157:21
wearing
213:20 378:7,8
website
182:3,4,12 192:21,22
Wednesday
285:10,11 304:2 319:8
398:5
week
11:8,10 104:16,16 119:19
119:20 190:18 223:9,9
232:15,16,20 267:19,20
325:18 332:20 337:22
340:4,7,9 347:9 349:22
388:17 398:5
weekend
338:1
weekly
70:6 107:23 111:16,19
114:8 116:5 118:6,15
139:22 276:4,20 277:1
weeks
39:18 112:8 113:11 232:8
232:14,15,23 233:2,3,4
278:4,23 281:2 289:5
293:12 294:9 325:19
337:20 341:13,15,17
342:2 347:8 349:22
356:6,8,11 360:4,9
weigh
345:12
weightlifting
345:9
welcome
67:23
went
18:11 23:14 24:1,12 30:22
33:4 39:10 42:20 43:2
43:4,10,11 55:10 72:15
77:22 79:4,19 106:3
117:17 127:12 157:1
159:19 165:18 169:11
226:3,9 228:9 234:10
259:2 272:10,19 274:21
304:8 306:1 321:8
332:20 342:23 344:3,7
345:6 346:5,7 347:13
370:20 384:9 385:14
386:22 389:23 393:8
weren't

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

42:22 55:20 64:5
77:18 89:6 119:4,8
142:21 148:10,16 149:4
190:16,17 199:12,14
200:6 209:18 215:2
221:15 228:7 249:13
263:5 283:19 356:17
405:2
**Wetumpka**
10:16,18 12:15 322:22
**we'll**
8:10 16:21 51:1 63:17
68:10 124:17 152:17
154:16 165:8 166:11,17
180:6 193:1 266:14
**we're**
20:10 30:4 42:5 69:11
115:1,6,11,13,14,15,15
123:6,15 124:16 137:10
140:9,10,14 144:11
145:2 162:10 163:10
164:23 167:11 168:2,12
172:9,21 186:12,14
190:22 197:14 207:13
213:11,13 222:5 230:20
230:21,22 231:4 242:5
262:8 266:13 267:9
274:3 287:12,14 314:3
325:20,22 376:12
385:22 388:6 389:1
391:20 409:17
**we've**
48:22 134:4 136:20 137:9
146:10 149:15,16 183:13
203:19 211:15,19 222:15
222:17 246:3 281:15
295:4 354:22 360:11
363:10 364:5 381:14
387:15 398:4 408:23
**we-want-you-to-join-the...**
48:18
**whipped**
165:19
**white**
3:13 154:2,5 168:12,20
169:9,10,16 195:12
213:12 222:5 233:10
343:14,15 347:17 378:7
404:17,18,20 405:17
**wholly**
376:17
**wife**
11:2 13:16 39:2 386:16
395:4
**wife's**
11:11
**willing**
283:13
**willingness**
151:9 288:13
**Wilton**

24:7,12
**Winter**
1:17 2:5 5:10,15 6:2,6,7
6:8 10:7 12:10 56:12
156:10 163:16 168:11
175:3,4,14,17 195:12
205:14 209:10,14 216:11
216:22 239:7 314:19
337:8 393:10 406:12
**Winter's**
314:7
**wise**
83:8 185:19
**wish**
104:3 123:23
**wished**
295:3,10
**witness**
2:9 5:10 15:18,22 16:9,10
410:14
**witnessed**
181:13
**Wochester**
39:5
**woman**
173:14 178:13
**woman-owned**
219:22
**Wool**
362:15
**Worcester**
36:22 37:1
**word**
122:14 123:17 163:5
173:10 186:14 200:13
213:18 251:9 264:10
360:8
**words**
72:7 81:13 184:10,12
186:17 188:13 211:7
268:21 278:6 363:8
403:1
**work**
13:18,21 14:2,14,21 15:20
24:1 26:6 28:17 30:22
36:7 74:2,3 93:6
104:18 108:19 124:13
159:6 180:19,22 189:7
199:10 210:7,12 218:16
220:13 224:15 226:11
233:19 237:18 241:11,14
241:19 242:4 252:2,3
255:4 265:4 270:14
272:10 295:15 320:16
329:11,12 331:19,20
332:2,6 333:22 337:19
337:23 338:16 340:11
340:12,23 360:4,9
367:23 368:1,19 375:12
377:17
**worked**

14:17 24:13 25:19,21
26:23 27:3 38:7 41:9
43:1 67:13,14,15 102:22
105:9,15 182:5 226:20
233:8 235:5 236:20
255:7 325:19 340:16,19
**working**
31:2,7,14 39:21 64:13,20
74:2 92:2 115:2 175:9
188:19 199:11 227:2
233:9 241:15 243:8
247:15 305:14 329:4
330:1,11 332:8,12,13
333:18 336:4 338:7
339:20 341:8,22 342:4
357:10 361:5 368:10
375:17 376:13 385:22
**works**
238:12 266:5
**world**
143:23 388:3
**worried**
70:12 117:20 385:5
396:19
**worry**
140:13 152:20 246:7
266:14 339:20
**worst**
159:9 176:20
**worthy**
209:21
**wouldn't**
146:1 156:4,11 159:16
181:7 229:20 235:8
370:15 385:4
**wow**
225:6 281:20 351:19
354:11,15,20
**write**
101:22 307:11 363:14
**write-up**
41:4
**writing**
217:19,21 220:22 313:23
**written**
48:17 363:2
**wrong**
105:17 294:7 328:16
343:6 359:5 366:14
**wrote**
217:16 218:6
**W-O-R-C-E-S-T-E-R**
36:23

**X**

**X**
4:1,5

**Y**

**yeah**

12:7 13:11 16:10,23 18:3
18:8,15 19:16 25:15
27:10,17 28:4 29:16,18
30:12 34:6,20,20 36:12
38:5 39:7,13 40:9
45:11 51:8 52:19 54:13
54:13,18,19 55:13 59:15
60:18 63:15 68:21
75:14,17,21 76:3,11,13
80:6 81:9 85:17 88:8
90:3 93:11 94:6,16
96:6,15 98:6,7,10,14
100:23 104:10,19 105:7
106:14 109:14 112:8
118:8 121:23 124:14
127:20 131:3,23 133:19
134:22 139:16 143:12
144:10 148:21 149:2
151:20 154:9 158:1
159:5,22 160:19 162:18
162:19 172:19 173:3,3,3
173:20 175:6,11 178:2
178:19 179:12 180:7
183:13 200:23 201:6
202:1 203:6 210:13
211:4 212:23 217:6
220:2,18 221:17 222:1
222:11 225:3 227:14
231:15 232:2 237:20
246:17 247:22 250:17
254:17 260:18 273:12
282:17 288:4 290:6
292:2,18,23 294:16
295:6 298:10 305:17
306:12 309:4 322:17
326:7 334:17 335:22
341:7,16 342:23 347:6
360:18 367:7 368:9
374:5 378:22 380:2,19
381:22 385:14 387:4,6
389:4 392:1 394:20
395:3,5 398:1 406:22
**year**
11:15 12:3,6 14:20 21:10
21:21 24:9 28:14 61:22
70:4 112:14,15,16,21
113:1,5 114:11,15,16
115:22 116:1 141:23
207:22 255:20 269:7
280:23 317:2 331:15,16
339:3 347:4 359:16
**years**
10:20 12:17,18 26:20
34:6 54:18 125:7
130:13,16 154:11 185:16
185:16 205:18 238:23
322:4 339:3 345:6
354:19 386:18 387:15
398:17
**yep**
129:11 334:21

**yes-or-no**
7:14
**yields**
86:1 116:7
**young**
164:14 175:22
**younger**
157:20 322:5 332:18
**y'all**
12:11,16 91:3

**Z**

**Zone**
259:19 260:3,5,7,16
358:1,2

**0**

**03**
203:10
**04**
205:19 226:5,9
**05**
105:6 329:2,3 380:3
**06**
347:5,6

**1**

**1**
4:7 170:2,5 217:12
**1.4**
143:8,10,20 144:15 146:9
269:5
**1:23**
169:23
**10**
4:16 184:4 259:23
260:22 294:18,21
362:23
**10:08**
56:11
**11**
4:17 10:9 317:11,14
363:17
**11:02**
113:22
**11:07**
113:22
**12**
4:18 202:19 323:22
324:2
**12:02**
169:23
**13**
4:19 326:15,19 368:23
**14**
1:18 4:20 5:9 334:10,14
**15**
4:21 271:11 352:22 353:2
**16**
4:22 358:8,11

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031

http://www.TylerEaton.com

JERRY A. MCCARTNEY, ET AL.
ONYX CAPITAL VENTURES, LLC, ET AL.

