**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **JERRY A. MacCARTNEY, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:  2:05cv1207-MHT** |
| | ) | |
| **ONYX CAPITAL VENTURES, LLC, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**AS TO ALL CLAIMS OF PLAINTIFF JERRY MACCARTNEY**

Defendants Jeff Larry, Chris Day, and Henry Hicks (collectively the "Defendants") respectfully move this Court for Summary Judgment on all claims by Plaintiff Jerry MacCartney ("Plaintiff" or "MacCartney"). This is a reverse race discrimination case under 42 U.S.C. § 1981. Plaintiff claims he was discriminated against in the terms, conditions and privileges of his employment with Piknik Products Company because he is Caucasian, and he seeks to hold each defendant individually liable. Plaintiff's claims fail as a matter of law for several reasons. Plaintiff has no direct evidence that any decisions affecting his employment were made because of his race. Even in the absence of direct evidence, Plaintiff's claims fail because he cannot establish a prima facie case of race discrimination, all decisions regarding his employment were made for legitimate, non-discriminatory reasons, and he cannot adduce any evidence that those reasons are lies. No genuine issues of material fact exist, and the Defendants are entitled to judgment as a matter of law.

I.     STATEMENT OF FACTS

    A.     **The Relationship Between Piknik Products Company, Piknik Acquisitions Corporation and Onyx Capital Ventures, LLC: Because of Piknik's dire financial condition, Onyx obtained a 51% ownership interest in Piknik.**

Onyx Capital Ventures, LLC ("Onyx") is a minority-owned business enterprise ("MBE") specializing in the acquisition or recapitalization of businesses. (Day Dep. 33/4-5, 14-25; 52/22-53/1). Onyx was formed as a "firm that was going to be deploying capital to acquire businesses." (Id. at 33/4-5). Defendant Chris Day ("Day") defined Onyx's mission as an MBE as follows:

> [T]he anticipated mission was to acquire businesses whose customers valued supplier diversity. And therefore, by – it was explicitly an African-American-owned entity that Onyx was going to be. And we all knew that when we signed onto it.
>
> And the opportunity was to try and solve the, what they call the MBE conundrum, "MBE" meaning minority business enterprise, through the use of our specific expertise in raising leverage finance and in finding and acquiring businesses that would benefit from MBE ownership.

(Id. at 33/13-25). Defendant Jeff Larry ("Larry") further explained Onyx's strategy:

> We were really focused on taking advantage of some opportunities under what are called the supplier diversity programs at a lot of these companies, and they generally focus in the manufacturing businesses, or at least that's where the opportunities are most developed.
>
> But then the other thing was that we saw an opportunity beyond that to just roll up businesses that weren't getting the focus of the big boys at the time when people were looking at high tech and other sexy things and just making them better and more efficient.

(Larry Dep. 14/18-15/5).

Qualification as an MBE requires minorities to have a controlling interest in all classes of stock and a minority having management control of the business, which means that the most

senior decision maker (i.e., chairman of the board, chief executive officer) must be a minority. (Day Dep. 73/22-74/13). Attaining MBE status does not require the replacement of managerial employees, and Larry made clear that such was not Onyx's mission:

> And sometimes, you know, customers would say you're not really an MBE, because, you know, you're black but everybody else isn't. And I would say that's not our gig. We don't go in and fire people and turn over management. We go in, hopefully identify a company that has a stable and talented management, and work with that management to move forward.
>
> Now, to the extent that the management team needs to be supplemented or there's some deficiencies and there's some transitioning, then of course we'll go out and we'll hire folks.

(Larry Dep. 76/11-22).

The six original partners of Onyx were Defendant Larry (African American), David Palmer (Caucasian), Russell Pallesen (Caucasian), Patrice Daniels (African American), Pat McGreevy (Caucasian) and Defendant Day (Caucasian). (Day Dep.29/18-30/12; 34/3-16). At the time the six original members joined Onyx, Larry controlled approximately 53% or 54% of the shares in Onyx. (Id. at 40/4-6). Day initially had an approximately 5% ownership interest in Onyx, but resigned in October of 2005 and no longer has an ownership interest. (Id. at 27/9-29/20; 32/9-11; 64/5-6). Defendant Henry Hicks ("Hicks") has never had any ownership interest in Onyx. (Hicks Dep. 38/8-14).

Piknik Products Company ("Piknik") was a Montgomery-based company that manufactured and bottled beverages and condiments for various companies. For many years Piknik struggled financially. Ricky Loeb ("Loeb"), the majority owner of Piknik, wanted to sell the company and hired an investment bank to facilitate this, who in turn contacted Onyx. (Day Dep. 46/1-48/1). Loeb initially offered to sell his share of Piknik to Onyx for $20 million. (Id. at 48/5-12). Piknik had roughly $17 million in indebtedness and Loeb hoped to pay off that debt

from the sale proceeds and make a profit.  (Id. at 48/13-17).  Because Piknik's business did not

support such a high valuation, Onyx declined to purchase Piknik on those terms.  (Id. at 48/18-

25).

       In the six months following Loeb's $20 million offer to Onyx, Piknik continued

deteriorating and "missed their numbers by a mile."  (Id. at 49/1-9).  In fact, Day characterized

Piknik's decline as a "catastrophe" because "they were missing their numbers during the months

where they really needed to start making hay."  (Id. at 50/6-17).  Due to the further decline of

Piknik's financial condition, Onyx set up Piknik Acquisition Corporation[1] and through it

purchased a 51% of the ownership in Piknik for only one dollar.  (Id. at 52/14-17; 54/6-16;

70/14-71/7).  Day testified that the deal was done out of "desperation" because Loeb had no

other choice due to the poor financial condition of his company.  (Id.)  After Onyx's arrival,

Piknik also became certified as a minority-owned business enterprise.  (Id. at 73/5-25).

       **B.**     **The Defendants' Positions at Piknik.**

       Piknik hired Defendants Larry, Day and Hicks after Onyx acquired majority ownership

interest.  Larry, Chairman and CEO of Onyx, assumed the title of Chairman and CEO of Piknik

as a result of the sale transaction.  (Id. at 132/3-4).  Larry is African American.  (Id.)

       Day was the Onyx partner assigned to managing Onyx's investment in Piknik.  (Id. at

29/6-9; 78/8-17).  During the early days of Onyx having an ownership interest, Day temporarily

filled management positions at Piknik, while Piknik searched for qualified individuals to fill the

positions permanently.  (Id. at 79/5-9, 16-18; 82/3-12; 84/1-23; 85/3-11; 86/6-8).  In Janaury

2004, Day became Executive Vice President of Piknik.  (Id. at 84/1-8).  From February 1, 2005

---

[1]   It was actually Piknik Acquisition Corporation, which was a wholly owned affiliate of Onyx, which had an ownership interest in Piknik, which is common in such acquisitions.  (Day Dep. 70/14-71/7).  To avoid confusion due to there being two "Piknik" entities involved, Defendants will refer to both entities as "Onyx" in this brief. However, it was actually Piknik Acquisition Corporation that had the ownership interest in Piknik.

until July 7, 2005, Day was President and COO of Piknik. (Id. at 86/6-8; 87/23-88/1-10). Day is Caucasian. (Mayer Dep. 93/20-23).

