UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JERRY A. MacCARTNEY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No.: 2:05cv1207-MHT |
| v. ) | |
| ) | |
| PIKNIK ACQUISITION CORP., L.L.C., et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM BRIEF IN SUPPORT OF MOTION TO REINSTATE ONYX CAPITAL VENTURES, L.L.C. AS A PARTY DEFENDANT**

This Memorandum is provided to support the Motion of Plaintiffs to Reinstate Onyx Capital Ventures, L.L.C. (hereinafter referred to as "Onyx") as a party Defendant in this cause. Onyx was originally named and served with the Complaint and Amended Complaint in this case (See Court Doc. 1 and Doc. 23). Onyx filed a Motion to Dismiss and supporting declarations challenging the jurisdiction of Alabama courts over said entity (See Court Doc. 13). Based upon the representations made within the declarations and the assertions of Onyx at that time, the Plaintiffs filed a Motion to Dismiss without prejudice in May 2006. This Court granted the motion on May 19, 2006. A copy of the Motion to Dismiss by Plaintiffs is attached hereto as Exhibit "1". Within the motion, the Plaintiffs specifically made representations to the Court that discovery was necessary in order to determine the extent and nature of the relationship between Onyx and businesses within the State of Alabama (See Exhibit "1").

The Plaintiffs have conducted extensive discovery taking the depositions of the Defendants, as well as having their own depositions taken by counsel for the Defendants. It should be noted that the same counsel that filed the Motion to Dismiss on behalf of Onyx has continued active

participation within this case and has represented the remaining Defendants. The remaining Defendants are either shareholders or employees of Onyx (See Exhibits "5" and "13"). The representations of these Onyx stakeholders in their original declarations supporting Onyx's Motion to Dismiss are directly contradicted by the evidence obtained through discovery. In the best light, the Onyx assertions are erroneous or mistaken. From a practical view, the suggestions of Onyx's limited involvement in the operation of Piknik Products Company (hereinafter referred to as "Piknik") in Alabama were designed to draw a veil around the truth from both the Plaintiffs and this Court. Much like the scheme of creating a shell entity to avoid the reality of its true intentions, Onyx has attempted to hide its true plan and strategy in its initial filings with this Court ( See Exhibits "2", "4" and "5"). Notwithstanding the statements of Onyx principals to this Court, Onyx made aggressive and assertive statements to various third parties promoting its ownership and operational control of the Alabama company, Piknik, as a means of showing its success in converting a company historically owned and operated by whites into a company owned, operated and controlled by minorities (See Exhibit "3" beginning at page 20).

Onyx originally asserted that it had conducted no business in Alabama and did not have any contacts with the State of Alabama. Jeffrey Larry stated that he worked wholly within his offices in Chicago, Illinois and that if any decisions were made by Onyx with respect to Piknik, they took place within Chicago, Illinois. See Declaration of Jeffrey Larry attached as Exhibit "A" to Defendants' Motion to Dismiss (See Court Doc. 14). The suggestions made in these declarations have been clearly rebutted by substantial documentation that demonstrates the extensive control and conduct of Onyx shareholders and employees in the daily business affairs of Piknik. The plan of Onyx was to acquire a controlling interest in Piknik through another limited liability company, Piknik Acquisitions Corp., L.L.C. (hereinafter referred to as "PAC") (See Exhibits "3", "4", "5",

"12", and "13"). PAC was wholly owned by Onyx and they entered into a Management Agreement with Piknik on July 25, 2003 (See Exhibit "2"). Onyx was the only shareholder of PAC (See Exhibit "5"). The goal of Onyx through PAC was to convert a non Minority Business Enterprise (non-MBE) business into an Minority Business Enterprise (MBE) company. Plaintiffs' Exhibit "3" is a paper version of a presentation by Henry Beecher Hicks of Onyx to the Packaging Services Expo on May 11, 2005. Within Exhibit "3" on page 20, Onyx lays out **"The Onyx Model"** wherein its strategy is detailed for converting non-MBE's into an MBE and seeking additional marketing opportunities thereafter. Onyx specifically identifies within Exhibit "3" its operational control of Piknik and its future goals for the Alabama company. Specifically, on page 24 of Exhibit "3", Onyx speaks of its "positioning Piknik for significant growth." This is an impossible task to accomplish if one relies upon the assertions of Jeffery Larry that Onyx is removed from the picture and only makes decisions in Illinois (See Court Doc. 14).

