## CERTIFICATE

I, Jeffery Larry, do hereby certify as follows:

1.      That I am the chief executive officer of Piknik Acquisition Corp., LLC, a limited liability company created and existing under the laws of the State of Delaware ("PAC"), and the chief executive officer of Onyx Capital Ventures, LLC, a limited liability company created and existing under the laws of the State of Delaware ("Onyx"), and that as such officer I have custody and control of the records of PAC and Onyx and am personally familiar with those books and records and the organization and operations of PAC and Onyx.

2.      That Onyx is the sole member of PAC.

3.      That Jeffery Larry, Patrice Daniels, Patrick McGarvey, Russell Pallesen and David Palmer are all of the managers of Onyx.

4.      That set forth below is the name and signature of the duly elected, qualified and acting Chief Executive Officer of PAC.

| Name | Title | Signature |
|------|-------|-----------|
| Jeffery Larry | Chief Executive Officer | |

5.      That set forth below are the name and signature of the duly elected, qualified and acting Chief Executive Officer of Onyx.

| Name | Title | Signature |
|------|-------|-----------|
| Jeffery Larry | Chief Executive Officer | |

6.      That each of PAC and Onyx is in good standing with the Secretary of State of the State of Delaware.

7.      That no suit or proceeding for the dissolution or liquidation of PAC or Onyx or which would effect the Agreement and Plan of Recapitalization dated October 5th, 2004 or the transactions described therein (collectively, the "Plan of Recapitalization") has been instituted or is now threatened.

8.      That Exhibit A attached hereto is a true and correct copy of resolutions duly adopted by written consent of the sole member of PAC on or as of October 5th, 2004; such resolutions remain in full force and effect and have not been modified or amended.

EXHIBIT
5

PENGAD 800-631-6989

**PIKNIK ONYX 02557**

9. That the resolutions attached hereto as <u>Exhibit A</u> constitute all of the actions required by PAC to authorize the Plan of Recapitalization and the transactions contemplated in such resolution.

10. That PAC does not have a limited liability company agreement and is governed pursuant to the terms of The Limited Liability Company Act of the State of Delaware.

11. That <u>Exhibit C</u> attached hereto is a true and correct copy of the Certificate of Formation of PAC and such Certificate of Formation has not been amended and remains in full force and effect.

12. That <u>Exhibit D</u> attached hereto is a true and correct copy of resolutions duly adopted by written consent of the managers of Onyx on or as of October 15, 2004; such action by the managers is permitted by the Limited Liability Company Agreement of Onyx as amended, and such resolutions remain in full force and effect and have not been modified or amended.

13. That the resolutions attached hereto as <u>Exhibit D</u> constitute all of the actions required by Onyx to authorize the Plan of Recapitalization and the transactions contemplated in such resolution.

14. That <u>Exhibit E</u> attached hereto is a true and correct copy of the Limited Liability Company Agreement, as amended, Onyx as in effect on the date hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Company, this 15th day of October, 2004.

Jeffery Larry

2

PIKNIK ONYX 02558

**PIKNIK ACQUISITION CORP., LLC**
**ACTION BY THE SOLE MEMBER**
**BY WRITTEN CONSENT**

The undersigned, being the sole member of Piknik Acquisition Corp., LLC, a Delaware limited liability company (the "**Company**"), agrees and consents to the following actions by and on behalf of the Company:

1.    In order to approve the plan of recapitalization of Piknik Products Company, Inc., an Alabama corporation (the "**Corporation**"), the following resolution is adopted:

"**RESOLVED**, That the form, terms, and provisions of, and the transactions contemplated by, the Agreement and Plan of Recapitalization, to be entered into by and among the Corporation, Herman R. Loeb, Herman Loeb, Jr., the Company, and Onyx Capital Ventures, LLC, a Delaware limited liability company ("**Onyx**"), substantially in the form attached hereto as Exhibit 'A' and reviewed by the member (the "**Agreement and Plan of Recapitalization**"), and any and all related agreements, including, but not limited to, the Promissory Note and Pledge and Security Agreement in favor of Loeb-Piknik, LLC and attached as exhibits to the Agreement and Plan of Recapitalization (the Agreement and Plan of Recapitalization Agreement and all related agreements thereto are collectively referred to as the "**Recapitalization Agreements**"), with such changes therein and additions thereto (substantial or otherwise) as the member or officer or officers of the Company executing the Recapitalization Agreements may deem necessary, appropriate, or desirable on behalf of and in the name of the Company be, and they hereby are, approved and adopted in all respects;

"**RESOLVED, FURTHER**, That the Company is authorized to borrow up to $4,100,000 from Loeb-Piknik, LLC (the "**Loeb-Piknik Loan**") and secure the Loeb-Piknik Loan by a pledge of all of the stock of the Corporation owned by the Company;

PIKNIK ONYX 02559

"**RESOLVED FURTHER,** That in connection with the Loeb-Piknik Loan, the Company is hereby authorized to enter into, execute and deliver the Promissory Note, in the form attached to the Agreement and Plan of Recapitalization;"

"**RESOLVED FURTHER,** That the member and the appropriate officer or officers of the Company be, and they hereby are, authorized to execute and deliver, on behalf of and in the name of the Company, the Recapitalization Agreements, including specifically but without limitation, the Promissory Note, all substantially in the forms reviewed by the member, with such changes therein and additions thereto (substantial or otherwise) as the member or officer or officers executing the Recapitalization Agreements may deem necessary, appropriate, or desirable, the execution thereof by the member or any officer or officers constituting conclusive evidence of his or their authority to make such changes and to execute and deliver the Recapitalization Agreements;

"**RESOLVED FURTHER,** That the Company, its officer or officers, and the member are hereby authorized and directed to consummate the transactions contemplated by the Recapitalization Agreements, when and if executed, in accordance with their terms and conditions and to perform the obligations of the Company thereunder; and

"**RESOLVED FURTHER,** That the member and officer or officers of the Company be, and each of them hereby is on behalf and in the name of the Company, authorized and directed to do and perform all such other acts and things and to execute and deliver all such other instruments, certificates, notices, and documents as may be necessary, appropriate, or desirable to effectuate the purposes of the foregoing resolutions and to pay all such costs and expenses as may be required by the terms of any of the foregoing documents."

2.   In order to approve the pledge of all of the stock of the Corporation owned by the Company to SouthTrust Bank, an Alabama banking corporation

2

PIKNIK ONYX 02560

("**SouthTrust**") as security for the obligations of the Corporation and Onyx to SouthTrust the following resolutions are adopted:

> "**RESOLVED**, That the Company is authorized to pledge all of the stock of the Corporation owned by the Company to SouthTrust as security for the obligations of the Corporation and Onyx to SouthTrust (the "SouthTrust Pledge"); and

> "**RESOLVED FURTHER**, That the Company shall have the authority to enter into any and all guaranties, arrangements, agreements, security agreements, pledges, assignments, and/or contracts with SouthTrust in order to effectuate the SouthTrust Pledge, said guaranties, arrangements, agreements, security agreements, pledges, assignments, and/or contracts shall be upon such terms and provisions as its member or officer or officers shall determine; and

> "**RESOLVED FURTHER**, That in furtherance of the foregoing resolutions, the member and each of the officers of the Company shall have the authority to execute and deliver any and all guaranties, documents, instruments, agreements, security agreements, assignments, agreements, writings, schedules, and certificates which he shall deem necessary or desirable to consummate said transactions."

    3.    In order to approve, confirm, and reaffirm all actions taken by the member and officers of the Company in connection with the recapitalization of the Corporation and the consummation of any and all transactions related thereto, the following resolution is adopted:

> "**RESOLVED**, That all actions heretofore taken by the member and any officer of the Company, on behalf and in the name of the Company, in connection with the transactions contemplated by the foregoing resolutions are hereby adopted, ratified, confirmed, and approved in all respects as acts and deeds of the Company."

3

PIKNIK ONYX 02561

**IN WITNESS WHEREOF**, the undersigned, being the sole member of Piknik Acquisition Corp., LLC does hereby execute this consent on and as of this 15th day of October, 2004.

ONYX CAPITAL VENTURES, LLC

By: _____
Jeffery Larry
Its Chief Executive Officer

60317622

4

PIKNIK ONYX 02562

EXHIBIT "A"

## AGREEMENT AND PLAN OF RECAPITALIZATION

5

PIKNIK ONYX 02563

## AGREEMENT AND PLAN OF RECAPITALIZATION

This Agreement and Plan Recapitalization is entered into by and among Piknik Products Company, Inc., an Alabama corporation (the "Company"), Herman R. Loeb ("Ricky"), Herman Loeb, Jr. ("Loeb, Jr."), Piknik Acquisition Corp. LLC, a Delaware limited liability company ("PAC"), and Onyx Capital Ventures, L.L.C., a Delaware limited liability company ("Onyx").

### Recitals

A.    PAC and Ricky are all of the shareholders of the Company, owning 510 and 490 shares, respectively, of the 1,000 outstanding shares of the Company.

B.    Onyx is the sole member of PAC.

C.    The Company is currently indebted to SouthTrust Bank, an Alabama banking corporation ("SouthTrust"), pursuant to (1) the Second Amended and Restated Revolving Note dated November ___, 2001 in the original principal amount of up to $5,000,000, which was increased to $7,000,000 as evidenced by the Note Modification Agreement dated February 13, 2004 (collectively, the "Revolving Credit Note"); (2) the Second Amended and Restated Term Note A dated November ___, 2001 in the original principal amount of $6,956,000 ("Term Note A"); (3) the Amended and Restated Term Note B dated November ___, 2001 in the original principal amount of $2,224,000 ("Term Note B"); (4)  the Term Note C dated November ___, 2001 in the original principal amount of $2,500,000 ("Term Note C"); (5) the Promissory Note dated December 23, 2003 in the original principal amount of $1,300,000 (the "Kraft Note"); and (6) the Letter of Credit issued by SouthTrust dated June 16, 2000 in the original stated amount of $6,057,535 and the reimbursement agreement executed in connection therewith (collectively, the "Letter of Credit").  The Revolving Credit Note, Term Note A, Term Note B, Term Note C, and the Letter of Credit are collectively referred to as the "Company Notes."

PIKNIK ONYX 02564

D.    The Company Notes are subject to the terms of the Second Amended and Restated Credit Agreement dated November 5, 2001 (the "Credit Agreement").

E.    SouthTrust has agreed to permit and has permitted advances under the Revolving Credit Note in excess of the Borrowing Base (as defined in the Credit Agreement, as amended) of up to $1,000,000 (the "Overadvance Line").

F.    The Company Notes are personally guaranteed by Ricky as evidenced by the Amended and Restated Guaranty dated November ___, 2001 ("Ricky's Guaranty").

G.    The Company Notes and Ricky's Guaranty are secured by, among other things, a pledge of marketable securities (the "Pledged Securities") by Ricky and Loeb, Jr. as evidenced by (1) the Pledge and Security Agreement – Securities dated April 11, 2001; (2) the Pledge and Security Agreement – First Union Account dated April 11, 2001; and (3) the Pledge and Security Agreement dated November ___, 2001 (collectively, the "Pledge Agreement").

H.    The Company has a pipeline of potential business, the performance of which is being hindered by the Company's current balance sheet and debt structures.

I.    The Company, Ricky, Loeb, Jr., PAC, and Onyx desire to improve the Company's balance sheet by contributing additional capital to the Company and retiring a substantial part of the Company Notes as provided herein.

J.    SouthTrust is willing to provide additional financing for the Company to satisfy its liquidity requirements as provided herein.

In consideration of the matters described above, and of the mutual benefits and obligations set forth in this Agreement, the parties agree as follows:

## ARTICLE I

## RECAPITALIZATION OF THE COMPANY

The Company will be recapitalized according to the following plan:

2

PIKNIK ONYX 02565

1.   Ricky and Loeb, Jr. will form an Alabama limited liability company ("Loeb-Piknik, LLC"), with Ricky as the sole manager.

2.   Ricky will transfer his 490 shares of the Company stock and all of the Pledged Securities owned by him to Loeb-Piknik, LLC.

3.   Loeb, Jr. will transfer all of the Pledged Securities owned by him to Loeb-Piknik, LLC.

4.   Loeb-Piknik, LLC will sell and/or monetize 51% of the Pledged Securities (valued at approximately $4,100,000).[1]

5.   The Company will amend its Articles of Incorporation to authorize a total of 10,000 shares of common stock and to provide that, as long as SouthTrust has a pledge of the Company stock, no additional shares of the Company shall be issued without SouthTrust's consent.

6.   Loeb-Piknik, LLC will loan the proceeds from the sale and/or monetization of 51% of the Pledged Securities to PAC (the "PAC Loan"). PAC will contribute the PAC Loan proceeds to the Company in exchange for approximately 4,100 additional shares of the Company stock.

