IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION (MONTGOMERY)

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| PIKNIK PRODUCTS COMPANY, INC., | ) | Case No. 05-33035-DHW |
| | ) | |
| Debtor. | ) | Chapter 11 |
| _____ | ) | |
| PIKNIK PRODUCTS COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. 06-03045 |
| | ) | |
| ONYX CAPITAL VENTURES, L.L.C., a | ) | |
| Delaware limited liability company, | ) | |
| ANTHONY BARBER, an individual, | ) | |
| CHRIS DAY, an individual, and HENRY | ) | |
| HICKS, an individual, | ) | |
| Defendants. | ) | |

### ONYX CAPITAL VENTURES, L.L.C.'S FIRST SET OF REQUESTS FOR ADMISSION OF FACTS DIRECTED TO PLAINTIFF

Onyx Capital Ventures, L.L.C. ("Onyx"), by and through its attorneys, pursuant to Rule 36 of the Federal Rules of Civil Procedure, incorporated herein by Rule 7036 of the Federal Rules of Bankruptcy Procedure, hereby requests that Piknik Products Company, Inc. respond to these requests for admissions of fact and serve responsive documents at the office of Katten Muchin Rosenman LLP, 525 West Monroe Street, Chicago, Illinois 60661 (Attn: Jeffrey A. Chadwick) **within thirty (30) days of your receipt hereof,** unless otherwise ordered by the Court or agreed to in writing by the undersigned counsel.

### DEFINITIONS

A.     Capitalized terms used herein shall have the meanings ascribed to them herein.

B.     "*Bank*" shall mean Wachovia Bank, N.A., successor-in-interest to SouthTrust Bank.

C.     "*Barber*" means Anthony Barber.



D.     *"Case"* shall mean the above-referenced chapter 11 case, Bankruptcy Case 05-33035-DHW.

E.     *"Cash Bonus"* or *"Cash Bonuses"* shall mean one or more of the "cash bonuses [given] to selected management personnel" on or about June 30, 2005 that are referred to in the Debtor's written response to interrogatory no. 8 of Barber's First Set of Interrogatories Directed to Debtor.

F.     *"Complaint"* shall mean the above-referenced adversary proceeding, Adv. Pro. 06-03045, filed by the Debtor against Defendants.

G.     *"Day"* means Chris Day.

H.     *"Debtor"* shall mean Piknik Products Company, Inc. and its officers, directors, principals, partners, associates, employees, agents, representatives and attorneys.

I.     *"Defendants"* shall mean Onyx, Anthony Barber, Chris Day and Henry Hicks.

J.     "Hicks" means Henry Hicks.

K.     *"Loeb"* shall mean Herman R. Loeb.

L.     *"Lampert"* shall mean Robert Lampert.

M.     *"Management Agreement"* shall mean that certain Management Agreement, dated July 25, 2003, by and between Piknik Acquisition Corp., LLC and the Debtor.

N.     *"Petition Date"* means September 29, 2005.

O.     *"You"* and *"Your"* shall mean the Debtor and its respective officers, directors, principals, partners, associates, employees, agents, representatives and attorneys.

P.     The terms *"concerns"* or *"concerning"* or *"relates to"* or *"relating to"* each should be broadly construed as meaning pertaining to, referring to, embodying, reflecting, mentioning, requesting, discussing, describing, evidencing, constituting, comprising, or in any way logically or factually connected with a stated subject matter.

## INSTRUCTIONS

2

Q.      These discovery requests are continuing, and you are required to supplement your responses in accordance with Rules 36 of the Federal Rules of Civil Procedure.

R.      Words used in these discovery requests in the present tense include the future as well as the present; words used in the masculine gender include the feminine and neuter; the singular includes the plural, and the plural includes the singular.

## REQUESTS FOR ADMISSION OF FACTS

1.      Admit that the document attached hereto as Exhibit A is a true and correct copy of the Management Agreement.

2.      Admit that the Debtor terminated the Management Agreement after June 30, 2005.

3.      Admit that the Debtor did not provide written notice to Onyx of the termination of the Management Agreement.

4.      Admit that the Debtor wire transferred the sum of $46,666.00 to Onyx on June 30, 2005.

5.      Admit that Onyx received the sum of $46,666.00 from the Debtor on June 30, 2005.

6.      Admit that the Debtor wire transferred the sum of $17,827.84 to Barber on June 30, 2005.

7.      Admit that Barber received the sum of $17,827.84 from the Debtor on June 30, 2005.

8.      Admit that $2,827.84 of the total sum of $17,827.84 that Barber received from the Debtor was for travel expenses incurred by Barber prior to June 30, 2005 while working for the Debtor.

9.      Admit that the Debtor had a general policy in place to reimburse its employees for their reasonable out-of-pocket travel expenses incurred while working within the scope of their employment for the Debtor.