ROBERT WINTER
August 14, 2007

379:14
170
  4:7,8
1819
  3:14
19
  34:5
1957
  10:9
1976
  21:12
1980
  21:22 25:17,18
1981
  351:16
1983
  15:18 24:22 25:20 26:9
    26:10 359:7,9
1987
  19:16
1990
  30:20 359:4
1991
  26:10 30:21,22 31:5
    359:5,11
1993
  26:8,9 359:3
1995
  35:18,19

---
2
---
2
  4:8 170:18,21 358:20
2:05-CVI207-MHT
  1:5
2:12
  216:19
2:13
  216:19
2:38
  239:6
2:44
  239:6
20
  382:6 386:2,7
20th
  329:15
2000
  13:9,12 39:2,9 40:8 52:3
    56:21 61:10 113:4
2001
  10:21 12:13 18:7 62:2
    74:20,21 75:13 90:16
    94:3 114:18 170:15
    259:1 266:9
2002
  57:6,7 58:1 59:1 61:6
    63:18 74:19 75:20 78:4
    78:21 87:6 88:7 91:11
    91:15 93:10,11,15 94:4

100:5 204:6 205:12
2003
  58:3 76:12,17 91:13,16
    93:16 95:4 102:5
    120:18,20 132:20 185:7
    201:12,13 205:19
    206:20 255:6 408:9
2004
  102:20 103:4,18,19 105:3
    105:14,18,19 106:12
    121:5,10,14 122:10 125:1
    127:16 144:13,17 145:10
    171:6 185:8 201:4,7
    202:1,5,19 203:3,10
    209:2 227:9,13 250:14
    408:10
2004–2005
  124:18
2005
  125:2 136:23 137:5 139:9
    141:11 148:5 194:18
    196:6 207:22 226:22
    227:6,8 231:14 254:7
    271:11 275:9,16 276:19
    279:18 280:8,16 287:10
    287:21 304:2 329:7
    331:18,19 353:15,20
    354:1 359:21 371:22
    399:18
2006
  340:21 361:13 362:16
2007
  1:18 5:9 329:17,18
201
  4:9
216
  4:10
22
  170:15 275:8,15 276:19
    279:18 304:2 353:15
    354:1 359:21
22nd
  288:23 313:1 319:8
23rd
  313:2,3 319:3 320:4
    322:9 330:13,14 356:5
230
  329:15
236
  10:15,17 12:23 13:14
236
  12:19,21
24–7
  191:1
254
  4:11
256
  4:12
27
  361:13
270
  4:13
279

4:14
289
  4:15
29
  280:8,16 353:20
29th
  280:4,5,13
294
  4:16

---
3
---
3
  4:9 201:17,20
3D
  362:16
3–D
  343:4
3:28
  276:16
3:35
  276:16
3:48
  292:13,17,21 326:13
3:49
  326:13
30
  5:5
317
  4:17
323
  4:18
326
  4:19
334
  4:20
352
  4:21
35203
  3:15
358
  4:22
36093
  10:16
36103
  3:8

---
4
---
4
  4:10 9:23 216:6,9,23
    218:1 224:20 237:23
    380:6
4:15
  315:8
4:16
  315:8
4:41
  337:7
4:45
  337:7
401

5:8
  44
25:9
  491–66–3035
  10:12

---
5
---
5
  4:11 254:10,13,19 257:17
5th
  3:14
5:00
  349:7
5:01
  349:7
50
  88:9 184:4 278:2,19
    353:19
5059
  3:7
51
  95:11,18

---
6
---
6
  4:3,12 256:19,22 257:13
    360:14 361:19
6:06
  409:19

---
7
---
7
  4:13 250:14 270:20,23
    271:4 362:14
7th
  244:6 250:22
7–Up
  35:3

---
8
---
8
  4:14 279:9,12 289:9
    290:13,18 293:4 306:11
    325:9 328:13
8th
  326:8
83
  25:22

---
9
---
9
  4:15 171:6 289:20,23
    290:8 294:14
9:04
  5:10
9:56
  56:11
90
  184:4
93

32:7 34:5
95
34:5 36:11,12 315:19
99
36:12,12,13 39:1

Tyler Eaton Morgan Nichols & Pritchett, Inc.

800.458.6031                    http://www.TylerEaton.com

*Bob Winter*

STATE OF ALABAMA
COUNTY OF MONTGOMERY

DEFENDANT'S
EXHIBIT
1
*Winter*

## PIKNIK PRODUCTS CONFIDENTIALITY AGREEMENT

THIS CONFIDENTIALITY AGREEMENT (hereinafter referred to as the "Agreement") is made this 1/22 day of Jan , 2001, between Piknik Products Company, Inc., an Alabama corporation, having its principal place of business at 3806 Day Street, Montgomery, Alabama 36108 (hereinafter referred to herein as "Piknik"), and _____, (hereinafter referred to as "Employee").

### RECITALS:

1.   Piknik is in the business of packaging and manufacturing food products under contract for various food manufacturers and beverage companies which are referred to herein as "Co-Manufacturers"; and

2.   Such Co-Manufacturers as a condition of entering into production or packaging contracts with Piknik have required Piknik to keep any and all information regarding the processing of, production of, marketing of, selling of, receipts for and quantities of any product Piknik processes or packages as well as any of the terms and conditions of the Packaging and Manufacturing Contracts described below, whether such information is conveyed orally or in written form or by observation, as confidential, proprietary and trade secret information, and Piknik has agreed that such information shall be confidential, proprietary and trade secret information; and

3.   Additionally, Employee may have access to information processes, process parameters, methods, practices, manufacturing techniques, technical plans, algorithms, formulas, computer programs and related documentation, customer lists, information regarding manufacturing methods and procedures, sales distribution, marketing information, price lists, supplier lists marketing plans, financial information, designs relating to the business of Piknik, which information is confidential, proprietary and trade secret information; and

4    Employee has either applied for employment with or is currently employed by Piknik and as such may have access to such confidential information and Piknik, as a condition of employment of Employee or as a condition of continued employment of Employee has required Employee to enter into this Confidentiality Agreement recognizing that the confidential information is confidential, proprietary and trade secret information and Employee is agreeable to same.

NOW, THEREFORE, in consideration of the foregoing premises and good and valuable consideration from Piknik to Employee, the sufficiency of which is hereby acknowledged by Employee, Piknik and Employee do hereby agree as follows:

1.      Confidential Information. Employee agrees to keep the terms and conditions of this Agreement confidential and secret. In addition, Employee agrees to keep confidential and secret any and all Confidential Information as described herein. As used herein, the term "Confidential Information" shall mean any and all information regarding the processing of, production of, marketing of, selling of, receipts for and quantities of any product Piknik processes or packages, whether such information is conveyed orally or in written form or by observation, and includes but is not limited to information processes, process parameters, methods, practices, manufacturing techniques, technical plans, algorithms, formulas, computer programs and related documentation, customer lists, information regarding manufacturing methods and procedures, sales distribution, marketing information, price lists, supplier lists marketing plans, financial information, or designs relating to the business of Piknik, and includes, but is not limited to the terms,

E:\Executive\FORMS\Confidentiality Agreement.rtf

conditions and existence of any and all manufacturing agreements or co-manufacturing agreements between Piknik and the various companies for whom Piknik performs contract services (sometimes referred to herein as the "Packaging and Manufacturing Contracts").