Piknik hired Hicks in November 2003 as Vice President of Sales and Marketing. (Hicks Dep. 45/12-15; 47/5-7). Hicks oversaw all sales and marketing efforts for Piknik's beverage and condiment divisions. (Id. at 50/6-10). Hicks is African American. (Larry Dep. 33/13-17).

> **C.    Background of the Defendants: Because of his extensive business and operating experience, Chris Day took on the responsibility of managing the day to day operations of Piknik, including responsibility for making personnel decisions.**

Defendant Larry has an undergraduate degree in economics and a law degree. (Id. at 48/10-14). Larry's expertise is in mergers and acquisitions. (Id.) By his own admission, he is "not an operational guy." (Id. at 10/20). Accordingly, while CEO of Piknik, Larry "had to work through an operator because: "I'm not – I don't try to be or pretend to be [an operational manager]." (Id. at 10/15-11/1). Rather, as CEO of Piknik, Larry interfaced with shareholders, the bank, customers and suppliers. (Id. at 10/15-19). Larry had no involvement with the internal operations of Piknik:

> Well, really, as I said, I would deal with the external world, did a lot with the customers; and initially, that was my almost whole focus. I would have periodic conversations with Chris, where he would tell me what's going on with the business and whatever challenges or successes he was having, but I was, you know, completely externally focused.

(Id. at 24/1-8).

Like Plaintiff, Defendant Day is Caucasian. (Day Dep. 34/12). Day received his undergraduate degree from Northwestern University and received his M.B.A. from Northwestern's Kellogg School of Management the following year. (Id. at 7/20-8/6). Following his graduation, Day was a general investment banking associate for the investment firm Kidder

Peabody and Company. (Id. at 8/25-9/4). He later joined Morgan Stanley as a sales trader and then transferred to straight equity sales. (Id. at 9/5-10/12). Three years later, Day joined Sears & Roebuck as manager of mergers and acquisitions in the specialty merchandising group and then became director of marketing for the computer service business. (Id. at 10/13-12/8). Thereafter Day joined Packaging Corporation of America, a subsidiary of Tenneco, as manager of corporate development. (Id. at 12/20-13/21). He worked at Packaging Corporation of America for more than 6 years, holding the titles of manager of corporate development, director of manufacturing planning, group controller and plant manager. (Id. at 13/22-14/2; 14/14-16/7). In 1994, Day took a one year leave of absence from Packaging Corporation of America to serve as a White House Fellow during the Clinton administration. (Id. at 14/3-14/16). Upon leaving Packaging Corporation of America, Day became the general manager of the closure business at Silgan packaging and, thereafter, became the co-president of Packtion, a joint venture between Silgan and Morgan Stanley. (Id. at 17/20- 27/8).

Unlike Larry, Day had extensive operational experience and thus it was natural for Day to take an active role in managing Piknik. Indeed, he was the only Onyx partner with "business and operating experience, as opposed to the other partners [who] had experience as transactional attorneys in mergers and acquisitions or leveraged finance, in particular." (Id. at 32/17-22). Accordingly, Day was the Onyx partner assigned to manage Piknik. (Id. at 78/8-17).

When Day began his role in management for Piknik, he hired Defendant Hicks as Vice President for Sales and Marketing. (Id. at 101/20-22). Day knew Hicks because Hicks was also a White House Fellow during the Clinton administration. (Id. at 101/23-102/2). The position of Vice President for Sales and Marketing did not exist before Onyx obtained an ownership interest in Piknik; rather, it was a new position created by Day. (Id. at 102/3-9).

Hicks received his undergraduate degree from Morehouse College and an M.B.A. from the University of North Carolina.  (Hicks Dep. 37/9-38/1).  His pre-Piknik employment experience included positions with Coopers and Lybrand, Bank of America, and Catalyst, LLC, which was an interim management consulting firm.  (Id. at 22/14-21; 30/20-31/1; 31/25-32/16; 36/2-17).  Immediately preceding his employment with Piknik, Hicks owned a consulting business that helped companies develop financial projections, raise capital and took on interim management roles at various companies.  (Id. at 10/2-15; 21/24-22/2).

**D.    The relationship between the new management that came in after Onyx obtained an ownership interest in Piknik and Piknik's former majority owner, Ricky Loeb, was contentious.**

The relationship between Loeb, the former majority owner of Piknik, and the new management put in place after Onyx took an ownership interest was contentious.  According to Day, "Ricky, on his best day, is a distraction."  (Day Dep. 176/15-16).  In fact, Day believed that Loeb's "meddling" within Piknik was so disruptive that he asked Piknik managers who had previously worked directly for Loeb, including Plaintiff, to cease all communications with Loeb concerning Piknik's business.  (Id. at 176/3-177/21).  Specifically, Day testified:

> And he [Loeb] was causing us a tremendous amount of wasted non-value added effort trying to clean up messes he was starting with his meddling.  And his meddling was not to try and further the business.  He was trying to meddle so that he had something to do and people would think that he was important and still involved in the business.
>
> And, so, I didn't say that you couldn't talk to him outside of work.  I didn't say you couldn't talk to him at all.
>
> I said, don't talk to him about business stuff because he doesn't have a business role.
>
> And I was doing it as much for their protection.  Make me the bad guy.  Make Jeff the bad guy.  We'll give you a reason not to talk to him.

> Because so many of them were saying, he calls me and what am I
> supposed to say?
>
> I said, make me the bad guy. That's fine. I'm trying to keep you
> from having a boatload of wasted time in your day. And it's
> wasted time just talking to him, but it will be five times as much
> waste when you're trying to clean up the mess that he will
> instigate.

(Id. at 176/16-177/15; Day Dep. PX1).

      **E.**     **Both before and after Onyx obtained an ownership interest in Piknik, the
company was multimillions of dollars in default on its loan and was only able
to operate subject to a forbearance agreement with SouthTrust Bank (later
Wachovia). Piknik eventually ceased doing business and filed for
bankruptcy when the bank refused to extend the forbearance agreement.**

Piknik was involved in a forbearance agreement with SouthTrust[2] because it was in
default on loans from SouthTrust both before and during the time Onyx had an ownership
interest in Piknik. (Day Dep. 108/24-109/6). The forbearance agreement with SouthTrust came
up for an extension at regular intervals and was generally extended by either a year or six
months. (Id. at 109/16-19). During Onyx's two year tenure with Piknik, the company's
indebtedness improved from $17 million to approximately $15.3 million. (Id. at 108/25-23).
Although Piknik significantly reduced its indebtedness and remained current on its principal and
interest payments, it continued to be in violation of the financial covenants in its forbearance
agreement with SouthTrust, such as "interest coverage ratios, the liquidity cash flow ratios, the
working capital." (Id. at 108/13-15).