     Onyx implemented its "model" and submitted an application to the South Regions Minority Business Council in Birmingham, Alabama for Piknik to be certified as an MBE (See Exhibit "4"). Within Exhibit "4" representations were made by Onyx, as the owner of the company managing Piknik, regarding the makeup of its management team and the ethnicity of those managers. Exhibit "4" contains biographies of the management wherein Mr. Jeffrey Larry is described not only as the Chairman and Chief Executive Officer of Piknik, but is also shown as the Chairman and CEO of Onyx. Within Exhibit "4", Defendant Christopher Day is identified as the Executive Vice President of the company (Piknik) and also an equity holder and employee of Onyx. This directly contradicts the declaration of Mr. Day offered with the Motion to Dismiss by Onyx wherein he denies an equity position in Onyx (See Court Doc. 13). Defendant, Henry Hicks, III, is identified as President of Sales and Marketing in Exhibit "4". Patrice Daniels is also referenced in the biographies as an equity

holder and employee of Onyx. Ms. Daniels is identified as the Executive Vice President of Piknik in Montgomery, Alabama. (Id.) These people were key decision-makers regarding how Onyx planned to meet its goals in Alabama.

Substantial representations about operational control of Piknik were made by Onyx, its members and employees to lending institutions, specifically within the State of Alabama, in order to secure credit for the operations of Piknik (See Exhibits "5" and "6"). Many more documents exist to demonstrate the close relationship between Onyx and Piknik. Only a portion are attached hereto. Once Onyx obtained complete control of Piknik through its management agreement under PAC, it participated in numerous financial transactions in Alabama for the purpose of inducing Alabama banks, more specifically SouthTrust Bank of Alabama, and thereafter Wachovia Bank, to extend credit and provide additional capital for the operation of Piknik. Onyx did nothing to draw any distinction that it was not Onyx at the core of these inducements and representations for the extension of continued and/or new financing for Piknik. A logical extension of Onyx's failure to distinguish itself rests within the true nature of the actual relationship existing between Piknik and Onyx. Exhibit "5" is one of those documents wherein Jeffrey Larry, CEO of Onyx, makes express representations as the CEO of PAC and as the CEO of Onyx to induce and encourage the lending institutions in Alabama to extend credit and continue to provide capital for the financial operations of Piknik. More specifically within Exhibit "5" there is an Unanimous Written Consent by Onyx to ratify the "Guaranty" of Piknik to SouthTrust Bank. This ratification dated October 15, 2004, is signed by Patrice Daniels and Jeffrey Larry, both of whom are identified in the application for MBE status as employees of both Onyx and Piknik.

Exhibit "6" provides further evidence of the close relationship that existed between Onyx and Piknik wherein a "Guaranty" appears consistent with the previously referenced banking documents

in order to provide sufficient confidence to SouthTrust Bank of Alabama that they should continue to provide capital, and forebear executing upon existing lines of credit which had been provided to the Alabama company. Exhibits "5" and "6" demonstrate the complete control, close relationship, and contacts Onyx enjoyed with the day-to-day operations of Piknik in Alabama. These representations by Onyx continued to SouthTrust Bank and its successor, Wachovia, well into 2005. Exhibit "7" is a copy of a "Ninth Amendment and Amended Forbearance Agreement" specifically referencing Onyx in and for the benefit of Piknik. Within the initial paragraph of the agreement, Onyx is identified as being one of the obligors under this agreement with SouthTrust Bank (See Exhibit "7"). Onyx made earlier representations to SouthTrust Bank in order to induce their extension of credit and provided unconditional guaranties sufficient to allow SouthTrust to provide continuing operating capital for Onyx's latest acquisition, Piknik (See Exhibit "8").