7.   The PAC Loan will be evidenced by a promissory note substantially in the form of the promissory note attached hereto as Exhibit A.

8.   The PAC Loan will be secured by a pledge to Loeb-Piknik, LLC of all of the Company stock owned by PAC (the "Piknik Stock Pledge") substantially in the form of the pledge and security agreement attached hereto as Exhibit B (the "Piknik Stock Pledge Agreement"). The Piknik Stock Pledge shall be junior and subordinated to the SouthTrust Stock Pledge (as defined in Article III below).

9.   Loeb-Piknik, LLC will contribute 49% of the Pledged Securities (valued at approximately $4,000,000) to the Company in exchange for approximately 4,000 additional shares of the Company stock, and the Company will sell those Pledged Securities. The PAC Loan proceeds contributed to the

---

[1] The value of the Pledged Securities will be determined when the Capital Contribution is made. Because of a recent decline in value of the stock of Dean Foods, one of the major positions in the Pledged Securities, the portfolio at the close of business on October 13 had a value of approximately $7.727 million. A 51% interest in the portfolio then had a value of approximately $3.94 million.

3

PIKNIK ONYX 02566

Company and the proceeds from the sale of Pledged Securities by the Company are referred to as the "Capital Contribution."

10.    The Company, Ricky, Loeb-Piknik, LLC, and PAC will amend the Piknik Products Company, Inc. Shareholders' Agreement dated July 25, 2003 (the "Shareholders' Agreement") as follows:

(a)    Loeb-Piknik, LLC will be substituted for Ricky as a party to the Shareholders' Agreement and will thereafter be entitled to all of his rights, benefits, and privileges and subject to all of his obligations under the Shareholders' Agreement and Ricky will thereafter be released from such obligations.

(b)    If Loeb-Piknik, LLC forecloses on some, but not all, of the Company stock under the Piknik Stock Pledge Agreement, the number of PAC Directors (as defined in the Shareholders' Agreement) will be reduced and the number of Loeb Directors (as defined in the Shareholders' Agreement) will be increased as further provided in the amendment to the Shareholders' Agreement.

(c)    The term "Option Period" will be defined as the period commencing on October 1, 2007, and ending on September 30, 2009.

(d)    The Piknik Stock Pledge and any transfer pursuant to the Piknik Stock Pledge Agreement will be included as a Permitted Transfer under Section 3.2 of the Shareholders' Agreement.

(e)    If Loeb-Piknik, LLC exercises its Call Right (as defined in the Shareholders' Agreement), (i) the Call Price (as defined in the Shareholders' Agreement) will be reduced by the outstanding principal, all accrued interest, and all other amounts due under the PAC Loan, and (ii) any and all amounts then or thereafter due or payable under the PAC Loan shall be considered paid in full.

(f)    Loeb-Piknik, LLC will not be entitled to exercise its Call Right unless and until Onyx is removed from the Onyx Guaranty (defined below).

(g)    Article VI of the Shareholders' Agreement dealing with corporate opportunities will be clarified to confirm that nothing contained in Article VI is intended to, or will restrict, reduce, or eliminate the fiduciary duties of majority shareholders, directors, or officers under Alabama law.

4

PIKNIK ONYX 02567

(h)    Section 7.1 of the Shareholder's Agreement dealing with assignment of distributions will be revoked.

11.    The Company, Ricky, Loeb-Piknik, LLC, and PAC will amend the Put Agreement dated July 25, 2003 (the "Put Agreement") as follows:

(a) Loeb-Piknik, LLC will be substituted for Ricky as a party to the Put Agreement and will thereafter be entitled to all of his rights, benefits, and privileges and subject to all of his obligations under the Put Agreement and Ricky will thereafter be released from such obligations.

(b) Exhibit A to the Put Agreement will be amended to conform to the payment terms contained in Section 1(d) of the Put Agreement.

(c) If Loeb-Piknik, LLC or PAC exercises its Put Rights (as defined in the Put Agreement), the Company and the remaining shareholder shall use commercially reasonable efforts to have the selling shareholder released from all guaranties of Company debt.

12.    The Company, Ricky, Loeb-Piknik, LLC, and PAC will amend the Stock Purchase Agreement dated July 25, 2003 (the "Stock Purchase Agreement) as follows:

(a)    All    indemnification    will    be    eliminated    except indemnification for Losses (as defined in the Purchase Agreement) resulting from, arising out of or otherwise by virtue of (i) any breach of the Fundamental Representations (as defined in the Purchase Agreement) or (ii) fraud.

(b)    Section 8.5 dealing with set-off against the Promissory Note (as defined in the Stock Purchase Agreement) will be revoked.

13.    Loeb-Piknik, LLC's Call Right (as defined in the Shareholders' Agreement) and the PAC Put Right (as defined in the Put Agreement) will be subject and subordinated to the SouthTrust Stock Pledge (as defined in Article III below).

14.    The Company, Ricky, Loeb-Piknik, LLC, PAC, Loeb, Jr., and Onyx will execute and deliver such other documents as are customarily executed in connection with the transactions described above.

5

PIKNIK ONYX 02568

## ARTICLE II

### USE OF CAPITAL CONTRIBUTION

On or before October 22, 2004, the Capital Contribution will be made to an acceptable escrow agent and disbursed from escrow as follows:

1.    Term Note B and Term Note C will be fully satisfied.

2.    $2,000,000 of the Capital Contribution will be used as payment on the Revolving Credit Note.

3.    The remaining Capital Contribution will be applied to Term Note A.

## ARTICLE III

### ACTIONS TO BE TAKEN BY ONYX AND PAC

On or before October 15, 2004, Onyx will guaranty the Company Notes by executing a guaranty substantially in the form of the guaranty attached hereto as Exhibit C (the "Onyx Guaranty"), and PAC will pledge to SouthTrust of all of the Company stock owned by PAC by executing a pledge and security agreement substantially in the form of the pledge and security agreement attached hereto as Exhibit D (the "SouthTrust Stock Pledge).

## ARTICLE IV

### CONDITIONS PRECEDENT

The parties' obligations contained herein are conditioned on the receipt, on or before October 15, 2004, of a fully executed loan modification agreement, which provides as follows:

1.    The Overadvance Line is increased to $3,000,000 until October 22, 2004 and advances under the Overadvance Line will be fully allowed.

2.    Provided that the payments are made as provided in Article II, the $3,000,000 Overadvance Line and the Forbearance Period (as defined in the

6

PIKNIK ONYX 02569

Seventh Amendment and Amended Forbearance Agreement dated June 24, 2004) are extended until March 31, 2005.

      3.   Effective upon the payments on the Company Notes as provided in Article II, SouthTrust's security interest in the Pledged Securities will be immediately released.

      4.   Failure to make the payments as provided in Article II will constitute a default under the Company Notes and, in such event, no further advance will be allowed under the Revolving Credit Note.

      5.   At the end of the Forbearance Period, or at an earlier date if the Company's balance sheet justifies such action, SouthTrust will reassess the Company Notes and the Kraft Note to provide a more stable debt structure and eliminate all defaults.

      6.   The maximum cumulative liability of Ricky under the Guaranty shall in all events be limited to the "Guaranteed Amount". As used herein, the term "Guaranteed Amount" shall mean an amount equal to the sum of (i) the outstanding principal balance of the Obligations (as defined in the Credit Agreement) at the time demand for payment is made against Ricky less $1,700,000, plus (ii) all interest on the outstanding indebtedness evidenced by the Notes (as defined in the Credit Agreement) (whether accrued before or after a demand for payment is made by SouthTrust) plus (iii) any additional or protective advances made pursuant to the Loan Documents (as defined in the Credit Agreement) after a demand for payment is made by SouthTrust plus (iv) any fees and/or expenses incurred by SouthTrust in connection with exercising its rights and/or remedies under the Loan Documents (as defined in the Credit Agreement).

## ARTICLE V

### EXECUTION

The parties have executed this Agreement as of October ___, 2004.

**[SIGNATURES APPEAR ON THE IMMEDIATELY FOLLOWING PAGE]**

7

PIKNIK ONYX 02570

PIKNIK PRODUCTS COMPANY, INC.

By:_____

       _____

Its: _____

The Company

ONYX CAPITAL VENTURES, L.L.C.

By:_____

       _____

Its: _____

Onyx

PIKNIK ACQUISITION CORP., LLC

By:_____

       _____

Its:_____

PAC

_____

Herman R. Loeb

Ricky

_____

Herman Loeb, Jr.

Loeb, Jr.

8

PIKNIK ONYX 02571

G:\HH\Piknik Products Company\Financial Restructuring\Recapitalization Agreement\Recapitalization Agreement - Final.doc
10/18/04 11:10 AM

9

PIKNIK ONYX 02572

# Delaware

PAGE 1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "PIKNIK ACQUISITION CORP., LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE THIRD DAY OF JULY, A.D. 2003, AT 11:05 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY.



Harriet Smith Windsor, Secretary of State

3678052    8100H

040073434

AUTHENTICATION: 2907643

DATE: 02-03-04

PIKNIK ONYX 02573

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 12:11 PM 07/03/2003*
*FILED 11:05 AM 07/03/2003*
*SRV 030440935 — 3678052 FILE*

## CERTIFICATE OF FORMATION
### OF
### PIKNIK ACQUISITION CORP., LLC

**FIRST:**     The name of the limited liability company is **PIKNIK ACQUISITION CORP., LLC** (the "Company").

**SECOND:**     The address of the Company's registered office in the State of Delaware is 1209 Orange Street, Wilmington, Delaware 19801, in the county of New Castle. The name of the Company's registered agent is The Corporation Trust Company.

**THIRD:**     Except as otherwise provided by the Delaware Limited Liability Company Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no member or manager of the Company shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member or acting as a manager of the Company.

**FOURTH:**     The existence of the Company is to be perpetual.

**IN WITNESS WHEREOF,** the undersigned has executed this Certificate of Formation of Piknik Acquisition Corp., LLC this 2nd day of July, 2003.

By:     /s/ Suzanne M. Hoffman
        Suzanne M. Hoffman, an authorized person

#60192623

PIKNIK ONYX 02574

**ONYX CAPITAL VENTURES, LLC**
**ACTION BY MANAGERS**
**BY UNANIMOUS WRITTEN CONSENT**

The undersigned, being all of the managers of Onyx Capital Ventures, LLC, a Delaware limited liability company (the "**Company**"), agree and consent to the following actions by and on behalf of the Company:

1.    In order to approve the plan of recapitalization of Piknik Products Company, Inc., an Alabama corporation (the "**Corporation**"), the following resolution is adopted:

> "**RESOLVED**, That the form, terms, and provisions of, and the transactions contemplated by, the Agreement and Plan of Recapitalization, to be entered into by and among the Corporation, Herman R. Loeb, Herman Loeb, Jr., Piknik Acquisitions Corp., LLC, a Delaware limited liability company, and the Company substantially in the form attached hereto as Exhibit 'A' and reviewed by the managers (the "**Agreement and Plan of Recapitalization**"), and any and all related agreements, (the Agreement and Plan of Recapitalization Agreement and all related agreements are collectively referred to as the "**Recapitalization Agreements**"), with such changes therein and additions thereto (substantial or otherwise) as the officer or officers executing the Recapitalization Agreements may deem necessary, appropriate, or desirable on behalf of and in the name of the Company be, and they hereby are, approved and adopted in all respects;

> "**RESOLVED FURTHER**, That the appropriate officer or officers of the Company be, and they hereby are, authorized to execute and deliver, on behalf of and in the name of the Company, the Recapitalization Agreements, substantially in the forms reviewed by the members, with such changes therein and additions thereto (substantial or otherwise) as the officer or officers executing the Recapitalization Agreements may deem necessary, appropriate, or desirable, the execution

PIKNIK ONYX 02575

thereof by any officer or officers constituting conclusive evidence of his or their authority to make such changes and to execute and deliver the Recapitalization Agreements;

"**RESOLVED FURTHER**, That the Company and its officer or officers are hereby authorized and directed to consummate the transactions contemplated by the Recapitalization Agreements, when and if executed, in accordance with their terms and conditions and to perform the obligations of the Company thereunder; and

"**RESOLVED FURTHER**, That the officer or officers of the Company be, and each of them hereby is on behalf and in the name of the Company, authorized and directed to do and perform all such other acts and things and to execute and deliver all such other instruments, certificates, notices, and documents as may be necessary, appropriate, or desirable to effectuate the purposes of the foregoing resolutions and to pay all such costs and expenses as may be required by the terms of any of the foregoing documents."