3

10. Admit that the Debtor had a procedure by which its employees could seek reimbursement of their reasonable out-of-pocket travel expenses incurred while working within the scope of their employment for the Debtor.

11. Admit that it was the Debtor's policy in March of 2005 to reimburse its employee for their reasonable out-of-pocket travel expenses incurred while working within the scope of their employment with the Debtor.

12. Admit that it was the Debtor's policy in April of 2005 to reimburse its employees for their reasonable out-of-pocket travel expenses incurred while working within the scope of their employment with the Debtor.

13. Admit that it was the Debtor's policy in May of 2005 to reimburse its employees for their reasonable out-of-pocket travel expenses incurred while working within the scope of their employment with the Debtor.

14. Admit that it was the Debtor's policy in June of 2005 to reimburse its employees for their reasonable out-of-pocket travel expenses incurred while working within the scope of their employment with the Debtor.

15. Admit that the Debtor did not need the consent of the Bank in June 2005 to reimburse its employees for their reasonable out-of-pocket travel expenses incurred while working within the scope of their employment with the Debtor.

16. Admit that the Debtor did need the consent of the Bank in June 2005 to reimburse its employees for their reasonable out-of-pocket travel expenses incurred while working within the scope of their employment with the Debtor.

17. Admit that the Debtor wire transferred the sum of $126,800 to Day on June 30, 2005.

18. Admit that Day received the sum of $126,800 from the Debtor on June 30, 2005.

19.    Admit that $11,000 of the total sum of $126,800 that Day received from the Debtor was for travel expenses incurred by Day prior to June 30, 2005 while working for the Debtor.

20.    Admit that the Debtor wire transferred the sum of $46,057.59 to Hicks on June 30, 2005.

21.    Admit that Hicks received the sum of $46,057.59 from the Debtor on June 30, 2005.

22.    Admit that $8,825.32 of the total sum of $46,057.59 that Hicks received from the Debtor was for travel expenses incurred by Hicks prior to June 30, 2005 while working for the Debtor.

23.    Admit that, on June 30, 2005, Barber was the general manager of the Debtor's Beverages Division.

24.    Admit that, on June 30, 2005, Hicks was the general manager of the Debtor's Sales Division.

25.    Admit that, on June 30, 2005, Day was the Debtor's President.

26.    Admit that, on June 30, 2005, Barber was not a director of the Debtor.

27.    Admit that, on June 30, 2005, Barber was not the Debtor's President, Treasurer or Secretary.

28.    Admit that, on or before June 30, 2005, Barber was not in control of the Debtor.

29.    Admit that, on or before June 30, 2005, Hicks was not in control of the Debtor.

30.    Admit that, on or before June 30, 2005, Hicks was not a director of the Debtor.

31.    Admit that, on or before June 30, 2005, Hicks was not the Debtor's President, Treasurer or Secretary.

32.    Admit that, on or before June 30, 2005, Hicks was not an officer of the Debtor.

33.    Admit that, on or before June 30, 2005, Barber was not an officer of the Debtor.

34.    Admit that, on or before June 30, 2005, Hicks was not an insider of the Debtor.

35.    Admit that, on or before June 30, 2005, Barber was not an insider of the Debtor.

36.    Admit that the Debtor had liquidity problems in the first quarter of 2005.

37.    Admit that the Debtor had liquidity problems in the second quarter of 2005.

38.    Admit that PepsiCo was one of the Debtor's vendors in 2005.

39.    Admit that PepsiCo did a substantial amount of business with the Debtor in 2005.

40.    Admit that PepsiCo was one of the Debtor's larger vendors in 2005 in terms of sales with the Debtor.

41.    Admit that PepsiCo was the Debtor's largest vendors in 2005 in terms of sales with the Debtor.

42.    Admit that PepsiCo was the Debtor's largest vendors from 2003 through June 30, 2005 in terms of sales with the Debtor.

43.    Admit that PepsiCo was concerned in the second quarter of 2005 about the Debtor's operational performance in 2005.

44.    Admit that PepsiCo was concerned in the second quarter of 2005 about the stability of the Debtor's workforce.

45.    Admit that some of the Debtor's vendors other than PepsiCo were concerned in the second quarter of 2005 about the Debtor's operational performance in 2005.

46.    Admit that some of the Debtor's vendors other than PepsiCo were concerned in the second quarter of 2005 about the stability of the Debtor's workforce.

47.    Admit that PepsiCo was concerned in the second quarter of 2005 about the Debtor's retention of its key employees.

48.    Admit that PepsiCo was concerned in the second quarter of 2005 about the Debtor's retention of its management personnel.

49.    Admit that some of the Debtor's vendors other than PepsiCo were concerned in the second quarter of 2005 about the Debtor's retention of its key employees.

50.     Admit that some of the Debtor's vendors other than PepsiCo were concerned in the second quarter of 2005 about the Debtor's retention of its management personnel.