2.    <u>Obligation of Employee</u>. Employee shall keep such Confidential Information strictly confidential and secret and shall not divulge, communicate or transmit Confidential Information to third parties nor utilize Confidential Information in any commercial manner, except for and on behalf of Piknik. Employee shall further restrict disclosure of any such Confidential Information only to other employees of Piknik who require this information in connection with the performance of their duties on behalf of Piknik. Employee acknowledges that such Confidential Information is specialized, unique in nature and of great value to the Piknik and its subsidiaries, that Piknik is required by its Co-Manufacturers to keep such information confidential, and that such information gives Piknik a competitive advantage in the marketplace and Employee agrees to exercise reasonable efforts to safeguard and preserve the confidential status of such Confidential Information. Employee shall take whatever action may be necessary to prevent others from using or disclosing such Confidential Information without Piknik's written permission except for the purposes specifically set forth herein.

3.    <u>Survival of Agreements</u>. The obligations of this Agreement are continuing and survive the termination of Employee's employment with Piknik. Employee agrees to deliver or return to Piknik, at Piknik's request at any time or upon termination or expiration of this employment or as soon thereafter as possible, all documents, computer tapes and disks, records, lists, data, drawings, prints, notes and written information (and all copies thereof) furnished by Piknik to Employee relating to or which pertains to the Confidential Information.

4.    <u>Termination of Employment/Equitable and Injunctive Relief</u>. Employee acknowledges and agrees that a breach or threatened breach by Employee of the obligation to keep the Confidential Information confidential as provided for herein shall be grounds for immediate dismissal or termination of employment of the Employee by Piknik. Furthermore, in the event of a breach or threatened breach by Employee of the obligations under this Agreement, Employee acknowledges that Piknik will not have an adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain Employee from the violation of this Agreement. Nothing in this paragraph shall be construed as prohibiting Piknik from pursuing any other remedies for breach or threatened breach of this covenant, including the recovery of damages from Employee.

5.    <u>Employee Remains Employee at Will</u>. Nothing stated herein shall be construed to indicate that Employee is anything other than an Employee at Will and this Agreement shall not be deemed to imply that Employee is other than an Employee at Will.

6.    <u>Miscellaneous</u>. This Agreement will be governed and construed in accordance with the laws of the State of Alabama. In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been contained herein. Time shall be of the essence in this Agreement. This Agreement shall not be amended, modified, supplemented or changed in any way except by written agreement of the parties. Any reference in this Agreement to the date of this Agreement shall mean and refer to the date on which this document has been signed by the last party to sign this Agreement. Each party to this Agreement shall be and is hereby authorized to date this Agreement as of the date on which this Agreement is signed by the last party to sign this Agreement. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and permitted assigns. There shall be no inference or rule of construction which shall apply based on the fact or circumstance that either party drafted any or all of the provisions of this Agreement. No person shall be deemed to possess any third-party beneficiary right pursuant to this

E:\Executive\FORMS\Confidentiality Agreement.rtf

Agreement (except for any of the parties under the Packaging and Manufacturing Contracts). It is the intent of the parties hereto that no direct benefit to any third party is intended or implied by the execution of this Agreement (except for any of the parties under the Packaging and Manufacturing Contracts).

**IN WITNESS WHEREOF,** Employee has hereunto set his or her hand and seal and Piknik has caused this instrument to be executed the date set forth above.

**PIKNIK:**
Piknik Products Company, Inc.

By: _____ [Seal]
   As its duly authorized _____

**EMPLOYEE:**
_____ [Seal]
Name: _____

**STATE OF ALABAMA**
**MONTGOMERY COUNTY**

I, the undersigned, a Notary Public in and for said County and State, hereby certify that _____, whose name as _____ of Piknik Products Company, Inc., a corporation, is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that being informed of the contents of said instrument, he, as such officer and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this _____ day of _____, 200__.

(NOTARIAL SEAL)

_____
Notary Public
My commission expires_____

**STATE OF ALABAMA**
_____ **COUNTY**

I, the undersigned, a Notary Public in and for said County and State, hereby certify that _____, whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this day that being informed of the contents of said instrument, he, executed the same voluntarily.

Given under my hand and official seal this _____ day of _____, 200__.

(NOTARIAL SEAL)

_____
Notary Public
My commission expires_____

E:\Executive\FORMS\Confidentiality Agreement.rtf



# Internet, E-mail, Telephone Use Policy

Reliance on computers for communications has grown to such an extent that it would be difficult to function without this tool. However, the emergence of electronic mail (e-mail), voice mail and the Internet as tools in communicating information creates a number of potential concerns. If these tools are improperly used, not only is it a waste of Piknik resources, but it can expose both Piknik as well as individual employees to liability for antitrust and/or copyright violations for improper receipt, downloading or dissemination of information. In addition, Piknik must continue to protect trade secrets and proprietary information that could be improperly disseminated internally or externally through e-mail, voice mail or the Internet.

Therefore, in order to assure the utmost protection from liability resulting from misuse of its computers, Piknik is implementing a policy describing the proper use of electronic communications systems such as e-mail, voice mail and the Internet.

**Communications must be business related:** The use of e-mail and the Internet are to be used in the course and scope of the users performing their duties for the company. Occasional personal use is acceptable if the employee's manager has approved such use and the company's computer resources are being used in a manner consistent with the spirit and intent of this policy. Company computer resources may not be used for personal gain or profit and may not result in misuse of work-time. Similarly, company computer resources may not be used in a manner that is unprofessional or unethical or in any way compromises the company or its business reputation. Use of company electronic communications systems in a manner inconsistent with this policy may subject the user to severe discipline up to and including termination.

**The Company May Audit and Review all E-mail Communications, Telephone and Internet Usage:** All e-mail, telephone communications and information accessed through the internet by means of the company provided computers are the property of the company. Piknik reserves the right to retrieve and review any electronic messages composed, sent, received or stored through company provided computer communication systems without notice to employees for any purpose or as required by law. Internet access and usage through company provided computers is subject to review by the company without notice to the employee.

## EMPLOYEE RESPONSIBILITIES

**General:** Electronic communications may survive long after they are composed, sent or received. Electronic communications can have the same impact legally as formal written



reports, letters and memos. Therefore, such messages should be as carefully and thoughtfully composed as written communications sent by another means of transmission. Accordingly, when drafting an electronic communication, employees should think about the following:

**Prohibition on Illegal or Harassing Communications:** Participating in online gambling, chatting, chain letter distribution or accessing or disseminating pornographic material is strictly prohibited. In addition, sending messages with sexual content, overtones or messages that would tend to disparage or harass others on the basis of gender, race, age, disability, religion, sexual orientation or national origin is strictly prohibited. (These are simply examples of prohibited uses and are not meant to be exhaustive.)

**Compliance with Other Company Policies:** Electronic communications must be written, communicated and stored in a manner consistent with all other applicable policies.

**Proper Disclosure or Dissemination:** Employees may disclose electronic communications or information contained in electronic communications only to authorized employees or vendors. This is especially important with respect to legal and proprietary information. Therefore, posting confidential or proprietary information regarding the company, its products or its customers on Internet sites such as bulletin boards is strictly prohibited.

**Use of Proper Legends:** All computer-based communications containing technical or proprietary information must be marked "Company-Confidential & Proprietary."

Any employee found to have misused, acquired without approval or unlawfully breached the security or integrity of the system as it is intended would be subject to discipline up to and including termination.

**Compliance with Copyright Laws:** Employees may not download or distribute copyrighted software or material available through computer networks without authorization from the Information Technology department or the employee's immediate supervisor. Any personal software that is being installed by the employee requires written approval from the Director of Information Technology. In addition, employees are not allowed to distribute or remove software that had been licensed to the company.

**Solicitation of Outside Business Ventures:** Employees may not use company computer/telephone communication systems to solicit on behalf of outside business interests or charitable organizations without first receiving written approval from their manager and member of senior management.

**Anti-Virus Procedure:** Employees may not download, use or distribute software or executable programs from computer networks without first verifying their operational

**Reporting Misuse of Computer Networks or Phone Systems:** Any employee having knowledge of the use of company computer/telephone communications systems in a manner inconsistent with this policy should immediately notify their immediate supervisor, manager, or human resources.