In the Fall of 2004, Piknik was awarded a significant amount of new business that it
forecasted would result in a substantial increase in production volume. (Id. at 99/17-100/19).
This business growth required Piknik to invest approximately $3.5 million in new equipment.
(See id. at 116/12-22 (explaining the capital investment was necessary "to buy new fillers, new

---

[2] SouthTrust later became Wachovia. For purposes of this brief, we will refer to both as "SouthTrust."

cappers, any number of different things to customize to that particular product and formulation")).   Piknik looked to SouthTrust to fund this capital investment; however, SouthTrust declined to extend additional credit to Piknik.  (Id. at 116/23-25; Hicks Dep. PX2). By the Spring of 2005, Piknik realized it was "going to be in a real battle with SouthTrust" and the bank was not going to let Piknik bring in the money that was necessary to position the company to receive new business. (Day Dep. 116/23-117/24).   Although it could not get additional loans, Piknik had to find an alternative way to fund these capital investments that were required to secure new business and to keep the company "afloat." (Id. at 117/22-24).   Faced with this "increasingly tight, tight, tight, tight, tight, situation," Day had to make "painful and difficult" decisions regarding personnel.  (Id.)

On June 30, 2005, Piknik's last forbearance agreement expired.  Despite all of its efforts to negotiate another six month extension of the forbearance agreement, such negotiations were ultimately unsuccessful.  (Id. at 109/20-110/3).  On July 7, 2005, the bank informed Piknik that it was ending all negotiations regarding any extension of the forbearance agreement and exercised its right to take control of the company.  (Id. at 110/1-3; 169/22-25).   Upon the bank taking control of Piknik, Loeb was reinstalled as CEO.  (Id. at 87/23-88/10; 169/22-170/1). Loeb immediately fired both Defendants Day and Jeff Larry.  (Id. at 170/2-3).  Shortly thereafter, in September or October 2005, Loeb fired Defendant Hicks.  (Hicks Dep. 107/23-108/3).  Even after the bank placed Ricky Loeb back in charge of Piknik, the company's financial condition continued to deteriorate.  Piknik filed for chapter 11 bankruptcy in September of 2005 and ceased all operations in approximately December of 2005.  (Winter Dep. 329/1-3).

F.      **Plaintiff's Employment with Piknik**

Plaintiff started at Piknik in April 2003, before any of the Defendants were employed by Piknik.  (MacCartney Dep. 38/5-10).  He was hired as Director of Logistics.  (<u>Id</u>. at 41/23 – 42/3).  When he was hired, Plaintiff knew that Piknik was looking for investors and venture capitalists to help secure some of the company's long-term debt and provide funding for growth and expansion.  (<u>Id</u>. at 42/6-18).  He remained Director of Logistics until May of 2005.  (<u>Id</u>. at 43/10-12).

G.      **Due to severe financial constraints, Jerry MacCartney's position as Director of Logistics was eliminated and he was moved to Manager of the Alatex Road Plant.**

One of the painful and difficult decisions made necessary by the difficult financial situation Piknik was facing due to the bank's refusal to extend any additional financing was eliminating the Director of Logistics position and moving Plaintiff to Manager of the Alatex Road plant in the Spring of 2005.  (Day Dep. 116/4-118/8; MacCartney Dep. DX5).  Day, who made this decision, explained:

> Jerry was a good performer.  He was well reviewed in his role.
> But we did not have the luxury of maintaining a staff-kind-of-role
> in logistics and supply chain when we had individual doers that
> were capable of doing it without, perhaps, that oversight.
>
> So, we moved Jerry into the role of plant manager for the Alatex
> Road plant sometime in that April-ish time frame of 2005.

(Day Dep. 117/25-118/8).  Accordingly, the position of Director of Logistics, which was a supervisory position, was eliminated.  (<u>Id</u>. at 117/25-118/8).  Day further explained why he felt it was necessary to eliminate positions like Director of Logistics:

> The pattern that you saw was were there staff jobs of people who
> were the high-dollar people who were not responsible for actually
> doing day-to-day work that could be eliminated or reshuffled and

let the people who are the line people doing the work absorb that
responsibility and oversight.

(Id. at 168/5-168/11).

**H.    In June 2005, Piknik was forced to introduce across the board pay cuts due to the financial crisis the company was experiencing.**

In June of 2005, to stave off its growing financial constraints, Piknik introduced across-the-board pay cuts, which applied to virtually everyone in the company except for three employees (two African Americans and one Caucasian) who had very recently been hired by Piknik. (Id. at 137/2-21; 154/2-8; PX6; Larry Dep. 82/12-83/16). Day explained why he did not cut the pay of these three brand new employees:

> I did not ask the three new employees to take pay cuts. So, Anthony Barber, Annissia Haynard and Carl Bleier did not have to participate because it just didn't feel like it was the right thing to do to go out and recruit them to come join the firm and within the first week on the job get five or ten percent off of their agreed-upon deal, especially since all three of them were relocating to take the jobs and were enduring a financial hardship to do that.

(Day Dep. 137/11-21). With limited exception, there was an across-the-board 5% pay cut for all employees of every race, including African Americans. (Id. at 137/22-138/1; 161/17-23; PX 6; see also id. 139/5-9 (Day stating his belief that his salary was also reduced by 5%); Hicks Dep. 108/4-109/3 (explaining that his salary was reduced)). A few Piknik employees were given pay cuts greater than 5% for separate and independent reasons. (Day Dep. at 139/10-16).

**I.    Chris Day decided to cut Plaintiff MacCartney's salary by more than 5% because MacCartney's salary as the Alatex Plant Manager was higher than the market rate for a plant manager.**

Plaintiff's salary was reduced more than 5% because he was still being paid the same salary he made as Director of Logistics even though he had changed job duties to plant manager. (Id. at 140/24-141/1). Day testified about Plaintiff's salary reduction as follows:

> And in the case of MacCartney, we cut his pay because he was getting paid as director of logistics while he was running a plant. He was both not as qualified as he probably could have been, but we were making an investment in him. And the cost of, you know, what you pay a plant manager, somewhere around 70-, $75,000 a year. And I can't remember what we cut him to, but we cut him from around a hundred to something around 70.

(Day Dep. 140/24-141/7). Accordingly, Plaintiff's salary was cut to approximately $70,000 to bring him in line with plant manager salaries. (Id. at 140/24-141/7).

**J.    The Termination of Plaintiff's Employment.**

Day made the decision to terminate Plaintiff's employemnt. (Id. at 130/1-131/15). The termination decision was based on two factors: insubordination and untrustworthiness. (Id. at 130/3-131/4). First, Day received reports that Plaintiff discussed his pay cut with other employees in contravention of specific instructions not to do so. (Id. at 130/7-12). According to Day, Plaintiff discussed pay cuts with the employees who he managed "in a group environment in a very public and demoralizing way." (Id. at 130/13-15). Second, Day learned that Plaintiff was involved in discussions with Loeb (Piknik's former majority owner) and Plaintiff Bob Winter (who had recently left Piknik's employment, surreptitiously taken Piknik's proprietary information, and contacted some of Piknik's largest customers) regarding forming a group to take control of Piknik from Onyx. (Id. at 130/3-131/14).