Onyx exerted significant control in the day-to-day decisions of Piknik. Whenever a change was contemplated within the management team, Onyx had to give its approval and acquiescence to said change. Exhibit "9" include copies of emails wherein Ricky Loeb, the minority stockholder for Piknik and former owner, is seeking the approval and acquiescence of Jeffrey Larry and Onyx for the replacement of Mike McConnell on the Board of Directors with Scott Montana. As Mr. Loeb seeks to obtain information about the affairs of Piknik, he is met with great reluctance on the part of Onyx and Jeffrey Larry to have board meetings and provide information regarding the implementation of Onyx's plan for Piknik. Jeffrey Larry states to Ricky Loeb that, "I am also working very closely with Bill, Henry, the rest of the senior management team at Piknik and the Onyx team to continue to successfully implement our strategy at Piknik" (See Exhibit "9"). It is difficult to accept the position of Jeffery Larry that Onyx was not involved in Piknik when operational decisions at Piknik required the approval of Onyx and its personnel. There were specific

"talking points" developed by Onyx for Piknik employees' communication with internal and external constituents. Exhibit "10" demonstrates the close working relationship and oversight held by Onyx over Piknik. Onyx even takes an affirmative and active role in seeking to find new equity capital sources for Piknik (See Exhibit "10").

Onyx asserted it was an improper venue for it to be forced to participate in litigation in Alabama (See Court Doc. 14). However, Onyx is presently participating in litigation within the United States Bankruptcy Court for the Middle District of Alabama, Northern Division in proceedings that arise directly from the relationship between Onyx and Piknik (See Exhibit "11"). An adversarial proceeding is ongoing wherein Onyx has submitted to and is actively participating in the defense of an action to recover funds allegedly procured by Onyx from Piknik. Exhibit "11" is a set of Requests for Admissions submitted by Onyx in the case that is presently pending in Alabama. Therefore, Onyx has already submitted to the jurisdiction of the federal courts in Alabama. Any suggestion of improper or inconvenient forum has been effectively waived. Onyx is an active participant in current litigation within Alabama.

Onyx's participation in the management and activities of Piknik in Montgomery, Alabama can also be observed in the presentations made to third parties who are not financial institutions. Exhibit "12" is a paper copy of a PowerPoint presentation made by Onyx/Piknik to the Hershey Corporation after receiving notice that Hershey was terminating its long relationship with Piknik. Onyx made affirmative representations to outside companies of its investment and participation in the Alabama company by stating that Onyx had sent executives to Piknik to try and fill the gap and had disengaged the prior owner from the daily operation decisions of Piknik (See page 15, Exhibit "12"). Onyx's assertions to third parties is clear evidence of its actual contacts within the State of Alabama. Onyx indicates on page 22 of Exhibit "12" that it is a leading, private employer in

Alabama and was key in getting Piknik certified as an MBE. Moreover, they specifically made the representations in 2004 that they were operating an economic development zone in a historically under utilized business zone within Alabama through their ownership of Piknik (See page 22, Exhibit "12").

A substantial number of documents in addition to the exhibits provided with this memorandum and motion, support and demonstrate the close contacts and connection of Onyx with the day-to-day operations of Piknik. Only a small number are attached hereto. Onyx did not take a "hands off" posture in its dealings with Piknik, but, rather, had an aggressive, hands on experience in putting Onyx's key personnel in management positions in order to effectuate "**The Onyx Model**" as described on pages 20-26 of Exhibit "3". "**The Onyx Model**" is the business plan and paradigm through which the conversion of white owned businesses (non-MBE) can be accomplished to thereafter become companies owned and controlled by minority persons (MBE's). In the instant case, the Plaintiffs allege that this mode of operation by Onyx weighed heavily upon the decisions to terminate their employment and replace them with minority persons.

A review of Onyx's website reveals its goal to acquire controlling interest over businesses in states beyond Illinois and participate in the operation of those businesses (See Exhibit "13"). Onyx specifically acknowledges its acquisition of a majority interest in Piknik, an Alabama based contract manufacturer, within its own web page announcements (See Exhibit "13"). Here again is evidence of Onyx's representations to third parties of its interest and contact with a company operating and located within the State of Alabama, namely, Piknik.