2.   In order to approve the guaranty of a portion of the indebtedness of the Corporation to SouthTrust Bank, an Alabama banking corporation ("**SouthTrust**"), the following resolutions are adopted:

"**RESOLVED**, That the Company is authorized to guaranty the indebtedness and obligations of the Corporation to SouthTrust (the "**Guaranty**"); and

"**RESOLVED FURTHER**, That the Company shall have the authority to enter into any and all guaranties, arrangements, agreements, security agreements, assignments, and/or contracts with SouthTrust in order to effectuate the Guaranty, said guaranties, arrangements, security agreements, assignments, agreements, and/or contracts shall be upon such terms and provisions as its officer or officers shall determine; and

"**RESOLVED FURTHER**, That in furtherance of the foregoing resolutions, each of the officers of the Company shall have the authority to execute and deliver any and all guaranties, documents, instruments, agreements, security agreements, assignments,

2

PIKNIK ONYX 02576

agreements, writings, schedules, and certificates which he shall deem necessary or desirable to consummate said transactions."

3.    In order to approve, confirm, and reaffirm all actions taken by the officers of the Company in connection with the recapitalization of the Corporation and the consummation of any and all transactions related thereto, the following resolution is adopted:

> **"RESOLVED**, That all actions heretofore taken by any officer of the Company, on behalf and in the name of the Company, in connection with the transactions contemplated by the foregoing resolutions are hereby adopted, ratified, confirmed, and approved in all respects as acts and deeds of the Company."

4.    This consent may be signed in any number of counterparts, each of which shall be deemed to be an original and all of which when taken together shall be deemed to be a single document.

*Remainder of page intentionally blank.*
*Signature pages follow.*

3

PIKNIK ONYX 02577

**IN WITNESS WHEREOF**, the undersigned, being all of the managers of Onyx Capital Ventures, LLC, do hereby execute this unanimous written consent on and as of this 15 day of October, 2004.

_____
Jeffery Lamy

_____
Patrice Daniels


_____
Patrick McGarvey

_____
Russell Pallesen

_____
David Palmer

#60317606

4

PIKNIK ONYX 02578

# EXHIBIT "A"

## AGREEMENT AND PLAN OF RECAPITALIZATION

PIKNIK ONYX 02579

## AGREEMENT AND PLAN OF RECAPITALIZATION

This Agreement and Plan Recapitalization is entered into by and among Piknik Products Company, Inc., an Alabama corporation (the "Company"), Herman R. Loeb ("Ricky"), Herman Loeb, Jr. ("Loeb, Jr."), Piknik Acquisition Corp. LLC, a Delaware limited liability company ("PAC"), and Onyx Capital Ventures, L.L.C., a Delaware limited liability company ("Onyx").

### Recitals

A.    PAC and Ricky are all of the shareholders of the Company, owning 510 and 490 shares, respectively, of the 1,000 outstanding shares of the Company.

B.    Onyx is the sole member of PAC.

C.    The Company is currently indebted to SouthTrust Bank, an Alabama banking corporation ("SouthTrust"), pursuant to (1) the Second Amended and Restated Revolving Note dated November ___, 2001 in the original principal amount of up to $5,000,000, which was increased to $7,000,000 as evidenced by the Note Modification Agreement dated February 13, 2004 (collectively, the "Revolving Credit Note"); (2) the Second Amended and Restated Term Note A dated November ___, 2001 in the original principal amount of $6,956,000 ("Term Note A"); (3) the Amended and Restated Term Note B dated November ___, 2001 in the original principal amount of $2,224,000 ("Term Note B"); (4) the Term Note C dated November ___, 2001 in the original principal amount of $2,500,000 ("Term Note C"); (5) the Promissory Note dated December 23, 2003 in the original principal amount of $1,300,000 (the "Kraft Note"); and (6) the Letter of Credit issued by SouthTrust dated June 16, 2000 in the original stated amount of $6,057,535 and the reimbursement agreement executed in connection therewith (collectively, the "Letter of Credit"). The Revolving Credit Note, Term Note A, Term Note B, Term Note C, and the Letter of Credit are collectively referred to as the "Company Notes."

PIKNIK ONYX 02580

D.    The Company Notes are subject to the terms of the Second Amended and Restated Credit Agreement dated November 5, 2001 (the "Credit Agreement").

E.    SouthTrust has agreed to permit and has permitted advances under the Revolving Credit Note in excess of the Borrowing Base (as defined in the Credit Agreement, as amended) of up to $1,000,000 (the "Overadvance Line").

F.    The Company Notes are personally guaranteed by Ricky as evidenced by the Amended and Restated Guaranty dated November ___, 2001 ("Ricky's Guaranty").

G.    The Company Notes and Ricky's Guaranty are secured by, among other things, a pledge of marketable securities (the "Pledged Securities") by Ricky and Loeb, Jr. as evidenced by (1) the Pledge and Security Agreement – Securities dated April 11, 2001; (2) the Pledge and Security Agreement – First Union Account dated April 11, 2001; and (3) the Pledge and Security Agreement dated November ___, 2001 (collectively, the "Pledge Agreement").

H.    The Company has a pipeline of potential business, the performance of which is being hindered by the Company's current balance sheet and debt structures.

I.    The Company, Ricky, Loeb, Jr., PAC, and Onyx desire to improve the Company's balance sheet by contributing additional capital to the Company and retiring a substantial part of the Company Notes as provided herein.

J.    SouthTrust is willing to provide additional financing for the Company to satisfy its liquidity requirements as provided herein.

In consideration of the matters described above, and of the mutual benefits and obligations set forth in this Agreement, the parties agree as follows:

## ARTICLE I

## RECAPITALIZATION OF THE COMPANY

The Company will be recapitalized according to the following plan:

2

1.     Ricky and Loeb, Jr. will form an Alabama limited liability company ("Loeb-Piknik, LLC"), with Ricky as the sole manager.

2.     Ricky will transfer his 490 shares of the Company stock and all of the Pledged Securities owned by him to Loeb-Piknik, LLC.

3.     Loeb, Jr. will transfer all of the Pledged Securities owned by him to Loeb-Piknik, LLC.

4.     Loeb-Piknik, LLC will sell and/or monetize 51% of the Pledged Securities (valued at approximately $4,100,000).[1]

5.     The Company will amend its Articles of Incorporation to authorize a total of 10,000 shares of common stock and to provide that, as long as SouthTrust has a pledge of the Company stock, no additional shares of the Company shall be issued without SouthTrust's consent.

6.     Loeb-Piknik, LLC will loan the proceeds from the sale and/or monetization of 51% of the Pledged Securities to PAC (the "PAC Loan"). PAC will contribute the PAC Loan proceeds to the Company in exchange for approximately 4,100 additional shares of the Company stock.

7.     The PAC Loan will be evidenced by a promissory note substantially in the form of the promissory note attached hereto as Exhibit A.

8.     The PAC Loan will be secured by a pledge to Loeb-Piknik, LLC of all of the Company stock owned by PAC (the "Piknik Stock Pledge") substantially in the form of the pledge and security agreement attached hereto as Exhibit B (the "Piknik Stock Pledge Agreement"). The Piknik Stock Pledge shall be junior and subordinated to the SouthTrust Stock Pledge (as defined in Article III below).

9.     Loeb-Piknik, LLC will contribute 49% of the Pledged Securities (valued at approximately $4,000,000) to the Company in exchange for approximately 4,000 additional shares of the Company stock, and the Company will sell those Pledged Securities. The PAC Loan proceeds contributed to the

---

[1] The value of the Pledged Securities will be determined when the Capital Contribution is made. Because of a recent decline in value of the stock of Dean Foods, one of the major positions in the Pledged Securities, the portfolio at the close of business on October 13 had a value of approximately $7.727 million. A 51% interest in the portfolio then had a value of approximately $3.94 million.

3

PIKNIK ONYX 02582

Company and the proceeds from the sale of Pledged Securities by the Company are referred to as the "Capital Contribution."

10.    The Company, Ricky, Loeb-Piknik, LLC, and PAC will amend the Piknik Products Company, Inc. Shareholders' Agreement dated July 25, 2003 (the "Shareholders' Agreement") as follows:

(a)    Loeb-Piknik, LLC will be substituted for Ricky as a party to the Shareholders' Agreement and will thereafter be entitled to all of his rights, benefits, and privileges and subject to all of his obligations under the Shareholders' Agreement and Ricky will thereafter be released from such obligations.

(b)    If Loeb-Piknik, LLC forecloses on some, but not all, of the Company stock under the Piknik Stock Pledge Agreement, the number of PAC Directors (as defined in the Shareholders' Agreement) will be reduced and the number of Loeb Directors (as defined in the Shareholders' Agreement) will be increased as further provided in the amendment to the Shareholders' Agreement.

(c)    The term "Option Period" will be defined as the period commencing on October 1, 2007, and ending on September 30, 2009.

(d)    The Piknik Stock Pledge and any transfer pursuant to the Piknik Stock Pledge Agreement will be included as a Permitted Transfer under Section 3.2 of the Shareholders' Agreement.

(e)    If Loeb-Piknik, LLC exercises its Call Right (as defined in the Shareholders' Agreement), (i) the Call Price (as defined in the Shareholders' Agreement) will be reduced by the outstanding principal, all accrued interest, and all other amounts due under the PAC Loan, and (ii) any and all amounts then or thereafter due or payable under the PAC Loan shall be considered paid in full.

(f)    Loeb-Piknik, LLC will not be entitled to exercise its Call Right unless and until Onyx is removed from the Onyx Guaranty (defined below).

(g)    Article VI of the Shareholders' Agreement dealing with corporate opportunities will be clarified to confirm that nothing contained in Article VI is intended to, or will restrict, reduce, or eliminate the fiduciary duties of majority shareholders, directors, or officers under Alabama law.

4

PIKNIK ONYX 02583

(h)     Section 7.1 of the Shareholder's Agreement dealing with assignment of distributions will be revoked.

11.     The Company, Ricky, Loeb-Piknik, LLC, and PAC will amend the Put Agreement dated July 25, 2003 (the "Put Agreement") as follows:

(a) Loeb-Piknik, LLC will be substituted for Ricky as a party to the Put Agreement and will thereafter be entitled to all of his rights, benefits, and privileges and subject to all of his obligations under the Put Agreement and Ricky will thereafter be released from such obligations.

(b) Exhibit A to the Put Agreement will be amended to conform to the payment terms contained in Section 1(d) of the Put Agreement.

(c) If Loeb-Piknik, LLC or PAC exercises its Put Rights (as defined in the Put Agreement), the Company and the remaining shareholder shall use commercially reasonable efforts to have the selling shareholder released from all guaranties of Company debt.

12.     The Company, Ricky, Loeb-Piknik, LLC, and PAC will amend the Stock Purchase Agreement dated July 25, 2003 (the "Stock Purchase Agreement) as follows:

(a)     All     indemnification     will     be     eliminated     except indemnification for Losses (as defined in the Purchase Agreement) resulting from, arising out of or otherwise by virtue of (i) any breach of the Fundamental Representations (as defined in the Purchase Agreement) or (ii) fraud.

(b)     Section 8.5 dealing with set-off against the Promissory Note (as defined in the Stock Purchase Agreement) will be revoked.

13.     Loeb-Piknik, LLC's Call Right (as defined in the Shareholders' Agreement) and the PAC Put Right (as defined in the Put Agreement) will be subject and subordinated to the SouthTrust Stock Pledge (as defined in Article III below).

14.     The Company, Ricky, Loeb-Piknik, LLC, PAC, Loeb, Jr., and Onyx will execute and deliver such other documents as are customarily executed in connection with the transactions described above.

5

PIKNIK ONYX 02584

## ARTICLE II

## USE OF CAPITAL CONTRIBUTION

On or before October 22, 2004, the Capital Contribution will be made to an acceptable escrow agent and disbursed from escrow as follows:

1.    Term Note B and Term Note C will be fully satisfied.

2.    $2,000,000 of the Capital Contribution will be used as payment on the Revolving Credit Note.

3.    The remaining Capital Contribution will be applied to Term Note A.

## ARTICLE III

## ACTIONS TO BE TAKEN BY ONYX AND PAC

On or before October 15, 2004, Onyx will guaranty the Company Notes by executing a guaranty substantially in the form of the guaranty attached hereto as Exhibit C (the "Onyx Guaranty"), and PAC will pledge to SouthTrust of all of the Company stock owned by PAC by executing a pledge and security agreement substantially in the form of the pledge and security agreement attached hereto as Exhibit D (the "SouthTrust Stock Pledge).

## ARTICLE IV

## CONDITIONS PRECEDENT

The parties' obligations contained herein are conditioned on the receipt, on or before October 15, 2004, of a fully executed loan modification agreement, which provides as follows:

1.    The Overadvance Line is increased to $3,000,000 until October 22, 2004 and advances under the Overadvance Line will be fully allowed.