51.     Admit that PepsiCo encouraged the Debtor's consideration of a retention bonus plan for management personnel in the second quarter of June 2005.

52.     Admit that the Cash Bonuses were meant to entice selected management personnel to remain with the Debtor and continue performing their employment duties for the Debtor.

53.     Admit that Barber was a recipient of one of the Debtor's Cash Bonuses.

54.     Admit that the Debtor gave Barber a Cash Bonus in exchange for his promise to remain with the Debtor and continue performing his employment duties for the Debtor.

55.     Admit that Barber's Cash Bonus was $15,000.

56.     Admit that Barber's Cash Bonus was not made for or on account of services rendered by Barber to the Debtor prior to June 30, 2005.

57.     Admit that Hicks was a recipient of one of the Debtor's Cash Bonuses.

58.     Admit that the Debtor gave Hicks a Cash Bonus in exchange for his promise to remain with the Debtor and continue performing his employment duties for the Debtor.

59.     Admit that Hicks' Cash Bonus was $36,562.50.

60.     Admit that Hicks' Cash Bonus was not made for or on account of services rendered by Hicks to the Debtor prior to June 30, 2005.

61.     Admit that Day was a recipient of one of the Debtor's Cash Bonuses.

62.     Admit that the Debtor gave Day a Cash Bonus in exchange for his promise to remain with the Debtor and continue performing his employment duties for the Debtor.

63.     Admit that Day's Cash Bonus was $115,800.

64.     Admit that Day's Cash Bonus was not made for or on account of services rendered to the Debtor by Day prior to June 30, 2005.

65.     Admit that Lampert was a recipient of one of the Debtor's Cash Bonuses.

66.     Admit that the Debtor gave Lampert a Cash Bonus in exchange for his promise to remain with the Debtor and continue performing his employment duties for the Debtor.

67.     Admit that Lampert's Cash Bonus was $28,125.

68.     Admit that Lampert's Cash Bonus was not made for or on account of services rendered to the Debtor by Lampert prior to June 30, 2005.

69.     Admit that Carl Bleir was a recipient of one of the Debtor's Cash Bonuses.

70.     Admit that the Debtor gave Carl Bleir a Cash Bonus in exchange for his promise to remain with the Debtor and continue performing his employment duties for the Debtor.

71.     Admit that Carl Bleir's Cash Bonus was $7,000.

72.     Admit that Carl Bleir's Cash Bonus was not made for or on account of services rendered to the Debtor by Carl Bleir prior to June 30, 2005.

73.     Admit that Hicks' date of hire with the Debtor was November 1, 2003.

74.     Admit that Hicks' employment with the Debtor ceased in November 2005.

75.     Admit that Hicks' employment with the Debtor ceased on November 18, 2005.

76.     Admit that Hicks remained employed by the Debtor throughout July of 2005.

77.     Admit that Hicks remained employed by the Debtor throughout August of 2005.

78.     Admit that Hicks remained employed by the Debtor throughout September of 2005.

79.     Admit that Hicks remained employed by the Debtor throughout October of 2005.

80.     Admit that Hicks remained employed by the Debtor at all times from June 30, 2005 through and including November 18, 2005.

81.     Admit that Hicks was terminated by the Debtor.

82.     Admit that Hicks was terminated by the Debtor on November 18, 2005.

83.     Admit that Hicks did not voluntarily terminate his employment with the Debtor.

84.     Admit that Barber's date of hire with the Debtor was April 9, 2005.

85.     Admit that Barber's employment with the Debtor ceased on August 31, 2005.

8

86.    Admit that Barber remained employed by the Debtor throughout July of 2005.

87.    Admit that Barber remained employed by the Debtor throughout August of 2005.

88.    Admit that Barber remained employed by the Debtor at all times from June 30, 2005 through and including August 31, 2005.

89.    Admit that Barber was terminated by the Debtor on August 31, 2005.

90.    Admit that Barber did not voluntarily terminate his employment with the Debtor.

91.    Admit that Day's date of hire with the Debtor was February 1, 2005.

92.    Admit that Day was terminated by the Debtor on July 7, 2005.

93.    Admit that Day remained employed by the Debtor at all times from June 30, 2005 through and including July 7, 2005.

94.    Admit that Day did not voluntarily terminate his employment with the Debtor.

95.    Admit that Loeb orally notified Day of his termination on July 7, 2005.

96.    Admit that Day never received any form of written notification of the Debtor's termination of his employment.

97.    Admit that Day had an employment contract with the Debtor.

98.    Admit that Day's employment contract with the Debtor was still effective as of June 30, 2005.

99.    Admit that Day's employment contract with the Debtor was in effect from June 30, 2005 through and including July 6, 2006.

100.    Admit that the Debtor did not provide Day with 60 days prior notice of his termination as an employee of the Debtor.