**Violation of any of the foregoing rules may result in discipline up to and including discharge.** My signature below indicates that:

1) I have **read and understood** the internet, e-mail, telephone communication policy of Piknik Products Company

2) I agree to conduct my behavior in accordance with that policy.

3) I further **understand and accept** that this policy is a condition of my continued access to the internet/e-mail/telephone communication systems as well as my continued employment at Piknik Products Company

4) I **understand and agree** that abuse of Piknik's Internet, e-mail and telephone systems or use of these systems for purposes other that those benefiting Piknik Products Company is grounds for disciplinary action up to and including termination of employment on the first offense.

Employee: _Robert Ichton_   Date: _7/9/04_

Supervisor: _____   Date: _____

HR: _____   Date: _7/9/04_

# Piknik Products Company

# Internet, E-mail, Telephone Use Policy

I hereby request access to the Internet/E-mail/telephone communications. I **understand and agree** that such access is to be used for Piknik Products Company purposes only. I further **understand and agree** that my approved access to the internet/e-mail/telephone communications system is neither private nor secured. It may be monitored by the designated personnel or systems in place at the request of Piknik Products Company or its designee. I further **understand and agree** that abuse of the internet/e-mail/telephone

# Piknik Products Company Internet, E-mail, and Telephone Use Policy

I hereby request access to the Internet/E-mail/telephone communications. **I understand and agree** that such access is to be used for Piknik Products Company purposes only. I further **understand and agree** that my approved access to the internet/e-mail/telephone communications system is neither private nor secured. It may be monitored by the designated personnel or systems in place at the request of Piknik Products Company or its designee. I further **understand and agree** that abuse of the internet/e-mail/telephone system or use of system for purposes other that those benefiting Piknik Products Company is grounds for disciplinary action up to and including termination of employment on the first offense. I further **understand and agree** that my acceptance of the terms and conditions of this policy is a condition of my continued access to the internet/e-mail/telephone communication systems. I also **acknowledge having read and understood** Piknik Products Company internet/e-mail/telephone communication system policy.

Employee: _Robert White_    Date: _7/9/04_

Supervisor: _____    Date: _____

HR : _____    Date: _7/9/04_

## PERSONNEL ANNOUNCEMENT

<u>January 12, 2004:</u>

Michael O'Connell has left his position as President of Piknik Products, effective immediately. Mike will not be replaced at this time. Mike's responsibilities will be split between Chris Day and Patrice Daniels of Onyx Capital Ventures. Chris will take responsibility for operations, logistics, quality and human resources, and Patrice will take responsibility for sales, contract administration, purchasing, finance and IT. Jeffery Larry of Onyx remains Chairman and CEO of Piknik.

Reporting to Chris will be David Daneshmayeh, General Manager, Condiments; Jerry MacCartney, Director of Logistics; Bert Mayer, Director of Operations; Shannon McGlon, Director of Quality; and Brenda Sellers, Manager of Human Resources.

Reporting to Patrice will be Henry Hicks, VP Sales & Marketing; Bob Lampert, VP Finance; Bob Winter, VP Purchasing and Contract Administration, and Athenia Figgs, acting Director, Information Technology (IT).

We wish Mike every success in his future endeavors.


Patrice Daniels          Chris Day              Jeffery Larry
EVP – Sales & Finance    EVP – Operations       Chairman and CEO



Attachment A.
Note the underlined sentences that refer to our claim of discrimination.

——Original Message——
> From: Henry Hicks [mailto:hhicks@piknikproducts.com]
> Sent: Wednesday, February 16, 2005 1:08 PM
> To: Shannon McGlon (E-mail); Chris Day (E-mail); Robert Lampert
> (E-mail); Bert Mayer (E-mail); Jerry MacCartney (E-mail); Bob Winter
> (E-mail)
> Cc: Sales Group (E-mail); Jeffery Larry (E-mail); Brenda Sellers
> (E-mail)
> Subject: Call Summary - PepsiCo
>
>
> On January 15th, 2005 Jeff Larry and I met with April Blackmore at
> PepsiCo's
> offices in Chicago. Following is a summary of the call.
>
> _____
>
> 20oz business is done! We should begin producing in Pepsi's period 4
> and
> they will take all that we can give them through period 9. Annual
> estimate
> is 3mm 24 pack cases annually. Pepsi will fund all capital. She also
> asked
> that we look at the possibility of installing a Hi-Cone machine on the
> end
> of Line 301. The idea is that this would drive even more volume our
> way.
> Our pricing is fine, and at those rates they will try to keep us full.
> In
> fact, April strongly hinted that we might consider raising our price a
> bit.
> Action: Bob W. we should look at the tolling to see if we want to take
> the
> price up, or eliminate the teiring.
>
> If the 34oz product does as well as hoped, she would want to put this on
> line 301 and this would have them on there year-round.
>
> On the 20oz, April wanted to get Tim Olson down to walk Line 301 and
> make
> sure that there is no needed capital that has been overlooked. We need
> to
> provide them with lead times, a project plan and estimated production
> dates.
>
> 500ml Propel may be the next product that they look at Line 301 for.
> The
> new And 1 product will also be in the same package. They will know in
> May
> which direction they want to go in for the Propel.
>
> Regarding the Season's Best and Twister products that we mentioned in


DEFENDANT'S
EXHIBIT
WINTER

> our
> proposal, she suggested that we stay away from them. The business is
> not
> growing. Gatorade and cans are where its at, she said. She mentioned
> that
> 11 plants make the 15.2oz trop product - so price is the driver on this
> business.
>
> Pepsi would be interested in Line 302 for the And 1 product. This
> allergen
> based product will be in the 500ml Propel bottle, bliss box with roll
> fed
> labels. They will be making a decision on this project in May/June of
> this
> year, and may be interested in participating in the capitalization of
> the
> new line. Action: Henry and Bob W. to follow up with April and with
> Unilever to include them on the cost of constructing the line.
>
> Regarding the gallon production, she indicated that the business is
> growing
> 7-8% per year. She also said that there has been some discussion of
> putting
> Propel in the Lenny bottle.
>
> We discussed the tight schedule that we have this year given that we
> have
> added a new customer. She was concerned that we were displacing them in
> favor of Arizona. I assured her that this was not the case. She did
> ask
> that we quickly move to 48 or 72 hour CIP if possible to get more
> capacity
> out of the line. Action: Bert and Shannon - please let Henry know if
> we
> have written authorization from Pepsi to CIP every 48 or 72 hours. If
> not,
> I will ask April and Ken to have someone take the steps needed to offer
> that
> approval.
>
> I indicated that we were installing a bulk depal system this season and
> asked for a price increase to $1.25 per case. She agreed. She also
> indicated that they should have been accruing for the difference between
> the
> tolling that we billed in 2004 and the agreed to price of $1.20. She
> was
> very pleased with this investment and is hopeful that we will see
> increased
> volumes and efficiencies as a result.
>
> PepsiCo's canned energy drink business (Sobe Adrenaline Rush, Mountain
> Dew
> Amp) is growing at more than 70% per year. They are actively looking
> for
> capacity to manufacture these products. There is a particular need on
> for

> this on the west coast. It may make sense to put a can line in Alatex.
>
> Whitlock (OK), PriPack (IN) and Creir (WI), as well as Mark Ocean Spray
> (NV) - which manufactures 12, 24 and 64oz Gatorade, have each been, are
> or
> are rumored to be for sale. Dean Foods in Benton Harbor, MI
> manufactured
> aseptic packaging, but they closed the plant.
>
> April is interested in moving to a master PepsiCo contract with Piknik
> that
> will cover all Gatorade and Tropicana business. She will discuss this
> with
> Sharon and report back next steps.
>
> We discussed our desire to recruit talented minorities in operating
> roles
> within the company. April suggested using diversity.com as a search
> site
> and suggested cultivating a relationship with NC A&T University. She
> said
> that they have a great engineering school, where the students have good
> co-op experience. She said that Ford get the tope tier of students
> there,
> but that we could get 2nd tier candidates and be very pleased.
>
> April suggested that we invite their supplier diversity person, Ernest
> Freeman, down to Piknik. She said that we are the only MBE in their
> system,
> with the exception of a woman owned business in Mass. that does water
> for
> them.
>
> The meeting ended something like 3 hours later...
>
> Henry
>
> H. Beecher Hicks, III
> Vice President, Sales and Marketing
> Piknik Products Company
> 404/653-8914 office
> 334/265-1567 x217 office
> 404/313-6669 cell
> 509/471-8561 efax
> www.piknikproducts.com



Date:  March 4, 2005

To:    Bob Winter
       Vice President, Sales Administration

From:  Chris Day
       President

Re:    Salary Adjustment

Bob, I wanted to acknowledge your hard work on behalf of Piknik since Onyx acquired the company in 2003. In the face of adversity and turmoil, you have worked tirelessly to keep the management team focused on important tasks and keep our key customers happy. You have never put yourself before the Company, and your dedication has been an example for everyone.