**K.    Neither Jeff Larry nor Henry Hicks participated in the decision to fire Plaintiff MacCartney.**

Although Day informed Defendant Larry whenever he terminated an employee, such as Plaintiff, Larry did not participate in any of the termination decisions. (Id. at 131/21-132/16). Specifically, Day testified about his discussions with Larry over terminations, which were merely meant to inform Larry of termination decisions, as follows:

> . . . he was chairman and CEO of the organization. And I wasn't required to, but the relationship that I had with Jeff was always one of I'll tell you what I think you need to know. And I'll make sure that you're – you're not caught off guard or surprised by anything that may come back and – you know, that Ricky [Loeb] may come and question you about. I always made sure I was out in front on those things.

(Id. at 131/5-132/11). Larry similarly testified that any decision to terminate Plaintiff would have been by Day or Plaintiff's direct supervisor. (Larry Dep. 52/5-53/16). In fact, Larry is not even aware of the series of events that resulted in the Plaintiff's departure from Piknik. (Id. at 52/5-53/16).

Plaintiff never reported to Defendant Hicks at any time. (Hicks Dep. 88/14-89/19). Hicks did not make any decision concerning the Plaintiff's employment with Piknik. (Id. at 89/18-19; 156/5-8).

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist. Celotex Corp. v. Catrett, 477 U. S. 317 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604 (11th Cir. 1991). After the moving party discharges its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593 (11th Cir. 1995). "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995), cert. denied, 516 U.S. 817 (1995) (citation omitted). Moreover, evidence that is merely colorable, conclusory, or conjectural, does not

create a genuine issue of material fact.  See Brown v. City of Clewiston, 848 F.2d 1534, 1537 (11th Cir. 1988); Peppers v. Coates, 887 F.2d 1493, 1498 (11th Cir. 1989).  The summary judgment rule applies in employment discrimination cases just as in other cases.  See Chapman v. AI Transport, 229 F.3d 1012, 1025 (11th Cir. 2000).

## III.    ARGUMENT

Plaintiff identifies the following six ways in which he contends he was discriminated against because he is Caucasian: (1) Patrice Daniels told him that he did not know anything about Piknik's information technology systems; (2) Patrice Daniels would not let him talk during staff meetings; (3) he was asked to submit written justification to purchase software program; (4) his Director of Logistics position was eliminated and he was transferred to Plant Manager of the Alatex facility; (5) his salary was reduced from $100,000 to $70,000 after his job change from Director of Logistics to Plant Manager; and (6) his employment was terminated.  (MacCartney Dep. 105/14-112/8; 125/4-12).  We will demonstrate below why each of Plaintiff's claims fail as a matter of law.

### A.    Plaintiff has no direct evidence that his employment was terminated because of his race.

Plaintiff does not have any direct evidence of race discrimination.  (Id. at 322/17-323/2 (stating he never heard Day, Hicks, or Larry say anything derogatory about Caucasians)).  Direct evidence is evidence that "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption."  EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).  "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004).  Direct evidence must relate directly in time and subject to the adverse employment

action.  "[R]emarks…unrelated to the decision making process itself are not direct evidence of discrimination."  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998); see also Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002) (explaining that the remark "[w]e'll burn his black ass" did not constitute direct evidence of discrimination because it was made 2 ½ years before and thus was not directly related to plaintiff's termination); Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997) (finding CEO's remark about wanting to hire a man instead of a woman because too many women already held officer positions was not direct evidence of discrimination).

Defendants anticipate that Plaintiff may argue that a statement allegedly made by Day that it was "one of Onyx's intention – their vision to place minorities in middle and senior management positions and basically make Piknik a breeding ground for African Americans to grow and achieve management positions" constitutes direct evidence of discrimination. (MacCartney Dep. 204/13-19).  Any such attempt by Plaintiff fails for several reasons.  First, Day never made any statement that could be construed to mean he intended to terminate Caucasian managers, like the Plaintiffs, so he could replace them with African Americans.  (Day Dep. 91/15-21).  In his deposition, Day clearly explained what his statements were:

> What I was describing to them was a couple of things.  One was a process.  And that is that in order to –  in order to fairly represent both the community that we were doing business in, Montgomery which is 50 percent African-American by census, and the vision of Onyx Capital Ventures of being more than a sham with one black guy at the top, the only way to – the only way to address that when – and – and by the way, I looked around and was pointing out the fact that there were zero African-Americans in management at Piknik in the town that's 50 percent black, that you had to address that by a process, and that that needed to be – African-Americans needed to become part of the management hiring process.

Doesn't mean we're going to take blacks over whites, it means you got to present African-American candidates when openings were there.

And this was something that we got into discussions with the Pepsis and Proctor and Gamble's with. They wanted to see what Onyx was doing turned into a social program where we were going in.

And we always pushed back and said, no, we're about ownership and management control, and a slow sustainable process of introducing African-Americans into management ranks n the companies that we acquire.

Nothing would have been more disruptive than to go in and turn a place upside-down just for racial reasons.

And oh, by the way, we plan to be in business and acquire another companies, and you don't think word would get out to the other companies we're looking at that, oh, yeah, you better watch out, all you white guys, you're going to – we never want to do that. That's bad business.

(Id. at 170/19-172/8; see also id. at 95/7-24 (explaining that his hiring process included the consideration of qualified African-American candidates but that he awarded the job to the most qualified candidate regardless of race)). Day is adamant that he never told any Piknik employee that he was going to get rid of a Caucasian employee and replace them with an African American. (Id. at 173/18-21). In fact, by Plaintiff's own admission, when Plaintiff asked Day if he should be worried about losing his job to an African American, Day informed Plaintiff that he had "nothing to worry about" and Plaintiff believed Day's statement in this regard. (McCartney Dep. 210/14-211/9).

To further evidence the fact that he had no intentions of replacing existing Caucasian managers, Day raised the salaries of MacCartney as well as Plaintiffs Bob Winter and Bert Mayer. (Day Dep. 172/11-17). Not only were Plaintiff, Mayer and Winter given raises, but all three remained employed at Piknik in managerial capacities approximately two years after Onyx

obtained an ownership interest in Piknik and after Day made the alleged statement.  (Id. at 172/20-173/6; Mayer Dep. 135/22-136/4).

However, even assuming, arguendo, that Day made the statement as alleged by Plaintiff, the statement still falls short of rising to the requisite level of direct evidence.  The statement was not made in connection with the decision making process at issue and, in fact, was purportedly made in 2003 more than 2 years before Plaintiff's termination.  Because the alleged remark was not directly related to Plaintiff's termination, it cannot constitute direct evidence of discrimination.  Standard, 161 F.3d at 1330; Scott, 295 F.3d at 1227-28; Burrell, 125 F.3d at 1393.  Accordingly, any reliance on it falls short.