Onyx sought to obtain certification as an MBE in Alabama by filing an application with the South Regions Minority Business Council in Birmingham, Alabama (See Exhibit "4"). A review of the certification criteria set out on the website for the South Regions Minority Business Council

in Exhibit "14" demonstrates the criteria necessary to receive certification as an MBE. It states therein "the minority owners shall possess the title and power to direct or cause the direction of the management and policies of the business and to make independent and unilateral day-to-day business decisions as well as other major decisions on matters of management, policy and operations" (See Exhibit "14"). A certifiable MBE must demonstrate operational and managerial control of the firm. This control shall be real, substantial and continuing and shall go beyond the pro forma ownership of the business as reflected in ownership documents. If the owners of the business who are non-minorities are disproportionately responsible for the operation and management of the business, then the firm is not controlled by minorities and shall not be considered a certifiable MBE (See Exhibit "14", page 3). Therefore, it is implausible to accept as true the intent of Onyx to remain removed and beyond the jurisdiction of the state wherein it owned a majority interest in a business. In order to obtain the certification which made up the genesis of "**The Onyx Model**", the entity had to take advantage of and participate in the day-to-day operations in a meaningful fashion (See Exhibit "14"). It is highly unlikely that Onyx could have succeeded and prevailed in its application to gain MBE status for Piknik had it not been willing to accept and shoulder the actual responsibility that goes hand in hand with owning 51% of the business in Alabama.

## LEGAL STANDARDS ANALYSIS

A state will have jurisdiction over a person or corporation so long as its "long arm statute" reaches the person or corporation and the state's jurisdiction comports with the requirements of due process. Leithead v. Banyan Corporation, 926 So.2d 1025 (2005). The Banyan court held that Alabama's long arm "statute", which is actually Rule 4.2 (Ala.R.Civ.P.), extends to the limits of due process. Ex Parte McInnis, 820 So.2d 802; Duke v. Young, 496 So.2d 37, 39 (Ala. 1986). In the

event that none of the specific actions listed brought the defendant within the state's jurisdiction, subdivision (a)(2)(I) provided that the state could assert jurisdiction over the person if he otherwise had "some **minimum contacts** with this state and, under the circumstances, it is reasonable to require the person to come to the state to defend the action." This "catch all" provision authorized asserting jurisdiction permitted by the Due Process Clause of the 14th Amendment of the United States Constitution. Banyan, supra.

A physical presence in Alabama is not a prerequisite to personal jurisdiction over a non resident. Sieber v. Campbell, 810 So.2d 641, 644 (Ala. 2001). What is required, however, is that the defendant have such contacts with Alabama that it "should reasonably anticipate being haled into court [here]." Dillon Equities v. Palmer & Cay, Inc., 501 So.2d 459, 462 (Ala. 1986) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 59, 62 L.Ed. 2d 90 (1980)). Depending on the quality and quantity of the contact, jurisdiction may be either general or specific. Leventhal v. Harrelson, 723 So.2d 566, 569 (Ala. 1998). General jurisdiction applies where a defendant's activities in the forum state are "substantial" or "continuous and systematic" regardless whether those activities gave rise to the lawsuit . . . But regardless of whether jurisdiction is alleged to be general or specific, the nexus between the defendant and the forum state must arise out of "an action of the defendant [that was] purposely directed toward the forum state." Elliott v. Van Kleef, 830 So.2d 726, 731 (Ala. 2002) (quoting Asahi Metal Industries Company v. Superior Court of California, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed. 92 (1987)). This purposeful-availment requirement assures that a defendant will not be haled into a jurisdiction as a result of the "unilateral activity of another person or a third person." Id., 830 So.2d at 731 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 So.2d 21, 74, 85 L.Ed. 2d 528 (1985)). Ex Parte Dill, Carr, Stonbracker & Hutchings, P.C., 866 So.2d at 525-26. For general jurisdiction to apply, the out

of state defendant's contacts with Alabama must be "substantial" or "continuous and systematic." Ex Parte Dill, supra. Contacts may constitute general contacts "regardless of whether those activities gave rise to the lawsuit." Heliocopteros Nacionales De Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