2.    Provided that the payments are made as provided in Article II, the $3,000,000 Overadvance Line and the Forbearance Period (as defined in the

6

PIKNIK ONYX 02585

Seventh Amendment and Amended Forbearance Agreement dated June 24, 2004) are extended until March 31, 2005.

3.    Effective upon the payments on the Company Notes as provided in Article II, SouthTrust's security interest in the Pledged Securities will be immediately released.

4.    Failure to make the payments as provided in Article II will constitute a default under the Company Notes and, in such event, no further advance will be allowed under the Revolving Credit Note.

5.    At the end of the Forbearance Period, or at an earlier date if the Company's balance sheet justifies such action, SouthTrust will reassess the Company Notes and the Kraft Note to provide a more stable debt structure and eliminate all defaults.

6.    The maximum cumulative liability of Ricky under the Guaranty shall in all events be limited to the "Guaranteed Amount". As used herein, the term "Guaranteed Amount" shall mean an amount equal to the sum of (i) the outstanding principal balance of the Obligations (as defined in the Credit Agreement) at the time demand for payment is made against Ricky less $1,700,000, plus (ii) all interest on the outstanding indebtedness evidenced by the Notes (as defined in the Credit Agreement) (whether accrued before or after a demand for payment is made by SouthTrust) plus (iii) any additional or protective advances made pursuant to the Loan Documents (as defined in the Credit Agreement) after a demand for payment is made by SouthTrust plus (iv) any fees and/or expenses incurred by SouthTrust in connection with exercising its rights and/or remedies under the Loan Documents (as defined in the Credit Agreement).

## ARTICLE V

## EXECUTION

The parties have executed this Agreement as of October ___, 2004.

**[SIGNATURES APPEAR ON THE IMMEDIATELY FOLLOWING PAGE]**

7

PIKNIK ONYX 02586

PIKNIK PRODUCTS COMPANY, INC.

By:_____

      Its: _____

            The Company

ONYX CAPITAL VENTURES, L.L.C.

By:_____

      Its: _____

            Onyx

PIKNIK ACQUISITION CORP., LLC

By:_____

      Its:_____

            PAC

_____

Herman R. Loeb

            Ricky

_____

Herman Loeb, Jr.

            Loeb, Jr.

8

PIKNIK ONYX 02587

FEB-26-2004 THU 01:02 PM NRAI-DE                FAX NO. 302 674 5266              P. 02



PAGE 1

*The First State*

    I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "ONYX CAPITAL VENTURES, LLC" AS RECEIVED AND FILED IN THIS OFFICE.

    THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

    CERTIFICATE OF FORMATION, FILED THE FOURTEENTH DAY OF AUGUST, A.D. 2000, AT 4:30 O'CLOCK P.M.

    CERTIFICATE OF CANCELLATION, FILED THE TWENTY-THIRD DAY OF AUGUST, A.D. 2002, AT 4:30 O'CLOCK P.M.

    CERTIFICATE OF CORRECTION, FILED THE TWENTY-SIXTH DAY OF DECEMBER, A.D. 2002, AT 11:30 O'CLOCK A.M.

    AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY.

3239139  8100H

040138764

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 2953282

DATE: 02-25-04

PAGE 25 * RCVD AT 2/26/2004 12:02:11 PM [Central Standard Time] * SVR:CHI-US-FAX-01/14 * DNIS:8920 * CSID:302 674 5266 * DURATION (mm-ss):01-52

PIKNIK ONYX 02588

FEB-26-2004 THU 01:02 PM NRAI-DE          FAX NO. 302 674 5266          P. 03

TOTAL P.02

# CERTIFICATE OF FORMATION
## OF
## ONYX CAPITAL VENTURES, L.L.C.

**First:**     The name of the limited liability company is Onyx Capital Ventures, L.L.C. (the "Company")

**Second:**     The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

**Third:**     The Company shall have perpetual existence.

**Fourth:**     Except as otherwise provided by the Delaware Limited Liability Company Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no member, manager or other agent of the Company shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member, manager or other agent of the Company.

IN WITNESS WHEREOF, the undersigned have executed this Certificate of Formation of Onyx Capital Ventures, L.L.C. 14th day of August, 2000.

Jeffery Larry, Authorized Person

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 04:30 PM 08/14/2000
001411714 - 3289139

PAGE 35 * RCVD AT 2/26/2004 12:02:11 PM [Central Standard Time] * SVR:CHI-US-FAX-01/14 * DNIS:8926 * CSID:302 674 5266 * DURATION (mm-ss):01-52

PIKNIK ONYX 02589

FEB-26-2004 THU 01:02 PM NRAI-DE          FAX NO. 302 674 5266          P. 04

AUG-23-2002  14:02          CT CORP

STATE OF DELAWARE
SECRETARY OF STATE P.03
DIVISION OF CORPORATIONS
FILED 04:30 PM 08/23/2002
020535809 - 3239139

## CERTIFICATE OF CANCELLATION

### OF

## ONYX CAPITAL VENTURES, L.L.C.

This Certificate (the "Certificate") of Cancellation of Onyx Capital Ventures, L.L.C., a Delaware limited liability company (the "Company"), is being executed on August 23, 2002.

It is certified as follows:

1. The name of the Company is Onyx Capital Ventures, L.L.C..

2. The Certificate of Formation of the Company was filed on August 14, 2000.

3. The reason for filing the Certificate of Cancellation is that the Company has ceased doing business.

IN WITNESS WHEREOF, the undersigned has duly executed this Certificate as of the day and year first above written.

ONYX CAPITAL VENTURES, L.L.C.

By:  Karen M. McElligatt /s/
    Name: Karen M. McElligatt
    Title: Authorized Person

NGEDOCS:16086.0501:769671.1

PIKNIK ONYX 02590

FEB-26-2004 THU 01:02 PM NRAI-DE                 FAX NO. 302 674 5266              P. 05

DEC-26-2002 18:27        CT CORP                            STATE OF DELAWARE
                                                           SECRETARY OF STATE P.02/02
                                                       DIVISION OF CORPORATIONS
                                                       FILED 11:30 AM 12/26/2002
                                                       020798670 - 3239139

## LIMITED LIABILITY COMPANY
## CERTIFICATE OF CORRECTION
### FILED TO CORRECT A CERTAIN ERROR IN THE CERTIFICATE OF

Cancellation

of

ONYX Capital Ventures, LLC

Filed in the office of the Secretary of State of Delaware on August 23rd, 2002.

1. The name of the limited liability company is ONYX Capital Ventures, LLC.

2. A Certificate of Cancellation was filed by the Secretary of State of Delaware on August, 23rd, 2002 that requires correction as permitted by Section 18-211 of the Delaware Limited Liability Company Act.

3. The inaccuracy or defect of the Certificate to be corrected is as follows: Document was filed in error.


/s/: David Palmer
David Palmer, Authorized Person

DE115-73800 C.T System Online

TOTAL P.02

PAGE 5/5 * RCVD AT 2/26/2004 12:02:11 PM [Central Standard Time] * SVR:CHI-US-FAX-01/14 * DNIS:8920 * CSID:302 674 5266 * DURATION (mm-ss):01-52

PIKNIK ONYX 02591

08/20/02

# AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

OF

## ONYX CAPITAL VENTURES, L.L.C.

### EFFECTIVE AS OF JUNE 20, 2002

THE MEMBERSHIP UNITS REPRESENTED BY THIS AMENDED AND RESTATED
LIMITED LIABILITY COMPANY OPERATING AGREEMENT HAVE NOT BEEN
REGISTERED UNDER ANY SECURITIES LAWS.  SUCH UNITS MAY NOT BE SOLD,
ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT
COMPLIANCE WITH SUCH APPLICABLE LAWS OR EXEMPTION THEREFROM, AND
COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET
FORTH HEREIN.

Doc #:CH02 (213484-00001) 60064359v10;08 21/2002/Time:15:33

PIKNIK ONYX 02592

TABLE OF CONTENTS

Page

ARTICLE I    FORMATION; BACKGROUND; NAME; PURPOSES;
             DEFINITIONS..................................................1
    Section 1.1.    Recitals..............................................1
    Section 1.2.    Formation.............................................1
    Section 1.3.    Intent................................................1
    Section 1.4.    Name..................................................2
    Section 1.5.    Place of Business.....................................2
    Section 1.6.    Purposes; Activities..................................2
    Section 1.7.    Term..................................................2
    Section 1.8.    Members...............................................2
    Section 1.9.    Registered Agent......................................2
    Section 1.10.   Definitions...........................................2
    Section 1.11.   Accounting; Books and Records.........................4

ARTICLE II    CAPITALIZATION OF THE COMPANY; PROFITS AND LOSSES;
              CASH DISTRIBUTIONS..........................................4
    Section 2.1.    Initial Units, Capital Contributions..................4
    Section 2.2.    Allocation of Profits and Losses......................5
    Section 2.3.    Special Allocations Relating to Entity-Level Taxes....6
    Section 2.4.    Member's Share of Liabilities of the Company..........6
    Section 2.5.    Distributions of Distributable Cash...................6
    Section 2.6.    Distributions with Respect to Tax.....................7
    Section 2.7.    Restrictions Relating to Capital......................7
    Section 2.8.    Interpretation and Changes............................7
    Section 2.9.    Records, Audits and Reports...........................7

ARTICLE III    CLASSES, RIGHTS AND DUTIES OF MEMBERS, MANAGEMENT.........8
    Section 3.1.    Classes of Members....................................8
    Section 3.2.    Information Right of Members..........................9
    Section 3.3.    Management............................................9
    Section 3.4.    Matters Requiring Supermajority Vote of Managers.....10
    Section 3.5.    Officers.............................................10

ARTICLE IV    BOARD OF ADVISORS.........................................10
    Section 4.1.    Board of Advisors Duties.............................10

ARTICLE V    CHANGES IN MEMBERS OF COMPANY..............................11
    Section 5.1.    Additional Capital Contributions; New Members........11
    Section 5.2.    Pre-emptive Rights of Members........................11
    Section 5.3.    Class B Membership Units Anti-dilution Protection....12
    Section 5.4.    Withdrawal, Retirement and Resignation...............12
    Section 5.5.    Continuation of Company; Withdrawal; Etc.............12
    Section 5.6.    Restriction on Transferability--General..............12

i

PIKNIK ONYX 02593

Section 5.7.    Involuntary Transfers.............................................................13
Section 5.8.    Transfer of Economic Rights .................................................14
Section 5.9.    Maintenance of MBE Certification..........................................14

ARTICLE VI    TERM, DISSOLUTION AND TERMINATION ................................14
Section 6.1.    Term; Dissolution .................................................................14
Section 6.2.    Liquidation and Winding Up. ................................................15
Section 6.3.    Termination..........................................................................15

ARTICLE VII    INDEMNIFICATION OF MANAGERS, MEMBERS AND OTHERS ..........15
Section 7.1.    Indemnification of Managers and Members ............................15
Section 7.2.    Limitation of Liability...........................................................16
Section 7.3.    Indemnification of Others .....................................................16
Section 7.4.    Insurance..............................................................................16

ARTICLE VIII    MISCELLANEOUS PROVISIONS ............................................17
Section 8.1.    Notices.................................................................................17
Section 8.2.    Confidentiality......................................................................17
Section 8.3.    Amendments. .......................................................................17
Section 8.4.    Successors ...........................................................................18
Section 8.5.    Counterparts ........................................................................18
Section 8.6.    Governing Law......................................................................18
Section 8.7.    Waiver of Action for Partition ...............................................18
Section 8.8.    Execution of Additional Instruments.......................................18
Section 8.9.    Construction.........................................................................18
Section 8.10.   Headings...............................................................................19
Section 8.11.   Waivers ...............................................................................19
Section 8.12.   Rights and Remedies Cumulative...........................................19
Section 8.13.   Severability ..........................................................................19
Section 8.14.   No Third-Party Beneficiaries..................................................19

ii

PIKNIK ONYX 02594

## AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
## OF ONYX CAPITAL VENTURES, L.L.C.

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT of ONYX CAPITAL VENTURES, L.L.C. (the *"Company"*) is made and effective as of June 20, 2002, by and among each of the Persons (as defined herein) listed as a Member (as defined herein) on Exhibit A attached hereto and hereby made a part hereof, as the same may be amended from time to time.