101.    Admit that Day's compensation ceased on July 7, 2005.

102.    Admit that Day's benefits ceased on July 7, 2005.

103.    Admit that the Bank provided funding to the Debtor in May 2005.

104.    Admit that the Bank provided funding to the Debtor in June 2005.

105.    Admit that the Bank provided funding to the Debtor through and including June 30, 2005.

106.    Admit that the Bank provided funding to the Debtor from May 2005 through June 2005 through and overadvance line of credit under the Debtor's then-existing borrowing agreement with Bank.

107.    Admit that the Bank's forbearance on the Debtor's then-existing borrowing agreement with the Bank was set to terminate on June 30, 2005.

108.    Admit that the Debtor had available credit on June 30, 2005 under the then-existing borrowing agreement with the Bank.

109.    Admit that the Debtor had at least $400,000 of available credit on June 30, 2005 under the then-existing borrowing agreement with the Bank.

110.    Admit that the Debtor, in June 2005, attempted to negotiate with the Bank to extend the June 30, 2005 forbearance termination date of the then-existing borrowing agreement.

111.    Admit that the Debtor, from June 20, 2005 through and including June 30, 2005, attempted to negotiate with the Bank to extend the June 30, 2005 forbearance termination date of the then-existing borrowing agreement.

112.    Admit that the Debtor did not succeed in its attempts to negotiate an extension of the June 30, 2005 forbearance termination date of the then-existing borrowing agreement.

113.    Admit that June 30, 2005 was not the last day of Onyx's service as manager of the Debtor.

114.    Admit that Loeb orally notified Onyx of its termination as manager of the Debtor on July 7, 2005.

115.    Admit that Onyx did not receive actual notice of its termination as the manager of the Debtor until July 7, 2005.

116.    Admit that the Debtor did not provide notice to Onyx of its intent to remove Onyx as manager of the Debtor until after June 30, 2005.

117.   Admit that the Debtor did not provide notice to Onyx of its removal as manager of the Debtor until July 7, 2005.

118.   Admit that the Debtor did not provide notice to Day of its intent to remove Day as President of the Debtor until after June 30, 2005.

119.   Admit that the Debtor did not provide notice to Day of its intent to remove Day as an employee of the Debtor until after June 30, 2005.

120.   Admit that the Debtor did not provide notice to Day of its removal of Day as President of the Debtor until July 7, 2005.

121.   Admit that the Debtor did not provide notice to Day of its removal of Day as an employee of the Debtor until July 7, 2005.

122.   Admit that Day did not receive actual notice of his termination as President of the Debtor until July 7, 2005.

123.   Admit that Onyx provided services to the Debtor until it received notice of its removal as manager of the Debtor.

124.   Admit that Day provided services to the Debtor until it received notice of its removal as President of the Debtor.

125.   Admit that Onyx provided services to the Debtor after June 30, 2005.

126.   Admit that Day provided services to the Debtor after June 30, 2005.

127.   Admit that Onyx provided services to the Debtor after it received notice of its removal as manager of the Debtor.

128.   Admit that Day provided services to the Debtor after he received notice of his removal as President of the Debtor.

129.   Admit that $20,833 of the total sum of $46,666 that Onyx received from the Debtor was for the monthly management fee for the month of July 2005.

130.    Admit that $5,000 of the total sum of $46,666 that Onyx received from the Debtor was for traveling expenses incurred by Onyx personnel prior to June 30, 2005 while working for the Debtor.

131.    Admit that the Debtor always paid the monthly management fee to Onyx in advance of services rendered.

132.    Admit that Onyx's monthly management fee under the Management Agreement was required to be paid in advance.

133.    Admit that Onyx performed services for the Debtor in July 2005.

134.    Admit that Onyx performed services for the Debtor in August 2005.

135.    Admit that, on June 30, 2005, Jeffery Larry was the Chief Executive Officer of the Debtor.

136.    Admit that, on June 30, 2005, Onyx was the manager of the Debtor pursuant to the Management Agreement.

137.    Admit that the Management Agreement was effective on June 30, 2005.

138.    Admit that Onyx wanted to remain the manager of the Debtor after June 30, 2005.

139.    Admit that Onyx attempted to find alternative financing for the Debtor in May and June of 2005.

140.    Admit that Onyx made it known to the Debtor that Onyx wanted to remain the manager of the Debtor after receiving notice of its removal as manager of the Debtor.

141.    Admit that Day made it known to the Debtor that Day wanted to remain President of the Debtor after receiving notice of his removal as President of the Debtor.

142.    Admit that Day made it known to the Debtor that Day wanted to remain an officer of the Debtor after receiving notice of his removal as President of the Debtor.

143.    Admit that Barber was a key employee of the Debtor on June 30, 2005.

144.    Admit that Barber was a key employee of the Debtor prior to June 30, 2005.

145.    Admit that Barber was a key employee of the Debtor after June 30, 2005.

146. Admit that Barber performed management level duties for the Debtor after June 30, 2005.

147. Admit that Barber performed management level duties for the Debtor in July 2005.

148. Admit that Barber performed management level duties for the Debtor in August 2005.

149. Admit that Barber was qualified to perform each of the duties and tasks that the Debtor assigned to and/or asked of him after June 30, 2005.