I am pleased to raise your salary to $100,000 per year, effective today. Additionally your participation in the management incentive plan, which provides you with a target incentive participation of 20% of base salary if we hit our EBITDA target, will be applied to your new salary retroactive to the start of the fiscal year.

You've been a foundational employee at Piknik, and I am personally grateful for all you have done. I look forward to working together to build out this platform into something great. Thanks for all of your hard work.

Chris

Cc:    Jeffery Larry, CEO
       Brenda Sellers, HR


DEFENDANT'S
EXHIBIT

**From:** Bob Winter [mailto:bwinter@piknikproducts.com]
**Sent:** Tuesday, March 08, 2005 6:39 PM
**To:** Chris Day; cday12345@aol.com; hhicks@piknikproducts.com; Jeffery Larry
**Subject:** Thank You

Chris/Jeff/Henry,

I wanted to thank you for the letter last week. In a lot of ways, I feel a sense of vindication. I realize that when Onyx arrived on the scene, I may have not been represented well by Mike O'Connell given my long standing concerns with his business and leadership skills. In addition, I was playing the bad cop in the In Zone debacle, negotiating a delicate contractual dispute with Tropicana and attempting to protect Piknik's interest with Quaker regarding the 10oz delamination issue among others. In addition, navigating the dysfunctional leadership/ownership structure while trying to focus the leadership team on the key drivers of our business and generate a profit was probably the greatest challenge I have encountered.

Under new ownership and the constant fear of liquidation not pounding on my door, I was able to breathe a sense of relief. Soon I realized my contributions to Piknik may not have been well represented to Onyx and I may have in fact I been maligned. I always believed that should I stay the course, be true to my values and beliefs and continue to apply myself to the business at hand, that someday my actions, behavior and contributions would be recognized.

My reason for sharing my family situation with you is to make it clear that my motivation is not for wealth or title or power or prestige. Yes, I would like to be rewarded relative to my contribution; however, my passion for Piknik's success goes well beyond these goals. A profitable and growing Montgomery based company provides me the opportunity to be with my children the three nights p/week I have them. This has always been my driving force during those many months before and after the Onyx acquisition. They are 8 and 12 years old. I only have 10 more years to nurture, train and enjoy them. Then they are off to college. I share this not to create a sense of obligation on your part, rather, to illustrate my passion for the success of Piknik is at the core of my motivation and therefore, my commitment to you.

With that said, I would like to continue to explore and enjoy the satisfaction of job enrichment that comes with a dynamic, growing and successful enterprise. We still have a lot of work to do. I look forward to applying myself to that mission.

Thanks again,
Bob Winter



**From:** Brenda Sellers [mailto:bsellers@piknikproducts.com]
**Sent:** Friday, April 15, 2005 11:39 AM
**To:** Piknik All
**Cc:** cday12345@aol.com; Chris Day
**Subject:** FW: Reorganization Announcement

Hello Everyone,

Please read the following attachment in regard to the reorganization of certain members of the company and some additional personnel moves.

Thanks

Brenda Sellers

HR Manager





## ORGANIZATIONAL ANNOUNCEMENTS

April 15, 2005

As you know, Team Piknik was fortunate to add two world-class players recently to its senior management team ... Anthony Barber, as Vice President and General Manager of the Beverage Division, and Carl Bleier, as Vice President and General Manager of the Condiments Division. With these two additions, we have all the pieces in place on our senior management team to continue to bring the focus and intensity to move Piknik forward on all fronts.

To maximize this effort and continue the significant improvements we are seeing in our business, we have reassigned certain members of our organization and made some additional personnel moves. In the **Condiments Division**, Eddie Crosby is moving to Condiments as Production Manager in Brundidge, reporting to Carl. Eddie will be responsible for production, maintenance and sanitation. We are extremely excited to have a proven leader from within Piknik move to join Condiments, and we are confident that he will help speed the improvements to our business in Brundidge.

In the **Beverage Division**, **Bert Mayer** will assume the role of Plant Manager, Day Street, reporting to Anthony Barber. Bert will assume leadership over the team that had been reporting to Eddie Crosby at Day Street. **Jerry MacCartney** will assume the role of Plant Manager, Alatex, also reporting to Anthony. All of the Alatex personnel will report to Jerry. As a result of the above assignments, **Jimmy Whitehead, Dawn Mitchell and Bill Boykin** will now report directly to Anthony Barber.

Similar to Condiments, the QA Managers in Beverages will now report directly to the plant managers of the facility in which they work, with a dotted line to **Shannon McGlon**. Shannon remains QA Director in charge of the overall Piknik quality systems, and **Allen Walters, Barbara Williams and Jessica Daniel** remain accountable for implementing the system at their respective plants.

In Beverage Sales, **Bob Winter** becomes Director of Customer Planning, reporting to Henry Hicks, to reflect his vital role in onboarding and interfacing with our customers.

Regretfully, with change sometimes come departures. In Condiments Sales, we are changing our emphasis from a geographic focus to a market focus, and as a result we are eliminating the positions of **Bob Gross and Letitia Strowbridge**. In administration, we are eliminating the receptionist position held by **Clarice Crosby**. We want to thank Bob, Letitia and Clarice for their service and wish them well in their future endeavors.

We are confident that these moves will greatly enhance our ability to deliver results across all areas of the company. We are grateful for your continuing efforts and support.

Jeffery Larry
Chairman & CEO



June 22, 2005

Mr. Robert Winter
3806 Day Street
Montgomery, AL 36108

<u>HAND DELIVERED</u>

Dear Bob:

I regret to inform you that the current circumstances at Piknik necessitate changes in your position with the company. Effective this pay period your rate of salary will be reduced to $50,000 per year, and your position will be eliminated effective July 29th, 2005.

We want to be as supportive as possible as you transition to another career opportunity. Please use the time between now and the end of July to support your colleagues in the transition of your job responsibilities, but also to consider and commence a search for a new position. You are welcome to use me, Henry or Brenda as resources or to answer any questions during this period.

It is with genuine regret that we are making these changes to ensure the continuation of the company. Please accept my thanks for your service and commitment to Piknik Products.

Sincerely,

Chris Day
President

cc:    Henry Hicks
       Jeff Larry
       Brenda Sellers



**From:** Robert Winter [mailto:robertawinter@bellsouth.net]
**Sent:** Thursday, June 23, 2005 3:48 PM
**To:** 'Henry Hicks'; 'Brenda Sellers'; 'J Larry'; cday12345@aol.com
**Subject:** [JunkMail] Termination effective immediately

Henry,

Further to our conversation of yesterday, it will not be possible to continue as an employee of Piknik until the termination date you noted of July 29th, 2005. This termination is effective immediately.

Thanks,
Bob Winter



**From:** CDay12345@aol.com [mailto:CDay12345@aol.com]
**Sent:** Thursday, June 23, 2005 3:59 PM
**To:** robertawinter@bellsouth.net; hhicks@piknikproducts.com; bsellers@piknikproducts.com
**Subject:** Re: Termination effective immediately

Bob:

I am sorry the company's circumstances have changed so quickly, and I wish we didn't have to do some of the things we've had to. I understand your decision to not work the next 5 weeks. Your resignation is accepted.

I know you gave us your best while you were here, and I really appreciate it. I wish you the best going forward.