Defendants also anticipate that Plaintiff may rely on an email from Defendant Hicks as "direct evidence" of discrimination.  (MacCartney Dep. DX4).  In this email summarizing a meeting with a customer, Hicks noted that "[w]e discussed our desire to recruit talented minorities in operating roles within the company."  (Id.)  This email also falls short of being direct evidence.  Like the alleged comment by Day, it has absolutely nothing to do with Plaintiff or his employment.  Indeed, Hicks was not even involved in any decision affecting Plaintiff's employment.  (Hicks Dep. 156/8).  As such, it falls short of constituting direct evidence. See Trotter v. Bd. of Trustees, 91 F.3d 1449, 1453-54 (11th Cir. 1996) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision"); Standard, 161 F.3d at 1330 (stating "remarks by non-decisionmakers…are not direct evidence of discrimination").  Moreover, for this email to establish the existence of any discriminatory intent would require the drawing of inferences and presumptions.  It would require a presumption that "operating roles" included Plaintiff's position.  It would similarly require a presumption and inference that "recruit[ing]" minorities

also meant terminating Caucasian employees to create vacancies – none of which has any basis in fact. Because inferences and presumptions must be drawn from this email to establish any discriminatory intent, this email from Hicks is not direct of evidence of discrimination. <u>See Joe's Stone Crab</u>, 220 F.3d at 1286 (stating direct evidence of discrimination must "establish the existence of discriminatory intent…without any inference or presumption").

Additionally, Defendants expect that Plaintiff will rely on a statement allegedly made by Anthony Barber as direct evidence of discrimination. Plaintiff alleges that, when discussing the paint color of the office walls, Barber said that "me and white don't work; I'm not about white; I don't work good with white; I'm more about color; color and me work together much better." (MacCartney Dep. 182/5-9). Plaintiff interpreted the statement to mean that "[Barber] does not work well with white, he prefers to work with nonwhite people, and that he was trying to make himself very clear." (<u>Id</u>. at 183/18-184/1). Barber's alleged statement does not amount to direct evidence of race discrimination for at least two reasons. First, for this statement to establish any racial animus, it would require an inference or presumption that Barber was referring to the color of the people with whom he preferred to work and <u>not</u> the color of the paint on the walls. However, direct evidence of discrimination must "establish the existence of discriminatory intent…**without any inference or presumption**." <u>Joe's Stone Crab</u>, 220 F.3d at 1286 (emphasis added). Second, Barber was not involved in any decisions affecting Plaintiff's employment. The law is clear that "remarks made by non-decisionmakers…are not direct evidence of discrimination." <u>Standard</u>, 161 F.3d at 1330. For these reasons, Barber's alleged statement does not constitute direct evidence of discrimination.

      **B.**      **The Defendants are entitled to summary judgment because Plaintiff cannot establish a <u>prima</u> <u>facie</u> case of discrimination, all decisions regarding his employment were made for legitimate non-discriminatory reasons, and he cannot adduce any evidence that these legitimate non-discriminatory reasons are merely pretext for intentional race discrimination.**

Because Plaintiff has no direct evidence of race discrimination, he must rely on circumstantial evidence to show a discriminatory motive.[3]  The law governing disparate treatment cases involving circumstantial evidence is well-settled.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  First, a plaintiff must establish a <u>prima</u> <u>facie</u> case by showing (1) that he belongs to a protected group; (2) that he experienced an adverse job action; (3) that he was qualified for his position; and (4) that his employer treated similarly-situated persons outside of the protected group more favorably.  <u>Abel v. Dubberly</u>, 210 F.3d 1334, 1339 (11th Cir. 2000); <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1185 (11th Cir. 1984).  If a plaintiff successfully establishes a <u>prima</u> <u>facie</u> case, a defendant must then articulate legitimate non-discriminatory reasons for its actions.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  After a defendant articulates its reasons, a plaintiff must come forward with substantial evidence that the articulated reasons are pretext –lies – to cover up intentional discrimination.  <u>Id</u>. at 804.  Plaintiff's discrimination claims fail because he cannot establish a <u>prima</u> <u>facie</u> case and/or he cannot show that the articulated reasons for the decisions affecting his employment are pretextual.

      1.      <u>Defendants are entitled to summary judgment on Plaintiff's claims that Patrice Daniels criticized him for not knowing about the information technology system and that Patrice Daniels would occasionally not let him speak during staff meetings because Defendants were not involved in these alleged acts of discrimination and because he suffered no adverse employment action.</u>

---

[3]  The test for intentional discrimination in suits under 42 U.S.C. § 1981 is the same as under Title VII.  <u>Ferrill v. The Parker Group, Inc.</u>, 168 F.3d 468, 472 (11th Cir. 1999).

Plaintiff's complaints about Patrice Daniels – that she said that Plaintiff did not know anything about Piknik's information technology systems and that she "shut [him] down and gave [him] the hand and not let [him] talk" – fail as a matter of law because these Day, Hicks, and Larry were not involved in the alleged discriminatory acts and thus are not liable for any of Ms. Daniels' actions.   (MacCartney Dep. 108/2-9).   An individual may be held personally liable under 42 U.S.C. § 1981 only if he was "personally involved in the discrimination" by having "directly participated" in the alleged discriminatory acts.  Al-Khazraji v. Saint Francis Coll., 784 F.3d 505, 518 (3rd Cir. 1986); see also Wallace v. DM Customs, Inc., No. 8:04-cv-115-T-23TBM, 2006 WL 2882715, at *7 (M.D.Fla. 2006) ("To establish a claim for individual liability under § 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action…The claim must be predicated on the actor's personal involvement.'"); Richard v. Bell Atl. Corp., 946 F.Supp. 54, 74 (D.D.C. 1996); Daulo v. Commonwealth Edison, 892 F.Supp. 1088, 1091 (N.D.Ill. 1995) (noting that "Section 1981 liability against an individual demands personal involvement in discrimination").  Because Day, Hicks and Larry did not "directly participate" in these alleged discriminatory acts with Patrice Daniels (MacCartney Dep. 148/1-150/3), they are due summary judgment.

Furthermore, Plaintiff cannot establish that he suffered an adverse employment action when he was criticized as not knowing anything about Piknik's information technology system or when Patrice Daniels allegedly refused to let him speak during staff meetings.  The law is clear that "not everything that makes an employee unhappy is an actionable adverse action." Stavropoulos v. Firestone, 361 F.3d 610, 618 (11th Cir. 2004); see also Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001) (stating "not all conduct by an employer negatively affecting an employee constitutes an adverse employment action").  Rather, the

Eleventh Circuit explained the standard for establishing an adverse employment action as follows:

> [T]he employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way….[T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action…, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

Davis, 245 F.3d at 1239 (italics in original).

Any criticism that Plaintiff received for not being familiar with the information technology systems does not rise to the level of an adverse employment action. The Eleventh Circuit has noted that such employer criticism is customary and expected in the workplace and is not a basis for an actionable adverse employment action:

> Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit an employer's ability to maintain and improve job performance. Federal courts ought not be put in the position of monitoring and second-guessing the feedback that an employer gives, and should be encouraged to give, an employee.