In Steel Processors, Inc. v. Sue's Pumps, Inc. Rentals, 622 So.2d 910, 913 (Ala. 1993), the Alabama Supreme Court stated that "the use of interstate facilities (telephone, the mail, . . . [is a] secondary or ancillary factor and cannot alone provide the '**minimum contacts**' required by due process." Id., at 913 (quoting Scullin Steel Company v. National Ry. Utilization Corp., 676 F.2d 309, 314 (8th Circuit 1982)). This court's emphasis in Steel Processors on the inability of telephone calls or mail documents "alone" to provide minimum contacts indicates that, in conjunction with other contacts, telephone calls and mail can constitute contacts that can be considered to determine whether a party has subjected itself to general jurisdiction of the courts of this state. Further support for this notion is found in Investors Guaranty Fund, Ltd. v. Compass Bank, 779 So.2d 185 (Ala. 2000), in which the Alabama Supreme Court found that the trial court had jurisdiction based upon numerous contacts between the out of state defendant and Alabama; in discussing those contacts we referenced "repeated telephone and written communication as 'further' evidence of those contacts." Id. at 190.

The Alabama Supreme Court, in considering the relationship of the parties in the Banyan case stated the following:

> Considering the presence of a Banyan employee in Alabama during the time in question, as well as the presence of Leithead in his capacity under the employment agreement to which Banyan was a party, plus nearly 300 telephone calls made by Banyan to Leithead in Alabama during that same time frame, we believe that Banyan's contacts with Alabama were both "substantial" and "continuous and systematic".

Consequently, the court concluded that it was foreseeable that Banyan could be haled into the Alabama courts and subjected into its jurisdiction. Banyan, supra.

Onyx has had substantial contact going far beyond just mail and telephone contacts with the State of Alabama. Onyx has taken upon itself the responsibilities of the day-to-day management of Piknik with literally thousands of emails similar to Exhibit "9" demonstrating the need for approval by Onyx of the decisions made in Montgomery, Alabama.

The Banyan court went further to determine the necessary contact needed to confer jurisdiction. "The final analysis in which we must engage is whether subjecting Banyan to Alabama's jurisdiction would violate traditional notions of 'fair play and substantial justice' ". International Shoe v. Washington, 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945). This court in an appropriate case may evaluate (1) the burden on Banyan of litigating in Alabama, (2) Alabama's "interest in adjudicating the dispute", (3) Leithead's "interest in obtaining convenient and effective relief", (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies", and (5) the "shared interest of the several states in further fundamental substantive social policies." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The Plaintiffs would suggest that it is not an undue burden to impose upon Onyx the responsibilities of defending itself in the courts of a state wherein it is actively conducting business.

The United States District Court, Southern District of Alabama, Southern Division reviewed the question of Alabama's long arm statute in the case of Brewer v. Trans Union, L.L.C., et al., 453 F.Supp.2d 1346 (2006) and found the Alabama statute comported with due process and allowed the exercise of personal jurisdiction over an out of state telephone service provider. The court observed that personal jurisdiction may be general, which arise from the parties contact with the forum state

that are unrelated to the claim, or specific, which arise from the parties contacts with the forum state that are related to the claim. Madara v. Hall, 916 F.2d 1510, 1516, n.7 (11th Cir. 1990). The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state. Consolidated Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1292 (11th Cir. 2000), cert. denied, 534 U.S. 827, 122 S.Ct. 68, 151 L.Ed.2d 34 (2001). The United States Supreme Court has described the due process clause, in pertinent part, as follows:

> The due process clause protects an individual's liberty interest in not being subject to the binding judgments of the forum with which he has established no meaningful "contacts, ties or relations". By requiring that individuals have "fair warning" that a particular activity may subject [them] to the jurisdiction of a foreign sovereign, "the Due Process Clause" gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.

Where a forum seeks to assert specific jurisdiction over an out of state defendant who has not consented to suit there, this "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at residents of the forum and the litigation results from alleged injuries that "arise out of or relate to" those activities. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citation omitted). Specific contacts may be found "when a controversy is related to or arises out of a defendant's contacts with the forum." Heliocopteros Nacionales Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (quotations and citations omitted).