## RECITALS

WHEREAS, the Limited Liability Company Agreement of the Company was entered into as of March 15, 2001 (the *"Original Agreement"*);

WHEREAS, in accordance with the terms of the Original Agreement, the Original Agreement is hereby amended and restated in its entirety to be in the form of this Agreement;

WHEREAS, this Agreement, including the Exhibit hereto, supersedes all other prior oral or written agreements, including without limitation, the Original Agreement, between the parties to the Original Agreement with respect to the matters discussed herein, and supercedes all other prior oral or written agreements between the parties of this Agreement with respect to the matters discussed herein, and contains the entire understanding with respect to the matters covered herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth in this Agreement, the parties hereto hereby agree as follows:

## ARTICLE I

## FORMATION; BACKGROUND; NAME; PURPOSES; DEFINITIONS

*Section 1.1.*    *Recitals.*    The Recitals set forth above are incorporated herein by this reference.

*Section 1.2.*    *Formation.*    Pursuant to the Act, a Delaware limited liability company was formed upon the filing of the Certificate of Formation with the Delaware Secretary of State on August 14, 2000. The parties shall from time to time, as may be required by law, execute all amendments of the Certificate of Formation, and do all filings, recordings and other acts as may be required or appropriate to comply with the provisions of the Act.

*Section 1.3.*    *Intent.*    It is the intent of the Members that the Company shall always be operated in a manner consistent with its treatment as a "partnership" for federal and state income tax purposes, but not for any other purposes. No Member shall take any action inconsistent with the express intent of the parties hereto.

PIKNIK ONYX 02595

**Section 1.4.** *Name.* The name of the Company shall be Onyx Capital Ventures. L.L.C. or such other name as the Managers shall determine from time to time.

**Section 1.5.** *Place of Business.* The principal place of business of the Company shall be in Chicago, Illinois. The Company may maintain such other place or places of business within or without the State of Delaware or Illinois as may be determined from time to time by the Managers.

**Section 1.6.** *Purposes; Activities.* The purposes of the Company shall be to, directly or through entities created, owned or controlled by the Company, engage in any lawful act or activity for which limited liability companies may be organized under the Act. Without limiting the generality of the foregoing, the Company may: (x) borrow or raise monies and arrange for credit and, from time to time, without limitation as to amount, issue, accept, endorse and execute promissory notes, drafts, bonds, guarantees, certificates of undertaking, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and secure the payment of any thereof and the interest and other sums charged thereon or in connection therewith, by the making or granting of security interests, mortgages or pledges, conveyances and assignments of the whole, or any part of, the property of the Company; (y) lend or invest any of its properties or funds, either with or without security; and (z) enter into, make and perform all contracts, agreements and other undertakings as may be necessary, advisable or incident to the carrying out of the Company's general purposes.

**Section 1.7.** *Term.* The Company commenced upon the filing of its Certificate of Formation and shall continue until such time as it shall be dissolved under the provisions of Article VI hereof.

**Section 1.8.** *Members.* The name and address of each of the Members of the Company are set forth on Exhibit A attached hereto and hereby made a part hereof.

**Section 1.9.** *Registered Agent.* The name of the initial registered agent for the Company in the State of Delaware is The Corporation Trust Company and the initial registered office for the Company is Corporation Trust Center, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801. The registered agent and registered office of the Company may be changed from time to time by the Managers in accordance with the Act.

**Section 1.10.** *Definitions.* Whenever used in this Agreement, the following terms shall have the following meanings:

"*Act*" shall mean the Delaware Limited Liability Company Act at Del. C. 6 §§ 18-101, *et seq.*, as amended from time to time.

"*Agreement*" shall mean this written Amended and Restated Limited Liability Company Operating Agreement of the Company, as amended from time to time in accordance with the provisions hereof. No other document or oral agreement among the Members shall be treated as part of or superseding this Agreement unless it is reduced to writing and it has been authorized in accordance with the provisions of this Agreement.

2

PIKNIK ONYX 02596

"*Capital Contributions*" shall mean the capital contributed by the Members from time to time.

"*Certificate of Formation*" shall mean the Certificate of Formation of the Company as filed with the Secretary of State of Delaware, as amended from time to time.

"*Class A Membership Units*" shall mean those Units designated as Class A Membership Units herein and having the rights, preferences, qualifications, limitations and/or restrictions specified in this Agreement.

"*Class B Membership Units*" shall mean those Units designated as Class B Membership Units herein and having the rights, preferences, qualifications, limitations and/or restrictions specified in this Agreement.

"*Class B Preferential Distributions*" shall have the meaning set forth in Section 2.5.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"*Distributable Cash*" means, as of any date, (i) all cash received by the Company from all sources, including the proceeds from any refinancing or recapitalization; minus (ii) all expenditures paid by the Company, including (but not limited to) repayment of principal and interest on Company indebtedness; minus (iii) all prior distributions of Distributable Cash; minus (iv) such additions to the Company's reserves as the Managers may reasonably deem necessary for anticipated working capital, capital investment requirements and contingencies of the Company; plus (v) such additional cash (not theretofore taken into account) as the Managers may reasonably determine to be available for distribution to the Members, including amounts released from reserves.

"*Economic Rights*" shall mean a Member's share of Net Profits and Net Losses of the Company, the right to receive distributions of the Company's assets and the right to withdraw from the Company, but shall not include the right (if any) to participate in the management and affairs of the Company's business, the right to vote on, consent to or otherwise participate in any decision of the Members or any other rights of a Member.

"*Fiscal Year*" means the Company's fiscal year, which shall be the year ending on December 31.

"*Former Member*" shall mean a Member who ceases to be a Member upon the occurrence of a Withdrawal Event with respect to such Member when the business of the Company is continued as described in Article VI hereof.

"*Manager*" shall have the meaning set forth in Section 3.3.

"*Member*" shall mean each of the Persons who executes a counterpart of this Agreement as a Member on the date hereof and each of the Persons who may hereafter become a Member pursuant to the terms hereof.

3

PIKNIK ONYX 02597

"*Minority Manager*" shall mean a Manager who is an African American individual or another minority as defined by the Chicago Minority Business Development Council or similar authority.

"*Net Profit*" or "*Net Loss*" for any Fiscal Year or other period means an amount equal to the Company's taxable income for United States federal income tax purposes for such year or period determined in accordance with Code §703(a) and the Treasury Regulations thereunder.

"*Person*" shall mean any individual, partnership, limited partnership, limited liability company, trust, estate, association, corporation, Governmental body or other judicial being.

"*Supermajority*" shall have the meaning set forth in Section 3.4.

"*Treasury Regulations*" shall mean the Regulations issued by the U.S. Treasury Department under the Code.

"*Unit*" shall mean a Member's interest in the Company, including the Member's share of Net Profit and Net Loss of the Company, the right to receive distributions of the Company's assets and the right (if any) to participate in the management and affairs of the Company's business, including, where indicated, the right to vote on, consent to, or otherwise participate in any decision of the Members, as provided in this Agreement. Units are currently classified as either a Class A Membership Unit or a Class B Membership Unit but shall also include any other class of membership units which may be issued in accordance with this Agreement.

"*Withdrawal Event*" shall mean as to any Member, such Member's death, bankruptcy, court declaration of incompetence or dissolution.

Section 1.11. *Accounting; Books and Records.* The accounting period for the Company shall be a fiscal year commencing on January 1 and ending on December 31. The books of the Company shall be kept in accordance with generally accepted accounting principles and shall be closed and balanced at the end of each Fiscal Year and at the end of such intervening period(s) as the Managers shall determine. The books of the Company shall be open to inspection and copying by any Member at all times.

## ARTICLE II

## CAPITALIZATION OF THE COMPANY; PROFITS AND LOSSES; CASH DISTRIBUTIONS

Section 2.1. *Initial Units, Capital Contributions.* Upon the execution of this Agreement, the Members shall make the Capital Contributions to the Company in cash in the amounts respectively set forth on <u>Exhibit A</u>, as such exhibit may be amended from time to time as additional Capital Contributions may be made pursuant to Section 5.1.

4

PIKNIK ONYX 02598

Section 2.2.    *Allocation of Profits and Losses.*    After giving effect to the special allocations set forth in Sections 2.3 and 2.4 hereof, and except as otherwise required by Section 704 of the Code, and the Treasury Regulations promulgated thereunder, any Net Profits or Net Losses of the Company for any Fiscal Year shall be allocated to the Members as follows:

(a)    Net Profits shall be allocated in the following order and priority:

(i)    First, to the Members, until an amount equal to the excess of (x) all Net Losses allocated to the Members pursuant to Section 2.2(b)(iv) over (y) the total amount of Net Profits previously allocated to the Members pursuant to this Section 2.2(a)(i) has been allocated to the Members, in proportion to each Member's share of such excess of (x) over (y);

(ii)    Second, to the Members entitled to receive the Class B Preferential Distributions, until an amount equal to the excess of (x) such Members' aggregate Class B Preferential Distribution from the date hereof through the end of such Fiscal Year, over (y) the difference between (A) the total amount of Net Profits previously allocated to the Members pursuant to this Section 2.2(a)(ii) and (B) the amount of Net Losses previously allocated to such Members pursuant to Section 2.2(b)(iii) has been allocated to such Members, in proportion to each Member's share of such excess of (x) over (y);

(iii)    Third, to the Members, until an amount equal to the excess of (x) all Net Losses previously allocated to the Members pursuant to Section 2.2(b)(ii) over (y) the total amount of Net Profits previously allocated to the Members pursuant to this Section 2.2(a)(iii), has been allocated to the Members, in proportion to each Member's share of such excess of (x) over (y); and

(iv)    Thereafter, to the Members, based on the number of Units owned by each Member.

(b)    Net Losses shall be allocated in the following order and priority:

(i)    First, to the Members, until an amount equal to the excess of (x) all Net Profits previously allocated to the Members pursuant to Section 2.2(a)(iv) over (y) the total amount of Net Losses previously allocated to Members pursuant to this Section 2.2(b)(i), has been allocated to the Members, in proportion to each Member's share of such excess of (x) over (y);

(ii)    Second, to the Members in proportion to, and to the extent of, their respective cumulative Capital Contributions, plus the aggregate Net Profits previously allocated to such Members pursuant to Section 2.2(a)(iii), until such Net Losses equal the sum of (x) Members' cumulative Capital Contributions plus (y) the aggregate Net Profits previously allocated to the Members pursuant to Section 2.2(a)(iii), in proportion to each Member's share of the sum of (x) plus (y);

5

PIKNIK ONYX 02599

(iii)     Third, to the Members, until an amount equal to the excess of (x) all Net Profits previously allocated to the Members pursuant to Section 2.2(a)(ii) over (y) the total amount of Net Losses previously allocated to the Members pursuant to this Section 2.2(b)(iii), has been allocated to the Members, in proportion to each Member's share of such excess of (x) over (y); and

(iv)     Thereafter, to the Members, based on the number of Units owned by each Member.

Section 2.3.     *Special Allocations Relating to Entity-Level Taxes.*     Notwithstanding anything to the contrary herein, in the event that any state, local or other income tax imposed on the Company as an entity (such as the Illinois Personal Property Replacement Income Tax) is reduced by reason of the holding of an interest by any Member, no part of the expense of the Company for such tax shall be allocated to such Member. In addition, if the Company is obligated under applicable law to pay any amount to a governmental agency because of a Member's status as a member of the Company for federal or state withholding or other taxes (such as the Illinois Personal Property Replacement Income Tax), such amount shall reduce the distributions which would otherwise be made to such Member pursuant to this Article II.

Section 2.4.     *Member's Share of Liabilities of the Company.*     Except as otherwise required by Section 752 of the Code and the Treasury Regulations promulgated thereunder, each Member's share of the Company's liabilities the proceeds of which are distributed to the Members in accordance with Section 2.5 shall be equal to each Member's share of such proceeds for purposes of Section 752 of the Code and the Treasury Regulations promulgated thereunder.

Section 2.5.     *Distributions of Distributable Cash.*     The Managers shall have the right to determine whether, and to what extent, distributions shall be made to the Members. When and to the extent the Managers determine, in their sole discretion, that, after providing for the Company's present and anticipated debts and obligations, capital needs, expenses and reasonable reserves for contingencies, it is appropriate and in the best interests of the Company to make distributions, the Company shall distribute all (or such lesser portion as may be determined by the Managers) of the Company's Distributable Cash to the Members as follows:

(a)     first, to all Members holding Class B Membership Units pro rata based on the number of Class B Membership Units owned by such Members, until such Members have received distributions equal to all accrued and unpaid Class B Preferred Distributions to which each such Member is entitled;

(b)     second, to all Members holding Class B Membership Units pro rata based on the number of Class B Membership Units owned by such Members, until such Members have received distributions equal to their respective Capital Contributions; and

(c)     thereafter, to all Members pro rata based on the number of Units owned by such Members.