150. Admit that Barber was a management level employee of the Debtor after June 30, 2005.

151. Admit that the Debtor's creditors holding allowed unsecured priority pre-petition claims for wages, salaries or commissions of $10,000 or less against the Debtor will receive 100% of such allowed claims in the Debtor's bankruptcy proceeding.

152. Admit that the Debtor's creditors holding allowed unsecured priority pre-petition claims for wages, salaries or commissions of $10,000 or less against the Debtor will receive 100% of such allowed claims under the Debtor's proposed chapter 11 plan of liquidation.

153. Admit that the Debtor's creditors holding allowed unsecured priority pre-petition claims for wages, salaries or commissions of $10,000 or less against the Debtor will receive 100% of such allowed claims under any liquidation plan proposed by the Debtor.

154. Admit that the Debtor's creditors holding allowed unsecured priority pre-petition claims for wages, salaries or commissions of $10,000 or less against the Debtor will receive 100% of such allowed claims under a chapter 7 liquidation proceeding.

155. Admit that Hicks was a key employee of the Debtor on June 30, 2005.

156. Admit that Hicks was a key employee of the Debtor prior to June 30, 2005.

157. Admit that Hicks was a key employee of the Debtor after June 30, 2005.

158.   Admit that Hicks performed management level duties for the Debtor on June 30, 2005.

159.   Admit that Hicks performed management level duties for the Debtor prior to June 30, 2005.

160.   Admit that Hicks performed management level duties for the Debtor after June 30, 2005.

161.   Admit that Hicks performed management level duties for the Debtor in July 2005.

162.   Admit that Hicks performed management level duties for the Debtor in August 2005.

163.   Admit that Hicks performed management level duties for the Debtor in September 2005.

164.   Admit that Hicks performed management level duties for the Debtor in October 2005.

165.   Admit that Hicks performed management level duties for the Debtor in November 2005.

166.   Admit that Hicks was qualified to each of the duties and tasks that the Debtor assigned to and/or asked of him after June 30, 2005.

167.   Admit that Hicks was a management level employee of the Debtor after June 30, 2005.

168.   Admit that Day was a key employee of the Debtor on June 30, 2005.

169.   Admit that Day was a key employee of the Debtor prior to June 30, 2005.

170.   Admit that Day was a key employee of the Debtor after June 30, 2005.

171.   Admit that Day was a key employee of the Debtor until he was removed by the Debtor as an officer of the Debtor.

172.   Admit that the Bank would not provide funding to the Debtor after June 30, 2005.

CHI02_60482177_1_213484_00007 7/20/2006 10:56 PM

173.   Admit that the Cash Bonuses were meant to encourage selected personnel to remain with the Debtor and continue performing their employment duties for the Debtor.

174.   Admit that the Cash Bonuses were retention bonuses.

175.   Admit that the Cash Bonuses were "stay" bonuses.

Dated:   July 21, 2006.

ONYX CAPITAL VENTURES, LLC

By: _____
One of its attorneys

John P. Sieger
Jeffrey A. Chadwick
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL 60661
Telephone:  312-902-5200
Facsimile:  312-902-1061
Jeffrey.chadwick@kattenlaw.com

-and-

Leonard N. Math
CHAMBLESS & MATH, P.C.
P.O. Box 230759
Montgomery, AL 36123
Telephone:  334-272-2230

### Certificate of Service

I hereby certify that I have this date served a copy of the foregoing document by: (i) mailing same via first-class United States Mail, postage prepaid, and properly addressed on July 21, 2006 to James L. Day and Von G. Memory, Memory & Day, Post Office Box 4054, Montgomery, Alabama 36130-4054; and (ii) e-mailing the same to Messrs. Day and Memory at vgmemory@memorylegal.com and jlday@memorylegal.com on July 21, 2006 on or before the hour of 4:30 p.m. (Central/Chicago time).

Jeffrey A. Chadwick

Counsel for Onyx Capital Ventures, LLC, et al.

Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661
Telephone: 312-902-5200
Facsimile: 312-902-1061
E-mail: jeffrey.chadwick@kattenlaw.com

16

*Exhibit A*

## MANAGEMENT AGREEMENT

This **MANAGEMENT AGREEMENT** (this "Agreement") is entered into as of July 25, 2003, by and between **PIKNIK ACQUISITION CORP., LLC**, a Delaware limited liability company ("PAC"), and **PIKNIK PRODUCTS COMPANY, INC.**, an Alabama corporation (the "Company").