Chris


DEFENDANT'S EXHIBIT



# MEMORANDUM

TO:        Robert Winter

FROM:    Henry Hicks

RE:        Return of Company Property

DATE:     June 23, 2005

## HAND DELIVERED

Upon your resignation today from the company you made it clear to me that you did not intend to immediately return company property. This memo will serve as a reminder that the law and the company information technology policy that you signed makes it clear that all company property must be promptly returned upon the conclusion of your employment.

Further, it has come to my attention that you have taken steps in recent days, and as recently as the evening of the 22nd, to gather company information that was not germane to the performance of your job duties and that was not resident on your company issued computer (i.e. Carpedia and production yield data). Given the decision that you made today, I can only conclude that these efforts were intended to collect proprietary information for use in a competitive manner or in other ways that may be harmful to Piknik. This is unacceptable and will not be tolerated.

I am requesting that you immediately return all company property to Brenda Sellers at the Day Street plant. This will include you laptop computer, cellular telephone, and other assets that the company may have purchased to aid in the performance of your job. In addition, this will include all electronic media used to store company information (i.e. diskettes, CD ROM's, Zip Disks etc), and paper files relating to company business. I am also requesting that you provide Brenda with a memorandum attesting to the fact that you have returned to the company all such information and any copies thereof, including any data or files that may be stored in your home or on a personal computer or other storage device. **Failure to do so by the close of business on June 24th, 2005 will be addressed seriously and result in immediate legal action being taken that is intended to compel the same.**



**From:** introlink@bellsouth.net
**Sent:** Friday, July 08, 2005 11:07 AM
**To:** bsellers@piknikproducts.com
**Cc:** rloeb3@juno.com; hhicks@piknikproducts.com
**Subject:** Return of company property

Brenda,

I spoke with Ricky Loeb and Henry Hicks this morning. As you may know by now, my computer and back up copies were given to Ricky Loeb on Monday, June 27th. I still have my cell phone which I will give to you when I return next week to Montgomery.

The reason I held onto this equipment was due to the retroactive pay reduction and the fact I was told I would unlikely receive an expense check for my latest expenses. Along with my cell phone, I will bring my last expense report into you.

Please e-mail me back confirming receipt of this e-mail.

Thanks,
Bob Winter


DEFENDANT'S
EXHIBIT

July 10, 2005

Dear Brenda,

As I mentioned last Friday, I returned the computer and back up disks to Ricky Loeb on Monday June 27th. I returned it to him after discussing the letter from Henry Hicks dated June 23rd. Could you please discuss this with Ricky?

Further, the next day I called Ricky to tell him I had a box of misc Piknik materials in my car along with my cell phone that I would give him. We have not had a chance to make this exchange to date. I will drop these off to you Monday morning July 11th.

These are the last of Piknik related property that I have. This completes the request outlined in Henry's letter of June 23rd.

Bob Winter
334-514-9047 home
334-328-8770 cell



| Company | Street Address | City | State | Zip | Prefix | First Name | Last Name | Title |
|---|---|---|---|---|---|---|---|---|
| ACG Automotive Americas | 101 Total Solutions Way | Alabaster | AL | 35007 | Mr. | Chris | Freeze | HR Manager |
| Arvin Meritor/Sejong | 450 Old Fort Road | Fort Deposit | AL | 36032 | Mr. | Dave | Mashburn | Vice President |
| CNC Enterprises | 1748 County Road 1149 | Troy | AL | 36081 | Mr. | Chang | Keun Jo | President |
| Arvin Meritor | 139 Folmar Parkway | Montgomery | AL | 36105 | Mr. | Todd | Morgan | Operations Manager |
| Auto Electronic America Corporation | P.O. Box 876 | Georgianna | AL | 36033 | Mr. | Joseph | Choi | President |
| Collins and Aikman | 1395 Mitchell Young Road, Suite B | Montgomery | AL | 36108 | Mr. | Jim | Comperchio | President |
| Delphi Steering | P.O. Box 311 | Athens | AL | 35612 | Mr. | Curt | Cargile | Operations Manager |
| Daehan Solutions CO. LTD | 9101 County Road 28 | Hope Hull | AL | 36043 | Mr. | Kevin | Kim | COO |
| Dongwon | 12970 Montgomery Highway | Luverne | AL | 36049 | Mr. | Charles | Harbaugh | HR Manager |
| Glovis Alabama | 300 Hyundai Boulevard | Montgomery | AL | 36105 | Ms. | Liz | Lindemann | HR Manager |
| Glovis America | 250 Hyundai Boulevard | Montgomery | AL | 36105 | Mr. | Patrick | Foran | VPC Manager |
| Hisan | 103 Thomas French Drive | Scottsboro | AL | 35769 | Mr. | Matt | McKinnon | Plant Manager |
| Halla Climate Systems Alabama Corp | 676 Halla-Bama Drive | Shorter | AL | 36075 | Mr. | Sung Woo | Oh | Managing Director |
| Hinge Tech USA | 302 March Street | Union Springs | AL | 36089 | Mr. | Simon | Kwek | CEO |
| HS Automotive Alabama, Inc. | 100 Sonata Drive | Enterprise | AL | 36330 | Mr. | James | Hwang | General Manager |
| Hwashin America Corporation | 661 Montgomery Highway | Greenville | AL | 36037 | Mr. | David | Nam | CEO |
| Jay Mid South LLC | 140 Thomas Avenue | Gadsden | AL | 34904 | Mr. | Brent | Taylor | Divison Manager |
| Lear Montgomery | 200 Folmar Parkway | Montgomery | AL | 36105 | Mr. | Jerry | Cabe | Manager Human Resources |
| Hysco America | 200 Team Member Lane | Greenville | AL | 36037 | Mr. | Myung Jun | Kim | President |
| Johnson Controls | 130 6th Street | Montgomery | AL | 36104 | Mr. | Dean | Familton | Operations Manager |
| Lear/Kyung Shin Sales and Engineerin | 1 Meadowcraft Parkway | Selma | AL | 36701 | Mr. | George | Pennington | Operations Manager |
| Mando America Corporation | 4201 North Park Drive | Opelika | AL | 36801 | Mr. | Jerry | Rolison | Human Resources Director |
| Mobis Alabama | 1395 Mitchell Young Road | Montgomery | AL | 36108 | Mr. | H.M. | Rhyoo | President |
| PPG Industries, Inc. | 89000 Highway 77 | Talladega | AL | 35160 | Mr. | Rick | Michaels | Plant Manager |
| Panalpina World Transport | 4590 Mobile Highway, Suite 100 | Montgomery | AL | 36108 | Mr. | Michael | Hansford | Director Logistics |
| Renosol Seating Properties, LLC | 6 Meadowcraft Parkway | Selma | AL | 36701 | Mr. | Pete | Bernier | Plant Manager |
| Safa Systems, LLC | Alabama Highway 14 | Tallassee | AL |  | Mr. | Changzoo | Park | President |
| Smart Alabama, LLC | 121 Shin Young Drive | Luverne | AL | 36049 | Mr. | Homan | Hong | President |
| Seoil America | 9 Twin Creeks Drive | Tallassee | AL | 36078 | Mr. | Sung Don | Cho | Vice President |
| SL Alabama, LLC | 2481 Airport Blvd | Alexander City | AL | 35010 | Mr. | Sung Kyun | Seok | President |
| Sung Won Elec-Comm Corp. | 1 Twin Creeks Drive, Unit 8 | Tallassee | AL | 36078 | Mr. | Kwanglion | Jeong | Sales Manager |
| Sungwoo USA Corp | 6177 Perimeter Parkway | Montgomery | AL | 36116 | Mr. | Youngbae | Park | General Manager |
| Teskid Aluminum Components | 2100 Old Sylacauga Highway | Sylacauga | AL | 35150 | Mr. | Dick | Dickson | H.R. Director |
| T&WA | 5130 Westport Blvd | Montgomery | AL | 36108 | Mr. | Ray | Robertson | Plant Manager |
| Y.E.S.A.C Alabama Corporation | 3 Twin Creeks Drive | Tallassee | AL | 36078 | Ms. | Tracy | Pitts | Manager |



DEFENDANT'S EXHIBIT
14
Winter

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA<br>☑ EEOC | 130-2005- 05520 |

_____ and EEOC

*State or local Agency, if any*

| NAME (Indicate Mr., Ms, Mrs.)<br>Robert A. Winter | HOME TELEPHONE (Include Area Code)<br>(334) 514-9047 |
|---|---|

| STREET ADDRESS<br>230 Cedar Ridge Drive | CITY, STATE AND ZIP CODE<br>Wetumpka, AL 36093 | DATE OF BIRTH<br>11/11/57 |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME<br>Onyx Capital Ventures D/B/A Piknik Products Company | NUMBER OF EMPLOYEES, MEMBERS<br>250+ | TELEPHONE (Include Area Code)<br>(334) - 265-1567 |
|---|---|---|

| STREET ADDRESS<br>3806 Day Street | CITY, STATE AND ZIP CODE<br>Montgomery, Alabama 36108 | COUNTY<br>Montgomery |
|---|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box (es)

☑ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify)

DATE OF DISCRIMINATION TOOK PLACE
EARLIEST                                  LATEST
                                          06/28/05
☐ CONTINUING ACTION

See the attached Addendum.