Shotz v. City of Plantation, 344 F.3d 1161, 1182 (11th Cir. 2003) (citing Davis, 245 F.3d at 1239). While Plaintiff apparently disagreed with the critique he received and felt that he was perceived as lacking credibility (MacCartney Dep. 107/9-108/1; 134/15-135/16; 137/5-19; 144/1-9), federal anti-discrimination law is not intended to remedy everything that makes an

employee unhappy.  <u>Davis</u>, 245 F.3d at 1242.  Because Plaintiff suffered no adverse employment action (<u>see</u> <u>also</u> MacCartney Dep. 139/10-142/6), this claim fails as a matter of law.

Similarly, Plaintiff's claim that Patrice Daniels at times refused to let him speak during staff meetings fails because he suffered no adverse employment action.  (<u>Id</u>. at 151/10-159/130).  Plaintiff cannot establish that Patrice Daniels' alleged actions caused a "serious and material" change in the circumstances of his employment.  To the contrary, Plaintiff testified that the only impact this had on his employment was that "[he] probably needed to start keeping [his] eyes and ears open because the end probably wasn't that far away."  (<u>Id</u>. at 159/6-13).  Clearly, Plaintiff suffered no adverse employment action, and this claim is due to be dismissed.

    2.    <u>Plaintiff's claim that he was asked to provide business justification before purchasing new software because of his race fails as a matter of law because he suffered no adverse employment action and he cannot identify any similarly-situated, non-Caucasian employee who received more favorable treatment</u>.

Plaintiff suffered no adverse employment action when he was merely asked to perform one of his job duties and provide a business justification for the purchase of new software. (MacCartney Dep. 159/14-180/6).  Plaintiff contends that he and Plaintiff Bert Mayer suggested purchasing some new software.  (<u>Id</u>. at 162/21-163/11).  Day advised them to discuss the purchasing issue with Athenia Figgs, who was responsible for Piknik's information technology systems.  (<u>Id</u>. at 163/12-164/20).  Figgs then asked for a business justification outlining why the software was needed and the potential benefit of having the software.  (<u>Id</u>. at 165/21-166-6).  While Plaintiff provided some input, he admits that Plaintiff Mayer "spearheaded" the business justification process.  (<u>Id</u>. at 166/7-22 ("I don't recall if we sat down and we walked through it or if I actually sent an e-mail.  I think we sat down and I walked him through it with me.  He filled out the form.  He filled it in.  He kind of spearheaded it from there.")).  Figgs ultimately

concluded that this software was not necessary and stated she believed other, "better programs" existed.  (Id. at 167/17-19).  Plaintiff believes that, based on Figgs' recommendation, Day and Patrice Daniels chose not to purchase the software at that time and to reevaluate the issue at a later time.  (Id. at 168/16-20).

Plaintiff apparently disagreed with this final decision, and he now claims that he was discriminated against when Figgs asked for a business justification for the software.  However, simply fulfilling a job responsibility, such as explaining the basis for a company expenditure, hardly qualifies as an employment action that seriously and materially changed the terms and conditions of Plaintiff's employment.  Davis, 245 F.3d at 1239.  Indeed, Plaintiff cannot establish how his providing information to Plaintiff Bert Mayer to be included in the final business justification impacted his employment in a "real and demonstrable way."  Id.  Because Plaintiff suffered no adverse employment action, summary judgment is due on this claim.

Plaintiff attempts to make a simple request for a business justification seem nefarious by arguing that Defendant Hicks was allowed to purchase contact management software without providing any business justification.  (MacCartney Dep. 173/11-175/21).  However, Plaintiff's reliance on Hicks as a comparator is misplaced.  Manicci v. Brown, 171 F.3d 1364, 1668-69 (11th Cir. 1999) (requiring "the quantity and quality of the comparator's conduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges").  Plaintiff does not even know whether Hicks was required to provide a business justification for this expenditure.  (Id. at 174/3-6 (stating he is unaware of any written justification); 175/16-21 (stating he does not know if Hicks verbally provided a business justification)).  He also admits that he does not know if Athenia Figgs, who requested the business justification from Plaintiffs MacCartney and Mayer, was involved in the process of

approving Hicks' request to purchase this software.  (Id. at 175/13-15).  Indeed, Plaintiff can only speculate as to who and what was involved in the process of purchasing this contact management software.  (Id. at 175/1-12 ("**I don't know** who made the decision…but **I believe** it was Henry and/or Chris.  Patrice Daniels was also involved at the time…or collectively all of them….") (emphasis added)).  Plaintiff cannot rely on such speculation and conjecture to manufacture an issue of fact to defeat summary judgment.  See Brown, 848 F.2d at 1537; Peppers, 887 F.2d at 1498.  Finally, Hicks, **Vice President** of Sales and Marketing, was a higher-level employee than Plaintiff, **Director** of Logistics at the time.  For these reasons, Hicks is not a proper comparator.  Because Plaintiff cannot identify any similarly-situated, non-Caucasian individual who received more favorable treatment, this claim fails as a matter of law.

> 3.    Plaintiff's Director of Logistics position was eliminated because Chris Day determined that the Director of Logistics position was no longer needed in light of the cash crisis that Piknik was facing.

The Director of Logistics position was eliminated because Piknik no longer needed a full-time Director of Logistics.  As previously stated, Plaintiff was a good performer, and he was well reviewed in his role.  Despite Plaintiff's work record, Onyx did not have the luxury of maintaining a director-level position in logistics and supply chain when there were lower level employees who were capable of performing the same job duties without Plaintiff's oversight.  (Day Dep. 117/25–118/8).  As a result, in April 2005, the Director of Logistics position was eliminated.  (Id.; MacCartney Dep. DX5).  Notably, although his position was eliminated, Plaintiff's employment was not terminated.  Instead, Plaintiff testified that he was initially asked to assume the role of Plant Manager of the Brundidge facility.  (MacCartney Dep. 239/20-240/16).  Plaintiff expressed his preference to serve as Plant Manager of the Alatex facility, and Day agreed.  (Id.)  Plaintiff thus moved into the role of Plant Manager at the Alatex facility

without any reduction in salary.  Day's willingness to continue Plaintiff's employment and to accommodate Plaintiff's request to work at the Alatex plant rather than the Brundidge plant further demonstrates that Day had no intent to discriminate against Plaintiff because of his race.

4.    Plaintiff's salary was reduced more than 5% because he was a Plant Manager but was still earning a director-level salary.