The Brewer court went further and stated that the determination of whether a non resident defendant is subject to personal jurisdiction is guided by a two prong analysis. Cable-Home

Communication Corp. v. Network Productions, Inc., 902 F.2d 829, 855 (11th Cir. 1990). First, the court must look to the applicable state's long arm statute. Id. If there exists a basis for personal jurisdiction, the next query is whether sufficient minimum contacts exist to satisfy the Due Process Clause of the 14th Amendment so that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Company v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). Personal jurisdiction is proper only if both prongs are satisfied. Alabama's long arm rule provides "an appropriate basis exists if service of process outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is non inconsistent with the constitution of this state or the Constitution of the United States . . . Rule 4.2, Ala.R.Civ.P.

"A state has jurisdiction over a person or corporation so long as its long arm statute reaches the person or corporation and the state's jurisdiction comports with the requirements of due process." Ex Parte Bufkin, 936 So.2d 1042 (Ala. 2006) (quoting Leithead v. Banyan Corp., 926 So.2d 1025, 1029-30 (Ala. 2005)). Thus, Alabama's long arm rule extends the personal jurisdiction of Alabama courts to the limits of due process permissible under the 14th Amendment to the United States Constitution and Article 1, §13, Constitution of Alabama 1901. See Ex Parte Alloy Wheels Int'l., 882 So.2d 819, 882 (Ala. 2003); Olivier v. Merritt Dredging, Inc., 979 F.2d 827, 830 (11th Cir. 1992). (Finding personal jurisdiction on petition for writ of garnishment in a maritime action; Alabama long arm jurisdiction extends to limits of due process.)

The Plaintiffs in this cause would submit that the question before the court is whether the exercise of jurisdiction over the previously named Defendant, Onyx, comports with constitutional

due process. Plaintiffs suggest the affirmative. The Exhibits to this memorandum clearly demonstrate the nexus with Alabama for Onyx in marketing its services to third parties and in financial documents to induce the extension of credit to the Alabama company in which Onyx held a controlling interest, Piknik. Significant contacts and affirmative representations were made within the State of Alabama by Onyx stakeholders and employees. Onyx directly benefitted from the opportunities obtained through these agreements. The Management Agreement executed between PAC and Piknik (Exhibit "2") is an effort by Onyx to insulate itself from the true nature of its relationship within the jurisdiction of the State of Alabama. PAC, a Delaware Limited Liability Company, was only an instrument and nothing more to Onyx by which it sought to conduct business in the State of Alabama. Onyx was the only shareholder and only entity with any interest in PAC (See Exhibit "5"). Onyx sought to hide its actual activities and undertakings through this mechanism of limited liability companies. However, when the situation required Onyx to demonstrate its "hands on" control over an entity it had targeted, Piknik, Onyx freely displayed and heralded its prowess in conducting business within the State of Alabama (See Exhibit "3", page 21). Onyx touts its strong management team and abilities to cause the product sector to grow in double digits ( See Exhibit "3", page 23). Moreover, Onyx took an active role in positioning Piknik for significant growth by investing in additions to senior management, performing human resources training and development, and making significant access to capital for investment and acquisitions according to Onyx's own documents describing its efforts at Piknik (See Exhibit "3", page 24).

For the reasons stated herein, Plaintiffs believe there is overwhelming reason to conclude that Onyx intended to participate in the day-to-day affairs of its Alabama acquisition, Piknik. Key members of the Onyx inner circle became the Chief Executive Officer and other high ranking officials at Piknik within Alabama. It was required to meet the goal of the Onyx Model to convert

Piknik into an MBE. Shareholders in Onyx, namely, Jeffrey Larry and Chris Day, inserted themselves into the daily decision making in an Alabama business. Notwithstanding the attempt to shield itself through another limited liability company, Onyx, through its own actions, removed that curtain by entering into critical financial and certification documents with businesses and banking institutions in the State of Alabama. It was a part of the business paradigm for Onyx that it be intertwined and critically aligned to the control of the businesses in which it sought controlling interest.