For purposes of this Agreement, *"Class B Preferential Distributions"* shall mean a preferred distribution equal to 8% per annum of all Capital Contributions minus any payments made pursuant to subsection (b) above, which preferred distribution shall (i) be cumulative from

6

PIKNIK ONYX 02600

the later of the date of issuance of such Class B Membership Units and the last date through which a distribution has been paid with respect to the Class B Membership Units pursuant to this Section 2.5, and (ii) accrue and compound annually until paid, whether or not earned, whether or not declared by the Managers and whether or not there are funds legally available therefor on the date such preferred distribution is payable.

Section 2.6.    *Distributions with Respect to Tax.*    Notwithstanding Section 2.5 or any other provision of this Agreement, the Company shall, prior to any distributions pursuant to Section 2.5, distribute sufficient cash, if available (which determination of availability shall be in the reasonable judgment of the Managers) to enable the Members to pay federal, state and local income taxes arising from their ownership of Units during a taxable year (a "*Tax Distribution*"); provided, however, in no event shall the Company make Tax Distributions if the cumulative taxable losses over the life of the Company at any given time exceeds the cumulative taxable income of the Company for such period. For the purpose of determining the amount of any Tax Distribution, it will be assumed that all Members are subject to taxation at a rate equal to the highest federal and Illinois state individual income tax rates. Such distribution shall be paid with respect to a Fiscal Year of the Company on a quarterly basis to allow the Members to pay their estimated tax liability on their share of the Company income, with additional distributions to be paid no later than seventy-five (75) days after the end of such Fiscal Year. Distributions made pursuant to Section 2.5 shall serve to discharge the Company's obligations under this Section 2.6 to the extent paid. Distributions required by this Section 2.6 shall reduce amounts distributable pursuant to Section 2.5.

Section 2.7.    *Restrictions Relating to Capital.*    Except as otherwise specifically provided in this Agreement or with the consent of the Managers, no Member shall be entitled to receive interest on its Capital Contribution. No Member shall have the right to partition of the Company's properties. No Member shall be liable to the Company or to any other Member to restore any deficit balance in its Capital Account (except as may be required by the Act) or to reimburse any other Member for any portion of such other Member's investment in the Company. Except as otherwise specifically provided in this Agreement, no Member shall have priority over any other Member, either as to the return of its Capital Contribution or as to income, losses, interest, returns, or distributions.

Section 2.8.    *Interpretation and Changes.*    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the Code and applicable Treasury Regulations and shall be interpreted and applied in a manner consistent therewith. In the event it is determined, after consultation with Company counsel, that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are allocated or computed, in order to comply with such applicable federal law, the Managers shall make such modification as recommended by Company counsel, *provided* that such modification is not likely to have a material adverse effect on the amounts properly distributable to any Member upon the termination of the Company and that such modification will not increase the liability of any Member to third parties.

Section 2.9.    *Records, Audits and Reports.*

7

Doc #:CH02 (213484-00001) 60064359v10;08·21/2002·Time:15:33

PIKNIK ONYX 02601

(a)    Jeffery Larry is designated as the initial Tax Matters Partner as that term is defined in Section 6231(a)(7) of the Code, until he resigns or is replaced by the affirmative vote of the Managers; provided, however, that if any Tax Matters Partner would not be treated as a party to the proceeding within the meaning of Section 6226(c) and (d) of the Code for any Fiscal Year involved in a Company proceeding, then the Tax Matters Partner for such year shall be determined in accordance with Section 6231(a)(7) of the Code and the regulations promulgated thereunder.

(b)    At the expense of the Company, the appropriate representative shall maintain records and accounts of all operations and expenditures of the Company. At a minimum, the Company shall keep at its principal place of business all of the following records as required by the Act:

(i)    A current list of the full name and last known address of each Member, both past and present setting forth the amount of cash each Member has contributed, a description and statement of the agreed value of the other property or services each Member has contributed or has agreed to contribute in the future, and the date on which each became a Member;

(ii)    A copy of the Certificate of Formation of the Company, as amended or restated, together with executed copies of any powers of attorney under which any articles, application, or certificate has been executed;

(iii)    Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(iv)    Copies of the Company's then effective written operating agreement and any amendments thereto; and

(v)    Copies of any financial statements of the Company for the three most recent years.

## ARTICLE III

### CLASSES, RIGHTS AND DUTIES OF MEMBERS, MANAGEMENT

**Section 3.1.    Classes of Members.**  The ownership of the Company shall be split into Class A Membership Units and Class B Membership Units. The Company shall initially issue One Hundred Twenty-Seven Thousand Five Hundred (127,500) Class A Membership Units and Twenty-Two Thousand Five Hundred (22,500) Class B Membership Units. Notwithstanding anything to the contrary in this Agreement, in no event shall the Company issue additional Class A Membership Units in excess of One Hundred Twenty-Seven Thousand Five Hundred (127,500) Class A Membership Units without the prior written consent of the Members holding a majority of the Units (other than Class A Membership Units) then outstanding (unless appropriate adjustment to the Company's capitalization is made so that the other classes of Units do not suffer any dilution by such issuances, in which case no such consent shall be required).

8

PIKNIK ONYX 02602

*Section 3.2.    Information Right of Members.* The Company covenants and agrees that it will deliver to each of the Members who holds Class B Membership Units: (a) audited annual consolidated financial statements of the Company within 120 days after the end of each fiscal year of the Company and (b) unaudited quarterly consolidated financial statements of the Company within 60 days after the end of each of the first three fiscal quarters of the Company. The financial statements referred to in parts (a) and (b) above shall be prepared in accordance with generally accepted accounting principles ("*GAAP*"), except that the unaudited financial statements shall lack the footnote disclosure otherwise required by GAAP. Furthermore, with respect to the financial statements referred to in part (b), the principal financial or accounting officer of the Company shall certify that such financial statements fairly and accurately present the financial position of the Company as of the date of such statement.

*Section 3.3.    Management.*

(a)     The management of the business and affairs of the Company shall be reserved to the Managers. Except as otherwise provided in this Section 3.3 and Section 3.5, the Managers shall have full, exclusive and complete discretion, power and authority to manage, control, administer and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs.

(b)     The number of Managers shall be five (5), subject to future increase or decrease in the number of Managers as determined by the affirmative vote of the Managers.    The initial Managers shall be Jeffery Larry, Patrice Daniels, Patrick McGarvey, Russell Pallesen and David Palmer.    The Managers shall serve as Managers until death, resignation or removal by the affirmative vote of the other Managers in accordance with Section 3.4. Except as set forth in Section 3.4, the Managers shall act by majority vote, with each Manager's voting power determined by dividing the number of Class A Membership Units (as indicated on <u>Exhibit A</u>, as the same may be amended from time to time) held by such Manager by the total number of Class A Membership Units (as indicated on <u>Exhibit A</u>, as the same may be amended from time to time) held by all Managers; provided that the Minority Manager(s) shall always have in the aggregate at least fifty-one percent (51%) of such voting power regardless of the aggregate number of Class A Membership Units held by such Minority Manager(s) and all other Managers. In addition to the foregoing, a Manager or Managers may be removed by the affirmative vote of the Members holding at least fifty-one percent (51%) of the Class B Membership Units outstanding; <u>provided</u> that such right of removal shall not apply if: (a) the holders of Class B Membership Units have received distributions equal to their Capital Contributions pursuant to Section 2.5(b) (including distributions pursuant to Section 2.6); or (b) in the judgment of the Manager(s) not being removed, such removal could call into question the Company's certification as a Minority Business Enterprises ("*MBE*") by the Chicago Minority Business Development Council or similar authority.

(c)     Except as otherwise provided in this Agreement or the Act, the Managers may delegate authority and may delineate distinct areas of authority to a specific Manager or officers of the Company or a committee or committees made up of two (2) or more Members (which may include for such purposes any responsible officers of the Company).

9

PIKNIK ONYX 02603

(d)    Except as provided in this Agreement or in the Act, no Member in its capacity as such shall have any part in the management or control of the Company nor have the authority, power or right to act on behalf of the Company in connection with any matter. No Member in its capacity as such shall have the power to incur any indebtedness or other liability on behalf of the Company or any other Member or bind the Company in any manner.

Section 3.4.    *Matters Requiring Supermajority Vote of Managers.*    The following actions shall require a two-thirds (2/3) vote of the Managers with each Manager's voting power determined by dividing the number of Class A Membership Units (as indicated on Exhibit A, as the same may be amended from time to time) held by such Manager by the total number of Class A Membership Units (as indicated on Exhibit A, as the same may be amended from time to time) held by all Managers (the "*Supermajority*"):

(a)    the issuance of a new class of Units or any other securities convertible into Units ranking on parity with or senior to the Class A Membership Units or the Class B Membership Units in liquidation, voting or with respect to any other rights and privileges;

(b)    the making of Company loans to Members;

(c)    the sale of all or substantially all of the business or the assets of the Company;

(d)    an amendment of this Agreement;

(e)    the removal of any Manager;

(f)    the dissolution or liquidation of the Company; and

(g)    an investment in, or acquisition of, another Person or business by the Company or any subsidiary of the Company.

Section 3.5.    *Officers.*    The Managers may appoint officers of the Company (who may also be Managers or Members) in their sole discretion, which may include a Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, one or more vice-presidents, a secretary and one or more assistant secretaries and such other officers as the Managers deem necessary or desirable. Any number of offices may be held by the same person. The Persons selected shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Managers. The salary, benefits and other terms of any such officers' employment shall be subject to approval by the Managers.

## ARTICLE IV

## BOARD OF ADVISORS

Section 4.1.    *Board of Advisors Duties.*    The Company may also have a Board of Advisors (the "*Board*"), which shall consist of Persons who may, but need not be, Members.

10

PIKNIK ONYX 02604

Each Board member shall hold office until his or her death, resignation or removal in accordance with the terms hereof. A Board member may resign at any time by giving written notice to the Managers and all other Board members then constituting the Board. The resignation of a Board member shall not affect such Board member's rights as a Member and shall not constitute a withdrawal of such Board member as a Member. A Board member may be removed at any time with or without cause by the Managers. The Managers may increase or decrease the size of the Board at their discretion.

## ARTICLE V

## CHANGES IN MEMBERS OF COMPANY

Section 5.1.    Additional Capital Contributions; New Members.    Subject to Sections 5.2 and 5.9, if, at any time, the Managers reasonably determine that the Company requires additional funds for any valid business reason, then the Managers, may admit new Members to the Company, on such terms and conditions as the Managers may prescribe (including giving such Members rights which may be senior to, junior to or on parity with the terms of the existing outstanding Units). In connection therewith, subject to the terms and conditions set forth in this Agreement including, without limitation, Sections 3.1 and 5.9, the Managers may issue additional Class A or Class B Membership Units or create additional classes of Units and make such changes to this Agreement as they deem appropriate. Each Person that is to be admitted as an additional Member pursuant to this Agreement shall accede to this Agreement by executing a counterpart signature page to this Agreement providing for such admission, which shall be deemed for all purposes to constitute an amendment to this Agreement providing for such admission but shall not require the consent of any Member. The Managers shall cause Exhibit A to be amended from time to time, without the consent of any Member pursuant to Section 8.3(b), to reflect the addition of any new Members or any changes in the Units or Capital Contribution of any Member occurring pursuant to this Agreement.

Section 5.2.    Pre-emptive Rights of Members.

(a)    If the Managers deem it to be in the best interest of the Company to raise additional capital as described in Section 5.1 above, the Managers shall deliver written notice (the "Notice") to the Members, which notice shall set forth the amount and terms of such additional capital.

(b)    The Notice shall also include an offer (the "Offer") to each Member to invest an amount equal to its pro rata share of the amount to be raised based on such Member's percentage ownership of the total number of Units outstanding as of such date.

(c)    In the event that any such Member does not accept any portion of the Offer within 15 days of receipt of the Notice, the Managers shall offer to those other Members, who chose to invest their pro rata share in the Company, the opportunity to invest the remaining amounts to be raised in amounts proportionate to their respective ownership percentages or such other amounts as the Managers and the investing Members may agree. Any amounts not raised through this process within 30 days of receipt of the Notice may then be raised by pursuing other outside investors who shall

Doc #:CHI02 (215484-00001) 60064359v10;08 21;2002. Time:15:33

PIKNIK ONYX 02605

make the investment at any time up to 120 days after the Notice. Thereafter, the provisions of this Section 5.2 will again apply.

(d)    Notwithstanding anything to the contrary in this Section 5.2, all investments made pursuant to this Section 5.2 remain subject to Section 5.9 hereof, and therefore, the Members hereby acknowledge and agree that they may be cut-back if necessary pursuant to Section 5.9.