### RECITALS

WHEREAS, the Company is engaged in the business of the contract production and private-label manufacturing of foods and beverages (the "Business"); and

WHEREAS, pursuant to the terms and conditions of that certain Stock Purchase Agreement (the "Purchase Agreement"), dated as of   July 25 2003, by and among the Company, PAC and Herman R. Loeb , an individual resident of the State of Alabama ("Loeb"), PAC has agreed to purchase from the Company 510 shares of Common Stock ("Stock Acquisition"); and

WHEREAS, in connection with the Stock Acquisition, the Company desires to obtain the services of PAC to consult with and perform services as an independent contractor for the Company, and PAC desires to consult with and perform services for the Company, upon the terms and conditions set forth in this Agreement; and

WHEREAS, the obligation of PAC and the Company to consummate the Stock Acquisition is conditioned on the execution and delivery of this Agreement by the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the parties hereby agree as follows:

1. Management Services.  The Company hereby engages PAC to render consulting, advisory and other special services and expertise to the Company, and PAC hereby accepts such engagement, for the Term (as defined in Section 3 below).  During the Term, PAC shall be available to consult with and render such services to the Company as the board of directors of the Company or officers of the Company from time to time requests, which services shall include, without limitation, providing merger and acquisition advisory services, acting as agent under the Company's debt facilities, operational consulting, reviewing requests for proposals for competitive bidding of services and products for the Company, attending periodic management meetings, providing other services related to business plans and strategy, employee benefits and compensation, insurance, cash management and expenditures, accounting systems and controls, financing and bank relationships, customer and supplier relationships, and review and analysis of capital expenditures.  The amount of time devoted by PAC, and means and methods by which PAC performs its duties hereunder, shall be determined solely by PAC.

2. Compensation.  In consideration of the services provided pursuant to Section 1, the Company will pay PAC an aggregate of Two Hundred Fifty Thousand Dollars ($250,000) (the "Management Fee") per calendar year during the Term, payable in equal monthly installments

in advance on the first business day of each calendar month hereunder, commencing on August 1, 2003; provided, however, at the end of the first calendar year following the date hereof that the EBITDA of the Company for such calendar year equals or exceeds Six Million Five Hundred Thousand Dollars ($6,500,000), the Management Fee payable pursuant to this Section 2 shall automatically increase to Five Hundred Thousand Dollars ($500,000) per calendar year. Notwithstanding such increase in the Management Fee in the amount of Two Hundred Fifty Thousand Dollars (the "Increased Amount"), PAC and the Company agree that the Increased Amount shall not be paid to PAC but shall accrue until the Senior Debt is paid in full or the Senior Lender has approved payment of such Increased Amount to PAC. PAC shall also be entitled to reimbursement for reasonable out-of-pocket expenses incurred by PAC in connection with rendering the services set forth in Section 1 upon presentation of proper vouchers and receipts.

3. <u>Term</u>. The term of this Agreement (the "Term") shall commence on the date hereof and continue until the first to occur of the following: (a) all, or substantially all, of the Company's assets or stock are sold to an unaffiliated third party in an arm's length transaction, (b) PAC exercises its rights pursuant to Section 2 of that certain Put Agreement, dated as of the date hereof, among the Company, Loeb, and PAC; and (c) Loeb exercises his "call right" pursuant to Article IV of the Shareholders Agreement, dated as of the date hereof, among the Company, PAC and Loeb.

4. <u>Indemnification</u>. The Company will reimburse and indemnify PAC for and against any losses, damages, liabilities and expenses (including without limitation reasonable attorneys' fees) imposed on, incurred by or asserted against PAC solely in connection with the rendering of services by PAC (including its employees or affiliates) to the Company as set forth in Section 1; provided that the Company shall not be liable under this Section 4 or otherwise for any portion of such losses, damages, liabilities or expenses resulting directly from PAC's gross negligence, willful misconduct or willful breach of law.

5. <u>Successors and Assigns</u>. No party hereto may assign or delegate any of its rights or obligations hereunder without the prior written consent of the other party hereto, provided, however, that PAC shall have the right to assign all or any part of its rights and obligations under this Agreement to any Affiliate of PAC at any time. Except as otherwise expressly provided herein, all covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto whether so expressed or not.

6. <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

7. <u>Construction</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without regard to conflicts of law principles.

8. Definitions. As used in this Agreement:

"Credit Agreement" means that certain Second Amended and Restated Credit Agreement, dated November 5, 2001, between the Company and SouthTrust Bank, N.A., Birmingham, Alabama.

"EBITDA" shall mean earnings before taxes, interest income and expense, depreciation and amortization expense, determined in accordance with GAAP; provided, however, that there shall be excluded from the calculation of earnings (to the extent representing a reduction of earnings in accordance with GAAP), the amount of any and all Losses (as defined in the Purchase Agreement) incurred or paid by the Company that have been sustained by a Buyer Indemnified Party (as defined in the Purchase Agreement) under circumstances entitling the Buyer Indemnified Party to indemnification pursuant to Article 8 of the Purchase Agreement.