DEFENDANT'S EXHIBIT

RECEIVED
EEOC
JUL 1 3 2005
BIRMINGHAM DISTRICT OFFICE

RECEIVED
JUL 0 2005
BY: _____

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for State and Local Requirements) |
|---|---|
| | I swear of affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty or perjury that the foregoing is true and correct | SIGNATURE OF COMPLAINANT |
| date 7/14/05          Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Month, day and year) 7/14/05 |

OC FORM 5 (Rev. 07/99)

## ADDENDUM TO THE CHARGE OF DISCRIMINATION OF
## ROBERT A. WINTER

"My name is Robert A. Winter. I was employed by Piknik Products Company. I had been a regular employee since about November 1, 2000. In my job I was considered Director Customer Planning. I am a white male.

"During my tenure with Piknik I worked at the 3806 Day Street, Montgomery, Alabama location. My immediate supervisor was Henry Hicks, a black male. On or about June 22, 2005, Ms. Brenda Sellers, human resources manager, and Henry Hicks, Vice President of Sales & Marketing, met with me to tell me my position would be eliminated as of July 29, 2005. Further, there would not be any severance. My responsibilities were replaced by Henry Hicks, a black male. I always considered myself a valuable employee. I was never reprimanded nor written-up for poor performance. As a matter of fact, I was given a raise on or about March, 2005, and a letter illustrating my strong performance and value as a committed employee.

"I believe I am the victim of discrimination on the basis of my race, white."

_____
Robert A. Winter

SWORN TO and SUBSCRIBED before me this _14_ day of July, 2005.

_____
NOTARY PUBLIC State at Large

My Commission Expires: _9/19/07_

RECEIVED
EEOC
JUL 1 3 2005
BIRMINGHAM DISTRICT OFFICE

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

JERRY A. MacCARTNEY,           )
BERT MAYER, SHANNON A. McGLON, )
and                            )
ROBERT A. WINTER,              )
      Plaintiffs,            )
                      )    Civil Action No.: 2:05cv1207-MHT
v.                             )
                      )
PIKNIK ACQUISITION CORP., L.L.C., et al., )
      Defendants.            )

## PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST INTERROGATORIES

COMES NOW, Plaintiff, Robert A. Winter, in response to Defendant's First Interrogatories pursuant to Rule 33 of the Federal Rules of Civil Procedure and states as follows:

1.      State you full name, current address, social security number, date of birth, spouse's name (if applicable) and the name and address of your current employer.

**RESPONSE:**    **Robert A. Winter, 230 Cedar Ridge Drive, Wetumpka, Alabama 36093; SS# 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; 11/11/1957; Anita Winter - spouse; Glovis Alabama, LLC; 300 Hyundai Blvd., Montgomery, AL 36105.**

2.      Outline your educational background giving the full name of the educational institution, the dates of attendance, and the degrees earned for each high school, vocational or trade school, college or university, and graduate or professional school.

**RESPONSE:**    **Southeast Missouri State University, BS/BA; 1976-1980.**

3.      Identify all of your relatives, by blood or marriage, over the age of seventeen who live in the Middle District of Alabama and provide their address and current employer.

**RESPONSE:**    **None.**


DEFENDANT'S
EXHIBIT
16
Winter

4.    Identify every employer or company that has ever employed you. If you have been self-employed, please indicate. As part of your identification, describe the job title, the duties you performed, the name of your immediate supervisor, the dates you held the job, your hours of work, your rate of pay, and the circumstances surrounding your departure (e.g., voluntary termination, lay off, etc.).

**RESPONSE:**        **Glovis Alabama LLC; operations manager; manage the operation, Jin Ho Choi; September 2005 to present; 50-60 hours per week; $80,400 per year, currently employed;**

**IntroLink Counseling LLC, Principal/Senior Consultant, consulting; June 2005 to September 2005; 60 hours per week; $0 income, left to work for Glovis;**

**Piknik Products Company, VP Operations and Strategic Planning; VP Sales and Marketing; VP Sales Administration, Director Customer Relations; Ricky Loeb, Mike O'Connell, Ricky Loeb, Patrice Daniels, Henry Hicks; October 2000 through June 2005; 50-60 hours per week; $135,000 per year; left because plaintiff was terminated (severance - given 5 weeks to work at half plaintiff's compensation);**

**Polar Beverages Company, VP Logistics and Strategic Planning, Ralph Crowley, June 1999 through October 2000; 50-60 hours per week; $135,000 per year; left to relocate to Montgomery to be with and raise plaintiff's children; plaintiff and wife divorced soon after she returned;**

**Cadbury Schweppes Place, Director Bottler Operations, Transition Liaison; National Sales Planning Manager; Regional Sales Manager; Brian Fitzsimons (last supervisor); May 1990 through June 1999; $106,000 per year; left to take a position with Polar Beverages;**

**PepsiCo; Regional Sales Manager, Franchise Manager; Regional Sales Development Manager; Steve Allison; May 1993 through January 1990; $60,000 per year; took severance package;**

Richardson Vicks, Inc.; Retail Manager; December 1980 through 1983; $23,000 per year; left to work for PepsiCo.

5.    Describe your involvement as a witness or a party in any past legal proceedings, civil or criminal. List the name, style, case number, jurisdiction, and date filed for each proceeding described.

RESPONSE:        August 2001- divorce, settled; January 1987 - Case in Birmingham, AL brought by District Attorney regarding "Pepsi Instant Cash" consumer promotion. DA claimed a violation of anti-gambling laws as games of chance were not legal. Pepsi prevailed in the case.

6.    State the name, and address of each and every physician, psychiatrist, psychologist or counselor with whom you consulted or who rendered any diagnosis, treatment or other medical care to you during the last three (3) years and the nature of your illness or condition.

RESPONSE:        Molly Robertson, Psychiatrist, Family Therapy, Alabama Psychiatric Services; 5906 Carmichael Place, Montgomery, AL 36117; Laura Mattson-Shoemaker, Family Counselor; 8200 Old Federal Road, Montgomery, AL 36117; Kathy Bonds, Frazer Counseling Clinic; 6000 Atlanta Highway, Montgomery, AL; Dr. Mark Lindsey; Family Physician, Alabama Family Practice; 370 Saint Lukes Drive, Montgomery, AL 36117.

7.    State the name and address of each and every institution, hospital or clinic, in which you have received treatment, or in which you were confined or hospitalized during the last three (3) years. With respect to each facility you have listed in this interrogatory, state the dates that you were hospitalized or received treatment, the name(s) of your attending physician(s) and the nature of your illness or condition.

RESPONSE:        Baptist East, Dr. Kennety Wool; 3/20/06; 3D imaging of heart; Baptist East, Dr. William White III MD; 7/7/06; gastroenterology.

8.    State whether you filed state and federal income tax returns for each of the following years:

2004, 2005 and 2006. State the amount of your gross income for each calendar year from 2004 to 2006.

**RESPONSE:**      **Filed tax returns for 2004 and 2005. Have not filed for 2006. Plaintiff's gross income is as follows: 2004 - $91,545; 2005 - $73,653; 2006 – $80,426.**

9.      State the amount of income you have earned , from any source, in 2007 as of the date of your response to these interrogatories. This interrogatory includes without limitation any unemployment compensation or social security benefits you may have received.