When Piknik implemented a company-wide 5% pay cut, Plaintiff's salary was reduced more than 5% in order to bring his salary in line with his role as a Plant Manager.  Although Plaintiff's job as Director of Logistics was eliminated and he was moved to Plant Manager of the Alatex facility in April 2005, Day allowed Plaintiff to continue earning a director-level salary. (Day Dep. 140/24-141/7).  In June 2005, however, Piknik's dire financial condition forced it to make difficult decisions, which included an across-the-board salary reduction.  (MacCartney Dep. DX3 (explaining that "the current circumstances at Piknik necessitate imposing salary reductions"); DX1 (describing the circumstances Piknik was facing)).  In general, all employee salaries were reduced by 5%.  (Day Dep. 137/22-138/1; Day Dep. PX6).  However, Day chose to reduce Plaintiff's salary more than 5% in order "pay [Plaintiff] a rate commensurate with [Plaintiff's] current position rather than [his] prior one."  (MacCartney Dep. DX3).  Day explained his decision to reduce Plaintiff's salary as follows:

> And in the case of MacCartney, we cut his pay because he was getting paid as director of logistics while he was running a plant. He was both not as qualified as he probably could have been, but we were making an investment in him.  And the cost of, you know, what you pay a plant manager, somewhere around 70-, $75,000 a year.  And I can't remember what we cut him to, but we cut him from around a hundred to something around 70.

(Day Dep. 140/24-141/7).  Clearly, this decision was wholly unrelated to Plaintiff's race, and Defendants are entitled to summary judgment.

It appears that Plaintiff will attempt to prove that Day is lying about his reason for reducing Plaintiff's salary by more than 5% by arguing that African American employees – namely, Hicks, Barber, and Brenda Sellers – did not receive similar salary reductions. (MacCartney Dep. 121/2-19). The Eleventh Circuit "require[s] that the quantity and quality of the comparator's conduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." <u>Manicci</u>, 171 F.3d at 1668-69.

However, Hicks, Barber, and Sellers are not proper comparators for several reasons. None of their positions were eliminated thereby causing them to transfer to a lower level position. (MacCartney Dep. 122/16-123/18). Furthermore, Barber is not a proper comparator because he (along with a Caucasian employee whose salary also was not cut) was a brand new employee of Piknik, who negotiated his salary with Piknik and relocated immediately before the salary cuts and, accordingly, Day thought it unfair to reduce his salary when it had just been negotiated. (Day Dep. 137/11-21). Additionally, contrary to Plaintiff's assertion, Hicks in fact received a five or ten percent salary reduction at the same of the across-the-board pay cuts. (Hicks Dep. 108/4-6). Finally, Plaintiff admits that he does not know whether Brenda Sellers' salary was reduced and, instead, bases his assertion solely on inadmissible hearsay. (MacCartney Dep. 128/7-15l; <u>but</u> <u>see</u> Day Dep. 137/11-21 (stating that only Anthony Barber (African American), Annissia Hanyard (African American) and Carl Bleier (Caucasian) did not receive a salary reduction and explaining the basis for that decision)). Plaintiff, however, cannot rely on inadmissible hearsay to create a fact issue and defeat summary judgment. <u>See</u> <u>Macuba v. Deboer</u>, 193 F.3d 1316, 1322 (11th Cir. 1999) (stating that "inadmissible hearsay cannot be considered on a motion for summary judgment"). For these reasons, comparing Barber, Hicks, or Sellers to Plaintiff is not confusing apples with oranges; it is confusing grapes with

watermelons. Because Plaintiff cannot identify any similarly-situated non-Caucasian employee who received a more favorable salary reduction, his claim fails as a matter of law.

       5.      <u>Plaintiff's employment was terminated for legitimate, non-discriminatory reasons – namely, Chris Day believed Plaintiff violated a direct instruction not to discuss his salary decrease with his subordinate employees and also believed that Plaintiff was attempting to undermine Piknik and Onyx. Plaintiff has no evidence that Chris Day is lying about these being the true reasons for Plaintiff's termination.</u>

Plaintiff's employment was terminated for legitimate, non-discriminatory reasons – namely, insubordination and untrusworthiness – and thus her termination claim fails as a matter of law. First, he was terminated for insubordination. When Plaintiff's salary was reduced in June 2005, he was asked not to discuss with other employees, particularly his subordinate employees, the specifics of his pay cut. (Day Dep. 130/9-12). However, Day subsequently learned that Plaintiff ignored this clear instruction. He learned that Plaintiff discussed his pay cut with the employees who reported to him "in a group environment in a very public and demoralizing way." (Day Dep. 130/7-15; 131/5-14; 136/23-137/1). Day thus decided to terminate Plaintiff's employment for ignoring an explicit instruction not to discuss his salary reduction with his subordinate employees, not because of his race. (Day Dep. 117/25 – 118/8; 130/3-12).

Plaintiff's employment was terminated for an additional legitimate, non-discriminatory reason: untrustworthiness. Day received information that Plaintiff and other current and former Piknik employees – including Ricky Loeb and Plaintiffs Bob Winter and Shannon McGlon – were plotting to seize control of Piknik from Onyx and otherwise undermine Onyx. (Id. at 130/25-131/14). On June 22, 2005, Piknik informed Plaintiff Bob Winter that his salary was being reduced and that his position would be eliminated in five weeks. (Winter Dep. DX8). Winter asked to go home to think things over. (Winter Dep. 283/1-3). Meanwhile, Winter

decided to leave Piknik's employment immediately instead of working for the next five weeks until his position was eliminated. (Id. at 306/8-14). Having decided to leave Piknik but before informing Piknik of his decision, Winter returned to his office under the cover of night and took a company computer and various company documents regarding Piknik's customers, including contracts, pricing and cost information, and other proprietary information. (Id. at 305/2-6; 306/20-307/19; 310/19-311/22; Hicks Dep. 154/3-24). Winter tendered his resignation the following day. (Winter Dep. DX9). Piknik discovered Winter's covert operation just hours after Winter resigned. (Winter Dep. DX11; Day Dep. 165/25-167/19; Hicks Dep. 154/3-24).

On or about June 27, 2005, Day learned that Plaintiff was conspiring with Winter (among others) to undermine Piknik customers' confidence in Onyx's role at Piknik and to take control of Piknik from Onyx. (Day Decl. ¶7; see also Day Dep. 130/7-131/5; 166/10-167/19). In particular, Day received the following email summarizing a conversation between Hicks and a Piknik customer:

> I talked with Rudy Mansfield at Kraft today and he mentioned that Peter Lloyd, his counterpart, had received an email from Bob Winter indicating that he was working to pull together a group to make an offer to buy Piknik Products. Kraft's reaction was neutral to negative on this development and cautiously supportive of Onyx. This development does suggest that Winter et. al. are likely to have contact other customers in similar manner, and is further unsettling to our customers regarding the stability of the company and its future. Anything that we can do to support their confidence in us is necessary.

(Day Decl. Exhibit A). After learning that Plaintiff was attempting to undermine Piknik and Onyx, Day determined that Plaintiff's actions warranted termination because he simply felt he could no longer trust Plaintiff. (Day Dep. 131/1-5; see also Day Decl. ¶7 and Exhibit A (asking that a copy of the email summarizing Mr. Hicks' call with Kraft be placed in Plaintiff's file and noting "[t]he fact that they are operating as a group, trying to disrupt our business, is further

evidence of the need for their immediate termination")).  Plaintiff's employment was terminated on June 29th, two days after Day learned about Plaintiff's activities.  (MacCartney Dep. 45/14/15).  Plaintiff's employment was clearly terminated because Day believed that he could not trust Plaintiff, not because of Plaintiff's race.