Had Onyx not submitted any documentation to Alabama banking companies or filed any applications as the majority shareholder in an Alabama corporation asserting that it exercised majority day-to-day control or had key personnel working and holding positions simultaneously within both companies, Onyx and Piknik, and only conducted business through its subsidiary, PAC, then Plaintiffs might have difficulty in convincing this Court of the imposition of jurisdiction upon Onyx. Doing business through a wholly owned subsidiary does not, in and of itself, constitute doing business by the parent corporation. Ex Parte Baker, 432 So.2d 1281 (Ala. 1983) (comparing activities in Alabama of parent and subsidiary corporations for purposes of determining venue); see also, Thompson v. Tara Corp., Inc., 684 So.2d 152, 158 (Ala.Civ.App. 1996) (concluding that trial court was correct in finding that acts of subsidiary corporation in Alabama were insufficient to impose personal jurisdiction over parent corporation). However, it is clear from the documents provided and obtained in the discovery process that Onyx not only operated within the protected veil of PAC, but also operated beyond that veil, within its own self interest, and acted independent of PAC in conducting its business within the State of Alabama at Piknik. In Sieber v. Campbell, 810 So.2d 641 (2001), the Alabama Supreme Court determined that a corporate agent who personally participates, albeit it in his or her capacity as such agent, in a tort is personally liable for the tort.

Bethel v. Thorn, 757 So.2d 1154, 1158 (Ala. 1999); Ex Parte Charles Bell Pontiac-Buick-Cadillac-GMC, 496 So.2d 774, 775 (Ala. 1986). Likewise, corporate agent status does not insulate the agent from the personal jurisdiction of a state court for the litigation of those torts, or any other claims pendent to that lawsuit. Calder v. Jones, 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); Accord Sudduth v. Howard supra, 646 So.2d 668 (Ala. 1994). The facts within the Sieber case led the Alabama Supreme Court to find that substantial evidence in the case supported the conclusions shared by the trial judge that "it is fair and reasonable to require [Sieber] to come to [Alabama] to defend [this] action" and that Sieber "should reasonably [have] anticipated being haled into court" to litigate the claims in Alabama to conduct the business of Sieber and the other defendants. It is a similar question to be answered similarly in the instant case. Onyx is a necessary party to this litigation.

## CONCLUSION

Since July 2003, when the agreements were executed and signed granting Onyx the ownership and control of Piknik, there is absolutely no question as to whether Onyx has exercised that operational control over its Alabama business. Moreover, Onyx has placed its personnel in key positions and made significant and substantial representations to Alabama lending institutions to induce them to extend millions of dollars of credit to its asset in Montgomery, Alabama. Onyx came to Alabama with a purpose of changing the entity of Piknik into the entity of Onyx. Onyx has made presentations and touted to other businesses its successes in converting Piknik into a MBE. Documents such as Exhibit "12" which is the presentation to the Hershey Food Corporation and Exhibit "3" wherein Onyx touted its successes at the Packaging Services Expo in May 2005 regarding Piknik extinguish any curtain drawn between the entity of Piknik and Onyx. Onyx is a

necessary party for Plaintiffs to demonstrate how the decisions impacting their respective employments were reached. Onyx personnel made key decisions within Piknik which directly impacted upon the Plaintiffs employment in an adverse way. It was the implementation of the "Onyx Model" in its purest form to replace white decision makers with African-American counterparts. Counsel prays that Onyx will be reinstated within this action now that substantial evidence shows the direct involvement of Onyx in this case.

K. ANDERSON NELMS (NEL022)
P.O. Box 5059
Montgomery, AL 36103
Phone: (334) 263-7733
Fax: (334) 832-4390
andynelms@jaylewislaw.com
ASB-6972-E63K

OF COUNSEL:
Law Offices of Jay Lewis, LLC
P.O. Box 5059
Montgomery, AL 36103
(334) 263-7733
Fax: (334) 832-4390

## CERTIFICATE OF SERVICE

  I hereby certify that I have this day filed a copy of the foregoing via the CM/ECF system which forward a copy via email notification to the following:

Robert E. Poundstone, IV
George R. Parker
William C. McGowin
Jennifer J. McGahey


on this the 29th day of October, 2007.

                */s/ K. Anderson Nelms*
                K. ANDERSON NELMS (NEL022)
                P.O. Box 5059
                Montgomery, AL 36103
                Phone: (334) 263-7733
                Fax: (334) 832-4390
                andynelms@jaylewislaw.com
                ASB-6972-E63K