Section 5.3.    *Class B Membership Units Anti-dilution Protection.*  If at any time after the date hereof, the Company shall issue or sell, Units (other than Class A Membership Units) (or securities convertible into or exchangeable or exercisable for Units (other than Class A Membership Units)) in any such case, at a price per Unit (treating the price per unit of the securities convertible into or exchangeable or exercisable for a Unit as equal to the sum of (i) the price for a unit of the security convertible into or exchangeable or exercisable for a Unit, plus (ii) any additional consideration initially payable upon the conversion of such security into a Units or the exchange or exercise of such security for a Unit) (the "*New Unit Price*") that is less than $444.44 (the "*Measuring Price*") on the date of such issuance then, immediately after the date of such issuance or sale, the number of Class B Membership Units held by each Member prior to such issuance or sale shall be automatically increased so each such Member's Class B Membership Units shall be increased to a number determined by multiplying the number of Class B Membership Units such Member owned immediately before the date of such issuance or sale (as indicated on Exhibit A, as the same may be amended from time to time) by a fraction, the denominator of which shall be the number of Units outstanding (calculated to include all then currently convertible and exchangeable securities that are "in the money") on such date plus the number of Units that the aggregate offering price of the total number of Units so offered for subscription or purchase (or the aggregate purchase price of the convertible, exchangeable or exercisable securities so offered plus the aggregate of amount of any additional consideration initially payable upon conversion into Units or exchange or exercise for Units) would purchase at the Measuring Price and the numerator of which shall be the number of Units outstanding (calculated to include all then currently exercisable, convertible and exchangeable securities that are "in the money") on such date plus the number of Units offered for subscription or purchase (or into or for which the convertible or exchangeable securities or rights, options or warrants so offered are initially convertible or exchangeable or exercisable, as the case may be). After any such adjustment, the Measuring Price shall be equal to the New Unit Price.

Section 5.4.    *Withdrawal, Retirement and Resignation.*  Except as expressly provided herein, no Member may withdraw from the Company or receive the return of, or interest on, its Capital Contribution, Capital Account, or other amounts.

Section 5.5.    *Continuation of Company; Withdrawal; Etc.*  The Company shall continue until dissolved by the Managers as herein provided and shall not dissolve upon the admission of any new Member, or upon a Withdrawal Event of any kind of any Member. After any Withdrawal Event, the Former Member (or its heirs, successors or legal representatives) shall retain its Economic Rights (except as may be otherwise provided in the Restricted Unit Agreement) but shall cease to be a Member or to have any of the rights of a Member.

Section 5.6.    *Restriction on Transferability--General.*

12

Doc #:CHI02 (213484-00001) 60064359v10;08/21/2003/Time:15:33

PIKNIK ONYX 02606

(a)     Except or otherwise provided herein and subject to Section 5.9, no Member shall have the right to sell, assign, mortgage, pledge, hypothecate, give or in any manner transfer or encumber all, or any part of his Units and no assignee, mortgagee, pledgee or other Person having a right in any Units of a Member may be admitted as a Member of the Company without, in either case, the consent of the Managers (excluding, in determining a majority, any Manager who is the proposed transferor); provided that such consent shall not be unreasonably withheld or delayed. Any attempted transfer in violation of this Agreement shall be considered null and void and the Member attempting to transfer such Interest shall continue to be treated as a Member for purposes of this Agreement and shall continue to be bound by all of the provisions hereof.

(b)     As a condition to the Company recognizing the effectiveness of any conveyance of Units in the Company upon the consent of the Managers as provided herein, the Managers may require the Member making such conveyance, or the proposed purchaser, transferee or assignee, as the case may be, to execute, acknowledge and deliver to the Company such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Managers may deem necessary or desirable to:

(i)     verify the conveyance, as the case may be;

(ii)     confirm that the Person desiring to acquire the Units has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this Agreement;

(iii)     maintain the status of the Company as a partnership for federal tax purposes; and

(iv)     assure compliance with any applicable state and federal laws including securities laws and regulations.

*Section 5.7.     Involuntary Transfers.*

(a)     If all or any part of the Units held by a Member shall be subject to an involuntary transfer to any person by operation of law or otherwise (such as, without limitation, to a trustee in bankruptcy, or a purchaser in any creditors' or court sale or a transfer pursuant to any divorce proceeding) or a transfer which has not been approved under Section 5.6(a) hereof (collectively an *"Involuntary Transfer"*), then immediately upon the happening of any such event, the Company shall have an option to purchase the Units which are subject to the Involuntary Transfer (the *"Transferred Units"*). Within thirty (30) days after the receipt by the Company of written notice of the Involuntary Transfer, the Company may elect to purchase any or all of the Transferred Units.

(b)     The Company shall evidence the election to purchase by written notice to the transferee of the Transferred Units, specifying the number of Units to be purchased. The price shall be the price per Unit established pursuant to Section 5.7(d) of this Agreement. Should the Company elect to purchase all or any portion of the Transferred Units, the closing of the sale and purchase shall, unless otherwise agreed, take place at

13

PIKNIK ONYX 02607

the offices of the Company as soon as practicable, but in any event not more than ninety (90) days after the receipt by the Company of written notice of the Involuntary Transfer. Such sale and purchase shall be deemed to be effective immediately preceding Involuntary Transfer.

(c)    If, under any bankruptcy laws, similar debtor relief laws, or other laws, the rights of the Company to purchase Units under this Agreement is voided or declared unenforceable by any court of competent jurisdiction, or if the Company elects not to exercise its option under this Section 5.7, then the Company shall have the right of first refusal to purchase any or all of the Transferred Units in the event of any subsequently proposed transfer thereof by any trustee, receiver, liquidator, or other transferee at the same price and on the same terms as the proposed transfer.

(d)    The purchase price per Unit to be purchased pursuant to this Agreement from a transferee pursuant to an Involuntary Transfer shall be an amount equal to 80% of the then positive balance of the Capital Account of the Transferor in respect of such Units.

Section 5.8.    *Transfer of Economic Rights.*  Subject to Section 5.9, the Managers shall permit transfers by a Member at any time to transfer its Economic Rights (but not its other rights as a Member), directly or by operation of law, to any of the following (A) spouse or surviving spouse; (B) children or descendants; (C) the spouse or surviving spouse of a person identified in (A) or (B); or (D) a trust created for the benefit of a Member or a person identified in (A), (B) or (C); or (E) any corporation, limited liability company, partnership or other legal entity owned by the Member or a person identified in (A), (B), (C) or (D). The Managers may require the assignee and assignor of such Economic Rights to execute acknowledge and deliver to the Company such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Managers may deem necessary or desirable to document the transfer.

Section 5.9.    *Maintenance of MBE Certification.*  Notwithstanding anything else contained in this Article V to the contrary, in no event shall any new issuance, transfer or assignment of any Units or Economic Rights be permitted or deemed effective hereunder to the extent as a result of such issuance, transfer or assignment the Company's certification as a MBE could, in the sole and absolute discretion of the Managers, be called into question.

## ARTICLE VI

### TERM, DISSOLUTION AND TERMINATION

Section 6.1.    *Term; Dissolution.*  The Company shall have perpetual existence. The Company shall be dissolved only upon the occurrence of any of the following events:

(a)    the Supermajority written agreement of the Managers to dissolve the Company; and

(b)    the entry of a decree of dissolution of the Company under Section 18.802 of the Act.

14

PIKNIK ONYX 02608

*Section 6.2.    Liquidation and Winding Up.*

(a)    Notwithstanding any other provision of this Agreement, in the event of dissolution as provided in Section 6.1, the Company shall continue for the purpose of effecting an orderly liquidation. The Members shall continue to share in Net Profit and Net Loss during the period of liquidation in the same manner as before the liquidation. The Managers (or, if there are no Managers, a person selected by Members holding in excess of fifty percent (50%) of the then outstanding Units) shall act as liquidator and wind up the affairs of the Company in accordance with the provisions of this Section 6.2.

(b)    Except as provided below, the liquidator shall use its best efforts to sell all of the Company's assets in an orderly manner (so as to avoid the loss normally associated with forced sales).    The liquidator shall apply and distribute the proceeds of all such sales, together with other assets which the liquidator were unable to dispose of in accordance with paragraph (i), in the following order of priority: (A) First. to the payment of all debts and liabilities of the Company (including debts and liabilities owed to Members); (B) Second, to the establishment of any reserves reasonably necessary to provide for any contingent Company liabilities and obligations (such reserves to be paid over to a bank or trust company, as escrowee, to be held by such escrowee for the purpose of disbursing such reserves in payment of any such contingent liability or obligation and to pay over the balance thereafter remaining for distribution in the manner set forth in clause (C) hereof); and (C) Third, to the Members in accordance with the priorities set forth in Section 2.5.

(c)    No Member shall have any obligation to restore any negative balance in its Capital Account upon liquidation of the Company.    The fact that the assets of the Company are insufficient to pay and discharge the obligations and liabilities to creditors shall not create any liability on the part of a Member to a third party.

*Section 6.3.    Termination.*    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall file a certificate of termination with the Secretary of State of Delaware and the existence of the Company shall cease.

## ARTICLE VII

## INDEMNIFICATION OF MANAGERS, MEMBERS AND OTHERS

*Section 7.1.    Indemnification of Managers and Members.*    The Company shall indemnify and hold harmless the Managers (including but not limited to any member, officer, partner, director or manager of any entity that is a Manager and that is authorized to act on behalf of such Manager) and the Members, from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of such party's activities on behalf of the Company, including, but not limited to, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, if the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claim is based were for a purpose reasonably believed to be in, or not opposed to, the best

15

PIKNIK ONYX 02609

interests of the Company and were not performed or omitted fraudulently or in bad faith or as a result of gross negligence by such party and provided such acts, omissions or alleged acts or omissions were not prohibited by the terms of this Agreement. Any such indemnification shall only be from the assets of the Company. It shall be a condition to the Company's obligation to indemnify a Manager or a Member, as the case may be, under this section that (a) the Manager or the Member, as the case may be, shall give the Company written notice of the action, proceeding or claim promptly after he, she or it has actual knowledge thereof, (b) the Company shall have the exclusive right to defend and/or settle such action, proceeding or claim at its expense, with counsel designated by the Company, and (c) the Manager or the Member, as the case may be, shall cooperate with such defense and/or settlement. If, in its sole discretion, the Company elects to allow the Manager or the Member, as the case may be, to defend such action, proceeding or claim through his, her or its own counsel, then the expenses of such counsel shall be paid by the Company in advance of the final disposition of the action, proceeding or claim upon receipt of an undertaking by or on behalf of the Manager or the Member, as the case may be, seeking advancement to repay the amount advanced should it ultimately be determined that the Manager or the Member. as th case may be, was not entitled to be indemnified hereunder or under the Act.

Section 7.2.    *Limitation of Liability.*  No Member shall be liable under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation or liability of the Company. Any negative balance in a Member's Capital Account shall not create any liability on the part of a Member to any third party.

Section 7.3.    *Indemnification of Others.*  The Company may, at the discretion of the Managers, indemnify and hold harmless the officers, employees and agents of the Company and any person serving at the request of the Company as a member, officer, employee or agent of another entity, against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of their activities on behalf of the Company or such other entity, including, but not limited to, any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim; provided that the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claim is based were (i) not prohibited by the terms of this Agreement; and (ii) done for a purpose reasonably believe to be in, or not opposed to, the best interests of the Company and were not performed or omitted fraudulently or in bad faith or as a result of gross negligence by such party.

Section 7.4.    *Insurance.*  The Company may purchase and maintain insurance on behalf of any person who is or was a Manager, Member, agent, employee, officer or authorized representative of the Company, or who is or was serving at the request of the Company as a member, director, manager, officer, partner or trustee of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against any liability asserted against the person and incurred by the person in any capacity, or arising out of the person's status as such, whether or not the Company would have the power to indemnify the person against the liability under the provisions of this Article VII.

16

Doc #:CHI02 (213484-00001) 60064359v10;08/21/2002/Time:15:33

PIKNIK ONYX 02610

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

*Section 8.1.    Notices.* All notices required to be given under this Agreement shall be in writing and shall be delivered by facsimile transmission or, certified or registered mail, return receipt requested, or shall be delivered personally or by courier service. Such notices to the Members shall be sent to the addresses or facsimile numbers set forth opposite their respective names in Exhibit A or such other address or facsimile number as a Member may provide in writing to the Managers. Any notices to be sent to the Company shall be sent to the office or facsimile number of the Company at its Chicago, Illinois address, with a copy to each of the Members at their respective addresses or facsimile numbers as described above, or at such other address or facsimile number for the Company as the Company may specify in a notice sent to all Members.