"Senior Debt" means any and all Indebtedness (as defined in the Purchase Agreement), (excluding any trade payables of the Company in the ordinary course of business), now or hereafter owing from, or guaranteed by the Company or any of its subsidiaries pursuant to the Credit Agreement.

"Senior Lender" means SouthTrust Bank, N.A., Birmingham, Alabama, and any successor thereto as lender pursuant to the Credit Agreement

9. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument, and a facsimile of a signature shall be deemed to be the same, and equally enforceable, as an original of such signature.

10. Headings. The various headings used in this Agreement as headings for paragraphs, subparagraphs, and otherwise are for convenience only and shall not be used in interpreting the text in which they appear.

11. Further Assurances. Each party promises and agrees to execute and deliver, or cause to be executed and delivered, such additional or further instruments and to perform any acts, which may be reasonably required for the purpose of carrying out the transactions as contemplated hereunder.

12. Entire Agreement; Waivers; Amendments. This Agreement constitutes the entire and complete contract of the parties, and supercedes any and all other oral or written communication, with respect to the subject matter hereof. This Agreement cannot be changed, waived, released or discharged orally or by the conduct of any party. Any amendment, waiver, release or termination of this Agreement must be in writing and must contain the signature of each party hereto.

13. Notices. Any notices, consents or other communications required or permitted to be sent or given hereunder by any of the parties shall in every case be in writing and shall be deemed properly served if (a) delivered personally, (b) delivered by a recognized overnight

courier service, or (c) sent by facsimile transmission to the parties at the addresses as set forth below or at such other addresses as may be furnished in writing.  Such notices, demands and other communications shall be sent to the addresses indicated below:

      (a)    <u>If to the Company</u>:

Piknik Products Company, Inc.
Post Office Drawer 9388
Montgomery, Alabama  36108-0388
Attention: Jeffery Larry
Facsimile:  (334) 241-8402

      with a copy to (which shall not constitute notice):

King & Spalding LLP
191 Peachtree Street
Atlanta, Georgia  30303-1763
Attention:  Philip A. Theodore
Facsimile:  (404) 572-5136

      (b)    <u>If to PAC</u>:

Piknik Acquisition Corp., LLC
c/oOnyx Capital Ventures, L.L.C.
525 W. Monroe St. Ste. 1600
Chicago, IL  60661
Facsimile:  (312) 902-1061
Telephone:  (312) 902-5254
Attention:  Jeffrey Larry

      with a copy to (which shall not constitute notice):

Katten Muchin Zavis Rosenman
525 West Monroe Street, Suite 1600
Chicago, Illinois 60661-3693
Attention:     Gerald M. Penner, Esq.
                 Leslie D. Dent, Esq.
Fax No.:      (312) 902-1061

    Date of service of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day after date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by facsimile.

[Signature page follows]

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the date first above written.

**PAC:**

**PIKNIK ACQUISITION CORP., LLC**

By: _____
Name: _____
Its: _____

**THE COMPANY:**

**PIKNIK PRODUCTS COMPANY, INC.**

By: _____
Name: _____
Its: _____

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

PAC:

PIKNIK ACQUISITION CORP., LLC

By: _____
Name: _____
Its: _____


THE COMPANY:

PIKNIK PRODUCTS COMPANY, INC.

By: _____
Name: *Michael O'Connell*
Its: *CEO*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| PIKNIK PRODUCTS COMPANY, INC., | CASE NO. 05-33035-DHW |
| Debtor. | |
| | CHAPTER 11 |

| | |
|---|---|
| PIKNIK PRODUCTS COMPANY, INC., | |
| Plaintiff, | |
| v. | ADV. PRO. |
| ONYX CAPITAL VENTURES, L.L.C., a Delaware limited liability company, ANTHONY BARBER, an individual, CHRIS DAY, an individual, HENRY HICKS, an individual, | NO. 06-03045-DHW |
| Defendant. | |

**PLAINTIFF'S RESPONSE TO THE FIRST SET OF REQUEST FOR ADMISSIONS OF FACT OF ONYX CAPITAL VENTURES, LLC**

COMES NOW THE PLAINTIFF in the above styled cause, and responds to Defendant, Onyx Capital Venture LLC's first set of request for admissions, bearing a service date of July 21, 2006 as follows:

**General Objections**

Plaintiff objects to each of this Defendant's discovery requests to the extent that they are overly broad, vague, unduly burdensome, seek information not designed nor reasonably calculated to the discovery of relevant evidence; and, purport to request information protected by the attorney/client privilege or the work-product doctrine or seeks information taken and/or

prepared in anticipation of litigation, or privileged, not subject to discovery or which otherwise are impermissible subjects of discovery under the rules of civil procedure.

Plaintiff further objects to each discovery request to the extent each seeks documents or things that constitute confidential, proprietary information or to which Plaintiff has a duty or obligation of confidentiality with respect to persons or entities not parties to this litigation. This objection is made specifically, but without limitation, with respect to any request that entails disclosure of the identities or other confidential information of persons not parties to this litigation, whose privacy rights would be violated by such disclosure.