**RESPONSE:**      **$12,719.**

10.      If you or anyone acting on your behalf has taken statements (oral, written or recorded) from any person concerning the incidents which are the subject6 matter of this lawsuit, identify the individuals from whom such statement was taken, who took the statement and when, and who has possession of that statement.

**RESPONSE:**      **I do not know of any statements.**

11.      State the position you claim you were terminated from because of your race. In your answer, include the position title and, if the position was filled after your departure from Piknik Products, when the position was filled and to whom the position was awarded.

**RESPONSE:**      **Plaintiff was terminated from Director Customer Relations position, a title given to plaintiff by Henry Hicks. Plaintiff had a number of titles under Onyx, but his role never changed. Plaintiff was the VP Sales and handled all aspects of the core role of this position. Henry Hicks, an African American male, was awarded VP Sales and Marketing upon his arrival to Piknik Products in the fall of 2003. Mr. Hicks came to Piknik with no prior consumer packaging goods experience and no contract manufacturing experience. He was there because he was African American and Onyx wanted an African American representing**

Onyx and Piknik Products with the consumers. Plaintiff was kept there to train him in all facets of the job. Once this was completed, Plaintiff was terminated.

For two years, Plaintiff continued to handle the commercialization of products from initial customer inquiry, through the introduction phases, RFQ development, pricing decisions, project leader, planning and executing test runs and eventual commercialization. Henry Hicks represented himself as the main contact. In fact, he had no knowledge of the business, contract manufacturing, knowledge of pricing strategy and had a weak knowledge of basic financial concepts. Onyx had every intention of removing Plaintiff from his position soon after Henry Hicks came "up to speed."

12.    Identify each person whom you expect to call as an expert witness at trial. For each expert witness identified, provide the information required by Federal Rules of Civil Procedure Rule 26, including the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, a summary of the grounds for each opinion, and the person's education, experience, or other background that qualifies that person to testify as an expert witness in this case.

RESPONSE:        Will be provided in accordance with the Federal Rules of Civil Procedure.

13.    Identify any and all employees or former employees of Piknik Products Company, Onyx Capital Ventures LLC, or Piknik Acquisition Corp LLC who you contend participated in any allegedly discriminatory acts or omissions towards you because of race and describe fully the details of any act or omission in which they participated.

RESPONSE:        Jeff Larry, Chris Day, Henry Hicks and Patrice Daniels all participated in the decision process; Ms. Daniels during the period of August 2003 through June 2004. The remaining three conspired to use Plaintiff to train Henry Hicks in the VP Sales position. Once

that training period was complete, they intended to terminate Plaintiff. He believes they postponed their decision to terminate him early on because Mr. Hicks knew he could not perform this function without Plaintiff's knowledge of the business, customers, operations, etc. Ms. Daniels moved Plaintiff to VP Sales Purchasing, Plaintiff believes, to eventually have him terminated but did not want to risk an EEOC claim. Mr. Hicks prevailed in convincing Ms. Daniels and Chris Day to have Plaintiff work for him as VP Sales Administration and continue to do his job. He was wholly unqualified for the position and he knew it. The customers knew it too.

14.    Describe anyone who has knowledge of the mental and emotional anguish for which you are seeking damages and, for each person identified, state the subject matter of their knowledge and the basis for such knowledge.

**RESPONSE:**    **Anita Winter - she has been with me through all of this.**

15.    If you believe you have been discriminated against by any other employer, other that Piknik Products, state all particulars relating to the alleged incidents of discrimination including names of employers, dates, names of participants, and whether or not you complained to the Equal Employment Opportunity Commission or any other governmental (federal or state) agency or private agency receiving complaints of employment discrimination.

**RESPONSE:**    **None.**

16.    Identify by name, last known address, telephone number, employer, and synopsis of expected testimony, each and every person you may call as a witness at trial. You are reminded of your obligation to supplement your response to this interrogatory under Federal Rule of Civil Procedure 26(e).

**RESPONSE:**    **Will submit in accordance with Rules of Civil Procedure.**

17.     Identify any written notes, photographs, diaries, calendars, letters, documents, records (including any computerized records), audio or video tapes or recordings of any kind which describe, reflect, or relate in any way to alleged discrimination against you.

**RESPONSE:**     **See two attached documents. PowerPoint presentation and email.**

18.     Describe the compensatory damages you are claiming from Hicks, Larry and/or Day and state each calculation you performed in determining this amount in sufficient detail so that the Defendants can duplicate those calculations.

**RESPONSE:**     RETROACTIVE REDUCTION: $1,923; 13 WEEKS BETWEEN JOBS:$25,000.00 (6/23/05 through 9/6/05); LOSS OF PAY: $33,380 (88 weeks @ #385 per week difference in $100,000 at Piknik vs. $80k at new employer); LOST WAGES NEXT 7 YEARS: $140,000($20,000 per year difference in $100, 000 at Piknik vs $80,000 at new employer); LOST BONUS NEXT 7 YEARS: $98,000 ($14,000 per year difference in bonus plan at Piknik of 20% of base vs $6,000 per year at new employer). TOTAL: $298,303

19.     Describe any other monetary loss(es) you are claiming as a result of the alleged actions of Hicks, Larry and/or Day, and state each calculation you performed in determining this amount in sufficient detail so that the Defendant can duplicate those calculations.

**RESPONSE:**     **Please refer to answer # 18.**

20.     State any and all facts and alleged facts that support your claims for punitive damages in this case.

**RESPONSE:**     **I worked for Onyx controlled Piknik from approximately August 2003 to my termination date of June 22, 2005. During this time, the mental anguish I suffered and the impact to my relationship with my children, friends and family suffered. Our family is currently in family counseling.**

My role in the company to the outside customers was marginalized to the point of embarrassment all the while I was the person who understood the business, developed the RFQ, performed all the pricing analysis, planned and held the on-boarding meetings etcetera. My work was taken, reformatted and presented as Henry Hicks work in order to create the impression Henry was knowledgeable about the business. This long period of transition was solely designed to enable him to become knowledgeable enough to perform my function on his own. It is clear to me that Onyx intent all along was to terminate me and replace me with Henry Hicks.

All the while I was performing this work "behind the scenes" Henry Hicks assigned me the various titles of VP Purchasing, VP Administration and eventually Director of Customer Planning.

21.    State whether you have ever filed a petition for bankruptcy. If you have filed a petition for bankruptcy, please identify the case by court, case number, and year.

**RESPONSE:**        No.

22.    Describe all efforts you have made to find employment since the time you left the employment of Piknik Products. Identify each employer with which you have sought employment, the date of such attempt, and the result of the inquiry.

**RESPONSE:**        I have made numerous attempts since my termination from Piknik to find suitable employment via the internet's CareerBuilder.com and Monster.com.

I have had interviews with Jenkins Brick in August 2005; Southeast Atlantic in August 2005; Wilpack Inc. in February 2006; Panalpina in June 2006; and Coco Cola Enterprises in March 2007. I currently work for Glovis Alabama, LLC.

23.    Identify any offers of employment you have declined since the termination of your employment with Piknik Products and the reasons therefore, and any conditions you have placed upon prospective employment.

**RESPONSE:**    **I have not had any offers other than Glovis Alabama LLC. .I accepted Glovis Alabama LLC's offer.**

Dated this the 9th day of ~~April~~ May 2007.

_____
BOB WINTER

SWORN TO AND SUBSCRIBED before me on this the 9th day of ~~April~~ May 2007.

_____
NOTARY PUBLIC
My Commission Expires:  9/19/07

(SEAL)

RESPECTFULLY submitted this the 9th day of ~~April~~ May 2007.

_____
K. ANDERSON NELMS (NEL022)

Attorney for Plaintiffs

OF COUNSEL

Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing has been served on counsel of record listed below by placing same in the United States Mail, postage prepaid, and properly addressed on this the 10th day of ~~April,~~ May 2007:

Bill McGowin
George Parker
Bob Poundstone
Bradley Arant Rose & White LLP
Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104

OF COUNSEL