To survive summary judgment, Plaintiff must rebut each proffered legitimate non-discriminatory reason for his termination.  Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1308 (11th Cir. 2007).  This he cannot do.  Defendants anticipate that Plaintiff will argue these reasons are pretext for discrimination by denying that he discussed his salary reduction with other employees in violation of a direct order and denying that he participated with a group to seize control of Piknik from Onyx.  (MacCartney Dep. 119/3-6; 281/2-283/12 (explaining he was "just copied on these emails" from Plaintiff Winter); MacCartney Dep. DX8; see also Winter Dep. 296/14-297/16 (stating Plaintiff was involved with the group that was being formed)).  However, the correctness of the facts upon which the termination decision was based is not the relevant legal inquiry.  The relevant legal inquiry is whether the decision maker had an honest belief that the events occurred.  See Dawson v. Henry County Police Dep't, No. 06-14640, 2007 WL 1893367, at *3 (11th Cir. Jul. 3, 2007) ("The pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of the facts underlying that explanation without impugning the employer's honest belief, fails to create a triable pretext issue"); Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1318 (11th Cir. 2003) ("Even if, as Knight claims, the events did not actually occur, they can be considered if Ryder (the decisionmaker) honestly believed they occurred"); Smith v. Papp Clinic, PA, 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such a belief, the

discharge is not 'because of race' and the employer has not violated § 1981").  Plaintiff has no evidence that Day lacked an honest belief that Plaintiff ignored an instruction not to discuss his salary reduction with others and that Plaintiff conspired with others to seize control of Piknik from Onyx.

Indeed, other evidence demonstrates that Day had no discriminatory animus against Plaintiff because of his race.  For example, Day increased Plaintiff's salary from $96,000 to $100,000 when Plaintiff was still the Director of Logistics to acknowledge Plaintiff's job performance.  (MacCartney Dep. 45/18-46/17).    Additionally, when Plaintiff's Director of Logistics position was eliminated, Day chose not to terminate his employment immediately. Day explained that he was "trying to be as creative and humane as [he] could be to not have to throw [Plaintiff]…out the door in these difficult circumstances, but to try to find something else" for Plaintiff.  (Day Dep. 121/25-122/3).  Accordingly, Day decided to transfer Plaintiff into a vacant position, Plant Manager of the Alatex facility.  (Id. at 117/25-118/8).  Additionally, when Plaintiff's salary was reduced in June 2005, clearly there was no intent to terminate his employment at that time.  (MacCartney Dep. DX3).  Day was hopeful that Plaintiff would stick with the company and that he would eventually be able to increase Plaintiff's salary again.  (See id. (stating he is "hopeful that we can emerge from this bank-induced situation before too long and increase pay rates again, but until then we have to make painful choices to keep the company operating")).  The thought of terminating Plaintiff's employment arose only after Day learned that Plaintiff discussed his salary reduction with his subordinate employees and that he was attempting to undermine Piknik and Onyx.  (Day Dep. 130/7-131/4).

In fact, there is substantial evidence refuting any allegation that Day's decisions were motivated by race.  Day testified that in discussions he had with representatives of Pepsi and

Proctor and Gamble, who indicated they would like to see Onyx operated more like a social program, he responded:

> And we always pushed back and said, no, we're about ownership and management control, and a slow sustainable process of introducing African-Americans into management ranks in the companies that we acquire.
>
> Nothing would have been more disruptive than to go in and turn a place upside-down just for racial reasons.
>
> And oh, by the way, we plan to be in business and acquire another companies, and you don't think word would get out to the other companies we're looking at that, oh, yeah, you better watch out, all you white guys, you're going to – we never want to do that. That's bad business.

(Id. at 170/19-172/8). Further, in addition to raising Plaintiff's salary, Day also raised the salaries of Plaintiffs Bob Winter (Caucasian) and Bert Mayer (Caucasian). (Id. at 172/11-17). Day also hired several Caucasians in management positions at Piknik[4] and terminated the employment of African Americans. (Id. at 175/5-11). These facts certainly do not suggest that Mr. Day was "out to get" Plaintiff or any other employee because of their Caucasian race.

> **C.    Jeff Larry and Henry Hicks are due summary judgment because they did not participate in the decision to terminate Plaintiff's employment and thus they cannot be held personally liable.**

To the extent the Court determines that a trial is warranted on Plaintiff's claim of reverse discrimination, Larry and Hicks are still entitled to judgment as a matter of law because they were not personally involved in any decisions affecting Plaintiff's employment. As stated previously, an individual may be held personally liable under 42 U.S.C. § 1981 only if he was "personally involved in the discrimination" by having "directly participated" in the alleged discriminatory acts.    Al-Khazraji, 784 F.2d at 518 ; see also Wallace, No. 8:04-cv-115-T-

---

[4] Day hired (1) Carl Bleier – General Manager and Vice President of the Condiments Division, (2) Jessica Daniels – Quality Manager of the Brundidge facility, (3) Allan Walters – Quality Manager of the Day Street facility, and (4) Robert Niedbalski – Corporate Controller. (Day Dep. 94/14-24; 95/18-20; 173/22-174/14).

23TBM, 2006 WL 2882715, at *7 ("To establish a claim for individual liability under § 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action…The claim must be predicated on the actor's personal involvement.'"); <u>Richard</u>, 946 F.Supp. at 74; <u>Daulo</u>, 892 F.Supp. at 1091 (noting that "Section 1981 liability against an individual demands personal involvement in discrimination").

Neither Hicks nor Larry were "personally involved" in any of the alleged discrimination. Hicks never supervised Plaintiff (Hicks Dep. 89/18-19) and was not involved in any decision concerning Plaintiff's employment, including the decisions to eliminate the Director of Logistics position, reduce Plaintiff's salary or terminate his employment.  (Hicks Dep. 156/15-18; 109/4-13;127/21-23).   Similarly, there is no evidence that Larry was personally involved in such decisions either.   (<u>See</u> Day Dep. 131/21-25; 132/141 (stating he informed Larry of the termination decision to ensure Larry was "not caught off guard or surprised by anything that may come back…."); Larry Dep. 52/21-53/16; 82/12-83/16).   Accordingly, Hicks and Larry are entitled to summary judgment.

## IV.    CONCLUSION AND RELIEF REQUESTED

For all of the foregoing reasons, summary judgment is due in favor of the Defendants on all of Plaintiff's claims and Defendants respectfully move this Court to dismiss each and every on of the Plaintiff's claims in its entirety, with prejudice.

Respectfully submitted,

s/ Robert E. Poundstone IV
Robert E. Poundstone IV (POU006)
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
Email: bpoundstone@bradleyarant.com

OF COUNSEL
George R. Parker
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701

Jennifer J. McGahey
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2104
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

K. Anderson Nelms, Esquire
Law Offices of Jay Lewis
P.O. Box 5059
Montgomery, AL 36103


s/ Jennifer J. McGahey
OF COUNSEL

33