*Section 8.2.    Confidentiality.*    Each Member acknowledges and agrees that the Confidential Information (as defined below) constitutes a protectible business interest of the Company and is vital, sensitive, confidential and proprietary to the Company. Each Member agrees to take all reasonable steps to hold such information in strict confidence and to refrain from duplicating, using or disclosing in any form whatsoever such information except in the ordinary course of the Company's business. Each Member's obligations under this section with respect to particular Confidential Information shall terminate only at such time (if any) as the Confidential Information in question becomes generally known to the public other than through a breach of such Member's obligations hereunder.  As used herein, "Confidential Information" means all data and information concerning the business and affairs of the Company.  The Members further acknowledge and agree that a violation of this Section 8.2 would cause irreparable harm to the Company and may give rise to both monetary damages and injunctive relief or any other relief to which the Company is or may be entitled. The determination of whether a violation of this Section 8.2 has occurred shall be made by the Managers.  The Members' obligations under this section shall survive any termination of their interest in the Company.

*Section 8.3.    Amend. :ents.*

(a)    Except as otherwise provided in Section 8.3(b) below, any proposed amendment to this Agreement which has been approved by the Managers pursuant to Section 3.4(d) hereof shall be submitted by the Managers for approval to the Members. Each amendment submitted for approval by the Managers shall be approved upon the affirmative vote of the Members owning a majority of each class of Units then outstanding and entitled to vote thereon, which vote can be made at a meeting or by written consent.  In the event this Agreement shall be amended, the Managers shall amend the Certificate of Formation to reflect such change if necessary or appropriate.

(b)    In addition to any amendments otherwise authorized herein, amendments may be made to this Agreement from time to time by the Managers pursuant to Section 3.4(d) hereof, but without the consent of the Members, (i) to add to the representations, duties or obligations of the Managers or surrender any right or power granted to the

17

PIKNIK ONYX 02611

Managers herein, for the benefit of the Members; (ii) to cure any ambiguity, to correct or supplement any provisions herein which may be inconsistent with any other provision herein, or to add other provisions with respect to matters arising under this Agreement which will not be inconsistent with the provisions of this Agreement; (iii) to delete or add any provision to this Agreement required to be so deleted or added by any federal or state agency deemed to be for the benefit or protection of the Members; (iv) subject to Sections 3.1 and 4.2, to amend this Agreement to reflect the addition of new Members, additional Capital Contributions and/or the creation of new classes of Units; (v) to avoid loss of MBE status; (vi) to better assure, in the opinion of counsel to the Company, that the Company will continue to be classified as a pass-through entity for purposes of federal income taxes; provided, however, that no amendment shall be adopted pursuant to this section unless the adoption thereof (A) is for the benefit of or not adverse to the interests of the Members (other than for amendments to this Agreement pursuant to Section 8.3(b)(iv)); and (B) does not adversely affect the limited liability of the Members or the status of the Company as a pass-through entity for federal income tax purposes. The Members hereby specifically consent to the amendment of this Agreement from time to time in such manner as is determined by counsel for the Company to be necessary or reasonably helpful to ensure that the allocations of profits, losses and individual items thereof are given effect for federal income tax purposes, including any amendments determined by counsel to be necessary to comply with the treasury regulations promulgated under Section 704 of the Code.{ TC }

Section 8.4.    Successors.  This Agreement and all the terms and provisions hereof shall be binding upon and inure to the benefit of the Members and their respective legal representatives, heirs and successors; subject, however to the restrictions of transferability of Units as provided in this Agreement.

Section 8.5.    Counterparts.  This Agreement may be executed in multiple counterparts. each of which shall be an original, but all of which shall constitute one instrument.  All of such counterpart signature pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page.  Any Member may evidence his, her or its assent to, and shall be bound by, this Agreement by execution of a subscription agreement for Units without execution of a counterpart hereof.

Section 8.6.    Governing Law.  This Agreement shall be governed by and construed under the laws and decisions of the State of Delaware.

Section 8.7.    Waiver of Action for Partition.  Each Member irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

Section 8.8.    Execution of Additional Instruments.  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

Section 8.9.    Construction.  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural, and the masculine gender

18

Doc #:CHI02 (213484-00001) 60364359v10:08:21/2002/Time:15:33

PIKNIK ONYX 02612

shall include the feminine and neuter genders and vice ver_a; and the word "party" shall include any individual, limited liability company, corporation, partnership, limited partnership, trust, estate, association, governmental body or other judicial being.

Section 8.10.  *Headings.*  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

Section 8.11.  *Waivers.*  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

Section 8.12.  *Rights and Remedies Cumulative.*  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

Section 8.13.  *Severability.*  If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

Section 8.14.  *No Third-Party Beneficiaries.*  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person, other than the parties to this Agreement and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

[Signature Page(s) Follow]

Doc #:CHI02 (213484-00001) 60064359v10;08/21/2002;Time:15:33

PIKNIK ONYX 02613

# OPERATING AGREEMENT

## OF

## ONYX CAPITAL VENTURES, L.L.C.

### SIGNATURE BLOCK FOR INDIVIDUAL AND JOINT ACCOUNTS

Mr.
(1) Mrs. _____     Signature: _____
Ms.                               Date: _____

Joint Tenant/Tenant in Common (if applicable):

Mr.
(2) Mrs. _____     Signature: _____
Ms.                               Date: _____

TYPE OF OWNERSHIP:

_____  Individual          _____  Joint Tenants with
                                    Right of Survivorship

_____  Tenants in Common   _____  Community Property
                                    (check only if a resident
                                    of a Community Property
_____  Other _____   State)

20

Doc #:CHI02 (21314-00001) 60064359v10;08/21/2002/Time:15:33

PIKNIK ONYX 02614

OPERATING AGREEMENT

OF

ONYX CAPITAL VENTURES, L.L.C.

SIGNATURE BLOCK FOR ENTITIES

Name of Entity:


By: _____
               (Signature)

      _____

Its: _____

Date: _____


_____ Partnership
_____ Corporation
_____ Limited Liability Company
_____ Trust
_____ Bank
_____ Individual Retirement Account
_____ Other _____

21

PIKNIK ONYX 02615

EXHIBIT A

## CAPITALIZATION

**Class A Members (October 1, 2002)**

| Class A Members | Percent | No. of Units |
|---|---|---|
| James W. Compton | 1% | 1,275 |
| Patrice M. Daniels Living Trust Dated August 3, 2000 | 13.5% | 17,212 |
| Christopher J. Day | 5% | 6,375 |
| KMZ Rosenman | 1.5% | 1,912 |
| Jeffery Larry (25.5%) and Onyx Pool (11%) | 36.5% | 46,537 |
| Kenneth A. Lehman 1992 F Family Trust | 1% | 1,275 |
| Patrick J. McGarvey | 13.5% | 17,212 |
| Lester H. McKeever, Jr. | 1% | 1,275 |
| Russell N. Pallesen | 13.5% | 17,212 |
| David F. Palmer | 13.5% | 17,212 |
| | 100.0% | 127,497 |

PIKNIK ONYX 02616

ADDENDUM TO EXHIBIT A

### CAPITALIZATION
As of December 31 2003

| Class B Members | Invested Amount | No. of Units | % Ownership |
|---|---|---|---|
| OCV Investors, LLC | $1,500,000 | 3,375 | 37% |
| Kenneth R. Williams | 1,400,000 | 3,150 | 35% |
| Jeffery Larry | 641,000 | 1,350 | 15% |
| Benjamin D. Chereskin | 300,000 | 675 | 7% |
| Kenneth A. Lehman 1992 F | 200,000 | 450 | |
| Family Trust | | | 5% |
| Patrice M. Daniels Living Trust | 41,000 | 92 | 1% |
| dated August 3, 2000 | $4,041,000 | 9,092 | 100% |

Doc #.CH02 (213484-00001) 60064359v10;01/21/2003 Time:15:33

PIKNIK ONYX 02617

OPERATING AGREEMENT

OF

ONYX CAPITAL VENTURES, L.L.C.

SIGNATURE BLOCK FOR ENTITIES

Name of Entity: *PATRICE M. DANIELS LIVING TRUST DATED AUGUST 3, 2000*

By: _____
(Signature)

*PATRICE MARIE DANIELS*
(Signer's Printed Name)

Its: *TRUSTEE*

Date: August 23, 2002

_____ Partnership
_____ Corporation
_____ Limited Liability Company
__X__ Trust
_____ Bank
_____ Individual Retirement Account
_____ Other _____

21

PIKNIK ONYX 02618

# OPERATING AGREEMENT

## OF

## ONYX CAPITAL VENTURES, L.L.C.

### SIGNATURE BLOCK FOR INDIVIDUAL AND JOINT ACCOUNTS

|     | Mr. | | |
| --- | --- | --- | --- |
| (1) | Mrs. | Christopher J. Day | Signature: _~~signature~~_ |
|     | Ms. | | Date: August 23, 2002 |

Joint Tenant Tenant in Common (if applicable):

|     | Mr. | | |
| --- | --- | --- | --- |
| (2) | Mrs. | _____ | Signature: _____ |
|     | Ms. | | Date: _____ |

TYPE OF OWNERSHIP:

| __X__ | Individual | _____ | Joint Tenants with Right of Survivorship |
| --- | --- | --- | --- |
| _____ | Tenants in Common | _____ | Community Property (check only if a resident of a Community Property State) |
| _____ | Other _____ | | |

Doc #:CHI02 (213484-00001) 60064359v10,08/21/2002/Time:15:33

PIKNIK ONYX 02619

OPERATING AGREEMENT

OF

ONYX CAPITAL VENTURES, L.L.C.

### SIGNATURE BLOCK FOR INDIVIDUAL AND JOINT ACCOUNTS

Mr.
(1)  Mrs.    Jeffery Larry _____      Signature: _____
Ms.                                        Date: August 23, 2002

Joint Tenant/Tenant in Common (if applicable):

Mr.
(2)  Mrs.    _____       Signature: _____
Ms.                                        Date: _____

TYPE OF OWNERSHIP:

__X__    Individual            _____    Joint Tenants with
                                         Right of Survivorship

_____    Tenants in Common    _____    Community Property
                                         (check only if a resident
                                         of a Community Property
_____    Other _____              State)

20

Doc = CHI02 (213454-00001) 60064359v10,08 21 2002 Time 15 33

PIKNIK ONYX 02620

# OPERATING AGREEMENT

## OF

## ONYX CAPITAL VENTURES, L.L.C.

### SIGNATURE BLOCK FOR INDIVIDUAL AND JOINT ACCOUNTS

Mr.
(1)  Mrs.    Patrick J. McGarvey            Signature: _____
Ms.                                        Date:      August 23, 2002

Joint Tenant/Tenant in Common (if applicable):

Mr.
(2)  Mrs.    _____               Signature: _____
Ms.                                        Date:      _____

TYPE OF OWNERSHIP:

___X___     Individual            _____  Joint Tenants with
                                           Right of Survivorship

_____     Tenants in Common     _____  Community Property
                                           (check only if a resident
                                           of a Community Property
_____     Other _____            State)

20

Doc   CHI02 (213484-00001) 60064359v10;08 21/2002/Time::5:33

PIKNIK ONYX 02621

# OPERATING AGREEMENT

## OF

### ONYX CAPITAL VENTURES, L.L.C.

## SIGNATURE BLOCK FOR INDIVIDUAL AND JOINT ACCOUNTS

Mr.
(1)  Mrs.  Russell N. Pallesen          Signature: _____
Ms.                                     Date:  August 23, 2002

Joint Tenant/Tenant in Common (if applicable):

Mr.
(2)  Mrs. _____       Signature: _____
Ms.                                     Date: _____

TYPE OF OWNERSHIP:

___X___   Individual          _____   Joint Tenants with
                                        Right of Survivorship

_____   Tenants in Common   _____   Community Property
                                        (check only if a resident
                                        of a Community Property
_____   Other _____           State)

20

Doc # CHI02 (215484-0000.) 60064359v10,08/21/2002/Time 15.33

PIKNIK ONYX 02622

# OPERATING AGREEMENT

## OF

## ONYX CAPITAL VENTURES, L.L.C.

### SIGNATURE BLOCK FOR INDIVIDUAL AND JOINT ACCOUNTS

Mr.
(1)  Mrs.  <u>David F. Palmer</u>          Signature:  _____
Ms.                                         Date:  <u>August 23, 2002</u>

Joint Tenant/Tenant in Common (if applicable):

Mr.
(2)  Mrs.  _____             Signature:  _____
Ms.                                         Date:  _____

TYPE OF OWNERSHIP:

___X___     Individual                  _____   Joint Tenants with
                                                   Right of Survivorship

_____     Tenants in Common           _____   Community Property
                                                   (check only if a resident
                                                   of a Community Property
_____     Other _____              State)

20

Doc #:CH02 (213484-00001) 60064359v10;08/21/2002/Time:15:33

PIKNIK ONYX 02623