1. Admitted

2. Admitted

3. Denied

4. Admitted

5. Admitted

6. Admitted

7. Admitted

8. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

9. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

10. Admitted

11. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

12. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

13. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

14. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

15. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

16. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

17. Admitted

18. Admitted

19. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

20. Admitted

21. Admitted

22. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

23. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

24. Admitted

25. Admitted

26. Admitted

27. Admitted

28. Admitted

29. Admitted

30. Admitted

31. Admitted

32. Admitted

33. Admitted

34. This request is asking for a legal opinion or conclusion of law and is therefore, denied.

35. This request is asking for a legal opinion or conclusion of law and is therefore, denied.

36. Admitted

37. Admitted

38. Admitted

39. Without a definition of the words or term "substantial amount" the Plaintiff is unable to respond to this admission, therefore, it is denied.

40. Admitted

41. Without a definition of the words or term "largest vendors" the Plaintiff is unable to respond to this admission, therefore, it is denied.

42. Without a definition of the words or term "largest vendors" the Plaintiff is unable to respond to this admission, therefore, it is denied

43. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

44. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

45. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

46. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

47. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

48. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

49. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

50. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

51. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

52. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

53. Admitted

54. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

55. Denied

56. Denied

57. Admitted

58. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

59. Denied

60. Denied

61. Admitted

62. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

63. Admitted

64. Denied

65. Admitted

66. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

67. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

68. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

69. Admitted

70. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

71. Denied

72. Denied

73. Admitted

74. Admitted

75. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

76. Admitted

77. Admitted

78. Admitted

79. Admitted

80. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

81. Denied

82. Denied

83. Denied

84. Admitted

85. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

86. Admitted

87. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

88. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

89. Denied

90. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

91. Admitted

92. Admitted

93. Admitted

94. Admitted

95. Admitted

96. Admitted

97. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

98. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

99. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

100.    Admitted

101.    Admitted

102.    Admitted

103.    Admitted

104.    Admitted

105.    Admitted

106.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

107.    Admitted

108.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

109. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

110. Admitted

111. Admitted

112. Admitted

113. Admitted

114. Denied

115. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

116. Admitted

117. Admitted

118. Admitted

119. Admitted

120. Admitted

121. Admitted

122. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

123. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

124. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

125. The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

126.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

127.    Denied

128.    Denied

129.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

130.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

131.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

132.    Denied

133.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

134.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

135.    Admitted

136.    Admitted

137.    Admitted

138.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

139.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

140.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

141.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

142.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

143.    Without a definition of the words or term "key employee" the Plaintiff is unable to respond to this admission, therefore, it is denied.

144.    Without a definition of the words or term "key employee" the Plaintiff is unable to respond to this admission, therefore, it is denied.

145.    Without a definition of the words or term "key employee" the Plaintiff is unable to respond to this admission, therefore, it is denied.

146.    Admitted

147.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

148.    Denied

149.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

150.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

151.    The instant request is for a statement or conclusion of law and is therefore denied.

152.    The instant request is for a statement or conclusion of law and is therefore denied.

153.    The instant request is for a statement or conclusion of law and is therefore denied.

154.    The instant request is for a statement or conclusion of law and is therefore denied.

155.    Without a definition of the words or term "key employee" the Plaintiff is unable to respond to this admission, therefore, it is denied.

156.    Without a definition of the words or term "key employee" the Plaintiff is unable to respond to this admission, therefore, it is denied.

157.    Without a definition of the words or term "key employee" the Plaintiff is unable to respond to this admission, therefore, it is denied.

158.    Admitted

159.    Admitted

160.    Admitted

161.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

162.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

163.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

164.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

165.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

166.    Admitted

167.    Admitted

168.    Without a definition of the words or term "key employee" the Plaintiff is unable to respond to this admission, therefore, it is denied.

169.    Without a definition of the words or term "key employee" the Plaintiff is unable to respond to this admission, therefore, it is denied.

170.    Without a definition of the words or term "key employee" the Plaintiff is unable to respond to this admission, therefore, it is denied.

171.    Without a definition of the words or term "key employee" the Plaintiff is unable to respond to this admission, therefore, it is denied.

172.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

173.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

174.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

175.    The Plaintiff is without sufficient knowledge or information sufficient to form a belief as to the truth of this averment and it is therefore denied.

Dated this 29th day of August 2006.

PIKNIK PRODUCTS
COMPANY, INC.

By: _____
        Herman R. Loeb

Its:  President

Sworn to before me this 29 day of August 2006.

_Paula Kay Holton_
Notary Public

(SEAL)

Prepared by:
Memory & Day
P.O. Box 4054
Montgomery, AL 36013
Tel (334) 834-8000
Fax (334) 834-8001